**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| EP ENERGY CORPORATION, *et al.,* | § | Case No. 19-35654 (MI) |
| | § | |
| Debtors. [1] | § | (Jointly Administered) |
| | § | |

**TESORO REFINING & MARKETING**
**COMPANY LLC'S LIMITED OBJECTION TO MOTION OF DEBTORS FOR FINAL**
**ORDER (I) AUTHORIZING USE OF CASH COLLATERAL; (II) AUTHORIZING**
**DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION**
**FINANCING; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS;**
**(IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED**
**PARTIES; (V) AUTHORIZING DEBTORS TO ENTER INTO AND PERFORM UNDER**
**EXIT FINANCING AGREEMENTS; AND (VI) GRANTING RELATED RELIEF**

Tesoro Refining & Marketing Company LLC ("Tesoro") respectfully submits this

limited objection (this "Objection") to the above-captioned debtors and debtors in possession's

(collectively, the "Debtors") *Motion of Debtors for Final Order (I) Authorizing Use of Cash*

*Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Super-Priority, Post-petition*

*Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to*

*Prepetition Secured Parties; (V) Authorizing Debtors to Enter Into and Perform Under Exit*

*Financing Agreements; and (VI) Granting Related Relief* [Docket No. 182] (the "DIP Motion"),

and respectfully states that:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092).  The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

## PRELIMINARY STATEMENT[2]

1.      In the DIP Motion and the proposed final financing order (the "DIP Order"), the Debtors ask the Court to grant post-petition DIP and adequate protection liens that—perhaps unintentionally—impermissibly purport to prime the Tesoro Liens (defined below).  Tesoro does not consent to the priming of its liens.  Nor have the Debtors carried their burden of establishing that the Tesoro Liens are adequately protected, as required for priming under Section 364(d)(1).  Other than the Prepetition Secured Parties, the DIP Order proposes no adequate protection to Tesoro or any other secured creditor.  Similarly, the proposed adequate protections liens should also not be priming because section 363 does not authorize the granting of priming liens.

2.      Tesoro respectfully requests that the Court condition approval of the DIP Motion on the inclusion of the Proposed Revisions (defined below) to the language in paragraph 37 of the DIP Order to preserve and carve out the Tesoro Liens from the priming liens proposed in the DIP Order.  Further, the Proposed Revisions would conform the carve-out in paragraph 37 to language that was negotiated and included in the Interim Cash Collateral Order as part of the First Day Hearing.  Given that the Proposed Revisions were agreed once already in this case, Tesoro is hopeful those revisions should not be controversial now.[3]

---

[2]   Capitalized terms not otherwise defined herein shall be ascribed the same meaning provided to them in the DIP Motion or DIP Order, where applicable.

[3]   Tesoro provided the Proposed Revisions to the Debtors on November 4, 2019.  The Debtors, through their advisors, have been working to address these issues with their RBL lenders, but as of the objection deadline, have not reached resolution.  Tesoro is filing this limited objection to meet the deadline and preserve its rights and appreciates the Debtors and their Lenders ongoing efforts to resolve this limited objection amicably before the hearing.

## RELEVANT BACKGROUND

### A. The Chapter 11 Cases

3.      On October 3, 2019 (the "Petition Date") each of the Debtors commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.      The Debtors currently have secured funded debt obligations in the aggregate amount of approximately $4.221 billion. *See* DIP Motion, ¶ 17.  The Debtors suggest that substantially all of their assets are encumbered. *See id.* at ¶¶ 50-52

### B. The Tesoro Liens

5.      On May 11, 2017, Tesoro and Debtor EP Energy E&P Company, L.P. ("EP Energy") entered into a series of interrelated agreements for the joint development and operation of wells in the Uinta Basin in Duchesne County and Uintah County, Utah and the marketing of oil production from those and other wells in Utah.  Those agreements include: (i) a Participation and Development Agreement, dated May 11, 2017 ("PDA"); (ii) a Joint Operating Agreement, dated May 11, 2017 (the "JOA"); and (iii) a Crude Oil Sales Agreement, dated May 11, 2017.

6.      Tesoro holds a duly-recorded lien and security interest (the "Tesoro Liens")  in and against EP Energy's interests in the wells, oil and gas leases, production, other assets and proceeds thereof more fully described[4] in the following recorded documents:

   a.      the Recording Supplement to Operating Agreement and Financing Statement (the "Duchesne County Perfection Document"), which was signed on May 11, 2017 and recorded in the land records of Duchesne County, Utah, on May 24, 2017, entry number 505310,  which is attached hereto as Exhibit 1 and incorporated herein by reference; and

---

[4]   Tesoro's security interests are described in paragraph 3 of the Duchesne Perfection Document and the Unitah Perfection Document.

b.      the Recording Supplement to Operating Agreement and Financing Statement (the "Unitah County Perfection Document"), which was signed on May 11, 2017 and recorded in the land records of Uintah County, Utah, on May 24, 2017, entry number 2017003752, a true and correct copy of which is attached hereto as Exhibit 2 and incorporated herein by reference.

7.      The Tesoro Liens secures the payment and performance of EP Energy's obligations

under the JOA and the PDA.  The JOA defines the term "Secured Obligations" as follows:

The term "Secured Obligations" shall mean, with respect to each party, (i) all of such party's obligations under this Agreement [JOA], including but not limited to payment of costs, expenses, interest and fees hereunder, the proper disbursement of all monies paid hereunder, the assignment or relinquishment of interest in Oil and Gas Leases as required hereunder, and the proper performance of operations hereunder, (ii) such party's share of the Well Costs, including the Carried Costs (in each case, as defined in the Participation Agreement), pursuant to the terms and subject to the conditions of the Participation Agreement, and (iii) TRMC (as defined in the Participation Agreement) or its affiliate's payment obligations in its capacity as buyer pursuant to the Crude Oil Sales Agreement entered into by the parties, or their respective affiliates, simultaneously with the Participation Agreement.

JOA, Article XVI.A.9.

8.      The JOA and PDA are cross defaulted with each other[5] and the PDA is incorporated

into the JOA by reference:

---

[5]   The JOA provides:

Cross Default:

In addition to the terms and provisions set forth at Article VII.D., as between EP Energy E&P Company, L.P. and Tesoro Refining & Marketing Company LLC (or its successors and assigns), if either such party becomes a Defaulting Party (as defined in the Participation Agreement) under the Participation Agreement, such Defaulting Party shall be automatically deemed to be in default under this Agreement, and in such an event, the non-defaulting party shall be entitled to enforce any of its rights as a non-defaulting party under this Agreement, including its rights to the remedies set forth in Article VII.D hereof.

JOA, Article XVI.T.

> Agreement Subject to Participation Agreement:
>
> This Agreement [JOA] was entered into in connection with the execution and delivery of the Participation Agreement. The rights, obligations and remedies of the parties under this Agreement are expressly subject to and burdened by the terms and conditions of the Participation Agreement, which is hereby incorporated by reference into, and made a part of, this Agreement, and the rights, obligations and remedies of the EP Energy E&P Company, L.P. and Tesoro Refining & Marketing Company LLC under the Participation Agreement also constitutes rights, obligations and remedies of EP Energy E&P Company, L.P. and Tesoro Refining & Marketing Company LLC under this Agreement. To the extent there is a conflict between the terms of this Agreement and the express terms of the Participation Agreement, the terms of the Participation Agreement shall control.

JOA, Article, XVI.V.

### C. The DIP Motion

9.      Pursuant to the DIP Motion, the Debtors seek entry of the DIP Order which would authorize the Debtors to, among other things, obtain a post-petition revolving credit facility in the aggregate principle amount of up to $314,710,456 (the "DIP Facility") on a final basis. *See* DIP Motion, ¶ 9 (b)(b)(i).

10.      In the DIP Motion, the Debtors seek authorization to grant the DIP Lenders priming liens pursuant to section 364(d) of the Bankruptcy Code. *See Id.*, ¶¶ 48-55. The Debtors argue that the requirements of section 364(d)(1) are satisfied because (i) there is no alternative financing available to the Debtors without priming, *see id.*, ¶¶ 49-51; and (ii) (a) the Prepetition Secured Parties[6] have consented (or have deemed to consent) to the priming liens by virtue of being party to the Intercreditor Agreements, *see id*, ¶53, and (b) the Prepetition Secured Parties are receiving adequate protection under the DIP Order, *see id*, ¶¶ 54-55.

---

[6]    The DIP Order defines the term "Prepetition Secured Parties" as including the Junior Lien Trustees, the RBL Agent, the RBL Secured Parties, the Intermediate Lien Noteholders, and the 1.5 Lien Noteholders. *See* DIP Order, ¶¶ III (a)-(c).

11.     The DIP Motion does not expressly seek authority to prime the liens of, or to provide adequate protection to, any secured creditor other than the Prepetition Secured Parties.

**D.  The Priming Liens**

12.     The DIP Order proposes to grant different post-petition DIP and adequate protection liens based on the type of collateral at issue.  As to Pre-Petition Collateral[7], paragraph 9(a)(i)(1) of the DIP Order provides that the RBL Agent and RBL Secured Parties shall be granted as adequate protection, among other things:

> Subject to the Carve-Out,[8] pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding continuing, enforceable, fully perfected **first priority, senior priming** lien on and security interest in, all Prepetition Collateral.  The RBL Adequate Protection Liens on the Prepetition Collateral shall be senior in all respects to the security interest in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties (including the applicable Adequate Protection Liens Granted to Such Prepetition Secured Parties).

DIP Order, ¶ 9(a)(i)(1) (emphasis added).  The first sentence proposes to grant a priming lien and security interest in the Prepetition Collateral, subject only to the Carve-Out.  Given the breadth of the definition of Prepetition Collateral, it is reasonable to conclude that the term includes the collateral in Utah encumbered by the Tesoro Liens.  The second sentence provides that the lien granted in the first sentence is senior to the other Prepetition Secured Parties.  But nothing in the second sentence limits the purported priming effect of the lien grant in the first sentence as to Prepetition Collateral.

---

[7]   The DIP Order defines the term "Prepetition Collateral" as including all of the Debtors' "material real or personal property constituting Collateral."  *See* DIP Order, ¶ 4(c).

[8]    The DIP Order defines the term "Carve-Out" as including only Professional Fees and Expenses incurred before and after the Carve-Out Trigger Date.  *See* DIP Order, ¶ 13.

13.     Further, paragraph 11(a) of the DIP Order provides that the DIP Lenders shall be granted:

> Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected **first priority, senior priming lien** on, and security interest in, all Prepetition Collateral. The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties (including the applicable Adequate Protection Liens granted to such Prepetition secured Parties).

*Id.* ¶ 11 (a) (emphasis added).  Again, the lien grant in the first sentence is clearly priming as to any lien or security interest in the Prepetition Collateral, and the second sentence does attempt to limit the grant or priority of the lien in the first sentence.

14.     The DIP Order also grants additional post-petition DIP and adequate protection liens in and against all pre- and post-petition property of the Debtors— regardless of whether or not included in the definition of Prepetition Collateral—that, although labeled junior to existing liens, are nevertheless priming <u>except</u> as to any pre-existing liens that fall within the Debtors' definition of "Non-Primed Liens."[9]  *See id.*, ¶¶ 9(a)(i)(3), 9(b)(i), (c)(i), 11 (c).  The DIP Order defines the term "Non-Primed Liens" as including "valid, perfected, and unavoidable **senior** liens in existence immediately prior to the Petition Date …."  *See* DIP Order, ¶ 9(a)(i)(3) (emphasis added).  The DIP Order does not define or describe to what must a pre-existing lien be senior to as a condition to being included in the definition of Non-Primed Liens.

---

[9]     For example, the DIP Order provides that the Intermediate Lien Adequate Protection Liens are "subject and subordinate only to (I) the RBL Adequate Protection Liens, (II) the DIP Liens, (III) the Carve-Out , and (IV) the Non-Primed Liens. . . ." *See* DIP Order, ¶ 9(b)(i).  Similarly, the DIP Order provides that the 1.5 Lien Adequate Protection Liens are subject and subordinate only to (I) the RBL Adequate Protection Liens, (II) the DIP Liens, (III) the Carve-Out , and (IV) the Non-Primed Liens. . . . ." *See* DIP Order, ¶ 9(c)(i).

**E.  The Adequate Protection Provisions**

15.     The DIP Order provides that the Prepetition Secured Lenders are each receiving adequate protection (the "Adequate Protection Provisions") in the form of adequate protection liens, super-priority claims and for some lenders, cash payments.  *See* DIP Motion, p. 23; DIP Order, ¶ 9.  No other secured creditor, including Tesoro, is receiving anything.

## LIMITED OBJECTION

16.     It is, of course, axiomatic that a debtor cannot prime a secured creditor's existing liens without adequate protection.  *See* 11 U.S.C. § 364(d)(1).  "The concept of adequate protection is not defined in the [Bankruptcy] Code except by the implications of the examples of adequate protection listed in § 361." *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (internal quotation marks omitted).  Section 361 of the Bankruptcy Code contains a non-exhaustive list of acceptable forms of adequate protection, including a cash payment or periodic cash payments, additional liens, replacement liens, and the granting of other relief, other than an administrative priority claim under section 503(b)(1), as will result in the realization by such secured creditor of the "indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361.

17.     The Debtors carry the burden of proof to establish that Tesoro is adequately protected and must detail how Tesoro is adequately protected. *See* 11 U.S.C. § 363(p)(1) (providing that debtor-in-possession has the burden of proof on issue of adequate protection); 11 U.S.C. § 364(d)(2) (same); *see also In re Cafeteria Operators, L.P.*, 299 B.R. 400, 406 (Bankr. N.D. Tex. 2003).

18.     Here, the Debtors purpose to grant priming liens on substantially all of the Debtors' assets, which will prime all of the Debtors' prepetition secured lenders, including Tesoro.  Tesoro

does not consent to the priming of its liens.  And the Adequate Protection Provisions do not apply to Tesoro.

19.     Further, the Debtors' definition of Non-Primed Liens provides little or no protection.  First, that definition is irrelevant to the post-petition priming liens on Prepetition Collateral.  Second, the definition requires liens to be senior in priority to an unspecified lien, or perhaps to all other liens, for the definition to apply.  Yet a secured creditor is not required to establish a senior priority of its lien to avoid being primed by a DIP lien (without consent and without any showing of adequate protection as required under Section 364(d)(1)).  Nor is a senior priority a condition to avoid priming by an adequate protection lien (for which priming is not authorized under the Bankruptcy Code).  To be sure, the DIP Motion is premised on a consensual priming of the Prepetition Secured Parties.  Those Prepetition Secured Parties are also receiving adequate protection under the DIP Order.  Many of the Prepetition Secured Parties hold junior liens.  Yet those junior liens are nevertheless receiving adequate protection for their consensual priming of their junior liens.  The same cannot be said for Tesoro or any other secured creditor.

20.     For these reasons, the Debtors have not met their burden, pursuant to sections 364(d)(1) and (2), of establishing that Tesoro's Liens are adequately protected; priming should thus be denied.  Tesoro respectfully requests, therefore, that the Court condition approval of the DIP Motion on the inclusion of the following changes (the "Proposed Revisions") to the language in paragraph 37 of the DIP Order to preserve Tesoro's lien and security interest from being subject to the priming liens contained in the DIP Order:

> **Notwithstanding anything to the contrary contained herein,** Oother than the consensual and/or contractual priming described in this Order, no DIP Lien, RBL Adequate Protection Lien, Intermediate Lien Adequate Protection Lien and/or 1.5 Lien Adequate Protection Lien shall, on a non-consensual basis, prime any valid and unavoidable ~~senior~~ lien, security interest and/or

encumbrance existing as of the Petition Date (including any properly perfected ~~senior~~ lien under section 546 of the Bankruptcy Code). All rights of any party claiming a royalty, separate property interest, other interest not comprising property of the estate, or ~~senior~~ lien, security interest and/or encumbrance are hereby preserved.

## **RESERVATION OF RIGHTS**

21.     Tesoro reserves all rights to supplement or add to the legal or factual arguments raised in this Objection and to object to the DIP Motion on any bases whatsoever at a future date.

[*The Remainder of this Page is Intentionally Blank*]

## CONCLUSION

**WHEREFORE**, for the reasons set forth herein, the Debtors respectfully request that the Court condition approval of the DIP Motion on the inclusions of the Proposed Revisions in the DIP Order, and grant such other and further relieve as is just and warranted.

Dallas, Texas
Dated:  November 15, 2019

Respectfully submitted,

**BAKER BOTTS L.L.P.**

*/s/ James R. Prince*
James R. Prince, State Bar No. 00784791
**BAKER BOTTS L.L.P.**
2001 Ross Avenue, Suite 900
Dallas, Texas 75201-2980
Telephone:  (214) 953-6500
Facsimile:  (214) 953-6503
Email:  jim.prince@bakerbotts.com

*Counsel to Tesoro Refining & Marketing Company LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2019, true and correct copies of the Objection were served by electronic means via the Court's ECF system on all parties authorized to receive electronic notice in these chapter 11 cases.

/s/ James R. Prince
James R. Prince

## <u>EXHIBT 1</u>

**Duchesne Perfection Document**

Ent **505310** Page **1** of **18**
Date: 24-MAY-2017 12:38:42PM
Fee: $90.00 Credit Card Filed By: IMH
SHELLEY BRENNAN, Recorder
DUCHESNE COUNTY CORPORATION
For: EP ENERGY E&P COMPANY LP

**Duchesne County, Utah**
**Memorandum of Operating Agreement**

**RECORDING REQUESTED BY**

**WHEN RECORDED MAIL TO**
**EP Energy E&P Company**
**1001 Louisiana Street**
**Houston, Texas 77002**
**Attention: Director Business Development**

**RECORDING SUPPLEMENT TO**
**OPERATING AGREEMENT AND FINANCING STATEMENT**

THIS AGREEMENT, entered into by and between **EP Energy E&P Company, L.P.**, hereinafter referred to as "**Operator**," and **Tesoro Refining & Marketing Company LLC**, hereinafter referred to as "**Non-Operator**".    Operator and Non-Operator are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**".

WHEREAS, Operator is the owner of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "**Contract Area**"), and in any instance in which the Leases or Interests of a Party are not of record, the record owner and the Party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the Parties have executed a Participation and Development Agreement dated May 11, 2017 (herein the "**Participation Agreement**"), covering the Contract Area for the purpose of drilling and Completing certain specified wells (defined in the Participation Agreement as the "**Farmout Wells**") in the Contract Area for the production of Oil and Gas pursuant to the Drilling Program described in the Participation Agreement; and

WHEREAS, by participating in the drilling and Completion of the Farmout Wells, Non-Operator shall earn an assignment of a wellbore interest in each such Farmout Well and any associated right, title and interest in and to the Oil and Gas Leases and Oil and Gas Interests that entitle Operator to produce Oil and Gas from such Farmout Well, insofar and only insofar as said Oil and Gas Leases and Oil and Gas Interests are necessary to operate, maintain and produce such Farmout Well as to all depths down to the deeper of (A) the base of the Wasatch Formation, or (B) the deepest depth drilled with respect to such Farmout Well, excepting all other right, title and interest in the Oil and Gas Leases and Oil and Gas Interests (such assigned interests defined in the Participation Agreement as the "**Conveyed Interests**"); and

WHEREAS, the Parties have executed an Operating Agreement dated May 11, 2017 (herein the "**Operating Agreement**"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas to the extent contemplated by the Participation Agreement; and

WHEREAS, the Parties have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

NOW, THEREFORE, in consideration of the mutual rights and obligations of the Parties, it is agreed as follows:

1.   This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Operating Agreement.

2.   The Parties do hereby agree that:

A. The Oil and Gas Leases and/or Oil and Gas Interests comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement, the Operating Agreement, and the Participation Agreement and the Parties do hereby commit such Leases and Interests to the performance thereof to the extent contemplated by the Participation Agreement.

B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Participation Agreement and the Operating Agreement, as supplemented by this agreement.

C. All costs and liabilities incurred in operations under this agreement, the Operating Agreement and the Participation Agreement shall be borne and paid for by the Parties, as provided in the Operating Agreement and the Participation Agreement.

D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Farmout Wells located within the Contract Area shall be owned by the Parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

E. Operator shall pay or deliver, or cause to be paid or delivered, all burdens on the Party's share of the production from the Farmout Wells located within the Contract Area as provided in the Participation Agreement.

F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the Party whose interest is burdened therewith, (ii) subject to suspension if a Party is required to assign or relinquish to another Party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the Party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Participation Agreement and the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Participation Agreement and Operating Agreement regulating such transfers.

This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the Parties, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the Contract Area.

H. The Parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

I. The rights and obligations of the Parties and the adjustment of interests among them in the event of a failure or loss of title, each Party's right to propose operations, obligations with respect to participation in operations in the Farmout Wells located within the Contract Area and the consequences of a failure

to participate in operations, the rights and obligations of the Parties regarding the marketing of production, and the rights and remedies of the Parties for failure to comply with financial obligations shall be as provided in the Operating Agreement and the Participation Agreement.

J. Each Party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each Party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement and the Participation Agreement.

3. The Parties hereby grant reciprocal liens and security interests as follows:

A. Each Party grants to the other Party a lien upon any interest it now owns or hereafter acquires in the (a) wells drilled in the Contract Area and (b) Oil and Gas Leases and/or Oil and Gas Interests in the Contract Area insofar and only insofar as such Oil and Gas Leases and/or Oil and Gas Interests are necessary to operate, maintain and produce such wells drilled in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, excluding any such personal property and/or fixtures located downstream of the wellhead of any such well (the properties and other assets upon which such lien and security interests are granted by a Party, as further described and defined in the immediately following sentence, are referred to herein as such Party's **"WI Pledged Interests"**), in each case to secure the payment and performance of all of its Secured Obligations. Such lien and security interest granted by each Party in such Party's WI Pledged Interests shall include and encumber (a) such Party's leasehold interests, working interests, operating rights and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this Agreement, including, without limitation, such Party's interest in wells that are yet to be assigned pursuant to the Participation Agreement, (b) the Oil and Gas when extracted therefrom (including, without limitation, any lien thereon in favor of such Party pursuant to the provisions of Section 9.343 of the Uniform Commercial Code to the extent such Party is permitted pursuant to applicable law to assign any such lien); (c) equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells and tubular goods and all such equipment located downstream of the wellhead of the applicable well); (d) the revenues and proceeds now and hereafter attributable to such WI Pledged Interests, including, without limitation the Oil and Gas and all products obtained or processed therefrom, and all payments in lieu, such as "take or pay" payments or settlements; (e) all amounts and proceeds hereafter payable or to become payable to such Party or now or hereafter relating to any Party of such WI Pledged Interests and all amounts, sums, monies, revenues and income that become payable to such Party from, or with respect to, any of such WI Pledged Interests, present or future, now or hereafter constituting a part thereof; (f) all accounts (including without limitation accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom; and (g) all proceeds and products of the foregoing.

B. To perfect the lien and security interest granted pursuant to the Operating Agreement, each Party shall execute and acknowledge, if applicable, this Memorandum and/or any financing statement prepared and submitted by any Party in conjunction herewith or at any time following execution hereof, and each Party is authorized to file the Memorandum and any supplement thereto executed hereafter as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as such Party shall deem appropriate to perfect the security interests granted hereunder.

C. All Parties acquiring an interest in any well and/or Oil and Gas Leases and/or Oil and Gas Interests covered by this Agreement, including, without limitation, the Parties, whether by assignment, merger,

mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

D. Subject to paragraph 5 below, with respect to the WI Pledged Interests, the non-defaulting Parties shall be entitled to exercise the rights and remedies of a secured party under the Uniform Commercial Code and the rights of a mortgagee or beneficiary of a mortgage or a deed of trust, as applicable, as well as the remedies provided in Article VII of the Operating Agreement against each defaulting Party. The bringing of a suit and the obtaining of judgment by a Party for the obligations secured by the lien and security interest granted by any of the other Parties shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.

E. Notwithstanding anything herein to the contrary, the following remedies shall apply only in the event of (i) a default by a Party in the payment of its share of costs, expenses, interests or fees in respect of its Secured Obligations, or (ii) the improper use of funds by the Operator:

  (a) the non-defaulting Parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting Party's share of Oil and Gas until the amounts owed by such Party under this Agreement, plus interest as provided in the Operating Agreement has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Party's share of Oil and Gas (the "**Production Proceeds**"). All purchasers of production may rely on a notification of default from the non-defaulting Party (which any defaulting Party hereby authorizes each non-defaulting Party to deliver) or Parties stating the amount due as a result of the default, and all Parties waive any recourse available against purchasers for releasing Production Proceeds and against the non-defaulting Parties for delivering such notices (provided such notices were delivered in good faith) as provided herein; and/or

  (b) the non-defaulting Parties shall have the right, without prejudice to other rights or remedies, to, at any such non-defaulting Party's option, exercisable at any time prior to such defaulting Party's cure of any WI Default, which option shall be exercised by twenty (20) days' prior written notice, by such non-defaulting Party to such defaulting Party stating that such non-defaulting Party is exercising its rights and remedies under the Operating Agreement, foreclose upon its lien upon and security interests in the WI Pledged Interests, which foreclosure remedy will include the right to sell or otherwise dispose of the WI Pledged Interests in their then condition, or after any further development thereof, at one or more public or, if permitted by applicable law, private sales, with such notice as may be required by applicable law, as an entirety or in parcels, at such locations, all as any such non-defaulting Party, in its discretion, deems advisable; provided that, in the event any non-defaulting Party elects to exercise its remedies set forth in this paragraph 5(b), upon such non-defaulting Party's delivery of written notice to such defaulting Party of such election, such non-defaulting Party shall apply any Production Proceeds held by such non-defaulting Party as of the date of such notice to the WI Default Amount. Any such defaulting Party agrees that 20 days' notice of any proposed sale or other disposition of the WI Pledged Interests by any such non-defaulting Party shall be reasonable. If the WI Pledged Interests are situated in more than one jurisdiction, notice as above provided shall be posted and filed in all such jurisdictions (if such notices are required by applicable law), and all such WI Pledged Interests may be sold in any such jurisdiction or at such other place as any such non-defaulting Party may elect in its discretion, if permitted by law, and any such notice shall designate the jurisdiction where such WI Pledged Interests are to be sold. Any such non-defaulting Party shall have the right to adjourn any such sales from time to time in accordance with applicable law. Any such non-defaulting Party shall have the right to sell, lease or otherwise dispose of any WI Pledged Interests for cash, credit or any combination thereof, and such non-defaulting Party may purchase any WI Pledged Interest at any public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the WI Default Amount.

AAPL – FORM 610RS - 1989

F. If any Party fails to pay any of its Secured Obligations within thirty (30) days of the delivery of a notice of default in respect thereof, the non-defaulting Parties, including Operator, shall, upon request by Operator (or, if Operator is the defaulting party, upon request by a non-defaulting party), pay the undischarged amount in the proportion that the interest of each such Party bears to the interest of all such Parties. The amount paid by each Party so paying its share of the undischarged amount shall be secured by the liens and security interests described in the Operating Agreement, and each paying Party may independently pursue any remedy available hereunder or otherwise.

G. If any Party does not perform all of its obligations hereunder, and the failure to perform subjects such Party to foreclosure or execution proceedings pursuant to the provisions of the Operating Agreement, including, without limitation, the remedies set forth in Article VII and Article XVI.P. of the Operating Agreement, to the extent allowed by governing law, the defaulting Party waives (a) any available right of redemption from and after the date of judgment, (b) any required valuation or appraisement of the mortgaged or secured property prior to sale, (c) any available right to stay execution or to require a marshaling of assets and (d) any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each Party hereby grants to the other Parties a POWER OF SALE as to any property that is subject to the lien and security interests granted hereunder, such power to be exercised in the manner set forth in Article XVI.P. of the Operating Agreement and otherwise in the manner and with such notice required or provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

H. Each Party agrees that the other Parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each Party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator in accordance with the terms of the Operating Agreement.

4. This agreement may be amended from time to time by written amendment thereto executed by the Parties, including for the purpose of amending the description of the Contract Area in accordance with changes to the Drilling Program as contemplated by the Participation Agreement. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination and each Party agrees to execute such a notice of termination upon request by Operator if all obligations under the Operating Agreement have been satisfied.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition, whether directly or indirectly, shall be made by a Party of any interest in the Contract Area except as permitted under the Participation Agreement and the Operating Agreement and, if permitted, shall be made subject to this agreement, the Operating Agreement and the Participation Agreement.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the Parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon the Parties when this agreement or a counterpart thereof has been executed by all such Parties. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

*[Rest of page intentionally left blank; signatures on next page]*

AAPL – FORM 610RS – 1989

IN WITNESS WHEREOF, this agreement is executed this 11 day of _____ May _____, 2017.

### EP ENERGY E&P COMPANY, L.P.

By: _____

Frank Falleri

Title: S Vice President, Central Division

Date: _____

Address: _____

### TESORO REFINING & MARKETING COMPANY LLC

By: _____

Gregory J. Goff

Title: Chairman of the Board of Managers and President

Date: _____

Address: _____

- 6 -

AAPL – FORM 610RS – 1989

IN WITNESS WHEREOF, this agreement is executed this 11th day of _____ May _____, 2017.

## EP ENERGY E&P COMPANY, L.P.

By: _____

     Frank Falleri

Title:   Vice President, Central Division

Date: _____

Address: _____

## TESORO REFINING & MARKETING COMPANY LLC

By: _____

     Gregory J. Goff

Title:   Chairman of the Board of Managers and President

Date: _____

Address: _____

- 6 -

AAPL – FORM 610RS - 1989

## ACKNOWLEDGMENTS

STATE OF TEXAS §
§
COUNTY OF BEXAR §

This instrument was acknowledged before me on the _____ day of _____, 2017, by
Gregory J. Goff, Chairman of the Board of Managers and President of Tesoro Refining &
Marketing Company LLC, on behalf of said company.

_____
Notary Public in for the State of Texas

STATE OF TEXAS §
§
COUNTY OF HARRIS §

This instrument was acknowledged before me on the 9th day of May _____, 2017, by
Frank Falleri, Vice President, Central Division of EP Energy E&P Company L.P., a Delaware
limited partnership, on behalf of said limited partnership.

_____
Notary Public in for the State of Texas

JOSEPH C JAMES
Commission # 126317298
My Commission Expires
November 15, 2019

- 7 -

AAPL – FORM 610RS - 1989

## ACKNOWLEDGMENTS

STATE OF TEXAS      §
                              §
COUNTY OF BEXAR      §

This instrument was acknowledged before me on the 5ᵗʰ day of _____, 2017, by Gregory J. Goff, Chairman of the Board of Managers and President of Tesoro Refining & Marketing Company LLC, on behalf of said company.

DIDRA LARA
Notary Public, State of Texas
My Commission expires
August 24, 2018
ID # 12579062-4

_____
Notary Public in for the State of Texas

STATE OF TEXAS      §
                              §
COUNTY OF HARRIS      §

This instrument was acknowledged before me on the _____ day of _____, 2017, by Frank Falleri, Vice President, Central Division of EP Energy E&P Company, L.P., a Delaware limited partnership, on behalf of said limited partnership.

_____
Notary Public in for the State of Texas

- 7 -

505310 Page 10 of 18

## EXHIBIT "A"

## CONTRACT AREA

Attached to and made a part of that certain Recording Supplement to Operating Agreement
and Financing Statement ("Agreement"), dated May 11, 2017,
by and between EP Energy E&P Company, L.P., as Operator,
and Tesoro Refining & Marketing Company LLC, as Non-Operator

## I.    Lands Subject to this Agreement (Contract Area):

Section 31, T3S-R4W, USM, Duchesne County, Utah:
All, containing 650.32 acres, more or less,
LIMITED TO the wellbore of the Moon 5-31C4 (API #43013532970000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 33, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Moon 3-33C4 (API #43013532570000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 5, T3S-R4W, USM, Duchesne County, Utah:
All, containing 642.92 acres, more or less,
LIMITED TO the wellbore of the Butte 5-5C4 (API #43013532870000), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 21-T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbores of the Owl & Hawk 2-21C5 (API #43013532490000), and the
Owl & Hawk 3-21C5 (API #43013532740000), from the surface down to the deeper of the
base of the Wasatch Formation or the deepest depth drilled in said wellbores.

Section 4, T3S-R4W, USM, Duchesne County, Utah:
All, containing 644.56 acres, more or less,
LIMITED TO the wellbore of the Thomas 3-4C4 (API #43013534260000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 16, T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Owl & Hawk 3-16C5  (API #43013533270000), from
the surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

AAPL – FORM 610RS - 1989

Section 10, T3S-R4W, USM, Duchesne County, Utah:

All, containing 640.00 acres, more or less,

LIMITED TO the wellbore of the Four LP LLC 6-10C4 (API #43013532980000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 20, T3S-R4W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbores of the Ostler 7-20C4 (API #43013531370000), and the Rodack 9-20C4 (API #43013532090000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbores.

Section 8, T3S-R4W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the McNeil 4-8C4 (API #43013534380000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 16, T3S-R4W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the Vanderplaats Trust 4-16C4 (API #43013529700000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 26, T3S-R5W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the "Location" 2-26C5 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 17, T3S-R4W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the Bullock 4-17C4 (API #43013529000000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 33, T1S-R1W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the Edwards 3-33A1 (API #43013533960000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 19, T3S-R4W, USM, Duchesne County, Utah:

All, containing 646.88 acres, more or less,

LIMITED TO the wellbore of the Bagley 4-19C4 (API #43013528430000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 18, T3S-R4W, USM, Duchesne County, Utah:

All, containing 644.94 acres, more or less,

LIMITED TO the wellbore of the Flying Dutchman 5-18C4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 24, T2S-R1W, USM, Uintah County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the Max's Place 2-24B1 (API #43047556400000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 7, T3S-R4W, USM, Duchesne County, Utah:

All, containing 641.50 acres, more or less,

LIMITED TO the wellbore of the Faust 5-7C4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 1, T3S-R5W, USM, Duchesne County, Utah:

All, containing 640.24 acres, more or less,

LIMITED TO the wellbore of the Faust 5-1C5 (API #43013362790000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 34, T1S-R1W, USM, Duchesne and Uintah Counties, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the Ute Tribal 3-34A1 (API #43047556990000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 3, T3S-R5W, USM, Duchesne County, Utah:

All, containing 637.36 acres, more or less,

LIMITED TO the wellbore of the Circle B 4-3C5 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 20, T3S-R5W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,

LIMITED TO the wellbore of the BBC 4-20C5 (API #43013532700000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 2, T2S-R1W, USM, Uintah County, Utah:

All, containing 641.30 acres, more or less,

LIMITED TO the wellbore of the Todd 3-2B1 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 25, T2S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Lake Fork Ranch 4-25B4 (API #43013531160000), from
the surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 30, T2S-R3W, USM, Duchesne County, Utah:
All, containing 632.48 acres, more or less,
LIMITED TO the wellbores of the Lake Fork Ranch 2-30B3 (API #Pending) and the Lake
Fork Ranch 1-30B3 (API #Pending), from the surface down to the deeper of the base of the
Wasatch Formation or the deepest depth drilled in said wellbores.

Section 8, T2S-R1E, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Bleazard 2-8B1E (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 31, T2S-R4W, USM, Duchesne County, Utah:
All, containing 684.96 acres, more or less,
LIMITED TO the wellbore of the Ochenta 4-31B4 (API #Pending), from the surface down
to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said
wellbore.

Section 34, T2S-R4W, USM, Duchesne County, Utah:
All, containing 650.84 acres, more or less,
LIMITED TO the wellbore of the "Location" 3-34B4 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 34, T1S-R1E, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-34A1E (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 19, T2S-R2W, USM, Duchesne County, Utah:
All, containing 628.04 acres, more or less,
LIMITED TO the wellbore of the Anderson Rowley 2-19B2 (API #43013533590000),
from the surface down to the deeper of the base of the Wasatch Formation or the deepest
depth drilled in said wellbore.

Section 22, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Brotherson 3-22B3 (API #43013533640000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

AAPL – FORM 610RS - 1989

Section 26, T1S-R1W, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 2-26A1 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 10, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Fotes 3-10B3 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 32, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Myrin Ranch 1-32B3 (API #43013533690000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 11, T1S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the "Location" 5-11A2 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 36, T1S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-36A4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 36, T2S-R4W, USM, Duchesne County, Utah:
All, containing 641.88 acres, more or less,
LIMITED TO the wellbores of the Lake Fork Ranch 1-36B4 (API #Pending) and the Lake Fork Ranch 2-36B4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbores.

Section 15, T2S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Kendall 4-15B2 (API #43013532150000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 20, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,

LIMITED TO the wellbore of the Myrin Ranch 2-20B3 (API #43013531560000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 35, T2S-R4W, USM, Duchesne County, Utah:
All, containing 646.86 acres, more or less,
LIMITED TO the wellbore of the Newfield 3-35B4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 19, T2S-R3W, USM, Duchesne County, Utah:
All, containing 632.66 acres, more or less,
LIMITED TO the wellbore of the Myrin Ranch 3-19B3 (API #43013532590000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 29, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Myrin Ranch 1-29B3 (API #43013533700000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 1, T2S-R3W, USM, Duchesne County, Utah:
All, containing 644.98 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 4-1B3 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 10, T2S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Bernard Trust 3-10B2 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 15, T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the "Location" 3-15C5 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 32, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Huff Trust 3-32A3 (API #43013530650000), from the surface down to the deeper of the bae of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 16, T2S-R3W, USM, Duchesne County, Utah:

All, containing 640 acres, more or less,
LIMITED TO the wellbore of the "Location" 4-16B3 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.


Section 25, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-25A3 (API #43013532140000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 28, T1S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Moffitt Trust 3-28A4 (API #43013532420000), from the
surface down to the deeper of the bae of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 30, T2S-R2W, USM, Duchesne County, Utah:
All, containing 629.56 acres, more or less,
LIMITED TO the wellbore of the Peterson Trust 3-30B2 (API #43013533550000), from
the surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 26, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-26A3 (API #43013532750000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 12, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 6-12B3 (API #43013532390000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 24, T2S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Peatross 3-24B2 (API #43013533680000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 1, T2S-R1W, USM, Uintah County, Utah:
All, containing 640.40 acres, more or less,
LIMITED TO the wellbore of the Sagebrush LLC 2-1B1 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

AAPL – FORM 610RS - 1989

Section 35, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 5-35A3 (API #43013532430000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 28, T1S-R1W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Hill 4-28A1 (API #43013531110000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 20, T1S-R1W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Horrocks 5-20A1 (API #43013342800000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


## II.   Oil and Gas Leases and Oil and Gas Interests Subject to this Agreement:


Those Oil and Gas Leases held by EP Energy E&P Company, L.P. and included in any Drilling Unit associated with each well described in item I. above (a "Farmout Well") and that entitle EP Energy E&P Company, L.P. to produce Oil and Gas from such Farmout Well, insofar and only insofar as such Oil and Gas Leases are necessary to operate, maintain, produce, save, treat and transport from such well as to all depths down to the deeper of (i) the base of the Wasatch Formation, or (ii) the deepest depth drilled with respect to such Farmout Well, excepting all other right, title and interest in the Oil and Gas Leases. "the base of the Wasatch Formation" means the stratigraphic equivalent of the base of the Wasatch formation (top of Cretaceous) as found in the Dual Induction Log depths of 16,720 feet in the Shell-Ute 1-18B5 well located in the S2NE4 of Section 18, Township 2 South, Range 5 West, U.S.M., and 16,970 feet in the Shell-Brotherson 1-11B4 well located in S2NE4 of Section 11, Township 2 South, Range 4 West, U.S.M.

### III.    Parties to this Agreement:

EP Energy E&P Company, L.P.
Attn: Altamont Asset
1001 Louisiana Street, Suite 2400
Houston, Texas 77002
Phone:     (713)-997-1000


Tesoro Refining & Marketing Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attention:  Rick Weyen
Email:    Rick.D.Weyen@tsocorp.com

With a copy to:
Tesoro Refining & Marketing Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attention:  General Counsel
Email:  Kim.Rucker@tsocorp.com

## **EXHIBIT 2**

**Unitah Perfection Document**

Entry 2017003752
Book 1520  Pages 912-929  $49.00
24-MAY-17              04:21
BRENDA MCDONALD
RECORDER, UINTAH COUNTY, UTAH
EP ENERGY E&P COMPANY LP
1001 LOUISIANA ST HOUSTON, TX 77002
Rec By: WANDA MERKLEY        , DEPUTY

Entry 2017003752
Book 1520   Page 912

**Uintah County, Utah**
**Memorandum of Operating Agreement**

**RECORDING REQUESTED BY**

**WHEN RECORDED MAIL TO**
**EP Energy E&P Company**
**1001 Louisiana Street**
**Houston, Texas 77002**
**Attention: Director Business Development**

## RECORDING SUPPLEMENT TO

## OPERATING AGREEMENT AND FINANCING STATEMENT

THIS AGREEMENT, entered into by and between **EP Energy E&P Company, L.P.**, hereinafter referred to as "***Operator***," and **Tesoro Refining & Marketing Company LLC**, hereinafter referred to as "***Non-Operator***". Operator and Non-Operator are sometimes referred to herein individually as a "***Party***" and collectively as the "***Parties***".

WHEREAS, Operator is the owner of Oil and Gas Leases and/or Oil and Gas Interests in the land identified in Exhibit "A" (said land, Leases and Interests being hereinafter called the "***Contract Area***"), and in any instance in which the Leases or Interests of a Party are not of record, the record owner and the Party hereto that owns the interest or rights therein are reflected on Exhibit "A";

WHEREAS, the Parties have executed a Participation and Development Agreement dated May 11, 2017 (herein the "***Participation Agreement***"), covering the Contract Area for the purpose of drilling and Completing certain specified wells (defined in the Participation Agreement as the "***Farmout Wells***") in the Contract Area for the production of Oil and Gas pursuant to the Drilling Program described in the Participation Agreement; and

WHEREAS, by participating in the drilling and Completion of the Farmout Wells, Non-Operator shall earn an assignment of a wellbore interest in each such Farmout Well and any associated right, title and interest in and to the Oil and Gas Leases and Oil and Gas Interests that entitle Operator to produce Oil and Gas from such Farmout Well, insofar and only insofar as said Oil and Gas Leases and Oil and Gas Interests are necessary to operate, maintain and produce such Farmout Well as to all depths down to the deeper of (A) the base of the Wasatch Formation, or (B) the deepest depth drilled with respect to such Farmout Well, excepting all other right, title and interest in the Oil and Gas Leases and Oil and Gas Interests (such assigned interests defined in the Participation Agreement as the "***Conveyed Interests***"); and

WHEREAS, the Parties have executed an Operating Agreement dated May 11, 2017 (herein the "***Operating Agreement***"), covering the Contract Area for the purpose of exploring and developing such lands, Leases and Interests for Oil and Gas to the extent contemplated by the Participation Agreement; and

WHEREAS, the Parties have executed this agreement for the purpose of imparting notice to all persons of the rights and obligations of the Parties under the Operating Agreement and for the further purpose of perfecting those rights capable of perfection.

AAPL – FORM 610RS - 1989

NOW, THEREFORE, in consideration of the mutual rights and obligations of the Parties, it is agreed as follows:

1. This agreement supplements the Operating Agreement, which Agreement in its entirety is incorporated herein by reference, and all terms used herein and not otherwise defined herein shall have the meaning ascribed to them in the Operating Agreement.

2. The Parties do hereby agree that:

    A. The Oil and Gas Leases and/or Oil and Gas Interests comprising the Contract Area shall be subject to and burdened with the terms and provisions of this agreement, the Operating Agreement, and the Participation Agreement and the Parties do hereby commit such Leases and Interests to the performance thereof to the extent contemplated by the Participation Agreement.

    B. The exploration and development of the Contract Area for Oil and Gas shall be governed by the terms and provisions of the Participation Agreement and the Operating Agreement, as supplemented by this agreement.

    C. All costs and liabilities incurred in operations under this agreement, the Operating Agreement and the Participation Agreement shall be borne and paid for by the Parties, as provided in the Operating Agreement and the Participation Agreement.

    D. Regardless of the record title ownership to the Oil and Gas Leases and/or Oil and Gas Interests identified on Exhibit "A," all production of Oil and Gas from the Farmout Wells located within the Contract Area shall be owned by the Parties as provided in the Operating Agreement; provided nothing contained in this agreement shall be deemed an assignment or cross-assignment of interests covered hereby.

    E. Operator shall pay or deliver, or cause to be paid or delivered, all burdens on the Party's share of the production from the Farmout Wells located within the Contract Area as provided in the Participation Agreement.

    F. An overriding royalty, production payment, net profits interest or other burden payable out of production hereafter created, assignments of production given as security for the payment of money and those overriding royalties, production payments and other burdens payable out of production heretofore created and defined as Subsequently Created Interests in the Operating Agreement shall be (i) borne solely by the Party whose interest is burdened therewith, (ii) subject to suspension if a Party is required to assign or relinquish to another Party an interest which is subject to such burden, and (iii) subject to the lien and security interest hereinafter provided if the Party subject to such burden fails to pay its share of expenses chargeable hereunder and under the Participation Agreement and the Operating Agreement, all upon the terms and provisions and in the times and manner provided by the Operating Agreement.

    G. The Oil and Gas Leases and/or Oil and Gas Interests which are subject hereto may not be assigned or transferred except in accordance with those terms, provisions and restrictions in the Participation Agreement and Operating Agreement regulating such transfers.

    This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the Parties, and their respective heirs, devisees, legal representatives, and assigns, and the terms hereof shall be deemed to run with the leases or interests included within the Contract Area.

    H. The Parties shall have the right to acquire an interest in renewal, extension and replacement leases, leases proposed to be surrendered, wells proposed to be abandoned, and interests to be relinquished as a result of non-participation in subsequent operations, all in accordance with the terms and provisions of the Operating Agreement.

    I. The rights and obligations of the Parties and the adjustment of interests among them in the event of a failure or loss of title, each Party's right to propose operations, obligations with respect to participation in operations in the Farmout Wells located within the Contract Area and the consequences of a failure

AAPL – FORM 610RS - 1989

to participate in operations, the rights and obligations of the Parties regarding the marketing of production, and the rights and remedies of the Parties for failure to comply with financial obligations shall be as provided in the Operating Agreement and the Participation Agreement.

J. Each Party's interest under this agreement and under the Operating Agreement shall be subject to relinquishment for its failure to participate in subsequent operations and each Party's share of production and costs shall be reallocated on the basis of such relinquishment, all upon the terms and provisions provided in the Operating Agreement.

K. All other matters with respect to exploration and development of the Contract Area and the ownership and transfer of the Oil and Gas Leases and/or Oil and Gas Interest therein shall be governed by the terms and provisions of the Operating Agreement and the Participation Agreement.

3. The Parties hereby grant reciprocal liens and security interests as follows:

A. Each Party grants to the other Party a lien upon any interest it now owns or hereafter acquires in the (a) wells drilled in the Contract Area and (b) Oil and Gas Leases and/or Oil and Gas Interests in the Contract Area insofar and only insofar as such Oil and Gas Leases and/or Oil and Gas Interests are necessary to operate, maintain and produce such wells drilled in the Contract Area, and a security interest and/or purchase money security interest in any interest it now owns or hereafter acquires in the personal property and fixtures on or used or obtained for use in connection therewith, excluding any such personal property and/or fixtures located downstream of the wellhead of any such well (the properties and other assets upon which such lien and security interests are granted by a Party, as further described and defined in the immediately following sentence, are referred to herein as such Party's "**WI Pledged Interests**"), in each case to secure the payment and performance of all of its Secured Obligations. Such lien and security interest granted by each Party in such Party's WI Pledged Interests shall include and encumber (a) such Party's leasehold interests, working interests, operating rights and royalty and overriding royalty interests in the Contract Area now owned or hereafter acquired and in lands pooled or unitized therewith or otherwise becoming subject to this Agreement, including, without limitation, such Party's interest in wells that are yet to be assigned pursuant to the Participation Agreement, (b) the Oil and Gas when extracted therefrom (including, without limitation, any lien thereon in favor of such Party pursuant to the provisions of Section 9.343 of the Uniform Commercial Code to the extent such Party is permitted pursuant to applicable law to assign any such lien); (c) equipment situated thereon or used or obtained for use in connection therewith (including, without limitation, all wells and tubular goods and all such equipment located downstream of the wellhead of the applicable well); (d) the revenues and proceeds now and hereafter attributable to such WI Pledged Interests, including, without limitation the Oil and Gas and all products obtained or processed therefrom, and all payments in lieu, such as "take or pay" payments or settlements; (e) all amounts and proceeds hereafter payable or to become payable to such Party or now or hereafter relating to any Party of such WI Pledged Interests and all amounts, sums, monies, revenues and income that become payable to such Party from, or with respect to, any of such WI Pledged Interests, present or future, now or hereafter constituting a part thereof; (f) all accounts (including without limitation accounts arising from gas imbalances or from the sale of Oil and/or Gas at the wellhead), contract rights, inventory and general intangibles relating thereto or arising therefrom; and (g) all proceeds and products of the foregoing.

B. To perfect the lien and security interest granted pursuant to the Operating Agreement, each Party shall execute and acknowledge, if applicable, this Memorandum and/or any financing statement prepared and submitted by any Party in conjunction herewith or at any time following execution hereof, and each Party is authorized to file the Memorandum and any supplement thereto executed hereafter as a lien or mortgage in the applicable real estate records and as a financing statement with the proper officer under the Uniform Commercial Code in the state in which the Contract Area is situated and such other states as such Party shall deem appropriate to perfect the security interests granted hereunder.

C. All Parties acquiring an interest in any well and/or Oil and Gas Leases and/or Oil and Gas Interests covered by this Agreement, including, without limitation, the Parties, whether by assignment, merger,

mortgage, operation of law, or otherwise, shall be deemed to have taken subject to the lien and security interest granted by the Operating Agreement as to all obligations attributable to such interest hereunder whether or not such obligations arise before or after such interest is acquired.

D. Subject to paragraph 5 below, with respect to the WI Pledged Interests, the non-defaulting Parties shall be entitled to exercise the rights and remedies of a secured party under the Uniform Commercial Code and the rights of a mortgagee or beneficiary of a mortgage or a deed of trust, as applicable, as well as the remedies provided in Article VII of the Operating Agreement against each defaulting Party. The bringing of a suit and the obtaining of judgment by a Party for the obligations secured by the lien and security interest granted by any of the other Parties shall not be deemed an election of remedies or otherwise affect the lien rights or security interest as security for the payment thereof.

E. Notwithstanding anything herein to the contrary, the following remedies shall apply only in the event of (i) a default by a Party in the payment of its share of costs, expenses, interests or fees in respect of its Secured Obligations, or (ii) the improper use of funds by the Operator:

(a) the non-defaulting Parties shall have the right, without prejudice to other rights or remedies, to collect from the purchaser the proceeds from the sale of such defaulting Party's share of Oil and Gas until the amounts owed by such Party under this Agreement, plus interest as provided in the Operating Agreement has been received, and shall have the right to offset the amount owed against the proceeds from the sale of such defaulting Party's share of Oil and Gas (the "**Production Proceeds**"). All purchasers of production may rely on a notification of default from the non-defaulting Party (which any defaulting Party hereby authorizes each non-defaulting Party to deliver) or Parties stating the amount due as a result of the default, and all Parties waive any recourse available against purchasers for releasing Production Proceeds and against the non-defaulting Parties for delivering such notices (provided such notices were delivered in good faith) as provided herein; and/or

(b) the non-defaulting Parties shall have the right, without prejudice to other rights or remedies, to, at any such non-defaulting Party's option, exercisable at any time prior to such defaulting Party's cure of any WI Default, which option shall be exercised by twenty (20) days' prior written notice, by such non-defaulting Party to such defaulting Party stating that such non-defaulting Party is exercising its rights and remedies under the Operating Agreement, foreclose upon its lien upon and security interests in the WI Pledged Interests, which foreclosure remedy will include the right to sell or otherwise dispose of the WI Pledged Interests in their then condition, or after any further development thereof, at one or more public or, if permitted by applicable law, private sales, with such notice as may be required by applicable law, as an entirety or in parcels, at such locations, all as any such non-defaulting Party, in its discretion, deems advisable; provided that, in the event any non-defaulting Party elects to exercise its remedies set forth in this paragraph 5(b), upon such non-defaulting Party's delivery of written notice to such defaulting Party of such election, such non-defaulting Party shall apply any Production Proceeds held by such non-defaulting Party as of the date of such notice to the WI Default Amount. Any such defaulting Party agrees that 20 days' notice of any proposed sale or other disposition of the WI Pledged Interests by any such non-defaulting Party shall be reasonable. If the WI Pledged Interests are situated in more than one jurisdiction, notice as above provided shall be posted and filed in all such jurisdictions (if such notices are required by applicable law), and all such WI Pledged Interests may be sold in any such jurisdiction or at such other place as any such non-defaulting Party may elect in its discretion, if permitted by law, and any such notice shall designate the jurisdiction where such WI Pledged Interests are to be sold. Any such non-defaulting Party shall have the right to adjourn any such sales from time to time in accordance with applicable law. Any such non-defaulting Party shall have the right to sell, lease or otherwise dispose of any WI Pledged Interests for cash, credit or any combination thereof, and such non-defaulting Party may purchase any WI Pledged Interest at any public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may set off the amount of such price against the WI Default Amount.

Entry 2019003752
Book 1520 Page 916

AAPL – FORM 610RS - 1989

F. If any Party fails to pay any of its Secured Obligations within thirty (30) days of the delivery of a notice of default in respect thereof, the non-defaulting Parties, including Operator, shall, upon request by Operator (or, if Operator is the defaulting party, upon request by a non-defaulting party), pay the undischarged amount in the proportion that the interest of each such Party bears to the interest of all such Parties. The amount paid by each Party so paying its share of the undischarged amount shall be secured by the liens and security interests described in the Operating Agreement, and each paying Party may independently pursue any remedy available hereunder or otherwise.

G. If any Party does not perform all of its obligations hereunder, and the failure to perform subjects such Party to foreclosure or execution proceedings pursuant to the provisions of the Operating Agreement, including, without limitation, the remedies set forth in Article VII and Article XVI.P. of the Operating Agreement, to the extent allowed by governing law, the defaulting Party waives (a) any available right of redemption from and after the date of judgment, (b) any required valuation or appraisement of the mortgaged or secured property prior to sale, (c) any available right to stay execution or to require a marshaling of assets and (d) any required bond in the event a receiver is appointed. In addition, to the extent permitted by applicable law, each Party hereby grants to the other Parties a POWER OF SALE as to any property that is subject to the lien and security interests granted hereunder, such power to be exercised in the manner set forth in Article XVI.P. of the Operating Agreement and otherwise in the manner and with such notice required or provided by applicable law or otherwise in a commercially reasonable manner and upon reasonable notice.

H. Each Party agrees that the other Parties shall be entitled to utilize the provisions of Oil and Gas lien law or other lien law of any state in which the Contract Area is situated to enforce the obligations of each Party hereunder. Without limiting the generality of the foregoing, to the extent permitted by applicable law, Non-Operators agree that Operator may invoke or utilize the mechanics' or materialmen's lien law of the state in which the Contract Area is situated in order to secure the payment to Operator of any sum due hereunder for services performed or materials supplied by Operator in accordance with the terms of the Operating Agreement.

4. This agreement may be amended from time to time by written amendment thereto executed by the Parties, including for the purpose of amending the description of the Contract Area in accordance with changes to the Drilling Program as contemplated by the Participation Agreement. This agreement shall be effective as of the date of the Operating Agreement as above recited. Upon termination of this agreement and the Operating Agreement and the satisfaction of all obligations thereunder, Operator is authorized to file of record in all necessary recording offices a notice of termination and each Party agrees to execute such a notice of termination upon request by Operator if all obligations under the Operating Agreement have been satisfied.

5. This agreement and the Operating Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, devisees, legal representatives, successors and assigns. No sale, encumbrance, transfer or other disposition, whether directly or indirectly, shall be made by a Party of any interest in the Contract Area except as permitted under the Participation Agreement and the Operating Agreement and, if permitted, shall be made subject to this agreement, the Operating Agreement and the Participation Agreement.

6. In the event of a conflict between the terms and provisions of this agreement and the terms and provisions of the Operating Agreement, then, as between the Parties, the terms and provisions of the Operating Agreement shall control.

7. This agreement shall be binding upon the Parties when this agreement or a counterpart thereof has been executed by all such Parties. In the event that any provision herein is illegal or unenforceable, the remaining provisions shall not be affected, and shall be enforced as if the illegal or unenforceable provision did not appear herein.

*[Rest of page intentionally left blank; signatures on next page]*

AAPL – FORM 610RS – 1989

IN WITNESS WHEREOF, this agreement is executed this //⁵ᵗʰ day of _MAY_ ___, 2017.

### EP ENERGY E&P COMPANY, L.P.

By: _____
     Frank Falleri
Title: Sr. Vice President, Central Division
Date: _____
Address: _____

### TESORO REFINING & MARKETING COMPANY LLC

By: _____
     Gregory J. Goff
Title:  Chairman of the Board of Managers and
      President
Date: _____
Address: _____

Entry 2017003752
Book 1320   Page 918

AAPL – FORM 610RS – 1989

IN WITNESS WHEREOF, this agreement is executed this 11ᵗʰ day of _____May_____, 2017.

### EP ENERGY E&P COMPANY, L.P.

By: _____

Frank Falleri

Title: Vice President, Central Division

Date: _____

Address: _____

### TESORO REFINING & MARKETING COMPANY LLC

By: _____

Gregory J. Goff

Title: Chairman of the Board of Managers and President

Date: _____

Address: _____

- 6 -

AAPL – FORM 610RS - 1989

### ACKNOWLEDGMENTS

STATE OF TEXAS               §
                            §
COUNTY OF BEXAR              §

This instrument was acknowledged before me on the _____ day of _____, 2017, by Gregory J. Goff, Chairman of the Board of Managers and President of Tesoro Refining & Marketing Company LLC, on behalf of said company.

_____
Notary Public in for the State of Texas

STATE OF TEXAS               §
                            §
COUNTY OF HARRIS             §

This instrument was acknowledged before me on the 9th day of May_____, 2017, by Frank Falleri, Vice President, Central Division of EP Energy E&P Company, L.P., a Delaware limited partnership, on behalf of said limited partnership.

JOSEPH C JAMES
Commission # 126317298
My Commission Expires
November 15, 2019

_____
Notary Public in for the State of Texas

- 7 -

Entry 2017003752
Book 1520  Page 920

AAPL – FORM 610RS - 1989

## ACKNOWLEDGMENTS

STATE OF TEXAS                    §
                                 §
COUNTY OF BEXAR                   §


This instrument was acknowledged before me on the 5ᵗʰ day of May, 2017, by Gregory J. Goff, Chairman of the Board of Managers and President of Tesoro Refining & Marketing Company LLC, on behalf of said company.

DIDRA LARA
Notary Public, State of Texas
My Commission expires
August 24, 2018
ID # 12579062-4

_____
Notary Public in for the State of Texas


STATE OF TEXAS                    §
                                 §
COUNTY OF HARRIS                  §


This instrument was acknowledged before me on the _____ day of _____, 2017, by Frank Falleri, Vice President, Central Division of EP Energy E&P Company, L.P., a Delaware limited partnership, on behalf of said limited partnership.


_____
Notary Public in for the State of Texas

AAPL – FORM 610RS - 1989

## EXHIBIT "A"

## CONTRACT AREA

Attached to and made a part of that certain Recording Supplement to Operating Agreement
and Financing Statement ("Agreement"), dated May 11, 2017,
by and between EP Energy E&P Company, L.P., as Operator,
and Tesoro Refining & Marketing Company LLC, as Non-Operator

## I.  Lands Subject to this Agreement (Contract Area):

Section 31, T3S-R4W, USM, Duchesne County, Utah:
All, containing 650.32 acres, more or less,
LIMITED TO the wellbore of the Moon 5-31C4 (API #43013532970000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 33, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Moon 3-33C4 (API #43013532570000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 5, T3S-R4W, USM, Duchesne County, Utah:
All, containing 642.92 acres, more or less,
LIMITED TO the wellbore of the Butte 5-5C4 (API #43013532870000), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 21-T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbores of the Owl & Hawk 2-21C5 (API #43013532490000), and the
Owl & Hawk 3-21C5 (API #43013532740000), from the surface down to the deeper of the
base of the Wasatch Formation or the deepest depth drilled in said wellbores.

Section 4, T3S-R4W, USM, Duchesne County, Utah:
All, containing 644.56 acres, more or less,
LIMITED TO the wellbore of the Thomas 3-4C4 (API #43013534260000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 16, T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Owl & Hawk 3-16C5  (API #43013533270000), from
the surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

AAPL – FORM 610RS - 1989

Section 10, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640.00 acres, more or less,
LIMITED TO the wellbore of the Four LP LLC 6-10C4 (API #43013532980000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 20, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbores of the Ostler 7-20C4 (API #43013531370000), and the Rodack 9-20C4 (API #43013532090000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbores.

Section 8, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the McNeil 4-8C4 (API #43013534380000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 16, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Vanderplaats Trust 4-16C4 (API #43013529700000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 26, T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the "Location" 2-26C5 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 17, T3S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Bullock 4-17C4 (API #43013529000000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 33, T1S-R1W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Edwards 3-33A1 (API #43013533960000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 19, T3S-R4W, USM, Duchesne County, Utah:
All, containing 646.88 acres, more or less,
LIMITED TO the wellbore of the Bagley 4-19C4 (API #43013528430000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

AAPL – FORM 610RS - 1989

Entry 2017003752
Book 1520   Page 923

Section 18, T3S-R4W, USM, Duchesne County, Utah:
All, containing 644.94 acres, more or less,
LIMITED TO the wellbore of the Flying Dutchman 5-18C4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 24, T2S-R1W, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Max's Place 2-24B1 (API #43047556400000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 7, T3S-R4W, USM, Duchesne County, Utah:
All, containing 641.50 acres, more or less,
LIMITED TO the wellbore of the Faust 5-7C4 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 1, T3S-R5W, USM, Duchesne County, Utah:
All, containing 640.24 acres, more or less,
LIMITED TO the wellbore of the Faust 5-1C5 (API #43013362790000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 34, T1S-R1W, USM, Duchesne and Uintah Counties, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-34A1 (API #43047556990000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 3, T3S-R5W, USM, Duchesne County, Utah:
All, containing 637.36 acres, more or less,
LIMITED TO the wellbore of the Circle B 4-3C5 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 20, T3S-R5W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the BBC 4-20C5 (API #43013532700000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Section 2, T2S-R1W, USM, Uintah County, Utah:
All, containing 641.30 acres, more or less,
LIMITED TO the wellbore of the Todd 3-2B1 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

Entry 2017003752
Book 1520  Page 924

Section 25, T2S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Lake Fork Ranch 4-25B4 (API #43013531160000), from
the surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 30, T2S-R3W, USM, Duchesne County, Utah:
All, containing 632.48 acres, more or less,
LIMITED TO the wellbores of the Lake Fork Ranch 2-30B3 (API #Pending) and the Lake
Fork Ranch 1-30B3 (API #Pending), from the surface down to the deeper of the base of the
Wasatch Formation or the deepest depth drilled in said wellbores.

Section 8, T2S-R1E, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Bleazard 2-8B1E (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 31, T2S-R4W, USM, Duchesne County, Utah:
All, containing 684.96 acres, more or less,
LIMITED TO the wellbore of the Ochenta 4-31B4 (API #Pending), from the surface down
to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said
wellbore.

Section 34, T2S-R4W, USM, Duchesne County, Utah:
All, containing 650.84 acres, more or less,
LIMITED TO the wellbore of the "Location" 3-34B4 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 34, T1S-R1E, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-34A1E (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 19, T2S-R2W, USM, Duchesne County, Utah:
All, containing 628.04 acres, more or less,
LIMITED TO the wellbore of the Anderson Rowley 2-19B2 (API #43013533590000),
from the surface down to the deeper of the base of the Wasatch Formation or the deepest
depth drilled in said wellbore.

Section 22, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Brotherson 3-22B3 (API #43013533640000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

AAPL – FORM 610RS - 1989

Section 26, T1S-R1W, USM, Uintah County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 2-26A1 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 10, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Fotes 3-10B3 (API #Pending), from the surface down to
the deeper of the base of the Wasatch Formation or the deepest depth drilled in said
wellbore.

Section 32, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Myrin Ranch 1-32B3 (API #43013533690000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 11, T1S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the "Location" 5-11A2 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 36, T1S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-36A4 (API #Pending), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 36, T2S-R4W, USM, Duchesne County, Utah:
All, containing 641.88 acres, more or less,
LIMITED TO the wellbores of the Lake Fork Ranch 1-36B4 (API #Pending) and the Lake
Fork Ranch 2-36B4 (API #Pending), from the surface down to the deeper of the base of the
Wasatch Formation or the deepest depth drilled in said wellbores.

Section 15, T2S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Kendall 4-15B2 (API #43013532150000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.

Section 20, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,

AAPL – FORM 610RS - 1989

LIMITED TO the wellbore of the <u>Myrin Ranch 2-20B3</u> (API #43013531560000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 35, T2S-R4W, USM, Duchesne County, Utah:</u>
All, containing 646.86 acres, more or less,
LIMITED TO the wellbore of the <u>Newfield 3-35B4</u> (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 19, T2S-R3W, USM, Duchesne County, Utah:</u>
All, containing 632.66 acres, more or less,
LIMITED TO the wellbore of the <u>Myrin Ranch 3-19B3</u> (API #43013532590000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 29, T2S-R3W, USM, Duchesne County, Utah:</u>
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the <u>Myrin Ranch 1-29B3</u> (API #43013533700000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 1, T2S-R3W, USM, Duchesne County, Utah:</u>
All, containing 644.98 acres, more or less,
LIMITED TO the wellbore of the <u>Ute Tribal 4-1B3</u> (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 10, T2S-R2W, USM, Duchesne County, Utah:</u>
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the <u>Bernard Trust 3-10B2</u> (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 15, T3S-R5W, USM, Duchesne County, Utah:</u>
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the <u>"Location" 3-15C5</u> (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 32, T1S-R3W, USM, Duchesne County, Utah:</u>
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the <u>Huff Trust 3-32A3</u> (API #43013530650000), from the surface down to the deeper of the bae of the Wasatch Formation or the deepest depth drilled in said wellbore.

<u>Section 16, T2S-R3W, USM, Duchesne County, Utah:</u>

AAPL – FORM 610RS - 1989

Entry 2017003752
Book 1520   Page 927

All, containing 640 acres, more or less,
LIMITED TO the wellbore of the "Location" 4-16B3 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 25, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-25A3 (API #43013532140000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 28, T1S-R4W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Moffitt Trust 3-28A4 (API #43013532420000), from the surface down to the deeper of the bae of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 30, T2S-R2W, USM, Duchesne County, Utah:
All, containing 629.56 acres, more or less,
LIMITED TO the wellbore of the Peterson Trust 3-30B2 (API #43013533550000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 26, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 3-26A3 (API #43013532750000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 12, T2S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 6-12B3 (API #43013532390000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 24, T2S-R2W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Peatross 3-24B2 (API #43013533680000), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.


Section 1, T2S-R1W, USM, Uintah County, Utah:
All, containing 640.40 acres, more or less,
LIMITED TO the wellbore of the Sagebrush LLC 2-1B1 (API #Pending), from the surface down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in said wellbore.

E-0003752
Book 1520  Page 928

AAPL – FORM 610RS - 1989

Section 35, T1S-R3W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Ute Tribal 5-35A3 (API #43013532430000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


Section 28, T1S-R1W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Hill 4-28A1 (API #43013531110000), from the surface
down to the deeper of the base of the Wasatch Formation or the deepest depth drilled in
said wellbore.

Section 20, T1S-R1W, USM, Duchesne County, Utah:
All, containing 640 acres, more or less,
LIMITED TO the wellbore of the Horrocks 5-20A1 (API #43013342800000), from the
surface down to the deeper of the base of the Wasatch Formation or the deepest depth
drilled in said wellbore.


## II.   Oil and Gas Leases and Oil and Gas Interests Subject to this Agreement:


Those Oil and Gas Leases held by EP Energy E&P Company, L.P. and included in any
Drilling Unit associated with each well described in item I. above (a "Farmout Well") and
that entitle EP Energy E&P Company, L.P. to produce Oil and Gas from such Farmout
Well, insofar and only insofar as such Oil and Gas Leases are necessary to operate,
maintain, produce, save, treat and transport from such well as to all depths down to the
deeper of (i) the base of the Wasatch Formation, or (ii) the deepest depth drilled with
respect to such Farmout Well, excepting all other right, title and interest in the Oil and
Gas Leases. "the base of the Wasatch Formation" means the stratigraphic equivalent of
the base of the Wasatch formation (top of Cretaceous) as found in the Dual Induction Log
depths of 16,720 feet in the Shell-Ute 1-18B5 well located in the S2NE4 of Section 18,
Township 2 South, Range 5 West, U.S.M., and 16,970 feet in the Shell-Brotherson 1-
11B4 well located in S2NE4 of Section 11, Township 2 South, Range 4 West, U.S.M.

AAPL – FORM 610RS - 1989

### III.   Parties to this Agreement:

EP Energy E&P Company, L.P.
Attn: Altamont Asset
1001 Louisiana Street, Suite 2400
Houston, Texas 77002
Phone:    (713)-997-1000


Tesoro Refining & Marketing Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attention:  Rick Weyen
Email:    Rick.D.Weyen@tsocorp.com

With a copy to:
Tesoro Refining & Marketing Company LLC
19100 Ridgewood Parkway
San Antonio, Texas 78259
Attention:  General Counsel
Email:  Kim.Rucker@tsocorp.com