## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
**FILED**

**NOV 15 2019**

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| In re: | § | Case No. 19-35654 (MI) |
| | § | |
| EP ENERGY CORPORATION, *et al*,[1] | § | Chapter 11 |
| | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

## MSB ROYALTY OWNERS' OBJECTION TO MOTION OF DEBTORS FOR FINAL ORDER (I) AUTHORIZING USE OF CASH COLLATERAL; (II) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (V) AUTHORIZING THE DEBTORS TO ENTER INTO AND PERFORM UNDER EXIT FINANCING AGREEMENTS; AND (VI) GRANTING RELATED RELIEF

Storey Minerals, Ltd. ("Storey Minerals"), Storey Surface, Ltd. ("Storey Surface"), Maltsberger/Storey Ranch, LLC ("Maltsberger") and Rene R. Barrientos, Ltd. ("Barrientos") (collectively, the "MSB Royalty Owners"), file this *Objection to Motion of Debtors for Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Authorizing the Debtors to Enter into and Perform Under Exit Financing Agreements; and (VI) Granting Related Relief* (the "Objection"), and respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases (the "Bankruptcy Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

## <u>PRELIMINARY STATEMENT</u>

1.      Even before the Debtors have (i) filed Schedules and Statement of Financial Affairs, (ii) filed and this Court has approved a disclosure statement, (iii) filed a plan of reorganization or a single creditor has cast a ballot on a plan of reorganization, the Debtors seek this Court's approval of debtor-in-possession financing inexorably intertwined with exit financing that dictate the distributions to creditors and equity holders of the Debtors. While called a "DIP-to Exit" Financing, what the Debtors and insiders seek through the DIP Motion (in tandem with their separately filed Backstop Motion) is to handcuff this Court and all the creditor constituencies on the 48th day of the bankruptcy to an insider sponsored plan of reorganization.

2.      Unless this Court puts brakes on the Debtors, the complete tie-up of the Debtors to a fait accompli will all occur without creditors having any of the traditional safeguards and protections Congress built into the Bankruptcy Code to ensure the twin goals of equality of treatment and maximization of values for the debtor's estate. Respectfully, the Court should protect creditors, by requiring approval of the disclosure statement and the subsequent voting on and confirmation of a plan of reorganization for the Debtors' insider sponsored plan.

3.      Once this Court approves the DIP Motion, the die is cast. Thereafter, neither the Bankruptcy Code nor the Bankruptcy Rules promulgated by Congress will govern these chapter 11 cases: the covenants in the DIP Credit Agreement and the milestones in the Backstop Agreement drafted by the sponsors of the DIP-to-Exit Financing will.

4.      The irony here is that the DIP is not needed.  The Debtors have $179,000,000 in cash on hand. The head of Debtors' Special Committee admits that if this Court denies the DIP Motion, the Debtors still have "optionality" and could operate the Debtors for 36 months with

the cash on hand. Then what is the rationale for the Debtors to tie entry into the DIP Financing with Exit Financing?

5.      The answer is the so-called "execution" risk, as set out in Mr. D'Souza's Declaration, not due to the Debtors' inability to adequately protect against the diminution in the value of the cash collateral used by the Debtors. He declares, "the DIP-to-Exit Proposal was the best financing alternative available to the Debtors because it offered the Debtors the highest commitment at the lowest cost and with the lowest level of execution risk." D'Souza Declaration, ¶ 33.

6.      The MSB Royalty Owners submit that the standard for approval of the DIP Motion on November 20, 2019 is clearly set out under Bankruptcy Code Sections 363 and 364. The hearing on November 20, 2019 should not devolve into a "mini" Bankruptcy Code § 1129 hearing: the Debtors have not filed a disclosure statement, have not been authorized to solicit votes on any plan of reorganization, and are not seeking confirmation of a plan of reorganization.

7.      Nowhere did Congress write in either Sections 363 or 364 of the Bankruptcy Code the rationale that DIP Financing should be approved because such financing minimizes execution risk of a bigger scheme to restructure the balance sheet of a distressed company. The words "reduce execution risk" simply do not appear in either Bankruptcy Code Sections 363 or 364 as a test to be met to approve either the use of cash collateral or entry into DIP Financing. Reducing execution risk is a feasibility concept that must be met under Bankruptcy Code § 1129 in connection with confirmation of a plan of reorganization.

8.      The MSB Royalty Owners believe that approval of the DIP Motion, along with the Backstop Motion, on November 20, 2019 predetermines a plan that (i) delivers much of the new equity to insiders, Apollo Global Management, LLC (along with affiliates, if any, "Apollo")

and executive management; (ii) forces reinstatement of all fully secured debt [who are getting paid all interest and fees in the interim], (iii) dictates payment to selected unsecured creditors, while discriminating against other unsecured creditors, and (iv) distributes the remaining equity to a single junior tranche of alleged undersecured creditor, by the use of an artificial, unsubstantiated, and arbitrary enterprise value.  In the end, approval of the DIP Motion and the Backstop Motion on the 48th day of the bankruptcy case will dictate that $700,000,000 of unsecured claims will receive a pro rata distribution of 1% of the Reorganized Common Stock of EP Energy.

9.      Not only is the result horrifying, but what is more upsetting to the MSB Royalty Owners is that the *process* the Debtors used to accomplish the awful result is flawed, unfair and riddled with irregularities. The financial "engineering" here is not being advanced by the so-called independent directors of the Debtors, rather it is the proverbial "fox in the hen house" dictating the outcome. The unfair process began before the appointment of a Special Committee. The unfair process will continue post-petition unless checked by this Court.

10.      Public information and cursory expedited discovery reveals that the principal controlling shareholder of the Debtors, Apollo, pulled a chapter out of its usual distressed debtor takeover playbooks and began implementing it before the Special Committee was even formed – and even before its restructuring legal and financial advisory professionals were retained.  The Debtors contend that the creation of the Special Committee comprised of "independent" board members, Alan Crain, Carol Flaton and J. Barton Kalsu, in early June of 2019 and their participation in approving the Debt-to-Exit Financing entitles these Debtors to have their judgment immunized under the traditional "business judgment" rule.

11.     The MSB Royalty Owners submit that this preplanned and unnecessarily rushed "DIP-to-Exit" proposal should not be approved either under an absolute fairness test [given the conflicts permeating the process] or even under a business judgment test because the financing agreement here contains terms "that leverage the bankruptcy process and powers or its purpose is not such to benefit the estate as it is to benefit a party-in-interest." *In re Ames Dept. Stores, Inc.* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).

12.     The Debtors do not have a need for a DIP: the roll up of approximately $315 million of $630 million in first lien secured debt has no rational business justification; no new money is being advanced for the roll-up; the Debtors have $179,000,000 of cash collateral in the bank, and another $60 million in positive positions on hedges.  Virtually all the cash flow losses is to pay in full tranches of secured debt and to pay the professional costs, including a multimillion dollar fee to Evercore upon approval of the DIP for their work dating back to well before the bankruptcy, to secure a DIP that is not needed.

13.     Instead of being able to explore avenues of restructuring independently that would have been fair to all constituents, the Special Committee inherited and was given the recipe for really one cake: The insider's "Debt-to-Exit Financing." After being on the job as professionals advising fiduciaries since June of 2019, the Special Committee has not 1) commissioned a Total Enterprise Value report, 2) determined the fair market value of the assets of the Debtors, and 3) yet, been able to magically restructure the balance sheet and seeks to deliver consideration to various layers of holders of debt and equity on the capital stock, without regard to the absolute priority rule.

14.     Since June of 2019, the Special Committee has not retained its own professionals, instead it has relied on professionals retained by the Debtors, who have connections to insiders of the Debtors who will benefit if the Debt-to-Exit Financing is approved next Wednesday.

15.     Since June of 2019, the Special Committee essentially inherited a pre-existing process; indeed, there was apparently **_no_** consideration of a standalone plan that could have devoted the available liquidity to operations, or to stretch the terms of what truly is secured versus unsecured debt.

16.     It also appears from what limited discovery was allowed for the period from June 2019 to the Petition Date that the Debtors never seriously considered a sale option. While professing to consider "liability management" scenarios, nothing was really considered along this line other than to fence off inquiries by an ad hoc group of unsecured notes and another ad hoc group of secured notes, which stayed mired in NDA discussions incident to due diligence efforts for most of the time after the Debtors formed the Special Committee. The Debtors and their professionals recognized that a more "traditional" Bankruptcy Code section 506(a) valuation allowed secured claim bifurcation with the remaining unsecured claim receiving equity was a possibility.  But neither the Debtors nor the Special Committee appear to have realistically pursued that avenue of restructuring. Under such a plan scenario, the $700,000,000 of unsecured creditors should have shared ratably with all the other unsecured deficiency claims of the 1.5 lien Notes, instead of being left out to share in only 1% of the reorganized Debtors' predilution equity

17.     Approval of the DIP Motion, therefore, is premature and tantamount to an abdication by the Debtors of their obligations to **_all_** creditors (not just those that the Debtors prefer or find themselves secured) to maximize recoveries.

18.     As noted above and bears repeating, if the Debtors' request for approval of the DIP Motion is not granted, the Debtors and their estates will not suffer any actual harm, because the Debtors are not obtaining any new monies and, in fact, do not need any new money to survive and operate in chapter 11.[2] The Court can simply fashion appropriate adequate protection for any diminution that occurs through the use of cash collateral in the secured creditors' lien position, and approval of the Exit Facility can comfortably wait until plan confirmation, as is the typical process in almost every other bankruptcy case.

19.     The Debtors' sponsored roll-up of approximately $315 million under the DIP Motion, while obtaining no new money, and providing substantial benefits to the RBL Lenders, should be denied—it truly comprises a sub rosa plan because it dictates the outcome of the case—99% predilution for the most junior tranche presumed under of secured 1.5 Lien Notes, and 1% predilution to the unsecured creditors, allegedly including the MSB Royalty Owners. That calculates to about $1.5 million of predilution value based on a completely arbitrary valuation, with provision for insider Apollo, Elliott Management Corporation ("Elliott") [through their recently bought positions] and the management [apparently 7.5% of 10% allocated] to dilute this even further.  To add insult to injury, for the privilege of rolling up hundreds of millions of dollars of prepetition debt, the Debtors will have the burden of committing prematurely to terms of an Exit Facility months before any plan confirmation hearing, while paying undisclosed (because of such documents being sealed) amounts in various additional fees related to the Exit Facility.  The Debtors have not cited a single precedent where a bankruptcy

---

[2] Given prior late night last minute filings, this objection is also directed to any updates after this objection is filed to "add" some new financing to the DIP, since it too is not needed and simply would be calculated to backfill the glaring lack of need to have this approved with zero new financing to support the rollup.

court has approved a roll-up without any new money provided; certainly, in the face of an objection there should be none.

20.     For the prohibition of *sub rosa* plans to have any meaning, the DIP Motion must be denied as a modern *sub rosa* plan because approval of the DIP Motion and the Backstop Motion is tantamount to "game over" on day 48 of this company's bankruptcy case. The so-called "fiduciary" out is meaningless once this Court blesses the DIP and the Backstop Motion. The enormous fees and penalties that the Debtors must pay make switching horses punitive and not economic for these Debtors.

21.     The Debtors finally seek to provide liens on unencumbered assets, superpriority claims, and substantial fees and expenses, without showing any need for financing during these bankruptcy cases.   They do so without affording the unsecured creditors a meaningful opportunity to fully evaluate and challenge the liens of the secured lenders.

22.     The Debtors do not need new money. The Debtors cannot satisfy the requirements under Bankruptcy Code § 363 and §364 at the November 20, 2019 hearing, and, therefore, the DIP Motion should be denied, and the Backstop Motion should also be denied as being premature.

## BACKGROUND

### I.     MSB Royalty Owners Relationship with the Debtors

23.     The MSB Royalty Owners own approximately 40,000 Eagle Ford basin acres leased (in substantial part) to EP Energy E&P Company, L.P. ("EPLP"), one of the above-captioned debtors (the "Debtors"), under sixteen (16) oil and gas leases (the "MSB O&G Leases").

24.     After due demand and refusal to comply with the terms imposed by the MSB O&G Leases, on March 19, 2019, the MSB Royalty Owners filed a lawsuit in the 81st Judicial District Court in La Salle County, Texas, Cause No. 18-05-00083-CVL (the "State Court") asserting claims against EPLP for breach of the MSB O&G Leases.  EPLP vigorously disputed the claims, even though it did admit in public SEC filings that it had a liability of at least $4 million on such claims.

25.     On June 6, 2019, the State Court granted partial summary judgment against EPLP in favor of the MSB Royalty Owners.  On June 19, 2019, the State Court issued a final judgment finding EPLP had materially breached the MSB O&G Leases and ordering, among other things, EPLP to execute an amendment to the MSB O&G Leases and pay the MSB Royalty Owners additional bonus amounts arising as obligations under the MSB O&G Leases totaling $41,034,055.00, plus attorneys' fees, costs and interests (the "Lease Judgment"). When the Lease Judgment was not properly superseded, the clerk issued the requested abstract of judgment and it was filed to secure the judgment by placing a lien on all of the Debtors' real estate [and fixtures] in LaSalle County, Texas.[3]

26.     As such, the MSB Royalty Owners are substantial creditors and parties in interest. They are owed (i) a judgment for amounts arising under several of their oil and gas leases that exceeds $41 million, (ii) an estimated $200,000 in suspended royalty that should have been previously paid, (iii) a reported $1 million plus in apparent royalties [per the Debtors' list of creditors in the Petition]; (iv) an unknown amount [despite requests made going back months for easily deliverable accounting information] on its Allocation Wells [defined below], to which the

---

[3] The Royalty O&G Lien is subject to a pending adversary proceeding filed in this Court by the Debtors against the MSB Royalty Owners.  The answer is due December 3, 2019.

MSB Royalty Owners own directly 50% of the mineral interests on property the Debtors are drilling, and (v) other amounts.

27.     The Debtors' focus on obtaining approval of the DIP Facility while ignoring essential operational obligations and needs illustrates the serious dysfunction of these Debtors. The MSB Royalty Owners leases are likely the most valuable assets the Debtors have in their portfolio.  The Debtors are obligated to pay royalties and account for royalty and other amounts due to the MSB Royalty Owners, in exchange for exploiting the minerals owned by MSB and other landowners as well.  They are required, as a precondition to access and the right to develop, to pay the lease obligations.  Debtors must also provide accounting information when requested.

28.     Yet the Debtors have been largely delinquent in fulfilling their obligations to the MSB Royalty Owners. Prepetition, EPLP [who is this? Which debtor spell out first time and define] drilled one or more allocation well(s) (the "Allocation Wells") which are divided equally between EPLP and the MSB Royalty Owners. Under applicable Texas law, the profits from the production arising from mineral interests co-owned by EPLP and the MSB Royalty Owners are to be shared equally.

29.     The MSB Royalty Owners have made requests and demands on EPLP for an accounting of the costs and production from the Allocation Wells.  To date these requests [whether pre or post-petition] have been ignored.  Debtors should be able to "push a button" to deliver this type of accounting and revenue information.  They have refused. Their refusal is inexplicable.

30.     Demand for segregation of proceeds from production attributable to the MSB Royalty Owners, which should not be comingled with and does not constitute property of the Debtors' estates, has similarly been ignored.  As of the Petition Date, EPLP is not abiding by its

obligations under Texas law regarding the Allocation Wells or the leases. Instead, the Debtors are using the Bankruptcy Code as both a sword and a shield by retaining funds that do not belong to the Debtors estates and yet shirking their liability for interest or other damages for such improper retention. Other similar requests for an accounting and demands for information regarding the calculation and payment of royalty or mineral estate proceeds have similarly been ignored.

## II.   The Chapter 11 Cases

31.    Just before midnight on October 3, 2019 (the "Petition Date"), EP Energy Corporation and related entities (the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), commencing these chapter 11 cases.

32.    The MSB Royalty Owners filed a timely objection before the October 4 first day hearings and preserved their rights.

33.    On October 21, 2019, the U.S. Trustee filed his Notice of the Appointment of the Official Committee of Unsecured Creditors (the "UCC"), which included the appointment of, among others, Carlos R. Soltero as a representative of Barrientos, one of the MSB Royalty Owners. *See* Doc. No. 200. Since that time the UCC has been hard at work with its professionals to understand what the Debtors are trying to accomplish, and test whether it is proper. Similarly, the MSB Royalty Owners have continued to independently address issues and to preserve their rights.

## III.   Debtors' Requests for Cash Collateral and DIP Financing

34.    On October 4, 2019, the Debtors filed an *Emergency Motion of Debtors (I) Authorizing Debtors' Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition*

*Secured Parties; (III) Modifying Automatic stay; (IV) Scheduling a Final Hearing; and (V) Seeking Related Relief* (Doc. No. 5) (the "<u>Initial Cash Collateral Motion</u>").

35.     On October 4, 2019, in support of the Initial Cash Collateral Motion and other first day relief, the Debtors filed the *Declaration of David Rush in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* (Doc. No. 16) (the "<u>Rush First Day Declaration</u>").

36.     Also, on October 4, 2019, the MSB Royalty Owners filed *Preliminary Omnibus Objection of (1) Storey Minerals, Ltd., (2) MSB Surface, Ltd.; (3) Maltsberger/MSB Ranch, LLC, and Rene R. Barrientos, Ltd. To Certain First Day Motions* (Doc. No. 50) (the "<u>First Day Objection</u>"). The First Day Objection included an objection to, among other things, the terms of any initial order permitting the Debtors' use of cash collateral and priming of liens in a manner that was inconsistent with the MSB Royalty Owners' rights, while reasonably recognizing the need to continue operations and provide adequate protection.

37.     On October 4, 2019, this Court held a hearing on, among other things, the Initial Cash Collateral Motion and signed an order granting interim relief (Doc. No. 65) (the "<u>Interim Cash Collateral Order</u>"), which included, among other things, reservation of rights language for creditors.

38.     On October 18, 2019, the Debtors filed *Motion of Debtors for Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Authorizing the Debtors to Enter into and Perform Under Exit Financing Agreements; and (VI) Granting Related Relief* (Doc. No. 182) (the "<u>DIP Motion</u>").[4] The DIP Motion seeks the following:

---

[4] All otherwise undefined terms shall have the same meaning ascribed to them in the DIP Motion.

A.   The DIP Motion seeks authority to enter into the DIP Facility, which consists entirely of a Roll-Up of approximately $315 million of the RBL. It is unclear whether the conversion of prepetition letters of credit into the postpetition letters of credit would be within the $315 million Roll-Up or in excess of that amount.

B.   Further, the DIP Motion seeks authority to enter into and perform under the Commitment/Fee Letters, which would essentially authorize the Exit Facility.

C.   The Debtors are also seeking authority to provide the Credit Parties with liens on Avoidance Actions, Unencumbered Property, superpriority administrative claims, waiver of surcharge, and waiver of the equities of the case exception.

39.   Attached to the DIP Motion as Exhibit A is a proposed form of *Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Authorizing the Debtors to Enter into and Perform Under Exit Financing Agreements; and (VI) Granting Related Relief* (Doc. No. 182) (the "Proposed DIP Order").

40.   Also, on October 18, 2019, the Debtors filed the *Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Agreement, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* (Doc. No. 181) (the "Backstop Motion").

41.   Also, on October 18, 2019, the Debtors filed the *Declaration of Avinash D'Souza in support of the DIP Motion and the Backstop Motion* (Doc. No. 186) (the "D'Souza Declaration"). On November 11th and 12th, limited scope and time depositions occurred, immediately preceding by sharply limited document production from Debtors.

## OBJECTION TO DIP MOTION

42.     The MSB Royalty Owners object to the DIP Motion to the extent it seeks to (a) Roll-Up approximately $315 million of the prepetition amount outstanding under the RBL Facility despite the lack of any new money, (b) require entry into and performance under various Exit Facility documents months before any confirmation, and (c) provide various protections and benefits to the Secured Parties, including liens and superpriority claims, and waivers of certain rights and remedies.

## I.     Debtors Have Not Met Their High Burden for Granting the Roll-Up.

43.     The Debtors seek to obtain financing under the DIP Facility pursuant to sections 364(c) and 364(d) of the Bankruptcy Code. DIP Motion, ¶ 45. A debtor must meet a very high bar to allow this relief under any standard of review. *In re First South Sav. Ass'n*, 820 F.2d 700 (5th Cir. 1987). Bankruptcy courts often require a showing of, among other things, that the "credit transactions are necessary to preserve assets of the estate" and "terms of the transactions are fair, reasonable and adequate, given the circumstances of the debtor." 3 COLLIER ON BANKRUPTCY ¶ 364.04[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *see, e.g., In re Crouse Group, Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) ("A similar combination of clear findings on the necessity of the funds, an absence of alternatives, and a weighing of the wisdom of the funding agreements is included in other cases approving lending pursuant to 11 U.S.C. § 364(c).").

44.     In *Farmland*, the bankruptcy court listed, amongst others, the following factors, "the credit transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the Debtors' businesses" and "the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower

and the proposed lender." *In re Farmland Industries, Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003). In other words, for the *relatively* ordinary post-petition financing, to the extent that there is a request for superiority claims or priming liens, a debtor must show that the financing is necessary, essential and appropriate, and lacking alternatives, and subject to fair, reasonable and adequate terms.

45.     The hallmark of approved roll-ups under post-petition financing is the contribution of substantial sums of new money. In *ATP Oil & Gas Corp.*, this Court approved a DIP facility in the amount of over $600 million, where approximately $225 million was new money. *In re ATP Oil & Gas Corp.,* Case No. 12-36187, ECF Doc. No. 440 (Bankr. S.D. Tex., Nov. 21, 2012) (the "ATP DIP Order"). To provide $225 million of new money, for a debtor in desperate need for capital, is certainly a significant consideration to obtain the extraordinary relief of a roll-up. In fact, a search of roll-ups provides that perhaps even the most aggressive roll-ups include sizable amounts of new money provided as part of the transaction. In *RadioShack Corp.,* the Delaware bankruptcy court approved a DIP facility in the amount of over $285 million, where $20 million was new money and $15 million of letter of credit availability. *In re RadioShack Corp.,* Case No. 15-10197, ECF Doc. No. 947 (Bankr. D. Del., March 12, 2015) (the "RadioShack DIP Order"). In fact, the three roll-ups cited by the Debtors each included significant amounts of new money.  The beneficiaries of the roll-up here are not lending any new money to the Debtors.

46.     In fact, the Debtors do not require any new financing. "Debtors did not require postpetition financing due to their sufficient cash position...." D'Souza Declaration, ¶ 40. As *Farmland Industries* makes clear, to obtain approval of the DIP Facility, the Debtors would need to show that the DIP Facility, including the Roll-Up was "necessary, essential and appropriate."

It is unclear, what business justification exists to roll-up $315 million in prepetition debt or why such roll-up is essential or appropriate, where the Debtors admit that they have sufficient cash to operate the business.

47.     The Debtors also assert that section 363(b) of the Bankruptcy Code permits roll-ups but admit the doctrine of necessity. As the Fifth Circuit provides, albeit in the context of a sale under Section 363 of the Bankruptcy Code, approval requires "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986). The Debtors, however, have simply not articulated business justification nor shown how there is any current necessity.

48.     The Debtors have over $170,000,000 in cash on hand. The RBL is fully drawn. The "necessity" the Debtors are asserting is with respect to the Exit Facility. "The Debtors believe that the Exit Commitment Parties would not have agreed to provide the Exit Facility without the Roll-Up." DIP Motion, ¶ 58.   But the availability of other future financing is untested, just as is any structuring of an exit under the Bankruptcy Code.  In assessing financing in May 2018 or earlier, a number of lenders tendered financing term sheets.  Here, the facts do not justify the application of the necessity doctrine to roll up the RBL debt.

49.     The Debtors assert that the (i) Exit Facility of $629 million, (ii) consent to use Cash Collateral, and (iii) commitment to support the Approved Plan, is sufficient to justify the Roll-Up. The Debtors fundamentally misunderstand the extraordinary remedy that a Roll-Up is. The Exit Facility is simply a continuation of the RBL, which is fully drawn. The provision for continuation of a fully funded RBL does not provide the Debtors with any additional benefit. Further, the commitment to support an Approved Plan is of limited, if any benefit.

50.     To support a plan of reorganization, which substantially benefits a party other than the Debtors, is not a benefit for the Debtors. First, as a first-lien secured creditor not subject to impairment under the current proposal, the RBL Lenders are presumed to accept the plan of reorganization, and therefore, not entitled to vote on the plan, which makes support of the plan without any value. Second, the Debtors cite use of cash collateral. While, undoubtedly, that is a benefit, the question is whether the Debtors could otherwise obtain authority to use cash collateral. Given that the Debtors contend that the RBL Lenders are substantially oversecured (and as evidence, the Debtors assert that the borrowing base is twice the outstanding amount), it is reasonable to expect that cash collateral authority would be granted under Section 363 of the Bankruptcy Code based on the substantial equity that exists vis-à-vis the secured claim of the RBL Lenders and the collateral securing their claim.

51.     Finally, the Debtors boldly assert that the Roll-Up will not prejudice the Debtors' stakeholders, DIP Motion, ¶ 5, and that "the Roll-Up has a negligible (if any) impact on such secured lenders' rights." *Id.*  The Debtors, however, fail to properly disclose the real detriment from the Roll-Up to the Debtors. Without the Roll-Up, the RBL Lenders would comprise a prepetition secured obligation, which could be treated as provided under Section 1129 of the Bankruptcy Code. With the Roll-Up, however, the rolled-up claims comprise superpriority administrative expense claims; this means they must be cashed out at exit, or risk foreclosure, and which substantially reduce the options the Debtors have. *See Official Committee of Unsecured Creditors of New World Pasta Co. v. New World Pasta Co.*, 322 B.R. 560, 569 n.4 (M.D. Pa. 2005) (noting that roll-up provisions "have the effect of improving the priority of a prepetition creditor").  The Roll-Up prejudices the Debtors and their unsecured creditors by

substantially enhancing the RBL Lenders rights without any corollary benefit to the Debtors' estates or the other creditors.

52.     The Court should deny the Roll-Up, as it confers no reasonably equivalent benefit to the Debtors for what is traded away. Further, unlike in many cases where the Roll-Up is tied to new money necessary for a debtor to survive, here, the Court can authorize use of Cash Collateral, providing the Debtors sufficient liquidity, as they themselves admit.

**II.     The Court Should Not Approve the Exit Facility through the DIP Motion.**

53.     Without first obtaining approval of a disclosure statement, a debtor may not solicit agreement from creditors and parties in interest on their treatment under a plan of reorganization. Congress and the courts have developed protections for minority or dissenting creditors during the bankruptcy process to protect due process rights.  In *Braniff*, the Fifth Circuit specifically addressed where pre-plan provisions "had the practical effect of dictating some of the terms of any future reorganization plan.... The debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan sub rosa in connection with a sale of assets." *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983).  Here, of course, there is not a sale under Section 363 of the Bankruptcy Code, but rather a request for approval of the DIP Motion under Section 364 of the Bankruptcy Code. The cautionary requirements of the Fifth Circuit, however, apply just the same.

54.     The Debtors seek authority of the Court to "to enter into and perform under the Exit Financing Agreements and to incur and satisfy the Exit Facility Fees." DIP Motion, ¶ 73. The Debtors, however, simply side-step the concern that exit financings should be addressed as part of a plan of reorganization. Notwithstanding whether the terms and fees related to the Exit

Facility for so much of what was done prepetition are appropriate, there is no attempt made by the Debtors to justify the procedure used. Even assuming the Exit Facility is reasonable and appropriate, it is unreasonable for the Debtors to agree to the Exit Facility through the DIP Motion and substantially in advance of plan confirmation.

55.     Two of the most important components of any plan of reorganization is treatment of prepetition creditors and exit financing. With respect to the treatment of prepetition creditors, if the DIP Motion is approved, the Debtors would convert 50% of the prepetition RBL debt obligation to a postpetition superpriority claim, which must be paid in full on the Effective Date of what the RBL considers an "Acceptable Plan", which presumably now comprises the Debtors' Apollo backed plan, and given the size of the Roll Up effectively dictates the plan treatment of almost all classes of creditors.

56.     Once approved under the DIP and Backstop Motions, the Debtors are committing to use the Exit Facility, as the Debtors will have obligated themselves to pay substantial (undisclosed due to being filed under seal) amounts of fees for the Exit Facility. These benefits, are of course, being provided at the tremendous detriment to the general unsecured creditors, who are to receive only 1% of predilution new equity, with huge dilution resulting from the allocations of the new equity to insiders.

57.     The Court should also analyze the consequences of approving the DIP and the Backstop Motion on the Debtors and any party in interest's ability to fully explore alternatives to the insider plans during the chapter 11. Granting the relief requested in the two combined ensures the practical foreclosure of any alternative terms for a plan of reorganization. Even a fiduciary out does not help: any alternative plan would need to pay off in full approximately $315 million on the effective date of any such alternative plan. The Court should deny the Exit Facility as

premature and an improper restraint on the Debtors' ability to fulfill their fiduciary obligations to all creditors.

### III.  Debtors Cannot Hide Behind the Business Judgment Rule to Seek Unreasonable Relief.

58. The Debtors seek improper shelter under the business judgment rule to prosecute the DIP and the Backstop Motion. The MSB Royalty Owners contend that the Debtors fall outside the protections of the business judgment rule because the process and the outcome derived is permeated with insider representatives of substantial equity owners who also have been busy buying up large swaths of secured debt in the traches below the RBLs.

59. The emerging facts create very large doubts that the process Special Committee employed was "fair" in any sense, that the Special Committee properly considered all options as one would expect or that the Special Committee did anything other than implement a predetermined effort to pursue the insider sponsored plan.  The web of insider connections between several substantial sponsors, equity owners, creditors and the Debtors' management and board of directors is considerable.  An attempt to illustrate such connections as were available publicly for the time when the Special Committee was formed is attached as **Exhibit A**.  It remains to be determined if further discovery for the period before June 2019 might uncover still more conflicts.

60. Despite the Debtors' creation of a so-called Special Committee that began operating after June 3, 2019, and apparent delegation of authority to act on behalf of the Debtors, the influence of insider relationships from before this continued, which seems apparent from records that are concealed under broad protective designations of confidentiality of all documents, even if incomplete for any period before June, and which do <u>not</u> include exchanges between parties before July 2019.

61.     Based on the twin pillars that (a) the restructuring process, which is partially embodied in the DIP-to-Exit facility conceptually commenced in advance of the so-called Special Committee, and (b) the so-called Special Committee may not have been entirely independent given the influence that the status quo ante had on the Special Committee, the default business judgment standard should not be utilized, but rather the transaction should be subject to the entire fairness standard. Delaware law is clear. Where board members "confronted actual conflicts of interest such that the directors making the decision did not comprise a disinterested and independent board majority" the entire fairness standard is appropriate. *In re Trados Inc. Shareholder Litig.*, 73 A.3d 17, 36 (Del. Ch. 2013). Further, entire fairness requires "both (i) fair dealing and (ii) fair price, *examined together as a whole*." *In re Broadstripe, LLC*, 444 B.R. 51, 106 (Bankr. Del. 2010). In other words, both the process and the results need to be examined.

62.     Here, the process was to allow a board of directors, which was to a significant extent comprised of directors with substantial connections to substantial controlling equity owners and creditors, to propose the DIP Facility and the overall structure of the reorganization which benefits those same owners and creditors. Further, the *price* or result sought here requires a substantial benefit to the RBL Lenders, all in the hopes of forcing the ultimate solution of providing disparate percentage of new equity to creditors holding unsecured claims and providing a nominal percentage of new equity to other general unsecured creditors.

63.     The Debtors emphasize that their business judgment should be given enormous deference. However, even if applicable, business judgment is not *carte blanche*. As the Debtors cited themselves, "cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the

financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in interest." *In re Ames Dept. Stores, Inc.*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990). The Debtors also assert that deference should be given to their "*sound* business judgment," and only if the DIP Motion "does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code…" DIP Motion, ¶ 42.

64.     Here, however, the Debtors are improperly seeking to obtain a benefit that leverages approval of the Exit Facility under the plan sponsored with insider benefits, together with associated fees, without a plan of reorganization ever being solicited or confirmed or consummated. This type of DIP Facility and Exit Facility does, in fact, leverage the bankruptcy process and powers, and there is, at least, uncertainty in whether the Debtors benefit from entering into these transactions at this juncture.

**IV.     Debtors are Seeking Unreasonable Provisions in the Proposed DIP Order.**

65.     In addition to the substantive issues addressed above, the proposed DIP Order is replete with problematic provisions which should not be approved. Specifically, (1) Adequate Protection Liens, DIP Liens and DIP Superpriority Claims on Unencumbered Property, including proceeds of Avoidance Actions, (2) certain Cash Collateral Events of Default and DIP Events of Default, (3) remedies with respect to an event of default, (4) waiver of marshalling, (5) waiver of surcharge and the equities of the case exception, and the (6) Challenge Period.

*i.     Adequate Protection Liens, DIP Liens and 507(b) Claims on Unencumbered Property*

66.     The Proposed DIP Order defines Unencumbered Property broadly and includes general intangibles, which would include commercial tort claims, and proceeds of Avoidance Actions. *See* Proposed DIP Order, ¶ 9(a)(i)(1). Further, the Proposed DIP Order provides that the

Adequate Protection Liens and the DIP Liens shall encumber the Unencumbered Property, and the 507(b) Claims and the Superpriority Claims may be paid from all of the Debtors prepetition and postpetition property, including proceeds of Avoidance Actions. *See* Proposed DIP Order, ¶¶ 9(a)(i)(1), 9(a)(ii), 9(b)(i)-(ii), 9(c)(i)-(ii), 11(a), 12.

67.     The Debtors have discussed proposing a plan of reorganization that purports to treat the general unsecured creditors with just 1% predilution of the equity in the Reorganized Debtors. It seems to be the case, however, that potentially a material amount of Encumbered Assets are being provided as adequate protection to the various prepetition lenders. It seems incongruent to allow such leakage of potential value, where the Debtors are intending to pay interest, and at least certain tranches of prepetition lenders may be fully secured.

68.     Further, as the Roll-Up already provides substantial benefit in the form of administrative expense claims which must be paid in full upon a confirmation of the plan, it seems unnecessary to provide additional value in the form of DIP Liens and Superpriority Claims that may be payable from Unencumbered Assets.

   ii.     *Cash Collateral Events of Default and DIP Events of Default*

69.     The Proposed DIP Order proposes, amongst others, a Cash Collateral Events of Default, for the appointment of an examiner. Proposed DIP Order, ¶ 14(a)(xiii). Section 1104(c) of the Bankruptcy Code provides that an examiner may be appointed for "investigation of the debtor as is appropriate…" under certain circumstances. 11 U.S.C. § 1104(c). It is unclear why a potential appointment of an examiner who would be tasked with investigation would result in a Cash Collateral Event of Default, entitling the RBL Lenders to substantial remedies.

70.     The Proposed DIP Order also includes certain DIP Events of Default which are incorporated by reference to the DIP Credit Agreement. Proposed DIP Order, ¶ 14(d).

A.    The DIP Credit Agreement also contains a default for the appointment of an examiner. DIP Credit Agreement, § 11.11(c). As discussed above, this is unnecessary, as the examiner would only be entitled to conduct an investigation.

B.    The DIP Credit Agreement contains a provision providing for a default in the event that the Court allows a third party to proceed against assets having a value in excess of $25,000,000. DIP Credit Agreement, § 11.11(f).  This seems an invitation for default for an operation of this size, and particularly seems to be potentially tripped by any favorable outcome for the MSB Royalty Owners on their claims.  As such, this amount should not be approved, or it predestined the case for failure if indeed the MSB Royalty Owners continue to prevail on their claims.

C.    The DIP Credit Agreement contains a provision providing for a default if an order is entered by the Court requiring disgorgement of amounts received by the Administrative Agent or the Lenders under the Credit Documents. DIP Credit Agreement, § 11.11(h)(iii). There should be no default in the event that certain payments are made, but it is later successfully shown that any group of lenders received a payment it was not entitled to under a valuation of the assets. Further, the DIP Motion expressly provides that "all arguments [are] preserved as to the treatment of such cash payments under a chapter 11 plan" at least with respect to "cash payments in the form of postpetition interest…." DIP Motion, ¶ 4. The Court should strike this DIP Event of Default, at least to the extent that there is a preservation with respect to recharacterization or disgorgement due to subsequent valuation.

D.     The DIP Credit Agreement contains a provision creating a DIP Event of Default where the Debtors file a motion for financing under Section 364(d) of the Bankruptcy Code. DIP Credit Agreement, § 11.11(h)(iv). The Debtors state in the DIP Motion that the DIP Facility is oversecured. *See* DIP Motion, ¶ 19 ("In April 2019, the Borrowing Base was reaffirmed at approximately $1.36 billion…."). Discovery has revealed that the so-called enterprise value underpinning the Debtors' described by not yet filed plan presumed a value of $2.5 billion—but this remains arbitrary and not tested.

E.     The DIP Credit Agreement also creates a DIP Event of Default with respect to surcharge of collateral pursuant to Section 506(c) of the Bankruptcy Code. DIP Credit Agreement, § 11.11(h)(v). In addition to and as described below with respect to the Proposed DIP Order, this provision should not be granted with respect to any parties objecting to the DIP Motion

iii.     *Remedies with respect to Events of Default*

71.     The Proposed DIP Order provides that upon a Cash Collateral Event of Default, the RBL Agent need only provide five (5) business days' notice for termination of use of Cash Collateral, subject only to the Debtors' right for a hearing on whether such default has occurred. Proposed DIP Order, ¶ 14(c). The Court should provide that the Debtors or other parties in interest can show cause as to why Cash Collateral usage should not be terminated, and/or the Debtors should be able to seek use of Cash Collateral through Court order and providing adequate protection.

72.     The Proposed DIP Order also provides that upon a DIP Event of Default, after five (5) business days' notice, the DIP Agent can exercise remedies, with a hearing at which the

only issue that may be raised by any party in opposition is whether a DIP Event of Default actually occurred, and the Debtors waive any right to seek relief including under Section 105 of the Bankruptcy Code. This provision may be excessive in any context, but in the context of a Roll-Up without any new money, this provision should be stricken. Parties should have the right to make any showing to the Court, and the Court should have the right to enforce its order as appropriate.

        *iv.*    *Marshaling*

73.      The Proposed DIP Order provides that in "no event shall the DIP Agent, the DIP Lenders or the Prepetition Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine…." Proposed DIP Order, ¶ 14(d). This provision is included with respect to DIP Events of Default. It is unclear how the Prepetition Secured Parties should be carved-out of the potential application of the doctrine of marshaling due to an event of default under the DIP Facility. Further, due to the specific context of the Roll-Up, even if granted, it should not have the typical benefits associated with new money DIP financing. The Court should strike the prohibition on the application of marshaling, if warranted and successful.

        *v.*    *Surcharge and Equities of the Case*

74.      Various provisions of the Proposed DIP Order provide for waivers of the right to surcharge and the equities of the case exception. *See* Proposed DIP Order, ¶¶ 9(a)(i)(4), 11(d), 15, 16. Pursuant to the right to surcharge under Section 506(c) of the Bankruptcy Code, the Debtors can charge the cost of maintenance and disposition onto the lienholder of the collateral. To the extent new money was being provided, a surcharge waiver would be appropriate. Here, however, where the primary beneficiary of the Roll-Up are prepetition lenders providing no new

value, to the extent that such collateral requires substantial resources, it is only appropriate that the unsecured creditors should not bear those expenses.

75.     The equities of the case waiver allow parties to argue that equitable considerations justify excluding certain proceeds from the prepetition lender's collateral. 11 U.S.C. § 552(b). There has been no evidence that the equities of the case waiver is appropriate to be provided here, where the RBL Lenders are receiving substantial benefit, for uncertain consideration. Further, as described above, to the extent the borrowing base provides the Debtors assurance that the RBL Lenders are oversecured, there is no need to waive the few potential avenues for material recovery for the unsecured creditors.

*vi.     Challenge Period*

76.     The Proposed DIP Order provides a Challenge Period for parties in interest of only sixty (60) days from the entry of the Proposed DIP Order. Proposed IDP Order, ¶ 21(a). The MSB Royalty Owners submit that this period is far too short for such a complex case, with complex capital structure and billions of dollars of asset and liabilities.  The Court should change this provision to be 90 days and permit it to be subject to extension for cause shown.

**V.     MSB Royalty Owners Provisions and Reservation of Rights.**

77.     MSB Royalty Owners assert that any liens granted under the Proposed DIP Order be without prejudice to their rights or superpriorities, and certainly not encumber this property. Furthermore, any amounts payable pursuant to all payments required under the MSB O&G Leases, including the Royalties and Lease Judgment, and monies owed from the Allocation Wells should remain beyond any liens granted in any order approving the DIP Motion.

78.     The MSB Royalty Owners expressly reserve the right to supplement and amend this Objection, seek discovery with regards to the same, and introduce evidence at any hearing(s) related to the DIP Motion.

WHEREFORE, the MSB Royalty Owners requests that the Court (i) sustain this Objection, (ii) not grant the DIP Motion, and (iii) grant such other relief as the Court deems just and proper.

Dated:  November 15, 2019                KYUNG S. LEE PLLC

                                         By: /s/ Kyung S. Lee _____
                                         Kyung S. Lee
                                         4723 B Oakshire Dr.
                                         Houston TX 77027-5499
                                         Telephone: (713) 301-4751
                                         Fax: (713) 301-4751
                                         E-mail: kslee50@gmail.com

                                         COUNSEL FOR THE MSB ROYALTY OWNERS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on November 15, 2019.

*/s/ Kyung S. Lee*
Kyung S. Lee

**Exhibit A**

**Debtors' Board Connections Chart**

## BOARD CONNECTIONS TO APOLLO[1]
### Per Exhibit 5 EP 10K 13 members, and 5 appointed by Apollo

| BOARD MEMBER | APOLLO |
|---|---|
| Alan R. Crain, Chairman and Special Committee member | Yes, appointed to EP board by Apollo in May 2017 |
| Russell E. Parker, also CEO | Yes, CEO of Phoenix Natural Resources LLC (EP board members Gregory Beard & Scott Browning previously on the board) from March 2016 until October 2017, Apollo owned company |
| J. Barton Kalsu, Special Committee | Yes, appointed to EP board January 2018.  Previously served on the board of Athlon Energy Inc. (Gregory Beard, Wilson Handler, Robert Reeves & Rakesh Wilson were also on the board).  Kalsu, Reeves, Beard, Wilson, and Handler are all codefendants in Delaware chancery suit involving Athlon transaction. |
| Gregory A. Beard | Yes, Apollo Global Head of Natural Resources and Senior Partner since June 2010, and on EP board since August 2013; Concurrently also serves as a director on the boards of: Spartan Energy Acquisition Corp (chairman) (with EP board member Robert Reeves), a "blank check" company sponsored by Apollo; Caelus Energy Alaska LLC, Apollo owned; CSV Midstream Solutions GP LLC[2] (with EP board members Wilson Handler & Rakesh Wilson); Double Eagle Development LLC, also Apollo backed; Jupiter Resources GP LLC (with EP board members Wilson Handler, Rakesh Wilson & Carol Flaton), backed by Apollo; Apex Energy , LLC, in a strategic partnership with Apollo; Northwoods Energy LLC, backed by Apollo; Pegasus Optimization Partners, LLC (with EP board member Scott Browning), affiliated with Apollo; Roundtable Energy Holdings, LLC, funded by Apollo; DoublePoint Energy, LLC, owned by Apollo; Talos Energy Inc. (with EP board members Rajen Mahagaokar & Robert Tichio. Rakesh Wilson was previously on the board of Talos Energy), also Apollo owned; also previously on board of Apollo affiliates Phoenix Natural Resources Holding, LLC (EP |

---

[1] Source of information is public website information and reporting for listed companies and in places revealed in depositions for deposed witnesses; where entry is shaded yellow the information was revealed in depositions that are UNDER SEAL and therefore to be redacted absent consent from Debtors, which has not been obtained at the time of public use of this document.

[2] Previously backed by Apollo, CSV Midstream Corp. was reported sold to Northleaf Capital Partners in 2019.

| | |
|---|---|
| | board member Scott Browning previously on the board & EP board member Russell Parker previously CEO) and Athlon Energy Inc. (Barton Kalsu, Wilson Handler, Robert Reeves & Rakesh Wilson were also on the board), each affiliate to Apollo. In addition, he previously served as a director of NRI Management Group, LLC, and Pinnacle Agriculture Holdings, LLC, both backed by Apollo. Kalsu, Reeves, Beard, Wilson, and Handler are all codefendants in Delaware chancery suit involving Athlon transaction. |
| Scott R. Browning | Yes, member of Apollo's natural resources group since 2014; appointed to EP board by Apollo in June 2016; also currently serves on the board of directors for Express Energy Services (with EP board member Rakesh Wilson), Momentum Minerals, LLC, Pegasus Optimization Partners, LLC (with EP board member Gregory Beard), and Tidewater Logistics, all are affiliates to Apollo; previously on board of Phoenix Natural Resources Holding, LLC (EP board member Gregory Beard previously on the board & EP board member Russell Parker previously CEO), an affiliate to Apollo |
| Carol Flaton, Special Committee | On EP board since May 1, 2019; [REDACTED DUE TO PROTECTIVE ORDER]; formerly served on Apollo affiliate Jupiter Resources (with EP board members Gregory Beard, Wilson Handler & Rakesh Wilson) while a Zolfo employee from 8/2018 to 11/2018. [REDACTED DUE TO PROTECTIVE ORDER] |
| Jae Hwii Gwag | None located. |
| Wilson B. Handler | Yes, with Apollo since 2011, and on EP board since November 2013; also on board of Wolfkamp Drillco, LLC (with EP board member Rakesh Wilson), owned by Apollo and to be Apollo contributed entity under proposed plan to gain new equity dilutive to others; Currently, Wilson Handler serves on the board of directors for American Petroleum Partners, LLC (with EP board member Rakesh Wilson), CSV Midstream Solutions GP LLC (with EP board members Gregory Beard & Rakesh Wilson), Jupiter Resources GP LLC (with EP board members Gregory Beard, Rakesh Wilson & Carol Flaton), and Resource Energy Partners, LLC (with EP board member Rakesh Wilson), all affiliates to Apollo; previously on board of Athlon Energy Inc. (Gregory Beard, Barton Kalsu, Robert Reeves & Rakesh Wilson were also on the board). In addition, Kalsu, |

3

| | |
|---|---|
| | Reeves, Beard, Wilson, and Handler are all codefendants in Delaware chancery suit involving Athlon transaction. |
| Rajen Mahagaokar | No, a principal of shareholder Riverstone Holdings, LLC; on EP board since November 2017, also on the board of Talos Energy Inc (with EP board members Gregory Beard & Robert Tichio. Rakes Wilson was previously on the board of Talos Energy), an Apollo affiliated company. |
| Robert C. Reeves | Yes, appointed to EP board in December 2017. Previously board chairman, president and CEO of Athlon Energy Inc. (Gregory Beard, Wilson Handler, Barton Kalsu & Rakesh Wilson were also on the board) from its formation in December 2010 until its sale to Encana for $7.1 billion in November 2014.[3] Next served on board of Spartan Energy Acquisition Corporation (with EP board member Gregory Beard), a SPAC owned by Apollo affiliate. Kalsu, Reeves, Beard, Wilson, and Handler are all codefendants in Delaware chancery suit involving Athlon transaction. |
| Robert M. Tichio | Yes, while a partner of shareholder Riverstone Holdings, LLC, he is on board of Talos Energy, Inc. (with EP board members Gregory Beard & Rajen Mahagaokar. Rakesh Wilson was previously on the board of Talos Energy) which since 2012, Talos announced that Apollo and Riverstone committed up to $600 Million to form a new company focusing on O&G opportunities in the Gulf Coast and Gulf of Mexico.; on EP board since September 2013 |
| Donald A. Wagner | No, a Managing Director of shareholder Access Industries, Inc., and on EP board since August 2013 |
| Rakesh Wilson | Yes, Senior Partner of Apollo since 2009, and on EP board since August 2013; also on board of Wolfkamp Drillco, LLC (with EP board member Wilson Handler), owned by Apollo and to be Apollo contributed entity under proposed plan to gain new equity dilutive to others; also serves on other Apollo affiliate boards including CSV Midstream Solutions GP LLC (with EP board members Gregory Beard & Wilson Handler); Jupiter Resources GP LLC (with EP board members Gregory Beard, Wilson Handler and Carol Flaton); American Petroleum Partners LLC (with EP board member Wilson |

---

[3] An independent director at Solar Winds [Bingle] now with Silver Lake is ex Apollo, per Solar Winds S-1 in 9/2018.

| | |
|---|---|
| | Handler); Resource Energy Partners, LLC (with EP board member Wilson Handler); Express Energy Services, LLC (with EP board member Scott Browning); previously on board of Athlon Energy Inc. (Gregory Beard, Wilson Handler, Robert Reeves & Barton Kalsu were also on the board), Parallel Petroleum and Talos Energy, LLC (Gregory Beard, Rajen Mahagaokar & Robert Tichio are currently on the board of Talos Energy), Apollo affiliated entities.  Kalsu, Reeves, Beard, Wilson, and Handler are all codefendants in Delaware chancery suit involving Athlon transaction. |