IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| EP ENERGY CORPORATION, *et al.*, | § | Case No. 19-35654 (MI) |
| | § | |
| | § | (Jointly Administered) |
| Debtors.[1] | § | |
| | § | |

CONDITIONAL LIMITED OBJECTION OF THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS TO MOTION OF DEBTORS FOR FINAL ORDER
(I) AUTHORIZING USE OF CASH COLLATERAL; (II) AUTHORIZING DEBTORS
TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING;
(III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING
ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES;
(V) AUTHORIZING DEBTORS TO ENTER INTO AND PERFORM UNDER EXIT
FINANCING AGREEMENTS; AND (VI) GRANTING RELATED RELIEF
[Relates to Docket No. 182]

The Official Committee of Unsecured Creditors (the "***Committee***") appointed in

the above-captioned chapter 11 cases of EP Energy Corporation ("***EP Energy***") and its affiliated

debtors and debtors-in-possession (collectively, together with EP Energy, the "***Debtors***") hereby

files this conditional limited objection (the "***Limited Objection***") to the *Motion of Debtors for*

*Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior*

*Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims;*

*(IV) Granting Adequate Protection to Prepetition Secured Parties; (V) Authorizing Debtors to*

*Enter Into and Perform Under Exit Financing Agreements; and (VI) Granting Related Relief*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' mailing address is 1001 Louisiana Street, Houston, TX 77002.

[Docket No. 182] (the "***DIP Motion***").[2]   In support of this Limited Objection, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1.       Since its formation three weeks ago, the Committee and its professionals have undertaken best efforts to conduct necessary due diligence and get up to speed as quickly and as efficiently as possible.  The Committee has also adopted a strategic approach to these cases, and has sought to narrow the issues necessary to be brought before the Court, so as not to embroil these cases in wasteful litigation that might otherwise divert the Court's attention from the central issue of these cases—namely, the Debtors' attempt to fast-track a plan proposal (the "***Plan Proposal***") that delivers extraordinary returns and outsized recoveries to two of its equity sponsors but offers general unsecured creditors close to nothing.

2.       To that end, the Committee undertook a careful and objective analysis of the relief requested in the DIP Motion, identified a number of controversial terms, and successfully negotiated a modified form of DIP and cash collateral order (the "***DIP Order***"), as reflected in the redline order attached hereto as Exhibit A, that addresses the Committee's concerns, to which the RBL Agent has consented.[3]   Specifically, the Committee's concerns focused primarily upon the following: (a) the roll-up of 50% of the RBL Loans, even though the Debtors admittedly do not need postpetition financing and have sufficient cash on hand to fund operations and administer these cases, (b) the potentially adverse impact of entry into an exit facility commitment upon an alternative plan process, in light of the fact that the capital needs of the business have not yet been verified and the pro forma capital structure is expected to be

---

[2]   Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the DIP Motion.

[3]   Counsel to the Committee sent the agreed-upon changes to the DIP Order to counsel to the Debtors on Sunday evening, November 10.  However, the Committee did not receive a meaningful response from the Debtors until 2 hours before the objection deadline, thereby necessitating the filing of this Limited Objection.

heavily disputed, (c) the upfront approval of significant DIP-related fees on account of a facility that offers no incremental credit, and the incurrence of exit commitment fees at this early stage of the cases, (f) the unnecessary cash adequate protection payments, in the form of post-petition interest, to certain secured noteholders, (g) the inappropriate granting of liens on proceeds of avoidance actions, (h) substantial limitations upon the Committee's fiduciary duty to properly investigate the liens and claims of the prepetition secured parties (including proponents of the Plan Proposal that hold a significant amount of secured debt), and (i) the excessive waivers under Sections 506(c) and 552(b) of the Bankruptcy Code and the waiver of the equitable doctrine of marshalling being offered to the prepetition secured noteholders for no consideration.  These provisions, particularly when viewed in the context of the Debtors' singular focus on jamming through the Plan Proposal, would substantially prejudice the Committee and general unsecured creditors right from the start.

3.      Fortunately, after extensive negotiations with the RBL Agent, the Committee has obtained the consent of the RBL Agent for the modified terms of the proposed DIP Order, as described in more detail below, that adequately address the Committee's concerns. This resolution (subject to this Court's approval), would pave the way for the Debtors' entry into exit facility commitments that are not tied to the Plan Proposal, and would provide for the continued usage of cash collateral and adequate protection to the prepetition secured parties upon fair and equitable terms.  Accordingly, the Committee respectfully requests that the Court condition its approval of the DIP Motion upon the modifications described herein and enter a modified form of DIP Order that incorporates the redline changes attached hereto.

## RELEVANT BACKGROUND

### I.   General Background

4.   On October 3, 2019 (the "**_Petition Date_**"), the Debtors each filed a voluntary petition for relief under title 11 of the United States Code (the "**_Bankruptcy Code_**") in the United States Bankruptcy Court for the Southern District of Texas.

5.   On October 21, 2019, the Office of the United States Trustee for Region 7 appointed the following members to the Committee: (a) Wilmington Trust, N.A.; (b) Wilmington Savings Fund Society, FSB; (c) Rene R. Barrientos, Ltd.; and (d) Antora Peak Capital Management LP.  The Committee selected Stroock & Stroock & Lavan LLP, as lead counsel, Polsinelli PC, as local counsel, and Pachulski Stang Ziehl & Jones LLP, as conflicts counsel. The Committee also selected Jefferies LLC, as investment banker, and AlixPartners LLP, as financial advisor.

### II.   Prepetition Capital Structure

6.   As of the Petition Date, the Debtors' funded debt obligations consisted of the following:[4]

| Debt | Principal Amount Outstanding |
|---|---|
| Reserve-based revolving loans (the "**_RBL Facility_**") | $629 million |
| 7.750% Senior Secured Notes due 2026 (the "**_1.125L Notes_**") | $1 billion |
| 8.00% Senior Secured Notes due 2024 (the "**_1.25L Notes_**") | $500 million |
| 9.375% Senior Secured Notes due 2024<br>8.00% Senior Secured Notes due 2025 (collectively, the "**_1.5L Notes_**") | $2.092 billion |

---

[4]   *See Declaration of David Rush In Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* ¶¶ 48–62 [Docket No. 16] (the "**_First Day Declaration_**").

| Debt | Principal Amount Outstanding |
|---|---|
| *Total Secured Debt:* | *$4.221 billion* |
| 9.375% Senior Unsecured Notes due 2020 | $182 million |
| 7.750% Senior Unsecured Notes due 2022 | $182 million |
| 6.375% Senior Unsecured Notes due 2023 | $324 million |
| *Total Unsecured Notes (collectively, the "**Unsecured Notes**"):* | *$688 million* |

7.     The Debtors are defendants in "numerous" civil actions that may give rise to "substantial" unsecured claims, and also owe an unspecified amount to certain of their vendors.  *See* First Day Declaration ¶ 62.  When coupled with the deficiency claims implied under the Plan Proposal, *the general unsecured claims pool could exceed $2.4 billion*.

**III.     Plan Proposal**

8.     On October 18, 2019, the Debtors announced that they had entered into a plan support agreement ("***PSA***") with (a) Apollo Global Management ("***Apollo***"), the Debtors' largest equity sponsor and significant holder of the 1.5L Notes and the 1.25L Notes, (b) Access Industries, Inc. ("***Access***"), another equity sponsor, (c) Elliott Management Corporation, one of the largest 1.25L Noteholders, and (d) Avenue Capital Group (collectively, the "***PSA Parties***"), with respect to a plan of reorganization upon the terms set forth in the plan term sheet annexed to the PSA (the "***Plan Term Sheet***").[5]  *See* EP Energy Corp., Current Report (Form 8-K) (Oct. 21, 2019).

---

[5]     *See* First Day Declaration ¶ 42.  Apollo holds 39.0%, Access holds 13.7%, Korean National Oil Corporation holds 12.3%, and Riverstone Holdings, LLC holds 12.3% of EP Energy's Class A common stock; the remaining 22.7% of shares are held by other shareholders.  *See id.* In addition to their roles as equity sponsors, representatives of Apollo and Access also sat  on the Debtors' board of directors.  *See* Board of Directors, EP Energy,  http://www.epenergy.com/about/board-of-directors.html (last  visited Nov. 14,  2019) (identifying directors Gregory A. Beard, Scott R. Browning, Wilson B. Handler and Rakesh Wilson as Apollo employees, and identifying Donald A. Wagner as an Access employee).

9.      Collectively, the PSA Parties own approximately 52.0% of the 1.25L Notes and approximately 79.3% of the 1.5L Notes. *Id.* It therefore comes as no surprise that the Plan Term Sheet reflects a "stipulated equity value" that conveniently places the 1.5L Notes, which are currently trading at 2 cents on the dollar, as the fulcrum security and drives outsized value to that class and the 1.25L Notes.

10.      The Plan Term Sheet generally proposes (a) the conversion of the RBL Facility into a $629 million exit facility, (b) the reinstatement of the 1.125L Notes and the 1.25L Notes, (c) the distribution of 99% of the new stock to be issued by reorganized EP Energy to the holders of the 1.5L Notes, along with subscription rights to acquire shares of new equity to be offered in a rights offering, and (d) the distribution of 1% of the new equity (subject to substantial dilution) to all general unsecured creditors, representing a recovery of approximately 0.07%.  The subscription rights being offered to the 1.5L Noteholders entitle the holders to purchase new shares at a ***substantial 35%*** discount to the stipulated equity value.

11.      In addition, the equity sponsors stand to benefit from other related party transactions contemplated in the Plan Term Sheet, including (a) the potential contribution by Apollo and Access of their equity interests in a joint venture to the Debtors in exchange for additional shares of new equity of reorganized EP Energy, with little additional information on the terms of that transaction being provided, and (b) a cash payment of $500,000 (representing approximately one-third of the value of the distribution to the general unsecured class) to existing EP Energy equity holders on account of certain tax attributes of unproven benefit to the Debtors' estates, representing additional value being diverted to the equity sponsors. *See id.* Ex. 10.1.

12.     Under the Backstop Agreement (as defined in the Plan Term Sheet), each of the PSA Parties stand to gain further as a result of, among other things, new money opportunities at significant discounts, an outsized commitment fee payable in shares (at a significant discount), the right to exchange 1.25L Notes (currently trading at 43 cents on the dollar) at face value to purchase backstop shares (again, at a significant discount), reimbursement of professional fees (including investment bankers and financial advisors) and the suppression of competing offers by virtue of a no-shop provision and $26 million cash break-up fee, which would make any alternative transaction prohibitively more expensive).

13.     General unsecured creditors, however, would receive close to nothing.

## CONDITIONAL LIMITED OBJECTION

14.     As noted above, the Debtors' proposed Roll-Up, entry into the exit facility commitments, and payment of DIP and exit related fees should not be approved absent appropriate modifications to the DIP Order (which has been consented to by the RBL Agent and are summarized below).

**I.      The Roll-Up and Payment of DIP and Exit Related Fees Should Not Be Approved Absent Modifications to the DIP Order**

15.     As this Court is well aware, courts disfavor roll-ups.  *See e.g.,* Procedures for Complex Chapter 11 Cases in the Southern District of Texas ¶ 22.  From the outset of these cases, the Debtors acknowledged that they have no need for a DIP facility.  *See* Oct. 4 Hr'g Tr. at 77:16–18 (counsel for the Debtors stating that "[t]he Debtors filed their petitions with approximately $188 million in cash, which is sufficient to operate their business and pay the cost of these Chapter 11 cases").  As demonstrated in the Debtors' 13-week cash flow forecast, the Debtors' businesses are generating positive cash flow (before restructuring costs).  *See* DIP

Motion, Ex. C.  The Debtors have also acknowledged that the DIP Facility does not offer them any incremental liquidity.

16.     Instead, the Debtors admit that the basis for the DIP Facility and the roll-up contemplated thereby is to satisfy a condition imposed by the Prepetition RBL Lenders in exchange for their commitment to provide the Debtors with exit financing.  *See* D'Souza Declaration ¶ 47 ("[T]he Roll-up is a necessary feature of the DIP Facility, as the Exit Commitment Parties would not commit to provide exit financing without it.").  The Debtors rationalize that the roll-up has no adverse impact upon the Debtors' estates because it is economically neutral (if not beneficial), the liens securing the RBL Loans are allegedly perfected and the RBL Loans are significantly over-secured.  *See* DIP Motion ¶ 59.

17.     However, the DIP Motion, if approved, would obligate the Debtors to pay "DIP Arrangement Fees" and certain other fees in respect of a DIP Facility that offer no incremental liquidity.  Moreover, the Committee, at this incipient stage of the cases, has not had the opportunity to investigate the liens and claims asserted by the Prepetition Secured Parties, and must independently do so, particularly given the Plan Proposal currently on the table and in light of the Debtors' apparent abdication of their duty to maximize value.  Nor is the Committee in a position to stipulate as to the value of any collateral at this incipient stage of these chapter 11 cases.  Ultimately, the Committee was concerned with the potential adverse impact of the exit facility commitment upon the Committee's ability to explore an alternative plan proposal.

18.     Despite the unprecedented nature of this roll up, the Committee focused upon the nature and extent of the RBL Lenders' exit facility commitments, and weighed the net benefit of locking in those commitments at this stage, against the attendant costs to the Debtors' estates described above.  As a result of this cost-benefit analysis, the Committee determined that

it would be prepared to support the DIP Motion, subject to certain modifications to the relief sought under the DIP Motion, as reflected in the redline form of order attached hereto, and as described more generally below:

19.     *First,* as a threshold matter, the exit facility commitments must not be tied to the Plan Proposal alone; nor can they otherwise dictate the specific form of an alternative restructuring.  To that end, in order to truly render the exit facility commitment agnostic to an alternative plan process: (i) the RBL Agent has confirmed (and the Debtors should acknowledge) that, although the exit facility term sheet commits the RBL Lenders to support an "Approved Plan," which may *include* the Plan Proposal, such support is *not limited to* the Plan Proposal; rather, any plan structure that meets the minimum cash balance and other maximum debt requirements under (and that is otherwise generally consistent with) the Exit Facility Term Sheet would constitute an Approved Plan; (ii) the cross-default contained in Section 11.11(j) of the DIP Credit Agreement tied to any challenge under the "Prepetition Note Documents" should be removed; (iii) the cash collateral event of default tied to the termination of exclusivity should include a carve-out for an Approved Plan; and (iv) the RBL Lenders should agree that any adequate protection claims they may have under Section 507(b) of the Bankruptcy Code would be deemed waived in the event an Approved Plan is confirmed and becomes effective.

20.     *Second*, any DIP liens granted to the DIP Lenders must exclude avoidance actions or the proceeds thereof.  As explained in more detail below in the adequate protection context, preserving such unencumbered value for general unsecured creditors may prove to be the primary source for any meaningful recoveries to general unsecured creditors.

21.     *Third,* particularly in light of the draconian Plan Proposal, certain modifications to the cash collateral and adequate protection sections of the DIP Order should be

made in order to preserve the Committee's fiduciary mandate and to generally preserve potential sources of recovery to unsecured creditors, as described in more detail in the section below.

## II.     Certain Terms Related to Cash Collateral Usage and Adequate Protection Should Not be Approved Absent Modifications to the DIP Order

22.     As noted above, the Committee respectfully submits that the DIP Motion should not be approved absent the following modifications:

### A.     Avoidance Actions Should Remain Unencumbered

23.     The Debtors seek authorization to grant the Prepetition Secured Parties adequate protection liens on, and superpriority claims that have recourse to, avoidance actions and the proceeds thereof (collectively, including the proceeds thereof, "***Avoidance Actions***"). The encumbrance of Avoidance Actions would be inappropriate, particularly in light of the facts of these cases.

24.     Avoidance actions are statutory rights designed to ensure equitable distributions of a debtor's estate. *See, e.g.*, *Cullen Ctr. Bank & Tr. v. Hensley (In re Criswell)*, 102 F.3d 1411, 1414 (5th Cir. 1997) (noting that avoidance powers under the Bankruptcy Code were created to "facilitate[e] the prime bankruptcy policy of equality of distribution among creditors of the debtor"). Indeed, avoidance powers are intended to allow a debtor in possession or other party with standing to gain recoveries for the benefit of all unsecured creditors. *See Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm Ltd. P'ship IV*, 229 F.3d 245, 250 (3d Cir. 2000). Accordingly, bankruptcy courts customarily restrict a debtor's ability to pledge avoidance actions and their proceeds as collateral. *See, e.g.*, *Gaudet v. Babin (In re Zedda)*, 103 F.3d 1195, 1203 (5th Cir. 1997) ("A trustee's avoidance powers are intended to benefit the debtor's creditors, as such powers facilitate a trustee's recovery of as much property as possible for distribution to the [unsecured] creditors."); *McFarland v. Leyh (In re Tex. Gen.*

10

*Petrol. Corp.*), 52 F.3d 1330, 1335–36 (5th Cir. 1995) ("[T]he proceeds recovered in an avoidance action satisfy the claims of priority and general unsecured creditors before the debtor benefits."); *In re Excel Maritime Carriers, Ltd.*, No. 13-23060 (RDD) (Bankr. S.D.N.Y. Aug. 6, 2013) (ECF No. 133) (excluding avoidance actions and proceeds thereof from scope of adequate protection liens and property that could be used to pay superpriority administrative expense claims); *In re Sapolin Paints, Inc.*, 11 B.R. 930, 937 (Bankr. E.D.N.Y. 1981) ("[N]either a trustee . . . nor a debtor-in-possession, can assign, sell or otherwise transfer the right to maintain a suit to avoid a preference.").

25.     Consistent with this precedent, Avoidance Actions should remain unencumbered, free from any superpriority claims and available for distribution among all unsecured creditors.  The necessity of preserving Avoidance Actions for the benefit of unsecured creditors is particularly compelling under the circumstances of these cases, given that the Debtors intend to pursue the Plan Proposal that offers general unsecured creditors a fraction of a penny.  Based solely on the aggregate principal amount outstanding under the Unsecured Notes and the deficiency claims in respect of the 1.5L Notes implied by the stipulated equity value under the Plan Proposal—before taking into account trade, litigation and rejection damages claims—the Plan Proposal offers a mere 0.06% recovery to unsecured creditors (*i.e.*, ($1.5 million / $2.4 billion) x 100 = 0.06%).  Accordingly, Avoidance Actions may prove an important (if not the sole) source of potential value for unsecured creditors in these chapter 11 cases.  The Debtors should not deprive unsecured creditors of this potentially meaningful source of value by granting liens on, and superpriority claims payable from, the proceeds of Avoidance Actions.

**B.**      **The Debtors Should Not Be Authorized to Pay Postpetition Interest to the Intermediate Lien Noteholders**

26.      As part of the adequate protection package granted to the Intermediate Lien Noteholders, the proposed DIP Order authorizes the Debtors to pay, at their option, post-petition interest of at least $58.75 million in the aggregate (representing approximately 29% of the Debtors' cash balance as of the Petition Date), as it becomes due under the Intermediate Lien Debt Documents.  *See* DIP Motion, Ex. A ¶ 9(b).  Though styled as optional, the Debtors fully intend to make these payments, as reflected in their budget.  *See* DIP Motion, Ex. C.  Based on the record of these cases, neither the Debtors nor the Intermediate Lien Noteholders can sustain their burden of demonstrating that such payments would be appropriate.

27.      The legal and factual standards associated with Sections 361 and 363(e) of the Bankruptcy Code are black letter law need not be reiterated here.  Suffice it to say that neither the Debtors nor the Intermediate Lien Noteholders can demonstrate that such payments are necessary to adequately protect the Intermediate Lien Notes.  *First*, the Intermediate Lien Notes are already receiving postpetition liens and adequate protection claims to protect them in the event of any proven diminution in value of their allegedly perfected security interests in the Debtors' assets, which should be sufficient adequate protection.

28.      *Second*, there has been no evidentiary showing that the payment of postpetition interest to the Intermediate Lien Noteholders is in any way a proxy for, or is somehow correlative to, any as-of-yet unproven adequate protection claim.  Under Section 361 of the Bankruptcy Code, periodic cash payments awarded as adequate protection must be limited "*to the extent that* the stay under section 362 of this title, use, sale or lease under section 363 of this title, or grant of a lien under section 364 of this title *results in a decrease in the value of such entity's interest in such property*."  11 U.S.C. § 361 (emphasis added).  Here, there has been no

12

demonstration in the DIP Motion that the value of the Intermediate Lien Noteholders' collateral will diminish in value by an amount equal to the postpetition interest payments.  Indeed, the Debtors' forecast demonstrates that the Debtors are generating positive cash flow (before taking into account the Debtors' unendorsed estimate of restructuring costs).  *See* DIP Motion, Ex. C. In any event, the continued usage of cash collateral allows the Debtors to maintain and preserve the going concern value of the collateral for the Intermediate Lien Noteholders' benefit.  Indeed, courts have found secured creditors were adequately protected where, as here, the value of their interests in collateral was preserved as a result of the debtors' continued operation as a going concern.  *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) ("If the debtors make a solid showing that their continued operation of their business during the relevant period will pose no serious danger of . . . a decline [in the value of the secured creditor's interest in the collateral], there is no need for any additional adequate protection . . . .").

29.     *Third*, the Debtors' payment of postpetition interest to the Intermediate Lien Notes contravenes Section 506(b)'s proscription against the payment of postpetition interest to an *under*-secured creditor.  *See* 11 U.S.C. § 506(b); *see also, United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 372–73 (1988).  At minimum, the post-reinstatement "equitization" of the 1.25L Notes represents a tacit acknowledgement that the 1.25L Notes are under-secured.  And the Debtors offer no evidence as to the value of the collateral securing the 1.125L Notes.  In any event, the Plan Proposal contemplates the reinstatement of the 1.125L Notes and the 1.25L Notes, which would require all accrued but unpaid interest to be trued-up on the plan effective date.  In that scenario, the Debtors fail to

explain why making interest payments now, as opposed to preserving a significant percentage of their operating budget until after confirmation is adjudicated, would be necessary or appropriate.[6]

30.      *Fourth*, based on the express terms of Intercreditor Agreements to which the Intermediate Lien Noteholders are bound, so long as the consent of the RBL Agent has been obtained (which it has) for the use of cash collateral, and so long as the respective adequate protection liens granted to the respective series of notes are parallel and apply to the same collateral (subject to the relative ranking and priorities as set forth in the Intercreditor Agreements), then the consent of the Intermediate Noteholders to the use of such cash collateral is not required.  *See* Intercreditor Agreements § 2.06(b).  Accordingly, given that the junior secured noteholders' consent is not required for the use of cash collateral, the Debtors cannot satisfy their burden of demonstrating that these cash payments fall within the Debtors' business judgment.  Indeed, the very purpose of adequate protection "is to insure that the creditor receives the value for which he bargained prebankruptcy."  *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).  The Intermediate Lien Noteholders expressly bargained for certain economics, as reflected in the Intermediate Debt Documents, in exchange for entering into the Intercreditor Agreements.  Thus, the Intermediate Lien Noteholders are not in any way being deprived of the benefit of their bargain.

31.      *Fifth,* under the circumstances of these cases, where the implied value of the distribution proposed to be made pursuant to the Plan Proposal to the entire general unsecured class is approximately $1.5 million in the aggregate, as a matter of equity, the Court

---

[6]     Although the proposed DIP Order contains what appears to be a "recharacterization" right under Section 506(b) of the Bankruptcy Code, the language could be construed as limiting parties' rights under Section 506(b) in certain aspects, and otherwise shifts the burden of, and invites further litigation with respect to, recharacterization to general unsecured creditors who stand to recover almost nothing under the Plan Proposal.

should decline to authorize pre-confirmation cash payments that are ***39 times greater*** than the distribution to unsecured creditors in the aggregate.

### C. The Undue Limitations Upon the Committee's Ability to Conduct Its Investigation Should be Eliminated

32.     The scope and limited duration of the Challenge Period, coupled with an inadequate investigation budget, unduly constrains the ability of the Committee to satisfy its fiduciary duties to investigate the liens and claims of the secured lenders.  Specifically, the proposed DIP Order would effectively require the Committee to complete its investigation of all series of secured debt (not just the RBL Facility), prepare a challenge, and obtain standing to prosecute a challenge, with respect to the liens *and* claims of all prepetition secured parties within two months.

33.     As suggested above, given the circumstances of these cases, the Committee's investigation will be wide-ranging.  The Debtors have more than 1,700 gross producing wells spread across two states and numerous counties.  *See* First Day Declaration ¶¶ 35–37.  Analyzing the existence and validity of the alleged liens on this many wells spread across several jurisdictions will require a significant amount of time and resources.  In addition, the Committee will be investigating potential causes of action against the Prepetition Secured Parties, including potential causes of action relating to the 2018 "uptier" exchange of unsecured notes into 1.5L Notes and other prepetition transactions as well as potential claims and defenses against insiders.[7]  Within that same timeframe, the Committee must fend off the predatory Plan Proposal, while exploring alternative solutions.  Thus, the liens and claims of the Intermediate Lien Notes and the 1.5L Notes should be removed from the scope of the Challenge Period, and

---

[7]     Moreover, the DIP order should make clear that the valuation of any prepetition collateral is not subject to the Challenge Period.  As previewed by counsel to the Committee at a status conference before this Court, the Debtors' total enterprise valuation is likely to be the subject of a vigorous dispute in these cases.

the 60 day Challenge Period should be extended to a date that is no earlier than 90 days from entry of the Final DIP Order.

34.     In addition, the proposed $50,000 budget is woefully inadequate.  The Committee's professionals must be able to advocate on behalf of unsecured creditors without being hamstrung by arbitrary limitations imposed by third parties whose interests are not aligned with the Committee's constituency.  Thus, to the extent the Court determines to impose an investigation cap, the Committee respectfully submits that, in line with recent precedent, the investigation budget should be increased to $200,000 to ensure that the Committee is able to properly discharge its statutory mandate.[8]

### D.     The Proposed Waivers of Sections 506(c) and 552(b) and the Equitable Doctrine of Marshaling, as it Relates to the Intermediate Lien Notes and the 1.5L Notes, Should be Eliminated

35.     The proposed waivers of Sections 506(c) of 552(b) of the Bankruptcy Code and the equitable doctrine of marshaling, as such waivers relate to the Intermediate Lien Notes, are inappropriate and should be eliminated.  The Debtors acknowledge the existence of unencumbered assets.  *See* First Day Declaration ¶ 93–94.  Though the Debtors believe such unencumbered assets are "minimal" (DIP Motion ¶ 5), the Committee has not had the opportunity to conduct its own investigation or determine the value of the Debtors' assets.  As is the case with many E&P chapter 11 cases, it would not be surprising if additional non-perfected

---

[8]     *See, e.g.*, *In re Westmoreland Coal Co.*, Case No. 1835672 (DRJ) (Bankr. S.D. Tex. Nov. 15, 2018) (ECF No. 520) ($150,000 cap); *In re EXCO Resources, Inc.*, Case No. 18-30155 (MI) (Bankr. S.D. Tex. Feb. 22, 2018) (ECF No. 348) ($250,000 cap); *In re CJ Holding Co.*, Case No. 16-33590 (DRJ) (Bankr. S.D. Tex. Sept. 9, 2016) (ECF No. 497) ($150,000 cap); *In re Midstates Petrol. Co.*, Case No. 16-32237 (DRJ) (Bankr. S.D. Tex. June 30, 2016) (ECF No. 324) ($150,000)); *In re Swift Energy Co.*, Case No. 15-12670 (MFW) (Bankr. D. Del. Feb. 2, 2016) (ECF No. 224) ($200,000 cap); *In re Samson Res. Corp.*, Case No. 15-11934 (CSS) (Bankr. D. Del. Jan. 26, 2016) (ECF No. 610) ($200,000 cap); *In re Aralez Pharm. US Inc.*, Case No. 18-12425 (MG) (Bankr. S.D.N.Y. Sept. 14, 2018) (ECF No. 98) ($250,000 cap); *In re Quicksilver Res. Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 1, 2015) (ECF No. 307) (providing no cap on non-cash collateral and $100,000 cap solely as to use of prepetition collateral or carve-out).

or unencumbered assets exist.  Indeed, as is common in E&P financings, the RBL Credit Agreement does not require that the RBL Lenders maintain a perfected lien in 100% of the Debtors' assets.  Rather, the RBL Credit Agreement requires EP Energy to maintain "Collateral Coverage Minimum," *i.e.*, that the "Mortgaged Properties" comprise at least 9% of the PV-10 of the Credit Parties' total Proved Reserves.[9]  *See* RBL Credit Agreement § 9.11(d).  It stands to reason that additional unencumbered value may be uncovered by the Committee.  However, the Committee's efforts would be undermined if, in retrospect, unencumbered assets were used to benefit the secured lenders, particularly here where general unsecured creditors are being offered close to nothing.  As applied to the Prepetition Secured Parties, the Section 506(c) waiver could eliminate a potential avenue of recovery for the Debtors' estates by ensuring that the Debtors' unsecured creditors will solely bear the costs of the Debtors' restructuring.  In addition, given the fact-intensive, equitable nature of the court's powers under Section 552(b), courts have denied requests for Section 552(b) waivers as premature when the factual record has not been fully developed.  The record in these chapter 11 cases is completely undeveloped, and, at this stage,

---

[9]    Specifically, Section 9.11(d) of the RBL Credit Agreement provides, in relevant part, as follows:

> In connection with each redetermination (but not any adjustment) of the Borrowing Base, the Borrower shall review the applicable Reserve Report, if any, and the list of current Mortgaged Properties (as described in Section 9.14(c)), to ascertain whether the PV-10 of the Mortgaged Properties (calculated at the time of redetermination) meets the Collateral Coverage Minimum after giving effect to exploration and production activities, acquisitions, Dispositions and production. In the event that the PV-10 of the Mortgaged Properties (calculated at the time of redetermination) does not meet the Collateral Coverage Minimum, then the Borrower shall, and shall cause its Credit Parties to, grant, within 75 days of delivery of the certificate required under Section 9.14(c) (or such longer period as the Administrative Agent may agree in its reasonable discretion), to the Collateral Agent as security for the Obligations a first-priority Lien interest (subject to Liens permitted by Section 10.2) on additional Oil and Gas Properties not already subject to a Lien of the Security Documents such that, after giving effect thereto, the PV-10 of the Mortgaged Properties (calculated at the time of redetermination) meets the Collateral Coverage Minimum.

RBL Credit Agreement § 9.11(d).

there is simply no information available for the Court to determine whether to invoke the "equities of the case" exception.  Accordingly, the Committee respectfully submits that these waivers should be eliminated.

## CONCLUSION

36.     Based on the foregoing, the Committee respectfully requests that the Court condition its approval of the DIP Motion upon the modifications set forth herein, and enter proposed form of modified order consistent with the redline order annexed hereto as **Exhibit A**.

**WHEREFORE**, based on the foregoing, the Committee respectfully requests that the Court (a) condition its approval of the DIP Motion upon the modifications requested herein, and (b) grant the Committee relief that is consistent with the foregoing or such other and further relief as the Court may deem just and proper.

Dated: November 15, 2019

Respectfully submitted,

By: */s/ Maxim B. Litvak*

PACHULSKI STANG ZIEHL & JONES LLP
Robert J. Feinstein, Esq. (pro hac vice to be filed)
780 Third Avenue, 34th Floor
New York, NY 10017
Telephone:  (212) 561-7700

Debra I. Grassgreen, Esq. (pro hac vice to be filed)
Maxim B. Litvak, Esq. (TX Bar No. 24002482)
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:  (415) 263-7000

*Proposed Conflicts Counsel for the Official Committee of Unsecured Creditors*

**<u>Certificate of Service</u>**

I, Maxim B. Litvak, do hereby certify that on this 15th day of November 2019, this

Limited Objection was served on all parties entitled to service under the Court's ECF system.

*<u>/s/ Maxim B. Litvak</u>*
Maxim B. Litvak

**<u>Exhibit A</u>**

**Redline DIP Order**

**RBL / UCC DRAFT 11/15/19**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| | § | **Case No. 19-35654 (MI)** |
| **EP ENERGY CORPORATION, *et al.*,**[1] | § | |
| | § | **Jointly Administered** |
| | § | |
| Debtors. | § | |

### FINAL ORDER (I) AUTHORIZING USE OF CASH COLLATERAL; (II) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (V) GRANTING RELATED RELIEF

Upon the motions, dated October 3, 2019[2] and October 18, 2019[3] (collectively, the "**Motions**")[4] of EP Energy Corporation (the "**Company**") and certain of its subsidiaries and affiliates, including EP Energy LLC (the "**Borrower**;" the Borrower, together with EPE Acquisition, LLC, the parent entity of the Borrower ("**Holdings**") and its direct and indirect subsidiaries, the "**Credit Parties**"), as debtors and debtors-in-possession (collectively, together with the Company, the "**Debtors**")[5] in the above-captioned chapter 11 cases (the "**Chapter 11**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092).  The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

[2] *Emergency Motion / Emergency Motion of Debtors (I) Authorizing Debtors Use of Cash Collateral; (II) Granting Adequate Protection to Prepetition Secured Parties; (III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Seeking Related Relief Filed by Debtor EP Energy Corporation* [Dkt. No. 4].

[3] *Motion of Debtors ~~for Final Order~~ (I) Authorizing ~~Debtors~~ **for Final Order** (I) Authorizing ~~Debtors~~ Use of Cash Collateral; (II) Authorizing ~~the~~ Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting **Liens and Super-Priority Claims; (IV) Granting** Adequate Protection to Prepetition Secured Parties; ~~(III) Modifying Automatic Stay; (IV) Scheduling a Final Hearing; and (V) Seeking Related Relief Filed by Debtor EP Energy Corporation~~ **(V) Authorizing Debtors to Enter Into and Perform Under Exit Financing Agreements; and (IV) Granting Related Relief*** [Dkt. No. [●]**182**].

[4] Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motions.

[5] All of the Credit Parties are Debtors; however, **for purposes hereof,** the Company is not a Credit Party.  **For purposes hereof, the term "Note Credit Parties" shall refer to the Credit Parties excluding Holdings.**

Cases") commenced on October 3, 2019 (the "**Petition Date**") for interim and final orders pursuant to sections 105, 361, 362, 363, 364, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**"), Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (as amended, the "**Bankruptcy Rules**"), and Rules 2002-1, 4001-1(b), 4002-1(i), and 9013-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Texas (this "**Court**"), and the Southern District of Texas Complex Chapter 11 Case Procedures (together, the "**Local Rules**") seeking **the following relief (in each case, subject to the terms of this Order)**:

(I)     authorization for the Debtors to use cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**") pursuant to section 363 of the Bankruptcy Code;

(II)     authorization for:

(a)     the Debtors to obtain a post-petition revolving secured credit facility in the aggregate principal amount of up to $314,710,456 (the "**DIP Facility**," and all extensions of credit, including the issuance of letters of credit, under the DIP Facility, collectively, the "**DIP Loans**"), and to otherwise incur the DIP Obligations (as defined herein) on the terms and conditions set forth in this final order (this "**Order**"), and that certain Senior Secured Superpriority Debtor-in-Possession Credit Agreement[6] (substantially in the form attached hereto as **Exhibit 1**, and as hereafter may be  amended, restated, amended and restated, supplemented or otherwise modified in accordance with the terms thereof, the "**DIP Credit Agreement**," and collectively with the Commitment/Fee Letters (as defined herein) and all other agreements, documents and instruments executed and delivered in connection with the DIP Credit Agreement

---

[6] **NTD: Please provide a current draft of the DIP Credit Agreement.**

2

and this Order, as hereafter may be amended, supplemented or otherwise modified in accordance with the terms thereof, collectively, the "**DIP Documents**"), among Borrower, Holdings, each subsidiary of the Borrower that guarantees the DIP Obligations (collectively, the "**DIP Facility Guarantors**"), the lenders party thereto from time to time (collectively, with the other Secured Parties (as defined in the DIP Credit Agreement), the "**DIP Lenders**"), JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the DIP Lenders (in such capacity, the "**DIP Agent**") and JPMorgan Chase Bank, N.A., in its capacity as lead arranger for the DIP Facility (the "**DIP Arranger**");

(b) the DIP Facility Guarantors to guarantee on a secured and joint and several basis the DIP Obligations **(as defined herein)**; and

(c) the Credit Parties to execute and deliver the DIP Credit Agreement and the other DIP Documents to which they are a party and to perform their respective obligations thereunder and such other and further acts as may be necessary or appropriate in connection therewith;

(III) authorization to provide adequate protection, ~~including~~ **(excluding** adequate protection liens on the proceeds and property recovered in respect of the Credit Parties' claims and causes of action arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other state or federal law (collectively, the "**Avoidance Actions**")**)**, to the following parties with respect to the applicable prepetition secured debt obligations of:

(a) the lenders party to the RBL Credit Agreement (as defined herein) (the "**RBL Lenders**") and the other Secured Parties, including the Hedge Banks party to Hedge Transactions (each as defined in the RBL Credit Agreement) (collectively, solely in their capacities as such, the "**RBL Secured Parties**") and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent for the RBL Secured Parties (in such capacities, the "**RBL Agent**") under that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and

3

restated, supplemented or otherwise modified as of the Petition Date, the "**RBL Credit Agreement**", and together with all security, pledge and guaranty agreements and all other Credit Documents and Hedge Agreements (as defined therein), each as amended, restated, amended and restated, supplemented or otherwise modified as of the Petition Date, the "**RBL Documents**") among the Borrower in its capacity as borrower thereunder, EPE Acquisition LLC, as Holdings, the RBL Lenders and the RBL Agent;

(b)   the noteholders (collectively and solely in their capacities as such, the "**Intermediate Lien Noteholders**") under (i) the Indenture, dated as of November 29, 2016 (as amended, supplemented or otherwise modified as of the Petition Date, the "**1.25 Lien Indenture**") among the Borrower and Everest Acquisition Finance Inc. as issuers thereunder, the subsidiary guarantors party thereto and Wilmington Trust, National Association, as trustee (in such capacity, the "**1.25 Lien Indenture Trustee**") and as collateral agent (in such capacity, the "**1.25 Lien Collateral Agent**"); and (ii) the Indenture, dated as of May 23, 2018 (as amended, supplemented or otherwise modified as of the Petition Date, the "**1.125 Lien Indenture**" and collectively with the 1.25 Lien Indenture the "**Intermediate Lien Indentures**" and the notes issued pursuant to the Intermediate Lien Indentures, the "**Intermediate Lien Notes**" and the Intermediate Lien Indentures together with the other documents governing the Intermediate Lien Notes the "**Intermediate Lien Debt Documents**") among the Borrower and Everest Acquisition Finance Inc. as issuers thereunder, the subsidiary guarantors party thereto and Wilmington Trust, National Association, as trustee (in such capacity, the "**1.125 Lien Indenture Trustee**" and collectively with the 1.25 Lien Indenture Trustee the "**Intermediate Lien Indenture Trustees**") and as collateral agent (in such capacity, the "**1.125 Lien Collateral Agent**" and collectively with the 1.25 Lien Collateral Agent the "**Intermediate Lien Collateral Agents**"); and

(c)   the noteholders (collectively and solely in their capacities as such, the "**1.5 Lien Noteholders**") under (i) the Indenture, dated as of February 6, 2017 (as amended, supplemented or otherwise modified as of the Petition Date, the "**8.00% 1.5 Lien Indenture**") among the Borrower and Everest Acquisition Finance Inc. as issuers thereunder, the subsidiary guarantors party thereto and Wilmington Trust, National Association, as trustee (in such capacity, the "**8.00% 1.5 Lien Indenture Trustee**") and as collateral agent (in such capacity, the "**8.00% 1.5 Lien Collateral Agent**"); and (ii) the Indenture, dated as of January 3, 2018 (as amended, supplemented or otherwise modified as of the Petition Date, the "**9.375% 1.5 Lien Indenture**," and collectively with the 8.00% 1.5 Lien Indenture, the "**1.5 Lien Indentures**," and the notes issued pursuant to the 1.5 Lien Indentures, the "**1.5 Lien Notes**," and the 1.5 Lien Indentures together with the other documents governing the 1.5 Lien Notes, the "**1.5 Lien Debt Documents**," and the 1.5 Lien Debt Documents together with the Intermediate Lien Debt Documents and the RBL Documents, the "**Prepetition Debt Documents**") among the Borrower and Everest Acquisition Finance Inc., as issuers thereunder, the

4

subsidiary guarantors party thereto, and Wilmington Trust, National Association, as trustee (in such capacity, the "**9.375% 1.5 Lien Indenture Trustee**," and collectively with the 8.00% 1.5 Lien Indenture Trustee, the "**1.5 Lien Indenture Trustees**" and, together with the Intermediate Lien Indenture Trustees the "**Junior Lien Trustees**"), and as collateral agent (in such capacity, the "**9.375% 1.5 Lien Collateral Agent**," and collectively with the 8.00% 1.5 Lien Collateral Agent, the "**1.5 Lien Collateral Agents**" and, together with the Intermediate Lien Collateral Agents the "**Junior Lien Collateral Agents**"; and the Junior Lien Collateral Agents collectively with the Junior Lien Trustees, the RBL Agent, the RBL Secured Parties, the Intermediate Lien Noteholders and the 1.5 Lien Noteholders, the "**Prepetition Secured Parties**"));

(IV)    authorization for the Debtors to issue letters of credit under the DIP Facility and refund, refinance, replace and repay outstanding letters of credit issued under the RBL Credit Agreement and outstanding on the Petition Date (the "**RBL Letters of Credit**"), which refunding, refinancing, replacement and repayment will be effectuated by converting or rolling-over on a cashless basis the RBL Letters of Credit into letters of credit issued under the DIP Facility and deeming them issued thereunder;

(V)    authorization for the Debtors to provide superpriority administrative claims status and DIP Liens (as defined herein)**,** subject to the ~~same~~ priorities and protections ~~provided to the DIP Loans~~**set forth herein,** to secure:

(a)    the obligations under those Hedge Transactions (as defined in the DIP Credit Agreement) entered into prior to the Petition Date which the listed Hedge Bank (as defined in the DIP Credit Agreement) does not terminate as a result of these Chapter 11 Cases (each such Hedge Bank described in this clause, a "**Consenting Prepetition Hedge Bank**," and each such Hedge Transaction described in this clause, a "**Prepetition Hedge Transaction**"); and

(b)    the obligations under any Hedge Transaction that is entered into after the Petition Date (a "**Postpetition Hedge Agreement**") and to which a Hedge Bank is a counterparty

5

(each such Hedge Bank described in this clause, a "**Postpetition Hedge Bank**") permitted under the terms of the DIP Credit Agreement;

(VI)   authorization for the Debtors to:

(a)   use the initial borrowing under the DIP Facility, as set forth in the DIP Credit Agreement, to refund, refinance, replace and repay a portion of the RBL Loans (as defined herein) arising under the RBL Documents which refunding, refinancing and repayment may be effectuated by converting or rolling-over on a cashless basis RBL Loans into DIP Loans on a dollar-for-dollar basis and deeming them made thereunder; and

(b)   to use cash on hand (including Cash Collateral) to repay the DIP Facility, as required pursuant to the DIP Credit Agreement, which repayment shall create an equivalent amount of availability under the DIP Facility which availability may be drawn down and used by the Debtors during these Chapter 11 Cases in accordance with the DIP Credit Agreement;

(VII)   authorization for the Debtors to perform their obligations under, and pay the fees set forth in the Commitment/Fee Letters (as defined herein) and the DIP Credit Agreement, including with respect to the committed exit financing facility referenced in the Commitment/Fee Letters;

(VIII)   authorization for the DIP Agent to exercise remedies under, and in accordance with, the DIP Documents upon the occurrence and during the continuance of a DIP Event of Default (as defined herein);

(IX)   the waiver by the Debtors of any right to seek to surcharge the DIP Collateral (as defined herein) or the Prepetition **RBL** Collateral **(as defined herein)** pursuant to section 506(c) of the Bankruptcy Code and the waiver by the Debtors of the equities of the case exception of section 552(b) of the Bankruptcy Code with respect to the DIP Collateral and the Prepetition

6

**RBL** Collateral;

(X)     modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Order; and

(XI)     waiver of any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Order and providing for the immediate effectiveness of this Order.

The final hearing on the Motions pursuant to Bankruptcy Rule 4001 (the "**Final Hearing**") having been held by this Court on November [●**20**], 2019, and upon the record made by the Debtors at the Final Hearing, including without limitation, the admission into evidence of the *Declaration of David Rush in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* [Dkt. No. 16] and the *Declaration of Avinash D'Souza in Support of Debtors' Motions for Orders (I)(A) Authorizing Entry Into Backstop Commitment  Agreement, (B) Approving Obligations Thereunder, and (C) Granting Related Relief,~~nd~~ **and** (II)(A) Approving Postpetition Financing Arrangements and Use of Cash Collateral and (B) Authorizing Entry Into Exit Financing Agreements and Approving Obligations Thereunder, and (III) Authorizing Debtors to File Fee Letters Under Seal* [Dkt. No. ~~[●]~~**186**], and the other evidence submitted or adduced and the arguments of counsel made at the Final Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.     *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.    *Notice*.  Proper, timely, adequate and sufficient notice of the Motions and the Final Hearing has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and no other or further notice of the Motions, the relief sought at the Final Hearing, or the entry of this Order shall be required.

3.    *Approval of Motions*.  The relief requested in the Motions is granted on a final basis as set forth herein.  Except as otherwise expressly provided in this Order, any objection to the entry of this Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

4.    *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but**in interest, and** subject to the limitations thereon**with respect to parties other than the RBL Secured Parties** contained in paragraphs 20 and**paragraph** 21 herein), the Debtors, on behalf of themselves and their respective estates, admit, stipulate, and agree, and this Court finds that:

(a)    as of the Petition Date, the Credit Parties were indebted and liable on a joint and several basis to the RBL Lenders, without defense, objection, counterclaim or offset of any kind, in the aggregate principal amount of not less than $629,420,912 in respect of loans (such loans, collectively, the "**RBL Loans**") and other extensions of credit made, including any letters of credit issued pursuant to, the RBL Credit Agreement, plus all accrued and unpaid interest thereon and any reasonable fees and out-of-pocket expenses (including reasonable fees and out-of-pocket expenses of attorneys provided for in the RBL Credit Agreement) related thereto as provided in the RBL Documents, plus all other outstanding amounts (including, without limitation, any contingent or unliquidated indemnification or reimbursement obligations) that would constitute Obligations (or other similar term) under and as defined in the RBL Credit

Agreement (collectively, with the Prepetition Hedge Obligations (as defined below), the "**Prepetition RBL Obligations**");

(b)        as of the Petition Date, the Borrower was party to, and had certain obligations with respect to, certain Hedge Transactions (as defined in the RBL Documents), which obligations are guaranteed on a joint and several basis by each of the Guarantors (as defined in the RBL Credit Agreement) and the obligations (including, without limitation, any contingent obligations and mark to market movements) of the Borrower and the Guarantors under and with respect to such Hedge Transactions (such obligations, the "**Prepetition Hedge Obligations**") constitute Prepetition RBL Obligations secured by the Prepetition **RBL** Collateral (as defined herein). The Borrower and Guarantors are indebted and/or liable with respect to the Prepetition Hedge Obligations **that existed as of the Petition Date** without objection, defense, counterclaim or offset of any kind.  The Prepetition Hedge Obligations constitute legal, valid, binding and non-avoidable obligations against each of the Credit Parties and are not subject to any avoidance, recharacterization, ~~effect,~~ counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  No payments or transfers made to or for the benefit of (or obligations incurred to or for the benefit of) the RBL Agent or the RBL Secured Parties by or on behalf of any of the Credit Parties prior to the Petition Date under or in connection with any of the RBL Documents or Hedge Transactions is subject to avoidance, recharacterization, effect, counterclaim, defense, offset, subordination, other claim, cause of action or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise;

(c)        the liens, security interests, and mortgages granted by the Credit Parties to the RBL Agent (for the ratable benefit of the RBL Secured Parties) to secure the Prepetition RBL Obligations are:  (i) legal, valid, binding, properly perfected, enforceable, first priority (in each case, subject to permitted exceptions under the RBL Credit Agreement) liens on and security interests in substantially all of the Credit Parties' material real or personal property constituting Collateral (as defined in the RBL Documents, and herein referred to as, the "**Prepetition Collateral**" which Prepetition Collateral shall **(a)** include, for the avoidance of doubt, all proceeds received by the Credit Parties in connection with the Prepetition Hedge Obligations including, without limitation, any monthly settlement payments, any termination payments and/or any other similar amounts**, (b) exclude any assets that are expressly excluded from collateral under the RBL Documents;** *provided however* **that references herein to "Prepetition RBL Collateral" shall be considered references solely to the RBL Secured Parties' interests in the Prepetition Collateral**) to secure the Prepetition RBL Obligations (including, without limitation, the Prepetition Hedge Obligations); (ii) not subject to avoidance, recharacterization, offset, subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law or other challenge; and (iii) after giving effect to this Order and subject to the Carve-Out (as defined herein), subject and subordinate only to other valid and unavoidable liens properly perfected ~~prior to~~**as of** the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) to the extent such liens are permitted under the RBL Documents to be senior to the liens securing the Prepetition RBL Obligations;

(d)        **the Intermediate Lien Noteholders have asserted (but the Debtors do not hereby stipulate) that,** as of the Petition Date, the **Note** Credit Parties were indebted to the Intermediate Lien Noteholders, without defense, counterclaim or offset of any kind, in the

10

aggregate principal amount of not less than $1,500,000,000 **in the aggregate** in respect of ~~the~~**both series of** Intermediate Lien Notes pursuant to the Intermediate Lien Debt Documents, plus accrued and unpaid interest thereon and fees and expenses, if any, as provided in the Intermediate Lien Debt Documents, plus all other amounts that would constitute Obligations (or other similar term) under, and as defined in, the Intermediate Lien Note Indentures (collectively, the "**Prepetition Intermediate Lien Obligations**"); *provided that*, in the event of a ~~final~~ determination **by the Court** that **any of** the Intermediate Lien Noteholders are undersecured **(or totally unsecured)** as of the Petition Date, payments received by **any of** the Intermediate Lien Noteholders pursuant to this Order, if any, may be recharacterized and applied as either (i) payments of **the secured portion of** principal on **any of** the Intermediate Lien Notes, or (ii) ~~otherwise, in accordance with an approved plan or~~ as otherwise ordered by the Court;

(e)     the **Intermediate Lien Noteholders have asserted (but the Debtors do not hereby stipulate) that the** liens and security interests granted to the Intermediate Lien Collateral Agents (for the ratable benefit of the Intermediate Lien Noteholders) to secure the Prepetition Intermediate Lien Obligations are: (i) valid, binding, perfected, enforceable, second priority (in each case, subject to permitted exceptions under the Intermediate Lien Note Indentures) liens on and security interests in substantially all of the ~~Prepetition~~**Collateral (as defined in the 1.25 Lien Indenture and the 1.125 Lien Indenture (as applicable) (but, for the avoidance of doubt, shall exclude any assets that are expressly excluded from collateral under the Intermediate Lien Debt Documents) and herein referred to as, the "Prepetition Intermediate Lien Collateral")**; (ii) not subject to avoidance, recharacterization or subordination (except as set forth in the Intercreditor Agreements (as defined herein) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) subject and subordinate only to

11

(A) after giving effect to this Order, the Carve-Out and the liens and security interests granted to secure the Adequate Protection Obligations (as defined herein), (B) prior to repayment in full of the Prepetition RBL Obligations, ~~and~~ the liens securing the Prepetition RBL Obligations, and (C) other valid and unavoidable liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code to the extent such liens are senior to the liens securing the Prepetition Intermediate Lien Obligations);

(f)       **the 1.5 Lien Noteholders have asserted (but the Debtors do not hereby stipulate) that,** as of the Petition Date, the **Note** Credit Parties were indebted to the 1.5 Lien Noteholders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of not less than $2,091,792,000 **in the aggregate** in respect of **both series of** the ~~notes~~**1.5 Lien Notes** issued to the 1.5 Lien Noteholders pursuant to the 1.5 Lien Debt Documents, plus accrued and unpaid interest thereon and fees and expenses as provided in the 1.5 Lien Debt Documents, plus all other outstanding amounts that would constitute Obligations (or other similar term) under, and as defined in, the 1.5 Lien Note Indentures (collectively, the "**Prepetition 1.5 Lien Obligations**," and, together with the Prepetition RBL Obligations and the Prepetition Intermediate Lien Obligations, the "**Prepetition Obligations**"); *provided* *that*, in the event of a ~~final~~ determination **by the Court** that **any of** the 1.5 Lien Noteholders are undersecured **(or totally unsecured)** as of the Petition Date, payments received by **any of** the 1.5 Lien Noteholders pursuant to this Order, if any, may be recharacterized and applied as either (i) payments of **the secured portion of** principal on **any of** the 1.5 Lien Notes, or (ii) ~~otherwise, in accordance with an approved plan or~~ as otherwise ordered by this Court;

(g)       the **1.5 Lien Noteholders have asserted (but the Debtors do not hereby stipulate) that the** liens and security interests granted to the 1.5 Lien Collateral Agents (for the

12

ratable benefit of the 1.5 Lien Noteholders) to secure the Prepetition 1.5 Lien Obligations are: (i) valid, binding, perfected, enforceable, third priority (in each case, subject to permitted exceptions under the 1.5 Lien Note Indentures) liens on and security interests in substantially all of the ~~Prepetition~~**Collateral (as defined in the 1.5 Lien Indentures (but, for the avoidance of doubt, shall exclude any assets that are expressly excluded from collateral under the 1.5 Lien Debt Documents), and herein referred to as, the "Prepetition 1.5 Lien Collateral")**;[7] (ii) not subject to avoidance, recharacterization or subordination (except as set forth in the Intercreditor Agreements (as defined herein) and as a result of the value of the Prepetition **1.5 Lien** Collateral pursuant to section 506(a) of the Bankruptcy Code) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) subject and subordinate only to (A) after giving effect to this Order, the Carve-Out and the liens and security interests granted to secure the Adequate Protection Obligations (as defined herein), (B) (I) prior to repayment in full of the Prepetition RBL Obligations, ~~and~~ the liens securing the Prepetition RBL Obligations and (II) prior to repayment in full of the Prepetition Intermediate Lien Obligations, **the** liens securing the Prepetition Intermediate Lien Obligations, and (C) other valid and unavoidable liens properly perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code to the extent such liens are senior to the liens securing the Prepetition 1.5 Lien Obligations) and are permitted by the 1.5 Lien Documents;

(h)      none of the DIP Agent, the DIP Lenders ~~or the Prepetition Secured Parties~~**, the RBL Agent or the RBL Secured Parties** are control persons or insiders of the Debtors or

---

[7]  **For purposes hereof, when the term "Prepetition Collateral" is used herein (i) with respect to the RBL Secured Parties' interest in the Prepetition Collateral, such term shall refer to the Prepetition RBL Collateral; (ii) with respect to the Intermediate Lien Noteholders' interest in the Prepetition Collateral, such term shall refer to the Prepetition Intermediate Lien Collateral; and (iii) with respect to the 1.5 Lien Noteholders' interest in the Prepetition Collateral such term shall refer to the Prepetition 1.5 Lien Collateral.  Otherwise, the term Prepetition Collateral shall refer, collectively, to each of the Prepetition RBL Collateral, Prepetition Intermediate Lien Collateral and Prepetition 1.5 Lien Collateral.**

any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from the DIP Facility, the DIP Documents ~~and/~~or the ~~Prepetition Debt~~**RBL** Documents;

        (i)        no portion of any of the Prepetition RBL Obligations shall be subject to contest, avoidance, attack, offset, re-characterization, subordination or other challenge of any kind or nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise, except with respect to subordination as set forth in the Intercreditor Agreements (as defined herein);

        (j)        subject to ~~paragraphs 20 and~~**paragraph** 21 of this Order, the Credit Parties, on behalf of themselves and their respective estates, forever and irrevocably release, discharge, and acquit all former and current RBL Secured Parties, affiliates of ~~the~~**such** RBL Secured Parties, and each of their respective former and current officers, directors, employees, agents, representatives, consultants, accountants, attorneys, affiliates, and predecessors and successors-in-interest (collectively, the "**Releasees**"), solely in their capacity as RBL Secured Parties~~,~~ of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, reasonable attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the ~~Prepetition Debt~~**RBL** Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, (x) any so-called "lender liability" or equitable

14

subordination claims or defenses, (y) any and all claims and causes of action arising under the Bankruptcy Code, and (z) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the ~~Prepetition~~**RBL** Secured Parties, *provided*, *that,* the releases set forth in this section shall be limited to such claims arising prior to or including the date of the entry of this Order.  Other than with respect to any continuing obligations of the Hedge Banks under the Prepetition Hedge Transaction documents, the Credit Parties further waive and release any defense, right of counterclaim, right of setoff or deduction of the payment of the Prepetition **RBL** Obligations that the Credit Parties now have or may claim to have against the Releasees arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Order**, arising under, in connection with or related to the RBL Documents or the Prepetition RBL Obligations**;

(k)     no portion of any of the Prepetition RBL Obligations shall be subject to contest, attack, avoidance, impairment, disallowance, defense, counterclaim, recharacterization, reduction, recoupment, setoff, recovery or, except as set forth in the Intercreditor Agreements (as defined herein), subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(l)     the RBL Secured Parties, the Credit Parties and the other parties thereto are party to that certain:  (i) Amended and Restated Senior Lien Intercreditor Agreement, dated August 24, 2016; (ii) Priority Lien Intercreditor Agreement, dated August 24, 2016; (iii) Additional Priority Lien Intercreditor Agreement, dated November 29, 2016; and (iv) Senior Priority Lien Intercreditor Agreement, dated May 23, 2018 (collectively, together with the consent and acknowledgments executed in connection therewith, the "**Intercreditor**

**Agreements**") that set forth the relative lien priorities and other rights and remedies of the Prepetition Secured Parties with respect to, among other things, the Prepetition Collateral;

(m)    with respect to those Intercreditor Agreements to which they are a party, such Intercreditor Agreements are valid and binding agreements and obligations of the RBL Agent, the Junior Lien Trustees, the other Prepetition Secured Parties and the Credit Parties, respectively, and are enforceable under section 510 of the Bankruptcy Code;

(n)    pursuant to the Intercreditor Agreements, the liens on the Prepetition Collateral and Adequate Protection Collateral (as defined here) held by the Junior Lien Collateral Agents for the benefit of the Intermediate Lien Noteholders and the 1.5 Lien Noteholders are subordinate to the liens held on the Prepetition Collateral and Adequate Protection Collateral (as defined here) held by the RBL Agent for the benefit of the RBL Secured Parties; and

(o)    the aggregate value of the Prepetition **RBL** Collateral securing the Prepetition RBL Obligations ~~substantially~~ exceeds the aggregate amount of the Prepetition RBL Obligations.

5.    *Consent by the Prepetition Secured Parties*.  The RBL Agent, for and on behalf of the RBL Lenders, consents to the Credit Parties' use of Cash Collateral and to their entry into the DIP Facility and their obtaining of the DIP Loans, in accordance with and subject to the terms and conditions provided for in this Order.  Pursuant to the Intercreditor Agreements, as a result of the RBL Agent's consent, for and on behalf of the RBL Lenders, to the use of Cash Collateral and to the DIP Facility and DIP Loans as provided in this Order, the other Prepetition Secured Parties are also deemed to have consented to entry of this Order.

6.    *Findings Regarding the DIP Loans and Cash Collateral*.

(a)    Good cause has been shown for the entry of this Order.

16

(b)        The Credit Parties have a need to use the Cash Collateral and to enter into the DIP Facility, obtain the DIP Loans, avoid termination of their Prepetition Hedge Obligations with Consenting Prepetition Hedge Banks, have the ability to enter into Hedge Transactions with Postpetition Hedge Banks, in order to, among other things, permit the orderly continuation of their businesses, preserve and maintain the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents, capital expenditures and any payments owed with respect to the Prepetition Obligations as and to the extent set forth in this Order and in accordance with the DIP Documents), and refund, refinance, replace and repay in part the Prepetition RBL Obligations.  Repayment in part of the Prepetition RBL Obligations with proceeds of the DIP Facility **solely in respect of the roll-up approved hereunder**, with a paydown of all or a portion of the DIP Facility **(but, for the avoidance of doubt, not any Prepetition RBL Obligations that are not being rolled-up hereunder)**, in the Debtors' discretion, and creation, thereby, of an equivalent amount of availability under the DIP Facility**, in each case, subject to the terms hereof and the DIP Documents,** is appropriate because (i) the aggregate value of the Prepetition **RBL** Collateral securing the Prepetition RBL Obligations substantially exceeds the aggregate amount of the Prepetition RBL Obligations; (ii) the DIP Credit Agreement requires that the proceeds of the DIP Loans be used to repay in part the Prepetition RBL Obligations; (iii) the **DIP Lenders have committed that the** DIP Credit Agreement will convert into an exit financing facility subject to the terms set forth in the exit facility term sheet attached as an exhibit to the Commitment/Fee Letters which provides the Debtors assurance of a valuable exit facility upon emergence from chapter 11; (iv) the refunding, refinancing, replacement and repayment of a portion of the RBL Loans with DIP Loans, with a

17

paydown of such DIP Loans with cash on hand and the creation, thereby, of an equivalent amount of availability under the DIP Facility, will reduce interest expense that otherwise would accrue on such RBL Loans, but for such refunding, refinancing, replacement and repayment; and (v) subject to further order of the Court, the Company will be permitted to continue hedging with Hedge Banks that are also RBL Lenders on a postpetition basis against commodity pricing and other risk. The inclusion of the Prepetition Hedge Obligations as DIP Obligations hereunder is appropriate because the Consenting Prepetition Hedge Banks to the Prepetition Hedge Transactions have agreed not to terminate the Prepetition Hedge Transactions subject to such relief being granted, among other conditions, and such obligations are secured to the same extent as the other Prepetition RBL Obligations.  In accordance with the terms of the Intercreditor Agreements, the DIP Facility and all DIP Obligations shall constitute "First Priority Lien Obligations" or "Priority Lien Obligations" (or other similar defined term) as defined in, and for all purposes under, the Intercreditor Agreements.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 364(b) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting priming liens under section 364(d)(1) of the Bankruptcy Code and the DIP Superpriority Claims (as defined herein) and refunding, refinancing, replacing and repaying in part the Prepetition RBL Obligations, in each case on the terms and conditions set forth in this Order and the DIP Documents.

(d)      The terms of the DIP Loans pursuant to the DIP Documents and the use of the Cash Collateral pursuant to this Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)      The DIP Documents, the use of the Prepetition Collateral (including the Cash Collateral), and the grant of adequate protection hereunder have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, the DIP Arranger, and the RBL Secured Parties, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Documents, any Prepetition Hedge Transactions with a Consenting Prepetition Hedge Bank, any Postpetition Hedge Agreements with a Postpetition Hedge Bank or cash management agreements to which any Debtor and any DIP Lender are party, this Order and the DIP Loans (collectively, the "**DIP Obligations**") shall be deemed to have been extended by the DIP Agent and DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise. Any such reversal, modification, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder or any obligations previously incurred under a Prepetition Hedge Transaction with a Consenting Prepetition Hedge Bank or a Postpetition Hedge Agreement with a Postpetition Hedge Bank, or lien, claim or priority authorized or created hereby.  Any liens or claims granted to the DIP Lenders hereunder arising prior to the effective date of any such reversal,

19

modification, or vacatur of this Order shall be governed in all respects by the original provisions of this Order, including entitlement to all rights, remedies, privileges and benefits granted herein.

(f)        The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  The borrowing of the DIP Loans and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are in the best interest of the Debtors' chapter 11 estates.

7.        *Cash Collateral.*  All or substantially all of the Credit Parties' cash as of the Petition Date, including without limitation, all cash and other amounts on deposit or maintained by the **applicable** Credit Parties in any account or accounts with any ~~Prepetition~~**RBL** Secured Party and any cash proceeds of the disposition of any Prepetition ~~Collateral~~**RBL Collateral** **(excluding, in cash case, any cash or cash proceeds on deposit or maintained in any "Excluded Accounts" (as defined in the RBL Credit Agreement, including the accounts listed on Exhibit 2 attached hereto)**, constitute proceeds of the Prepetition **RBL** Collateral and, therefore, are Cash Collateral of the ~~Prepetition~~**RBL** Secured Parties (subject in all cases to the Intercreditor Agreements), within the meaning of section 363(a) of the Bankruptcy Code.

8.        *Use of Cash Collateral.*   The Credit Parties are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the Termination Date (as defined herein) as and to the extent set forth in this Order and in accordance with the terms and conditions of this Order and the DIP Documents; *provided that*, (a) the Prepetition Secured Parties are granted adequate protection as set forth herein, and (b) except on the terms of this Order, the Credit Parties are not authorized to use the Cash Collateral.  As used herein, "**Termination Date**" means the earlier to occur of:  (i) a Cash Collateral Event of Default (as defined herein); (ii) the Maturity Date (as defined in the DIP Credit Agreement) of the DIP

20

Facility; and (iii) the acceleration of any DIP Loans and the termination of any Commitments (as defined in the DIP Credit Agreement) in accordance with the terms of the DIP Credit Agreement.

9.      *Adequate Protection Obligations*.

(a)      *RBL Adequate Protection Obligations*.   The RBL Agent and the RBL Secured Parties (for the avoidance of doubt, including the Hedge Banks) are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their valid, perfected and enforceable interests in the Prepetition **RBL** Collateral, including, without limitation, the Cash Collateral, in an amount equal to the aggregate diminution in value **from and after the Petition Date** of their interests in the Prepetition **RBL** Collateral resulting from the sale, lease or use by the Credit Parties of the Cash Collateral and any other Prepetition **RBL** Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (~~such diminution in value,~~ the "**RBL Adequate Protection Obligations**").  The foregoing shall not, nor shall any other provision of this Order, be construed as a determination or finding that there has been or will be any diminution in value of Prepetition Collateral (including Cash Collateral) and the rights of all parties as to such issues are hereby preserved.  As adequate protection for the RBL Adequate Protection Obligations, the RBL Agent and the RBL Secured Parties are hereby granted the following, subject to the Carve-Out **(and, in the case of each of clauses (i) and (ii) below, solely in an amount equal to the aggregate diminution in value from and after the Petition Date of their interests in the Prepetition Collateral resulting from the stay, sale, lease, use, or grant, as provided in section 361 of the Bankruptcy Code, by the Credit Parties of the Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code)**:

(i)      RBL Adequate Protection Liens.    As security for the RBL Adequate Protection Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Credit Parties (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the RBL Agent of any property, the following security interests in and liens and mortgages upon all property identified in the clauses **of this paragraph** below (collectively, the "**Adequate Protection Collateral**") are hereby granted to the RBL Agent, for its own benefit and the benefit of the RBL Secured Parties, subject only to the Carve-Out (all such liens and security interests granted to the RBL Agent, for its benefit and for the benefit of the RBL Secured Parties, pursuant to this Order, the "**RBL Adequate Protection Liens**"):

(1)  Liens Priming the Liens of the Prepetition Secured Parties.  Subject to the Carve-Out, pursuant to sections 361 and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral.  The RBL Adequate Protection Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured Parties (including the applicable Adequate Protection Liens granted to such Prepetition Secured Parties).

(2)  First Lien On Unencumbered Property.  Subject to the Carve-Out, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property in which the Credit Parties have an interest, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date or valid liens perfected (but not granted) after the Petition Date to the extent such postpetition perfection is expressly permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Unencumbered Property**"), including, without limitation, any and all unencumbered cash, all oil, gas and other hydrocarbons and all products and substances derived therefrom (including all raw materials and work in process therefore, finished goods thereof, and materials used or consumed in the manufacture or production thereof), accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, oil and gas leases, servicing rights, servicing receivables, fixtures, machinery, equipment, vehicles, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of the Credit Parties and the proceeds of all of the foregoing**, but excluding any Avoidance Actions** and the proceeds or property recovered in respect of any Avoidance Actions.

(3)  Liens Junior to Certain Existing Liens.  Subject to the Carve-Out, pursuant to sections 361(2) and 363(c)(2) of the Bankruptcy Code, a valid, binding,

continuing, enforceable, perfected junior lien on, and security interest in, all tangible and intangible prepetition and post-petition property in which the Credit Parties have an interest, whether now existing or hereafter acquired and all proceeds thereof, that is subject to valid, perfected and unavoidable senior liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "**Non-Primed Liens**"), which security interests and liens in favor of the RBL Agent and the RBL Secured Parties shall be junior to the Non-Primed Liens.

(4) <u>Liens Senior to Certain Other Liens.</u>   Except with respect to Non-Primed Liens, no claim or lien, security interest or mortgage having a priority senior to or *pari passu* with those granted by this Order to the RBL Agent and the RBL Secured Parties pursuant to this section other than the Carve-Out shall be granted or allowed while any RBL Adequate Protection Obligations remain outstanding, and the RBL Adequate Protection Liens shall not be:  (a) subject or subordinate to (i) any lien, security interest or mortgage that is avoided and preserved for the benefit of the Credit Parties and their estates under section 551 of the Bankruptcy Code or (ii) any liens, security interests or mortgages arising after the Petition Date; or (b) subordinated to or made *pari passu* with any other lien, security interest or mortgage under sections 363 or 364 of the Bankruptcy Code or otherwise.  The RBL Adequate Protection Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (such Chapter 11 Cases or proceedings, the "**Successor Cases**"), and/or upon the dismissal of any of the Chapter 11 Cases.  The RBL Adequate Protection Liens shall not be subject to section 510 of the Bankruptcy Code (other than as set forth in the Intercreditor Agreements), to the "equities of the case" exception of section 552 of the Bankruptcy Code, or to section 506(c) of the Bankruptcy Code, or sections 549, 550 or 551 of the Bankruptcy Code.

(5) <u>Buildings</u>.  However, notwithstanding any provision in this Order to the contrary, in  no event shall any enclosed structure (having two walls and a roof) or manufactured mobile home (each, a "**Building**") be included in the definition of Adequate Protection Collateral, in each case until such time as the RBL Agent notifies the applicable Credit Parties that such property shall be included in the definition of Adequate Protection Collateral, upon the RBL Agent's determination and RBL Secured Parties' determination that all applicable Flood Insurance Regulation requirements have been satisfied.  Subject to the Carve-Out, upon such notice by the RBL Agent and the RBL Secured Parties, any and all Buildings shall automatically be included in the definition of Adequate Protection Collateral, and shall be encumbered pursuant to this Order without any further action by any party.  As used herein, "**Flood Insurance Regulations**" means (a) the National Flood Insurance Act of 1968 as now or hereafter in effect or any

23

successor statute thereto, (b) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (c) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, *et seq.),* as the same may be amended or recodified from time to time, and (d) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

(ii)    RBL 507(b) Claims.  The RBL Adequate Protection Obligations shall constitute allowed superpriority claims as provided in section 507(b) of the Bankruptcy Code  (the "**RBL 507(b) Claims**") against each of the Credit Parties on a joint and several basis, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331, 503 and 726 of the Bankruptcy Code, subject and subordinate only to the Carve-Out, which RBL 507(b) Claims shall have recourse to and be payable from all prepetition and postpetition property of the Credit Parties, excluding **(i)** the Carve-Out, and ~~including, without limitation,~~**(ii) any Avoidance Actions and** the proceeds or property recovered in respect of any Avoidance Actions**; *provided, that*, the RBL Agent and the RBL Secured Parties shall not assert any RBL 507(b) Claims in the event that (x) an Approved Plan shall have been confirmed, all Exit Facility Conditions Precedent shall have been satisfied, and the Exit Facility Conversion Date and Plan Effective Date each have occurred (each defined term in this clause (x) as defined in the Exit Facility Term Sheet); and (y) all remaining outstanding RBL Adequate Protection Obligations (if any) have been paid in full as of such Plan Effective Date**.  For the avoidance of doubt, the RBL 507(b) Claims shall include amounts due to the RBL Agent and RBL Secured Parties for all out-of-pocket expenses (including attorneys' fees and legal expenses of counsel and settlement costs) incurred in connection with these Chapter 11 Cases.

(iii)    Interest, Fees and Expenses.  The Credit Parties are authorized and directed to pay, as adequate protection, to the RBL Agent all accrued and unpaid interest (including interest accrued prior to the Petition Date) on the outstanding amounts under the RBL Documents constituting Prepetition RBL Obligations at the applicable non-default rate set forth in the RBL Documents, and to pay all other accrued and unpaid fees and disbursements owing to the RBL Agent **to the extent payable** under the RBL Documents, as set forth below. For the avoidance of doubt, the payment of adequate protection payments pursuant to this paragraph shall be without prejudice to the rights of the RBL Agent and RBL Secured Parties to assert claims for payment of additional amounts, including additional interest at any other rates, in accordance with the RBL Documents. As additional adequate protection to the RBL Agent and the RBL Secured Parties (including the Hedge Banks), the Credit Parties shall pay to the RBL Agent or other applicable RBL Secured Party all prepetition and postpetition reasonable and documented fees and out-of-pocket expenses of counsel and other professional advisors payable to the RBL Agent or other applicable RBL Secured Party **to the extent payable** under the RBL Documents.  None of the fees and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.

Invoices with respect to such fees and expenses (which shall include the number of hours billed (except for financial advisors compensated on other than an hourly basis) and a summary description of services provided and the expenses) shall be provided to the Debtors, the U.S. Trustee and the statutory committee of unsecured creditors (the "**Committee**"), if any, appointed in the Chapter 11 Cases who may object to the reasonableness, as such standard is used in section 506(b) of the Bankruptcy Code, of such fees and expenses within five (5) Business Days of the receipt of such invoices, and this Court shall resolve any dispute as to the reasonableness of any such fees and expenses. Promptly following the completion of the five (5) Business Day objection period, if no objection is made or following the resolution of any dispute regarding the fees and expenses payable pursuant to this paragraph in this Court, the Debtors shall pay the professional fees and expenses provided for in this paragraph.

(iv)    Other Covenants.    The Debtors shall maintain their cash management arrangements in a manner consistent with this Court's October 4, 2019 order granting the Debtors' cash management motion.  The Credit Parties shall not use, sell or lease any material assets outside the ordinary course of business, or seek authority of the Court to do any of the foregoing, without prior consultation with the RBL Agent at least five (5) Business Days prior to the date on which the Credit Parties seek the authority of this Court for such use, sale or lease.  The**In the event the DIP Credit Agreement is not in effect, and/or the commitments thereunder are terminated, the** Credit Parties shall comply with the covenants contained in Section 9.3 of the RBL Credit Agreement regarding the maintenance and insurance of the Prepetition Collateral and the Collateral.

(v)    Reporting.    The Credit Parties shall comply with the reporting requirements set forth in the Prepetition Debt Documents with copies of all such reporting to be provided to the RBL Agent; *provided that* such reporting obligations shall only apply to the extent that the DIP Credit Agreement is no longer in effect and the commitments thereunder are terminated**; *provided, further, that a copy of any and all such reports or other financial information (as well as any other reports or other financial information delivered under the DIP Documents) shall also be simultaneously provided to the Committee's professionals*.**

(b)    *Intermediate Lien Adequate Protection Obligations*. The Intermediate Lien Indenture Trustees, the Intermediate Lien Collateral Agents and the Intermediate Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection of their**solely to the extent they hold valid, perfected and enforceable** interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate **post-petition** diminution in value of their**any such** valid, perfected and enforceable

25

interests in the Prepetition Collateral**, respectively,** resulting from the sale, lease or use by the **Note** Credit Parties of the Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (~~such diminution in value,~~ the "**Intermediate Lien Adequate Protection Obligations**").  The foregoing shall not, nor shall any other provision of this Order, be construed as a determination or finding that **any such liens are valid, perfected or enforceable, that** there has been or will be any diminution in value of Prepetition Collateral **or that the value of any Prepetition Collateral securing either series of Intermediate Lien Notes exceeds the amount of such series of Intermediate Lien Notes for purposes of section 506 of the Bankruptcy Code,** and the rights of all parties **in interest (including the Debtors and the Committee)** as to such issues are hereby preserved.  As adequate protection, **each of** the Intermediate Lien Indenture Trustees, **each of** the Intermediate Lien Collateral Agents and ~~the~~**each series of** Intermediate Lien Noteholders are hereby granted the following, subject in all respects to the Carve-Out **(and, in the case of each of clauses (i) and (ii) below, solely to the extent of any post-petition Diminution in Value of the respective Intermediate Lien Noteholders' interests in the respective Prepetition Intermediate Lien Collateral (as applicable))**:

> (i)      Intermediate Lien Adequate Protection Liens.  As security for the payment of the Intermediate Lien Adequate Protection Obligations **(if any)**, the Intermediate Lien Indenture Collateral Agents (for themselves and for the benefit of the Intermediate Lien Noteholders and the Intermediate Lien Trustees) are hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the **Note** Credit Parties of security agreements, pledge agreements, mortgages, financing statements or other agreements), a valid, binding, continuing, enforceable, perfected junior lien on, and security interest in, all of the Adequate Protection Collateral **(excluding, for the avoidance of doubt, any Avoidance Actions and the proceeds or property recovered in respect of any Avoidance Actions)** subject and subordinate only to (I) the RBL Adequate Protection Liens, (II) the DIP Liens, (III)

the Carve-Out, and (IV) the Non-Primed Liens, and subject further to the Intercreditor Agreements (the "**Intermediate Lien Adequate Protection Liens**").

(ii)     Intermediate Lien 507(b) Claims.  The Intermediate Lien Adequate Protection Obligations **(if any)** shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**Intermediate Lien 507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (I) the Carve-Out, (II) the DIP Superpriority Claims, and (III) the RBL 507(b) Claims, to the extent set forth in the applicable Intercreditor Agreements**, which Intermediate Lien 507(b) Claims shall have recourse to and be payable from all Adequate Protection Collateral (excluding, for the avoidance of doubt, any Avoidance Actions and any proceeds or property recovered in respect of any Avoidance Actions)**.

~~(iii)     Optional Cash Payments of Postpetition Interest.   The Credit Parties are authorized to make, at the Credit Parties' option, current cash payments as interest becomes due under the Intermediate Lien Debt Documents; *provided*, that the payments made under this paragraph 9(b)(iii) shall be without prejudice to the right of any party as to whether such payments constitute postpetition interest allowable under section 506(b) of the Bankruptcy Code or are in respect of principal.~~

(c)     *1.5 Lien Adequate Protection Obligations*.     The 1.5 Lien Indenture Trustees, the 1.5 Lien Collateral Agents and the 1.5 Lien Noteholders are entitled, pursuant to sections 361, 363(c)(2), and 363(e) of the Bankruptcy Code, to adequate protection ~~of their~~**solely to the extent they hold valid, perfected and enforceable** interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate **post-petition** diminution in value of ~~their~~**any such** valid, perfected and enforceable interests in the Prepetition Collateral**, respectively,** resulting from the sale, lease or use by the **Note** Credit Parties of the Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (~~such diminution in value,~~ the "**1.5 Lien Adequate Protection Obligations**" and collectively, together with the RBL Adequate Protection Obligations and the Intermediate Lien Adequate Protection Obligations, the "**Adequate Protection Obligations**"). The foregoing shall not, nor shall any other provision of this Order, be

27

construed as a determination or finding **that such liens are valid, perfected or enforceable,** that there has been or will be any diminution in value of Prepetition Collateral (including Cash Collateral) **or that the value of any Prepetition Collateral securing either series of 1.5 Lien Notes exceeds the amount of such series of Intermediate Lien Notes for purposes of section 506 of the Bankruptcy Code,** and the rights of all parties **in interest (including the Committee and the Debtors)** as to such issues are hereby preserved.  As adequate protection, the 1.5 Lien Indenture Trustees, the 1.5 Lien Collateral Agents and the 1.5 Lien Noteholders are hereby granted the following, subject in all respects to the Carve-Out **(and, in the case of each of clauses (i) and (ii) below, solely to the extent of any post-petition Diminution in Value of the 1.5 Lien Noteholders' respective interests in the Prepetition 1.5 Lien Collateral (as applicable))**:

(i)     1.5 Lien Adequate Protection Liens.  As security for the payment of the 1.5 Lien Adequate Protection Obligations **(if any)**, the 1.5 Lien Collateral Agents (for themselves and for the benefit of the 1.5 Lien Noteholders and the 1.5 Lien Trustees) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the **Note** Credit Parties of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the Adequate Protection Collateral **(excluding, for the avoidance of doubt, any Avoidance Actions and the proceeds or property recovered in respect of any Avoidance Actions)** (the "**1.5 Lien Adequate Protection ~~Liens~~Lien**" and, together with the RBL Adequate Protection Liens and the Intermediate Lien Adequate Protection Liens, the "**Adequate Protection Liens**"), subject and subordinate only to (I) the DIP Liens, (II) the RBL Adequate Protection Liens,  (III) the Intermediate Lien Adequate Protection Liens, (IV) the Carve-Out, and (V) the Non-Primed Liens, and subject further to the Intercreditor Agreements.

(ii)     1.5 Lien 507(b) Claims.  The 1.5 Lien Adequate Protection Obligations **(if any)** shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "**1.5 Lien 507(b) Claims**", together with the RBL 507(b) Claims and the Intermediate Lien 507(b) Claims, the "**507(b) Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (I) the Carve-Out, (II) the DIP Superpriority Claims, (III) the RBL 507(b) Claims, and (IV)

28

the Intermediate Lien 507(b) Claims; such subordination referenced in subsections (III) and (IV) to the extent set forth in the applicable Intercreditor Agreements**, which 1.5 Lien 507(b) Claims shall have recourse to and be payable from all Adequate Protection Collateral (excluding, for the avoidance of doubt, any Avoidance Actions and the proceeds or property recovered in respect of any Avoidance Actions)**.

10.     *Authorization of the DIP Loans and the DIP Documents.*

(a)     The Debtors are hereby authorized to (i) enter into and perform under the DIP Documents and, (ii) borrow under the DIP Credit Agreement up to an aggregate principal amount of $314,710,456 of the DIP Loans (including issuance of letters of credit or the deemed issuance of the RBL Letters of Credit as letters of credit issued under the DIP Facility), the proceeds of which shall be used for, subject to the terms of this Order and the DIP Documents, working capital and other general corporate purposes of the Debtors (including fees, costs and expenses related to the Chapter 11 Cases and the DIP Documents and capital expenditures), including without limitation, to pay interest, fees and expenses in connection with the DIP Loans and the Adequate Protection Obligations (~~as defined herein~~**with the payment of fees and expenses subject to the same terms and conditions applicable to the payment of fees and expenses under Paragraph 9(a)(iii) hereof (without duplication thereof)**) and to refund, refinance, replace and repay in part the RBL Loans, with the Debtors then to repay a portion of the DIP Facility which repayment shall create an equivalent amount of availability under the DIP Facility which availability may be drawn down and used by the Debtors during these Chapter 11 Cases in accordance with the DIP Documents~~.~~**, in each case, subject to the terms of this Order and the DIP Documents.**

(b)     Upon the closing of the DIP Facility, that portion of RBL Loans that is refunded, refinanced, replaced and repaid by proceeds from the DIP Loans (on a cashless basis) shall be deemed "Loans" made under, and as defined in, the DIP Credit Agreement.

29

(c)     Upon the closing of the DIP Facility, all RBL Letters of Credit shall be deemed "Letters of Credit" issued under, and as defined in, the DIP Credit Agreement.

(d)     Upon the closing of the DIP Facility, all Prepetition Hedge Transactions with Consenting Prepetition Hedge Banks and all Postpetition Hedge Transactions are hereby deemed DIP Obligations.   The Debtors are hereby authorized to satisfy and perform all obligations under or in connection with Hedge Transactions that constitute DIP Obligations.

(e)     Upon the closing of the DIP Facility, the mortgages and deposit account control agreements that provide liens on and security interests in the real property and personal property assets of the Debtors with respect to the Prepetition Obligations, shall remain in full force and effect and shall be effective to provide liens on and security interests in the DIP Collateral and shall constitute DIP Documents for all purposes hereunder.

(f)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and empowered to perform all acts and to execute and deliver all instruments and documents that the DIP Agent reasonably determines to be required or necessary for such Debtor's performance of its obligations under the applicable DIP Documents, including without limitation:

        (i)     the execution, delivery and performance of the DIP Documents;

        (ii)     the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents (in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent and the required DIP Lenders may agree) and no further approval of this Court shall be required for any amendment, waiver, consent or other modification to and under the DIP Documents that does not **either** materially and adversely affect the Debtors or ~~which does not~~**otherwise** (A) shorten the scheduled maturity of the DIP Loans, (B) increase the principal amount of, or the rate of interest **or fees** payable on, the DIP Loans, or (C) change any DIP Event of Default, add any covenants or amend the covenants therein, in any such case to be materially more restrictive; *provided, **however**, that the Committee shall be provided a copy of any*

30

**and all amendments, waivers, consents or other modifications to and under the DIP Documents prior to the effectiveness thereof;** *provided, further, however,* that a copy of any ~~such~~ amendment, waiver, consent or other modification **to and under the DIP Documents that either materially and adversely affects the Debtors or that (A) shortens the scheduled maturity of the DIP Loans, (B) increases the principal amount of, or the rate of interest or fees payable on, the DIP Loans, or (C) changes any DIP Event of Default, adds any covenants or amends the covenants therein, in any such case to be materially more restrictive (each, a "Material Amendment"),** shall be filed by the Debtors with this Court and served by the Debtors on counsel for the Junior Lien Trustees, the U.S. Trustee, and counsel to the Committee~~, if any, appointed in the Chapter 11 Cases~~ within three (3) Business Days of its effectiveness **during which time period counsel to the Committee may raise objections to any such Material Amendment and, if such objection cannot be resolved within such three (3) Business Day time period, such Material Amendment shall be subject to notice, a hearing and this Court's approval;**~~;~~

(iii)     the non-refundable payment to the DIP Agent, the DIP Arranger and the DIP Lenders, as the case may be, of the commitment, underwriting, arranger and administrative agency fees set forth in the applicable DIP Documents ~~as described in the Motion~~ and/or ~~referred to~~**required** in one or more fee letters executed among certain of the Debtors and the respective DIP Agent and/or DIP Arranger (collectively, the "**Commitment/Fee Letters**"); and

(iv)     the performance of all other acts required under or in connection with the DIP Documents.

(g)     Each Debtor is authorized to enter into and perform its respective obligations under the applicable Commitment/Fee Letters, including in connection with the commitment by the DIP Arranger to provide up to $629,420,912 of proposed exit financing facilities on the terms, and subject to the conditions, set forth in the applicable Commitment/Fee Letters ~~and~~**,** the DIP Documents **and this Order**.

(h)     Upon the execution thereof, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms of this Order and the DIP Documents.  No obligation, payment, transfer or grant of security by the Debtors under the DIP Documents, the Hedge Transactions with Consenting Prepetition Hedge Banks or Postpetition Hedge Banks or this Order shall be voidable, avoidable, restrained

31

or recoverable under the Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

**(i)** **Section 11.11(j)(2) of the DIP Agreement is hereby amended such that the words "the Prepetition Note Documents" in clause (2) of Section 11.11(j) of the DIP Agreement shall be deleted and replaced with the words "the Existing RBL Credit Documents".**

11.     *DIP Liens.*  As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests in and liens and mortgages upon all property identified in the clauses below (collectively, the "**DIP Collateral**") are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders, subject only to the Carve-Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Documents, the "**DIP Liens**"):

(a)     Liens Priming the Liens of the Prepetition Secured Parties.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of each of the Prepetition Secured

32

Parties (including the applicable Adequate Protection Liens granted to such Prepetition Secured Parties).

(b)  <u>First Lien on Unencumbered Property.</u>  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all Unencumbered Property, including, without limitation, any and all unencumbered cash, all oil, gas and other hydrocarbons and all products and substances derived therefrom (including all raw materials and work in process therefore, finished goods thereof, and materials used or consumed in the manufacture or production thereof), accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, oil and gas leases, servicing rights, servicing receivables, fixtures, machinery, equipment, vehicles, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of the Debtors and the proceeds of all of the foregoing, **(but excluding any Avoidance Actions** and the proceeds or property recovered in respect of any Avoidance Actions**)**.

(c)  <u>Liens Junior to Certain Existing Liens.</u>  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, perfected junior lien on, and security interest in, all tangible and intangible prepetition and post-petition property in which the Debtors have an interest, whether now existing or hereafter acquired and all proceeds thereof, that is subject to Non-Primed Liens, which security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to the Non-Primed Liens.

(d)  <u>Liens Senior to Certain Other Liens.</u>  Except with respect to the Non-Primed Liens and liens permitted by the DIP Credit Agreement to be incurred after the Petition Date, no claim or lien, security interest or mortgage having a priority senior to or *pari*

33

*passu* with those granted by this Order to the DIP Agent and the DIP Lenders other than the Carve-Out shall be granted or allowed while any portion of the DIP Obligations remain outstanding, and the DIP Liens shall not be (i) subject or subordinate to (A) any lien, security interest or mortgage that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens, security interests or mortgages arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien, security interest or mortgage under sections 363 or 364 of the Bankruptcy Code or otherwise. The DIP Liens shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or in any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases.  The DIP Liens shall not be subject to section 510 of the Bankruptcy Code (other than as set forth in the Intercreditor Agreements), to the "equities of the case" exception of section 552 of the Bankruptcy Code, or to section 506(c) of the Bankruptcy Code, or sections 549, 550 or 551 of the Bankruptcy Code.

(e)     Buildings/**Excluded Collateral**. However, notwithstanding any provision in this Order to the contrary, **(1)** in no event shall any Building be included in the definition of DIP Collateral, in each case until such time as the DIP Agent notifies the applicable Debtors that such property shall be included in the definition of DIP Collateral, upon the DIP Agent's determination and DIP Lenders' determination that all applicable Flood Insurance Regulation requirements have been satisfied. Upon**, and upon** such notice by the DIP Agent and the DIP Lenders, any and all Buildings shall automatically be included in the definition of DIP Collateral, and shall be encumbered pursuant to this Order without any further action by any party**; and (2)**

34

**in no event shall any assets that are expressly excluded from collateral in the DIP Documents be included in the definition of DIP Collateral**.

12.    *DIP Superpriority Claims.*    The DIP Obligations shall constitute allowed superpriority claims as provided in Section 507(b) of the Bankruptcy Code (the "**DIP Superpriority Claims**") against each of the Debtors on a joint and several basis, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation sections 326, 328, 330, 331, 503and 726 of the Bankruptcy Code, subject and subordinate only to the Carve-Out, which DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property of the Debtors~~,~~ **(**excluding the Carve-Out~~, and including, without limitation~~, **and excluding any Avoidance Actions and** the proceeds or property recovered in respect of any Avoidance Actions**)**. For the avoidance of doubt, the DIP Superpriority Claims shall include amounts due to the DIP Agent and DIP Lenders for all out-of-pocket expenses (including reasonable attorneys' fees and out-of-pocket legal expenses of counsel and settlement costs) incurred in connection with these Chapter 11 Cases **and payable under the DIP Documents and this Order**.  Other than the Carve-Out, no priority claims are, or will be, senior to, prior to, or *pari passu* with the DIP Superpriority Claims, or any of the DIP Obligations, or with any other claims of the DIP Agent or the DIP Lenders arising hereunder or under the other DIP Documents or under any Prepetition Hedge Transaction or Postpetition Hedge Agreement, or otherwise in connection with the DIP Facility.

13.    <u>Carve Out</u>.

(a)    For purposes hereof, the "**Carve-Out**" shall mean: (i) fees owing to the U.S. Trustee incurred in connection with the Chapter 11 Cases; (ii) all reasonable fees and

35

expenses in an amount up to $100,000 incurred by a trustee appointed in the Debtors' cases under section 726(b) of the Bankruptcy Code; (iii) **allowed** professional fees, expenses, and disbursements incurred by professional persons employed by the Credit Parties ~~or~~**and** any Committee in these Chapter 11 Cases**, whenever allowed by the Court** (collectively, "**Professional Fees and Expenses**") incurred on and after the Petition Date and before the occurrence of a Carve-Out Trigger Date (defined in this paragraph); and (iv) Professional Fees and Expenses incurred after the occurrence of a Carve-Out Trigger Date, in an amount not to exceed $7,500,000 (the "**Post-Trigger Date Carve-Out**").   For the purposes hereof, a "**Carve-Out Trigger Date**" means the first (1st) Business Day after the DIP Agent or RBL Agent provides a written notice to the Credit Parties and their counsel**, the Office of the United States Trustee and counsel to the Committee,** that a DIP Event of Default or a Cash Collateral Event of Default ~~(or an event which with the giving of notice would constitute a DIP Event of Default or Cash Collateral Event of Default)~~ has occurred.

(b)     Upon the occurrence of the Carve-Out Trigger Date, the Credit Parties shall deposit into an interest-bearing escrow account at a financial institution acceptable to the RBL Agent (the "**Carve-Out Account**") an amount equal to the sum of:  (i) all fees and expenses required to be paid pursuant to paragraph 10(a)(i) and 10(a)(ii) hereof; (ii) all billed and unpaid Professional Fees and Expenses (including outstanding holdbacks) incurred on or after the Petition Date and prior to the Carve-Out Trigger Date; (iii) all unbilled Professionals Fees and Expenses incurred on or after the Petition Date and prior to the Carve-Out Trigger Date; and (iv) $7,500,000.  The failure of the Carve-Out Account to satisfy in full the amount set forth in the Carve-Out shall not affect the priority of the Carve-Out.  For the avoidance of doubt, to the extent the Carve-Out is funded from borrowings under the DIP Facility, such borrowed amounts

shall constitute a DIP Obligation.  The amount in the Carve-Out Account shall be reduced on a dollar-for-dollar basis for Professional Fees and Expenses that are paid after the Carve-Out Trigger Date and the Carve-Out Account shall not be replenished for any such amounts so paid.~~I a~~

(c)     The DIP Agent and the DIP Lenders and, upon any payment in full of the DIP Facility, the RBL Agent and the RBL Secured Parties shall retain automatically perfected and continuing first priority security interests in any residual interest in the Carve-Out Account available following satisfaction in full of all obligations benefiting from the Carve-Out (the "**Residual Carve-Out Amount**").  Subject to the terms of the Intercreditor Agreements, (i) the Intermediate Lien Collateral Agents, Intermediate Lien Indenture Trustees and Intermediate Lien Noteholders shall retain automatically perfected and continuing second priority security interests, and (ii) the 1.5 Lien Collateral Agents, 1.5 Lien Indenture Trustees and 1.5 Lien Noteholders shall retain automatically perfected and continuing third priority security interests in the Residual Carve-Out Amount.  Promptly (but in no event later than five (5) Business Days) following the satisfaction in full of all obligations benefiting from the Carve-Out, the Credit Parties shall deliver the Residual Carve-Out Amount, if any, to the DIP Agent or, upon payment in full of the DIP Facility, the RBL Agent, as applicable.

14.     *Events of Default and Remedies After Events of Default*.

(a)     <u>Cash Collateral Events of Default</u>.  Solely to the extent that the DIP Credit Agreement is no longer in effect and the commitments thereunder are terminated, the occurrence of any of the following events after the date of such termination other than with the written consent **<u>or waiver</u>** of the RBL Agent shall constitute a "**Cash Collateral Event of Default**":

(i)     failure of the Credit Parties to make any payment under this Order within two (2) Business Days after such payment becomes due;

(ii)     failure of the Credit Parties to comply in any material respect with any other provision of this Order;

(iii)     the Credit Parties shall grant, create, incur or suffer to exist any material postpetition liens or security interests other than: (I) those granted pursuant to this Order; (II) carriers', mechanics', operator's, warehousemen's, repairmen's or other similar liens arising in the ordinary course of business; (III) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation or regulations; (IV) deposits to secure the payment of any postpetition statutory obligations, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and (V) any other ~~junior~~ liens or security interests that the Credit Parties are permitted to incur under the Prepetition Debt Documents;

(iv)     an order shall be entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Order in a manner adverse to the RBL Secured Parties without the written consent of the RBL Agent;

(v)     this Court shall terminate or reduce the periods pursuant to section 1121 of the Bankruptcy Code, during which the Credit Parties have the exclusive right to file a plan of reorganization and solicit acceptances thereof**_, provided however_, that termination or reduction of such periods at the request of, and in order for such party in interest other than the Credit Parties to file a plan of reorganization that qualifies as an Approved Plan (as defined in the Exit Facility Term Sheet) and solicit acceptances thereof shall not constitute a Cash Collateral Event of Default, to the extent that such party actually files an Approved Plan (as defined in the Exit Facility Term Sheet) within a period no later than seven (7) calendar days thereof (unless otherwise extended by written agreement by the RBL Agent)**;

(vi)     entry of an order granting relief from any stay of proceeding (including, without limitation, the automatic stay) so as to allow a third party to proceed with foreclosure (or granting of a deed in lieu of foreclosure) or other remedy against any asset with a value in excess of $5 million;

(vii)     entry of any postpetition judgment against any Credit Party in excess of $5 million that would otherwise not be treated as a claim in these Chapter 11 Cases (to the extent not paid or covered by insurance provided by a carrier not disputing coverage as such carrier shall promptly confirm to the DIP Agent in writing), which judgments are not immediately discharged, waived, or stayed (including as a result of the automatic stay in place in the Chapter 11 Cases);

(viii)     the Credit Parties shall for more than one (1) Business Day fail to hold in accounts with the RBL Agent, or in accounts over which the RBL Agent has an

account control agreement, unrestricted cash or cash equivalents in an aggregate amount of not less than $25 million;

(ix)   the payment of any prepetition claims that are junior in interest or right to the claims and/or liens and mortgages on such collateral held by the RBL Agent on behalf of the RBL Secured Parties, other than as permitted by this Order or another order entered in the Chapter 11 Cases;

(x)   the existence of any claims or charges, or the entry of any order of this Court authorizing any claims or charges, **(**other than as permitted under this Order, **or with the written consent of the RBL Agent)** entitled to superpriority under section 364(c)(1) of the Bankruptcy Code **ranking** *pari passu* or senior to the Prepetition RBL Obligations or the RBL Adequate Protection Obligations, or there shall arise or be granted by this Court, **(in each case, except as may otherwise be permitted under this Order or** except with the written consent of the RBL Agent**)**, (I) any claim (other than claims in respect of Hedge Transactions which are *pari passu* to the Prepetition RBL Obligations or the RBL Adequate Protection Obligations) having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve Out), including the 507(b) Claims, or (II) subject to the Non-Primed Liens, any lien on the Prepetition Collateral or Adequate Protection Collateral having a priority senior to or *pari passu* with the liens and security interests granted herein, except as expressly provided in the Prepetition Debt Documents or in this Order (but only in the event ~~specifically~~**expressly** consented to by the RBL Agent), whichever is in effect;

(xi)   this Court shall have entered an order dismissing any of the Credit Parties' Chapter 11 Cases;

(xii)   this Court shall have entered an order converting any of the Credit Parties' Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(xiii)   this Court shall have entered an order appointing a chapter 11 trustee, responsible officer, or any examiner (other than a fee examiner) with enlarged powers relating to the operation of the businesses in the Credit Parties' Chapter 11 Cases;

(xiv)   a filing by any Debtor of any motion, pleading, application or adversary proceeding challenging the validity, enforceability, perfection or priority of the liens securing the Prepetition RBL Obligations or asserting any other cause of action against and/or with respect to the Prepetition RBL Obligations, the Prepetition **RBL** Collateral, the RBL Agent or **the** RBL Secured Parties (or if the Debtors support any such motion, pleading, application or adversary proceeding commenced by any third party); or

(xv)   the Credit Parties or any of their subsidiaries, shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against the RBL Agent or RBL Secured Parties relating to the Prepetition RBL Obligations.

39

(b)     *Remedies After Cash Collateral Event of Default*.  Upon the occurrence and during the continuance of a Cash Collateral Event of Default, and the giving of five (5) Business Days' prior written notice by the RBL Agent to the Debtors, the U.S. Trustee and counsel to any Committee (with a copy to counsel to the Debtors and counsel to the Junior Lien Trustees) **of the occurrence of a Cash Collateral Event of Default**, the Credit Parties' right to use Cash Collateral shall terminate subject to the Debtors' rights to seek an emergency hearing on whether a Cash Collateral Event of Default has in fact occurred and is continuing.

(c)     *DIP Events of Default.*  The occurrence of any Event of Default under the DIP Credit Agreement shall constitute a "**DIP Event of Default**";

(d)     *Remedies After DIP Event of Default*.  The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise:  (i) immediately upon the occurrence and during the continuance of a DIP Event of Default, all rights and remedies under the applicable DIP Documents~~, other than those rights and remedies against the applicable DIP Collateral as provided in clause (ii) below~~ **to declare the termination, reduction or restriction of any further commitment to the extent any such commitment remains outstanding (including provisions of any letters of credit) under the DIP Documents, declare all DIP Obligations to be immediately due and payable, declare the termination of any future liability or obligations of the DIP Agents and the DIP Lenders (but without affecting any of the DIP Liens or the DIP Obligations of the Debtors) or terminate any Hedging Obligations**; and (ii) upon the occurrence and during the continuance of a DIP Event of Default, and the giving of five (5) Business Days' prior written notice to the Debtors (with a copy to counsel to the Debtors, counsel to the Junior Lien Trustees, the U.S. Trustee, and counsel to any Committee), **of the**

40

**occurrence of a DIP Event of Default,** all rights and remedies against the DIP Collateral provided for in the applicable DIP Documents and this Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender); *provided that*, during the foregoing five (5) Business Day period, the only issue that may be raised by any party in opposition other than the Court, the U.S. Trustee, or any Committee to the exercise of rights and remedies shall be whether a DIP Event of Default has in fact occurred and is continuing, and other than as set forth in the prior clause of this proviso, the Debtors hereby waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit or restrict, or delay the exercise or benefit of, the rights and remedies of the DIP Agent and the DIP Lenders under the DIP Documents or this Order; *provided*, *further*, *that*, the DIP Agent and the DIP Lenders may not repossess, foreclose or seize any DIP Collateral without first filing a motion and obtaining an order of the Court authorizing such activity (with the DIP Agent and DIP Lenders' burden of proof to obtain such relief being the burden imposed by section 362 of the Bankruptcy Code). In no event shall the DIP Agent, the DIP Lenders or the ~~Prepetition~~**RBL** Secured Parties be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition **RBL** Collateral. Neither the DIP Agent's nor any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall constitute a waiver of such DIP Agent's or any DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Credit Agreement. For the avoidance of doubt, nothing in this paragraph shall limit or impair the rights of a Consenting Prepetition Hedge Bank or a Postpetition Hedge Bank to terminate, liquidate or accelerate any Hedge Transaction in accordance with the terms thereof

41

or to exercise any rights of netting, offset or other remedies thereunder, including without limitation, the right **(if any) under applicable law** to offset obligations under any Hedge Transaction against any other DIP Obligations or Prepetition RBL Obligations, as applicable, upon the occurrence of an "Event of Default" or "Termination Event" (as defined in the Hedge Agreement), *provided*, *that*, for the further avoidance of doubt, any exercise of remedies following a DIP Event of Default to liquidate or foreclose on DIP Collateral shall be subject to the provisions of this paragraph.

15.     *Limitation on Charging Expenses Against Collateral.* Except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition **RBL** Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or RBL Agent, as applicable, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the RBL Agent or the other RBL Secured Parties.

16.     *Limitations under Section 552(b) of the Bankruptcy Code.* The DIP Secured Parties and the RBL Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the DIP Secured Parties or the RBL Secured Parties with respect to (a) proceeds, products, offspring or profits of any of the DIP Collateral or the Prepetition Collateral, or (b) the extension of the Adequate Protection Liens to cover proceeds of any of the DIP Collateral or the Prepetition **RBL** Collateral.

17.   *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or (except as provided in paragraph 20 of this Order) to any of the Prepetition Secured Parties, as adequate protection or otherwise, pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability; *provided that*, in the event of a ~~final~~ determination **by this Court** that **any of** the Intermediate Lien Noteholders and/or **any of** the 1.5 Lien Noteholders are undersecured **(or totally unsecured)** as of the Petition Date, payments received by **any of** the Intermediate Lien Noteholders and/or **any of** the 1.5 Lien Noteholders pursuant to this Order, if any, may be recharacterized and applied as either (a) payments of **the secured portion of** principal on the **applicable series or** Intermediate Lien Notes or ~~the~~ 1.5 Lien Notes, or (b) ~~otherwise, in accordance with an approved plan or~~ as otherwise ordered by the Court.

18.   *Prepetition RBL Obligations*.

(a)      Subject to the provisions of this paragraph, $314,710,456 of the Prepetition RBL Obligations shall be refunded, refinanced, replaced and repaid by the Debtors from the proceeds of the DIP Loans**, which refunding, refinancing and repayment may be effectuated by converting or rolling-over on a cashless basis RBL Loans into DIP Loans on a dollar-for-dollar basis and deeming them made thereunder** (with the Debtors authorized to repay a portion of DIP Loans to create an equivalent amount of availability under the DIP Facility) **as set forth herein,** and, upon such ~~payment~~**refunding, refinancing and repayment**, a commensurate portion of commitments of all RBL Secured Parties under the RBL Credit Agreement shall be terminated.  Upon such refunding, refinancing, replacement and repayment of the Prepetition RBL Obligations, all security interests in, and liens on, Prepetition Collateral granted to secure such portion of the Prepetition RBL Obligations shall be immediately, and

without the necessity of further action, deemed to be included among the DIP Liens granted pursuant to this Order to secure the DIP Obligations. Upon the closing of the DIP Facility, (i) the RBL Letters of Credit shall be deemed issued and outstanding under the DIP Facility, and neither the RBL Agent nor any RBL Secured Parties shall have any further obligations or liabilities with respect to such RBL Letters of Credit to either the Debtors or the beneficiaries thereof and (ii) the Prepetition Hedge Obligations with Consenting Prepetition Hedge Banks shall constitute DIP Obligations for all purposes hereunder, including for purposes of receiving the benefit of the DIP Collateral and DIP Superpriority Claims subject to the terms of the DIP Credit Agreement.

(b)     With respect to those portions of the Prepetition RBL Obligations that are not refunded, refinanced, replaced and paid by the Debtors from the proceeds of the borrowing of the DIP Loans, **except as provided in paragraph 9(a)(iii) hereof, nothing contained herein or in the DIP Documents shall authorize the repayment of any such amounts;** *provided, that,* nothing in this Order or the DIP Documents shall prejudice the rights, remedies and privileges of the RBL Agent, the Hedge Banks, and the RBL Secured Parties granted in the Bankruptcy Code or as set forth in the RBL Documents and all of the RBL Agent's, RBL Secured Parties', and Hedge Banks' rights and remedies under the Bankruptcy Code and the RBL Documents (including the Intercreditor Agreements) are hereby fully preserved **(subject to the Bankruptcy Code)**, including their right to seek additional or further adequate protection.

19.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     Subject to the Intercreditor Agreements, without further notice, order or leave required, the DIP Agent or RBL Agent, as applicable, is hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any

other action in order to validate and perfect the DIP Liens or the applicable Adequate Protection Liens granted to it hereunder, in each case, subject to the terms of the DIP Documents. Whether or not the DIP Agent or RBL Agent, each in its respective sole discretion, chooses to file any such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, takes possession of or control over, or otherwise confirms perfection of the DIP Liens and the applicable Adequate Protection Liens, such DIP Liens and Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or, other than as set forth in the Intercreditor Agreements, subordination as of the date of entry of this Order.

(b)     A certified copy of this Order may, in the discretion of the DIP Agent or RBL Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)     The Credit Parties shall execute and deliver to the DIP Agent and RBL Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the applicable DIP Agent or RBL Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the applicable Adequate Protection Liens.

20.     *Preservation of Rights Granted Under this Order.*

(a)     Subject to the Carve-Out, (i) other than the DIP Liens, the DIP Superpriority Claims, and any permitted liens under the Prepetition Debt Documents (and subject to the terms of the Intercreditor Agreements), no claim or lien having a priority senior to or *pari passu* with those granted by this Order to the RBL Agent shall be granted or allowed while any

45

portion of the **RBL Secured Parties'** Adequate Protection Obligations ~~remains~~**remain** outstanding, and (ii) the Adequate Protection Liens **granted to the RBL Secured Parties** shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Credit Parties' estates under section 551 of the Bankruptcy Code or, except as set forth in the Intercreditor Agreements, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash, it shall constitute a DIP Event of Default under the DIP Credit Agreement and a termination of the right to use the Cash Collateral (i) if any of the Debtors seeks **any modification of this Order**, or if there is entered~~,~~ any modification of this Order **that is adverse to the RBL Agent or the DIP Agent, in each case,** without the prior written consent of the DIP Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent or (ii) an order is entered converting or dismissing any of the Chapter 11 Cases.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of the DIP Obligations or any Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens. Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral, any DIP Obligations ~~or~~ or any Adequate Protection Obligations incurred by the Credit Parties to the Prepetition Secured Parties prior to the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions of this Order, and the

46

Prepetition Secured Parties shall be entitled to all of the rights, remedies, privileges and benefits granted in this Order.

(d)    Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by this Order shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or dismissing any of the Chapter 11 Cases, or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Credit Parties have waived any discharge as to any remaining DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in the Chapter 11 Cases, and in any Successor Cases, and the DIP Liens, Adequate Protection Liens, the DIP Obligations, the Adequate Protection Obligations, the DIP Superpriority Claims, the 507(b) Claims, and the other administrative claims granted pursuant to this Order, and all other rights and remedies of the DIP Agent, the DIP Lenders, and the Prepetition Secured Parties granted by this Order and the DIP Documents shall continue in full force and effect until all DIP Obligations are indefeasibly paid in full in cash and all Adequate Protection Obligations **owed to the RBL Secured Parties** are indefeasibly paid in full in cash or otherwise satisfied.

21.    *Effect of Stipulations on Third Parties.*

(a)    The stipulations and admissions contained in ~~this Order, including, without limitation, in paragraphs~~**each of clauses (a) through (c) and (h) through (o) in paragraph** 4 and **paragraph** 7 of this Order, shall be binding upon the Debtors under all

47

circumstances.   The stipulations and admissions contained in ~~this Order, including, without limitation, in paragraphs~~**each of clauses (a) through (c) and (h) through (o) in paragraph** 4 and **paragraph** 7 of this Order~~,~~ shall be binding upon all other parties-in-interest unless: (i) any party-in-interest (including the Committee~~, if any~~) (a "**Challenge Party**") that successfully seeks and obtains standing to do so has timely filed a motion, adversary proceeding, or other pleading (in each case, setting forth the legal and factual basis for any Challenge in specific detail) seeking such standing (subject to the limitations contained herein, including without limitation, in this paragraph) by the later of 60 days after entry of this Order and ~~60~~**90** days after the formation of the Committee (if any) (the "**Challenge Period**"); and (ii) an order is entered and becomes final in favor of the Challenge Party sustaining a Challenge; *provided that* any such Challenge Period deadline is subject to extension as may be specified by this Court for cause shown, or if the RBL Agent agrees in writing to such an extension.  For purposes hereof, the term "**Challenge**" shall refer to all claims or defenses in respect of the Prepetition RBL Obligations challenging the validity, enforceability, priority or extent of the Prepetition RBL Obligations or the liens on Prepetition Collateral securing the Prepetition RBL Obligations or otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses against any of the RBL Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, each in their capacity as such, in connection with any matter related to the Prepetition RBL Obligations; *provided**, further***, *that* ~~subject to~~**except as provided in** this paragraph, ~~as to the Credit Parties,~~ all ~~such~~**other** Challenges are hereby irrevocably waived, released, and relinquished as of the Petition Date; *provided further*, *that* during the Challenge Period, the Debtors' admissions,

48

stipulations and waivers herein shall not be binding on any chapter 7 or 11 trustee appointed or elected for any of the Debtors.

(b)     If no such Challenge is timely filed in respect of the Prepetition RBL Obligations:  (i**) the stipulations and admissions contained in each of clauses (a) through (c) and (h) through (o) in paragraph 4 and paragraph 7 of this Order, shall be binding upon all parties-in-interest: (ii**) the Prepetition RBL Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination (except as set forth in the applicable Intercreditor Agreements or this Order), defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, recovery, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case; (~~iii~~**iii**) the valid and perfected liens on the Prepetition **RBL** Collateral securing the Prepetition RBL Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 4 as applicable, not subject to setoff, subordination (except as set forth in the Intercreditor Agreements or this Order), defense, avoidance, impairment, disallowance, recharacterization, reduction, recoupment, or recovery; and (~~iii~~**iv**) the Prepetition RBL Obligations, the RBL Agent and the RBL Secured Parties (each in their capacity as such), as the case may be, and the liens on the Prepetition Collateral granted to ~~secured~~**secure** the Prepetition **RBL** Obligations, shall not be subject to any other or further ~~challenge,~~ **Challenge (**except**,** with respect to the ~~value of the~~ Prepetition Collateral, **as set forth in clause (e) of this paragraph),** by any party-in-interest (including ~~any~~**the** Committee), and all such parties-in-interest shall be enjoined from seeking to exercise ~~the~~**any such** rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for any of the Credit Parties).  Nothing in this Order shall confer standing on

49

any party-in-interest to assert any ~~Claims or Defenses~~**Challenge** or otherwise bring any cause of action**, and all rights to assert or object to such standing are expressly preserved**.

(c)     If any Challenge is timely filed, the stipulations and admissions contained in paragraphs 4 and 7 of this Order shall nonetheless remain binding and preclusive (as provided in this paragraph) on all parties-in-interest (including the Committee, if any), except as to any such findings and admissions that were expressly and successfully challenged in such Challenge.

(d)     In the event that there is a timely successful Challenge by a final non-appealable order, pursuant and subject to the limitations contained in this paragraph, to the repayment of the Prepetition **RBL** Obligations pursuant to this Order based upon a successful challenge to the validity, enforceability, extent, perfection or priority of the Prepetition **RBL** Obligations or the liens securing the same, this Court shall have the power to unwind or otherwise modify (which might include the disgorgement or reallocation of interest, fees, principal or other incremental consideration paid in respect of the Prepetition **RBL** Obligations or the avoidance of liens and/or guarantees with respect to the Debtors)~~ to the extent that such payment resulted in the payment of any portion of the Prepetition Obligations determined by this Court to be an unsecured claim or other amount not allowable under section 502 of the Bankruptcy Code.~~**, as determined by the Court; and**

(e)     **Notwithstanding anything contained in this Order or in any DIP Document to the contrary (but subject to the proviso in this sub-paragraph (e)), (i) any motion or proceeding to determine the value of any DIP Collateral, Prepetition Collateral or Adequate Protection Collateral shall not be subject to either the Debtors' stipulations set forth herein, the Challenge Period or any other term or provision in this paragraph 21, (ii) nothing contained in this Order or in any DIP Document shall prejudice, impair, limit or**

50

**otherwise be deemed a waiver of the right of any party in interest (including the Committee or the Debtors) to determine the value of any pre- or post-petition collateral securing any pre- or post-petition obligations of the Debtors or any other assets of the Debtors, and all such rights are fully and expressly preserved, and (iii) nothing contained in this Order or in any DIP Document shall constitute a finding by this Court as to the value of any pre- or post-petition collateral securing any pre- or post-petition obligations of the Debtors or any other assets of the Debtors; *provided, however*, that the issue of whether the aggregate value of the Prepetition RBL Collateral securing the Prepetition RBL Obligations exceeds the aggregate amount of the Prepetition RBL Obligations shall be subject to the Challenge Period.**

22.     *Limitation on Use of DIP Loans, DIP Collateral, and Prepetition Collateral.*  The Credit Parties shall use the DIP Loans and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, none of the DIP Loans, the DIP Collateral, the Prepetition **RBL** Collateral (including the Cash Collateral) or the Carve-Out may be used to:  (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the ~~Prepetition Debt~~**RBL** Documents, the Hedge Agreements or the liens or claims granted under this Order, the DIP Documents or the RBL Documents; (b) assert any Challenges or any other causes of action against the DIP Agent, the DIP Lenders, the ~~Prepetition~~**RBL** Secured Parties or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) except as otherwise permitted herein, prevent, hinder or otherwise delay the DIP Agent's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP

51

Documents or this Order; (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders or the ~~Prepetition~~**RBL** Secured Parties hereunder or under the DIP Documents or the ~~Prepetition Debt~~**RBL** Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent; (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents; or (f) seek to modify any of the rights granted to the RBL Secured Parties hereunder or under the ~~Prepetition Debt~~**RBL** Documents, in the case of each of the foregoing clauses, without the RBL Agent's consent; *provided that*, notwithstanding anything to the contrary herein, no more than an aggregate of $~~50,000~~**200,000** of the Cash Collateral may be used by any Committee to investigate the validity, enforceability or priority of the Prepetition **RBL** Obligations or the liens on the Prepetition **RBL** Collateral securing the Prepetition **RBL** Obligations or investigate any Challenges against the ~~Prepetition~~**RBL** Secured Parties.

23.      *Insurance.*  To the extent any Prepetition Secured Party is listed as loss payee under the Debtors' insurance policies, the DIP Agent is also deemed to be the loss payee under the Debtors' insurance policies and shall act in that capacity and subject to the terms of the DIP Documents, distribute any proceeds recovered or received in respect of any such insurance policies, first, to the payment of the DIP Obligations until paid in full, second, to the payment of the Prepetition RBL Obligations, and third, to the payment of the Prepetition Intermediate Lien Obligations and the Prepetition 1.5 Lien Obligations, subject to and in accordance with the Intercreditor Agreements.  To the extent no Prepetition Secured Party is listed as loss payee under any of the Debtors' insurance policies, the DIP Agent is deemed to be a loss payee under such policies for purposes of the receipt of any proceeds under such policies which proceeds shall be used to pay down the DIP Obligations.

52

24.     *Order Governs.*  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.

25.     *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Secured Parties, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Secured Parties and the Debtors and their respective successors and assigns; *provided that,* except to the extent expressly set forth in this Order, and subject to the terms of the DIP Documents or the Intercreditor Agreements, the DIP Agent, the DIP Lenders and the Prepetition Secured Parties shall have no obligation to permit the use of the DIP Loans or the Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

26.     *Limitation of Liability.*  In determining to make any loan under the DIP Credit Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the DIP Lenders and the ~~Prepetition~~**RBL** Secured Parties shall not solely by reason thereof be deemed in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and

53

Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute). Furthermore, nothing in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders or any ~~Prepetition~~**RBL** Secured Party of any liability for any claims arising from the prepetition or post-petition activities of any of the Debtors.

27.     *Intercreditor Agreements.*  Nothing in this Order shall amend or otherwise modify the terms or enforceability of the Intercreditor Agreements, including without limitation, the turnover and bankruptcy-related provisions contained therein, and the Intercreditor Agreements shall each remain in full force and effect.  The rights of the Prepetition Secured Parties shall at all times remain subject to the Intercreditor Agreements.

28.     *Commitment/Fee Letters.*  The Commitment/Fee Letters are authorized to be filed in redacted form satisfactory to the DIP Agent and unredacted copies shall be provided solely to (i) the U.S. Trustee, (ii) counsel to any Committee, (iii) this Court and (iv) any other party as may be ordered by this Court after notice and a hearing, or agreed by the Debtors and the DIP Agent (collectively, the "**Limited Notice Parties**").  The Limited Notice Parties shall at all times keep the Commitment/Fee Letters strictly confidential and shall not disclose the contents of the Commitment/Fee Letters to any party whatsoever, including but not limited to their respective clients**, subject to legal or regulatory process**.  Any pleadings filed in these Chapter 11 Cases that reference or disclose information from the Commitment/Fee Letters shall be filed under seal or redacted in form and substance satisfactory to the DIP Agent.

29.     *Proofs of Claim.*  None of the DIP Agent, the DIP Lenders, or the ~~Prepetition~~**RBL** Secured Parties shall be required to file proofs of claim or otherwise request payment of an administrative expense in any of the Chapter 11 Cases or any Successor Cases for any claim in

respect of the DIP Obligations or Prepetition **RBL** Obligations. Notwithstanding any order entered by this Court in relation to the establishment of a bar date in any of the Chapter 11 Cases or any Successor Cases to the contrary, the RBL Agent, on behalf of the RBL Secured Parties, ~~the Intermediate Lien Indenture Trustees, on behalf of the Intermediate Lien Noteholders, and the 1.5 Lien Indenture Trustee, on behalf of the 1.5 Lien Noteholders, respectively, are~~**is** hereby authorized and entitled, in ~~each of their~~**its** sole and absolute discretion, but not required, to file (and amend and/or supplement, as each sees fit) a proof of claim or request for payment of an administrative expense and/or aggregate proofs of claim or request for payment of administrative expenses in each of the Chapter 11 Cases or any Successor Cases for any claim allowed herein; for avoidance of doubt, any such proof of claim or request for payment of an administrative expense, in each case, may (but is not required to) be filed as one consolidated proof of claim or request for payment of administrative expense against all of the Credit Parties, rather than as separate proofs of claim or request for payment of administrative expense against each Credit Party. Any proof of claim or request for payment of administrative expense filed by the RBL Agent or applicable Junior Lien Trustee or Junior Lien Collateral Agent shall be deemed to be in addition to and not in lieu of any other proof of claim that may be filed by any of the respective Prepetition Secured Parties. Any order entered by this Court in relation to the establishment of a bar date for any claim (including without limitation administrative claims) in any of the Chapter 11 Cases or any Successor Cases shall not apply to the ~~Prepetition~~**RBL** Secured Parties with respect to the Prepetition **RBL** Obligations. Without limiting the foregoing, nothing herein shall impair or be deemed to impair the rights of any party to a Hedge Transaction (as defined in the RBL Documents) to exercise any rights or remedies available to such party pursuant to the terms of such Hedge Transaction.

30.     *No Waiver.*  The failure of the DIP Lenders or the RBL Secured Parties to seek relief or otherwise exercise their rights and remedies under this Order, the DIP Documents or the ~~Prepetition Debt~~**RBL** Documents or otherwise (including, without limitation, any delay and/or forbearance by any Hedge Bank with respect to its termination, liquidation and/or acceleration rights in connection with any Hedge Transactions), as applicable, shall not constitute a waiver of any of the DIP Lenders' or RBL Secured Parties' rights hereunder, thereunder, or otherwise. Except as expressly provided herein, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights, claims, privileges, objections, defenses or remedies of the DIP Lenders or the RBL Secured Parties, including the Hedge Banks, under the Bankruptcy Code or under non-bankruptcy law against any other person or entity in any court.

31.     *Preservation of Rights in Connection with Certain Contracts or Transactions*. The rights of any entity, including any Hedge Banks, in connection with a contract or transaction of the kind listed in sections 555, 556, 559, 560 and 561 of the Bankruptcy Code, whatever they might or might not be, are hereby preserved in all respects and no such entity shall lose any of its rights under such sections as a result of any delay and/or forbearance by such entity in the exercise of its rights thereunder (including, without limitation, its termination, liquidation and/or acceleration rights).

32.     *No Third-Party Rights.*  Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, third party or incidental beneficiary.

56

33.     *Effectiveness.*  This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no stay of effectiveness of this Order.

34.     *Authorizations Regarding Hedge Transactions*.  Pursuant to sections 105(a) and 363(b), and to the extent applicable, section 364 of the Bankruptcy Code, the Debtors are authorized to continue performance under the Hedge Transactions (as defined in the RBL Documents) and to honor, pay, or otherwise satisfy the Prepetition Hedge Obligations as they come due.  The automatic stay provisions of section 362 of the Bankruptcy Code are hereby modified to the extent necessary to permit each Hedge Bank to immediately and unconditionally (but, for the avoidance of doubt, subject to any grace or cure periods under, and other provisions of, the Hedge Agreements and any other RBL Documents governing the applicable Hedge Transactions) exercise and enforce any and all rights and remedies provided for in the Hedge Agreements, including but not limited to rights and remedies relating to the suspension of performance thereunder, the termination, liquidation, or acceleration thereof, withholding of performance thereof, and setoff, netting, and application of any payment, settlement payment, termination value, termination payment, and any other amounts that the Hedge Banks would be entitled to receive from or otherwise be obligated to pay to any Debtor under Hedge Transactions in accordance with the terms of the Hedge Agreements, without the need for any further Court order, and the exercise of any such rights and remedies by the Hedge Banks shall not be stayed, avoided, or otherwise limited as result of the pendency of these Chapter 11 Cases.

35.     *Collateral Agent Replacement.*  The Credit Parties and the Prepetition Secured Parties are permitted to take any actions necessary or appropriate (including filing documents with appropriate filing agencies or authorities) to effectuate the replacement of any collateral

57

agents or trustees with respect to, and in accordance with the terms of, the Prepetition Debt Documents.

36.     *Retention of Jurisdiction.*  This Court shall have and retain exclusive jurisdiction to enforce the terms of this Order and to adjudicate any and all matters arising from or related to the interpretation or implementation of this Order, including with respect to any and all disputes or matters under, arising out of or in connection with either the DIP Loans or the DIP Documents

37.     Other than the consensual and/or contractual priming described in this Order, no DIP Lien, RBL Adequate Protection Lien, Intermediate Lien Adequate Protection Lien and/or 1.5 Lien Adequate Protection Lien shall, on a non-consensual basis, prime any valid and unavoidable senior lien, security interest and/or encumbrance existing as of the Petition Date (including any properly perfected senior lien under section 546 of the Bankruptcy Code). All rights of any party claiming a royalty, separate property interest, other interest not comprising property of the estate, or senior lien, security interest and/or encumbrance are hereby preserved.

Date:   [_____], 2019


_____
MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

58

**Exhibit 1**
**DIP Credit Agreement**

**Exhibit 2**
**Excluded Accounts**

| | | | |
|---|---|---|---|
| **EP Energy E&P Company, L.P.** | **The Bank of New York Mellon** | **Rental Land Account** | **xxxxx5751** |
| **EP Energy E&P Company, L.P.** | **JP Morgan Chase Bank, N.A.** | **Rental Land Account** | **xxxxx7216** |
| **EP Energy E&P Company, L.P.** | **The Bank of New York Mellon** | **Royalty Payment Account** | **xxxxx3654** |
| **EP Energy E&P Company, L.P.** | **JP Morgan Chase Bank, N.A.** | **Royalty Payment Account** | **xxxxxx7109** |
| **EP Energy Management, L.L.C.** | **JP Morgan Chase Bank, N.A.** | **Payroll Account** | **xxxxx2730** |
| **EP Energy Management, L.L.C.** | **The Bank of New York Mellon** | **Benefit Account** | **xxxxx4762** |
| **EP Energy Management, L.L.C.** | **JP Morgan Chase Bank, N.A.** | **Benefit Account** | **xxxxx7695** |
| **EP Energy E&P Company, L.P.** | **JP Morgan Chase Bank, N.A.** | **A/P Payment Account** | **xxxxxx1509** |
| **EP Energy E&P Company, L.P.** | **JP Morgan Chase Bank, N.A.** | **Utility Account** | **xxxxx8572** |

Document comparison by Workshare 9.5 on Friday, November 15, 2019 10:37:44 AM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://DMEAST/NY/77884658/1 |
| Description | #77884658v1<NY> - EPE - Final DIP-CC Order - WEIL INITIAL DRAFT |
| Document 2 ID | interwovenSite://DMEAST/NY/77907395/1 |
| Description | #77907395v1<NY> - EP -- DIP Order 11-15-19 EVENING - RBL-UCC Draft |
| Rendering set | Stroock-strikethru(b_n_w) |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| ~~Moved from~~ | |
| Moved to | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 281 |
| Deletions | 115 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 396 |