**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **EP ENERGY CORPORATION, *et al.*,** | § | **Case No. 19-35654 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.[1]** | § | |
| | § | |

**DISCLOSURE STATEMENT FOR
AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford Carlson
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Ronit Berkovich (admitted *pro hac vice*)
Scott R. Bowling (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and
Debtors in Possession*

Dated: December 12, 2019
       Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

**DISCLOSURE STATEMENT, DATED DECEMBER 12, 2019**

**Solicitation of Votes on the**
**Plan of Reorganization of**

**EP ENERGY CORPORATION,** *ET AL.*

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE CHAPTER 11 PLAN OF REORGANIZATION OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "DEBTORS") ATTACHED HERETO AS EXHIBIT A (THE "PLAN")

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS [4:00 P.M.] (PREVAILING CENTRAL TIME) ON [FEBRUARY 6], 2020 UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS [JANUARY 9], 2020 (THE "VOTING RECORD DATE").

**RECOMMENDATION BY THE DEBTORS**

The special committee of the board of directors of EP Energy Corporation and each of the governing bodies for each of its affiliated debtors have unanimously approved the transactions contemplated by the Solicitation and the Plan. The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Further, parties holding approximately 95% in aggregate principal amount of the Claims under the Debtors' RBL Facility (as defined herein), 79.3% in aggregate principal amount of the Debtors' 1.5L Notes (as defined herein), and 52.0% in aggregate principal amount of the Debtors' 1.25L Notes (as defined herein) have agreed to vote in favor of the Plan.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW COMMON SHARES PURSUANT TO SECTIONS 4.6 AND 4.7 OF THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS

AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE SHAREHOLDER AGREEMENT, THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE SHAREHOLDER AGREEMENT, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE ISSUANCE AND SALE OF THE NEW COMMON SHARES PURSUANT TO THE RIGHTS OFFERING AND TO THE BACKSTOP PARTIES UNDER THE BACKSTOP COMMITMENT AGREEMENT (INCLUDING THE NEW COMMON SHARES COMPRISING THE BACKSTOP COMMITMENT PREMIUM) IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(a)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER. SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT. THE TRANSFERS OF SUCH SECURITIES ARE ALSO SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE SHAREHOLDER AGREEMENT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH AND UNDER THE CAPTION "FINANCIAL PROJECTIONS"

ELSEWHERE IN THIS DISCLOSURE STATEMENT) AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS THE VOLATILITY OF AND POTENTIAL FOR SUSTAINED LOW OIL, NATURAL GAS AND NGLS PRICES, THE SUPPLY AND DEMAND FOR OIL, NATURAL GAS AND NGLS, CHANGES IN COMMODITY PRICES FOR OIL AND NATURAL GAS, THE DEBTORS' ABILITY TO MEET PRODUCTION VOLUME TARGETS, THE UNCERTAINTY OF ESTIMATING PROVED RESERVES AND UNPROVED RESOURCES, THE DEBTORS' ABILITY TO DEVELOP PROVED UNDEVELOPED RESOURCES AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES AND OTHER FACTORS LISTED IN THE DEBTORS' SEC FILINGS.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE

PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) HOLDERS OF ALL CLAIMS AND INTERESTS THAT ARE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN BUT DO NOT OPT OUT, (V) ALL OTHER HOLDERS OF CLAIMS AND INTERESTS, AND (VI) THE RELEASED PARTIES.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

    A.     Overview of Restructuring................................................................1
    B.     Plan Support Agreement ..................................................................3
    C.     Backstop Commitment Agreement....................................................4
    D.     DIP-to-Exit Commitment..................................................................5
    E.     Inquiries ...........................................................................................6

II. SUMMARY OF PLAN TREATMENT ...............................................................7

III. OVERVIEW OF DEBTORS' OPERATIONS.....................................................11

    A.     Business Overview..........................................................................11
         1.     General Overview ...............................................................11
         2.     Drilling Operations ............................................................12
         3.     Joint Ventures ....................................................................12
         4.     Hedging..............................................................................13
    B.     Debtors' Corporate History and Structure .....................................13
         1.     Corporate History...............................................................13
         2.     Debtors' Corporate and Governance Structure.................14
    C.     Equity Ownership ...........................................................................15
    D.     Prepetition Indebtedness .................................................................16
         1.     RBL Claims .......................................................................16
         2.     1.125L Notes Claims .........................................................17
         3.     1.25L Notes Claims ...........................................................17
         4.     1.5L Notes Claims .............................................................18
         5.     Intercreditor Agreements ...................................................18
         6.     Unsecured Notes Claims ....................................................19
         7.     Other Claims......................................................................19
         8.     Prepetition Legal Proceedings ..........................................20
         9.     Intercompany Claims .........................................................20

IV. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ................21

    A.     Continued Weakness in Oil & Gas Exploration and Production Industry............21
    B.     Prepetition Restructuring Efforts ...................................................21
         1.     Operational Initiatives........................................................21
         2.     Strategic Transactions ........................................................21
         3.     Leverage and Liquidity Concerns......................................22
         4.     Special Committee Appointed to Oversee Strategic Process ...................22

5.      Debtors Engage with Creditors and Other Parties ......................................23

6.      Utilization of Grace Period and Entry into Forbearance
        Agreements ..............................................................24

7.      Agreement in Principle with Initial Supporting Noteholders ...................24

8.      Negotiations Regarding Tax Attributes ................................................25

C.   Prepetition Analysis .................................................................................25

1.      Independent Investigation .................................................................25

2.      Mortgage Lien Analysis ...................................................................26

V. OVERVIEW OF CHAPTER 11 CASES ...............................................................27

A.   Commencement of Chapter 11 Cases and First Day Motions ...............................27
B.   First Day Motions ......................................................................................28
C.   Procedural Motions and Retention of Professionals ............................................28
D.   Retention of Chapter 11 Professionals ..............................................................29
E.   Postpetition Novation of Hedges ......................................................................29
F.   Execution of Backstop Commitment Agreement and PSA and Entry into
     DIP Facility and Exit Commitment Letter ...........................................................29
G.   Appointment of Creditors' Committee ..............................................................29
H.   Adversary Complaint to Invalidate MSB's Judgement Lien ................................30
I.   Altamont Adversary Complaint ......................................................................31
J.   Exclusivity ..............................................................................................31
K.   Statements and Schedules, and Claims Bar Dates ...............................................31

VI. SUMMARY OF PLAN .....................................................................................32

A.   Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax
     Claims. .................................................................................................32

1.      Treatment of Administrative Expense Claims. .......................................32

2.      Treatment of Fee Claims. ................................................................33

3.      Treatment of DIP Claims and Commitments. .........................................33

4.      Payment of Fees and Expenses Under DIP Order. ..................................34

5.      Treatment of Priority Tax Claims. ......................................................34

B.   Classification of Claims and Interests. .............................................................34

1.      Classification in General. .................................................................34

2.      Formation of Debtor Groups for Convenience Only. ..............................34

3.      Summary of Classification of Claims and Interests. ...............................35

4.      Special Provision Governing Unimpaired Claims. ..................................35

5.      Separate Classification of Other Secured Claims. ..................................35

6.      Elimination of Vacant Classes. .........................................................35

7.      Voting Classes; Presumed Acceptance by Non-Voting Classes. ...............36

8.      Voting; Presumptions; Solicitation. ....................................................36

9.      Cramdown. ...................................................................................36

|   | 10. | No Waiver. | 36 |
| C. | | Treatment of Claims and Interests. | 37 |
|   | 1. | Class 1: Other Secured Claims. | 37 |
|   | 2. | Class 2: Other Priority Claims. | 37 |
|   | 3. | Class 3: RBL Claims. | 37 |
|   | 4. | Class 4: 1.125L Notes Claims. | 38 |
|   | 5. | Class 5: 1.25L Notes Claims. | 38 |
|   | 6. | Class 6: Secured 1.5L Notes Claims. | 38 |
|   | 7. | Class 7: Unsecured Claims. | 39 |
|   | 8. | Class 8: Convenience Claims. | 39 |
|   | 9. | Class 9: Intercompany Claims. | 39 |
|   | 10. | Class 10: Subordinated Claims. | 40 |
|   | 11. | Class 11: Existing Parent Equity Interests. | 40 |
|   | 12. | Class 12: Other Equity Interests. | 40 |
|   | 13. | Class 13: Intercompany Interests. | 40 |
|   | 14. | Treatment of Vacant Classes. | 41 |
| D. | | Means for Implementation. | 41 |
|   | 1. | Compromise and Settlement of Claims, Interests, and Controversies. | 41 |
|   | 2. | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 41 |
|   | 3. | Corporate Action. | 42 |
|   | 4. | Plan Funding. | 42 |
|   | 5. | Cancellation of Existing Securities and Agreements. | 42 |
|   | 6. | Cancellation of Certain Existing Security Interests. | 44 |
|   | 7. | Officers and Boards of Directors. | 44 |
|   | 8. | Employee Incentive Plan. | 45 |
|   | 9. | Authorization, Issuance, and Delivery of New Common Shares. | 45 |
|   | 10. | Exit Credit Agreement. | 46 |
|   | 11. | Rights Offering. | 46 |
|   | 12. | Intercompany Interests; Corporate Reorganization. | 47 |
|   | 13. | Restructuring Transactions. | 48 |
|   | 14. | Restructuring Expenses. | 48 |
|   | 15. | Indenture Trustee Expenses. | 48 |
|   | 16. | Private Company. | 49 |
| E. | | Distributions. | 49 |
|   | 1. | Distributions Generally. | 49 |
|   | 2. | No Postpetition Interest on Claims. | 49 |
|   | 3. | Date of Distributions. | 49 |

4. Distribution Record Date. ....................................................................49

5. Distributions after Effective Date ........................................................50

6. Disbursing Agent. ................................................................................50

7. Delivery of Distributions. ....................................................................50

8. Unclaimed Property. ............................................................................51

9. Satisfaction of Claims. .........................................................................51

10. Manner of Payment under Plan............................................................51

11. Fractional Shares and De Minimis Cash Distributions. ........................51

12. No Distribution in Excess of Amount of Allowed Claim.......................52

13. Allocation of Distributions between Principal and Interest.....................52

14. Exemption from Securities Laws...........................................................52

15. Setoffs and Recoupments......................................................................53

16. Rights and Powers of Disbursing Agent. ..............................................53

17. Withholding and Reporting Requirements. ............................................53

F. Procedures for Disputed Claims. .....................................................................54

1. Allowance of Claims. ...........................................................................54

2. Claims Objections. ...............................................................................54

3. Estimation of Claims.............................................................................55

4. Adjustment to Claims Register Without Objection. ...............................55

5. Time to File Objections to Claims. ........................................................55

6. Disallowance of Claims ........................................................................55

7. Amendments to Claims. ........................................................................56

8. No Distributions Pending Allowance. ...................................................56

9. Disputed Claims Reserve. .....................................................................56

10. Distributions after Allowance. ..............................................................58

11. Claims Resolution Procedures Cumulative. ...........................................58

G. Executory Contracts and Unexpired Leases. ....................................................58

1. General Treatment. ...............................................................................58

2. Determination of Cure Amounts and Deemed Consent. .........................59

3. Payments Related to Assumption of Contracts and Leases. .....................59

4. Rejection Damages Claims. ...................................................................60

5. Survival of the Debtors' Indemnification Obligations............................60

6. Compensation and Benefit Plans. ..........................................................60

7. Insurance Policies. ................................................................................61

8. Modifications, Amendments, Supplements, Restatements, or Other Agreements. ..........................................................................................61

9. Reservation of Rights. ..........................................................................61

H. Conditions Precedent to Occurrence of Effective Date. ....................................62

1. Conditions Precedent to Confirmation...................................................62

2.      Conditions Precedent to Effective Date. ..................................................62

3.      Waiver of Conditions Precedent. ...........................................................64

4.      Effect of Failure of a Condition. ............................................................64

I.      Effect of Confirmation. ...................................................................................65

1.      Binding Effect. .......................................................................................65

2.      Vesting of Assets. ...................................................................................65

3.      Discharge of Claims Against and Interests in Debtors. ..........................65

4.      Pre-Confirmation Injunctions and Stays. ...............................................66

5.      Injunction against Interference with Plan. ..............................................66

6.      Plan Injunction. ......................................................................................66

7.      Releases...................................................................................................67

8.      Exculpation. ............................................................................................70

9.      Injunction Related to Releases and Exculpation......................................71

10.     Subordinated Claims. ..............................................................................71

11.     Retention of Causes of Action and Reservation of Rights. ......................71

12.     Ipso Facto and Similar Provisions Ineffective. ......................................71

13.     Indemnification and Reimbursement Obligations. ..................................71

J.      Retention of Jurisdiction. ................................................................................72

1.      Retention of Jurisdiction. ........................................................................72

K.      Miscellaneous Provisions.................................................................................74

1.      Exemption from Certain Transfer Taxes. ................................................74

2.      Request for Expedited Determination of Taxes........................................74

3.      Dates of Actions to Implement Plan. ......................................................74

4.      Amendments. ..........................................................................................74

5.      Revocation or Withdrawal of Plan. .........................................................75

6.      Severability. ............................................................................................75

VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
    SECURITIES LAWS.................................................................................................76

A.      1145 Securities.................................................................................................76

B.      Private Placement.............................................................................................77

VIII. CERTAIN TAX CONSEQUENCES OF PLAN ...................................................79

A.      Consequences to the Debtors ...........................................................................80

1.      Cancellation of Debt ...............................................................................81

2.      Limitation of NOL Carryforwards and Other Tax Attributes...................81

B.      Consequences to Holders of Certain Claims .....................................................83

1.      Treatment of U.S. Holders of RBL Claims..............................................84

2.      Treatment of U.S. Holders of 1.5L Notes Claims.....................................86

3. Treatment of U.S. Holders of Unsecured Claims (Other Than 1.5L Deficiency Claims) ..................................................................89

4. Distributions in Discharge of Accrued Interest or OID ...........................90

5. Character of Gain or Loss ................................................................91

6. Disposition of New Common Shares by U.S. Holders .............................92

7. Tax Treatment of Disputed Claims Reserve ..........................................92

8. Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims) ......................................................93

9. FATCA .......................................................................................95

C. Treatment of Existing Parent Equity Interests ......................................96
D. Withholding on Distributions and Information Reporting......................97

IX. CERTAIN RISK FACTORS TO BE CONSIDERED ...........................................97

A. Certain Bankruptcy Law Considerations ............................................98
1. General .......................................................................................98
2. Risk of Non-Confirmation of the Plan..............................................98
3. Non-Consensual Confirmation and Conversion into Chapter 7 Cases ..........................................................................................99
4. Risk of Non-Occurrence of the Effective Date....................................99
5. Risk of Termination of the Plan Support Agreement ...........................99
6. Risks Related to Possible Objections to the Plan.................................99
7. Releases, Injunctions, and Exculpations Provisions May Not Be Approved....................................................................................100
B. Risks Related to Exit Facility .........................................................100
1. Defects in Collateral Securing the Exit Facility .................................100
2. Failure to Perfect Security Interests in Collateral ..............................100
3. Casualty Risk of Collateral ............................................................101
4. Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors............................101
C. Additional Factors Affecting the Value of Reorganized Debtors..............101
1. Claims Could Be More than Projected ..............................................101
2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary.............................................101
3. Risks Associated with the Debtors' Business and Industry....................102
4. DIP Facility................................................................................103
5. Post-Effective Date Indebtedness ....................................................103
D. Factors Relating to Securities to Be Issued under Plan .........................104
1. Market for Securities....................................................................104
2. Potential Dilution ........................................................................104
3. Significant Holders ......................................................................104

|  |  | 4. | Equity Interests Subordinated to Reorganized Debtors' Indebtedness | 104 |
|  |  | 5. | Implied Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares | 105 |
|  |  | 6. | No Intention to Pay Dividends | 105 |
|  |  | 7. | Reorganized EP Energy will be a Private Company | 105 |
|  | E. | Factors Relating to Rights Offering | | 105 |
|  |  | 1. | Debtors Could Modify Rights Offering Procedures | 105 |
|  |  | 2. | Backstop Commitment Agreement Could Be Terminated | 106 |
|  | F. | Additional Factors | | 106 |
|  |  | 1. | Debtors Could Withdraw Plan | 106 |
|  |  | 2. | Debtors Have No Duty to Update | 106 |
|  |  | 3. | No Representations Outside the Disclosure Statement Are Authorized | 106 |
|  |  | 4. | No Legal or Tax Advice Is Provided by the Disclosure Statement | 106 |
|  |  | 5. | No Admission Made | 106 |
|  |  | 6. | Certain Tax Consequences | 107 |

X. VOTING PROCEDURES AND REQUIREMENTS .............................................. 107

|  | A. | Voting Deadline | | 107 |
|  | B. | Voting Procedures | | 107 |
|  | C. | Parties Entitled to Vote | | 108 |
|  |  | 1. | Fiduciaries and Other Representatives | 109 |
|  |  | 2. | Agreements Upon Furnishing Ballots | 109 |
|  |  | 3. | Change of Vote | 110 |
|  | D. | Waivers of Defects, Irregularities, etc. | | 110 |
|  | E. | Further Information, Additional Copies | | 110 |

XI. CONFIRMATION OF PLAN ............................................................................... 110

|  | A. | Confirmation Hearing | | 110 |
|  | B. | Objections to Confirmation | | 111 |
|  | C. | Requirements for Confirmation of Plan | | 112 |
|  |  | 1. | Acceptance of Plan | 112 |
|  |  | 2. | Best Interests Test | 113 |
|  |  | 3. | Feasibility | 114 |
|  |  | 4. | Valuation | 115 |

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN ........ 116

|  | A. | Alternative Plan of Reorganization | | 116 |
|  | B. | Sale under Section 363 of the Bankruptcy Code | | 116 |
|  | C. | Liquidation under Chapter 7 of Bankruptcy Code | | 117 |

XIII. CONCLUSION AND RECOMMENDATION ................................................................117

**Exhibit A**:     Plan

**Exhibit B**:     Plan Support Agreement

**Exhibit C**:     Organizational Chart

**Exhibit D**:     Liquidation Analysis

**Exhibit E**:     Financial Projections

**Exhibit F**:     Rights Offering Procedures

# I.
# INTRODUCTION

## A.       Overview of Restructuring

EP Energy Corporation ("**EP Energy**" or "**EP Parent**") and its debtor affiliates[2] (each, a "**Debtor**," and collectively, the "**Debtors**" or the "**Company**") submit this disclosure statement (as may be amended from time to time, the "**Disclosure Statement**") in connection with the Solicitation of votes on the *Amended Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and Its Affiliated Debtors* dated December 12, 2019 attached hereto as **Exhibit A**.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and holders of interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan.  This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the chapter 11 cases that commenced (the "**Chapter 11 Cases**") on October 3, 2019 (the "**Petition Date**"), and certain documents related to the Plan.[3]

As described in more detail below, the Debtors faced certain financial difficulties prior to the Petition Date and commenced these Chapter 11 Cases to accomplish a successful restructuring of their business through a substantial deleveraging of their capital structure to reduce the go-forward cost of capital for their otherwise healthy operations, as well as reject certain executory contracts the Debtors are party to that are burdensome to the Debtors' operations and estates.

The Plan is the result of extensive good faith negotiations, overseen by the Debtors' independent Special Committee (as defined herein), among the Debtors and a number of their key economic stakeholders that have agreed to support the Plan pursuant to (i) that certain Plan Support Agreement dated as of October 18, 2019 (the "**Plan Support Agreement**" or "**PSA**") with holders of approximately (a) 52.0% of the Debtors' 8.00% senior secured notes due 2024 and (b) 79.3% (in the aggregate) of the Debtors' 9.375% senior secured notes due 2024 and the Debtors' 8.00% senior secured notes due 2025, and (ii) that certain Exit Commitment Letter (as defined below) with holders of over 95% of the Claims under the Debtors' prepetition RBL Facility.

The Plan provides for a comprehensive restructuring of the Company's balance sheet and a significant investment of capital in the Debtors' business.  The transactions contemplated in the Plan will strengthen the Company by substantially reducing its debt and increasing its cash flow on a go-forward basis, and preserve in excess of 500 jobs.  Specifically, the proposed restructuring contemplates, among other things:

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

[3] Capitalized terms used in the Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

- a reduction of current debt on the Debtors' balance sheet by approximately $3.3 billion,

- a $475 million equity rights offering (the "**Rights Offering**"), which is being backstopped by the Supporting Noteholders (as defined below),

- access to an approximately $629 million exit credit facility (the "**Exit Facility**"), which RBL Lenders holding over 95% of the Claims under the Debtors' prepetition RBL Facility have committed to provide support for, and which the Debtors' prepetition RBL Facility and postpetition DIP Facility will "roll" into on the effective date of the Plan ("**Effective Date**").

The Company also may, subject to the terms of the Plan Support Agreement and Exit Commitment Letter, (i) consummate a private placement of New Common Shares for an aggregate purchase price of up to $75 million (the "**Private Placement**"), and (ii) obtain an incremental amount of up to $300 million in exit financing under the Exit Facility.

The Debtors will use the proceeds of the Rights Offering (and the Private Placement, if consummated) to, among other things, fund the costs and expenses of these Chapter 11 Cases, fund distributions under the Plan, and pay down the DIP Facility and Exit Facility as well as for working capital after emergence from chapter 11.

The Debtors believe that upon consummation of the Plan and the transactions contemplated thereby, the post-emergence enterprise will have the ability to withstand the challenges and volatility of the oil and gas industry and succeed as a leading operator in their three main regions: Northeastern Utah, the Eagle Ford shale in South Texas, and the Permian basin in West Texas.

The Plan provides for the following treatment of claims and equity interests:

- To the extent the DIP Facility is not paid down in full from the proceeds of the Rights Offering or the Private Placement, each holder of Allowed **DIP Claims** will receive on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

- Holders of Allowed **RBL Claims** will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

- Holders of Allowed **1.125L Notes Claims** will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders (as defined below), deliver a notice of redemption with

respect to, or otherwise voluntarily prepay (including by way of tender offer), a portion of the 1.125L Notes.

- Holders of Allowed **1.25L Notes Claims** will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes.

- Holders of Allowed **1.5L Notes Claims** will receive on account of the secured portion of such Allowed 1.5L Notes Claims, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claims, their Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement (if applicable), the Backstop Commitment Premium, and the EIP Shares, and (ii) the right to participate in the Rights Offering.

- Holders of Allowed **Unsecured Claims** (*i.e.*, Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims) will receive their pro rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares.

- Holders of Allowed **Convenience Claims** (*i.e.*, Claims that would otherwise be a General Unsecured Claim but are (i) Allowed in the amount of $100,000 or less, or (ii) irrevocably reduced to the Convenience Claim Amount at the election of the holder in accordance with the Plan) will receive the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) their pro rata share of the Convenience Claim Distribution Amount.

- Holders of **Existing Parent Equity Interests** will receive, on account of available assets of EP Energy, their Pro Rata share of $500,000 in cash.

### B.   Plan Support Agreement

On October 18, 2019, the Debtors entered into the Plan Support Agreement, a copy of which is annexed hereto as **Exhibit B**, with certain affiliates of, or funds managed by (a) Apollo Management Holdings, L.P. ("**Apollo**"), (b) Elliott Management Corporation ("**Elliott**" and, together with Apollo, the "**Initial Supporting Noteholders**"), (c) Access Industries, Inc. ("**Access**"), and (d) Avenue Capital Group (collectively, with the Initial Supporting Noteholders and Access, the "**Supporting Noteholders**").

The Plan Support Agreement provides that the parties thereto will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions of the Plan Support Agreement. In addition, in the Plan Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan, and to be subject to

certain milestones set forth below which, if not achieved, enable the Supporting Noteholders to terminate the Plan Support Agreement.

In accordance with the Plan Support Agreement, such milestones include:

(a)    Entry of a final order or orders by the Bankruptcy Court approving the Backstop Commitment Agreement by no later than November 25, 2019;

(b)    Entry of a final order or orders by the Bankruptcy Court approving the DIP Facility, the Exit Commitment Letter, and the Debtors' use of cash collateral by no later than December 2, 2019;

(c)    Entry of a final order by the Bankruptcy Court approving the Disclosure Statement by no later than January 8, 2020;

(d)    Entry of a final order by the Bankruptcy Court approving the Rights Offering Procedures by no later than January 8, 2020;

(e)    Entry of a final order by the Bankruptcy Court confirming the Plan by no later than February 28, 2020;[4] and

(f)    Occurrence of the Effective Date of the Plan by no later than March 19, 2020.

### C.    **Backstop Commitment Agreement**

On October 18, 2019, the Debtors also entered into the Backstop Commitment Agreement, pursuant to which the Supporting Noteholders have committed to (i) purchase New Common Shares at a 35% discount to a Stated Equity Value of $900 million for cash consideration of $325 million (which shall be reduced dollar-for-dollar for cash proceeds received in the Rights Offering) (the "**Cash Purchase Obligation**"), and (ii) exchange $138 million of Reinstated 1.25L Notes for New Common Shares issued at a 25.7% discount to a Stated Equity Value of $900 million (the "**Exchange Transaction**").

Until November 4, 2019, qualified holders of 1.5L Notes (other than the Supporting Noteholders) were offered the opportunity to join the Backstop Commitment Agreement (each such joining holder, an "**Additional Supporting Noteholder**" and collectively with the Supporting Noteholders, the "**Commitment Parties**") and (a) assume up to their *pro rata* portion of the Cash Purchase Obligation (and receive a corresponding *pro rata* portion of the Backstop Commitment Premium and Termination Fee (each as defined below)), and (b) commit to participate in the Exchange Transaction (for which no Backstop Commitment Premium or Termination Fee will be allocated or become payable) and exchange Reinstated 1.25L Notes for New Common Shares (subject to certain limitations specified in the Backstop Commitment Agreement), in each case at the same discount as the Supporting Noteholders.  No Additional Supporting Noteholders elected to join the Backstop Commitment Agreement.

---

[4] If the Bankruptcy Court has commenced a hearing on confirmation of the Plan as of February 28, 2020, this Milestone date shall be extended to March 16, 2020.

In consideration of the Commitment Parties' commitments under the Backstop Commitment Agreement, the Backstop Commitment Agreement provides that the Debtors shall provide to the Commitment Parties: (i) a commitment premium of $26 million of additional New Common Shares (the "**Backstop Commitment Premium**"), earned upon entry of the order approving the Backstop Commitment Agreement, and payable on the Closing Date at the Cash Purchase Price (as defined in the Backstop Commitment Agreement); (ii) if the Backstop Commitment Agreement is terminated as the result of the occurrence of certain specified conditions set forth in the Backstop Commitment Agreement, a termination fee in cash in an amount equal to $26 million (the "**Termination Fee**"); (iii) the reimbursement of the Supporting Noteholders' and their advisors' reasonable and documented out-of-pocket fees and expenses; and (iv) an indemnification against any and all losses, claims, damages, liabilities and costs and expenses arising out of or in connection with the Backstop Commitment Agreement and the transactions contemplated thereunder.

The Backstop Commitment Agreement has the same milestones as the PSA.

On November 25, 2019, the Bankruptcy Court entered an order approving the Debtors' entry into the Backstop Commitment Agreement and their obligations thereunder [Docket No. 483].

### D.      DIP-to-Exit Commitment

On October 18, 2019, the Debtors also reached an agreement with RBL Lenders holding over 95% of the Claims under the Debtors' prepetition RBL Facility (the "**Exit Commitment Parties**") to secure their commitment to support the Exit Facility, including to convert 50% of the obligations under their RBL Facility into a $314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility (the "**DIP Facility**") and upon the Effective Date of the Plan, to convert their remaining obligations under the RBL Facility and the DIP Facility into the Exit Facility (the "**DIP-to-Exit Facility**").

During the months leading up to the Petition Date, the Debtors conducted a thorough marketing process and engaged in extensive negotiations that resulted in obtaining a commitment to provide the Exit Facility on the best available terms.  Each of the other exit financing offers received by the Debtors were significantly less attractive than the DIP-to-Exit Facility due to one or more of the following: (i) a meaningfully smaller committed exit facility relative to the DIP-to-Exit Facility, (ii) a requirement that the Debtors take market risk due to syndications on a best-efforts basis, (iii) increased negative carry costs associated with the use of cash collateral, and/or (iv) significantly higher fees.

The RBL Agent and RBL Lenders conditioned the Exit Facility on it being part of a DIP-to-Exit Facility that included a roll up (the "**Roll-Up**") of 50% of the obligations owed under the RBL Credit Agreement into the DIP Facility.  The Debtors agreed to the Roll-Up as part of a package deal that included the Exit Commitment Parties' (i) commitment to provide an approximately $629 million Exit Facility, (ii) commitment to vote to accept the Plan, and (iii) consent to the Debtors' continued use of Cash Collateral.

As set forth in further detail in the Exit Term Sheet, a copy of which is annexed as Exhibit B to the Plan Support Agreement (annexed hereto as **Exhibit B**), on the Effective Date, the DIP Facility

and the remaining principal amount of any Allowed RBL Claims of each Prepetition RBL Lender that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of creditor participations under the Exit Credit Agreement (the "**Exit Revolving Facility**") that will be subject to a Borrowing Base (as defined in the Exit Term Sheet) and with commitments in an aggregate maximum principal amount of up to $629,420,912 less the aggregate principal amount of the Exit Term Facility (as defined below). In addition, the aggregate principal amount of any Allowed RBL Claims of each Prepetition RBL Lender that has not elected to participate in the Exit Revolving Facility will automatically be converted to a non-amortizing last-out term loan facility secured in a manner *pari passu* with the Exit Revolving Facility (the "**Exit Term Facility**").

The Debtors and the Exit Commitment Parties' agreements are memorialized in that certain $314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility and $629,420,912 Senior Secured Revolving Exit Facility Commitment Letter, dated October 18, 2019 (the "**Exit Commitment Letter**"). In addition to the approximately $629 million in the Exit Facility, pursuant to the Commitment Letter, the RBL Agent agreed to use its commercially reasonable efforts to arrange and syndicate an incremental amount of up to $300 million in exit financing pursuant to the Commitment Letter.

On November 25, 2019, the Bankruptcy Court entered an order approving the Debtors' entry into the DIP Facility and their obligations under the Exit Commitment Letter and related fee letters [Docket No. 482] (the "**DIP Order**").

### E. Inquiries

If you have any questions about the packet of materials you have received, please contact Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), at 1-877-502-9869 (domestic toll-free) or 1-917-947-2373 (international). Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available upon written request made to the Voting Agent at the following address:

<div align="center">

EP Energy Ballot Processing
c/o Prime Clerk, LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

</div>

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.primeclerk.com/EPEnergy. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

WHERE TO FIND ADDITIONAL INFORMATION: The Company currently files quarterly and annual reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement. Reports filed with the SEC on or after the date of this Disclosure Statement are also incorporated by reference herein.

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on March 18, 2019, as amended on April 30, 2019;

- Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2019, filed with the SEC on May 9, 2019;

- Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019, filed with the SEC on August 9, 2019; and

- Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2019, filed with the SEC on November 12, 2019.

## II.
## SUMMARY OF PLAN TREATMENT

The following table summarizes: (1) the treatment of Claims and Interests under the Plan; (2) which Classes are impaired by the Plan; (3) which Classes are entitled to vote on the Plan; and (4) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* section VI – Summary of the Plan below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in section XI.C.4 – Valuation below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 1 (Other Secured Claims) | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 2 (Other Priority Claims) | The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 3 (RBL Claims) | Each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: $314,710,456<br><br>Estimated Percentage Recovery: 100% |
| 4 (1.125L Notes Claims) | On the Effective Date, all Allowed 1.125L Notes Claims will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.125L Notes Indenture, a portion of the 1.125L Notes Claims. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $1,000,000,000[5]<br><br>Estimated Percentage Recovery: 100% |

---

[5] The estimated Allowed amount of 1.125L Notes Claims does not include any accrued interest. Pursuant to the DIP Order, holders of such 1.125L Claims are receiving adequate protection payments equal to interest payments due under the 1.125 Indenture. To the extent any interest under the 1.125L Indenture is accrued and unpaid on the Effective Date, such interest will be payable when due under the 1.125L Indenture in the ordinary course of business after the Effective Date.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 5 (1.25L Notes Claims) | On the Effective Date, all Allowed 1.25L Notes Claims will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes Claims. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $500,000,000[6] Estimated Percentage Recovery: 100% |
| 6 (Secured 1.5L Notes Claims) | On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares, and (ii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures. On the Effective Date, the 1.5L Notes will be cancelled, released and extinguished and will be of no further force or effect except as set forth herein, whether surrendered for cancellation or otherwise. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: $2,186,617,532[7] Estimated Percentage Recovery: 18.13%[8] |

---

[6] The estimated Allowed amount of 1.25L Notes Claims does not include any accrued interest. Pursuant to the DIP Order, holders of such 1.25L Claims are receiving adequate protection payments equal to interest payments due under the 1.25 Indenture. To the extent any interest under the 1.25L Indenture is accrued and unpaid on the Effective Date, such interest will be payable when due under the 1.25L Indenture in the ordinary course of business after the Effective Date.

[7] The estimated Allowed amount referred to herein includes the full amount of the 1.5L Notes Claims, including the 1.5L Notes Deficiency Claims. For purposes of establishing the Allowed amount of the 1.5L Notes Deficiency Claims, the Plan provides that, on the Effective Date, the Secured 1.5L Notes Claims (Class 6) will receive a recovery equal to $395,257,335 on account of the secured portion of the 1.5L Notes Claims, and the 1.5L Notes Deficiency Claims shall therefore be Allowed in the amount of $1,791,360,197.

[8] This percentage recovery is based on the full Allowed amount of the 1.5L Notes Claims.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 7 (Unsecured Claims) | On the Effective Date, holders of Allowed Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims will receive, in full and final satisfaction of such Claims, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares (the "Unsecured Shares"). On the Effective Date, the Unsecured Notes Claims, 1.5L Notes Deficiency Claims and General Unsecured Claims will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: $2,546,427,425  Estimated Percentage Recovery: 0.07% |
| 8 (Convenience Claims) | Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of (i) the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount.  Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: $1,750,000  Estimated Percentage Recovery: 10% |
| 9 (Intercompany Claims) | On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Initial Supporting Noteholders. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 10 (Subordinated Claims) | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims. | Impaired (**Not entitled** to vote because presumed to reject) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 11 (Existing Parent Equity Interests) | Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $500,000 in Cash.  On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 12 (Other Equity Interests) | Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution. | Impaired (**Not entitled** to vote because presumed to reject) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 13 (Intercompany Interests) | Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall, subject to the reasonable consent of the Initial Supporting Noteholders, be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |

## III.
## OVERVIEW OF DEBTORS' OPERATIONS

### A.  Business Overview

#### 1.  General Overview

EP Energy operates as an independent exploration and production company engaged in the acquisition and development of unconventional onshore oil and natural gas properties in the United States.  In 2018, EP Energy had operating revenues of approximately $1.324 billion.  The Company's revenues are generated primarily through the physical sale of oil, natural gas, and natural gas liquids to third-party customers at spot or market prices under both short and long-term contracts, as well as settlements of the Company's in-the-money commodity hedge positions.  The Debtors operate through a diverse base of producing assets and are focused on the development of drilling inventory located in three areas: the Eagle Ford shale in South Texas, the Permian basin in West Texas, and Northeastern Utah.  The Debtors have established significant contiguous leasehold positions in each of its three areas, representing approximately 463,000 net acres in total (as of May 2019).

The Debtors' strategy is to invest in opportunities that provide the highest return across their asset base, continually seek out operating and capital efficiencies, effectively manage costs, and identify accretive acquisition opportunities and divestitures – all with the objective of enhancing the Debtors' portfolio, growing asset value, improving cash flow and increasing financial flexibility.  Each of EP's areas is characterized by a long-lived reserve base and high drilling success rates.  EP's mission is to set the standard for the efficient development of hydrocarbons in the United States.

In addition to opportunities in its existing portfolio, the Company continuously explores strategic acquisitions of leasehold acreage or acquisitions of producing assets that allow the Company to leverage existing expertise in its operating areas, balance exposure to regions, basins and commodities, help achieve or enhance risk-adjusted returns competitive with those available in

11

existing programs and increase reserves. The Company also continuously evaluates its asset portfolio and sold oil and natural gas properties if such properties no longer meet long-term objectives.

As of the Petition Date, the Debtors employed approximately 360 employees and a supplemental workforce of approximately 180 temporary employees and independent contractors in their operations.

### 2. Drilling Operations

The Debtors' operations are extremely capital-intensive, with capital expenditures and asset acquisitions in 2018 totaling approximately $984 million in the aggregate ($644 million excluding acquisitions). In 2018, the Debtors completed 136 gross wells, and as of December 31, 2018 had a total of 29 gross wells drilled, but not completed, across its programs. The Debtors operate approximately 95% of their producing wells. Further, during 2018, the Debtors completed (i) 85 gross wells in the Eagle Ford for a total of 800 net operated wells, (ii) 27 gross wells in Northeastern Utah for a total of 342 net operated wells, and (iii) 24 gross wells in the Permian basin for a total of 350 net operated wells. In addition, the Debtors recompleted 81 gross wells in Northeastern Utah during 2018.

As of December 31, 2018, the Debtors had proven reserves of 324.5 million barrels of oil equivalent ("**MBoe**"), including 169 million barrels of proved oil reserves, 60 million barrels of proved natural gas liquids reserves, and 575 billion cubic feet of proved natural gas reserves, representing 52%, 18%, and 30%, respectively, of total proved reserves. Approximately 234 MBoe, or 72%, of the Company's total proved reserves are proved developed producing assets, which generated average production of 80.7 MBoe/d in 2018 from approximately 1,744 gross wells. During the six months ended June 30, 2019, the Company produced on average approximately 71,600 Boe per day, compared to 81,300 Boe per day during the same period in 2018.[9]

### 3. Joint Ventures

In addition to the Debtors' owned properties, the Debtors are party to certain joint ventures in their asset areas to enhance the development of wells, hold acreage, and/or improve near-term economics in its existing programs. In Northeastern Utah, the Company's joint venture partner is participating in the development of 60 wells, and as of December 31, 2018, the Debtors drilled and completed 43 wells under the joint venture agreement. Under the joint venture agreement, the Debtors fund less than half of the estimated drilling costs for a 50% working interest in the joint venture wells and sell the associated production to its joint venture partner.

Moreover, since 2017, EP Energy has been party to a joint venture with Wolfcamp Drillco Operating L.P. ("**Jeter Drillco**") to fund future oil and natural gas development in the Permian basin and the Eagle Ford Shale (the "**Jeter Drillco JV**"). Under the Jeter Drillco JV, Jeter Drillco

---

[9] Average production has been lower as a result of, among other reasons downstream third-party operational issues and constraints in the Eagle Ford shale and Permian basin, fewer wells placed on production in the Eagle Ford Shale, reduced drilling activity in Northeastern Utah, and a reduction in capital allocated to the Permian basin.

agreed to fund 60% of the estimated drilling, completion, and equipping costs in the joint venture wells, divided into two approximately $225 million investment tranches, in exchange for a 50% working interest. The Company is the operator of Jeter Drillco's assets. Under the Jeter Drillco JV, once Jeter achieves a specified internal rate of return on its invested capital in each tranche, a portion of its working interest reverts to the Company. The Debtors have completed the planned activity in the first tranche, having completed 69 wells in the Permian basin. In April 2018, the parties amended the Jeter Drillco JV to direct the second tranche investment to the Eagle Ford shale. Wells in the Eagle Ford shale began producing in the third quarter of 2018. As of September 24, 2019, the Debtors drilled and completed 57 wells in the Eagle Ford under the Jeter Drillco JV and have substantially completed their planned activity in the second tranche.

### 4.      Hedging

The Company utilizes derivative contracts to hedge its exposure to commodity price fluctuations and reduce the variability in the Company's cash flows associated with anticipated sales of future oil and natural gas production. As of the Petition Date, the Company had fifty-two (52) open hedging agreements that extend through 2020, including thirty-two (32) crude oil three-way arrangements; four (4) crude oil collar arrangements; eight (8) crude oil basis swaps; one (1) crude oil roll arrangement; three (3) natural gas fixed price swaps; and four (4) natural gas collar arrangements.

Approximately 90% of the Debtors' open hedging agreements relate to its crude oil production and the remaining 10% relates to the Company's natural gas production. As of the Petition Date, the aggregate mark-to-market value of all derivative assets and liabilities related to Company's prepetition hedging agreements, calculated using standard industry valuation processes, was a net derivative asset of approximately $62.6 million (subject to daily fluctuations). The Company's obligations under its hedges are secured by the same collateral (on the same priority) that secures its obligations under the RBL Credit Agreement. All of the Debtors' hedge counterparties are also RBL Lenders under the RBL Facility. Pursuant to the DIP Order, the Debtors' Prepetition Hedge Obligations are treated as DIP Obligations (each as defined in the DIP Order).

### B.      Debtors' Corporate History and Structure

### 1.      Corporate History

On February 14, 2012, affiliates of Apollo, Riverstone Holdings LLC ("**Riverstone**"), Access, and Korean National Oil Corporation ("**KNOC**", and collectively with Apollo, Riverstone, and Access, the "**Sponsors**"), along with other co-investors, formed EPE Acquisition, LLC ("**AcqCo**"). On May 24, 2012, the Sponsors acquired Debtor EP Energy LLC's predecessor and its subsidiaries from El Paso Corporation for approximately $7.2 billion in cash in a spin-out sale transaction that was consummated in connection with the $21.1 billion cash and stock merger of El Paso Corporation and Kinder Morgan, Inc. The acquisition was partly financed through the issuance of approximately $4.25 billion of debt by the Company.

On August 30, 2013, EP Energy was formed and the Sponsors and other members of AcqCo contributed their membership interests in AcqCo to EP Energy in exchange for common stock in EP Energy, resulting in EP Energy becoming the 100% equity owner of AcqCo. Subsequently, in

January 2014, EP Energy completed an initial public offering of 35.2 million shares of Class A common stock (approximately 14% of Class A common stock at the time) and received net proceeds of approximately $664 million (the "**2013 IPO**").  EP Energy's Class A common stock commenced trading on the New York Stock Exchange (the "**NYSE**") on January 17, 2014 under the ticker symbol "EPE".

### 2.   Debtors' Corporate and Governance Structure

Collectively, EP Energy and its direct and indirect subsidiaries consist of nine (9) entities organized under the laws of the State of Delaware, eight (8) of which are Debtors in these Chapter 11 Cases.[10]  A chart illustrating the Debtors' organizational structure as of the Petition Date is annexed hereto as **Exhibit C.**

EP Energy's board of directors generally functions as the Company's governing board.  On June 4, 2019, the Board of Directors of EP Energy (the "**Board**") established a special committee of three independent directors (the "**Special Committee**") to evaluate the Company's strategic alternatives, and to the extent applicable, negotiate, and implement one or more capital structure transactions.  Accordingly, the Special Committee, by virtue of its mandate, serves as the Company's governing body with respect to the restructuring and these Chapter 11 Cases.  The Special Committee approved the Debtors' entry into the Backstop Commitment Agreement and PSA as well as the filing of the Plan.

Each Debtor other than EP Energy (which was formerly a NYSE-listed corporation) is either a member-managed or manager-managed limited liability company or a corporation with a one-person or two-person board of directors, with the exception of one partnership entity that is managed by its general partner.  EP Energy's Board consists of the following thirteen directors:

| Name | Position |
| --- | --- |
| Alan R. Crain | Chairman; Independent Director; Special Committee Member |
| Gregory A. Beard | Director |
| Scott R. Browning | Director |
| Carol Flaton | Independent Director; Chair of Special Committee |
| Jae Hwii Gwag | Director |
| Wilson B. Handler | Director |
| J. Barton Kalsu | Independent Director; Special Committee Member |
| Rajen Mahagaokar | Director |
| Russell E. Parker | Director; President and CEO |
| Robert C. Reeves | Independent Director |
| Robert Tichio | Director |
| Rakesh Wilson | Director |
| Donald A. Wagner | Director |

---

[10] EPE Employee Holdings II, LLC ("**Employee Holdings**") is the only subsidiary of EP Energy that is not a debtor in these Chapter 11 Cases.  Employee Holdings has no operations or liabilities.  Its only asset is Class B common stock of EP Energy held for the benefit of current and former employees of the Company.  The Company believes that the Class B common stock is worthless.

The Company has highly experienced managers for its operations.  The Company's core management team consists of the following individuals:

| Name | Position |
| --- | --- |
| Russell E. Parker | President and Chief Executive Officer |
| Kyle A. McCuen | Senior Vice President and Chief Financial Officer |
| David Rush | Chief Restructuring Officer |
| Raymond J. Ambrose | Senior Vice President, Engineering and Subsurface |
| Chad D. England | Senior Vice President, Operations |
| Jace D. Locke | Vice President, General Counsel and Corporate Secretary |
| Peter D. Addison | Vice President, Land and Land Administration |
| Mark E. Hargis | Vice President, Geoscience |
| Dennis M. Price | Vice President, Marketing |

### C.   Equity Ownership

EP Energy is a public company and files annual reports with, and furnishes other information to, the Securities and Exchange Commission.  Until May 2019, the Class A common stock of EP Energy was listed on the NYSE under the symbol "EPE."  However, on January 3, 2019, the Company was notified by the NYSE that EP Energy was not in compliance with NYSE continued listing standards because the average closing price of its shares of Class A common stock had fallen below $1.00 per share over a period of 30 consecutive trading days.  On May 24, 2019, the Company was notified that due to "abnormally low" trading price levels, the NYSE commenced delisting proceedings to delist EP Energy's Class A common stock.  Trading in the Company's Class A common stock was suspended on May 23, 2019 and, beginning on May 24, 2019, the Class A common stock of the Company began trading on the OTC Pink marketplace under the symbol "EPEG".

As of August 31, 2019, (i) 255,136,111 shares of EP Energy's $0.01 par value Class A common stock were issued and outstanding, and (ii) 237,256 shares of the EP Energy's $0.01 par value Class B common stock were issued and outstanding.[11]

Holders of Class A common shares are entitled to one vote per Class A shares on all matters to be voted on by EP Energy's stockholders.  EP Energy's Class A common stock is currently held 39.0% by Apollo as record holder, 13.7% by Access, 12.3% by Riverstone, 12.3% by KNOC, and 22.7% by other shareholders.  All of the other Debtors are wholly-owned direct or indirect subsidiaries of EP Energy.

Class B common shares are non-voting shares that are held by certain current and former employees who were issued such shares in 2012, in addition to a smaller portion that were issued

---

[11] The Board is also authorized to provide for the issuance from time to time of preferred shares, but no preferred stock is currently issued or outstanding.

to non-debtor affiliate Employee Holdings in late 2013 in advance of the Company's 2013 IPO.[12] Class B common shares entitle holders to receive proceeds in the form of cash or Class A common shares upon certain performance events that did not occur prior to the Petition Date (*e.g*., the Sponsors receiving a return of at least 1.0x their invested capital plus a stated return).

Further, under EP Energy's prepetition stock-based compensation plans (the 2014 Omnibus Incentive Plan and 2017 Employment Inducement Plan), EP Energy may issue to the Company's employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, cash awards, and other stock-based awards. EP Energy is authorized to grant awards of up to 36,832,525 shares of common stock for awards under these plans, with 8,645,338 shares remaining available for issuance as of December 31, 2018.

### D.   Prepetition Indebtedness

As of the Petition Date, the Debtors' funded prepetition indebtedness was approximately $4.909 billion (plus accrued and unpaid interest and other expenses), consisting of the following:

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| RBL Claims | $629 million[13] | First lien on substantially all of the Debtors' assets |
| 1.125L Notes Claims | $1 billion | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims |
| 1.25L Notes Claims | $500 million | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims and 1.125L Notes Claims |
| 1.5L Notes Claims | $2.092 billion | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims, 1.125L Notes Claims, and 1.25L Note Claims |
| Unsecured Notes Claims | $688 million | N/A |
| **Total** | **$4.909 billion** | |

In connection with the DIP Order, the Bankruptcy Court approved the "roll-up" of 50% of the commitments under the RBL Facility into the DIP Facility. Accordingly, the current principal amount of the RBL Claims is approximately $315 million.

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing such indebtedness.

### 1.   RBL Claims

Certain of the Debtors are parties to that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time,

---

[12] Employee Holdings, as the holder of 70,000 Class B shares, was designed as a vehicle for future employee incentive awards pursuant to which employee participants would become entitled to receive amounts equal to a proportion of proceeds received by Employee Holdings from time to time.

[13] Including $27 million of outstanding letters of credit.

the "**RBL Credit Agreement**", and the claims thereunder, the "**RBL Claims**") between EP Energy LLC, as borrower (the "**RBL Borrower**"), AcqCo, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in its capacity as such, the "**RBL Agent**") and issuing bank, and the lenders party thereto (the "**RBL Lenders**") that provided for a commitment of approximately $629 million, including a sublimit for a letter of credit facility (the "**RBL Facility**"). As noted above, the current principal amount of the RBL Claims is approximately $315 million.

All of the Debtors, other than EP Energy and the RBL Borrower, are guarantors under the RBL Facility.  As of the Petition Date, the RBL Facility was fully drawn, including approximately $27 million in letters of credit that remained outstanding but were undrawn as of the date thereof, plus any applicable interest, fees, and other amounts outstanding under the RBL Credit Agreement. The RBL Claims are secured by a first-priority security interest in and liens (subject to certain permitted liens) on substantially all of the assets of AcqCo and its direct and indirect subsidiaries, including the vast majority of such entities' oil and natural gas properties, cash, accounts receivable, and other material assets.

### 2.    1.125L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**1.125L Indenture**", and the claims thereunder, the "**1.125L Notes Claims**"), dated as of May 23, 2018, among EP Energy LLC and Everest Acquisition Finance Inc. ("**Acquisition FinanceCo**", and together with EP Energy LLC, the "**EP Co-Issuers**") as co-issuers, each of the guarantors named therein (each of EP Energy LLC's direct and indirect subsidiaries, the "**Debtor Guarantors**"), and UMB Bank, National Association, as successor indenture trustee and notes collateral agent.  The obligations under the 1.125L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens on substantially all of the assets of the EP Co-Issuers and the Debtor Guarantors, including the vast majority of such entities' oil and natural gas properties, cash, accounts receivable, and other material assets (the "**Collateral**").

The liens securing the obligations under the 1.125L Indenture are junior in priority to the liens securing the RBL Claims.  As of the Petition Date, the aggregate amount outstanding under the 1.125L Indenture was $1 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

### 3.    1.25L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**1.25L Indenture**", and the claims thereunder, the "**1.25L Notes Claims**"), dated as of November 29, 2016, among the EP Co-Issuers, the Debtors Guarantors, and BOKF, NA, as successor indenture trustee and notes collateral agent.  The obligations under the 1.25L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral.  The liens securing the obligations under the 1.25L Indenture are junior in priority to the liens securing the RBL Claims and the 1.125L Notes Claims.  As of the Petition Date, the aggregate amount outstanding under the 1.25L Indenture was $500 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

4. **1.5L Notes Claims**

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2024 1.5L Indenture**", and the claims thereunder, the "**2024 1.5L Notes Claims**"), dated as of January 3, 2018, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee and notes collateral agent. The obligations under the 2024 1.5L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 2024 1.5L Indenture are junior in priority to the liens securing the RBL Claims, the 1.125L Notes Claims, and the 1.25L Notes Claims, and are *pari passu* with the 2025 1.5L Notes Claims (as defined herein). As of the date hereof, the aggregate amount outstanding under the 2024 1.5L Indenture is $1.092 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2025 1.5L Indenture**", and together with the 2024 1.5L Indenture, the "**1.5L Indentures**", and the claims thereunder, the "**2025 1.5L Notes Claims**", and together with the 2024 1.5L Notes Claims, the "**1.5L Notes Claims**"), dated as of February 6, 2017, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee and notes collateral agent. The obligations under the 2025 1.5L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 2025 1.5L Indenture are junior in priority to the liens securing the RBL Claims, the 1.125L Notes Claims, and the 1.25L Notes Claims, and are *pari passu* with the 2024 1.5L Notes Claims. As of the Petition Date, the aggregate amount outstanding under the 2025 1.5L Indenture was $1 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

The Debtors estimate that $1,791,360,197 of the 1.5L Notes Claims are 1.5L Deficiency Claims.

5. **Intercreditor Agreements**

The rights of the Debtors' prepetition secured parties with respect to the Collateral are governed by three intercreditor agreements (collectively, the "**Intercreditor Agreements**"):

(a) the rights as between the RBL Agent on one hand, and the notes collateral agent under the 1.125L Indenture on the other, are governed by that certain *Senior Priority Lien Intercreditor Agreement* dated as of May 23, 2018, with RBL Claims being "First-Priority Lien Obligations" thereunder, and 1.125L Notes Claims being "Second-Priority Lien Obligations" thereunder;

(b) the rights as between the RBL Agent and the notes collateral agent under the 1.125L Indenture on one hand, and the notes collateral agent under the 1.25L Indenture on the other, are governed by that certain *Additional Priority Lien Intercreditor Agreement* dated as of November 29, 2016, with RBL Claims and 1.125L Notes Claims being "First-Priority Lien Obligations" thereunder, and 1.25L Notes Claims being "Second-Priority Lien Obligations" thereunder; and

(c)     the rights as between the RBL Agent and the notes collateral agent under the 1.125L Indenture and the 1.25L Indenture on one hand, and the notes collateral agent under the 1.5L Indentures on the other, are governed by that certain *Priority Lien Intercreditor Agreement* dated as of August 24, 2016, with RBL Claims, 1.125L Notes Claims, and 1.125L Notes Claims being "First-Priority Lien Obligations" thereunder, and 1.5L Notes Claims being "Second-Priority Lien Obligations" thereunder.

The Intercreditor Agreements govern, among other things, the priority of distribution of the Collateral and proceeds thereof between the prepetition secured parties.

### 6.     Unsecured Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2020 Unsecured Notes Indenture**"), dated as of April 24, 2012, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee.  The obligations under the 2020 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2020 Unsecured Notes Indenture was $182 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2022 Unsecured Notes Indenture**"), dated as of August 13, 2012, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Services Fund Society, FSB, as indenture trustee.  The obligations under the 2022 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2022 Unsecured Notes Indenture was $182 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2023 Unsecured Notes Indenture**"), dated as of May 28, 2015, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Services Fund Society, FSB, as indenture trustee.  The obligations under the 2023 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2023 Unsecured Notes Indenture was $323 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

### 7.     Other Claims

The Company has other claims against it that do not consist of long-term funded debt.  Among other things, as described below, the Company is a defendant in numerous civil actions that may give rise to substantial unsecured claims, most of which are contingent, unliquidated, and disputed.

Further, in the ordinary course of their business, the Debtors incur trade debt with numerous vendors in connection with their operations.  The Company has a number of unsecured prepetition obligations to certain of its vendors that do not benefit from state-law lien rights or setoff rights.  However, a significant number of the Debtors' prepetition trade obligations have been satisfied by

the Debtors in accordance with first day relief granted by the Bankruptcy Court (as described below).

On November 18, 2019, the Debtors filed their schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**Statements**") detailing known claims against the Debtors. Upon the expiration of the Bar Date (as defined below), the Debtors will have more information regarding the amount of other claims against the Debtors, including General Unsecured Claims.

### 8.      Prepetition Legal Proceedings

Certain Debtors are named as defendants from time to time in routine litigation proceedings including, but not limited to, personal injury and breach of contract disputes.  For example, see Section V.H. herein describing the MFN Lawsuit (as defined below).  In management's view, Claims made in connection with the Legal Proceedings will be Allowed in an amount that is less than the claimed amount, and the outcome of these proceedings will not have a material adverse effect on the Debtors' financial position, results of operations, or cash flows.  The Debtors, however, cannot predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

### 9.      Intercompany Claims

In the ordinary course of business, the Debtors enter into intercompany transactions with one another ("**Intercompany Transactions,**" and any intercompany receivable and payable generated pursuant to an Intercompany Transaction, "**Intercompany Claim**") including when, among other things, (i) Debtors EP Energy, EP Energy E&P Company, L.P. ("**EP OpCo**"), and EP Energy LLC receive funds into their bank accounts on behalf of other Debtors, (ii) Debtors EP Energy, Ep OpCo, EP Energy Management, L.L.C., and EP Energy LLC make payments and disbursements out of their Bank Accounts on behalf of other Debtors, and (iii) funds are transferred between and among the Debtors.[14]

Intercompany Transactions and Intercompany Claims between Debtors are not generally settled by actual transfers of cash among the Debtors.  Instead, the Debtors track all Intercompany Transactions and Intercompany Claims electronically in their centralized accounting system, the results of which are recorded concurrently on the applicable Debtor's balance sheets and regularly reconciled.  The accounting system requires that all general ledger entries be balanced at the legal-entity level; therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet.  This results in a net balance of zero when consolidating all intercompany accounts.

The Debtors maintain records of all transactions processed through their cash management system. During these Chapter 11 Cases, the Debtors have kept and will continue to keep records of any postpetition Intercompany Transactions and Intercompany Claims.

---

[14] The Debtors do not transact or have any intercompany claims with their non-Debtor affiliate, EPE Employee Holdings II, LLC.

## IV.
## KEY EVENTS LEADING TO
## <u>COMMENCEMENT OF CHAPTER 11 CASES</u>

### A.     <u>Continued Weakness in Oil & Gas Exploration and Production Industry</u>

As has been well documented, the distressed market conditions in the oil and gas industry, which began in 2014, have negatively impacted all levels of the industry, including upstream companies that produce oil and gas.  As evidenced by the numerous chapter 11 filings or other announcements of debt restructurings in the industry, the impact of the volatility of the commodity markets on the Debtors' businesses is clear.  Notably, oil and natural gas prices dropped precipitously in 2014 and 2015 and have held at depressed levels for the last several years.  Both the decline and the length of this trough have been greater than what anyone in the business could have reasonably anticipated, resulting in a substantial decline in revenue, reserves, and asset values across the industry

The Debtors, of course, have not been immune to these adverse market conditions and the impact on its reserves, cash flow, and ability to service its outstanding indebtedness.  As with many of its peers, this drastic and prolonged drop in prices and the severe dislocations it caused to the Debtors' operations have impacted their asset base and put the Debtors in a stressed liquidity situation.

### B.     <u>Prepetition Restructuring Efforts</u>

#### 1.     <u>Operational Initiatives</u>

In November 2017, the Board announced a change in senior leadership with Russell E. Parker joining the Company and becoming its President and Chief Executive Officer, along with a new streamlined management structure.  In connection with the leadership change, the majority of the prior management team departed the organization.  The change in senior leadership was a move from an asset-based to a function-based organization, which was intended to enable greater flexibility in allocating capital and resources to specific assets and to improve the Debtors' cost structure and create efficiencies.

Further, the Debtors undertook a number of operational efforts to improve its financial position. Through vendor cost reduction initiatives, business optimization, and general efficiencies, the Debtors significantly reduced their cash operating cost structure.  For example, the Debtors reduced their run-rate general and administrative expenses by approximately 24% and its lease operating expense by 27% since Q3 2017.[15]

#### 2.     <u>Strategic Transactions</u>

Facing a declining revenue and asset-base on account of commodity prices, and approximately $365 million of annual interest expense, in 2018 the Debtors took a number of strategic steps in an effort to improve its asset portfolio and financial flexibility and address its capital structure and liquidity needs, including (i) completing $277 million in acquisitions in the Eagle Ford shale and

---

[15] Based on Q3 2017 compared to year-to-date 2019 (through May).

divesting of certain assets in Northeastern Utah for approximately $177 million, (ii) exchanging approximately $1.147 billion of the Unsecured Notes maturing in 2020, 2022, and 2023, for the new $1.092 billion of 2024 1.5L Notes, (iii) repurchasing $134 million of Unsecured Notes for approximately $89 million in cash, (iv) issuing $1 billion in senior secured 1.125L Notes maturing in 2026 and using the net proceeds to repay in full the outstanding amounts at that time under the RBL Facility, and (v) extending the maturity of the RBL Facility from May 2019 to November 2021.

### 3.   Leverage and Liquidity Concerns

Despite these efforts, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service its outstanding debt on a long-term basis and to maintain the liquidity necessary to operate its businesses and preserve its long-term viability and enterprise value. In March 2019, EP Energy stated in its Form 10-K annual report that its projections showed that, based on its then-forecasted EBITDAX (assuming approximately $55/barrel of oil), cash on hand, and remaining capacity under the RBL Facility, the Debtors would not have sufficient liquidity available to repay the 2020 Unsecured Notes at maturity and meet their working capital needs and/or fund their planned capital expenditures.[16]

### 4.   Special Committee Appointed to Oversee Strategic Process

Beginning in April 2019, certain ad hoc committees comprised of the Company's creditors began to organize, engage advisors, and deliver letters to the Company, each asking that the Company consider certain strategic alternatives. These creditors included (i) an ad hoc group of holders of the Company's 1.125L Notes and 1.25L Notes (each as defined herein) (the "**Ad Hoc 1.125L/1.25L Noteholder Group**"), (ii) certain holders of the Company's 1.5L Notes, including Elliott and Apollo, and (iii) an ad hoc group of holders of the Company's Unsecured Notes (as defined herein) (the "**Ad Hoc Unsecured Noteholder Group**"). Around this time, certain 1.5L Noteholders, including Elliott, and the Ad Hoc Unsecured Noteholder Group also delivered unsolicited proposals for potential restructuring and refinancing transactions, respectively.

On June 4, 2019, the Board established the Special Committee (and appointed to it independent members of the Board who are not affiliated with the Sponsors) to evaluate the Company's strategic alternatives, and to the extent applicable, negotiate, and implement one or more capital structure transactions. The Company also retained Weil, Gotshal & Manges LLP ("**Weil**") as counsel, Evercore Group L.L.C. ("**Evercore**") as investment banker, and FTI Consulting, Inc. ("**FTI**") (initially solely as financial advisor) to explore strategic alternatives and assist it in both (i) evaluating certain other sources of incremental liquidity, including additional debt issuances, refinancings, and asset sales, and (ii) potentially developing and implementing a comprehensive plan to restructure its balance sheet, whether in-court or out-of-court.

---

[16] Later, on May 9, 2019, the Company noted in its first-quarter 10-Q that there was substantial doubt about its ability to continue as a going concern.

### 5.        Debtors Engage with Creditors and Other Parties

In the months leading up to the Petition Date, the Company engaged in continuous discussions with its existing stakeholders with respect to a range of strategic transactions, including various out-of-court financing and capital markets transactions and potential comprehensive recapitalization and/or restructuring solutions.  Such stakeholders included (i) the Company's RBL Lenders, (ii) the Ad Hoc 1.125L/1.25L Noteholder Group, (iii) the certain 1.5L Noteholders, including Elliot, (iv) Apollo (the Company's largest prepetition equity sponsor and one of the Company's largest noteholders, holding 1.25L Notes and 1.5L Notes), (v) the Ad Hoc Unsecured Noteholder Group, and (vi) certain other creditors.

The Debtors executed non-disclosure agreements with (i) the advisors to (a) Elliott (Milbank LLP, Houlihan Lokey, Inc., W.D Von Gonten & Co., and DeGolyer and MacNaughton Corp.), (b) Apollo (Paul, Weiss, Rifkind, Wharton & Garrison LLP and Moelis & Company LLC), (c) the Ad Hoc 1.125L/1.25L Noteholder Group (Morrison & Foerster LLP and PJT Partners LP), and (d) the Ad Hoc Unsecured Noteholder Group (Stroock & Stroock & Lavan LLP, Rothschild & Co., and Intrepid Financial Partners), and (ii) certain members of certain of the foregoing constituencies. The Debtors also (x) established a data room to facilitate providing diligence to the foregoing advisors, (y) held a significant number of diligence calls and meetings between management, the Company's advisors and such parties and/or their respective advisors, and (z) participated in a number of in-person meetings with a number of such parties to discuss potential in-court restructurings and out-of-court transactions.

From May to mid-August 2019, EP's advisors had numerous calls and meetings with advisors to (i) the Ad Hoc 1.125L/1.25L Noteholder Group regarding, among other things, the terms of a potential restructuring, (ii) the certain 1.5L Noteholders, including Elliott and Apollo, to discuss a potential debt-for-equity transaction coupled with an equity rights offering, and (iii) the Ad Hoc Unsecured Noteholder Group to discuss a potential new financing transaction and/or unsecured notes repurchase.  During this period, the Special Committee met regularly to analyze and consider EP's strategic options, including the proposals made by the ad hoc committees.  The Special Committee meticulously weighed whether the Company should raise new money financing (including by, through its advisors, soliciting numerous indications of interest from potential lenders) to give the Company runway to continue to implement its business plan and make its scheduled coupon payments, or to implement a comprehensive restructuring of the Company.

The principal out-of-court strategies that the Special Committee considered (among other strategies) involved (i) fully utilizing the ability to raise up to an incremental $371 million of senior secured debt financing for additional funding or as an exchange, (ii) investing assets in an "unrestricted" subsidiary and utilizing such baskets to raise incremental financing to augment the Company's liquidity or fund a cash tender for existing securities of the Company at a discount to par value, and/or (iii) issuing new debt securities for existing securities of the Company at a discount to par value. However, absent an unforeseeable, substantial, and sustained rise in commodity prices, these potential transactions did not offer a sufficient solution to address the Debtors' balance sheet problems.  Further, as commodity prices continued to drop over the summer of 2019, access to the capital markets for oil and gas exploration and production firms became extremely limited.

The Debtors also began negotiating competing restructuring proposals with Elliott and Apollo on one hand, and the Ad Hoc 1.125L/1.5L Noteholder Group, on the other, as well as Exit Facility terms with JPM and other prospective RBL Lenders.  The Debtors also continued to have discussions with other stakeholders and financing sources.

### 6.      Utilization of Grace Period and Entry into Forbearance Agreements

Prior to the payment dates for their (i) $40 million coupon payment due on August 15, 2019 for the Company's 2025 1.5L Notes (the "**1.5L Coupon**"), and (ii)  $7.05 million coupon payment due on September 3, 2019 for the Company's 2022 Unsecured Notes, the Debtors elected not to pay such coupons and instead utilized the 30-day grace period in respect of such coupon payments in order to preserve liquidity and continue negotiations with stakeholders as long as possible.

Frequent discussions with the Debtors' stakeholders continued throughout the grace period.  After entering the grace period, the Debtors also continued to consider whether an out-of-court refinancing transaction on terms proposed by the Ad Hoc Unsecured Noteholder Group could be consummated, but given market conditions (i) such a transaction did not appear to offer a viable long-term capital structure solution for the Debtors, and (ii) in any event, capital providers in the market were not willing to finance the new money required in such a transaction.

To allow discussions to continue past the expiry of the grace period on the 1.5L Coupon, on September 14, 2019, the Debtors entered into forbearance agreements with parties holding more than 70% of the 2025 1.5L Notes (the "**1.5L Forbearance**") through September 22, 2019, and with the RBL Lenders through October 3, 2019 (but terminating upon the termination of the 1.5L Forbearance) (collectively with the 1.5L Forbearance, the "**Forbearance Agreements**").  The 1.5L Forbearance was subsequently extended through October 3, 2019 to allow negotiations to continue.

During this period, EP and its advisors held numerous in-person meetings and conference calls with the principals of and advisors to the Ad Hoc 1.125/1.25L Noteholder Group, Elliott, and Apollo to discuss EP's go-forward business plan and negotiate the terms of a potential restructuring transaction.  The Debtors exchanged competing proposals with these creditors with respect to a potential restructuring backstopped by a new money equity investment in EP.  The Debtors also made a proposal to the Ad Hoc 1.125L/1.25L Noteholder Group and the Initial Supporting Noteholders that would provide for all such parties to provide a new money equity investment in the Debtors and support a chapter 11 plan.  Further, EP and its advisors engaged in continuing negotiations with its RBL Lenders regarding a potential restructuring, including the consensual use of cash collateral in a chapter 11 case and provision of a committed exit reserve-based lending facility.

### 7.      Agreement in Principle with Initial Supporting Noteholders

Ultimately, after months of diligence and negotiations, the Initial Supporting Noteholders agreed in principle to backstop $463 million of an equity rights offering in connection with a deleveraging chapter 11 plan, and no other creditor or ad hoc group agreed to make a new money investment in the Debtors at sufficiently attractive terms.  Accordingly, after thoroughly exploring all options available to the Company and extensive negotiations with creditors across the Company's capital

structure, the Special Committee authorized the Debtors to reach an agreement in principle with the Initial Supporting Noteholders and commence these Chapter 11 Cases to pursue the transactions contemplated thereby.

### 8. Negotiations Regarding Tax Attributes

In connection with entry into the Plan Support Agreement, the Debtors and the Supporting Noteholders negotiated the treatment of holders of the Existing Parent Equity Interests.  During such negotiations, the parties focused on certain tax attributes of EP Parent and its Debtor subsidiaries, including (i) federal net operating loss carryforwards ("**NOLs**") that, as of the Petition Date were estimated to exceed $3.3 billion, (ii) federal interest expense carryforwards under section 163(j) of Title 26 of the United States Code that, as of the Petition Date, was estimated to exceed approximately $393 million, and (iii) other tax benefits, including tax basis in excess of the fair market value of the assets (collectively, the "**Tax Attributes**").  The Tax Attributes may reduce future taxable income and thus future tax liability, subject to certain statutory limitations.

For U.S. federal income tax purposes, the Tax Attributes are currently treated as residing at EP Parent rather than the Debtor subsidiaries which are generally disregarded as separate from EP Parent for U.S. federal income tax purposes. During the course of negotiations with the Initial Supporting Noteholders, the Debtors raised arguments suggesting that the Tax Attributes might have independent value from which only EP Parent (and not the Debtor subsidiaries) could benefit from.  The Debtors also raised arguments that because none of the holders of Claims on account of the Debtors' funded debt hold such claims against EP Parent, any value of the Tax Attributes should inure to the benefit of the Existing Parent Equity Interest Holders.  However, independent utilization of the Tax Attributes by EP Parent would entail surmounting significant practical and legal hurdles, including (i) the fact that EP Parent would have to generate taxable income in order to utilize the Tax Attributes, which would require new capital contributions by Existing Parent Equity Interest Holders to acquire or develop a new business able to generate taxable income, and (ii) EP Parent's ability to continue as a going concern.

Thus, while it is not clear whether the Tax Attributes have independent value (and, if they do, whether any such value should inure to the benefit of the Existing Parent Equity Holders), the parties to the Plan Support Agreement determined that, taking into account the significant hurdles to independent utilization, the uncertainty as to the value of the Tax Attributes, and the potential for unidentified liabilities of EP Parent, a $500,000 payment to the Existing Parent Equity Interest Holders under the Plan on account of the Tax Attributes would be in the best interests of all stakeholders.

### C. Prepetition Analysis

### 1. Independent Investigation

Prior to the Petition Date, Carol Flaton, in her capacity as both an independent director and member of the Special Committee, oversaw an investigation (the "**Independent Investigation**") into certain potential claims and estate causes of action in connection with (a) related party transactions (the "**RPTs**") between the Company and its Sponsors and (b) the general operation of the business and Board practices.  The RPTs included transactions involving the Company and its Sponsors

from May 2012 to October 2019 including, but not limited to (i) certain debt purchases in late 2018 and 2019; (ii) Jeter Drillco JV and certain payable disputes in connection therewith; and (iii) the management fee paid to Phoenix Natural Resources LLC to release members of its leadership team to join EP Energy. In connection with the Independent Investigation, Ms. Flaton directed Weil to assist in evaluating the colorability of any potential claims and estate causes of action related to the RPTs.

The Independent Investigation took place over the course of two months and involved an extensive factual and legal analysis, where Weil conferred with and reported on its investigation to Ms. Flaton throughout. In connection with the Independent Investigation, ten separate interviews were conducted, extensive documentation was reviewed, and the Company's governance practices and controls were carefully reviewed.

At the conclusion of the Independent Investigation, no colorable claims were identified belonging to the Company related to the RPTs or conduct by officers or directors, other than a potential non-material preference claim for reimbursements to Sponsors of reasonable expenses related to Board activities and transactions per the Company's Stockholders' Agreement, which may be subject to valid defenses. Given that there are no colorable claims, any such claims lack any measurable value. Further, when litigation costs were considered, it was concluded that such claims would likely have a negative value to the Company. Based upon the results of the Independent Investigation, Ms. Flaton concluded and therefore recommended to the Special Committee that any transaction should include releases for officers, directors, and Sponsors if such transaction is otherwise the best transaction available to the Company and is in the best interests of the Company and its stakeholders. Moreover, if the Sponsors provided any consideration to the Company in any such transaction, then such consideration significantly outweighs the benefits of preserving any potential claims.

## 2. Mortgage Lien Analysis

Prior to the Petition Date, the Debtors' advisors conducted an independent analysis of the quality and value of the mortgages filed in association with the Debtors' four tranches of secured funded debt. The Company's books and records were reviewed to determine (i) the technical validity of all filed mortgages to assure that individual mortgage forms satisfied relevant technical legal requirements (the "**Technical Validity Analysis**") and (ii) the lien coverage ratio, or the asset value of mortgaged properties to total asset value (the "**Lien Coverage Analysis**").

The Technical Validity Analysis included a comprehensive search of UCC financing statements in Utah and filed mortgages in Texas and Utah. FTI manually reviewed each of the 91 mortgage documents to determine whether (i) the document is legible, (ii) the mortgagor name is correct, (iii) the mortgagee name is correct, (iv) the trustee name is correct, (v) party signatures are present, (vi) the document is notarized, and (vii) the document is properly recorded (stamped with book/liber/volume number, page number, date, and time). In addition, Weil manually reviewed each of the 91 mortgage documents to determine the following: (i) within each secured loan tranche, relative to the base form for that tranche, the language of the grant, the language of the security agreement (for fixtures/as-extracted collateral), enforcement provisions, the description of debt, whether the mortgage has a valid "catchall/all assets in county" provision, (ii) documented

discrepancies between tranches of debt, and (iii) whether UCC's filed in Utah were validly extended.

Moreover, the Lien Coverage Analysis was performed using various reserve databases, including the most recent fall 2019 reserve report (the "**Fall 2019 Reserve Report**"), which was conducted during August and September of 2019 and provided to the RBL Agent.  The coverage ratio of the total proved value of mortgaged oil and gas leases to total Company reserve value (unrisked PV-10), based on the Fall 2019 Reserve Report, are as follows for each of the secured debt tranches:[17][18][19]

| Loan | PDP (Proved Developed Producing) | PNP (Proved Not Producing) | PUD (Proven Undeveloped Reserves) | Total |
|------|------|------|------|------|
| **RBL Facility** | 98.6% | 97.1% | 92.1% | 97.2% |
| **1.125L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **1.25L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **1.5L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **Total** | **98.6%** | **97.1%** | **92.1%** | **97.2%** |

As shown above, for each of the secured debt tranches, the Debtors determined that their prepetition secured lenders had valid, perfected liens in over 98.6% of the Debtors' proved developed producing reserves, 97.1% of the Debtors' proved developed non-producing reserves, and 92.1% of the Debtors' proved undeveloped reserves.

<div align="center">

**V.**
**OVERVIEW OF CHAPTER 11 CASES**

</div>

**A.    Commencement of Chapter 11 Cases and First Day Motions**

On October 3, 2019, the Debtors commenced their Chapter 11 Cases.  The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

---

[17] The values in the coverage ratio include $2.2 million of oil and gas leases that are potentially impacted by the Technical Validity Analysis, which if excluded would reduce the total coverage ratio in each tranche by 0.09%.

[18] Results shown are based solely on unrisked PV-10 values.

[19] Drilled Uncompleted Wells are included in the PNP reserve category in the Fall 2019 Reserve Report.

B.      **First Day Motions**

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**"). The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Restrict certain transfers of equity interests in the Debtors [Docket Nos. 56, 313];

- Pay certain prepetition taxes and assessments [Docket No. 57];

- Continue paying employee wages and benefits [Docket No. 58];

- Continue insurance and surety bond programs [Docket No. 61];

- Obtain use cash collateral [Docket No. 65];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket Nos. 66, 327];

- Pay certain prepetition joint interest billing, royalty, and lienable operating expenses [Docket Nos. 67];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 99]; and

- Reject a burdensome executory contract with Ruby Pipeline, L.L.C. [Docket No. 319].

C.      **Procedural Motions and Retention of Professionals**

The Debtors have filed various motions regarding procedural issues that are common to Chapter 11 Cases of similar size and complexity as these Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief request in such motions and entered various orders authorizing the Debtors to, among other things:

- Jointly administer the Debtors' estates [Docket No. 26]

- File a consolidated creditor matrix and list of 30 largest unsecured creditors and modify the requirement to file a list of equity security holders [Docket No. 59];

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 318]; and

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 317].

### D. Retention of Chapter 11 Professionals

The Debtors have filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include (i) FTI (including designating David Rush to serve as Chief Restructuring Officer); (ii) Evercore, as investment banker; (iii) Weil, as counsel to the Debtors; and (iv) Prime Clerk LLC, as claims, noticing, and solicitation agent; and (v) Ernst & Young LLP, as auditor. The Bankruptcy Court entered orders authorizing the retention of such professionals [Docket Nos. 316, 328, 315, 114, and 497, respectively].

### E. Postpetition Novation of Hedges

Following the Petition Date, DNB Bank AKA ("**DNB**"), one of the Debtors' hedging counterparties, informed the Debtors that it intended to terminate each of its outstanding hedging transactions with the Debtors unless such hedging transactions were successfully novated and such novation was approved by the Court. After negotiations, J. Aron & Company (the "**J. Aron**"), one of the Debtors' other hedging counterparties, DNB, and the Debtors agreed that DNB would novate its position under such hedging transactions to J. Aron and the Debtors would pay a $1 million novation fee to J. Aron. On October 16, 2019, the Bankruptcy Court entered the order granting the relief requested [Docket No. 155].

### F. Execution of Backstop Commitment Agreement and PSA and Entry into DIP Facility and Exit Commitment Letter

Following the Petition Date, the Debtors and their advisors worked to finalize definitive documentation to memorialize their agreement in principle with the Supporting Noteholders and secure the commitments necessary to prosecute their restructuring.

On October 18, 2019, following months of good-faith, arms'-length negotiations, the Debtors (i) entered into the Backstop Commitment Agreement and Plan Support Agreement with the Supporting Noteholders, and (ii) reached an agreement with the Exit Commitment Parties to provide the DIP-to-Exit Facility. The Backstop Commitment Agreement, Plan Support Agreement, and DIP-to-Exit Facility are described further in Section I herein.

On October 27, 2019, following the Debtors' entry into the PSA and Backstop Commitment Agreement, an ad hoc group of the Debtors' 1.125L Noteholders and 1.25L Noteholders submitted an alternative restructuring proposal to the Debtors. The Special Committee analyzed the proposal and determined that it did not provide an alternative that was superior to the Plan.

### G. Appointment of Creditors' Committee

On October 21, 2019, the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") was appointed by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these chapter 11 cases [Docket No. 200]. The members of the Creditors' Committee

are: (i) Wilmington Trust, N.A.; (ii) Wilmington Savings Fund Society, FSB; (iii) Rene R. Barrientos, Ltd. ("**Barrientos**"); and (iv) Antora Peak Capital Management LP. The Creditors' Committee has retained Stroock & Stroock & Lavan LLP as counsel, AlixPartners LLP as its financial advisor, and Jefferies Group LLC as its investment banker.

### H.      Adversary Complaint to Invalidate MSB's Judgement Lien

On October 31, 2019, the Debtors filed a complaint (the "**Complaint**") against Maltsberger/Storey Ranch, LLC ("**Maltsberger**"), Storey Minerals, Ltd. ("**Storey**"), and Barrientos (together with Maltsberger and Storey, "**MSB**"), seeking a declaratory judgment that MSB does not hold a valid judgment lien on certain of the Debtors' property, or alternatively, that the purported judgment lien should be avoided as a preferential transfer under section 547 of the Bankruptcy Code. On December 3, 2019, MSB filed its answer to the Complaint.

The Complaint arose in response to a breach of contract lawsuit filed by MSB against Debtor EP Energy E&P Company, L.P. ("**EP**") on May 29, 2018 in the 81st District Court of La Salle County, Texas, alleging that EP Energy E&P Company, L.P. breached a most favored-nations provision (the "**MFN Provision**") in three oil and gas leases with respect to the payment of bonus and delay rentals (the "**MFN Lawsuit**"). The MFN Lawsuit was litigated in the state trial court over the course of a year, and on March 2019, EP and MSB each filed cross-motions for summary judgment regarding the construction and interpretation of the most favored-nations provision contained in the applicable leases.

On June 6, 2019, the trial court granted in part and denied in part MSB's motion for partial summary judgment, (i) holding that EP breached the leases with respect to the bonus payment, entitling MSB to an additional bonus above what EP already paid to MSB, and (ii) denying MSB's claim for an increase in delay rentals under the MFN Provision. On June 19, 2019, the La Salle County District Court entered a judgment in favor of MSB in an amount of approximately $17.5 million to Maltsberger, $17.5 million to Storey, and $6.1 million to Barrientos. The final judgment was entered on the MFN Lawsuit docket on July 11, 2019 (the "**Final Judgment**"). EP perfected an appeal from the Final Judgment on July 17, 2019 and superseded the Final Judgment by depositing a cashier's check with the trial court clerk the same day. EP's appeal remains pending in the Texas Fourth Court of Appeals and the Final Judgment remains superseded. Meanwhile, MSB obtained an abstract of judgment from the trial court clerk on July 16, 2019 (the "**Abstract of Judgment**"), which was not in compliance with the requirements set forth under Texas Property Code § 52.003, and proceeded to record such Abstract of Judgment in the Real Property Records of La Salle County on August 22, 2019.

While MSB purports to hold a judgment lien because of the recorded Abstract of Judgment, the Debtors are seeking a judgment of the Bankruptcy Court declaring that the Abstract of Judgment fails to substantially comply with the statutory requirements of Texas Property Code § 52.003 and, in the alternative, that the judgment lien should be avoided as a preferential transfer under Section 547 of the Bankruptcy Code as it was recorded within 90 days of the filing of these Chapter 11 Cases.

## I.      Altamont Adversary Complaint

On November 22, 2019, Kinder Morgan Altamont LLC ("**Kinder**") filed an adversary complaint (the "**Altamont Complaint**") against EP, seeking (i) a declaration that the Altamont Agreement[20] is a covenant that runs with the land and cannot be rejected; (ii) alternatively, if the Altamont Agreement does not satisfy the privity of estate requirement for a covenant running with the land, a declaration that the Altamont Agreement is an equitable servitude that cannot be rejected; (iii) a declaration that the Omnibus Agreement[21] is integrated and non-severable from the Altamont Agreement; or (iv) alternatively, if the Bankruptcy Court determines that the Altamont Agreement is neither a covenant running with the land nor an equitable servitude, an order pursuant to section 365(d)(2) of the Bankruptcy Code compelling the Debtors to assume or reject the Altamont Agreement.[22]  EP's response deadline has not yet passed, but EP intends to file one or more pleadings contesting the requested relief.

## J.      Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Exclusive Periods currently remain in effect and expire on January 31, 2020, and March 31, 2020, respectively.

## K.      Statements and Schedules, and Claims Bar Dates

On October 7, 2019, the Bankruptcy Court entered an order approving (i) December 16, 2019 as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**Bar Date**");

---

[20]   The Altamont Agreement is defined to mean that certain gas purchasing/processing contract entered into between Kinder and EP, dated November 14, 2017, and made effective June 1, 2010 (as amended, modified, or supplemented).

[21]   The Omnibus Agreement is defined to mean that certain omnibus agreement entered into between El Paso E&P and El Paso Midstream, by which Kinder and EP became successor-in-interest to, dated February 8, 2012, and made effective January 1, 2012 (as amended, modified, or supplemented).

[22]   On October 8, 2019, Kinder filed a motion (Docket No. 105) seeking entry of an order "lifting the automatic stay for cause to require [EP] to provide adequate assurance that it has the financial wherewithal to perform under the [Altamont Agreement], a non-executory contract, that in accordance with sections 365(c) and 365(e)(2)(B) of the Bankruptcy Code, [Kinder] shall not be required to provide financial accommodations to [EP] and expend further funds absent a court order that the [Altamont Agreement] is not an executory contract or to the extent that it is deemed to be an executory contract, Debtor has assumed the [Altamont Agreement] and for such other and future relief to which [Kinder] may be entitled."  This motion was subsequently withdrawn prior to the filing of the Altamont Complaint.

and (ii) March 31, 2020 as the deadline for all governmental units to file a proof of Claim [Docket No. 98].

The Debtors provided notice of the Bar Date, and published notice of the Bar Date in the national edition of the *New York Times* and the *Houston Chronicle*.

On November 18, 2019, the Debtors filed their Schedules and Statements, detailing known claims against the Debtors. Further, as of December 11, 2019, over 189 proofs of Claim had been filed against the Debtors asserting in the aggregate approximately $70 million. The Debtors have begun to review and analyze the filed Claims, and will reconcile objections to the filed Claims as appropriate.

Upon the expiration of the Bar Date, the Debtors will have more information regarding the General Unsecured Claims and the allowed amounts in connection therewith.

Further, the Debtors intend to reject certain executory contracts pursuant to the Plan. Any counterparty to an executory contract that is rejected must file and serve a proof of Claim on the applicable Debtor that is party to the applicable executory contract to be rejected by no later than the applicable bar date governed by the Plan of the Court order governing such rejection.

## VI.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**. This summary is qualified in its entirety by reference to the Plan.

### A. **Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims.**

#### 1. **Treatment of Administrative Expense Claims.**

On (or as soon thereafter as is reasonably practicable) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or Restructuring Expenses) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2. Treatment of Fee Claims.

(a)    All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)    On the Confirmation Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 318]; *provided* that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way. For the avoidance of doubt, Restructuring Expenses shall not be paid into the Fee Escrow Account, and shall be payable on the Effective Date pursuant to Section 5.14 of the Plan.

(c)    Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 3. Treatment of DIP Claims and Commitments.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim and DIP Commitment, each holder of an Allowed DIP Claim or DIP Commitment shall receive, either (i) on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement or (ii) such other less favorable

treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed DIP Claims will have agreed upon in writing. Upon the indefeasible payment or satisfaction in Cash, and/or in the form of first-lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

### 4.      Payment of Fees and Expenses Under DIP Order.

On the later of (i) the Effective Date and (ii) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Agent and otherwise required to be paid under or pursuant to the applicable DIP Order. All payments of fees, expenses, or disbursements pursuant to Section 2.4 of the Plan shall be subject in all respects to the terms of the applicable DIP Order.

### 5.      Treatment of Priority Tax Claims.

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (i) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) or such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### B.      <u>Classification of Claims and Interests.</u>

### 1.      Classification in General.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 2.      Formation of Debtor Groups for Convenience Only.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a

change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.    Summary of Classification of Claims and Interests.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth in the Plan shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | RBL Claims | Impaired | Yes |
| Class 4 | 1.125L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 5 | 1.25L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 6 | Secured 1.5L Notes Claims | Impaired | Yes |
| Class 7 | Unsecured Claims | Impaired | Yes |
| Class 8 | Convenience Claims | Impaired | Yes |
| Class 9 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 10 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 11 | Existing Parent Equity Interests | Impaired | Yes |
| Class 12 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 13 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

### 4.    Special Provision Governing Unimpaired Claims.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 5.    Separate Classification of Other Secured Claims.

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 6.    Elimination of Vacant Classes.

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes

that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 7.    Voting Classes; Presumed Acceptance by Non-Voting Classes.

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 8.    Voting; Presumptions; Solicitation.

(a)    **Acceptance by Certain Impaired Classes**. Only holders of Allowed Claims or Interests in Classes 3, 6, 7, 8 and 11 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan. Holders of Claims or Interests in Classes 3, 6, 7, 8 and 11 shall receive ballots containing detailed voting instructions.

(b)    **Deemed Acceptance by Unimpaired Classes**. Holders of Claims and Interests in Classes 1, 2, 4, 5, 9, and 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)    **Deemed Rejection by Certain Impaired Classes**. Holders of Claims and Interests in Classes 10 and 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 9.    Cramdown.

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 10.    No Waiver.

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

C.      **Treatment of Claims and Interests**.

1.      **Class 1: Other Secured Claims.**

(a)     **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(b)     **Impairment and Voting**: Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

2.      **Class 2:  Other Priority Claims.**

(a)     **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

(b)     **Impairment and Voting**: Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

3.      **Class 3:  RBL Claims.**

(a)     **Treatment**: Each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

(b)     **Impairment and Voting**: RBL Claims are Impaired. Holders of Allowed RBL Claims are entitled to vote on the Plan.

(c)     **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date, consisting of $314,710,456 in principal amount, plus all other secured obligations, including unpaid interest, fees, and other reasonable and documented expenses arising and payable under the Prepetition RBL Credit Agreement that have not become DIP Claims pursuant to the DIP Order.

4.     **Class 4:  1.125L Notes Claims.**

(a)     **Treatment**: On the Effective Date, all Allowed 1.125L Notes Claims will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.125L Notes Indenture, a portion of the 1.125L Notes Claims.

(b)     **Impairment and Voting**: 1.125L Notes Claims are Unimpaired. Holders of Allowed 1.125L Notes Claims are not entitled to vote on the Plan.

5.     **Class 5:  1.25L Notes Claims.**

(a)     **Treatment**: On the Effective Date, all Allowed 1.25L Notes Claims will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes Claims.

(b)     **Impairment and Voting**: 1.25L Notes Claims are Unimpaired. Holders of Allowed 1.25L Notes Claims are not entitled to vote on the Plan.

6.     **Class 6:  Secured 1.5L Notes Claims.**

(a)     **Treatment**: On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares, and (ii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures.  On the Effective Date, the 1.5L Notes will be cancelled, released and extinguished and will be of no further force or effect except as set forth in the Plan, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting**: Secured 1.5L Notes Claims are Impaired. Holders of Allowed Secured 1.5L Notes Claims are entitled to vote on the Plan.

(c)     **Allowance**: The Secured 1.5L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $395,257,335.

### 7.     Class 7:  Unsecured Claims.

(a)     **Treatment**: On the Effective Date, holders of Allowed Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims will receive, in full and final satisfaction of such Claims, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares (the "**Unsecured Shares**").  On the Effective Date, the Unsecured Notes Claims, 1.5L Notes Deficiency Claims and General Unsecured Claims will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting**: Allowed Unsecured Claims are Impaired. Holders of Allowed Unsecured Claims are entitled to vote on the Plan.

### 8.     Class 8:  Convenience Claims.

(a)     **Treatment**: Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount. Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim.

(b)     **Impairment and Voting**: Allowed Convenience Claims are Impaired. Holders of Allowed Convenience Claims are entitled to vote on the Plan.

### 9.     Class 9:  Intercompany Claims.

(a)     **Treatment**: On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Initial Supporting Noteholders.

(b)     **Impairment and Voting**: All Allowed Intercompany Claims are deemed Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

10.        **Class 10:  Subordinated Claims.**

(a)        **Treatment**: All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(b)        **Impairment and Voting**: Allowed Subordinated Claims are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

11.        **Class 11:  Existing Parent Equity Interests.**

(a)        **Treatment**: Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $500,000 in Cash. On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b)        **Impairment and Voting:** Existing Parent Equity Interests are Impaired. Holders of Existing Parent Equity Interests are entitled to vote on the Plan.

12.        **Class 12:  Other Equity Interests.**

(a)        **Treatment**: Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.

(b)        **Impairment and Voting**: Other Equity Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

13.        **Class 13:  Intercompany Interests.**

(a)        **Treatment**: Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests shall, subject to the reasonable consent of the Initial Supporting Noteholders, be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.

(b)        **Impairment and Voting**: Intercompany Interests are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the **votes** of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

14.        **Treatment of Vacant Classes.**

Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan shall receive no Plan Distribution.

D.        **Means for Implementation.**

1.        **Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

2.        **Continued Corporate Existence; Effectuating Documents; Further Transactions.**

(a)        Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents or other applicable corporate governance documents.

(b)        On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, subject to the consent of the Initial Supporting Noteholders, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal and foreign law).

(c)        On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, subject to the consent of the Initial Supporting Noteholders: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery

of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

### 3.    Corporate Action.

(a)    Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided in the Plan, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Common Shares, (d) the entry into or execution of the Exit Facility Documents, (e) entry into the Shareholder Agreement by the Reorganized Debtors and the holders of New Common Shares, including participants in the Rights Offering, and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)    On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to, subject to the reasonable consent of the Initial Supporting Noteholders, issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by Section 5.3 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### 4.    Plan Funding.

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering and the Exit Facility.

### 5.    Cancellation of Existing Securities and Agreements.

(a)    Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (other than certain Intercompany Interests, the Reinstated Debt, the indentures governing the Reinstated Debt, the security documents governing or evidencing any security interests granted in favor of the holders of the Reinstated Debt or the collateral agents for the Reinstated Debt, the Intercreditor

Agreements and the security interests with respect to the Prepetition RBL Facility which secure the Exit Facility that are not modified by the Plan) (collectively, the "**Cancelled Agreements**") and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (a) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims and Interests and (b) allowing and preserving the rights of the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees, as applicable, to (i) make distributions on account of such Claims or Interests; (ii) maintain, enforce, and exercise their respective Indenture Trustee Charging Liens, as applicable, under the terms of the applicable Indentures, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (iv) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, or Unsecured Notes Trustees may have under the Plan, the applicable credit agreement, Indentures, collateral agreements, or pledge agreements; (v) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or Indentures; and (vi) execute documents pursuant to section 5.6 of the Plan; *provided*, *further*, that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees may take such further action to implement the terms of the Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and the Initial Supporting Noteholders to the extent not inconsistent with the Confirmation Order or the Plan.

        (b)    On and after the Effective Date, all duties, responsibilities or obligations of the Prepetition RBL Agent, the holders of RBL Claims, the DIP Agent, the holders of DIP Claims, the 1.5L Notes Trustees, the holders of 1.5L Notes Claims, the Unsecured Notes Trustees, and the holders of Unsecured Notes Claims, in each case under (i) the Prepetition RBL Credit Agreement and the other Credit Documents (as defined in the Prepetition RBL Credit Agreement), (ii) the DIP Facility Credit Agreement and the other Credit Documents (as defined in the DIP Facility Credit Agreement), (iii) the 1.5L Notes Indentures and the other Notes Documents (as defined in the applicable 1.5L Notes Indentures), and (iv) the Unsecured Notes Indentures and the other Notes Documents (as defined in the applicable Unsecured Notes Indentures), shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan. For the avoidance of doubt, the Debtors and the Reorganized Debtors (in each case, subject to the reasonable consent of the Initial Supporting Noteholders), the Prepetition RBL Agent, the DIP Agent, the 1.5L Notes Trustees, the Unsecured Notes Trustees, and the Disbursing Agent may (i) make post-Effective Date Distributions or take such other action to exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (ii) may take any other action necessary to cause the Plan to become Effective, including by implementing the Restructuring Transactions set forth in the Plan.

(c)     If the record holder of any 1.5L Note or Unsecured Note is DTC or its nominee or another securities depository or custodian thereof, and such 1.5L Note or Unsecured Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such 1.5L Note or Unsecured Note shall be deemed to have surrendered such Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.

## 6.     Cancellation of Certain Existing Security Interests.

(a)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(b)     After the Effective Date, the distributions to holders on account of 1.5L Notes Claims, and the payment of the Indenture Trustee Fees and Expenses with respect to the 1.5L Notes Trustees (including, without limitation, attorneys' fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the 1.5L Notes Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the 1.5L Notes Trustees, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the 1.5L Notes Trustees, including, without limitation, UCC-3 termination statements.

## 7.     Officers and Boards of Directors.

(a)     On the Effective Date, the New Board shall consist of the number of directors as set forth in the Plan Supplement. EP Energy's chief executive officer shall serve as a member of the New Board. The remaining initial members of the New Board shall be appointed by the Initial Supporting Noteholders in consultation with the Debtors and in accordance with the Plan Support Agreement. The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(c)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as

applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 8. Employee Incentive Plan.

On the Effective Date, the Employee Incentive Plan and the Emergence Awards (as defined in the EIP Term Sheet annexed as <u>Exhibit A-2</u> to the Plan Support Agreement) will become effective. All awards issued under the Employee Incentive Plan will be dilutive of all other New Common Shares issued pursuant to the Plan.

### 9. Authorization, Issuance, and Delivery of New Common Shares.

On the Effective Date, Reorganized EP Energy is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Reorganized EP Energy's New Corporate Governance Documents shall have provided for sufficient shares of authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by the Plan, including the Rights Offering, the Backstop Commitment Agreement, and the Employee Incentive Plan, and Reorganized EP Energy shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate such issuances.

On the Effective Date, each holder of New Common Shares (including participants in the Rights Offering) may, at the option of the Debtors, with the consent of the Initial Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the Shareholder Agreement and the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms.  The Shareholder Agreement may, and the New Corporate Governance Documents shall, be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document.  Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan or the Rights Offering upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

The Shareholder Agreement, a form of which will be filed as part of the Plan Supplement, will govern certain rights and obligations of the holders of New Common Shares and related corporate governance matters, including, among other things:  (i) the rights of certain holders of New Common Shares to designate directors to the New Board; (ii) certain provisions, if any, on the

transferability of the New Common Shares; (iii) preemptive rights and registration rights for certain holders of New Common Shares; and (iv) procedures and mechanisms associated with any future sale or public offering of New Common Shares.

## 10.     Exit Credit Agreement.

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Credit Agreement without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The Exit Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit Facilities Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all letters of credit issued under the Prepetition RBL Credit Agreement, shall be deemed issued or reissued, as applicable, under the Exit Credit Agreement in accordance with the terms and conditions of the Exit Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the Exit Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Exit Credit Agreement, as applicable, (including any Liens and security interests granted on the Assets) shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable Intercreditor Agreements, and not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facilities are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

## 11.     Rights Offering.

(a)     Terms. Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith and,

on the Effective Date, the Debtors shall consummate the Rights Offering, in each case subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders. The Rights Offering shall be backstopped in an amount equal to $463 million ($138 million of which shall be funded through the exchange of $138 million in aggregate principal amount of Reinstated 1.25L Notes held by the Backstop Parties on the terms set forth in the Backstop Commitment Agreement) by the Backstop Parties in accordance with and subject to the terms and conditions of the Rights Offering Procedures and the Backstop Agreement. The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement. The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the EIP Shares, is approximately 76.2%-78.0%, consisting of (i) approximately 55.6%-57.4% in the case of Rights Offering Shares purchased for cash and (ii) approximately 20.6% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes. The low end of the ranges set forth in the preceding sentence assumes that New Common Shares are issued only with respect to the backstopped portion of the Rights Offering and the high end of the ranges set forth in the preceding sentence assumes that the Rights Offering is fully subscribed. For the avoidance of doubt, EP Parent shall pay or cause to be paid all accrued but unpaid interest, including any stub interest, in Cash to the holders of the Reinstated 1.25L Notes that are exchanged in connection with the Rights Offering.

(b) <u>Purpose</u>. On the Effective Date, the proceeds of the Rights Offering may be used: (i) to pay down a portion of the DIP Facility and the Prepetition RBL Facility; (ii) pay all reasonable and documented Restructuring Expenses; (iii) fund Plan Distributions, case administration expenses, and exit costs; and (iv) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

(c) <u>Backstop Commitment</u>. In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase for Cash or in exchange for Reinstated 1.25L Notes, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the New Common Shares.

(d) <u>Backstop Commitment Premium</u>. As consideration for providing the backstop commitment for the Rights Offering, on the Effective Date, the Backstop Commitment Premium shall be allocated among the Backstop Parties in accordance with the Backstop Commitment Agreement.

## 12.    Intercompany Interests; Corporate Reorganization.

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 13.    Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan, the Confirmation Order and the Plan Support Agreement, including the reasonable consent of the Initial Supporting Noteholders, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 14.    Restructuring Expenses.

The outstanding Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (whether incurred prepetition or postpetition) shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Backstop Commitment Agreement, and without the need for any further notice or approval by the Bankruptcy Court or otherwise. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

### 15.    Indenture Trustee Expenses.

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Fees and Expenses without a reduction to recoveries to holders of the Secured Notes; *provided* that the Indenture Trustees shall provide the Debtors with summary invoices for the Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than fifteen (15) days prior to the Effective Date. Such summary invoices may (but are not required to) include estimates for the Indenture Trustee Fees and Expenses anticipated through the Effective Date and the release of any Liens required under the Plan. If the Debtors dispute any Indenture Trustee Fees and Expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) provide written notification, within ten (10) days after receipt of the summary invoices, to the Indenture Trustees (as applicable) specifying the disputed portion of the Indenture Trustee Fees and Expenses and the basis for such dispute, (ii) on the Effective Date, pay in Cash the undisputed portion of the Indenture Trustee Fees and Expenses, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Fees and Expenses pending any consensual resolution or resolution by the Bankruptcy Court.  Upon receipt of such notification, the applicable Indenture Trustee may assert its Indenture Trustee Charging Lien to pay the disputed portion of its Indenture Trustee Fees and Expenses to the extent provided under the applicable Indenture or may submit such dispute for resolution by the Bankruptcy Court.  For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the Indenture Trustees' rights to exercise their respective Indenture Trustee Charging Liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, or the Indentures (as applicable) from and after fifteen (15) days prior to the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services. The payment of such compensation and expenses will be made as soon as reasonably practicable, but in any case within the earlier of (i) the date upon which the Indenture Trustee releases any Liens under the Plan or (ii) ten (10) days following the applicable Indenture Trustee's notification of the Debtors or Reorganized Debtors, as applicable, of the amount of such costs or expenses.

### 16.    Private Company

The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; *provided*, that from and after the Effective Date, Reorganized EP Energy shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements).

### E.    Distributions.

### 1.    Distributions Generally.

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 2.    No Postpetition Interest on Claims.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 3.    Date of Distributions.

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, *however*, that the Reorganized Debtors may, with the consent of the Initial Supporting Noteholders, implement periodic distribution dates to the extent they determine them to be appropriate.

### 4.    Distribution Record Date.

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall

be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease and the Initial Supporting Noteholders, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions. All New Common Shares to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book- entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Shares will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deems such method of distribution advisable.

### 5.     Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.     Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.17 of the Plan.

### 7.     Delivery of Distributions.

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at:   (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.

In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Distributions of the New Common Shares will be made through the facilities of DTC in accordance with DTC's customary practices; *provided*, that the New Common Shares are permitted to be held through DTC's book-entry system; *provided*, *further*, that to the extent that the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, the Reorganized Debtors will take such reasonable actions as may be required to cause distributions of the New Common Shares under the Plan. No distributions will be made other than through DTC if the New Common Shares are permitted to be held through DTC's book entry system. Any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date will be forfeited. For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

### 8. Unclaimed Property.

One year from the later of: (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 9. Satisfaction of Claims.

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 10. Manner of Payment under Plan.

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 11. Fractional Shares and De Minimis Cash Distributions.

No fractional New Common Shares shall be distributed. When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.

The total number of New Common Shares to be distributed on account of Allowed Secured 1.5L Notes Claims, Allowed Unsecured Claims, the Rights Offering, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares shall be adjusted as necessary to account for the rounding provided for in the Plan. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $100.00 in Cash. Fractional New Common Shares that are not distributed in accordance with Section 6.11 of the Plan shall be returned to, and ownership thereof shall vest in, Reorganized EP Energy.

### 12.    No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### 13.    Allocation of Distributions between Principal and Interest.

Except as otherwise required by law, consideration received in respect of an Allowed 1.5L Notes Claim or Allowed Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 14.    Exemption from Securities Laws.

(a)    The issuance of and the distribution under the Plan of the New Common Shares pursuant to Sections 4.6(a) and 4.7(a) of the Plan shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)    The offer, issuance, and distribution of each of the Subscription Rights and the New Common Shares issuable upon the exercise thereof and the New Common Shares to Eligible Offerees pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain

conditions, the resale provisions of Rule 144 of the Securities Act. Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement.

### 15. Setoffs and Recoupments.

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against an Allowed Claim, other than the 1.5L Notes Claims, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s), with the consent of the Initial Supporting Noteholders, and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 16. Rights and Powers of Disbursing Agent.

(a)  Powers of Disbursing Agent. The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)  Expenses Incurred on or After the Effective Date. Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 17. Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. If such form is requested and not

submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution. If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to Section 6.17 of the Plan and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

### F.   Procedures for Disputed Claims.

#### 1.   Allowance of Claims.

Except as expressly provided in the Plan, the Claims Resolution Procedures, or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

#### 2.   Claims Objections.

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without

any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, in accordance with the Claims Resolution Procedures, in each case subject to the reasonable consent of the Initial Supporting Noteholders.

### 3.      Estimation of Claims.

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection, in each case subject to the reasonable consent of the Initial Supporting Noteholders. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 4.      Adjustment to Claims Register Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 5.      Time to File Objections to Claims.

Any objections to a Claim shall be filed on or before the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time.

### 6.      Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive

any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

## 7. Amendments to Claims.

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors.

## 8. No Distributions Pending Allowance.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

## 9. Disputed Claims Reserve.

(a)     There shall be withheld from the New Common Shares (which withheld New Common Shares shall not be issued by Reorganized EP Energy until such time as the respective Disputed Claims are resolved) to be distributed to holders of Allowed Unsecured Claims an amount of New Common Shares that would be distributable to Disputed Unsecured Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve). The Debtors intend to seek a determination, subject to the reasonable consent of the Initial Supporting Noteholders, by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed Unsecured Claims for purposes of determining the amount of New Common Shares attributable to such Disputed Claims. To the extent any dividends would have been payable on any withheld New Common Shares had such New Common Shares been issued and distributed on the Effective Date, an amount equal to such dividends shall be held by Reorganized EP Energy for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed and (ii) holders of Allowed Unsecured Claims (including holders of Disputed Unsecured Claims that are subsequently Allowed).

(b)     To the extent applicable, there shall also be withheld Cash from the Convenience Claim Distribution Amount in an amount that would be distributable to any Disputed Convenience Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).

(c)     Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat any cash and other property (other than the New Common Stock) held in the Disputed Claims Reserve as held by a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. For the avoidance

of doubt, New Common Stock which is not issued and outstanding until Disputed Claims are resolved and such New Common Stock can be immediately issued and distributed to the applicable claimant, shall not be treated as held by a disputed ownership fund for U.S. federal income tax purposes. All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

(d)      The Disbursing Agent shall hold in the Disputed Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed, (ii) holders of Disputed Convenience Claims against any of the Debtors whose Claims are subsequently Allowed, as applicable, and (iii) other parties entitled thereto hereunder. The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

(e)      To the extent that a Disputed Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of the New Common Shares, which Reorganized EP Energy shall issue to the Disbursing Agent (together with any amounts held on account of dividends on such withheld New Common Shares) out of the Disputed Claims Reserve, to which such holder is entitled hereunder. To the extent that a Disputed Convenience Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled hereunder out of the Disputed Claims Reserve. No interest shall be paid with respect to any Disputed Convenience Claim or any Disputed Unsecured Claim that becomes an Allowed Claim after the Effective Date.

(f)      In the event the remaining withheld New Common Shares attributable to Disputed Unsecured Claims are insufficient to satisfy all the Disputed Unsecured Claims that have become Allowed, such Disputed Unsecured Claims shall be satisfied Pro Rata from such remaining New Common Shares. After all New Common Shares have been distributed, no further distributions shall be made in respect of Disputed Unsecured Claims. At such time as all Disputed Unsecured Claims have been resolved, any remaining withheld New Common Shares issued in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for distribution in accordance with Section 4.7 of the Plan.

(g)      In the event the remaining withheld Cash from the Convenience Claim Distribution Amount is insufficient to satisfy all the Disputed Convenience Claims that have become Allowed, such Disputed Convenience Claims shall be satisfied Pro Rata from such remaining Cash. After all Cash has been distributed, no further distributions shall be made in respect of Disputed Convenience Claims. At such time as all Disputed Claims have been resolved,

any remaining withheld Cash from the Convenience Claim Amount issued in the Disputed Claims Reserve shall be revert to the Reorganized Debtors.

### 10. Distributions after Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 11. Claims Resolution Procedures Cumulative.

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by the Claims Resolution Procedures.

### G. Executory Contracts and Unexpired Leases.

### 1. General Treatment.

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. The assumption of executory contracts and unexpired leases hereunder may include, subject to the consent of the Initial Supporting Noteholders, the assignment of certain such contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing, or such earlier time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts, subject to the consent of the Initial Supporting Noteholders, to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and subject to the consent of the Initial Supporting Noteholders.

## 2. Determination of Cure Amounts and Deemed Consent.

(a) The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders.

(b) The Debtors shall serve a Cure Notice, which shall be reasonably acceptable to the Initial Supporting Noteholders, on parties to executory contracts and unexpired leases no later than thirty (30) days prior to the Confirmation Hearing in accordance with the order approving the Disclosure Statement. If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c) Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement to object to the proposed assumption, assumption and assignment, or related Cure Amount listed on the Cure Notice.

(d) The Bankruptcy Court will determine any Assumption Dispute by entry of an order; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any Assumption Dispute with the reasonable consent of the Initial Supporting Noteholders, and without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that where an Assumption Dispute relates solely to the applicable Cure Amount, the Debtors may with the reasonable consent of the Initial Supporting Noteholders assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute. If there is an Assumption Dispute, the Debtors reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

## 3. Payments Related to Assumption of Contracts and Leases.

(a) Any Cure Amounts shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amount as reflected in the applicable Cure Notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2 of the Plan, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors

may otherwise agree. If no Cure Amount is reflected in the applicable Cure Notice, no Cure Amount shall be deemed to be owing, unless otherwise ordered by the Bankruptcy Court.

(b)      Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 4.      Rejection Damages Claims.

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 5.      Survival of the Debtors' Indemnification Obligations.

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 6.      Compensation and Benefit Plans.

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental

death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of certain employment agreements, effective as of the Effective Date, in accordance with Employment Agreement Term Sheet annexed as Exhibit A-3 to the Plan Support Agreement.

7.      **Insurance Policies.**

(a)      All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)      In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)      In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

8.      **Modifications, Amendments, Supplements, Restatements, or Other Agreements.**

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

9.      **Reservation of Rights.**

(a)      Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)      Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)      Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall, subject to the consent of the Initial Supporting Noteholders, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### H.      Conditions Precedent to Occurrence of Effective Date.

### 1.      Conditions Precedent to Confirmation.

The confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)      The Plan and the Plan Supplement are consistent with the Plan Support Agreement.

(b)      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders; and

(c)      the Plan Support Agreement shall be in full force and effect and shall not have been terminated.

### 2.      Conditions Precedent to Effective Date.

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)      the Plan Support Agreement shall be in full force and effect and shall not have been terminated;

(b)      the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

(c)      the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(d)      the Bankruptcy Court shall have entered the order approving the Disclosure Statement, in form and substance acceptable to the Initial Supporting Noteholders, and

such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(e)        the Rights Offering and, if applicable, the Private Placement, shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Commitment Agreement, and any other relevant transaction documents;

(f)        the Definitive Documents will contain terms and conditions consistent in all material respects with the Plan Support Agreement (including all exhibits thereto) and shall otherwise be satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders;

(g)        the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement, and in form and substance acceptable to the Initial Supporting Noteholders;

(h)        the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(i)        the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

(j)        the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the Plan Support Agreement;

(k)        the Reinstated Debt shall have been reinstated in accordance with Sections 4.4 and 4.5 of the Plan;

(l)        all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived, and the Exit Facility, including all documentation related thereto, shall be in form and substance satisfactory to the Initial Supporting Noteholders and the Debtors;

(m)        the New Corporate Governance Documents shall be in full force and effect and in form and substance satisfactory to the Initial Supporting Noteholders;

(n)        the Registration Rights Agreement shall have been executed and delivered by EP Energy, shall otherwise have become effective with respect to the Supporting Noteholders and the other parties thereto, and shall be in full force and effect;

(o)        the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(p)     all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Commitment Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Commitment Agreement shall have been obtained; and

(q)     all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date shall have been paid in full by the Debtors in accordance with the Backstop Commitment Agreement.

### 3.     Waiver of Conditions Precedent.

(a)     Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Initial Supporting Noteholders without leave of or order of the Bankruptcy Court. If any such condition precedent is waived pursuant to Section 9.3 of the Plan and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. For the avoidance of doubt, the rendering of the Reinstated 1.25L Notes as unimpaired pursuant to Section 1124(2) of the Bankruptcy Code shall be deemed to occur immediately prior to the consummation of the Rights Offering.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 4.     Effect of Failure of a Condition.

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the termination of the Plan Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Supporting Noteholders, or any other Person.

I.     **Effect of Confirmation**.

1.     **Binding Effect.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

2.     **Vesting of Assets.**

Except as otherwise provided in the Plan, the Confirmation Order or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

3.     **Discharge of Claims Against and Interests in Debtors.**

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or

affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor

### 4. Pre-Confirmation Injunctions and Stays.

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. The *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of Debtors* [Docket No. 313] shall remain in full force and effect following the Effective Date solely with respect to transfers of the Existing Parent Equity Interests and Other Equity Interests prior to the Effective Date.

### 5. Injunction against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 6. Plan Injunction.

(a)     Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any

judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

**7.     Releases.**

(a)     <u>**RELEASES BY THE DEBTORS**</u>**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR**

**COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

**(b)** **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS.
AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS, AND THE DOCUMENTS IN THE PLAN SUPPLEMENT OR AS OTHERWISE PROVIDED IN ANY ORDER OF THE BANKRUPTCY COURT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR**

**UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

**(c)** *Release of Liens*. **Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Reinstated Debt and the Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions**

made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

### 8. Exculpation.

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, EXIT FACILITY, THE RIGHTS OFFERING, THE PRIVATE PLACEMENT, THE EMPLOYEE INCENTIVE PLAN, THE DISCLOSURE STATEMENT, THE PSA, THE RESTRUCTURING, AND THE PLAN (INCLUDING THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 9.        Injunction Related to Releases and Exculpation.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 10.        Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.        Retention of Causes of Action and Reservation of Rights.

Except as otherwise provided in the Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 12.        Ipso Facto and Similar Provisions Ineffective.

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 13.        Indemnification and Reimbursement Obligations.

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity prior

to, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## J.   Retention of Jurisdiction.

### 1.   Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)   to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)   to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)   to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)   to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)   to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)   to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)   to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any

Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)      to hear and determine matters related to the DIP Facilities and the Final DIP Order; and

(t)      to enter a final decree closing each of the Chapter 11 Cases.

### K.      Miscellaneous Provisions.

#### 1.      Exemption from Certain Transfer Taxes.

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

#### 2.      Request for Expedited Determination of Taxes.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

#### 3.      Dates of Actions to Implement Plan.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

#### 4.      Amendments.

(a)      Plan Modifications. Subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant

to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Initial Supporting Noteholders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the Plan Support Agreement through the Effective Date.

(b)      Certain Technical Amendments. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court with the consent of the Initial Supporting Noteholders.

(c)      Notwithstanding anything to the contrary in the Plan, any amendments or modifications to Section 9.2 of the Plan shall require the consent of the Initial Supporting Noteholders, and any change, modification, or amendment to the Plan that treats or affects any Supporting Noteholders in a manner that is materially and adversely disproportionate to the manner in which any other Supporting Noteholders are treated (after taking into account each of such Supporting Noteholders' respective holdings in the Debtors and the recoveries contemplated by the Plan) shall require the written consent of such materially adversely and disproportionately affected Supporting Noteholders.

## 5.      Revocation or Withdrawal of Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

## 6.      Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Initial Supporting Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the

remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with Section 12.6 of the Plan, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and (iii) nonseverable and mutually dependent.

# VII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

### A.    1145 Securities

The issuance of and the distribution under the Plan of the New Common Shares pursuant to Sections 4.6(a) and 4.7(a) of the Plan (the "**1145 Securities**") will be exempt from registration under section 5 of the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right.  In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more

of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

### B.  Private Placement

The issuance and sale of the New Common Shares pursuant to the Rights Offering and to the Backstop Parties under the Backstop Commitment Agreement (including the New Common Shares comprising the Backstop Commitment Premium) is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder (the "**4(a)(2) Securities**"). Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer. Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "**Exchange Act**") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also comply with the volume, manner of sale and notice requirements of Rule 144. First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker. Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must

file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.   It is currently contemplated that Reorganized EP Energy will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act; however, there may be a period after emergence from chapter 11 during which Reorganized EP Energy is subject to the reporting requirements of Section 13 or 15(b).   During any such period, the holding periods described above decrease from one-year to six months.

In addition to the foregoing, all transfers of New Common Shares will be subject to the transfer provisions and other applicable provisions set forth in the Shareholder Agreement.

\* \* \* \* \*

*Legends*.   To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the New Common Shares held by holders of 10% or more of the outstanding New Common Shares, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all 4(a)(2) Securities will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.   The Debtors and Reorganized Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.   All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN. THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VIII.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims and Existing Parent Equity Interests. The following summary does not address the U.S. federal income tax consequences to holders of Claims who are paid in full in cash, unimpaired or deemed to reject the Plan, or to holders of Claims acting in their capacity as Backstop Parties under the Backstop Commitment Agreement.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court. No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. Holders (as defined below) whose functional

currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction or who may hold both Claims and Existing Parent Equity Interests, and persons who use the accrual method of accounting and report income on an "applicable financial statement"). Except as otherwise indicated with respect to holders of Claims receiving New Common Shares pursuant to the Plan and to holders of Existing Parent Equity Interests, this summary does not address the U.S. federal income tax consequences of the transactions to non-U.S. taxpayers. In addition, this discussion does not address U.S. federal taxes other than income taxes.

The following discussion assumes that all Claims and Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtors are parties are respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion also assumes, that (i) Reorganized EP Energy will be the existing EP Energy corporate entity, it will not be a reincorporated entity or another new entity, and it will not be a member of a consolidated tax group of which it is not the common parent, and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from EP Energy for U.S. federal income tax purposes will continue to be disregarded as separate from EP Energy following the Effective Date (the "**Current Structure**"). However, under the Plan, the definition of "Reorganized EP Energy" allows for alternative structures, including the possibility that Reorganized EP Energy could be a different entity that acquires the assets or equity of the existing EP Energy. Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors, holders of Claims and holders of Interests described herein.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.

### A.   Consequences to the Debtors

For U.S. federal income tax purposes, EP Energy is the common parent of an affiliated group of companies that files a single consolidated U.S. federal income tax return (the "**Tax Group**"), of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly-owned by a member of the Tax Group. The Debtors estimate that, as of the Petition Date, the Tax Group had in excess of $3.3 billion of NOLs, disallowed interest expense carryforwards in excess of $393 million, and certain other Tax Attributes (including an aggregate tax basis in assets substantially in excess of their estimated fair market value).

The amount of any such NOLs and other Tax Attributes remain subject to audit and adjustment by the IRS. In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of the Tax Group independent of the Plan, which could adversely affect the ability to utilize the Tax Group's Tax Attributes. In an attempt to minimize

the likelihood of such an ownership change occurring, the Debtors obtained a final order from the Bankruptcy Court authorizing certain protective equity trading effective as of the Petition Date [Docket No. 313].

As discussed below, in connection with the implementation of the Plan, the Debtors expect that the amount of the Tax Group's NOL carryforwards, and possibly certain other Tax Attributes, will be reduced.   In addition, the subsequent utilization of any remaining NOLs and other Tax Attributes following the Effective Date may be severely restricted.

### 1.    Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its Tax Attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.   Although not free from doubt, it is expected that carryover of disallowed interest expense would not be a tax attribute subject to such reduction. The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.   Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other Tax Attributes.   Any reduction in Tax Attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

In connection with the implementation of the Plan, the Debtors expect to incur a substantial amount of COD for U.S. federal income tax purposes. The amount of COD and resulting attribute reduction is primarily dependent on the fair market value of the New Common Shares.  Based on the Stated Equity Value (*see* Section XI.C.4 – Valuation), the Debtors expect the Tax Group's NOL carryforwards to be substantially reduced but not entirely eliminated, with no reduction in other Tax Attributes.

### 2.    Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any NOL carryforwards, disallowed interest expense carryforwards and certain other Tax Attributes ("**Pre-Change Losses**") may be subject to limitation under section 382 of the Tax Code.   Any such limitation applies in addition to, and not in lieu of, the reduction of Tax Attributes that results from COD arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation.   The Debtors anticipate that the issuance of the New Common Shares pursuant to the Plan will result in an ownership change of the Tax Group.

(a)        Annual Limitation

In the event of an ownership change, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 1.59% for ownership changes occurring in December 2019).  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a currently effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance.  Alternatively, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.   In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10,000,000.00 or (2) fifteen percent of the fair market value of its assets (with certain adjustments) before the ownership change.

Whether the Debtors will have net unrealized built-in gain or loss as of the Effective Date is currently uncertain, and may be affected by the finalization of newly proposed Treasury Regulations.  On September 9, 2019, the IRS issued proposed regulations that would modify the calculation and treatment of net unrealized built-in gains and losses.  The regulations are proposed to be effective prospectively from the date final regulations are published in the Federal Register.  Depending on the terms of the final regulations, and whether such regulations are issued on or before the date the Plan becomes effective, any deductions or losses relating to the portion of the Tax Group's aggregate tax basis in excess of fair market value as of the Effective Date could be severely restricted.  Accordingly, final regulations, if issued and applicable, could have a material adverse impact on the Tax Group's ability to utilize such excess tax basis to offset future taxable income.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding

any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  The Debtors do not anticipate that such exception will apply in the present case, and the Plan is not premised on the application of such exception.

### B.     Consequences to Holders of Certain Claims

This summary discusses the U.S. federal income tax consequences to (i) U.S. Holders of Allowed RBL Claims, 1.5L Notes Claims and Unsecured Claims and (ii) Non-U.S. Holders[23] of Allowed 1.5L Notes Claims and Unsecured Claims receiving New Common Shares.  As used herein, the term "**U.S. Holder**" means a beneficial owner of Claims or Existing Parent Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims or Existing Parent Equity Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any such Claims or Existing Parent Equity Interests, you should consult your own tax advisor.

As indicated above, the discussion herein is based on the Current Structure and any deviation therefrom could materially change the U.S. federal income tax consequences described herein.

---

[23]  A "Non-U.S. Holder" means a beneficial owner of Claims or Existing Parent Equity Interests that is neither a U.S. Holder nor a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes.

### 1.     Treatment of U.S. Holders of RBL Claims

On the Effective Date, each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided* that each holder of an Allowed RBL Claim that elects to participate in the Exit Facility by the Voting Deadline will receive, on a dollar-for-dollar basis, first lien, first-out (with the holders of Allowed DIP Claims) revolving loans under the Exit Credit Agreement (such term loan and revolving loan, the "**New Loan Obligations**").

#### (a)     Gain or Loss on the Exchange of RBL Claims

For U.S. federal income tax purposes, the purported exchange of a new debt instrument for an existing debt instrument will be respected as an exchange, as a result of which (among other things) gain or loss is realized, if the terms of the new debt instrument compared to existing debt instrument constitute a "significant modification."   The applicable Treasury Regulations concerning modification of debt instruments generally provide that an exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes which are tested separately), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant.  The Debtors believe that the exchange of Allowed RBL Claims for New Loan Obligations is likely to be treated as a "significant modification" of the Allowed RBL Claims, and the remainder of this discussion so assumes.

Accordingly, the Debtors believe that the receipt of the New Loan Obligations in exchange for Allowed RBL Claims will be a fully taxable transaction to holders.  In general, a U.S. Holder of Allowed RBL Claims should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the "issue price" (as defined below) of the New Loan Obligations received in satisfaction of its Claims (other than any consideration received in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest).  *See* Section B.5 below – Character of Gain or Loss.  A U.S. Holder of Allowed RBL Claims will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* Section B.4 below – Distributions in Discharge of Accrued Interest or OID.

The "issue price" of any of the New Loan Obligations depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, the New Loan Obligations or the Allowed RBL Claims are considered traded on an "established market."  Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of the New Loan Obligations or Allowed RBL Claims, or if there is one or more "firm quotes" or "indicative quotes" with respect to the New Loan Obligations or Allowed RBL Claims, in each case as such terms are defined in applicable Treasury Regulations.  If any of the New Loan Obligations received are considered traded on an established market, the issue price of such New Loan Obligations for U.S. federal income tax purposes will equal their fair market value as of the Effective Date.  If any New Loan Obligations are not considered traded on an established market but the Allowed RBL Claims are so treated, the issue price of the New Loan Obligations for U.S. federal income tax purposes will be based on the fair market value of the Allowed RBL Claims.  Alternatively, if the Allowed RBL

Claims are also not considered traded on an established market, the issue price of the New Loan Obligations for U.S. federal income tax purposes generally will be their stated principal amount. If EP Energy determines that any of the New Loan Obligations or the Allowed RBL Claims are traded on an established market, such determination and the determination of issue price will be binding on a holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the EP Energy's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

As of the date hereof, the Debtors do not believe that the RBL Claims would currently be considered traded on an established market; however the relevant determination date for such purpose is the Effective Date and there can be no assurances that a sufficient market will not arise in respect of the RBL Claims or the New Loan Obligations between now and 15 days after the Effective Date. Accordingly, holders of RBL Claims are urged to consult their own tax advisors regarding such determination and the gain or loss that such holder may recognize upon implementation of the Plan.

If the RBL Claims or the New Loan Obligations are treated as traded on an established market and the New Loan Obligations are determined to be issued at a discount, it is possible that the final agreed terms of the New Loan Obligations may implicate the provisions of the Treasury Regulations relating to "contingent payment debt instruments." For example, if the New Loan Obligations are issued at a discount, the obligation of the Reorganized Debtors to prepay the loan if there is a reduction in the "borrowing base" could subject the New Loan Obligations to treatment as contingent payment debt instrument depending on the likelihood as of the Effective Date that such prepayments might actually occur. Based in part on the principle terms contained in the Exit Commitment Letter and the Financial Projections, as well as the likely absence of an established market, the Debtors do not currently expect to treat the New Loan Obligations as contingent payment debt instruments, and the tax discussion herein assumes that the New Loan Obligations are not contingent payment debt instruments. However, the Debtors' determination will be made based on the facts and circumstances as of the Effective Date, including the final agreed terms of the New Loan Obligations. No assurance can be provided that the Debtors' treatment would be sustained if challenged by the IRS. Treatment as a contingent payment debt instrument could affect the timing and amount of a holder's income and could cause the gain from the sale or other disposition of New Loan Obligations to be treated as ordinary income rather than capital gain. Holders of New Loan Obligations are urged to consult their own tax advisors regarding the possible application of the contingent payment debt instrument rules to the New Loan Obligations.

(b)     Stated Interest and Original Issue Discount on New Loan Obligations

Payments of stated interest on the New Loan Obligations generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the holder's regular method of tax accounting.

The New Loan Obligations may be treated as issued with original issue discount ("**OID**"). A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described in the preceding section) by at least a statutorily defined *de minimis* amount. The

"stated redemption price at maturity" of the New Loan Obligations for this purpose would include all principal and interest payable over the term of the New Loan Obligations, other than "qualified stated interest," *i.e.*, stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer).  The stated interest payable on the New Loan Obligations should be considered qualified stated interest for this purpose.   Accordingly, New Loan Obligations should be considered to be issued with OID for U.S. federal income tax purposes only if the stated principal amount of the respective New Loan Obligation exceeds its issue price by at least a *de minimis* amount.

If the New Loan Obligations are issued with OID, a U.S. Holder of New Loan Obligations generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the obligation.  Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash.  Any OID that a holder includes in income will increase the holder's adjusted tax basis in the New Loan Obligations.  A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the New Loan Obligations; instead, such payments will reduce the holder's adjusted tax basis in the New Loan Obligations by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on the New Loan Obligations for each day during the taxable year on which such holder holds the New Loan Obligations, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes.  The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period.  The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the New Loan Obligations at the beginning of the accrual period multiplied by the yield to maturity of the New Loan Obligations less the amount of any qualified stated interest allocable to such accrual period.  The "adjusted issue price" of the New Loan Obligations at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the New Loan Obligations in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the New Loan Obligations other than qualified stated interest.

The rules regarding the determination of issue price and OID are complex.  Accordingly, U.S. Holders of Allowed RBL Claims are urged to consult their own tax advisors regarding the possible application of the OID rules to the New Loan Obligations.

<h3 style="text-align:center">2.      Treatment of U.S. Holders of 1.5L Notes Claims</h3>

On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of such Allowed 1.5L Notes Claim, in full and final satisfaction of such Allowed 1.5L Notes Claim (i) New Common Shares (subject to dilution), plus additional New Common Shares in respect of any 1.5L Deficiency Claims, and (ii) the right to participate in the Rights Offering (such rights are herein referred to as "**Subscription Rights**").  In addition, a holder may from time to time receive

additional distributions of New Common Shares (and any distributions thereon) in respect of its 1.5L Deficiency Claims if any Disputed Unsecured Claims are subsequently disallowed.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of an Allowed 1.5L Notes Claim depends, in part, on whether a holder's Allowed 1.5L Notes Claim constitutes a "security" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.

The Allowed 1.5L Notes Claims had a six and a quarter (6-¼) year maturity and an eight (8) year maturity, respectively, at issuance. In addition, the 2024 1.5L Notes Claims were issued in January 2018 in exchange for outstanding debt obligations with maturities of between eight (8) and ten (10) years. Although it is the determination of whether the new instrument constitutes a security that generally controls, that determination may be governed by whether the exchanged instrument constituted a security based on the IRS ruling mentioned above. The Debtors intend to take the position and, unless otherwise indicated, the rest of this discussion assumes that the Allowed 1.5L Notes Claims qualify as securities for U.S. federal income tax purposes. U.S. Holders of Allowed 1.5L Notes Claims are urged to consult their own tax advisors regarding the appropriate status of their Allowed 1.5L Notes Claims for U.S. federal income tax purposes.

Also, unless otherwise indicated, the discussion below assumes that Subscription Rights to participate in the Rights Offering are respected as options to acquire the New Common Shares, but see subsection (b) below for a more complete discussion.

(a)     Recapitalization Treatment

A U.S. Holder's receipt of New Common Shares and Subscription Rights in exchange for Allowed 1.5L Notes Claims (that are treated as "securities" for U.S. federal income tax purposes) will qualify as a "recapitalization" for U.S. federal income tax purposes. Thus, in general, a U.S. Holder of an Allowed 1.5L Notes Claims will not recognize any gain or loss upon the exchange of its Claim for New Common Shares and Subscription Rights. However, a U.S. Holder will have interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued OID not previously included in income (*see* Section B.4 below – Distributions in Discharge of Accrued Interest or OID).

In the event of the subsequent disallowance of any Disputed Unsecured Claims, it is possible that a holder of a previously Allowed 1.5L Notes Claim may receive additional distributions of New Common Shares (and any cash or other distributions thereon) in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code.  If a holder receives any cash or other property in respect of its Claim due to the disallowance of a Disputed Unsecured Claim and has a realized gain with respect to its Claim (taking into account all additional distributions), such holder should recognize the gain to the extent of such distributions of cash or other property.  *See also* Section B.7 below – Tax Treatment of Disputed Claims Reserve.

In a recapitalization exchange, a U.S. Holder's aggregate tax basis in the New Common Shares and Subscription Rights should equal such U.S. Holder's adjusted tax basis in its Allowed 1.5L Notes Claim, increased by any gain or interest income recognized in the exchange, and decreased by the fair market value of any taxable consideration received.   In general, the holder's holding period in the New Common Shares and Subscription rights received would include the holder's holding period for its Claim, except to the extent that such rights were issued in respect of a Claim for accrued but unpaid interest or treated as imputed interest.

(b)      Right to Participate in the Rights Offering

The characterization of a Subscription Right and its subsequent exercise for U.S. federal income tax purposes – as the exercise of an option to acquire a portion of the New Common Shares or, alternatively, as an integrated transaction pursuant to which the New Common Shares are acquired directly in partial satisfaction of a holder's Claim – is uncertain.  As indicated, the discussion herein generally assumes that a Subscription Right is respected as an option to acquire New Common Shares.

Regardless of the characterization of a Subscription Right, a U.S. Holder of an Allowed 1.5L Notes Claim generally would not recognize any gain or loss upon the exercise of such right.  A U.S. holder's aggregate tax basis in the New Common Shares received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the New Common Shares and (ii) the holder's tax basis, if any, in either (a) the Subscription Rights, or (b) under an integrated transaction analysis, any New Common Shares received pursuant to the exercise of a Subscription Right to the extent that they are treated as directly acquired in partial satisfaction of the holder's Claim.  A U.S. holder's holding period in the New Common Shares received upon exercise of a Subscription Right (that are respected as an option) generally should commence the day following the Effective Date.  Under an integrated transaction analysis, a U.S. Holder's holding period in the portion of New Common Shares received in respect of its Claim would be determined as described above under recapitalization treatment, whereas the holding period for New Common Shares treated as purchased for cash should commence the day following the Effective Date.

It is uncertain whether a U.S. Holder that receives but does not exercise the Subscription Right should be treated as receiving anything of additional value in respect of its Claim.  If the U.S. Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Subscription Right.  In general, such loss would be a

capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which in the case of a recapitalization exchange, even if the right goes unexercised, should include the holding period of the Allowed 1.5L Notes Claim exchanged therefor).

### 3.   Treatment of U.S. Holders of Unsecured Claims (Other Than 1.5L Deficiency Claims)

Pursuant to the Plan, each holder of an Allowed Unsecured Claim generally will receive, in full and final satisfaction of such Unsecured Claim, their Pro Rata share of 1.0% of the New Common Shares (subject to dilution and other terms of the Plan). An initial distribution of New Common Shares to holders of Allowed Unsecured Claims may be made on the Effective Date, and additional distributions of New Common Shares (and any distributions thereon) may be made from time to time thereafter if any Disputed Unsecured Claims are subsequently disallowed. The Plan provides that holders of Allowed Convenience Claims will receive distributions up to an aggregate amount in Cash as set forth in the Plan, in full and final satisfaction of their Claims.

(a)   Unsecured Notes Claims

In the event that a holder of an Allowed 2020 Unsecured Notes Claim, Allowed 2022 Unsecured Notes Claim, or an Allowed 2023 Unsecured Notes Claim receives New Common Shares, such holder's U.S. federal income tax consequences will depend, in part, on whether the 2020 Unsecured Notes Claims, the 2022 Unsecured Notes Claims, or the 2023 Unsecured Notes Claims, as applicable, constitute "securities" for U.S. federal income tax purposes. As described above (*see* Section B.2 above – Treatment of U.S. Holders of 1.5L Notes Claims), the determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. The Debtors intend to take the position and, unless otherwise indicated, the rest of this discussion assumes that the Allowed Unsecured Notes Claims qualify as "securities" and that the exchange of such Claims for New Common Shares qualifies as a "recapitalization" for U.S. federal income tax purposes.

Accordingly, U.S. Holders of Allowed Unsecured Claims should be subject to treatment equivalent to that described for holders of Allowed 1.5L Notes under recapitalization treatment in Section B.2(a) above – Treatment of U.S. Holders of 1.5L Notes Claims – Recapitalization Treatment (disregarding the Subscription Rights).

U.S. Holders of Allowed Unsecured Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their Allowed Unsecured Claims.

(b)   General Unsecured Claims

In general, a U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of New Common Shares received in respect of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest). *See* Section B.5 below – Character of Gain or Loss. A U.S. Holder will have ordinary interest income to the extent

of any consideration allocable to accrued but unpaid interest not previously included in income. *See* Section B.4 below – Distributions in Discharge of Accrued Interest or OID.

In the event of the subsequent disallowance of any Disputed Unsecured Claim, it is possible that a holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code.  Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed General Unsecured Claim may be deferred until all Unsecured Claims are Allowed or Disallowed.  Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received due to the disallowance of a Disputed General Unsecured Claim.  *See also* Section B.7 below – Tax Treatment of Disputed Claims Reserve.

A U.S. Holder of an Allowed General Unsecured Claim will have a tax basis in its New Common Shares received in satisfaction of its Claims equal to their fair market value.  The holder's holding period in which the New Common Shares received should begin on the day following the Effective Date.

(c)     Convenience Claims

In general, a U.S. Holder of Allowed Convenience Claims receiving Cash in full and final satisfaction of its Claims, should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of Cash received in respect of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* Section B.5 below – Character of Gain or Loss.  A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or accrued OID not previously included in income.  *See* Section B.4 below – Distributions in Discharge of Accrued Interest or OID.

In the event of the subsequent disallowance of any Disputed Convenience Claims, it is possible that a holder of a previously Allowed Convenience Claim may receive additional distributions in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code.  Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Convenience Claim may be deferred until all Convenience Claims are Allowed or Disallowed.  Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received in respect of its Allowed Convenience Claim. *See also* Section B.7 below – Tax Treatment of Disputed Claims Reserve.

**4.     Distributions in Discharge of Accrued Interest or OID**

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross

income).  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued unpaid OID.  Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Section 6.13 of the Plan provides that, except as otherwise required by law, consideration received in respect of an Allowed 1.5L Notes Claim or Allowed Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  *U.S. Holders of Allowed Claims are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.*

### 5.        Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the stated redemption price of such Claim at maturity by at least a statutorily defined *de minimis* amount.  Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.  If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange but, if the exchange qualifies for recapitalization treatment, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of an Allowed 1.5L Notes Claim or Unsecured Notes Claim that qualifies for recapitalization treatment, the Tax Code indicates that any accrued market discount in respect of the Claim should not be currently includible in income under Treasury Regulations to be issued.  Any accrued market discount that is not included in income should carry over to any

nonrecognition property received in exchange therefor, *i.e.*, to the New Common Shares and, if applicable, Subscription Rights received.  Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Shares (including any New Common Shares received upon exercise of any Subscription Rights) should then be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury Regulations implementing this rule have not been issued.

### 6.        Disposition of New Common Shares by U.S. Holders

In general, unless a nonrecognition provision applies to a future disposition, and subject to the discussion above with respect to the potential carryover of accrued market discount (*see* B.5 above – Character of Gain or Loss), U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Shares in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Shares held and (ii) the sum of the cash and the fair market value of any property received from such disposition.  Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Shares is more than one year at that time.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

However, any gain recognized by a U.S. Holder upon a disposition of the New Common Shares received in exchange for its Claim (or any stock or property received for such New Common Shares in a later tax-free exchange) generally will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 7.        Tax Treatment of Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash or other property held in the Disputed Claims Reserve on account of Disputed Unsecured Claims and Disputed Convenience Claims as held in a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, the Disbursing Agent and the holders of 1.5L Notes Claims, Unsecured Claims, and Convenience Claims) will be required to report for tax purposes consistently with such treatment.  Accordingly, the Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the reserve will be taxable to such entity.

Any distributions from the reserve to holders of Allowed Claims will be treated for U.S. federal income tax purposes as if received directly from the Debtors on their Allowed Claims. The Disbursing Agent will be responsible for payment, out of the cash in the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve.  Accordingly, distributions from the reserve

will be net of any expenses including any taxes relating to the retention, disposition and distribution of assets in the reserve.  In the event, and to the extent, any cash of the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

The Plan provides that any New Common Shares withheld from distribution on account of Disputed Unsecured Claims will not be issued by Reorganized EP Energy until such time as the respective Disputed Claims are resolved and the shares are distributable by the Disbursing Agent to holders of Allowed Claims.  Accordingly, such shares should not be treated as held in and taxable to the Disputed Claims Reserve.

### 8.  Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims)

(a)     General Tax Treatment

In general, a Non-U.S. Holder of 1.5L Notes Claims and Unsecured Claims will not be subject to U.S. federal income or withholding tax on any gain recognized in a fully taxable exchange or recapitalization exchange of such Claims unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the exchange and certain other conditions are met (in which case the Non-U.S. Holder will be subject to 30% U.S. federal income tax (or, if applicable, a lower treaty rate) on any gain recognized, net of certain U.S. source net capital losses), or (b) such gain is effectively connected with the conduct of a U.S. trade or business (in which case such gain will be taxed as described below).

Consideration received by a Non-U.S. Holder in exchange for a 1.5L Notes Claim or Unsecured Claim, to the extent it represents accrued but unpaid interest (or imputed interest arising as a result of the receipt of additional consideration upon a subsequent disallowance of Disputed Unsecured Claims), generally will not be subject to U.S. federal income or withholding tax, provided that such amounts are not effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and: (1) the Non-U.S. Holder is not a "10-percent shareholder" with respect to the Company within the meaning of section 871(h)(3)(B) of the Tax Code; (2) the Non-U.S. Holder is not a controlled foreign corporation for U.S. federal income tax purposes that is related to the Company within the meaning of section 864(d)(4) of the Tax Code; (3) the Non-U.S. Holder is not a bank described in section 881(c)(3)(A) of the Tax Code; and (4) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN or Form W-8BEN-E, as applicable, certifying its non-U.S. status and exemption from FATCA withholding, if applicable.

Alternatively, such accrued but unpaid interest (or imputed interest) will be exempt from, or subject to a reduced rate of, U.S. federal withholding tax if (A) such Non-U.S. Holder provides a properly completed IRS Form W-8BEN or Form W-8BEN-E, as applicable, claiming an exemption from or reduction in withholding under an applicable tax treaty or (B) such interest is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business and such Non-U.S. Holder provides a properly completed IRS Form W-8ECI.

Accrued but unpaid interest (or imputed interest) that is not exempt from withholding as described above will be subject to a 30% U.S. federal withholding tax (unless an applicable income tax treaty provides otherwise).

If any gain or income (including amounts attributable to accrued but unpaid interest or imputed interest) recognized by a Non-U.S. Holder upon the exchange of a 1.5L Notes Claim or Unsecured Claim is effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder, the Non-U.S. Holder, although exempt from U.S. federal withholding tax described above (provided that the certification requirements described above are satisfied), will generally be subject to tax on a net income basis as if it were a U.S. Holder (unless an applicable income tax treaty provides otherwise).  In addition, if such Non-U.S. Holder is a foreign corporation and the gain or income (including amounts attributable to accrued and unpaid interest) is effectively connected with its conduct of a U.S. trade or business, such Non-U.S. Holder may be subject to a branch profits tax equal to 30% (or a lower applicable treaty rate) of its effectively connected earnings and profits subject to adjustments.

> (b)    Non-U.S. Holder Ownership and Disposition of New Common Shares
>
> (1)    Distributions

Subject to the application of FATCA and/or backup withholding, each discussed below, generally, any distributions of cash or property made to a Non-U.S. Holder with respect to New Common Shares that constitute dividend income, that are not effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder, will be subject to U.S. federal withholding tax at a rate of thirty percent (30%), or a lower treaty rate, if applicable.  Such dividend income will be subject to a reduced rate of U.S. federal withholding tax if (A) such Non-U.S. Holder provides a properly completed IRS Form W-8BEN or Form W-8BEN-E, as applicable, claiming a reduction in withholding under an applicable tax treaty or (B) such dividend income is effectively connected with the conduct of a U.S. trade or business of such Non-U.S. Holder, and such Non-U.S. Holder provides a properly completed IRS Form W-8ECI. Amounts not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and first be applied against and reduce a non-U.S. holder's adjusted tax basis in its common stock, but not below zero. Any excess will be treated as capital gain and such gain will be taxed as described below in Section B.8(b)(2 – Disposition of New Common Shares.

If any dividend income of a Non-U.S. Holder with respect to New Common Shares is effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder, the Non-U.S. Holder, although exempt from U.S. federal withholding tax described above (provided that the certification requirements described above are satisfied), will generally be subject to tax on a net income basis as if it were a U.S. Holder (unless an applicable income tax treaty provides otherwise). In addition, if such Non-U.S. Holder is a foreign corporation and the dividend income is effectively connected with its conduct of a U.S. trade or business, such Non-U.S. Holder may be subject to a branch profits tax equal to 30% (or a lower applicable treaty rate) of its effectively connected earnings and profits subject to adjustments.

(2)     Disposition of New Common Shares

Subject to the application of FATCA and/or backup withholding, each discussed below, a Non-U.S. Holder who sells, exchanges or otherwise disposes of New Common Shares will generally not be subject to U.S. federal income or withholding tax on any gain recognized unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met (in which case the Non-U.S. Holder will be subject to 30% U.S. federal income tax (or, if applicable, a lower treaty rate) on any gain recognized, net of certain U.S. source net capital losses), (b) such gain is effectively connected with the conduct of a U.S. trade or business (in which case such gain will be taxed as described above in the final paragraph of Section B.8(a) – Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims) – General Tax Treatment) or (c) Reorganized EP Energy is or has been a U.S. real property holding corporation for U.S. federal income tax purposes (a "**USRPHC**") at any time within the shorter of the Non-U.S. Holder's holding period of the New Common Shares and the five-year period ending on the date of the disposition (the "**Testing Period**").  If exception (c) applies, any gain recognized by the Non-U.S. Holder would generally be treated as effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder and taxed accordingly ("**FIRPTA tax**") and, the Non-U.S. Holder would generally be subject to U.S. federal withholding tax at a rate of fifteen percent (15%) with respect to the sale consideration ("**FIRPTA withholding**").  Although the Debtors have not performed a formal analysis and it is therefore not free from doubt, EP Energy believes that it currently is, and expects to remain, a USRPHC and that Reorganized EP Energy will also be a USRPHC.  However, an exception provides that a Non-U.S. Holder of New Common Shares should not be subject to FIRPTA tax or FIRPTA withholding if (1) the New Common Shares are regularly traded on an established securities market and (2) the New Common Shares held by the Non-U.S. Holder have a fair market value less than or equal to five percent (5%) of the total fair market value of the New Common Shares at all times during the Testing Period.  Reorganized EP Energy will be a private company and so the New Common Shares are not currently expected to be considered regularly traded on an established securities market.

Non-U.S. Holders are urged to consult their own tax advisors on the consequences to them of the transactions contemplated under the Plan and the ownership of New Common Shares based on their particular circumstances.

## 9.     FATCA

Pursuant to sections 1471 through 1474 of the Tax Code (commonly referred to as "**FATCA**"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities who do not comply with certain information reporting rules with respect to their U.S. account holders, investors or owners may be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party).  A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements will generally be subject to a 30% withholding tax with respect to any "withholdable payments."   For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income (including distributions, if any, on New Common Shares).   Foreign financial institutions located in jurisdictions that have an

intergovernmental agreement with the United States governing FATCA may be subject to different rules. Under certain circumstances, a Non-U.S. Holder might be eligible for refunds or credits of such taxes. Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

### C.     Treatment of Existing Parent Equity Interests

On the Effective Date, each holder of Existing Parent Equity Interests will receive its Pro Rata share of $500,000.00 in Cash in cancellation, release, and extinguishment of its Existing Parent Equity Interests.

In general, a U.S. Holder of Existing Parent Equity Interests should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of Cash received in respect of its Existing Parent Equity Interests, and (ii) the U.S. Holder's adjusted tax basis in the Existing Parent Equity Interests exchanged. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its Existing Parent Equity Interests is more than one year. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

In general, a Non-U.S. Holder of Existing Parent Equity Interests will not be subject to U.S. federal income or withholding tax on any gain recognized on the receipt of Cash pursuant to the Plan unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the exchange and certain other conditions are met (in which case the Non-U.S. Holder will be subject to 30% U.S. federal income tax (or, if applicable, a lower treaty rate) on any gain recognized, net of certain U.S. source net capital losses), (b) such gain is effectively connected with the conduct of a U.S. trade or business (in which case such gain will be taxed as described above in the final paragraph of Section B.8(a) – Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims) – General Tax Treatment) or (c) EP Energy is or has been a USRPHC at any time within the shorter of the five-year period preceding the exchange and the Non-U.S. Holder's holding period of the Existing Parent Equity Interests. If exception (c) applies, any gain recognized by the Non-U.S. Holder would generally be subject to FIRPTA tax and FIRPTA withholding. Although the Debtors have not performed a formal analysis and it is therefore not free from doubt, EP Energy believes that it is a USRPHC. However, as discussed above, an exception provides that a Non-U.S. Holder of Existing Parent Equity Interests should not be subject to FIRPTA tax or FIRPTA withholding if (1) the Existing Parent Equity Interests are regularly traded on an established securities market and (2) the Existing Parent Equity Interests held by the Non-U.S. Holder have a fair market value less than or equal to five percent (5%) of the total fair market value of the Existing Parent Equity Interests at all times during the shorter of the Non-U.S. Holder's holding period and the five-year period ending on the Effective Date. It is unclear at this time whether the Existing Parent Equity Interests are, or will be as of the Effective Date, considered regularly traded on an established securities market. Non-U.S. Holders of Existing Parent Equity Interests are urged to consult their own tax advisors with respect to the U.S. tax consequences applicable to the exchange of their Existing Parent Equity Interests pursuant to the Plan.

As indicated above, the foregoing discussion does not address holders of Existing Parent Equity Interests that also hold Claims. Holders of Existing Parent Equity Interests are urged to consult their own tax advisors regarding the U.S. federal income tax treatment to them under the Plan.

### D.      Withholding on Distributions and Information Reporting

All distributions to holders of RBL Claims, 1.5L Notes Claims, Unsecured Claims, and Existing Parent Equity Interests under the Plan are subject to any applicable tax withholding, including backup withholding and withholding on distributions to Non-U.S. Holders.  Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  *Holders are urged to consult their own tax advisors regarding the potential application of U.S. withholding taxes to the transactions contemplated under the Plan and whether any distributions to them would be subject to withholding.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

In general, a Non-U.S. Holder will not be subject to information reporting or backup withholding with respect to payments made in respect of 1.5L Notes Claims, Unsecured Claims, and Existing Parent Equity Interests provided (i) the Non-U.S. Holder certifies that it is not a U.S. person (generally, by providing an IRS Form W-8BEN, IRS Form W-8BEN-E or other applicable IRS Form W-8) or (ii) the Non-U.S. Holder otherwise establishes an exemption. However, information returns generally are required to be filed with the IRS in connection with the payment of accrued interest even if such payment is not subject to U.S. federal income tax.

The foregoing summary has been provided for informational purposes only.  All holders of Claims and Interests are urged to consult their own tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.

### IX.
### CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. ADDITIONAL RISK FACTORS IDENTIFIED IN THE DEBTORS' PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN THE DEBTORS' ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2018 FILED WITH THE SEC ON MARCH 18, 2019 AND AMENDED ON APRIL 30, 2019, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2019 FILED WITH THE SEC ON MAY 9, 2019, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2019 FILED WITH THE SEC ON AUGUST 9, 2019, AND THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2019 FILED WITH THE SEC ON NOVEMBER 12, 2019 ARE HEREBY INCORPORATED BY REFERENCE. ANY CURRENT REPORTS ON FORM 8-K (OTHER THAN INFORMATION FURNISHED PURSUANT TO ITEMS 2.02 OR 7.01 AND ANY RELATED EXHIBITS OF ANY FORM 8-K, UNLESS EXPRESSLY STATED OTHERWISE THEREIN), QUARTERLY REPORTS ON FORM 10-Q OR ANNUAL REPORTS ON FORM 10-K FILED BY THE DEBTORS WITH THE SEC AFTER THE DATE OF THIS DISCLOSURE STATEMENT MAY ALSO INCLUDE RISK FACTORS AND WILL BE CONSIDERED A PART OF THIS DISCLOSURE STATEMENT FROM THE DATE OF THE FILING OF SUCH DOCUMENTS. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.   Certain Bankruptcy Law Considerations

#### 1.   General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy cases to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees. The cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.   Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all

Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3.      Non-Consensual Confirmation and Conversion into Chapter 7 Cases

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  *See* Section XII.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 4.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5.      Risk of Termination of the Plan Support Agreement

The PSA contains certain provisions that give the Initial Supporting Noteholders the ability to terminate the PSA if various conditions are satisfied.  Termination of the PSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

### 6.      Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 7. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provide for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B. Risks Related to Exit Facility

### 1. Defects in Collateral Securing the Exit Facility

The indebtedness under the Exit Facility will be secured, subject to certain exceptions and permitted liens, by security interests in substantially all assets of the Reorganized Debtors (henceforth, the "**Collateral**").  The Collateral securing the Exit Facility may be subject to exceptions, defects, encumbrances, liens, and other imperfections.  Further, the Debtors have not conducted appraisals of any of their assets constituting Collateral to determine if the value of the Collateral upon foreclosure or liquidation equals or exceeds the amount of the Exit Facility or such other obligation secured by the Collateral.  Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the obligations under the Exit Facility all amounts owed in accordance therewith.  The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors.  The amount received upon a sale of Collateral would be dependent on numerous factors, including the actual fair market value of the Collateral at such time, and the timing and manner of the sale.  By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Exit Facility, in full or at all.  There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Exit Facility.

### 2. Failure to Perfect Security Interests in Collateral

The failure to properly perfect liens on the Collateral could adversely affect the Exit Facility Agent's ability to enforce their respective rights with respect to the Collateral for the benefit of the holders of the Exit Facility.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the Exit Facility Agent will monitor, or that the Reorganized Debtors will inform the Exit Facility Agent of the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral.  The Exit

Facility Agent has no obligation to monitor the acquisition of additional property or rights that constitute Collateral or the perfection of any security interests therein. Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

### 3. Casualty Risk of Collateral

The Reorganized Debtors will be obligated by the Exit Facility to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities. There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part. As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtors fully for their losses. If there is a total or partial loss of any of the pledged Collateral, the insurance proceeds received may be insufficient to satisfy the secured obligations of the Reorganized Debtors, including the Exit Facility.

### 4. Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors

Any future pledge of Collateral in favor of the Exit Facility Agent, including pursuant to security documents delivered after the date of the Exit Facility, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the Exit Facility to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### C. Additional Factors Affecting the Value of Reorganized Debtors

### 1. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results. Therefore, the actual amount of Allowed Claims may vary materially from the Debtors' projections and feasibility analysis.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Prepackaged Plan, customer demand for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or

the amount of Claims in the various Classes that might be allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

<div align="center">

**3.      Risks Associated with the Debtors' Business and Industry**

</div>

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on March 18, 2019, as amended, as updated by the quarterly report on Form 10-Q for the quarter ended March 31, 2019 filed with the SEC on May 9, 2019, the quarterly report on Form 10-Q for the quarter ended June 30, 2019 filed with the SEC on August 9, 2019, and the quarterly report on Form 10-Q for the quarter ended September 30, 2019 filed with the SEC on November 12, 2019.  The risks associated with the Debtors' businesses and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business and operational relationships, to retain key executives and to maintain various licenses and approvals necessary for the Debtors to conduct the Debtors' business;

- risk and uncertainties relating to the Debtors' ability to complete definitive documentation in connection with any financing and the amount, terms and conditions of any such financing; and the Debtors' ability to comply with the terms of the PSA and/or the Backstop Commitment Agreement;

- risk and uncertainties relating to the Debtors' ability to obtain requisite support for the Plan from various stakeholders; the Debtors' ability to confirm and consummate the Plan in accordance with the terms of the PSA; and Reorganized EP Energy's ability to continue as a going concern;

- risks related to the trading of the Debtors' securities ;

- the volatility and potential for sustained low oil, natural gas, and natural gas liquids prices;

- the supply and demand for oil, natural gas, and natural gas liquids;

- changes in commodity prices and basis differentials for oil and natural gas;

- the Debtors' ability to meet production volume targets;

- the uncertainty of estimating proved reserves and unproved resources;

- the Debtors' ability to develop proved undeveloped reserves;

- the future level of operating and capital costs;

- the availability and cost of financing to fund future exploration and production operations;

- the Debtors' ability to comply with the covenants in various financing documents, including making principal and interest payments or to obtain any necessary consents, waivers or forbearances thereunder;

- the Debtors' ability to generate sufficient cash flow to meet their debt obligations and commitments;

- the Debtors' ability to borrow under existing debt agreements to fund their operations;

- the Debtors' ability to obtain necessary governmental approvals for proposed exploration and production projects and to successfully construct and operate such projects;

- actions by credit ratings agencies, including potential downgrades;

- credit and performance risk of the Debtors' lenders, trading counterparties, customers, vendors, suppliers and third party operators;

- general economic and weather conditions in geographic regions or markets we serve, or where operations are located, including the risk of a global recession and negative impact on demand for oil and/or natural gas;

- the uncertainties associated with governmental regulation, including any potential changes in federal and state tax laws and regulations; and

- competition.

### 4.    DIP Facility

The DIP Facility, along with the use of cash on hand (cash collateral), is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 5.    Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have $1.577 billion of secured funded indebtedness outstanding composed of the Exit Facility (assumed to be drawn in an amount of $225 million on the Effective Date), the Reinstated 1.125L Notes, and the Reinstated 1.25L Notes that are not equitized pursuant to the Exchange Transaction. The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating

performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D. Factors Relating to Securities to Be Issued under Plan

#### 1. Market for Securities

There is currently no market for the New Common Shares, and there can be no assurance as to the development or liquidity of any market for any such securities.

The Reorganized Debtors are under no obligation to list the New Common Shares on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2. Potential Dilution

The ownership percentage represented by the New Common Shares distributed on the Effective Date under the Plan, distributed pursuant to the Rights Offering, and distributed as the Backstop Commitment Premium, will be subject to dilution from the equity issued in connection with the Employee Incentive Program, the Private Placement, any other shares that may be issued in connection with the Plan or post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

#### 3. Significant Holders

Certain holders of 1.5L Claims are expected to acquire a significant ownership interest in the New Common Shares pursuant to the Plan, the Backstop Commitment Agreement, and the Rights Offering. Such holders, if their decisions are aligned, would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Shares.

#### 4. Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Shares would rank below all debt claims against the Reorganized Debtors. As a result,

holders of the New Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### 5. Implied Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Common Shares is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

### 6. No Intention to Pay Dividends

Reorganized EP Energy may not pay any dividends on the New Common Shares and may instead retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Common Shares may depend entirely upon any future appreciation in the value of the New Common Shares.  There is, however, no guarantee that the New Common Shares will appreciate in value or even maintain their initial value.

### 7. Reorganized EP Energy will be a Private Company

Reorganized EP Energy is not expected to be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.  As a result, holders of the New Common Shares may receive less information with respect to the Debtors' business than they would have received if Reorganized EP Energy was subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

### E. Factors Relating to Rights Offering

### 1. Debtors Could Modify Rights Offering Procedures

The Debtors may modify the procedures governing the Rights Offering in a manner that is reasonably acceptable to the Requisite Commitment Parties (as defined in the Backstop Commitment Agreement), to, among other things, adopt additional detailed procedures if necessary in the Debtors' business judgment. Such modifications may adversely affect the rights of those participating in the Rights Offering.

### 2. Backstop Commitment Agreement Could Be Terminated

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement if various conditions are not satisfied. Termination of the Backstop Commitment Agreement could result in termination of the Plan Support Agreement and prevent the Debtors from consummating the Plan.

### F. Additional Factors

### 1. Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2. Debtors Have No Duty to Update

The statements contained in the Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6.    Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII thereof.

## X.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a claim in a Voting Class as of the Record Date (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in the Disclosure Statement are subject to the terms and conditions of the Plan.

### A.    Voting Deadline

All Eligible Holders have been sent a Ballot together with the Disclosure Statement.  Such holders should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF [4:00 P.M.] (PREVAILING CENTRAL TIME) ON [FEBRUARY 6], 2020, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT.  ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk LLC**
**Telephone: (877)-502-9869 (domestic toll free) or (917)-947-2373 (international)**
**E-mail: EPEnergyinfo@primeclerk.com (with "EP Energy" in the subject line)**

Additional copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.    Voting Procedures

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent, or electronically via e-mail to EPEnergyinfo@primeclerk.com with "EP Energy" in the subject line, or (b) submit a Ballot electronically via the E-Ballot voting platform on Prime Clerk's website by visiting https://cases.primeclerk.com/EPEnergy, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

### C. Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class 3 – RBL Claims

Class 6 – 1.5L Notes Claims

Class 7 – Unsecured Claims

Class 8 – Convenience Class

Class 11 – Existing Parent Equity Interests

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date.  Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots.  Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted.  The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 1.    Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### 2.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Plan Support Agreement.

### 3. Change of Vote

Subject to the provisions of the PSA, any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### D. Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E. Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

### XI.
### CONFIRMATION OF PLAN

### A. Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

## B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a)  **Debtors** at
EP Energy Corporation
1001 Louisiana Street, Houston, TX 77002
Houston, Texas 77042
Attn:   Jace Locke, Esq.

b)  **Counsel to Debtors** at
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Alfredo R. Pérez (Alfredo.Perez@weil.com)
Clifford Carlson (Clifford.Carlson@weil.com)

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Matthew S. Barr (Matt.Barr@weil.com)
Ronit Berkovich (Ronit.Berkovich@weil.com)
Scott R. Bowling (Scott.Bowling@weil.com)
David J. Cohen (DavidJ.Cohen@weil.com)

c)  **Counsel to Apollo Management Holdings, L.P.** at
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Jeffrey D. Saferstein (jsaferstein@paulweiss.com)
Jacob A. Adlerstein (jadlerstein@paulweiss.com)
Brian Bolin (bbolin@paulweiss.com)

d)  **Counsel to Elliot Management Corporation** at
Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Casey Fleck (cfleck@milbank.com)

Gerard Uzzi (guzzi@milbank.com)
Eric Stodola (estodola@milbank.com)

e) **Counsel to Access Industries, Inc.** at
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Tel: (212) 909-6000
Attn: Sidney P. Levinson (slevinson@debevoise.com)

f) **Counsel to the Creditors' Committee** at
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Attn: Kristopher M. Hansen (khansen@stroock.com)
      Frank A. Merola (fmerola@stroock.com)
      Erez E. Gilad (egilad@stroock.com)
      Jonathan D. Canfield (jcanfield@stroock.com)

g) **Office of the U.S. Trustee** at
Office of the U.S. Trustee for Region 7
515 Rusk Street, Suite 3516
Houston, Texas 77002

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### C. Requirements for Confirmation of Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. Among the requirements for confirmation are that the Plan is (1) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (3) feasible.

### 1. Acceptance of Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each

impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

### 2.     Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such

holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit D.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3. Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for the fiscal years 2020 through 2024 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit E**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Article IX hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or to include such information in documents required to be

filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

### 4.      Valuation

The Plan and the restructuring transactions in connection therewith represent the culmination of extensive multi-month negotiations to obtain the capital commitments necessary for the Debtors to reorganize and execute their post-chapter 11 business plan.  As described above, the Plan contemplates that holders of Allowed 1.5L Notes Claims will receive (a) 99.0% of the New Common Shares issued by the Reorganized Debtors, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, and the EIP Shares,  and (b) the right to invest $475 million through the Rights Offering to acquire up to approximately 78.0% of the New Common Shares issued by the Reorganized Debtors, subject to dilution by the Private Placement, and the EIP Shares.  In addition, the Backstop Commitment Parties are backstopping $463 million of the Rights Offering, subject to the terms and provisions of the Backstop Commitment Agreement.

The Debtors and Evercore believe that the valuation implied by the Rights Offering is currently the best measure of the reorganized Debtors' value given the facts and circumstances of these cases, which include:

- A substantial capital infusion is necessary for the Debtors to reorganize and the restructuring provides for that necessary capital;

- Significant new capital would be likely unobtainable without the equitization of the 1.5L Notes; and

- The terms of the Rights Offering are the result of robust, good faith, arms' length, and comprehensive negotiations between the Debtors' independent Special Committee, their prepetition secured parties, and each of their financial and legal advisors.

Pursuant to the Plan, Stated Equity Value is defined to be $900 million. This implies a total enterprise value of $2.5 billion assuming net debt of $1.6 billion on the Effective Date. This estimate is based in part on the information provided by the Debtors (solely for purposes of the Plan) the Rights Offering, and the Backstop Commitment Agreement. For purposes of this analysis, Evercore assumes no material changes that would affect value between the date of the Disclosure Statement and the Effective Date.

Evercore's view as to the value of the reorganized Debtors based on consummation of the restructuring and the post-reorganization capital structure does not constitute a recommendation as to how to vote on the Plan and does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

## XII.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets. The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.    Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Subject to the terms of the Intercreditor Agreements, holders of Claims in Classes 3, 4, 5 and 6 and the DIP Lenders would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 3, 4, 5 and 6 and the DIP Lenders would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration

of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

### C.   Liquidation under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the  Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### XIII.
### CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims and Interests in Classes 3, 6, 7, 8, and 11 to vote in favor thereof.

Dated:  December 12, 2019
           Houston, Texas                  Respectfully submitted,

                                      EP ENERGY CORPORATION, on behalf of itself and its undersigned subsidiaries

                                      */s/ David Rush*

                                      Name: David Rush
                                      Title:   Chief Restructuring Officer

                                      EPE ACQUISITION, LLC
                                      EP ENERGY LLC
                                      EVEREST ACQUISITION FINANCE INC.
                                      EP ENERGY GLOBAL LLC
                                      EP ENERGY MANAGEMENT, L.L.C.
                                      EP ENERGY RESALE COMPANY, L.L.C.
                                      EP ENERGY E&P COMPANY, L.P.

**<u>Exhibit A</u>**

**Plan**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **EP ENERGY CORPORATION**, *et al.*, | § | **Case No. 19-35654 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| **Debtors.**[1] | § | |
| | § | |

**AMENDED JOINT CHAPTER 11 PLAN OF
<u>EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS</u>**

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Ronit Berkovich (admitted *pro hac vice*)
Scott R. Bowling (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Counsel for Debtors
and Debtors in Possession*

Dated:  December 12, 2019
        Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092).  The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

## Table of Contents

**ARTICLE I.**     **Definitions and Interpretation.** ..........................................................................1

    1.1     Definitions...................................................................................................1

    1.2     Interpretation; Application of Definitions; Rules of Construction. ...............18

    1.3     Reference to Monetary Figures.....................................................................18

    1.4     Consent Rights of Supporting Noteholders. .................................................18

    1.5     Controlling Document. .................................................................................19

**ARTICLE II.**    **Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims.**.........................................................................................................19

    2.1     Treatment of Administrative Expense Claims................................................19

    2.2     Treatment of Fee Claims...............................................................................19

    2.3     Treatment of DIP Claims and Commitments..................................................20

    2.4     Payment of Fees and Expenses Under DIP Order. .........................................21

    2.5     Treatment of Priority Tax Claims. ................................................................21

**ARTICLE III.**   **Classification of Claims and Interests.**................................................................21

    3.1     Classification in General. .............................................................................21

    3.2     Formation of Debtor Groups for Convenience Only. .....................................21

    3.3     Summary of Classification of Claims and Interests........................................22

    3.4     Special Provision Governing Unimpaired Claims..........................................22

    3.5     Separate Classification of Other Secured Claims. .........................................22

    3.6     Elimination of Vacant Classes. .....................................................................22

    3.7     Voting Classes; Presumed Acceptance by Non-Voting Classes......................23

    3.8     Voting; Presumptions; Solicitation. ..............................................................23

    3.9     Cramdown.....................................................................................................23

    3.10    No Waiver.....................................................................................................23

**ARTICLE IV.  Treatment of Claims and Interests**.................................................................**24**

4.1        Class 1: Other Secured Claims. ..........................................................24

4.2        Class 2:  Other Priority Claims. ..........................................................24

4.3        Class 3:  RBL Claims...........................................................................24

4.4        Class 4:  1.125L Notes Claims.............................................................25

4.5        Class 5:  1.25L Notes Claims...............................................................25

4.6        Class 6:  Secured 1.5L Notes Claims...................................................25

4.7        Class 7:  Unsecured Claims. ................................................................26

4.8        Class 8:  Convenience Claims. ............................................................26

4.9        Class 9:  Intercompany Claims. ..........................................................26

4.10       Class 10:  Subordinated Claims. .........................................................27

4.11       Class 11:  Existing Parent Equity Interests. .......................................27

4.12       Class 12:  Other Equity Interests. .......................................................27

4.13       Class 13:  Intercompany Interests. ......................................................27

4.14       Treatment of Vacant Classes. .............................................................28

**ARTICLE V.  Means for Implementation**...................................................................**28**

5.1        Compromise and Settlement of Claims, Interests, and Controversies............28

5.2        Continued Corporate Existence; Effectuating Documents; Further
           Transactions. ......................................................................................28

5.3        Corporate Action.................................................................................29

5.4        Plan Funding. ......................................................................................29

5.5        Cancellation of Existing Securities and Agreements..........................29

5.6        Cancellation of Certain Existing Security Interests. ..........................31

5.7        Officers and Boards of Directors. .......................................................31

5.8        Employee Incentive Plan. ...................................................................32

5.9        Authorization, Issuance, and Delivery of New Common Shares. ..................32

5.10      Exit Credit Agreement. ...................................................................................33

5.11      Rights Offering. .............................................................................................33

5.12      Intercompany Interests; Corporate Reorganization. ......................................34

5.13      Restructuring Transactions. ...........................................................................34

5.14      Restructuring Expenses. .................................................................................35

5.15      Indenture Trustee Expenses. ..........................................................................35

5.16      Private Company ............................................................................................36

**ARTICLE VI.      Distributions. ..................................................................................................36**

6.1       Distributions Generally. ................................................................................36

6.2       No Postpetition Interest on Claims. ...............................................................36

6.3       Date of Distributions. .....................................................................................36

6.4       Distribution Record Date. ..............................................................................37

6.5       Distributions after Effective Date ..................................................................37

6.6       Disbursing Agent. ...........................................................................................37

6.7       Delivery of Distributions. ..............................................................................37

6.8       Unclaimed Property. .......................................................................................38

6.9       Satisfaction of Claims. ...................................................................................38

6.10      Manner of Payment under Plan.......................................................................38

6.11      Fractional Shares and De Minimis Cash Distributions...................................39

6.12      No Distribution in Excess of Amount of Allowed Claim................................39

6.13      Allocation of Distributions between Principal and Interest.............................39

6.14      Exemption from Securities Laws.....................................................................39

6.15      Setoffs and Recoupments................................................................................40

6.16      Rights and Powers of Disbursing Agent..........................................................40

6.17      Withholding and Reporting Requirements. .....................................................41

**ARTICLE VII.    Procedures for Disputed Claims.**.................................................................**41**

    7.1      Allowance of Claims..............................................................................41

    7.2      Claims Objections.................................................................................42

    7.3      Estimation of Claims.............................................................................42

    7.4      Adjustment to Claims Register Without Objection. .......................................42

    7.5      Time to File Objections to Claims. ...........................................................43

    7.6      Disallowance of Claims ..........................................................................43

    7.7      Amendments to Claims...........................................................................43

    7.8      No Distributions Pending Allowance. .........................................................43

    7.9      Disputed Claims Reserve........................................................................43

    7.10     Distributions after Allowance. .................................................................45

    7.11     Claims Resolution Procedures Cumulative. .................................................45

**ARTICLE VIII.   Executory Contracts and Unexpired Leases. ......................................45**

    8.1      General Treatment. ..............................................................................45

    8.2      Determination of Cure Amounts and Deemed Consent. .................................46

    8.3      Payments Related to Assumption of Contracts and Leases. ............................47

    8.4      Rejection Damages Claims......................................................................47

    8.5      Survival of the Debtors' Indemnification Obligations.....................................47

    8.6      Compensation and Benefit Plans. .............................................................48

    8.7      Insurance Policies. ...............................................................................48

    8.8      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ......................................................................................49

    8.9      Reservation of Rights............................................................................49

**ARTICLE IX.    Conditions Precedent to Occurrence of Effective Date. .........................49**

    9.1      Conditions Precedent to Confirmation........................................................49

    9.2      Conditions Precedent to Effective Date......................................................50

| 9.3 | Waiver of Conditions Precedent. | 51 |
|---|---|---|
| 9.4 | Effect of Failure of a Condition. | 52 |
| **ARTICLE X.** | **Effect of Confirmation.** | **52** |
| 10.1 | Binding Effect. | 52 |
| 10.2 | Vesting of Assets. | 52 |
| 10.3 | Discharge of Claims Against and Interests in Debtors. | 53 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 53 |
| 10.5 | Injunction against Interference with Plan. | 54 |
| 10.6 | Plan Injunction. | 54 |
| 10.7 | Releases. | 54 |
| 10.8 | Exculpation. | 57 |
| 10.9 | Injunction Related to Releases and Exculpation. | 58 |
| 10.10 | Subordinated Claims. | 58 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 59 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 59 |
| 10.13 | Indemnification and Reimbursement Obligations. | 59 |
| **ARTICLE XI.** | **Retention of Jurisdiction.** | **60** |
| 11.1 | Retention of Jurisdiction. | 60 |
| **ARTICLE XII.** | **Miscellaneous Provisions.** | **61** |
| 12.1 | Exemption from Certain Transfer Taxes. | 61 |
| 12.2 | Request for Expedited Determination of Taxes. | 62 |
| 12.3 | Dates of Actions to Implement Plan. | 62 |
| 12.4 | Amendments. | 62 |
| 12.5 | Revocation or Withdrawal of Plan. | 63 |
| 12.6 | Severability. | 63 |

12.7        Governing Law. ...........................................................................................64

12.8        Immediate Binding Effect. .........................................................................64

12.9        Successors and Assigns. ..............................................................................64

12.10       Entire Agreement. ......................................................................................64

12.11       Computing Time. ........................................................................................64

12.12       Exhibits to Plan. ........................................................................................64

12.13       Notices. ......................................................................................................64

12.14       Reservation of Rights. ................................................................................66

Each of EP Energy Corporation; EPE Acquisition, LLC; EP Energy LLC; Everest Acquisition Finance Inc.; EP Energy Global LLC; EP Energy Management, L.L.C.; EP Energy Resale Company, L.L.C.; and EP Energy E&P Company, L.P. (each, a "*Debtor*" and collectively, the "*Debtors*") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in section 1.1 below.

## ARTICLE I.  DEFINITIONS AND INTERPRETATION.

### 1.1  *Definitions.*

The following terms shall have the respective meanings specified below:

*1.125L Notes* means the 7.750% senior secured notes due 2026 issued pursuant to the 1.125L Notes Indenture.

*1.125L Notes Claims* means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the 1.125L Notes, the 1.125L Notes Indenture, or any of the security documents governing or evidencing any security interests entered into in connection therewith, including accrued but unpaid interest, costs, fees and indemnities through the Effective Date.  The 1.125L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1 billion.

*1.125L Notes Indenture* means that certain indenture, dated as of May 23, 2018, by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 1.125L Notes Trustee, as the same may be amended, modified, or otherwise supplemented from time to time.  The 1.125L Notes Indenture will not be cancelled and will remain in full force and effect on the Effective Date.

*1.125L Notes Trustee* means UMB Bank, National Association, in its capacity as successor indenture trustee and notes collateral agent under the 1.125L Notes Indenture.

*1.25L Notes* means the 8.000% senior secured notes due 2024 issued pursuant to the 1.25L Notes Indenture.

*1.25L Notes Claims* means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the 1.25L Notes, the 1.25L Notes Indenture, or any of the security documents governing or evidencing any security interests entered into in connection therewith, including accrued but unpaid interest, costs, fees and indemnities through the Effective Date.  The 1.25L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $500 million.

*1.25L Notes Indenture* means that certain indenture, dated as of November 29, 2016, by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 1.25L Notes Trustee, as the same may be amended,

modified, or otherwise supplemented from time to time.  The 1.25L Notes Indenture will not be cancelled and will remain in full force and effect on the Effective Date.

*1.25L Notes Trustee* means BOKF, NA, in its capacity as successor indenture trustee and notes collateral agent under the 1.25L Notes Indenture.

*1.5L Notes* means, collectively, the 2024 1.5L Notes and the 2025 1.5L Notes.

*1.5L Notes Claims* means, collectively, the 2024 1.5L Notes Claims and the 2025 1.5L Notes Claims.

*1.5L Notes Deficiency Claims* means the portion of the 1.5L Notes Claims that are not Secured Claims.  The 1.5L Notes Deficiency Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $1,791,360,197.  For the avoidance of doubt, the 1.5L Notes Deficiency Claims are Unsecured Claims.

*1.5L Notes Indentures* means the 2024 1.5L Notes Indenture and the 2025 1.5L Notes Indenture.

*1.5L Notes Trustees* means the 2024 1.5L Notes Trustee and the 2025 1.5L Notes Trustee.

*2020 Unsecured Notes Claims* means all Claims arising under or based upon the 9.375% senior notes due 2020 or the 2020 Unsecured Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $189,286,918.

*2020 Unsecured Notes Indenture* means that certain indenture dated as of April 24, 2012 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2020 Unsecured Notes Indenture Trustee.

*2020 Unsecured Notes Trustee* means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2020 Unsecured Notes Indenture.

*2022 Unsecured Notes Claims* means all Claims arising under or based upon the 7.750% senior notes due 2022 or the 2022 Unsecured Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $190,729,276.

*2022 Unsecured Notes Indenture* means that certain indenture, dated as of August 13, 2012 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2022 Unsecured Notes Indenture Trustee.

*2022 Unsecured Notes Trustee* means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2022 Unsecured Notes Indenture.

**2023 Unsecured Notes Claims** means all Claims arising under or based upon the 6.375% senior notes due 2023 or the 2023 Unsecured Notes Indenture, the aggregate principal amount plus accrued and unpaid interest thereon of which outstanding as of the Petition Date was $330,051,034.

**2023 Unsecured Notes Indenture** means that certain indenture, dated as of May 28, 2015 (as amended, modified, or otherwise supplemented from time to time) by and among the EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2023 Unsecured Notes Indenture Trustee.

**2023 Unsecured Notes Trustee** means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2023 Unsecured Notes Indenture.

**2024 1.5L Notes** means the 9.375% senior secured notes due 2024 issued pursuant to the 2024 1.5L Notes Indenture.

**2024 1.5L Notes Claims** means all Claims arising under the 2024 1.5L Notes or 2024 1.5L Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $1,135,293,088.

**2024 1.5L Notes Indenture** means that that certain indenture, dated as of January 3, 2018 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2024 1.5L Notes Trustee.

**2024 1.5L Notes Trustee** means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the 2024 1.5L Notes Indenture.

**2025 1.5L Notes** means the 8.000% senior secured notes due 2025 issued pursuant to the 2025 1.5L Notes Indenture.

**2025 1.5L Notes Claims** means all Claims arising under the 2025 1.5L Notes or 2025 1.5L Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $1,051,324,444.

**2025 1.5L Notes Indenture** means that that certain indenture, dated as of February 6, 2017 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2025 1.5L Notes Trustee.

**2025 1.5L Notes Trustee** means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the 2025 1.5L Notes Indenture.

**Administrative Bar Date** means the date that requests for payment of Administrative Expense Claims (other than Fee Claims and Restructuring Expenses) must be filed with the Bankruptcy Court and served on the Debtors or Reorganized Debtors, as applicable, that is thirty (30) days after the Effective Date.

*Administrative Expense Claim* means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses.

*Aggregate Fully Diluted Common Shares* means the total number of New Common Shares outstanding as of the Effective Date after giving effect to this Plan and the Backstop Commitment Agreement (including the shares issued pursuant to the Backstop Commitment Agreement), but excluding any New Common Shares issued or issuable pursuant to the Employee Incentive Plan and the Private Placement (if applicable).

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (a) (i) that is timely filed by the bar date established in the Chapter 11 Cases, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order. With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

*Antitrust Authorities* means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws.

*Antitrust Laws* means the Sherman Antitrust Act, the Clayton Antitrust Act, the HSR Act, the Federal Trade Commission Act and all other United States, federal or state or foreign or multinational statutes, rules, regulation, orders, decrees, administrative or judicial doctrines or other laws, including antitrust, competition and merger control laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of lessening or negatively impacting competition, monopolization or restraint of trade.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

4

*Assumption Dispute* means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption of an executory contract or unexpired lease.

*Backstop Commitment Agreement* means that certain Backstop Commitment Agreement, dated as of October 18, 2019, entered into by the Debtors and the Backstop Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms, and approved by the Court pursuant to the Backstop Order.

*Backstop Commitment Premium* means $26,000,000 to be paid to the Backstop Parties on the Effective Date in the form of New Common Shares issued at the Cash Purchase Price, pursuant to the terms and conditions in this Plan and the Backstop Commitment Agreement.

*Backstop Order* means the *Order (I) Authorizing the Debtors to Enter into Backstop Commitment Agreement, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* (ECF No. 483).

*Backstop Parties* means those parties that agree to backstop the Rights Offering pursuant to the Backstop Commitment Agreement, each in its respective capacity as such.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

*Business Day* means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

*Cash* means legal tender of the United States of America.

*Cash Purchase Price* means a price per New Common Share equal to (a) 65% of $900 million, divided by (b) the Aggregate Fully Diluted Common Shares, rounded to two decimal places.

*Cause of Action* means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit,

5

obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).   For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim.

*Chapter 11 Cases* means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

*Claims Resolution Procedures* means those procedures set forth in the Plan Supplement that will govern the resolution of Claims asserted against the Debtors and the Debtors' authority to settle such Claims, which shall be subject to the reasonable consent of the Initial Supporting Noteholders.

*Class* means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Collateral* means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

*Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be acceptable to the Initial Supporting Noteholders.

*Convenience Claim* means any Claim that would otherwise be a General Unsecured Claim that is (i) Allowed in the Convenience Claim Amount or less, or (ii) irrevocably reduced to the Convenience Claim Amount at the election of the holder of the Allowed General Unsecured Claim evidenced on the Ballot timely and validly submitted by such holder; *provided* that a General Unsecured Claim may not be subdivided into multiple Claims of

the Convenience Claim Amount or less for purposes of receiving treatment as a Convenience Claim; *provided, further* that, to the extent that a holder of a Convenience Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

**Convenience Claim Amount** means $100,000.

**Convenience Claim Distribution Amount** means the aggregate amount of Cash distributed to holders of Allowed Convenience Class Claims against the Debtors, which amount shall not exceed $175,000.

**Cure Amount** means the payment of Cash or the distribution of other property (as the Debtors or the Reorganized Debtors, as applicable, (subject to the consent of the Initial Supporting Noteholders), and the counterparty to such executory contract or unexpired lease may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Cure Notice** means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall be reasonably acceptable to the Initial Supporting Noteholders and shall include (i) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (ii) any Cure Amount to be paid in connection therewith, and (iii) procedures for resolution by the Bankruptcy Court of any related disputes.

**D&O Policy** means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

**Debtor(s)** has the meaning set forth in the introductory paragraph of the Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**Definitive Documents** shall have the meaning given to such term in the Plan Support Agreement.

**DIP Facility** means the postpetition senior secured superpriority priming revolving loan facility approved by the DIP Order.

**DIP Agent** means JPMorgan Chase Bank, N.A., solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

*DIP Claim* means any Claim held by the DIP Facility Lenders or the DIP Agent arising under or relating to the DIP Facility Credit Agreement or the DIP Order, which includes Claims for all principal amounts outstanding of up to $314,710,456 (which is subject to reduction based on the amount outstanding as of the Effective Date), plus interest, reasonable and documented out-of-pocket fees, expenses, costs and other charges of the DIP Agent or DIP Lenders arising and required to be repaid under the DIP Facility Credit Agreement.

*DIP Commitments* means obligations of the DIP Facility Lenders on account of unfunded loans under the DIP Facility Credit Agreement.

*DIP Facility Credit Agreement* means the credit agreement governing the terms of the DIP Facility dated as of November 25, 2019, by and among EP Energy LLC, as borrower, EPE Acquisition LLC, the DIP Agent, and the DIP Facility Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Order, which shall be acceptable in form and substance to the Initial Supporting Noteholders.

*DIP Facility Lenders* means the lenders from time to time party to the DIP Facility Credit Agreement.

*DIP Order* means the *Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; and (V) Granting Related Relief* (ECF No. 482), authorizing the Debtors to enter into the DIP Facility Credit Agreement and access the DIP Facility.

*Disbursing Agent* means any Entity in its capacity as a disbursing agent under section 6.6 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

*Disclosure Statement* means the Disclosure Statement for the Plan, in form and substance acceptable to the Initial Supporting Noteholders, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

*Disputed* means, with respect to a Claim, (i) any Claim, which Claim is disputed under section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (iii) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (iv) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the

amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

**Disputed Claims Reserve** means the reserve established pursuant to and governed by Section 7.9 of the Plan.

**Distribution Record Date** means, except as otherwise provided in the Plan, the Effective Date.

**DTC** means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

**Effective Date** means the date which is the first Business Day on which (i) all conditions to the effectiveness of the Plan set forth in Section 9.2 of the Plan have been satisfied or waived in accordance with the terms of the Plan, (ii) no stay of the Confirmation Order is in effect, and (iii) the substantial consummation of the Plan occurs pursuant to 11 U.S.C. § 1101(2).

**EIP Shares** means the awards issued under the Employee Incentive Plan, including restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares, which shall be dilutive of all other equity interests in the Reorganized Debtors.

**Eligible Offeree** means a holder or permitted transferee of an Allowed 1.5L Notes Claim that either (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, or (ii) is an institutional "accredited investor" as such term is defined in Rule 501 of the Securities Act.

**Employee Incentive Plan** means the employee incentive plan to be implemented pursuant to Section 5.8 of the Plan, which shall be consistent with the terms set forth in the EIP Term Sheet annexed as Exhibit A-2 to the Plan Support Agreement and otherwise in form and substance acceptable to the Initial Supporting Noteholders.

**Entity** means an "entity," as defined in section 101(15) of the Bankruptcy Code.

**EP Energy** means EP Energy Corporation.

**Estate(s)** means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

**Exchange Act** means the Securities Exchange Act of 1934, as amended.

**Exchange Purchase Price** means a price per New Common Share equal to (a) 74.3% of $900 million, divided by (b) the Aggregate Fully Diluted Common Shares, rounded to two decimal places.

**Exculpated Parties** means collectively, and in each case in their capacities as such during the Chapter 11 Cases (i) the Debtors, (ii) the Reorganized Debtors, (iii) the members of any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of

the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*Existing Parent Equity Interests* means shares of Class A common stock of EP Energy that existed immediately prior to the Effective Date, including any restricted stock in EP Energy that vests prior to the Effective Date.

*Exit Credit Agreement* means that certain Amended and Restated Credit Agreement, to be dated as of the Effective Date, by and among EP Energy LLC, as borrower, EPE Acquisition LLC, as holdings, the Exit Agent, and the Exit Lenders, which shall be in form and substance substantially consistent with the Exit Term Sheet or on terms otherwise acceptable to the Debtors and Initial Supporting Noteholders.

*Exit Facility Agent* means the administrative agent and collateral agent under the Exit Credit Agreement.

*Exit Facility* means the $629 million first lien exit credit facility arising pursuant to the Exit Credit Agreement.

*Exit Lenders* means the lenders from time to time party to the Exit Credit Agreement, including any permitted assignees thereof.

*Exit Term Sheet* means that certain term sheet attached to the Plan Support Agreement as Exhibit A-1 that sets forth the principal terms of the Exit Facility.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

*Fee Escrow Account* means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date.

*Final Order* means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that: (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided*, *however* that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

*General Unsecured Claim* means any Claim against the Debtors that is not an RBL Claim, a 1.125L Notes Claim, a 1.25L Notes Claim, a 1.5L Notes Claim, an Intercompany

Claim, an Unsecured Notes Claim, or a Convenience Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code.

*Governmental Entity* means U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

*HSR Act* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnification Obligation* means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

*Indenture Trustees* means the 1.125L Notes Trustee, the 1.25L Notes Trustee and the 1.5L Notes Trustees.

*Indenture Trustee Charging Lien* means any Lien or other priority in payment in favor of the Indenture Trustees against distributions to be made to holders of Allowed Notes Claims for payment of any Indenture Trustee Fees and Expenses.

*Indenture Trustee Fees and Expenses* means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the Indenture Trustees, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Indenture Trustees, whether prior to or after the Petition Date and whether prior to or after the Effective Date, in each case to the extent payable or reimbursable under the Indentures.

*Indentures* means the 1.125L Notes Indenture, the 1.25L Notes Indenture and the 1.5L Notes Indentures.

*Initial Backstop Party* means each Backstop Party as of October 18, 2019.

*Initial Supporting Noteholders* means each of (i) Apollo Management Holdings, L.P. and its affiliates and (ii) Elliott Associates L.P., and Elliott International, L.P. and their respective affiliates.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than any Existing Parent Equity Interests or Other Equity Interests.

*Intercreditor Agreements* means collectively, (i) that certain *Priority Lien Intercreditor Agreement*, dated as of August 24, 2016, among JP Morgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, Wilmington Trust, National Association, as the Initial Other Authorized Representative and each additional Authorized Representative from time to time party thereto; (ii) that certain *Amended and Restated Senior Lien Intercreditor Agreement*, dated as of August 24, 2016, among JP Morgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, and EP Energy LLC and the Subsidiaries of EP Energy LLC named therein; (iii) that certain *Additional Priority Lien Intercreditor Agreement*, dated as of November 29, 2016, by and among JPMorgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, BOKF, N.A., as successor Notes Facility Agent and Applicable Second Lien Agent, EP Energy LLC and the Subsidiaries of EP Energy LLC named therein; and (iv) that certain *Senior Priority Lien Intercreditor Agreement*, dated as of May 23, 2018, by and among JPMorgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, UMB Bank, National Association, as successor Notes Facility Agent and Applicable Second Lien Agent, EP Energy LLC and the Subsidiaries of EP Energy LLC named therein. The Intercreditor Agreements will not be cancelled and will remain in full force and effect on the Effective Date.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, and any other security or equity interest in any of the Debtors, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any of the Debtors, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, that existed immediately before the Effective Date, and including any equity interest issued to any of the Debtors' current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*New Board* means the initial board of directors of Reorganized EP Energy.

*New Common Shares* means shares of common stock, par value $0.01 per share, of Reorganized EP Energy to be issued (i) on the Effective Date, (ii) upon implementation of the Employee Incentive Plan, or (iii) as otherwise permitted pursuant to the New Corporate Governance Documents of Reorganized EP Energy, in each case subject to the terms of the Amended Certificate of Incorporation and Amended By-Laws of Reorganized EP Energy.

*New Corporate Governance Documents* means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, the Shareholder Agreement, and the operating agreement or other similar organizational or formation documents,

as applicable, of the Reorganized Debtors, which in each case shall be acceptable to the Initial Supporting Noteholders.

**Other Equity Interests** means Class B common stock of EP Energy that existed immediately prior to the Effective Date and all other Interests in EP Energy other than Existing Parent Equity Interests.

**Other Priority Claim** means any Claim other than an Administrative Expense Claim, a DIP Facilities Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**Other Secured Claim** means any Secured Claim against a Debtor other than a Priority Tax Claim, a DIP Claim, an RBL Claim, a 1.125L Notes Claim, 1.25L Notes Claim, and a 1.5L Notes Claim.

**Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**Plan** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Plan Support Agreement.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under the Plan.

**Plan Supplement** means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the Plan Support Agreement (including any consent rights in favor of the Initial Supporting Noteholders) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court no later than ten (10) calendar days before the Voting Deadline, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement (including any consent rights in favor of the Initial Supporting Noteholders) which shall include, but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Employee Incentive Plan, (v) the Exit Facility documents, (vi) a schedule of retained Causes of Action, (vii) the Schedule of Rejected Contracts; and (viii) the Claims Resolution Procedures.

**Plan Support Agreement** means that certain Plan Support Agreement, dated as of October 18, 2019, by and among the Debtors, and the Supporting Noteholders, as the same may be amended, restated, or otherwise modified in accordance with its terms.

**Prepetition RBL Agent** means JPMorgan Chase Bank N.A., as administrative agent and collateral agent, solely in its capacity as administrative agent and collateral agent under the Prepetition RBL Credit Agreement.

**Prepetition RBL Credit Agreement** means that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified or otherwise supplemented from time to time), by and among EP Energy, as borrower, EPE Acquisition, LLC, the Prepetition RBL Agent, and the lenders party thereto from time to time, as in effect immediately prior to the Effective Date.

**Prepetition RBL Facility** means the revolving credit facility arising under the Prepetition RBL Credit Agreement.

**Prepetition RBL Lenders** means the Lenders (as defined in the Prepetition RBL Credit Agreement) party to the Prepetition RBL Credit Agreement immediately prior to the Effective Date.

**Priority Tax Claim** means any Secured Claim or unsecured Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**Private Placement** means the private placement of New Common Shares, if any, which shall be subject to dilution by the EIP Shares, for an aggregate purchase price of up to $75 million in Cash, on terms acceptable to the Debtors and the Initial Supporting Noteholders.

**Pro Rata** means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

**Professional Person** means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

**RBL Claim** means any Claim arising under the Prepetition RBL Credit Agreement.

**Registration Rights Agreement** means the registration rights agreement to be entered into as of the Effective Date, which shall have terms that are customary for a transaction of this nature and shall be in form and substance acceptable to the Initial Supporting Noteholders and the Debtors.

**Reinstated 1.125L Notes** means 1.125L Notes, issued pursuant to the 1.125L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code

pursuant to the Plan to the extent of 1.125L Notes that have not been redeemed or repaid prior to the Effective Date.

**Reinstated 1.25L Notes** means the 1.25L Notes, issued pursuant to the 1.25L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.25L Notes that have not been redeemed or repaid prior to the Effective Date.

**Reinstated Debt** means the Reinstated 1.125L Notes and the Reinstated 1.25L Notes.

**Released Parties** means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the DIP Agent and DIP Lenders under the DIP Facility, (vi) the Prepetition RBL Agent and the Prepetition RBL Lenders under the Prepetition RBL Facility, (vii) the Backstop Parties, (viii) holders of Existing Parent Equity Interests, on account of their contributions under the Plan, (ix) the 1.5L Notes Trustees, and (x) with respect to each of the foregoing Persons, in clauses (i) through (ix), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.7(b) of the Plan shall not be deemed a Released Party hereunder.

**Releasing Parties** means collectively, (i) the holders of all Claims or Interests that vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, (v) all other holders of Claims and Interests to the maximum extent permitted by law, and (vi) the Released Parties.

**Reorganized Debtors** means the Debtors, as reorganized as of the Effective Date in accordance with the Plan.

**Reorganized EP Energy** means EP Energy, (a) as reorganized pursuant to and under the Plan, (b) any successor thereto, by merger, consolidation, or otherwise or (c) a new corporation or limited liability company that may be formed or caused to be formed by EP Energy or the Initial Supporting Noteholders to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of EP Energy and issue the New EP Common Shares to be distributed or sold pursuant to the Plan, as approved by the Initial Supporting Noteholders in the case of (b) or (c).

*Restructuring* means the financial restructuring of the Debtors, the principal terms of which are set forth in the Plan and Plan Supplement.

*Restructuring Expenses* means the reasonable and documented fees and out-of-pocket expenses payable to the Advisors (as defined in the Backstop Commitment Agreement, and in the case of Debevoise & Plimpton LLP, subject to the cap set forth therein), and Cole Schotz P.C.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including, subject to the reasonable consent of the Initial Supporting Noteholders, (i) the consummation of the transactions provided for under or contemplated by the Plan Support Agreement, (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Plan Support Agreement and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and Plan Support Agreement, and (iv) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Plan Support Agreement.

*Rights Offering* means that certain rights offering pursuant to which each Eligible Offeree will be offered the right to purchase New Common Shares for an aggregate purchase price of $475 million at a price per share equal to (a) in the case of Rights Offering Shares purchased for cash, the Cash Purchase Price, and (b) in the case of Rights Offering Shares purchased by Backstop Parties in exchange for Reinstated 1.25L Notes, the Exchange Purchase Price, in each case in accordance with the Rights Offering Procedures and the Backstop Commitment Agreement.

*Rights Offering Documents* means the Backstop Commitment Agreement and the Rights Offering Procedures.

*Rights Offering Procedures* means the procedures in form and substance acceptable to the Initial Supporting Noteholders for the implementation of the Rights Offering, as approved by the Bankruptcy Court pursuant to the order approving the Disclosure Statement, and attached as <u>Exhibit F</u> to the Disclosure Statement.

*Rights Offering Shares* means the New Common Shares issued pursuant to the Rights Offering.

*Schedule of Rejected Contracts* means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time, which shall be acceptable to the Initial Supporting Noteholders.

*Schedules* means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant

to section 521 of the Bankruptcy Code, which shall be reasonably acceptable to the Initial Supporting Noteholders.

*Secured Claim* means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Secured Notes* means the 1.125L Notes, the 1.25L Notes, and the 1.5L Notes.

*Securities Act* means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Shareholder Agreement* means the shareholder agreement to be entered into (or as may be deemed entered into, as applicable) by the Reorganized Debtors and the holders of New Common Shares, including participants in the Rights Offering, on the Effective Date that will govern certain matters related to the governance of the Reorganized Debtors.

*Solicitation Materials* means collectively, the Disclosure Statement and the related solicitation materials.

*Stated Equity Value* means the stated equity value of the Reorganized Debtors of $900 million, which such amount is solely for the purposes of calculations of Rights Offering amounts.

*Subordinated Claim* means a Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

*Supporting Noteholders* means the signatories to the Plan Support Agreement, and any 1.5L Noteholder that subsequently becomes party thereto in accordance with the terms of the PSA.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

*Unsecured Claim* means Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims.

*Unsecured Noteholders* means holders of Unsecured Notes Claims.

*Unsecured Notes Claims* means 2020 Unsecured Notes Claims, 2022 Unsecured Notes Claims, and 2023 Unsecured Notes Claims.

*Unsecured Notes Indentures* means the 2020 Unsecured Notes Indenture, 2022 Unsecured Notes Indenture, and 2023 Notes Indenture.

*Unsecured Notes Trustees* means the 2020 Unsecured Notes Trustee, the 2022 Unsecured Notes Trustee, and the 2023 Unsecured Notes Trustee.

*U.S. Trustee* means the United States Trustee for Region 7.

*Voting Deadline* means February [6], 2020 at 4:00 p.m. Prevailing Central Time, or such date and time as may set by the Bankruptcy Court.

### 1.2    *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Plan Support Agreement.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3    *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4    *Consent Rights of Supporting Noteholders.*

Notwithstanding anything herein to the contrary, any and all consent rights of the Supporting Noteholders set forth in the Plan Support Agreement and the Backstop Commitment Agreement with respect to the form and substance of this Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

### 1.5     *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

## ARTICLE II.          ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1     *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (i)  the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or Restructuring Expenses) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2     *Treatment of Fee Claims.*

(a)     All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Confirmation Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of

expenses incurred after the Confirmation Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On the Confirmation Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons retained by the Debtors and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 318); *provided* that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way. For the avoidance of doubt, Restructuring Expenses shall not be paid into the Fee Escrow Account, and shall be payable on the Effective Date pursuant to Section 5.14 of the Plan.

(c)     Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

## 2.3     *Treatment of DIP Claims and Commitments.*

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim and DIP Commitment, each holder of an Allowed DIP Claim or DIP Commitment shall receive, either (i) on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement or (ii) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed DIP Claims will have agreed upon in writing. Upon the indefeasible payment or satisfaction in Cash, and/or in the form of first-lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

### 2.4   *Payment of Fees and Expenses Under DIP Order.*

On the later of (i) the Effective Date and (ii) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Agent and otherwise required to be paid under or pursuant to the applicable DIP Order. All payments of fees, expenses, or disbursements pursuant to this section shall be subject in all respects to the terms of the applicable DIP Order.

### 2.5   *Treatment of Priority Tax Claims.*

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (i) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) or such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## ARTICLE III.   CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1   *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2   *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3    *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | RBL Claims | Impaired | Yes |
| Class 4 | 1.125L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 5 | 1.25L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 6 | Secured 1.5L Notes Claims | Impaired | Yes |
| Class 7 | Unsecured Claims | Impaired | Yes |
| Class 8 | Convenience Claims | Impaired | Yes |
| Class 9 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 10 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 11 | Existing Parent Equity Interests | Impaired | Yes |
| Class 12 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 13 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

### 3.4    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5    *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of

determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.8    *Voting; Presumptions; Solicitation.*

(a)     **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims or Interests in Classes 3, 6, 7, 8 and 11 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  An Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.  Holders of Claims or Interests in Classes 3, 6, 7, 8 and 11 shall receive ballots containing detailed voting instructions.

(b)     **Deemed Acceptance by Unimpaired Classes**.  Holders of Claims and Interests in Classes 1, 2, 4, 5, 9, and 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims and Interests in Classes 10 and 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9    *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10   *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

# ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

### 4.1    *Class 1: Other Secured Claims.*

(a)    **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(b)    **Impairment and Voting**:   Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.2    *Class 2:  Other Priority Claims.*

(a)    **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

(b)    **Impairment and Voting**:   Allowed Other Priority Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.3    *Class 3:  RBL Claims.*

(a)    **Treatment**: Each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

(b)     **Impairment and Voting**: RBL Claims are Impaired.  Holders of Allowed RBL Claims are entitled to vote on the Plan.

(c)     **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date, consisting of $314,710,456 in principal amount, plus all other secured obligations, including unpaid interest, fees, and other reasonable and documented expenses arising and payable under the Prepetition RBL Credit Agreement that have not become DIP Claims pursuant to the DIP Order.

### 4.4     *Class 4:  1.125L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, all Allowed 1.125L Notes Claims will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.125L Notes Indenture, a portion of the 1.125L Notes Claims.

(b)     **Impairment and Voting**:  1.125L Notes Claims are Unimpaired.  Holders of Allowed 1.125L Notes Claims are not entitled to vote on the Plan.

### 4.5     *Class 5:  1.25L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, all Allowed 1.25L Notes Claims will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes Claims.

(b)     **Impairment and Voting**:  1.25L Notes Claims are Unimpaired.  Holders of Allowed 1.25L Notes Claims are not entitled to vote on the Plan.

### 4.6     *Class 6:  Secured 1.5L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares, and (ii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures.  On the Effective Date, the 1.5L Notes will be cancelled, released and extinguished and will be of no further force or effect except as set forth herein, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting**:  Secured 1.5L Notes Claims are Impaired. Holders of Allowed Secured 1.5L Notes Claims are entitled to vote on the Plan.

(c)     **Allowance**:  The Secured 1.5L Notes Claims shall be deemed Allowed on the Effective Date in the amount of $395,257,335.

### 4.7     *Class 7:  Unsecured Claims.*

(d)     **Treatment**:  On the Effective Date, holders of Allowed Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims will receive, in full and final satisfaction of such Claims, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares (the "**Unsecured Shares**").  On the Effective Date, the Unsecured Notes Claims, 1.5L Notes Deficiency Claims and General Unsecured Claims will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(e)     **Impairment and Voting**:  Allowed Unsecured Claims are Impaired. Holders of Allowed Unsecured Claims are entitled to vote on the Plan.

### 4.8     *Class 8:  Convenience Claims.*

(a)     **Treatment**:  Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of (i) the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount.  Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim.

(b)     **Impairment and Voting**:  Allowed Convenience Claims are Impaired. Holders of Allowed Convenience Claims are entitled to vote on the Plan.

### 4.9     *Class 9:  Intercompany Claims.*

(a)     **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Initial Supporting Noteholders.

(b)     **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.10 *Class 10:  Subordinated Claims.*

(a)     **Treatment**:  All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(b)     **Impairment and Voting**: Allowed Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 4.11 *Class 11:  Existing Parent Equity Interests.*

(a)     **Treatment**:  Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $500,000 in Cash.  On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting:**  Existing Parent Equity Interests are Impaired. Holders of Existing Parent Equity Interests are entitled to vote on the Plan.

### 4.12 *Class 12:  Other Equity Interests.*

(a)     **Treatment**:  Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.

(b)     **Impairment and Voting**:  Other Equity Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

### 4.13 *Class 13:  Intercompany Interests.*

(a)     **Treatment**:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall, subject to the reasonable consent of the Initial Supporting Noteholders, be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.

(b)     **Impairment and Voting**:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the **votes** of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

**4.14**   *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan shall receive no Plan Distribution.


# ARTICLE V.          MEANS FOR IMPLEMENTATION.

**5.1**   *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

**5.2**   *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)      Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents or other applicable corporate governance documents.

(b)      On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, subject to the consent of the Initial Supporting Noteholders, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)      On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, subject to the consent of the Initial Supporting Noteholders:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring,

conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

### 5.3 *Corporate Action.*

(a)     Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided herein, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Common Shares, (d) the entry into or execution of the Exit Facility Documents, (e) entry into the Shareholder Agreement by the Reorganized Debtors and the holders of New Common Shares, including participants in the Rights Offering, and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)     On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to, subject to the reasonable consent of the Initial Supporting Noteholders, issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Section 5.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 5.4 *Plan Funding.*

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering and the Exit Facility.

### 5.5 *Cancellation of Existing Securities and Agreements.*

(a)     Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective

Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (other than certain Intercompany Interests, the Reinstated Debt, the indentures governing the Reinstated Debt, the security documents governing or evidencing any security interests granted in favor of the holders of the Reinstated Debt or the collateral agents for the Reinstated Debt, the Intercreditor Agreements and the security interests with respect to the Prepetition RBL Facility which secure the Exit Facility that are not modified by the Plan) (collectively, the "**Cancelled Agreements**") and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (a) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (b) allowing and preserving the rights of the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees, as applicable, to (i) make distributions on account of such Claims or Interests; (ii) maintain, enforce, and exercise their respective Indenture Trustee Charging Liens, as applicable, under the terms of the applicable Indentures, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (iv) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, or Unsecured Notes Trustees may have under the Plan, the applicable credit agreement, Indentures, collateral agreements, or pledge agreements; (v) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or Indentures; and (vi) execute documents pursuant to section 5.6 of the Plan; *provided*, *further*, that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees may take such further action to implement the terms of this Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and the Initial Supporting Noteholders to the extent not inconsistent with the Confirmation Order or the Plan.

(b)     On and after the Effective Date, all duties, responsibilities or obligations of the Prepetition RBL Agent, the holders of RBL Claims, the DIP Agent, the holders of DIP Claims, the 1.5L Notes Trustees, the holders of 1.5L Notes Claims, the Unsecured Notes Trustees, and the holders of Unsecured Notes Claims, in each case under (i) the Prepetition RBL Credit Agreement and the other Credit Documents (as defined in the Prepetition RBL Credit Agreement), (ii) the  DIP Facility Credit Agreement and the other Credit Documents (as defined in the DIP Facility Credit Agreement), (iii) the 1.5L Notes Indentures and the other Notes Documents (as defined in the applicable 1.5L Notes Indentures), and (iv) the Unsecured Notes Indentures and the other Notes Documents (as defined in the applicable Unsecured Notes Indentures), shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan. For the avoidance of doubt, the Debtors and the Reorganized Debtors (in each case, subject to the reasonable consent of the Initial Supporting Noteholders), the Prepetition RBL Agent, the DIP Agent, the 1.5L Notes Trustees, the Unsecured Notes Trustees, and the Disbursing Agent

may (i) make post-Effective Date Distributions or take such other action to exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (ii) may take any other action necessary to cause the Plan to become Effective, including by implementing the Restructuring Transactions set forth in this Plan.

(c)     If the record holder of any 1.5L Note or Unsecured Note is DTC or its nominee or another securities depository or custodian thereof, and such 1.5L Note or Unsecured Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such 1.5L Note or Unsecured Note shall be deemed to have surrendered such Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.

### 5.6     *Cancellation of Certain Existing Security Interests.*

(a)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(b)     After the Effective Date, the distributions to holders on account of 1.5L Notes Claims, and the payment of the Indenture Trustee Fees and Expenses with respect to the 1.5L Notes Trustees (including, without limitation, attorneys' fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the 1.5L Notes Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the 1.5L Notes Trustees, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the 1.5L Notes Trustees, including, without limitation, UCC-3 termination statements.

### 5.7     *Officers and Boards of Directors.*

(c)     On the Effective Date, the New Board shall consist of the number of directors as set forth in the Plan Supplement.  EP Energy's chief executive officer shall serve as a member of the New Board.  The remaining initial members of the New Board shall be appointed by the Initial Supporting Noteholders in consultation with the Debtors and in accordance with the Plan Support Agreement.  The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(d)     Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve

as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(e) Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.8    _Employee Incentive Plan._

On the Effective Date, the Employee Incentive Plan and the Emergence Awards (as defined in the EIP Term Sheet annexed as Exhibit A-2 to the Plan Support Agreement) will become effective. All awards issued under the Employee Incentive Plan will be dilutive of all other New Common Shares issued pursuant to the Plan.

### 5.9    _Authorization, Issuance, and Delivery of New Common Shares._

On the Effective Date, Reorganized EP Energy is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Reorganized EP Energy's New Corporate Governance Documents shall have provided for sufficient shares of authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by the Plan, including the Rights Offering, the Backstop Commitment Agreement, and the Employee Incentive Plan, and Reorganized EP Energy shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate such issuances. Each holder of New Common Shares (including participants in the Rights Offering) may, at the option of the Debtors, with the consent of the Initial Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the Shareholder Agreement and the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The Shareholder Agreement may, and the New Corporate Governance Documents shall, be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan or the Rights Offering upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

### 5.10    *Exit Credit Agreement.*

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Credit Agreement without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests.   The Exit Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order.   The financial accommodations to be extended pursuant to the Exit Facilities Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all letters of credit issued under the Prepetition RBL Credit Agreement, shall be deemed issued or reissued, as applicable, under the Exit Credit Agreement in accordance with the terms and conditions of the Exit Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the Exit Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Exit Credit Agreement, as applicable, (including any Liens and security interests granted on the Assets) shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable Intercreditor Agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facilities are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 5.11    *Rights Offering.*

(a)    <u>Terms</u>.   Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith and, on the Effective Date, the Debtors shall consummate the Rights Offering, in each case subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders.   The Rights Offering shall be backstopped in an amount equal to

$463 million ($138 million of which shall be funded through the exchange of $138 million in aggregate principal amount of Reinstated 1.25L Notes held by the Backstop Parties on the terms set forth in the Backstop Commitment Agreement) by the Backstop Parties in accordance with and subject to the terms and conditions of the Rights Offering Procedures and the Backstop Agreement.  The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement.  The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the EIP Shares, is approximately 76.2%-78.0%, consisting of (i) approximately 55.6%-57.4% in the case of Rights Offering Shares purchased for cash, and (ii) approximately 20.6% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes.  The low end of the ranges set forth in the preceding sentence assumes that New Common Shares are issued only with respect to the backstopped portion of the Rights Offering and the high end of the ranges set forth in the preceding sentence assumes that the Rights Offering is fully subscribed.  For the avoidance of doubt, EP Energy shall pay or cause to be paid all accrued but unpaid interest, including any stub interest, in Cash to the holders of the Reinstated 1.25L Notes that are exchanged in connection with the Rights Offering.

(b)      Purpose.  On the Effective Date, the proceeds of the Rights Offering may be used:  (i) to pay down a portion of the DIP Facility and the Prepetition RBL Facility; (ii) pay all reasonable and documented Restructuring Expenses; (iii) fund Plan Distributions, case administration expenses, and exit costs; and (iv) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

(c)      Backstop Commitment.  In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase for Cash or in exchange for Reinstated 1.25L Notes, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the New Common Shares.

(d)      Backstop Commitment Premium.  As consideration for providing the backstop commitment for the Rights Offering, on the Effective Date, the Backstop Commitment Premium shall be allocated among the Backstop Parties in accordance with the Backstop Commitment Agreement.

### 5.12      *Intercompany Interests; Corporate Reorganization.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.13      *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan, the Confirmation Order and the Plan Support Agreement, including the reasonable consent of the Initial Supporting Noteholders, as may be necessary or appropriate to effect any transaction

described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.14   *Restructuring Expenses.*

The outstanding Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (whether incurred prepetition or postpetition) shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Backstop Commitment Agreement, and without the need for any further notice or approval by the Bankruptcy Court or otherwise.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

### 5.15   *Indenture Trustee Expenses.*

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Fees and Expenses without a reduction to recoveries to holders of the Secured Notes; *provided* that the Indenture Trustees shall provide the Debtors with summary invoices for the Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than fifteen (15) days prior to the Effective Date. Such summary invoices may (but are not required to) include estimates for the Indenture Trustee Fees and Expenses anticipated through the Effective Date and the release of any Liens required under the Plan. If the Debtors dispute any Indenture Trustee Fees and Expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) provide written notification, within ten (10) days after receipt of the summary invoices, to the Indenture Trustees (as applicable) specifying the disputed portion of the Indenture Trustee Fees and Expenses and the basis for such dispute, (ii) on the Effective Date, pay in Cash the undisputed portion of the Indenture Trustee Fees and Expenses, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Fees and Expenses pending any consensual resolution or resolution by the Bankruptcy Court.  Upon receipt of such notification, the applicable Indenture Trustee may assert its Indenture Trustee Charging Lien to pay the disputed portion of its Indenture Trustee Fees and Expenses to the extent provided under the applicable Indenture or  may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the Indenture Trustees' rights to exercise their respective Indenture Trustee Charging Liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, or the Indentures (as applicable) from and after fifteen (15) days prior to the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further

Bankruptcy Court approval, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services. The payment of such compensation and expenses will be made as soon as reasonably practicable, but in any case within the earlier of (i) the date upon which the Indenture Trustee releases any Liens under the Plan or (ii) ten (10) days following the applicable Indenture Trustee's notification of the Debtors or Reorganized Debtors, as applicable, of the amount of such costs or expenses.

### 5.16    *Private Company*

The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; provided, that from and after the Effective Date, Reorganized EP Energy shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements).

## ARTICLE VI.        DISTRIBUTIONS.

### 6.1    *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 6.2    *No Postpetition Interest on Claims.*

Except as otherwise specifically provided for in this Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.3    *Date of Distributions.*

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, *however*, that the Reorganized Debtors may, with the consent of the Initial Supporting Noteholders, implement periodic distribution dates to the extent they determine them to be appropriate.

### 6.4 *Distribution Record Date.*

(a)     As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease and the Initial Supporting Noteholders, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Shares to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Shares will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deems such method of distribution advisable.

### 6.5 *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6 *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.17 of the Plan.

### 6.7 *Delivery of Distributions.*

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan

at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Distributions of the New Common Shares will be made through the facilities of DTC in accordance with DTC's customary practices; *provided*, that the New Common Shares are permitted to be held through DTC's book-entry system; provided, further, that to the extent that the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, the Reorganized Debtors will take such reasonable actions as may be required to cause distributions of the New Common Shares under the Plan.  No distributions will be made other than through DTC if the New Common Shares are permitted to be held through DTC's book entry system. Any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date will be forfeited.  For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

### 6.8    *Unclaimed Property.*

One year from the later of:  (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.9    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.11    *Fractional Shares and De Minimis Cash Distributions.*

No fractional New Common Shares shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Common Shares to be distributed on account of Allowed Secured 1.5L Notes Claims, Allowed Unsecured Claims, the Rights Offering, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $100.00 in Cash.  Fractional New Common Shares that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized EP Energy.

### 6.12    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### 6.13    *Allocation of Distributions between Principal and Interest.*

Except as otherwise required by law, consideration received in respect of an Allowed 1.5L Notes Claim or Allowed Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.14    *Exemption from Securities Laws.*

(a)    The issuance of and the distribution under this Plan of the New Common Shares pursuant to Sections 4.6(a) and 4.7(a) of this Plan shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  Subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b).     The offer, issuance, and distribution of each of the Subscription Rights and the New Common Shares issuable upon the exercise thereof and the New Common Shares to Eligible Offerees pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement.

### 6.15    _Setoffs and Recoupments._

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, other than the 1.5L Notes Claims, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s), with the consent of the Initial Supporting Noteholders, and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; _provided_, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 6.16    _Rights and Powers of Disbursing Agent._

(a)     Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)     Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.17    *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution. If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

# ARTICLE VII.    PROCEDURES FOR DISPUTED CLAIMS.

7.1    *Allowance of Claims.*

Except as expressly provided in the Plan, the Claims Resolution Procedures, or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation

Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim.  On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2    *Claims Objections.*

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims.  Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, in accordance with the Claims Resolution Procedures, in each case subject to the reasonable consent of the Initial Supporting Noteholders.

### 7.3    *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection, in each case subject to the reasonable consent of the Initial Supporting Noteholders.  In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4    *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

**7.5**     *Time to File Objections to Claims.*

Any objections to a Claim shall be filed on or before the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time.

**7.6**     *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

**7.7**     *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors.

**7.8**     *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**7.9**     *Disputed Claims Reserve.*

(a)     There shall be withheld from the New Common Shares (which withheld New Common Shares shall not be issued by Reorganized EP Energy until such time as the respective Disputed Claims are resolved) to be distributed to holders of Allowed Unsecured Claims an amount of New Common Shares that would be distributable to Disputed Unsecured Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).  The Debtors intend to seek a determination, subject to the reasonable consent of the Initial Supporting Noteholders, by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed Unsecured Claims for purposes of determining the amount of New Common Shares attributable to such Disputed Claims.  To the extent any dividends would have been payable on any withheld New Common Shares had such New Common Shares been issued and distributed on the Effective Date, an amount equal to such dividends shall be held by Reorganized EP Energy for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed and (ii) holders of Allowed Unsecured Claims (including holders of Disputed Unsecured Claims that are subsequently Allowed).

(b)      To the extent applicable, there shall also be withheld Cash from the Convenience Claim Distribution Amount in an amount that would be distributable to any Disputed Convenience Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).

(c)      Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat any cash and other property (other than the New Common Stock) held in the Disputed Claims Reserve as held by a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  For the avoidance of doubt, New Common Stock which is not issued and outstanding until Disputed Claims are resolved and such New Common Stock can be immediately issued and distributed to the applicable claimant, shall not be treated as held by a disputed ownership fund for U.S. federal income tax purposes.  All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

(d)      The Disbursing Agent shall hold in the Disputed Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed, (ii) holders of Disputed Convenience Claims against any of the Debtors whose Claims are subsequently Allowed, as applicable, and (iii) other parties entitled thereto hereunder.  The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

(e)      To the extent that a Disputed Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of the New Common Shares, which Reorganized EP Energy shall issue to the Disbursing Agent (together with any amounts held on account of dividends on such withheld New Common Shares) out of the Disputed Claims Reserve, to which such holder is entitled hereunder.  To the extent that a Disputed Convenience Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled hereunder out of the Disputed Claims Reserve.  No interest shall be paid with respect to any Disputed Convenience Claim or any Disputed Unsecured Claim that becomes an Allowed Claim after the Effective Date.

(f)      In the event the remaining withheld New Common Shares attributable to Disputed Unsecured Claims are insufficient to satisfy all the Disputed Unsecured Claims that

have become Allowed, such Disputed Unsecured Claims shall be satisfied Pro Rata from such remaining New Common Shares. After all New Common Shares have been distributed, no further distributions shall be made in respect of Disputed Unsecured Claims. At such time as all Disputed Unsecured Claims have been resolved, any remaining withheld New Common Shares issued in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for distribution in accordance with Section 4.7 hereof.

(g)     In the event the remaining withheld Cash from the Convenience Claim Distribution Amount is insufficient to satisfy all the Disputed Convenience Claims that have become Allowed, such Disputed Convenience Claims shall be satisfied Pro Rata from such remaining Cash. After all Cash has been distributed, no further distributions shall be made in respect of Disputed Convenience Claims. At such time as all Disputed Claims have been resolved, any remaining withheld Cash from the Convenience Claim Amount issued in the Disputed Claims Reserve shall be revert to the Reorganized Debtors.

### 7.10     *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.11     *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by the Claims Resolution Procedures.

## ARTICLE VIII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1     *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. The assumption of executory contracts and unexpired leases hereunder may include, subject to the consent of the Initial Supporting Noteholders, the assignment of certain such contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation

Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing, or such earlier time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts, subject to the consent of the Initial Supporting Noteholders, to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and subject to the consent of the Initial Supporting Noteholders.

## 8.2 *Determination of Cure Amounts and Deemed Consent.*

(a)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders.

(b)     The Debtors shall serve a Cure Notice, which shall be reasonably acceptable to the Initial Supporting Noteholders, on parties to executory contracts and unexpired leases no later than thirty (30) days prior to the Confirmation Hearing in accordance with the order approving the Disclosure Statement. If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c)     Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement to object to the proposed assumption, assumption and assignment, or related Cure Amount listed on the Cure Notice.

(d)     The Bankruptcy Court will determine any Assumption Dispute by entry of an order; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any

Assumption Dispute with the reasonable consent of the Initial Supporting Noteholders, and without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that where an Assumption Dispute relates solely to the applicable Cure Amount, the Debtors may with the reasonable consent of the Initial Supporting Noteholders assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute. If there is an Assumption Dispute, the Debtors reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

### 8.3    *Payments Related to Assumption of Contracts and Leases.*

(a)    Any Cure Amounts shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amount as reflected in the applicable Cure Notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree. If no Cure Amount is reflected in the applicable Cure Notice, no Cure Amount shall be deemed to be owing, unless otherwise ordered by the Bankruptcy Court.

(b)    Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 8.4    *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.5    *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by

the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.6     *Compensation and Benefit Plans.*

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of certain employment agreements, effective as of the Effective Date, in accordance with Employment Agreement Term Sheet annexed as Exhibit A-3 to the Plan Support Agreement.

### 8.7     *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.  Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

8.8 *__Modifications, Amendments, Supplements, Restatements, or Other Agreements.__*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

8.9 *__Reservation of Rights.__*

(a) Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b) Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c) Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d) If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall, subject to the consent of the Initial Supporting Noteholders, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.


**ARTICLE IX.     CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

9.1 *__Conditions Precedent to Confirmation.__*

The confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of this Plan:

(a) The Plan and the Plan Supplement are consistent with the Plan Support Agreement.

(b) the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders; and

(c)      the Plan Support Agreement shall be in full force and effect and shall not have been terminated.

**9.2**      *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of this Plan:

(a)      the Plan Support Agreement shall be in full force and effect and shall not have been terminated;

(b)      the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

(c)      the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(d)      the Bankruptcy Court shall have entered the order approving the Disclosure Statement, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(e)      the Rights Offering and, if applicable, the Private Placement, shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Commitment Agreement, and any other relevant transaction documents;

(f)      the Definitive Documents will contain terms and conditions consistent in all material respects with the Plan Support Agreement (including all exhibits thereto) and shall otherwise be satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders;

(g)      the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement, and in form and substance acceptable to the Initial Supporting Noteholders;

(h)      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(i)      the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

(j)      the Restructuring to be implemented on the Effective Date shall be consistent with this Plan and the Plan Support Agreement;

(k)     the Reinstated Debt shall have been reinstated in accordance with Sections 4.4 and 4.5 hereof;

(l)     all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived, and the Exit Facility, including all documentation related thereto, shall be in form and substance satisfactory to the Initial Supporting Noteholders and the Debtors;

(m)     the New Corporate Governance Documents shall be in full force and effect and in form and substance satisfactory to the Initial Supporting Noteholders;

(n)     the Registration Rights Agreement shall have been executed and delivered by EP Energy, shall otherwise have become effective with respect to the Supporting Noteholders and the other parties thereto, and shall be in full force and effect;

(o)     the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(p)     all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Commitment Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Commitment Agreement shall have been obtained; and

(q)     all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date shall have been paid in full by the Debtors in accordance with the Backstop Commitment Agreement.

### 9.3     *Waiver of Conditions Precedent.*

(a)     Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Initial Supporting Noteholders without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  For

the avoidance of doubt, the rendering of the Reinstated 1.25L Notes as unimpaired pursuant to Section 1124(2) of the Bankruptcy Code shall be deemed to occur immediately prior to the consummation of the Rights Offering.

      (c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4 *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the termination of the Plan Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Supporting Noteholders, or any other Person.

## ARTICLE X.    EFFECT OF CONFIRMATION.

### 10.1 *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2 *Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3    *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder,  shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor

### 10.4    *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  The *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of Debtors* (ECF No. 313) shall remain in full force and effect following the Effective Date solely with respect to transfers of Existing Parent Equity Interests and Other Equity Interests prior to the Effective Date.

### 10.5    *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

### 10.7    *Releases.*

(a)    **RELEASES BY THE DEBTORS.  AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE**

OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN,

**AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

(b) **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS, AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER**

DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(c)       *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Reinstated Debt and the  Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

## 10.8    *Exculpation.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, EXIT FACILITY, THE RIGHTS OFFERING, THE PRIVATE PLACEMENT, THE EMPLOYEE INCENTIVE PLAN, THE DISCLOSURE STATEMENT, THE PSA, THE RESTRUCTURING, AND THE PLAN (INCLUDING THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION

**OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER.  THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.**

### 10.9 *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 10.10 *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11    *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

### 10.13    *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity prior to, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

**ARTICLE XI.        RETENTION OF JURISDICTION.**

       **11.1    *Retention of Jurisdiction.***

       Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

       (a)      to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

       (b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

       (c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

       (d)      to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

       (e)      to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

       (f)      to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

       (g)      to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

       (h)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

       (i)      to hear and determine all Fee Claims;

       (j)      to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k) to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l) to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m) to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n) to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o) to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p) to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q) to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r) to recover all Assets of the Debtors and property of the Estates, wherever located;

(s) to hear and determine matters related to the DIP Facilities and the Final DIP Order; and

(t) to enter a final decree closing each of the Chapter 11 Cases.


## ARTICLE XII.     MISCELLANEOUS PROVISIONS.

### 12.1     *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions

consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2 *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.3 *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.4 *Amendments.*

(a) <u>Plan Modifications</u>.  Subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Initial Supporting Noteholders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Plan Support Agreement through the Effective Date.

(b) <u>Certain Technical Amendments</u>.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court with the consent of the Initial Supporting Noteholders.

(c) Notwithstanding anything to the contrary herein, any amendments or modifications to Section 9.2 of this Plan shall require the consent of the Initial Supporting Noteholders, and any change, modification, or amendment to the Plan that treats or affects any Supporting Noteholders in a manner that is materially and adversely disproportionate to the manner in which any other Supporting Noteholders are treated (after taking into account each of such Supporting Noteholders' respective holdings in the Debtors and the recoveries contemplated by this Plan) shall require the written consent of such materially adversely and disproportionately affected Supporting Noteholders.

## 12.5 *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

## 12.6 *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Initial Supporting Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and (iii) nonseverable and mutually dependent.

### 12.7 *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8 *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9 *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.10 *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.11 *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12 *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.13 *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have

been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or Reorganized Debtors:

> EP ENERGY CORPORATION
> 1001 Louisiana Street
> Houston, Texas 77002
> Attn:  Jace D. Locke
>
> – and –
>
> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., Ronit Berkovich, Esq., and Scott Bowling, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
>
> *Attorneys for the Debtors*

if to the Supporting Noteholders:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attn:  Jeffrey Saferstein, Esq. (jsaferstein@paulweiss.com), Jacob Adlerstein, Esq. (jadlerstein@paulweiss.com), and Brian Bolin, Esq. (bbolin@paulweiss.com)
> Telephone:  (212) 373-3000
> Facsimile:  (212) 757-3990
>
> *Attorneys for Apollo*
>
> –and–
>
> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001-2163
> Attn:  Gerald Uzzi, Esq. (guzzi@milbank.com), Eric Stodola, Esq. (estodola@milbank.com), and Parker Milender, Esq. (pmilender@milbank.com)
> Telephone:  (212) 530-5000
> Facsimile:  (212) 530-5219
>
> *Attorneys for Elliott*
>
> –and–

Debevoise & Plimpton
919 3rd Ave
New York, NY 10022
Attn:  Sidney P. Levinson
Telephone:  (212) 909-6000
Facsimile:  (212) 908-6836

*Attorneys for Access*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee and the Initial Supporting Noteholders need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, the Initial Supporting Noteholders, and those entities that have filed such renewed requests.

## 12.14   *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to any Claims or Interests prior to the Effective Date or (b) any holder of a Claim or Interest or other entity prior to the Effective Date.

Dated: December 12, 2019
      Houston, Texas

           Respectfully submitted,

           */s/ David Rush*

           Name:  David Rush
           Title:  Chief Restructuring Officer

           **EP ENERGY CORPORATION**
           **EPE ACQUISITION LLC**
           **EP ENERGY, LLC**
           **EVEREST ACQUISITION FINANCE INC.**
           **EP ENERGY GLOBAL LLC**
           **EP ENERGY MANAGEMENT, L.L.C.**
           **EP ENERGY RESALE COMPANY, L.L.C.**
           **EP ENERGY E&P COMPANY, L.P.**

**Exhibit B**

**Plan Support Agreement**

*Execution Version*

## PLAN SUPPORT AGREEMENT

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

This PLAN SUPPORT AGREEMENT (including all exhibits, and schedules attached hereto, and as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of October 18, 2019 is entered into by and among:

(a)     EP Energy Corporation ("***EP Parent***"), EPE Acquisition, LLC, EP Energy, LLC, Everest Acquisition Finance Inc., EP Energy Global LLC, EP Energy Management, L.L.C., EP Energy Resale Company, L.L.C., and EP Energy E&P Company, L.P., (each such entity, together with EP Parent, a "***Company Entity***," and collectively, and together with EP Parent, the "***Company***");

(b)     [RESERVED]; and

(c)     the undersigned beneficial holders, or investment managers, advisors, or subadvisors to beneficial holders (together with their respective successors and permitted assigns, the "***Supporting Noteholders***" and collectively with any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, the "***Supporting Creditors***") of (i) the notes issued pursuant to that certain Indenture, dated as of February 6, 2017, by and between EP Energy LLC and Everest Acquisition Finance Inc., as Issuers, the Subsidiary Guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee and Notes Collateral Agent, for the issuance of $1,000 million in aggregate principal amount of 8.00% senior secured notes due 2025 (the "***2025 1.5L Indenture***"; such notes, the "***2025 1.5L Notes***") and (ii) the notes issued pursuant to that certain Indenture, dated as of January 3, 2018, by and between EP Energy LLC and Everest Acquisition Finance Inc., as Issuers, the Subsidiary Guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee and Notes Collateral Agent, for the issuance of $1,092 million in aggregate principal amount of 9.375% senior secured notes due 2024 (the "***2024 1.5L Indenture***" and together with the 2025 1.5L Indenture, the "***1.5L Indentures***"; such notes, the "***2024 1.5L Notes***" and (i) and (ii) together, the "***1.5L Notes***").

The Company, each Supporting Noteholder, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and each individually as a "***Party***." Capitalized terms used but not defined herein shall have the meanings ascribed to them, as applicable, in the restructuring term sheet attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto) (the "***Term Sheet***").

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."

### Recitals

**WHEREAS**, the Parties have engaged in arm's-length, good faith discussions regarding a restructuring of certain of the Company's indebtedness and other obligations, including the Company's indebtedness and obligations under the 1.5L Notes;

**WHEREAS**, the Parties have agreed to a restructuring and recapitalization of the Company's capital structure (the "***Restructuring***"), the principal terms of which are set forth in the Term Sheet;

**WHEREAS**, the Restructuring is anticipated to be implemented through the Company's voluntary cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"; such cases, the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") and the solicitation of votes on, and confirmation and implementation of, a plan of reorganization (as may be amended or modified from time to time in accordance with this Agreement, the "***Plan***"; and such solicitation, the "***Solicitation***");

**WHEREAS**, in connection with the Restructuring, the Initial 1.5L Noteholders (as defined herein) and certain other parties have agreed to backstop $463 million of an offering of up to $475 million of equity subscription rights to eligible holders of 1.5L Notes (the "***Rights Offering***") in accordance with the terms and conditions specified in this Agreement, the Term Sheet, a backstop commitment agreement to be entered into concurrently with the execution of this Agreement (the "***Backstop Agreement***"), and the procedures governing the Rights Offering, as set forth in the Backstop Agreement (the "***Rights Offering Procedures***");

**WHEREAS**, as of the date hereof, the Supporting Noteholders hold approximately 79.3% of the aggregate outstanding principal amount of the 1.5L Notes, approximately 52.0% of the aggregate outstanding principal amount of the 8.000% Senior Secured Notes due 2024 (the "**1.25L Notes**"), and such other claims (as defined in section 101 of the Bankruptcy Code) against the Debtors (collectively, "***Claims***") as are set forth on their respective signature pages hereto;

**WHEREAS**, the Company has requested that each Supporting Creditor sign this Agreement to support the Restructuring in the interests of all parties; and

**WHEREAS**, subject to the terms and conditions set forth herein, the Parties desire to express to one another their mutual support for and commitment in respect of the matters set forth in the Term Sheet and this Agreement.

WEIL:\97235493\2\42780.0003

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.  Certain Definitions.

As used in this Agreement, the following terms have the following meanings:[1]

(a)    "*Alternative Restructuring*" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of all or substantially all assets, financing (debt or equity), restructuring (in each case, of all or substantially all of the Company, its assets, or its capital structure), or repurchase, refinancing, extension or repayment of a material portion of the Company's funded debt (in each case, outside of the ordinary course of business) other than in accordance with or in furtherance of the Restructuring.

(b)    "*Business Day*" means any day that is not a Saturday, Sunday, or legal holiday on which banks in New York City are closed for business.

(c)    "*Definitive Documents*" means (i) this Agreement, (ii) the Plan and the Plan Supplement, including the Schedule of Rejected Contracts, (iii) the Disclosure Statement and the Solicitation Materials, (iv) the Backstop Agreement and the Rights Offering Procedures, (v) the DIP Credit Agreement and the DIP Documents, (vi) the order or orders of the Bankruptcy Court approving (A) the Backstop Agreement, (B) the DIP Facility, (C) the Rights Offering Procedures, and (D) the Disclosure Statement and the procedures governing the Solicitation, (vii) the Confirmation Order, (viii) the Exit Credit Agreement and the Exit Documents, (ix) the New Corporate Governance Documents, (x) the EIP and any other documents or agreements related to any management incentive or retention programs, including any management employment agreements, (xi) any final orders granting any "first day" or "second day" motions (but excluding retention applications), (xii) any and all motions filed on or after the Support Effective Date to reject or assume and assign an executory contract or unexpired lease and the order or orders of the Bankruptcy Court approving such motions, (xiii) any and all other material agreements, documents, motions, pleadings and orders reasonably necessary or desirable to effectuate the transactions contemplated by the Restructuring, and (xiv) in the case of each of the foregoing clauses (i) through (xiii), all material exhibits, appendices, and supplements thereto.

(d)    "*DIP Documents*" means the DIP Credit Agreement, any guaranty related thereto, any collateral and security documentation related thereto, and any material ancillary documentation related thereto.

(e)    "*Effective Date*" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, (c) the

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to them, as applicable, in the Term Sheet.

transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated, and (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan occurs.

(f)     "*Exit Commitment Letter*" means the commitment letter for the DIP Credit Agreement and the Exit Credit Agreement attached to the Term Sheet.

(g)     "*Exit Documents*" means the Exit Credit Agreement, the Exit Commitment Letter, any guaranty related thereto, any collateral and security documentation related thereto, and any material ancillary documentation related thereto.

(h)     "*Initial Supporting Noteholders*" means each of Apollo Management Holdings, L.P., Elliott Associates, L.P. and Elliott International, L.P.

(i)     [RESERVED]

(j)     [RESERVED]

(k)     "*Solicitation Materials*" means the ballots seeking votes to accept or reject the Plan, any notices permitting holders of claims or interests to opt into or out of any releases or exculpations, any notices of voting or non-voting status for any class of claims or interests, and any motion and proposed order for approval of the procedures governing the Solicitation.

(l)     "*Support Period*" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with Section 6 and (ii) the Effective Date.

(m)     "*Supporting Noteholder Counsel*" means each of Milbank LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Debevoise & Plimpton LLP, each in its capacity as counsel to certain of the Supporting Noteholders.

2.     Bankruptcy Process; Plan of Reorganization.

Subject to the terms and conditions of this Agreement and the exhibits attached hereto, during the Support Period, each Party agrees as follows:

(a)     Term Sheet. The Term Sheet is expressly incorporated into and made a part of this Agreement. The terms and conditions of the Restructuring are set forth in the Term Sheet; *provided*, *however*, that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between this Agreement and the Term Sheet, the terms of the Term Sheet shall govern. In the event of any inconsistencies between this Agreement and any of the Exhibits hereto, the terms of such Exhibit(s) shall govern.

(b)     Definitive Documents. Each of the Definitive Documents, including any amendments, supplements or modifications thereof, shall (i) contain terms and conditions consistent in all material respects with this Agreement and the Plan and (ii) otherwise be in form and substance acceptable (including with respect to tax structuring and elections) to the Company and the Initial Supporting Noteholders, except that the items set forth in Sections 1(c)(xii) and

(xiii) hereof and all material exhibits, appendices, and supplements thereto shall be reasonably acceptable to the Company and the Initial Supporting Noteholders.

(c)      <u>Filing of the Plan and Disclosure Statement</u>.  As soon as reasonably practicable, but in no event later than November 18, 2019, the Company shall file the Plan and the Disclosure Statement with the Bankruptcy Court.

(d)      <u>Confirmation of the Plan</u>.  The Company shall use commercially reasonable efforts to obtain entry of the Confirmation Order as soon as reasonably practicable following October 3, 2019 (the "***Petition Date***") in accordance with the Bankruptcy Code and on terms consistent with this Agreement, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization.

3.      <u>Agreements of the Supporting Creditors</u>.

(a)      <u>Voting; Support</u>.  Subject to the terms and conditions of this Agreement, each Supporting Creditor, severally and not jointly, agrees that, for the duration of the Support Period, such Supporting Creditor (on a several and not joint basis) shall:

(i)      timely vote or cause to be voted its Claims, to the extent entitled to vote on the Plan, to accept the Plan by delivering its duly executed and completed ballot or ballots and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party, but subject to the actual receipt by such Supporting Creditor of (a) the Disclosure Statement, approved by the Bankruptcy Court as containing "adequate information" (as such term is defined in section 1125 of the Bankruptcy Code) and the Solicitation Materials approved by the Bankruptcy Court), and (b) fifteen (15) Business Days' written notice of any voting record date and/or voting deadline;

(ii)      not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) above; *provided*, *however*, that notwithstanding anything in this Agreement to the contrary, a Supporting Creditor's vote and release may, upon written notice to the Company, be revoked (and, upon such revocation, deemed void *ab initio*) by such Supporting Creditor at any time following the termination of this Agreement pursuant to the terms hereof with respect to such Supporting Creditor;

(iii)      timely vote (or cause to be voted) its Claims, to the extent entitled to vote with respect to an Alternative Restructuring, against any Alternative Restructuring (subject to such Supporting Creditor receiving at least fifteen (15) business days' written notice of any relevant voting record date and/or voting deadline);

(iv)      not take any action which would result in the occurrence of a Change of Control (as such term is defined in (i) the Indenture, dated as of November 29, 2016 (the "***1.125L Indenture***"), by and among EP Energy LLC and Everest Acquisition Finance Inc., the subsidiary guarantors party thereto and BOKF, NA, as successor trustee and notes collateral agent and (ii) the Indenture, dated as of May 23, 2018 (the "***1.25L Indenture***" and together with the 1.125L Indenture, the "***Reinstated Indentures***"), by and among EP

Energy LLC and Everest Acquisition Finance Inc., the subsidiary guarantors party thereto and UMB Bank, National Association, as successor trustee and collateral agent); *provided* that no Supporting Creditor shall be liable to any Company Entity or any other Supporting Creditor for a breach of this Section 3(a)(iv) that is solely the result of another Supporting Creditor's non-compliance with their obligations under this Agreement or the Backstop Agreement;

(v)     not directly or indirectly, through any person or entity (including any administrative agent, indenture trustee, or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring or object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the Chapter 11 Cases, Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(vi)     not direct any administrative agent, indenture trustee, or collateral agent (as applicable) to take any action inconsistent with such Supporting Creditor's obligations under this Agreement or the Plan, and, if any applicable administrative agent, indenture trustee, or collateral agent takes any action inconsistent with such Supporting Creditor's obligations under this Agreement or the Plan, such Supporting Creditor shall direct and use its commercially reasonable efforts (which shall exclude the incurrence or provision of any indemnity obligations) to cause such administrative agent, indenture trustee, or collateral agent to cease, withdraw, and refrain from taking any such action; and

(vii)     if reasonably requested by the Company, use commercially reasonable efforts to support approval of the Disclosure Statement and confirmation of the Plan by filing papers and appearing in the Bankruptcy Court in support thereof.

(b)     <u>Transfers</u>.  Each Supporting Creditor, severally and not jointly, agrees that, for the duration of the Support Period, such Supporting Creditor shall not sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in) (each, a "***Transfer***"), or permit a transfer of, directly or indirectly, in whole or in part, any of its Claims or, in each case, any option thereon or any right or interest therein or any other claims against the Company (including grant any proxies, deposit any Claims into a voting trust or enter into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Supporting Creditor or an entity that is controlled by such Supporting Creditor or for which such Supporting Creditor acts as investment manager, advisor or subadvisor, or (ii) prior to or contemporaneously with such Transfer, agrees in writing for the benefit of the Parties to become a Supporting Creditor and to be bound by all of the terms of this Agreement applicable to Supporting Creditor (including with respect to any and all Claims it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **<u>Exhibit B</u>** (the "***Joinder Agreement***"), and delivering an executed copy thereof within five (5) Business Days following such execution, to Weil, Gotshal & Manges LLP ("***Weil***"), as counsel to the Company and Supporting Noteholder Counsel, in which event (A) the transferee (including the Supporting

Creditor transferee, if applicable) shall be deemed to be a Supporting Creditor hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Each Supporting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Supporting Creditor shall have the right to enforce the voiding of such Transfer.   Notwithstanding anything to the contrary herein, a Supporting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker become a Party; *provided*, *however*, that (x) such Qualified Marketmaker must Transfer such right, title, or interest by the earlier of (A) ten (10) calendar days following its receipt thereof and (B) if received prior to the Voting Deadline, at least seven (7) calendar days prior to the Voting Deadline, (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Supporting Creditor at the time of such transfer, and (z) such Supporting Creditor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this <u>Section 3</u>.  For the avoidance of doubt, if a Supporting Noteholder, acting in its capacity as a Qualified Marketmaker, acquires a Claim from a holder of Claims that is not a Supporting Noteholder, as applicable, it may Transfer such Claim without the requirement that the transferee be or become a Supporting Noteholder.  For the avoidance of doubt, to the extent that a Supporting Creditor's 1.5L Notes, Claims, or other securities issued by the Company may be loaned by such Supporting Creditor (and consequently pledged, hypothecated, encumbered, or rehypothecated by) as part of customary securities lending arrangements (each such arrangement, a "***Customary Securities Lending Arrangement***"), and such Customary Securities Lending Arrangement does not adversely affect such Party's ability to timely satisfy any of its obligations under this Agreement or the Backstop Agreement, such Customary Securities Lending Arrangement shall not be deemed a Transfer hereunder.

(c)     <u>Additional Claims</u>.   This Agreement shall in no way be construed to preclude the Supporting Creditors from acquiring additional Claims or transferring Claims in accordance with this <u>Section 3</u>, and during the Support Period to the extent any Supporting Creditor acquires additional Claims, then each such Supporting Creditor shall promptly notify Weil and Supporting Noteholder Counsel.  Each such Supporting Creditor agrees, severally and not jointly, that such additional Claims shall be subject to this Agreement and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with <u>Section 3(a)</u> hereof, in each case other than with respect to any Claims acquired by such Supporting Noteholder in its capacity as a Qualified Marketmaker.

---

[2]     As used herein, the term "***Qualified Marketmaker***" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against the Company (or enter with customers into long and short positions in Claims against the Company), in its capacity as a dealer or marketmaker in Claims against the Company and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(d)    <u>Additional Parties</u>.   Any 1.5L Noteholder may, at any time after the occurrence of the Support Effective Date, become a party to this Agreement as a Supporting Noteholder (an "***Additional Supporting Noteholder***", or an "***Additional Supporting Creditor***"), by executing a Joinder Agreement, pursuant to which such Additional Supporting Creditor shall be bound by the terms of this Agreement as a Supporting Creditor hereunder, and delivering such Joinder Agreement to Weil and Supporting Noteholder Counsel.

(e)    <u>D&O Claims</u>.   Regardless of whether the Bankruptcy Court approves the releases by the Supporting Creditors that are set forth in the Term Sheet in favor of the Released Parties (the "***Third-Party Releases***"), but subject to the occurrence of the Effective Date, each Supporting Creditor hereby (i) grants such releases in favor of the current and former directors and officers of EP Parent and (ii) agrees not to pursue any claims that such Supporting Creditor may currently have against the current and former directors and officers of EP Parent and each of its subsidiaries.

(f)    <u>Stock Transfer Restriction and Tax Attribute Protection Motions</u>.   Each Supporting Noteholder, severally and not jointly, agrees not to transfer any Existing Equity Interests for the duration of the Support Period in any manner that would change the ownership of such Existing Equity Interests for purposes of section 382 of the Internal Revenue Code of 1986, as amended (the "***Tax Code***") without the prior consent of the Company not to be unreasonably withheld, conditioned, or delayed.   Each Supporting Noteholder further agrees to support the final approval of the Stock Procedures (as defined in the *Emergency Motion of Debtors to Establish Notification Procedures and Approving Restrictions on Certain Transfers of Stock of, and Claims Against, Debtors* (Ch. 11 Case No. 19-35654, Docket No. 6) (the "***NOL Motion***")).   The Debtors shall not seek a hearing on or approval of the Claims Procedures (as defined in the NOL Motion); *provided*, that the foregoing shall not affect the Supporting Noteholders' right to object to the NOL Motion following the end of the Support Period.

(g)    <u>New Corporate Governance Documents</u>.   The Supporting Noteholders, severally and not jointly, agree to provide drafts of the New Corporate Governance Documents through the Supporting Noteholder Counsel to Weil no later than fifteen (15) Business Days before the Voting Deadline.

(h)    <u>[RESERVED]</u>

(i)    <u>Rights Unaffected</u>.   Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall limit:

(i)    the rights of the Supporting Creditors under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not in violation of or inconsistent with such Supporting Creditor's obligations hereunder;

(ii)     the ability of a Supporting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or Interests, including 1.5L Notes, subject to the terms hereof and applicable law;

(iii)    except as expressly provided herein, any right of a Supporting Noteholder under (A) the 1.5L Notes Indenture, or constitute a waiver or amendment of any provisions of the 1.5L Notes Indenture or (B) any other applicable agreement, instrument, or document that gives rise to a Supporting Noteholder's Claims or Interests, as applicable, or constitute a waiver or amendment of any provision of any such agreement, instrument, or document;

(iv)    the ability of a Supporting Noteholder to consult with other Supporting Creditors, other holders of Claims against or equity interests in the Company, or the Company;

(v)    [RESERVED]; or

(vi)    the ability of a Supporting Creditor to enforce any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Document.

4.    <u>Agreements of the Parties</u>.

(a)    <u>Covenants</u>.  Each Party, severally and not jointly, agrees that, for the duration of the Support Period, such Party shall use its commercially reasonable efforts to:

(i)    take all commercially reasonable actions necessary to (i) support and consummate the Restructuring contemplated by the Term Sheet and all of the transactions contemplated herein, (ii) cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, and (iii) take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and refrain from taking any action that would frustrate the purposes and intent of this Agreement; and

(ii)    provide reasonably prompt written notice (in accordance with <u>Section 19</u> hereof) to the Company and Supporting Noteholder Counsel between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which any person in a managing capacity of such Party has actual knowledge, and which occurrence or failure would be likely to cause any covenant of such Party contained in this Agreement not to be satisfied in any material respect or (B) any failure of such Party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or the Backstop Agreement.

WEIL:\97235493\2\42780.0003

(b)   <u>Hedging</u>.   The Company shall consult with the Initial Supporting Noteholders on any material changes to its hedging program.

5.   <u>Agreements of the Company</u>.

(a)   <u>Covenants</u>.   Each Company Entity (jointly and severally) agrees that, for the duration of the Support Period, each such Company Entity shall:

(i)   use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third party approvals necessary or required for the implementation or consummation of the Restructuring or the approval by the Bankruptcy Court of the Definitive Documents;

(ii)   not take any action, or support, encourage or direct any other person or entity to take any action, that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Restructuring (including to propose, file, seek, solicit, or support any Alternative Restructuring), in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members, or partners, as applicable, of the Company; *provided*, *however*, that the Company shall not be obligated to agree to any modification of any document that is inconsistent with this Agreement;

(iii)   provide draft copies of all Definitive Documents and any other material motions or applications and other material documents related to the Restructuring (including, but not limited to, any proposed final orders granting "first day" and "second day" motions (but excluding retention applications), the Plan, the Disclosure Statement, ballots, and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed Confirmation Order and amended versions of any of the foregoing) the Company intends to file with the Bankruptcy Court to Supporting Noteholder Counsel, if reasonably practicable, at least two (2) Business Days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders, or materials at least two (2) Business Days in advance is not reasonably practicable prior to filing, such motion, order, or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with Supporting Noteholder Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; *provided*, that the Company Parties shall not file any pleading or other document unless such pleading or other document is consistent with this Agreement;

(iv)   subject to professional responsibilities of counsel, timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order or relief (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan, or (E) that (1) is inconsistent with this Agreement in any

WEIL:\97235493\2\42780.0003

material respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(v)     not modify the Plan or any other Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement or not in form and substance acceptable to the Initial Supporting Noteholders;

(vi)     not seek relief or request any order from the Bankruptcy Court requiring any Initial Supporting Noteholder to sell, cause to sell, or otherwise transfer a specified amount of its beneficial ownership of Claims, for purposes of section 382(l)(5) of the Tax Code or otherwise, without the affirmative consent of such Initial Supporting Noteholder;

(vii)     consent to the sale or other disposition during the 2019 calendar year (including by abandonment to a state or governmental authority) of the Existing Equity Interests in the Company owned by Texas Oil & Gas Holdings LLC (31,276,726 shares), AI Energy Holdings LLC (3,556,387 shares) and ALTEP 2014 LP (109,991 shares), and, in the event of any Official Committee of Unsecured Creditors objects to such disposition, exercise reasonable best efforts to obtain approval by the Bankruptcy Court of such disposition; *provided*, that Access shall reasonably cooperate with the Debtors to provide any information reasonably requested related to any stock ownership analysis under section 382 of the Tax Code;

(viii)     execute and deliver any other required agreements to effectuate and consummate the Restructuring; and

(ix)     support and consummate the Restructuring in accordance with this Agreement within the time-frames contemplated under this Agreement.

(b)     <u>Automatic Stay</u>.  The Company acknowledges and agrees and shall not dispute that the giving of any notices, including notices of termination by any Party pursuant to this Agreement, shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided*, *however*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)     Nothing in this Agreement shall require any director or officer of a Company Entity to take any action or inaction that would be, based on the advice of counsel, inconsistent with their fiduciary duties to such Company Entity.  No action or inaction on the part of any director or officer of any Company Entity that such officer or director believes is, based on the advice of counsel, consistent, their fiduciary duties shall be limited or precluded by this Agreement; *provided*, that no such action or inaction shall be deemed to prevent the Initial Supporting Noteholders from taking actions they are permitted to take as a result of such actions or inactions, including terminating their obligations hereunder, and neither the Company nor any Supporting Creditor that is affiliated with such officer or director shall be in violation of this Agreement by virtue of such individual taking, or refraining from taking, any such action, so long

as any such action is consistent with the fiduciary obligations of the Company under applicable law (as determined by the Company after consultation with counsel).

(d)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company, or the Supporting Creditors, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

6.     <u>Termination of Agreement</u>.

(a)     This Agreement shall terminate three (3) Business Days following the delivery of written notice (in accordance with <u>Section 19</u> hereof) from (i) the Initial Supporting Noteholders to EP Parent at any time after and during the continuance of any Supporting Noteholder Termination Event (as defined below), or (ii) EP Parent to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event (as defined below).  Notwithstanding any provision to the contrary in this <u>Section 6</u>, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the applicable Supporting Noteholder Termination Event or Company Termination Event giving rise to such termination right; *provided*, that nothing in this sentence shall limit the termination rights of any Party pursuant to Section 6(c)(viii) or 6(d)(vii).  This Agreement shall automatically terminate, without any further required action or notice, unless the Bankruptcy Court has entered an order or orders, in form and substance acceptable to the Company, on the one hand, and the Initial Supporting Noteholders, on the other hand, approving the Backstop Agreement as of November 18, 2019 (*provided*, that if the Bankruptcy Court is unable to hear or fully consider the motion to approve the Backstop Agreement on November 12, 2019, then November 25, 2019), unless otherwise extended in accordance with the terms of the Backstop Agreement.  If not terminated on an earlier date, then this Agreement shall automatically terminate, without any further required action or notice, upon the occurrence of the Effective Date.

(b)     [RESERVED]

(c)     A "Supporting Noteholder Termination Event" shall mean any of the following:

(i)     if, as of October 25, 2019, the Required Lenders (as defined in that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified or otherwise supplemented from time to time) by and among EP Energy LLC, as borrower, EPE Acquisition, LLC, JPMorgan Chase Bank, N.A., as administrative

agent and as collateral agent, have not provided the Company with an executed Exit Commitment Letter;

(ii)      if, as of 11:59 p.m. prevailing Eastern time on October 18, 2019, the Company has not filed a motion seeking approval of the Backstop Agreement;

(iii)      if, as of November 18, 2019 (*provided*, that if the Bankruptcy Court is unable to hear or fully consider the motion to approve the Backstop Agreement on November 12, 2019, then November 25, 2019), the Bankruptcy Court has not entered a final order or orders, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, approving the Backstop Agreement.

(iv)      if, as of December 2, 2019, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, authorizing and approving the DIP Facility, the Exit Commitment Letter and the Debtors' use of cash collateral.

(v)      if, as of January 8, 2020, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, approving the Disclosure Statement;

(vi)      if, as of January 8, 2020, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, approving the Rights Offering Procedures;

(vii)      if, as of February 28, 2020, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, confirming the Plan; *provided* that if the Bankruptcy Court has commenced a hearing on confirmation of the Plan as of February 28, 2020, such date shall automatically extend to March 16, 2020, *provided, further*, that each such date shall be automatically extended one (1) Business Day for each Business Day that the Supporting Noteholders fail to deliver drafts of the New Corporate Governance Documents to Weil in accordance with the deadlines set forth in Section 3(g) hereof;

(viii)      if, as of March 19, 2020, the Effective Date has not occurred;

(ix)      the Backstop Agreement is terminated in accordance with its terms;

(x)      the occurrence of any material breach of this Agreement by the Company that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 19 (as applicable);

(xi)      the amendment or modification of this Agreement, the Rights Offering Procedures, the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, or any of the Definitive Documents without the consent of the Initial Supporting Noteholders;

WEIL:\97235493\2\42780.0003

(xii)     any of the orders approving, the Backstop Agreement, the Rights Offering Procedures, the Disclosure Statement, or the Plan are reversed, dismissed, stayed, vacated or reconsidered or modified or amended without the consent of the Initial Supporting Noteholders;

(xiii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) Business Days after such issuance;

(xiv)    the Bankruptcy Court enters an order (A) directing the appointment of a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Case of any of the Debtors other than the Company, or (D) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases;

(xv)     any Company Entity makes any filing in support of, enters into an agreement with respect to, or announces its support for any Alternative Restructuring or that it will file any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets (other than as provided for in the Plan), without the prior written consent of the Initial Supporting Noteholders;

(xvi)    the breach in any material respect by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Initial Supporting Noteholders pursuant to this Section 6 and in accordance with Section 19 (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(xvii)   a determination is made with respect to any Company Entity that its continued support of the Restructuring would be inconsistent with its fiduciary obligations under applicable law;

(xviii) entry of an order by the Bankruptcy Court terminating the Company's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or if the Company loses such right because (A) the Company fails to make a timely motion to extend the exclusivity period and exclusivity lapses or (B) the Bankruptcy Court denies the Company's motion to extend the exclusivity period;

(xix)    any court of competent jurisdiction has entered a judgment or order declaring this Agreement or the Backstop Agreement to be unenforceable;

(xx)     any of the following shall have occurred: (i) the Company shall have filed any motion, application, adversary proceeding, or cause of action (A) challenging the

validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Claims of the Supporting Noteholders, or any of the liens securing the Claims of the Supporting Noteholders, or (B) otherwise seeking to impose liability upon or enjoin the Supporting Noteholders (other than with respect to a breach of this Agreement); or (ii) the Company shall have supported any motion, application, adversary proceeding or cause of action referred to in the immediately preceding clause (i) filed by a third party, or affirmatively consents (without the consent of the Initial Supporting Noteholders) to the standing of any such third party to bring such application, adversary proceeding or cause of action; or

(xxi)   failure to conduct the Rights Offering in accordance with the Backstop Agreement and the Rights Offering Procedures.

(d)   A "*Company Termination Event*" shall mean any of the following:

(i)   [RESERVED]

(ii)   the breach by one or more of the Supporting Noteholders of any of the undertakings, representations, warranties, or covenants of the Supporting Noteholders set forth herein in any material respect that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 19 hereof (as applicable), but only if the non-breaching Supporting Noteholders hold less than 66.67% of the aggregate principal amount of 1.5L Notes;

(iii)   the board of directors (or any committee having appropriate authority thereof), managers, members, or partners or general partner, as applicable, of any Company Entity party hereto reasonably determines in good faith based upon the advice of counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided*, *however*, that such Company Entity provides notice of such determination to the Supporting Creditors within five (5) Business Days after the date thereof;

(iv)   [RESERVED]

(v)   the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) Business Days after such issuance;

(vi)   the Bankruptcy Court enters an order (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Case of any of the Debtors other than the Company; or (D) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases; or

(vii)    if, as of March 19, 2020, the Effective Date has not occurred.

(e)    <u>Certain Extensions of Time</u>.   Notwithstanding anything to the contrary herein, any of the dates or deadlines set forth in

(i)    <u>Sections 6(a)</u> and <u>6(d)</u> above may be extended by written agreement (with email from counsel being sufficient) of the Company and the Initial Supporting Noteholders,

(ii)    [RESERVED]; and

(iii)    <u>Section 6(c)</u> above may be extended by written agreement (with email from counsel being sufficient) of the Company and the Initial Supporting Noteholders.

(f)    <u>Mutual Termination</u>.   This Agreement may be terminated by mutual agreement of the Company and the Initial Supporting Noteholders upon the receipt and acknowledged acceptance (whether oral or by electronic mail) of written notice delivered in accordance with <u>Section 19</u> hereof.

(g)    <u>Effect of Termination</u>.

(i)    Subject to the provisions contained in <u>Section 6(a)</u> and <u>Section 13</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 6</u>, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law and, with respect to the Supporting Noteholders, the 1.5L Indentures; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(ii)    If this Agreement is terminated at a time when permission of the Bankruptcy Court is required for the Supporting Creditors to terminate or cause the termination of, this Agreement, the Company shall not oppose any attempt by the Supporting Creditors to terminate, or cause the termination of, this Agreement at such time, *provided*, *however*, the Company may contest whether the Agreement has been validly terminated. Notwithstanding anything to the contrary herein, (A) the Company acknowledges and agrees that following the Petition Date, if this Agreement has been validly terminated, then all votes by the Supporting Creditors to accept the Plan and opt in to or not opt out of the releases shall, upon written notice to the Company, be revoked, null and void; and (B) all Parties acknowledge that valid termination of this Agreement would be an occurrence of the type that constitutes "cause" under Bankruptcy Rule 3018. The foregoing sentence shall survive termination of this Agreement.

WEIL:\97235493\2\42780.0003

(h)     If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party, or the ability of any Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

7.     <u>Representations and Warranties</u>.

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Supporting Creditor becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)     the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

(iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(v)     it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or Entity, would prevent it from taking any action required of it under this Agreement.

(b)     Each Supporting Creditor severally (and not jointly) represents and warrants to the other Parties that, as of the date hereof (or as of the date such Supporting Creditor becomes a party hereto), such Supporting Creditor (i) is the beneficial owner of the aggregate principal amount of (x) the Claims set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Additional Supporting Creditor), or (y) is the nominee, investment manager, advisor, or subadvisor for one or more beneficial holders thereof, or (ii) has, with respect to the beneficial owners of such Claims, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Claims or to exchange, assign, and Transfer such Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)     Each Supporting Noteholder severally (and not jointly) makes the representations and warranties set forth in Section 20(c) hereof, and in each case, to the other Parties.

(d)     Each Supporting Noteholder severally (and not jointly) represents and warrants to the other Parties that such Supporting Noteholder has not taken any action which would result in the occurrence of a Change of Control (as such term is defined in the Reinstated Indentures), *provided* that no Supporting Creditor shall be liable to any Company Entity or any other Supporting Creditor for a breach of this Section 3(a)(iv) that is solely the result of another Supporting Creditor's non-compliance of their obligations under this Agreement or the Backstop Agreement.

8.     Disclosure; Publicity.

The Company shall submit drafts to Supporting Noteholder Counsel of any press releases that constitute disclosure of the existence of the terms of this Agreement or any amendment to the terms of this Agreement at least (1) Business Day prior to making any such disclosure.  Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Supporting Creditor, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any 1.5L Notes held by any Supporting Noteholder without such Supporting Noteholder's consent; *provided*, *however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Supporting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the Supporting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of 2024 Notes and 2025 Notes held by all Supporting Noteholders, collectively, on a tranche by tranche basis. Notwithstanding the provisions in this Section 8, any Party may disclose, to the extent consented to in writing by a Supporting Creditor, such Supporting Creditor's individual holdings.  The Supporting Noteholders that are affiliates of Apollo Management Holdings, L.P. (the "**Apollo Funds**") consent to the disclosure of the aggregate percentage and aggregate principal amount of 2024 Notes and 2025 Notes held collectively by the Apollo Funds in any reports filed or furnished by the Company or any of its subsidiaries with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder or the Securities Act.

9.    <u>Amendments and Waivers</u>.

(a)    Other than as set forth in <u>Section 9(b)</u>, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except with the written consent of the Company and the Initial Supporting Noteholders (such consent not to be unreasonably withheld, conditioned, or delayed).

(b)    Notwithstanding <u>Section 9(a)</u>:

(i)    any waiver, modification, amendment, or supplement to this <u>Section 9</u> shall require the written consent of all of the Parties;

(ii)    any modification, amendment, or change to the definition of "Initial Supporting Noteholders" shall require the written consent of each Initial Supporting Noteholder and the Company;

(iii)    any change, modification, or amendment to this Agreement or the Plan that treats or affects any Supporting Noteholder in a manner that is materially and adversely disproportionate to the manner in which any other Supporting Noteholder is treated (after taking into account each of such Supporting Noteholder's respective holdings in the Company and the recoveries contemplated by the Plan) shall require the written consent of such materially adversely and disproportionately affected Supporting Noteholder.

(iv)    [RESERVED]

(v)    [RESERVED]

(c)    In the event that a materially adversely and disproportionately affected Supporting Noteholder other than Access or Avenue (such affected Supporting Noteholder, a "***Nonconsenting Creditor***") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Supporting Noteholder, as applicable, but such waiver, change, modification, or amendment receives the consent of the Initial Supporting Noteholders, then the Company and such Initial Supporting Noteholders may elect to terminate this Agreement as to each such Nonconsenting Creditor (excluding, for the avoidance of doubt, Access and Avenue) and this Agreement shall continue in full force and effect with respect to all other Supporting Creditors from time to time.

10.    <u>Effectiveness</u>.

This Agreement shall become effective and binding upon each Party upon the date (the "***Support Effective Date***") on which each of the Initial Supporting Noteholders has executed and delivered to the Company a signature page hereto; *provided*, however, that signature pages executed by any Supporting Creditors shall be delivered to (i) the other Supporting Creditors in a redacted form that removes such Supporting Creditors' individual holdings and (ii) the Company,

WEIL:\97235493\2\42780.0003

Weil, and Supporting Noteholder Counsel in an unredacted form (to be held by Weil and Supporting Noteholder Counsel on a "professionals' eyes only" basis).

11.     GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.

(a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York without giving effect to the conflict of laws principles thereof.

(b)     Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding arising out of or relating to this Agreement or the Restructuring except in the NY Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided in Section 19 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

WEIL:\97235493\2\42780.0003

12.    <u>Specific Performance/Remedies</u>.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement (but not any agreements attached as exhibits hereto, the remedies for which shall be set forth in such applicable exhibits) by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

13.    Survival.

Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u> hereof, the agreements and obligations of the Parties in this <u>Section 13</u> and <u>Sections 3(e)</u>, <u>6(g)</u>, <u>8</u>, <u>11</u>, <u>12</u>, <u>14</u> <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u> (in the case of fees and expenses incurred prior to such termination), and <u>22</u> through <u>26</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

14.    <u>Headings</u>.

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.  The recitals to this Agreement are true and correct and incorporated by reference into this <u>Section 14</u>.

15.    <u>Successors and Assigns; Severability; Several Obligations</u>.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this <u>Section 15</u> shall be deemed to permit Transfers of the Claims arising under the 1.5 Notes or otherwise, other than in accordance with the express terms of this Agreement.  If any provision of this Agreement or the exhibits attached hereto, or the application of any such provision to any person or entity or circumstance, shall be held invalid, unenforceable, void, or violative of applicable law, in each case in whole or in part, such invalidity, unenforceability, violability or violation shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party; *provided*, that this provision shall not operate to waive any condition precedent to any event set forth herein.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations, and obligations of the Supporting Creditors

under this Agreement are, in all respects, ratable and several and neither joint nor joint and several. Any breach of this Agreement by a Supporting Creditor shall not result in liability for any other Supporting Creditor. The Supporting Creditors are acting in their individual capacities and not as agent or trustee, or in any other fiduciary capacity, with respect to any other Supporting Creditor or any other party.

16.     No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

17.     Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Supporting Creditor shall continue in full force and effect.

18.     Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

19.     Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

If to the Company, to:

EP Energy Corporation
1001 Louisiana Street
Houston, Texas 77002
Attn:   Jace D. Locke
jace.locke@epenergy.com

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Matt Barr (matt.barr@weil.com)

Alfredo R. Perez (alfredo.perez@weil.com)
Ronit J. Berkovich (ronit.berkovich@weil.com)

If to a Supporting Noteholder:

To the notice and copy (if any) addresses specified on such Supporting Noteholder's signature page to this Agreement.

Any notice given by delivery, mail, or courier shall be effective when received. Any notice given by e-mail shall be effective upon oral, machine, or e-mail (as applicable) confirmation of transmission.

20.    No Solicitation; Representation by Counsel; Adequate Information.

(a)    Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code. The acceptances of the Supporting Creditor with respect to the Plan will not be solicited until such Supporting Creditor has received the Disclosure Statement and Solicitation Materials. In addition, this Agreement is not and shall not be deemed an offer with respect to the issue or sale of securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Each Supporting Creditor acknowledges, agrees, and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Supporting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, (iv) will not acquire any securities pursuant to the Restructuring as a result of any form of general solicitation or general advertising, and (v) has such knowledge and experience in financial and business matters that such Supporting Creditor, is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

23

21.     [RESERVED]

22.     <u>Severability and Construction</u>.

If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

23.     <u>Reservation of Rights; Settlement Discussions</u>.

This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties.  Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and the exhibits attached hereto and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement or the exhibits attached hereto (as applicable).

24.     <u>No Strict Construction</u>.

Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement and the exhibits attached hereto have been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement or the exhibits attached hereto nor any alleged ambiguity herein or therein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement or the exhibits attached hereto, or based on any other rule of construction.

25.     <u>Remedies Cumulative; No Waiver</u>.

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.  The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

26.     <u>Relationship Among Parties</u>.

(a)     Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof.  No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement.  The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or

24

disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

[*Signature pages follow.*]

WEIL:\97235493\2\42780.0003

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**EP ENERGY CORPORATION**
**EVEREST ACQUISITION, LLC**
**EP ENERGY, LLC**
**EVEREST ACQUISITION FINANCE INC.**
**EP ENERGY GLOBAL LLC**
**EP ENERGY MANAGEMENT, L.L.C.**
**EP ENERGY RESALE COMPANY, L.L.C.**
**EP ENERGY E&P COMPANY, L.P.**

By: _____
    Name: Jace D. Locke
    Title:   Vice President & General Counsel

**<u>Exhibit A</u>**

**Term Sheet**

# EP ENERGY CORPORATION

## <u>RESTRUCTURING TERM SHEET</u>

### October 18, 2019

This restructuring term sheet (this "***Term Sheet***") presents the principal terms of a proposed financial restructuring (the "***Restructuring***") of the existing capital structure of EP Energy Corporation ("***EP Parent***") and its subsidiaries identified below (collectively with EP Parent, the "***Company***" or the "***Debtors***"), which Restructuring will be consummated pursuant to a chapter 11 plan containing the terms set forth herein to be confirmed in the cases commenced on October 3, 2019 (the "***Petition Date***") in the United Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under chapter 11 of title 11  of the United States Code (the "***Bankruptcy Code***"; Ch. 11 Case No. 19-35654 *et al.*, the "***Chapter 11 Cases***").  This is the Term Sheet referred to in, and appended to, the Plan Support Agreement dated as of October 18, 2019, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "***PSA***").  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in **<u>Annex 1</u>**.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.  EXCEPT AS SET FORTH IN THE PSA, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

| OVERVIEW | |
|---|---|
| **Company:** | EP Parent, EPE Acquisition, LLC; EP Energy LLC; Everest Acquisition Finance Inc.; EP Energy Global LLC; EP Energy Management, L.L.C.; EP Energy Resale Company, L.L.C.; EP Energy E&P Company, L.P. |
| **Claims and Interests to be Restructured:** | RBL Claims: consisting of approximately $629.4 million in principal amount, including reimbursement obligations in respect of letters of credit, plus all other secured obligations, including unpaid interest, fees, and other expenses arising and payable under that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "***RBL Facility***", and the Claims thereunder, the "***RBL Claims***"), by and among EP Energy LLC, as borrower, EPE Acquisition, LLC, JPMorgan Chase Bank, N.A., as administrative agent (the "***RBL Agent***") and as collateral agent, and the lenders (the "***RBL Lenders***") party thereto from time to time.<br><br>Senior Secured Notes Claims: consisting of:<br><br>   a)  $1 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 7.750% Senior Secured Notes due 2026 (the "***1.125L Notes***") under that certain indenture, dated as of May 23, 2018 (as amended, modified, or otherwise supplemented from time to time, the "***1.125L Notes Indenture***," and the Claims thereunder, the "***1.125L Notes Claims***"), by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers (the "***Co-Issuers***"), each of the guarantors named therein, and UMB Bank, National Association, as successor indenture trustee and notes collateral agent;<br><br>   b)  $500 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 8.000% Senior Secured Notes due 2024 (the "***1.25L Notes***") under that certain indenture, dated as of November 29, 2016 (as amended, modified, or otherwise supplemented from time to time, the "***1.25L Notes Indenture***," and the Claims thereunder, the "***1.25L Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and, BOKF, NA, as successor indenture trustee and notes collateral agent;<br><br>   c)  Approximately $1.092 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 9.375% Senior Secured Notes due 2024 (the "***2024 1.5L Notes***," and the holders thereof, the "***2024 1.5L Noteholders***") under that certain indenture, dated as of January 3, 2018 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2024 1.5L Notes Claims***") by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as indenture trustee and collateral agent; and<br><br>   d)  $1 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 8.000% Senior Secured Notes due 2025 (the "***2025 1.5L Notes***," and collectively with the 2024 1.5L Notes, the "***1.5L Notes***," and the holders of the 2025 1.5L Notes, the "***2025 1.5L Noteholders***", and collectively with the 2024 1.5L Noteholders, the "***1.5L Noteholders***") under that certain indenture, dated as of February 6, 2017 (as amended, modified, or otherwise supplemented from time to time) (the |

WEIL:\97148206\28\42780.0003

Claims thereunder, the "***2025 1.5L Notes Claims***", and collectively with the 2024 1.5L Notes Claims, the "***1.5L Notes Claims***" and together with 1.125L Notes Claims and the 1.25L Notes Claims, the "***Senior Secured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as indenture trustee and collateral agent.

Unsecured Notes Claims: consisting of

a)  Approximately $182 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 9.375% Senior Notes due 2020 under that certain indenture, dated as of April 24, 2012 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2020 Unsecured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee;

b)  Approximately $182 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 7.750% Senior Notes due 2022 under that certain indenture, dated as of August 13, 2012 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2022 Unsecured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee; and

c)  Approximately $323 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 6.375% Senior Notes due 2023 under that certain indenture, dated as of May 28, 2015 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2023 Unsecured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee.

General Unsecured Claims: consisting of any prepetition Claim against the Company that is not an RBL Claim, a Senior Secured Notes Claim, an Unsecured Notes Claim (each as defined herein), an Intercompany Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "***General Unsecured Claims***").  For the avoidance of doubt, deficiency claims in respect of the 1.5 Lien Notes Claims ("***1.5L Deficiency Claims***") are not General Unsecured Claims.

Existing Equity Interests: consisting of shares of the Class A common stock of EP Parent that existed immediately prior to the Effective Date, including any restricted stock of EP Parent that vests prior to the Effective Date.

Other Equity Interests: consisting of the Class B common stock of EP Parent that existed immediately prior to the Effective Date and all other Interests in EP Parent other than Existing Equity Interests.

Subordinated Claims: consisting of any prepetition Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

WEIL:\97148206\28\42780.0003

| **TRANSACTION OVERVIEW** | |
|---|---|
| **Overview of Restructuring:** | The Restructuring will be implemented through the Chapter 11 Cases commenced by the Company to pursue confirmation of a prenegotiated chapter 11 plan consistent with the terms herein. |
| | As a component of the Restructuring and consistent with the Rights Offering Documents, each eligible 1.5L Noteholder will be offered the right to purchase up to its Pro Rata share of New Common Shares for an aggregate value of up to $475 million (as described below, the "***Rights Offering***"). |
| | The Company may also, with the consent of the Initial Supporting Noteholders, consummate a private placement of New Common Shares, subject to dilution by the Jeter Shares and EIP Shares, for an aggregate purchase price of up to $75 million (the "***Private Placement***"), in Cash, on terms acceptable to the Company and the Initial Supporting Noteholders. |
| | The proceeds of the Rights Offering and the Private Placement will be used by the Company to (i) pay down the DIP Facility and the RBL Facility, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan distributions, case administration expenses, and exit costs.  The terms of the Rights Offering shall be in accordance with the Backstop Agreement to be executed concurrently with the PSA and otherwise acceptable to the Initial Supporting Noteholders. |
| | On the Effective Date, Apollo and Access may contribute their equity interests in Jeter to the Reorganized Debtors in exchange for the Jeter Shares, subject to the agreement of the Company, Access and the Initial Supporting Noteholders. |
| | As of the Effective Date, the DIP Claims, RBL Claims, 1.5L Notes Claims, Unsecured Notes Claims, General Unsecured Claims, Existing Equity Interests, and Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect. |
| **DIP Financing; Use of Cash Collateral** | The Restructuring will be financed by (i) consensual use of Cash collateral on final terms to be acceptable to the Initial Supporting Noteholders, and (ii) a postpetition senior secured superpriority priming revolving loan facility (the "***DIP Facility***") on terms and conditions acceptable to the Initial Supporting Noteholders, it being acknowledged that the Commitment Letter and related exhibits attached hereto as **Exhibit A-1** (the "***Exit Commitment Letter***") are acceptable to the Initial Supporting Noteholders.  The DIP Facility will roll-up up to 50.0% of the obligations under the RBL Facility, applied Pro Rata among the exposures of the RBL Lenders that elect to participate in the Exit Facility by the Voting Deadline to receive its Pro Rata share of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.  Upon emergence, the DIP Facility will convert dollar for dollar into first lien, first-out revolving loans under the Exit Facility. |

4

| TREATMENT OF CLAIMS AND INTEREST | |
|---|---|
| **Administrative Expense Claims and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Claims:** | On the Effective Date, to the extent the DIP Facility is not paid down in full from the proceeds of the Rights Offering or the Private Placement, each holder of an Allowed DIP Claim will receive its Pro Rata share (taking into account the elections made by holders of Allowed RBL Claims as provided below) of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. |
| **Class 1** <br><br> **Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Holders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. <br><br> **Unimpaired – Presumed to Accept.** |
| **Class 2** <br><br> **Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Holders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. <br><br> **Unimpaired – Presumed to Accept.** |
| **Class 3** <br><br> **RBL Claims:** | On the Effective Date, each holder of an Allowed RBL Claim will receive its Pro Rata share of the Exit Facility as a first lien, second-out term loan under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the Exit Facility by the Voting Deadline shall receive its Pro Rata share (with the holders of Allowed DIP Claims) of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. <br><br> **Impaired – Entitled to Vote.** |

WEIL:\97148206\28\42780.0003

| Class 4<br><br>1.125L Notes Claims: | On the Effective Date, all Allowed 1.125L Notes Claims will (i) be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.125L Notes Indenture, a portion of the 1.125L Notes Claims, or (ii) receive new notes on terms acceptable to the Initial Supporting Noteholders and the Company.<br><br>**Unimpaired – Presumed to Accept.** |
|---|---|
| Class 5<br><br>1.25L Notes Claims: | On the Effective Date, all Allowed 1.25L Notes Claims will (i) be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes Claims, or (ii) receive new notes on terms acceptable to the Initial Supporting Noteholders and the Company.<br><br>**Unimpaired – Presumed to Accept.** |
| Class 6<br><br>1.5L Notes Claims: | On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, the Jeter Shares, and the EIP Shares, and (ii) the right to participate in the Rights Offering.<br><br>**Impaired – Entitled to Vote.** |
| Class 7<br><br>Unsecured Claims: | On the Effective Date, each holder of Allowed 2020 Unsecured Notes Claims, 2022 Unsecured Notes Claims, and 2023 Unsecured Notes Claims (collectively, "***Unsecured Notes Claims***", and the holders of such Claims, the "***Unsecured Noteholders***"), 1.5L Deficiency Claims, and General Unsecured Claims (collectively with Unsecured Notes Claims, "***Unsecured Claims***") will receive, in full and final satisfaction of such Unsecured Claim, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, the Jeter Shares, and the EIP Shares (the "***Unsecured Shares***"); *provided, that* a convenience class may be established under the Plan (with such Plan provisions being acceptable to the Initial Supporting Noteholders) to provide distributions up to an aggregate amount in Cash to be specified under the Plan.<br><br>**Impaired – Entitled to Vote.** |

WEIL:\97148206\28\42780.0003

| Class 8<br><br>Intercompany Claims: | All Intercompany Claims will be adjusted, reinstated, or discharged in the Company's discretion, subject to the reasonable consent of the Initial Supporting Noteholders.<br><br>**Unimpaired – Presumed to Accept.** |
|---|---|
| Class 9<br><br>Subordinated Claims: | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.<br><br>**Impaired – Deemed to Reject.** |
| Class 10<br><br>Existing Equity Interests: | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. Each holder of Existing Equity Interests will receive its Pro Rata share of $500,000 in Cash.<br><br>**Impaired – Entitled to Vote.** |
| Class 11<br><br>Other Equity Interests: | On the Effective Date, Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.<br><br>**Impaired – Deemed to Reject.** |
| Class 12<br><br>Intercompany Interests: | All Allowed Intercompany Interests shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.<br><br>**Unimpaired – Presumed to Accept.** |
| <div align="center">**OTHER MATERIAL PROVISIONS**</div> ||
| Rights Offering: | Pursuant to the Rights Offering, eligible 1.5L Noteholders will be offered the right to purchase New Common Shares for an aggregate purchase price of up to $475,000,000 (the "***Rights Offering Amount***").  The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the Jeter Shares and the EIP Shares, is approximately 76.2%-78.0%, consisting of (i) approximately 55.6% in the case of Rights Offering Shares purchased for cash and (ii) approximately 20.6%-22.4% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes, depending on the amount of Reinstated 1.25L Notes being exchanged in the Rights Offering (which amount will be between $138,000,000 and $150,000,000).<br><br>The Rights Offering will be backstopped by the Backstop Parties pursuant to the Backstop Agreement in exchange for (i) the Backstop Commitment Premium, and (ii) the right to exchange Reinstated 1.25L Notes as described below.  Subject to the terms of the Backstop Agreement, the Backstop Parties shall backstop the aggregate purchase price of $463 million, (a) $220.6 million of which shall be backstopped by Apollo ($20.6 million of which shall be funded through the exchange of $20.6 million in aggregate principal amount of Reinstated 1.25L Notes held by Apollo on the terms set forth in the Backstop Agreement, which amount shall reduce the aggregate amount of Apollo's purchase rights in the Rights Offering on a dollar for |

WEIL:\97148206\28\42780.0003

dollar basis), (b) $192.4 million of which shall be backstopped by Elliott ($117.4 million of which shall be funded through the exchange of $117.4 million in aggregate principal amount of Reinstated 1.25L Notes held by Elliott on the terms set forth in the Backstop Agreement, which amount shall reduce the aggregate amount of Elliott's purchase rights in the Rights Offering on a dollar for dollar basis), (c) $42.5 million shall be backstopped by Avenue, and (d) $7.5 million shall be backstopped by Access, *provided*, that an additional $12 million aggregate purchase price, to be funded through the exchange of Reinstated 1.25L Notes on the terms set forth in the Backstop Agreement, may be backstopped by the Backstop Parties with the consent of the Initial Supporting Noteholders in accordance with the terms of the Backstop Agreement. The Company shall pay all accrued but unpaid interest in Cash to the holders of the Reinstated 1.25L Notes in connection with the foregoing exchanges.

Discount: Rights Offering Shares will be issued at an aggregate purchase price of up to $475,000,000 at a price per share representing: (i) in the case of Rights Offering Shares purchased for cash, a 35% discount to the Stated Equity Value, and (ii) in the case of Rights Offering Shares purchased by Backstop Parties in exchange for Reinstated 1.25L Notes, a 25.7% discount to the Stated Equity Value.

Each eligible 1.5L Noteholder will be entitled to join the Backstop Agreement within ten (10) Business Days of the date on which the Debtors file the motion to approve the Backstop Agreement on terms acceptable to the Initial Supporting Noteholders.

| | |
|---|---|
| **Exit Facility:** | On the Effective Date, the RBL Facility and the DIP Facility will be replaced with a $629 million first lien revolving exit credit facility (the "***Exit Facility***") on terms and conditions acceptable to the Initial Supporting Noteholders and the Company. |
| **Jeter Contribution:** | On the Effective Date, Apollo and Access may contribute their equity interests in Jeter to the Reorganized Debtors in exchange for the Jeter Shares, subject to the agreement of the Company, Access, and the Initial Supporting Noteholders. |
| | **GENERAL PROVISIONS** |
| **Executory Contracts and Unexpired Leases:** | As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. |

8

| | |
|---|---|
| **Board of Directors:** | The Board of Directors will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the members selected by the Initial Supporting Noteholders in consultation with the Company (the "***New Board***"). Provisions regarding the removal, appointment, and replacement of members of the New Board to be determined by the Initial Supporting Noteholders in consultation with the Company. |
| **Charter, By-Laws and Organizational Documents:** | The New Corporate Governance Documents will be acceptable to the Initial Supporting Noteholders and the Company and will become effective as of the Effective Date. |
| **Private Company:** | The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; *provided*, that from and after the Plan Effective Date, Reorganized EP Parent shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements). |
| **Employee Incentive Plan:** | The Plan will provide for the establishment of a post-emergence employee incentive plan on the Effective Date (the "***Employee Incentive Plan***" or the "***EIP***"). All awards issued under the EIP, including restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares (the "***EIP Shares***") will be dilutive of all other equity interests in the Reorganized Debtors. 10% of the New Common Shares, on a fully diluted basis, shall be reserved for issuance in connection with the Employee Incentive Plan. The other terms of the Employee Incentive Plan shall be consistent with the terms set forth on **Exhibit A-2** annexed hereto and otherwise in form and substance acceptable to the Initial Supporting Noteholders and the Company. |
| **Employment Agreements:** | All employment agreements and severance plans that exist as of the Petition Date will be assumed, as may be amended, pursuant to the Plan. The Debtors will enter into new employment agreements with their officers, to be effective on the Effective Date, consistent with the terms set forth on **Exhibit A-3** annexed hereto. |
| **Cancellation of Notes, Instruments, Certificates and other Documents:** | On the Effective Date of the Plan, other than the 1.125L Notes and 1.25L Notes being reinstated pursuant to the Plan, all notes, instruments, certificates evidencing debt of the Company and Interests in EP Parent will be cancelled and obligations of the Company thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make further distributions to the applicable holders on account of their Claims. |
| **Vesting of Assets:** | On the Effective Date, pursuant to sections 1141(b)-(c) of the Bankruptcy Code, all assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Hedging Program:** | The Company shall consult with the Initial Supporting Noteholders on any material changes to its hedging program. |

WEIL:\97148206\28\42780.0003

| | |
|---|---|
| **Survival of Indemnification Obligations and D&O Insurance:** | No obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Company will be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Debtors. Any Claim based on such obligations of the Company will be an Allowed Claim. |
| | In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |

10

| | |
|---|---|
| **Conditions to Effectiveness:** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are satisfactory to the Company and the Initial Supporting Noteholders, including the following (as applicable): |

    i.    the Backstop Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

    ii.    the Reinstated Debt shall have been reinstated, or shall have been given such other treatment (as applicable), in accordance with the terms and conditions of this Term Sheet;

    iii.    the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered;

    iv.    the Definitive Documents (as defined in the PSA) will contain terms and conditions consistent in all material respects with this Term Sheet and the PSA and otherwise satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders;

    v.    the PSA shall remain in full force and effect and shall not have been terminated;

    vi.    all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived, and the Exit Facility, including all documentation related thereto, is in form and substance satisfactory to the Initial Supporting Noteholders and the Company and in effect;

    vii.    the Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered;

    viii.    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered;

    ix.    the Rights Offering and if applicable, the Private Placement shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Agreement, and any other relevant transaction documents;

    x.    the New Corporate Governance Documents shall be in full force and effect;

    xi.    all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Agreement shall have been obtained;

    xii.    the Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the

WEIL:\97148206\28\42780.0003

| | |
|---|---|
| | Supporting Noteholders and the other parties thereto, and shall be in full force and effect; |
| | xiii.    the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods will have expired; |
| | xiv.    the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the PSA, and in form and substance acceptable to the Initial Supporting Noteholders; |
| | xv.    the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to the occurrence of the Closing) set forth in the Plan shall have been satisfied or, with the prior consent of the Initial Supporting Noteholders waived in accordance with the terms of the Plan; |
| | xvi.    the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the PSA; and |
| | xvii.    all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date by the Supporting Noteholder Advisors shall have been paid in full by the Debtors in accordance with the Backstop Agreement. |
| | The conditions to effectiveness may be waived, in whole or in part, in writing by the Debtors and the Initial Supporting Noteholders. |
| **Releases by Debtors:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents and the documents in the Plan Supplement, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission |

12

| | |
|---|---|
| | of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the PSA, the Definitive Documents and the documents in the Plan Supplement or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. |
| **Releases by Third-Parties:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents, and the documents in the Plan Supplement or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring, the restructuring of any Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the PSA, the Definitive Documents and the documents in the Plan Supplement, or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date. |
| **Exculpation:** | To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, Exit Facility, the Rights Offering, the Private Placement, the Employee Incentive Plan, the Disclosure Statement, the PSA, the Restructuring, and the Plan (including the Definitive Documents and the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or |

| | |
|---|---|
| | the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.   The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Discharge and Injunction:** | The Plan will contain customary discharge and injunction provisions acceptable to the Initial Supporting Noteholders. |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial structure for the Company, the Initial Supporting Noteholders and the Company's equity holders post-Restructuring, as determined by the Company with the consent of the Initial Supporting Noteholders and in consultation with Access. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |
| **Restructuring Transactions:** | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, subject to the reasonable consent of the Initial Supporting Noteholders, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the PSA. |

WEIL:\97148206\28\42780.0003

## <u>ANNEX 1</u>

## Defined Terms

| **Defined Terms** | |
|---|---|
| "***Access***" | Access Industries, Inc. |
| "***Administrative Expense Claim***" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses. |
| "***Allowed***" | With reference to any Claim or Interest against a Debtor, (a) (i) that is timely filed by the Bar Date, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| "***Antitrust Authorities***" | The United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws. |
| "***Apollo***" | Apollo Global Management, LLC and its affiliates. |
| "***Avenue***" | Affiliates of Avenue Capital Group that are Supporting Noteholders |
| "***Backstop Agreement***" | The backstop commitment agreement entered into simultaneously with the PSA, and attached thereto as <u>Exhibit B</u>. |

| Defined Terms | |
|---|---|
| "**Backstop Commitment Premium**" | The amount to be paid as consideration to the Backstop Parties on the Effective Date, pursuant to the terms and conditions to be set forth in the Plan and the Backstop Agreement, in the form of Rights Offering Shares, issued at a price per share equal to a 35% discount to the Stated Equity Value, equal to 8% of the aggregate Cash commitments of the Backstop Parties pursuant to the Backstop Agreement (*i.e.*, $325,000,000). |
| "**Backstop Order**" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, approving the Debtors' entry into and performance under the Backstop Agreement and the PSA, which remains in full force and effect and is not subject to a stay. |
| "**Backstop Parties**" | The Supporting Noteholders that are signatories to the Backstop Agreement and each party that executes a joinder thereto. |
| "**Bar Date**" | The dates by which Proofs of Claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| "**Business Day**" | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close. |
| "**Cash**" | Legal tender of the United States of America. |
| "**Cause of Action**" | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |
| "**Chapter 11 Cases**" | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court. |
| "**Claim**" | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |

| Defined Terms | |
|---|---|
| "***Confirmation Date***" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "***Confirmation Order***" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, as evidenced in writing, confirming the Plan in the Chapter 11 Cases, which remains in full force and effect and is not subject to a stay. |
| "***DIP Agent***" | JPMorgan Chase Bank, N.A. |
| "***DIP Claim***" | All Claims held by the DIP Lenders on account of, arising under, or relating to the DIP Facility or the DIP Orders, which includes Claims for all principal amounts outstanding, interest, reasonable and documented fees, expenses, costs and other charges of the DIP Lenders. |
| "***DIP Credit Agreement***" | The credit agreement governing the terms of the DIP Facility. |
| "***DIP Lenders***" | The lenders party to the DIP Credit Agreement. |
| "***DIP Order***" | The interim or final orders, as applicable, of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
| "***Disclosure Statement***" | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| "***Disclosure Statement Order***" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, as evidenced in writing, approving the Disclosure Statement in the Chapter 11 Cases, which remains in full force and effect and is not subject to a stay. |
| "***Effective Date***" | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| "***Elliott***" | Elliott Associates, L.P., and Elliott International, L.P. and their respective affiliates. |
| "***Entity***" | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| "***Estate(s)***" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "***Exchange Act***" | The Securities Exchange Act of 1934. |

| Defined Terms | |
|---|---|
| "**Exculpated Parties**" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "**Exit Credit Agreement**" | The RBL Credit Agreement, as amended and restated on the Effective Date. |
| "**Exit Facility Lenders**" | The lenders from time to time party to the Exit Credit Agreement, including any applicable permitted assignees thereof. |
| "**Existing Equity Interests**" | Shares of the Class A common stock of EP Parent that existed immediately prior to the Effective Date, including any restricted stock of EP Parent that vests prior to the Effective Date. |
| "**Fee Claim**" | A Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases. |
| "**Final Order**" | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; provided, however, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| "**Governmental Entity**" | Any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof). |
| "**Initial Supporting Noteholders**" | Each of Apollo and Elliott. |
| "**Intercompany Claim**" | Any Claim against a Debtor held by another Debtor. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "**Intercompany Interest**" | An Interest in a Debtor held by another Debtor, other than any Existing Equity Interests or Other Equity Interests (including any Class B common stock of EP Parent held by EPE Employee Holdings, II, LLC). |
| "**Interest**" | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, that existed immediately before the Effective Date, and including any equity interest issued to the Company's current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards. |
| "**Jeter**" | Wolfcamp Drillco Operating L.P. |
| "**Jeter Shares**" | New Common Shares issued in consideration of the contribution of equity interests in Jeter to the Reorganized Debtors, which shall be subject to dilution by the EIP Shares. |
| "**New Common Shares**" | Shares of common stock of Reorganized EP Parent. |
| "**New Corporate Governance Documents**" | The certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized EP Parent, which shall be acceptable to the Initial Supporting Noteholders. |
| "**Other Equity Interests**" | Class B common stock of EP Parent that existed immediately prior to the Effective Date and all other Interests in EP Parent other than Existing Equity Interests. |
| "**Other Priority Claim**" | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "**Other Secured Claim**" | A Secured Claim other than a Priority Tax Claim, a DIP Claim, an RBL Claim, a 1.125L Notes Claim, 1.25L Notes Claim and a 1.5L Notes Claim. |
| "**Person**" | Any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| "**Plan**" | The prearranged chapter 11 plan of reorganization of the Company implementing the Restructuring, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the PSA. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "**Plan Supplement**" | A supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the PSA (including any consent rights in favor of the Initial Supporting Noteholders) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the PSA (including any consent rights in favor of the Supporting Noteholders), which shall include, but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Employee Incentive Plan, (v) the Exit Facility documents, (vi) a schedule of retained Causes of Action, and (vii) the Schedule of Rejected Contracts. |
| "**Priority Tax Claim**" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "**Pro Rata**" | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interests in that class. |
| "**Registration Rights Agreement**" | The registration rights agreement to be entered into as of the Effective Date, which shall have terms that are customary for a transaction of this nature and shall be in form and substance acceptable to the Initial Supporting Noteholders and the Company. |
| "**Released Parties**" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the DIP Agent and DIP Lenders under the DIP Facility, (vi) the RBL Agent and the RBL Lenders under the RBL Facility, (vii) the Backstop Parties, (viii) holders of Existing Equity Interests, on account of their contributions under the Plan, (ix) with respect to each of the foregoing Persons, in clauses (i) through (viii), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "**Reinstated 1.125L Notes**" | The 1.125L Notes, issued pursuant to the 1.125L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.125L Notes that have not been redeemed or repaid prior to the Closing. |
| "**Reinstated 1.25L Notes**" | The 1.25L Notes, issued pursuant to the 1.25L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.25L Notes that have not been redeemed or repaid prior to the Closing. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "***Reinstated Debt***" | The Reinstated 1.125L Notes and the Reinstated 1.25L Notes. |
| "***Releasing Parties***" | Collectively, (i) the holders of all Claims or Interests that vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, (v) all other holders of Claims and Interests, and (vi) the Released Parties. |
| "***Reorganized Debtors***" | Each of the Debtors as reorganized on the Effective Date in accordance with the Plan. |
| "***Reorganized EP Parent***" | EP Parent as reorganized on the Effective Date in accordance with the Plan. |
| "***Restructuring Expenses***" | The reasonable and documented fees and out-of-pocket expenses payable to the Supporting Noteholder Advisors as set forth in the Backstop Agreement (and in the case of Debevoise & Plimpton LLP, subject to the cap set forth therein) |
| "***Restructuring Transactions***" | One or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the consummation of the transactions provided for under or contemplated by the PSA and this Term Sheet, (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan, the PSA, and this Term Sheet, and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the PSA, and this Term Sheet, and (iv) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the PSA and this Term Sheet. |
| "***Rights Offering Shares***" | New Common Shares issued pursuant to the Rights Offering. |
| "***Rights Offering Documents***" | Collectively, the Backstop Agreement and the Rights Offering Procedures. |
| "***Rights Offering Procedures***" | The rights offering procedures in form and substance acceptable to the Initial Supporting Noteholders setting forth the procedures for the 1.5L Noteholders to participate in the Rights Offering. |
| "***Schedule of Rejected Contracts***" | The schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time. |

7

| **Defined Terms** | |
|---|---|
| "*Schedules*" | The schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, which shall be reasonably acceptable to the Initial Supporting Noteholders. |
| "*Secured Claim*" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "*Securities Act*" | Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby. |
| "*Solicitation Materials*" | Collectively, the Disclosure Statement and the related solicitation materials. |
| "*Stated Equity Value*"[1] | The stated equity value of the Reorganized Debtors of $900 million. |
| "*Subordinated Claim*" | A Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise. |
| "*Supporting Noteholder Advisors*" | Milbank LLP, Houlihan Lokey Capital, Inc., W.D. Von Gonten & Co., DeGolyer & MacNaughton Corp., Cole Schotz P.C., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, in its capacity as local Texas counsel to certain of the Supporting Noteholders, Moelis & Company, and Debevoise & Plimpton LLP. |
| "*Supporting Noteholders*" | The Supporting Noteholders that are signatories to the PSA, and any subsequent 1.5L Noteholder that becomes party thereto in accordance with the terms of the PSA. |
| "*Unimpaired*" | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code. |
| "*Voting Deadline*" | The date and time to be set by the Bankruptcy Court as the deadline for Impaired holders of Claims to vote to accept or reject the Plan. |

---

[1] Stated Equity Value is for purposes of calculations of Rights Offering amounts and not for establishing performance goals related to EIP.

**Exhibit A-1**

**Exit Commitment Letter**

**EXECUTION VERSION**

| | | | |
|---|---|---|---|
| JPMorgan Chase Bank, N.A.<br>383 Madison Avenue<br>New York, NY 10179 | Citibank, N.A.<br>383 Greenwich Street<br>New York, NY 100013 | BMO Harris Financing, Inc.<br>111 West Monroe Street, 4th<br>Floor<br>Chicago, IL 60603 | Credit Suisse AG,<br>Cayman Islands Branch<br>11 Madison Avenue<br>New York, NY 10016 |
| Royal Bank of Canada<br>3 World Financial Center<br>200 Vesey Street, 12th Floor<br>New York, NY 10281 | The Toronto-Dominion<br>Bank, New York Branch<br>31 West 32nd Street<br>New York, NY 10019 | DNB Capital LLC<br>200 Park Avenue, 31st Floor<br>New York, NY 10166 | Sumitomo Mitsui Banking<br>Corporation<br>277 Park Avenue<br>New York, NY 10172 |

**CONFIDENTIAL**

October 18, 2019

EP Energy LLC
EPE Acquisition LLC
1001 Louisiana Street
Houston, TX 77002
Attention:  Kyle McCuen, Senior Vice President,
              Chief Financial Officer and Treasurer

<u>$314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility</u>
<u>$629,420,912 Senior Secured Revolving Exit Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

      JPMorgan Chase Bank, N.A. ("***JPMorgan***"), Citibank, N.A. ("***Citi***"), BMO Harris Financing, Inc. ("***BMOH***"), Credit Suisse AG, Cayman Islands Branch ("***CSAG***"), Royal Bank of Canada ("***RBC***"), The Toronto-Dominion Bank, New York Branch ("***TD***"), DNB Capital LLC ("***DNB***"), and Sumitomo Mitsui Banking Corporation ("***SMBC***", and together with JPMorgan, Citi, BMOH, CSAG, RBC, TD, and DNB, collectively, the "***Initial Commitment Parties***", and together with each other Prepetition RBL Lender (as defined below) that joins this letter (this letter, including <u>Exhibits A</u> and <u>B</u> hereto, this "***Commitment Letter***") prior to the Outside Commitment Date (as defined below), collectively, the "***Commitment Parties***", "***we***" or "***us***") understand that EP Energy Corporation, a Delaware corporation ("***Parent***"), and certain of its subsidiaries, including EPE Acquisition LLC, a Delaware limited liability company ("***Holdings***"), and EP Energy LLC, a Delaware limited liability company ("***Borrower***" and together with Parent and Holdings, "***you***"; and together with Parent, Holdings and such subsidiaries, the "***Debtors***") have filed voluntary petitions commencing cases (the "***Chapter 11 Cases***") under title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") in order to implement a restructuring of the Debtors (collectively, the "***Transactions***").

      In connection therewith, you have requested that:

          (i) each Commitment Party commit to provide a senior secured superpriority priming debtor-in-possession revolving credit facility in an aggregate principal amount of fifty percent (50%) of the aggregate amount of the outstanding loans and commitments under the Borrower's existing reserve-based senior secured revolving credit facility (the "***Prepetition RBL Facility***") pursuant to that certain Credit Agreement dated as of May 24, 2012, among the Borrower, Holdings, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, the lenders from time to time party thereto (the "***Prepetition RBL Lenders***"), and the other parties thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition RBL Credit Agreement***"), outstanding immediately prior to the filing of the Chapter 11 Cases (the loans and

commitments of the Commitment Parties under the Prepetition RBL Facility, "***Prepetition Consenting RBL Claims***" and together with the loans and commitments of the Prepetition RBL Lenders that are not Commitment Parties as of the Outside Commitment Date (each, a "***Term Lender***"), collectively, the "***Prepetition RBL Claims***"), substantially in the form of, and as further described in, the Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement attached hereto as Exhibit A (the "***DIP Credit Agreement***" and the facility thereunder, the "***DIP Facility***"), and which DIP Facility shall:

(x)  be effectuated by the cashless conversion on a dollar for dollar basis of a ratable portion of each of the Commitment Parties' respective Prepetition Consenting RBL Claims into (A) new commitments to make revolving loans to the Borrower during the Chapter 11 Cases under the DIP Facility (subject to the terms and conditions therein) and (B) outstanding loans under the DIP Facility (until repaid in whole or in part by the Borrower with a portion of the Debtor's cash collateral upon approval of the DIP Order in accordance with the DIP Credit Agreement); and

(y)  be convertible, together with all (but not less than all) of the remaining outstanding Prepetition RBL Claims that were not converted into a portion of the DIP Facility into a senior secured exit facility (the "***Exit Facility***" and, together with the DIP Facility, each, a "***Credit Facility***" and collectively, the "***Credit Facilities***") on substantially the terms described in, and subject to the conditions precedent set forth in, the Exit Facility Term Sheet attached hereto as <u>Exhibit B</u> (the "***Exit Facility Term Sheet***"; and the credit agreement evidencing such senior secured exit facility, the "***Exit Facility Credit Agreement***" and together with the DIP Credit Agreement, the "***Credit Agreements***") in an aggregate principal amount of up to $629,420,912; *provided*, that (x) the portion of the Exit Facility provided by the Commitment Parties shall be in the form of a senior secured first-out reserve-based revolving facility (the "***Exit Revolving Facility***") subject to an initial borrowing base (the "***Borrowing Base***") to be determined and approved in accordance with the Exit Facility Term Sheet and (y) the portion of the Exit Facility on account of the Prepetition RBL Claims of the Term Lenders pursuant to their treatment under a chapter 11 plan shall be in the form of a senior secured second-out fully drawn term loan facility (the "***Exit Term Facility***");

(ii)  subject to its receipt of a disclosure statement and solicitation materials approved by the Bankruptcy Court relating to an Approved Plan, each Commitment Party commit to vote or cause to be voted its Prepetition RBL Claims in a timely manner in favor of such Approved Plan (to the extent entitled to vote on such Approved Plan) and to accept such Approved Plan by delivering its duly executed and completed ballot or ballots relating thereto (and not to change or withdraw its votes except on the terms included herein); and

(iii)  JPMorgan agree to use its commercially reasonable efforts to arrange and syndicate, commencing on a date mutually agreed among the Borrower and JPMorgan in anticipation of the projected Exit Facility Conversion Date, additional commitments to the Exit Revolving Facility from one or more financial institutions identified by JPMorgan, and subject to your consent (not to be unreasonably withheld, conditioned or delayed) (together with the Commitment Parties, the "***Lenders***") in an aggregate incremental principal amount of up to $300,000,000 (any such additional commitments, the "***Incremental Commitments***"); *provided* that (x) the arrangement and syndication of the Incremental Commitments by JPMorgan shall not be a condition to the commitments of the Commitment Parties (including JPMorgan) set forth in clauses (i) or (ii) above and (y) the increase in the Exit Facility by the Incremental Commitments shall be subject to the Maximum Secured Debt Capacity Condition.

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exhibits attached hereto.

1.       **Commitments and Undertakings**

In connection with the Transactions, subject to the terms and conditions set forth in this Commitment Letter, each of the Commitment Parties is pleased to advise you of its several (and not joint) commitment to:

(a)      provide the following percentages of the DIP Facility and the Exit Revolving Facility, respectively:

(i)       in respect of the DIP Facility, (i) JPMorgan, 14.78%, (ii) Citi, 14.78%, (iii) BMOH, 26.09%, (iv) CSAG, 12.87%, (v) RBC, 14.78%, (vi) TD, 8.17%, (vii) DNB 4.87%, and SMBC, 3.65%, which in the aggregate for all Initial Commitment Parties, equals 100% of the DIP Facility; *provided* that the foregoing commitments shall be proportionately reduced by the commitments of any Prepetition RBL Lender that join this Commitment Letter as a Commitment Party prior to the date on which the Bankruptcy Court enters the DIP Order (the "*Outside Commitment Date*") pursuant to a joinder agreement confirming such RBL Lender agrees to be bound to this Commitment Letter as if it were an original signatory, in a form reasonably acceptable to JPMorgan and the Borrower; and

(ii)      in respect of the Exit Revolving Facility, (i) JPMorgan, $85,000,000, (ii) Citi, $85,000,000, (iii) BMOH, $150,000,000, (iv) CSAG, $74,000,000, (v) RBC, $85,000,000, (vi) TD, $46,947,275, (vii) DNB $28,000,000, and (viii) SMBC, $21,000,000, which in the aggregate for all Commitment Parties, equals 100% of the Exit Revolving Facility; *provided* that the aggregate maximum revolving credit amount shall be increased by the maximum revolving credit amounts of any Prepetition RBL Lender that joins this Commitment Letter as a Commitment Party prior to the Outside Commitment Date pursuant to a joinder agreement confirming such RBL Lender agrees to be bound to this Commitment Letter as if it were an original signatory, in a form reasonably acceptable to JPMorgan and the Borrower; and

(b)      subject to its receipt of a disclosure statement and solicitation materials approved by the Bankruptcy Court relating to an Approved Plan:

(i)       timely vote or cause to be voted its Prepetition RBL Claims in favor of such Approved Plan (to the extent entitled to vote on such Approved Plan) and to accept such Approved Plan by delivering its duly executed and completed ballot or ballots relating thereto; and

(ii)      not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (i) above; *provided*, *however*, that notwithstanding anything herein to the contrary, a Commitment Party's vote may, upon written notice to the Borrower, be revoked (and, upon such revocation, deemed void *ab initio*) by such Commitment Party at any time following the termination of this Commitment Letter pursuant to the terms hereof with respect to such Commitment Party.

For the avoidance of doubt, no Prepetition RBL Lender that is not an Initial Commitment Party shall be permitted to join this Commitment Letter unless such Prepetition RBL Lender commits to join both the DIP Facility and the Exit Revolving Facility.

In addition, subject to the terms and conditions set forth in this Commitment Letter, JPMorgan is pleased to advise you that it is willing to use its commercially reasonable efforts to arrange and syndicate the Incremental Commitments until the Exit Facility Conversion Date.

2.       **Titles and Roles**

It is agreed that:

3

(a)      JPMorgan will act as arranger and bookrunner for each Credit Facility (other than with respect to the Incremental Commitments) (acting in such capacities, the "**_Lead Arranger_**"); _provided_ that the Borrower agrees that JPMorgan may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC, (b) JPMorgan will act as administrative agent and collateral agent for each Credit Facility, and (c) JPMorgan will act as arranger and bookrunner for the Incremental Commitments.  You further agree that the Lead Arranger shall not have any other responsibilities except as otherwise mutually agreed.  You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Credit Agreements and Fee Letters referred to below) will be paid in connection with the Credit Facilities unless you and JPMorgan shall so reasonably agree (it being understood and agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of either Credit Facility than JPMorgan).

3.      Syndication

JPMorgan intends to syndicate the Incremental Commitments commencing on a date mutually agreed among the Borrower and JPMorgan in anticipation of the projected Exit Facility Conversion Date to one or more financial institutions identified by JPMorgan, and subject to your consent (not to be unreasonably withheld, conditioned or delayed).  You agree actively to assist JPMorgan in completing a syndication of the Incremental Commitments satisfactory to us and you.  Such assistance shall include until the Exit Facility Conversion Date (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit materially from your existing lending relationships, (b) direct contact between senior management and advisors of the Debtors and the proposed Lenders at times and locations to be mutually agreed upon, (c) the hosting, with JPMorgan, of one or more meetings of prospective Lenders at times and locations to be mutually agreed upon and (d) your preparing and providing to JPMorgan a customary confidential information memoranda and other customary marketing materials (including, without limitation, lender slides and/or other marketing materials to be used in connection with the syndication) with respect to the Debtors and each Debtor's respective properties, including financial information, reserve information and reports, information to conduct diligence and Projections (as defined below), as JPMorgan may reasonably request in connection with the arrangement of the Credit Facilities and the syndication of the Incremental Commitments (all such information, memoranda and material, "**_Information Materials_**").

Notwithstanding anything to the contrary contained in this Commitment Letter or any Fee Letter or any other letter agreement or undertaking concerning the financing of the Transactions, without limiting your obligations to assist with syndication efforts as set forth above, none of the commencement or completion of syndication of the Incremental Commitments, the completion of a confidential information memorandum or other marketing materials, or compliance with any other provision set forth in this Commitment Letter (other than the conditions described in Section 6 of this Commitment Letter) shall constitute a condition to the commitments hereunder or to the Credit Facilities.

You hereby authorize JPMorgan to download copies of the Debtors' trademark logos from its website and post copies thereof and any Information Materials to a deal site on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by JPMorgan to be its electronic transmission system (an "**_Electronic Platform_**") established by JPMorgan to perform services in its capacity as the administrative agent of either Credit Facility or to syndicate the Incremental Commitments, and to use the Debtors' trademark logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the administration of either Credit Facility or the syndication of the Incremental Commitments, with your consent (which consent not to be unreasonably withheld, conditioned or delayed), in any advertisements that we may place after the closing of the Credit Facilities or the Incremental Commitments in financial and other newspapers, journals, the World Wide Web, home page or otherwise, at their own expense describing its services to the Debtors hereunder.  You also understand and acknowledge that we may provide to market data collectors, such as league table, or other service providers to the lending industry, information regarding the closing date, size, type, purpose of, and parties to, the Credit Facilities.

4.      Information

You hereby represent and warrant that (a) all written information (including the Information Materials), other than the financial projections and other forward-looking information (collectively, the "***Projections***") and information of a general economic or general industry nature (the "***Information***"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the Projections that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material).  You agree that if, at any time prior to the Exit Facility Conversion Date, you become aware that any of the representations in the preceding sentence would be incorrect if such Information or Projections were furnished at such time and such representations were remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances.  You understand that in arranging each Credit Facility we may use and rely on the Information and Projections without independent verification thereof.

5.      Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the fees described in the Agency Fee Letter and the Upfront and Conversion Fee Letter, each dated as of the date hereof and delivered herewith (collectively, the "***Fee Letters***") on the terms and subject to the conditions set forth therein.

6.      Conditions

Each Commitment Party's commitments and agreements hereunder are subject to (a) in the case of the DIP Facility, the conditions set forth in Section 6 of the DIP Credit Agreement and (b) in the case of the Exit Facility, the conditions set forth in the Exit Facility Term Sheet under the heading "Conditions to Exit Facility Conversion Date".  It being understood and agreed that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Fee Letters and the Credit Documents other than those expressly stated in this <u>Section 6</u>.  Notwithstanding anything to the contrary in this Commitment Letter or the Fee Letters, your obligations hereunder and thereunder are subject to the entry of the DIP Order by the Bankruptcy Court.

7.      Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Parties, the Lead Arranger and any other arrangers or agents in respect of the Credit Facilities appointed pursuant to this Commitment Letter, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "***indemnified person***") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letters, either Credit Facility, the use of the proceeds thereof, any Incremental Commitments, the use of the proceeds thereof, or the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "***Proceeding***"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon written demand with customary backup documentation for any reasonable and documented out-of-pocket legal or other documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing

(limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the indemnified persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons), provided that the foregoing indemnity will not, as to any indemnified person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its controlled affiliates, directors, officers or employees, advisors or agents (collectively, the "***Related Parties***"), (ii) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or control affiliate of such indemnified person under this Commitment Letter or (iii) to the extent arising from any dispute solely among indemnified persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Lead Arranger, arranger (with respect to any Incremental Commitments), administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with this Commitment Letter, the Fee Letters, either Credit Facility, the use of the proceeds thereof, any Incremental Commitments, or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates; and (b) regardless of whether the DIP Facility becomes effective or the Exit Facility Conversion Date occurs, to reimburse each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including, without limitation, due diligence expenses, syndication expenses, financial advisor's fees, consultant's fees, travel expenses, and the fees, charges and disbursements of counsel) incurred in connection with the Credit Facilities and any related documentation (including this Commitment Letter, the Fee Letters and the definitive financing documentation in connection with each Credit Facility and any Incremental Commitments) or the administration, amendment, modification or waiver thereof (limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the indemnified persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons).  No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet, or for any special, indirect, consequential or punitive damages in connection with the Credit Facilities or the Incremental Commitments, or in connection with its activities related to the Credit Facilities or the Incremental Commitments, and you agree, to the extent permitted by applicable law, not to assert any claims against any indemnified person with respect to the foregoing.  None of the indemnified persons or you or any of your or their respective Related Parties of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letters, the Credit Facilities, any Incremental Commitments, or the transactions contemplated hereby, *provided* that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 7.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless (a) such settlement includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy.  You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to JPMorgan, any other Commitment Party, the Lead Arranger and the other indemnified persons.

8.      Sharing of Information, Affiliate Activities, Absence of Fiduciary Relationship.

JPMorgan, the other Commitment Parties and the Lead Arranger may employ the services of their respective affiliates in providing certain services hereunder and, in connection with the provision of such

services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the Transactions contemplated by this Commitment Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits, and be subject to the obligations, of JPMorgan, the other Commitment Parties and the Lead Arranger hereunder.  JPMorgan, each other Commitment Party and the Lead Arranger shall be responsible for its respective affiliates' failure to comply with such obligations under this Commitment Letter.

You acknowledge that any of Commitment Parties or their respective affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  Each Commitment Party agrees severally (and not jointly) that it will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you in connection with the performance by it of services for other companies, and it will not furnish any such information to other companies.  You also acknowledge that the Commitment Parties have no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You further acknowledge that each Commitment Party is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services.  In the ordinary course of business, a Commitment Party and/or its affiliates may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships.  With respect to any securities and/or financial instruments so held by a Commitment Party, its affiliates or any of its respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

You agree that the Commitment Parties and the Lead Arranger will act under this Commitment Letter as independent contractors and that nothing in this Commitment Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Commitment Party or the Lead Arranger and you, your respective equity holders or your and their respective affiliates.  You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter are arm's-length commercial transactions between each Commitment Party or the Lead Arranger and, if applicable, its affiliates, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction each Commitment Party and the Lead Arranger and, if applicable, its respective affiliates, is acting solely as a principal and has not been, is not and will not be acting as an advisor, agent or fiduciary of you, your management, equity holders, creditors, affiliates or any other person and (iii) each Commitment Party and the Lead Arranger, if applicable, and each of their respective affiliates, has not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether such Commitment Party or the Lead Arranger or any of its respective affiliates has advised or is currently advising you or your affiliates on other matters) except the obligations expressly set forth in this Commitment Letter.  You further acknowledge and agree that (i) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (ii) you are capable of evaluating and you understand and accept the terms, risks and conditions of the transactions contemplated hereby, and neither JPMorgan, nor any other Commitment Party or the Lead Arranger shall have any responsibility or liability to you with respect thereto, and (iii) no Commitment Party or the Lead Arranger is advising the Debtors as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction, and you shall consult with your own advisors concerning such matters and you shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby.  Any review by JPMorgan or any other Commitment Party or the Lead Arranger of the Debtors, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of JPMorgan or such other Commitment Party or the Lead Arranger, respectively, and shall not be on behalf of the Debtors.  You agree that you will not assert any claim against JPMorgan or any other Commitment

Party or the Lead Arranger based on an alleged breach of fiduciary duty by JPMorgan or such other Commitment Party or the Lead Arranger in connection with this Commitment Letter and the transactions contemplated hereby.

9.      Confidentiality

        This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person, except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) as may be required by or in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental or regulatory authority (in which case you agree, to the extent permitted by law, to inform us promptly thereof), (c) if the Commitment Parties consent in writing to such proposed disclosure, (d) in connection with the enforcement of your rights hereunder or under the Fee Letters or (e) this Commitment Letter and the existence and contents hereof (but not the Fee Letters or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed (x) in connection with the syndication or arrangement of the Credit Facilities or the Incremental Commitments, or in connection with, and as may be required for, any public filing and (y) to the parties to the Plan Support Agreement filed in the Chapter 11 Cases on the date hereof and any other party required by the Bankruptcy Court.  Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letters with the Bankruptcy Court under seal in form and substance reasonably satisfactory to JPMorgan or in a redacted manner in form and substance reasonably satisfactory to JPMorgan and provide an unredacted copy of the Fee Letters to the Bankruptcy Court, the Office of the United States Trustee for the Southern District of Texas and any other party required by the Bankruptcy Court and advisors to (i) any official committee appointed in the Chapter 11 Cases and (ii) the parties to the Plan Support Agreement filed in the Chapter 11 Cases on the date hereof; *provided*, that the disclosure of the Fee Letters to such advisors is on a confidential, "professionals only" basis.

        Each Commitment Party severally (and not jointly) shall use all nonpublic information received by it in connection with the Credit Facilities and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; *provided*, *however*, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to any Lenders or participants or prospective Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority (including any self-regulatory authority) or other governmental authority purporting to have jurisdiction over JPMorgan, a Commitment Party or the Lead Arranger, or any of its respective affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law or regulation, to inform you promptly thereof prior to disclosure), (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "***Representatives***") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its respective affiliates (*provided* that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its respective affiliates' compliance with this paragraph) solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter, (g) for purposes of establishing a "due diligence" defense, (h) in connection with the exercise of any remedies hereunder or under any Fee Letter or any suit, action or proceeding relating to this Commitment Letter, any Fee Letter or any Credit Facility and (i) pursuant to customary disclosure about the terms of the financing contemplated hereby in the ordinary course of business to market data collectors and similar service providers to the loan industry for league table purposes; *provided* that the disclosure of any such information to any Lenders or prospective

Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information.  The provisions of this paragraph shall automatically terminate on the earlier of (a) the Exit Facility Conversion Date and (b) one year following the date of this Commitment Letter.

10.    Assignments

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.

From the date hereof until the Exit Facility Expiration Date, each Commitment Party agrees not to assign its Prepetition RBL Claims under the Prepetition RBL Facility or the commitments and agreements hereunder, in whole or in part, without the prior written consent of the Borrower; provided, that, to the extent the Borrower consents to any assignment, the proposed new Commitment Party shall execute a joinder agreement in form and substance acceptable to the Borrower.

11.    Miscellaneous

Each Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates certain fees payable to such Commitment Party in such manner as such Commitment Party and its affiliates may agree in their sole discretion.  This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter and the Fee Letters are the only agreements that have been entered into among us and you with respect to the Credit Facilities and set forth the entire understanding of the parties with respect thereto.  This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.  You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum.  You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.  Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "*PATRIOT Act*"), it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with

733425071 12335469

the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter

The indemnification, fee, expense, jurisdiction, information and confidentiality provisions contained herein and in the Fee Letters shall remain in full force and effect regardless of whether definitive financing documentation for either Credit Facility shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to (confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the applicable Credit Agreement upon the occurrence of the effectiveness thereof.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letters by returning to us executed counterparts of this Commitment Letter and the Fee Letters not later than 11:59 p.m., New York City time, on October 18, 2019.  This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence.  In the event that the initial borrowing under the DIP Facility does not occur on or before the Expiration Date (as defined below), then this Commitment Letter and the commitments hereunder (including, for the avoidance of doubt, the commitments with respect to the Exit Facility) shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension.  Following such initial borrowing under the DIP Facility, in the event that the initial borrowing under the Exit Facility does not occur on or before the Exit Facility Expiration Date (as defined below), then the commitments with respect to the Exit Facility shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension.

For purposes of this Commitment Letter (a) "***Expiration Date***" means 5:00 p.m., New York City time on the date that is sixty (60) days after the Petition Date if the DIP Order has not been entered by the Bankruptcy Court, and (b) "***Exit Facility Expiration Date***" means the Maturity Date (as defined in the DIP Credit Agreement).

*[Signature Pages Follow]*

733425071 12335469

## <u>Exhibit C</u>

**Organizational Chart**



**EP ENERGY**

**As of the Petition Date**

| Outstanding Funded Indebtedness | |
|---|---|
| RBL Facility | $629M |
| 1.125L Notes | $1,000M |
| 1.25L Notes | $500M |
| 1.5 L Notes | $2,092M |
| **Total Secured Debt** | **$4,221M** |
| | |
| Unsecured Debt: | |
| 6.375% Senior Notes | $323M |
| 7.75% Senior Notes | $182M |
| 9.375% Senior Notes | $182M |
| **Total Unsecured Debt** | **$688M** |
| | |
| **Total Funded Debt** | **$4,909M** |

**Legend:**

- ☐ Debtor Entity
- ☐ Non-Debtor Entity
- ☐ RBL Obligor
- ☐ 1.125L Obligor
- ☐ 1.25L Obligor
- ☐ 2024 1.5L Obligor
- ☐ 2025 1.5L Obligor
- ☐ 2023 Unsecured Notes Obligor
- ☐ 2022 Unsecured Notes Obligor
- ☐ 2020 Unsecured Notes Obligor

**RBL Credit Facility**
Borrower: EP Energy, LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $629M
Maturity: November 23, 2021

**7.750% 1.125L due 2026**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $1,000M
Maturity: May 15, 2026

**8.000% 1.25L due 2024**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $500M
Maturity: November 29, 2024

**9.375% 1.5L due 2024**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $1,092M
Maturity: May 1, 2024

**8.000% 1.5L due 2025**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $1,000M
Maturity: February 15, 2025

**6.375% UNS due 2023**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $323M
Maturity: June 15, 2023

**7.775% UNS due 2022**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $182M
Maturity: September 1, 2022

**9.375% UNS due 2020**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $182M
Maturity: May 1, 2020

**<u>Exhibit D</u>**

**Liquidation Analysis**

EXHIBIT D

**LIQUIDATION ANALYSIS**

As part of the chapter 11 process, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court determine that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive under the plan value that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Debtors' *Amended Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and Its Affiliated Detors* (as amended, modified, or supplemented, the "**Plan**").

Below is a summary of an illustrative liquidation analysis (the "**Liquidation Analysis**") assuming that the Debtors pursue a hypothetical liquidation under chapter 7. Per chapter 7 requirements, the Debtors' assets would be disposed under the direction of a chapter 7 Trustee ("**Trustee**"). The illustrative sale proceeds would provide for lower recoveries relative to the recoveries under the Plan and as a result the Debtors believe that under the Plan, Holders of Claims and Interests would receive value greater than the amounts that such Holders would receive if the Debtors were forced to liquidate under chapter 7, and that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

A.  **Limitations and Key Assumptions Underlying the Hypothetical Liquidation**

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

The Debtors prepared the illustrative Liquidation Analysis with the assistance of FTI Consulting. The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims based upon a review of the Debtors' financial statements to account for estimated liabilities as necessary. The Liquidation Analysis does not contemplate a sale of the Debtors' business on a going concern basis. The Liquidation Analysis includes estimates for Claims as part of the Chapter 11 Cases which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and Trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis, and the bar date to file proofs of claim has not yet passed. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and interests under the Plan. **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

The Debtors note that the assumptions utilized in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors or a chapter 7 Trustee. Accordingly, there can be no guarantees that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter

1

7 liquidation not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and delayed creditor recoveries.

**THE DEBTORS RESERVE THEIR RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

1.     **General Assumptions**

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

a)     **Administrative Procedures and Conversion of Cases**

For purposes of the chapter 7 Liquidation Analysis, the Debtors assume that each of the Chapter 11 Cases are converted to a chapter 7 case and consolidated during the chapter 7 proceeding for procedural purposes only. Since EP Energy Corporation (the "Parent Company") is not a guarantor to the Debtors' secured and unsecured debt, the Parent Company's illustrative liquidation analysis has been presented separately from the other Debtors. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, the Debtors' operational costs, etc. would likely be higher than if the cases were consolidated.

b)     **Professionals Involved in the Chapter 7 Proceedings**

As part of the chapter 7 case, the Debtors assume that the Trustee would choose to retain certain professionals, including counsel, advisors and investment bankers, among others, to provide expertise and assistance in the liquidation of the Debtors. The Liquidation Analysis illustratively assumes that the existing counsel, advisors, and consultants would be replaced by the Trustee with new professionals.

c)     **Timing Considerations of Chapter 7 Cases**

The Liquidation Analysis assumes the conversion to Chapter 7 occurs on March 31, 2020 (the "Conversion Date"), and the Trustee's advisors would require time to get up to speed before a process could begin to liquidate the assets. While the Debtors' oil and gas properties may be sold in several transactions, this analysis assumes that they are all sold by July 31, 2020, four months after the start of the liquidation. The Liquidation Analysis assumes the oil and gas properties are sold as of an effective date on March 31, 2020. An additional four months are assumed for a wind down of the estate.

It is assumed that the Debtors' use of cash collateral would be limited and that the Debtors would not have funds to support any process other than an orderly and expedited wind-down of the Debtors' business by the trustee to convert the Debtors' assets to cash and limit the amount of administrative expenses. There can be no assurance, however, that the liquidation would be completed in a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized.

In an actual liquidation, the process and length of wind-down could be significantly longer and more expensive than the amounts assumed herein and thereby significantly reduce the actual recoveries compared to this analysis. For example, the potential for priority, contingent, and other Claims; litigation; rejection costs; and the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Also, in the context of a liquidation, there would likely be potential offset Claims, particularly with respect to joint interest billings that would take time to reconcile and resolve. Additionally, certain of the joint operating agreements may be non-assignable (absent consent from the other working interest owners) which could result in potential asset transfer issues in the context of a chapter 7

liquidation. Also, a number of factors in a liquidation could affect the Trustee's ability to sell the Debtors' oil and gas assets for their current market value. These risks include if they are forced to halt production for a period of time or lose relationships with vendors, customers, royalty owners, joint interest owners, and midstream firms. There is a high risk that the employee base could deteriorate and the Trustee could be challenged to gather appropriate information on the assets for the sales process. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

### d)      Trustee Fees for Chapter 7 Administration

The Debtors assume that under a chapter 7 liquidation, the Trustee would require fees necessary to facilitate a sale of the Debtors' business. The illustrative Liquidation Analysis assumes that such fees would likely be approximately three percent (3%) of the available liquidation proceeds in excess of $1 million and excluding cash. These fees are assumed to be earned for the Trustee's creation and development of materials for marketing and the facilitation of the solicitation process for the parties, in addition to general administrative expenses, such as Trustee's compensation. Additionally, per section 326(a) of the Bankruptcy Code, for a case under chapter 7, the Court may allow reasonable compensation for the Trustee's services not to exceed three percent (3%) such moneys disbursed or turned over in the case by the Trustee to parties in interest, excluding the Debtors, but including holders of secured Claims.

### e)      Additional Claims

The cessation of the Debtors' business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the proposed Plan. Examples of these kinds of Claims include tax liabilities, employee Claims, Claims related to rejection of executory contracts, incremental costs associated with plugging and abandoning liabilities, and litigation Claims. While some of these Claims could be significant, no adjustment has been made for these potential Claims unless specified in the assumptions to the Liquidation Analysis.

### B.      Consummation of the Plan Will Provide Greater Value than Under a Hypothetical Liquidation through Chapter 7 of the Bankruptcy Code

As presented in the illustrative Liquidation Analysis, the Debtors believe that a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code would result in reductions in the value to be realized by constituents as compared to the distributions that are contemplated under the Plan. As a result, the Debtors believe that Consummation of the Plan will provide a substantially greater return to constituents than would any liquidation under chapter 7 of the Bankruptcy Code.

# LIQUIDATION ANALYSIS

## Guarantor Debtors[1]

| Liquidation Analysis | Note | Actual 30-Sep | Adj. | Forecast 31-Mar | Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | Note | 30-Sep | | 31-Mar | $ | % | $ | % | $ | % |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $189,508 | ($167,258) | $22,251 | $22,251 | 100% | $22,251 | 100% | $22,251 | 100% |
| Trade Accounts Receivable | B | 118,070 | (12,319) | 105,750 | 95,175 | 90% | 100,463 | 95% | 105,750 | 100% |
| Joint Interest Billing Receivable | C | 7,031 | 24,368 | 31,399 | 25,119 | 80% | 26,689 | 85% | 28,259 | 90% |
| Other Receivable | D | 7,423 | (7,423) | - | - | N/A | - | N/A | - | N/A |
| Net Derivatives Receivables | E | 42,894 | (23,686) | 19,208 | 4,802 | 25% | 7,203 | 38% | 9,604 | 50% |
| Other Current Assets | F | 38,797 | (32,129) | 6,668 | - | 0% | 833 | 13% | 1,667 | 25% |
| Net Oil & Gas Properties | G | 3,916,102 | - | 3,916,102 | 1,271,635 | 32% | 1,382,272 | 35% | 1,492,909 | 38% |
| Other Net Property, Plant & Equipment | H | 31,958 | (6,961) | 24,997 | 1,746 | 7% | 2,780 | 11% | 3,813 | 15% |
| **Total Gross Liquidation Proceeds** | | $4,351,783 | ($225,409) | $4,126,375 | $1,420,728 | | $1,542,491 | | $1,664,254 | |
| Encumbered Value | | | | | $1,402,054 | | $1,521,063 | | $1,640,071 | |
| Unencumbered Value | | | | | $18,674 | | $21,428 | | $24,182 | |
| (-) Net Wind-Down Expenses | I | | | | ($20,815) | | ($20,815) | | ($20,815) | |
| (-) Post-Conversion Cash Flow | J | | | | (77,308) | | (77,308) | | (77,308) | |
| (-) Chapter 7 Trustee Fees | K | | | | (41,954) | 3.00% | (45,607) | 3.00% | (49,260) | 3.00% |
| (-) Chapter 7 Trustee Legal & Financial Advisors | L | | | | (34,962) | 2.50% | (34,205) | 2.25% | (32,840) | 2.00% |
| (-) Chapter 11 Professional Fees Carve-Out | M | | | | (18,587) | | (18,587) | | (18,587) | |
| **Total Net Liquidation Proceeds** | | | | | $1,227,102 | | $1,345,968 | | $1,465,444 | |
| Remaining Encumbered Value | | | | | 1,227,102 | | 1,345,968 | | 1,465,444 | |
| Remaining Unencumbered Value | | | | | - | | - | | - | |

| Claims Recovery Analysis ($000s) | | | Claims Estimates | | | Low | | Mid | | High | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class | Claims | Note | Low | Mid | High | $ | % | $ | % | $ | % |
| 1 | Other Secured Claims | N | 4,463 | 4,463 | 4,463 | 4,463 | 100% | 4,463 | 100% | 4,463 | 100% |
| 2 | Other Priority Claims | O | - | - | - | - | N/A | - | N/A | - | N/A |
| 3 | DIP Claims | P | 263,539 | 263,539 | 263,539 | 263,539 | 100% | 263,539 | 100% | 263,539 | 100% |
| 3 | RBL Claims | Q | 327,089 | 327,089 | 327,089 | 327,089 | 100% | 327,089 | 100% | 327,089 | 100% |
| 4 | 1.125L Notes Claims | R | 1,000,000 | 1,000,000 | 1,000,000 | 632,012 | 63% | 750,878 | 75% | 870,353 | 87% |
| 5 | 1.25L Notes Claims | S | 513,667 | 513,667 | 513,667 | - | 0% | - | 0% | - | 0% |
| 6 | Secured 1.5L Notes Claims | T | 2,186,618 | 2,186,618 | 2,186,618 | - | 0% | - | 0% | - | 0% |
| | Administrative Claims | U | 185,026 | 185,026 | 185,026 | - | 0% | - | 0% | - | 0% |
| 7 | Deficiency Claims | V | 3,068,273 | 2,949,406 | 2,829,931 | - | 0% | - | 0% | - | 0% |
| 7 | Unsecured Claims | V | 918,130 | 834,312 | 750,494 | - | 0% | - | 0% | - | 0% |
| 8 | Convenience Claims | W | - | - | - | - | N/A | - | N/A | - | N/A |
| 9 | Intercompany Claims | X | - | - | - | - | N/A | - | N/A | - | N/A |
| 10 | Subordinated Claims | Y | - | - | - | - | N/A | - | N/A | - | N/A |
| 11 | Existing Equity Interests | Z | - | - | - | - | N/A | - | N/A | - | N/A |
| 12 | Other Equity Interests | AA | - | - | - | - | N/A | - | N/A | - | N/A |
| 13 | Intercompany Interests | AB | - | - | - | - | N/A | - | N/A | - | N/A |
| **Total Claims Recovery** | | | $8,466,803 | $8,264,119 | $8,060,826 | $1,227,102 | | $1,345,968 | | $1,465,444 | |

## EP Energy Corporation

| Liquidation Analysis | Note | Actual 30-Sep | Adj. | Forecast 31-Mar | Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | Note | 30-Sep | | 31-Mar | $ | % | $ | % | $ | % |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $644 | ($644) | $0 | $0 | N/A | $0 | N/A | $0 | N/A |
| Investments in Subsidiaries | AC | (599,216) | - | (599,216) | - | 0% | - | 0% | - | 0% |
| **Total Gross Liquidation Proceeds** | | ($598,571) | ($644) | ($599,216) | $0 | | $0 | | $0 | |
| (-) Net Wind-Down Expenses | I | | | | $0 | | $0 | | $0 | |
| (-) Post-Conversion Cash Flow | J | | | | - | | - | | - | |
| (-) Chapter 7 Trustee Fees | K | | | | - | 3.00% | - | 3.00% | - | 3.00% |
| (-) Chapter 7 Trustee Legal & Financial Advisors | L | | | | - | 2.50% | - | 2.25% | - | 2.00% |
| (-) Chapter 11 Professional Fees Carve-Out | M | | | | - | | - | | - | |
| **Total Net Liquidation Proceeds** | | | | | $0 | | $0 | | $0 | |

[1] Guarantor Debtors include EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092).

### C.    Notes to Liquidation Analysis

*Gross Liquidation Proceeds*

**A. Cash and Equivalents**

- Cash consists of cash in bank accounts and highly liquid investment securities that have original maturities of one year or less.

- The Liquidation Analysis assumes that the Debtors will have access to the cash in its accounts upon conversion of the cases to Chapter 7. However, the secured lenders may have the right to sweep this cash to pay down their Claims upon conversion, which could adversely affect the Trustee's ability to run an orderly liquidation.

- EP Energy Corporation's cash balance is expected to be depleted as of the Conversion Date for the Parent Company's post-petition obligations.

**B. Trade Accounts Receivable**

- Balances include amounts due for oil, gas and NGL production accrued through the chapter 7 Conversion Date and not yet received from the Debtors' customers.

- These receivables are expected to be highly collectible, but there could be a risk that the Debtors' customers could make Claims against the estate in a liquidation and attempt to set off their Claims with the Debtors' receivables.

- The analysis assumes that the Trustee would be able to retain the necessary personnel at the Debtors to assist in calculating and collecting these receivables. If the Trustee did not have sufficient access to capital or for any other reason was not able to retain these key personnel, that could negatively impact recovery of these receivables.

- For the purposes of the Liquidation Analysis, recoveries of trade receivables are estimated to be highly recoverable due to the short-term contractual obligations of the receivable counterparties and the low probability of contractual breaches. An ultimate recovery range of 90% to 100% is estimated for trade receivables.

**C. Joint Interest Billing Receivables**

- Joint Interest Billing Receivables include receivables from joint interest owners for their share of lease operating expenses, capital expenditures, production taxes, and gathering and transport fees, among other items.

- These receivables are expected to be less collectible than receipts for production as joint interest owners are likely to attempt to offset their potential Claims against the estate for unpaid royalties, lost revenue, and potential other disputes by holding back these receivables and potential other disputes.

- Furthermore, collecting these receipts is further dependent on retaining company personnel to calculate the appropriate bills, and any loss in personnel can negatively impact the Trustee's ability to collect. An ultimate recovery range of 80% to 90% is estimated for Joint Interest Billing Receivables.

**D. Other Receivables**

- Other Receivables include tax receivable, intercompany receivables, and other miscellaneous receivables.

- The Debtors anticipate receiving certain tax receivables, which account for the majority of the assets in this category, before the Conversion Date.

- The Liquidation Analysis assumes that no Other Receivables remain as of the Conversion Date. Conversely,

if any Other Receivables should remain, recovery would be negligible, if any.

**E. Net Derivatives Receivables**

- Net Derivatives Receivables include net receivables from hedge settlement partners.

- These receivables are expected to be collectable but are highly susceptible to daily movements in commodity prices and hedge settlement partners may deduct fees or costs to terminate hedges prematurely.

- Values shown are net of derivative settlements expected to be received prior to the Conversion Date.

- To account for commodity price risk and potential termination costs, an ultimate recovery range of 50 to 75% is estimated for Net Derivatives Receivables.

**F. Other Current Assets**

- Other Current Assets include prepaid expenses, prepaid insurance, deferred charges related to the Debtors' employee retention program for 2019 performance, and other vendor deposits.

- Prepaid insurance and deferred charged related to the deferred retention plan are assumed to run off, or otherwise have no salvage value, in the course of the wind-down. Most of the remaining Other Current Assets are not expected to be recoverable under a liquidation scenario.

- For the purposes of the Liquidation Analysis, an ultimate recovery range of 0% to 25% is assumed for Other Current Assets.

**G. Net Oil & Gas Properties**

- Given the daily production and depletion of oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prompt and broad marketing of the assets over a four-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets. The Liquidation Analysis assumes that the Trustee will expend minimal capital necessary to maintain production and preserve asset value.

- The liquidation of the Debtors' oil and gas properties includes proved reserves and unproved reserves that are assumed to generate an aggregate sale value in the range of $1.272 billion to $1.493 billion based on the application of income approach (the discounted cash flow method) for proved and unproved reserves, adjusted to account for current market conditions, limited operational performance history for certain of the Debtors' assets, and the impact of the sale in a forced liquidation.

- Proceeds from Net Oil & Gas Properties are assumed to be adjusted for a buyer's assumption of approximately $17.4 million of royalties payable in suspense.

- The income approach considered the Debtors' reserve report with an effective date as of March 31, 2020 using the NYMEX strip as of December 6, 2019 for the commodity price forecast.  Depending on the reserve category, certain risk adjustments were made to the discounted cash flow values for proved and unproved reserves.

- The Liquidation Analysis does not account for the potential loss of unproved reserves as a result of lease acreage that the Debtors may lose upon the cessation of drilling and completion capital expenditures, under contractual continuous drilling obligations or lease expiration provisions.

**H. Other Net Property, Plant & Equipment**

- Net Other Property, Plant & Equipment, mainly consists of capitalized leases, office furniture, fixtures, and computer equipment, for which only a limited recovery is assumed.

6

- For the purpose of the Liquidation Analysis, an ultimate recovery of 7% to 15% is estimated for Net Other Property, Plant & Equipment.

*Liquidation Costs*

### I. Net Wind-Down Expenses

- The Liquidation Analysis assumes the sale of the Debtors' oil and gas assets on July 31, 2020 and an additional four-month post-closing wind-down period. During the eight-month total wind-down period, the Liquidation Analysis assumes the Debtors will continue to employ the workforce required during the asset marketing and sale process and ensuing wind-down of the estate.

- The Trustee is assumed to reduce employee and other related expenses upon the conversion of the case and throughout the eight-month liquidation timeframe. This Liquidation Analysis includes the cost of an employee retention program equal to a blended rate of 35% of total employee compensation.

### J. Post-Conversion Cash Flow

- The Liquidation Analysis assumes that the Trustee will make payments necessary to maintain existing production during the four-month sales process to preserve value of the marketed oil and gas assets.

- These expenses include: (1) royalty payments where the Debtors have collected funds for the benefit of royalty owners; (2) oil and gas production taxes related to the sale of produced oil and gas assets prior to the Conversion Date; (3) gathering, processing and transportation counterparties that might be able to shut-in production of certain oil and gas properties in the event of nonpayment; and (4) certain lease operating expense vendors necessary for the continued operation of producing oil and gas wells.

### K. Chapter 7 Trustee Fees

- Section 326 of the Bankruptcy Code provides for fees payable to the Trustee of 3.0% for liquidation proceeds in excess of $1 million, excluding cash.

### L. Chapter 7 Trustee Legal and Financial Advisors

- Professional fees include estimates for certain legal and financial advisory professionals required during the wind-down period.

- These professionals are assumed to be paid 2.0% to 2.5% of the gross liquidation proceeds, excluding cash.

### M. Chapter 11 Professional Fees Carve-Out

- Chapter 11 Professional Fees Carve-Out includes unpaid professional fees for professionals retained by the Debtors pursuant to section 327, 238, or 363 of the Bankruptcy Code and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code, incurred prior to the Carve Out Trigger Date as defined in the DIP Order.

*Recovery Analysis*

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

### N. Class 1 – Other Secured Claims

7

- Other Secured Claims include accrued and unpaid property taxes. The Liquidation Analysis projects a full recovery on account of these Claims.

## O. Class 2 – Other Priority Claims

- No Class 2 Claims are estimated, and, therefore, no recovery on account of these Claims is projected.

## P. Class 3 - DIP Claims

- Class 3 Claims consist of approximately $263.5 million in outstanding DIP Claims, consisting of principal and letters of credit assumed to be drawn on the Conversion Date, plus accrued and unpaid pre- and post-Conversion Date interest.

- While not included in the Class 3 Claims, unpaid professional fees included in the Chapter 11 Professional Fees Carve-Out would otherwise be considered pari-passu with the other DIP Claims.

- The Liquidation Analysis projects that all allowed and undisputed DIP Claims (including all claims for adequate protection pursuant to the order approving the DIP) will be paid in full.

## Q. Class 3 - RBL Claims

- Class 3 Claims consist of approximately $327.1 million in outstanding RBL Claims, consisting of principal, plus accrued and unpaid pre- and post-Conversion Date interest.

- The Liquidation Analysis projects that all allowed and undisputed RBL Claims will be paid in full.

## R. Class 4 – 1.125 Lien Notes Claims

- The Liquidation Analysis assumes there will be approximately $1.000 billion in outstanding Class 4 Claims consisting of principal, plus accrued and unpaid pre-Petition Date interest.

- The Liquidation Analysis <u>excludes</u> approximately $97.8 million of a potential make-whole claim that the 1.125 Lien Noteholders could attempt to assert.  Since no recovery scenarios assume that Class 4 Claims will recover in full, no make-whole claim has been included in any of the recovery scenarios.

- The Liquidation Analysis projects the Class 4 Claims will be paid approximately 63% to 87%.

## S. Class 5 – 1.25 Lien Notes Claims

- The Liquidation Analysis assumes there will be approximately $513.7 million in outstanding Class 5 Claims consisting of principal, plus accrued and unpaid pre-Petition Date interest.

- The Liquidation Analysis <u>excludes</u> approximately $30 million of a potential make-whole claim that the 1.25 Lien Noteholders could attempt to assert. Since no recovery scenarios assume that Class 5 Claims will recover in full, no make-whole claim has been included in any of the recovery scenarios.

- The Liquidation Analysis projects the Class 5 Claims will receive no recovery.

## T. Class 6 – Secured 1.5 Lien Notes Claims

- The Liquidation Analysis assumes there will be approximately $2.187 billion in outstanding Class 6 Claims consisting of principal, plus accrued and unpaid pre-petition interest.

- The Liquidation Analysis projects the Class 6 Claims will receive no recovery.

## U. Administrative Claims

- Administrative Claims include approximately $159.0 million of unpaid post-petition trade vendor payables

and accrued liabilities and other costs and expenses of administration of the Debtors' estates during the Chapter 11 Cases. This estimate is exclusive of claims that might otherwise have administrative status but which are assumed to be paid in the Post-Conversion Cash Flow or which are included in the Chapter 11 Professional Fees Carve-Out.

- In addition to the above, Administrative Claims include the $26 million Backstop Agreement Termination Fee to the Commitment Parties.

- The cessation of the business in a liquidation would likely incur other Claims including contract rejection Claims unless specified herein. No attempt has been made here to value such liabilities, unless specified herein.

- The Liquidation Analysis projects no recovery for holders of Administrative Claims.

- Adequate protection claims in the form of superpriority administrative claims granted under the DIP Order (ECF No. 482) are entitled to recover out of all prepetition and postpetition property of the applicable Debtors, excluding the Carve-Out (*provided*, that such claims must be satisfied out of property other than avoidance actions or the proceeds thereof before being satisfied out of avoidance actions or the proceeds thereof). The Liquidation Analysis does not take into account recoveries that may occur on account of any such adequate protection claims.

## V. Class 7 – Unsecured Claims

- The Liquidation Analysis assumes that there will be approximately $3.580 billion to $3.986 billion in Class 7 Claims.

- Class 7 Claims consist of approximately $2.830 billion to $3.068 billion of deficiency claims relating to the 1.125 Lien Notes Claims, the 1.25 Lien Notes Claims, and the 1.5 Lien Notes Claims. In addition, Class 7 includes approximately $710.1 million of Unsecured Notes Claims, inclusive of principal plus pre-petition accrued and unpaid interest; and approximately $40.4 million to $208.1 million of General Unsecured Claims, inclusive of estimates of pending litigation claims and contract rejection damages for contracts included in contract rejection motions approved by the Court.

- The inclusion of estimates of pending litigation claims are provided for the illustrative purposes of this Liquidation Analysis and do not represent an admission of liability or degree of fault by the Debtors. In the event these Cases are converted to a Chapter 11 liquidation, additional contracts would likely be rejected, thereby increasing Class 7 Claims by the amount of additional damages arising out of such additional contract rejections.

- The Liquidation Analysis projects no estimated recovery for Class 7 Claims.

## W. Class 8 - Convenience Claims

- The Debtors estimate that there will be no Class 8 recoveries.

## X. Class 9 - Intercompany Claims

- The Liquidation Analysis does not take into account intercompany claims among the Debtors.

- The Debtors estimate that there will be no Class 9 recoveries.

## Y. Class 10 – Subordinated Claims

- The Debtors estimate that there will be no Class 10 recoveries.

## Z. Class 11 – Existing Equity Interests

- The Debtors estimate that there will be no Class 11 recoveries.

**AA. Class 12 – Other Equity Interests**

- The Debtors estimate that there will be no Class 12 recoveries.

**AB. Class 13 – Intercompany Interests**

- The Debtors estimate that there will be no Class 13 recoveries.

**AC. Investment in Subsidiaries**

- The Liquidation Analysis assumes that Investments in Subsidiaries, which include EP Energy Corporation's equity interests in the Guarantor Debtors and have a negative value generate no liquidation proceeds for distribution.

**<u>Exhibit E</u>**

**Financial Projections**

# EXHIBIT E
# FINANCIAL PROJECTIONS

*The prospective financial information included in this Disclosure Statement has been prepared by, and is the responsibility of, the Debtors' management team ("**Management**"). No independent auditors have examined, compiled or performed any procedures with respect to the accompanying prospective financial information.*

*The Debtors do not, as a matter of course, publish their business plans, budgets or strategies or disclose projections or forecasts of their anticipated financial positions, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets, strategies, projections or forecasts of their anticipated financial positions, results of operations or cash flows to creditors or equity interest holders prior to the Effective Date of the Plan or to include such information in documents required to be filed with the SEC or otherwise make such information publicly available.*

*The assumptions, projections and other financial information contained in this section contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.*

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Management has prepared financial projections (the "**Projections**") for April 2020 through December 2024 (the "**Projection Period**"). The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations assuming the consummation of the Plan. The Projections are presented on a consolidated basis, including estimates of operating results for all Debtor entities. The Projections will also assist each holder of a claim or interest in determining whether to vote to accept or reject the Plan. In general, as illustrated by the Projections, the reduction of debt on the Debtors' balance sheet will substantially reduce future interest expense and improve future cash flows. Based on the Projections, the Debtors should have sufficient cash flow to pay and service their post-restructuring debt obligations and to operate their business. The Debtors believe that the Confirmation Date and Effective Date of the Plan are not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF A COMPREHENSIVE FRESH START ACCOUNTING ANALYSIS, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES. ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED BELOW IN SECTION [XI], A VARIETY OF RISK FACTORS COULD AFFECT THE

REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN SECTION XI BELOW AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES AND ANY RESULTING CHANGES TO THE PROJECTIONS COULD BE MATERIAL.

## 1) General Assumptions

### a. Overview

The Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore liquids-rich oil and natural gas assets in the United States.

### b. Presentation

The Projections are presented on a consolidated basis, including estimates of operating results for the Debtor entities in total.

### c. Accounting Policies

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to Accounting Standards Certification ("**ASC**") 852-10, as issued by the Financial Accounting Standards Board.

### d. Methodology

Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections. In preparation of the Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The Projections were developed on a bottoms-up basis and incorporate multiple sources of information, including general business and economic conditions.

### e. Plan Consummation

The operating assumptions assume that the Restructuring Transaction will be consummated pursuant to the Plan and that the Plan will be confirmed and consummated by March 31, 2020 and reflect the estimated cash impact of the Plan's treatment of each class of claims or interests. The Debtors do not believe a change in the assumed date of the consummation of the Plan would materially impact the post-confirmation capital structure, their operating performance, these Projections or the underlying economics associated with the Plan.

## 2) Assumptions with Respect to the Projected Income Statement

### a. Production

Forecasted oil, natural gas and natural gas liquids ("**NGL**") volumes for operated production are based on production estimates by Management and contemplate future commodity prices and anticipated operated rig activity. Forecasted volumes for non-operated production are based on anticipated development plans of outside operators obtained through active dialogue with those operators.

| FORECASTED VOLUMES Equivalent MBOE/day | Apr. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Permian | 16.3 | 15.4 | 14.2 | 13.0 | 12.0 |
| Eagle Ford | 39.5 | 33.9 | 33.4 | 37.1 | 33.0 |
| NEU/Altamont | 24.5 | 29.1 | 32.7 | 33.7 | 38.9 |
| **Total Volumes** | **80.3** | **78.4** | **80.3** | **83.8** | **83.9** |

**b. Revenues**

Revenues are derived from the sale of the consolidated **Reorganized Debtors'** share of oil, natural gas and NGL production primarily from its owned working interests in the Permian Basin, Eagle Ford Basin and Northeastern Utah.

**c. Commodity Pricing**

Revenues are sensitive to changes in the prices received for oil and natural gas production. Oil and natural gas production are sold at prevailing market prices, which may be volatile and subject to numerous factors which are outside of the Reorganized Debtors' control. The Projections assume New York Mercantile Exchange ("**NYMEX**") futures strip pricing for crude oil and natural gas as of **December 6, 2019**, as shown in the chart below: Assumptions regarding realized pricing (i.e., "differentials") from NYMEX are based on input from Management and existing marketing, gathering and transportation contracts with purchasers of the Reorganized Debtors' production.

| FORECASTED PRICE DECK | Apr. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Oil ($bbl) | $  57.16 | $  53.35 | $  51.58 | $  50.94 | $  50.97 |
| Gas ($/mcf) | $  2.30 | $  2.44 | $  2.45 | $  2.48 | $  2.53 |

**d. Rig Count**

Contemplating the forecasted commodity pricing, Management has assumed the following operated rig counts, as shown in the chart below:

| FORECASTED RIGS | Apr. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Permian | 0 | 0 | 0 | 0 | 0 |
| Eagle Ford | 0.5 | 1 | 1 | 1 | 1 |
| NEU/Altamont | 2 | 2 | 2 | 2 | 2.5 |
| Total | 2.5 | 3 | 3 | 3 | 3.5 |

**e. Transportation Costs**

Transportation costs are based on forecast production and the terms of existing transportation contracts. Certain savings are forecast for contracts that are anticipated to be rejected or renegotiated. As contracts

expire, they are assumed to be replaced with new arrangements at Management's estimate of market rates.

**f. Operating Costs**

Lease operating expenses ("**LOE**"), gathering and transportation expenses, and production taxes are based on Management estimates of future production, activity, and revenue. LOE includes, among other items, lifting costs, fuel, certain payroll, maintenance and repair and outside services.

**g. Income Taxes**

For the forecast period, no Federal Income Taxes are projected to be paid due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs. The projections show a net tax benefit each year building a deferred tax asset. Tax projections have not been approved by a licensed tax professional and do not constitute a thorough and exhaustive tax analysis performed on behalf of the Debtors.

**h. General and Administrative**

General and Administrative Costs ("**G&A**") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead. Projected G&A is based on a department by department budget.

**i. Depreciation, Depletion & Amortization**

Depreciation, Depletion and Amortization ("**DD&A**") is forecasted using the units of production method ("**UOP**") for oil and gas properties and the straight-line method for fixed assets. The amortization base in the UOP calculation includes the sum of proved property, net of accumulated DD&A, estimated future development costs (future costs to access and develop proved reserves), and asset retirement costs, less related salvage value.

**j. Reorganization Expenses**

Reorganization expenses consist of actual and estimated fees for professional advisors, financing fees and other costs directly attributable to the Chapter 11 Cases. Expenses and other costs associated with the restructuring are forecasted to be approximately $84.5 million. These expenses are forecast to be paid by March 31, 2020 and there are therefore no reorganization expenses in the Projection Period.

**3) Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

The projected Consolidated Balance Sheet was developed using September 30, 2019 unaudited financial results as a starting point and adjusted on a go-forward basis, incorporating projected results from operations and cash flows over the Projection Period.

**a. Capital Expenditures**

Projections for capital expenditures were prepared with consideration of the Debtors' current drilling program and future estimates in the development of the Permian Basin, Eagle Ford Basin and Northeastern Utah. These expenditures include capital associated with drilling and completing new wells, improving operational efficiency and building infrastructure. Capital expenditures also include

expenditures directed at maintaining lease acreage positions, capitalized maintenance, and geological and geophysical expenditures.

**b. Working Capital**

The Projections contemplate timing of forecasted receivables, payables and interest payments that are consistent with the timing experienced with the Debtors' historical receipts and payments.

**c. Pro Forma Adjustments Related to Emergence**

The Balance Sheet included in the Projections presents a pro forma view assuming the effect of certain adjustments related to the Debtors' Restructuring Transactions. These adjustments primarily relate to the exchange of 1.5L Notes and 1.25L Notes for equity as well as the $325 million rights offering proceeds. While the 2020 through 2024 Projections roll-forward the effect of such pro forma adjustments, fresh-start accounting pursuant to ASC 852-10 principles have not been applied.

**d. Capital Structure**

The Projections include secured financing in the form of 1) a $629 million reserve based revolving Exit Facility, 2) $1 billion in reinstated 1.125L Notes and 3) $362 million in reinstated 1.25L Notes. The Projections also include a $463 million Equity Rights Offering at emergence in the form of 1) $325 million of cash and 2) $138 million in equitized 1.25L Notes. Proceeds under the Exit Facility and Equity Rights Offering will allow the Reorganized Debtors to finance day-to-day operations and the forecasted capital plan.

Assuming an Effective Date of March 31, 2020, the Exit Facility will mature on March 31, 2024 and the 1.25L Notes will mature on May 1, 2024. The Projections are presented through year end 2024 and these debt issuances are assumed to be refinanced upon their respective maturities. This is assumed for illustrative purposes only and the Projections do not contemplate any other debt financings or equity issuances.

**e. Interest Expense**

Interest Expense includes interest on all tranches of the Reorganized Debtors' debt. Interest on the Exit Facility is assumed at a constant LIBOR rate of 2.2% and the applicable rate grid is based on the pre-petition Borrowing Base of $1.36 billion.

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on December 12,2019*

| CONSOLIDATED INCOME STATEMENT | | | | | |
|---|---|---|---|---|---|
| ($ in Thousands) | Apr.-Dec. 2020E | 2021E | 2022E | 2023E | 2024E |
| **OPERATING REVENUE** | | | | | |
| Oil | 669,730 | 767,641 | 774,939 | 797,887 | 810,285 |
| Natural Gas | 42,250 | 66,968 | 66,328 | 74,445 | 73,861 |
| NGLs | 51,047 | 67,074 | 61,343 | 68,029 | 63,254 |
| **Total Physical Sales** | $ 763,027 | $ 901,683 | $ 902,611 | $ 940,362 | $ 947,399 |
| **TOTAL OPERATING REVENUE** | $ 763,027 | $ 901,683 | $ 902,611 | $ 940,362 | $ 947,399 |
| **OPERATING EXPENSES** | | | | | |
| Transportation Costs | 41,865 | 50,820 | 45,267 | 42,510 | 38,378 |
| Lease Operating Expense | 111,421 | 150,711 | 154,989 | 161,703 | 163,746 |
| General & Administrative | 49,791 | 62,284 | 62,284 | 62,284 | 62,284 |
| Depreciation, Depletion & Amortization | 376,349 | 487,825 | 499,797 | 521,804 | 523,504 |
| Exploratory Costs | 1,022 | 2,672 | 2,672 | 2,672 | 2,672 |
| Other Terminations | 3,000 | - | - | - | - |
| Taxes Other Than Income | 54,388 | 61,353 | 61,227 | 63,911 | 64,790 |
| **Total Operating Expenses** | $ 637,837 | $ 815,664 | $ 826,236 | $ 854,884 | $ 855,375 |
| **Operating Income (Loss)** | $ 125,190 | $ 86,018 | $ 76,374 | $ 85,478 | $ 92,025 |
| **INCOME (LOSS) FROM OPERATIONS** | | | | | |
| Other-Income(Expense) | (940) | (1,253) | (1,253) | (1,253) | (1,253) |
| Interest Expense | (91,240) | (116,976) | (115,273) | (115,429) | (113,848) |
| **Income (Loss) Before Income Taxes** | $ 33,011 | $ (32,211) | $ (40,152) | $ (31,204) | $ (23,077) |
| **LOSS FROM CONTINUING OPERATIONS BEFORE INCOME TAX** | | | | | |
| Income Tax Expense (Benefit) | 6,932 | (6,764) | (8,432) | (6,553) | (4,846) |
| **NET (LOSS) INCOME** | $ 26,079 | $ (25,447) | $ (31,720) | $ (24,651) | $ (18,231) |
| **NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS** | $ 26,079 | $ (25,447) | $ (31,720) | $ (24,651) | $ (18,231) |
| **EBITDAX RECONCILIATION** | | | | | |
| Net Income (Loss) Attributable to Common Shareholders | 26,079 | (25,447) | (31,720) | (24,651) | (18,231) |
| Depreciation, Depletion & Amortization | 376,349 | 487,825 | 499,797 | 521,804 | 523,504 |
| Interest Expense | 91,240 | 116,976 | 115,273 | 115,429 | 113,848 |
| Exploration Expense | 1,022 | 2,672 | 2,672 | 2,672 | 2,672 |
| Hedge Settlements | (2,617) | - | - | - | - |
| Income Tax Expense | 6,932 | (6,764) | (8,432) | (6,553) | (4,846) |
| **Adjusted EBITDAX** | $ 499,944 | $ 576,515 | $ 578,844 | $ 609,954 | $ 618,201 |

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on December 12,2019*

| CONSOLIDATED BALANCE SHEET<br>($ in Thousands) | Pre-Reorg<br>3/31/2020 | Debt<br>Discharge | Equity<br>Raise | Credit<br>Facility<br>Refinancing | Post-Reorg<br>3/31/2020 | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| Cash & Cash Equivalents | 54,838 | | 325,000 | (358,379) | 21,458 | 19,077 | 17,809 | 23,429 | 21,881 | 22,433 |
| Restricted Cash | 925 | | | | 925 | 925 | 925 | 925 | 925 | 925 |
| Accounts Receivable | 133,244 | | | | 133,244 | 142,064 | 136,389 | 134,486 | 135,772 | 142,158 |
| Materials and Supplies | 45,442 | | | | 45,442 | 45,442 | 45,442 | 45,442 | 45,442 | 45,442 |
| Deferred Income Tax | - | | | | - | - | - | 8,264 | 14,817 | 19,663 |
| Other | 22,863 | | | | 22,863 | 16,523 | 15,270 | 14,017 | 12,764 | 11,510 |
| **Total Current Assets** | $ 257,312 | $ - | $ 325,000 | $ (358,379) | $ 223,933 | $ 224,031 | $ 215,836 | $ 226,562 | $ 231,601 | $ 242,131 |
| **Property, Plant & Equipment, net** | $ 3,971,689 | $(1,359,442) | $ - | $ - | $ 2,612,246 | $ 2,518,592 | $ 2,434,262 | $ 2,403,241 | $ 2,346,187 | $ 2,292,494 |
| **Other Non-Current Assets** | $ 22,118 | $ - | $ - | $ - | $ 22,118 | $ 22,118 | $ 22,118 | $ 22,118 | $ 22,118 | $ 22,118 |
| **TOTAL ASSETS** | $ 4,251,118 | $(1,359,442) | $ 325,000 | $ (358,379) | $ 2,858,297 | $ 2,764,740 | $ 2,672,216 | $ 2,651,921 | $ 2,599,906 | $ 2,556,743 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable-Trade | 203,475 | | | | 203,475 | 99,281 | 129,308 | 140,943 | 133,641 | 138,832 |
| Derivative Instruments | 2,617 | | | | 2,617 | - | - | - | - | - |
| Accrued Interest | 161,259 | (118,863) | | | 42,396 | 12,639 | 12,300 | 12,258 | 12,196 | 12,073 |
| Deferred Income Tax | - | | | | - | 6,932 | 168 | - | - | - |
| Reserves-Current | 11,250 | | | | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 |
| Asset Retirement Obligation | 2,900 | | | | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 |
| Accrued Taxes Other Than Income | 29,243 | | | | 29,243 | 29,243 | 29,243 | 29,243 | 29,243 | 29,243 |
| Other | 17,258 | | | | 17,258 | 17,258 | 17,258 | 17,258 | 17,258 | 17,258 |
| **Total Current Liabilities** | $ 428,002 | $ (118,863) | $ - | $ - | $ 309,139 | $ 179,504 | $ 202,426 | $ 213,851 | $ 206,488 | $ 211,555 |
| **Debt** | | | | | | | | | | |
| DIP Facility | 268,669 | | | (268,669) | - | - | - | - | - | - |
| Exit Facility | | | | 225,000 | 225,000 | 235,000 | 145,000 | 145,000 | 125,000 | 95,000 |
| RBL | 314,710 | | | (314,710) | - | - | - | - | - | - |
| 1.125L Notes due May 2026 | 1,000,000 | | | | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| 8.000% 1.25L Notes Due November 2024 | 500,000 | | (138,000) | | 362,000 | 362,000 | 362,000 | 362,000 | 362,000 | 362,000 |
| 9.375% 1.5L Notes Due May 2024 | 1,091,792 | (1,091,792) | | | - | - | - | - | - | - |
| 8.000% 1.5L Notes due February 2025 | 1,000,000 | (1,000,000) | | | - | - | - | - | - | - |
| 9.375% Senior Unsecured Notes Due May 2020 | 182,034 | (182,034) | | | - | - | - | - | - | - |
| 7.750% Senior Unsecured Notes Due Sept. 2022 | 182,319 | (182,319) | | | - | - | - | - | - | - |
| 6.375% Senior Unsecured Notes Due June 2023 | 323,801 | (323,801) | | | - | - | - | - | - | - |
| **Total Debt** | $ 4,863,325 | $(2,779,946) | $ (138,000) | $ (358,379) | $ 1,587,000 | $ 1,597,000 | $ 1,507,000 | $ 1,507,000 | $ 1,487,000 | $ 1,457,000 |
| **Other Long Term Liabilities** | | | | | | | | | | |
| Asset Retirement Obligation | 41,268 | | | | 41,268 | 41,268 | 41,268 | 41,268 | 41,268 | 41,268 |
| Other | 20,890 | | | | 20,890 | 20,890 | 20,890 | 20,890 | 20,890 | 20,890 |
| **Total Other Long Term Liabilities** | $ 62,158 | $ - | $ - | $ - | $ 62,158 | $ 62,158 | $ 62,158 | $ 62,158 | $ 62,158 | $ 62,158 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| Common Stock | 2,555 | (2,465) | | | 90 | 90 | 90 | 90 | 90 | 90 |
| Additional Paid-in-Capital | 3,542,672 | (3,105,762) | 463,000 | | 899,910 | 899,910 | 899,910 | 899,910 | 899,910 | 899,910 |
| Retained Earnings | (4,646,591) | 4,646,591 | | | - | 26,079 | 632 | (31,088) | (55,740) | (73,971) |
| Treasury Stock | (1,003) | 1,003 | | | - | - | - | - | - | - |
| **Total Stockholders' Equity** | $(1,102,367) | $ 1,539,367 | $ 463,000 | $ - | $ 900,000 | $ 926,079 | $ 900,632 | $ 868,912 | $ 844,260 | $ 826,029 |
| **Total Liabilities & Equity** | $ 4,251,118 | $(1,359,442) | $ 325,000 | $ (358,379) | $ 2,858,297 | $ 2,764,740 | $ 2,672,216 | $ 2,651,921 | $ 2,599,906 | $ 2,556,743 |

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on December 12, 2019*

| CONSOLIDATED STATEMENT OF CASH FLOWS | Apr.-Dec. 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|
| ($ in Thousands) | | | | | |
| **OPERATING** | | | | | |
| Net Income (loss) | $ 26,079 | $ (25,447) | $ (31,720) | $ (24,651) | $ (18,231) |
| **Adjustments:** | | | | | |
| DD&A | 376,349 | 487,825 | 499,797 | 521,804 | 523,504 |
| Amortization of equity compensation expense | 5,400 | - | - | - | - |
| | 388,681 | 481,060 | 491,365 | 515,251 | 518,658 |
| **Asset and Liability Changes** | | | | | |
| Accounts receivable | (8,820) | 5,674 | 1,904 | (1,287) | (6,386) |
| Accounts payable | (104,194) | 30,027 | 11,634 | (7,302) | 5,191 |
| Derivative Instruments | (2,617) | - | - | - | - |
| Accrued interest | (29,756) | (340) | (41) | (62) | (124) |
| Other current asset changes | 940 | 1,253 | 1,253 | 1,253 | 1,253 |
| NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | $ 270,313 | $ 492,228 | $ 474,395 | $ 483,203 | $ 500,362 |
| **INVESTING** | | | | | |
| Capital expenditures | (282,694) | (403,495) | (468,776) | (464,751) | (469,810) |
| NET CASH (USED IN) PROVIDED BY INVESTING ACTIVITIES | $ (282,694) | $ (403,495) | $ (468,776) | $ (464,751) | $ (469,810) |
| **FINANCING** | | | | | |
| Exit Facility Draws / (Repayments) | 10,000 | (90,000) | - | (20,000) | (30,000) |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | $ 10,000 | $ (90,000) | $ - | $ (20,000) | $ (30,000) |
| **CASH  - BEGINNING** | $ 21,458 | $ 19,077 | $ 17,809 | $ 23,429 | $ 21,881 |
| **NET (DECREASE) INCREASE IN CASH** | $ (2,382) | $ (1,267) | $ 5,619 | $ (1,548) | $ 552 |
| **CASH - ENDING** | $ 19,077 | $ 17,809 | $ 23,429 | $ 21,881 | $ 22,433 |

**<u>Exhibit F</u>**

**Rights Offering Procedures**

**EP ENERGY CORPORATION**

**RIGHTS OFFERING PROCEDURES**

Pursuant to the *Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and its Affiliate Debtors* (as such plan of reorganization may be amended, modified or supplemented from time to time in accordance with its terms, the "*Plan*") of EP Energy Corporation, a Delaware company (the "*Company*") and its affiliated debtors (collectively, the "*Debtors*"), each holder of an Allowed 1.5 Lien Notes Claim is being granted a subscription right (each, a "*Subscription Right*") to purchase shares of common stock, par value $0.01 per share (the "*New Common Shares*") of the Company offered pursuant to this Rights Offering.

The New Common Shares issuable upon exercise of a Subscription Right are being distributed and issued without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance upon the exemption provided by Section 4(a)(2) thereof, and as more fully described in these Rights Offering Procedures.

None of the Subscription Rights or New Common Shares issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no New Common Shares may be sold or transferred except pursuant to an effective registration statement or pursuant to an exemption from registration under the Securities Act.

Other than as provided in Section 2.9 of the Backstop Commitment Agreement (as defined below), which permits the (i) transfer of Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser and (ii) the transfer of a Commitment Party's 1.5 Lien Notes Claims following the Rights Offering Record Date without a corresponding transfer of Subscription Rights, the Subscription Rights are not detachable from Allowed Claims (as defined below), and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Common Shares, the 1.5L Notes Claims and any related claims), except as set forth in Section 5 herein, and any such sale, transfer, assignment, pledge, hypothecation, participation, encumbrance or disposal of the Allowed Claims (except, with respect to the settlement of Allowed Claims held on the Rights Offering Record Date or in accordance with Section 2.9 of the Backstop Commitment Agreement) shall void the Subscription Rights.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, any

1

**person that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

**Each of the New Common Shares issued upon exercise of a Subscription Right, and each book-entry position or certificate issued in exchange for or upon the transfer, sale or assignment of any such New Common Share, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:**

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

[●], 2020

Eligible Claimants (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Rights Offering Record Date………………………. | [●], 2020 | The date and time for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date.. | 9:00 a.m. New York City Time on [●], 2020 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City Time on [●], 2020 | The deadline for Eligible Claimants to subscribe for New Common Shares. An Eligible Claimant's rights offering subscription exercise form (the "***Rights Offering Subscription Form***") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and executed subscription agreement (the "***Subscription Agreement***") must be returned to (a) its securities nominee (the "***Nominee***") or (b) if such Eligible Claimant does not hold its 1.5 Lien Notes through a Nominee (such Eligible Claimant, a "***Registered Holder***") or is otherwise directed to do so by its Nominee, Prime Clerk LLC (the "***Subscription Agent***"), in either case so that such documents are actually received by the Subscription Agent on or before the Subscription Expiration Deadline.<br><br>Eligible Claimants who are not Initial Commitment Parties must deliver the Aggregate Purchase Price (as defined below) on or prior to the Subscription Expiration Deadline.<br><br>Eligible Claimants who are Initial Commitment Parties must deliver the Aggregate Purchase Price (as defined below) and, if applicable, their Exchange Subscription Amount (as defined below) by the Backstop Funding Deadline (as defined below). |

3

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below) or the Backstop Commitment Agreement, as the case may be.**

To Eligible Claimants:

EP Energy Corporation and certain of its directly- and indirectly-owned subsidiaries, as chapter 11 debtors and debtors in possession (such subsidiaries, together with the Company, the "***Debtors***"), are seeking to implement a proposed financial restructuring of their existing funded debt and certain other obligations pursuant to the Plan and related disclosure statement (the "***Disclosure Statement***").

The New Common Shares, with an aggregate purchase price of $475,000,000 (the "***Rights Offering Amount***"), may be subscribed for by Eligible Claimants. Each holder of 1.5L Notes Claims (as defined in the Plan) on the Rights Offering Record Date that is either (i) an institutional "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act or (ii) a qualified institutional buyer as defined in Rule 144A under the Securities Act (each such holder, an "***Eligible Holder***") will receive Subscription Rights with respect to the 1.5L Notes Claims held or beneficially held[1] by such Eligible Holder as of the Rights Offering Record Date (such 1.5L Notes Claims, "***Allowed Claims***" and an Eligible Holder of Allowed Claims, an "***Eligible Claimant***").

Each Eligible Claimant has the right, but not the obligation, subject to and in accordance with these Rights Offering Procedures, to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) (x) timely pays the applicable Aggregate Purchase Price and (y) in the case of certain Commitment Parties, timely delivers its applicable Exchange Subscription Amount.

In addition, no Eligible Claimant shall be entitled to participate in the Rights Offering unless its Aggregate Purchase Price is received by the Subscription Agent and, if applicable, its Exchange Subscription Amount is received by the Debtors, in each case with respect to the New Common Shares it subscribes for (i) in the case of an Eligible Claimant that is not an Initial Commitment Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Claimant that is an Initial Commitment Party, by the deadline and in the form and manner specified in the Backstop Commitment Agreement (the "***Backstop Funding Deadline***"). No interest is payable on any funding of the Aggregate Purchase Price (but, for the avoidance of doubt, interest shall continue to accrue on all Reinstated 1.25 Lien Notes in accordance with their terms). If the Rights Offering is terminated for any reason, your Aggregate Purchase Price and Exchange Subscription Amount will be returned to you promptly.

---

[1] For these purposes, 1.5 Lien Notes Claims held or beneficially owned, shall include only those Allowed Claims that are properly reflected in the Rights Offering Subscription Form delivered by an Eligible Claimant in accordance with these Rights Offering Procedures.

Before electing to participate in the Rights Offering, all Eligible Claimants should review the Disclosure Statement (including the risk factors described in the section entitled "Factors Related to the Rights Offering") and the Plan, and, in each case, any amendments, supplements or other modifications thereto, in addition to these Rights Offering Procedures and the instructions contained in the Rights Offering Subscription Form. A copy of the Disclosure Statement is available from the Subscription Agent and on the Debtors' restructuring website at http://www.primeclerk.com/EPEnergy.

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

1.       **Rights Offering**

Eligible Claimants have the right, but not the obligation, to participate in the Rights Offering.  Only Eligible Claimants as of the Rights Offering Record Date may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Claimant is entitled to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, determined in accordance with Item 2 of the Rights Offering Subscription Form annexed hereto as Exhibit A, as set forth below.

Reinstated 1.25 Lien Notes Exchange Subscription

Each Eligible Claimant that is a Commitment Party and has an Exchange Amount (as defined in the Backstop Commitment Agreement) ("***Exchange Claimant***") is entitled to and required pursuant to the Backstop Commitment Agreement to (x) exercise its Subscription Rights to subscribe for a number of New Common Shares (the "***Exchange Shares***") equal to (i) such Commitment Party's Exchange Amount, divided by (ii) the Exchange Purchase Price (as defined in the Backstop Commitment Agreement), and (y) in payment for such New Common Shares, to assign for cancellation Reinstated 1.25 Lien Notes held by such Commitment Party with a principal amount equal to its Exchange Amount (such Reinstated 1.25 Lien Notes, such Commitment Party's "***Exchange Subscription Amount***").  Upon such assignment for cancellation, the Company will pay such Commitment Party in cash all accrued but unpaid interest to, but not including, the Effective Date on such Reinstated 1.25 Lien Notes assigned for cancellation.

Assuming that the Aggregate Fully Diluted Common Shares will equal [●] shares, the Exchange Purchase Price will be $[●] per share.  The Company may, subject to the consent of the Requisite Commitment Parties and in accordance with the Plan, determine

to issue a greater or lesser number of shares of New Common Shares on the Effective Date, which would result in a proportional adjustment to both the Exchange Purchase Price and the Exchange Shares pursuant to the definitions of such terms in the Backstop Commitment Agreement and these Rights Offering Procedures.

<u>Cash Subscription</u>

Each Eligible Claimant is entitled to exercise its Subscription Rights to subscribe for New Common Shares (the "***Cash Shares***") for aggregate cash consideration (such Eligible Claimant's "***Aggregate Purchase Price***") not to exceed (i) such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, minus (ii) if such Eligible Claimant is a Commitment Party, such Eligible Claimant's Exchange Amount (if any).  The number of Cash Shares issued to each Eligible Claimant electing to exercise its Subscription Rights will equal such Eligible Claimant's Aggregate Purchase Price divided by the Cash Purchase Price (as defined in the Backstop Commitment Agreement).

Assuming that the Aggregate Fully Diluted Common Shares will equal [●] shares, the Cash Purchase Price will be $[●] per share. The Company may, subject to the consent of the Requisite Commitment Parties and in accordance with the Plan, determine to issue a greater or lesser number of shares of New Common Shares on the Effective Date, which would result in a proportional adjustment to both the Cash Purchase Price and the Cash Shares pursuant to the definitions of such terms in the Backstop Commitment Agreement and these Rights Offering Procedures.

There will be no over-subscription privilege in the Rights Offering. Any New Common Shares that are unsubscribed by the Eligible Claimants entitled thereto will not be offered to other Eligible Claimants but will be purchased by the applicable Commitment Parties in accordance with the Backstop Commitment Agreement.  Subject to the terms and conditions of the Backstop Commitment Agreement, each Commitment Party has agreed to purchase (on a several and not joint basis) a certain portion of the Unsubscribed Shares.

Eligible Claimants will be subject to restrictions under the Securities Act on their ability to resell the New Common Shares, as discussed in more detail in Article VII of the Disclosure Statement, entitled "Transfer Restrictions and Consequences Under Federal Securities Laws."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

**2.      Subscription Period**

The Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Expiration Deadline. Each Eligible Claimant intending to purchase New Common Shares in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Rights Offering Subscription Form by the Subscription Expiration Deadline, and must pay for any such exercise by the Subscription Expiration Deadline or Backstop Funding Deadline, as applicable.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Requisite Commitment Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended by the Debtors with the consent of the Requisite Commitment Parties or as required by law.

### 3. Delivery of Subscription Agreement

Each Eligible Claimant may exercise all or any portion of such Eligible Claimant's Subscription Rights, subject to the terms and conditions of the Plan, these Rights Offering Procedures and the Subscription Agreement. In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send these Rights Offering Procedures and a Subscription Agreement to each Eligible Claimant, together with any additional appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Agreement and the payment of the applicable Aggregate Purchase Price and Exchange Subscription Amount, if applicable, for its New Common Shares set forth in Item 2 of such Eligible Claimant's Rights Offering Subscription Form.

To effectuate delivery of the aforementioned documents, the Subscription Agent is authorized to rely on (i) information or registers provided by the applicable indenture trustees of the 1.5 Lien Notes and (ii) securities position reports requested and obtained from DTC for purposes of distribution. In addition, appropriate service of the aforementioned documents will be deemed completed by the Subscription Agent upon delivery of such documents to DTC and the applicable Nominees (or such Nominees' agents); *provided* that the Subscription Agent will instruct such Nominees (or their agents) to immediately distribute such documents to the underlying Noteholders in accordance with their customary procedures.

### 4. Exercise of Subscription Rights

(a)     In order to validly exercise its Subscription Rights, each Eligible Claimant that is not an Initial Commitment Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or

appropriate IRS Form W-8, as applicable) to the Subscription Agent (if a Registered Holder), or its Nominee (or as otherwise directed by its Nominee) so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.  promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay or have paid the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form.

(b) In order to validly exercise its Subscription Rights, each Eligible Claimant that is an Initial Commitment Party must:

i.  return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.  no later than the Backstop Funding Deadline, (i) pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), in accordance with Section 2.4 of the Backstop Commitment Agreement by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form and (ii) transfer via book-entry, Reinstated 1.25 Lien Notes in an amount equal to its Exchange Amount to an account specified by the Debtors in accordance with the Funding Notice.

With respect to 4(a) and 4(b) above, Eligible Claimants that hold 1.5L Notes Claims through a Nominee must duly complete, execute and return their Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), and completed Subscription Agreement in accordance with the instructions herein directly to their Nominee (or as otherwise directed by their Nominee) in sufficient time to allow their Nominee to process their information and deliver to the Subscription Agent their completed Rights Offering Subscription Form on or before the Subscription Expiration Deadline.

Eligible Claimants that are Record Holders must duly complete, execute and return their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and completed Subscription Agreement, directly to the Subscription Agent on or before the Subscription Expiration Deadline.

In all cases, Eligible Claimants that are not Initial Commitment Parties must deliver payment of the applicable Aggregate Purchase Price payable for the New Common Shares elected to be purchased by such Eligible Claimant to the Subscription Agent on or prior to the

Subscription Expiration Deadline. Eligible Claimants that are Initial Commitment Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the New Common Shares elected to be purchased with cash by such Eligible Claimant in accordance with Section 2.4 of the Backstop Commitment Agreement and deliver their Exchange Subscription Amount via book-entry transfer to an account specified by the Debtors no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent do not correspond to the Aggregate Purchase Price payable for the New Common Shares elected to be purchased by such Eligible Claimant, the number of the New Common Shares deemed to be purchased for cash by such Eligible Claimant will be the lesser of (a) the number of the New Common Shares elected to be purchased by such Eligible Claimant and (b) the number of the New Common Shares determined by dividing the amount of the funds received on account by the Cash Purchase Price, in each case up to the number of New Common Shares permitted to be purchased for cash by such Eligible Claimant.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures (and with respect to the Commitment Parties, the Backstop Commitment Agreement) will be deposited and held by the Subscription Agent in a segregated account, which may be an escrow account, held in an agreed upon financial institution until distributed in connection with the settlement of the Rights Offering on the Effective Date or returned to Eligible Claimants as provided in Section 7. The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder and the Reinstated 1.25 Lien Notes held by the Debtors hereunder shall not be deemed part of or property of the Debtors' bankruptcy estates.

**5.     Transfer Restriction; Revocation**

Other than as provided in Section 2.9 of the Backstop Commitment Agreement, which permits the (i) transfer of Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser and (ii) the transfer of a Commitment Party's 1.5 Lien Notes Claims following the Rights Offering Record Date without a corresponding transfer of Subscription Rights, the Subscription Rights are not detachable from Allowed Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Common Shares, the 1.5L Notes Claims and any related claims) (collectively, "***transfer***" or "***transferred***"). In connection with a transfer of Subscription Rights by any Commitment Party to a Commitment Party's Related Purchaser (in addition to any documentation required by the Backstop Commitment Agreement), the Related Purchaser shall deliver upon the exercise of such Subscription Rights a Rights Offering Subscription Form (including its accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to its Nominee or to the Subscription Agent.

Other than as provided in Section 2.9 of the Backstop Commitment Agreement described above, any transfer or assignment following the Rights Offering Record Date of the corresponding Allowed Claim (except with respect to the settlement of Allowed Claims held on the Rights Offering Record Date) shall void the Subscription Right, and neither such Eligible Claimant nor the purported transferee will receive any New Common Shares otherwise purchasable on account of such voided Subscription Rights.

However, in connection with the exercise of the Subscription Rights, the Eligible Claimant shall have the right to designate the receipt of the New Common Shares to another person that is a Related Fund or a custodian for a Related Fund (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit B to the Rights Offering Subscription Form. Any such designation and delivery of New Common Shares shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

Once an Eligible Claimant has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Commitment Party, such exercise will be irrevocable.

## 6.      Failure to Exercise Subscription Rights

Unexercised Subscription Rights will be relinquished on the Subscription Expiration Deadline. If, on or prior to the Subscription Expiration Deadline, the Subscription Agent for any reason does not receive from an Eligible Claimant a duly completed applicable Rights Offering Subscription Form and Subscription Agreement and, other than in the case of an Eligible Claimant that is an Initial Commitment Party, the applicable Aggregate Purchase Price, such Eligible Claimant shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering. None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.

Any attempt to exercise Subscription Rights after the Subscription Expiration Deadline shall be null and void and the Debtors shall not be obligated (but, with the consent of the Requisite Commitment Parties, shall be permitted) to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Deadline regardless of when the documents relating thereto were sent.

The method of delivery of the applicable Subscription Agreement, Rights Offering Subscription Form and any other required documents is at each Eligible Claimant's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to 5:00 p.m. (prevailing Eastern Time) on the Subscription Expiration Deadline

## 7.      Return of Payment

Unless the Effective Date has occurred, the Rights Offering will be deemed automatically

terminated without any action of any party upon the earliest of (i) revocation of the Plan or rejection of the Plan by all classes entitled to vote, (ii) termination of the Plan Support Agreement (as defined in the Backstop Commitment Agreement) in accordance with its terms, (iii) termination of the Backstop Commitment Agreement in accordance with its terms, and (iv) March 19, 2020 (as may be extended pursuant to Section 2.3(a) of the Backstop Commitment Agreement), which date may be extended by the Debtors with the consent of the Requisite Commitment Parties.

If the Rights Offering is terminated or otherwise not consummated, any cash paid to the Subscription Agent will be returned, together with any Reinstated 1.25 Lien Notes actually transferred via book entry, to the applicable Eligible Claimant as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated.  No interest will be paid on any returned cash (but, for the avoidance of doubt, interest shall continue to accrue on the Reinstated 1.25 Lien Notes in accordance with their terms).

## 8.    Settlement of the Rights Offering and Distribution of the New Common Shares

The settlement of the Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Rights Offering Procedures, satisfaction of the conditions precedent set forth in the Backstop Commitment Agreement and the occurrence of the Effective Date. The Debtors intend that the New Common Shares will be issued in book-entry form in accordance with the practices and procedures of DTC, and that DTC, or its nominee, will be the holder of record of such New Common Shares. The Company will cause the New Common Shares to be credited to the accounts at DTC through which the respective Eligible Claimants or Nominees, as applicable, held the applicable Allowed 1.5L Notes Claims, and/or to any Related Fund or custodian for a Related Fund that an Eligible Claimant so designates in the Rights Offering Subscription Form in accordance with Section 5 above, and, for 1.5 Lien Notes held through Nominees, the Nominees will arrange for the credit of the New Common Shares to the individual accounts of the applicable Eligible Claimants and/or to any Related Fund or custodian for a Related Fund that an Eligible Claimant so designated in the Rights Offering Subscription Form in accordance with Section 5 above. For Registered Holders, the Subscription Agent will obtain delivery instructions directly from Registered Holders that participate in the Rights Offering.  Although it is expected that all distributions of New Common Shares will occur through The Depository Trust Company, there is no guarantee that this will occur.

No distributions will be made other than through DTC if the New Common Shares are permitted to be held through DTC's book entry system.  If for any reason the New Common Shares cannot be issued in book-entry form in accordance with the practices and procedures of DTC, the New Common Shares will be issued and registered in the name of the subscribing Eligible Claimants on the books and records of the applicable transfer agent of the New Common Shares, subject to the terms of the Plan and applicable law.  After the initial issuance of the New Common Shares, Eligible Claimants may transfer such New Common Shares in accordance with the procedures of the applicable transfer agent and applicable law.

9.      **Fractional Shares**

No fractional rights or New Common Shares will be issued in the Rights Offering. All share allocations (including each Eligible Claimant's New Common Shares) will be calculated and rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be round to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  No consideration shall be provided, whether in cash or otherwise, in lieu of fractional shares that are rounded down.

10.     **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors, with the consent of the Requisite Commitment Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors, with the consent of the Requisite Commitment Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith with the consent of the Requisite Commitment Parties.  In addition, the Debtors, with the consent of the Requisite Commitment Parties, may permit any such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate.

For the avoidance of doubt and notwithstanding the above, the Debtor and its agents are not required to inform parties of any defect or irregularity with their submission of documents or payments and may reject such submissions without previously notifying the party prior to such rejection. Additionally, each such irregularity or defect, if reviewed, will be done so on an individual submission basis.

*Before exercising any Subscription Rights, Eligible Claimants should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

11.     **Modification of Procedures**

With the prior written consent of the Requisite Commitment Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the New Common Shares; *provided*, *however*, that the Debtors shall provide prompt written notice to each Eligible Claimant (which may be through such Eligible Claimant's Nominee) of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date, which notice may be provided through posting such notice on the Subscription Agent's website at https://cases.primeclerk.com/epenergy. In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate

and implement the Rights Offering and the issuance of the New Common Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Claimant that is a party thereto.

The Debtors may undertake procedures to confirm that each participant in the Rights Offering is in fact an Eligible Claimant, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

### 12.    DTC

Some or all of the 1.5 Lien Notes are held in book-entry form in accordance with the practices and procedures of the DTC. The Debtors intend to comply with the practices and procedures of DTC for the purpose of conducting the Rights Offering, and, subject to compliance with Section 12 hereof, these Rights Offering Procedures will be deemed appropriately modified to achieve such compliance.

Without limiting the foregoing, the Company intends that, to the extent practicable, the New Common Shares will be issued in book entry form, and that DTC, or its nominee, will be the holder of record of such New Common Shares. The ownership interest of each holder of such New Common Shares, and transfers of ownership interests therein, is expected to be recorded on the records of the direct and indirect participants in DTC. It is expected that the New Common Shares will be allocated to Eligible Claimants that validly exercise their Subscription Rights through DTC on or as soon as practicable after the Effective Date. To the extent the New Common Shares are not eligible to be held through DTC, the Offered Shares will be allocated to Eligible Claimants based on the information provided in Item 6 on the Rights Offering Subscription Form.

### 13.    Inquiries and Transmittal of Documents; Subscription Agent

The Rights Offering Instructions attached hereto should be read carefully and strictly followed by the Eligible Claimants.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone numbers: 917-947-2373 (international) or 877-502-9869 (domestic, toll free) or via email to epenergysubscription@primeclerk.com with "EP Energy Corporation Rights Offering" in the subject line.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Claimants electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

Registered Holders and Nominees (or Eligible Claimants that are instructed by their Nominees to return the Rights Offering Subscription Form directly to the Subscription Agent) must return the Rights Offering Subscription Form and the appropriate IRS tax form by no later than the Subscription Expiration Deadline to the following:

<div align="center">

**EP Energy Corporation Rights Offering Processing**
**c/o Prime Clerk, LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**Email: epenergysubscription@primeclerk.com**

</div>

All documents relating to the Rights Offering are available from the Subscription Agent at this address. In addition, these documents, together with all filing made with the Court by the Debtors, are available free of charge from the Debtors' restructuring website at http://www.primeclerk.com/epenergy.

<div align="center">

**Only choose one method of return. If you choose to return the applicable documents via email, do not follow up with hard copies.**

</div>

**14.    Backstop Commitment Agreement**

The Debtors are party to that certain Backstop Commitment Agreement (the "***Backstop Commitment Agreement***"), dated October 18, 2019, with the Commitment Parties. In the event of any conflict between these Rights Offering Procedures and the terms of the Backstop Commitment Agreement, the terms of the Backstop Commitment Agreement will control.

The Rights Offering has been backstopped by the Commitment Parties in an amount equal to $463,000,000.  Each of the Commitment Parties, severally and not jointly, has agreed, pursuant to the Backstop Commitment Agreement by and among the Company and the Commitment Parties party thereto, dated as of October 18, 2019 (as amended and supplemented from time to time) (the "***Backstop Commitment Agreement***"), to the extent the cash proceeds of the Rights Offering is less than $325,000,000, to purchase New Common Shares in an amount that results in the aggregate cash proceeds to the Company being equal to $325,000,000. Certain of the Commitment Parties, severally and not jointly, have also agreed, pursuant to the Backstop Commitment Agreement, to purchase Exchange Shares pursuant to the Rights Offering for an aggregate Exchange Subscription Amount of $138,000,000.  As consideration for their undertakings in the Backstop Commitment Agreement, the Commitment Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement).

**EP ENERGY CORPORATION**

**RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE CLAIMANTS**

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.      **Insert** the principal amount of the Notes that you held as of the Rights Offering Record Date in Item 1 of your Rights Offering Subscription Form.  If your Nominee holds the Notes issued by the Debtors on your behalf and you do not know the principal amount, please contact your Nominee immediately.

2.      **Complete** (for Eligible Claimants that are not Commitment Parties only) the calculation in Item 2a of your Rights Offering Subscription Form, which calculates the maximum number of New Common Shares available for you to purchase for cash. Such amount must be rounded down to the nearest whole share.

3.      **Complete** (for Eligible Claimants that are not Commitment Parties only) the calculation in Item 2b of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Common Shares that you elect to purchase.

4.      **Complete** (for Commitment Parties only) the calculation in Item 2c of your Rights Offering Subscription Form, which calculates the number of New Common Shares for which you are required to subscribe in exchange for Reinstated 1.25 Lien Notes. Such amount must be rounded down to the nearest whole share.

5.      **Complete** (for Commitment Parties only) the calculation in Item 2d of your Rights Offering Subscription Form, which calculates maximum number of New Common Shares available for you to purchase for cash.

6.      **Complete** (for Commitment Parties only) the calculation in Item 2e of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Common Shares that you elect to purchase.

7.      **Check the box** in Item 3 of your Rights Offering Subscription Form if you are an Initial Commitment Party to make the representation therein.

8.      **Complete** the wire refund information requested in Item 5, which will be used by the Subscription Agent in the event a refund is due.

9.      **Complete** Item 6 and provide the information needed for the registration of the New Common Shares.

10.    **Read, complete, and sign** the certification in Item 7 of your Rights Offering Subscription Form.

11.    **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

12.    **Read, complete, and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

13.    **Return** your signed Subscription Agreement and Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to, as applicable, the Subscription Agent or to your Nominee in accordance with their instructions in sufficient time to allow your Nominee to process your instructions and prepare and deliver your Rights Offering Subscription Form to the Subscription Agent, in each case prior to the Subscription Expiration Deadline.  Submissions directly to the Subscription Agent may be made either via email (in PDF or other standard format) to epenergysubscription@primeclerk.com or to the following physical address via first class mail, hand delivery, or overnight mail:

> **EP Energy Corporation Rights Offering Processing**
> **c/o Prime Clerk, LLC**
> **One Grand Central Place**
> **60 East 42nd Street, Suite 1440**
> **New York, NY 10165**

14.    **Arrange for full payment** of the Aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2 of your Rights Offering Subscription Form.  An Eligible Claimant that is not a Commitment Party should follow the payment instructions as provided in Item 4 of the Rights Offering Subscription Form. An Eligible Claimant that is an Initial Commitment Party should follow the payment instructions in the Funding Notice delivered by the Subscription Agent to the Commitment Parties in accordance with the Backstop Commitment Agreement.

> **The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [●], 2020.**
>
> **Rights Offering Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent by the Subscription Expiration Deadline or the Subscription Rights represented by your Rights Offering Subscription Form will NOT be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.**

**Eligible Claimants that are not Initial Commitment Parties should follow the delivery and payment instructions provided in the Rights Offering Subscription Form, and must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Claimants that are Initial Commitment Parties should follow the payment instructions in the Funding Notice, and must deliver the appropriate funding in accordance with Section 2.4 of the Backstop Commitment Agreement no later than the Backstop Funding Deadline.  If you do not deliver the appropriate funding by the applicable deadline, the subscription represented by your Rights Offering Subscription Form will <u>NOT</u> be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.**

**Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number or email address: +1 877-502-9869 (domestic toll-free) or +1 917-947-2373  (for international calls) or epenergysubscription@primeclerk.com. To obtain copies of the documents, please visit https://cases.primeclerk.com/epenergy.**

## **Exhibit A**

Rights Offering Subscription Form

**EP ENERGY CORPORATION**

**RIGHTS OFFERING SUBSCRIPTION FORM FOR USE BY ELIGIBLE CLAIMANTS FOR THE RIGHTS OFFERING IN CONNECTION WITH THE JOINT CHAPTER 11 PLAN OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [●], 2020.**

**In order to validly exercise its Subscription Rights, each Eligible Claimant that is not an Initial Commitment Party must return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent (if a Registered Holder), or its Nominee (or as otherwise directed by its Nominee) so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline, and promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay or have paid the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of this Rights Offering Subscription Form.**

**In order to validly exercise its Subscription Rights, each Eligible Claimant that is an Initial Commitment Party must return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and no later than the Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), in accordance with Section 2.4 of the Backstop Commitment Agreement by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of this Rights Offering Subscription Form and transfer via book-entry, Reinstated 1.25 Lien Notes in an amount equal to its Exchange Amount to an account specified by the Debtors in accordance with the Funding Notice.**

**The New Common Shares issuable upon exercise of a Subscription Right are being distributed and issued without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance upon the exemption provided by Section 4(a)(2) thereof, and as more fully described in the Rights Offering Procedures.**

**None of the Subscription Rights or New Common Shares issuable upon exercise of such rights distributed pursuant to the Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no New Common Shares may be sold or transferred except pursuant to an effective registration statement or pursuant to an exemption from registration under the Securities Act.**

**Please consult the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to the Rights Offering and this Rights Offering Subscription Form.**

**The record date for the Rights Offering is [●], 2020 (the "Subscription Record Date").**

**Terms used and not defined herein shall have the meaning assigned to them in the Rights Offering Procedures.**

Each Eligible Claimant has the right, but not the obligation, subject to and in accordance with the Rights Offering Procedures, to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Subscription Record Date) of $475,000,000, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) (x) timely pays the applicable Aggregate Purchase Price by the Subscription Expiration Deadline (or, in the case of the Initial Commitment Parties, by the Backstop Funding Deadline) and (y) in the case of certain Commitment Parties, timely delivers its applicable Exchange Subscription Amount.

To subscribe, fill out Items 1, 2a and 2b (if applicable) or Items 2c, 2d, and 2e (if applicable), 3 (if applicable), 5, and 6, and read, complete and sign Item 7 below.

Each Eligible Claimant who wishes to have the New Common Shares issued in the name of a Related Fund or a custodian of a Related Fund (a "Custodian"), must complete <u>Exhibit B</u> hereto.

"Related Fund" has the meaning set forth in the Backstop Commitment Agreement.

**Item 1.  Maximum Subscription Amount.**

The undersigned Eligible Claimant certifies that, as of the Subscription Record Date, it held or beneficially owned Notes in the following principal amounts and that the person executing this form is an authorized signatory of such Eligible Claimant. For purposes of this Subscription Form, do not adjust the principal (face) amount of your Notes for any accrued and unpaid or unmatured interest, other than as specifically directed by this Subscription Form. (If a Nominee holds your Notes on your behalf and you do not know the principal amount, please contact your Nominee immediately).

**IMPORTANT NOTE: IF YOU HOLD YOUR NOTES THROUGH MORE THAN ONE NOMINEE, YOU MUST COMPLETE AND RETURN A SEPARATE SUBSCRIPTION FORM TO EACH APPLICABLE NOMINEE. YOU MAY NOT AGGREGATE POSITIONS HELD BY DIFFERENT NOMINEES ON A SINGLE SUBSCRIPTION FORM.**

| Notes | CUSIP/ISIN | Principal Amount of Notes | | Adjustment for Accrued and Unpaid Interest | | Allowed Claim |
|---|---|---|---|---|---|---|
| a. 9.375% Senior Secured Notes due 2024 | 268787AH1/ U2937LAE4 | $_____ | X | [●] | = | $_____ <br> Item 1a |
| b. 8.000% Senior Secured Notes due 2025 | 268787AF5/ U2937LAD6 | $_____ | X | [●] | = | $_____ <br> Item 1b |
| c. Total Allowed Claims (sum Item 1a and Item 1b) | | $_____ <br> Item 1c | | | | |
| d. Maximum Subscription Amount (Item 1c divided by $[2,092,000,000] and then multiplied by $475,000,000) | | $_____ <br> Item 1d | | | | |

**Item 2.  Rights.**

**2a. Calculation of Maximum Number of New Common Shares For Which the Undersigned May Subscribe (For Eligible Claimants that are not Commitment Parties Only). <u>If you are a Commitment Party, skip Item 2a and Item 2b and proceed to Item 2c.</u>**

The maximum number of New Common Shares for which the undersigned may subscribe is calculated as follows:

| _____ <br> (Insert Maximum Subscription Amount from Item 1d above) | / | $[●] | = | _____ <br> (Maximum Number of New Common Shares For Which the Undersigned May Subscribe) (Round fractions equal to or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |
|---|---|---|---|---|

**2b. Aggregate Purchase Price (For Eligible Claimants that are not Commitment Parties**

**Only**). By filling in the following blanks, the undersigned Eligible Claimant is indicating that it is committing to subscribe for and purchase the number of New Common Shares specified below (specify a number of New Common Shares, which is not greater than the Maximum Number of New Common Shares calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

| _____<br>(Indicate number of New Common Shares the undersigned elects to purchase) | X | $[●] | = | $_____<br>Aggregate Purchase Price |
|---|---|---|---|---|

**2c. Calculation of Number of New Common Shares Subscribed In Exchange for Reinstated 1.25 Lien Notes (For Commitment Parties Only)**. **If you are not a Commitment Party, skip Item 2c, Item 2d, and Item 2e and proceed to Item 3.**

The number of New Common Shares in exchange for Reinstated 1.25 Lien Notes for which the undersigned is required to subscribe is calculated as follows:

| _____<br>(Insert your Exchange Amount (as defined in the Backstop Commitment Agreement)) | / | [●] | = | _____<br>(Number of New Common Shares) (Round fractions equal to or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |
|---|---|---|---|---|

**2d. Calculation of Maximum Number of New Common Shares For Which the Undersigned May Subscribe For Cash. (For Commitment Parties Only).** The maximum number of New Common Shares for which the undersigned may subscribe for cash is calculated as follows:

| _____<br>(Insert Maximum Subscription Amount from Item 1d above) | – | _____<br>(Insert your Exchange Amount) | = | _____<br>(Maximum Cash Subscription Amount) |
|---|---|---|---|---|

| _____<br>(Insert Maximum Cash Subscription Amount above) | X | [●] | = | _____<br>(Maximum Number of New Common Shares For Which the Undersigned May Subscribe For Cash) (Round fractions equal to or |
|---|---|---|---|---|

4

| | | | | greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |
|---|---|---|---|---|
| | | | | |

**2e. Aggregate Purchase Price (For Commitment Parties Only).** By filling in the following blanks, the undersigned Eligible Claimant is indicating that it is committing to subscribe for and purchase the number of New Common Shares specified below (specify a number of New Common Shares the undersigned elects to purchase for cash, which is not greater than the Maximum Number of New Common Shares calculated in Item 2d above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

| _____ (Indicate number of New Common Shares the undersigned elects to purchase) | X | $[●] | = | $_____ Aggregate Purchase Price |
|---|---|---|---|---|

### Item 3.  Eligible Holder Representation.

(*This section is for <u>all</u> parties who wish to participate in the Rights Offering*).

☐       The undersigned and any Related Fund or Custodian is an Eligible Holder (as defined in the Rights Offering Procedures), meaning that such holder (i) has reviewed the definitions of accredited investor and qualified institutional buyer annexed hereto as Exhibit A and is an institutional accredited investor within the meaning of Rule 501(a) promulgated under Regulation D of the Securities Act or a qualified institutional buyer as defined in Rule 144A under the Securities Act and (ii) has made the representations set forth in the Subscription Agreement.

### Item 4.  Payment and Delivery Instructions

Eligible Claimants that are not Initial Commitment Parties must submit payment of the Aggregate Purchase Price calculated pursuant to Item 2b or Item 2e, as applicable, to the Subscription Agent by wire transfer ONLY in accordance with the following wire instructions:

*Domestic wire*:

| Account Name : | [●] |
|---|---|
| Bank Account No.: | [●] |
| ABA/Routing No.: | [●] |
| Bank Name: | [●] |
| Bank Address: | [●] |

| Reference: | [Name of Eligible Claimant Subscribing] |
|---|---|

*International wire*:

| Correspondent/Intermediary Bank SWIFT | [●] |
|---|---|
| Correspondent/Intermediary Bank Name | [●] |
| Correspondent/Intermediary Bank Address | [●] |
| Beneficiary Account Number | [●] |
| Beneficiary Name | [●] |
| Beneficiary Address | [●] |
| Memo, Special Instructions, Originator to Beneficiary Information, Bank to Bank Information | [●]<br>[Name of Eligible Claimant Subscribing] |

Please note that the failure to include the Eligible Claimant name in the reference field of any domestic or international wire payment may result in the rejection of the corresponding Rights Offering submission. In addition, please also note that payments cannot be aggregated, and one wire should be sent per Subscription Form submission.

**For Eligible Claimants That Are Not Initial Commitment Partie**s. Eligible Claimants that are not Initial Commitment Parties must deliver their subscription payment (along with their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and properly executed Subscription Agreement) to the Subscription Agent by the Subscription Expiration Deadline.

**For Initial Commitment Parties.** Eligible Claimants that are Initial Commitment Parties must deliver payment of the Aggregate Purchase Price directly to the Subscription Agent pursuant to the wire instructions above no later than the Backstop Funding Deadline.

### Item 5.  Refund Information

Please use the chart below to provide the appropriate wire information in the event the Subscription Agent must refund of any (or all) of your subscription payment.  If payment of the Aggregate Purchase Price will be made by your Nominee on your behalf, the wire information in this Item 5 should be your Nominee's information, and any refund will be issued to your Nominee.

| Account Name: | |
|---|---|

| | |
|---|---|
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

**Item 6. Registration Information for New Common Shares**

In the event the New Common Shares will not be eligible to be initially distributed through DTC, please indicate on the lines provided below the Eligible Claimant's name and address as you would like it to be reflected on the Debtors' or the transfer agent's records (as applicable).

If the Eligible Claimant is designating any Related Fund or Custodian to receive the New Common Shares on its behalf, please complete Exhibit B to this Rights Offering Subscription Form.

Registration Line 1: _____

Registration Line 2 (if needed):_____

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email:_____

**Item 7.  Certification.**

The undersigned certifies that: (i) the undersigned or a Related Fund or Custodian whom the undersigned has designated to receive the New Common Shares pursuant to Exhibit B is an Eligible Holder as set forth in Item 3 above and in the Subscription Agreement, (ii) the undersigned is an Eligible Claimant and as of the Subscription Record Date beneficially held Notes in the principal amount set forth in Item 1 above, (iii) the undersigned received a copy of the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures, (iv) the undersigned understands that the exercise of its Subscription Rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures, and (v) the undersigned understands that, subject to the terms and conditions of the Subscription Agreement, and the Backstop Commitment Agreement in the case of any Commitment Party, the exercise of its Subscription Rights is irrevocable.

**The undersigned acknowledges that, by executing the Subscription Agreement and this Rights Offering Subscription Form, the undersigned Eligible Claimant has elected to subscribe for the number of New Common Shares designated in Item 2 above and will be bound to pay for the New Common Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

7

Date: _____

Name of Eligible Claimant: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

If Initial Commitment Party, check here ☐ (**ONLY CHECK THIS BOX IF YOU ARE CERTAIN THIS APPLIES TO YOU. IF YOU ARE UNSURE, DO NOT CHECK THIS BOX AND PLEASE CONTACT THE SUBSCRIPTION AGENT.**)

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Fax: _____

Email: _____

**PLEASE RETURN THIS RIGHTS OFFERING SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND THE SUBSCRIPTION AGREEMENT TO THE SUBSCRIPTION AGENT.**

**IF YOU HOLD YOUR NOTES THROUGH A NOMINEE, PLEASE RETURN THIS SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W- 8, AS APPLICABLE) ONLY TO YOUR NOMINEE (OR AS OTHERWISE DIRECTED BY YOUR NOMINEE). DO NOT RETURN THIS FORM DIRECTLY TO THE SUBSCRIPTION AGENT (UNLESS OTHERWISE DIRECTED TO DO SO BY YOUR NOMINEE).**

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS RIGHTS OFFERING SUBSCRIPTION FORM AND THE SIGNED SUBSCRIPTION AGREEMENT, ALONG WITH THE APPROPRIATE FUNDS (SOLELY WITH RESPECT TO ELIGIBLE CLAIMANTS THAT ARE NOT INITIAL COMMITMENT PARTIES) ARE VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT BY THE SUBSCRIPTION EXPIRATION DEADLINE. FORMS MAY BE SUBMITTED TO THE PHYSICAL ADDRESS BELOW OR VIA EMAIL AT:**

**EP Energy Corporation Rights Offering Processing**
**c/o Prime Clerk, LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**EPEnergySubscription@primeclerk.com.**


**ELIGIBLE CLAIMANTS THAT ARE INITIAL COMMITMENT PARTIES MUST
DELIVER THE APPROPRIATE FUNDING DIRECTLY TO THE SUBSCRIPTION
AGENT NO LATER THAN THE BACKSTOP FUNDING DEADLINE.**

**Questions relating to the Rights Offering should be directed to the Subscription Agent at
the following phone number or email address: 877-502-9869 (domestic toll-free) or +1 917-
947-2373 (for international calls) or epenergysubscription@primeclerk.com with "EP
Energy Corporation Rights Offering" in the subject line. To obtain copies of the
documents, please visit https://cases.primeclerk.com/epenergy.**

# EXHIBIT A

"Accredited Investor" as defined in Rule 501 of Regulation D of the Securities Act shall mean any person who comes within any of the following categories, at the time of the sale of the securities to the person:

(1)      Any bank as defined in Section 3(a)(2) of the Securities Act of 1933 (the "Act"), or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in Section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2)      Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)      Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)      Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)      Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(i) Except as provided in clause (ii) paragraph (5), for purposes of calculating net worth under this paragraph (5):

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

(ii) Clause (i) of this paragraph (5) will not apply to any calculation of a person's net worth made

in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

(A) Such right was held by the person on July 20, 2010;

(B) The person qualified as an Accredited Investor on the basis of net worth at the time the person acquired such right; and

(C) The person held securities of the same issuer, other than such right, on July 20, 2010.

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act; and

(8)     Any entity in which all of the equity owners are Accredited Investors.

"Qualified institutional buyer" as defined in Rule 144A under the Securities Act shall mean:

(i)     Any of the following entities, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity:

(A) Any insurance company as defined in section 2(a)(13) of the Act;

(B) Any investment company registered under the Investment Company Act or any business development company as defined in section 2(a)(48) of that Act;

(C) Any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958;

(D) Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees;

(E) Any employee benefit plan within the meaning of title I of the Employee Retirement Income Security Act of 1974;

(F) Any trust fund whose trustee is a bank or trust company and whose participants are exclusively plans of the types identified in paragraph (a)(1)(i) (D) or (E) of this section, except trust funds that include as participants individual retirement accounts or H.R. 10 plans.

(G) Any business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(H) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation (other than a bank as defined in section 3(a)(2) of the Act or a savings and loan association or other institution referenced in section 3(a)(5)(A) of the Act or a foreign bank or savings and loan association or equivalent institution), partnership, or Massachusetts or similar business trust; and

(I) Any investment adviser registered under the Investment Advisers Act.

(ii)     Any dealer registered pursuant to section 15 of the Exchange Act, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $10 million of securities of issuers that are not affiliated with the dealer, Provided, That securities constituting the whole or a part of an unsold allotment to or subscription by a dealer as a participant in a public offering shall not be deemed to be owned by such dealer;

(iii)    Any dealer registered pursuant to section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a qualified institutional buyer;

(iv)    Any investment company registered under the Investment Company Act, acting for its own account or for the accounts of other qualified institutional buyers, that is part of a family of investment companies which own in the aggregate at least $100 million in securities of issuers, other than issuers that are affiliated with the investment company or are part of such family of investment companies. Family of investment companies means any two or more investment companies registered under the Investment Company Act, except for a unit investment trust whose assets consist solely of shares of one or more registered investment companies, that have the same investment adviser (or, in the case of unit investment trusts, the same depositor), Provided That, for purposes of this section:

(A) Each series of a series company (as defined in Rule 18f-2 under the Investment Company Act [17 CFR 270.18f-2]) shall be deemed to be a separate investment company; and

(B) Investment companies shall be deemed to have the same adviser (or depositor) if their advisers (or depositors) are majority-owned subsidiaries of the same parent, or if one investment company's adviser (or depositor) is a majority-owned subsidiary of the other investment company's adviser (or depositor);

(v)     Any entity, all of the equity owners of which are qualified institutional buyers, acting for its own account or the accounts of other qualified institutional buyers; and

(vi)    Any bank as defined in section 3(a)(2) of the Act, any savings and loan association or other institution as referenced in section 3(a)(5)(A) of the Act, or any foreign bank or savings and loan association or equivalent institution, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with it and that has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of sale under the Rule in the case of a U.S. bank or savings and loan association, and not more than 18 months preceding such date of sale for a foreign bank or savings and loan association or equivalent institution.

**EXHIBIT B**
**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE DESIGNEE, COMPLETE A SEPARATE FORM FOR <u>EACH</u> DESIGNEE.**
**YOU MUST SPECIFY THE NUMBER OF NEW COMMON SHARES FOR <u>EACH</u> DESIGNEE.**

**Please complete ONLY if New Common Shares are to be issued in the name of a Related Fund or a Custodian rather than the Eligible Claimant. Any such designated party must also complete an IRS Form W-8 or IRS Form W-9, as applicable.**

Issue New Common Shares in the name of: _____

Number of New Common Shares:_____

Name: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

**A. Please indicate on the lines provided below the Registration Name of the designee in whose name the New Common Shares should be issued:**

Registration Line 1:_____
Registration Line 2:_____
(if needed)
Address 1:_____
Address 2:_____
Address 3:_____
Address 4:_____
Telephone:_____
Email: _____

**B. Wire information in the event a refund is needed:**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

**EP ENERGY CORPORATION**

**RIGHTS OFFERING PROCEDURES**

Pursuant to the *Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and its Affiliate Debtors* (as such plan of reorganization may be amended, modified or supplemented from time to time in accordance with its terms, the "*Plan*") of EP Energy Corporation, a Delaware company (the "*Company*") and its affiliated debtors (collectively, the "*Debtors*"), each holder of an Allowed 1.5 Lien Notes Claim is being granted a subscription right (each, a "*Subscription Right*") to purchase shares of common stock, par value $0.01 per share (the "*New Common Shares*") of the Company offered pursuant to this Rights Offering.

The New Common Shares issuable upon exercise of a Subscription Right are being distributed and issued without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance upon the exemption provided by Section 4(a)(2) thereof, and as more fully described in these Rights Offering Procedures.

None of the Subscription Rights or New Common Shares issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no New Common Shares may be sold or transferred except pursuant to an effective registration statement or pursuant to an exemption from registration under the Securities Act.

Other than as provided in Section 2.9 of the Backstop Commitment Agreement (as defined below), which permits the (i) transfer of Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser and (ii) the transfer of a Commitment Party's 1.5 Lien Notes Claims following the Rights Offering Record Date without a corresponding transfer of Subscription Rights, the Subscription Rights are not detachable from Allowed Claims (as defined below), and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Common Shares, the 1.5L Notes Claims and any related claims), except as set forth in Section 5 herein, and any such sale, transfer, assignment, pledge, hypothecation, participation, encumbrance or disposal of the Allowed Claims (except, with respect to the settlement of Allowed Claims held on the Rights Offering Record Date or in accordance with Section 2.9 of the Backstop Commitment Agreement) shall void the Subscription Rights.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, any

**person that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.**

**Each of the New Common Shares issued upon exercise of a Subscription Right, and each book-entry position or certificate issued in exchange for or upon the transfer, sale or assignment of any such New Common Share, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:**

**"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."**

[●], 2020

Eligible Claimants (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Rights Offering Record Date………………………. | [●], 2020 | The date and time for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date.. | 9:00 a.m. New York City Time on [●], 2020 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City Time on [●], 2020 | The deadline for Eligible Claimants to subscribe for New Common Shares. An Eligible Claimant's rights offering subscription exercise form (the "***Rights Offering Subscription Form***") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and executed subscription agreement (the "***Subscription Agreement***") must be returned to (a) its securities nominee (the "***Nominee***") or (b) if such Eligible Claimant does not hold its 1.5 Lien Notes through a Nominee (such Eligible Claimant, a "***Registered Holder***") or is otherwise directed to do so by its Nominee, Prime Clerk LLC (the "***Subscription Agent***"), in either case so that such documents are actually received by the Subscription Agent on or before the Subscription Expiration Deadline.<br><br>Eligible Claimants who are not Initial Commitment Parties must deliver the Aggregate Purchase Price (as defined below) on or prior to the Subscription Expiration Deadline.<br><br>Eligible Claimants who are Initial Commitment Parties must deliver the Aggregate Purchase Price (as defined below) and, if applicable, their Exchange Subscription Amount (as defined below) by the Backstop Funding Deadline (as defined below). |

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below) or the Backstop Commitment Agreement, as the case may be.**

To Eligible Claimants:

EP Energy Corporation and certain of its directly- and indirectly-owned subsidiaries, as chapter 11 debtors and debtors in possession (such subsidiaries, together with the Company, the "*Debtors*"), are seeking to implement a proposed financial restructuring of their existing funded debt and certain other obligations pursuant to the Plan and related disclosure statement (the "*Disclosure Statement*").

The New Common Shares, with an aggregate purchase price of $475,000,000 (the "*Rights Offering Amount*"), may be subscribed for by Eligible Claimants. Each holder of 1.5L Notes Claims (as defined in the Plan) on the Rights Offering Record Date that is either (i) an institutional "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act or (ii) a qualified institutional buyer as defined in Rule 144A under the Securities Act (each such holder, an "*Eligible Holder*") will receive Subscription Rights with respect to the 1.5L Notes Claims held or beneficially held[1] by such Eligible Holder as of the Rights Offering Record Date (such 1.5L Notes Claims, "*Allowed Claims*" and an Eligible Holder of Allowed Claims, an "*Eligible Claimant*").

Each Eligible Claimant has the right, but not the obligation, subject to and in accordance with these Rights Offering Procedures, to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) (x) timely pays the applicable Aggregate Purchase Price and (y) in the case of certain Commitment Parties, timely delivers its applicable Exchange Subscription Amount.

In addition, no Eligible Claimant shall be entitled to participate in the Rights Offering unless its Aggregate Purchase Price is received by the Subscription Agent and, if applicable, its Exchange Subscription Amount is received by the Debtors, in each case with respect to the New Common Shares it subscribes for (i) in the case of an Eligible Claimant that is not an Initial Commitment Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Claimant that is an Initial Commitment Party, by the deadline and in the form and manner specified in the Backstop Commitment Agreement (the "*Backstop Funding Deadline*"). No interest is payable on any funding of the Aggregate Purchase Price (but, for the avoidance of doubt, interest shall continue to accrue on all Reinstated 1.25 Lien Notes in accordance with their terms). If the Rights Offering is terminated for any reason, your Aggregate Purchase Price and Exchange Subscription Amount will be returned to you promptly.

---

[1] For these purposes, 1.5 Lien Notes Claims held or beneficially owned, shall include only those Allowed Claims that are properly reflected in the Rights Offering Subscription Form delivered by an Eligible Claimant in accordance with these Rights Offering Procedures.

5

Before electing to participate in the Rights Offering, all Eligible Claimants should review the Disclosure Statement (including the risk factors described in the section entitled "Factors Related to the Rights Offering") and the Plan, and, in each case, any amendments, supplements or other modifications thereto, in addition to these Rights Offering Procedures and the instructions contained in the Rights Offering Subscription Form. A copy of the Disclosure Statement is available from the Subscription Agent and on the Debtors' restructuring website at http://www.primeclerk.com/EPEnergy.

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

1.      **Rights Offering**

Eligible Claimants have the right, but not the obligation, to participate in the Rights Offering.  Only Eligible Claimants as of the Rights Offering Record Date may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Claimant is entitled to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, determined in accordance with Item 2 of the Rights Offering Subscription Form annexed hereto as Exhibit A, as set forth below.

Reinstated 1.25 Lien Notes Exchange Subscription

Each Eligible Claimant that is a Commitment Party and has an Exchange Amount (as defined in the Backstop Commitment Agreement) ("***Exchange Claimant***") is entitled to and required pursuant to the Backstop Commitment Agreement to (x) exercise its Subscription Rights to subscribe for a number of New Common Shares (the "***Exchange Shares***") equal to (i) such Commitment Party's Exchange Amount, divided by (ii) the Exchange Purchase Price (as defined in the Backstop Commitment Agreement), and (y) in payment for such New Common Shares, to assign for cancellation Reinstated 1.25 Lien Notes held by such Commitment Party with a principal amount equal to its Exchange Amount (such Reinstated 1.25 Lien Notes, such Commitment Party's "***Exchange Subscription Amount***").  Upon such assignment for cancellation, the Company will pay such Commitment Party in cash all accrued but unpaid interest to, but not including, the Effective Date on such Reinstated 1.25 Lien Notes assigned for cancellation.

Assuming that the Aggregate Fully Diluted Common Shares will equal [●] shares, the Exchange Purchase Price will be $[●] per share.  The Company may, subject to the consent of the Requisite Commitment Parties and in accordance with the Plan, determine

to issue a greater or lesser number of shares of New Common Shares on the Effective Date, which would result in a proportional adjustment to both the Exchange Purchase Price and the Exchange Shares pursuant to the definitions of such terms in the Backstop Commitment Agreement and these Rights Offering Procedures.

<u>Cash Subscription</u>

Each Eligible Claimant is entitled to exercise its Subscription Rights to subscribe for New Common Shares (the "***Cash Shares***") for aggregate cash consideration (such Eligible Claimant's "***Aggregate Purchase Price***") not to exceed (i) such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, minus (ii) if such Eligible Claimant is a Commitment Party, such Eligible Claimant's Exchange Amount (if any).  The number of Cash Shares issued to each Eligible Claimant electing to exercise its Subscription Rights will equal such Eligible Claimant's Aggregate Purchase Price divided by the Cash Purchase Price (as defined in the Backstop Commitment Agreement).

Assuming that the Aggregate Fully Diluted Common Shares will equal [●] shares, the Cash Purchase Price will be $[●] per share. The Company may, subject to the consent of the Requisite Commitment Parties and in accordance with the Plan, determine to issue a greater or lesser number of shares of New Common Shares on the Effective Date, which would result in a proportional adjustment to both the Cash Purchase Price and the Cash Shares pursuant to the definitions of such terms in the Backstop Commitment Agreement and these Rights Offering Procedures.

There will be no over-subscription privilege in the Rights Offering. Any New Common Shares that are unsubscribed by the Eligible Claimants entitled thereto will not be offered to other Eligible Claimants but will be purchased by the applicable Commitment Parties in accordance with the Backstop Commitment Agreement.  Subject to the terms and conditions of the Backstop Commitment Agreement, each Commitment Party has agreed to purchase (on a several and not joint basis) a certain portion of the Unsubscribed Shares.

Eligible Claimants will be subject to restrictions under the Securities Act on their ability to resell the New Common Shares, as discussed in more detail in Article VII of the Disclosure Statement, entitled "Transfer Restrictions and Consequences Under Federal Securities Laws."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

**2.      Subscription Period**

The Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Expiration Deadline.  Each Eligible Claimant intending to purchase New Common Shares in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Rights Offering Subscription Form by the Subscription Expiration Deadline, and must pay for any such exercise by the Subscription Expiration Deadline or Backstop Funding Deadline, as applicable.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Requisite Commitment Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended by the Debtors with the consent of the Requisite Commitment Parties or as required by law.

### 3.      Delivery of Subscription Agreement

Each Eligible Claimant may exercise all or any portion of such Eligible Claimant's Subscription Rights, subject to the terms and conditions of the Plan, these Rights Offering Procedures and the Subscription Agreement.  In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send these Rights Offering Procedures and a Subscription Agreement to each Eligible Claimant, together with any additional appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Agreement and the payment of the applicable Aggregate Purchase Price and Exchange Subscription Amount, if applicable, for its New Common Shares set forth in Item 2 of such Eligible Claimant's Rights Offering Subscription Form.

To effectuate delivery of the aforementioned documents, the Subscription Agent is authorized to rely on (i) information or registers provided by the applicable indenture trustees of the 1.5 Lien Notes and (ii) securities position reports requested and obtained from DTC for purposes of distribution. In addition, appropriate service of the aforementioned documents will be deemed completed by the Subscription Agent upon delivery of such documents to DTC and the applicable Nominees (or such Nominees' agents); *provided* that the Subscription Agent will instruct such Nominees (or their agents) to immediately distribute such documents to the underlying Noteholders in accordance with their customary procedures.

### 4.      Exercise of Subscription Rights

(a)      In order to validly exercise its Subscription Rights, each Eligible Claimant that is not an Initial Commitment Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or

appropriate IRS Form W-8, as applicable) to the Subscription Agent (if a Registered Holder), or its Nominee (or as otherwise directed by its Nominee) so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.          promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay or have paid the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form.

(b)     In order to validly exercise its Subscription Rights, each Eligible Claimant that is an Initial Commitment Party must:

i.          return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.          no later than the Backstop Funding Deadline, (i) pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), in accordance with Section 2.4 of the Backstop Commitment Agreement by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form and (ii) transfer via book-entry, Reinstated 1.25 Lien Notes in an amount equal to its Exchange Amount to an account specified by the Debtors in accordance with the Funding Notice.

With respect to 4(a) and 4(b) above, Eligible Claimants that hold 1.5L Notes Claims through a Nominee must duly complete, execute and return their Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), and completed Subscription Agreement in accordance with the instructions herein directly to their Nominee (or as otherwise directed by their Nominee) in sufficient time to allow their Nominee to process their information and deliver to the Subscription Agent their completed Rights Offering Subscription Form on or before the Subscription Expiration Deadline.

Eligible Claimants that are Record Holders must duly complete, execute and return their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and completed Subscription Agreement, directly to the Subscription Agent on or before the Subscription Expiration Deadline.

In all cases, Eligible Claimants that are not Initial Commitment Parties must deliver payment of the applicable Aggregate Purchase Price payable for the New Common Shares elected to be purchased by such Eligible Claimant to the Subscription Agent on or prior to the

Subscription Expiration Deadline.  Eligible Claimants that are Initial Commitment Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the New Common Shares elected to be purchased with cash by such Eligible Claimant in accordance with Section 2.4 of the Backstop Commitment Agreement and deliver their Exchange Subscription Amount via book-entry transfer to an account specified by the Debtors no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent do not correspond to the Aggregate Purchase Price payable for the New Common Shares elected to be purchased by such Eligible Claimant, the number of the New Common Shares deemed to be purchased for cash by such Eligible Claimant will be the lesser of (a) the number of the New Common Shares elected to be purchased by such Eligible Claimant and (b) the number of the New Common Shares determined by dividing the amount of the funds received on account by the Cash Purchase Price, in each case up to the number of New Common Shares permitted to be purchased for cash by such Eligible Claimant.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures (and with respect to the Commitment Parties, the Backstop Commitment Agreement) will be deposited and held by the Subscription Agent in a segregated account, which may be an escrow account, held in an agreed upon financial institution until distributed in connection with the settlement of the Rights Offering on the Effective Date or returned to Eligible Claimants as provided in Section 7.  The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder and the Reinstated 1.25 Lien Notes held by the Debtors hereunder shall not be deemed part of or property of the Debtors' bankruptcy estates.

## 5. Transfer Restriction; Revocation

Other than as provided in Section 2.9 of the Backstop Commitment Agreement, which permits the (i) transfer of Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser and (ii) the transfer of a Commitment Party's 1.5 Lien Notes Claims following the Rights Offering Record Date without a corresponding transfer of Subscription Rights, the Subscription Rights are not detachable from Allowed Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Common Shares, the 1.5L Notes Claims and any related claims) (collectively, "***transfer***" or "***transferred***").  In connection with a transfer of Subscription Rights by any Commitment Party to a Commitment Party's Related Purchaser (in addition to any documentation required by the Backstop Commitment Agreement), the Related Purchaser shall deliver upon the exercise of such Subscription Rights a Rights Offering Subscription Form (including its accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to its Nominee or to the Subscription Agent.

Other than as provided in Section 2.9 of the Backstop Commitment Agreement described above, any transfer or assignment following the Rights Offering Record Date of the corresponding Allowed Claim (except with respect to the settlement of Allowed Claims held on the Rights Offering Record Date) shall void the Subscription Right, and neither such Eligible Claimant nor the purported transferee will receive any New Common Shares otherwise purchasable on account of such voided Subscription Rights.

However, in connection with the exercise of the Subscription Rights, the Eligible Claimant shall have the right to designate the receipt of the New Common Shares to another person that is a Related Fund or a custodian for a Related Fund (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit B to the Rights Offering Subscription Form.  Any such designation and delivery of New Common Shares shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

Once an Eligible Claimant has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Commitment Party, such exercise will be irrevocable.

## 6.      Failure to Exercise Subscription Rights

Unexercised Subscription Rights will be relinquished on the Subscription Expiration Deadline. If, on or prior to the Subscription Expiration Deadline, the Subscription Agent for any reason does not receive from an Eligible Claimant a duly completed applicable Rights Offering Subscription Form and Subscription Agreement and, other than in the case of an Eligible Claimant that is an Initial Commitment Party, the applicable Aggregate Purchase Price, such Eligible Claimant shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.

Any attempt to exercise Subscription Rights after the Subscription Expiration Deadline shall be null and void and the Debtors shall not be obligated (but, with the consent of the Requisite Commitment Parties, shall be permitted) to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Deadline regardless of when the documents relating thereto were sent.

The method of delivery of the applicable Subscription Agreement, Rights Offering Subscription Form and any other required documents is at each Eligible Claimant's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to 5:00 p.m. (prevailing Eastern Time) on the Subscription Expiration Deadline

## 7.      Return of Payment

Unless the Effective Date has occurred, the Rights Offering will be deemed automatically

terminated without any action of any party upon the earliest of (i) revocation of the Plan or rejection of the Plan by all classes entitled to vote, (ii) termination of the Plan Support Agreement (as defined in the Backstop Commitment Agreement) in accordance with its terms, (iii) termination of the Backstop Commitment Agreement in accordance with its terms, and (iv) March 19, 2020 (as may be extended pursuant to Section 2.3(a) of the Backstop Commitment Agreement), which date may be extended by the Debtors with the consent of the Requisite Commitment Parties.

If the Rights Offering is terminated or otherwise not consummated, any cash paid to the Subscription Agent will be returned, together with any Reinstated 1.25 Lien Notes actually transferred via book entry, to the applicable Eligible Claimant as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated.  No interest will be paid on any returned cash (but, for the avoidance of doubt, interest shall continue to accrue on the Reinstated 1.25 Lien Notes in accordance with their terms).

8.     **Settlement of the Rights Offering and Distribution of the New Common Shares**

The settlement of the Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Rights Offering Procedures, satisfaction of the conditions precedent set forth in the Backstop Commitment Agreement and the occurrence of the Effective Date. The Debtors intend that the New Common Shares will be issued in book-entry form in accordance with the practices and procedures of DTC, and that DTC, or its nominee, will be the holder of record of such New Common Shares. The Company will cause the New Common Shares to be credited to the accounts at DTC through which the respective Eligible Claimants or Nominees, as applicable, held the applicable Allowed 1.5L Notes Claims, and/or to any Related Fund or custodian for a Related Fund that an Eligible Claimant so designates in the Rights Offering Subscription Form in accordance with Section 5 above, and, for 1.5 Lien Notes held through Nominees, the Nominees will arrange for the credit of the New Common Shares to the individual accounts of the applicable Eligible Claimants and/or to any Related Fund or custodian for a Related Fund that an Eligible Claimant so designated in the Rights Offering Subscription Form in accordance with Section 5 above. For Registered Holders, the Subscription Agent will obtain delivery instructions directly from Registered Holders that participate in the Rights Offering.  Although it is expected that all distributions of New Common Shares will occur through The Depository Trust Company, there is no guarantee that this will occur.

No distributions will be made other than through DTC if the New Common Shares are permitted to be held through DTC's book entry system.  If for any reason the New Common Shares cannot be issued in book-entry form in accordance with the practices and procedures of DTC, the New Common Shares will be issued and registered in the name of the subscribing Eligible Claimants on the books and records of the applicable transfer agent of the New Common Shares, subject to the terms of the Plan and applicable law.  After the initial issuance of the New Common Shares, Eligible Claimants may transfer such New Common Shares in accordance with the procedures of the applicable transfer agent and applicable law.

### 9. Fractional Shares

No fractional rights or New Common Shares will be issued in the Rights Offering. All share allocations (including each Eligible Claimant's New Common Shares) will be calculated and rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be round to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number. No consideration shall be provided, whether in cash or otherwise, in lieu of fractional shares that are rounded down.

### 10. Validity of Exercise of Subscription Rights

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors, with the consent of the Requisite Commitment Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors, with the consent of the Requisite Commitment Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith with the consent of the Requisite Commitment Parties. In addition, the Debtors, with the consent of the Requisite Commitment Parties, may permit any such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate.

For the avoidance of doubt and notwithstanding the above, the Debtor and its agents are not required to inform parties of any defect or irregularity with their submission of documents or payments and may reject such submissions without previously notifying the party prior to such rejection. Additionally, each such irregularity or defect, if reviewed, will be done so on an individual submission basis.

*Before exercising any Subscription Rights, Eligible Claimants should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

### 11. Modification of Procedures

With the prior written consent of the Requisite Commitment Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the New Common Shares; *provided, however*, that the Debtors shall provide prompt written notice to each Eligible Claimant (which may be through such Eligible Claimant's Nominee) of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date, which notice may be provided through posting such notice on the Subscription Agent's website at https://cases.primeclerk.com/epenergy. In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate

and implement the Rights Offering and the issuance of the New Common Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Claimant that is a party thereto.

The Debtors may undertake procedures to confirm that each participant in the Rights Offering is in fact an Eligible Claimant, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

### 12.    DTC

Some or all of the 1.5 Lien Notes are held in book-entry form in accordance with the practices and procedures of the DTC. The Debtors intend to comply with the practices and procedures of DTC for the purpose of conducting the Rights Offering, and, subject to compliance with Section 12 hereof, these Rights Offering Procedures will be deemed appropriately modified to achieve such compliance.

Without limiting the foregoing, the Company intends that, to the extent practicable, the New Common Shares will be issued in book entry form, and that DTC, or its nominee, will be the holder of record of such New Common Shares. The ownership interest of each holder of such New Common Shares, and transfers of ownership interests therein, is expected to be recorded on the records of the direct and indirect participants in DTC. It is expected that the New Common Shares will be allocated to Eligible Claimants that validly exercise their Subscription Rights through DTC on or as soon as practicable after the Effective Date. To the extent the New Common Shares are not eligible to be held through DTC, the Offered Shares will be allocated to Eligible Claimants based on the information provided in Item 6 on the Rights Offering Subscription Form.

### 13.    Inquiries and Transmittal of Documents; Subscription Agent

The Rights Offering Instructions attached hereto should be read carefully and strictly followed by the Eligible Claimants.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone numbers: 917-947-2373 (international) or 877-502-9869 (domestic, toll free) or via email to epenergysubscription@primeclerk.com with "EP Energy Corporation Rights Offering" in the subject line.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Claimants electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

Registered Holders and Nominees (or Eligible Claimants that are instructed by their Nominees to return the Rights Offering Subscription Form directly to the Subscription Agent) must return the Rights Offering Subscription Form and the appropriate IRS tax form by no later than the Subscription Expiration Deadline to the following:

<div align="center">

**EP Energy Corporation Rights Offering Processing**
**c/o Prime Clerk, LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**Email: epenergysubscription@primeclerk.com**

</div>

All documents relating to the Rights Offering are available from the Subscription Agent at this address. In addition, these documents, together with all filing made with the Court by the Debtors, are available free of charge from the Debtors' restructuring website at http://www.primeclerk.com/epenergy.

<div align="center">

**Only choose one method of return. If you choose to return the applicable documents via email, do not follow up with hard copies.**

</div>

**14.     Backstop Commitment Agreement**

The Debtors are party to that certain Backstop Commitment Agreement (the "***Backstop Commitment Agreement***"), dated October 18, 2019, with the Commitment Parties. In the event of any conflict between these Rights Offering Procedures and the terms of the Backstop Commitment Agreement, the terms of the Backstop Commitment Agreement will control.

The Rights Offering has been backstopped by the Commitment Parties in an amount equal to $463,000,000.  Each of the Commitment Parties, severally and not jointly, has agreed, pursuant to the Backstop Commitment Agreement by and among the Company and the Commitment Parties party thereto, dated as of October 18, 2019 (as amended and supplemented from time to time) (the "***Backstop Commitment Agreement***"), to the extent the cash proceeds of the Rights Offering is less than $325,000,000, to purchase New Common Shares in an amount that results in the aggregate cash proceeds to the Company being equal to $325,000,000. Certain of the Commitment Parties, severally and not jointly, have also agreed, pursuant to the Backstop Commitment Agreement, to purchase Exchange Shares pursuant to the Rights Offering for an aggregate Exchange Subscription Amount of $138,000,000.  As consideration for their undertakings in the Backstop Commitment Agreement, the Commitment Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement).

**EP ENERGY CORPORATION**

**RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE CLAIMANTS**

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.  **Insert** the principal amount of the Notes that you held as of the Rights Offering Record Date in Item 1 of your Rights Offering Subscription Form.  If your Nominee holds the Notes issued by the Debtors on your behalf and you do not know the principal amount, please contact your Nominee immediately.

2.  **Complete** (for Eligible Claimants that are not Commitment Parties only) the calculation in Item 2a of your Rights Offering Subscription Form, which calculates the maximum number of New Common Shares available for you to purchase for cash. Such amount must be rounded down to the nearest whole share.

3.  **Complete** (for Eligible Claimants that are not Commitment Parties only) the calculation in Item 2b of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Common Shares that you elect to purchase.

4.  **Complete** (for Commitment Parties only) the calculation in Item 2c of your Rights Offering Subscription Form, which calculates the number of New Common Shares for which you are required to subscribe in exchange for Reinstated 1.25 Lien Notes. Such amount must be rounded down to the nearest whole share.

5.  **Complete** (for Commitment Parties only) the calculation in Item 2d of your Rights Offering Subscription Form, which calculates maximum number of New Common Shares available for you to purchase for cash.

6.  **Complete** (for Commitment Parties only) the calculation in Item 2e of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Common Shares that you elect to purchase.

7.  **Check the box** in Item 3 of your Rights Offering Subscription Form if you are an Initial Commitment Party to make the representation therein.

8.  **Complete** the wire refund information requested in Item 5, which will be used by the Subscription Agent in the event a refund is due.

9.  **Complete** Item 6 and provide the information needed for the registration of the New Common Shares.

10.     **Read, complete, and sign** the certification in Item 7 of your Rights Offering Subscription Form.

11.     **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

12.     **Read, complete, and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

13.     **Return** your signed Subscription Agreement and Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to, as applicable, the Subscription Agent or to your Nominee in accordance with their instructions in sufficient time to allow your Nominee to process your instructions and prepare and deliver your Rights Offering Subscription Form to the Subscription Agent, in each case prior to the Subscription Expiration Deadline.  Submissions directly to the Subscription Agent may be made either via email (in PDF or other standard format) to epenergysubscription@primeclerk.com or to the following physical address via first class mail, hand delivery, or overnight mail:

> **EP Energy Corporation Rights Offering Processing**
> **c/o Prime Clerk, LLC**
> **One Grand Central Place**
> **60 East 42nd Street, Suite 1440**
> **New York, NY 10165**

14.     **Arrange for full payment** of the Aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2 of your Rights Offering Subscription Form.  An Eligible Claimant that is not a Commitment Party should follow the payment instructions as provided in Item 4 of the Rights Offering Subscription Form. An Eligible Claimant that is an Initial Commitment Party should follow the payment instructions in the Funding Notice delivered by the Subscription Agent to the Commitment Parties in accordance with the Backstop Commitment Agreement.

> **The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [●], 2020.**
>
> **Rights Offering Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent by the Subscription Expiration Deadline or the Subscription Rights represented by your Rights Offering Subscription Form will <u>NOT</u> be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.**

**Eligible Claimants that are not Initial Commitment Parties should follow the delivery and payment instructions provided in the Rights Offering Subscription Form, and must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Claimants that are Initial Commitment Parties should follow the payment instructions in the Funding Notice, and must deliver the appropriate funding in accordance with Section 2.4 of the Backstop Commitment Agreement no later than the Backstop Funding Deadline.  If you do not deliver the appropriate funding by the applicable deadline, the subscription represented by your Rights Offering Subscription Form will <u>NOT</u> be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.**

**Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number or email address: +1 877-502-9869 (domestic toll-free) or +1 917-947-2373  (for international calls) or epenergysubscription@primeclerk.com. To obtain copies of the documents, please visit https://cases.primeclerk.com/epenergy.**

## **Exhibit A**

Rights Offering Subscription Form

**EP ENERGY CORPORATION**

**RIGHTS OFFERING SUBSCRIPTION FORM FOR USE BY ELIGIBLE CLAIMANTS FOR THE RIGHTS OFFERING IN CONNECTION WITH THE JOINT CHAPTER 11 PLAN OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**

**<ins>SUBSCRIPTION EXPIRATION DEADLINE</ins>**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [●], 2020.**

**In order to validly exercise its Subscription Rights, each Eligible Claimant that is not an Initial Commitment Party must return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent (if a Registered Holder), or its Nominee (or as otherwise directed by its Nominee) so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline, and promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay or have paid the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of this Rights Offering Subscription Form.**

**In order to validly exercise its Subscription Rights, each Eligible Claimant that is an Initial Commitment Party must return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and no later than the Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), in accordance with Section 2.4 of the Backstop Commitment Agreement by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of this Rights Offering Subscription Form and transfer via book-entry, Reinstated 1.25 Lien Notes in an amount equal to its Exchange Amount to an account specified by the Debtors in accordance with the Funding Notice.**

**The New Common Shares issuable upon exercise of a Subscription Right are being distributed and issued without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance upon the exemption provided by Section 4(a)(2) thereof, and as more fully described in the Rights Offering Procedures.**

**None of the Subscription Rights or New Common Shares issuable upon exercise of such rights distributed pursuant to the Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no New Common Shares may be sold or transferred except pursuant to an effective registration statement or pursuant to an exemption from registration under the Securities Act.**

**Please consult the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to the Rights Offering and this Rights Offering Subscription Form.**

**The record date for the Rights Offering is [●], 2020 (the "Subscription Record Date").**

**Terms used and not defined herein shall have the meaning assigned to them in the Rights Offering Procedures.**

Each Eligible Claimant has the right, but not the obligation, subject to and in accordance with the Rights Offering Procedures, to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Subscription Record Date) of $475,000,000, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) (x) timely pays the applicable Aggregate Purchase Price by the Subscription Expiration Deadline (or, in the case of the Initial Commitment Parties, by the Backstop Funding Deadline) and (y) in the case of certain Commitment Parties, timely delivers its applicable Exchange Subscription Amount.

To subscribe, fill out Items 1, 2a and 2b (if applicable) or Items 2c, 2d, and 2e (if applicable), 3 (if applicable), 5, and 6, and read, complete and sign Item 7 below.

Each Eligible Claimant who wishes to have the New Common Shares issued in the name of a Related Fund or a custodian of a Related Fund (a "Custodian"), must complete <u>Exhibit B</u> hereto.

"Related Fund" has the meaning set forth in the Backstop Commitment Agreement.

### Item 1.  Maximum Subscription Amount.

The undersigned Eligible Claimant certifies that, as of the Subscription Record Date, it held or beneficially owned Notes in the following principal amounts and that the person executing this form is an authorized signatory of such Eligible Claimant. For purposes of this Subscription Form, do not adjust the principal (face) amount of your Notes for any accrued and unpaid or unmatured interest, other than as specifically directed by this Subscription Form. (If a Nominee holds your Notes on your behalf and you do not know the principal amount, please contact your Nominee immediately).

**IMPORTANT NOTE: IF YOU HOLD YOUR NOTES THROUGH MORE THAN ONE NOMINEE, YOU MUST COMPLETE AND RETURN A SEPARATE SUBSCRIPTION FORM TO EACH APPLICABLE NOMINEE. YOU MAY NOT AGGREGATE POSITIONS HELD BY DIFFERENT NOMINEES ON A SINGLE SUBSCRIPTION FORM.**

| Notes | CUSIP/ISIN | Principal Amount of Notes | | Adjustment for Accrued and Unpaid Interest | | Allowed Claim |
|---|---|---|---|---|---|---|
| a. 9.375% Senior Secured Notes due 2024 | 268787AH1/ U2937LAE4 | $_____ | X | [●] | = | $_____ <br> Item 1a |
| b. 8.000% Senior Secured Notes due 2025 | 268787AF5/ U2937LAD6 | $_____ | X | [●] | = | $_____ <br> Item 1b |
| c. Total Allowed Claims (sum Item 1a and Item 1b) | | $_____ <br> Item 1c | | | | |
| d. Maximum Subscription Amount (Item 1c divided by $[2,092,000,000] and then multiplied by $475,000,000) | | $_____ <br> Item 1d | | | | |

**Item 2.  Rights.**

**2a. Calculation of Maximum Number of New Common Shares For Which the Undersigned May Subscribe (For Eligible Claimants that are not Commitment Parties Only). <u>If you are a Commitment Party, skip Item 2a and Item 2b and proceed to Item 2c.</u>**

The maximum number of New Common Shares for which the undersigned may subscribe is calculated as follows:

| _____ <br> (Insert Maximum Subscription Amount from Item 1d above) | / | $[●] | = | _____ <br> (Maximum Number of New Common Shares For Which the Undersigned May Subscribe) (Round fractions equal to or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |
|---|---|---|---|---|

**2b. Aggregate Purchase Price (For Eligible Claimants that are not Commitment Parties**

**Only**). By filling in the following blanks, the undersigned Eligible Claimant is indicating that it is committing to subscribe for and purchase the number of New Common Shares specified below (specify a number of New Common Shares, which is not greater than the Maximum Number of New Common Shares calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

| | | | | |
|---|---|---|---|---|
| _____<br>(Indicate number of New Common Shares the undersigned elects to purchase) | X | $[●] | = | $_____<br>Aggregate Purchase Price |

**2c. Calculation of Number of New Common Shares Subscribed In Exchange for Reinstated 1.25 Lien Notes (For Commitment Parties Only). <u>If you are not a Commitment Party, skip Item 2c, Item 2d, and Item 2e and proceed to Item 3.</u>**

The number of New Common Shares in exchange for Reinstated 1.25 Lien Notes for which the undersigned is required to subscribe is calculated as follows:

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert your Exchange Amount (as defined in the Backstop Commitment Agreement)) | / | [●] | = | _____<br>(Number of New Common Shares) (Round fractions equal to or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |

**2d. Calculation of Maximum Number of New Common Shares For Which the Undersigned May Subscribe For Cash. (For Commitment Parties Only).** The maximum number of New Common Shares for which the undersigned may subscribe for cash is calculated as follows:

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert Maximum Subscription Amount from Item 1d above) | – | _____<br>(Insert your Exchange Amount) | = | _____<br>(Maximum Cash Subscription Amount) |

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert Maximum Cash Subscription Amount above) | X | [●] | = | _____<br>(Maximum Number of New Common Shares For Which the Undersigned May Subscribe For Cash) (Round fractions equal to or |

| | | | | greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |
|---|---|---|---|---|
| | | | | |

**2e. Aggregate Purchase Price (For Commitment Parties Only).** By filling in the following blanks, the undersigned Eligible Claimant is indicating that it is committing to subscribe for and purchase the number of New Common Shares specified below (specify a number of New Common Shares the undersigned elects to purchase for cash, which is not greater than the Maximum Number of New Common Shares calculated in Item 2d above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

| _____ (Indicate number of New Common Shares the undersigned elects to purchase) | X | $[●] | = | $_____ Aggregate Purchase Price |
|---|---|---|---|---|

### Item 3.  Eligible Holder Representation.

*(This section is for <u>all</u> parties who wish to participate in the Rights Offering).*

☐         The undersigned and any Related Fund or Custodian is an Eligible Holder (as defined in the Rights Offering Procedures), meaning that such holder (i) has reviewed the definitions of accredited investor and qualified institutional buyer annexed hereto as Exhibit A and is an institutional accredited investor within the meaning of Rule 501(a) promulgated under Regulation D of the Securities Act or a qualified institutional buyer as defined in Rule 144A under the Securities Act and (ii) has made the representations set forth in the Subscription Agreement.

### Item 4.  Payment and Delivery Instructions

Eligible Claimants that are not Initial Commitment Parties must submit payment of the Aggregate Purchase Price calculated pursuant to Item 2b or Item 2e, as applicable, to the Subscription Agent by wire transfer ONLY in accordance with the following wire instructions:

*Domestic wire*:

| **Account Name :** | [●] |
|---|---|
| **Bank Account No.:** | [●] |
| **ABA/Routing No.:** | [●] |
| **Bank Name:** | [●] |
| **Bank Address:** | [●] |

5

| Reference: | [Name of Eligible Claimant Subscribing] |
|---|---|

*International wire*:

| Correspondent/Intermediary Bank SWIFT | [●] |
|---|---|
| Correspondent/Intermediary Bank Name | [●] |
| Correspondent/Intermediary Bank Address | [●] |
| Beneficiary Account Number | [●] |
| Beneficiary Name | [●] |
| Beneficiary Address | [●] |
| Memo, Special Instructions, Originator to Beneficiary Information, Bank to Bank Information | [●]<br>[Name of Eligible Claimant Subscribing] |

Please note that the failure to include the Eligible Claimant name in the reference field of any domestic or international wire payment may result in the rejection of the corresponding Rights Offering submission. In addition, please also note that payments cannot be aggregated, and one wire should be sent per Subscription Form submission.

**For Eligible Claimants That Are Not Initial Commitment Partie**s. Eligible Claimants that are not Initial Commitment Parties must deliver their subscription payment (along with their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and properly executed Subscription Agreement) to the Subscription Agent by the Subscription Expiration Deadline.

**For Initial Commitment Parties.** Eligible Claimants that are Initial Commitment Parties must deliver payment of the Aggregate Purchase Price directly to the Subscription Agent pursuant to the wire instructions above no later than the Backstop Funding Deadline.

### Item 5.  Refund Information

Please use the chart below to provide the appropriate wire information in the event the Subscription Agent must refund of any (or all) of your subscription payment.  If payment of the Aggregate Purchase Price will be made by your Nominee on your behalf, the wire information in this Item 5 should be your Nominee's information, and any refund will be issued to your Nominee.

| Account Name: | |
|---|---|

| Bank Account No.: | |
| --- | --- |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

**Item 6. Registration Information for New Common Shares**

In the event the New Common Shares will not be eligible to be initially distributed through DTC, please indicate on the lines provided below the Eligible Claimant's name and address as you would like it to be reflected on the Debtors' or the transfer agent's records (as applicable).

If the Eligible Claimant is designating any Related Fund or Custodian to receive the New Common Shares on its behalf, please complete <u>Exhibit B</u> to this Rights Offering Subscription Form.

Registration Line 1: _____

Registration Line 2 (if needed):_____

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email:_____

**Item 7.  Certification.**

The undersigned certifies that: (i) the undersigned or a Related Fund or Custodian whom the undersigned has designated to receive the New Common Shares pursuant to Exhibit B is an Eligible Holder as set forth in Item 3 above and in the Subscription Agreement, (ii) the undersigned is an Eligible Claimant and as of the Subscription Record Date beneficially held Notes in the principal amount set forth in Item 1 above, (iii) the undersigned received a copy of the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures, (iv) the undersigned understands that the exercise of its Subscription Rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures, and (v) the undersigned understands that, subject to the terms and conditions of the Subscription Agreement, and the Backstop Commitment Agreement in the case of any Commitment Party, the exercise of its Subscription Rights is irrevocable.

**The undersigned acknowledges that, by executing the Subscription Agreement and this Rights Offering Subscription Form, the undersigned Eligible Claimant has elected to subscribe for the number of New Common Shares designated in Item 2 above and will be bound to pay for the New Common Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

7

Date: _____

Name of Eligible Claimant: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

If Initial Commitment Party, check here ☐ **(ONLY CHECK THIS BOX IF YOU ARE CERTAIN THIS APPLIES TO YOU. IF YOU ARE UNSURE, DO NOT CHECK THIS BOX AND PLEASE CONTACT THE SUBSCRIPTION AGENT.)**

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Fax: _____

Email: _____

**PLEASE RETURN THIS RIGHTS OFFERING SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND THE SUBSCRIPTION AGREEMENT TO THE SUBSCRIPTION AGENT.**

**IF YOU HOLD YOUR NOTES THROUGH A NOMINEE, PLEASE RETURN THIS SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W- 8, AS APPLICABLE) ONLY TO YOUR NOMINEE (OR AS OTHERWISE DIRECTED BY YOUR NOMINEE). DO NOT RETURN THIS FORM DIRECTLY TO THE SUBSCRIPTION AGENT (UNLESS OTHERWISE DIRECTED TO DO SO BY YOUR NOMINEE).**

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS RIGHTS OFFERING SUBSCRIPTION FORM AND THE SIGNED SUBSCRIPTION AGREEMENT, ALONG WITH THE APPROPRIATE FUNDS (SOLELY WITH RESPECT TO ELIGIBLE CLAIMANTS THAT ARE NOT INITIAL COMMITMENT PARTIES) ARE VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT BY THE SUBSCRIPTION EXPIRATION DEADLINE. FORMS MAY BE SUBMITTED TO THE PHYSICAL ADDRESS BELOW OR VIA EMAIL AT:**

**EP Energy Corporation Rights Offering Processing**
**c/o Prime Clerk, LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**EPEnergySubscription@primeclerk.com.**

**ELIGIBLE CLAIMANTS THAT ARE INITIAL COMMITMENT PARTIES MUST DELIVER THE APPROPRIATE FUNDING DIRECTLY TO THE SUBSCRIPTION AGENT NO LATER THAN THE BACKSTOP FUNDING DEADLINE.**

**Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number or email address: 877-502-9869 (domestic toll-free) or +1 917-947-2373 (for international calls) or epenergysubscription@primeclerk.com with "EP Energy Corporation Rights Offering" in the subject line. To obtain copies of the documents, please visit https://cases.primeclerk.com/epenergy.**

## EXHIBIT A

"Accredited Investor" as defined in Rule 501 of Regulation D of the Securities Act shall mean any person who comes within any of the following categories, at the time of the sale of the securities to the person:

(1)      Any bank as defined in Section 3(a)(2) of the Securities Act of 1933 (the "Act"), or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in Section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2)      Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)      Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)      Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)      Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(i) Except as provided in clause (ii) paragraph (5), for purposes of calculating net worth under this paragraph (5):

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

(ii) Clause (i) of this paragraph (5) will not apply to any calculation of a person's net worth made

in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

(A) Such right was held by the person on July 20, 2010;

(B) The person qualified as an Accredited Investor on the basis of net worth at the time the person acquired such right; and

(C) The person held securities of the same issuer, other than such right, on July 20, 2010.

(6)    Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)    Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act; and

(8)    Any entity in which all of the equity owners are Accredited Investors.

"Qualified institutional buyer" as defined in Rule 144A under the Securities Act shall mean:

(i)    Any of the following entities, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity:

(A) Any insurance company as defined in section 2(a)(13) of the Act;

(B) Any investment company registered under the Investment Company Act or any business development company as defined in section 2(a)(48) of that Act;

(C) Any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958;

(D) Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees;

(E) Any employee benefit plan within the meaning of title I of the Employee Retirement Income Security Act of 1974;

(F) Any trust fund whose trustee is a bank or trust company and whose participants are exclusively plans of the types identified in paragraph (a)(1)(i) (D) or (E) of this section, except trust funds that include as participants individual retirement accounts or H.R. 10 plans.

(G) Any business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(H) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation (other than a bank as defined in section 3(a)(2) of the Act or a savings and loan association or other institution referenced in section 3(a)(5)(A) of the Act or a foreign bank or savings and loan association or equivalent institution), partnership, or Massachusetts or similar business trust; and

(I) Any investment adviser registered under the Investment Advisers Act.

(ii)     Any dealer registered pursuant to section 15 of the Exchange Act, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $10 million of securities of issuers that are not affiliated with the dealer, Provided, That securities constituting the whole or a part of an unsold allotment to or subscription by a dealer as a participant in a public offering shall not be deemed to be owned by such dealer;

(iii)     Any dealer registered pursuant to section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a qualified institutional buyer;

(iv)     Any investment company registered under the Investment Company Act, acting for its own account or for the accounts of other qualified institutional buyers, that is part of a family of investment companies which own in the aggregate at least $100 million in securities of issuers, other than issuers that are affiliated with the investment company or are part of such family of investment companies. Family of investment companies means any two or more investment companies registered under the Investment Company Act, except for a unit investment trust whose assets consist solely of shares of one or more registered investment companies, that have the same investment adviser (or, in the case of unit investment trusts, the same depositor), Provided That, for purposes of this section:

(A) Each series of a series company (as defined in Rule 18f-2 under the Investment Company Act [17 CFR 270.18f-2]) shall be deemed to be a separate investment company; and

(B) Investment companies shall be deemed to have the same adviser (or depositor) if their advisers (or depositors) are majority-owned subsidiaries of the same parent, or if one investment company's adviser (or depositor) is a majority-owned subsidiary of the other investment company's adviser (or depositor);

(v)     Any entity, all of the equity owners of which are qualified institutional buyers, acting for its own account or the accounts of other qualified institutional buyers; and

(vi)     Any bank as defined in section 3(a)(2) of the Act, any savings and loan association or other institution as referenced in section 3(a)(5)(A) of the Act, or any foreign bank or savings and loan association or equivalent institution, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with it and that has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of sale under the Rule in the case of a U.S. bank or savings and loan association, and not more than 18 months preceding such date of sale for a foreign bank or savings and loan association or equivalent institution.

**EXHIBIT B**
**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE DESIGNEE, COMPLETE A SEPARATE FORM FOR <u>EACH</u> DESIGNEE.**
**YOU MUST SPECIFY THE NUMBER OF NEW COMMON SHARES FOR <u>EACH</u> DESIGNEE.**

**Please complete ONLY if New Common Shares are to be issued in the name of a Related Fund or a Custodian rather than the Eligible Claimant. Any such designated party must also complete an IRS Form W-8 or IRS Form W-9, as applicable.**

Issue New Common Shares in the name of: _____

Number of New Common Shares:_____

Name: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____
If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐
If U.S. person, check here and attach IRS Form W-9 ☐
**A. Please indicate on the lines provided below the Registration Name of the designee in whose name the New Common Shares should be issued:**

Registration Line 1:_____
Registration Line 2:_____
(if needed)
Address 1:_____
Address 2:_____
Address 3:_____
Address 4:_____
Telephone:_____
Email: _____

**B. Wire information in the event a refund is needed:**

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |