**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | Case No. 19-35654 (MI) |
| | § | |
| EP ENERGY CORPORATION, *et al*,[1] | § | Chapter 11 |
| | § | |
| | § | |
| Debtors. | § | (Jointly Administered) |
| | § | |

**MSB OWNERS' OBJECTION TO THE DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**

Storey Minerals, Ltd. ("Storey Minerals"), Storey Surface, Ltd. ("Storey Surface"), Maltsberger, LLC ("Maltsberger"), Maltsberger/Storey Ranch, LLC ("MS Ranch"), the Estate of Sarah Lee Maltsberger (the "Estate"), and Rene R. Barrientos, Ltd. ("Barrientos") (collectively, the "MSB Owners"),[2] file this *Objection to the Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and its Affiliated Debtors* (the "Objection"), and respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases (the "Bankruptcy Cases"), along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

[2] Storey Minerals, Maltsberger, MS Ranch, the Estate, and Barrientos are collectively the "MSB Royalty Owners." Storey Surface, Maltsberger, and Ranch Lands are collectively the "MSB Surface Owners." For the avoidance of doubt, Maltsberger is both a royalty and a surface owner. Together the MSB Royalty Owners and the MSB Surface Owners are collectively the MSB Owners.

## PRELIMINARY STATEMENT[3]

1.      The Disclosure Statement cannot be approved because it does not provide adequate information and disclosure related to the MSB Owners' rights and potential remedies. Specifically, the Debtors have failed to disclose the significant legal rights that the MSB Owners are entitled to assert and have maintained, and the significant risk that the Debtors face in the event that the MSB Owners are successful in establishing their rights. The Disclosure Statement also fails to provide adequate information to justify providing substantially all equity in the Reorganized Debtors to one group of creditors, that may well be unsecured in circumstances where no valuation has yet been made of the Debtors' assets whether in a going concern basis or by constituent parts, while providing almost no equity to general unsecured creditors.   The disclosure also omits to disclose in any detail connections as between insiders who are beneficiaries of the transactions for which approval of the Plan is sought, and these are matters that also should be disclosed fully.  Lastly, to the extent the MSB Owners are creditors only of debtor EPLP there is inadequate disclosure to account for its assets and liabilities and how creditors of that entity are impacted by the Plan and its effort to aggregate claims regardless of debtor entity.

2.      The Disclosure Statement also cannot be approved because the Plan is patently unconfirmable in several respects even before solicitation is to begin. With respect to the MSB Owners, the Plan fails to classify and treat the MSB Owners appropriately. Further, the Plan fails to meet the best interests of creditors test, as the MSB Owners would receive substantially more in a Chapter 7 liquidation than under the Plan.  Finally, the Plan purports to adjudicate noncore

---

[3] Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Disclosure Statement.

and purely state law rights in a manner that is impermissible and would comprise an unlawful taking of property rights.

3.      Even assuming without conceding that the MSB Owners are just general unsecured creditors, the Plan is patently unconfirmable because it treats substantially similar creditors differently by providing, without any valuation having been conducted or market testing of the going concern, 99% equity (subject to dilution) to the Secured 1.5L Notes Claims and only 1% equity (subject to dilution) to the General Unsecured Claims, even though both claimants may yet be substantially similar, and thus able to be discriminated against.

4.      The Bankruptcy Court should not approve the Disclosure Statement unless and until the Debtors (a) improve the adequacy of information contained in the Disclosure Statement regarding the MSB Owners and the basis for valuation, and (b) amend the Plan to comply with the Bankruptcy Code.

## **BACKGROUND**

I.      **MSB Owners' Relationship with the Debtors**

5.      The MSB Owners collectively own approximately 40,000 contiguous acres in the Eagle Ford basin. In 2009, the MSB Owners' respective predecessors-in-interest began a business relationship with El Paso E&P Company, LP, the predecessor-in-interest to EP Energy E&P Company, L.P. ("EPLP"), one of the above-captioned debtors (the "Debtors"), by executing sixteen (16) oil and gas leases (the "MSB Leases") and other intertwined and integral agreements, including, without limitation, surface use agreements ("SUAs" and collectively with the MSB Leases, the "Agreements") covering acreage located in what is known as the Altito Ranch and Maltsberger Ranch. The MSB Royalty Owners were vested by these agreements to ongoing and continuing bonus rights in the MSB Leases including, without limitation, (i) the

right to an immediate payment of $500 per net mineral acre upon execution of the MSB Leases ***and*** (ii) further rights to additional bonus payments if EPLP, for the duration of the  MSB Leases, subsequently acquires oil and gas leases within the same geographic area as the MSB Leases that provide for greater bonus payments than $500 per net mineral acre (the "MFN Clause"). *See, e.g.*, Oil and Gas Lease, §§ II, XXVI.

6.      The MFN Clauses, as ongoing material obligations and entitlements, were granted as conditions precedent and by their continuing vitality for the life of the fee simple determinable also comprise conditions subsequent to the Debtors' right to enter upon the lands and to commence *and continue* oil and gas exploration activities.  These rights are inherent in the fee simple determinable under which title to exploit minerals was conveyed, and thus are performable in full and completely as a requirement by which title can be maintained and not terminate.[4]  Importantly, the Debtors were required to execute a lease amendment confirming the triggered new terms in the MFN clauses when the events occurred, and to this day and despite a state court order to do so, they have failed and refused to comply this fundamental requirement in the leases.  Several of the conditions allowing for the continuation of certain MSB Leases (the "Breached Leases") have accordingly been triggered by EPLP's subsequent acquisition of oil and gas leases within the same geographic area as the Breached Leases that provide for greater bonus payments than $500 per net mineral acre. After due demand and refusal to comply with the MFN Clauses, on March 19, 2019, some of the MSB Royalty Owners filed a lawsuit in the 81st Judicial District Court in La Salle County, Texas, Cause No. 18-05-00083-CVL (the "State Court") asserting claims against EPLP for breach of the MFN Clauses in some of the Breached

---

[4] Significantly, the MSB Owners agreed to accept a below-market bonus on the front end based on the representation that they would not be treated commercially worse than their adjacent neighbors.

Leases.[5]   Despite admissions there were indeed amounts triggered by the MFN clauses to activate the requirement for a lease amendment, EPLP disputed the claims in the State Court. Notably, the Debtors admitted in in several writings prebankruptcy that the Debtors have such obligations pursuant to the MFN Clauses in three of the Breached Leases.   For example, EP Energy, LLC, admitted in its 10-Q filed with the SEC for the quarterly period ending on June 30, 2019, that "[a]fter investigation, EP Energy agreed that the MFN clause had been triggered" as to three of the MSB O&G Leases, which resulted in a liability of at least $4 million.  This triggered the obligation to deliver a lease amendment noting the same, which is a condition subsequent to the MSB Leases and of course is also a condition precedent to the continued entry onto the lands and the continued extraction of oil and gas that continues to this day.  The only detail that EP Energy, LLC disputed was the effective date of the increased lease bonus and therefore, the total acreage that was leased at the time the increased lease bonus became due.  Similarly, EPLP made admissions in sworn responses to interrogatories, and in the EPLP response to the original demand letter in December 2018.

    7.    On June 6, 2019, the State Court granted partial summary judgment against EPLP in favor of the MSB Royalty Owners.  On June 19, 2019, the State Court issued a final judgment finding EPLP had materially breached the MSB Leases and ordering, among other things, EPLP to execute an amendment to the MSB Leases and pay the MSB Royalty Owners additional bonus amounts arising as obligations under the MSB Leases totaling $41,034,055.00, plus attorneys' fees, costs and interests (the "Lease Judgment"). When the lease amendment was refused, and the Lease Judgment was not paid, the clerk issued the requested abstract of judgment and the

---

[5] The lawsuit filed in the State Court did not include each of the Leases which are not in breach and risk of having terminated or be terminated.

MSB Royalty Owners filed the abstract to secure their judgment by placing a lien on all of the Debtors' real estate [and fixtures] in LaSalle County, Texas.[6]

## II.       The Debtors' Rights in Certain MSB Leases May Have Terminated

8.       Debtors have apparently repudiated their obligations under the MSB Leases and view their performance of conditions precedent and subsequent under the fee simple determinable interests optional, even though this may have caused, or cause, termination of EPLP's rights in the MSB Leases.  Debtors routinely honor property rights in oil and gas leases for the very reason that these property interests in the form of fee simple determinable interests are perishable and can or do terminate upon independent acts, in this case solely triggered by what EPLP did and failed to do.  In order to avoid such a result, courts in this district have routinely granted motions by upstream oil and gas companies approving payment of royalties and other similar interests in bankruptcy cases. *See, e.g., In re Fieldwood Energy LLC, et al.,* No. 18-30648 (Bankr. S.D. Tex. March 13, 2018) (Doc. No. 203); *In re Cobalt Int'l Energy, Inc.,* No. 1736709 (MI) (Bankr. S.D. Tex. Dec. 14, 2017) (Doc. No. 60); *In re Energy XXI Ltd.,* No. 16-31928 (DRJ) (Bankr. S.D. Tex. Apr. 15, 2016) (Doc. No. 60); *In re Mem'l Prod. Partners LP*, No. 17-30262 (MI) (Bankr. S.D. Tex. Jan. 17, 2017) (Doc. No.59); *In re Linn Energy, LLC,* No. 16-60040 (DRJ) (Bankr. S.D. Tex. 2017 June 27, 2019) (Doc. No.401); *In re ATP Oil & Gas Corp.,* No. 12-36187 (MI) (Bankr. S.D. Tex. Aug. 23, 2012) (Doc. No. 191). Here the Debtors have paid royalty, but apparently are viewing other inherent property rights under the MSB Leases as optional amounts not to be accorded any recognition—to be discarded as mere unsecured claims.  The MSB Owners assert that the Debtors should be required to deliver a lease

---

[6] The lien arising from the Lease Judgment is subject to a pending adversary proceeding filed in this Court by the Debtors against the MSB Royalty Owners.

amendment confirming the MFN clauses application to the MSB Leases, perform thereon, and otherwise confirm payment as required to continue exploration and production operations, or be subject to claims in the LaSalle County Texas state district court that EPLP is a trespasser and that title rightfully terminated under the fee simple determinable prebankruptcy, and thereby vests in the MSB Owners.

9.      Debtors cannot cavalierly disregard the MSB Owners' property rights without consequence.  Texas law recognizes five inherent rights of a severed mineral estate.  These are the rights to: (1) develop (the right of ingress and egress); (2) lease (the executive right); (3) receive bonus payments; (4) receive delay rentals; and (5) receive royalty payments.  *Altman v. Blake*, 712 S.W.2d 117, 118 (Tex. 1986).  Parties can agree to modifications from any "normal" course of dealing with respect to these five essential rights.  For example, the right to receive bonus payments often is a one-time, up-front payment; however, that is not the case here.  The mineral estate's right to receive bonus payments is not limited to a one-time, up-front payment.  In the case of the MSB Leases, the right to receive the bonus payment includes the MFN Clause.[7]  This entails that the right to a bonus payment runs with the land and is inherent in the conveyance.  It continues, and like royalty and delay rentals, must be paid or the Debtors' lease rights will terminate by the Debtors' own actions.

10.     The nature of EPLP's property rights here is critically important in assessing why its actions threaten its continued ability to develop and extract oil and gas from the MSB Leases. Under Texas law, real property interests conveyed in oil and gas leases are virtually always a fee simple determinable because it is conveyed for a primary term and thereafter for so long as there

---

[7] Significantly, the MSB Owners agreed to accept a below-market bonus on the front end based on the representation that they would not be treated commercially worse than their adjacent neighbors.

is production in paying quantities, or until there is a condition subsequent. *See BP Am. Prod. Co. v. Laddex, Ltd.*, 513 S.W.3d 476, 480 (Tex. 2017) (quoting *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991)) ("'In Texas, a typical oil and gas lease actually conveys the mineral estate (less those portions expressly reserved, *such as royalty*) as a determinable fee.'") (emphasis added). "The lessee's interest is 'determinable' because it may terminate and revert entirely to the lessor upon the occurrence of events that the lease specifies will cause termination of the estate." *Endeavor Energy Resources, L.P. v. Discovery Operating, Inc.*, 448 S.W.3d 169, 175 (Tex. App.—Eastland, 2014, *pet. denied*) (citing *Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003)).   The grantor of the oil and gas lease retains a right of reverter, which is "the grantor's right to fee ownership in the real property reverting to him if the condition terminating the determinable fee occurs." *Luckel v. White*, 819 S.W.2d 459, 464 (Tex. 1991). This reversionary right is truly an inevitable property interest that will some day be triggered, because inherent in oil and gas production is the fact that there will always be some time in the future where production in paying quantities will cease—wish that it were otherwise but oil and gas in the ground is ultimately finite.   For this reason, mineral owners leasing from owners to develop oil and gas must be respectful of the perishability of their interests.   In addition to the terminable nature of a fee simple determinable, other provisions in the MSB Leases also must be disclosed to ensure parties voting on the Plan appreciate that the Debtors' Plan may trigger other grounds for termination of the interests in oil and gas.   That is because the MSB Leases also include **conditions subsequent** instead of mere covenants that might give rise to claims solely for damages, as distinct with exposing the lessee to a triggered termination for noncompliance.   *See, e.g.*, *Vinson Minerals, Ltd. V. XTO Energy, Inc.*, 335 S.W.3d 344, 354 (Tex. App.—Fort Worth, 2010, *pet. denied*).

11.     The right to further additional bonus payments pursuant to the MFN Clause is a condition subsequent in the MSB Leases. Article II states "in consideration of [the bonus] and of the covenants and agreements hereafter contained on the part of the lessee…." coupled with "Lessee is not entitled to conduct any drilling or exploration activities or operations on the leased premises ….".   Elsewhere Article XXIV require the MSB Royalty Owners to notify EPLP prior to litigation "for **damages, forfeiture or cancellation** with respect to **any breach or default** by lessee."  Lease, Art. XXIV (emphasis added).  The MSB Owners did provide notice; it was ignored.  They filed suit; it was disputed.  They obtain a judgment and directive to issue the lease amendment; this too was refused.   This allowed EPLP multiple opportunities to satisfy conditions to enable continuation of the leases.  This provision, therefore, expressly reserves the MSB Royalty Owners' right to continue for the duration of EPLP's presence upon their lands to obtain remedies after non-compliance with, amongst other things, the MFN Clause, in order to, obtain a declaration that all of EPLP's interests in the lease have been terminated. The MFN Clause, therefore, is a condition subsequent because it is one of the breaches that, pursuant to Articles II and XXIV, the MSB Royalty Owners are entitled to, among other things, seek a declaration of EPLP's loss of the lease.  *See Circle Ridge Prod., Inc.*, 2013 WL 3781367 at *8 (holding that provision of termination makes a clause either "a condition subsequent or a special limitation rather than a covenant").

12.     As bonus payments, notwithstanding the contingency, are rights that are substantially similar to royalties and delay rentals, and the consequences that can befall a lessee of oil and gas minerals for further development and extraction, and as the Debtors' have not taken any steps to ensure compliance with those obligations, the Debtors risk termination that

can materially impact their projections and treatment of creditors under the Plan.  This must be disclosed.

## II.      The Chapter 11 Cases

13.      On October 3, 2019 (the "<u>Petition Date</u>"), EP Energy Corporation and related entities (the "<u>Debtors</u>") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), commencing the Bankruptcy Cases.

14.      On October 21, 2019, the U.S. Trustee filed his Notice of the Appointment of the Official Committee of Unsecured Creditors (the "<u>UCC</u>"), which included the appointment of, among others, Carlos R. Soltero as a representative of Barrientos, one of the MSB Royalty Owners.  *See* Doc. No. 200.  Since that time Mr. Soltero has resigned from the UCC.

## III.     The Disclosure Statement and Plan

15.      On November 18, 2019, the Debtors filed the Joint Chapter 11 Plan of EP Energy Corporation and its Affiliated Debtors (Doc. No. 429) (the "<u>Original Plan</u>"), and the Disclosure Statement for Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and its Affiliated Debtors (Doc. No. 430) (the "<u>Original Disclosure Statement</u>").

16.      On December 12, 2019, the Debtors filed an amended Original Plan (Doc. No. 536) (as amended, supplemented or modified, the "<u>Plan</u>"), and an amended Disclosure Statement (Doc. No. 537) (as amended, supplemented or modified, the "<u>Disclosure Statement</u>").

## <u>OBJECTION TO DISCLOSURE STATEMENT</u>

17.      The MSB Owners object to the Disclosure Statement because (i) the Disclosure Statement does not provide adequate information to the Debtors' stakeholders regarding the risk that the Debtors have with respect to their continued breach of the MSB Leases and (ii) with respect to the valuation that is being used to ostensibly justify the disparate treatment amongst

similarly situated creditors.  In addition, (iii) the Plan is patently unconfirmable because (a) the

Plan does not classify the claims of the MSB Owners in their appropriate classification, (b) the

Plan does not provide the MSB Owners with more than they would, (c) alternatively, the Plan

does not treat similarly situated creditors similarly as required under the Bankruptcy Code.

## I.     The Disclosure Statement does not contain adequate information.

18.     Under Section 1125(b) of the Bankruptcy Code, a disclosure statement must

contain "adequate information" about the debtor and be provided to "each holder of a claim or

interest of a particular class." 11 U.S.C. § 1125(c). Section 1125(a)(1) of the Bankruptcy Code

provides as follows:

> "adequate information" means information of a kind, and in sufficient detail,
> as far as is reasonably practicable in light of the nature and history of the
> debtor and the condition of the debtor's books and records, including a
> discussion of the potential material Federal tax consequences of the plan to the
> debtor, any successor to the debtor, and a hypothetical investor typical of the
> holders of claims or interests in the case, that would enable such a
> hypothetical investor of the relevant class to make an informed judgment
> about the plan, but adequate information need not include such information
> about any other possible or proposed plan….

19.     The determination of whether the information contained within the disclosure

statement is adequate is "subjective and made on a case by case basis" and is "largely within the

discretion of the bankruptcy court."  *In re Texas Extrusion Corp.,* 844 F.2d 1142, 1157 (5th

Cir.1988) (internal citations omitted).   The Fifth Circuit Court of Appeals has stated that

information contained in a disclosure statement is adequate if it enables "a reasonable creditor to

make an informed decision about the Plan."  *Id.*

20.     Citing *In re Metrocraft Pub. Servs. Inc.,* 39 B.R. 567 (Bankr. N.D. Ga. 1984), the

Bankruptcy Court for the Southern District of Texas has considered the so called *Metrocraft*

factors when determining whether the information contained in a disclosure statement is

adequate.  *In re Divine Ripe, L.L.C.,* 554 B.R. 395 (Bankr. S.D. Tex. 2016).   Those factors are as follows:

> a.  the events which led to the filing of a bankruptcy petition;
> b.  a description of the available assets and their value;
> c.  the anticipated future of the company;
> d.  the source of information stated in the disclosures statement;
> e.  a disclaimer;
> f.  the present condition of the debtor while in Chapter 11;
> g.  the scheduled claims;
> h.  the estimated return to creditors under a Chapter 7 liquidation;
> i.  the accounting method utilized to produce financial information and the name of the accountants responsible for such information;
> j.  the future management of the debtor;
> k.  the Chapter 11 plan or a summary thereof;
> l.  the estimated administrative expenses, including attorneys' and accountants' fees;
> m.  the collectability of accounts receivable;
> n.  financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan;
> o.  information relevant to the risks posed to creditors under the plan;
> p.  the actual or projected realizable value from recovery of preferential or otherwise voidable transfers;
> q.  litigation likely to arise in a non-bankruptcy context;
> r.  tax attributes of the debtor; and
> s.  the relationship of the debtor with the affiliates.

**A.    The Disclosure Statement information regarding the MSB Owners' rights and the Debtors risk of termination is wholly inadequate.**

21.     As discussed in detail above, the Debtors failure to comply with the MSB Leases with respect to the MSB Royalty Owners' ongoing entitlement to bonus rights have exposed the Debtors to significant risk of termination of the MSB Leases. Although the Disclosure Statement discusses the pending adversary proceeding regarding disputes over whether the Debtors are subject to liens securing the judgment against them, it does not disclose the material risk of termination that the Debtors have already exposed themselves to both prebankruptcy and now post bankruptcy resulting from their refusal to execute a lease amendment to confirm the

amounts payable under the MSB Leases as a condition to entry upon the lands and development and extraction of oil and gas.

22.     Even if the Debtors do not believe there is a substantial risk of lease termination whether pre-bankruptcy or as a result of their continued repudiation of obligations owing under the MSB Leases, the severity of such a result requires the Debtors to provide adequate information to their creditors. For example, the following *Metrocraft* factors are implicated, (b) description of available assets and their value, (c) anticipated future of the company, (g) scheduled claims, (n) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan, (o) information relevant to the risks posed to creditors under the plan, and (q) litigation likely to arise in a non-bankruptcy context. The Debtors unwillingness to address the MSB Royalty Owners' potential rights and remedies in the Disclosure Statement is a gaping hole which negates the ability of a creditor to make an informed decision.  Because of the risk of termination, and the further risk of administrative claim damages to the extent the termination is found to have occurred prebankruptcy making the Debtors liable for trespass and damages post bankruptcy for their continued extraction, the Debtors should model and include projections on what the impact would be for their actions causing a termination, to test the assumptions made regarding feasibility and payments.

23.     The disclosure omissions permeate the disclosure provided.  To facilitate a resolution of this concern, MSB Royalty Owners are committed to working with the Debtors to develop language to be added to the Disclosure Statement to provide adequate information to creditors to address the Debtors deficiencies in describing the rights and remedies of the MSB Royalty Owners.

**B.     The Disclosure Statement information regarding pre-petition actions and insider relationships and connections is wholly inadequate.**

24.     The Debtors provide limited information regarding their prepetition activities leading to negotiating the details of the Plan, agreeing to reinstate various tranches of debt and provide disproportionate recovery to the Secured 1.5L Notes Claims. The Disclosure Statement fails to address the proliferation of related party relationships, affiliations, divided loyalties, negotiations, the abundance of negotiators with substantial history of previous conflicting loyalties, and creditor constituencies with multiple hats. Even if the Debtors do not believe, and the Court accepts the Debtors view, that none of this is bad faith or to state it better, the absence of good faith, a conflict or creates any adversity, the appearance of conflict here is abundant enough to require the Debtors to disclose in detail these potential concerns.

25.     The Debtors with the input of the Unsecured Creditors' Committee ("UCC") are best situated to provide additional details to meet their burden of adequate information on these matters.

**C.     Disclosure Statement information regarding Valuation is wholly inadequate.**

26.     The Debtors' Plan proposes that RBL Claims, 1.125L Notes Claims and 1.25L Notes Claims essentially remain unimpaired (notwithstanding the technical impairment for the RBL Claims). These three tranches, including the potential DIP Facility which will be converted into the Exit Facility, contain claims of approximately $2.12 billion, plus interest and fees. It would not be an exaggeration to assume that these claims are over $2.3 billion, after accrual of fees and expenses. The next and last tranche of secured claims however, the Secured 1.5L Notes Claims, contain approximately $2 billion of claims, which the Debtors have divided into secured portion of approximately $300 to $400 million, and unsecured portion of approximately $1.7 billion. Conveniently, the deemed "value" of up to $400 million of secured claims entitle the

Secured 1.5L Notes Claims to 99% of the predilution new equity, with essentially nothing for the unsecured creditors. In other words, the Debtors attempt to essentially wipe away hundreds of millions of dollars of unsecured claims and treat them disparately from the *Secured* 1.5L Notes Claims based on a valuation of $2.5 billion for the Debtors and provide less than a page of explanation in the Disclosure Statement. *See* Disclosure Statement, art. XI.C.4. This is wholly inappropriate, even if it was accurate because it is uncontested that no valuation was ever attempted. There was no market testing sale process. There was no going concern value evaluated. The accuracy of the valuation disclosure, is accordingly subject to substantial common-sense concerns, which will be the subject of potential litigation. In the meantime, however, the Debtors should present more fulsome information justifying their valuation, and potential risks to that valuation from objections.

27.     The disclosure that there was no effort to generate any third-party valuation nor to market test the Debtors assets or enterprise on a going concern basis either pre- or post-bankruptcy must be made. The implied enterprise value attached to the so called back stop transaction that ensures insiders get most of the new equity under the Plan needs to be accompanied by full disclosure that there was no independent valuation process undertaken. The failure to shop the assets in whole or in part, or to solicit other valuation opinions, must also be disclosed. The Debtors and perhaps the UCC are best situated to provide additional details to meet their burden of adequate information.

II.     **The Disclosure Statement should not be approved because the Plan is patently unconfirmable.**

28.     On its face, the Plan fails to comply with Bankruptcy Code confirmation requirements. The Debtors should not engage in a wasteful and fruitless exercise of distributing

the Disclosure Statement to creditors and soliciting votes when the Plan is patently unconfirmable.   A plan of reorganization cannot be confirmed unless it meets all of the requirements set forth in section 1129(a) of the Bankruptcy Code. *See* 11 U.S.C. § 1129(a). Pursuant to section 1129(a) of the Bankruptcy Code, a court may confirm a plan of reorganization only if it complies with the applicable provisions of the Bankruptcy Code. *See id.* Courts can determine that a plan is unconfirmable at a hearing to consider approval of a disclosure statement. *See In re Am. Capital Equip., LLC*, 688 F.3d 145, 154 (3d Cir. 2012). Courts recognize that they should "not proceed with the time-consuming and expensive proposition of hearings on a disclosure statement and a plan when the plan may not be confirmable because it does not comply with confirmation requirements." *Id.* (quoting *In re Kehn Ranch, Inc.*, 41 B.R. 832, 832–33 (Bankr. S.D.1984)); *see also In re Quigley Co.*, 377 B.R. 110, 115–16 (Bankr. S.D.N.Y. 2007) ("If the plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied, as solicitation of the vote would be futile."); *In re U.S. Brass Corp.*, 194 B.R. 420, 422 (Bankr. E.D. Tex. 1996) ("Disapproval of the adequacy of a disclosure statement may sometimes be appropriate where it describes a plan of reorganization which is so fatally flawed that confirmation is impossible."); *In re Felicity Assocs., Inc.*, 197 B.R. 12, 14 (Bankr. D.R.I. 1996) ("It has become standard Chapter 11 practice that 'when an objection raises substantive plan issues that are normally addressed at confirmation, it is proper to consider and rule upon such issues prior to confirmation, where the proposed plan is arguably unconfirmable on its face.'"); *In re Market Square Inn, Inc.*, 163 B.R. 64, 68 (Bankr. W.D. Pa. 1994) ("Where it is clear that a plan of reorganization is not capable of confirmation, it is appropriate to refuse the approval of the disclosure statement.").

29. Courts will find a plan unconfirmable at the disclosure statement stage "where (1) confirmation 'defects [cannot] be overcome by creditor voting results' and (2) those defects 'concern matters upon which all material facts are not in dispute or have been fully developed at the disclosure statement hearing.'" *In re Am. Capital Equip., LLC*, 688 F.3d at 154–55 (quoting *In re Monroe Well Serv.*, 80 B.R. 324, 333 (Bankr. E.D. Pa. 1987)).

30. The Plan fails both because of how it treats and classifies the MSB Owners and due to structural flaws that require substantial changes.

**A.    Debtors cannot satisfy the best interest of creditors test for MSB Royalty Owners.**

31. Section 1129 of the Bankruptcy Code, in relevant part, provides that "each holder of a claim…will receive…under the plan on account of such claim or interest property of a value….that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date…." 11 U.S.C. § 1129(a)(7)(A).

32. In a chapter 7 liquidation, the Debtors would not be entitled to a discharge. 11 U.S.C. § 727(a)(1). Without a discharge, the Debtors would have to pay the amounts owed under the Final Judgment. If such amounts are paid, then the Debtors would receive more in a chapter 7 liquidation than under the Plan. If such amounts were not paid, undoubtedly the MSB Leases would terminate or, absent cure, be subject to termination, resulting in the MSB Royalty Owners realizing on their reversion interest in the MSB Leases. This would result in a significant additional recovery over and above anything provided in the Plan for the MSB Royalty Owners.

33. The Debtors, therefore, cannot satisfy section 1129(a)(7) of the Bankruptcy Code, and the Plan is therefore patently unconfirmable.

**B.    The Plan treats similarly situated claims disparately.**

34.    The Plan separately classifies similarly situated claims without a legitimate reason. Specifically, the Plan provides holders of the Secured 1.5L Notes Claims with 99% of the new equity, and provides the holders of Unsecured Claims with only 1% of the new equity, both subject to dilution. This is in violation of section 1122 of the Bankruptcy Code.   While the MSB Owners view their status as not mere unsecured, so long as the Debtors treat them as such and require future litigation outcomes to determine this issue, the Plan must properly treat the MSB Owners even if a disputed unsecured creditor in a way that is compliant with the Code.

35.    Generally, courts provide debtors substantial deference to classify claims and interests in a plan of reorganization. *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992) ("A plan proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a ***reasonable basis*** for the classification scheme and if all claims within a particular class are substantially similar." (emphasis added)). A debtor, however, does not have complete freedom to classify claims in a plan of reorganization. Section 1122(a) of the Bankruptcy Code expressly prohibits confirmation of a plan which classifies disparate claims in a single class and provides, "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C. § 1122(a); *see also In re Tribune Co.*, 476 B.R. 843, 855 (Bankr. D. Del. 2012).

36.    Courts interpreting section 1122(a) of the Bankruptcy Code generally hold that "classification is constrained by two straight-forward rules:  Dissimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason." *In re Chateaugay Corp.*, 89 F.3d 942, 949 (2d Cir. 1996); *In re Heritage Organization, L.L.C.*, 375 B.R. 230 (Bankr. N.D. Tex. 2007) ("Substantially similar claims must be classified together

unless some reason, other than gerrymandering, exists for separating them."); *Phoenix Mutual Life Ins. Co. v. Greystone III J.V. (In re Greystone III J.V.)*, 995 F.2d 1274, 1278 (5th Cir. 1991) ("Ordinarily 'substantially similar claims,' those which share common priority and rights against the debtor's estate, should be placed in the same class."); *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1019 (Bankr. S.D.N.Y. 1993) ("Since these are creditors of equal rank with equal rights within chapter 11, in the absence of a purpose independent of the debtor's desire to gerrymander an impaired assenting class, they should be classified together."); *In re W.R. Grace & Co.,* 475 B.R. 34, 110 (Bankr. D. Del. 2012) ("Therefore, in determining claim placement, plan proponents should attempt to group together those claims that exhibit a similar effect on the debtor's bankruptcy estate, rather than merely grouping together claims that are otherwise similar in character."); *In re Coram Healthcare Corp.,* 315 B.R. 321, 349 (Bankr. D. Del. 2004) ("Even though similar claims may be placed in separate classes, plan proponents cannot do so when it would be unreasonable.").

37.     Whether a claim is "substantially similar" under section 1122(a) of the Bankruptcy Code depends on the "legal character of the claim as it relates to the assets of the debtor." *In re W.R. Grace & Co.*, 729 F.3d 311, 326 (3d Cir. 2013) (quoting *In re AOV Indus., Inc.*, 792 F.2d 1140, 1150 (D.C. Cir. 1986)); *see also In re Tribune Co.*, 476 B.R. at 855 ("Courts in this Circuit have interpreted 'substantially similar' as a reflection of the 'legal attributes of the claims, not who holds them.'"). If claims have a similar legal effect against the debtor's assets (e.g., similar rights to debtor's assets), courts will generally find that they are substantially similar. *In re Tribune Co.*, 476 B.R. 843, 855; *In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 723, 757 (Bankr. S.D.N.Y. 1992).   By these measures the MSB Owners should plainly be classified separately from unsecured creditors.

38.      But if simply unsecured and refused their own class, the MSB Owners object to how they are treated in contrast to other unsecured creditors.  The Plan seems entirely geared to benefit the class of Secured 1.5L notes Claims that are largely made up of insiders [Apollo and Access] that bought up debt at steep discounts while knowing this ship was near sunk, and for another noninsider that similarly gambled the value setting would favor their acquisition of all equity.  This certainly smacks of a lack of good faith, especially as to insider benefits being retained to the detriment of other unsecured creditors.  The Debtors have not and cannot show that the holders of Secured 1.5L Notes Claims are entitled to a disproportionate share of the new equity based on any real valuation process. Cursory statements regarding valuation are thus not sufficient to overcome the fact that the Debtors have arbitrarily placed a value on the Reorganized Debtors that is conveniently sufficient to provide substantially all equity to the favored holders of Secured 1.5L Notes Claims. If wholly unsecured, their deficiency claim should be treated substantially similarly to the holders of other Unsecured Claims.[8]

### C.      The Plan violates the absolute priority rule by providing distribution to holders of equity interests.

39.      It is axiomatic that equity holders cannot receive distributions on account of their equity interests, if holders of claims are not paid in full, often referred to as the absolute priority rule. The Plan proposes to pay equity holders $500,000 in cash. There is no valuation of whether such equity holders are even entitled to a distribution of this amount. The only justification seems to be some notion that there are valuable tax attributes that exist at the parent level. Whether this is true or not, is wholly beside the point. Equity holders of the ultimate parent

---

[8] Its not like these insiders and distress investors suffer too greatly; that they share pro rata in the new equity with other unsecureds results in only "some" dilution.  But likely they still will be controlling equity holders at exit.

cannot receive distribution in a case where general unsecured creditors of EPLP will largely receive next to nothing, if not zero.

40.    Further, the Debtors assert that this payment is necessary because tax attributes are considered property of the equity holder. This question is currently pending before the United States Supreme Court. *Simon E. Rodriguez v. Federal Deposit Insurance Corp.*, 18-1269 (Sup. Ct.). It is unclear why the Debtors do not make a case that it's plausible that the tax attributes are actually not held by the parent, as this view is reasonable enough for the Supreme Court to address.   Certainly from the MSB Owners perspective EPLP should own and have the full benefit of these attributes as the "Opco".   At a minimum, the Disclosure Statement does not contain adequate information to decide whether the payment to the equity holders is reasonable or not. Further, even if the payment to the equity holders is reasonable, it is still prohibited under the absolute priority rule. If preservation of the tax attributes is critical, then full payment to the unsecured creditors is necessary to preserve the critical tax attributes.

**D.    The Plan provides for unlawful releases to an expansive number of parties.**

41.    The Plan defines Released Parties to include various lenders, equity holders, and other related entities, and the Releasing Parties to include any holder of a claim or interest who votes for the Plan, or does not opt-out when voting against the Plan.   Such a broad release is unacceptable. In the Fifth Circuit, non-consensual third party releases are not acceptable. *In re Pac. Lumber Co.*, 584 F.3d 229, 253 (5th Cir. 2009) ("These cases seem broadly to foreclose non-consensual non-debtor releases and permanent injunctions."). Here, due to the breath of the parties covered by the releases, and the inability of a creditor to vote for the plan but opt-out, the release provisions should be considered unlawful, and therefore, the Plan is fatally flawed.

Simply put, coercion by not allowing an opt-out where creditors may otherwise wish to vote for the Plan, is not consent as required under *Pacific Lumber*.

**III.     MSB Owners' Provisions and Reservation of Rights.**

42.     The MSB Owners expressly reserve the right to supplement and amend this Objection, seek discovery with regards to the same, and introduce evidence at any hearing(s) related to the Disclosure Statement.

WHEREFORE, the MSB Owners requests that the Court (i) sustain this Objection, (ii) not approve the Disclosure Statement, and (iii) grant such other relief as the Court deems just and proper.

Dated:  December 19, 2019           HAYNES AND BOONE, LLP

By: */s/ Patrick L. Hughes*
Patrick L. Hughes
Texas Bar No. 10227300
Arsalan Muhammad
Texas Bar No. 24074771
David Trausch
Texas Bar No. 24113513
1221 McKinney Street, Suite 2100
Houston, Texas 77010
Telephone: (713) 547-2000
Facsimile: (713) 547-2600
Email: Patrick.Hughes@haynesboone.com
Email: Arsalan.Muhammad@haynesboone.com
Email: David.Trausch@haynesboone.com

-and-

MCGINNIS LOCHRIDGE LLP
Donald D. Jackson
State Bar No. 00787753
Christopher L. Halgren
State Bar No. 24069859
Austin W. Brister
State Bar No. 24080804
711 Louisiana St., Suite 1600
Houston, Texas 77002
Telephone: (713) 615-8500
Fax: (713) 615-8585
Email: djackson@mcginnislaw.com
Email: chalgren@mcginnislaw.com
Email: abrister@mcginnislaw.com

COUNSEL FOR THE MSB OWNERS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was served by electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on December 19, 2019.

*/s/ David Trausch for*

Patrick L. Hughes
