**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **EP ENERGY CORPORATION, et al.,** | § | **Case No. 19-35654 (MI)** |
| | § | |
| **Debtors.[1]** | § | **(Jointly Administered)** |
| | § | |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO
MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING PROPOSED
DISCLOSURE STATEMENT; (II) ESTABLISHING SOLICITATION AND VOTING
PROCEDURES; (III) ESTABLISHING RIGHTS OFFERING PROCEDURES;
(IV) SCHEDULING CONFIRMATION HEARING; (V) ESTABLISHING NOTICE
AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PROPOSED
PLAN; AND (VI) APPROVING NOTICE AND OBJECTION PROCEDURES FOR
THE ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**
**[Relates to Docket No. 435]**

The Official Committee of Unsecured Creditors (the "***Committee***") appointed in

the above-captioned chapter 11 cases (the "***Chapter 11 Cases***") of EP Energy Corporation and its

debtor affiliates, as debtors and debtors in possession (collectively, the "***Debtors***"), hereby files

this objection (the "***Objection***") to the *Motion of Debtors for Entry of an Order (I) Approving*

*Proposed Disclosure Statement; (II) Establishing Solicitation and Voting Procedures;*

*(III) Establishing Rights Offering Procedures; (IV) Scheduling Confirmation Hearing;*

*(V) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan; and*

*(VI) Approving Notice and Objection Procedures for the Assumption of Executory Contracts and*

*Unexpired Leases* [Docket No. 435] (the "***Disclosure Statement Motion***"), seeking approval of,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021),
Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013),
EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' mailing
address is 1001 Louisiana Street, Houston, TX 77002.

among other things, the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and Its Affiliated Debtors* [Docket No. 537] (the "***Disclosure Statement***") in respect of the *Amended Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors* [Docket No. 536] (the "***Plan***").[2] In support of this Objection,[3] the Committee states as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors have proposed a non-confirmable Plan, which seeks to implement a carefully choreographed takeover strategy that: (a) inappropriately drives significant outsized returns to two of its equity Sponsors (along with a select group of creditors) who are being given the exclusive right to invest new money at substantial discounts to plan value; (b) offers certain Backstop Parties the opportunity to recover *more than* payment in full on account of their *pre*-petition claims; (c) proposes a significant cash distribution to out-of-the-money parent-level equity holders, even while billions of dollars of unsecured claims remain unpaid; (d) insulates insiders – such as Apollo, Access, as well as a wide universe of individuals and non-debtor entities – from liability by way of sweeping blanket releases with unproven or inadequate consideration being provided to the Debtors' estates in exchange; and (e) provides senior management with significant day-one compensation that takes effect immediately as of

---

[2] Each capitalized term that is not defined herein shall have the meaning ascribed to such term in the Plan or the Disclosure Statement, as applicable.

[3] On December 12, 2019, the Debtors filed the Plan and the Disclosure Statement, which reflected modifications to the original versions filed by the Debtors and, included for the first time, the Debtors' Liquidation Analysis and Financial Projections as Exhibits D and E to the Disclosure Statement, respectively. Pursuant to a notice filed by the Debtors with the Court [Docket No. 541], the Debtors held the original Disclosure Statement objection deadline of December 19, 2019 in place, except that the objection deadline solely with respect to those modifications and new exhibits was extended to December 23, 2019 at 12:00 p.m. (prevailing Central Time). The Debtors refused to extend the objection deadline by two business days so as to be coterminous with the December 23rd deadline and avoid the need for the Committee to file piecemeal objections. Accordingly, the Committee reserves its right to supplement this Objection pending its continuing review of the updated Plan and Disclosure Statement and the recently-filed exhibits.

2

the Effective Date (on top of millions of dollars in retention payments already received in the period leading up to the bankruptcy filing). Unsecured creditors, by contrast, stand to recover close to nothing.

2.      The Committee recognizes that many of these issues are more appropriately addressed in connection with the confirmation hearing, and that the issues currently before the Court relate to the adequacy of the Debtors' proposed Disclosure Statement. However, as a threshold matter, the Disclosure Statement fails to adequately describe these patently non-confirmable aspects of the Plan.

3.      Moreover, from a more general informational perspective, the Disclosure Statement fails to include critical information necessary for creditors – and this Court – to evaluate key terms of the Plan, including the value of the Debtors' assets and the securities being issued under the Plan, recovery levels proposed under the Plan, the pro forma capital structure and go-forward risks to the Debtors' business plan, as described below.

4.      ***De Minimis Nature of Distribution to Unsecured Creditors:***  The Disclosure Statement fails to adequately describe the illusory nature of the distribution being offered to unsecured creditors under the Plan. The distribution of 1% of the primary equity to unsecured creditors – a paltry distribution in the first instance – actually translates into a mere 0.2% of the new equity on a post-dilution basis, *for a diminutive 0.06% recovery to holders of more than $2.5 billion in unsecured claims*. This distribution is expected to be further reduced as a result of the mechanics related to distributions under the Plan. Furthermore, the highly illiquid nature of the likely non-transferable New Common Shares renders the net value of the distribution highly speculative.

3

5.     *Valuation:*  In an extraordinary departure from well-accepted bankruptcy practice for non-sale cases, the Debtors' advisors will not be presenting their own analysis of the value of the securities being offered to creditors under the Plan or the total enterprise value of the Debtors, which renders the Disclosure Statement patently deficient. Valuation is fundamental to the assessment of any plan and disclosure statement. The "paper valuation" which the Debtors are prepared to rely upon, but which is untested by any formal marketing or sales process, cannot serve as a credible proxy for an independent analysis conducted by the estates' fiduciaries.

6.     *Potential Pay Down:*  The Plan contemplates the possibility of a voluntary prepayment of the 1.125L Notes and/or the 1.25L Notes on the Effective Date. However, no legal or business justification is given for any paydown, which could trigger "make-whole" payments, and no explanation is given as to (a) which series, or the precise amount of notes that would be redeemed, (b) how the funds used to make a redemption would be sourced, (c) what impact the funding would have on the pro forma capital structure, go-forward liquidity and the Debtors' ability to satisfy certain conditions under the Exit Facility, or (d) how the payments, if made under the Plan, are legally justified under the Bankruptcy Code.

7.     *Affiliate and Related Party Disclosure:*  Apollo, one of the Debtors' largest equity Sponsors, and Elliott are expected to become sizable shareholders of the Reorganized Debtors. Yet, the Debtors neglect to disclose basic affiliate and related party information concerning the Debtors, Apollo, Elliott, the other Supporting Noteholders and other non-debtor affiliates. The Disclosure Statement should include (a) a description of all existing relationships between the Debtors and the Supporting Noteholders (and their affiliates), (b) current and pro forma debt and equity holdings of the Supporting Noteholders and any other affiliates or related parties, and (c) financial interests and other investments in other oil and gas

companies held by the Supporting Noteholders. Such information is necessary to evaluate the pro forma capital structure and corporate governance of the Reorganized Debtors in order to determine whether to accept New Common Shares, as well as to assess the feasibility of the Plan from a regulatory perspective.

8.  ***Releases / Investigation:***  The Disclosure Statement does not provide "adequate information" regarding the scope of the releases or the nature and value of third party or non-debtor claims being released pursuant to the Plan; nor does the Disclosure Statement adequately describe the consideration provided in exchange for such broad releases. The Debtors offer only a summary discussion of the Special Committee's investigation of certain related party transactions and conclusory assertions in support of the releases, without disclosing additional information. An explanation of the impact of the non-debtor releases is especially important here, where unsecured creditors are proposed to receive close to nothing.[4]

9.  ***Feasibility:***  The Disclosure Statement fails to adequately describe potential feasibility concerns with the Plan. As noted above, the pro forma ownership of the New Common Shares will be highly concentrated, and may subject the Plan to review under the HSR Act. The Debtors should disclose the pro forma equity holdings and provide adequate disclosure as to any regulatory challenges the Debtors may otherwise anticipate in connection with the consummation of the Plan. In addition, the Debtors' Plan involves the incurrence and/or reinstatement of a significant amount of funded debt. Here too, the Debtors should provide ample disclosure as to the Reorganized Debtors' financial metrics, a comparison of its debt load to its

---

[4] Importantly, the Disclosure Statement must disclose the Committee's pending investigation into the liens and claims of the Debtors' secured lenders, as well as an investigation into potential estate claims and causes of action, including any that may exist as a result of Apollo's (and Access') trading activity during the restructuring process (allegedly undertaken pursuant to 10b5-1 trading plans) and certain other prepetition transactions.

peers, and more than just a cursory determination that the Reorganized Debtors will be in a position to service their debt going forward.

10. ***Executive Compensation:*** The Debtors fail to disclose the significant payouts received by the executive management team in the months leading to the bankruptcy filing. The Debtors also fail to provide adequate disclosure concerning the proposed Employee Incentive Plan, including whether the requirements imposed by Section 503(c) of the Bankruptcy Code have been (or will be) met. To wit, prior to the bankruptcy filing, the Debtors' CEO received a retention payment of approximately $2.4 million, which exceeds the amount of the entire distribution being proposed to holders of over $2.5 billion in unsecured claims under the Plan. The CEO also stands to receive significant emergence awards on the Effective Date under a rich Employee Incentive Plan, with performance targets that are "TBD" (which comes as no surprise given the absence of a formal valuation). In fact, pursuant to those emergence awards, the CEO alone would ultimately be entitled to receive 1.75% of the New Common Shares (on a fully diluted basis)—a distribution that is ***10 times greater*** than that proposed to be made to unsecured creditors in the aggregate.

11. Such information is all the more critical given the proposed treatment of unsecured creditors under the Plan. The Disclosure Statement must contain additional information before such unsecured creditors can evaluate the basis for their treatment, the value of their proposed recovery and the risks associated with the Reorganized Debtors' business plan.

12. For these reasons, and for the additional reasons described in more detail below, the Committee respectfully submits that the Disclosure Statement Motion should be denied.

6

## GENERAL BACKGROUND

13.     On October 3, 2019 (the "***Petition Date***"), the Debtors each filed a voluntary petition for relief under the Bankruptcy Code with this Court.

14.     On October 21, 2019, the Office of the United States Trustee for Region 7 appointed the Committee. The members of the Committee currently include: (a) Wilmington Trust, N.A.; (b) Wilmington Savings Fund Society, FSB; and (c) Antora Peak Capital Management LP.

15.     On October 18, 2019, the Debtors announced that they had entered into a plan support agreement ("***PSA***") with Apollo and Access – two of its equity Sponsors – as well as Elliot and Avenue (collectively, the "***Supporting Noteholders***"), with respect to the material terms of a Chapter 11 plan of reorganization.[5]

16.     On November 18, 2019, the Debtors filed the *Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors* [Docket No. 429] (the "***Original Plan***") and related disclosure statement [Docket No. 430], which were later modified by the Plan and Disclosure Statement on December 12, 2019.

17.     As modified, the Plan generally provides the following:

- ▪ ***RBL Facility:***  The RBL Facility – together with the DIP Facility – will roll into an approximately $629 million Exit Facility;
- ▪ ***1.125L Notes:***  The $1 billion in 1.125L Notes will be reinstated;
- ▪ ***1.25L Notes:***  The $500 million in 1.25L Notes will be reinstated; *however,* $138 million in 1.25L Notes held by the Backstop Parties can be "credited" at face value (i.e., at a significant premium to the current trading price) for the purchase of New Common Shares in connection with the Rights Offering at a 25.7% discount to the Stated Equity Value of $900 million;
- ▪ ***1.5L Notes:***  Holders of the $2.092 billion in 1.5L Notes will receive (i) 99% of the New Common Shares (subject to substantial dilution by the Rights Offering Shares,

---

[5] *See Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Agreement, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 181].

the Backstop Commitment Premium, the Private Placement (if applicable) and the EIP Shares, and (ii) subscription rights to participate in a $475 million Rights Offering and purchase New Common Shares at a 35% discount to the Stated Equity Value;

- *Unsecured Creditors:* Unsecured creditors (which includes holders of the $688 million in senior unsecured notes as well as deficiency claims under the 1.5L Notes pursuant to the Plan) would receive 1% of the New Common Shares (similarly subject to substantial dilution), resulting in an estimated recovery of approximately 0.06% post-dilution; and

- *Parent Level Equity Holders:* Despite creditors being substantially impaired, parent-level equity holders will receive $500,000 in cash.[6]

18. In addition, each of Apollo, Elliot, Access and Avenue (the "*Backstop Parties*") agreed to backstop up to $463 million of the Rights Offering.[7] In exchange, the Backstop Parties would be entitled to a $26 million Backstop Commitment Premium, payable in the form of New Common Shares issued at a 35% discount to the Stated Equity Value (or, alternatively, a $26 million cash break-up fee payable if the Debtors pursue an alternative transaction).[8]

19. Apollo and Access each own 39% and 12.3%, respectively, of EP Energy's Class A common stock, and (until recently) employees of Apollo and Access served on the Debtors' board of directors.[9] In addition, as of September 30, 2019, affiliates of Apollo held approximately $675 million in 1.5L Notes and approximately $21 million in 1.25L Notes.[10]

---

[6] *See* Disclosure Statement at 2–3.

[7] *See id.* at 4.

[8] *Id.*

[9] *See Debtors' Omnibus Reply to Objections to Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Agreement, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket No. 431], ¶ 30.

[10] EP Energy Corp., Quarterly Report (Form 10-Q), at 19 (Nov. 12, 2019).

The Supporting Noteholders collectively own approximately 52.0% of the 1.25L Notes and approximately 79.3% of the 1.5L Notes.[11]

## OBJECTION

20.     The Disclosure Statement fails to provide adequate information within the meaning of section 1125 of the Bankruptcy Code and, therefore, should not be approved in its current form. Section 1125(b) of the Bankruptcy Code requires that a disclosure statement contain "adequate information" regarding a proposed plan to holders of impaired claims and interests entitled to vote on such plan. 11 U.S.C. § 1125(b). "Adequate information" means "information of a kind, and in sufficient details, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan." *Id.* § 1125(a)(1). In other words, to satisfy the disclosure requirements of Section 1125, a debtor must "adequately, not selectively, disclose fully and precisely all information a creditor would reasonably want before voting on the plan." *Westland Oil Dev. Corp. v. MCorp. Mgmt. Solutions, Inc.*, 157 B.R. 100, 104 (S.D. Tex. 1993).

21.     The determination of what constitutes "adequate information" is within the discretion of the bankruptcy court and made on a case-by-case basis. *See In re Cajun Elec. Power Co-op., Inc.*, 150 F.3d 503, 518 (5th Cir. 1998). Courts consider numerous factors when determining the sufficiency of information provided in a disclosure statement, including, but not limited to: (a) financial information, data, and valuations relevant to a party in interest's decision to accept or reject the chapter 11 plan; (b) information relevant to the risks posed to creditors under the plan; (c) the actual or projected realizable value from recovery of preferential or

---

[11] Disclosure Statement at 1.

otherwise voidable transfers; and (d) the relationship of the debtor with affiliates. *See In re Divine Ripe, L.L.C.*, 554 B.R. 395, 402 (Bankr. S.D. Tex. 2016) (listing nineteen non-exhaustive factors set forth in *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. 567, 568 (Bankr. N.D. Ga. 1984)).[12]

22.     In short, a disclosure statement must "inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution." *In re Ferretti*, 128 B.R. 16, 19 (Bankr. D.N.H. 1991). In its current form, the Disclosure Statement fails to satisfy the disclosure requirements of section 1125 of the Bankruptcy Code for the reasons set forth below.

## A.     The Plan Pays Certain Holders of 1.25L Notes More than in Full, in Violation of the Absolute Priority Rule

23.     The Disclosure Statement fails to adequately describe a fatal flaw in the Plan, namely, that the Plan provides for a select group of creditors to receive a greater than 100% recovery on their claims, in violation of the absolute priority rule.

24.     In order to confirm the Plan, the Debtors will need to establish that the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to the unsecured creditor class. 11 U.S.C. § 1129(b)(1). In turn, the Debtors will have to demonstrate compliance

---

[12] The non-exhaustive factors courts consider in determining whether a disclosure statement provides adequate information include: "(1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4) the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with the affiliates." *Divine Ripe*, 554 B.R. at 401–02 (citing *Metrocraft*, 39 B.R. at 568).

with the absolute priority rule codified in Section 1129(b)(2)(B) of the Bankruptcy Code, which requires that, if holders of unsecured claims in a designated class receive less than payment in full on account of their claims, no holders of claims or equity interests in a junior class may receive property under the plan on account of such junior claims or interests. *Id.* § 1129(b)(2)(B). The corollary to the absolute priority rule, however, is that "senior classes cannot receive more than a one hundred percent (100%) recovery for their claims."[13]

25.     Here, under the Plan, Backstop Parties holding 1.25L Notes Claims (the "***Exchanging Backstop Parties***") will receive a greater than 100% recovery on account of their prepetition 1.25L Notes Claims. Specifically, the Plan reinstates the 1.25L Notes on the Effective Date,[14] and provides that $138 million of the Rights Offering shall be funded through the exchange of $138 million in aggregate principal amount of Reinstated 1.25L Notes held by the Exchanging Backstop Parties for New Common Shares issued at a 25.7% discount to a Stated Equity Value of $900 million.[15] The Reinstated 1.25L Notes would in essence be exchanged for approximately 20.6% of the New Common Shares (or approximately 18.6% of the *post*-dilution shares).[16] This results in a 121.1% recovery on account of the 1.25L Notes Claims held by the

---

[13] *In re Idearc Inc.*, 423 B.R. 138, 170 (Bankr. N.D. Tex. 2009); *see also In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr. S.D.N.Y. 2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of fair and equitable treatment is that a plan may not pay a premium to a senior class."); *In re Exide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003) ("[A] corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); *In re MCorp. Fin., Inc.*, 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) (finding that a plan was not fair and equitable to equity interests because it "include[d] a provision which establishes no upper limit on the amount that junior creditors of the Debtors (who are senior to the rejecting equity class) may receive").

[14] Plan § 4.5(a).

[15] Disclosure Statement at 4.

[16] *See* Plan § 5.11(a).

Exchanging Backstop Parties (or a whopping 242.3% recovery relative to the current market value of the 1.25L Notes), as illustrated below:

| Exchange of $138 million in Reinstated 1.25L Notes = | 20.6% of New Common Shares (pre-dilution) or 18.6% of New Common Shares (post-dilution) |
|---|---|
| 18.6% x $900 million (i.e., Stated Plan Equity Value) = | $167.2 million |
| $167.2 million / $138 million = | 121.1% |
| $167.2 million / $69 million[17] = | 242.3% |

26.     Mindful of this impediment to confirmation of the Plan, the Debtors inserted language into the Plan purporting that "the rendering of the Reinstated 1.25L Notes as unimpaired . . . shall be deemed to occur immediately prior to the consummation of the Rights Offering,"[18] thus suggesting that the reinstatement of the 1.25L Notes and "subsequent" exchange represent two totally distinct and unrelated transactions. But this suggestion elevates form over substance, and glosses over the fact that the transactions both occur pursuant to the Plan on the Effective Date and are mutually dependent upon one another and therefore inextricably linked. In addition, the Exchanging Backstop Parties are entitled to preferential treatment relative to all other holders of 1.25L Notes insofar as the Exchanging Backstop Parties are also entitled to receive payment in cash of "all accrued but unpaid interest, including any stub interest, . . . [on] the Reinstated 1.25L Notes that are exchanged in connection with the Rights Offering."[19] This preferential treatment to a subset of the holders of 1.25L Notes contravenes the

---

[17] Based on last trade price of $50.00 as of December 18, 2019. *See Trade Reporting and Compliance Engine (TRACE)*, FINRA, http://finra-markets.morningstar.com/BondCenter/Default.jsp (follow "Search" hyperlink; then search Symbol / CUSIP field for "EPE4427915" and select "Show Results").

[18] Plan § 9.3(b).

[19] *Id.* § 5.11(a).

Bankruptcy Code and results in the Exchanging Backstop Parties receiving a substantial premium on their prepetition claims in violation of the absolute priority rule. Accordingly, the Disclosure Statement must be modified to adequately describe these flaws with the Plan.

27.     Also, in order to facilitate creditors' – and this Court's – assessment of the distributions being made under the Plan, the Disclosure Statement should also break out estimates of recoveries of (a) holders of the 1.5L Notes Claims on account of, separately, (i) their primary equity distribution, and (ii) equity acquired in the Rights Offering (on a fully subscribed basis, as well as assuming zero participation in the Rights Offering), after taking into account the substantial discount to Stated Equity Value, and (b) the Backstop Parties on account of, separately, the receipt of the shares acquired pursuant to the Backstop Agreement and on account of the Reinstated 1.25L Notes (as applicable) (after taking into account the substantial discount to Stated Equity Value).

## B.     The Plan Offers a Distribution to Holders of Existing Parent Equity Interests in Violation of the Absolute Priority Rule

28.     In addition to overcompensating select creditors, the Plan also provides a $500,000 cash distribution to parent-level equity holders even though unsecured creditors are receiving close to nothing. In their Disclosure Statement, the Debtors suggest that, arguably, "the Tax Attributes might have independent value from which only EP Parent (and not the Debtor subsidiaries) could benefit from," and "because none of the holders of Claims on account of the Debtors' funded debt hold such claims against EP Parent, any value of the Tax Attributes should inure to the benefit of the Existing Parent Equity Interest Holders."[20]

---

[20] Disclosure Statement at 25.

29.     Elsewhere, however, the Debtors appear to downplay the value of those Tax Attributes, first by acknowledging limited use of the NOL carryforwards given the occurrence of a change of control for tax purposes,[21] and then by explaining that the "*subsequent utilization of any remaining NOLs and other Tax Attributes following the Effective Date may be severely restricted*."[22] In addition, the Debtors cite the "surmounting significant practical and legal hurdles" to the utilization of the Tax Attributes by EP Parent, "including (i) the fact that EP Parent would have to generate taxable income, which would require new capital contributions by Existing Parent Equity Interest Holders to acquire or develop a new business able to generate taxable income, and (ii) EP Parent's ability to continue as a going concern."[23]

30.     In any event, the Disclosure Statement fails to highlight that this arrangement will primarily benefit Apollo and Access twice—first, by providing a cash payment on account of their existing equity interests, and then, by ensuring that any value associated with the Tax Attributes will inure to their benefit as future holders of new equity. Ultimately, the cash distribution to holders of Existing Parent Equity Interests is clearly being made "on account of" their junior interests, and squarely runs afoul of the absolute priority rule. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). Accordingly, the Disclosure Statement must be modified to reflect the impermissibility of this proposed form of treatment.

31.     Moreover, the Debtors must explain whether, absent this $500,000 distribution to equity holders, the Debtors would be able to confirm a chapter 11 plan of reorganization with respect to the parent company. The Debtors must also explain the propriety

---

[21] *See id.* at 81–83.

[22] *Id.* at 81 (emphasis added).

[23] *Id.* at 25.

of offering creditors, whose claims reside at the intermediate holding company, stock in the parent company. It may come as no surprise that this "settlement" represents little more than another value grab by the Supporting Noteholders, driven largely by an attempt to circumvent the change in control language in each of the 1.125L Notes and the 1.25L Notes that the Debtors propose to reinstate under the Plan.

## C.     The Disclosure Statement Fails to Adequately Describe the Unsecured Creditor Distribution and Recoveries

32.     The Disclosure Statement also fails to explain that the proposed distribution to unsecured creditors may, in fact, be illusory. Under the Plan, unsecured creditors are entitled to receive 1% of the New Common Shares, subject to massive dilution by shares issued in connection with the Rights Offering, the Backstop Agreement, the "Private Placement" (if applicable) and the EIP Shares. The Committee estimates that, post-dilution, holders of more than $2.5 billion in unsecured claims would share in 0.2% of the New Common Shares, resulting in a recovery of 0.06%. What the Debtors do not highlight is that this paltry distribution is subject to further erosion, which renders the distribution practically valueless.

33.     *First*, the Unsecured Notes Trustees' fees are not proposed to be repaid on the Effective Date, thus resulting in the exercise of a charging lien, which may involve a significant holdback to the distribution. That holdback will be difficult to monetize given that the stock will not be listed on any national securities exchange and will be thinly traded (as described below), which in turn will result in a substantial offset to the distribution. *Second*, under the Plan, fractional shares will not be distributed and, to the extent rounded down, New Common Shares may be zeroed out, which would be immaterial to the Reorganized Debtors but could have a significant impact on unsecured creditors (depending on the number of shares issued at emergence). *Third*, the fees and expenses of any Disputed Claims Reserve will be

15

charged against the reserve, thus further diminishing any holdback distribution. *Finally*, as glossed over in the Disclosure Statement, the unsecured creditors' *de minimis* allotment of New Common Shares will be highly illiquid: (a) the shares to be received by unsecured creditors reflect a very small minority position in a privately held company dominated by Apollo and Elliott, with no indication in the Plan that unsecured creditors will be entitled to any standard form of minority protections, (b) the modified Plan and Disclosure Statement make clear that the New Shareholder Agreement will contain transfer restrictions (and, contrary to Delaware law, the Plan deems all shareholders to be a party to that shareholder agreement whether or not they consent), (c) the Reorganized Debtors will not be registered under the Exchange Act, and reporting and access to information will likely be limited, and (d) the New Common Shares will not be listed on a national exchange. As a result, unsecured creditors should expect – and the Disclosure Statement must clearly emphasize – that little to no distributable value may be realized under the Plan.

**D.    The Disclosure Statement Is Patently Deficient Because it Does Not Include a Valuation Analysis**

34.    One of the most fundamental inadequacies of the Disclosure Statement is its omission of any valuation analysis prepared by the Debtors. As previewed during proceedings held before the Court, the Debtors have determined that performing a valuation analysis simply was not necessary. Despite not having run a formal marketing process for a sale of all or substantially all of the Debtors' assets, whereby bids received by prospective buyers could serve as a proxy for market value, the Debtors' professionals posit "that the valuation implied by the

Rights Offering is currently the best measure of the reorganized Debtors' value given the facts and circumstances of these cases . . . ."[24]

35.     However, as described below, the stipulated equity value reflected in the Plan is not a proxy for actual value. Valuation is a vital component of any disclosure statement. It is one of the key factors that courts consider in determining whether to approve a disclosure statement and that claimants and interest holders consider in determining whether to accept or reject a plan of reorganization. *See, e.g.*, *In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. S.D.N.Y. 1988) (refusing to approve a debtor's disclosure statement "[a]bsent a more recent valuation of the property by a qualified individual" and finding that the valuation in the disclosure statement was "unsupported" and "self-serving"); *In re City of Colo. Springs Spring Creek Gen. Improvement Dist.*, 177 B.R. 684, 690 (Bankr. D. Colo. 1995) (holding that a disclosure statement which failed to "address the possibility or effect of a decrease in the assessed value of the real property" in the district failed to adequately inform bondholders); *In re Integrated Pet Foods, Inc.*, Case No. 03-33362 (DWS), 2004 WL 2252119, at *3 (Bankr. E.D. Pa. Sept. 17, 2004) ("Absent a clear and prominent statement of market value of the assets, the disclosure statement does not contain adequate information to allow creditors to vote for the plan.").

36.     In the absence of a consensual plan of reorganization, the need for a verifiable valuation of the debtor is paramount. Indeed, the Bankruptcy Code's drafters recognized that "a valuation of the debtor's business . . . will almost always be required under Section 1129(b) in order to determine the consideration to be distributed under the plan." H.R. REP. NO. 95-595, at 414 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6370. A valuation is

---

[24] Disclosure Statement at 119.

necessary to enable the Court to determine whether dissenting creditors are receiving fair and equitable treatment – particularly when they are to receive distributions of unvalued equity – and to ensure that no senior class of creditors will be paid a premium by capturing value that rightly belongs to such dissenting creditors. *See In re Exide Techs.*, 303 B.R. 48, 60–61 (Bankr. D. Del. 2003) ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b)."); *see also* H.R. REP. NO. 95-595, at 408 (1977), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6364 ("Use of [securities of the debtor] to pay a creditor or equity security holder without his consent may be done only under section 1129(b) and *only after a valuation of the debtor*.") (emphasis added).

37.     A "market-based approach" that "determines value on a going concern basis by analyzing the price that could be realized for a debtor's assets in a realistic framework, assuming a willing seller and a willing buyer," may be appropriate in limited circumstances. *In re Exide Techs.*, 303 B.R. at 59 (citing *Travellers Int'l AG v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.)*, 134 F.3d 188, 193–94 (3d Cir. 1998)). However, courts are reluctant to rely on a market-based approach in determining the value of securities of a reorganized debtor, preferring, instead, valuation methodologies that focus on the reorganized debtor's earning capacity are preferred. *See Consol. Rock Prods. Co. v. Du Bois*, 312 U.S. 510, 526 (1941) ("The criterion of earning capacity is the essential one if the enterprise is to be freed from the heavy hand of past errors, miscalculations or disaster, and if the allocation of securities among the various claimants is to be fair and equitable."); *In re Exide Techs.*, 303 B.R. at 65–66 ("Collier's notes that 'modern finance has caught up with' the Supreme Court's directions in *Consolidated Rock* by providing courts with valuation methodologies that focus upon earning capacity, such as

18

the comparable company analysis and the discounted cash flow analysis used in this case."
(quoting 7 COLLIER ON BANKRUPTCY § 1129.06[2][a], at 1129-156 (15th ed. rev. 2003))).

   38. The Debtors' decision not to perform a valuation analysis deprives
creditors of the ability to assess the true earning capacity of these Debtors, to better evaluate the
Debtors' projections and to make an informed determination as to the risks associated with the
Debtors' business plan. The notion that the "Stated Equity Value" serves a proxy for actual value
is misguided, particularly since the Debtors concede there was no formal marketing or sales
process. Moreover, the set up value imposed by the Backstop Parties in the Plan could be the
function of a number of self-serving considerations – including tax, debt capacity,
gerrymandering, internal mark-to-market purposes – and should not relieve the Debtors of their
obligation to inform their creditors what they think these estates are worth. At a minimum, an
independent valuation analysis would validate whether (or not) the 1.5L Notes are in fact the
fulcrum security as well as whether (and the extent to which) the holders of 15L Notes Claims
are entitled to vote as unsecured creditors. Ultimately, the failure to include a valuation analysis
is extraordinary and cuts against well-established bankruptcy practice, as reflected by the many
chapter 11 reorganization cases that have appeared before this Court involving backstop
commitments that included independent valuation analyses.

   39. In short, "[a]bsent a valuation of the assets with some factual basis, . . . the
disclosure statement does not provide adequate information as required by the Bankruptcy
Code." *In re Metrocraft Pub. Servs., Inc.*, 39 B.R. at 570. The Disclosure Statement should not
be approved unless and until the Debtors' professionals include a valuation analysis using one or
more well-established methodologies that focus on the Reorganized Debtors' earning capacity.

E.    **The Disclosure Statement Fails to Establish the Basis for the Debtors' Classification Structure**

40.    As noted above, the Debtors do not provide adequate disclosure to enable creditors to determine whether the Plan can satisfy the confirmation requirements of Section 1129 of the Bankruptcy Code with respect to each and every Debtor – the parent Debtor in particular – or whether the classification of the parent equity holders as an impaired class is inappropriate. In addition, the Debtors do not adequately disclose the basis for classifying the 1.5L Notes Deficiency Claims in the same class as other general unsecured claims, if not for gerrymandering purposes. Nor do the Debtors explain how they would expect to proceed if the Court sustained the Committee's confirmation objections related to classification.

F.    **The Disclosure Statement Fails to Sufficiently Explain the Justification for any Contemplated Prepayment of a Portion of Reinstated Debt and the Attendant Risks**

41.    The Plan provides that the 1.125L Notes and 1.25L Notes will be reinstated, but that, on the Effective Date, the Debtors may redeem or voluntarily repay a portion of the reinstated notes with the consent of the Initial Supporting Noteholders. However, the Debtors offer no business or legal justification in the Disclosure Statement for the potential redemption or voluntary repayment of the notes that are being reinstated on the Effective Date. Nor do the Debtors not disclose whether or not a redemption or voluntary repayment would trigger an obligation to pay a "make-whole" premium and, if so, the estimated amount of such premium. The Disclosure Statement also lacks any information regarding the source of funding for any such redemption or voluntary repayment, or how the funding would impact the pro forma capital structure and liquidity. Accordingly, the Court should require that these provisions be modified and/or condition its approval of the Disclosure Statement upon the Debtors' inclusion of a "sources and uses" analysis to illustrate and clarify the anticipated inflows and outflows on the Effective Date.

**G.     The Disclosure Statement Fails to Sufficiently Disclose Risk Factors Related to Feasibility**

42.     The Disclosure Statement must apprise creditors of various risks attendant to the feasibility of the Plan, in terms of the ability of the Debtors to consummate their proposed financings, as well as their ability to service that debt going forward. With regards to the proposed Exit Facility, the Exit Term Sheet contemplates a borrowing base redetermination prior to the Effective Date. That redetermination should be made available to creditors, upon notice to this Court, to ensure the Debtors maintain the necessary liquidity and working capital going forward. With regards to the Debtors' pro forma capital structure, the Debtors should disclose how they compare to their peers in terms of debt load and financial metrics upon the Effective Date. From a regulatory perspective, the Debtors must provide adequate disclosure of pro forma equity holdings and address any anticipated regulatory challenges the Debtors may face in consummating the Plan, including any review under the HSR Act.

43.     In addition, the Disclosure Statement should disclose the significant discretion and effective control conferred upon Apollo and Elliott over the ability to confirm and consummate the Plan. By way of illustration, the Plan confers significant discretionary consent rights upon the Initial Supporting Noteholders (*i.e.*, Apollo and Elliott), including a ***sole consent right*** with respect to the Confirmation Order, the Schedule of Rejected Contracts, the order approving the Disclosure Statement, certain of the Definitive Documents, the "final version" of the Plan, the Plan Supplement and various related documents, and a consent right (together with the Debtors) with respect to the Exit Facility documentation.

**H.     The Disclosure Statement Fails to Adequately Describe the Basis for the Broad Third Party Releases Being Offered Under the Plan**

44.     The Plan contains impermissibly broad and vastly overreaching release and injunction provisions that inure largely to the benefit of the Plan sponsors, without the

21

benefit of reciprocal consideration being offered to the Debtors' estates in exchange. It is imperative that the Disclosure Statement provide adequate disclosure that justifies the breadth and scope of those releases.

45.     As the Court is aware, it is a fundamental principle that the Bankruptcy Code does not authorize the release and permanent injunction of claims against non-debtors. *See* 11 U.S.C. § 524(e) ("Except as provided in subsection (a)(3) . . . discharge of a debt of a debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."). Under Fifth Circuit law, third-party releases are permitted only to the extent they are (1) consensual, (2) specific in language, (3) a condition of settlement, and (4) given for consideration. *See, e.g.*, *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 776 (Bankr. N.D. Tex 2007).

46.     Non-debtor releases must be thoroughly scrutinized; indeed, the Fifth Circuit has cautioned bankruptcy courts to protect the integrity of the reorganization process. *See In re Pac. Lumber Co.*, 584 F.3d 229, 252 (collecting cases). In fact, courts have struck release provisions where they would unjustly foreclose litigation against potential defendants. *See, e.g., In re Coho Res., Inc.,* 345 F.3d 338, 342 (5th Cir.2003); *Hall v. Nat'l Gypsum Co.,* 105 F.3d 225, 229 (5th Cir.1997); *In re Edgeworth,* 993 F.2d 51, 53–54 (5th Cir.1993); *Feld v. Zale Corp.*, 62 F.3d 746 (5th Cir.1995).[25]

---

[25] Notably, in *Pacific Lumber*, the court struck *all* of the non-debtor releases except those provided to members of the creditors' committee, including releases of plan proponents who would have been unwilling to provide financing for the plan in the absence of such releases. *In re Pac. Lumber Co.*, 584 F.3d at 251–53.

### a.  The Disclosure Statement Should Amplify Its Disclosure Concerning Third Party Releases

47.     The Debtors fail to provide sufficient information demonstrating that the sweeping third party releases they seek approval of pursuant to the Plan are appropriate in this case. Specifically, the Disclosure Statement (a) does not include a sufficiently detailed assessment of the merits or value of potential claims against the non-debtor Released Parties, (b) does not explain to stakeholders "whether the benefits of the proposed plan [outweigh] what they would give up by agreeing to the third party release," (c) does not explain what the non-debtor Released Parties are giving to the estates in exchange for the releases, and, critically, (d) does not explain why the releases are necessary. *See In re Lower Bucks Hosp.*, 488 B.R. 303, 321 (E.D. Pa. 2013) (holding that failure to include these elements in disclosure statement fell short of "adequate information" standard); *see also Cadle Co. II, Inc. v. PC Liquidation Corp. (In re PC Liquidation Corp.)*, 383 B.R. 856, 865 (E.D.N.Y 2008) (disclosure statement should include "specifics" justifying releases and settlements, including "reasons" for resolution and "merits of the potential litigation").

48.     The Court should direct the Debtors to explain the nature, value, necessity, and scope of the non-debtor releases, identify the consideration given to the estates in exchange for the releases, and explain the benefits of the non-debtor releases to the estates and the creditor body. The Debtors must also explain the absence of a typical carve-out for fraud, willful misconduct and gross negligence.

### b.  The Disclosure Statement Must Sufficiently Disclose Related Party Transactions and Affiliate Relationships

49.     To provide creditors with sufficient facts enabling them to make an informed decision concerning the value of the releases being provided to insiders (as well as from a basic corporate governance perspective), the Supporting Noteholders and their respective

affiliates, the Disclosure Statement must provide additional information concerning related party transactions and affiliate relationships. At a minimum, the Disclosure Statement should describe all prepetition and postpetition related party transactions involving the Sponsors, officers, directors, and other affiliates or related parties, along with the Debtors' assessment of any potentially colorable estate causes of action related to each such transaction. The Disclosure Statement must also disclose the existence and general terms of any related party and/or debt trading protocols implemented by the Debtors, indicate when the Debtors became aware of Apollo's 10b5-1 trading plans,[26] provide a general description of that program, and chronologically disclose changes in Apollo's debt holdings known to the Debtors over the relevant time period covered in the Disclosure Statement. All known interests held by the Supporting Noteholders and their affiliates in the Debtors, their competitors and/or any persons or entities in the Debtors' industry must also be disclosed to enable creditors to evaluate potential conflicts of interest, particularly as they may relate to strategic decisions of the Reorganized Debtors.

50.     Relatedly, the Original Plan provided that Apollo and Access may be permitted to contribute their equity interests in Wolfcamp Drillco Operating L.P. – a party to a joint venture with EP Energy – to the Reorganized Debtors in exchange for additional New Common Shares;[27] however, the amended Plan and Disclosure Statement no longer contemplate this possible transaction. The Debtors should disclose the basis for their initial determination to consider this transaction and explain why it was ultimately rejected.

---

[26] *See* Hr'g Tr. 84:23–85:2, Nov. 20, 2019, ECF No. 486.

[27] *See* Original Plan at 12 n.2.

51.     In addition, the Disclosure Statement should include pro forma equity and debt ownership (as well as anticipated board positions or other connections) of any substantial individual creditor. Based upon information available to the Committee, it appears that Apollo, after giving effect to the Plan, will hold a substantial interest in, and would be in a position to exert significant influence upon, the Reorganized Debtors. The existence of a dominant stakeholder would be material to any reasonable investor considering a minority equity investment in a privately-held company.

### c. The Disclosure Statement Must Provide Sufficient Information Concerning the Special Committee's Investigation

52.     In a similar vein, the Disclosure Statement must provide more detailed disclosure concerning the Special Committee and its investigation. The Disclosure Statement devotes a mere three paragraphs to its description of the Special Committee's prepetition investigation of potential claims and estate causes of action, offering only a few cursory examples of "related party transactions" between the Debtors and the Sponsors that were evaluated by the Special Committee. At a minimum, the Disclosure Statement should identify each transaction evaluated by the Special Committee in its investigation, including its material terms, describe the Special Committee's cost-benefit analysis in reviewing the transaction, and explain the bases for its conclusion.

53.     Among other things, the Disclosure Statement should:

- Explain the circumstances surrounding the Debtors' determination to pay down the RBL by $62 million on July 22, 2019 (i.e., within the 90 day period prior to the Petition Date) and then draw the full amount thereunder on August 1, 2019, less than two weeks later;
- Provide additional information regarding the March 2019 disclosure concerning the ability to refinance the 2020 Unsecured Notes;
- Describe the existence of the related party protocol and debt trading protocol in place with the Debtors;

- Disclose the significant payments made to executives, totaling approximately $6.5 million in July 2019 (including approximately $2.5 million paid to the CEO alone), and whether those transfers were investigated; and

- Disclose payments made to Apollo portfolio companies and/or other affiliated entities in the one-year period prior to the Petition Date, and whether those transfers were investigated.

54.     The Disclosure Statement should also note that the Special Committee did not feel the need to retain its own professionals, and instead relied upon the advice of counsel that had been recently retained by the Debtors and a financial advisor that had a long history with the Debtors.

55.     The Court should also direct the Debtors to include a statement in the Disclosure Statement indicating that (a) the Committee's investigation of the Debtors' secured lenders and insiders is underway, including an investigation into the trading activities of Apollo and Access, the former of which amassed positions in the 1.5L Notes over the course of the restructuring process (allegedly pursuant to 10b5-1 trading plans),[28] and (b) subject to the outcome of that investigation, the granting of a release may result in the surrender of estate causes of action.

### d. *The Non-Consensual Third Party Releases Are Vague and Should Be Modified*

56.     The Plan's third party release language also fails the specificity requirements of the Fifth Circuit. *See, e.g.*, *In re Applewood Chair Co.*, 203 F.3d 914, 919 (Bankr. N.D. Tex. 2007) (vague release language which fails to clearly identify the person or class of persons granting the release fails the consent requirement). Specifically, the Plan's definition of "Releasing Parties" contains ambiguous references to creditors that will be subject to the release, including creditors "that were given notice of the opportunity to opt out of

---

[28] *See* Hr'g Tr. 84:23–85:2, Nov. 20, 2019, ECF No. 486.

granting the releases set forth herein but did not opt out" or other creditors "to the maximum extent permitted by law."[29] However, neither the Plan nor Disclosure Statement describes the circumstances under which a creditor will be deemed to grant third party releases based on constructive notice of the opportunity to opt out of the releases or explains when creditors will be otherwise deemed to grant third party releases "to the maximum extent permitted by law." The Court should require the Debtors to clarify or delete this language from the release provisions altogether.

**I.      The Disclosure Statement Should Sufficiently Describe Alternative Plan Proposals**

57.      A disclosure statement must delineate the consequences of the proposed plan and the possible alternatives to the proposed plan. *See In re Copy Crafters Quickprint, Inc.*, 92 B.R. 973, 981 (Bankr. N.D.N.Y. 1988). Consequently, the Disclosure Statement should contain additional disclosure with respect to the plan process and alternative plan efforts. Currently, the Debtors offer a very broad description of their prepetition financing and plan process. The Debtors should also be required to provide a reasonable description of the efforts, *if any*, the Debtors and their advisors undertook to seek or solicit alternatives to the current Plan (whether prior to or following the Petition Date).

**J.      The Disclosure Statement Fails to Provide Sufficient Information Concerning Executive Employee Compensation**

58.      The Plan contemplates the establishment of an Employee Incentive Plan on the Effective Date. A creditor that wishes to understand the material terms of the Employee Incentive Plan is expected to refer to the EIP Term Sheet annexed as an exhibit to the PSA, which, in turn, is purportedly attached to the Disclosure Statement as Exhibit B. Significantly,

---

[29] Plan § 1.1 (definition of "Releasing Parties").

however, the Debtors neglected to actually include the EIP Term Sheet as an exhibit to the version of the PSA attached to the Disclosure Statement.

59.     Creditors who are savvy (and patient) enough to locate the EIP Term Sheet by searching the Debtors' SEC filings will learn that, under the Employee Incentive Plan, (a) 10% of the New Common Shares on the Effective Date, on a fully diluted basis (including shares issuable under the Employee Incentive Plan), will be reserved for issuance to officers and employees designated by the New Board, and (b) of that total award pool, 70% of the awards will be granted to the CEO and seven other officers and become immediately effective as of the Effective Date.[30] In other words, on the Effective Date, the CEO and seven other officers will receive equity representing 7% of the New Common Shares, on a fully diluted basis—an amount approximately *40 times* the estimated 0.06% recovery for unsecured creditors post-dilution.

60.     As an initial matter, the principal terms of the Employee Incentive Plan should be clearly and prominently described in the Plan and Disclosure Statement, not buried among hundreds of pages of text (let alone in a referenced, but omitted, exhibit). Moreover, given that the Bankruptcy Court is being asked to approve the Employee Incentive Plan in connection with confirmation of the Plan, the Disclosure Statement should describe the basis for the Employee Incentive Plan and the Debtors' position on whether or not the Employee Incentive Plan (or aspects thereof) constitute(s) a retention plan that must comply with the requirements of Section 503(c) of the Bankruptcy Code (and, if so, the manner in which the plan complies with those requirements). The Disclosure Statement should also identify the parties who negotiated the terms of the Employee Incentive Plan (including the advisors retained by each of the negotiating parties) and describe the process by which the Debtors determined that the Employee

---

[30] *See* EP Energy Corp., Current Report (Form 8-K) (Oct. 21, 2019), Ex. 10.1 at Ex. A-2.

Incentive Plan reflected justifiable terms in light of these Chapter 11 Cases and the *de minimis* distribution to be made to unsecured creditors under the Plan. The performance goals applicable to awards under the Employee Incentive Plan should also be disclosed so that creditors can compare them to the recently filed Financial Projections and determine whether they represent meaningful targets or simply reward management for meeting their own projections. Finally, the Disclosure Statement must disclose recent payments to the executive management team, so that the Employee Incentive Plan may be evaluated in context.

## K. Other Modifications to Disclosure Statement

61.     The following modifications to the Disclosure Statement and/or Plan (as applicable) should also be made:

- In Article III.D.8 ("Prepetition Legal Proceedings"), the Debtors should provide an estimate, on a risk-adjusted basis, of anticipated claim amounts resulting from litigation;
- The Debtors should reconcile the projections with the July business plan;
- Any "Claims Resolution Procedures," which may impact unsecured creditor recoveries, should be the subject of a separate motion, filed upon notice to creditors (rather than embedded in the Plan Supplement);
- The provision contained in Section 7.3 of the Plan that prohibits a creditor whose claim has been estimated from seeking reconsideration of such estimation, should be stricken; and
- Certain aspects of the Plan's proposed treatment of executory contracts and unexpired leases raise concerns with respect to proper notice to the Committee and counterparties, and the Committee will endeavor to negotiate appropriate modifications with the Debtors.

## L. Committee Recommendations

62.     In addition to addressing the foregoing infirmities, the Disclosure Statement and related solicitation materials should include the Committee's views on the Plan. Given the treatment proposed under the Plan and the number of creditors that will have the opportunity to vote, understanding the views of the Committee is essential for creditors and a

reasonable investor to determine whether to vote to accept the Plan. In addition, the Debtors should be directed to include in the solicitation materials a recommendation letter prepared by the Committee. The Committee will provide the Debtors with a recommendation letter prior to the date on which the Debtors commence solicitation.

## CONCLUSION

63.     Based on the foregoing, the Committee respectfully submits that the Debtors' Disclosure Statement cannot be approved in its current form. The Committee will endeavor to prepare and circulate to the Debtors proposed language (to the extent practicable) to address some or all of the issues described above (as well as to address certain miscellaneous comments to the Plan, Disclosure Statement and related materials).

64.     The Committee has significant concerns regarding the Plan and intends to vigorously object to confirmation of the Plan. The Committee submits this Objection without prejudice to, and with a full reservation of, the Committee's rights to supplement or amend this Objection in advance of, or in connection with, the hearing to approve the Disclosure Statement and/or confirmation of the Plan. Nothing herein is intended to be a waiver by the Committee of any right, objection, argument, claim, or defense with respect to any matter, including matters involving the Disclosure Statement and the Plan, all of which are hereby expressly reserved.

**WHEREFORE**, the Committee respectfully requests that the Court (a) deny the Disclosure Statement Motion absent the Debtors modifying the Disclosure Statement in the manner requested herein and (b) grant the Committee such other and further relief as is just and proper.

Dated: December 19, 2019
Houston, Texas

Respectfully submitted,

POLSINELLI PC

By: */s/_____*

Trey Monsour
Texas State Bar No. 14277200
1000 Louisiana Street, Suite 6400
Houston, TX 77002
Telephone.: (713) 374-1600
Facsimile: (713) 374-1601
Email: tmonsour@polsinelli.com

-and-

STROOCK & STROOCK & LAVAN LLP
Kristopher M. Hansen (admitted *pro hac vice*)
Frank A. Merola (admitted *pro hac vice*)
Kenneth Pasquale (admitted *pro hac vice*)
Erez E. Gilad (admitted *pro hac vice*)
Jonathan D. Canfield (admitted *pro hac vice*)
180 Maiden Lane
New York, NY 10038
Telephone: 212-806-5400
Facsimile: 212-806-6006
Email: khansen@stroock.com
        fmerola@stroock.com
        kpasquale@stroock.com
        egilad@stroock.com
        jcanfield@stroock.com

*Proposed Counsel for the Official Committee*
*of Unsecured Creditors*

## Certificate of Service

I, Trey Monsour, do hereby certify that on December 19, 2019, this *OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTION OF DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING PROPOSED DISCLOSURE STATEMENT; (II) ESTABLISHING SOLICITATION AND VOTING PROCEDURES; (III) ESTABLISHING RIGHTS OFFERING PROCEDURES; (IV) SCHEDULING CONFIRMATION HEARING; (V) ESTABLISHING NOTICE AND OBJECTION PROCEDURES FOR CONFIRMATION OF THE PROPOSED PLAN; AND (VI) APPROVING NOTICE AND OBJECTION PROCEDURES FOR THE ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES* **[Relates to Docket No. 435]** was served on all parties entitled to service under the Court's ECF system and on the below-listed parties by U.S. Mail.

Top 30 Creditor Archrock Services LP
Brad K. Howell
Baker & Hostetler LLP
811 Main St., Suite
1100 Houston TX 77002

Counsel to Rene R. Barrientos, Ltd., et al
Attn: Carlos R. Soltero
4611 Bee Cave Road Suite 306B
Austin TX 78746

Duane Morely Cox, Pro Se
1199 Cliffside Dr
Logan UT 84321

Top 30 Creditor Frio LaSalle Pipeline LP
Attn: General Counsel
1717 Main Street, Suite 5200
Dallas TX 75201

Counsel for Storey Minerals, Ltd.,
Attn: Patrick L. Hughes, Arsalan Muhammad, David Trausch
1221 McKinney Suite 2100
Houston TX 77010

Top 30 Creditor J W Power Company
Attn: General Counsel
15505 Wright Brothers Drive
Addison, TX 75001

Top 30 Creditor Baker Hughes
Christopher J. Ryan
17021 Aldine Westfield Road
Houston TX 77073

Co-Counsel to Access Industries Inc.
Debevoise & Plimpton LLP
Attn: Sidney P. Levinson
949 Third Avenue
New York NY 10022

Environmental Protection Agency
Attn: Bankruptcy Division
Ariel Rios Building
1200 Pennsylvania Avenue N.W.
Washington DC 20004

Top 30 Creditor FTS International
D. Patrick Long
Squire Patton Boggs LLP
2500 McKinney Ave, Suite 1700
Dallas TX 75201

Top 30 Creditor Independence Oilfield Chemicals LLC
Patrick Williams
1450 Lake Robbine Drive Suite 400
The Woodlands TX 77380

Counsel to Kinder Morgan Altamont
Law Office of Patricia Williams Prewitt
Attn Patricia Williams Prewitt
10953 Vista Lake Court
Navasota, TX 77868

Top 30 Creditor Basic Energy Services Inc.
Attn: General Counsel
801 Cherry Street, Suite 2100
Fort Worth TX 76102

Top 30 Creditor DNOW L.P.
Attn: Raymond Chang
7402 N. Eldridge Parkway
Houston TX 77041

US Attorney General
Attention Bankruptcy
Dept 950 Pennsylvania Avenue, NW
Washington DC 20530-0001

Top 30 Creditor Halliburton Energy
Hal C. Welch
Chaffe, McCall LLP
1100 Poydras Street
New Orleans LA 70163

IRS Insolvency Section
IRS Centralized Insolvency Operation
PO Box 7346
Philadelphia PA 19101-7346

Counsel to Hughes Springs ISD,
Linebarger Goggan Blair & Sampson LLP Attn: Elizabeth Weller
2777 N. Stemmons Freeway Suite 1000
Dallas TX 75207

Counsel to JPMorgan Chase Bank
Mayer Brown LLP
Attn: Sean T. Scott
71 S. Wacker
Chicago IL 6060

Counsel to Elliott Management
L.P. Milbank LLP
Attn: Gerard Uzzi, Eric K. Stodola
55 Hudson Yards
New York NY 10001

Counsel to the Ad Hoc 1.125L/1.25L
Morrison & Foerster LLP
Attn: Dennis L. Jenkins
250 W 55th Street
New York NY 10019

Top 30 Creditor Multi Chem
Attn: General Counsel
3000 N. Sam Houston Pkwy
East Houston TX 77032

Top 30 Creditor Nabors Drilling
Technologies USA Inc.
Anthony G. Petrello
515 W Greens Road Suite 1200
Houston TX 77067

Top 30 Creditor NGL Water Solutions
Attn: General Counsel
3773 Cherry Creek North Drive
Suite 1000
Denver CO 80209

Creditor Office of Natural Resources
Revenue (Ute Tribal)
Attn: Bankruptcy Department
PO Box 25165
Denver CO 80225-0165

Counsel for Apollo Management
Paul, Weiss, Rifkind, Wharton
Attn: Jeffrey Saferstein
1285 Avenue of the Americas
New York NY 10019

Counsel to Dimmit County
Perdue, Brandon, Fielder, Collins &
Attn: Carlos Arce
613 NW Loop 410 Suite 550
San Antonio TX 78216

Top 30 Creditor Premier Pipe LLC
Attn: General Counsel
15600 John F. Kennedy Blvd.
Suite 200
Houston TX 77032

Interested Party Dimmit County Perdue
Brandon,Fielder,Collins&Mott, LLP
613 NW Loop 410, Suite 550
San Antonio, TX 78216

Duane Morley Cox
1199 Cliffside Drive
Logan, UT 84321

Prime Clerk LLC
60 East 42nd, Suite 1440
New York, NY 10165

Linebarger Goggan Blair & Sampson,
LLP
c/o Elizabeth Weller
2777 N. Stemmons Fwy, Suite 1000
Dallas, TX 75207

Michael C. Shepherd on behalf of
Creditor Kinder Morgan Altamont LLC
White & Case LLP
200 South Biscayne Blvd., Ste. 4900
Miami, FL 33131

Jason N. Zakia on behalf of Creditor
Kinder Morgan Altamont LLC
White & Case LLP
111 South Wacker Drive, Ste 5100
Chicago, IL 60606-5055

*/s/ Trey Monsour*
By: Trey Monsour