**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | § | |
|---|---|---|
| In re: | § | **Chapter 11** |
| | § | |
| **EP ENERGY CORPORATION**, *et al.*, | § | **Case No. 19-35654 (MI)** |
| | § | |
| | § | **(Jointly Administered)** |
| Debtors.[1] | § | |
| | § | |

**DISCLOSURE STATEMENT FOR SECOND**
**AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION**
<u>**OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**</u>

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford Carlson
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Ronit Berkovich (admitted *pro hac vice*)
Scott R. Bowling (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and*
*Debtors in Possession*

Dated: January 2, 2020
Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

**DISCLOSURE STATEMENT, DATED JANUARY 2, 2020**

**Solicitation of Votes on the**

**Plan of Reorganization of**

**EP ENERGY CORPORATION, *ET AL.***

---

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE CHAPTER 11 PLAN OF REORGANIZATION OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "DEBTORS") ATTACHED HERETO AS EXHIBIT A (THE "PLAN")

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS [4:00 P.M.] (PREVAILING CENTRAL TIME) ON [FEBRUARY 6], 2020 UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS [JANUARY 9], 2020 (THE "VOTING RECORD DATE").

---

### RECOMMENDATION BY THE DEBTORS

The special committee of the board of directors of EP Energy Corporation and each of the governing bodies for each of its affiliated debtors have unanimously approved the transactions contemplated by the Solicitation and the Plan.  The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Further, holders of 100% in aggregate principal amount of the Claims under the Debtors' RBL Facility (as defined herein), 79.3% in aggregate principal amount of the Debtors' 1.5L Notes (as defined herein), and 52.0% in aggregate principal amount of the Debtors' 1.25L Notes (as defined herein) have agreed to vote in favor of the Plan.

Please note that the Official Committee of Unsecured Creditors (the "**Creditors' Committee**") has included a letter in the solicitation package outlining its recommendation that all unsecured creditors vote to reject the Plan.  The Debtors wholly disagree with the Creditors' Committee recommendation and the reasoning supporting its recommendation.

---

**HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.**

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW COMMON SHARES PURSUANT TO SECTIONS 4.6 AND 4.7 OF THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE SHAREHOLDER AGREEMENT, THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE SHAREHOLDER AGREEMENT, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE ISSUANCE AND SALE OF THE NEW COMMON SHARES (I) PURSUANT TO THE RIGHTS OFFERING AND (II) TO THE BACKSTOP PARTIES UNDER THE BACKSTOP COMMITMENT AGREEMENT (INCLUDING THE NEW COMMON SHARES COMPRISING THE BACKSTOP COMMITMENT PREMIUM) IS BEING MADE IN RELIANCE ON THE EXEMPTION FROM REGISTRATION SET FORTH IN SECTION 4(a)(2) OF THE SECURITIES ACT AND REGULATION D THEREUNDER. SUCH SECURITIES WILL BE CONSIDERED "RESTRICTED SECURITIES" AND MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR UNDER AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, SUCH AS, UNDER CERTAIN CONDITIONS, THE RESALE PROVISIONS OF RULE 144 OF THE SECURITIES ACT.  THE TRANSFERS OF SUCH SECURITIES ARE ALSO SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE SHAREHOLDER AGREEMENT.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH AND UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT) AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS THE VOLATILITY OF AND POTENTIAL FOR SUSTAINED LOW OIL, NATURAL GAS AND NGLS PRICES, THE SUPPLY AND DEMAND FOR OIL, NATURAL GAS AND NGLS, CHANGES IN COMMODITY PRICES FOR OIL AND NATURAL GAS, THE DEBTORS' ABILITY TO MEET PRODUCTION VOLUME TARGETS, THE UNCERTAINTY OF ESTIMATING PROVED RESERVES AND UNPROVED RESOURCES, THE DEBTORS' ABILITY TO DEVELOP PROVED UNDEVELOPED RESOURCES AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES AND OTHER FACTORS LISTED IN THE DEBTORS' SEC FILINGS. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF ALL CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) HOLDERS OF ALL CLAIMS AND INTERESTS THAT ARE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN BUT DO NOT OPT OUT, AND (V) THE RELEASED PARTIES.

HOLDERS OF CLAIMS IN VOTING CLASSES (3, 6, 7, 8 AND 11) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR BALLOT.  HOLDERS OF CLAIMS IN NON-VOTING CLASSES (1, 2, 4, 5, 10 AND 12) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS.

## TABLE OF CONTENTS

**Page**

I. INTRODUCTION ...................................................................................................1

    A.    Overview of Restructuring.......................................................................1
    B.    Plan Support Agreement ..........................................................................3
    C.    Backstop Commitment Agreement...........................................................4
    D.    DIP-to-Exit Commitment.........................................................................5
    E.    Inquiries ...................................................................................................6

II. SUMMARY OF PLAN TREATMENT ................................................................7

III. OVERVIEW OF DEBTORS' OPERATIONS.....................................................12

    A.    Business Overview.................................................................................12
        1.    General Overview .......................................................................12
        2.    Drilling Operations .....................................................................13
        3.    Joint Ventures .............................................................................13
        4.    Hedging.......................................................................................14
    B.    Debtors' Corporate History and Structure .............................................14
        1.    Corporate History.......................................................................14
        2.    Debtors' Corporate and Governance Structure..........................15
    C.    Equity Ownership...................................................................................16
    D.    Prepetition Indebtedness ........................................................................17
        1.    RBL Claims ................................................................................18
        2.    1.125L Notes Claims ...................................................................18
        3.    1.25L Notes Claims .....................................................................19
        4.    1.5L Notes Claims .......................................................................20
        5.    Intercreditor Agreements ............................................................20
        6.    Unsecured Notes Claims.............................................................21
        7.    Other Claims...............................................................................21
        8.    Prepetition Legal Proceedings ...................................................22
        9.    Intercompany Claims ..................................................................22
        10.    Decommissioning, Reclamation and Plugging and Abandonment
                Obligations for Federal Oil & Gas Leases.................................23

IV. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ...............23

    A.    Continued Weakness in Oil & Gas Exploration and Production Industry.............23
    B.    Prepetition Restructuring Efforts ...........................................................24
        1.    Operational Initiatives................................................................24
        2.    Strategic Transactions ................................................................24

3.    Leverage and Liquidity Concerns ................................................................24
4.    Special Committee Appointed to Oversee Strategic Process ..................25
5.    Debtors Engage with Creditors and Other Parties ....................................25
6.    Utilization of Grace Period and Entry into Forbearance Agreements ..........................................................................................................26
7.    Agreement in Principle with Initial Supporting Noteholders ..................27
8.    Negotiations Regarding Tax Attributes .......................................................27
9.    Employee Incentive Plan and Management Employment Agreement Negotiations .............................................................................28

C.    Prepetition Analysis ..........................................................................................29
1.    Independent Investigation ...............................................................................29
2.    Mortgage Lien Analysis ...................................................................................30

D.    Prepetition Compensation Program ..............................................................31

V. OVERVIEW OF CHAPTER 11 CASES ..........................................................................32

A.    Commencement of Chapter 11 Cases and First Day Motions ...............32
B.    First Day Motions ...............................................................................................32
C.    Procedural Motions and Retention of Professionals ................................33
D.    Retention of Chapter 11 Professionals .........................................................33
E.    Postpetition Novation of Hedges ...................................................................34
F.    Execution of Backstop Commitment Agreement and PSA and Entry into DIP Facility and Exit Commitment Letter .........................................34
G.    Appointment of Creditors' Committee .........................................................35
H.    Adversary Complaint to Invalidate MSB's Judgement Lien ..................35
I.    Altamont Adversary Complaint ......................................................................37
J.    Exclusivity ..............................................................................................................37
K.    Statements and Schedules, and Claims Bar Dates .....................................37
L.    Alternative Plan Proposals ...............................................................................38
M.    Request for Equity Committee .........................................................................38

VI. SUMMARY OF PLAN ..........................................................................................................38

A.    Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims. ..................................................................................................39
1.    Treatment of Administrative Expense Claims. ..........................................39
2.    Treatment of Fee Claims. ................................................................................39
3.    Treatment of DIP Claims and Commitments. ...........................................40
4.    Payment of Fees and Expenses Under DIP Order. ..................................40
5.    Treatment of Priority Tax Claims. ................................................................40

B.    Classification of Claims and Interests. ..........................................................41
1.    Classification in General. ..................................................................................41
2.    Formation of Debtor Groups for Convenience Only. .............................41
3.    Summary of Classification of Claims and Interests. ...............................41

|     | 4.  | Special Provision Governing Unimpaired Claims. | 42 |
|     | 5.  | Separate Classification of Other Secured Claims. | 42 |
|     | 6.  | Elimination of Vacant Classes. | 42 |
|     | 7.  | Voting Classes; Presumed Acceptance by Non-Voting Classes. | 42 |
|     | 8.  | Voting; Presumptions; Solicitation. | 42 |
|     | 9.  | Cramdown. | 43 |
|     | 10. | No Waiver. | 43 |
| C.  | Treatment of Claims and Interests. | | 43 |
|     | 1.  | Class 1: Other Secured Claims | 43 |
|     | 2.  | Class 2:  Other Priority Claims. | 43 |
|     | 3.  | Class 3:  RBL Claims. | 44 |
|     | 4.  | Class 4:  1.125L Notes Claims. | 44 |
|     | 5.  | Class 5:  1.25L Notes Claims. | 44 |
|     | 6.  | Class 6:  Secured 1.5L Notes Claims. | 44 |
|     | 7.  | Class 7:  Unsecured Claims. | 45 |
|     | 8.  | Class 8:  Convenience Claims. | 45 |
|     | 9.  | Class 9:  Intercompany Claims. | 45 |
|     | 10. | Class 10:  Subordinated Claims. | 46 |
|     | 11. | Class 11:  Existing Parent Equity Interests. | 46 |
|     | 12. | Class 12:  Other Equity Interests. | 46 |
|     | 13. | Class 13:  Intercompany Interests. | 46 |
|     | 14. | Treatment of Vacant Classes. | 47 |
| D.  | Means for Implementation. | | 47 |
|     | 1.  | Compromise and Settlement of Claims, Interests, and Controversies. | 47 |
|     | 2.  | Continued Corporate Existence; Effectuating Documents; Further Transactions. | 47 |
|     | 3.  | Corporate Action. | 48 |
|     | 4.  | Plan Funding. | 48 |
|     | 5.  | Cancellation of Existing Securities and Agreements. | 48 |
|     | 6.  | Cancellation of Certain Existing Security Interests. | 50 |
|     | 7.  | Officers and Boards of Directors. | 50 |
|     | 8.  | Employee Incentive Plan. | 51 |
|     | 9.  | Authorization, Issuance, and Delivery of New Common Shares. | 51 |
|     | 10. | Exit Credit Agreement. | 52 |
|     | 11. | Rights Offering. | 52 |
|     | 12. | Intercompany Interests; Corporate Reorganization. | 53 |
|     | 13. | Restructuring Transactions. | 53 |
|     | 14. | Restructuring Expenses. | 54 |

|  | 15. | Indenture Trustee Expenses. | 54 |
|  | 16. | Private Company | 55 |
| E. | | Distributions. | 55 |
|  | 1. | Distributions Generally. | 55 |
|  | 2. | No Postpetition Interest on Claims. | 55 |
|  | 3. | Date of Distributions. | 55 |
|  | 4. | Distribution Record Date. | 55 |
|  | 5. | Distributions after Effective Date | 56 |
|  | 6. | Disbursing Agent. | 56 |
|  | 7. | Delivery of Distributions. | 56 |
|  | 8. | Unclaimed Property. | 57 |
|  | 9. | Satisfaction of Claims. | 57 |
|  | 10. | Manner of Payment under Plan. | 57 |
|  | 11. | Fractional Shares and De Minimis Cash Distributions. | 57 |
|  | 12. | No Distribution in Excess of Amount of Allowed Claim. | 58 |
|  | 13. | Allocation of Distributions between Principal and Interest. | 58 |
|  | 14. | Exemption from Securities Laws. | 58 |
|  | 15. | Setoffs and Recoupments. | 59 |
|  | 16. | Rights and Powers of Disbursing Agent. | 59 |
|  | 17. | Withholding and Reporting Requirements. | 59 |
| F. | | Procedures for Disputed Claims. | 60 |
|  | 1. | Allowance of Claims. | 60 |
|  | 2. | Claims Objections. | 60 |
|  | 3. | Estimation of Claims. | 61 |
|  | 4. | Adjustment to Claims Register Without Objection. | 61 |
|  | 5. | Time to File Objections to Claims. | 61 |
|  | 6. | Disallowance of Claims | 61 |
|  | 7. | Amendments to Claims. | 62 |
|  | 8. | No Distributions Pending Allowance. | 62 |
|  | 9. | Disputed Claims Reserve. | 62 |
|  | 10. | Distributions after Allowance. | 64 |
|  | 11. | Claims Resolution Procedures Cumulative. | 64 |
| G. | | Executory Contracts and Unexpired Leases. | 64 |
|  | 1. | General Treatment. | 64 |
|  | 2. | Determination of Cure Amounts and Deemed Consent. | 65 |
|  | 3. | Payments Related to Assumption of Contracts and Leases. | 65 |
|  | 4. | Rejection Damages Claims. | 66 |
|  | 5. | Survival of the Debtors' Indemnification Obligations. | 66 |
|  | 6. | Compensation and Benefit Plans. | 67 |

7.   Insurance Policies. ...................................................................67

8.   Modifications, Amendments, Supplements, Restatements, or Other
     Agreements. ...........................................................................67

9.   Reservation of Rights. ..............................................................68

H.   Conditions Precedent to Occurrence of Effective Date. ....................68

1.   Conditions Precedent to Confirmation.........................................68

2.   Conditions Precedent to Effective Date. ......................................68

3.   Waiver of Conditions Precedent. ...............................................70

4.   Effect of Failure of a Condition. ...............................................70

I.   Effect of Confirmation. .................................................................71

1.   Binding Effect. .......................................................................71

2.   Vesting of Assets. ...................................................................71

3.   Discharge of Claims Against and Interests in Debtors. ..................71

4.   Pre-Confirmation Injunctions and Stays. ....................................72

5.   Injunction against Interference with Plan. ...................................73

6.   Plan Injunction. ......................................................................73

7.   Releases..................................................................................74

8.   Exculpation. ...........................................................................77

9.   Injunction Related to Releases and Exculpation. ..........................78

10.  Subordinated Claims. ..............................................................78

11.  Retention of Causes of Action and Reservation of Rights. ............78

12.  Ipso Facto and Similar Provisions Ineffective. ............................79

13.  Indemnification and Reimbursement Obligations. ........................79

J.   Retention of Jurisdiction. ...............................................................79

1.   Retention of Jurisdiction. .........................................................79

K.   Miscellaneous Provisions................................................................81

1.   Exemption from Certain Transfer Taxes. ....................................81

2.   Request for Expedited Determination of Taxes. ...........................81

3.   Dates of Actions to Implement Plan. ..........................................82

4.   Amendments. .........................................................................82

5.   Revocation or Withdrawal of Plan. ............................................82

6.   Severability. ...........................................................................83

VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
     SECURITIES LAWS......................................................................83

A.   1145 Securities..............................................................................83

B.   Private Placement...........................................................................84

VIII. CERTAIN TAX CONSEQUENCES OF PLAN ...................................................86

    A.    Consequences to the Debtors .................................................87
        1.    Cancellation of Debt ................................................88
        2.    Limitation of NOL Carryforwards and Other Tax Attributes...................88
    B.    Consequences to Holders of Certain Claims ...............................90
        1.    Treatment of U.S. Holders of RBL Claims...............................91
        2.    Treatment of U.S. Holders of 1.5L Notes Claims.........................93
        3.    Treatment of U.S. Holders of Unsecured Claims (Other Than 1.5L Deficiency Claims) ...............................96
        4.    Distributions in Discharge of Accrued Interest or OID .....................97
        5.    Character of Gain or Loss ............................................98
        6.    Disposition of New Common Shares by U.S. Holders...........................99
        7.    Tax Treatment of Disputed Claims Reserve ..............................99
        8.    Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims) ......................100
        9.    FATCA ...........................................................102
    C.    Treatment of Existing Parent Equity Interests ...........................102
    D.    Withholding on Distributions and Information Reporting....................103

IX. CERTAIN RISK FACTORS TO BE CONSIDERED .........................................104

    A.    Certain Bankruptcy Law Considerations .................................105
        1.    General ...........................................................105
        2.    Risk of Non-Confirmation of the Plan...................................105
        3.    Non-Consensual Confirmation and Conversion into Chapter 7 Cases ...............................105
        4.    Risk of Non-Occurrence of the Effective Date................................106
        5.    Risk of Termination of the Plan Support Agreement .............................106
        6.    Risks Related to Possible Objections to the Plan....................................106
        7.    Releases, Injunctions, and Exculpations Provisions May Not Be Approved........................................106
    B.    Risks Related to Exit Facility ...........................................107
        1.    Defects in Collateral Securing the Exit Facility ...................................107
        2.    Failure to Perfect Security Interests in Collateral ....................................107
        3.    Casualty Risk of Collateral ..........................................107
        4.    Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors.............................108
        5.    Effectiveness of Exit Facility.........................................108
    C.    Additional Factors Affecting the Value of Reorganized Debtors.......................108
        1.    Claims Could Be More than Projected ...................................108

2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary ..................................................109

3. Risks Associated with the Debtors' Business and Industry....................109

4. DIP Facility ...........................................................................................111

5. Post-Effective Date Indebtedness .........................................................111

D. Factors Relating to Securities to Be Issued under Plan .....................................111

1. Market for Securities..............................................................................111

2. Potential Dilution ..................................................................................111

3. Significant Holders ...............................................................................112

4. Equity Interests Subordinated to Reorganized Debtors' Indebtedness............................................................................................112

5. Implied Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares ................................112

6. No Intention to Pay Dividends...............................................................112

7. Reorganized EP Energy will be a Private Company ..............................113

E. Factors Relating to Rights Offering..................................................................113

1. Debtors Could Modify Rights Offering Procedures ..............................113

2. Backstop Commitment Agreement Could Be Terminated .....................113

F. Additional Factors..............................................................................................113

1. Debtors Could Withdraw Plan ..............................................................113

2. Debtors Have No Duty to Update ..........................................................113

3. No Representations Outside the Disclosure Statement Are Authorized...............................................................................................113

4. No Legal or Tax Advice Is Provided by the Disclosure Statement .........114

5. No Admission Made ..............................................................................114

6. Certain Tax Consequences.....................................................................114

X. VOTING PROCEDURES AND REQUIREMENTS ................................................114

A. Voting Deadline .................................................................................................114

B. Voting Procedures..............................................................................................115

C. Parties Entitled to Vote .....................................................................................115

1. Fiduciaries and Other Representatives...................................................117

2. Agreements Upon Furnishing Ballots....................................................117

3. Change of Vote ......................................................................................117

D. Waivers of Defects, Irregularities, etc. .............................................................117

E. Further Information, Additional Copies ............................................................117

XI. CONFIRMATION OF PLAN .................................................................................118

A. Confirmation Hearing ........................................................................................118

B. Objections to Confirmation................................................................................118

    C.    Requirements for Confirmation of Plan..................................................119
        1.    Acceptance of Plan ...........................................................120
        2.    Best Interests Test ............................................................121
        3.    Feasibility.........................................................................121
        4.    Valuation..........................................................................122

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN............123

    A.    Alternative Plan of Reorganization.......................................................123
    B.    Sale under Section 363 of the Bankruptcy Code ...................................124
    C.    Liquidation under Chapter 7 of Bankruptcy Code.............................124

XIII. CONCLUSION AND RECOMMENDATION................................................125

**Exhibit A**:    Plan

**Exhibit B**:    Plan Support Agreement

**Exhibit C**:    Organizational Chart

**Exhibit D**:    Liquidation Analysis

**Exhibit E**:    Financial Projections

**Exhibit F**:    Rights Offering Procedures

**Exhibit G**:    Ad Hoc Proposal (October 27, 2019)

# I.
# INTRODUCTION

### A.    Overview of Restructuring

EP Energy Corporation ("**EP Energy**" or "**EP Parent**") and its debtor affiliates[2] (each, a "**Debtor**," and collectively, the "**Debtors**" or the "**Company**") submit this disclosure statement (as may be amended from time to time, the "**Disclosure Statement**") in connection with the Solicitation of votes on the *Second Amended Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and Its Affiliated Debtors* dated January 2, 2020 attached hereto as **Exhibit A**.

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and holders of interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the chapter 11 cases that commenced (the "**Chapter 11 Cases**") on October 3, 2019 (the "**Petition Date**"), and certain documents related to the Plan.[3]

As described in more detail below, the Debtors faced certain financial difficulties prior to the Petition Date and commenced these Chapter 11 Cases to accomplish a successful restructuring of their business through a substantial deleveraging of their capital structure to reduce the go-forward cost of capital for their otherwise healthy operations, as well as reject certain executory contracts the Debtors are party to that are burdensome to the Debtors' operations and estates.

The Plan is the result of extensive good faith negotiations, overseen by the Debtors' independent Special Committee (as defined herein), among the Debtors and a number of their key economic stakeholders that have agreed to support the Plan pursuant to (i) that certain Plan Support Agreement dated as of October 18, 2019 (the "**Plan Support Agreement**" or "**PSA**") with holders of approximately (a) 52.0% of the Debtors' 8.00% senior secured notes due 2024 and (b) 79.3% (in the aggregate) of the Debtors' 9.375% senior secured notes due 2024 and the Debtors' 8.00% senior secured notes due 2025, and (ii) that certain Exit Commitment Letter (as defined below) with holders of 100% of the Claims under the Debtors' prepetition RBL Facility.

The Plan provides for a comprehensive restructuring of the Company's balance sheet and a significant investment of capital in the Debtors' business. The transactions contemplated in the Plan will strengthen the Company by substantially reducing its debt and increasing its cash flow on a go-forward basis, and preserve in excess of 500 jobs. Specifically, the proposed restructuring contemplates, among other things:

- a reduction of current debt on the Debtors' balance sheet by approximately $3.3 billion,

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

[3] Capitalized terms used in the Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan. To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

- a $475 million equity rights offering (the "**Rights Offering**"), $463 million of which is being backstopped by the Supporting Noteholders (as defined below),

- access to an approximately $629 million exit credit facility (the "**Exit Facility**"), which RBL Lenders holding 100% of the Claims under the Debtors' prepetition RBL Facility have committed to provide support for, and which the Debtors' prepetition RBL Facility and postpetition DIP Facility will "roll" into on the effective date of the Plan ("**Effective Date**").

The Company also may, subject to the terms of the Plan Support Agreement and Exit Commitment Letter, (i) consummate a private placement of New Common Shares for an aggregate purchase price of up to $75 million (the "**Private Placement**"),[4] and (ii) obtain an incremental amount of up to $300 million in exit financing under the Exit Facility.

The Debtors will use the proceeds of the Rights Offering (and the Private Placement, if consummated) to, among other things, fund the costs and expenses of these Chapter 11 Cases, fund distributions under the Plan, and pay down the DIP Facility and Exit Facility as well as for working capital after emergence from chapter 11.

The Debtors believe that upon consummation of the Plan and the transactions contemplated thereby, the post-emergence enterprise will have the ability to withstand the challenges and volatility of the oil and gas industry and succeed as a leading operator in their three main regions: Northeastern Utah, the Eagle Ford shale in South Texas, and the Permian basin in West Texas.

The Plan provides for the following treatment of claims and equity interests:

- To the extent the DIP Facility is not paid down in full from the proceeds of the Rights Offering or the Private Placement, each holder of Allowed **DIP Claims** will receive on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

- Holders of Allowed **RBL Claims** will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

- Holders of Allowed **1.125L Notes Claims** will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes

---

[4] The terms of a Private Placement, if any, have not yet been determined.  In addition, the Plan Support Agreement provides that Apollo and Access may contribute their equity interests in Jeter Drillco in exchange for New Common Shares, subject to the agreement of the Company, Access, and the Initial Supporting Noteholders.  The parties no longer intend to pursue such a transaction and have accordingly removed all references to such a transaction from the Plan and Disclosure Statement.

Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture.

- Holders of Allowed **1.25L Notes Claims** will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture.

- Holders of Allowed **1.5L Notes Claims** will receive on account of the secured portion of such Allowed 1.5L Notes Claims, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claims, their Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement (if applicable), the Backstop Commitment Premium, and the EIP Shares, and (ii) the right to participate in the Rights Offering.

- Holders of Allowed **Unsecured Claims** (*i.e.*, Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims) will receive their pro rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares.

- Holders of Allowed **Convenience Claims** (*i.e.*, Claims that would otherwise be a General Unsecured Claim but are (i) Allowed in the amount of $100,000 or less, or (ii) irrevocably reduced to the Convenience Claim Amount at the election of the holder in accordance with the Plan) will receive the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) their pro rata share of the Convenience Claim Distribution Amount.

- Holders of **Existing Parent Equity Interests** will receive, on account of available assets of EP Energy, their Pro Rata share of $500,000 in cash.

### B.    Plan Support Agreement

On October 18, 2019, the Debtors entered into the Plan Support Agreement, a copy of which is annexed hereto as **Exhibit B**, with certain affiliates of, or funds managed by (a) Apollo Management Holdings, L.P. ("**Apollo**"), (b) Elliott Management Corporation ("**Elliott**" and, together with Apollo, the "**Initial Supporting Noteholders**"), (c) Access Industries, Inc. ("**Access**"), and (d) Avenue Capital Group ("**Avenue**", and collectively with the Initial Supporting Noteholders and Access, the "**Supporting Noteholders**").

The Plan Support Agreement provides that the parties thereto will support the Plan and the restructuring transactions contemplated thereby, subject to the terms and provisions of the Plan Support Agreement.  In addition, in the Plan Support Agreement, the Debtors have agreed to move forward expeditiously with confirmation and consummation of the Plan, and to be subject to certain milestones set forth below which, if not achieved, enable the Supporting Noteholders to terminate the Plan Support Agreement.

In accordance with the Plan Support Agreement, such milestones include:

(a)     Entry of a final order or orders by the Bankruptcy Court approving the Backstop Commitment Agreement by no later than November 25, 2019;

(b)     Entry of a final order or orders by the Bankruptcy Court approving the DIP Facility, the Exit Commitment Letter, and the Debtors' use of cash collateral by no later than December 2, 2019;

(c)     Entry of a final order by the Bankruptcy Court approving the Disclosure Statement by no later than January 8, 2020;

(d)     Entry of a final order by the Bankruptcy Court approving the Rights Offering Procedures by no later than January 8, 2020;

(e)     Entry of a final order by the Bankruptcy Court confirming the Plan by no later than February 28, 2020;[5] and

(f)     Occurrence of the Effective Date of the Plan by no later than March 19, 2020.

### C.     Backstop Commitment Agreement

On October 18, 2019, the Debtors also entered into the Backstop Commitment Agreement, pursuant to which the Supporting Noteholders have committed to (i) purchase New Common Shares at a 35% discount to a Stated Equity Value of $900 million for cash consideration of $325 million (which shall be reduced dollar-for-dollar for cash proceeds received in the Rights Offering) (the "**Cash Purchase Obligation**"), and (ii) exchange $138 million of Reinstated 1.25L Notes for New Common Shares issued at a 25.7% discount to a Stated Equity Value of $900 million (the "**Exchange Transaction**").

Until November 4, 2019, qualified holders of 1.5L Notes (other than the Supporting Noteholders) were offered the opportunity to join the Backstop Commitment Agreement (each such joining holder, an "**Additional Supporting Noteholder**" and collectively with the Supporting Noteholders, the "**Commitment Parties**") and (a) assume up to their *pro rata* portion of the Cash Purchase Obligation (and receive a corresponding *pro rata* portion of the Backstop Commitment Premium and Termination Fee (each as defined below)), and (b) commit to participate in the Exchange Transaction (for which no Backstop Commitment Premium or Termination Fee will be allocated or become payable) and exchange Reinstated 1.25L Notes for New Common Shares (subject to certain limitations specified in the Backstop Commitment Agreement), in each case at the same discount as the Supporting Noteholders.  No Additional Supporting Noteholders elected to join the Backstop Commitment Agreement.

In consideration of the Commitment Parties' commitments under the Backstop Commitment Agreement, the Backstop Commitment Agreement provides that the Debtors shall provide to the Commitment Parties: (i) a commitment premium of $26 million of additional New Common Shares (the "**Backstop Commitment Premium**"), earned upon entry of the order approving the

---

[5] If the Bankruptcy Court has commenced a hearing on confirmation of the Plan as of February 28, 2020, this Milestone date shall be extended to March 16, 2020.

Backstop Commitment Agreement, and payable on the Closing Date at the Cash Purchase Price (as defined in the Backstop Commitment Agreement); (ii) if the Backstop Commitment Agreement is terminated as the result of the occurrence of certain specified conditions set forth in the Backstop Commitment Agreement, a termination fee in cash in an amount equal to $26 million (the "**Termination Fee**"); (iii) the reimbursement of the Supporting Noteholders' and their advisors' reasonable and documented out-of-pocket fees and expenses (the "**Reimbursement Obligations**");[6] and (iv) an indemnification against any and all losses, claims, damages, liabilities and costs and expenses arising out of or in connection with the Backstop Commitment Agreement and the transactions contemplated thereunder.

The Backstop Commitment Agreement has the same milestones as the PSA.

On November 25, 2019, the Bankruptcy Court entered an order approving the Debtors' entry into the Backstop Commitment Agreement and their obligations thereunder [Docket No. 483].

###### D.   DIP-to-Exit Commitment

On October 18, 2019, the Debtors also reached an agreement with RBL Lenders holding 100% of the Claims under the Debtors' prepetition RBL Facility (the "**Exit Commitment Parties**") to secure their commitment to support the Exit Facility, including to convert 50% of the obligations under their RBL Facility into a $314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility (the "**DIP Facility**") and upon the Effective Date of the Plan, to convert their remaining obligations under the RBL Facility and the DIP Facility into the Exit Facility (the "**DIP-to-Exit Facility**").

During the months leading up to the Petition Date, the Debtors conducted a thorough marketing process and engaged in extensive negotiations that resulted in obtaining a commitment to provide the Exit Facility on the best available terms.  Each of the other exit financing offers received by the Debtors were significantly less attractive than the DIP-to-Exit Facility due to one or more of the following: (i) a meaningfully smaller committed exit facility relative to the DIP-to-Exit Facility, (ii) a requirement that the Debtors take market risk due to syndications on a best-efforts basis, (iii) increased negative carry costs associated with the use of cash collateral, and/or (iv) significantly higher fees.

The RBL Agent and RBL Lenders conditioned the Exit Facility on it being part of a DIP-to-Exit Facility that included a roll up (the "**Roll-Up**") of 50% of the obligations owed under the RBL Credit Agreement into the DIP Facility.  The Debtors agreed to the Roll-Up as part of a package deal that included the Exit Commitment Parties' (i) commitment to provide an approximately $629 million Exit Facility, (ii) commitment to vote to accept an Approved Plan (as defined in the Exit Term Sheet), which includes the Plan annexed hereto as **Exhibit A**, and (iii) consent to the Debtors'

---

[6]   As of December 28, 2019, the Debtors have paid approximately $6.43 million to the Supporting Noteholders' advisors in the aggregate on account of Reimbursement Obligations.  If the Plan is consummated, the financial advisors to the Initial Supporting Noteholders (Moelis & Company and Houlihan Lokey Capital Inc.) will each earn a success fee of $4,000,000.  Each financial advisor also earns a monthly fee of $150,000.  The Supporting Noteholders' attorneys are compensated based on their hourly rate.

continued use of Cash Collateral.  No new-money financing was provided to the Debtors in connection with the DIP Facility.

As set forth in further detail in the Exit Term Sheet, a copy of which is annexed as <u>Exhibit B</u> to the Plan Support Agreement (annexed hereto as **<u>Exhibit B</u>**), on the Effective Date, the DIP Facility and the remaining principal amount of any Allowed RBL Claims of each Prepetition RBL Lender that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of creditor participations under the Exit Credit Agreement (the "**Exit Revolving Facility**") that will be subject to a Borrowing Base (as defined in the Exit Term Sheet) and with commitments in an aggregate maximum principal amount of up to $629,420,912 less the aggregate principal amount of the Exit Term Facility (as defined below).  In addition, the aggregate principal amount of any Allowed RBL Claims of each Prepetition RBL Lender that has not elected to participate in the Exit Revolving Facility will automatically be converted to a non-amortizing last-out term loan facility secured in a manner *pari passu* with the Exit Revolving Facility (the "**Exit Term Facility**").[7]

The Debtors and the Exit Commitment Parties' agreements are memorialized in that certain $314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility and $629,420,912 Senior Secured Revolving Exit Facility Commitment Letter, dated October 18, 2019 (the "**Exit Commitment Letter**") annexed as <u>Exhibit A-1</u> to the Plan Support Agreement.  In addition to the approximately $629 million in the Exit Facility, pursuant to the Exit Commitment Letter, the RBL Agent agreed to use its commercially reasonable efforts to arrange and syndicate an incremental amount of up to $300 million in exit financing pursuant to the Exit Commitment Letter.

On November 25, 2019, the Bankruptcy Court entered an order approving the Debtors' entry into the DIP Facility and their obligations under the Exit Commitment Letter and related fee letters [Docket No. 482] (the "**DIP Order**").

### E.    Inquiries

If you have any questions about the packet of materials you have received, please contact Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), at 1-877-502-9869 (domestic toll-free) or 1-917-947-2373 (international).  Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available upon written request made to the Voting Agent at the following address:

<div align="center">

EP Energy Ballot Processing
c/o Prime Clerk, LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

</div>

---

[7]  The Debtors do not anticipate that any RBL Claims will convert into the Exit Term Facility because holders of 100% in aggregate principal amount of the Claims under the Debtors' RBL Facility have agreed to elect to participate in the Exit Revolving Facility.

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.primeclerk.com/EPEnergy. PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

WHERE TO FIND ADDITIONAL INFORMATION: The Company currently files quarterly and annual reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement. Reports filed with the SEC on or after the date of this Disclosure Statement are also incorporated by reference herein.

- Annual Report on Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on March 18, 2019, as amended on April 30, 2019;

- Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2019, filed with the SEC on May 9, 2019;

- Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2019, filed with the SEC on August 9, 2019; and

- Quarterly Report on Form 10-Q for the fiscal quarter ended September 30, 2019, filed with the SEC on November 12, 2019.

## II.
## SUMMARY OF PLAN TREATMENT

The following table summarizes: (1) the treatment of Claims and Interests under the Plan; (2) which Classes are impaired by the Plan; (3) which Classes are entitled to vote on the Plan; and (4) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, *see* section VI – Summary of the Plan below. A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in section XI.C.4 – Valuation below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 1 (Other Secured Claims) | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired  (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 2 (Other Priority Claims) | The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired  (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 3 (RBL Claims) | Each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. | Impaired  (**Entitled** to vote) | Estimated Allowed Amount: $314,710,456  Estimated Percentage Recovery: 100% |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 4 (1.125L Notes Claims) | On the Effective Date, all Allowed 1.125L Notes Claims will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $1,000,000,000[8] Estimated Percentage Recovery: 100% |
| 5 (1.25L Notes Claims) | On the Effective Date, all Allowed 1.25L Notes Claims will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: $500,000,000[9] Estimated Percentage Recovery: 100% |
| 6 (Secured 1.5L Notes Claims) | On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares, and (ii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures. On the Effective Date, the 1.5L Notes will be cancelled, released and extinguished and will be of no further force or effect except as set forth herein, whether surrendered for cancellation or otherwise. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: $2,186,617,532[10] Estimated Percentage Recovery: 17.58%[11] |

---

[8]   The estimated Allowed amount of 1.125L Notes Claims does not include any accrued interest.  Pursuant to the DIP Order, holders of such 1.125L Claims are receiving adequate protection payments equal to interest payments due under the 1.125 Indenture.  To the extent any interest under the 1.125L Indenture is accrued and unpaid on the Effective Date, such interest will be payable when due under the 1.125L Indenture in the ordinary course of business after the Effective Date.

[9]   The estimated Allowed amount of 1.25L Notes Claims does not include any accrued interest.  Pursuant to the DIP Order, holders of such 1.25L Claims are receiving adequate protection payments equal to interest payments due under the 1.25 Indenture.  To the extent any interest under the 1.25L Indenture is accrued and unpaid on the Effective Date, such interest will be payable when due under the 1.25L Indenture in the ordinary course of business after the Effective Date.

[10]   The estimated Allowed amount referred to herein includes the full amount of the 1.5L Notes Claims, including the 1.5L Notes Deficiency Claims.  For purposes of establishing the Allowed amount of the 1.5L Notes Deficiency Claims, the Plan provides that, on the Effective Date, the Secured 1.5L Notes Claims (Class 6) will receive a recovery on account of the secured portion of the 1.5L Notes Claims of $383,441,951, and the 1.5L Notes Deficiency Claims shall therefore be Allowed in an amount equal to $1,803,175,181.

[11]   This percentage recovery is based on the full Allowed amount of the 1.5L Notes Claims.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 7 (Unsecured Claims) | On the Effective Date, holders of Allowed Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims will receive, in full and final satisfaction of such Claims, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares (the "**Unsecured Shares**"). On the Effective Date, the Unsecured Notes Claims, 1.5L Notes Deficiency Claims and General Unsecured Claims will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: $2,648,242,809<br><br>Estimated Percentage Recovery: 0.06% |
| 8 (Convenience Claims) | Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of (i) the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount.  Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim. | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: $1,750,000<br><br>Estimated Percentage Recovery: 10% |
| 9 (Intercompany Claims) | On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Initial Supporting Noteholders. | Unimpaired<br><br>(**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 10 (Subordinated Claims) | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims. | Impaired<br><br>(**Not entitled** to vote because presumed to reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 11 (Existing Parent Equity Interests) | Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $500,000 in Cash.  On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired<br><br>(**Entitled** to vote) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 12 (Other Equity Interests) | Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution. | Impaired  (**Not entitled** to vote because presumed to reject) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 13 (Intercompany Interests) | Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall, subject to the reasonable consent of the Initial Supporting Noteholders, be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated. | Unimpaired  (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |

The following table sets forth the projected approximate percentages of equity ownership of the Reorganized Debtors (including per Supporting Noteholder) upon the Effective Date (prior to dilution by the EIP) assuming the Private Placement is not consummated:

| Category | Only Supporting Noteholders Participate in Rights Offering | | Cash Equity Rights Offering is Fully Subscribed[12] | |
|---|---|---|---|---|
| | New Common Share Ownership (%) | Value ($) | New Common Share Ownership (%) | Value ($) |
| Rights Offering Shares (New Money) | 55.56% | $500,000,000 | 57.61% | $518,461,538 |
| Rights Offering Shares (Exchange Transaction) | 20.64% | $185,733,513 | 20.64% | $185,733,513 |
| New Common Shares (1.5L Notes Claims) | 19.17% | $172,523,822 | 17.14% | $154,246,899 |
| Backstop Commitment Premium | 4.44% | $40,000,000 | 4.44% | $40,000,000 |
| New Common Shares (Unsecured Claims) | 0.19% | $1,742,665 | 0.17% | $1,558,049 |
| **Total** | **100%** | **$900,000,000** | **100%** | **$900,000,000** |

---

[12]   Assumes pro rata participation in full of $475 million Rights Offering.  The fully subscribed cash equity Rights Offering amount is assumed to be $337 million.

| Supporting Noteholder[13] | Only Supporting Noteholders Participate in Rights Offering | Cash Equity Rights Offering is Fully Subscribed[12] |
|---|---|---|
| | New Common Share Ownership (%) | New Common Share Ownership (%) |
| Apollo | 46.23% | 34.05% |
| Elliott | 38.92% | 36.88% |
| Avenue | 8.97% | 6.30% |
| Access | 1.82% | 2.34% |
| **Total** | **95.94%** | **79.56%** |

### III.
### OVERVIEW OF DEBTORS' OPERATIONS

A.    **Business Overview**

1.    **General Overview**

EP Energy operates as an independent exploration and production company engaged in the acquisition and development of unconventional onshore oil and natural gas properties in the United States.   In 2018, EP Energy had operating revenues of approximately $1.324 billion.   The Company's revenues are generated primarily through the physical sale of oil, natural gas, and natural gas liquids to third-party customers at spot or market prices under both short and long-term contracts, as well as settlements of the Company's in-the-money commodity hedge positions.   The Debtors operate through a diverse base of producing assets and are focused on the development of drilling inventory located in three areas: the Eagle Ford shale in South Texas, the Permian basin in West Texas, and Northeastern Utah.   The Debtors have established significant contiguous leasehold positions in each of their three areas, representing approximately 463,000 net acres in total (as of May 2019).

The Debtors' strategy is to invest in opportunities that provide the highest return across their asset base, continually seek out operating and capital efficiencies, effectively manage costs, and identify accretive acquisition opportunities and divestitures – all with the objective of enhancing the Debtors' portfolio, growing asset value, improving cash flow and increasing financial flexibility. Each of EP's areas is characterized by a long-lived reserve base and high drilling success rates. EP's mission is to set the standard for the efficient development of hydrocarbons in the United States.

---

[13] Supporting Noteholder equity splits include projected New Common Shares distributed on account of the 1.5L Deficiency Claim, assuming $2,648,242,809 of Unsecured Claims (of which $1,803,175,581 is the 1.5L Deficiency Claim).

In addition to opportunities in its existing portfolio, the Company continuously explores strategic acquisitions of leasehold acreage or acquisitions of producing assets that allow the Company to leverage existing expertise in its operating areas, balance exposure to regions, basins and commodities, help achieve or enhance risk-adjusted returns competitive with those available in existing programs and increase reserves.  The Company also continuously evaluates its asset portfolio and sells oil and natural gas properties if such properties no longer meet long-term objectives.

As of the Petition Date, the Debtors employed approximately 360 employees and a supplemental workforce of approximately 180 temporary employees and independent contractors in their operations.

### 2.      Drilling Operations

The Debtors' operations are extremely capital-intensive, with capital expenditures and asset acquisitions in 2018 totaling approximately $984 million in the aggregate ($644 million excluding acquisitions).  In 2018, the Debtors completed 136 gross wells, and as of December 31, 2018 had a total of 29 gross wells drilled, but not completed, across its programs.  The Debtors operate approximately 95% of their producing wells.  Further, during 2018, the Debtors completed (i) 85 gross wells in the Eagle Ford for a total of 800 net operated wells, (ii) 27 gross wells in Northeastern Utah for a total of 342 net operated wells, and (iii) 24 gross wells in the Permian basin for a total of 350 net operated wells.  In addition, the Debtors recompleted 81 gross wells in Northeastern Utah during 2018.

As of December 31, 2018, the Debtors had proven reserves of 324.5 million barrels of oil equivalent ("**MBoe**"), including 169 million barrels of proved oil reserves, 60 million barrels of proved natural gas liquids reserves, and 575 billion cubic feet of proved natural gas reserves, representing 52%, 18%, and 30%, respectively, of total proved reserves.  Approximately 234 MBoe, or 72%, of the Company's total proved reserves are proved developed producing assets, which generated average production of 80.7 MBoe/d in 2018 from approximately 1,744 gross wells.  During the six months ended June 30, 2019, the Company produced on average approximately 71,600 Boe per day, compared to 81,300 Boe per day during the same period in 2018.[14]

### 3.      Joint Ventures

In addition to the Debtors' owned properties, the Debtors are party to certain joint ventures in their asset areas to enhance the development of wells, hold acreage, and/or improve near-term economics in its existing programs.  In Northeastern Utah, the Company's joint venture partner is participating in the development of 60 wells, and as of December 31, 2018, the Debtors drilled and completed 43 wells under the joint venture agreement.  Under the joint venture agreement, the Debtors fund less than half of the estimated drilling costs for a 50% working interest in the joint venture wells and sell the associated production to its joint venture partner.

---

[14] Average production has been lower as a result of, among other reasons downstream third-party operational issues and constraints in the Eagle Ford shale and Permian basin, fewer wells placed on production in the Eagle Ford Shale, reduced drilling activity in Northeastern Utah, and a reduction in capital allocated to the Permian basin.

Moreover, since 2017, EP Energy has been party to a joint venture with Wolfcamp Drillco Operating L.P. ("**Jeter Drillco**") to fund future oil and natural gas development in the Permian basin and the Eagle Ford Shale (the "**Jeter Drillco JV**"). Under the Jeter Drillco JV, Jeter Drillco agreed to fund 60% of the estimated drilling, completion, and equipping costs in the joint venture wells, divided into two approximately $225 million investment tranches, in exchange for a 50% working interest. The Company is the operator of Jeter Drillco's assets. Under the Jeter Drillco JV, once Jeter achieves a specified internal rate of return on its invested capital in each tranche, a portion of its working interest reverts to the Company. The Debtors have completed the planned activity in the first tranche, having completed 69 wells in the Permian basin. In April 2018, the parties amended the Jeter Drillco JV to direct the second tranche investment to the Eagle Ford shale. Wells in the Eagle Ford shale began producing in the third quarter of 2018. As of September 24, 2019, the Debtors drilled and completed 57 wells in the Eagle Ford under the Jeter Drillco JV and have substantially completed their planned activity in the second tranche.

### 4.      Hedging

The Company utilizes derivative contracts to hedge its exposure to commodity price fluctuations and reduce the variability in the Company's cash flows associated with anticipated sales of future oil and natural gas production. As of the Petition Date, the Company had fifty-two (52) open hedging agreements that extend through 2020, including thirty-two (32) crude oil three-way arrangements; four (4) crude oil collar arrangements; eight (8) crude oil basis swaps; one (1) crude oil roll arrangement; three (3) natural gas fixed price swaps; and four (4) natural gas collar arrangements.

Approximately 90% of the Debtors' open hedging agreements relate to its crude oil production and the remaining 10% relates to the Company's natural gas production. As of December 25, 2019, the aggregate mark-to-market value of all derivative assets and liabilities related to Company's prepetition hedging agreements, calculated using standard industry valuation processes, was a net derivative asset of approximately $6.9 million (subject to daily fluctuations). The Company's obligations under its hedges are secured by the same collateral (on the same priority) that secures its obligations under the RBL Credit Agreement. All of the Debtors' hedge counterparties are also RBL Lenders under the RBL Facility. Pursuant to the DIP Order, the Debtors' Prepetition Hedge Obligations and any Postpetition Hedge Agreements with a Postpetition Hedge Bank are treated as DIP Obligations (each as defined in the DIP Order).

### B.      Debtors' Corporate History and Structure

### 1.      Corporate History

On February 14, 2012, affiliates of Apollo, Riverstone Holdings LLC ("**Riverstone**"), Access, and Korean National Oil Corporation ("**KNOC**", and collectively with Apollo, Riverstone, and Access, the "**Sponsors**"), along with other co-investors, formed EPE Acquisition, LLC ("**AcqCo**"). On May 24, 2012, the Sponsors acquired Debtor EP Energy LLC's predecessor and its subsidiaries from El Paso Corporation for approximately $7.2 billion in cash in a spin-out sale transaction that was consummated in connection with the $21.1 billion cash and stock merger of El Paso Corporation and Kinder Morgan, Inc. The acquisition was partly financed through the issuance of approximately $4.25 billion of debt by the Company.

On August 30, 2013, EP Energy was formed and the Sponsors and other members of AcqCo contributed their membership interests in AcqCo to EP Energy in exchange for common stock in EP Energy, resulting in EP Energy becoming the 100% equity owner of AcqCo. Subsequently, in January 2014, EP Energy completed an initial public offering of 35.2 million shares of Class A common stock (approximately 14% of Class A common stock at the time) and received net proceeds of approximately $664 million (the "**2013 IPO**"). EP Energy's Class A common stock commenced trading on the New York Stock Exchange (the "**NYSE**") on January 17, 2014 under the ticker symbol "EPE".

### 2.   Debtors' Corporate and Governance Structure

Collectively, EP Energy and its direct and indirect subsidiaries consist of nine (9) entities organized under the laws of the State of Delaware, eight (8) of which are Debtors in these Chapter 11 Cases.[15] A chart illustrating the Debtors' organizational structure as of the Petition Date is annexed hereto as **Exhibit C.**

EP Energy's board of directors generally functions as the Company's governing board. On June 4, 2019, the Board of Directors of EP Energy (the "**Board**") established a special committee of three independent directors (the "**Special Committee**") to evaluate the Company's strategic alternatives, and to the extent applicable, negotiate, and implement one or more capital structure transactions. Accordingly, the Special Committee, by virtue of its mandate, serves as the Company's governing body with respect to the restructuring and these Chapter 11 Cases. The Special Committee approved the Debtors' entry into the Backstop Commitment Agreement and PSA as well as the filing of the Plan.

Each Debtor other than EP Energy (which was formerly a NYSE-listed corporation) is either a member-managed or manager-managed limited liability company or a corporation with a one-person or two-person board of directors, with the exception of one partnership entity that is managed by its general partner. EP Energy's Board consists of the following thirteen directors:

| Name | Position |
| --- | --- |
| Alan R. Crain | Chairman; Independent Director; Special Committee Member |
| Gregory A. Beard | Director |
| Scott R. Browning | Director |
| Carol Flaton | Independent Director; Chair of Special Committee |
| Jae Hwii Gwag | Director |
| Wilson B. Handler | Director |
| J. Barton Kalsu | Independent Director; Special Committee Member |
| Rajen Mahagaokar | Director |
| Russell E. Parker | Director; President and CEO |
| Robert C. Reeves | Independent Director |
| Robert Tichio | Director |

---

[15] EPE Employee Holdings II, LLC ("**Employee Holdings**") is the only subsidiary of EP Energy that is not a debtor in these Chapter 11 Cases. Employee Holdings has no operations or liabilities. Its only asset is Class B common stock of EP Energy held for the benefit of current and former employees of the Company. The Company believes that the Class B common stock is worthless.

| Name | Position |
|------|----------|
| Rakesh Wilson | Director |
| Donald A. Wagner | Director |

The Company has highly experienced managers for its operations.   The Company's core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Russell E. Parker | President and Chief Executive Officer |
| Kyle A. McCuen | Senior Vice President and Chief Financial Officer |
| David Rush | Chief Restructuring Officer |
| Raymond J. Ambrose | Senior Vice President, Engineering and Subsurface |
| Chad D. England | Senior Vice President, Operations |
| Jace D. Locke | Vice President, General Counsel and Corporate Secretary |
| Peter D. Addison | Vice President, Land and Land Administration |
| Mark E. Hargis | Vice President, Geoscience |
| Dennis M. Price | Vice President, Marketing |

       **C.**      **Equity Ownership**

EP Energy is a public company and files annual reports with, and furnishes other information to, the Securities and Exchange Commission.  Until May 2019, the Class A common stock of EP Energy was listed on the NYSE under the symbol "EPE."  However, on January 3, 2019, the Company was notified by the NYSE that EP Energy was not in compliance with NYSE continued listing standards because the average closing price of its shares of Class A common stock had fallen below $1.00 per share over a period of 30 consecutive trading days.  On May 24, 2019, the Company was notified that due to "abnormally low" trading price levels, the NYSE commenced delisting proceedings to delist EP Energy's Class A common stock.  Trading in the Company's Class A common stock was suspended on May 23, 2019 and, beginning on May 24, 2019, the Class A common stock of the Company began trading on the OTC Pink marketplace under the symbol "EPEG".

As of August 31, 2019, (i) 255,136,111 shares of EP Energy's $0.01 par value Class A common stock were issued and outstanding, and (ii) 237,256 shares of the EP Energy's $0.01 par value Class B common stock were issued and outstanding.[16]

Holders of Class A common shares are entitled to one vote per Class A shares on all matters to be voted on by EP Energy's stockholders.  EP Energy's Class A common stock is currently held 39.0% by Apollo as record holder, 13.7% by Access, 12.3% by Riverstone, 12.3% by KNOC, and 22.7% by other shareholders.  All of the other Debtors are wholly-owned direct or indirect subsidiaries of EP Energy.

Class B common shares are non-voting shares that are held by certain current and former employees who were issued such shares in 2012, in addition to a smaller portion that were issued

---

[16] The Board is also authorized to provide for the issuance from time to time of preferred shares, but no preferred stock is currently issued or outstanding.

to non-debtor affiliate Employee Holdings in late 2013 in advance of the Company's 2013 IPO.[17] Class B common shares entitle holders to receive proceeds in the form of cash or Class A common shares upon certain performance events that did not occur prior to the Petition Date (*e.g.*, the Sponsors receiving a return of at least 1.0x their invested capital plus a stated return).

Further, under EP Energy's prepetition stock-based compensation plans (the 2014 Omnibus Incentive Plan and 2017 Employment Inducement Plan), EP Energy may issue to the Company's employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, cash awards, and other stock-based awards.  EP Energy is authorized to grant awards of up to 36,832,525 shares of common stock for awards under these plans, with 8,645,338 shares remaining available for issuance as of December 31, 2018.

### D.   Prepetition Indebtedness

As of the Petition Date, the Debtors' funded prepetition indebtedness was approximately $4.909 billion (plus accrued and unpaid interest and other expenses), consisting of the following:

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| RBL Claims | $629 million[18] | First lien on substantially all of the Debtors' assets |
| 1.125L Notes Claims | $1 billion | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims |
| 1.25L Notes Claims | $500 million | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims and 1.125L Notes Claims |
| 1.5L Notes Claims | $2.092 billion | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims, 1.125L Notes Claims, and 1.25L Note Claims |
| Unsecured Notes Claims | $688 million | N/A |
| **Total** | **$4.909 billion** | |

In connection with the DIP Order, the Bankruptcy Court approved the "roll-up" of 50% of the commitments under the RBL Facility into the DIP Facility.  Accordingly, the current principal amount of the RBL Claims is approximately $315 million.

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing such indebtedness.[19]

---

[17] Employee Holdings, as the holder of 70,000 Class B shares, was designed as a vehicle for future employee incentive awards pursuant to which employee participants would become entitled to receive amounts equal to a proportion of proceeds received by Employee Holdings from time to time.

[18] Including $27 million of outstanding letters of credit.

[19] The Creditors' Committee is currently investigating the extent of the liens and claims of holders of debt in each of the following tranches of secured prepetition indebtedness.

1.     **RBL Claims**

Certain of the Debtors are parties to that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "**RBL Credit Agreement**", and the claims thereunder, the "**RBL Claims**") between EP Energy LLC, as borrower (the "**RBL Borrower**"), AcqCo, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in its capacity as such, the "**RBL Agent**") and issuing bank, and the lenders party thereto (the "**RBL Lenders**") that provided for a commitment of approximately $629 million, including a sublimit for a letter of credit facility (the "**RBL Facility**"). As noted above, the current principal amount of the RBL Claims is approximately $315 million.

All of the Debtors, other than EP Energy and the RBL Borrower, are guarantors under the RBL Facility. As of the Petition Date, the RBL Facility was fully drawn, including approximately $27 million in letters of credit that remained outstanding but were undrawn as of the date thereof, plus any applicable interest, fees, and other amounts outstanding under the RBL Credit Agreement. The RBL Claims are secured by a first-priority security interest in and liens (subject to certain permitted liens) on substantially all of the assets of AcqCo and its direct and indirect subsidiaries, including the vast majority of such entities' oil and natural gas properties, cash, accounts receivable, and other material assets.

On July 22, 2019, in the ordinary course of the Company's business and to reduce interest exposure, the Company utilized excess cash on hand to pay down its RBL Facility by approximately $60 million. Subsequently, to provide the Company with increased liquidity and help ensure that the Debtors' operations could continue in the ordinary course of business in a potential restructuring, on August 1, 2019, the Debtors drew down on the remaining capacity under their RBL Facility (approximately $268 million).

2.     **1.125L Notes Claims**

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**1.125L Indenture**", and the claims thereunder, the "**1.125L Notes Claims**"), dated as of May 23, 2018, among EP Energy LLC and Everest Acquisition Finance Inc. ("**Acquisition FinanceCo**", and together with EP Energy LLC, the "**EP Co-Issuers**") as co-issuers, each of the guarantors named therein (each of EP Energy LLC's direct and indirect subsidiaries, the "**Debtor Guarantors**"), and UMB Bank, National Association, as successor indenture trustee and notes collateral agent. The obligations under the 1.125L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens on substantially all of the assets of the EP Co-Issuers and the Debtor Guarantors, including the vast majority of such entities' oil and natural gas properties, cash, accounts receivable, and other material assets (the "**Collateral**").

The liens securing the obligations under the 1.125L Indenture are junior in priority to the liens securing the RBL Claims. As of the Petition Date, the aggregate amount outstanding under the 1.125L Indenture was $1 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

The successor indenture trustee for the 1.125L Notes (the "**Successor Trustee**") and Ad Hoc 1.125L/1.25L Noteholder Group dispute the Debtors' view that only $1 billion (plus accrued and

unpaid interest) was owed under the 1.125L Indenture as of the Petition Date. On December 16, 2019, the Successor Trustee filed a proof of claim, asserting a liquidated claim as of the Petition Date of $1,177,651,774, plus all accrued and unpaid interest.

The Successor Trustee asserts that under sections 6.01 and 6.02 of the 1.125L Indenture, the commencement of these Chapter 11 Cases triggered an Event of Default, automatic acceleration of the 1.125L Notes, and accrual of the "Applicable Premium" (an amount that is to be determined as of the date of acceleration based on a contractually prescribed formula). Section 6.02 of the 1.125L Indenture provides that when "the Applicable Premium becomes due and payable it shall be deemed to be principal of the Notes and interest shall accrue on the full principal amount of the Notes (including the Applicable Premium) from and after the applicable triggering event." Thus, the Successor Trustee asserts (as reflected in the proof of claim filed by the Successor Trustee) that the total amount owed on account of the 1.125L Notes as of the Petition Date is equal to the original principal amount ($1 billion) plus the Applicable Premium (which it asserts to be approximately $177,651,774), and any accrued and unpaid interest.

The Successor Trustee and Ad Hoc 1.125L/1.25L Noteholder Group assert that the Applicable Premium is valid, due, and owing under applicable state law and is not subject to disallowance under section 502 of the Bankruptcy Code. The Successor Trustee and Ad Hoc 1.125L/1.25L Noteholder Group also assert that the 1.125L Notes cannot be reinstated under section 1124(2) of the Bankruptcy Code, as proposed under the Plan, unless the Plan (a) provides for the payment of, or otherwise properly honors, the Applicable Premium, and (b) leaves unimpaired any rights conferred to the holders of Allowed 1.125L Notes Claims under the DIP Order. As the Plan does not provide for payment of the "Applicable Premium" and instead provides that the 1.125L Notes will be reinstated in the principal amount of $1 billion (and contemplates that the provisions relating to "Applicable Premium" will simply ride through and be applicable to future redemptions that occur after the Effective Date), the Successor Trustee and Ad Hoc 1.125L/1.25L Noteholder Group assert that the Plan cannot be confirmed in its current form.

The Debtors and the Supporting Noteholders wholly disagree with the Successor Trustee and Ad Hoc 1.125L/1.25L Noteholder Group's assertions.

### 3.    1.25L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**1.25L Indenture**", and the claims thereunder, the "**1.25L Notes Claims**"), dated as of November 29, 2016, among the EP Co-Issuers, the Debtors Guarantors, and BOKF, NA, as successor indenture trustee and notes collateral agent. The obligations under the 1.25L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 1.25L Indenture are junior in priority to the liens securing the RBL Claims and the 1.125L Notes Claims. As of the Petition Date, the aggregate amount outstanding under the 1.25L Indenture was $500 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

### 4.      1.5L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2024 1.5L Indenture**", and the claims thereunder, the "**2024 1.5L Notes Claims**"), dated as of January 3, 2018, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee and notes collateral agent.  The obligations under the 2024 1.5L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 2024 1.5L Indenture are junior in priority to the liens securing the RBL Claims, the 1.125L Notes Claims, and the 1.25L Notes Claims, and are *pari passu* with the 2025 1.5L Notes Claims (as defined herein).  As of the date hereof, the aggregate amount outstanding under the 2024 1.5L Indenture is $1.092 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2025 1.5L Indenture**", and together with the 2024 1.5L Indenture, the "**1.5L Indentures**", and the claims thereunder, the "**2025 1.5L Notes Claims**", and together with the 2024 1.5L Notes Claims, the "**1.5L Notes Claims**"), dated as of February 6, 2017, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee and notes collateral agent.  The obligations under the 2025 1.5L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral.  The liens securing the obligations under the 2025 1.5L Indenture are junior in priority to the liens securing the RBL Claims, the 1.125L Notes Claims, and the 1.25L Notes Claims, and are *pari passu* with the 2024 1.5L Notes Claims.  As of the Petition Date, the aggregate amount outstanding under the 2025 1.5L Indenture was $1 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

The Debtors estimate that $1,803,175,581 of the 1.5L Notes Claims are 1.5L Deficiency Claims.

### 5.      Intercreditor Agreements

The rights of the Debtors' prepetition secured parties with respect to the Collateral are governed by three intercreditor agreements (collectively, the "**Intercreditor Agreements**"):

(a)     the rights as between the RBL Agent on one hand, and the notes collateral agent under the 1.125L Indenture on the other, are governed by that certain *Senior Priority Lien Intercreditor Agreement* dated as of May 23, 2018, with RBL Claims being "First-Priority Lien Obligations" thereunder, and 1.125L Notes Claims being "Second-Priority Lien Obligations" thereunder;

(b)     the rights as between the RBL Agent and the notes collateral agent under the 1.125L Indenture on one hand, and the notes collateral agent under the 1.25L Indenture on the other, are governed by that certain *Additional Priority Lien Intercreditor Agreement* dated as of November 29, 2016, with RBL Claims and 1.125L Notes Claims being "First-Priority Lien Obligations" thereunder, and 1.25L Notes Claims being "Second-Priority Lien Obligations" thereunder; and

(c)     the rights as between the RBL Agent and the notes collateral agent under the 1.125L Indenture and the 1.25L Indenture on one hand, and the notes collateral agent under the 1.5L Indentures on the other, are governed by that certain *Priority Lien Intercreditor Agreement* dated as of August 24, 2016, with RBL Claims, 1.125L Notes Claims, and 1.125L Notes Claims being "First-Priority Lien Obligations" thereunder, and 1.5L Notes Claims being "Second-Priority Lien Obligations" thereunder.

The Intercreditor Agreements govern, among other things, the priority of distribution of the Collateral and proceeds thereof between the prepetition secured parties.

### 6.     Unsecured Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2020 Unsecured Notes Indenture**"), dated as of April 24, 2012, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee.  The obligations under the 2020 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2020 Unsecured Notes Indenture was $182 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2022 Unsecured Notes Indenture**"), dated as of August 13, 2012, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Services Fund Society, FSB, as indenture trustee.  The obligations under the 2022 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2022 Unsecured Notes Indenture was $182 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2023 Unsecured Notes Indenture**"), dated as of May 28, 2015, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Services Fund Society, FSB, as indenture trustee.  The obligations under the 2023 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2023 Unsecured Notes Indenture was $323 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

### 7.     Other Claims

The Company has other claims against it that do not consist of long-term funded debt.  Among other things, as described below, the Company is a defendant in numerous civil actions that may give rise to substantial unsecured claims, most of which are contingent, unliquidated, and disputed. The Debtors estimate that the aggregate amount of litigation claims asserted against the Debtors is approximately $313 million (based on asserted damages claims that the Debtors dispute, including a number of duplicative claims).

Further, in the ordinary course of their business, the Debtors incur trade debt with numerous vendors in connection with their operations.  The Company has a number of unsecured prepetition

obligations to certain of its vendors that do not benefit from state-law lien rights or setoff rights. However, a significant number of the Debtors' prepetition trade obligations have been satisfied by the Debtors in accordance with first day relief granted by the Bankruptcy Court (as described below).

On November 18, 2019, the Debtors filed their schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**Statements**") detailing known claims against the Debtors. Since the expiration of the Bar Date (as defined below), the Debtors have been analyzing the approximately 860 proofs of claim filed in these Chapter 11 Cases. As of the date hereof, the Debtors estimate that Allowed Unsecured Claims against the Debtors will be approximately $2,648,242,809, including 1.5L Deficiency Claims of $1,803,175,581, Unsecured Notes Claims of $710,067,228, and other Unsecured Claims (including litigation claims, trade claims, and contract rejection claims) in the aggregate amount of approximately $135,000,000.

### 8.      Prepetition Legal Proceedings

Certain Debtors are named as defendants from time to time in routine litigation proceedings including, but not limited to, personal injury and breach of contract disputes. For example, see Section V.H. herein describing the MFN Lawsuit (as defined below). In management's view, Claims made in connection with the Legal Proceedings will be Allowed in an amount that is less than the claimed amount, and the outcome of these proceedings will not have a material adverse effect on the Debtors' financial position, results of operations, or cash flows. The Debtors, however, cannot predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

### 9.      Intercompany Claims

In the ordinary course of business, the Debtors enter into intercompany transactions with one another ("**Intercompany Transactions**," and any intercompany receivable and payable generated pursuant to an Intercompany Transaction, "**Intercompany Claim**") including when, among other things, (i) Debtors EP Energy, EP Energy E&P Company, L.P. ("**EP OpCo**"), and EP Energy LLC receive funds into their bank accounts on behalf of other Debtors, (ii) Debtors EP Energy, Ep OpCo, EP Energy Management, L.L.C., and EP Energy LLC make payments and disbursements out of their Bank Accounts on behalf of other Debtors, and (iii) funds are transferred between and among the Debtors.[20]

Intercompany Transactions and Intercompany Claims between Debtors are not generally settled by actual transfers of cash among the Debtors. Instead, the Debtors track all Intercompany Transactions and Intercompany Claims electronically in their centralized accounting system, the results of which are recorded concurrently on the applicable Debtor's balance sheets and regularly reconciled. The accounting system requires that all general ledger entries be balanced at the legal-entity level; therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the

---

[20] The Debtors do not transact or have any intercompany claims with their non-Debtor affiliate, EPE Employee Holdings II, LLC.

applicable affiliate's balance sheet. This results in a net balance of zero when consolidating all intercompany accounts.

The Debtors maintain records of all transactions processed through their cash management system. During these Chapter 11 Cases, the Debtors have kept and will continue to keep records of any postpetition Intercompany Transactions and Intercompany Claims.

### 10.  Decommissioning, Reclamation and Plugging and Abandonment Obligations for Federal Oil & Gas Leases

The United States asserts that (i) the Debtors that are lessees ("**Federal Debtor Lessees**") under federal and Indian oil and gas leases and grants of rights-of-way (collectively, the "**Federal Leases**") and have, and will retain, continuing decommissioning, plugging and abandonment and reclamation obligations (collectively, the "**P&A Obligations**") under the terms of their Federal Leases and the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.* ("**OCSLA**"), the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 *et seq.* ("**MLA**"), the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351 *et seq.* ("**MLAAL**"), the Act of March 3, 1909, 25 U.S.C. § 396 (the "**1909 Act**") and the Indian Mineral Leasing Act, 25 U.S.C. §§ 396a-g ("**IMLA**") and their respective implementing regulations (OCSLA, MLA, MLAAL, the 1909 Act, IMLA and any other statutes or applicable implementing regulations shall be referred to as the "Applicable Federal Laws") until such P&A Obligations are completed; (ii) Federal Debtor Lessees' offshore P&A Obligations are joint and several in nature (*see* 30 C.F.R. § 250.1701); (iii) for onshore and Indian leases, P&A Obligations are continuing in nature and cannot be divested by assignment or transfer (*see* 43 C.F.R. §§ 3106.7-2, 3106.7-6; 25 C.F.R. §§ 211.47(c), (d), (e), (g) and (i) (for tribal leases) and 212.47 (applicable to allotted leases)); and (iv) Federal Debtor Lessees must satisfy various maintenance and monitoring obligations, financial assurance obligations and other regulatory obligations as set forth in Applicable Federal Laws. The United States believes that the Federal Debtor Lessees' P&A Obligations, financial assurance obligations and maintenance and monitoring obligations will likely be significant.

### IV.
### KEY EVENTS LEADING TO
### COMMENCEMENT OF CHAPTER 11 CASES

### A.  Continued Weakness in Oil & Gas Exploration and Production Industry

As has been well documented, the distressed market conditions in the oil and gas industry, which began in 2014, have negatively impacted all levels of the industry, including upstream companies that produce oil and gas. As evidenced by the numerous chapter 11 filings or other announcements of debt restructurings in the industry, the impact of the volatility of the commodity markets on the Debtors' businesses is clear. Notably, oil and natural gas prices dropped precipitously in 2014 and 2015 and have held at depressed levels for the last several years. Both the decline and the length of this trough have been greater than what anyone in the business could have reasonably anticipated, resulting in a substantial decline in revenue, reserves, and asset values across the industry

The Debtors, of course, have not been immune to these adverse market conditions and the impact on its reserves, cash flow, and ability to service its outstanding indebtedness. As with many of its

peers, this drastic and prolonged drop in prices and the severe dislocations it caused to the Debtors' operations have impacted their asset base and put the Debtors in a stressed liquidity situation.

### B.    Prepetition Restructuring Efforts

#### 1.    Operational Initiatives

In November 2017, the Board announced a change in senior leadership with Russell E. Parker joining the Company and becoming its President and Chief Executive Officer, along with a new streamlined management structure.  In connection with the leadership change, the majority of the prior management team departed the organization.  The change in senior leadership was a move from an asset-based to a function-based organization, which was intended to enable greater flexibility in allocating capital and resources to specific assets and to improve the Debtors' cost structure and create efficiencies.

Further, the Debtors undertook a number of operational efforts to improve its financial position. Through vendor cost reduction initiatives, business optimization, and general efficiencies, the Debtors significantly reduced their cash operating cost structure.  For example, the Debtors reduced their run-rate general and administrative expenses by approximately 24% and its lease operating expense by 27% since Q3 2017.[21]

#### 2.    Strategic Transactions

Facing a declining revenue and asset-base on account of commodity prices, and approximately $365 million of annual interest expense, in 2018 the Debtors took a number of strategic steps in an effort to improve its asset portfolio and financial flexibility and address its capital structure and liquidity needs, including (i) completing $277 million in acquisitions in the Eagle Ford shale and divesting of certain assets in Northeastern Utah for approximately $177 million, (ii) exchanging approximately $1.147 billion of the Unsecured Notes maturing in 2020, 2022, and 2023, for the new $1.092 billion of 2024 1.5L Notes, (iii) repurchasing $134 million of Unsecured Notes for approximately $89 million in cash, (iv) issuing $1 billion in senior secured 1.125L Notes maturing in 2026 and using the net proceeds to repay in full the outstanding amounts at that time under the RBL Facility, and (v) extending the maturity of the RBL Facility from May 2019 to November 2021.

#### 3.    Leverage and Liquidity Concerns

Despite these efforts, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service its outstanding debt on a long-term basis and to maintain the liquidity necessary to operate its businesses and preserve its long-term viability and enterprise value.  In March 2019, EP Energy stated in its Form 10-K annual report that its projections showed that, based on its then-forecasted EBITDAX (assuming approximately $55/barrel of oil), cash on hand, and remaining capacity under the RBL Facility, the Debtors would not have sufficient

---

[21] Based on Q3 2017 compared to 2019 (through May).

liquidity available to repay the 2020 Unsecured Notes at maturity and meet their working capital needs and/or fund their planned capital expenditures.[22]

### 4.    Special Committee Appointed to Oversee Strategic Process

Beginning in April 2019, certain ad hoc committees comprised of certain of the Company's creditors began to organize, engage advisors, and deliver letters to the Company, each asking that the Company consider certain strategic alternatives.  These creditors included (i) an ad hoc group of holders of the Company's 1.125L Notes and 1.25L Notes (each as defined herein) (the "**Ad Hoc 1.125L/1.25L Noteholder Group**"), (ii) certain holders of the Company's 1.5L Notes, including Elliott and Apollo, and (iii) an ad hoc group of holders of the Company's Unsecured Notes (as defined herein) (the "**Ad Hoc Unsecured Noteholder Group**").  Around this time, certain 1.5L Noteholders, including Elliott, and the Ad Hoc Unsecured Noteholder Group also delivered unsolicited proposals for potential restructuring and refinancing transactions, respectively.

On June 4, 2019, the Board established the Special Committee (and appointed to it independent members of the Board who are not affiliated with the Sponsors) to evaluate the Company's strategic alternatives, and to the extent applicable, negotiate, and implement one or more capital structure transactions.  The Company also retained Weil, Gotshal & Manges LLP ("**Weil**") as counsel, Evercore Group L.L.C. ("**Evercore**") as investment banker, and FTI Consulting, Inc. ("**FTI**") (initially solely as financial advisor) to explore strategic alternatives and assist it in both (i) evaluating certain other sources of incremental liquidity, including additional debt issuances, refinancings, and asset sales, and (ii) potentially developing and implementing a comprehensive plan to restructure its balance sheet, whether in-court or out-of-court.  The independent members of the Board also retained Davis Polk & Wardwell LLP ("**Davis Polk**") as counsel and consulted with Davis Polk from time to time regarding various issues.  The Special Committee did not retain additional financial advisors or additional legal counsel thereafter.

### 5.    Debtors Engage with Creditors and Other Parties

In the months leading up to the Petition Date, the Company engaged in continuous discussions with its existing stakeholders with respect to a range of strategic transactions, including various out-of-court financing and capital markets transactions and potential comprehensive recapitalization and/or restructuring solutions.  Such stakeholders included (i) the Company's RBL Lenders, (ii) the Ad Hoc 1.125L/1.25L Noteholder Group, (iii) the certain 1.5L Noteholders, including Elliot, (iv) Apollo (the Company's largest prepetition equity sponsor and one of the Company's largest noteholders, holding 1.25L Notes and 1.5L Notes), (v) the Ad Hoc Unsecured Noteholder Group, and (vi) certain other creditors.  The Debtors also contacted five institutions outside of the Debtors' existing capital structure with respect to liability management options.

The Debtors executed non-disclosure agreements with (i) the advisors to (a) Elliott (Milbank LLP, Houlihan Lokey, Inc., W.D Von Gonten & Co., and DeGolyer and MacNaughton Corp.), (b) Apollo (Paul, Weiss, Rifkind, Wharton & Garrison LLP and Moelis & Company LLC), (c) the Ad Hoc 1.125L/1.25L Noteholder Group (Morrison & Foerster LLP and PJT Partners LP), and (d) the Ad Hoc Unsecured Noteholder Group (Stroock & Stroock & Lavan LLP, Rothschild & Co.,

---

[22] Later, on May 9, 2019, the Company noted in its first-quarter 10-Q that there was substantial doubt about its ability to continue as a going concern.

and Intrepid Financial Partners), and (ii) certain members of certain of the foregoing constituencies. The Debtors also (x) established a data room to facilitate providing diligence to the foregoing advisors, (y) held a significant number of diligence calls and meetings between management, the Company's advisors and such parties and/or their respective advisors, and (z) participated in a number of in-person meetings with a number of such parties to discuss potential in-court restructurings and out-of-court transactions.

From May to mid-August 2019, EP's advisors had numerous calls and meetings with advisors to (i) the Ad Hoc 1.125L/1.25L Noteholder Group regarding, among other things, the terms of a potential restructuring, (ii) the certain 1.5L Noteholders, including Elliott and Apollo, to discuss a potential debt-for-equity transaction coupled with an equity rights offering, and (iii) the Ad Hoc Unsecured Noteholder Group to discuss a potential new financing transaction and/or unsecured notes repurchase.  During this period, the Special Committee met regularly to analyze and consider EP's strategic options, including the proposals made by the ad hoc committees.  The Special Committee meticulously weighed whether the Company should raise new money financing (including by, through its advisors, soliciting numerous indications of interest from potential lenders) to give the Company runway to continue to implement its business plan and make its scheduled coupon payments, or to implement a comprehensive restructuring of the Company.

The principal out-of-court strategies that the Special Committee considered (among other strategies) involved (i) fully utilizing the ability to raise up to an incremental $371 million of senior secured debt financing for additional funding or as an exchange, (ii) investing assets in an "unrestricted" subsidiary and utilizing such baskets to raise incremental financing to augment the Company's liquidity or fund a cash tender for existing securities of the Company at a discount to par value, and/or (iii) issuing new debt securities for existing securities of the Company at a discount to par value. However, absent an unforeseeable, substantial, and sustained rise in commodity prices, these potential transactions did not offer a sufficient solution to address the Debtors' balance sheet problems.  Further, as commodity prices continued to drop over the summer of 2019, access to the capital markets for oil and gas exploration and production firms became extremely limited.

The Debtors also began negotiating competing restructuring proposals with Elliott and Apollo on one hand, and the Ad Hoc 1.125L/1.5L Noteholder Group, on the other, as well as Exit Facility terms with JPM and other prospective RBL Lenders.  The Debtors also continued to have discussions with other stakeholders and financing sources.

### 6.    Utilization of Grace Period and Entry into Forbearance Agreements

Prior to the payment dates for their (i) $40 million coupon payment due on August 15, 2019 for the Company's 2025 1.5L Notes (the "**1.5L Coupon**"), and (ii)  $7.05 million coupon payment due on September 3, 2019 for the Company's 2022 Unsecured Notes, the Debtors elected not to pay such coupons and instead utilized the 30-day grace periods in respect of such coupon payments in order to preserve liquidity and continue negotiations with stakeholders as long as possible.[23]

---

[23] On August 15, 2019, the Debtors filed an 8-K disclosing that the 1.5L Coupon Payment would not be made when due.  On September 3, 2019, the Debtors filed an 8-K disclosing that the unsecured coupon payment would not be made when due.

Frequent discussions with the Debtors' stakeholders continued throughout the grace period. After entering the grace periods, the Debtors also continued to consider whether an out-of-court refinancing transaction on terms proposed by the Ad Hoc Unsecured Noteholder Group could be consummated, but given market conditions (i) such a transaction did not appear to offer a viable long-term capital structure solution for the Debtors, and (ii) in any event, capital providers in the market were not willing to finance the new money required in such a transaction.

To allow discussions to continue past the expiry of the grace period on the 1.5L Coupon, on September 14, 2019, the Debtors entered into forbearance agreements with parties holding more than 70% of the 2025 1.5L Notes (the "**1.5L Forbearance**") through September 22, 2019, and with the RBL Lenders through October 3, 2019 (but terminating upon the termination of the 1.5L Forbearance) (collectively with the 1.5L Forbearance, the "**Forbearance Agreements**"). The 1.5L Forbearance was subsequently extended through October 3, 2019 to allow negotiations to continue.

During this period, EP and its advisors held numerous in-person meetings and conference calls with the principals of and advisors to the Ad Hoc 1.125/1.25L Noteholder Group, Elliott, and Apollo to discuss EP's go-forward business plan and negotiate the terms of a potential restructuring transaction. The Debtors exchanged competing proposals with these creditors with respect to a potential restructuring backstopped by a new money equity investment in EP. The Debtors also made a proposal to the Ad Hoc 1.125L/1.25L Noteholder Group and the Initial Supporting Noteholders that would provide for all such parties to provide a new money equity investment in the Debtors and support a chapter 11 plan. Further, EP and its advisors engaged in continuing negotiations with its RBL Lenders regarding a potential restructuring, including the consensual use of cash collateral in a chapter 11 case and provision of a committed exit reserve-based lending facility.

### 7.     Agreement in Principle with Initial Supporting Noteholders

Ultimately, after months of diligence and negotiations, the Initial Supporting Noteholders agreed in principle to backstop $463 million of an equity rights offering in connection with a deleveraging chapter 11 plan, and no other creditor or ad hoc group agreed to make a new money investment in the Debtors at sufficiently attractive terms. Accordingly, after thoroughly exploring all options available to the Company and extensive negotiations with creditors across the Company's capital structure, the Special Committee authorized the Debtors to reach an agreement in principle with the Initial Supporting Noteholders and commence these Chapter 11 Cases to pursue the transactions contemplated thereby.

### 8.     Negotiations Regarding Tax Attributes

In connection with entry into the Plan Support Agreement, the Debtors and the Supporting Noteholders negotiated the treatment of holders of the Existing Parent Equity Interests. During such negotiations, the parties focused on certain tax attributes of EP Parent and its Debtor subsidiaries, including (i) federal net operating loss carryforwards ("**NOLs**") that, as of the Petition Date were estimated to exceed $3.3 billion, (ii) federal interest expense carryforwards under section 163(j) of Title 26 of the United States Code that, as of the Petition Date, was estimated to exceed approximately $393 million, and (iii) other tax benefits, including tax basis in excess of

the fair market value of the assets (collectively, the "**Tax Attributes**"). The Tax Attributes may reduce future taxable income and thus future tax liability, subject to certain statutory limitations.

For U.S. federal income tax purposes, the Tax Attributes are currently treated as residing at EP Parent rather than the Debtor subsidiaries which are generally disregarded as separate from EP Parent for U.S. federal income tax purposes. During the course of negotiations with the Initial Supporting Noteholders, the Debtors raised arguments suggesting that the Tax Attributes might have independent value from which only EP Parent (and not the Debtor subsidiaries) could benefit from. The Debtors also raised arguments that because none of the holders of Claims on account of the Debtors' funded debt hold such claims against EP Parent, any value of the Tax Attributes should inure to the benefit of the Existing Parent Equity Interest Holders. In addition, without EP Parent's participation as a Debtor under the Plan, participation to which the Existing Parent Equity Holders could potentially have objected, the Debtors expect that the Reorganized Debtors (excluding EP Parent) would have a significantly lower tax basis in their assets and no access to the existing NOLs or other valuable Tax Attributes that would remain at EP Parent. However, independent utilization of the Tax Attributes by EP Parent would entail surmounting significant practical and legal hurdles, including (i) the fact that EP Parent would have to generate taxable income in order to utilize the Tax Attributes, which would require new capital contributions by Existing Parent Equity Interest Holders to acquire or develop a new business able to generate taxable income, and (ii) EP Parent's ability to continue as a going concern.

Thus, while it is not clear whether the Tax Attributes have independent value (and, if they do, whether any such value should inure to the benefit of the Existing Parent Equity Holders), the parties to the Plan Support Agreement determined that, taking into account those uncertainties, the significant hurdles to independent utilization, the uncertainty as to the value of the Tax Attributes to the Reorganized Debtors (as discussed in Section VIII.A.2 (Limitations of NOL Carryforwards and Other Tax Attributes), and the potential for unidentified liabilities of EP Parent, weighed against the potential future tax savings that the Tax Attributes could provide to the Reorganized Debtors, a $500,000 payment to the Existing Parent Equity Interest Holders under the Plan on account of the Tax Attributes of EP Parent would be in the best interests of all stakeholders.

### 9. Employee Incentive Plan and Management Employment Agreement Negotiations

In connection with the formulation and negotiation of the Employee Incentive Plan ("**EIP**") term sheet (annexed as Exhibit A-2 to the Plan Support Agreement) and management employment agreements term sheet (annexed as Exhibit A-3 to the Plan Support Agreement) the Debtors were advised by an independent compensation consultant, Longnecker & Associates. EIP and employment agreement negotiations were led by the Debtors' senior management team, overseen by the Special Committee.

Certain material terms of the EIP include:

- Participants of the EIP will include officers and employees of the Company who are designated by the New Board to receive awards under the EIP.

- 10% of the New Common Shares on the Effective Date, on a fully diluted basis (including shares issuable under the EIP), will be reserved for issuance under the EIP (the "**Award Pool**"). Up to 70% of the Award Pool will be allocated to the Emergence Awards.

- The CEO and seven (7) other officers of the Reorganized EP Parent (identified on Schedule 1 attached to the EIP Term Sheet) will receive the initial grants of awards under the EIP (the "**Emergence Awards**").

- Emergence Awards will be granted as follows:

  o 30% in the form of time-vesting restricted stock units, which shall vest 25% per year over 4 years, based on continued employment.

  o 70% in the form of performance-vesting restricted stock units, which shall vest 25% per year over 4 years, based on continued employment and the achievement of pre-established performance goals.

### C.    Prepetition Analysis

#### 1.    Independent Investigation

Prior to the Petition Date, Carol Flaton, in her capacity as both an independent director and member of the Special Committee, oversaw an investigation (the "**Independent Investigation**") into certain potential claims and estate causes of action in connection with (a) related party transactions (the "**RPTs**") between the Company and its Sponsors and (b) the general operation of the business and Board practices. The RPTs included transactions involving the Company and its Sponsors from May 2012 to October 2019 including (i) certain debt purchases by Apollo and Access in late 2018 and 2019; (ii) the Jeter Drillco JV and certain payable disputes in connection therewith; (iii) a management fee paid to Phoenix Natural Resources LLC to release members of its leadership team to join EP Energy; (iv) reimbursement payments made to Sponsors pursuant to the Stockholders' Agreement in relation to Board activities and transactions; (v) an August 2016 term loan exchange transaction; (vi) fees paid to Apollo and Riverstone as co-managers to underwrite bond offerings in May 2015 and November 2016; (vii) payments made to various Apollo affiliates Pegasus Optimization Partners, LLC, Express Energy Services, and Hexion Inc. f/k/a Momentive Specialty Chemicals Inc., under drilling services and supply agreements; (viii) a $6.25 million management fee paid to Sponsors in January 2014 pursuant to a May 2012 Management Agreement; (ix) an $83.3 million transaction fee paid to Sponsors in January 2014 pursuant to a May 2012 Management Agreement; (x) the incurrence of an obligation, and payment of, a $71.5 million transaction fee to the Sponsors in connection with the acquisition from El Paso Corporation in May 2012; and (xi) a dividend paid from proceeds of a PIK note issuance in December 2012 and a dividend paid from asset sale proceeds in June 2013. In connection with the Independent Investigation, Ms. Flaton directed Weil to assist in evaluating the colorability of any potential claims and estate causes of action related to the RPTs.

The Independent Investigation took place over the course of two months and involved an extensive factual and legal analysis, where Weil conferred with and reported on its investigation to Ms. Flaton throughout. In connection with the Independent Investigation, ten separate interviews

were conducted, extensive documentation was reviewed, and the Company's governance practices and controls were carefully reviewed.

At the conclusion of the Independent Investigation, no colorable claims were identified belonging to the Company related to the RPTs or conduct by officers or directors, other than a potential non-material preference claim for reimbursements to Sponsors of reasonable expenses related to Board activities and transactions per the Company's Stockholders' Agreement, which may be subject to valid defenses. The Independent Investigation concluded that the other claims were not colorable because, among other things, the Company has a robust governance protocol for evaluating related party transactions and debt trading by the Sponsors which was followed at all operative times. The Company's governance protocol includes a related party transaction policy that requires only independent members to vote on related party transactions and was adhered to for the transactions investigated with each transaction being evaluated before it was approved. For example, with respect to the Project Jeter Drillco JV, competing proposals were considered, and the transactions were deemed to be substantively fair before they were approved. Given that there are no colorable claims, any such claims lack any measurable value. Further, when litigation costs were considered, it was concluded that such claims would likely have a negative value to the Company. Based upon the results of the Independent Investigation, Ms. Flaton concluded and therefore recommended to the Special Committee that any transaction should include releases for officers, directors, and Sponsors if such transaction is otherwise the best transaction available to the Company and is in the best interests of the Company and its stakeholders. Specifically, the releases were supported because there were no colorable claims identified in the Independent Investigation. Moreover, if the Sponsors provided any consideration to the Company in any such transaction, then such consideration significantly outweighs the benefits of preserving any potential claims.

The Releases are an integral part of the highly-negotiated Plan Support Agreement and Backstop Agreement on which the Plan is premised and pursuant to which the Backstop Parties are backstopping the cash and equitization Rights Offering to sponsor the Debtors' reorganization. Absent this arrangement, the Debtors would have no actionable reorganization transaction and would be able to provide substantially less value to their economic stakeholders.

## 2.      Mortgage Lien Analysis

Prior to the Petition Date, the Debtors' advisors conducted an independent analysis of the quality and value of the mortgages filed in association with the Debtors' four tranches of secured funded debt. The Company's books and records were reviewed to determine (i) the technical validity of all filed mortgages to assure that individual mortgage forms satisfied relevant technical legal requirements (the "**Technical Validity Analysis**") and (ii) the lien coverage ratio, or the asset value of mortgaged properties to total asset value (the "**Lien Coverage Analysis**").

The Technical Validity Analysis included a comprehensive search of UCC financing statements in Utah and filed mortgages in Texas and Utah. FTI manually reviewed each of the 91 mortgage documents to determine whether (i) the document is legible, (ii) the mortgagor name is correct, (iii) the mortgagee name is correct, (iv) the trustee name is correct, (v) party signatures are present, (vi) the document is notarized, and (vii) the document is properly recorded (stamped with book/liber/volume number, page number, date, and time). In addition, Weil manually reviewed each of the 91 mortgage documents to determine the following:  (i) within each secured loan tranche, relative to the base form for that tranche, the language of the grant, the language of the

security agreement (for fixtures/as-extracted collateral), enforcement provisions, the description of debt, whether the mortgage has a valid "catchall/all assets in county" provision, (ii) documented discrepancies between tranches of debt, and (iii) whether UCC's filed in Utah were validly extended.

Moreover, the Lien Coverage Analysis was performed using various reserve databases, including the most recent fall 2019 reserve report (the "**Fall 2019 Reserve Report**"), which was conducted during August and September of 2019 and provided to the RBL Agent.  The coverage ratio of the total proved value of mortgaged oil and gas leases to total Company reserve value (unrisked PV-10), based on the Fall 2019 Reserve Report, are as follows for each of the secured debt tranches:[24][25][26]

| Loan | PDP (Proved Developed Producing) | PNP (Proved Not Producing) | PUD (Proven Undeveloped Reserves) | Total |
|---|---|---|---|---|
| **RBL Facility** | 98.6% | 97.1% | 92.1% | 97.2% |
| **1.125L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **1.25L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **1.5L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **Total** | **98.6%** | **97.1%** | **92.1%** | **97.2%** |

As shown above, for each of the secured debt tranches, the Debtors determined that their prepetition secured lenders had valid, perfected liens in over 98.6% of the Debtors' proved developed producing reserves, 97.1% of the Debtors' proved developed non-producing reserves, and 92.1% of the Debtors' proved undeveloped reserves.

To satisfy its fiduciary duties to general unsecured creditors, the Creditors' Committee is independently performing a mortgage lien analysis.  Such analysis remains ongoing as of the date hereof.

### D.    Prepetition Compensation Program

On May 29, 2019, the Compensation Committee of the Board approved the implementation of a Key Employee Retention Program (a "**KERP**") for all employees of the Company.  The KERP was designed to retain employees of the Company in their current roles over the near term while providing them with financial stability.  Pursuant to the KERP, employees must continue their

---

[24] The values in the coverage ratio include $2.2 million of oil and gas leases that are potentially impacted by the Technical Validity Analysis, which if excluded would reduce the total coverage ratio in each tranche by 0.09%.

[25] Results shown are based solely on unrisked PV-10 values.

[26] Drilled Uncompleted Wells are included in the PNP reserve category in the Fall 2019 Reserve Report.

employment with the Company for approximately thirteen months or they will forfeit the full amount of the retention payment. The KERP payments are in lieu of any bonuses or long-term incentive awards, if any, that would otherwise be due or payable to the KERP participants for 2019 performance.  If a KERP participant is terminated for cause or voluntarily terminates his or her employment with the Company without good reason (other than as a result of death or disability) such participant must repay his or her KERP payment in full. The KERP was formulated with the input and based upon the recommendations of the Compensation Committee's independent compensation consultant.[27]

The Company's named executive officers were awarded the following amounts under the KERP:

| Name | Position | Amount |
|------|----------|--------|
| Russell E. Parker | President and Chief Executive Officer | $ 2,392,800 |
| Chad D. England | Senior Vice President, Operations | $   813,600 |
| Raymond J. Ambrose | Senior Vice President, Engineering and Subsurface | $   572,000 |
| Kyle A. McCuen | Senior Vice President and Chief Financial Officer | $   543,000 |
| Jace D. Locke | Vice President, General Counsel and Corporate Secretary | $   543,000 |

## V.
## OVERVIEW OF CHAPTER 11 CASES

### A.      Commencement of Chapter 11 Cases and First Day Motions

On October 3, 2019, the Debtors commenced their Chapter 11 Cases.  The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.      First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Restrict certain transfers of equity interests in the Debtors [Docket Nos. 56, 313];

- Pay certain prepetition taxes and assessments [Docket No. 57];

- Continue paying employee wages and benefits [Docket No. 58];

---

[27] The KERP was not subject to the Independent Investigation.

- Continue insurance and surety bond programs [Docket No. 61];

- Obtain use of cash collateral [Docket No. 65];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket Nos. 66, 327];

- Pay certain prepetition joint interest billing, royalty, and lienable operating expenses [Docket Nos. 67];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 99]; and

- Reject a burdensome executory contract with Ruby Pipeline, L.L.C. [Docket No. 319].[28]

**C.      Procedural Motions and Retention of Professionals**

The Debtors have filed various motions regarding procedural issues that are common to Chapter 11 Cases of similar size and complexity as these Chapter 11 Cases.  The Bankruptcy Court granted substantially all of the relief request in such motions and entered various orders authorizing the Debtors to, among other things:

- Jointly administer the Debtors' estates [Docket No. 26]

- File a consolidated creditor matrix and list of 30 largest unsecured creditors and modify the requirement to file a list of equity security holders [Docket No. 59];

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 318]; and

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 317].

**D.      Retention of Chapter 11 Professionals**

The Debtors have filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases.  These professionals include (i) FTI (including designating David Rush to serve as Chief Restructuring Officer); (ii) Evercore, as investment banker; (iii) Weil, as counsel to the Debtors; and (iv) Prime Clerk LLC, as claims, noticing, and solicitation agent; and (v) Ernst & Young LLP, as auditor.  The Bankruptcy Court entered orders authorizing the retention of such professionals [Docket Nos. 316, 328, 315, 114, and 497, respectively].

---

[28] Since the Petition Date, the Debtors filed motions seeking to reject other burdensome contracts [Docket Nos. 535, 589, and 600].

### E.     Postpetition Novation of Hedges

Following the Petition Date, DNB Bank AKA ("**DNB**"), one of the Debtors' hedging counterparties, informed the Debtors that it intended to terminate each of its outstanding hedging transactions with the Debtors unless such hedging transactions were successfully novated and such novation was approved by the Court.  After negotiations, J. Aron & Company (the "**J. Aron**"), one of the Debtors' other hedging counterparties, DNB, and the Debtors agreed that DNB would novate its position under such hedging transactions to J. Aron and the Debtors would pay a $1 million novation fee to J. Aron.  On October 16, 2019, the Bankruptcy Court entered the order granting the relief requested [Docket No. 155].

### F.     Execution of Backstop Commitment Agreement and PSA and Entry into DIP Facility and Exit Commitment Letter

Following the Petition Date, the Debtors and their advisors worked to finalize definitive documentation to memorialize their agreement in principle with the Supporting Noteholders and secure the commitments necessary to prosecute their restructuring.

On October 18, 2019, following months of good-faith, arms'-length negotiations, the Debtors (i) entered into the Backstop Commitment Agreement and Plan Support Agreement with the Supporting Noteholders, and (ii) reached an agreement with the Exit Commitment Parties to provide the DIP-to-Exit Facility.  The Backstop Commitment Agreement, Plan Support Agreement, and DIP-to-Exit Facility are described further in Section I herein.

On October 27, 2019, following the Debtors' entry into the PSA and Backstop Commitment Agreement, an ad hoc group of the Debtors' 1.125L Noteholders and 1.25L Noteholders submitted an uncommitted alternative restructuring proposal to the Debtors that omitted details of certain material financing components.  The Special Committee analyzed the proposal and determined that it did not provide an alternative that was superior to the Plan.

Parties objected to approval of the Backstop Commitment Agreement on the following alleged grounds, among others: (i) the Backstop Agreement was not necessary or appropriate under the business judgment standard of section 363(b), (ii) the Commitment Premium, Termination Fee, and other commitment protections were excessive and unnecessary, (iii) the terms of the Backstop Commitment Agreement were unduly restrictive, (iv) the Backstop Commitment Agreement and PSA committed the Debtors to an unconfirmable plan because it violates equal treatment under section 1123(a)(4) of the Bankruptcy Code and the absolute priority rule, and would allow 1.25L noteholders to recover more than 100% on their claims, (v) Apollo, Access, and Elliot exercised improper influence over the Special Committee, and (vi) the Special Committee was not independent because it relied on the advice of the Company's advisors.  Following a hearing held on November 20 and 21, 2019, the Court overruled the objections to the Backstop Commitment Agreement, found that the Special Committee was independent and not influenced by Apollo, Access, and Elliott, and entered an order approving the Debtors' entry into the Backstop Commitment Agreement [Docket No. 483].  Prior to such hearing, the Supporting Noteholders also agreed to waive a "no-shop" provision that they had negotiated for in the Backstop Commitment Agreement.

Parties also objected to approval of the DIP-to-Exit Facility on the following alleged grounds, among others: (i) that the DIP-to-Exit Facility constitutes a *sub rosa* plan; (ii) that the DIP-to-Exit Facility was unnecessary; and (iii) that certain terms of the DIP-to-Exit Facility were unwarranted, including (a) temporal and budgetary limitations on the Creditors' Committee's ability to conduct certain investigations; (b) waivers of certain rights associated with sections 506(c) and 552(b) of the Bankruptcy Code; (c) adequate protection provided to holders of secured claims; (d) rights with respect to the occurrence of events of default; and (e) the equitable doctrine of marshaling. The Debtors negotiated a consensual resolution of all of the objections to the DIP-to-Exit Facility other than an objection filed by MSB [Docket No. 377]. Following the hearings held on November 20 and 21, 2019, the Court overruled MSB's objection. The Debtors subsequently filed a fully consensual form of final order approving the DIP-to-Exit Facility [Docket No. 479]. On November 25, 2019, the Court entered the final order approving the DIP-to-Exit Facility [Docket No. 482].

### G.    Appointment of Creditors' Committee

On October 21, 2019, the Creditors' Committee was appointed by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these chapter 11 cases [Docket No. 200]. The members of the Creditors' Committee are: (i) Wilmington Trust, N.A.; (ii) Wilmington Savings Fund Society, FSB; (iii) Rene R. Barrientos, Ltd. ("**Barrientos**"); and (iv) Antora Peak Capital Management LP. The Creditors' Committee has retained Strook & Strook & Lavan LLP as counsel, AlixPartners LLP as its financial advisor, and Jefferies Group LLC as its investment banker. Barrientos has since resigned from the Creditors' Committee.

The Creditors' Committee, in the exercise of its fiduciary duties, is currently investigating (i) the extent of the liens and claims of certain of the Debtors' secured creditors, including the holders of RBL Claims, 1.125L Notes Claims, 1.25L Notes Claims, and 1.5L Notes Claims, (ii) the prepetition trading activities of Apollo and Access, and (iii) potential avoidance actions, including potential claims against certain insiders of the Debtors. The proposed releases under the Plan would release estate causes of action related to the matters currently under review by the Creditors' Committee. As discussed herein, the Debtors conducted the Independent Investigation and determined that there are no colorable estate causes of action related to the matters under review by the Creditors' Committee.

### H.    Adversary Complaint to Invalidate MSB's Judgement Lien

On October 31, 2019, the Debtors filed a complaint (the "**Complaint**") against Maltsberger/Storey Ranch, LLC ("**Maltsberger**"), Storey Minerals, Ltd. ("**Storey**"), and Barrientos (together with Maltsberger and Storey, "**MSB**"), seeking a declaratory judgment that MSB does not hold a valid judgment lien on certain of the Debtors' property, or alternatively, that the purported judgment lien should be avoided as a preferential transfer under section 547 of the Bankruptcy Code. On December 3, 2019, MSB filed its answer to the Complaint.

The Complaint arose in response to a breach of contract lawsuit filed by MSB against Debtor EP Energy E&P Company, L.P. ("**EP**") on May 29, 2018 in the 81st District Court of La Salle County, Texas, alleging that EP Energy E&P Company, L.P. breached a most favored-nations provision (the "**MFN Provision**") in three oil and gas leases with respect to the payment of bonus and delay

rentals (the "**MFN Lawsuit**"). The MFN Lawsuit was litigated in the state trial court over the course of a year, and on March 2019, EP and MSB each filed cross-motions for summary judgment regarding the construction and interpretation of the most favored-nations provision contained in the applicable leases.

On June 6, 2019, the trial court granted in part and denied in part MSB's motion for partial summary judgment, (i) holding that EP breached the leases with respect to the bonus payment, entitling MSB to an additional bonus above what EP already paid to MSB, and (ii) denying MSB's claim for an increase in delay rentals under the MFN Provision. On June 19, 2019, the La Salle County District Court entered a judgment in favor of MSB in an amount of approximately $17.5 million to Maltsberger, $17.5 million to Storey, and $6.1 million to Barrientos. The final judgment was entered on the MFN Lawsuit docket on July 11, 2019 (the "**Final Judgment**"). EP perfected an appeal from the Final Judgment on July 17, 2019 and superseded the Final Judgment by depositing a cashier's check with the trial court clerk the same day. EP's appeal remains pending in the Texas Fourth Court of Appeals and the Final Judgment remains superseded. Meanwhile, MSB obtained an abstract of judgment from the trial court clerk on July 16, 2019 (the "**Abstract of Judgment**"), which was not in compliance with the requirements set forth under Texas Property Code § 52.003, and proceeded to record such Abstract of Judgment in the Real Property Records of La Salle County on August 22, 2019.

While MSB purports to hold a judgment lien because of the recorded Abstract of Judgment, the Debtors are seeking a judgment of the Bankruptcy Court declaring that the Abstract of Judgment fails to substantially comply with the statutory requirements of Texas Property Code § 52.003 and, in the alternative, that the judgment lien should be avoided as a preferential transfer under Section 547 of the Bankruptcy Code as it was recorded within 90 days of the filing of these Chapter 11 Cases.

The Debtors cannot predict with certainty the outcome of the MFN Lawsuit. Although the Debtors believe they have strong arguments to support each count asserted by MSB in the MFN Lawsuit, the Debtors may not prevail in such litigation. MSB asserts claims against EP in the aggregate amount of approximately $41,034,055.00, plus attorney's fees, expenses, and costs (the "**MSB Claims**"). If the Court determines that the MSB Claims are secured by a lien on all of the Debtors' real estate and fixtures in LaSalle County, Texas, as MSB alleges, and that such lien cannot be avoided pursuant to section 547 of the Bankruptcy Code, then the Debtors would move to value the collateral and determine the extent and priority of the lien in view of the very substantial funded secured claims that were perfected years before MSB filed its liens. MSB would have an allowed secured claim of based on the value of any unencumbered property which the Debtors believe is not significant. Under such circumstances, MSB could argue that the secured portion of their claims, if any, are entitled to the same treatment as the "Other Secured Claims" in Class 1 and therefore unimpaired pursuant to the Plan.

MSB also asserts that it may be able to obtain a declaration that all of EP's interests in certain oil and gas lease have been terminated due to EP's non-compliance with certain provisions in such leases, including the MFN Provision. Although the Debtors strongly dispute such assertion, termination of such leases could materially impact the Debtors' projections and treatment under the Plan.

### I. Altamont Adversary Complaint

On November 22, 2019, Kinder Morgan Altamont LLC ("**Kinder**") filed an adversary complaint (the "**Altamont Complaint**") against EP, seeking (i) a declaration that the Altamont Agreement[29] is a covenant that runs with the land and cannot be rejected; (ii) alternatively, if the Altamont Agreement does not satisfy the privity of estate requirement for a covenant running with the land, a declaration that the Altamont Agreement is an equitable servitude that cannot be rejected; (iii) a declaration that the Omnibus Agreement[30] is integrated and non-severable from the Altamont Agreement; or (iv) alternatively, if the Bankruptcy Court determines that the Altamont Agreement is neither a covenant running with the land nor an equitable servitude, an order pursuant to section 365(d)(2) of the Bankruptcy Code compelling the Debtors to assume or reject the Altamont Agreement.[31]  EP's response deadline has not yet passed, but EP intends to file one or more pleadings contesting the requested relief.

### J. Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Exclusive Periods currently remain in effect and expire on January 31, 2020, and March 31, 2020, respectively.

### K. Statements and Schedules, and Claims Bar Dates

On October 7, 2019, the Bankruptcy Court entered an order approving (i) December 16, 2019 as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**Bar Date**"); and (ii) March 31, 2020 as the deadline for all governmental units to file a proof of Claim [Docket No. 98].

---

[29]  The Altamont Agreement is defined to mean that certain gas purchasing/processing contract entered into between Kinder and EP, dated November 14, 2017, and made effective June 1, 2010 (as amended, modified, or supplemented).

[30]  The Omnibus Agreement is defined to mean that certain omnibus agreement entered into between El Paso E&P and El Paso Midstream, by which Kinder and EP became successor-in-interest to, dated February 8, 2012, and made effective January 1, 2012 (as amended, modified, or supplemented).

[31]  On October 8, 2019, Kinder filed a motion [Docket No. 105] seeking entry of an order "lifting the automatic stay for cause to require [EP] to provide adequate assurance that it has the financial wherewithal to perform under the [Altamont Agreement], a non-executory contract, that in accordance with sections 365(c) and 365(e)(2)(B) of the Bankruptcy Code, [Kinder] shall not be required to provide financial accommodations to [EP] and expend further funds absent a court order that the [Altamont Agreement] is not an executory contract or to the extent that it is deemed to be an executory contract, Debtor has assumed the [Altamont Agreement] and for such other and future relief to which [Kinder] may be entitled."  This motion was subsequently withdrawn prior to the filing of the Altamont Complaint.

The Debtors provided notice of the Bar Date, and published notice of the Bar Date in the national edition of the *New York Times* and the *Houston Chronicle*.

On November 18, 2019, the Debtors filed their Schedules and Statements, detailing known claims against the Debtors.  Further, as of December 11, 2019, over 189 proofs of Claim had been filed against the Debtors asserting in the aggregate approximately $70 million.  The Debtors have begun to review and analyze the filed Claims, and will reconcile objections to the filed Claims as appropriate.

Upon the expiration of the Bar Date, the Debtors will have more information regarding the General Unsecured Claims and the allowed amounts in connection therewith.

Further, the Debtors intend to reject certain executory contracts pursuant to the Plan.  Any counterparty to an executory contract that is rejected must file and serve a proof of Claim on the applicable Debtor that is party to the applicable executory contract to be rejected by no later than the applicable bar date governed by the Plan of the Court order governing such rejection.

## L.  Alternative Plan Proposals

Since entering into the Backstop Agreement, the Debtors have not actively solicited proposals for an alternative plan of reorganization.  On October 27, 2019, the Ad Hoc 1.125L/1.25L Noteholder Group delivered an uncommitted proposal for an alternative plan of reorganization to the Board, a copy of which is annexed hereto as **Exhibit G**.  The Debtors reviewed the proposal and analyzed its strengths and weaknesses.  The Special Committee considered the proposal at multiple meetings before determining it was not worthwhile for the Debtors to pursue the proposal because, among other things, it failed to maximize value for creditors.

## M.  Request for Equity Committee

On October 17, 2019 [Docket No. 160] and November 25, 2019 [Docket No. 488], Mr. Duane Morley Cox filed pleadings in these chapter 11 cases seeking, among other various relief, the appointment of an official equity committee in these chapter 11 cases.  On December 13, 2019, the Debtors filed an objection [Docket No. 543] to such relief on the grounds that the proposed appointment of an equity committee is plainly inappropriate.  Mr. Cox filed a reply brief on December 26, 2019 [Docket No. 592].  A Bankruptcy Court status conference on the matter was scheduled for January 8, 2020.

## VI.
## SUMMARY OF PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.

A.      **Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims**.

1.      **Treatment of Administrative Expense Claims.**

On (or as soon thereafter as is reasonably practicable) the later of (i) the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or Restructuring Expenses) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

2.      **Treatment of Fee Claims.**

(a)      All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)      On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account. The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims. Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full. The Fee Escrow Account shall be held in trust for Professional Persons and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full. Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [Docket No. 318]; *provided* that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons,

such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan.  No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.  For the avoidance of doubt, Restructuring Expenses shall not be paid into the Fee Escrow Account, and shall be payable on the Effective Date pursuant to Section 5.14 of the Plan.

(c)     Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 3.     Treatment of DIP Claims and Commitments.

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim and DIP Commitment, each holder of an Allowed DIP Claim or DIP Commitment shall receive, either (i) on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement or (ii) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed DIP Claims will have agreed upon in writing. Upon the indefeasible payment or satisfaction in Cash, and/or in the form of first-lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

### 4.     Payment of Fees and Expenses Under DIP Order.

On the later of (i) the Effective Date and (ii) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Agent and otherwise required to be paid under or pursuant to the applicable DIP Order. All payments of fees, expenses, or disbursements pursuant to Section 2.4 of the Plan shall be subject in all respects to the terms of the applicable DIP Order.

### 5.     Treatment of Priority Tax Claims.

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (i) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) or such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

B.    **Classification of Claims and Interests.**

1.    **Classification in General.**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

2.    **Formation of Debtor Groups for Convenience Only.**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

3.    **Summary of Classification of Claims and Interests.**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth in the Plan shall apply separately to each Debtor.

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | RBL Claims | Impaired | Yes |
| Class 4 | 1.125L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 5 | 1.25L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 6 | Secured 1.5L Notes Claims | Impaired | Yes |
| Class 7 | Unsecured Claims | Impaired | Yes |
| Class 8 | Convenience Claims | Impaired | Yes |
| Class 9 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 10 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 11 | Existing Parent Equity Interests | Impaired | Yes |
| Class 12 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 13 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

4.      **Special Provision Governing Unimpaired Claims.**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.      **Separate Classification of Other Secured Claims.**

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

6.      **Elimination of Vacant Classes.**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

7.      **Voting Classes; Presumed Acceptance by Non-Voting Classes.**

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

8.      **Voting; Presumptions; Solicitation.**

(a)      **Acceptance by Certain Impaired Classes**. Only holders of Allowed Claims or Interests in Classes 3, 6, 7, 8 and 11 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan. An Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan. Holders of Claims or Interests in Classes 3, 6, 7, 8 and 11 shall receive ballots containing detailed voting instructions.

(b)      **Deemed Acceptance by Unimpaired Classes**. Holders of Claims and Interests in Classes 1, 2, 4, 5, 9, and 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)      **Deemed Rejection by Certain Impaired Classes**. Holders of Claims and Interests in Classes 10 and 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 9. Cramdown.

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 10. No Waiver.

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

### C. <u>Treatment of Claims and Interests</u>.

### 1. Class 1: Other Secured Claims.

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(b) **Impairment and Voting**: Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 2. Class 2:  Other Priority Claims.

(a) **Treatment**: The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

(b)     **Impairment and Voting**: Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

3.     **Class 3:  RBL Claims.**

(a)     **Treatment**: Each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

(b)     **Impairment and Voting**: RBL Claims are Impaired. Holders of Allowed RBL Claims are entitled to vote on the Plan.

(c)     **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date, consisting of $314,710,456 in principal amount, plus all other secured obligations, including unpaid interest, fees, and other reasonable and documented expenses arising and payable under the Prepetition RBL Credit Agreement that have not become DIP Claims pursuant to the DIP Order.

4.     **Class 4:  1.125L Notes Claims.**

(a)     **Treatment**: On the Effective Date, all Allowed 1.125L Notes Claims will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture.

(b)     **Impairment and Voting**: 1.125L Notes Claims are Unimpaired. Holders of Allowed 1.125L Notes Claims are not entitled to vote on the Plan.

5.     **Class 5:  1.25L Notes Claims.**

(a)     **Treatment**: On the Effective Date, all Allowed 1.25L Notes Claims will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture.

(b)     **Impairment and Voting**: 1.25L Notes Claims are Unimpaired. Holders of Allowed 1.25L Notes Claims are not entitled to vote on the Plan.

6.     **Class 6:  Secured 1.5L Notes Claims.**

(a)     **Treatment**: On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata

share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares, and (ii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures.  On the Effective Date, the 1.5L Notes will be cancelled, released and extinguished and will be of no further force or effect except as set forth in the Plan, whether surrendered for cancellation or otherwise.

(b)      **Impairment and Voting**: Secured 1.5L Notes Claims are Impaired. Holders of Allowed Secured 1.5L Notes Claims are entitled to vote on the Plan.

(c)      **Allowance**: The Secured 1.5L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $395,257,335.

7.      **Class 7: Unsecured Claims.**

(a)      **Treatment**: On the Effective Date, holders of Allowed Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims will receive, in full and final satisfaction of such Claims, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares (the "**Unsecured Shares**").  On the Effective Date, the Unsecured Notes Claims, 1.5L Notes Deficiency Claims and General Unsecured Claims will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b)      **Impairment and Voting**: Allowed Unsecured Claims are Impaired. Holders of Allowed Unsecured Claims are entitled to vote on the Plan.

8.      **Class 8:  Convenience Claims.**

(a)      **Treatment**: Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount. Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim.

(b)      **Impairment and Voting**: Allowed Convenience Claims are Impaired. Holders of Allowed Convenience Claims are entitled to vote on the Plan.

9.      **Class 9:  Intercompany Claims.**

(a)      **Treatment**: On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Initial Supporting Noteholders.

(b)      **Impairment and Voting**: All Allowed Intercompany Claims are deemed Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of

Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 10.   Class 10:  Subordinated Claims.

(a)      **Treatment**: All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(b)      **Impairment and Voting**: Allowed Subordinated Claims are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 11.   Class 11:  Existing Parent Equity Interests.

(a)      **Treatment**: Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $500,000 in Cash. On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b)      **Impairment and Voting:** Existing Parent Equity Interests are Impaired. Holders of Existing Parent Equity Interests are entitled to vote on the Plan.

### 12.   Class 12:  Other Equity Interests.

(a)      **Treatment**: Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.

(b)      **Impairment and Voting**: Other Equity Interests are Impaired. In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

### 13.   Class 13:  Intercompany Interests.

(a)      **Treatment**: Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests shall, subject to the reasonable consent of the Initial Supporting Noteholders, be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.

(b)      **Impairment and Voting**: Intercompany Interests are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the **votes** of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

14.     **Treatment of Vacant Classes.**

Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan shall receive no Plan Distribution.

D.     **Means for Implementation.**

1.     **Compromise and Settlement of Claims, Interests, and Controversies.**

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

2.     **Continued Corporate Existence; Effectuating Documents; Further Transactions.**

(a)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents or other applicable corporate governance documents.

(b)     On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, subject to the consent of the Initial Supporting Noteholders, causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, subject to the consent of the Initial Supporting Noteholders: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery

of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

> ### 3.    Corporate Action.

> (a)      Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided in the Plan, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Common Shares, (d) the entry into or execution of the Exit Facility Documents, (e) entry into the Shareholder Agreement by the Reorganized Debtors and the holders of New Common Shares, including participants in the Rights Offering, and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

> (b)      On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to, subject to the reasonable consent of the Initial Supporting Noteholders, issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by Section 5.3 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

> ### 4.    Plan Funding.

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering and the Exit Facility.

> ### 5.    Cancellation of Existing Securities and Agreements.

> (a)      Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements:  the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing (i) certain Intercompany Interests not modified by the Plan, (ii) the Reinstated Debt; (iii) any security

interests granted in favor of the holders of the Reinstated Debt or the collateral agents for the Reinstated Debt; (iv) the Intercreditor Agreements (including the Intercreditor Agreements themselves) and (v) any security interests granted in connection with or with respect to the Prepetition RBL Facility, DIP Facility and/or the Exit Facility which secure the Exit Facility) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (a) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (b) allowing and preserving the rights of the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees, as applicable, to (i) make distributions on account of such Claims or Interests; (ii) maintain, enforce, and exercise their respective liens, including their Indenture Trustee Charging Liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (iv) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, or Unsecured Notes Trustees may have under the Plan, the applicable credit agreement, Indentures, collateral agreements, or pledge agreements; (v) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or Indentures; and (vi) execute documents pursuant to section 5.6 of the Plan; *provided*, *further*, that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees may take such further action to implement the terms of the Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and the Initial Supporting Noteholders to the extent not inconsistent with the Confirmation Order or the Plan.

(b)     On and after the Effective Date, all duties, responsibilities or obligations of the Prepetition RBL Agent, the holders of RBL Claims, the DIP Agent, the holders of DIP Claims, the 1.5L Notes Trustees, the holders of 1.5L Notes Claims, the Unsecured Notes Trustees, and the holders of Unsecured Notes Claims, in each case under (i) the Prepetition RBL Credit Agreement and the other Credit Documents (as defined in the Prepetition RBL Credit Agreement), (ii) the  DIP Facility Credit Agreement and the other Credit Documents (as defined in the DIP Facility Credit Agreement), (iii) the 1.5L Notes Indentures and the other Notes Documents (as defined in the applicable 1.5L Notes Indentures), and (iv) the Unsecured Notes Indentures and the other Notes Documents (as defined in the applicable Unsecured Notes Indentures), shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  For the avoidance of doubt, the Debtors and the Reorganized Debtors (in each case, subject to the reasonable consent of the Initial Supporting Noteholders), the Prepetition RBL Agent, the DIP Agent, the 1.5L Notes Trustees, the Unsecured Notes Trustees, and the Disbursing Agent may (i) make post-Effective Date Distributions or take such other action to exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (ii) may take any other action necessary to cause the Plan to become Effective, including by implementing the Restructuring Transactions set forth in the Plan.

(c)     If the record holder of any 1.5L Note or Unsecured Note is DTC or its nominee or another securities depository or custodian thereof, and such 1.5L Note or Unsecured Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such 1.5L Note or Unsecured Note shall be deemed to have surrendered such Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.

## 6.     Cancellation of Certain Existing Security Interests.

(a)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(b)     After the Effective Date, the distributions to holders on account of 1.5L Notes Claims, and the payment of the Indenture Trustee Fees and Expenses with respect to the 1.5L Notes Trustees (including, without limitation, attorneys' fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the 1.5L Notes Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the 1.5L Notes Trustees, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the 1.5L Notes Trustees, including, without limitation, UCC-3 termination statements.

## 7.     Officers and Boards of Directors.

(a)     On the Effective Date, the New Board shall consist of the number of directors as set forth in the Plan Supplement. EP Energy's chief executive officer shall serve as a member of the New Board. The remaining initial members of the New Board shall be appointed by the Initial Supporting Noteholders in consultation with the Debtors and in accordance with the Plan Support Agreement.  The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(c)     Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no

continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 8. Employee Incentive Plan.

On the Effective Date, the New Board shall adopt the Employee Incentive Plan and the Emergence Awards (as defined in the EIP Term Sheet annexed as Exhibit A-2 to the Plan Support Agreement). All awards issued under the EIP will be dilutive of all other New Common Shares issued pursuant to the Plan.

### 9. Authorization, Issuance, and Delivery of New Common Shares.

On the Effective Date, Reorganized EP Energy is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Reorganized EP Energy's New Corporate Governance Documents shall have provided for sufficient shares of authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by the Plan, including the Rights Offering, the Backstop Commitment Agreement, and the Employee Incentive Plan, and Reorganized EP Energy shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate such issuances.

On the Effective Date, each holder of New Common Shares (including participants in the Rights Offering) may, at the option of the Debtors, with the consent of the Initial Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the Shareholder Agreement and the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The Shareholder Agreement may, and the New Corporate Governance Documents shall, be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan or the Rights Offering upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

The Shareholder Agreement, a form of which will be filed as part of the Plan Supplement, will govern certain rights and obligations of the holders of New Common Shares and related corporate governance matters, including, among other things: (i) the rights of certain holders of New Common Shares to designate directors to the New Board; (ii) certain provisions, if any, on the transferability of the New Common Shares; (iii) preemptive rights and registration rights for

certain holders of New Common Shares; and (iv) procedures and mechanisms associated with any future sale or public offering of New Common Shares.

### 10. Exit Credit Agreement.

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Credit Agreement without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The Exit Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit Facility Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all letters of credit issued under the Prepetition RBL Credit Agreement, shall be deemed issued or reissued, as applicable, under the Exit Credit Agreement in accordance with the terms and conditions of the Exit Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the Prepetition RBL Credit Agreement or the Exit Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Prepetition RBL Credit Agreement or the Exit Credit Agreement, as applicable, (including any Liens and security interests granted on the Assets) shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable Intercreditor Agreements, and not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 11. Rights Offering.

       (a)    Terms. Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith and, on the Effective Date, the Debtors shall consummate the Rights Offering, in each case subject to

the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders.  The Rights Offering shall be backstopped in an amount equal to $463 million ($138 million of which shall be funded through the exchange of $138 million in aggregate principal amount of Reinstated 1.25L Notes held by the Backstop Parties on the terms set forth in the Backstop Commitment Agreement) by the Backstop Parties in accordance with and subject to the terms and conditions of the Rights Offering Procedures and the Backstop Agreement. The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement. The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the EIP Shares, is approximately 76.2%-78.2%, consisting of (i) approximately 55.6%-57.6% in the case of Rights Offering Shares purchased for cash and (ii) approximately 20.6% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes.  The low end of the ranges set forth in the preceding sentence assumes that New Common Shares are issued only with respect to the backstopped portion of the Rights Offering and the high end of the ranges set forth in the preceding sentence assumes that the Rights Offering is fully subscribed.  For the avoidance of doubt, EP Parent shall pay or cause to be paid all accrued but unpaid interest, including any stub interest, in Cash to the holders of the Reinstated 1.25L Notes that are exchanged in connection with the Rights Offering.

(b)     <u>Purpose</u>.  On the Effective Date, the proceeds of the Rights Offering may be used:  (i) to pay down a portion of the DIP Facility and the Prepetition RBL Facility; (ii) pay all reasonable and documented Restructuring Expenses; (iii) fund Plan Distributions, case administration expenses, and exit costs; and (iv) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

(c)     <u>Backstop Commitment</u>.  In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase for Cash or in exchange for Reinstated 1.25L Notes, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the New Common Shares.

(d)     <u>Backstop Commitment Premium</u>.  As consideration for providing the backstop commitment for the Rights Offering, on the Effective Date, the Backstop Commitment Premium shall be allocated among the Backstop Parties in accordance with the Backstop Commitment Agreement.

## 12.     Intercompany Interests; Corporate Reorganization.

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

## 13.     Restructuring Transactions.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan, the Confirmation Order and

the Plan Support Agreement, including the reasonable consent of the Initial Supporting Noteholders, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 14.    Restructuring Expenses.

The outstanding Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (whether incurred prepetition or postpetition) shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Backstop Commitment Agreement, and without the need for any further notice or approval by the Bankruptcy Court or otherwise. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

### 15.    Indenture Trustee Expenses.

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Fees and Expenses without a reduction to recoveries to holders of the Secured Notes; *provided* that the Indenture Trustees shall provide the Debtors with summary invoices for the Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than fifteen (15) days prior to the Effective Date. Such summary invoices may (but are not required to) include estimates for the Indenture Trustee Fees and Expenses anticipated through the Effective Date and the release of any Liens required under the Plan. If the Debtors dispute any Indenture Trustee Fees and Expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) provide written notification, within ten (10) days after receipt of the summary invoices, to the Indenture Trustees (as applicable) specifying the disputed portion of the Indenture Trustee Fees and Expenses and the basis for such dispute, (ii) on the Effective Date, pay in Cash the undisputed portion of the Indenture Trustee Fees and Expenses, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Fees and Expenses pending any consensual resolution or resolution by the Bankruptcy Court. Upon receipt of such notification, the applicable Indenture Trustee may assert its Indenture Trustee Charging Lien to pay the disputed portion of its Indenture Trustee Fees and Expenses to the extent provided under the applicable Indenture or may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the Indenture Trustees' rights to exercise their respective Indenture Trustee Charging Liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, or the Indentures (as applicable) from and after fifteen (15) days prior to the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further

Bankruptcy Court approval, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services. The payment of such compensation and expenses will be made as soon as reasonably practicable, but in any case within the earlier of (i) the date upon which the Indenture Trustee releases any Liens under the Plan or (ii) ten (10) days following the applicable Indenture Trustee's notification of the Debtors or Reorganized Debtors, as applicable, of the amount of such costs or expenses.

### 16.    Private Company

The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; *provided*, that from and after the Effective Date, Reorganized EP Energy shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements).

### E.    Distributions.

### 1.    Distributions Generally.

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 2.    No Postpetition Interest on Claims.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 3.    Date of Distributions.

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, *however*, that the Reorganized Debtors may, with the consent of the Initial Supporting Noteholders, implement periodic distribution dates to the extent they determine them to be appropriate.

### 4.    Distribution Record Date.

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date. Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date. In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation

to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease and the Initial Supporting Noteholders, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions. All New Common Shares to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book- entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Shares will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deem such method of distribution advisable.

### 5.    Distributions after Effective Date

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.    Disbursing Agent.

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided in the Plan. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.17 of the Plan.

### 7.    Delivery of Distributions.

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at:   (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Distributions of the New Common Shares will be made through the facilities of DTC in accordance with DTC's customary practices; *provided*, that such New Common Shares will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deem such method of distribution advisable; *provided*, *further*, that to the extent that the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, the Reorganized Debtors will take such reasonable actions as may be required to cause distributions of the New Common Shares under the Plan. Any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date will be forfeited. For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

### 8. Unclaimed Property.

One year from the later of: (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 9. Satisfaction of Claims.

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 10. Manner of Payment under Plan.

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 11. Fractional Shares and De Minimis Cash Distributions.

No fractional New Common Shares shall be distributed. When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number. The total number of New Common Shares to be distributed on account of Allowed Secured 1.5L Notes Claims, Allowed Unsecured Claims, the Rights Offering, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares shall be adjusted as necessary to account for the rounding provided for in the Plan. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing

Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $100.00 in Cash. Fractional New Common Shares that are not distributed in accordance with Section 6.11 of the Plan shall be returned to, and ownership thereof shall vest in, Reorganized EP Energy.

No holder of an Allowed General Unsecured Claim will be left without a distribution because any Allowed General Unsecured Claim that would entitle the holder to less than 1/2 of a New Common Share will be a Convenience Claim and such holder will receive a distribution in Cash in accordance with Section 4.8 of the Plan.

### 12.   No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### 13.   Allocation of Distributions between Principal and Interest.

Except as otherwise required by law, consideration received in respect of an Allowed 1.5L Notes Claim or Allowed Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 14.   Exemption from Securities Laws.

(a)     The issuance of and the distribution under the Plan of the New Common Shares pursuant to Sections 4.6(a) and 4.7(a) of the Plan shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)     The offer, issuance, and distribution of each of the Subscription Rights and the New Common Shares issuable upon the exercise thereof and the New Common Shares to Eligible Offerees pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act. Transfers of such securities

will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement.

### 15.       Setoffs and Recoupments.

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, other than the 1.5L Notes Claims, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s), with the consent of the Initial Supporting Noteholders, and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 16.       Rights and Powers of Disbursing Agent.

(a)       <u>Powers of Disbursing Agent</u>. The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)       <u>Expenses Incurred on or After the Effective Date</u>. Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 17.       Withholding and Reporting Requirements.

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions shall be subject to any such withholding or reporting requirements. In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms. If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such

withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution. If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale. The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to Section 6.17 of the Plan and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

> **F.     Procedures for Disputed Claims.**
>
> > **1.     Allowance of Claims.**

Except as expressly provided in the Plan, or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

> > **2.     Claims Objections.**

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any

further notice to or action, order, or approval by the Bankruptcy Court, in each case subject to the reasonable consent of the Initial Supporting Noteholders.

### 3.    Estimation of Claims.

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection, in each case subject to the reasonable consent of the Initial Supporting Noteholders. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 4.    Adjustment to Claims Register Without Objection.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 5.    Time to File Objections to Claims.

Any objections to a Claim shall be filed on or before the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time.

### 6.    Disallowance of Claims

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all

sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.    Amendments to Claims.

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors.

### 8.    No Distributions Pending Allowance.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 9.    Disputed Claims Reserve.

(a)    There shall be withheld from the New Common Shares (which withheld New Common Shares shall not be issued by Reorganized EP Energy until such time as the respective Disputed Claims are resolved) to be distributed to holders of Allowed Unsecured Claims an amount of New Common Shares that would be distributable to Disputed Unsecured Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve). The Debtors intend to seek a determination, subject to the reasonable consent of the Initial Supporting Noteholders, by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed Unsecured Claims for purposes of determining the amount of New Common Shares attributable to such Disputed Claims. To the extent any dividends would have been payable on any withheld New Common Shares had such New Common Shares been issued and distributed on the Effective Date, an amount equal to such dividends shall be held by Reorganized EP Energy for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed and (ii) holders of Allowed Unsecured Claims (including holders of Disputed Unsecured Claims that are subsequently Allowed).

(b)    To the extent applicable, there shall also be withheld Cash from the Convenience Claim Distribution Amount in an amount that would be distributable to any Disputed Convenience Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).

(c)    Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat any cash and other property (other than the New Common Stock) held in the Disputed Claims Reserve as held by a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. For the avoidance of doubt, New Common Stock which is not issued and outstanding until Disputed Claims are resolved and such New Common Stock can be immediately issued and distributed to the applicable claimant, shall not be treated as held by a disputed ownership fund for U.S. federal income tax

purposes. All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

(d)     The Disbursing Agent shall hold in the Disputed Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed, (ii) holders of Disputed Convenience Claims against any of the Debtors whose Claims are subsequently Allowed, as applicable, and (iii) other parties entitled thereto hereunder. The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

(e)     To the extent that a Disputed Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of the New Common Shares, which Reorganized EP Energy shall issue to the Disbursing Agent (together with any amounts held on account of dividends on such withheld New Common Shares) out of the Disputed Claims Reserve, to which such holder is entitled hereunder. To the extent that a Disputed Convenience Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled hereunder out of the Disputed Claims Reserve. No interest shall be paid with respect to any Disputed Convenience Claim or any Disputed Unsecured Claim that becomes an Allowed Claim after the Effective Date.

(f)     In the event the remaining withheld New Common Shares attributable to Disputed Unsecured Claims are insufficient to satisfy all the Disputed Unsecured Claims that have become Allowed, such Disputed Unsecured Claims shall be satisfied Pro Rata from such remaining New Common Shares. After all New Common Shares have been distributed, no further distributions shall be made in respect of Disputed Unsecured Claims. At such time as all Disputed Unsecured Claims have been resolved, any remaining withheld New Common Shares issued in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for distribution in accordance with Section 4.7 of the Plan.

(g)     In the event the remaining withheld Cash from the Convenience Claim Distribution Amount is insufficient to satisfy all the Disputed Convenience Claims that have become Allowed, such Disputed Convenience Claims shall be satisfied Pro Rata from such remaining Cash. After all Cash has been distributed, no further distributions shall be made in respect of Disputed Convenience Claims. At such time as all Disputed Claims have been resolved, any remaining withheld Cash from the Convenience Claim Amount issued in the Disputed Claims Reserve shall be revert to the Reorganized Debtors.

### 10. Distributions after Allowance.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 11. Claims Resolution Procedures Cumulative.

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with the Plan or any mechanism approved by the Bankruptcy Court.

### G. Executory Contracts and Unexpired Leases.

### 1. General Treatment.

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. The assumption of executory contracts and unexpired leases hereunder may include, subject to the consent of the Initial Supporting Noteholders, the assignment of certain such contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing, or such earlier time as may be agreed in writing

between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts, subject to the consent of the Initial Supporting Noteholders, to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided, further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and subject to the consent of the Initial Supporting Noteholders and entry of an order of the Bankruptcy Court.

## 2. Determination of Cure Amounts and Deemed Consent.

(a)     The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders.

(b)     The Debtors shall serve a Cure Notice, which shall be reasonably acceptable to the Initial Supporting Noteholders, on parties to executory contracts and unexpired leases no later than thirty (30) days prior to the Confirmation Hearing in accordance with the order approving the Disclosure Statement. If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign is not listed on the applicable Cure Notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c)     Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement to object to the proposed assumption, assumption and assignment, or related Cure Amount listed on the Cure Notice.

(d)     The Bankruptcy Court will determine any Assumption Dispute by entry of an order; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any Assumption Dispute with the reasonable consent of the Initial Supporting Noteholders, and without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that where an Assumption Dispute relates solely to the applicable Cure Amount, the Debtors may with the reasonable consent of the Initial Supporting Noteholders assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute. If there is an Assumption Dispute, the Debtors reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

## 3. Payments Related to Assumption of Contracts and Leases.

(a)     Any Cure Amounts shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amount as reflected in the applicable Cure Notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2 of the Plan, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree. If no Cure Amount is reflected in the applicable Cure Notice, no Cure Amount shall be deemed to be owing, unless otherwise ordered by the Bankruptcy Court.

(b)      Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

Note: The United States asserts that any assignment or transfer of Federal Leases requires the consent of the United States Department of the Interior and, for applicable Indian leases, the applicable Indian mineral owner. The United States asserts that the assumption and assignment, or transfer, of Federal Leases cannot be free and clear of: (i) any joint and several, or continuing, P&A Obligations accrued to the Federal Debtor Lessees; (ii) any maintenance and monitoring obligations, (iii) any financial assurance obligations; and/or (iv) any other regulatory obligations, provided for in the terms of the Federal Leases and/or in Applicable Federal Laws.

### 4.      Rejection Damages Claims.

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 5.      Survival of the Debtors' Indemnification Obligations.

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 6. Compensation and Benefit Plans.

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of certain employment agreements, effective as of the Effective Date, in accordance with Employment Agreement Term Sheet annexed as Exhibit A-3 to the Plan Support Agreement.

### 7. Insurance Policies.

(a)      All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)      In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)      In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

### 8. Modifications, Amendments, Supplements, Restatements, or Other Agreements.

Unless otherwise provided in the Plan or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

9.     **Reservation of Rights.**

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall, subject to the consent of the Initial Supporting Noteholders, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.     **Conditions Precedent to Occurrence of Effective Date.**

1.     **Conditions Precedent to Confirmation.**

The confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)     The Plan and the Plan Supplement are consistent with the Plan Support Agreement.

(b)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders; and

(c)     the Plan Support Agreement shall be in full force and effect and shall not have been terminated.

2.     **Conditions Precedent to Effective Date.**

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of the Plan:

(a)     the Plan Support Agreement shall be in full force and effect and shall not have been terminated;

(b)     the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

(c)      the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(d)      the Bankruptcy Court shall have entered the order approving the Disclosure Statement, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(e)      the Rights Offering and, if applicable, the Private Placement, shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Commitment Agreement, and any other relevant transaction documents;

(f)      the Definitive Documents will contain terms and conditions consistent in all material respects with the Plan Support Agreement (including all exhibits thereto) and shall otherwise be satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders;

(g)      the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement, and in form and substance acceptable to the Initial Supporting Noteholders;

(h)      the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(i)      the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

(j)      the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the Plan Support Agreement;

(k)      the Reinstated Debt shall have been reinstated in accordance with Sections 4.4 and 4.5 of the Plan;

(l)      all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived, and the Exit Facility, including all documentation related thereto, shall be in form and substance satisfactory to the Initial Supporting Noteholders and the Debtors;

(m)      the New Corporate Governance Documents shall be in full force and effect and in form and substance satisfactory to the Initial Supporting Noteholders;

(n)      the Registration Rights Agreement shall have been executed and delivered by EP Energy, shall otherwise have become effective with respect to the Supporting Noteholders and the other parties thereto, and shall be in full force and effect;

(o)      the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(p)      all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Commitment Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Commitment Agreement shall have been obtained; and

(q)      all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date shall have been paid in full by the Debtors in accordance with the Backstop Commitment Agreement.

### 3.      Waiver of Conditions Precedent.

(a)      Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Initial Supporting Noteholders without leave of or order of the Bankruptcy Court. If any such condition precedent is waived pursuant to Section 9.3 of the Plan and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)      Except as otherwise provided in the Plan, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. For the avoidance of doubt, the rendering of the Reinstated 1.25L Notes as unimpaired pursuant to Section 1124(2) of the Bankruptcy Code shall be deemed to occur immediately prior to the consummation of the Rights Offering.

(c)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 4.      Effect of Failure of a Condition.

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the termination of the Plan Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors,

(b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Supporting Noteholders, or any other Person.

## I.   **Effect of Confirmation**.

### 1.   **Binding Effect.**

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 2.   **Vesting of Assets.**

Except as otherwise provided in the Plan, the Confirmation Order or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests. Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

Note: To the extent that the Assets to be vested in the Reorganized Debtors include the Debtors' interests in Federal Leases, the United States (i) disputes that such Federal Leases can vest in the Reorganized Debtors, or in any assignee or transferee, free and clear of the Debtors' nondischargeable joint and several, or continuing, P&A Obligations and/or other applicable obligations under the terms of the Federal Leases and/or Applicable Federal Laws, (ii) asserts that the Federal Debtor Lessees' offshore P&A Obligations are joint and several in nature (*See* 30 C.F.R. § 250.1701) and (iii) asserts that for onshore and Indian leases, P&A Obligations are continuing in nature and cannot be divested by assignment or transfer. *See* 43 C.F.R. §§ 3106.7-2, 3106.7-6; 25 C.F.R. §§ 211.47(c), (d), (e), (g) and (i) (for tribal leases) and 212.47 (applicable to allotted leases).

### 3.   **Discharge of Claims Against and Interests in Debtors.**

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and

Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

Note: The United States disputes that the assumption, assumption and assignment, and/or transfer, of the Federal Leases releases, discharges, enjoins or otherwise extinguishes the Federal Debtor Lessees' accrued P&A Obligations or other obligations under the terms of the Federal Leases and/or Applicable Federal Laws.

### 4.     Pre-Confirmation Injunctions and Stays.

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay. The *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of Debtors* [Docket No. 313] shall remain in full force and effect following the Effective Date solely with respect to transfers of the Existing Parent Equity Interests and Other Equity Interests prior to the Effective Date.

Note: The United States disputes that the automatic stay or any other pre-confirmation injunctions and stays discharge, release, preclude or enjoin the United States from exercising its police and regulatory rights including, without limitation, ensuring compliance with P&A Obligations and other regulatory obligations under Applicable Federal Laws. The United States further disputes

that it could be required to move for relief from the automatic stay after confirmation, but prior to the Effective Date, to effectuate any setoff rights that the United States may have.

### 5. Injunction against Interference with Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 6. Plan Injunction.

(a)     Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

Note: The United States asserts that (i) nothing in the Disclosure Statement or the Plan releases the Federal Debtor Lessees, or any transferee or assignee of the Federal Leases, from their accrued joint and several, or continuing, P&A Obligations, and (ii) the Federal Debtor Lessees' accrued joint and several, or continuing, P&A Obligations shall continue and survive any assumption and

assignment, transfer and/or confirmation until P&A Obligations are performed because P&A Obligations are grounded in Applicable Federal Laws as well as the terms of the Federal Leases.

**7.     Releases.**

Under the Plan, "**Released Parties**" means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the DIP Agent and DIP Lenders under the DIP Facility, (vi) the Prepetition RBL Agent and the Prepetition RBL Lenders under the Prepetition RBL Facility, (vii) the Hedge Banks (as defined in the Prepetition RBL Credit Agreement), (viii) the Backstop Parties, (ix) holders of Existing Parent Equity Interests, on account of their contributions under the Plan, (x) the 1.5L Notes Trustees, and (xi) with respect to each of the foregoing Persons, in clauses (i) through (x), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.7(b) of the Plan shall not be deemed a Released Party thereunder.

Under the Plan, "**Releasing Parties**" means collectively, (i) the holders of all Claims or Interests that vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth therein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth therein but did not opt out, and (v) the Released Parties.

**ALL KNOWN HOLDERS OF CLAIMS AND EQUITY INTERESTS WILL BE GIVEN EITHER (I) BALLOTS WITH OPT-OUT FORMS OR (II) NOTICES OF NON-VOTING STATUS WITH OPT-OUT FORMS.  SPECIFICALLY, CLASSES 3 (RBL CLAIMS), 6 (SECURED 1.5L NOTES CLAIMS), 7 (UNSECURED CLAIMS), 8 (CONVENIENCE CLAIMS), 10 (SUBORDINATED CLAIMS), 11 (EXISTING PARENT EQUITY INTERESTS), AND 12 (OTHER EQUITY INTERESTS) WILL RECEIVE BALLOTS WITH OPT-OUT FORMS, AND CLASSES 1 (OTHER SECURED CLAIMS), 2 (OTHER PRIORITY CLAIMS), 4 (1.125L NOTES CLAIMS), 5 (1.25L NOTES CLAIMS), 9 (INTERCOMPANY CLAIMS), AND 13 (INTERCOMPANY INTERESTS) WILL RECEIVE NOTICES OF NON-VOTING STATUS WITH OPT-OUT FORMS.**

**(a)     RELEASES BY THE DEBTORS. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE**

SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "DEBTOR RELEASES"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE

REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

**(b)** **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS.** **AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS, AND THE DOCUMENTS IN THE PLAN SUPPLEMENT OR AS OTHERWISE PROVIDED IN ANY ORDER OF THE BANKRUPTCY COURT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE,

SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

        **(c)**    *Release of Liens*. **Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Reinstated Debt and the Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.**

        **8.**    **Exculpation.**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, EXIT FACILITY, THE RIGHTS OFFERING, THE PRIVATE PLACEMENT, THE EMPLOYEE INCENTIVE PLAN, THE DISCLOSURE STATEMENT, THE PSA, THE RESTRUCTURING, AND THE PLAN (INCLUDING THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE

WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 9.    Injunction Related to Releases and Exculpation.

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

### 10.    Subordinated Claims.

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 11.    Retention of Causes of Action and Reservation of Rights.

Except as otherwise provided in the Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 12.     Ipso Facto and Similar Provisions Ineffective.

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.  Notwithstanding the foregoing the Confirmation Order will confirm that as of the Effective Date no "Change of Control" (as defined therein) has occurred under any of the Reinstated Debt as a result of the Plan or otherwise.

### 13.     Indemnification and Reimbursement Obligations.

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity prior to, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

### J.     Retention of Jurisdiction.

### 1.     Retention of Jurisdiction.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)     to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)     to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)     to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)     to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)     to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)     to hear and determine matters related to the DIP Facilities and the Final DIP Order; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

### K.     Miscellaneous Provisions.

#### 1.     Exemption from Certain Transfer Taxes.

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

#### 2.     Request for Expedited Determination of Taxes.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

3.       **Dates of Actions to Implement Plan.**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

4.       **Amendments.**

(a)       Plan Modifications. Subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Initial Supporting Noteholders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan and the Plan Support Agreement through the Effective Date.

(b)       Certain Technical Amendments. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court with the consent of the Initial Supporting Noteholders.

(c)       Notwithstanding anything to the contrary in the Plan, any amendments or modifications to Section 9.2 of the Plan shall require the consent of the Initial Supporting Noteholders, and any change, modification, or amendment to the Plan that treats or affects any Supporting Noteholders in a manner that is materially and adversely disproportionate to the manner in which any other Supporting Noteholders are treated (after taking into account each of such Supporting Noteholders' respective holdings in the Debtors and the recoveries contemplated by the Plan) shall require the written consent of such materially adversely and disproportionately affected Supporting Noteholders.

5.       **Revocation or Withdrawal of Plan.**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained

in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

### 6.    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Initial Supporting Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with Section 12.6 of the Plan, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and (iii) nonseverable and mutually dependent.

## VII.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

### A.    1145 Securities

The issuance of and the distribution under the Plan of the New Common Shares pursuant to Sections 4.6(a) and 4.7(a) of the Plan (the "**1145 Securities**") will be exempt from registration under section 5 of the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the 1145 Securities will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such 1145 Securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

## B.    Private Placement

The issuance and sale of the New Common Shares pursuant to the Rights Offering and to the Backstop Parties under the Backstop Commitment Agreement (including the New Common Shares comprising the Backstop Commitment Premium) is being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act and/or Regulation D thereunder (the "**4(a)(2) Securities**").  Such securities will be considered "restricted securities", will bear customary legends and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act.

Rule 144 provides a limited safe harbor for the public resale of restricted securities if certain conditions are met. These conditions vary depending on whether the holder of the restricted securities is an "affiliate" of the issuer.  Rule 144 defines an affiliate of the issuer as "a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such issuer."

A non-affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934 (the "**Exchange Act**") and who has not been an affiliate of the issuer during the 90 days preceding such sale may resell restricted securities after a one-year holding period whether or not there is current public information regarding the issuer.

An affiliate of an issuer that is not subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act may resell restricted securities after the one-year holding period if at the time of the sale certain current public information regarding the issuer is available. An affiliate must also

comply with the volume, manner of sale and notice requirements of Rule 144.  First, the rule limits the number of restricted securities (plus any unrestricted securities) sold for the account of an affiliate (and related persons) in any three-month period to the greater of 1% of the outstanding securities of the same class being sold or, if the class is listed on a stock exchange, the average weekly reported volume of trading in such securities during the four weeks preceding the filing of a notice of proposed sale on Form 144 or if no notice is required, the date of receipt of the order to execute the transaction by the broker or the date of execution of the transaction directly with a market maker.  Second, the manner of sale requirement provides that the restricted securities must be sold in a broker's transaction, directly with a market maker or in a riskless principal transaction (as defined in Rule 144). Third, if the amount of securities sold under Rule 144 in any three month period exceeds 5,000 shares or has an aggregate sale price greater than $50,000, an affiliate must file or cause to be filed with the SEC three copies of a notice of proposed sale on Form 144, and provide a copy to any exchange on which the securities are traded.

The Debtors believe that the Rule 144 exemption will not be available with respect to any 4(a)(2) Securities (whether held by non-affiliates or affiliates) until at least one year after the Effective Date. Accordingly, unless transferred pursuant to an effective registration statement or another available exemption from the registration requirements of the Securities Act, nonaffiliated holders of 4(a)(2) Securities will be required to hold their 4(a)(2) Securities for at least one year and, thereafter, to sell them only in accordance with the applicable requirements of Rule 144, pursuant to the an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.   It is currently contemplated that Reorganized EP Energy will not be subject to the reporting requirements of Section 13 or 15(b) of the Exchange Act; however, there may be a period after emergence from chapter 11 during which Reorganized EP Energy is subject to the reporting requirements of Section 13 or 15(b).  During any such period, the holding periods described above decrease from one-year to six months.

In addition to the foregoing, all transfers of New Common Shares will be subject to the transfer provisions and other applicable provisions set forth in the Shareholder Agreement.

\* \* \* \* \*

*Legends*.  To the extent certificated or issued by way of direct registration on the records of the issuer's transfer agent, certificates evidencing the New Common Shares held by holders of 10% or more of the outstanding New Common Shares, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, and all 4(a)(2) Securities will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend or to any resale of the 4(a)(2) Securities.  The Debtors and Reorganized

Debtors, as applicable, also reserve the right to stop the transfer of any 4(a)(2) Securities if such transfer is not in compliance with Rule 144, pursuant to an effective registration statement or pursuant to another available exemption from the registration requirements of applicable securities laws.  All persons who receive 4(a)(2) Securities will be required to acknowledge and agree that (a) they will not offer, sell or otherwise transfer any 4(a)(2) Securities except in accordance with an exemption from registration, including under Rule 144 under the Securities Act, if and when available, or pursuant to an effective registration statement, and (b) the 4(a)(2) Securities will be subject to the other restrictions described above.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VIII.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims and Existing Parent Equity Interests.  The following summary does not address the U.S. federal income tax consequences to holders of Claims who are paid in full in cash, unimpaired or deemed to reject the Plan, or to holders of Claims acting in their capacity as Backstop Parties under the Backstop Commitment Agreement.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction or who may hold both Claims and Existing Parent Equity Interests, and persons who use the accrual method of accounting and report income on an "applicable financial statement"). Except as otherwise indicated with respect to holders of Claims receiving New Common Shares pursuant to the Plan and to holders of Existing Parent Equity Interests, this summary does not address the U.S. federal income tax consequences of the transactions to non-U.S. taxpayers. In addition, this discussion does not address U.S. federal taxes other than income taxes.

The following discussion assumes that all Claims and Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtors are parties are respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion also assumes, that (i) Reorganized EP Energy will be the existing EP Energy corporate entity, it will not be a reincorporated entity or another new entity, and it will not be a member of a consolidated tax group of which it is not the common parent, and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from EP Energy for U.S. federal income tax purposes will continue to be disregarded as separate from EP Energy following the Effective Date (the "**Current Structure**"). However, under the Plan, the definition of "Reorganized EP Energy" allows for alternative structures, including the possibility that Reorganized EP Energy could be a different entity that acquires the assets or equity of the existing EP Energy. Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors, holders of Claims and holders of Interests described herein.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.

### A.  Consequences to the Debtors

For U.S. federal income tax purposes, EP Energy is the common parent of an affiliated group of companies that files a single consolidated U.S. federal income tax return (the "**Tax Group**"), of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly-owned by a member of the Tax Group. The Debtors estimate that, as of the Petition Date, the Tax Group had in excess of $3.3 billion of NOLs, disallowed interest expense carryforwards in excess

of $393 million, and certain other Tax Attributes (including an aggregate tax basis in assets substantially in excess of their estimated fair market value).

The amount of any such NOLs and other Tax Attributes remain subject to audit and adjustment by the IRS.  In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of the Tax Group independent of the Plan, which could adversely affect the ability to utilize the Tax Group's Tax Attributes.  In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained a final order from the Bankruptcy Court authorizing certain protective equity trading effective as of the Petition Date [Docket No. 313].

As discussed below, in connection with the implementation of the Plan, the Debtors expect that the amount of the Tax Group's NOL carryforwards, and possibly certain other Tax Attributes, will be reduced.  In addition, the subsequent utilization of any remaining NOLs and other Tax Attributes following the Effective Date may be severely restricted.

### 1.        Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its Tax Attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  Although not free from doubt, it is expected that carryover of disallowed interest expense would not be a tax attribute subject to such reduction.  The amount of COD incurred is generally the amount by which the indebtedness discharged exceeds the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes.  If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other Tax Attributes.  Any reduction in Tax Attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

In connection with the implementation of the Plan, the Debtors expect to incur a substantial amount of COD for U.S. federal income tax purposes. The amount of COD and resulting attribute reduction is primarily dependent on the fair market value of the New Common Shares.  Based on the Stated Equity Value (*see* Section XI.C.4 – Valuation), the Debtors expect the Tax Group's NOL carryforwards to be substantially reduced but not entirely eliminated, with no reduction in other Tax Attributes.

### 2.        Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any NOL carryforwards, disallowed interest expense carryforwards and certain other Tax Attributes ("**Pre-Change Losses**") may be subject to limitation under section 382 of the Tax Code.  Any such limitation applies in addition to, and not in lieu of, the reduction of Tax Attributes that results from COD arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code discussed below, the amount of its Pre-

Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation.  The Debtors anticipate that the issuance of the New Common Shares pursuant to the Plan will result in an ownership change of the Tax Group.

<p style="text-align:center">(a)      Annual Limitation</p>

In the event of an ownership change, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 1.59% for ownership changes occurring in January 2020).  For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets.  Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a currently effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance.  Alternatively, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10,000,000.00 or (2) fifteen percent of the fair market value of its assets (with certain adjustments) before the ownership change.

Whether the Debtors will have net unrealized built-in gain or loss as of the Effective Date is currently uncertain, and may be affected by the finalization of newly proposed Treasury Regulations.  On September 9, 2019, the IRS issued proposed regulations that would modify the calculation and treatment of net unrealized built-in gains and losses.  The regulations are proposed to be effective prospectively from the date final regulations are published in the Federal Register.  Depending on the terms of the final regulations, and whether such regulations are issued on or before the date the Plan becomes effective, any deductions or losses relating to the portion of the Tax Group's aggregate tax basis in excess of fair market value as of the Effective Date could be severely restricted.  Accordingly, final regulations, if issued and applicable, could have a material adverse impact on the Tax Group's ability to utilize such excess tax basis to offset future taxable income.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. The Debtors do not anticipate that such exception will apply in the present case, and the Plan is not premised on the application of such exception.

> ### B.    Consequences to Holders of Certain Claims

This summary discusses the U.S. federal income tax consequences to (i) U.S. Holders of Allowed RBL Claims, 1.5L Notes Claims and Unsecured Claims and (ii) Non-U.S. Holders[32] of Allowed 1.5L Notes Claims and Unsecured Claims receiving New Common Shares. As used herein, the term "**U.S. Holder**" means a beneficial owner of Claims or Existing Parent Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims or Existing Parent Equity Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any such Claims or Existing Parent Equity Interests, you should consult your own tax advisor.

As indicated above, the discussion herein is based on the Current Structure and any deviation therefrom could materially change the U.S. federal income tax consequences described herein.

---

[32] A "Non-U.S. Holder" means a beneficial owner of Claims or Existing Parent Equity Interests that is neither a U.S. Holder nor a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes.

### 1.    Treatment of U.S. Holders of RBL Claims

On the Effective Date, each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided* that each holder of an Allowed RBL Claim that elects to participate in the Exit Facility by the Voting Deadline will receive, on a dollar-for-dollar basis, first lien, first-out (with the holders of Allowed DIP Claims) revolving loans under the Exit Credit Agreement (such term loan and revolving loan, the "**New Loan Obligations**").

#### (a)    Gain or Loss on the Exchange of RBL Claims

For U.S. federal income tax purposes, the purported exchange of a new debt instrument for an existing debt instrument will be respected as an exchange, as a result of which (among other things) gain or loss is realized, if the terms of the new debt instrument compared to existing debt instrument constitute a "significant modification."   The applicable Treasury Regulations concerning modification of debt instruments generally provide that an exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes which are tested separately), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant.  The Debtors believe that the exchange of Allowed RBL Claims for New Loan Obligations is likely to be treated as a "significant modification" of the Allowed RBL Claims, and the remainder of this discussion so assumes.

Accordingly, the Debtors believe that the receipt of the New Loan Obligations in exchange for Allowed RBL Claims will be a fully taxable transaction to holders.  In general, a U.S. Holder of Allowed RBL Claims should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the "issue price" (as defined below) of the New Loan Obligations received in satisfaction of its Claims (other than any consideration received in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest).  *See* Section B.5 below – Character of Gain or Loss.  A U.S. Holder of Allowed RBL Claims will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* Section B.4 below – Distributions in Discharge of Accrued Interest or OID.

The "issue price" of any of the New Loan Obligations depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, the New Loan Obligations or the Allowed RBL Claims are considered traded on an "established market."  Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of the New Loan Obligations or Allowed RBL Claims, or if there is one or more "firm quotes" or "indicative quotes" with respect to the New Loan Obligations or Allowed RBL Claims, in each case as such terms are defined in applicable Treasury Regulations.  If any of the New Loan Obligations received are considered traded on an established market, the issue price of such New Loan Obligations for U.S. federal income tax purposes will equal their fair market value as of the Effective Date.  If any New Loan Obligations are not considered traded on an established market but the Allowed RBL Claims are so treated, the issue price of the New Loan Obligations for U.S. federal income tax purposes will be based on the fair market value of the Allowed RBL Claims.  Alternatively, if the Allowed RBL Claims are also not considered traded on an established market, the issue price of the New Loan

Obligations for U.S. federal income tax purposes generally will be their stated principal amount. If EP Energy determines that any of the New Loan Obligations or the Allowed RBL Claims are traded on an established market, such determination and the determination of issue price will be binding on a holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the EP Energy's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

As of the date hereof, the Debtors do not believe that the RBL Claims would currently be considered traded on an established market; however the relevant determination date for such purpose is the Effective Date and there can be no assurances that a sufficient market will not arise in respect of the RBL Claims or the New Loan Obligations between now and 15 days after the Effective Date.  Accordingly, holders of RBL Claims are urged to consult their own tax advisors regarding such determination and the gain or loss that such holder may recognize upon implementation of the Plan.

If the RBL Claims or the New Loan Obligations are treated as traded on an established market and the New Loan Obligations are determined to be issued at a discount, it is possible that the final agreed terms of the New Loan Obligations may implicate the provisions of the Treasury Regulations relating to "contingent payment debt instruments."  For example, if the New Loan Obligations are issued at a discount, the obligation of the Reorganized Debtors to prepay the loan if there is a reduction in the "borrowing base" could subject the New Loan Obligations to treatment as contingent payment debt instrument depending on the likelihood as of the Effective Date that such prepayments might actually occur.  Based in part on the principle terms contained in the Exit Commitment Letter and the Financial Projections, as well as the likely absence of an established market, the Debtors do not currently expect to treat the New Loan Obligations as contingent payment debt instruments, and the tax discussion herein assumes that the New Loan Obligations are not contingent payment debt instruments.  However, the Debtors' determination will be made based on the facts and circumstances as of the Effective Date, including the final agreed terms of the New Loan Obligations.  No assurance can be provided that the Debtors' treatment would be sustained if challenged by the IRS.  Treatment as a contingent payment debt instrument could affect the timing and amount of a holder's income and could cause the gain from the sale or other disposition of New Loan Obligations to be treated as ordinary income rather than capital gain. Holders of New Loan Obligations are urged to consult their own tax advisors regarding the possible application of the contingent payment debt instrument rules to the New Loan Obligations.

<div align="center">(b)    Stated Interest and Original Issue Discount on New Loan Obligations</div>

Payments of stated interest on the New Loan Obligations generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the holder's regular method of tax accounting.

The New Loan Obligations may be treated as issued with original issue discount ("**OID**").  A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described in the preceding section) by at least a statutorily defined *de minimis* amount.  The "stated redemption price at maturity" of the New Loan Obligations for this purpose would include all principal and interest payable over the term of the New Loan Obligations, other than "qualified

stated interest," *i.e.*, stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer). The stated interest payable on the New Loan Obligations should be considered qualified stated interest for this purpose. Accordingly, New Loan Obligations should be considered to be issued with OID for U.S. federal income tax purposes only if the stated principal amount of the respective New Loan Obligation exceeds its issue price by at least a *de minimis* amount.

If the New Loan Obligations are issued with OID, a U.S. Holder of New Loan Obligations generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the obligation. Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash. Any OID that a holder includes in income will increase the holder's adjusted tax basis in the New Loan Obligations. A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the New Loan Obligations; instead, such payments will reduce the holder's adjusted tax basis in the New Loan Obligations by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on the New Loan Obligations for each day during the taxable year on which such holder holds the New Loan Obligations, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the New Loan Obligations at the beginning of the accrual period multiplied by the yield to maturity of the New Loan Obligations less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of the New Loan Obligations at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the New Loan Obligations in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the New Loan Obligations other than qualified stated interest.

The rules regarding the determination of issue price and OID are complex. Accordingly, U.S. Holders of Allowed RBL Claims are urged to consult their own tax advisors regarding the possible application of the OID rules to the New Loan Obligations.

<div align="center">

**2.      Treatment of U.S. Holders of 1.5L Notes Claims**

</div>

On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of such Allowed 1.5L Notes Claim, in full and final satisfaction of such Allowed 1.5L Notes Claim (i) New Common Shares (subject to dilution), plus additional New Common Shares in respect of any 1.5L Deficiency Claims, and (ii) the right to participate in the Rights Offering (such rights are herein referred to as "**Subscription Rights**"). In addition, a holder may from time to time receive additional distributions of New Common Shares (and any distributions thereon) in respect of its 1.5L Deficiency Claims if any Disputed Unsecured Claims are subsequently disallowed.

The U.S. federal income tax consequences of the Plan to a U.S. Holder of an Allowed 1.5L Notes Claim depends, in part, on whether a holder's Allowed 1.5L Notes Claim constitutes a "security" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.

The Allowed 1.5L Notes Claims had a six and a quarter (6-¼) year maturity and an eight (8) year maturity, respectively, at issuance. In addition, the 2024 1.5L Notes Claims were issued in January 2018 in exchange for outstanding debt obligations with maturities of between eight (8) and ten (10) years. Although it is the determination of whether the new instrument constitutes a security that generally controls, that determination may be governed by whether the exchanged instrument constituted a security based on the IRS ruling mentioned above. The Debtors intend to take the position and, unless otherwise indicated, the rest of this discussion assumes that the Allowed 1.5L Notes Claims qualify as securities for U.S. federal income tax purposes. U.S. Holders of Allowed 1.5L Notes Claims are urged to consult their own tax advisors regarding the appropriate status of their Allowed 1.5L Notes Claims for U.S. federal income tax purposes.

Also, unless otherwise indicated, the discussion below assumes that Subscription Rights to participate in the Rights Offering are respected as options to acquire the New Common Shares, but see subsection (b) below for a more complete discussion.

(a)     Recapitalization Treatment

A U.S. Holder's receipt of New Common Shares and Subscription Rights in exchange for Allowed 1.5L Notes Claims (that are treated as "securities" for U.S. federal income tax purposes) will qualify as a "recapitalization" for U.S. federal income tax purposes. Thus, in general, a U.S. Holder of an Allowed 1.5L Notes Claims will not recognize any gain or loss upon the exchange of its Claim for New Common Shares and Subscription Rights. However, a U.S. Holder will have interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued OID not previously included in income (*see* Section B.4 below – Distributions in Discharge of Accrued Interest or OID).

In the event of the subsequent disallowance of any Disputed Unsecured Claims, it is possible that a holder of a previously Allowed 1.5L Notes Claim may receive additional distributions of New Common Shares (and any cash or other distributions thereon) in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as

additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code.  If a holder receives any cash or other property in respect of its Claim due to the disallowance of a Disputed Unsecured Claim and has a realized gain with respect to its Claim (taking into account all additional distributions), such holder should recognize the gain to the extent of such distributions of cash or other property.  *See also* Section B.7 below – Tax Treatment of Disputed Claims Reserve.

In a recapitalization exchange, a U.S. Holder's aggregate tax basis in the New Common Shares and Subscription Rights should equal such U.S. Holder's adjusted tax basis in its Allowed 1.5L Notes Claim, increased by any gain or interest income recognized in the exchange, and decreased by the fair market value of any taxable consideration received.   In general, the holder's holding period in the New Common Shares and Subscription rights received would include the holder's holding period for its Claim, except to the extent that such rights were issued in respect of a Claim for accrued but unpaid interest or treated as imputed interest.

<div align="center">(b)      Right to Participate in the Rights Offering</div>

The characterization of a Subscription Right and its subsequent exercise for U.S. federal income tax purposes – as the exercise of an option to acquire a portion of the New Common Shares or, alternatively, as an integrated transaction pursuant to which the New Common Shares are acquired directly in partial satisfaction of a holder's Claim – is uncertain.  As indicated, the discussion herein generally assumes that a Subscription Right is respected as an option to acquire New Common Shares.

Regardless of the characterization of a Subscription Right, a U.S. Holder of an Allowed 1.5L Notes Claim generally would not recognize any gain or loss upon the exercise of such right.  A U.S. holder's aggregate tax basis in the New Common Shares received upon exercise of a Subscription Right should be equal to the sum of (i) the amount paid for the New Common Shares and (ii) the holder's tax basis, if any, in either (a) the Subscription Rights, or (b) under an integrated transaction analysis, any New Common Shares received pursuant to the exercise of a Subscription Right to the extent that they are treated as directly acquired in partial satisfaction of the holder's Claim.  A U.S. holder's holding period in the New Common Shares received upon exercise of a Subscription Right (that are respected as an option) generally should commence the day following the Effective Date.  Under an integrated transaction analysis, a U.S. Holder's holding period in the portion of New Common Shares received in respect of its Claim would be determined as described above under recapitalization treatment, whereas the holding period for New Common Shares treated as purchased for cash should commence the day following the Effective Date.

It is uncertain whether a U.S. Holder that receives but does not exercise the Subscription Right should be treated as receiving anything of additional value in respect of its Claim.  If the U.S. Holder is treated as having received a Subscription Right of value (despite its subsequent lapse), such that it obtains a tax basis in the right, the U.S. Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Subscription Right.  In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied (which in the case of a recapitalization exchange, even if the right goes unexercised, should include the holding period of the Allowed 1.5L Notes Claim exchanged therefor).

<div align="center">95</div>

3.      **Treatment of U.S. Holders of Unsecured Claims (Other Than 1.5L Deficiency Claims)**

Pursuant to the Plan, each holder of an Allowed Unsecured Claim generally will receive, in full and final satisfaction of such Unsecured Claim, their Pro Rata share of 1.0% of the New Common Shares (subject to dilution and other terms of the Plan).  An initial distribution of New Common Shares to holders of Allowed Unsecured Claims may be made on the Effective Date, and additional distributions of New Common Shares (and any distributions thereon) may be made from time to time thereafter if any Disputed Unsecured Claims are subsequently disallowed.  The Plan provides that holders of Allowed Convenience Claims will receive distributions up to an aggregate amount in Cash as set forth in the Plan, in full and final satisfaction of their Claims.

(a)      Unsecured Notes Claims

In the event that a holder of an Allowed 2020 Unsecured Notes Claim, Allowed 2022 Unsecured Notes Claim, or an Allowed 2023 Unsecured Notes Claim receives New Common Shares, such holder's U.S. federal income tax consequences will depend, in part, on whether the 2020 Unsecured Notes Claims, the 2022 Unsecured Notes Claims, or the 2023 Unsecured Notes Claims, as applicable, constitute "securities" for U.S. federal income tax purposes.  As described above (*see* Section B.2 above – Treatment of U.S. Holders of 1.5L Notes Claims), the determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. The Debtors intend to take the position and, unless otherwise indicated, the rest of this discussion assumes that the Allowed Unsecured Notes Claims qualify as "securities" and that the exchange of such Claims for New Common Shares qualifies as a "recapitalization" for U.S. federal income tax purposes.

Accordingly, U.S. Holders of Allowed Unsecured Notes Claims should be subject to treatment equivalent to that described for holders of Allowed 1.5L Notes under recapitalization treatment in Section B.2(a) above – Treatment of U.S. Holders of 1.5L Notes Claims – Recapitalization Treatment (disregarding the Subscription Rights).

U.S. Holders of Allowed Unsecured Claims are urged to consult their own tax advisors regarding the appropriate status for U.S. federal income tax purposes of their Allowed Unsecured Claims.

(b)      General Unsecured Claims

In general, a U.S. Holder of an Allowed General Unsecured Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the aggregate fair market value of New Common Shares received in respect of its Claim (other than any consideration received in respect of a Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest).  *See* Section B.5 below – Character of Gain or Loss.  A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* Section B.4 below – Distributions in Discharge of Accrued Interest or OID.

In the event of the subsequent disallowance of any Disputed Unsecured Claim, it is possible that a holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed General Unsecured Claim may be deferred until all Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received due to the disallowance of a Disputed General Unsecured Claim. *See also* Section B.7 below – Tax Treatment of Disputed Claims Reserve.

A U.S. Holder of an Allowed General Unsecured Claim will have a tax basis in its New Common Shares received in satisfaction of its Claims equal to their fair market value. The holder's holding period in which the New Common Shares received should begin on the day following the Effective Date.

<div align="center">(c) Convenience Claims</div>

In general, a U.S. Holder of Allowed Convenience Claims receiving Cash in full and final satisfaction of its Claims, should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of Cash received in respect of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* Section B.5 below – Character of Gain or Loss. A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or accrued OID not previously included in income. *See* Section B.4 below – Distributions in Discharge of Accrued Interest or OID.

In the event of the subsequent disallowance of any Disputed Convenience Claims, it is possible that a holder of a previously Allowed Convenience Claim may receive additional distributions in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code. Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Convenience Claim may be deferred until all Convenience Claims are Allowed or Disallowed. Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received in respect of its Allowed Convenience Claim. *See also* Section B.7 below – Tax Treatment of Disputed Claims Reserve.

<div align="center">**4. Distributions in Discharge of Accrued Interest or OID**</div>

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued unpaid

OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

Section 6.13 of the Plan provides that, except as otherwise required by law, consideration received in respect of an Allowed 1.5L Notes Claim or Allowed Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. *U.S. Holders of Allowed Claims are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.*

### 5.      Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the stated redemption price of such Claim at maturity by at least a statutorily defined *de minimis* amount. Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange but, if the exchange qualifies for recapitalization treatment, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of an Allowed 1.5L Notes Claim or Unsecured Notes Claim that qualifies for recapitalization treatment, the Tax Code indicates that any accrued market discount in respect of the Claim should not be currently includible in income under Treasury Regulations to be issued. Any accrued market discount that is not included in income should carry over to any nonrecognition property received in exchange therefor, *i.e.*, to the New Common Shares and, if applicable, Subscription Rights received. Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Shares (including any New Common Shares received upon exercise of any Subscription Rights) should then be treated as ordinary income to

the extent of any accrued market discount not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.

### 6.      Disposition of New Common Shares by U.S. Holders

In general, unless a nonrecognition provision applies to a future disposition, and subject to the discussion above with respect to the potential carryover of accrued market discount (*see* B.5 above – Character of Gain or Loss), U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Shares in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Shares held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Shares is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

However, any gain recognized by a U.S. Holder upon a disposition of the New Common Shares received in exchange for its Claim (or any stock or property received for such New Common Shares in a later tax-free exchange) generally will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 7.      Tax Treatment of Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash or other property held in the Disputed Claims Reserve on account of Disputed Unsecured Claims and Disputed Convenience Claims as held in a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including, without limitation, the Debtors, the Disbursing Agent and the holders of 1.5L Notes Claims, Unsecured Claims, and Convenience Claims) will be required to report for tax purposes consistently with such treatment. Accordingly, the Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the reserve will be taxable to such entity.

Any distributions from the reserve to holders of Allowed Claims will be treated for U.S. federal income tax purposes as if received directly from the Debtors on their Allowed Claims. The Disbursing Agent will be responsible for payment, out of the cash in the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve. Accordingly, distributions from the reserve will be net of any taxes relating to the retention, disposition and distribution of assets in the reserve. In the event, and to the extent, any cash of the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

The Plan provides that any New Common Shares withheld from distribution on account of Disputed Unsecured Claims will not be issued by Reorganized EP Energy until such time as the respective Disputed Claims are resolved and the shares are distributable by the Disbursing Agent to holders of Allowed Claims.  Accordingly, such shares should not be treated as held in and taxable to the Disputed Claims Reserve.

### 8. Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims)

(a)     General Tax Treatment

In general, a Non-U.S. Holder of 1.5L Notes Claims and Unsecured Claims will not be subject to U.S. federal income or withholding tax on any gain recognized in a fully taxable exchange or recapitalization exchange of such Claims unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the exchange and certain other conditions are met (in which case the Non-U.S. Holder will be subject to 30% U.S. federal income tax (or, if applicable, a lower treaty rate) on any gain recognized, net of certain U.S. source net capital losses), or (b) such gain is effectively connected with the conduct of a U.S. trade or business (in which case such gain will be taxed as described below).

Consideration received by a Non-U.S. Holder in exchange for a 1.5L Notes Claim or Unsecured Claim, to the extent it represents accrued but unpaid interest (or imputed interest arising as a result of the receipt of additional consideration upon a subsequent disallowance of Disputed Unsecured Claims), generally will not be subject to U.S. federal income or withholding tax, provided that such amounts are not effectively connected with the Non-U.S. Holder's conduct of a U.S. trade or business and: (1) the Non-U.S. Holder is not a "10-percent shareholder" with respect to the Company within the meaning of section 871(h)(3)(B) of the Tax Code; (2) the Non-U.S. Holder is not a controlled foreign corporation for U.S. federal income tax purposes that is related to the Company within the meaning of section 864(d)(4) of the Tax Code; (3) the Non-U.S. Holder is not a bank described in section 881(c)(3)(A) of the Tax Code; and (4) the Non-U.S. Holder provides a properly completed IRS Form W-8BEN or Form W-8BEN-E, as applicable, certifying its non-U.S. status and exemption from FATCA withholding, if applicable.

Alternatively, such accrued but unpaid interest (or imputed interest) will be exempt from, or subject to a reduced rate of, U.S. federal withholding tax if (A) such Non-U.S. Holder provides a properly completed IRS Form W-8BEN or Form W-8BEN-E, as applicable, claiming an exemption from or reduction in withholding under an applicable tax treaty or (B) such interest is effectively connected with such Non-U.S. Holder's conduct of a U.S. trade or business and such Non-U.S. Holder provides a properly completed IRS Form W-8ECI.

Accrued but unpaid interest (or imputed interest) that is not exempt from withholding as described above will be subject to a 30% U.S. federal withholding tax (unless an applicable income tax treaty provides otherwise).

If any gain or income (including amounts attributable to accrued but unpaid interest or imputed interest) recognized by a Non-U.S. Holder upon the exchange of a 1.5L Notes Claim or Unsecured Claim is effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder, the Non-U.S. Holder, although exempt from U.S. federal withholding tax described above

(provided that the certification requirements described above are satisfied), will generally be subject to tax on a net income basis as if it were a U.S. Holder (unless an applicable income tax treaty provides otherwise). In addition, if such Non-U.S. Holder is a foreign corporation and the gain or income (including amounts attributable to accrued and unpaid interest) is effectively connected with its conduct of a U.S. trade or business, such Non-U.S. Holder may be subject to a branch profits tax equal to 30% (or a lower applicable treaty rate) of its effectively connected earnings and profits subject to adjustments.

> (b)    Non-U.S. Holder Ownership and Disposition of New Common Shares

> (1)    Distributions

Subject to the application of FATCA and/or backup withholding, each discussed below, generally, any distributions of cash or property made to a Non-U.S. Holder with respect to New Common Shares that constitute dividend income, that are not effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder, will be subject to U.S. federal withholding tax at a rate of thirty percent (30%), or a lower treaty rate, if applicable. Such dividend income will be subject to a reduced rate of U.S. federal withholding tax if (A) such Non-U.S. Holder provides a properly completed IRS Form W-8BEN or Form W-8BEN-E, as applicable, claiming a reduction in withholding under an applicable tax treaty or (B) such dividend income is effectively connected with the conduct of a U.S. trade or business of such Non-U.S. Holder, and such Non-U.S. Holder provides a properly completed IRS Form W-8ECI. Amounts not treated as dividends for U.S. federal income tax purposes will constitute a return of capital and first be applied against and reduce a non-U.S. holder's adjusted tax basis in its common stock, but not below zero. Any excess will be treated as capital gain and such gain will be taxed as described below in Section B.8(b)(2 – Disposition of New Common Shares.

If any dividend income of a Non-U.S. Holder with respect to New Common Shares is effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder, the Non-U.S. Holder, although exempt from U.S. federal withholding tax described above (provided that the certification requirements described above are satisfied), will generally be subject to tax on a net income basis as if it were a U.S. Holder (unless an applicable income tax treaty provides otherwise). In addition, if such Non-U.S. Holder is a foreign corporation and the dividend income is effectively connected with its conduct of a U.S. trade or business, such Non-U.S. Holder may be subject to a branch profits tax equal to 30% (or a lower applicable treaty rate) of its effectively connected earnings and profits subject to adjustments.

> (2)    Disposition of New Common Shares

Subject to the application of FATCA and/or backup withholding, each discussed below, a Non-U.S. Holder who sells, exchanges or otherwise disposes of New Common Shares will generally not be subject to U.S. federal income or withholding tax on any gain recognized unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the disposition and certain other conditions are met (in which case the Non-U.S. Holder will be subject to 30% U.S. federal income tax (or, if applicable, a lower treaty rate) on any gain recognized, net of certain U.S. source net capital losses), (b) such gain is effectively connected with the conduct of a U.S. trade or business (in which case such gain will be taxed as

described above in the final paragraph of Section B.8(a) – Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims) – General Tax Treatment) or (c) Reorganized EP Energy is or has been a U.S. real property holding corporation for U.S. federal income tax purposes (a "**USRPHC**") at any time within the shorter of the Non-U.S. Holder's holding period of the New Common Shares and the five-year period ending on the date of the disposition (the "**Testing Period**").  If exception (c) applies, any gain recognized by the Non-U.S. Holder would generally be treated as effectively connected with the conduct of a U.S. trade or business of the Non-U.S. Holder and taxed accordingly ("**FIRPTA tax**") and, the Non-U.S. Holder would generally be subject to U.S. federal withholding tax at a rate of fifteen percent (15%) with respect to the sale consideration ("**FIRPTA withholding**").  Although the Debtors have not performed a formal analysis and it is therefore not free from doubt, EP Energy believes that it currently is, and expects to remain, a USRPHC and that Reorganized EP Energy will also be a USRPHC. However, an exception provides that a Non-U.S. Holder of New Common Shares should not be subject to FIRPTA tax or FIRPTA withholding if (1) the New Common Shares are regularly traded on an established securities market and (2) the New Common Shares held by the Non-U.S. Holder have a fair market value less than or equal to five percent (5%) of the total fair market value of the New Common Shares at all times during the Testing Period.  Reorganized EP Energy will be a private company and so the New Common Shares are not currently expected to be considered regularly traded on an established securities market.

Non-U.S. Holders are urged to consult their own tax advisors on the consequences to them of the transactions contemplated under the Plan and the ownership of New Common Shares based on their particular circumstances.

### 9.    FATCA

Pursuant to sections 1471 through 1474 of the Tax Code (commonly referred to as "**FATCA**"), foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities who do not comply with certain information reporting rules with respect to their U.S. account holders, investors or owners may be subject to a withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party).  A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements will generally be subject to a 30% withholding tax with respect to any "withholdable payments."   For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodical income (including distributions, if any, on New Common Shares).   Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Under certain circumstances, a Non-U.S. Holder might be eligible for refunds or credits of such taxes.  Non-U.S. Holders are urged to consult with their own tax advisors regarding the effect, if any, of the FATCA provisions to them based on their particular circumstances.

### C.    Treatment of Existing Parent Equity Interests

On the Effective Date, each holder of Existing Parent Equity Interests will receive its Pro Rata share of $500,000.00 in Cash in cancellation, release, and extinguishment of its Existing Parent Equity Interests.

In general, a U.S. Holder of Existing Parent Equity Interests should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of Cash received in respect of its Existing Parent Equity Interests, and (ii) the U.S. Holder's adjusted tax basis in the Existing Parent Equity Interests exchanged. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its Existing Parent Equity Interests is more than one year. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

In general, a Non-U.S. Holder of Existing Parent Equity Interests will not be subject to U.S. federal income or withholding tax on any gain recognized on the receipt of Cash pursuant to the Plan unless (a) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more in the taxable year of the exchange and certain other conditions are met (in which case the Non-U.S. Holder will be subject to 30% U.S. federal income tax (or, if applicable, a lower treaty rate) on any gain recognized, net of certain U.S. source net capital losses), (b) such gain is effectively connected with the conduct of a U.S. trade or business (in which case such gain will be taxed as described above in the final paragraph of Section B.8(a) – Non-U.S. Holders of 1.5L Notes Claims and Unsecured Claims (Other Than 1.5L Deficiency Claims) – General Tax Treatment) or (c) EP Energy is or has been a USRPHC at any time within the shorter of the five-year period preceding the exchange and the Non-U.S. Holder's holding period of the Existing Parent Equity Interests. If exception (c) applies, any gain recognized by the Non-U.S. Holder would generally be subject to FIRPTA tax and FIRPTA withholding. Although the Debtors have not performed a formal analysis and it is therefore not free from doubt, EP Energy believes that it is a USRPHC. However, as discussed above, an exception provides that a Non-U.S. Holder of Existing Parent Equity Interests should not be subject to FIRPTA tax or FIRPTA withholding if (1) the Existing Parent Equity Interests are regularly traded on an established securities market and (2) the Existing Parent Equity Interests held by the Non-U.S. Holder have a fair market value less than or equal to five percent (5%) of the total fair market value of the Existing Parent Equity Interests at all times during the shorter of the Non-U.S. Holder's holding period and the five-year period ending on the Effective Date. It is unclear at this time whether the Existing Parent Equity Interests are, or will be as of the Effective Date, considered regularly traded on an established securities market. Non-U.S. Holders of Existing Parent Equity Interests are urged to consult their own tax advisors with respect to the U.S. tax consequences applicable to the exchange of their Existing Parent Equity Interests pursuant to the Plan.

As indicated above, the foregoing discussion does not address holders of Existing Parent Equity Interests that also hold Claims. Holders of Existing Parent Equity Interests are urged to consult their own tax advisors regarding the U.S. federal income tax treatment to them under the Plan.

### D.    Withholding on Distributions and Information Reporting

All distributions to holders of RBL Claims, 1.5L Notes Claims, Unsecured Claims, and Existing Parent Equity Interests under the Plan are subject to any applicable tax withholding, including backup withholding and withholding on distributions to Non-U.S. Holders. Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%). Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain

circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. *Holders are urged to consult their own tax advisors regarding the potential application of U.S. withholding taxes to the transactions contemplated under the Plan and whether any distributions to them would be subject to withholding.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

In general, a Non-U.S. Holder will not be subject to information reporting or backup withholding with respect to payments made in respect of 1.5L Notes Claims, Unsecured Claims, and Existing Parent Equity Interests provided (i) the Non-U.S. Holder certifies that it is not a U.S. person (generally, by providing an IRS Form W-8BEN, IRS Form W-8BEN-E or other applicable IRS Form W-8) or (ii) the Non-U.S. Holder otherwise establishes an exemption. However, information returns generally are required to be filed with the IRS in connection with the payment of accrued interest even if such payment is not subject to U.S. federal income tax.

The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their own tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.

# IX.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. ADDITIONAL RISK FACTORS IDENTIFIED IN THE DEBTORS' PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN THE DEBTORS' ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2018 FILED WITH THE SEC ON MARCH 18, 2019 AND AMENDED ON APRIL 30, 2019, AS UPDATED BY THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED MARCH 31, 2019 FILED WITH THE SEC ON MAY 9, 2019, THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED JUNE 30, 2019 FILED WITH THE SEC ON AUGUST 9, 2019, AND THE QUARTERLY REPORT ON FORM 10-Q FOR THE QUARTER ENDED SEPTEMBER 30, 2019 FILED WITH THE SEC ON NOVEMBER 12, 2019 ARE HEREBY INCORPORATED BY REFERENCE. ANY

CURRENT REPORTS ON FORM 8-K (OTHER THAN INFORMATION FURNISHED PURSUANT TO ITEMS 2.02 OR 7.01 AND ANY RELATED EXHIBITS OF ANY FORM 8-K, UNLESS EXPRESSLY STATED OTHERWISE THEREIN), QUARTERLY REPORTS ON FORM 10-Q OR ANNUAL REPORTS ON FORM 10-K FILED BY THE DEBTORS WITH THE SEC AFTER THE DATE OF THIS DISCLOSURE STATEMENT MAY ALSO INCLUDE RISK FACTORS AND WILL BE CONSIDERED A PART OF THIS DISCLOSURE STATEMENT FROM THE DATE OF THE FILING OF SUCH DOCUMENTS.  NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.      Certain Bankruptcy Law Considerations

#### 1.      General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy cases to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.      Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Further, a number of parties, including the Successor Trustee, the Ad Hoc 1.125/1.25L Noteholder Group, and the Creditors' Committee, have asserted that the Plan will not satisfy all requirements necessary for confirmation, including assertions that the 1.125L Notes cannot be reinstated and that the Plan is not feasible. The Debtors disagree with such assertions.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

#### 3.      Non-Consensual Confirmation and Conversion into Chapter 7 Cases

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's

request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  *See* Section XII.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 4.      Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and that there is not a material risk that the Debtors will not be able to obtain any necessary governmental approvals (including any antitrust approval), there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5.      Risk of Termination of the Plan Support Agreement

The PSA contains certain provisions that give the Initial Supporting Noteholders the ability to terminate the PSA if various conditions are satisfied.  Termination of the PSA could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

### 6.      Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 7.      Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X of the Plan provide for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered

Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B.      Risks Related to Exit Facility

#### 1.      Defects in Collateral Securing the Exit Facility

The indebtedness under the Exit Facility will be secured, subject to certain exceptions and permitted liens, by security interests in substantially all assets of the Reorganized Debtors (henceforth, the "**Collateral**").  The Collateral securing the Exit Facility may be subject to exceptions, defects, encumbrances, liens, and other imperfections.  Further, the Debtors have not conducted appraisals of any of their assets constituting Collateral to determine if the value of the Collateral upon foreclosure or liquidation equals or exceeds the amount of the Exit Facility or such other obligation secured by the Collateral.  Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the obligations under the Exit Facility all amounts owed in accordance therewith.  The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors.  The amount received upon a sale of Collateral would be dependent on numerous factors, including the actual fair market value of the Collateral at such time, and the timing and manner of the sale.  By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value.  In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Exit Facility, in full or at all.  There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Exit Facility.

#### 2.      Failure to Perfect Security Interests in Collateral

The failure to properly perfect liens on the Collateral could adversely affect the Exit Facility Agent's ability to enforce their respective rights with respect to the Collateral for the benefit of the holders of the Exit Facility.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the Exit Facility Agent will monitor, or that the Reorganized Debtors will inform the Exit Facility Agent of the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral.  The Exit Facility Agent has no obligation to monitor the acquisition of additional property or rights that constitute Collateral or the perfection of any security interests therein.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

#### 3.      Casualty Risk of Collateral

The Reorganized Debtors will be obligated by the Exit Facility to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar

nature in the same or similar localities.  There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part.  As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtors fully for their losses.  If there is a total or partial loss of any of the pledged Collateral, the insurance proceeds received may be insufficient to satisfy the secured obligations of the Reorganized Debtors, including the Exit Facility.

### 4.   Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors

Any future pledge of Collateral in favor of the Exit Facility Agent, including pursuant to security documents delivered after the date of the Exit Facility, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the Exit Facility to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### 5.   Effectiveness of Exit Facility

The effectiveness of the Exit Facility and the commitment of the Exit Lenders to make revolving loans available to the Reorganized Debtor are subject to the conditions precedent set forth on Exhibit B to the Exit Commitment Letter, which include the following material conditions (i) entry of the Confirmation Order in form and substance reasonably satisfactory to the Exit Lenders, (ii) the Effective Date of the Plan occurring, (iii) all obligations under the DIP Facility and RBL Facility, to the extent not automatically converted into the Exit Facility, being repaid in full in cash, (iv) the Exit Facility Agent shall have received satisfactory evidence that immediately after the consummation of the Plan, total outstanding debt for borrowed money net of unrestricted cash and cash equivalents of EPE Acquisition LLC, EP Energy LLC and its restricted subsidiaries shall not exceed $1,600,000,000, including not more than $1,500,000,000 in outstanding principal amount under all junior lien indebtedness or other unsecured indebtedness, (v) the sum of the Credit Parties' (as defined in the Exit Commitment Letter) outstanding principal amount of secured indebtedness plus availability under the Exit Facility shall not exceed $2,200,000,000, (vi) the Credit Parties shall have minimum Liquidity (as defined in the Exit Commitment Letter) of $350,000,000, and (vii) the Credit Parties shall have entered into hedging transactions with hedge counterparties with respect to not less than 80% of their reasonably anticipated monthly projected production of oil from proved developed producing reserves for each of full calendar months then remaining in the fiscal year ending December 31, 2020.

### C.   Additional Factors Affecting the Value of Reorganized Debtors

### 1.   Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary materially from the Debtors' projections and feasibility analysis.  Further, the

Plan does not provide for the payment of the fees of the Unsecured Notes Trustee. As a result, the Unsecured Notes Trustee may exercise a charging lien in connection with making distributions to Unsecured Noteholders, which may result in a holdback or reduction in distributions made available to Unsecured Noteholders.

### 2.      Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences. Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Prepackaged Plan, customer demand for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions. There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed. Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results. Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects. In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved. Such results may vary significantly from the forecasts and such variations may be material.

### 3.      Risks Associated with the Debtors' Business and Industry

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on March 18, 2019, as amended, as updated by the quarterly report on Form 10-Q for the quarter ended March 31, 2019 filed with the SEC on May 9, 2019, the quarterly report on Form 10-Q for the quarter ended June 30, 2019 filed with the SEC on August 9, 2019, and the quarterly report on Form 10-Q for the quarter ended September 30, 2019 filed with the SEC on November 12, 2019. The risks associated with the Debtors' businesses and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business and operational relationships, to retain key executives and to maintain various licenses and approvals necessary for the Debtors to conduct the Debtors' business;

- risk and uncertainties relating to the Debtors' ability to complete definitive documentation in connection with any financing and the amount, terms and conditions of any such financing; and the Debtors' ability to comply with the terms of the PSA and/or the Backstop Commitment Agreement;

- risk and uncertainties relating to the Debtors' ability to obtain requisite support for the Plan from various stakeholders; the Debtors' ability to confirm and consummate the Plan in

accordance with the terms of the PSA; and Reorganized EP Energy's ability to continue as a going concern;

- risks related to the trading of the Debtors' securities;

- the volatility and potential for sustained low oil, natural gas, and natural gas liquids prices;

- the supply and demand for oil, natural gas, and natural gas liquids;

- changes in commodity prices and basis differentials for oil and natural gas;

- the Debtors' ability to meet production volume targets;

- the uncertainty of estimating proved reserves and unproved resources;

- the Debtors' ability to develop proved undeveloped reserves;

- the future level of operating and capital costs;

- the availability and cost of financing to fund future exploration and production operations;

- the Debtors' ability to comply with the covenants in various financing documents, including making principal and interest payments or to obtain any necessary consents, waivers or forbearances thereunder;

- the Debtors' ability to generate sufficient cash flow to meet their debt obligations and commitments;

- the Debtors' ability to borrow under existing debt agreements to fund their operations;

- the Debtors' ability to obtain necessary governmental approvals for proposed exploration and production projects and to successfully construct and operate such projects;

- actions by credit ratings agencies, including potential downgrades;

- credit and performance risk of the Debtors' lenders, trading counterparties, customers, vendors, suppliers and third party operators;

- general economic and weather conditions in geographic regions or markets we serve, or where operations are located, including the risk of a global recession and negative impact on demand for oil and/or natural gas;

- the uncertainties associated with governmental regulation, including any potential changes in federal and state tax laws and regulations; and

- competition.

### 4. DIP Facility

The DIP Facility, along with the use of cash on hand (cash collateral), is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases. If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing. There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 5. Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have $1.577 billion of secured funded indebtedness outstanding composed of the Exit Facility (assumed to be drawn in an amount of $225 million on the Effective Date), the Reinstated 1.125L Notes, and the Reinstated 1.25L Notes that are not equitized pursuant to the Exchange Transaction. The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control. The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing. In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D. <u>Factors Relating to Securities to Be Issued under Plan</u>

### 1. Market for Securities

There is currently no market for the New Common Shares, and there can be no assurance as to the development or liquidity of any market for any such securities.

The Reorganized Debtors are under no obligation to list the New Common Shares on any national securities exchange. Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date. Further, the New Common Shares will be subject to transfer restrictions, if any, in the Shareholders Agreement. If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all. Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors. Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time. Similarly, it may be difficult for the Unsecured Notes Trustee to monetize any New Common Shares held back from distributions on account of the Unsecured Notes Trustee's charging lien, which may cause such holdback of distributions to be more significant.

### 2. Potential Dilution

The ownership percentage represented by the New Common Shares distributed on the Effective Date under the Plan, distributed pursuant to the Rights Offering, and distributed as the Backstop

Commitment Premium, will be subject to dilution from the equity issued in connection with the Employee Incentive Program, the Private Placement, any other shares that may be issued in connection with the Plan or post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

### 3.　Significant Holders

Certain holders of 1.5L Claims are expected to acquire a significant ownership interest in the New Common Shares pursuant to the Plan, the Backstop Commitment Agreement, and the Rights Offering. Such holders, if their decisions are aligned, would be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Shares.

### 4.　Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Shares would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

### 5.　Implied Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities. The actual market price of the New Common Shares is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

### 6.　No Intention to Pay Dividends

Reorganized EP Energy may not pay any dividends on the New Common Shares and may instead retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the New Common Shares may depend entirely upon any future appreciation in the value of the New Common Shares. There is, however, no guarantee that the New Common Shares will appreciate in value or even maintain their initial value.

### 7. Reorganized EP Energy will be a Private Company

Reorganized EP Energy is not expected to be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.  As a result, holders of the New Common Shares may receive less information with respect to the Debtors' business than they would have received if Reorganized EP Energy was subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

### E. Factors Relating to Rights Offering

#### 1. Debtors Could Modify Rights Offering Procedures

The Debtors may modify the procedures governing the Rights Offering in a manner that is reasonably acceptable to the Requisite Commitment Parties (as defined in the Backstop Commitment Agreement), to, among other things, adopt additional detailed procedures if necessary in the Debtors' business judgment. Such modifications may adversely affect the rights of those participating in the Rights Offering.

#### 2. Backstop Commitment Agreement Could Be Terminated

The Backstop Commitment Agreement contains certain provisions that give the parties the ability to terminate the Backstop Commitment Agreement if various conditions are not satisfied. Termination of the Backstop Commitment Agreement could result in termination of the Plan Support Agreement and prevent the Debtors from consummating the Plan.

### F. Additional Factors

#### 1. Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Plan Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

#### 2. Debtors Have No Duty to Update

The statements contained in the Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

#### 3. No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII thereof.

## X.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a claim in a Voting Class as of the Record Date (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in the Disclosure Statement are subject to the terms and conditions of the Plan.

### A. Voting Deadline

All Eligible Holders have been sent a Ballot together with the Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF [4:00 P.M.] (PREVAILING CENTRAL TIME) ON [FEBRUARY 6], 2020, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk LLC**
**Telephone: (877)-502-9869 (domestic toll free) or (917)-947-2373 (international)**
**E-mail: EPEnergyinfo@primeclerk.com (with "EP Energy" in the subject line)**

Additional copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

## B.    Voting Procedures

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent, or electronically via e-mail to EPEnergyinfo@primeclerk.com with "EP Energy" in the subject line, or (b) submit a Ballot electronically via the E-Ballot voting platform on Prime Clerk's website by visiting https://cases.primeclerk.com/EPEnergy, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

## C.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan; and

(2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class 3 – RBL Claims

Class 6 – 1.5L Notes Claims

Class 7 – Unsecured Claims

Class 8 – Convenience Class

Class 11 – Existing Parent Equity Interests

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 1.    Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### 2.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code, subject to any applicable terms of the Plan Support Agreement.

### 3.    Change of Vote

Subject to the provisions of the PSA, any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

## D.    Waivers of Defects, Irregularities, etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## E.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain an additional

copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

## XI.
## CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a) **Debtors** at
EP Energy Corporation
1001 Louisiana Street, Houston, TX 77002
Houston, Texas 77042
Attn:   Jace Locke, Esq.

b) **Counsel to Debtors** at
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Alfredo R. Pérez (Alfredo.Perez@weil.com)
        Clifford Carlson (Clifford.Carlson@weil.com)

   -and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Matthew S. Barr (Matt.Barr@weil.com)
        Ronit Berkovich (Ronit.Berkovich@weil.com)
        Scott R. Bowling (Scott.Bowling@weil.com)

118

David J. Cohen (DavidJ.Cohen@weil.com)

c) **Counsel to Apollo Management Holdings, L.P.** at
Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:   Jeffrey D. Saferstein (jsaferstein@paulweiss.com)
Jacob A. Adlerstein (jadlerstein@paulweiss.com)
Brian Bolin (bbolin@paulweiss.com)

d) **Counsel to Elliot Management Corporation** at
Milbank LLP
55 Hudson Yards
New York, New York 10001
Attn:   Casey Fleck (cfleck@milbank.com)
Gerard Uzzi (guzzi@milbank.com)
Eric Stodola (estodola@milbank.com)

e) **Counsel to Access Industries, Inc.** at
Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Tel:  (212) 909-6000
Attn:   Sidney P. Levinson (slevinson@debevoise.com)

f) **Counsel to the Creditors' Committee** at
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Attn:   Kristopher M. Hansen (khansen@stroock.com)
Frank A. Merola (fmerola@stroock.com)
Erez E. Gilad (egilad@stroock.com)
Jonathan D. Canfield (jcanfield@stroock.com)

g) **Office of the U.S. Trustee** at
Office of the U.S. Trustee for Region 7
515 Rusk Street, Suite 3516
Houston, Texas 77002

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

### C.    Requirements for Confirmation of Plan

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or

deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (3) feasible.

### 1. Acceptance of Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

## 2.    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit D.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

## 3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the

reserve information, development of schedules, and financial information, the "**Financial Projections**") for the fiscal years 2020 through 2024 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as **Exhibit E**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. In addition, the Debtors have determined, among other things, that the effectiveness of the Plan would not constitute a "Change of Control" under the 1.125L Notes Indenture as such term is defined therein and therefore would not impact feasibility of the Plan. Notwithstanding the foregoing, the Successor Trustee and the Ad Hoc 1.125/1.25L Noteholder Group have asserted that a Change of Control under 1.125L Indenture could occur on the Effective Date. Article IX hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies. In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms. The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors. Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties. Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

### 4.    Valuation

The Plan and the restructuring transactions in connection therewith represent the culmination of extensive multi-month negotiations to obtain the capital commitments necessary for the Debtors to reorganize and execute their post-chapter 11 business plan. As described above, the Plan contemplates that holders of Allowed 1.5L Notes Claims will receive (a) 99.0% of the New Common Shares issued by the Reorganized Debtors, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, and the EIP Shares, and (b) the right to invest $475 million through the Rights Offering to acquire up to approximately 78.0% of the New Common Shares issued by the Reorganized Debtors, subject to dilution by the

Private Placement, and the EIP Shares.  In addition, the Backstop Commitment Parties are backstopping $463 million of the Rights Offering, subject to the terms and provisions of the Backstop Commitment Agreement.

The Debtors and Evercore believe that the valuation implied by the Rights Offering is currently the best measure of the reorganized Debtors' value given the facts and circumstances of these cases, which include:

- A substantial capital infusion is necessary for the Debtors to reorganize and the restructuring provides for that necessary capital;

- Significant new capital would be likely unobtainable without the equitization of the 1.5L Notes; and

- The terms of the Rights Offering are the result of robust, good faith, arms' length, and comprehensive negotiations between the Debtors' independent Special Committee, their prepetition secured parties, and each of their financial and legal advisors.

Pursuant to the Plan, Stated Equity Value is defined to be $900 million.  This implies a total enterprise value of $2.5 billion assuming net debt of $1.6 billion on the Effective Date.  This estimate is based in part on the information provided by the Debtors (solely for purposes of the Plan) the Rights Offering, and the Backstop Commitment Agreement.  For purposes of this analysis, Evercore assumes no material changes that would affect value between the date of the Disclosure Statement and the Effective Date.

Evercore's view as to the value of the reorganized Debtors based on consummation of the restructuring and the post-reorganization capital structure does not constitute a recommendation as to how to vote on the Plan and does not constitute an opinion as to the fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

## XII.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however, believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

B.     **Sale under Section 363 of the Bankruptcy Code**

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Subject to the terms of the Intercreditor Agreements, holders of Claims in Classes 3, 4, 5 and 6 and the DIP Lenders would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Claims in Classes 3, 4, 5 and 6 and the DIP Lenders would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

C.     **Liquidation under Chapter 7 of Bankruptcy Code**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the  Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

# XIII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims and Interests in Classes 3, 6, 7, 8, and 11 to vote in favor thereof.

Dated: January 2, 2020
      Houston, Texas

Respectfully submitted,

EP ENERGY CORPORATION, on behalf of itself and its undersigned subsidiaries

/s/ *David Rush*

Name: David Rush
Title:   Chief Restructuring Officer

EPE ACQUISITION, LLC
EP ENERGY LLC
EVEREST ACQUISITION FINANCE INC.
EP ENERGY GLOBAL LLC
EP ENERGY MANAGEMENT, L.L.C.
EP ENERGY RESALE COMPANY, L.L.C.
EP ENERGY E&P COMPANY, L.P.

**Exhibit A**

**Plan**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  | § |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EP ENERGY CORPORATION, *et al.*, | § | Case No. 19-35654 (MI) |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

## SECOND AMENDED JOINT CHAPTER 11 PLAN OF
## EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford W. Carlson
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Ronit Berkovich (admitted *pro hac vice*)
Scott R. Bowling (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: January 2, 2020
        Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 1001 Louisiana Street, Houston, TX 77002.

**Table of Contents**

**ARTICLE I.**   **Definitions and Interpretation.** ....................................................**1**

    1.1      Definitions ...........................................................................1

    1.2      Interpretation; Application of Definitions; Rules of Construction. .................18

    1.3      Reference to Monetary Figures ...................................................18

    1.4      Consent Rights of Supporting Noteholders. .......................................18

    1.5      Controlling Document. ...........................................................18

**ARTICLE II.**   **Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims.** ..................................................................**19**

    2.1      Treatment of Administrative Expense Claims. .....................................19

    2.2      Treatment of Fee Claims. ........................................................19

    2.3      Treatment of DIP Claims and Commitments. ......................................20

    2.4      Payment of Fees and Expenses Under DIP Order. .................................20

    2.5      Treatment of Priority Tax Claims. ................................................21

**ARTICLE III.**   **Classification of Claims and Interests.** ........................................**21**

    3.1      Classification in General. ........................................................21

    3.2      Formation of Debtor Groups for Convenience Only. ...............................21

    3.3      Summary of Classification of Claims and Interests. ................................21

    3.4      Special Provision Governing Unimpaired Claims. .................................22

    3.5      Separate Classification of Other Secured Claims. .................................22

    3.6      Elimination of Vacant Classes. ...................................................22

    3.7      Voting Classes; Presumed Acceptance by Non-Voting Classes. ....................23

    3.8      Voting; Presumptions; Solicitation. ...............................................23

    3.9      Cramdown. .....................................................................23

    3.10     No Waiver. .....................................................................23

**ARTICLE IV.    Treatment of Claims and Interests**.................................................................**24**

    4.1        Class 1: Other Secured Claims. ..................................................24

    4.2        Class 2:  Other Priority Claims. .................................................24

    4.3        Class 3:  RBL Claims...............................................................24

    4.4        Class 4:  1.125L Notes Claims ..................................................25

    4.5        Class 5:  1.25L Notes Claims ....................................................25

    4.6        Class 6:  Secured 1.5L Notes Claims..........................................25

    4.7        Class 7:  Unsecured Claims. .....................................................26

    4.8        Class 8:  Convenience Claims. ..................................................26

    4.9        Class 9:  Intercompany Claims. .................................................26

    4.10      Class 10:  Subordinated Claims. ...............................................26

    4.11      Class 11:  Existing Parent Equity Interests. ................................27

    4.12      Class 12:  Other Equity Interests. ..............................................27

    4.13      Class 13:  Intercompany Interests. .............................................27

    4.14      Treatment of Vacant Classes. ...................................................27

**ARTICLE V.    Means for Implementation**......................................................................**28**

    5.1        Compromise and Settlement of Claims, Interests, and Controversies............28

    5.2        Continued Corporate Existence; Effectuating Documents; Further Transactions. ...........................................................................28

    5.3        Corporate Action......................................................................29

    5.4        Plan Funding. ..........................................................................29

    5.5        Cancellation of Existing Securities and Agreements.......................29

    5.6        Cancellation of Certain Existing Security Interests. .......................31

    5.7        Officers and Boards of Directors. ..............................................31

    5.8        Employee Incentive Plan. .........................................................32

    5.9        Authorization, Issuance, and Delivery of New Common Shares. ..................32

5.10      Exit Credit Agreement. ................................................................33

5.11      Rights Offering. ...........................................................................33

5.12      Intercompany Interests; Corporate Reorganization. ..................34

5.13      Restructuring Transactions. ........................................................34

5.14      Restructuring Expenses. ..............................................................35

5.15      Indenture Trustee Expenses. .......................................................35

5.16      Private Company..........................................................................36

**ARTICLE VI.    Distributions. ....................................................................36**

6.1       Distributions Generally.............................................................36

6.2       No Postpetition Interest on Claims. ...........................................36

6.3       Date of Distributions..................................................................36

6.4       Distribution Record Date. ..........................................................37

6.5       Distributions after Effective Date ..............................................37

6.6       Disbursing Agent. ......................................................................37

6.7       Delivery of Distributions. ..........................................................37

6.8       Unclaimed Property. ..................................................................38

6.9       Satisfaction of Claims. ...............................................................38

6.10      Manner of Payment under Plan...................................................38

6.11      Fractional Shares and De Minimis Cash Distributions...............39

6.12      No Distribution in Excess of Amount of Allowed Claim..............39

6.13      Allocation of Distributions between Principal and Interest...........39

6.14      Exemption from Securities Laws.................................................39

6.15      Setoffs and Recoupments...........................................................40

6.16      Rights and Powers of Disbursing Agent. ...................................40

6.17      Withholding and Reporting Requirements. .................................41

**ARTICLE VII.    Procedures for Disputed Claims.**................................................................**41**

    7.1        Allowance of Claims..........................................................................41

    7.2        Claims Objections..............................................................................42

    7.3        Estimation of Claims.........................................................................42

    7.4        Adjustment to Claims Register Without Objection. .........................42

    7.5        Time to File Objections to Claims. ...................................................43

    7.6        Disallowance of Claims .....................................................................43

    7.7        Amendments to Claims.......................................................................43

    7.8        No Distributions Pending Allowance. ...............................................43

    7.9        Disputed Claims Reserve....................................................................43

    7.10      Distributions after Allowance. ..........................................................45

    7.11      Claims Resolution Procedures Cumulative. ......................................45

**ARTICLE VIII.    Executory Contracts and Unexpired Leases. .................................................45**

    8.1        General Treatment. ............................................................................45

    8.2        Determination of Cure Amounts and Deemed Consent. ..................46

    8.3        Payments Related to Assumption of Contracts and Leases. .............47

    8.4        Rejection Damages Claims..................................................................47

    8.5        Survival of the Debtors' Indemnification Obligations......................47

    8.6        Compensation and Benefit Plans. .....................................................48

    8.7        Insurance Policies. .............................................................................48

    8.8        Modifications, Amendments, Supplements, Restatements, or Other Agreements. ......................................................................................49

    8.9        Reservation of Rights.........................................................................49

**ARTICLE IX.    Conditions Precedent to Occurrence of Effective Date. .............................49**

    9.1        Conditions Precedent to Confirmation..............................................49

    9.2        Conditions Precedent to Effective Date.............................................50

| | | |
|---|---|---|
| 9.3 | Waiver of Conditions Precedent. | 51 |
| 9.4 | Effect of Failure of a Condition. | 52 |
| **ARTICLE X.** | **Effect of Confirmation.** | **52** |
| 10.1 | Binding Effect. | 52 |
| 10.2 | Vesting of Assets. | 52 |
| 10.3 | Discharge of Claims Against and Interests in Debtors. | 53 |
| 10.4 | Pre-Confirmation Injunctions and Stays. | 53 |
| 10.5 | Injunction against Interference with Plan. | 54 |
| 10.6 | Plan Injunction. | 54 |
| 10.7 | Releases. | 55 |
| 10.8 | Exculpation. | 57 |
| 10.9 | Injunction Related to Releases and Exculpation. | 58 |
| 10.10 | Subordinated Claims. | 58 |
| 10.11 | Retention of Causes of Action and Reservation of Rights. | 59 |
| 10.12 | Ipso Facto and Similar Provisions Ineffective. | 59 |
| 10.13 | Indemnification and Reimbursement Obligations. | 59 |
| **ARTICLE XI.** | **Retention of Jurisdiction.** | **60** |
| 11.1 | Retention of Jurisdiction. | 60 |
| **ARTICLE XII.** | **Miscellaneous Provisions.** | **61** |
| 12.1 | Exemption from Certain Transfer Taxes. | 61 |
| 12.2 | Request for Expedited Determination of Taxes. | 62 |
| 12.3 | Dates of Actions to Implement Plan. | 62 |
| 12.4 | Amendments. | 62 |
| 12.5 | Revocation or Withdrawal of Plan. | 63 |
| 12.6 | Severability. | 63 |

12.7      Governing Law. ...................................................................................64

12.8      Immediate Binding Effect..................................................................64

12.9      Successors and Assigns.......................................................................64

12.10    Entire Agreement. ...............................................................................64

12.11    Computing Time. .................................................................................64

12.12    Exhibits to Plan....................................................................................64

12.13    Notices. .................................................................................................64

12.14    Reservation of Rights..........................................................................66

Each of EP Energy Corporation; EPE Acquisition, LLC; EP Energy LLC; Everest Acquisition Finance Inc.; EP Energy Global LLC; EP Energy Management, L.L.C.; EP Energy Resale Company, L.L.C.; and EP Energy E&P Company, L.P. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in section 1.1 below.

# ARTICLE I.      DEFINITIONS AND INTERPRETATION.

### 1.1      *Definitions.*

The following terms shall have the respective meanings specified below:

***1.125L Notes*** means the 7.750% senior secured notes due 2026 issued pursuant to the 1.125L Notes Indenture.

***1.125L Notes Claims*** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the 1.125L Notes, the 1.125L Notes Indenture, or any of the security documents governing or evidencing any security interests entered into in connection therewith, including accrued but unpaid interest, costs, fees and indemnities through the Effective Date.  The 1.125L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1 billion.

***1.125L Notes Indenture*** means that certain indenture, dated as of May 23, 2018, by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 1.125L Notes Trustee, as the same may be amended, modified, or otherwise supplemented from time to time.  The 1.125L Notes Indenture will not be cancelled and will remain in full force and effect on the Effective Date.

***1.125L Notes Trustee*** means UMB Bank, National Association, in its capacity as successor indenture trustee and notes collateral agent under the 1.125L Notes Indenture.

***1.25L Notes*** means the 8.000% senior secured notes due 2024 issued pursuant to the 1.25L Notes Indenture.

***1.25L Notes Claims*** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the 1.25L Notes, the 1.25L Notes Indenture, or any of the security documents governing or evidencing any security interests entered into in connection therewith, including accrued but unpaid interest, costs, fees and indemnities through the Effective Date.  The 1.25L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $500 million.

***1.25L Notes Indenture*** means that certain indenture, dated as of November 29, 2016, by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 1.25L Notes Trustee, as the same may be amended,

modified, or otherwise supplemented from time to time.  The 1.25L Notes Indenture will not be cancelled and will remain in full force and effect on the Effective Date.

*1.25L Notes Trustee* means BOKF, NA, in its capacity as successor indenture trustee and notes collateral agent under the 1.25L Notes Indenture.

*1.5L Notes* means, collectively, the 2024 1.5L Notes and the 2025 1.5L Notes.

*1.5L Notes Claims* means, collectively, the 2024 1.5L Notes Claims and the 2025 1.5L Notes Claims.

*1.5L Notes Deficiency Claims* means the portion of the 1.5L Notes Claims that are not Secured Claims.  The 1.5L Notes Deficiency Claims shall be deemed Allowed on the Effective Date in the aggregate amount of $1,803,175,581.  For the avoidance of doubt, the 1.5L Notes Deficiency Claims are Unsecured Claims.

*1.5L Notes Indentures* means the 2024 1.5L Notes Indenture and the 2025 1.5L Notes Indenture.

*1.5L Notes Trustees* means the 2024 1.5L Notes Trustee and the 2025 1.5L Notes Trustee.

*2020 Unsecured Notes Claims* means all Claims arising under or based upon the 9.375% senior notes due 2020 or the 2020 Unsecured Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $189,286,918.

*2020 Unsecured Notes Indenture* means that certain indenture dated as of April 24, 2012 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2020 Unsecured Notes Indenture Trustee.

*2020 Unsecured Notes Trustee* means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2020 Unsecured Notes Indenture.

*2022 Unsecured Notes Claims* means all Claims arising under or based upon the 7.750% senior notes due 2022 or the 2022 Unsecured Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $190,729,276.

*2022 Unsecured Notes Indenture* means that certain indenture, dated as of August 13, 2012 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2022 Unsecured Notes Indenture Trustee.

*2022 Unsecured Notes Trustee* means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2022 Unsecured Notes Indenture.

*2023 Unsecured Notes Claims* means all Claims arising under or based upon the 6.375% senior notes due 2023 or the 2023 Unsecured Notes Indenture, the aggregate principal amount plus accrued and unpaid interest thereon of which outstanding as of the Petition Date was $330,051,034.

*2023 Unsecured Notes Indenture* means that certain indenture, dated as of May 28, 2015 (as amended, modified, or otherwise supplemented from time to time) by and among the EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2023 Unsecured Notes Indenture Trustee.

*2023 Unsecured Notes Trustee* means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2023 Unsecured Notes Indenture.

*2024 1.5L Notes* means the 9.375% senior secured notes due 2024 issued pursuant to the 2024 1.5L Notes Indenture.

*2024 1.5L Notes Claims* means all Claims arising under the 2024 1.5L Notes or 2024 1.5L Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $1,135,293,088.

*2024 1.5L Notes Indenture* means that that certain indenture, dated as of January 3, 2018 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2024 1.5L Notes Trustee.

*2024 1.5L Notes Trustee* means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the 2024 1.5L Notes Indenture.

*2025 1.5L Notes* means the 8.000% senior secured notes due 2025 issued pursuant to the 2025 1.5L Notes Indenture.

*2025 1.5L Notes Claims* means all Claims arising under the 2025 1.5L Notes or 2025 1.5L Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $1,051,324,444.

*2025 1.5L Notes Indenture* means that that certain indenture, dated as of February 6, 2017 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2025 1.5L Notes Trustee.

*2025 1.5L Notes Trustee* means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the 2025 1.5L Notes Indenture.

*Administrative Bar Date* means the date that requests for payment of Administrative Expense Claims (other than Fee Claims and Restructuring Expenses) must be filed with the Bankruptcy Court and served on the Debtors or Reorganized Debtors, as applicable, that is thirty (30) days after the Effective Date.

*Administrative Expense Claim* means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses.

*Aggregate Fully Diluted Common Shares* means the total number of New Common Shares outstanding as of the Effective Date after giving effect to this Plan and the Backstop Commitment Agreement (including the shares issued pursuant to the Backstop Commitment Agreement), but excluding any New Common Shares issued or issuable pursuant to the Employee Incentive Plan and the Private Placement (if applicable).

*Allowed* means, with respect to any Claim against or Interest in a Debtor, (a) (i) that is timely filed by the bar date established in the Chapter 11 Cases, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

*Antitrust Authorities* means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws.

*Antitrust Laws* means the Sherman Antitrust Act, the Clayton Antitrust Act, the HSR Act, the Federal Trade Commission Act and all other United States, federal or state or foreign or multinational statutes, rules, regulation, orders, decrees, administrative or judicial doctrines or other laws, including antitrust, competition and merger control laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of lessening or negatively impacting competition, monopolization or restraint of trade.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

**Assumption Dispute** means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption of an executory contract or unexpired lease.

**Backstop Commitment Agreement** means that certain Backstop Commitment Agreement, dated as of October 18, 2019, entered into by the Debtors and the Backstop Parties, as the same may be amended, restated, or otherwise modified in accordance with its terms, and approved by the Court pursuant to the Backstop Order.

**Backstop Commitment Premium** means $26,000,000 to be paid to the Backstop Parties on the Effective Date in the form of New Common Shares issued at the Cash Purchase Price, pursuant to the terms and conditions in this Plan and the Backstop Commitment Agreement.

**Backstop Order** means the *Order (I) Authorizing the Debtors to Enter into Backstop Commitment Agreement, (II) Approving All Obligations Thereunder, and (III) Granting Related Relief* (ECF No. 483).

**Backstop Parties** means those parties that agree to backstop the Rights Offering pursuant to the Backstop Commitment Agreement, each in its respective capacity as such.

**Bankruptcy Code** means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

**Bankruptcy Court** means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

**Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure as promulgated by Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

**Business Day** means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

**Cash** means legal tender of the United States of America.

**Cash Purchase Price** means a price per New Common Share equal to (a) 65% of $900 million, divided by (b) the Aggregate Fully Diluted Common Shares, rounded to two decimal places.

**Cause of Action** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit,

obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim.

*Chapter 11 Cases* means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

*Claim* means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

*Class* means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

*Collateral* means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid, is properly perfected as of the Petition Date, and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

*Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

*Confirmation Hearing* means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

*Confirmation Order* means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which shall be acceptable to the Initial Supporting Noteholders.

*Convenience Claim* means any Claim that would otherwise be a General Unsecured Claim that is (i) Allowed in the Convenience Claim Amount or less, or (ii) irrevocably reduced to the Convenience Claim Amount at the election of the holder of the Allowed General Unsecured Claim evidenced on the Ballot timely and validly submitted by such holder; *provided* that a General Unsecured Claim may not be subdivided into multiple Claims of the Convenience Claim Amount or less for purposes of receiving treatment as a Convenience Claim; *provided, further* that, to the extent that a holder of a Convenience Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience

6

Claim, such holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

*Convenience Claim Amount* means $100,000.

*Convenience Claim Distribution Amount* means the aggregate amount of Cash distributed to holders of Allowed Convenience Class Claims against the Debtors, which amount shall not exceed $175,000.

*Cure Amount* means the payment of Cash or the distribution of other property (as the Debtors or the Reorganized Debtors, as applicable, (subject to the consent of the Initial Supporting Noteholders), and the counterparty to such executory contract or unexpired lease may agree or the Bankruptcy Court may order) as necessary to (i) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and (ii) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

*Cure Notice* means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall be reasonably acceptable to the Initial Supporting Noteholders and shall include (i) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (ii) any Cure Amount to be paid in connection therewith, and (iii) procedures for resolution by the Bankruptcy Court of any related disputes.

*D&O Policy* means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

*Debtor(s)* has the meaning set forth in the introductory paragraph of the Plan.

*Debtor in Possession* means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

*Definitive Documents* shall have the meaning given to such term in the Plan Support Agreement.

*DIP Facility* means the postpetition senior secured superpriority priming revolving loan facility approved by the DIP Order.

*DIP Agent* means JPMorgan Chase Bank, N.A., solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

*DIP Claim* means any Claim held by the DIP Facility Lenders or the DIP Agent arising under or relating to the DIP Facility Credit Agreement or the DIP Order, which includes Claims for all principal amounts outstanding of up to $314,710,456 (which is subject to

reduction based on the amount outstanding as of the Effective Date), plus interest, reasonable and documented out-of-pocket fees, expenses, costs and other charges of the DIP Agent or DIP Lenders arising and required to be repaid under the DIP Facility Credit Agreement.

> **DIP Commitments** means obligations of the DIP Facility Lenders on account of unfunded loans under the DIP Facility Credit Agreement.

> **DIP Facility Credit Agreement** means the credit agreement governing the terms of the DIP Facility dated as of November 25, 2019, by and among EP Energy LLC, as borrower, EPE Acquisition LLC, the DIP Agent, and the DIP Facility Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Order, which shall be acceptable in form and substance to the Initial Supporting Noteholders.

> **DIP Facility Lenders** means the lenders from time to time party to the DIP Facility Credit Agreement.

> **DIP Order** means the *Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; and (V) Granting Related Relief* (ECF No. 482), authorizing the Debtors to enter into the DIP Facility Credit Agreement and access the DIP Facility.

> **Disbursing Agent** means any Entity in its capacity as a disbursing agent under section 6.6 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

> **Disclosure Statement** means the Disclosure Statement for the Plan, in form and substance acceptable to the Initial Supporting Noteholders, as supplemented from time to time, which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

> **Disputed** means, with respect to a Claim, (i) any Claim, which Claim is disputed under section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (ii) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (iii) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (iv) any Claim that is otherwise disputed by any of the Debtors or Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

> **Disputed Claims Reserve** means the reserve established pursuant to and governed by Section 7.9 of the Plan.

*Distribution Record Date* means, except as otherwise provided in the Plan, the Effective Date.

*DTC* means the Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

*Effective Date* means the date which is the first Business Day on which (i) all conditions to the effectiveness of the Plan set forth in Section 9.2 of the Plan have been satisfied or waived in accordance with the terms of the Plan, (ii) no stay of the Confirmation Order is in effect, and (iii) the substantial consummation of the Plan occurs pursuant to 11 U.S.C. § 1101(2).

*EIP Shares* means the awards issued under the Employee Incentive Plan, including restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares, which shall be dilutive of all other equity interests in the Reorganized Debtors.

*Eligible Offeree* means a holder or permitted transferee of an Allowed 1.5L Notes Claim that either (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, or (ii) is an institutional "accredited investor" as such term is defined in Rule 501 of the Securities Act.

*Employee Incentive Plan* means the employee incentive plan to be implemented pursuant to Section 5.8 of the Plan, which shall be consistent with the terms set forth in the EIP Term Sheet annexed as Exhibit A-2 to the Plan Support Agreement and otherwise in form and substance acceptable to the Initial Supporting Noteholders.

*Entity* means an "entity," as defined in section 101(15) of the Bankruptcy Code.

*EP Energy* means EP Energy Corporation.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Exchange Act* means the Securities Exchange Act of 1934, as amended.

*Exchange Purchase Price* means a price per New Common Share equal to (a) 74.3% of $900 million, divided by (b) the Aggregate Fully Diluted Common Shares, rounded to two decimal places.

*Exculpated Parties* means collectively, and in each case in their capacities as such during the Chapter 11 Cases (i) the Debtors, (ii) the Reorganized Debtors, (iii) the members of any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

9

**Existing Parent Equity Interests** means shares of Class A common stock of EP Energy that existed immediately prior to the Effective Date, including any restricted stock in EP Energy that vests prior to the Effective Date.

**Exit Credit Agreement** means that certain Amended and Restated Credit Agreement, to be dated as of the Effective Date, by and among EP Energy LLC, as borrower, EPE Acquisition LLC, as holdings, the Exit Agent, and the Exit Lenders, which shall be in form and substance substantially consistent with the Exit Term Sheet or on terms otherwise acceptable to the Debtors and Initial Supporting Noteholders.

**Exit Facility Agent** means the administrative agent and collateral agent under the Exit Credit Agreement.

**Exit Facility** means the $629 million first lien exit credit facility arising pursuant to the Exit Credit Agreement.

**Exit Lenders** means the lenders from time to time party to the Exit Credit Agreement, including any permitted assignees thereof.

**Exit Term Sheet** means that certain term sheet attached to the Plan Support Agreement as Exhibit A-1 that sets forth the principal terms of the Exit Facility.

**Fee Claim** means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

**Fee Escrow Account** means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on the Effective Date.

**Final Order** means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that: (i) is in full force and effect; (ii) is not stayed; and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided*, *however* that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

**General Unsecured Claim** means any Claim against the Debtors that is not an RBL Claim, a 1.125L Notes Claim, a 1.25L Notes Claim, a 1.5L Notes Claim, an Intercompany Claim, an Unsecured Notes Claim, or a Convenience Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code.

**Governmental Entity** means U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

*HSR Act* means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnification Obligation* means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

*Indenture Trustees* means the 1.125L Notes Trustee, the 1.25L Notes Trustee and the 1.5L Notes Trustees.

*Indenture Trustee Charging Lien* means any Lien or other priority in payment in favor of the Indenture Trustees against distributions to be made to holders of Allowed Notes Claims for payment of any Indenture Trustee Fees and Expenses.

*Indenture Trustee Fees and Expenses* means the reasonable and documented compensation, fees, expenses, disbursements, and indemnity claims incurred by the Indenture Trustees, including without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by the Indenture Trustees, whether prior to or after the Petition Date and whether prior to or after the Effective Date, in each case to the extent payable or reimbursable under the Indentures.

*Indentures* means the 1.125L Notes Indenture, the 1.25L Notes Indenture and the 1.5L Notes Indentures.

*Initial Backstop Party* means each Backstop Party as of October 18, 2019.

*Initial Supporting Noteholders* means each of (i) Apollo Management Holdings, L.P. and its affiliates and (ii) Elliott Associates L.P., and Elliott International, L.P. and their respective affiliates.

*Intercompany Claim* means any Claim against a Debtor held by another Debtor.

*Intercompany Interest* means an Interest in a Debtor other than any Existing Parent Equity Interests or Other Equity Interests.

*Intercreditor Agreements* means collectively, (i) that certain *Priority Lien Intercreditor Agreement*, dated as of August 24, 2016, among JP Morgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, Wilmington Trust, National Association, as the Initial Other Authorized Representative and each additional Authorized Representative from time to time party thereto; (ii) that certain *Amended and Restated Senior Lien Intercreditor*

11

*Agreement*, dated as of August 24, 2016, among JP Morgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, and EP Energy LLC and the Subsidiaries of EP Energy LLC named therein; (iii)  that certain *Additional Priority Lien Intercreditor Agreement*, dated as of November 29, 2016, by and among JPMorgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, BOKF, N.A., as successor Notes Facility Agent and Applicable Second Lien Agent, EP Energy LLC and the Subsidiaries of EP Energy LLC named therein; and (iv) that certain *Senior Priority Lien Intercreditor Agreement*, dated as of May 23, 2018, by and among JPMorgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, UMB Bank, National Association, as successor Notes Facility Agent and Applicable Second Lien Agent, EP Energy LLC and the Subsidiaries of EP Energy LLC named therein.  The Intercreditor Agreements will not be cancelled and will remain in full force and effect on the Effective Date.

*Interest* means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, and any other security or equity interest in any of the Debtors, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any of the Debtors, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, that existed immediately before the Effective Date, and including any equity interest issued to any of the Debtors' current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards.

*Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

*New Board* means the initial board of directors of Reorganized EP Energy.

*New Common Shares* means shares of common stock, par value $0.01 per share, of Reorganized EP Energy to be issued (i) on the Effective Date, (ii) upon implementation of the Employee Incentive Plan, or (iii) as otherwise permitted pursuant to the New Corporate Governance Documents of Reorganized EP Energy, in each case subject to the terms of the Amended Certificate of Incorporation and Amended By-Laws of Reorganized EP Energy.

*New Corporate Governance Documents* means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, the Shareholder Agreement, and the operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized Debtors, which in each case shall be acceptable to the Initial Supporting Noteholders.

*Other Equity Interests* means Class B common stock of EP Energy that existed immediately prior to the Effective Date and all other Interests in EP Energy other than Existing Parent Equity Interests.

**Other Priority Claim** means any Claim other than an Administrative Expense Claim, a DIP Facilities Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

**Other Secured Claim** means any Secured Claim against a Debtor other than a Priority Tax Claim, a DIP Claim, an RBL Claim, a 1.125L Notes Claim, 1.25L Notes Claim, and a 1.5L Notes Claim.

**Person** means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

**Petition Date** means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

**Plan** means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code, the terms hereof, and the terms of the Plan Support Agreement.

**Plan Distribution** means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under the Plan.

**Plan Supplement** means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the Plan Support Agreement (including any consent rights in favor of the Initial Supporting Noteholders) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court no later than ten (10) calendar days before the Voting Deadline, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Plan Support Agreement (including any consent rights in favor of the Initial Supporting Noteholders) which shall include, but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Employee Incentive Plan, (v) the Exit Facility documents, (vi) a schedule of retained Causes of Action, and (vii) the Schedule of Rejected Contracts.

**Plan Support Agreement** means that certain Plan Support Agreement, dated as of October 18, 2019, by and among the Debtors, and the Supporting Noteholders, as the same may be amended, restated, or otherwise modified in accordance with its terms.

**Prepetition RBL Agent** means JPMorgan Chase Bank N.A., as administrative agent and collateral agent, solely in its capacity as administrative agent and collateral agent under the Prepetition RBL Credit Agreement.

*Prepetition RBL Credit Agreement* means that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified or otherwise supplemented from time to time), by and among EP Energy, as borrower, EPE Acquisition, LLC, the Prepetition RBL Agent, and the lenders party thereto from time to time, as in effect immediately prior to the Effective Date.

*Prepetition RBL Facility* means the revolving credit facility arising under the Prepetition RBL Credit Agreement.

*Prepetition RBL Lenders* means the Lenders (as defined in the Prepetition RBL Credit Agreement) party to the Prepetition RBL Credit Agreement immediately prior to the Effective Date.

*Priority Tax Claim* means any Secured Claim or unsecured Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Private Placement* means the private placement of New Common Shares, if any, which shall be subject to dilution by the EIP Shares, for an aggregate purchase price of up to $75 million in Cash, on terms acceptable to the Debtors and the Initial Supporting Noteholders.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interests in that Class.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*RBL Claim* means any Claim arising under the Prepetition RBL Credit Agreement.

*Registration Rights Agreement* means the registration rights agreement to be entered into as of the Effective Date, which shall have terms that are customary for a transaction of this nature and shall be in form and substance acceptable to the Initial Supporting Noteholders and the Debtors.

*Reinstated 1.125L Notes* means 1.125L Notes, issued pursuant to the 1.125L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.125L Notes that have not been redeemed or repaid prior to the Effective Date.

*Reinstated 1.25L Notes* means the 1.25L Notes, issued pursuant to the 1.25L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.25L Notes that have not been redeemed or repaid prior to the Effective Date.

**Reinstated Debt** means the Reinstated 1.125L Notes and the Reinstated 1.25L Notes.

**Released Parties** means, collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the DIP Agent and DIP Lenders under the DIP Facility, (vi) the Prepetition RBL Agent and the Prepetition RBL Lenders under the Prepetition RBL Facility, (vii) the Hedge Banks (as defined in the Prepetition RBL Credit Agreement), (viii) the Backstop Parties, (ix) holders of Existing Parent Equity Interests, on account of their contributions under the Plan, (x) the 1.5L Notes Trustees, and (xi) with respect to each of the foregoing Persons, in clauses (i) through (x), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. Notwithstanding the foregoing, any Person that opts out of the releases set forth in section 10.7(b) of the Plan shall not be deemed a Released Party thereunder.

**Releasing Parties** means collectively, (i) the holders of all Claims or Interests that vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (v) the Released Parties.

**Reorganized Debtors** means the Debtors, as reorganized as of the Effective Date in accordance with the Plan.

**Reorganized EP Energy** means EP Energy, (a) as reorganized pursuant to and under the Plan, (b) any successor thereto, by merger, consolidation, or otherwise or (c) a new corporation or limited liability company that may be formed or caused to be formed by EP Energy or the Initial Supporting Noteholders to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of EP Energy and issue the New EP Common Shares to be distributed or sold pursuant to the Plan, as approved by the Initial Supporting Noteholders in the case of (b) or (c).

**Restructuring** means the financial restructuring of the Debtors, the principal terms of which are set forth in the Plan and Plan Supplement.

**Restructuring Expenses** means the reasonable and documented fees and out-of-pocket expenses payable to the Advisors (as defined in the Backstop Commitment Agreement, and in the case of Debevoise & Plimpton LLP, subject to the cap set forth therein), and Cole Schotz P.C.

**Restructuring Transactions** means one or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including, subject to the reasonable consent of the Initial Supporting Noteholders, (i) the consummation of the transactions provided for under or contemplated by the Plan Support Agreement, (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and the Plan Support Agreement and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan and Plan Support Agreement, and (iv) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Plan Support Agreement.

**Rights Offering** means that certain rights offering pursuant to which each Eligible Offeree will be offered the right to purchase New Common Shares for an aggregate purchase price of $475 million at a price per share equal to (a) in the case of Rights Offering Shares purchased for cash, the Cash Purchase Price, and (b) in the case of Rights Offering Shares purchased by Backstop Parties in exchange for Reinstated 1.25L Notes, the Exchange Purchase Price, in each case in accordance with the Rights Offering Procedures and the Backstop Commitment Agreement.

**Rights Offering Documents** means the Backstop Commitment Agreement and the Rights Offering Procedures.

**Rights Offering Procedures** means the procedures in form and substance acceptable to the Initial Supporting Noteholders for the implementation of the Rights Offering, as approved by the Bankruptcy Court pursuant to the order approving the Disclosure Statement, and attached as Exhibit F to the Disclosure Statement.

**Rights Offering Shares** means the New Common Shares issued pursuant to the Rights Offering.

**Schedule of Rejected Contracts** means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time, which shall be acceptable to the Initial Supporting Noteholders.

**Schedules** means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, which shall be reasonably acceptable to the Initial Supporting Noteholders.

**Secured Claim** means a Claim to the extent (i) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the

amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Secured Notes* means the 1.125L Notes, the 1.25L Notes, and the 1.5L Notes.

*Securities Act* means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Shareholder Agreement* means the shareholder agreement to be entered into (or as may be deemed entered into, as applicable) by the Reorganized Debtors and the holders of New Common Shares, including participants in the Rights Offering, on the Effective Date that will govern certain matters related to the governance of the Reorganized Debtors.

*Solicitation Materials* means collectively, the Disclosure Statement and the related solicitation materials.

*Stated Equity Value* means the stated equity value of the Reorganized Debtors of $900 million, which such amount is solely for the purposes of calculations of Rights Offering amounts.

*Subordinated Claim* means a Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

*Supporting Noteholders* means the signatories to the Plan Support Agreement, and any 1.5L Noteholder that subsequently becomes party thereto in accordance with the terms of the PSA.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

*Unsecured Claim* means Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims.

*Unsecured Noteholders* means holders of Unsecured Notes Claims.

*Unsecured Notes Claims* means 2020 Unsecured Notes Claims, 2022 Unsecured Notes Claims, and 2023 Unsecured Notes Claims.

*Unsecured Notes Indentures* means the 2020 Unsecured Notes Indenture, 2022 Unsecured Notes Indenture, and 2023 Notes Indenture.

    ***Unsecured Notes Trustees*** means the 2020 Unsecured Notes Trustee, the 2022 Unsecured Notes Trustee, and the 2023 Unsecured Notes Trustee.

    ***U.S. Trustee*** means the United States Trustee for Region 7.

    ***Voting Deadline*** means February [6], 2020 at 4:00 p.m. Prevailing Central Time, or such date and time as may set by the Bankruptcy Court.

    **1.2**   ***Interpretation; Application of Definitions; Rules of Construction.***

    Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof and the Plan Support Agreement. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively. The words "includes" and "including" are not limiting. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

    **1.3**   ***Reference to Monetary Figures.***

    All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

    **1.4**   ***Consent Rights of Supporting Noteholders.***

    Notwithstanding anything herein to the contrary, any and all consent rights of the Supporting Noteholders set forth in the Plan Support Agreement and the Backstop Commitment Agreement with respect to the form and substance of this Plan and the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

    **1.5**   ***Controlling Document.***

    In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document. In the event of an inconsistency between the Plan and any

other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.   The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

# ARTICLE II.        ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.

### 2.1    *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (i)  the Effective Date and (ii) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim or Restructuring Expenses) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

### 2.2    *Treatment of Fee Claims.*

(a)    All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim. The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)    On the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional

Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 318); *provided* that the Reorganized Debtors' obligations with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account.  To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan.  No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.  For the avoidance of doubt, Restructuring Expenses shall not be paid into the Fee Escrow Account, and shall be payable on the Effective Date pursuant to Section 5.14 of the Plan.

(c)     Any objections to Fee Claims shall be served and filed (a) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (b) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

## 2.3     *Treatment of DIP Claims and Commitments.*

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim and DIP Commitment, each holder of an Allowed DIP Claim or DIP Commitment shall receive, either (i) on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement or (ii) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed DIP Claims will have agreed upon in writing.  Upon the indefeasible payment or satisfaction in Cash, and/or in the form of first-lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

## 2.4     *Payment of Fees and Expenses Under DIP Order.*

On the later of (i) the Effective Date and (ii) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Agent and otherwise required to be paid under or pursuant to the applicable DIP Order.  All payments of fees, expenses, or disbursements pursuant to this section shall be subject in all respects to the terms of the applicable DIP Order.

2.5     *__Treatment of Priority Tax Claims.__*

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (i) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (ii) or such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Initial Supporting Noteholders, and the holder of such Allowed Administrative Expense claim will have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## ARTICLE III.        CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1     *__Classification in General.__*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2     *__Formation of Debtor Groups for Convenience Only.__*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan. Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

3.3     *__Summary of Classification of Claims and Interests.__*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (iii) presumed to accept or reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been

classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | RBL Claims | Impaired | Yes |
| Class 4 | 1.125L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 5 | 1.25L Notes Claims | Unimpaired | No (Presumed to accept) |
| Class 6 | Secured 1.5L Notes Claims | Impaired | Yes |
| Class 7 | Unsecured Claims | Impaired | Yes |
| Class 8 | Convenience Claims | Impaired | Yes |
| Class 9 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 10 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 11 | Existing Parent Equity Interests | Impaired | Yes |
| Class 12 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 13 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

**3.4**     ***Special Provision Governing Unimpaired Claims.***

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

**3.5**     ***Separate Classification of Other Secured Claims.***

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

**3.6**     ***Elimination of Vacant Classes.***

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7     *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

### 3.8     *Voting; Presumptions; Solicitation.*

(a)     **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims or Interests in Classes 3, 6, 7, 8 and 11 are entitled to vote to accept or reject the Plan. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  An Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.  Holders of Claims or Interests in Classes 3, 6, 7, 8 and 11 shall receive ballots containing detailed voting instructions.

(b)     **Deemed Acceptance by Unimpaired Classes**.  Holders of Claims and Interests in Classes 1, 2, 4, 5, 9, and 13 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)     **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims and Interests in Classes 10 and 12 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9     *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10     *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

## ARTICLE IV.   TREATMENT OF CLAIMS AND INTERESTS.

### 4.1   *Class 1: Other Secured Claims.*

(a)   **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(b)   **Impairment and Voting**:   Allowed Other Secured Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.2   *Class 2:  Other Priority Claims.*

(a)   **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Noteholders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

(b)   **Impairment and Voting**:   Allowed Other Priority Claims are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.3   *Class 3:  RBL Claims.*

(a)   **Treatment**: Each holder of an Allowed RBL Claim will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the first-out revolving portion of the Exit Facility by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

(b)     **Impairment and Voting**: RBL Claims are Impaired.  Holders of Allowed RBL Claims are entitled to vote on the Plan.

(c)     **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date, consisting of $314,710,456 in principal amount, plus all other secured obligations, including unpaid interest, fees, and other reasonable and documented expenses arising and payable under the Prepetition RBL Credit Agreement that have not become DIP Claims pursuant to the DIP Order.

### 4.4     *Class 4:  1.125L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, all Allowed 1.125L Notes Claims will be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture.

(b)     **Impairment and Voting**:  1.125L Notes Claims are Unimpaired.  Holders of Allowed 1.125L Notes Claims are not entitled to vote on the Plan.

### 4.5     *Class 5:  1.25L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, all Allowed 1.25L Notes Claims will be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture.

(b)     **Impairment and Voting**:  1.25L Notes Claims are Unimpaired.  Holders of Allowed 1.25L Notes Claims are not entitled to vote on the Plan.

### 4.6     *Class 6:  Secured 1.5L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares, and (ii) the right to participate in the Rights Offering in accordance with the Rights Offering Procedures.  On the Effective Date, the 1.5L Notes will be cancelled, released and extinguished and will be of no further force or effect except as set forth herein, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting**:  Secured 1.5L Notes Claims are Impaired. Holders of Allowed Secured 1.5L Notes Claims are entitled to vote on the Plan.

(c)     **Allowance**:  The Secured 1.5L Notes Claims shall be deemed Allowed on the Effective Date in the amount of $395,257,335.

### 4.7 *Class 7:  Unsecured Claims.*

(d) **Treatment**:  On the Effective Date, holders of Allowed Unsecured Notes Claims, 1.5L Notes Deficiency Claims, and General Unsecured Claims will receive, in full and final satisfaction of such Claims, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares (the "**Unsecured Shares**").  On the Effective Date, the Unsecured Notes Claims, 1.5L Notes Deficiency Claims and General Unsecured Claims will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(e) **Impairment and Voting**:  Allowed Unsecured Claims are Impaired.  Holders of Allowed Unsecured Claims are entitled to vote on the Plan.

### 4.8 *Class 8:  Convenience Claims.*

(a) **Treatment**:  Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of (i) the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount.  Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim.

(b) **Impairment and Voting**:  Allowed Convenience Claims are Impaired.  Holders of Allowed Convenience Claims are entitled to vote on the Plan.

### 4.9 *Class 9:  Intercompany Claims.*

(a) **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' discretion, subject to the reasonable consent of the Initial Supporting Noteholders.

(b) **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.10 *Class 10:  Subordinated Claims.*

(a) **Treatment**:  All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(b)     **Impairment and Voting**: Allowed Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 4.11    *Class 11:  Existing Parent Equity Interests.*

(a)     **Treatment**:  Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $500,000 in Cash.  On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting:**  Existing Parent Equity Interests are Impaired. Holders of Existing Parent Equity Interests are entitled to vote on the Plan.

### 4.12    *Class 12:  Other Equity Interests.*

(a)     **Treatment**:  Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.

(b)     **Impairment and Voting**:  Other Equity Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

### 4.13    *Class 13:  Intercompany Interests.*

(a)     **Treatment**:  Intercompany Interests are Unimpaired.  On the Effective Date, all Intercompany Interests shall, subject to the reasonable consent of the Initial Supporting Noteholders, be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.

(b)     **Impairment and Voting**:  Intercompany Interests are Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the **votes** of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### 4.14    *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.          MEANS FOR IMPLEMENTATION.

### 5.1     *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to section 363 and 1123(b)(2) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

### 5.2     *Continued Corporate Existence; Effectuating Documents; Further Transactions.*

(a)     Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents or other applicable corporate governance documents.

(b)     On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, subject to the consent of the Initial Supporting Noteholders, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, subject to the consent of the Initial Supporting Noteholders:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate

certificates or articles of incorporation or formation and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

### 5.3 *Corporate Action.*

(a)     Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (a) the assumption of executory contracts and unexpired leases as provided herein, (b) the selection of the managers, directors, or officers for the Reorganized Debtors, (c) the distribution of the New Common Shares, (d) the entry into or execution of the Exit Facility Documents, (e) entry into the Shareholder Agreement by the Reorganized Debtors and the holders of New Common Shares, including participants in the Rights Offering, and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)     On or (as applicable) before the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to, subject to the reasonable consent of the Initial Supporting Noteholders, issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan). The authorizations and approvals contemplated by this Section 5.3 shall be effective notwithstanding any requirements under non-bankruptcy law.

### 5.4 *Plan Funding.*

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Rights Offering and the Exit Facility.

### 5.5 *Cancellation of Existing Securities and Agreements.*

(a)     Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements: the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing (i) certain Intercompany Interests not modified by the Plan, (ii) the Reinstated Debt, (iii) any

29

security interests granted in favor of the holders of the Reinstated Debt or the collateral agents for the Reinstated Debt, (iv) the Intercreditor Agreements (including the Intercreditor Agreements themselves) and (v) any security interests granted in connection with or with respect to the Prepetition RBL Facility, DIP Facility and/or the Exit Facility which secure the Exit Facility) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (a) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (b) allowing and preserving the rights of the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees, as applicable, to (i) make distributions on account of such Claims or Interests; (ii) maintain, enforce, and exercise their respective liens, including their Indenture Trustee Charging Liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (iii) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (iv) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or entitlement that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, or Unsecured Notes Trustees may have under the Plan, the applicable credit agreement, Indentures, collateral agreements, or pledge agreements; (v) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or Indentures; and (vi) execute documents pursuant to section 5.6 of the Plan; *provided*, *further*, that the Prepetition RBL Agent, DIP Agent, 1.5L Notes Trustees, and the Unsecured Notes Trustees may take such further action to implement the terms of this Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and the Initial Supporting Noteholders to the extent not inconsistent with the Confirmation Order or the Plan.

(b)      On and after the Effective Date, all duties, responsibilities or obligations of the Prepetition RBL Agent, the holders of RBL Claims, the DIP Agent, the holders of DIP Claims, the 1.5L Notes Trustees, the holders of 1.5L Notes Claims, the Unsecured Notes Trustees, and the holders of Unsecured Notes Claims, in each case under (i) the Prepetition RBL Credit Agreement and the other Credit Documents (as defined in the Prepetition RBL Credit Agreement), (ii) the  DIP Facility Credit Agreement and the other Credit Documents (as defined in the DIP Facility Credit Agreement), (iii) the 1.5L Notes Indentures and the other Notes Documents (as defined in the applicable 1.5L Notes Indentures), and (iv) the Unsecured Notes Indentures and the other Notes Documents (as defined in the applicable Unsecured Notes Indentures), shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan. For the avoidance of doubt, the Debtors and the Reorganized Debtors (in each case, subject to the reasonable consent of the Initial Supporting Noteholders), the Prepetition RBL Agent, the DIP Agent, the 1.5L Notes Trustees, the Unsecured Notes Trustees, and the Disbursing Agent may (i) make post-Effective Date Distributions or take such other action to exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (ii) may take any other action necessary to cause the Plan to

become Effective, including by implementing the Restructuring Transactions set forth in this Plan.

(c)      If the record holder of any 1.5L Note or Unsecured Note is DTC or its nominee or another securities depository or custodian thereof, and such 1.5L Note or Unsecured Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such 1.5L Note or Unsecured Note shall be deemed to have surrendered such Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.

### 5.6     *Cancellation of Certain Existing Security Interests.*

(a)      Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(b)      After the Effective Date, the distributions to holders on account of 1.5L Notes Claims, and the payment of the Indenture Trustee Fees and Expenses with respect to the 1.5L Notes Trustees (including, without limitation, attorneys' fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the 1.5L Notes Claims, including, without limitation, the preparation and filing, in form, substance, and content reasonably acceptable to the 1.5L Notes Trustees, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the 1.5L Notes Trustees, including, without limitation, UCC-3 termination statements.

### 5.7     *Officers and Boards of Directors.*

(c)      On the Effective Date, the New Board shall consist of the number of directors as set forth in the Plan Supplement.  EP Energy's chief executive officer shall serve as a member of the New Board.  The remaining initial members of the New Board shall be appointed by the Initial Supporting Noteholders in consultation with the Debtors and in accordance with the Plan Support Agreement.  The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

(d)      Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(e)      Except to the extent that a member of the board of directors or managers, as applicable, of a Debtor continues to serve as a director or manager of such Reorganized Debtor on the Effective Date, the members of the board of directors or managers, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors or managers, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

## 5.8      *Employee Incentive Plan.*

On the Effective Date, the New Board shall adopt the Employee Incentive Plan and the Emergence Awards (as defined in the EIP Term Sheet annexed as Exhibit A-2 to the Plan Support Agreement).  All awards issued under the Employee Incentive Plan will be dilutive of all other New Common Shares issued pursuant to the Plan.

## 5.9      *Authorization, Issuance, and Delivery of New Common Shares.*

On the Effective Date, Reorganized EP Energy is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan without the need for any further corporate or shareholder action.  All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.  Reorganized EP Energy's New Corporate Governance Documents shall have provided for sufficient shares of authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by the Plan, including the Rights Offering, the Backstop Commitment Agreement, and the Employee Incentive Plan, and Reorganized EP Energy shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate such issuances.  Each holder of New Common Shares (including participants in the Rights Offering) may, at the option of the Debtors, with the consent of the Initial Supporting Noteholders, and as set forth in the Confirmation Order, be deemed, without further notice or action, to have agreed to be bound by the Shareholder Agreement and the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The Shareholder Agreement may, and the New Corporate Governance Documents shall, be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to the Shareholder Agreement or any other New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, may condition the distribution of any New Common Shares issued pursuant to the Plan or the Rights Offering upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Shareholder Agreement.

### 5.10 *Exit Credit Agreement.*

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Credit Agreement without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the holders of Claims or Interests. The Exit Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit Facility Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all letters of credit issued under the Prepetition RBL Credit Agreement, shall be deemed issued or reissued, as applicable, under the Exit Credit Agreement in accordance with the terms and conditions of the Exit Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the Prepetition RBL Credit Agreement or Exit Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Prepetition RBL Credit Agreement or the Exit Credit Agreement, as applicable, (including any Liens and security interests granted on the Assets) shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable non-bankruptcy law and the applicable Intercreditor Agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 5.11 *Rights Offering.*

(a)    Terms.    Following approval by the Bankruptcy Court of the Rights Offering Procedures, the Debtors will commence the Rights Offering in accordance therewith and, on the Effective Date, the Debtors shall consummate the Rights Offering, in each case subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the

Initial Supporting Noteholders.  The Rights Offering shall be backstopped in an amount equal to $463 million ($138 million of which shall be funded through the exchange of $138 million in aggregate principal amount of Reinstated 1.25L Notes held by the Backstop Parties on the terms set forth in the Backstop Commitment Agreement) by the Backstop Parties in accordance with and subject to the terms and conditions of the Rights Offering Procedures and the Backstop Agreement.  The right to participate in the Rights Offering may not be sold, transferred, or assigned, except in the circumstances described in the Backstop Commitment Agreement.  The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the EIP Shares, is approximately 76.2%-78.2%, consisting of (i) approximately 55.6%-57.6% in the case of Rights Offering Shares purchased for cash, and (ii) approximately 20.6% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes.  The low end of the ranges set forth in the preceding sentence assumes that New Common Shares are issued only with respect to the backstopped portion of the Rights Offering and the high end of the ranges set forth in the preceding sentence assumes that the Rights Offering is fully subscribed.  For the avoidance of doubt, EP Energy shall pay or cause to be paid all accrued but unpaid interest, including any stub interest, in Cash to the holders of the Reinstated 1.25L Notes that are exchanged in connection with the Rights Offering.

(b)     Purpose.  On the Effective Date, the proceeds of the Rights Offering may be used:  (i) to pay down a portion of the DIP Facility and the Prepetition RBL Facility; (ii) pay all reasonable and documented Restructuring Expenses; (iii) fund Plan Distributions, case administration expenses, and exit costs; and (iv) provide the Reorganized Debtors with additional liquidity for working capital and general corporate purposes.

(c)     Backstop Commitment.  In accordance with the Backstop Commitment Agreement and subject to the terms and conditions thereof, each of the Backstop Parties has agreed, severally but not jointly, to purchase for Cash or in exchange for Reinstated 1.25L Notes, on or prior to the Effective Date, its respective Backstop Commitment Percentage (as defined in the Backstop Commitment Agreement) of the New Common Shares.

(d)     Backstop Commitment Premium.  As consideration for providing the backstop commitment for the Rights Offering, on the Effective Date, the Backstop Commitment Premium shall be allocated among the Backstop Parties in accordance with the Backstop Commitment Agreement.

### 5.12   *Intercompany Interests; Corporate Reorganization.*

On the Effective Date and without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.13   *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions consistent with the Plan, the Confirmation Order and the Plan Support Agreement, including the reasonable consent of the

Initial Supporting Noteholders, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.14    *Restructuring Expenses.*

The outstanding Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (whether incurred prepetition or postpetition) shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Backstop Commitment Agreement, and without the need for any further notice or approval by the Bankruptcy Court or otherwise.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  On the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

### 5.15    *Indenture Trustee Expenses.*

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, shall distribute Cash to the Indenture Trustees in an amount equal to the Indenture Trustee Fees and Expenses without a reduction to recoveries to holders of the Secured Notes; *provided* that the Indenture Trustees shall provide the Debtors with summary invoices for the Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than fifteen (15) days prior to the Effective Date. Such summary invoices may (but are not required to) include estimates for the Indenture Trustee Fees and Expenses anticipated through the Effective Date and the release of any Liens required under the Plan. If the Debtors dispute any Indenture Trustee Fees and Expenses, the Debtors or Reorganized Debtors, as applicable, shall (i) provide written notification, within ten (10) days after receipt of the summary invoices, to the Indenture Trustees (as applicable) specifying the disputed portion of the Indenture Trustee Fees and Expenses and the basis for such dispute, (ii) on the Effective Date, pay in Cash the undisputed portion of the Indenture Trustee Fees and Expenses, and (iii) escrow the amount of any disputed portion of the Indenture Trustee Fees and Expenses pending any consensual resolution or resolution by the Bankruptcy Court.  Upon receipt of such notification, the applicable Indenture Trustee may assert its Indenture Trustee Charging Lien to pay the disputed portion of its Indenture Trustee Fees and Expenses to the extent provided under the applicable Indenture or  may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the Indenture Trustees' rights to exercise their respective Indenture Trustee Charging Liens pursuant to the terms of the applicable Indentures.

To the extent the Indenture Trustees provide services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, or the Indentures (as applicable) from and after fifteen (15) days prior to the Effective Date, such

Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, payment, in Cash, as reasonable compensation for such services and expenses (including, without limitation, attorneys' fees and expenses) incurred in connection with such services. The payment of such compensation and expenses will be made as soon as reasonably practicable, but in any case within the earlier of (i) the date upon which the Indenture Trustee releases any Liens under the Plan or (ii) ten (10) days following the applicable Indenture Trustee's notification of the Debtors or Reorganized Debtors, as applicable, of the amount of such costs or expenses.

### 5.16 *Private Company*

The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; provided, that from and after the Effective Date, Reorganized EP Energy shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements).

## ARTICLE VI.   DISTRIBUTIONS.

### 6.1 *Distributions Generally.*

The Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 6.2 *No Postpetition Interest on Claims.*

Except as otherwise specifically provided for in this Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.3 *Date of Distributions.*

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, *however*, that the Reorganized Debtors may, with the consent of the Initial Supporting Noteholders, implement periodic distribution dates to the extent they determine them to be appropriate.

### 6.4    *Distribution Record Date.*

(a)    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease and the Initial Supporting Noteholders, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)    Notwithstanding anything in the Plan to the contrary, in connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.  All New Common Shares to be distributed under the Plan shall be issued in the names of such holders or their nominees in accordance with DTC's book-entry exchange procedures or on the books and records of a transfer agent; *provided*, that such New Common Shares will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deem such method of distribution advisable.

### 6.5    *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6    *Disbursing Agent.*

All distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in section 6.17 of the Plan.

### 6.7    *Delivery of Distributions.*

Subject to section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan

37

at:  (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Distributions of the New Common Shares will be made through the facilities of DTC in accordance with DTC's customary practices; *provided*, that such New Common Shares will only be issued in accordance with DTC book-entry procedures if the same are permitted to be held through DTC's book-entry system and the Reorganized Debtors, in their sole discretion, deem such method of distribution advisable; *provided*, *further*, that to the extent that the New Common Shares are not eligible for distribution in accordance with DTC's customary practices, the Reorganized Debtors will take such reasonable actions as may be required to cause distributions of the New Common Shares under the Plan.  Any distribution that otherwise would be made to any holder eligible to receive a distribution who does not own or hold an account eligible to receive a distribution through DTC on a relevant distribution date will be forfeited. For the avoidance of doubt, DTC shall be considered a single holder for purposes of distributions.

### 6.8    *Unclaimed Property.*

One year from the later of:  (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

### 6.9    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.11 _Fractional Shares and De Minimis Cash Distributions._

No fractional New Common Shares shall be distributed.  When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows:  (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  The total number of New Common Shares to be distributed on account of Allowed Secured 1.5L Notes Claims, Allowed Unsecured Claims, the Rights Offering, the Backstop Commitment Premium, the Private Placement (if applicable), and the EIP Shares shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $100.00 in Cash.  Fractional New Common Shares that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized EP Energy.

### 6.12 _No Distribution in Excess of Amount of Allowed Claim._

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### 6.13 _Allocation of Distributions between Principal and Interest._

Except as otherwise required by law, consideration received in respect of an Allowed 1.5L Notes Claim or Allowed Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.14 _Exemption from Securities Laws._

(a).    The issuance of and the distribution under this Plan of the New Common Shares pursuant to Sections 4.6(a) and 4.7(a) of this Plan shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  Subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b).     The offer, issuance, and distribution of each of the Subscription Rights and the New Common Shares issuable upon the exercise thereof and the New Common Shares to Eligible Offerees pursuant to the Rights Offering, and to the Backstop Parties under the Backstop Commitment Agreement (including the New Equity Interests comprising the Backstop Commitment Premium), are being made in reliance on the exemption from registration set forth in section 4(a)(2) of the Securities Act.  Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act.  Transfers of such securities will also be subject to the transfer provisions, if any, and other applicable provisions set forth in the Shareholder Agreement.

### 6.15     *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, other than the 1.5L Notes Claims, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s), with the consent of the Initial Supporting Noteholders, and holder of the Allowed Claim or (b) otherwise adjudicated by the Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 6.16     *Rights and Powers of Disbursing Agent.*

(a)     Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)     Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

### 6.17    *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.  If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution.  If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale.  The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding obligation is satisfied pursuant to the preceding sentences.  If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.  Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.    PROCEDURES FOR DISPUTED CLAIMS.

### 7.1    *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an

Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2 *Claims Objections.*

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court, in each case subject to the reasonable consent of the Initial Supporting Noteholders.

### 7.3 *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection, in each case subject to the reasonable consent of the Initial Supporting Noteholders. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4 *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5 *Time to File Objections to Claims.*

Any objections to a Claim shall be filed on or before the date that is the later of (i) 180 days after the Effective Date and (ii) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time.

### 7.6 *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.7 *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors.

### 7.8 *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.9 *Disputed Claims Reserve.*

(a) There shall be withheld from the New Common Shares (which withheld New Common Shares shall not be issued by Reorganized EP Energy until such time as the respective Disputed Claims are resolved) to be distributed to holders of Allowed Unsecured Claims an amount of New Common Shares that would be distributable to Disputed Unsecured Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve). The Debtors intend to seek a determination, subject to the reasonable consent of the Initial Supporting Noteholders, by the Bankruptcy Court of the estimated amount (either on an individual or aggregate basis) of Disputed Unsecured Claims for purposes of determining the amount of New Common Shares attributable to such Disputed Claims. To the extent any dividends would have been payable on any withheld New Common Shares had such New Common Shares been issued and distributed on the Effective Date, an amount equal to such dividends shall be held by Reorganized EP Energy for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed and (ii) holders of Allowed Unsecured Claims (including holders of Disputed Unsecured Claims that are subsequently Allowed).

(b)     To the extent applicable, there shall also be withheld Cash from the Convenience Claim Distribution Amount in an amount that would be distributable to any Disputed Convenience Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).

(c)     Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat any cash and other property (other than the New Common Stock) held in the Disputed Claims Reserve as held by a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  For the avoidance of doubt, New Common Stock which is not issued and outstanding until Disputed Claims are resolved and such New Common Stock can be immediately issued and distributed to the applicable claimant, shall not be treated as held by a disputed ownership fund for U.S. federal income tax purposes.  All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

(d)     The Disbursing Agent shall hold in the Disputed Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such dividends, payments, or other distributions shall be held for the benefit of (i) holders of Disputed Unsecured Claims against any of the Debtors whose Claims are subsequently Allowed, (ii) holders of Disputed Convenience Claims against any of the Debtors whose Claims are subsequently Allowed, as applicable, and (iii) other parties entitled thereto hereunder.  The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

(e)     To the extent that a Disputed Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of the New Common Shares, which Reorganized EP Energy shall issue to the Disbursing Agent (together with any amounts held on account of dividends on such withheld New Common Shares) out of the Disputed Claims Reserve, to which such holder is entitled hereunder.  To the extent that a Disputed Convenience Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled hereunder out of the Disputed Claims Reserve.  No interest shall be paid with respect to any Disputed Convenience Claim or any Disputed Unsecured Claim that becomes an Allowed Claim after the Effective Date.

(f)     In the event the remaining withheld New Common Shares attributable to Disputed Unsecured Claims are insufficient to satisfy all the Disputed Unsecured Claims that

have become Allowed, such Disputed Unsecured Claims shall be satisfied Pro Rata from such remaining New Common Shares.  After all New Common Shares have been distributed, no further distributions shall be made in respect of Disputed Unsecured Claims.  At such time as all Disputed Unsecured Claims have been resolved, any remaining withheld New Common Shares issued in the Disputed Claims Reserve shall be released from the Disputed Claims Reserve for distribution in accordance with Section 4.7 hereof.

(g)    In the event the remaining withheld Cash from the Convenience Claim Distribution Amount is insufficient to satisfy all the Disputed Convenience Claims that have become Allowed, such Disputed Convenience Claims shall be satisfied Pro Rata from such remaining Cash.  After all Cash has been distributed, no further distributions shall be made in respect of Disputed Convenience Claims.  At such time as all Disputed Claims have been resolved, any remaining withheld Cash from the Convenience Claim Amount issued in the Disputed Claims Reserve shall be revert to the Reorganized Debtors.

### 7.10    *Distributions after Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.11    *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with this Plan or any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1    *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. The assumption of executory contracts and unexpired leases hereunder may include, subject to the consent of the Initial Supporting Noteholders, the assignment of

certain such contracts.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the Confirmation Hearing, or such earlier time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts, subject to the consent of the Initial Supporting Noteholders, to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the Business Day immediately before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties and subject to the consent of the Initial Supporting Noteholders and entry of an order of the Bankruptcy Court.

## 8.2    *Determination of Cure Amounts and Deemed Consent.*

(a)    The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders.

(b)    The Debtors shall serve a Cure Notice, which shall be reasonably acceptable to the Initial Supporting Noteholders, on parties to executory contracts and unexpired leases no later than thirty (30) days prior to the Confirmation Hearing in accordance with the order approving the Disclosure Statement.  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign is not listed on the applicable Cure Notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c)    Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement to object to the proposed assumption, assumption and assignment, or related Cure Amount listed on the Cure Notice.

(d)     The Bankruptcy Court will determine any Assumption Dispute by entry of an order; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any Assumption Dispute with the reasonable consent of the Initial Supporting Noteholders, and without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that where an Assumption Dispute relates solely to the applicable Cure Amount, the Debtors may with the reasonable consent of the Initial Supporting Noteholders assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute.  If there is an Assumption Dispute, the Debtors reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

### 8.3     *Payments Related to Assumption of Contracts and Leases.*

(a)     Any Cure Amounts shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amount as reflected in the applicable Cure Notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree. If no Cure Amount is reflected in the applicable Cure Notice, no Cure Amount shall be deemed to be owing, unless otherwise ordered by the Bankruptcy Court.

(b)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 8.4     *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.5     *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or

employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.6    *Compensation and Benefit Plans.*

All employment and severance agreements and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and shall be treated as, executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code and, in the case of certain employment agreements, effective as of the Effective Date, in accordance with Employment Agreement Term Sheet annexed as Exhibit A-3 to the Plan Support Agreement.

### 8.7    *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms.  All other insurance policies shall vest in the Reorganized Debtors.  Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the

full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

**8.8** *__Modifications, Amendments, Supplements, Restatements, or Other Agreements.__*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

**8.9** *__Reservation of Rights.__*

(a)     Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)     Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)     Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)     If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, shall, subject to the consent of the Initial Supporting Noteholders, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.


**ARTICLE IX.        CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.**

**9.1** *__Conditions Precedent to Confirmation.__*

The confirmation of the Plan shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of this Plan:

(a)     The Plan and the Plan Supplement are consistent with the Plan Support Agreement.

(b)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders; and

(c)     the Plan Support Agreement shall be in full force and effect and shall not have been terminated.

**9.2     *Conditions Precedent to Effective Date.***

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.3 of this Plan:

(a)     the Plan Support Agreement shall be in full force and effect and shall not have been terminated;

(b)     the Backstop Commitment Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

(c)     the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(d)     the Bankruptcy Court shall have entered the order approving the Disclosure Statement, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(e)     the Rights Offering and, if applicable, the Private Placement, shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Commitment Agreement, and any other relevant transaction documents;

(f)     the Definitive Documents will contain terms and conditions consistent in all material respects with the Plan Support Agreement (including all exhibits thereto) and shall otherwise be satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders;

(g)     the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the Plan Support Agreement, and in form and substance acceptable to the Initial Supporting Noteholders;

(h)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(i)     the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

(j)      the Restructuring to be implemented on the Effective Date shall be consistent with this Plan and the Plan Support Agreement;

(k)      the Reinstated Debt shall have been reinstated in accordance with Sections 4.4 and 4.5 hereof;

(l)      all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived, and the Exit Facility, including all documentation related thereto, shall be in form and substance satisfactory to the Initial Supporting Noteholders and the Debtors;

(m)      the New Corporate Governance Documents shall be in full force and effect and in form and substance satisfactory to the Initial Supporting Noteholders;

(n)      the Registration Rights Agreement shall have been executed and delivered by EP Energy, shall otherwise have become effective with respect to the Supporting Noteholders and the other parties thereto, and shall be in full force and effect;

(o)      the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(p)      all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Commitment Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Commitment Agreement shall have been obtained; and

(q)      all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date shall have been paid in full by the Debtors in accordance with the Backstop Commitment Agreement.

### 9.3      *Waiver of Conditions Precedent.*

(a)      Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Initial Supporting Noteholders without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  For the avoidance of doubt, the rendering of the Reinstated 1.25L Notes as unimpaired pursuant to Section 1124(2) of the Bankruptcy Code shall be deemed to occur immediately prior to the consummation of the Rights Offering.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.4     *Effect of Failure of a Condition.*

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the termination of the Plan Support Agreement, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the other Supporting Noteholders, or any other Person.

## ARTICLE X.        EFFECT OF CONFIRMATION.

### 10.1     *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2     *Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay

the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3     *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder,  shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor

### 10.4     *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  The *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock*

*of Debtors* (ECF No. 313) shall remain in full force and effect following the Effective Date solely with respect to transfers of Existing Parent Equity Interests and Other Equity Interests prior to the Effective Date.

### 10.5 *Injunction against Interference with Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6 *Plan Injunction.*

(a)     Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

10.7    *Releases.*

(a)    **RELEASES BY THE DEBTORS.  AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b)    <u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DEFINITIVE DOCUMENTS, AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY

RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE PSA, THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(c)     *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Reinstated Debt and the  Exit Facility Documents, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

10.8     *Exculpation.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP

**FACILITY, EXIT FACILITY, THE RIGHTS OFFERING, THE PRIVATE PLACEMENT, THE EMPLOYEE INCENTIVE PLAN, THE DISCLOSURE STATEMENT, THE PSA, THE RESTRUCTURING, AND THE PLAN (INCLUDING THE DEFINITIVE DOCUMENTS AND THE DOCUMENTS IN THE PLAN SUPPLEMENT), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN. THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER. THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.**

10.9   _Injunction Related to Releases and Exculpation._

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

10.10   _Subordinated Claims._

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the

Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### 10.11   *Retention of Causes of Action and Reservation of Rights.*

Except as otherwise provided in the Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 10.12   *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring. Notwithstanding the foregoing the Confirmation Order will confirm that as of the Effective Date no "Change of Control" (as defined therein) has occurred under any of the Reinstated Debt as a result of the Plan or otherwise.

### 10.13   *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity prior to, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## ARTICLE XI.   RETENTION OF JURISDICTION.

### 11.1   *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)   to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)   to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)   to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)   to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)   to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)   to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)   to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)   to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)   to hear and determine all Fee Claims;

(j)   to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)     to hear and determine matters related to the DIP Facilities and the Final DIP Order; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE XII.     MISCELLANEOUS PROVISIONS.

### 12.1   *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions

consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2     *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.3     *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.4     *Amendments.*

(a)     Plan Modifications.  Subject to the terms and conditions of the Plan Support Agreement, the Backstop Agreement, and any consents or approvals required under each of the foregoing, including the consent of the Initial Supporting Noteholders, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Initial Supporting Noteholders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  The Debtors shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of this Plan and the Plan Support Agreement through the Effective Date.

(b)      <u>Certain Technical Amendments</u>.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court with the consent of the Initial Supporting Noteholders.

(c)      Notwithstanding anything to the contrary herein, any amendments or modifications to Section 9.2 of this Plan shall require the consent of the Initial Supporting Noteholders, and any change, modification, or amendment to the Plan that treats or affects any Supporting Noteholders in a manner that is materially and adversely disproportionate to the manner in which any other Supporting Noteholders are treated (after taking into account each of such Supporting Noteholders' respective holdings in the Debtors and the recoveries contemplated by this Plan) shall require the written consent of such materially adversely and disproportionately affected Supporting Noteholders.

## 12.5   *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

## 12.6   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Initial Supporting Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (i) valid and enforceable pursuant to its terms, (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and (iii) nonseverable and mutually dependent.

### 12.7    *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

### 12.8    *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

### 12.9    *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

### 12.10   *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 12.11   *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.12   *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 12.13   *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have

been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or Reorganized Debtors:

> EP ENERGY CORPORATION
> 1001 Louisiana Street
> Houston, Texas 77002
> Attn:  Jace D. Locke

> – and –

> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., Ronit Berkovich, Esq.,
> and Scott Bowling, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007

> *Attorneys for the Debtors*

if to the Supporting Noteholders:

> Paul, Weiss, Rifkind, Wharton & Garrison LLP
> 1285 Avenue of the Americas
> New York, NY 10019-6064
> Attn:  Jeffrey Saferstein, Esq. (jsaferstein@paulweiss.com), Jacob Adlerstein,
> Esq. (jadlerstein@paulweiss.com), and Brian Bolin, Esq.
> (bbolin@paulweiss.com)
> Telephone:  (212) 373-3000
> Facsimile:  (212) 757-3990

> *Attorneys for Apollo*

> –and–

> Milbank LLP
> 55 Hudson Yards
> New York, NY 10001-2163
> Attn:  Gerald Uzzi, Esq. (guzzi@milbank.com), Eric Stodola, Esq.
> (estodola@milbank.com), and Parker Milender, Esq. (pmilender@milbank.com)
> Telephone:  (212) 530-5000
> Facsimile:  (212) 530-5219

> *Attorneys for Elliott*

> –and–

Debevoise & Plimpton
919 3rd Ave
New York, NY 10022
Attn:  Sidney P. Levinson
Telephone:  (212) 909-6000
Facsimile:  (212) 908-6836

*Attorneys for Access*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee and the Initial Supporting Noteholders need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee, the Initial Supporting Noteholders, and those entities that have filed such renewed requests.

**12.14** *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to any Claims or Interests prior to the Effective Date or (b) any holder of a Claim or Interest or other entity prior to the Effective Date.

Dated: January 2, 2020
      Houston, Texas

Respectfully submitted,


/s/ *David Rush*
  Name:  David Rush
  Title:  Chief Restructuring Officer

**EP ENERGY CORPORATION**
**EPE ACQUISITION LLC**
**EP ENERGY, LLC**
**EVEREST ACQUISITION FINANCE INC.**
**EP ENERGY GLOBAL LLC**
**EP ENERGY MANAGEMENT, L.L.C.**
**EP ENERGY RESALE COMPANY, L.L.C.**
**EP ENERGY E&P COMPANY, L.P.**

**<u>Exhibit B</u>**

**Plan Support Agreement**

*Execution Version*

<div align="center">

**PLAN SUPPORT AGREEMENT**

</div>

**THIS PLAN SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS PLAN SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE SUPPORT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

This PLAN SUPPORT AGREEMENT (including all exhibits, and schedules attached hereto, and as amended, restated, amended and restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"), dated as of October 18, 2019 is entered into by and among:

(a)  EP Energy Corporation ("***EP Parent***"), EPE Acquisition, LLC, EP Energy, LLC, Everest Acquisition Finance Inc., EP Energy Global LLC, EP Energy Management, L.L.C., EP Energy Resale Company, L.L.C., and EP Energy E&P Company, L.P., (each such entity, together with EP Parent, a "***Company Entity***," and collectively, and together with EP Parent, the "***Company***");

(b)  [RESERVED]; and

(c)  the undersigned beneficial holders, or investment managers, advisors, or subadvisors to beneficial holders (together with their respective successors and permitted assigns, the "***Supporting Noteholders***" and collectively with any subsequent person or entity that becomes a party hereto in accordance with the terms hereof, the "***Supporting Creditors***") of (i) the notes issued pursuant to that certain Indenture, dated as of February 6, 2017, by and between EP Energy LLC and Everest Acquisition Finance Inc., as Issuers, the Subsidiary Guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee and Notes Collateral Agent, for the issuance of $1,000 million in aggregate principal amount of 8.00% senior secured notes due 2025 (the "***2025 1.5L Indenture***"; such notes, the "***2025 1.5L Notes***") and (ii) the notes issued pursuant to that certain Indenture, dated as of January 3, 2018, by and between EP Energy LLC and Everest Acquisition Finance Inc., as Issuers, the Subsidiary Guarantors party thereto from time to time, and Wilmington Trust, National Association, as Trustee and Notes Collateral Agent, for the issuance of $1,092 million in aggregate principal amount of 9.375% senior secured notes due 2024 (the "***2024 1.5L Indenture***" and together with the 2025 1.5L Indenture, the "***1.5L Indentures***"; such notes, the "***2024 1.5L Notes***" and (i) and (ii) together, the "***1.5L Notes***").

The Company, each Supporting Noteholder, and any subsequent person or entity that becomes a party hereto in accordance with the terms hereof are referred to herein as the "***Parties***" and each individually as a "***Party***." Capitalized terms used but not defined herein shall have the meanings ascribed to them, as applicable, in the restructuring term sheet attached hereto as **Exhibit A** (including any schedules and exhibits attached thereto) (the "***Term Sheet***").

When a reference is made in this Agreement to a Section, Exhibit, or Schedule, such reference shall be to a Section, Exhibit, or Schedule, respectively, of or attached to this Agreement unless otherwise indicated.  Unless the context of this Agreement otherwise requires, (i) words using the singular or plural number also include the plural or singular number, respectively, (ii) the terms "hereof," "herein," "hereby," and derivative or similar words refer to this entire Agreement, (iii) the words "include," "includes," and "including" when used herein shall be deemed in each case to be followed by the words "without limitation," and (iv) the word "or" shall not be exclusive and shall be read to mean "and/or."

## Recitals

**WHEREAS**, the Parties have engaged in arm's-length, good faith discussions regarding a restructuring of certain of the Company's indebtedness and other obligations, including the Company's indebtedness and obligations under the 1.5L Notes;

**WHEREAS**, the Parties have agreed to a restructuring and recapitalization of the Company's capital structure (the "***Restructuring***"), the principal terms of which are set forth in the Term Sheet;

**WHEREAS**, the Restructuring is anticipated to be implemented through the Company's voluntary cases under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"; such cases, the "***Chapter 11 Cases***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") and the solicitation of votes on, and confirmation and implementation of, a plan of reorganization (as may be amended or modified from time to time in accordance with this Agreement, the "***Plan***"; and such solicitation, the "***Solicitation***");

**WHEREAS**, in connection with the Restructuring, the Initial 1.5L Noteholders (as defined herein) and certain other parties have agreed to backstop $463 million of an offering of up to $475 million of equity subscription rights to eligible holders of 1.5L Notes (the "***Rights Offering***") in accordance with the terms and conditions specified in this Agreement, the Term Sheet, a backstop commitment agreement to be entered into concurrently with the execution of this Agreement (the "***Backstop Agreement***"), and the procedures governing the Rights Offering, as set forth in the Backstop Agreement (the "***Rights Offering Procedures***");

**WHEREAS**, as of the date hereof, the Supporting Noteholders hold approximately 79.3% of the aggregate outstanding principal amount of the 1.5L Notes, approximately 52.0% of the aggregate outstanding principal amount of the 8.000% Senior Secured Notes due 2024 (the "**1.25L Notes**"), and such other claims (as defined in section 101 of the Bankruptcy Code) against the Debtors (collectively, "***Claims***") as are set forth on their respective signature pages hereto;

**WHEREAS**, the Company has requested that each Supporting Creditor sign this Agreement to support the Restructuring in the interests of all parties; and

**WHEREAS**, subject to the terms and conditions set forth herein, the Parties desire to express to one another their mutual support for and commitment in respect of the matters set forth in the Term Sheet and this Agreement.

2

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.  <u>Certain Definitions</u>.

As used in this Agreement, the following terms have the following meanings:[1]

(a)  "*Alternative Restructuring*" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of all or substantially all assets, financing (debt or equity), restructuring (in each case, of all or substantially all of the Company, its assets, or its capital structure), or repurchase, refinancing, extension or repayment of a material portion of the Company's funded debt (in each case, outside of the ordinary course of business) other than in accordance with or in furtherance of the Restructuring.

(b)  "*Business Day*" means any day that is not a Saturday, Sunday, or legal holiday on which banks in New York City are closed for business.

(c)  "*Definitive Documents*" means (i) this Agreement, (ii) the Plan and the Plan Supplement, including the Schedule of Rejected Contracts, (iii) the Disclosure Statement and the Solicitation Materials, (iv) the Backstop Agreement and the Rights Offering Procedures, (v) the DIP Credit Agreement and the DIP Documents, (vi) the order or orders of the Bankruptcy Court approving (A) the Backstop Agreement, (B) the DIP Facility, (C) the Rights Offering Procedures, and (D) the Disclosure Statement and the procedures governing the Solicitation, (vii) the Confirmation Order, (viii) the Exit Credit Agreement and the Exit Documents, (ix) the New Corporate Governance Documents, (x) the EIP and any other documents or agreements related to any management incentive or retention programs, including any management employment agreements, (xi) any final orders granting any "first day" or "second day" motions (but excluding retention applications), (xii) any and all motions filed on or after the Support Effective Date to reject or assume and assign an executory contract or unexpired lease and the order or orders of the Bankruptcy Court approving such motions, (xiii) any and all other material agreements, documents, motions, pleadings and orders reasonably necessary or desirable to effectuate the transactions contemplated by the Restructuring, and (xiv) in the case of each of the foregoing clauses (i) through (xiii), all material exhibits, appendices, and supplements thereto.

(d)  "*DIP Documents*" means the DIP Credit Agreement, any guaranty related thereto, any collateral and security documentation related thereto, and any material ancillary documentation related thereto.

(e)  "*Effective Date*" means the date upon which (a) no stay of the Confirmation Order is in effect, (b) all conditions precedent to the effectiveness of the Plan have been satisfied or are expressly waived in accordance with the terms thereof, as the case may be, (c) the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them, as applicable, in the Term Sheet.

transactions to occur on the Effective Date pursuant to the Plan become effective or are consummated, and (d) the substantial consummation (as defined in section 1101 of the Bankruptcy Code) of the Plan occurs.

(f) "***Exit Commitment Letter***" means the commitment letter for the DIP Credit Agreement and the Exit Credit Agreement attached to the Term Sheet.

(g) "***Exit Documents***" means the Exit Credit Agreement, the Exit Commitment Letter, any guaranty related thereto, any collateral and security documentation related thereto, and any material ancillary documentation related thereto.

(h) "***Initial Supporting Noteholders***" means each of Apollo Management Holdings, L.P., Elliott Associates, L.P. and Elliott International, L.P.

(i) [RESERVED]

(j) [RESERVED]

(k) "***Solicitation Materials***" means the ballots seeking votes to accept or reject the Plan, any notices permitting holders of claims or interests to opt into or out of any releases or exculpations, any notices of voting or non-voting status for any class of claims or interests, and any motion and proposed order for approval of the procedures governing the Solicitation.

(l) "***Support Period***" means the period commencing on the Support Effective Date and ending on the earlier of the (i) date on which this Agreement is terminated in accordance with <u>Section 6</u> and (ii) the Effective Date.

(m) "***Supporting Noteholder Counsel***" means each of Milbank LLP, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Debevoise & Plimpton LLP, each in its capacity as counsel to certain of the Supporting Noteholders.

2. <u>Bankruptcy Process; Plan of Reorganization</u>.

Subject to the terms and conditions of this Agreement and the exhibits attached hereto, during the Support Period, each Party agrees as follows:

(a) <u>Term Sheet</u>. The Term Sheet is expressly incorporated into and made a part of this Agreement. The terms and conditions of the Restructuring are set forth in the Term Sheet; *provided*, *however*, that the Term Sheet is supplemented by the terms and conditions of this Agreement. In the event of any inconsistencies between this Agreement and the Term Sheet, the terms of the Term Sheet shall govern. In the event of any inconsistencies between this Agreement and any of the Exhibits hereto, the terms of such Exhibit(s) shall govern.

(b) <u>Definitive Documents</u>. Each of the Definitive Documents, including any amendments, supplements or modifications thereof, shall (i) contain terms and conditions consistent in all material respects with this Agreement and the Plan and (ii) otherwise be in form and substance acceptable (including with respect to tax structuring and elections) to the Company and the Initial Supporting Noteholders, except that the items set forth in Sections 1(c)(xii) and

(xiii) hereof and all material exhibits, appendices, and supplements thereto shall be reasonably acceptable to the Company and the Initial Supporting Noteholders.

(c)     Filing of the Plan and Disclosure Statement.   As soon as reasonably practicable, but in no event later than November 18, 2019, the Company shall file the Plan and the Disclosure Statement with the Bankruptcy Court.

(d)     Confirmation of the Plan.  The Company shall use commercially reasonable efforts to obtain entry of the Confirmation Order as soon as reasonably practicable following October 3, 2019 (the "*Petition Date*") in accordance with the Bankruptcy Code and on terms consistent with this Agreement, including timely filing any objection or opposition to any motion filed with the Bankruptcy Court seeking the entry of an order modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a plan of reorganization.

3.     Agreements of the Supporting Creditors.

(a)     Voting; Support.   Subject to the terms and conditions of this Agreement, each Supporting Creditor, severally and not jointly, agrees that, for the duration of the Support Period, such Supporting Creditor (on a several and not joint basis) shall:

(i)     timely vote or cause to be voted its Claims, to the extent entitled to vote on the Plan, to accept the Plan by delivering its duly executed and completed ballot or ballots and consent to and, if applicable, not opt out of, the releases set forth in the Plan against each Released Party, but subject to the actual receipt by such Supporting Creditor of (a) the Disclosure Statement, approved by the Bankruptcy Court as containing "adequate information" (as such term is defined in section 1125 of the Bankruptcy Code) and the Solicitation Materials approved by the Bankruptcy Court), and (b) fifteen (15) Business Days' written notice of any voting record date and/or voting deadline;

(ii)     not change or withdraw (or cause or direct to be changed or withdrawn) any such vote or release described in clause (i) above; *provided*, *however*, that notwithstanding anything in this Agreement to the contrary, a Supporting Creditor's vote and release may, upon written notice to the Company, be revoked (and, upon such revocation, deemed void *ab initio*) by such Supporting Creditor at any time following the termination of this Agreement pursuant to the terms hereof with respect to such Supporting Creditor;

(iii)     timely vote (or cause to be voted) its Claims, to the extent entitled to vote with respect to an Alternative Restructuring, against any Alternative Restructuring (subject to such Supporting Creditor receiving at least fifteen (15) business days' written notice of any relevant voting record date and/or voting deadline);

(iv)     not take any action which would result in the occurrence of a Change of Control (as such term is defined in (i) the Indenture, dated as of November 29, 2016 (the "*1.125L Indenture*"), by and among EP Energy LLC and Everest Acquisition Finance Inc., the subsidiary guarantors party thereto and BOKF, NA, as successor trustee and notes collateral agent and (ii) the Indenture, dated as of May 23, 2018 (the "*1.25L Indenture*" and together with the 1.125L Indenture, the "*Reinstated Indentures*"), by and among EP

Energy LLC and Everest Acquisition Finance Inc., the subsidiary guarantors party thereto and UMB Bank, National Association, as successor trustee and collateral agent); *provided* that no Supporting Creditor shall be liable to any Company Entity or any other Supporting Creditor for a breach of this Section 3(a)(iv) that is solely the result of another Supporting Creditor's non-compliance with their obligations under this Agreement or the Backstop Agreement;

(v)    not directly or indirectly, through any person or entity (including any administrative agent, indenture trustee, or collateral agent), seek, solicit, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring or object to or take any other action that is inconsistent with or that would reasonably be expected to prevent, interfere with, delay, or impede the Chapter 11 Cases, Solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring;

(vi)    not direct any administrative agent, indenture trustee, or collateral agent (as applicable) to take any action inconsistent with such Supporting Creditor's obligations under this Agreement or the Plan, and, if any applicable administrative agent, indenture trustee, or collateral agent takes any action inconsistent with such Supporting Creditor's obligations under this Agreement or the Plan, such Supporting Creditor shall direct and use its commercially reasonable efforts (which shall exclude the incurrence or provision of any indemnity obligations) to cause such administrative agent, indenture trustee, or collateral agent to cease, withdraw, and refrain from taking any such action; and

(vii)    if reasonably requested by the Company, use commercially reasonable efforts to support approval of the Disclosure Statement and confirmation of the Plan by filing papers and appearing in the Bankruptcy Court in support thereof.

(b)    <u>Transfers</u>.  Each Supporting Creditor, severally and not jointly, agrees that, for the duration of the Support Period, such Supporting Creditor shall not sell, transfer, assign, pledge, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions in which any Person receives the right to own or acquire any current or future interest in) (each, a "***Transfer***"), or permit a transfer of, directly or indirectly, in whole or in part, any of its Claims or, in each case, any option thereon or any right or interest therein or any other claims against the Company (including grant any proxies, deposit any Claims into a voting trust or enter into a voting agreement with respect to any such Claims), unless the transferee thereof either (i) is a Supporting Creditor or an entity that is controlled by such Supporting Creditor or for which such Supporting Creditor acts as investment manager, advisor or subadvisor, or (ii) prior to or contemporaneously with such Transfer, agrees in writing for the benefit of the Parties to become a Supporting Creditor and to be bound by all of the terms of this Agreement applicable to Supporting Creditor (including with respect to any and all Claims it already may hold against or in the Company prior to such Transfer) by executing a joinder agreement, a form of which is attached hereto as **<u>Exhibit B</u>** (the "***Joinder Agreement***"), and delivering an executed copy thereof within five (5) Business Days following such execution, to Weil, Gotshal & Manges LLP ("***Weil***"), as counsel to the Company and Supporting Noteholder Counsel, in which event (A) the transferee (including the Supporting

Creditor transferee, if applicable) shall be deemed to be a Supporting Creditor hereunder to the extent of such transferred rights and obligations and (B) the transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations. Each Supporting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and the Company and each other Supporting Creditor shall have the right to enforce the voiding of such Transfer. Notwithstanding anything to the contrary herein, a Supporting Creditor may Transfer its Claims to an entity that is acting in its capacity as a Qualified Marketmaker[2] without the requirement that the Qualified Marketmaker become a Party; *provided*, *however*, that (x) such Qualified Marketmaker must Transfer such right, title, or interest by the earlier of (A) ten (10) calendar days following its receipt thereof and (B) if received prior to the Voting Deadline, at least seven (7) calendar days prior to the Voting Deadline, (y) any subsequent Transfer by such Qualified Marketmaker of the right, title, or interest in such Claims is to a transferee that is or becomes a Supporting Creditor at the time of such transfer, and (z) such Supporting Creditor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 3. For the avoidance of doubt, if a Supporting Noteholder, acting in its capacity as a Qualified Marketmaker, acquires a Claim from a holder of Claims that is not a Supporting Noteholder, as applicable, it may Transfer such Claim without the requirement that the transferee be or become a Supporting Noteholder. For the avoidance of doubt, to the extent that a Supporting Creditor's 1.5L Notes, Claims, or other securities issued by the Company may be loaned by such Supporting Creditor (and consequently pledged, hypothecated, encumbered, or rehypothecated by) as part of customary securities lending arrangements (each such arrangement, a "***Customary Securities Lending Arrangement***"), and such Customary Securities Lending Arrangement does not adversely affect such Party's ability to timely satisfy any of its obligations under this Agreement or the Backstop Agreement, such Customary Securities Lending Arrangement shall not be deemed a Transfer hereunder.

(c)     Additional Claims.  This Agreement shall in no way be construed to preclude the Supporting Creditors from acquiring additional Claims or transferring Claims in accordance with this Section 3, and during the Support Period to the extent any Supporting Creditor acquires additional Claims, then each such Supporting Creditor shall promptly notify Weil and Supporting Noteholder Counsel. Each such Supporting Creditor agrees, severally and not jointly, that such additional Claims shall be subject to this Agreement and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 3(a) hereof, in each case other than with respect to any Claims acquired by such Supporting Noteholder in its capacity as a Qualified Marketmaker.

---

[2]     As used herein, the term "***Qualified Marketmaker***" means an entity that (i) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Claims against the Company (or enter with customers into long and short positions in Claims against the Company), in its capacity as a dealer or marketmaker in Claims against the Company and (ii) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

WEIL:\97235493\2\42780.0003

(d)    <u>Additional Parties</u>.  Any 1.5L Noteholder may, at any time after the occurrence of the Support Effective Date, become a party to this Agreement as a Supporting Noteholder (an "***Additional Supporting Noteholder***", or an "***Additional Supporting Creditor***"), by executing a Joinder Agreement, pursuant to which such Additional Supporting Creditor shall be bound by the terms of this Agreement as a Supporting Creditor hereunder, and delivering such Joinder Agreement to Weil and Supporting Noteholder Counsel.

(e)    <u>D&O Claims</u>.  Regardless of whether the Bankruptcy Court approves the releases by the Supporting Creditors that are set forth in the Term Sheet in favor of the Released Parties (the "***Third-Party Releases***"), but subject to the occurrence of the Effective Date, each Supporting Creditor hereby (i) grants such releases in favor of the current and former directors and officers of EP Parent and (ii) agrees not to pursue any claims that such Supporting Creditor may currently have against the current and former directors and officers of EP Parent and each of its subsidiaries.

(f)    <u>Stock Transfer Restriction and Tax Attribute Protection Motions</u>.  Each Supporting Noteholder, severally and not jointly, agrees not to transfer any Existing Equity Interests for the duration of the Support Period in any manner that would change the ownership of such Existing Equity Interests for purposes of section 382 of the Internal Revenue Code of 1986, as amended (the "***Tax Code***") without the prior consent of the Company not to be unreasonably withheld, conditioned, or delayed.  Each Supporting Noteholder further agrees to support the final approval of the Stock Procedures (as defined in the *Emergency Motion of Debtors to Establish Notification Procedures and Approving Restrictions on Certain Transfers of Stock of, and Claims Against, Debtors* (Ch. 11 Case No. 19-35654, Docket No. 6) (the "***NOL Motion***")).  The Debtors shall not seek a hearing on or approval of the Claims Procedures (as defined in the NOL Motion); *provided*, that the foregoing shall not affect the Supporting Noteholders' right to object to the NOL Motion following the end of the Support Period.

(g)    <u>New Corporate Governance Documents</u>.  The Supporting Noteholders, severally and not jointly, agree to provide drafts of the New Corporate Governance Documents through the Supporting Noteholder Counsel to Weil no later than fifteen (15) Business Days before the Voting Deadline.

(h)    <u>[RESERVED]</u>

(i)    <u>Rights Unaffected</u>.  Notwithstanding anything herein to the contrary, nothing contained in this Agreement shall limit:

(i)    the rights of the Supporting Creditors under any applicable bankruptcy, insolvency, foreclosure, or similar proceeding, including, without limitation, appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not in violation of or inconsistent with such Supporting Creditor's obligations hereunder;

(ii)      the ability of a Supporting Creditor to purchase, sell, or enter into any transactions in connection with its Claims or Interests, including 1.5L Notes, subject to the terms hereof and applicable law;

(iii)     except as expressly provided herein, any right of a Supporting Noteholder under (A) the 1.5L Notes Indenture, or constitute a waiver or amendment of any provisions of the 1.5L Notes Indenture or (B) any other applicable agreement, instrument, or document that gives rise to a Supporting Noteholder's Claims or Interests, as applicable, or constitute a waiver or amendment of any provision of any such agreement, instrument, or document;

(iv)     the ability of a Supporting Noteholder to consult with other Supporting Creditors, other holders of Claims against or equity interests in the Company, or the Company;

(v)      [RESERVED]; or

(vi)     the ability of a Supporting Creditor to enforce any right, remedy, condition, consent, or approval requirement under this Agreement or any Definitive Document.

4.      Agreements of the Parties.

(a)      Covenants.  Each Party, severally and not jointly, agrees that, for the duration of the Support Period, such Party shall use its commercially reasonable efforts to:

(i)      take all commercially reasonable actions necessary to (i) support and consummate the Restructuring contemplated by the Term Sheet and all of the transactions contemplated herein, (ii) cooperate with each other in good faith in connection with, and shall exercise commercially reasonable efforts with respect to the pursuit, approval, negotiation, execution, delivery, implementation, and consummation of the Plan and the Restructuring, as well as the negotiation, drafting, execution and delivery of the Definitive Documents, and (iii) take such action as may be reasonably necessary or reasonably requested by the other Parties to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings, and refrain from taking any action that would frustrate the purposes and intent of this Agreement; and

(ii)     provide reasonably prompt written notice (in accordance with Section 19 hereof) to the Company and Supporting Noteholder Counsel between the date hereof and the Effective Date of (A) the occurrence, or failure to occur, of any event of which any person in a managing capacity of such Party has actual knowledge, and which occurrence or failure would be likely to cause any covenant of such Party contained in this Agreement not to be satisfied in any material respect or (B) any failure of such Party to comply, in any material respect, with or satisfy any covenant, condition or agreement to be complied with or satisfied by it under this Agreement or the Backstop Agreement.

(b)    <u>Hedging</u>.    The Company shall consult with the Initial Supporting Noteholders on any material changes to its hedging program.

5.    <u>Agreements of the Company</u>.

(a)    <u>Covenants</u>.  Each Company Entity (jointly and severally) agrees that, for the duration of the Support Period, each such Company Entity shall:

(i)    use commercially reasonable efforts to obtain any and all required governmental, regulatory and/or third party approvals necessary or required for the implementation or consummation of the Restructuring or the approval by the Bankruptcy Court of the Definitive Documents;

(ii)    not take any action, or support, encourage or direct any other person or entity to take any action, that is inconsistent with, or is intended or is reasonably likely to interfere with, consummation of the Restructuring (including to propose, file, seek, solicit, or support any Alternative Restructuring), in each case, to the extent consistent with, upon the advice of counsel, the fiduciary duties of the boards of directors, managers, members, or partners, as applicable, of the Company; *provided*, *however*, that the Company shall not be obligated to agree to any modification of any document that is inconsistent with this Agreement;

(iii)    provide draft copies of all Definitive Documents and any other material motions or applications and other material documents related to the Restructuring (including, but not limited to, any proposed final orders granting "first day" and "second day" motions (but excluding retention applications), the Plan, the Disclosure Statement, ballots, and other Solicitation materials in respect of the Plan and any proposed amended version of the Plan or the Disclosure Statement, and a proposed Confirmation Order and amended versions of any of the foregoing) the Company intends to file with the Bankruptcy Court to Supporting Noteholder Counsel, if reasonably practicable, at least two (2) Business Days prior to the date when the Company intends to file any such pleading or other document (provided that if delivery of such motions, orders, or materials at least two (2) Business Days in advance is not reasonably practicable prior to filing, such motion, order, or material shall be delivered as soon as reasonably practicable prior to filing), and shall consult in good faith with Supporting Noteholder Counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court; *provided*, that the Company Parties shall not file any pleading or other document unless such pleading or other document is consistent with this Agreement;

(iv)    subject to professional responsibilities of counsel, timely file with the Bankruptcy Court a written objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order or relief (A) directing the appointment of an examiner with expanded powers or a trustee, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing any of the Chapter 11 Cases, (D) modifying or terminating the Company's exclusive right to file and/or solicit acceptances of a chapter 11 plan, or (E) that (1) is inconsistent with this Agreement in any

WEIL:\97235493\2\42780.0003

material respect or (2) would, or would reasonably be expected to, frustrate the purposes of this Agreement, including by preventing the consummation of the Restructuring;

(v)     not modify the Plan or any other Definitive Documents, in whole or in part, in a manner that is inconsistent with this Agreement or not in form and substance acceptable to the Initial Supporting Noteholders;

(vi)     not seek relief or request any order from the Bankruptcy Court requiring any Initial Supporting Noteholder to sell, cause to sell, or otherwise transfer a specified amount of its beneficial ownership of Claims, for purposes of section 382(l)(5) of the Tax Code or otherwise, without the affirmative consent of such Initial Supporting Noteholder;

(vii)     consent to the sale or other disposition during the 2019 calendar year (including by abandonment to a state or governmental authority) of the Existing Equity Interests in the Company owned by Texas Oil & Gas Holdings LLC (31,276,726 shares), AI Energy Holdings LLC (3,556,387 shares) and ALTEP 2014 LP (109,991 shares), and, in the event of any Official Committee of Unsecured Creditors objects to such disposition, exercise reasonable best efforts to obtain approval by the Bankruptcy Court of such disposition; *provided*, that Access shall reasonably cooperate with the Debtors to provide any information reasonably requested related to any stock ownership analysis under section 382 of the Tax Code;

(viii)     execute and deliver any other required agreements to effectuate and consummate the Restructuring; and

(ix)     support and consummate the Restructuring in accordance with this Agreement within the time-frames contemplated under this Agreement.

(b)     Automatic Stay.  The Company acknowledges and agrees and shall not dispute that the giving of any notices, including notices of termination by any Party pursuant to this Agreement, shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the fullest extent permitted by law, the applicability of the automatic stay to the giving of such notice); *provided*, *however*, that nothing herein shall prejudice any Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

(c)     Nothing in this Agreement shall require any director or officer of a Company Entity to take any action or inaction that would be, based on the advice of counsel, inconsistent with their fiduciary duties to such Company Entity.  No action or inaction on the part of any director or officer of any Company Entity that such officer or director believes is, based on the advice of counsel, consistent, their fiduciary duties shall be limited or precluded by this Agreement; *provided*, that no such action or inaction shall be deemed to prevent the Initial Supporting Noteholders from taking actions they are permitted to take as a result of such actions or inactions, including terminating their obligations hereunder, and neither the Company nor any Supporting Creditor that is affiliated with such officer or director shall be in violation of this Agreement by virtue of such individual taking, or refraining from taking, any such action, so long

WEIL:\97235493\2\42780.0003

as any such action is consistent with the fiduciary obligations of the Company under applicable law (as determined by the Company after consultation with counsel).

(d)     Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Company, or the Supporting Creditors, or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the same or their respective affiliated entities, in such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of such Party or its affiliated entities, that such entities did not have prior to the execution of this Agreement.

6.     <u>Termination of Agreement</u>.

(a)     This Agreement shall terminate three (3) Business Days following the delivery of written notice (in accordance with <u>Section 19</u> hereof) from (i) the Initial Supporting Noteholders to EP Parent at any time after and during the continuance of any Supporting Noteholder Termination Event (as defined below), or (ii) EP Parent to the other Parties at any time after the occurrence and during the continuance of any Company Termination Event (as defined below).  Notwithstanding any provision to the contrary in this <u>Section 6</u>, no Party may exercise any of its respective termination rights as set forth herein if such Party has failed to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's actions or inactions), with such failure to perform or comply causing, or resulting in, the occurrence of the applicable Supporting Noteholder Termination Event or Company Termination Event giving rise to such termination right; *provided*, that nothing in this sentence shall limit the termination rights of any Party pursuant to Section 6(c)(viii) or 6(d)(vii).  This Agreement shall automatically terminate, without any further required action or notice, unless the Bankruptcy Court has entered an order or orders, in form and substance acceptable to the Company, on the one hand, and the Initial Supporting Noteholders, on the other hand, approving the Backstop Agreement as of November 18, 2019 (*provided*, that if the Bankruptcy Court is unable to hear or fully consider the motion to approve the Backstop Agreement on November 12, 2019, then November 25, 2019), unless otherwise extended in accordance with the terms of the Backstop Agreement.  If not terminated on an earlier date, then this Agreement shall automatically terminate, without any further required action or notice, upon the occurrence of the Effective Date.

(b)     [RESERVED]

(c)     A "Supporting Noteholder Termination Event" shall mean any of the following:

(i)     if, as of October 25, 2019, the Required Lenders (as defined in that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified or otherwise supplemented from time to time) by and among EP Energy LLC, as borrower, EPE Acquisition, LLC, JPMorgan Chase Bank, N.A., as administrative

agent and as collateral agent, have not provided the Company with an executed Exit Commitment Letter;

(ii)     if, as of 11:59 p.m. prevailing Eastern time on October 18, 2019, the Company has not filed a motion seeking approval of the Backstop Agreement;

(iii)     if, as of November 18, 2019 (*provided*, that if the Bankruptcy Court is unable to hear or fully consider the motion to approve the Backstop Agreement on November 12, 2019, then November 25, 2019), the Bankruptcy Court has not entered a final order or orders, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, approving the Backstop Agreement.

(iv)     if, as of December 2, 2019, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, authorizing and approving the DIP Facility, the Exit Commitment Letter and the Debtors' use of cash collateral.

(v)     if, as of January 8, 2020, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, approving the Disclosure Statement;

(vi)     if, as of January 8, 2020, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, approving the Rights Offering Procedures;

(vii)     if, as of February 28, 2020, the Bankruptcy Court has not entered a final order, in form and substance mutually satisfactory to the Company and the Initial Supporting Noteholders, confirming the Plan; *provided* that if the Bankruptcy Court has commenced a hearing on confirmation of the Plan as of February 28, 2020, such date shall automatically extend to March 16, 2020, *provided, further*, that each such date shall be automatically extended one (1) Business Day for each Business Day that the Supporting Noteholders fail to deliver drafts of the New Corporate Governance Documents to Weil in accordance with the deadlines set forth in Section 3(g) hereof;

(viii)     if, as of March 19, 2020, the Effective Date has not occurred;

(ix)     the Backstop Agreement is terminated in accordance with its terms;

(x)     the occurrence of any material breach of this Agreement by the Company that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 19 (as applicable);

(xi)     the amendment or modification of this Agreement, the Rights Offering Procedures, the Plan, the Disclosure Statement or any documents related to the Plan, notices, exhibits or appendices, or any of the Definitive Documents without the consent of the Initial Supporting Noteholders;

(xii)    any of the orders approving, the Backstop Agreement, the Rights Offering Procedures, the Disclosure Statement, or the Plan are reversed, dismissed, stayed, vacated or reconsidered or modified or amended without the consent of the Initial Supporting Noteholders;

(xiii)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and either (A) such ruling, judgment, or order has been issued at the request of or with the acquiescence of the Company, or (B) in all other circumstances, such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) Business Days after such issuance;

(xiv)    the Bankruptcy Court enters an order (A) directing the appointment of a trustee in any of the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Case of any of the Debtors other than the Company, or (D) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases;

(xv)    any Company Entity makes any filing in support of, enters into an agreement with respect to, or announces its support for any Alternative Restructuring or that it will file any plan of reorganization other than the Plan, or files any motion or application seeking authority to sell any material assets (other than as provided for in the Plan), without the prior written consent of the Initial Supporting Noteholders;

(xvi)    the breach in any material respect by the Company of any of the undertakings, representations, warranties or covenants of the Company set forth herein which remains uncured for a period of five (5) business days after the receipt of written notice of such breach from the Initial Supporting Noteholders pursuant to this Section 6 and in accordance with Section 19 (as applicable), which notice period shall run concurrently with the notice of termination of this Agreement set forth above;

(xvii)    a determination is made with respect to any Company Entity that its continued support of the Restructuring would be inconsistent with its fiduciary obligations under applicable law;

(xviii)   entry of an order by the Bankruptcy Court terminating the Company's exclusive right to file a plan of reorganization pursuant to section 1121 of the Bankruptcy Code or if the Company loses such right because (A) the Company fails to make a timely motion to extend the exclusivity period and exclusivity lapses or (B) the Bankruptcy Court denies the Company's motion to extend the exclusivity period;

(xix)    any court of competent jurisdiction has entered a judgment or order declaring this Agreement or the Backstop Agreement to be unenforceable;

(xx)    any of the following shall have occurred: (i) the Company shall have filed any motion, application, adversary proceeding, or cause of action (A) challenging the

WEIL:\97235493\2\42780.0003

validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of any of the Claims of the Supporting Noteholders, or any of the liens securing the Claims of the Supporting Noteholders, or (B) otherwise seeking to impose liability upon or enjoin the Supporting Noteholders (other than with respect to a breach of this Agreement); or (ii) the Company shall have supported any motion, application, adversary proceeding or cause of action referred to in the immediately preceding clause (i) filed by a third party, or affirmatively consents (without the consent of the Initial Supporting Noteholders) to the standing of any such third party to bring such application, adversary proceeding or cause of action; or

(xxi)    failure to conduct the Rights Offering in accordance with the Backstop Agreement and the Rights Offering Procedures.

(d)    A "*Company Termination Event*" shall mean any of the following:

(i)    [RESERVED]

(ii)    the breach by one or more of the Supporting Noteholders of any of the undertakings, representations, warranties, or covenants of the Supporting Noteholders set forth herein in any material respect that remains uncured for a period of five (5) Business Days after the receipt of written notice of such breach pursuant to this Section 6 and in accordance with Section 19 hereof (as applicable), but only if the non-breaching Supporting Noteholders hold less than 66.67% of the aggregate principal amount of 1.5L Notes;

(iii)    the board of directors (or any committee having appropriate authority thereof), managers, members, or partners or general partner, as applicable, of any Company Entity party hereto reasonably determines in good faith based upon the advice of counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under applicable law; *provided*, *however*, that such Company Entity provides notice of such determination to the Supporting Creditors within five (5) Business Days after the date thereof;

(iv)    [RESERVED]

(v)    the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment, or order enjoining the consummation of or rendering illegal the Plan or the Restructuring, and such ruling, judgment, or order has not been stayed, reversed, or vacated within fifteen (15) Business Days after such issuance;

(vi)    the Bankruptcy Court enters an order (A) directing the appointment of a trustee in the Chapter 11 Cases, (B) converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing the Chapter 11 Case of any of the Debtors other than the Company; or (D) directing the appointment of a trustee, receiver, or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in any of the Chapter 11 Cases; or

(vii)    if, as of March 19, 2020, the Effective Date has not occurred.

(e)    <u>Certain Extensions of Time</u>.  Notwithstanding anything to the contrary herein, any of the dates or deadlines set forth in

(i)    <u>Sections 6(a)</u> and <u>6(d)</u> above may be extended by written agreement (with email from counsel being sufficient) of the Company and the Initial Supporting Noteholders,

(ii)    [RESERVED]; and

(iii)    <u>Section 6(c)</u> above may be extended by written agreement (with email from counsel being sufficient) of the Company and the Initial Supporting Noteholders.

(f)    <u>Mutual Termination</u>.  This Agreement may be terminated by mutual agreement of the Company and the Initial Supporting Noteholders upon the receipt and acknowledged acceptance (whether oral or by electronic mail) of written notice delivered in accordance with <u>Section 19</u> hereof.

(g)    <u>Effect of Termination</u>.

(i)    Subject to the provisions contained in <u>Section 6(a)</u> and <u>Section 13</u> hereof, upon the termination of this Agreement in accordance with this <u>Section 6</u>, this Agreement shall forthwith become null and void and of no further force or effect and each Party shall, except as provided otherwise in this Agreement, be immediately released from its liabilities, obligations, commitments, undertakings, and agreements under or related to this Agreement and shall have all the rights and remedies that it would have had and shall be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law and, with respect to the Supporting Noteholders, the 1.5L Indentures; *provided*, *however*, that in no event shall any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(ii)    If this Agreement is terminated at a time when permission of the Bankruptcy Court is required for the Supporting Creditors to terminate or cause the termination of, this Agreement, the Company shall not oppose any attempt by the Supporting Creditors to terminate, or cause the termination of, this Agreement at such time, *provided*, *however*, the Company may contest whether the Agreement has been validly terminated.  Notwithstanding anything to the contrary herein, (A) the Company acknowledges and agrees that following the Petition Date, if this Agreement has been validly terminated, then all votes by the Supporting Creditors to accept the Plan and opt in to or not opt out of the releases shall, upon written notice to the Company, be revoked, null and void; and (B) all Parties acknowledge that valid termination of this Agreement would be an occurrence of the type that constitutes "cause" under Bankruptcy Rule 3018.  The foregoing sentence shall survive termination of this Agreement.

WEIL:\97235493\2\42780.0003

(h)     If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights.  Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party, or the ability of any Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

7.     <u>Representations and Warranties</u>.

(a)     Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct, and complete as of the date hereof (or as of the date a Supporting Creditor becomes a party hereto):

(i)     such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company, or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(ii)     the execution, delivery, and performance by such Party of this Agreement does not and will not (A) violate its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries or any material provision of law, rule, or regulation applicable to it or any of its subsidiaries or (B) conflict with, result in a breach of, or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it or any of its subsidiaries is a party except, in the case of the Company, for the filing of the Chapter 11 Cases;

(iii)     the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or filing with, consent or approval of, or notice to, or other action, with or by, any federal, state or governmental authority or regulatory body, except such filings as may be necessary and/or required by the SEC or other securities regulatory authorities under applicable securities laws; and

(iv)     this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of the Bankruptcy Court.

(v)     it has no actual knowledge of any event that, due to any fiduciary or similar duty to any other Person or Entity, would prevent it from taking any action required of it under this Agreement.

WEIL:\97235493\2\42780.0003

(b)      Each Supporting Creditor severally (and not jointly) represents and warrants to the other Parties that, as of the date hereof (or as of the date such Supporting Creditor becomes a party hereto), such Supporting Creditor (i) is the beneficial owner of the aggregate principal amount of (x) the Claims set forth below its name on the signature page hereto (or below its name on the signature page of a Joinder Agreement for any Additional Supporting Creditor), or (y) is the nominee, investment manager, advisor, or subadvisor for one or more beneficial holders thereof, or (ii) has, with respect to the beneficial owners of such Claims, (A) sole investment or voting discretion with respect thereto, (B) full power and authority to vote on and consent to matters concerning such Claims or to exchange, assign, and Transfer such Claims, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

(c)      Each Supporting Noteholder severally (and not jointly) makes the representations and warranties set forth in Section 20(c) hereof, and in each case, to the other Parties.

(d)      Each Supporting Noteholder severally (and not jointly) represents and warrants to the other Parties that such Supporting Noteholder has not taken any action which would result in the occurrence of a Change of Control (as such term is defined in the Reinstated Indentures), *provided* that no Supporting Creditor shall be liable to any Company Entity or any other Supporting Creditor for a breach of this Section 3(a)(iv) that is solely the result of another Supporting Creditor's non-compliance of their obligations under this Agreement or the Backstop Agreement.

8.      Disclosure; Publicity.

The Company shall submit drafts to Supporting Noteholder Counsel of any press releases that constitute disclosure of the existence of the terms of this Agreement or any amendment to the terms of this Agreement at least (1) Business Day prior to making any such disclosure. Except as required by applicable law or otherwise permitted under the terms of any other agreement between the Company and any Supporting Creditor, no Party or its advisors shall disclose to any person or entity (including, for the avoidance of doubt, any other Party), other than advisors to the Company, the principal amount or percentage of any 1.5L Notes held by any Supporting Noteholder without such Supporting Noteholder's consent; *provided*, *however*, that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, the disclosing Party shall afford the relevant Supporting Creditor a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure (the expense of which, if any, shall be borne by the Supporting Creditor) and (ii) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of 2024 Notes and 2025 Notes held by all Supporting Noteholders, collectively, on a tranche by tranche basis. Notwithstanding the provisions in this Section 8, any Party may disclose, to the extent consented to in writing by a Supporting Creditor, such Supporting Creditor's individual holdings. The Supporting Noteholders that are affiliates of Apollo Management Holdings, L.P. (the "***Apollo Funds***") consent to the disclosure of the aggregate percentage and aggregate principal amount of 2024 Notes and 2025 Notes held collectively by the Apollo Funds in any reports filed or furnished by the Company or any of its subsidiaries with the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder or the Securities Act.

9.      <u>Amendments and Waivers</u>.

(a)      Other than as set forth in <u>Section 9(b)</u>, this Agreement, including any exhibits or schedules hereto, may not be waived, modified, amended, or supplemented except with the written consent of the Company and the Initial Supporting Noteholders (such consent not to be unreasonably withheld, conditioned, or delayed).

(b)      Notwithstanding <u>Section 9(a)</u>:

(i)      any waiver, modification, amendment, or supplement to this <u>Section 9</u> shall require the written consent of all of the Parties;

(ii)      any modification, amendment, or change to the definition of "Initial Supporting Noteholders" shall require the written consent of each Initial Supporting Noteholder and the Company;

(iii)      any change, modification, or amendment to this Agreement or the Plan that treats or affects any Supporting Noteholder in a manner that is materially and adversely disproportionate to the manner in which any other Supporting Noteholder is treated (after taking into account each of such Supporting Noteholder's respective holdings in the Company and the recoveries contemplated by the Plan) shall require the written consent of such materially adversely and disproportionately affected Supporting Noteholder.

(iv)      [RESERVED]

(v)      [RESERVED]

(c)      In the event that a materially adversely and disproportionately affected Supporting Noteholder other than Access or Avenue (such affected Supporting Noteholder, a "***Nonconsenting Creditor***") does not consent to a waiver, change, modification, or amendment to this Agreement requiring the consent of each Supporting Noteholder, as applicable, but such waiver, change, modification, or amendment receives the consent of the Initial Supporting Noteholders, then the Company and such Initial Supporting Noteholders may elect to terminate this Agreement as to each such Nonconsenting Creditor (excluding, for the avoidance of doubt, Access and Avenue) and this Agreement shall continue in full force and effect with respect to all other Supporting Creditors from time to time.

10.      <u>Effectiveness</u>.

This Agreement shall become effective and binding upon each Party upon the date (the "***Support Effective Date***") on which each of the Initial Supporting Noteholders has executed and delivered to the Company a signature page hereto; *provided*, however, that signature pages executed by any Supporting Creditors shall be delivered to (i) the other Supporting Creditors in a redacted form that removes such Supporting Creditors' individual holdings and (ii) the Company,

WEIL:\97235493\2\42780.0003

Weil, and Supporting Noteholder Counsel in an unredacted form (to be held by Weil and Supporting Noteholder Counsel on a "professionals' eyes only" basis).

      11.     GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.

      (a)     This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York without giving effect to the conflict of laws principles thereof.

      (b)     Each of the Parties irrevocably agrees that any legal action, suit, or proceeding arising out of or relating to this Agreement brought by any Party shall be brought and determined in any federal or state court in the Borough of Manhattan in the City of New York ("*NY Courts*") and each of the Parties hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such proceeding arising out of or relating to this Agreement or the Restructuring. Each of the Parties agrees not to commence any proceeding arising out of or relating to this Agreement or the Restructuring except in the NY Courts, other than proceedings in any court of competent jurisdiction to enforce any judgment, decree, or award rendered by any NY Courts. Each of the Parties further agrees that notice as provided in Section 19 shall constitute sufficient service of process and the Parties further waive any argument that such service is insufficient. Each of the Parties hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any proceeding arising out of or relating to this Agreement or the Restructuring, (i) any claim that it is not personally subject to the jurisdiction of the NY Courts for any reason, (ii) that it or its property is exempt or immune from jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment, or otherwise) and (iii) that (A) the proceeding in any such court is brought in an inconvenient forum, (B) the venue of such proceeding is improper, or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Notwithstanding the foregoing, during the pendency of the Chapter 11 Cases, all proceedings contemplated by this Section 11(b) shall be brought in the Bankruptcy Court.

      (c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY). EACH PARTY (I) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (II) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

12.    <u>Specific Performance/Remedies</u>.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement (but not any agreements attached as exhibits hereto, the remedies for which shall be set forth in such applicable exhibits) by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief (including attorneys' fees and costs) as a remedy of any such breach, without the necessity of proving the inadequacy of money damages as a remedy, including an order of the Bankruptcy Court requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief.

13.    Survival.

Notwithstanding the termination of this Agreement pursuant to <u>Section 6</u> hereof, the agreements and obligations of the Parties in this <u>Section 13</u> and <u>Sections 3(e)</u>, <u>6(g)</u>, <u>8</u>, <u>11</u>, <u>12</u>, <u>14</u> <u>15</u>, <u>16</u>, <u>17</u>, <u>18</u>, <u>19</u>, <u>20</u>, <u>21</u> (in the case of fees and expenses incurred prior to such termination), and <u>22</u> through <u>26</u> hereof (and any defined terms used in any such Sections) shall survive such termination and shall continue in full force and effect in accordance with the terms hereof; *provided*, *however*, that any liability of a Party for failure to comply with the terms of this Agreement shall survive such termination.

14.    <u>Headings</u>.

The headings of the sections, paragraphs, and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.  The recitals to this Agreement are true and correct and incorporated by reference into this <u>Section 14</u>.

15.    <u>Successors and Assigns; Severability; Several Obligations</u>.

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors, permitted assigns, heirs, executors, administrators and representatives; *provided*, *however*, that nothing contained in this <u>Section 15</u> shall be deemed to permit Transfers of the Claims arising under the 1.5 Notes or otherwise, other than in accordance with the express terms of this Agreement.  If any provision of this Agreement or the exhibits attached hereto, or the application of any such provision to any person or entity or circumstance, shall be held invalid, unenforceable, void, or violative of applicable law, in each case in whole or in part, such invalidity, unenforceability, violability or violation shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party; *provided*, that this provision shall not operate to waive any condition precedent to any event set forth herein.  Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations, and obligations of the Supporting Creditors

under this Agreement are, in all respects, ratable and several and neither joint nor joint and several. Any breach of this Agreement by a Supporting Creditor shall not result in liability for any other Supporting Creditor.  The Supporting Creditors are acting in their individual capacities and not as agent or trustee, or in any other fiduciary capacity, with respect to any other Supporting Creditor or any other party.

16.      No Third-Party Beneficiaries.

Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof or shall otherwise be entitled to enforce any provision hereof.

17.      Prior Negotiations; Entire Agreement.

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties and supersedes all other prior negotiations, with respect to the subject matter hereof and thereof, except that the Parties acknowledge that any confidentiality agreements (if any) heretofore executed between the Company and each Supporting Creditor shall continue in full force and effect.

18.      Counterparts.

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this Agreement may be delivered by electronic mail, or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

19.      Notices.

All notices hereunder shall be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses:

If to the Company, to:

EP Energy Corporation
1001 Louisiana Street
Houston, Texas 77002
Attn:   Jace D. Locke
jace.locke@epenergy.com

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attn:   Matt Barr (matt.barr@weil.com)

WEIL:\97235493\2\42780.0003

Alfredo R. Perez (alfredo.perez@weil.com)
Ronit J. Berkovich (ronit.berkovich@weil.com)

If to a Supporting Noteholder:

To the notice and copy (if any) addresses specified on such Supporting Noteholder's signature page to this Agreement.

Any notice given by delivery, mail, or courier shall be effective when received.  Any notice given by e-mail shall be effective upon oral, machine, or e-mail (as applicable) confirmation of transmission.

20.    <u>No Solicitation; Representation by Counsel; Adequate Information</u>.

(a)    Notwithstanding any other provision herein, this Agreement is not and shall not be deemed to be a solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation will be made only in compliance with all applicable securities laws and provisions of the Bankruptcy Code.  The acceptances of the Supporting Creditor with respect to the Plan will not be solicited until such Supporting Creditor has received the Disclosure Statement and Solicitation Materials.  In addition, this Agreement is not and shall not be deemed an offer with respect to the issue or sale of securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful.

(b)    Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel shall have no application and is expressly waived.

(c)    Each Supporting Creditor acknowledges, agrees, and represents to the other Parties that it (i) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (ii) is an "accredited investor" as such term is defined in Rule 501 of the Securities Act, (iii) understands that if it is to acquire any securities, as defined in the Securities Act, pursuant to the Restructuring, such securities have not been registered under the Securities Act and that such securities are, to the extent not acquired pursuant to section 1145 of the Bankruptcy Code, being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Supporting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, (iv) will not acquire any securities pursuant to the Restructuring as a result of any form of general solicitation or general advertising, and (v) has such knowledge and experience in financial and business matters that such Supporting Creditor, is capable of evaluating the merits and risks of the securities to be acquired by it (if any) pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

WEIL:\97235493\2\42780.0003

21.     [RESERVED]

22.     Severability and Construction.

If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

23.     Reservation of Rights; Settlement Discussions.

This Agreement and the Restructuring are part of a proposed settlement of a dispute among the Parties. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and the exhibits attached hereto and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement or the exhibits attached hereto (as applicable).

24.     No Strict Construction.

Each Party acknowledges that it has received adequate information to enter into this Agreement, and that this Agreement and the exhibits attached hereto have been prepared through the joint efforts of all of the Parties. Neither the provisions of this Agreement or the exhibits attached hereto nor any alleged ambiguity herein or therein shall be interpreted or resolved against any Party on the ground that such Party's counsel drafted this Agreement or the exhibits attached hereto, or based on any other rule of construction.

25.     Remedies Cumulative; No Waiver.

All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party. The failure of any Party hereto to exercise any right, power, or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon strict compliance by any other Party hereto with its obligations hereunder, and any custom or practice of the parties at variance with the terms hereof, shall not constitute a waiver by such Party of its right to exercise any such or other right, power, or remedy or to demand such strict compliance.

26.     Relationship Among Parties.

(a)     Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary hereof. No Party shall have any responsibility for any trading by any other entity by virtue of this Agreement. No prior history, pattern or practice of sharing confidences among or between the Parties shall in any way affect or negate this understanding and agreement. The Parties have no agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting or

disposing of any equity securities of the Company and do not constitute a "group" within the meaning of Rule 13d-5 under the Securities Exchange Act of 1934, as amended.

[*Signature pages follow.*]

25

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**EP ENERGY CORPORATION**
**EVEREST ACQUISITION, LLC**
**EP ENERGY, LLC**
**EVEREST ACQUISITION FINANCE INC.**
**EP ENERGY GLOBAL LLC**
**EP ENERGY MANAGEMENT, L.L.C.**
**EP ENERGY RESALE COMPANY, L.L.C.**
**EP ENERGY E&P COMPANY, L.P.**


By: _____
    Name: Jace D. Locke
    Title:   Vice President & General Counsel

*[Signature Page to Plan Support Agreement]*

**Supporting 1.5L Noteholder**

**AOP VII (EPE INTERMEDIATE), L.P.**

By: Apollo Advisors VII, L.P., its general partner

By: Apollo Capital Management VII, LLC, its general partner

By: _____
       Name: Laurie D. Medley
       Title:  Vice President


**ANRP (EPE INTERMEDIATE), L.P.**

By: Apollo ANRP Advisors, L.P., its general partner

By: Apollo ANRP Capital Management, LLC, its general partner

By: _____
       Name: Laurie D. Medley
       Title:  Vice President


**ANRP (CORP AIV), L.P.**

By: Apollo ANRP Advisors, L.P., its general partner

By: Apollo ANRP Capital Management, LLC, its general partner

By: _____
       Name: Laurie D. Medley
       Title:  Vice President


**APOLLO INVESTMENT FUND VII, L.P.**

By: Apollo Advisors VII, L.P., its general partner

By: Apollo Capital Management VII, LLC, its general partner

By: _____
       Name: Laurie D. Medley
       Title:  Vice President

**APOLLO OVERSEAS PARTNERS (DELAWARE 892) VII, L.P.**

By: Apollo Advisors VII, L.P., its general partner

By: Apollo Capital Management VII, LLC, its general partner

By: _____
  Name: Laurie D. Medley
  Title:   Vice President


**APOLLO INVESTMENT FUND (PB) VII, L.P.**

By: Apollo Advisors VII, L.P., its general partner

By: Apollo Capital Management VII, LLC, its general partner

By: _____
  Name: Laurie D. Medley
  Title:   Vice President


Principal Amount of 2024 1.5L Notes: ■■■■■■

Principal Amount of 2025 1.5L Notes: ■■■■■■

All other Claims: <u>Principal Amount of 2024 1.25L Notes:</u> ■■■■■


Notice Address:

Apollo Global Management
9 West 57th Street
New York, NY 10019
Attn: General Counsel

With a copy to:

Paul, Weiss, Rifkind, Wharton & Garrison, LLP
1285 A venue of the Americas
New York, NY 10019
Attn: Jeffrey D. Saferstein


*[Signature Page to Plan Support Agreement]*

**Supporting 1.5L Noteholder**

**Elliott International, L.P.**
By: Hambledon, Inc., its General Partner
By: Elliott International Capital Advisors Inc., as Attorney-in-Fact

By: _____
Name:   Elliot Greenberg
Title:    Vice President

Principal Amount of 2024 1.25L Notes:  $█████████

Principal Amount of 2024 1.5L Notes:  $█████████

Principal Amount of 2025 1.5L Notes:  $█████████

All other Claims:_____

Notice Address:

c/o Elliott Management Corporation
40 West 57th Street, 4th Floor
New York, NY  10019
Name:  Elliot Greenberg and Rajat Bose
Facsimile:  212-478-2371 and 212-478-2366
Email address:  egreenberg@elliottmgmt.com and rbose@elliottmgmt.com

**Supporting 1.5L Noteholder**

**Elliott Associates, L.P.**
By: Elliott Capital Advisors, L.P., General Partner
By: Braxton Associates, Inc., General Partner

By: _____

Name:   Elliot Greenberg

Title:    Vice President

Principal Amount of 2024 1.25L Notes:  $ ███████

Principal Amount of 2024 1.5L Notes:  $ ███████

Principal Amount of 2025 1.5L Notes:  $ ███████

All other Claims:_____

Notice Address:

c/o Elliott Management Corporation
40 West 57th Street, 4th Floor
New York, NY  10019
Name:  Elliot Greenberg and Rajat Bose
Facsimile:  212-478-2371 and 212-478-2366
Email address:  egreenberg@elliottmgmt.com and rbose@elliottmgmt.com

**Supporting Creditor**

AI FQ HOLDINGS LLC
By:      Access Industries Management, LLC
         Its Manager

By: _____
Name:        Lincoln Benet
Title:        President


By: _____
Name:        Alejandro Moreno
Title:        Executive Vice President


Principal Amount of 2024 1.5L Notes:        ████████

Principal Amount of 2025 1.5L Notes:        ████████

All other Claims:                           ██


Notice Address:        AI FQ Holdings LLC
                       c/o Access Industries, Inc.
                       40 West 57th Street, 28th Floor
                       New York, New York 10019
                       Fax:    (212) 977-8112
                       Attn:   Donald A. Wagner; Langhorne S. Perrow
                       E-mail: dwagner@accind.com; lperrow@accind.com

With a copy to:        Access Industries, Inc.
                       40 West 57th Street, 28th Floor
                       New York, New York 10019
                       Fax:    (212) 977-8112
                       Attn:   Legal Department
                       E-mail: legalnotices@accind.com

**Supporting Creditor**

**A VENUE ENERGY OPPORTUNITIES FUND, L.P.**

By: AVENUE ENERGY OPPORTUNITIES PARTNERS, LLC,
*its General Member*
By: GL Energy Opportunities Partners, LLC,
*its Managing Member*

By: _____
     Name: Sonia Gardner
     Title: Member

Principal Amount of 2024 1.5L Notes, as applicable: $___ ▮▮▮▮▮
Principal Amount of 2025 1.5L Notes, as applicable: $_____▮_____
All other Claims: _____▮▮▮_____

**AVENUE ENERGY OPPORTUNITIES FUND II, L.P.**

By: AVENUE ENERGY OPPORTUNITIES PARTNERS II, LLC,
*its General Member*
By: GL ENERGY OPPORTUNITIES PARTNERS II, LLC
*its Sole Member*

By: _____
     Name: Sonia Gardner
     Title:   Member

Principal Amount of 2024 1.5L Notes, as applicable: $_____▮▮▮_____
Principal Amount of 2025 1.5L Notes, as applicable: $_____▮▮▮_____
All other Claims: _____▮▮▮_____

**AVENUE PPF OPPORTUNITIES FUND, L.P.**
By: Avenue PPF Opportunities Fund GenPar, LLC,
*its General Partner*

By: _____
     Name: Sonia Gardner
     Title: Member

Principal Amount of 2024 1.5L Notes, as applicable: $_____▮▮▮_____
Principal Amount of 2025 1.5L Notes, as applicable: $_____▮_____

[*Signature Page to Plan Support Agreement*]

All other Claims:_____ ███████ _____

**AVENUE SPECIAL OPPORTUNITIES FUND II, L.P.**
By: AVENUE SO PARTNERS II, LLC,
*its General Partner*
By: GL SO Partners II, LLC,
*its Managing Member*

By: _____
        Name: Sonia Gardner
        Title: Member

Principal Amount of 2024 1.5L Notes, as applicable:  $_____ ███████
Principal Amount of 2025 1.5L Notes, as applicable:  $_____ ██ _____
All other Claims:_____ ███████ _____

**AVENUE STRATEGIC OPPORTUNITIES FUND, L.P.**
By: Avenue Strategic Opportunities Fund GenPar, LLC,
*its General Partner*

By: GL Strategic Opportunities Partners, LLC,
*its sole member*

By: _____
        Name: Sonia Gardner
        Title: Managing Member

Principal Amount of 2024 1.5L Notes, as applicable:  $_____ ██████
Principal Amount of 2025 1.5L Notes, as applicable:  $_____ █ _____
All other Claims:_____ ██████ _____

**DESTINATIONS MULTI STRATEGY ALTERNATIVES FUND,**
**A SERIES OF BRINKER CAPITAL DESTINATIONS TRUST,**
**As Assignee**

By: _____
        Name: Sonia Gardner
        Title: Managing Member

Principal Amount of 2024 1.5L Notes, as applicable:  $_____ ███████
Principal Amount of 2025 1.5L Notes, as applicable:  $_____ █ _____
All other Claims:_____ ███████ _____

*[Signature Page to Plan Support Agreement]*

**AVENUE EUROPE SELECT OPPORTUNITIES FUND, L.P.**
By: Avenue Europe Select Opportunities Fund GenPar, LLC,
*its General Partner*

By: _____
     Name: Sonia Gardner
     Title: Member

Principal Amount of 2024 1.5L Notes, as applicable: $ ███████
Principal Amount of 2025 1.5L Notes, as applicable: $_____ █
All other Claims:_____ █_____

**Exhibit A**

**Term Sheet**

# EP ENERGY CORPORATION

## RESTRUCTURING TERM SHEET

### October 18, 2019

This restructuring term sheet (this "***Term Sheet***") presents the principal terms of a proposed financial restructuring (the "***Restructuring***") of the existing capital structure of EP Energy Corporation ("***EP Parent***") and its subsidiaries identified below (collectively with EP Parent, the "***Company***" or the "***Debtors***"), which Restructuring will be consummated pursuant to a chapter 11 plan containing the terms set forth herein to be confirmed in the cases commenced on October 3, 2019 (the "***Petition Date***") in the United Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under chapter 11 of title 11  of the United States Code (the "***Bankruptcy Code***"; Ch. 11 Case No. 19-35654 *et al.*, the "***Chapter 11 Cases***").  This is the Term Sheet referred to in, and appended to, the Plan Support Agreement dated as of October 18, 2019, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "***PSA***").  Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in **Annex 1**.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN.  THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS.  EXCEPT AS SET FORTH IN THE PSA, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

| OVERVIEW | |
|---|---|
| **Company:** | EP Parent, EPE Acquisition, LLC; EP Energy LLC; Everest Acquisition Finance Inc.; EP Energy Global LLC; EP Energy Management, L.L.C.; EP Energy Resale Company, L.L.C.; EP Energy E&P Company, L.P. |
| **Claims and Interests to be Restructured:** | RBL Claims: consisting of approximately $629.4 million in principal amount, including reimbursement obligations in respect of letters of credit, plus all other secured obligations, including unpaid interest, fees, and other expenses arising and payable under that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "***RBL Facility***", and the Claims thereunder, the "***RBL Claims***"), by and among EP Energy LLC, as borrower, EPE Acquisition, LLC, JPMorgan Chase Bank, N.A., as administrative agent (the "***RBL Agent***") and as collateral agent, and the lenders (the "***RBL Lenders***") party thereto from time to time.<br><br>Senior Secured Notes Claims: consisting of:<br><br>a) $1 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 7.750% Senior Secured Notes due 2026 (the "***1.125L Notes***") under that certain indenture, dated as of May 23, 2018 (as amended, modified, or otherwise supplemented from time to time, the "***1.125L Notes Indenture***," and the Claims thereunder, the "***1.125L Notes Claims***"), by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers (the "***Co-Issuers***"), each of the guarantors named therein, and UMB Bank, National Association, as successor indenture trustee and notes collateral agent;<br><br>b) $500 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 8.000% Senior Secured Notes due 2024 (the "***1.25L Notes***") under that certain indenture, dated as of November 29, 2016 (as amended, modified, or otherwise supplemented from time to time, the "***1.25L Notes Indenture***," and the Claims thereunder, the "***1.25L Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and, BOKF, NA, as successor indenture trustee and notes collateral agent;<br><br>c) Approximately $1.092 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 9.375% Senior Secured Notes due 2024 (the "***2024 1.5L Notes***," and the holders thereof, the "***2024 1.5L Noteholders***") under that certain indenture, dated as of January 3, 2018 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2024 1.5L Notes Claims***") by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as indenture trustee and collateral agent; and<br><br>d) $1 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 8.000% Senior Secured Notes due 2025 (the "***2025 1.5L Notes***," and collectively with the 2024 1.5L Notes, the "***1.5L Notes***," and the holders of the 2025 1.5L Notes, the "***2025 1.5L Noteholders***", and collectively with the 2024 1.5L Noteholders, the "***1.5L Noteholders***") under that certain indenture, dated as of February 6, 2017 (as amended, modified, or otherwise supplemented from time to time) (the |

2

Claims thereunder, the "**2025 1.5L Notes Claims**", and collectively with the 2024 1.5L Notes Claims, the "**1.5L Notes Claims**" and together with 1.125L Notes Claims and the 1.25L Notes Claims, the "**Senior Secured Notes Claims**"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as indenture trustee and collateral agent.

Unsecured Notes Claims: consisting of

a) Approximately $182 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 9.375% Senior Notes due 2020 under that certain indenture, dated as of April 24, 2012 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "**2020 Unsecured Notes Claims**"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee;

b) Approximately $182 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 7.750% Senior Notes due 2022 under that certain indenture, dated as of August 13, 2012 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "**2022 Unsecured Notes Claims**"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee; and

c) Approximately $323 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 6.375% Senior Notes due 2023 under that certain indenture, dated as of May 28, 2015 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "**2023 Unsecured Notes Claims**"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee.

General Unsecured Claims: consisting of any prepetition Claim against the Company that is not an RBL Claim, a Senior Secured Notes Claim, an Unsecured Notes Claim (each as defined herein), an Intercompany Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "**General Unsecured Claims**"). For the avoidance of doubt, deficiency claims in respect of the 1.5 Lien Notes Claims ("**1.5L Deficiency Claims**") are not General Unsecured Claims.

Existing Equity Interests: consisting of shares of the Class A common stock of EP Parent that existed immediately prior to the Effective Date, including any restricted stock of EP Parent that vests prior to the Effective Date.

Other Equity Interests: consisting of the Class B common stock of EP Parent that existed immediately prior to the Effective Date and all other Interests in EP Parent other than Existing Equity Interests.

Subordinated Claims: consisting of any prepetition Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

WEIL:\97148206\28\42780.0003

| **TRANSACTION OVERVIEW** |
|---|

| **Overview of Restructuring:** | The Restructuring will be implemented through the Chapter 11 Cases commenced by the Company to pursue confirmation of a prenegotiated chapter 11 plan consistent with the terms herein. |
|---|---|
| | As a component of the Restructuring and consistent with the Rights Offering Documents, each eligible 1.5L Noteholder will be offered the right to purchase up to its Pro Rata share of New Common Shares for an aggregate value of up to $475 million (as described below, the "***Rights Offering***"). |
| | The Company may also, with the consent of the Initial Supporting Noteholders, consummate a private placement of New Common Shares, subject to dilution by the Jeter Shares and EIP Shares, for an aggregate purchase price of up to $75 million (the "***Private Placement***"), in Cash, on terms acceptable to the Company and the Initial Supporting Noteholders. |
| | The proceeds of the Rights Offering and the Private Placement will be used by the Company to (i) pay down the DIP Facility and the RBL Facility, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan distributions, case administration expenses, and exit costs.  The terms of the Rights Offering shall be in accordance with the Backstop Agreement to be executed concurrently with the PSA and otherwise acceptable to the Initial Supporting Noteholders. |
| | On the Effective Date, Apollo and Access may contribute their equity interests in Jeter to the Reorganized Debtors in exchange for the Jeter Shares, subject to the agreement of the Company, Access and the Initial Supporting Noteholders. |
| | As of the Effective Date, the DIP Claims, RBL Claims, 1.5L Notes Claims, Unsecured Notes Claims, General Unsecured Claims, Existing Equity Interests, and Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect. |
| **DIP Financing; Use of Cash Collateral** | The Restructuring will be financed by (i) consensual use of Cash collateral on final terms to be acceptable to the Initial Supporting Noteholders, and (ii) a postpetition senior secured superpriority priming revolving loan facility (the "***DIP Facility***") on terms and conditions acceptable to the Initial Supporting Noteholders, it being acknowledged that the Commitment Letter and related exhibits attached hereto as **Exhibit A-1** (the "***Exit Commitment Letter***") are acceptable to the Initial Supporting Noteholders.  The DIP Facility will roll-up up to 50.0% of the obligations under the RBL Facility, applied Pro Rata among the exposures of the RBL Lenders that elect to participate in the Exit Facility by the Voting Deadline to receive its Pro Rata share of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. Upon emergence, the DIP Facility will convert dollar for dollar into first lien, first-out revolving loans under the Exit Facility. |

| TREATMENT OF CLAIMS AND INTEREST | |
|---|---|
| **Administrative Expense Claims and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Claims:** | On the Effective Date, to the extent the DIP Facility is not paid down in full from the proceeds of the Rights Offering or the Private Placement, each holder of an Allowed DIP Claim will receive its Pro Rata share (taking into account the elections made by holders of Allowed RBL Claims as provided below) of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. |
| **Class 1**<br><br>**Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Holders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 2**<br><br>**Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Holders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 3**<br><br>**RBL Claims:** | On the Effective Date, each holder of an Allowed RBL Claim will receive its Pro Rata share of the Exit Facility as a first lien, second-out term loan under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the Exit Facility by the Voting Deadline shall receive its Pro Rata share (with the holders of Allowed DIP Claims) of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.<br><br>**Impaired – Entitled to Vote.** |

| Class 4<br>1.125L Notes Claims: | On the Effective Date, all Allowed 1.125L Notes Claims will (i) be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.125L Notes Indenture, a portion of the 1.125L Notes Claims, or (ii) receive new notes on terms acceptable to the Initial Supporting Noteholders and the Company.<br><br>**Unimpaired – Presumed to Accept.** |
|---|---|
| Class 5<br>1.25L Notes Claims: | On the Effective Date, all Allowed 1.25L Notes Claims will (i) be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes Claims, or (ii) receive new notes on terms acceptable to the Initial Supporting Noteholders and the Company.<br><br>**Unimpaired – Presumed to Accept.** |
| Class 6<br>1.5L Notes Claims: | On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of the secured portion of such Allowed 1.5L Notes Claim, in full and final satisfaction of the secured portion of such Allowed 1.5L Notes Claim, its Pro Rata share of (i) 99.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, the Jeter Shares, and the EIP Shares, and (ii) the right to participate in the Rights Offering.<br><br>**Impaired – Entitled to Vote.** |
| Class 7<br>Unsecured Claims: | On the Effective Date, each holder of Allowed 2020 Unsecured Notes Claims, 2022 Unsecured Notes Claims, and 2023 Unsecured Notes Claims (collectively, "***Unsecured Notes Claims***", and the holders of such Claims, the "***Unsecured Noteholders***"), 1.5L Deficiency Claims, and General Unsecured Claims (collectively with Unsecured Notes Claims, "***Unsecured Claims***") will receive, in full and final satisfaction of such Unsecured Claim, their Pro Rata share of 1.0% of the New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, the Jeter Shares, and the EIP Shares (the "***Unsecured Shares***"); *provided, that* a convenience class may be established under the Plan (with such Plan provisions being acceptable to the Initial Supporting Noteholders) to provide distributions up to an aggregate amount in Cash to be specified under the Plan.<br><br>**Impaired – Entitled to Vote.** |

| Class 8<br><br>Intercompany Claims: | All Intercompany Claims will be adjusted, reinstated, or discharged in the Company's discretion, subject to the reasonable consent of the Initial Supporting Noteholders.<br><br>**Unimpaired – Presumed to Accept.** |
|---|---|
| Class 9<br><br>Subordinated Claims: | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.<br><br>**Impaired – Deemed to Reject.** |
| Class 10<br><br>Existing Equity Interests: | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. Each holder of Existing Equity Interests will receive its Pro Rata share of $500,000 in Cash.<br><br>**Impaired – Entitled to Vote.** |
| Class 11<br><br>Other Equity Interests: | On the Effective Date, Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.<br><br>**Impaired – Deemed to Reject.** |
| Class 12<br><br>Intercompany Interests: | All Allowed Intercompany Interests shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.<br><br>**Unimpaired – Presumed to Accept.** |
| <div align="center">**OTHER MATERIAL PROVISIONS**</div> ||
| Rights Offering: | Pursuant to the Rights Offering, eligible 1.5L Noteholders will be offered the right to purchase New Common Shares for an aggregate purchase price of up to $475,000,000 (the "***Rights Offering Amount***").  The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the Jeter Shares and the EIP Shares, is approximately 76.2%-78.0%, consisting of (i) approximately 55.6% in the case of Rights Offering Shares purchased for cash and (ii) approximately 20.6%-22.4% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes, depending on the amount of Reinstated 1.25L Notes being exchanged in the Rights Offering (which amount will be between $138,000,000 and $150,000,000).<br><br>The Rights Offering will be backstopped by the Backstop Parties pursuant to the Backstop Agreement in exchange for (i) the Backstop Commitment Premium, and (ii) the right to exchange Reinstated 1.25L Notes as described below.  Subject to the terms of the Backstop Agreement, the Backstop Parties shall backstop the aggregate purchase price of $463 million, (a) $220.6 million of which shall be backstopped by Apollo ($20.6 million of which shall be funded through the exchange of $20.6 million in aggregate principal amount of Reinstated 1.25L Notes held by Apollo on the terms set forth in the Backstop Agreement, which amount shall reduce the aggregate amount of Apollo's purchase rights in the Rights Offering on a dollar for |

WEIL:\97148206\28\42780.0003

dollar basis), (b) $192.4 million of which shall be backstopped by Elliott ($117.4 million of which shall be funded through the exchange of $117.4 million in aggregate principal amount of Reinstated 1.25L Notes held by Elliott on the terms set forth in the Backstop Agreement, which amount shall reduce the aggregate amount of Elliott's purchase rights in the Rights Offering on a dollar for dollar basis), (c) $42.5 million shall be backstopped by Avenue, and (d) $7.5 million shall be backstopped by Access, *provided*, that an additional $12 million aggregate purchase price, to be funded through the exchange of Reinstated 1.25L Notes on the terms set forth in the Backstop Agreement, may be backstopped by the Backstop Parties with the consent of the Initial Supporting Noteholders in accordance with the terms of the Backstop Agreement. The Company shall pay all accrued but unpaid interest in Cash to the holders of the Reinstated 1.25L Notes in connection with the foregoing exchanges.

Discount: Rights Offering Shares will be issued at an aggregate purchase price of up to $475,000,000 at a price per share representing: (i) in the case of Rights Offering Shares purchased for cash, a 35% discount to the Stated Equity Value, and (ii) in the case of Rights Offering Shares purchased by Backstop Parties in exchange for Reinstated 1.25L Notes, a 25.7% discount to the Stated Equity Value.

Each eligible 1.5L Noteholder will be entitled to join the Backstop Agreement within ten (10) Business Days of the date on which the Debtors file the motion to approve the Backstop Agreement on terms acceptable to the Initial Supporting Noteholders.

| | |
|---|---|
| **Exit Facility:** | On the Effective Date, the RBL Facility and the DIP Facility will be replaced with a $629 million first lien revolving exit credit facility (the "***Exit Facility***") on terms and conditions acceptable to the Initial Supporting Noteholders and the Company. |
| **Jeter Contribution:** | On the Effective Date, Apollo and Access may contribute their equity interests in Jeter to the Reorganized Debtors in exchange for the Jeter Shares, subject to the agreement of the Company, Access, and the Initial Supporting Noteholders. |
| | **GENERAL PROVISIONS** |
| **Executory Contracts and Unexpired Leases:** | As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. |

WEIL:\97148206\28\42780.0003

| | |
|---|---|
| **Board of Directors:** | The Board of Directors will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the members selected by the Initial Supporting Noteholders in consultation with the Company (the "***New Board***"). Provisions regarding the removal, appointment, and replacement of members of the New Board to be determined by the Initial Supporting Noteholders in consultation with the Company. |
| **Charter, By-Laws and Organizational Documents:** | The New Corporate Governance Documents will be acceptable to the Initial Supporting Noteholders and the Company and will become effective as of the Effective Date. |
| **Private Company:** | The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; *provided*, that from and after the Plan Effective Date, Reorganized EP Parent shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements). |
| **Employee Incentive Plan:** | The Plan will provide for the establishment of a post-emergence employee incentive plan on the Effective Date (the "***Employee Incentive Plan***" or the "***EIP***"). All awards issued under the EIP, including restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares (the "***EIP Shares***") will be dilutive of all other equity interests in the Reorganized Debtors. 10% of the New Common Shares, on a fully diluted basis, shall be reserved for issuance in connection with the Employee Incentive Plan. The other terms of the Employee Incentive Plan shall be consistent with the terms set forth on <u>**Exhibit A-2**</u> annexed hereto and otherwise in form and substance acceptable to the Initial Supporting Noteholders and the Company. |
| **Employment Agreements**: | All employment agreements and severance plans that exist as of the Petition Date will be assumed, as may be amended, pursuant to the Plan. The Debtors will enter into new employment agreements with their officers, to be effective on the Effective Date, consistent with the terms set forth on <u>**Exhibit A-3**</u> annexed hereto. |
| **Cancellation of Notes, Instruments, Certificates and other Documents:** | On the Effective Date of the Plan, other than the 1.125L Notes and 1.25L Notes being reinstated pursuant to the Plan, all notes, instruments, certificates evidencing debt of the Company and Interests in EP Parent will be cancelled and obligations of the Company thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make further distributions to the applicable holders on account of their Claims. |
| **Vesting of Assets:** | On the Effective Date, pursuant to sections 1141(b)-(c) of the Bankruptcy Code, all assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Hedging Program:** | The Company shall consult with the Initial Supporting Noteholders on any material changes to its hedging program. |

9

| | |
|---|---|
| **Survival of Indemnification Obligations and D&O Insurance:** | No obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Company will be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Debtors. Any Claim based on such obligations of the Company will be an Allowed Claim. |
| | In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |

WEIL:\97148206\28\42780.0003

| | |
|---|---|
| **Conditions to Effectiveness:** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are satisfactory to the Company and the Initial Supporting Noteholders, including the following (as applicable): |

    i.    the Backstop Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith;

    ii.    the Reinstated Debt shall have been reinstated, or shall have been given such other treatment (as applicable), in accordance with the terms and conditions of this Term Sheet;

    iii.    the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered;

    iv.    the Definitive Documents (as defined in the PSA) will contain terms and conditions consistent in all material respects with this Term Sheet and the PSA and otherwise satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders;

    v.    the PSA shall remain in full force and effect and shall not have been terminated;

    vi.    all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived, and the Exit Facility, including all documentation related thereto, is in form and substance satisfactory to the Initial Supporting Noteholders and the Company and in effect;

    vii.    the Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered;

    viii.    the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered;

    ix.    the Rights Offering and if applicable, the Private Placement shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Agreement, and any other relevant transaction documents;

    x.    the New Corporate Governance Documents shall be in full force and effect;

    xi.    all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Agreement shall have been obtained;

    xii.    the Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the

WEIL:\97148206\28\42780.0003

|  | Supporting Noteholders and the other parties thereto, and shall be in full force and effect; |
|--|--|
|  | xiii.   the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods will have expired; |
|  | xiv.   the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the PSA, and in form and substance acceptable to the Initial Supporting Noteholders; |
|  | xv.   the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to the occurrence of the Closing) set forth in the Plan shall have been satisfied or, with the prior consent of the Initial Supporting Noteholders waived in accordance with the terms of the Plan; |
|  | xvi.   the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the PSA; and |
|  | xvii.   all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date by the Supporting Noteholder Advisors shall have been paid in full by the Debtors in accordance with the Backstop Agreement. |
|  | The conditions to effectiveness may be waived, in whole or in part, in writing by the Debtors and the Initial Supporting Noteholders. |
| **Releases by Debtors:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents and the documents in the Plan Supplement, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission |

| | of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the PSA, the Definitive Documents and the documents in the Plan Supplement or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. |
|---|---|
| **Releases by Third-Parties:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents, and the documents in the Plan Supplement  or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring, the restructuring of any Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the PSA, the Definitive Documents and the documents in the Plan Supplement, or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date. |
| **Exculpation:** | To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, Exit Facility, the Rights Offering, the Private Placement, the Employee Incentive Plan, the Disclosure Statement, the PSA, the Restructuring, and the Plan (including the Definitive Documents and the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or |

| | |
|---|---|
| | the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder.  The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Discharge and Injunction:** | The Plan will contain customary discharge and injunction provisions acceptable to the Initial Supporting Noteholders. |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial structure for the Company, the Initial Supporting Noteholders and the Company's equity holders post-Restructuring, as determined by the Company with the consent of the Initial Supporting Noteholders and in consultation with Access. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |
| **Restructuring Transactions:** | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, subject to the reasonable consent of the Initial Supporting Noteholders, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan. |
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the PSA. |

14

## ANNEX 1

**Defined Terms**

| **Defined Terms** | |
|---|---|
| "*Access*" | Access Industries, Inc. |
| "*Administrative Expense Claim*" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses. |
| "*Allowed*" | With reference to any Claim or Interest against a Debtor, (a) (i) that is timely filed by the Bar Date, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order.  With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| "*Antitrust Authorities*" | The United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws. |
| "*Apollo*" | Apollo Global Management, LLC and its affiliates. |
| "*Avenue*" | Affiliates of Avenue Capital Group that are Supporting Noteholders |
| "*Backstop Agreement*" | The backstop commitment agreement entered into simultaneously with the PSA, and attached thereto as <u>Exhibit B</u>. |

| Defined Terms | |
|---|---|
| "**Backstop Commitment Premium**" | The amount to be paid as consideration to the Backstop Parties on the Effective Date, pursuant to the terms and conditions to be set forth in the Plan and the Backstop Agreement, in the form of Rights Offering Shares, issued at a price per share equal to a 35% discount to the Stated Equity Value, equal to 8% of the aggregate Cash commitments of the Backstop Parties pursuant to the Backstop Agreement (*i.e.*, $325,000,000). |
| "**Backstop Order**" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, approving the Debtors' entry into and performance under the Backstop Agreement and the PSA, which remains in full force and effect and is not subject to a stay. |
| "**Backstop Parties**" | The Supporting Noteholders that are signatories to the Backstop Agreement and each party that executes a joinder thereto. |
| "**Bar Date**" | The dates by which Proofs of Claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| "**Business Day**" | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close. |
| "**Cash**" | Legal tender of the United States of America. |
| "**Cause of Action**" | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |
| "**Chapter 11 Cases**" | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court. |
| "**Claim**" | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "**Confirmation Date**" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "**Confirmation Order**" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, as evidenced in writing, confirming the Plan in the Chapter 11 Cases, which remains in full force and effect and is not subject to a stay. |
| "**DIP Agent**" | JPMorgan Chase Bank, N.A. |
| "**DIP Claim**" | All Claims held by the DIP Lenders on account of, arising under, or relating to the DIP Facility or the DIP Orders, which includes Claims for all principal amounts outstanding, interest, reasonable and documented fees, expenses, costs and other charges of the DIP Lenders. |
| "**DIP Credit Agreement**" | The credit agreement governing the terms of the DIP Facility. |
| "**DIP Lenders**" | The lenders party to the DIP Credit Agreement. |
| "**DIP Order**" | The interim or final orders, as applicable, of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
| "**Disclosure Statement**" | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| "**Disclosure Statement Order**" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, as evidenced in writing, approving the Disclosure Statement in the Chapter 11 Cases, which remains in full force and effect and is not subject to a stay. |
| "**Effective Date**" | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| "**Elliott**" | Elliott Associates, L.P., and Elliott International, L.P. and their respective affiliates. |
| "**Entity**" | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| "**Estate(s)**" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "**Exchange Act**" | The Securities Exchange Act of 1934. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "*Exculpated Parties*" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Exit Credit Agreement*" | The RBL Credit Agreement, as amended and restated on the Effective Date. |
| "*Exit Facility Lenders*" | The lenders from time to time party to the Exit Credit Agreement, including any applicable permitted assignees thereof. |
| "*Existing Equity Interests*" | Shares of the Class A common stock of EP Parent that existed immediately prior to the Effective Date, including any restricted stock of EP Parent that vests prior to the Effective Date. |
| "*Fee Claim*" | A Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases. |
| "*Final Order*" | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; provided, however, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| "*Governmental Entity*" | Any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof). |
| "*Initial Supporting Noteholders*" | Each of Apollo and Elliott. |
| "*Intercompany Claim*" | Any Claim against a Debtor held by another Debtor. |

| **Defined Terms** |
|---|

| | |
|---|---|
| "*Intercompany Interest*" | An Interest in a Debtor held by another Debtor, other than any Existing Equity Interests or Other Equity Interests (including any Class B common stock of EP Parent held by EPE Employee Holdings, II, LLC). |
| "*Interest*" | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, that existed immediately before the Effective Date, and including any equity interest issued to the Company's current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards. |
| "*Jeter*" | Wolfcamp Drillco Operating L.P. |
| "*Jeter Shares*" | New Common Shares issued in consideration of the contribution of equity interests in Jeter to the Reorganized Debtors, which shall be subject to dilution by the EIP Shares. |
| "*New Common Shares*" | Shares of common stock of Reorganized EP Parent. |
| "*New Corporate Governance Documents*" | The certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized EP Parent, which shall be acceptable to the Initial Supporting Noteholders. |
| "*Other Equity Interests*" | Class B common stock of EP Parent that existed immediately prior to the Effective Date and all other Interests in EP Parent other than Existing Equity Interests. |
| "*Other Priority Claim*" | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "*Other Secured Claim*" | A Secured Claim other than a Priority Tax Claim, a DIP Claim, an RBL Claim, a 1.125L Notes Claim, 1.25L Notes Claim and a 1.5L Notes Claim. |
| "*Person*" | Any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| "*Plan*" | The prearranged chapter 11 plan of reorganization of the Company implementing the Restructuring, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the PSA. |

WEIL:\97148206\28\42780.0003

| **Defined Terms** | |
|---|---|
| "***Plan Supplement***" | A supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in each case subject to the terms and provisions of the PSA (including any consent rights in favor of the Initial Supporting Noteholders) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the PSA (including any consent rights in favor of the Supporting Noteholders), which shall include, but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Employee Incentive Plan, (v) the Exit Facility documents, (vi) a schedule of retained Causes of Action, and (vii) the Schedule of Rejected Contracts. |
| "***Priority Tax Claim***" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "***Pro Rata***" | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interests in that class. |
| "***Registration Rights Agreement***" | The registration rights agreement to be entered into as of the Effective Date, which shall have terms that are customary for a transaction of this nature and shall be in form and substance acceptable to the Initial Supporting Noteholders and the Company. |
| "***Released Parties***" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the DIP Agent and DIP Lenders under the DIP Facility, (vi) the RBL Agent and the RBL Lenders under the RBL Facility, (vii) the Backstop Parties, (viii) holders of Existing Equity Interests, on account of their contributions under the Plan, (ix) with respect to each of the foregoing Persons, in clauses (i) through (viii), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "***Reinstated 1.125L Notes***" | The 1.125L Notes, issued pursuant to the 1.125L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.125L Notes that have not been redeemed or repaid prior to the Closing. |
| "***Reinstated 1.25L Notes***" | The 1.25L Notes, issued pursuant to the 1.25L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.25L Notes that have not been redeemed or repaid prior to the Closing. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "*Reinstated Debt*" | The Reinstated 1.125L Notes and the Reinstated 1.25L Notes. |
| "*Releasing Parties*" | Collectively, (i) the holders of all Claims or Interests that vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, (v) all other holders of Claims and Interests, and (vi) the Released Parties. |
| "*Reorganized Debtors*" | Each of the Debtors as reorganized on the Effective Date in accordance with the Plan. |
| "*Reorganized EP Parent*" | EP Parent as reorganized on the Effective Date in accordance with the Plan. |
| "*Restructuring Expenses*" | The reasonable and documented fees and out-of-pocket expenses payable to the Supporting Noteholder Advisors as set forth in the Backstop Agreement (and in the case of Debevoise & Plimpton LLP, subject to the cap set forth therein) |
| "*Restructuring Transactions*" | One or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the consummation of the transactions provided for under or contemplated by the PSA and this Term Sheet, (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan, the PSA, and this Term Sheet, and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the PSA, and this Term Sheet, and (iv) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the PSA and this Term Sheet. |
| "*Rights Offering Shares*" | New Common Shares issued pursuant to the Rights Offering. |
| "*Rights Offering Documents*" | Collectively, the Backstop Agreement and the Rights Offering Procedures. |
| "*Rights Offering Procedures*" | The rights offering procedures in form and substance acceptable to the Initial Supporting Noteholders setting forth the procedures for the 1.5L Noteholders to participate in the Rights Offering. |
| "*Schedule of Rejected Contracts*" | The schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time. |

WEIL:\97148206\28\42780.0003

| Defined Terms | |
|---|---|
| "*Schedules*" | The schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, which shall be reasonably acceptable to the Initial Supporting Noteholders. |
| "*Secured Claim*" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "*Securities Act*" | Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby. |
| "*Solicitation Materials*" | Collectively, the Disclosure Statement and the related solicitation materials. |
| "*Stated Equity Value*"[1] | The stated equity value of the Reorganized Debtors of $900 million. |
| "*Subordinated Claim*" | A Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise. |
| "*Supporting Noteholder Advisors*" | Milbank LLP, Houlihan Lokey Capital, Inc., W.D. Von Gonten & Co., DeGolyer & MacNaughton Corp., Cole Schotz P.C., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, in its capacity as local Texas counsel to certain of the Supporting Noteholders, Moelis & Company, and Debevoise & Plimpton LLP. |
| "*Supporting Noteholders*" | The Supporting Noteholders that are signatories to the PSA, and any subsequent 1.5L Noteholder that becomes party thereto in accordance with the terms of the PSA. |
| "*Unimpaired*" | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code. |
| "*Voting Deadline*" | The date and time to be set by the Bankruptcy Court as the deadline for Impaired holders of Claims to vote to accept or reject the Plan. |

---

[1] Stated Equity Value is for purposes of calculations of Rights Offering amounts and not for establishing performance goals related to EIP.

## **Exhibit A-1**

### **Exit Commitment Letter**

EXECUTION VERSION

| | | | |
|---|---|---|---|
| JPMorgan Chase Bank, N.A.<br>383 Madison Avenue<br>New York, NY 10179 | Citibank, N.A.<br>383 Greenwich Street<br>New York, NY 100013 | BMO Harris Financing, Inc.<br>111 West Monroe Street, 4th<br>Floor<br>Chicago, IL 60603 | Credit Suisse AG,<br>Cayman Islands Branch<br>11 Madison Avenue<br>New York, NY 10016 |
| Royal Bank of Canada<br>3 World Financial Center<br>200 Vesey Street, 12th Floor<br>New York, NY 10281 | The Toronto-Dominion<br>Bank, New York Branch<br>31 West 32nd Street<br>New York, NY 10019 | DNB Capital LLC<br>200 Park Avenue, 31st Floor<br>New York, NY 10166 | Sumitomo Mitsui Banking<br>Corporation<br>277 Park Avenue<br>New York, NY 10172 |

CONFIDENTIAL

October 18, 2019

EP Energy LLC
EPE Acquisition LLC
1001 Louisiana Street
Houston, TX 77002
Attention:  Kyle McCuen, Senior Vice President,
      Chief Financial Officer and Treasurer

<u>$314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility</u>
<u>$629,420,912 Senior Secured Revolving Exit Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

JPMorgan Chase Bank, N.A. ("***JPMorgan***"), Citibank, N.A. ("***Citi***"), BMO Harris Financing, Inc. ("***BMOH***"), Credit Suisse AG, Cayman Islands Branch ("***CSAG***"), Royal Bank of Canada ("***RBC***"), The Toronto-Dominion Bank, New York Branch ("***TD***"), DNB Capital LLC ("***DNB***"), and Sumitomo Mitsui Banking Corporation ("***SMBC***", and together with JPMorgan, Citi, BMOH, CSAG, RBC, TD, and DNB, collectively, the "***Initial Commitment Parties***", and together with each other Prepetition RBL Lender (as defined below) that joins this letter (this letter, including <u>Exhibits A</u> and <u>B</u> hereto, this "***Commitment Letter***") prior to the Outside Commitment Date (as defined below), collectively, the "***Commitment Parties***", "***we***" or "***us***") understand that EP Energy Corporation, a Delaware corporation ("***Parent***"), and certain of its subsidiaries, including EPE Acquisition LLC, a Delaware limited liability company ("***Holdings***"), and EP Energy LLC, a Delaware limited liability company ("***Borrower***" and together with Parent and Holdings, "***you***"; and together with Parent, Holdings and such subsidiaries, the "***Debtors***") have filed voluntary petitions commencing cases (the "***Chapter 11 Cases***") under title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") in order to implement a restructuring of the Debtors (collectively, the "***Transactions***").

In connection therewith, you have requested that:

(i) each Commitment Party commit to provide a senior secured superpriority priming debtor-in-possession revolving credit facility in an aggregate principal amount of fifty percent (50%) of the aggregate amount of the outstanding loans and commitments under the Borrower's existing reserve-based senior secured revolving credit facility (the "***Prepetition RBL Facility***") pursuant to that certain Credit Agreement dated as of May 24, 2012, among the Borrower, Holdings, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent, the lenders from time to time party thereto (the "***Prepetition RBL Lenders***"), and the other parties thereto (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the date hereof, the "***Prepetition RBL Credit Agreement***"), outstanding immediately prior to the filing of the Chapter 11 Cases (the loans and

commitments of the Commitment Parties under the Prepetition RBL Facility, "***Prepetition Consenting RBL Claims***" and together with the loans and commitments of the Prepetition RBL Lenders that are not Commitment Parties as of the Outside Commitment Date (each, a "***Term Lender***"), collectively, the "***Prepetition RBL Claims***"), substantially in the form of, and as further described in, the Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement attached hereto as Exhibit A (the "***DIP Credit Agreement***" and the facility thereunder, the "***DIP Facility***"), and which DIP Facility shall:

(x)  be effectuated by the cashless conversion on a dollar for dollar basis of a ratable portion of each of the Commitment Parties' respective Prepetition Consenting RBL Claims into (A) new commitments to make revolving loans to the Borrower during the Chapter 11 Cases under the DIP Facility (subject to the terms and conditions therein) and (B) outstanding loans under the DIP Facility (until repaid in whole or in part by the Borrower with a portion of the Debtor's cash collateral upon approval of the DIP Order in accordance with the DIP Credit Agreement); and

(y)  be convertible, together with all (but not less than all) of the remaining outstanding Prepetition RBL Claims that were not converted into a portion of the DIP Facility into a senior secured exit facility (the "***Exit Facility***" and, together with the DIP Facility, each, a "***Credit Facility***" and collectively, the "***Credit Facilities***") on substantially the terms described in, and subject to the conditions precedent set forth in, the Exit Facility Term Sheet attached hereto as Exhibit B (the "***Exit Facility Term Sheet***"; and the credit agreement evidencing such senior secured exit facility, the "***Exit Facility Credit Agreement***" and together with the DIP Credit Agreement, the "***Credit Agreements***") in an aggregate principal amount of up to $629,420,912; *provided*, that (x) the portion of the Exit Facility provided by the Commitment Parties shall be in the form of a senior secured first-out reserve-based revolving facility (the "***Exit Revolving Facility***") subject to an initial borrowing base (the "***Borrowing Base***") to be determined and approved in accordance with the Exit Facility Term Sheet and (y) the portion of the Exit Facility on account of the Prepetition RBL Claims of the Term Lenders pursuant to their treatment under a chapter 11 plan shall be in the form of a senior secured second-out fully drawn term loan facility (the "***Exit Term Facility***");

(ii)  subject to its receipt of a disclosure statement and solicitation materials approved by the Bankruptcy Court relating to an Approved Plan, each Commitment Party commit to vote or cause to be voted its Prepetition RBL Claims in a timely manner in favor of such Approved Plan (to the extent entitled to vote on such Approved Plan) and to accept such Approved Plan by delivering its duly executed and completed ballot or ballots relating thereto (and not to change or withdraw its votes except on the terms included herein); and

(iii)  JPMorgan agree to use its commercially reasonable efforts to arrange and syndicate, commencing on a date mutually agreed among the Borrower and JPMorgan in anticipation of the projected Exit Facility Conversion Date, additional commitments to the Exit Revolving Facility from one or more financial institutions identified by JPMorgan, and subject to your consent (not to be unreasonably withheld, conditioned or delayed) (together with the Commitment Parties, the "***Lenders***") in an aggregate incremental principal amount of up to $300,000,000 (any such additional commitments, the "***Incremental Commitments***"); *provided* that (x) the arrangement and syndication of the Incremental Commitments by JPMorgan shall not be a condition to the commitments of the Commitment Parties (including JPMorgan) set forth in clauses (i) or (ii) above and (y) the increase in the Exit Facility by the Incremental Commitments shall be subject to the Maximum Secured Debt Capacity Condition.

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exhibits attached hereto.

1.      Commitments and Undertakings

      In connection with the Transactions, subject to the terms and conditions set forth in this Commitment Letter, each of the Commitment Parties is pleased to advise you of its several (and not joint) commitment to:

      (a)      provide the following percentages of the DIP Facility and the Exit Revolving Facility, respectively:

      (i)      in respect of the DIP Facility, (i) JPMorgan, 14.78%, (ii) Citi, 14.78%, (iii) BMOH, 26.09%, (iv) CSAG, 12.87%, (v) RBC, 14.78%, (vi) TD, 8.17%, (vii) DNB 4.87%, and SMBC, 3.65%, which in the aggregate for all Initial Commitment Parties, equals 100% of the DIP Facility; *provided* that the foregoing commitments shall be proportionately reduced by the commitments of any Prepetition RBL Lender that join this Commitment Letter as a Commitment Party prior to the date on which the Bankruptcy Court enters the DIP Order (the "***Outside Commitment Date***") pursuant to a joinder agreement confirming such RBL Lender agrees to be bound to this Commitment Letter as if it were an original signatory, in a form reasonably acceptable to JPMorgan and the Borrower; and

      (ii)      in respect of the Exit Revolving Facility, (i) JPMorgan, $85,000,000, (ii) Citi, $85,000,000, (iii) BMOH, $150,000,000, (iv) CSAG, $74,000,000, (v) RBC, $85,000,000, (vi) TD, $46,947,275, (vii) DNB $28,000,000, and (viii) SMBC, $21,000,000, which in the aggregate for all Commitment Parties, equals 100% of the Exit Revolving Facility; *provided* that the aggregate maximum revolving credit amount shall be increased by the maximum revolving credit amounts of any Prepetition RBL Lender that joins this Commitment Letter as a Commitment Party prior to the Outside Commitment Date pursuant to a joinder agreement confirming such RBL Lender agrees to be bound to this Commitment Letter as if it were an original signatory, in a form reasonably acceptable to JPMorgan and the Borrower; and

      (b)      subject to its receipt of a disclosure statement and solicitation materials approved by the Bankruptcy Court relating to an Approved Plan:

      (i)      timely vote or cause to be voted its Prepetition RBL Claims in favor of such Approved Plan (to the extent entitled to vote on such Approved Plan) and to accept such Approved Plan by delivering its duly executed and completed ballot or ballots relating thereto; and

      (ii)      not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (i) above; *provided*, *however*, that notwithstanding anything herein to the contrary, a Commitment Party's vote may, upon written notice to the Borrower, be revoked (and, upon such revocation, deemed void *ab initio*) by such Commitment Party at any time following the termination of this Commitment Letter pursuant to the terms hereof with respect to such Commitment Party.

      For the avoidance of doubt, no Prepetition RBL Lender that is not an Initial Commitment Party shall be permitted to join this Commitment Letter unless such Prepetition RBL Lender commits to join both the DIP Facility and the Exit Revolving Facility.

      In addition, subject to the terms and conditions set forth in this Commitment Letter, JPMorgan is pleased to advise you that it is willing to use its commercially reasonable efforts to arrange and syndicate the Incremental Commitments until the Exit Facility Conversion Date.

2.      Titles and Roles

      It is agreed that:

(a)     JPMorgan will act as arranger and bookrunner for each Credit Facility (other than with respect to the Incremental Commitments) (acting in such capacities, the "**_Lead Arranger_**"); *provided* that the Borrower agrees that JPMorgan may perform its responsibilities hereunder through its affiliate, J.P. Morgan Securities LLC, (b) JPMorgan will act as administrative agent and collateral agent for each Credit Facility, and (c) JPMorgan will act as arranger and bookrunner for the Incremental Commitments.  You further agree that the Lead Arranger shall not have any other responsibilities except as otherwise mutually agreed.  You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Credit Agreements and Fee Letters referred to below) will be paid in connection with the Credit Facilities unless you and JPMorgan shall so reasonably agree (it being understood and agreed that no other agent, co-agent, arranger, co-arranger, bookrunner, co-bookrunner, manager or co-manager shall be entitled to greater economics in respect of either Credit Facility than JPMorgan).

3.      Syndication

        JPMorgan intends to syndicate the Incremental Commitments commencing on a date mutually agreed among the Borrower and JPMorgan in anticipation of the projected Exit Facility Conversion Date to one or more financial institutions identified by JPMorgan, and subject to your consent (not to be unreasonably withheld, conditioned or delayed).  You agree actively to assist JPMorgan in completing a syndication of the Incremental Commitments satisfactory to us and you.  Such assistance shall include until the Exit Facility Conversion Date (a) your using commercially reasonable efforts to ensure that the syndication efforts benefit materially from your existing lending relationships, (b) direct contact between senior management and advisors of the Debtors and the proposed Lenders at times and locations to be mutually agreed upon, (c) the hosting, with JPMorgan, of one or more meetings of prospective Lenders at times and locations to be mutually agreed upon and (d) your preparing and providing to JPMorgan a customary confidential information memoranda and other customary marketing materials (including, without limitation, lender slides and/or other marketing materials to be used in connection with the syndication) with respect to the Debtors and each Debtor's respective properties, including financial information, reserve information and reports, information to conduct diligence and Projections (as defined below), as JPMorgan may reasonably request in connection with the arrangement of the Credit Facilities and the syndication of the Incremental Commitments (all such information, memoranda and material, "**_Information Materials_**").

        Notwithstanding anything to the contrary contained in this Commitment Letter or any Fee Letter or any other letter agreement or undertaking concerning the financing of the Transactions, without limiting your obligations to assist with syndication efforts as set forth above, none of the commencement or completion of syndication of the Incremental Commitments, the completion of a confidential information memorandum or other marketing materials, or compliance with any other provision set forth in this Commitment Letter (other than the conditions described in Section 6 of this Commitment Letter) shall constitute a condition to the commitments hereunder or to the Credit Facilities.

        You hereby authorize JPMorgan to download copies of the Debtors' trademark logos from its website and post copies thereof and any Information Materials to a deal site on IntraLinks™, DebtDomain, SyndTrak, ClearPar or any other electronic platform chosen by JPMorgan to be its electronic transmission system (an "**_Electronic Platform_**") established by JPMorgan to perform services in its capacity as the administrative agent of either Credit Facility or to syndicate the Incremental Commitments, and to use the Debtors' trademark logos on any confidential information memoranda, presentations and other marketing materials prepared in connection with the administration of either Credit Facility or the syndication of the Incremental Commitments, with your consent (which consent not to be unreasonably withheld, conditioned or delayed), in any advertisements that we may place after the closing of the Credit Facilities or the Incremental Commitments in financial and other newspapers, journals, the World Wide Web, home page or otherwise, at their own expense describing its services to the Debtors hereunder.  You also understand and acknowledge that we may provide to market data collectors, such as league table, or other service providers to the lending industry, information regarding the closing date, size, type, purpose of, and parties to, the Credit Facilities.

4.      Information

You hereby represent and warrant that (a) all written information (including the Information Materials), other than the financial projections and other forward-looking information (collectively, the "**_Projections_**") and information of a general economic or general industry nature (the "**_Information_**"), that has been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby, when taken as a whole, does not or will not, when furnished to us, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (giving effect to all supplements thereto) and (b) the Projections that have been or will be made available to us by you or any of your representatives in connection with the transactions contemplated hereby have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished to us (it being recognized by the Commitment Parties that such Projections are not to be viewed as facts and that actual results during the period or periods covered by any such Projections may differ from the projected results, and such differences may be material).  You agree that if, at any time prior to the Exit Facility Conversion Date, you become aware that any of the representations in the preceding sentence would be incorrect if such Information or Projections were furnished at such time and such representations were remade, in any material respect, then you will promptly supplement the Information and the Projections so that such representations when remade would be correct, in all material respects, under those circumstances.  You understand that in arranging each Credit Facility we may use and rely on the Information and Projections without independent verification thereof.

5.      Fees

As consideration for the commitments and agreements of the Commitment Parties hereunder, you agree to pay or cause to be paid the fees described in the Agency Fee Letter and the Upfront and Conversion Fee Letter, each dated as of the date hereof and delivered herewith (collectively, the "**_Fee Letters_**") on the terms and subject to the conditions set forth therein.

6.      Conditions

Each Commitment Party's commitments and agreements hereunder are subject to (a) in the case of the DIP Facility, the conditions set forth in Section 6 of the DIP Credit Agreement and (b) in the case of the Exit Facility, the conditions set forth in the Exit Facility Term Sheet under the heading "Conditions to Exit Facility Conversion Date".  It being understood and agreed that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, the Fee Letters and the Credit Documents other than those expressly stated in this <u>Section 6</u>.  Notwithstanding anything to the contrary in this Commitment Letter or the Fee Letters, your obligations hereunder and thereunder are subject to the entry of the DIP Order by the Bankruptcy Court.

7.      Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Parties, the Lead Arranger and any other arrangers or agents in respect of the Credit Facilities appointed pursuant to this Commitment Letter, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "**_indemnified person_**") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Fee Letters, either Credit Facility, the use of the proceeds thereof, any Incremental Commitments, the use of the proceeds thereof, or the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "**_Proceeding_**"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon written demand with customary backup documentation for any reasonable and documented out-of-pocket legal or other documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing

5

(limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the indemnified persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons), provided that the foregoing indemnity will not, as to any indemnified person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its controlled affiliates, directors, officers or employees, advisors or agents (collectively, the "*Related Parties*"), (ii) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or control affiliate of such indemnified person under this Commitment Letter or (iii) to the extent arising from any dispute solely among indemnified persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Lead Arranger, arranger (with respect to any Incremental Commitments), administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with this Commitment Letter, the Fee Letters, either Credit Facility, the use of the proceeds thereof, any Incremental Commitments, or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates; and (b) regardless of whether the DIP Facility becomes effective or the Exit Facility Conversion Date occurs, to reimburse each Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including, without limitation, due diligence expenses, syndication expenses, financial advisor's fees, consultant's fees, travel expenses, and the fees, charges and disbursements of counsel) incurred in connection with the Credit Facilities and any related documentation (including this Commitment Letter, the Fee Letters and the definitive financing documentation in connection with each Credit Facility and any Incremental Commitments) or the administration, amendment, modification or waiver thereof (limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the indemnified persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons). No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet, or for any special, indirect, consequential or punitive damages in connection with the Credit Facilities or the Incremental Commitments, or in connection with its activities related to the Credit Facilities or the Incremental Commitments, and you agree, to the extent permitted by applicable law, not to assert any claims against any indemnified person with respect to the foregoing. None of the indemnified persons or you or any of your or their respective Related Parties of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Fee Letters, the Credit Facilities, any Incremental Commitments, or the transactions contemplated hereby, *provided* that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 7.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless (a) such settlement includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to JPMorgan, any other Commitment Party, the Lead Arranger and the other indemnified persons.

8.      Sharing of Information, Affiliate Activities, Absence of Fiduciary Relationship.

JPMorgan, the other Commitment Parties and the Lead Arranger may employ the services of their respective affiliates in providing certain services hereunder and, in connection with the provision of such

services, may exchange with such affiliates information concerning you and the other companies that may be the subject of the Transactions contemplated by this Commitment Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits, and be subject to the obligations, of JPMorgan, the other Commitment Parties and the Lead Arranger hereunder.  JPMorgan, each other Commitment Party and the Lead Arranger shall be responsible for its respective affiliates' failure to comply with such obligations under this Commitment Letter.

You acknowledge that any of Commitment Parties or their respective affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  Each Commitment Party agrees severally (and not jointly) that it will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or its other relationships with you in connection with the performance by it of services for other companies, and it will not furnish any such information to other companies.  You also acknowledge that the Commitment Parties have no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You further acknowledge that each Commitment Party is a full service securities or banking firm engaged in securities trading and brokerage activities as well as providing investment banking and other financial services.  In the ordinary course of business, a Commitment Party and/or its affiliates may provide investment banking and other financial services to, and/or acquire, hold or sell, for its own accounts and the accounts of customers, equity, debt and other securities and financial instruments (including bank loans and other obligations) of, you and other companies with which you may have commercial or other relationships.  With respect to any securities and/or financial instruments so held by a Commitment Party, its affiliates or any of its respective customers, all rights in respect of such securities and financial instruments, including any voting rights, will be exercised by the holder of the rights, in its sole discretion.

You agree that the Commitment Parties and the Lead Arranger will act under this Commitment Letter as independent contractors and that nothing in this Commitment Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Commitment Party or the Lead Arranger and you, your respective equity holders or your and their respective affiliates.  You acknowledge and agree that (i) the transactions contemplated by this Commitment Letter are arm's-length commercial transactions between each Commitment Party or the Lead Arranger and, if applicable, its affiliates, on the one hand, and you, on the other, (ii) in connection therewith and with the process leading to such transaction each Commitment Party and the Lead Arranger and, if applicable, its respective affiliates, is acting solely as a principal and has not been, is not and will not be acting as an advisor, agent or fiduciary of you, your management, equity holders, creditors, affiliates or any other person and (iii) each Commitment Party and the Lead Arranger, if applicable, and each of their respective affiliates, has not assumed an advisory or fiduciary responsibility or any other obligation in favor of you or your affiliates with respect to the transactions contemplated hereby or the process leading thereto (irrespective of whether such Commitment Party or the Lead Arranger or any of its respective affiliates has advised or is currently advising you or your affiliates on other matters) except the obligations expressly set forth in this Commitment Letter.  You further acknowledge and agree that (i) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (ii) you are capable of evaluating and you understand and accept the terms, risks and conditions of the transactions contemplated hereby, and neither JPMorgan, nor any other Commitment Party or the Lead Arranger shall have any responsibility or liability to you with respect thereto, and (iii) no Commitment Party or the Lead Arranger is advising the Debtors as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction, and you shall consult with your own advisors concerning such matters and you shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby.  Any review by JPMorgan or any other Commitment Party or the Lead Arranger of the Debtors, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of JPMorgan or such other Commitment Party or the Lead Arranger, respectively, and shall not be on behalf of the Debtors.  You agree that you will not assert any claim against JPMorgan or any other Commitment

Party or the Lead Arranger based on an alleged breach of fiduciary duty by JPMorgan or such other Commitment Party or the Lead Arranger in connection with this Commitment Letter and the transactions contemplated hereby.

9.      Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any Fee Letter nor any of their terms or substance shall be disclosed by you, directly or indirectly, to any other person, except (a) to you and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) as may be required by or in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental or regulatory authority (in which case you agree, to the extent permitted by law, to inform us promptly thereof), (c) if the Commitment Parties consent in writing to such proposed disclosure, (d) in connection with the enforcement of your rights hereunder or under the Fee Letters or (e) this Commitment Letter and the existence and contents hereof (but not the Fee Letters or the contents thereof other than the existence thereof and the contents thereof as part of projections, pro forma information and a generic disclosure of aggregate sources and uses to the extent customary in marketing materials and other required filings) may be disclosed (x) in connection with the syndication or arrangement of the Credit Facilities or the Incremental Commitments, or in connection with, and as may be required for, any public filing and (y) to the parties to the Plan Support Agreement filed in the Chapter 11 Cases on the date hereof and any other party required by the Bankruptcy Court.  Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file the Fee Letters with the Bankruptcy Court under seal in form and substance reasonably satisfactory to JPMorgan or in a redacted manner in form and substance reasonably satisfactory to JPMorgan and provide an unredacted copy of the Fee Letters to the Bankruptcy Court, the Office of the United States Trustee for the Southern District of Texas and any other party required by the Bankruptcy Court and advisors to (i) any official committee appointed in the Chapter 11 Cases and (ii) the parties to the Plan Support Agreement filed in the Chapter 11 Cases on the date hereof; *provided*, that the disclosure of the Fee Letters to such advisors is on a confidential, "professionals only" basis.

Each Commitment Party severally (and not jointly) shall use all nonpublic information received by it in connection with the Credit Facilities and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; *provided, however*, that nothing herein shall prevent any Commitment Party from disclosing any such information (a) to any Lenders or participants or prospective Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case such Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority (including any self-regulatory authority) or other governmental authority purporting to have jurisdiction over JPMorgan, a Commitment Party or the Lead Arranger, or any of its respective affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law or regulation, to inform you promptly thereof prior to disclosure), (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of such Commitment Party (collectively, "***Representatives***") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its respective affiliates (*provided* that any such affiliate is advised of its obligation to retain such information as confidential, and such Commitment Party shall be responsible for its respective affiliates' compliance with this paragraph) solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by such Commitment Party, its affiliates or Representatives in breach of this Commitment Letter, (g) for purposes of establishing a "due diligence" defense, (h) in connection with the exercise of any remedies hereunder or under any Fee Letter or any suit, action or proceeding relating to this Commitment Letter, any Fee Letter or any Credit Facility and (i) pursuant to customary disclosure about the terms of the financing contemplated hereby in the ordinary course of business to market data collectors and similar service providers to the loan industry for league table purposes; *provided* that the disclosure of any such information to any Lenders or prospective

Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of such Commitment Party or customary market standards for dissemination of such type of information.  The provisions of this paragraph shall automatically terminate on the earlier of (a) the Exit Facility Conversion Date and (b) one year following the date of this Commitment Letter.

10.    Assignments

This Commitment Letter shall not be assignable by you without the prior written consent of each Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.

From the date hereof until the Exit Facility Expiration Date, each Commitment Party agrees not to assign its Prepetition RBL Claims under the Prepetition RBL Facility or the commitments and agreements hereunder, in whole or in part, without the prior written consent of the Borrower; provided, that, to the extent the Borrower consents to any assignment, the proposed new Commitment Party shall execute a joinder agreement in form and substance acceptable to the Borrower.

11.    Miscellaneous

Each Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates certain fees payable to such Commitment Party in such manner as such Commitment Party and its affiliates may agree in their sole discretion.  This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and each Commitment Party.  This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement.  Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof.  This Commitment Letter and the Fee Letters are the only agreements that have been entered into among us and you with respect to the Credit Facilities and set forth the entire understanding of the parties with respect thereto.  This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.  You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court.  You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum.  You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions, this Commitment Letter or the Fee Letters or the performance of services hereunder or thereunder.  Each of the Commitment Parties hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "**PATRIOT Act**"), it is required to obtain, verify and record information that identifies the Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify the Borrower and each Guarantor in accordance with

733425071 12335469

the PATRIOT Act.  This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Parties and each Lender.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter

The indemnification, fee, expense, jurisdiction, information and confidentiality provisions contained herein and in the Fee Letters shall remain in full force and effect regardless of whether definitive financing documentation for either Credit Facility shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to (confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the applicable Credit Agreement upon the occurrence of the effectiveness thereof.

If the foregoing correctly sets forth our agreement, please indicate your acceptance of the terms of this Commitment Letter and the Fee Letters by returning to us executed counterparts of this Commitment Letter and the Fee Letters not later than 11:59 p.m., New York City time, on October 18, 2019.  This offer will automatically expire at such time if we have not received such executed counterparts in accordance with the preceding sentence.  In the event that the initial borrowing under the DIP Facility does not occur on or before the Expiration Date (as defined below), then this Commitment Letter and the commitments hereunder (including, for the avoidance of doubt, the commitments with respect to the Exit Facility) shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension.  Following such initial borrowing under the DIP Facility, in the event that the initial borrowing under the Exit Facility does not occur on or before the Exit Facility Expiration Date (as defined below), then the commitments with respect to the Exit Facility shall automatically terminate unless the Commitment Parties shall, in their discretion, agree to an extension.

For purposes of this Commitment Letter (a) "***Expiration Date***" means 5:00 p.m., New York City time on the date that is sixty (60) days after the Petition Date if the DIP Order has not been entered by the Bankruptcy Court, and (b) "***Exit Facility Expiration Date***" means the Maturity Date (as defined in the DIP Credit Agreement).

*[Signature Pages Follow]*

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
    Name:
    Title:

*Commitment Letter Signature Page*

CITIBANK, N.A.

By: _____

Name: Paul Giarratano
Title: Vice President

BMO HARRIS FINANCING, INC.

By: _____
    Name:  Marc Maslanka
    Title: Vice President

*Commitment Letter Signature Page*

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH

By: _____

    Name:   MIKHAIL FAYBUSOVICH
    Title:    AUTHORIZED SIGNATORY

By: _____

    Name:
    Title:    Didier Siffer
               Authorized Signatory

*Commitment Letter Signature Page*

ROYAL BANK OF CANADA

By: _____
     Name:  Amy G. Josephson
     Title:   Authorized Signatory

*Commitment Letter Signature Page*

THE TORONTO-DOMINION BANK,
NEW YORK BRANCH

By: _____

    Name:  Michael Borowiecki
    Title:   Authorized Signatory

*Commitment Letter Signature Page*

DNB CAPITAL LLC

By: _____
    Name:  Kelton Glasscock
    Title:  Sr. Vice President


By: _____
    Name:  Leila Zomorrodian
    Title: First Vice President

*Commitment Letter Signature Page*

SUMITOMO MITSUI BANKING CORPORATION

By: _____

Name:
Title:        Toshitake Funaki
              Managing Director

*Commitment Letter Signature Page*

Accepted and agreed to as of
the date first above written:

**EP ENERGY LLC**

By: _____
Name: Kyle A. McCuen
Title: Senior Vice President, Chief Financial
      Officer and Treasurer

**EPE ACQUISITION LLC**

By: _____
Name: Kyle A. McCuen
Title: Senior Vice President, Chief Financial
      Officer and Treasurer

*Commitment Letter Signature Page*

SENIOR SECURED SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

Dated as of [●], 2019

among

EPE ACQUISITION LLC,
as Holdings,

EP ENERGY LLC,
as the Borrower,

The Several Lenders
from Time to Time Parties Hereto,

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent, Collateral Agent and an Issuing Bank

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| SECTION 1. | Definitions. | 1 |
| 1.1 | Defined Terms | 1 |
| 1.2 | Other Interpretive Provisions | 34 |
| 1.3 | Accounting Terms | 34 |
| 1.4 | Rounding | 35 |
| 1.5 | References to Agreements, Laws, Etc | 35 |
| 1.6 | Times of Day | 35 |
| 1.7 | Timing of Payment or Performance | 35 |
| 1.8 | [Reserved] | 35 |
| 1.9 | Classification of Loans and Borrowings | 35 |
| 1.10 | Divisions | 35 |
| SECTION 2. | Amount and Terms of Credit. | 35 |
| 2.1 | Commitments | 35 |
| 2.2 | Minimum Amount of Each Borrowing; Maximum Number of Borrowings | 36 |
| 2.3 | Notice of Borrowing | 36 |
| 2.4 | Disbursement of Funds | 37 |
| 2.5 | Repayment of Loans; Evidence of Debt | 37 |
| 2.6 | Conversions and Continuations | 38 |
| 2.7 | Pro Rata Borrowings | 39 |
| 2.8 | Interest | 39 |
| 2.9 | Interest Periods | 39 |
| 2.10 | Increased Costs, Illegality, Etc | 40 |
| 2.11 | Compensation | 42 |
| 2.12 | Change of Lending Office | 43 |
| 2.13 | Notice of Certain Costs | 43 |
| 2.14 | [Reserved] | 43 |
| 2.15 | Defaulting Lenders | 43 |
| 2.16 | Payments and Claims | 45 |
| SECTION 3. | Letters of Credit. | 45 |
| 3.1 | Letters of Credit | 45 |
| 3.2 | Letter of Credit Applications | 46 |
| 3.3 | Letter of Credit Participations | 47 |
| 3.4 | Agreement to Repay Letter of Credit Drawings | 49 |
| 3.5 | Increased Costs | 50 |
| 3.6 | New or Successor Issuing Bank | 51 |
| 3.7 | Role of Issuing Bank | 51 |
| 3.8 | Cash Collateral | 52 |
| 3.9 | Existing Letters of Credit | 52 |
| SECTION 4. | Fees; Commitments. | 53 |
| 4.1 | Fees | 53 |
| 4.2 | Voluntary Reduction of Commitments | 54 |
| 4.3 | Mandatory Termination of Commitments | 54 |
| SECTION 5. | Payments. | 54 |
| 5.1 | Voluntary Prepayments | 54 |
| 5.2 | Mandatory Prepayments | 55 |

| | | |
|---|---|---|
| 5.3 | Method and Place of Payment | 55 |
| 5.4 | Net Payments | 56 |
| 5.5 | Computations of Interest and Fees | 59 |
| 5.6 | Limit on Rate of Interest | 60 |
| SECTION 6. | Conditions Precedent to Initial Borrowing. | 60 |
| SECTION 7. | Conditions Precedent to All Subsequent Credit Events | 62 |
| SECTION 8. | Representations and Warranties. | 63 |
| 8.1 | Corporate Status | 63 |
| 8.2 | Corporate Power and Authority; Enforceability | 63 |
| 8.3 | No Violation | 63 |
| 8.4 | Litigation | 64 |
| 8.5 | Margin Regulations | 64 |
| 8.6 | Governmental Approvals | 64 |
| 8.7 | Investment Company Act | 64 |
| 8.8 | True and Complete Disclosure | 64 |
| 8.9 | Financial Condition; Financial Statements | 64 |
| 8.10 | Tax Matters | 65 |
| 8.11 | Compliance with ERISA | 65 |
| 8.12 | Subsidiaries | 66 |
| 8.13 | Intellectual Property | 66 |
| 8.14 | Environmental Laws | 66 |
| 8.15 | Properties | 66 |
| 8.16 | [Reserved] | 67 |
| 8.17 | Insurance | 67 |
| 8.18 | Gas Imbalances, Prepayments | 67 |
| 8.19 | Marketing of Production | 67 |
| 8.20 | Hedge Transactions | 67 |
| 8.21 | Patriot Act; Sanctions | 67 |
| 8.22 | No Material Adverse Effect | 68 |
| 8.23 | Foreign Corrupt Practices Act | 68 |
| 8.24 | Budget | 68 |
| 8.25 | Priority and Liens | 68 |
| SECTION 9. | Affirmative Covenants. | 68 |
| 9.1 | Information Covenants | 68 |
| 9.2 | Books, Records and Inspections | 73 |
| 9.3 | Maintenance of Insurance | 74 |
| 9.4 | Payment of Taxes | 74 |
| 9.5 | Consolidated Corporate Franchises | 74 |
| 9.6 | Compliance with Statutes, Regulations, Etc | 74 |
| 9.7 | ERISA | 74 |
| 9.8 | Maintenance of Properties | 75 |
| 9.9 | Transactions with Affiliates | 76 |
| 9.10 | End of Fiscal Years; Fiscal Quarters | 77 |
| 9.11 | Additional Guarantors, Grantors and Collateral | 77 |
| 9.12 | Use of Proceeds | 77 |
| 9.13 | Further Assurances | 78 |
| 9.14 | Reserve Reports | 78 |
| 9.15 | [Reserved] | 79 |
| 9.16 | Change in Business | 79 |
| 9.17 | Holdings Covenant | 79 |

| | | |
|---|---|---|
| 9.18 | Bankruptcy Pleadings | 80 |
| SECTION 10. | Negative Covenants. | 80 |
| 10.1 | Limitation on Indebtedness | 80 |
| 10.2 | Limitation on Liens | 83 |
| 10.3 | Limitation on Fundamental Changes | 85 |
| 10.4 | Limitation on Sale of Assets | 87 |
| 10.5 | Limitation on Investments | 88 |
| 10.6 | Limitation on Restricted Payments | 90 |
| 10.7 | Limitations on Debt Payments and Amendments | 92 |
| 10.8 | Negative Pledge Agreements | 92 |
| 10.9 | Limitation on Subsidiary Distributions | 94 |
| 10.10 | Hedge Transactions | 95 |
| 10.11 | Financial Covenants | 96 |
| 10.12 | [Reserved] | 96 |
| 10.13 | Use of Credit Extensions in Violation of Sanctions | 96 |
| 10.14 | Superpriority Claims | 97 |
| 10.15 | Bankruptcy Orders | 97 |
| SECTION 11. | Events of Default. | 97 |
| 11.1 | Payments | 97 |
| 11.2 | Representations, Etc | 97 |
| 11.3 | Covenants | 97 |
| 11.4 | Default Under Other Agreements | 97 |
| 11.5 | [Reserved] | 98 |
| 11.6 | ERISA | 98 |
| 11.7 | Guarantee | 98 |
| 11.8 | Security Documents | 98 |
| 11.9 | Judgments | 99 |
| 11.10 | Change of Control | 99 |
| 11.11 | Bankruptcy Related Events | 99 |
| 11.12 | Application of Proceeds | 100 |
| SECTION 12. | The Agents. | 101 |
| 12.1 | Appointment | 101 |
| 12.2 | Delegation of Duties | 102 |
| 12.3 | Exculpatory Provisions | 102 |
| 12.4 | Reliance by Agents | 102 |
| 12.5 | Notice of Default | 103 |
| 12.6 | Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders | 103 |
| 12.7 | Indemnification | 103 |
| 12.8 | Agents in Its Individual Capacities | 104 |
| 12.9 | Successor Agents | 104 |
| 12.10 | Withholding Tax | 105 |
| 12.11 | Security Documents and Collateral Agent under Security Documents and Guarantee | 105 |
| 12.12 | Right to Realize on Collateral and Enforce Guarantee | 106 |
| 12.13 | Administrative Agent May File Proofs of Claim | 107 |
| 12.14 | Certain ERISA Matters | 108 |
| SECTION 13. | Miscellaneous. | 109 |
| 13.1 | Amendments, Waivers and Releases | 109 |
| 13.2 | Notices | 111 |
| 13.3 | No Waiver; Cumulative Remedies | 111 |

WEIL:\97169709\10\74473.0003

13.4     Survival of Representations and Warranties..........................................................111
13.5     Payment of Expenses; Indemnification ................................................................112
13.6     Successors and Assigns; Participations and Assignments ...................................113
13.7     [Reserved]............................................................................................................117
13.8     Adjustments; Set-off............................................................................................117
13.9     Counterparts .........................................................................................................118
13.10    Severability...........................................................................................................118
13.11    Integration.............................................................................................................118
13.12    GOVERNING LAW ............................................................................................118
13.13    Submission to Jurisdiction; Waivers ...................................................................119
13.14    Acknowledgments .................................................................................................119
13.15    WAIVERS OF JURY TRIAL ...............................................................................120
13.16    Confidentiality......................................................................................................120
13.17    Release of Collateral and Guarantee Obligations ................................................121
13.18    USA PATRIOT Act ..............................................................................................122
13.19    Payments Set Aside ..............................................................................................122
13.20    Reinstatement .......................................................................................................122
13.21    Disposition of Proceeds .......................................................................................122
13.22    Collateral Matters; Hedge Agreements ................................................................123
13.23    Agency of the Borrower for the Other Credit Parties...........................................123
13.24    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...........123
13.25    Acknowledgement Regarding Any Supported QFCs.............................................123

EXHIBITS[1]

| | |
|---|---|
| Exhibit A | Form of Reserve Report Certificate |
| Exhibit B | Form of Notice of Borrowing |
| Exhibit C | Form of Guarantee |
| Exhibit D | Form of Mortgage |
| Exhibit E | Form of Collateral Agreement |
| Exhibit F | [Reserved] |
| Exhibit G | Form of Assignment and Acceptance |
| Exhibit H | Form of Promissory Note |
| Exhibit I | Form of Intercompany Note |
| Exhibit J | [Reserved] |
| Exhibit K | Form of Non-Bank Tax Certificate |
| Exhibit L | Form of DIP Order |
| Exhibit M | Initial Budget |
| Exhibit N | Initial Emergence Budget |

SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Commitments |
| Schedule 1.1(b) | Excluded Equity Interests |
| Schedule 1.1(c) | Excluded Subsidiaries |
| Schedule 1.1(e) | Closing Date Subsidiary Guarantors |
| Schedule 1.1(f) | Closing Date Hedge Banks |
| Schedule 3.9 | Existing Letters of Credit |
| Schedule 8.4 | Litigation |
| Schedule 8.12 | Subsidiaries |
| Schedule 8.18 | Closing Date Gas Imbalance |
| Schedule 8.19 | Closing Date Marketing Agreements |
| Schedule 8.20 | Closing Date Hedge Agreements |
| Schedule 9.9 | Closing Date Affiliate Transactions |
| [Schedule 9.13(b) | Further Assurances] |
| Schedule 10.1 | Closing Date Indebtedness |
| Schedule 10.2(d) | Closing Date Liens |
| Schedule 10.4(i) | Scheduled Dispositions |
| Schedule 10.5(d) | Closing Date Investments |
| Schedule 10.8 | Closing Date Negative Pledge Agreements |
| Schedule 13.2 | Notice Addresses |

---

[1] NTD – Forms of Exhibits to be mutually agreed.

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of [●], 2019, among EPE Acquisition LLC, a Delaware limited liability company ("Holdings"), EP Energy LLC, a Delaware limited liability company and a wholly owned subsidiary of Holdings (the "Borrower"), the banks, financial institutions and other lending institutions from time to time parties as lenders hereto (each a "Lender" and, collectively, the "Lenders"), JPMORGAN CHASE BANK, N.A., as administrative agent and collateral agent for the Lenders and an issuer of Letters of Credit, and each other Issuing Bank from time to time party hereto.

WHERAS, the Borrower is a party to that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, supplemented or otherwise modified, the "Existing RBL Credit Agreement"), among Holdings, the Borrower, the lenders from time to time party thereto (the "Existing RBL Lenders") and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "Existing RBL Agent") and an issuing bank;

WHEREAS, on October 3, 2019 (the "Petition Date"), the Borrower and certain Affiliates of the Borrower (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court;

WHEREAS, the Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession under sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that the Existing RBL Lenders provide it with a senior secured super-priority debtor-in-possession revolving credit and letter of credit facilities by converting their commitments under the Existing RBL Credit Agreement into commitments hereunder (the "DIP Facility"), to be used during the Chapter 11 Cases, and the Existing RBL Lenders party hereto as Lenders have indicated their willingness to lend on the terms and conditions set forth herein;

WHEREAS, the Guarantors have agreed to guarantee the Obligations of the Borrower hereunder and the Borrower and each Guarantor have agreed to secure all of the Obligations of the Borrower under the Credit Documents by granting to the Administrative Agent, for the benefit of the Administrative Agent and the other Lenders, a security interest in and lien upon all or substantially all of their assets; and

WHEREAS, pursuant to the terms of the DIP Order, all Obligations will be secured by valid perfected Liens on all or substantially all of the assets of the Credit Parties, having the priorities set forth in the DIP Order;

NOW, THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto hereby agree as follows:

SECTION 1.      Definitions.

1.1      Defined Terms.

As used herein, the following terms shall have the meanings specified below:

"ABR" shall mean for any day a fluctuating rate per annum equal to the highest of (a) the Federal Funds Effective Rate plus ½ of 1%, (b) the Prime Rate and (c) the LIBOR Rate for a one-month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.0%; *provided* that, for the avoidance of doubt, for purposes of calculating the LIBOR Rate pursuant to clause (c) above, the LIBOR Rate for any day shall be based on the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on such day by reference to the rate appearing on the Reuters Screen LIBOR01 Page (or any successor page or any successor service, or any substitute page or substitute for such service, providing rate quotations comparable to the Reuters Screen LIBOR01 Page, as determined by the

Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London interbank market) for a period equal to one-month; provided further that, for purposes of this Agreement, in no event shall ABR be less than zero.  Any change in the ABR due to a change in such rate announced by the Administrative Agent, in the Federal Funds Effective Rate or in the one-month LIBOR Rate shall take effect at the opening of business on the day specified in the public announcement of such change.  If ABR is being used as an alternate rate of interest pursuant to Section 2.10(d) hereof, then ABR shall be the greater of clause (a) and (b) above and shall be determined without reference to clause (c) above.

"ABR Loan" shall mean each Loan bearing interest based on the ABR.

"Acceptable Plan of Reorganization" means a chapter 11 plan of reorganization, which shall (a) be consistent in all material respects with the Exit Facility Term Sheet and give effect to the transactions contemplated by the Exit Facility Term Sheet or (b) otherwise be in form and substance reasonably satisfactory to the Administrative Agent and the Required Revolving Lenders (as defined in the Exit Facility Term Sheet); *provided*, that, for the avoidance of doubt, the plan described in the "Restructuring Term Sheet" attached as Exhibit A to the Plan Support Agreement filed in the Chapter 11 Cases on October [●], 2019 shall constitute an "Approved Plan".

"Adequate Protection Liens" has the meaning assigned in the DIP Order.

"Adjusted Total Commitment" shall mean, at any time, the Total Commitment less the aggregate amount of Commitments of all Defaulting Lenders.

"Administrative Agent" shall mean JPMorgan Chase Bank, N.A., as the administrative agent for the Lenders under this Agreement and the other Credit Documents, or any successor administrative agent appointed in accordance with the provisions of Section 12.9.

"Administrative Agent's Office" shall mean the Administrative Agent's address and, as appropriate, account as set forth on Schedule 13.2, or such other address or account as the Administrative Agent may from time to time notify in writing to the Borrower and the Lenders.

"Administrative Questionnaire" shall mean, for each Lender, an administrative questionnaire in a form approved by the Administrative Agent.

"Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise. "Controlling" ("controlling") and "controlled" shall have meanings correlative thereto.

"Agents" shall mean the Administrative Agent and the Collateral Agent.

"Agreement" shall mean this Senior Secured Superpriority Debtor-in-Possession Credit Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction applicable to the Borrower or any of its Subsidiaries or Holdings from time to time concerning or relating to bribery or corruption.

"Applicable Margin" shall mean, for any day, (a) with respect to any ABR Loan, 2.50% per annum or (b) with respect to any LIBOR Loan, 3.50% per annum.

"Approved Fund" shall mean any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Approved Petroleum Engineers" shall mean (a) Netherland, Sewell & Associates, Inc., (b) Ryder Scott Company, L.P., (c) DeGolyer and MacNaughton, (d) Cawley, Gillespie & Associates, Inc., and (e) at the Borrower's option, any other independent petroleum engineers selected by the Borrower and reasonably acceptable to the Administrative Agent.

"Asset Coverage Ratio" means, as of any date of determination, the ratio of (a) the sum of (i) the PV-10 of the Credit Parties' Proved Developed Producing Reserves as set forth in the most recently delivered Reserve Report and (ii) Hedge Value of the Credit Parties' Hedge Transactions set forth in the certificate most recently delivered to the Administrative Agent pursuant to Section 9.1(g) to (b) the sum of (i) the aggregate Total Exposures of all Lenders at such time and (ii) outstanding "Loans" under and as defined in the Existing RBL Credit Agreement; *provided* that the calculation of PV-10 of the Credit Parties' Proved Developed Producing Reserves for purposes of calculating the Asset Coverage Ratio shall only require the following updates (to the extent applicable) as of the last day of the Monthly Test Period: (a) changes in strip prices for oil and natural gas, (b) wells brought online or Disposed of during such Monthly Test Period, (c) production forecast for wells with less than six months of production, (d) the termination or unwinding of, or creation of any off-setting positions in respect of, any commodity hedge positions or any other Hedge Transaction, and (e) other inputs if materially changed from the most recently delivered Reserve Report.

"Assignment and Acceptance" shall mean an assignment and acceptance substantially in the form of Exhibit G or such other form as may be approved by the Administrative Agent.

"Authorized Officer" shall mean as to any Person, the President, the Chief Executive Officer, the Chief Financial Officer, the Chief Operating Officer, the Treasurer, the Assistant or Vice Treasurer, the Vice President-Finance, the General Counsel and any manager, managing member or general partner, in each case, of such Person, and any other senior officer designated as such in writing to the Administrative Agent by such Person.

"Auto-Extension Letter of Credit" shall have the meaning provided in Section 3.2(b).

"Available Commitment" shall mean, at any time, (a) the Total Commitment at such time minus (b) the aggregate Total Exposures of all Lenders at such time.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Price Deck" shall mean the Administrative Agent's forward curve for each of oil, natural gas and other Hydrocarbons, as applicable, furnished to the Borrower by the Administrative Agent from time to time in accordance with the terms of this Agreement.

"Bankruptcy Code" shall mean title 11 of the United States Code.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of Texas.

"Beneficial Ownership Certification" shall mean a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" shall mean 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in Section 3(3) of ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code to which Section 4975 of the Code applies, and (c) any Person whose assets include (for purposes of the Plan Asset Regulations or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"benefited Lender" shall have the meaning provided in Section 13.8.

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board" shall mean the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board of Directors" shall mean, as to any Person, the board of directors or other governing body of such Person, or if such Person is owned or managed by a single entity, the board of directors or other governing body of such entity.

"Borrower" shall have the meaning provided in the introductory paragraph hereto.

"Borrowing" shall mean the incurrence of one Type of Loan on a given date (or resulting from conversions on a given date) having, in the case of LIBOR Loans, the same Interest Period (*provided* that ABR Loans incurred pursuant to Section 2.10(b) shall be considered part of any related Borrowing of LIBOR Loans).

"Budget" shall have the meaning provided in Section 9.1(k).

"Business Day" shall mean any day excluding Saturday, Sunday and any other day on which banking institutions in New York City or Houston, Texas are authorized by law or other governmental actions to close, and, if such day relates to (a) any interest rate settings as to a LIBOR Loan, (b) any fundings, disbursements, settlements and payments in respect of any such LIBOR Loan, or (c) any other dealings pursuant to this Agreement in respect of any such LIBOR Loan, such day shall be a day on which dealings in deposits in Dollars are conducted by and between banks in the London interbank eurodollar market.

"Capital Lease" shall mean, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" is classified as a "capital lease".

"Capitalized Lease Obligations" shall mean, as applied to any Person, all obligations under Capital Leases of such Person or any of its Restricted Subsidiaries, in each case, taken at the amount thereof accounted for as liabilities in accordance with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)".

"Carve-Out" shall have the meaning provided in the DIP Order.

"Cash Collateralize" shall have the meaning provided in Section 3.8(c).

"<u>Cash Management Agreement</u>" shall mean any agreement entered into from time to time by the Borrower or any of the Borrower's Restricted Subsidiaries in connection with cash management services for collections, other Cash Management Services and for operating, payroll and trust accounts of such Person, including automatic clearing house services, controlled disbursement services, electronic funds transfer services, lockbox services, stop payment services and wire transfer services.

"<u>Cash Management Bank</u>" shall mean any Person that either (a) at the time it provides Cash Management Services, (b) on the Closing Date or (c) at any time after it has provided any Cash Management Services, is a Lender or an Agent or an Affiliate of a Lender or an Agent.

"<u>Cash Management Obligations</u>" shall mean obligations owed by the Borrower or any Restricted Subsidiary to any Cash Management Bank in connection with, or in respect of, any Cash Management Services.

"<u>Cash Management Services</u>" shall mean (a) commercial credit cards, merchant card services, purchase or debit cards, including non-card e-payables services, (b) treasury management services (including controlled disbursement, overdraft, automated clearing house fund transfer services, return items and interstate depository network services) and (c) any other demand deposit or operating account relationships or other cash management services, including any Cash Management Agreement.

"<u>Casualty Event</u>" shall mean, with respect to any Collateral, (a) any damage to, destruction of, or other casualty or loss involving, any property or asset or (b) any seizure, condemnation, confiscation or taking under the power of eminent domain of, or any requisition of title or use of, or relating to, or any similar event in respect of, any property or asset.

"<u>CFC</u>" shall mean a "<u>controlled foreign corporation</u>" within the meaning of Section 957 of the Code.

"<u>Change in Law</u>" shall mean, after the Closing Date (or, with respect to any Lender, such later date on which such Lender becomes a party to this Agreement), (a) the adoption of, or the taking effect of, any law, treaty, order, policy, rule or regulation, (b) any change in any law, treaty, order, policy, rule or regulation or in the administrative, interpretation or application thereof by any Governmental Authority or (c) compliance by any Lender with any guideline, request, directive or order enacted or promulgated by any central bank or other governmental or quasi-governmental authority (whether or not having the force of law); *provided* that notwithstanding anything herein to the contrary, the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) and all guidelines, requests, directives, orders, rules and regulations adopted, enacted or promulgated in connection therewith or in the implementation thereof shall be deemed to be included as a Change in Law regardless of the date adopted, enacted, promulgated or implemented, but only to the extent a Lender is imposing applicable increased costs or costs in connection with capital adequacy requirements similar to those described in <u>clauses (a)(ii)</u> and (c) of <u>Section 2.10</u> generally on other borrowers of loans under United States reserve-based credit facilities.

"<u>Change of Control</u>" shall mean and be deemed to have occurred if any Person, entity or "<u>group</u>" (within the meaning of Section 13(d) or 14(d) of the Exchange Act, but excluding any employee benefit plan of such Person, entity or "<u>group</u>" and its Subsidiaries and any Person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan), other than the Permitted Holders (or any holding company parent of Holdings owned directly or indirectly by the Permitted Holders), shall at any time have acquired direct or indirect beneficial ownership (as defined in Rules 13(d)-3 and 13(d)-5 under the Exchange Act) of voting power of the outstanding Voting Stock of the Borrower having more than the greater of (A) 35% of the ordinary voting power for the election of directors of the Borrower and (B) the percentage of the ordinary voting power for the election of directors of the Borrower owned in the aggregate, directly or indirectly, beneficially, by the Permitted Holders, unless the Permitted Holders have, at such time, the right or

the ability by voting power, contract or otherwise to elect or designate for election at least a majority of the members of the Board of Directors of the Borrower.

"Chapter 11 Cases" means the voluntary cases of the Debtors filed under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court from and after the Petition Date including any and all proceedings arising in or related to such cases.

"Closing Date" shall mean [●], 2019.

"Co-Investors" shall mean (a) the Sponsors, (b) any other investors party to that certain Interim Investors Agreement dated as of February 24, 2012[2] (as amended from time to time to the date hereof) and any other investors that may become party thereto prior to or on the Closing Date, in each case of this clause (b) disclosed to the Administrative Agent on or prior to the Closing Date, and (c) the respective Affiliates of the investors described in clause (b), excluding in each case any of their respective operating portfolio companies.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall have the meaning provided for such term in each of the Security Documents and shall include any and all assets securing any or all of the Obligations; *provided* that with respect to any Mortgages, "Collateral," as defined herein, shall include "Mortgaged Property" as defined therein.

"Collateral Agent" shall mean JPMorgan Chase Bank, N.A., as collateral agent under the Security Documents, or any successor collateral agent appointed in accordance with the provisions of Section 12.9.

"Collateral Agreement" shall mean the Collateral Agreement dated as of the Closing Date and among the Borrower, the other grantors party thereto and the Collateral Agent, for the benefit of the Secured Parties, substantially in the form of Exhibit E.

"Commitment" shall mean, (a) with respect to each Lender on the Closing Date, the portion of such Lender's commitments under the Existing RBL Credit Agreement that shall be deemed to be "Commitments" under this Agreement from and after the Closing Date, which is set forth opposite such Lender's name on Schedule 1.1(a) as such Lender's "Commitment" and (b) in the case of any Lender that becomes a Lender after the Closing Date, the amount specified as such Lender's "Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed a portion of the Total Commitment, in each case as the same may be changed from time to time pursuant to the terms of this Agreement.

"Commitment Fee" shall have the meaning provided in Section 4.1(a).

"Commitment Letter" shall mean that certain Commitment Letter dated as of October 18, 2019 between each Commitment Party (as defined in the Commitment Letter), Holdings and the Borrower.

"Commitment Percentage" shall mean, at any time, for each Lender, the percentage obtained by dividing (a) such Lender's Commitment at such time by (b) the amount of the Total Commitment at such time; *provided* that at any time when the Total Commitment shall have been terminated, each Lender's Commitment Percentage shall be the percentage obtained by dividing (i) such Lender's Total Exposure at such time by (ii) the aggregate Total Exposures of all Lenders at such time.

"Confidential Information" shall have the meaning provided in Section 13.16.

---

[2] NTD: Reference to be confirmed.

"<u>Confirmation Order</u>" means an order, in form and substance reasonably satisfactory to the Administrative Agent, confirming the Acceptable Plan of Reorganization and approving treatment of the Existing RBL Lenders consistent with the Exit Facility Term Sheet.

"<u>Consolidated Total Assets</u>" shall mean, as of any date of determination, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the Borrower and the Restricted Subsidiaries, without giving effect to any amortization of the amount of intangible assets since December 31, 2011, calculated on a pro forma basis after giving effect to any subsequent acquisition or Disposition of a Person, business or assets.

"<u>Contractual Requirement</u>" shall have the meaning provided in <u>Section 8.3</u>.

"<u>Covered Entity</u>" means any of the following:

    (i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

    (ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

    (iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Covered Party</u>" has the meaning assigned to it in <u>Section 13.25</u>.

"<u>Credit Documents</u>" shall mean this Agreement, the Guarantee, the Security Documents, each Letter of Credit, and any promissory notes issued by the Borrower under this Agreement.

"<u>Credit Event</u>" shall mean and include the making (but not the conversion or continuation) of a Loan and the issuance of a Letter of Credit.

"<u>Credit Party</u>" shall mean each of the Borrower and the Guarantors.

"<u>Debtors</u>" shall have the meaning provided in the recitals to this Agreement.

"<u>Default</u>" shall mean any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"<u>Default Rate</u>" shall have the meaning provided in <u>Section 2.8(c)</u>.

"<u>Default Right</u>" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"<u>Defaulting Lender</u>" shall mean any Lender whose acts or failures to act, whether directly or indirectly, cause it to meet any part of the definition of "<u>Lender Default</u>".

"<u>DIP Facility</u>" shall have the meaning provided in the recitals to this Agreement.

"<u>DIP Order</u>" means the final order of the Bankruptcy Court authorizing and approving the Debtors' entry into and performance under the DIP Facility on a final basis, including the granting of the Liens in respect of the DIP Facility and adequate protection in respect of the Existing RBL Lenders, in favor of the Administrative Agent and the Secured Parties, substantially in the form of <u>Exhibit L</u>, with only such

modifications thereto as are satisfactory in form and substance to the Administrative Agent and the Majority Lenders.

"Disposition" shall have the meaning provided in Section 10.4.

"Dispose" or "Disposed of" shall have a correlative meaning to the defined term of "Disposition".

"Disqualified Stock" shall mean, with respect to any Person, any Equity Interests of such Person which, by its terms, or by the terms of any security into which it is convertible or for which it is putable or exchangeable, or upon the happening of any event, matures or is mandatorily redeemable (other than solely for Qualified Equity Interests), other than as a result of a change of control or asset sale, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than as a result of a change of control or asset sale to the extent the terms of such Equity Interests provide that such Equity Interests shall not be required to be repurchased or redeemed until the Maturity Date has occurred or such repurchase or redemption is otherwise permitted by this Agreement (including as a result of a waiver hereunder)), in whole or in part, in each case prior to the date that is 91 days after the Maturity Date; *provided* that, if such Equity Interests are issued to any plan for the benefit of employees of the Borrower or its Subsidiaries or by any such plan to such employees, such Equity Interests shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries in order to satisfy applicable statutory or regulatory obligations; *provided*, *further*, that any Equity Interests held by any future, present or former employee, director, manager or consultant of the Borrower, any of its Subsidiaries or any of its Parent Entities or any other entity in which the Borrower or a Restricted Subsidiary has an Investment and is designated in good faith as an "affiliate" by the board of directors or managers of the Borrower, in each case pursuant to any equity holders' agreement, management equity plan or stock incentive plan or any other management or employee benefit plan or agreement shall not constitute Disqualified Stock solely because it may be required to be repurchased by the Borrower or its Subsidiaries.

"Distressed Person" shall have the meaning provided in the definition of "Lender-Related Distress Event".

"Dollars" and "$" shall mean dollars in lawful currency of the United States of America.

"Domestic Subsidiary" shall mean each Subsidiary of the Borrower that is organized under the laws of the United States or any state thereof, or the District of Columbia.

"Drawing" shall have the meaning provided in Section 3.4(b).

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Emergence Budget" shall have the meaning provided in Section 9.1(k).

"Environmental Claims" shall mean any and all actions, suits, orders, decrees, demands, demand letters, claims, liens, notices of noncompliance, restrictions on use, operations or transferability, violation or potential responsibility or investigation (other than internal reports prepared by or on behalf of the Borrower or any of the Subsidiaries (a) in the ordinary course of such Person's business or (b) as required in connection with a financing transaction or an acquisition or disposition of real estate) or proceedings arising under or based upon any Environmental Law or any permit issued, or any approval given, under any such Environmental Law (hereinafter, "Claims"), including, without limitation, (i) any and all Claims by governmental or regulatory authorities for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law and (ii) any and all Claims by any third party seeking damages, contribution, indemnification, cost recovery, compensation or injunctive relief relating to the presence, release or threatened release of Hazardous Materials or arising from alleged injury or threat of injury to health or safety (to the extent relating to human exposure to Hazardous Materials), or the environment including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands.

"Environmental Law" shall mean any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code and rule of common law now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to the protection of the environment, including, without limitation, ambient air, surface water, groundwater, land surface and subsurface strata and natural resources such as wetlands, or human health or safety (to the extent relating to human exposure to Hazardous Materials), or Hazardous Materials.

"Equity Interests" of any person shall mean any and all shares, interests, rights to purchase or otherwise acquire, warrants, options, participations or other equivalents of or interests in (however designated) equity or ownership of such person, including any preferred stock, any limited or general partnership interest and any limited liability company membership interest, and any securities or other rights or interests convertible into or exchangeable for any of the foregoing.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time.  Section references to ERISA are to ERISA as in effect on the Closing Date and any subsequent provisions of ERISA amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) that together with the Borrower would be deemed to be a "single employer" within the meaning of Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor Person), as in effect from time to time.

"Event of Default" shall have the meaning provided in Section 11.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

"Excluded Equity Interests" shall mean (a) any Equity Interests with respect to which, in the reasonable judgment of the Administrative Agent and the Borrower evidenced in writing delivered to the Agent, the cost or other consequences of pledging such Equity Interests in favor of the Secured Parties under the Security Documents shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom, (b) solely in the case of any pledge of Equity Interests of any Foreign Subsidiary or FSHCO (in each case, that is owned directly by the Borrower or a Guarantor) to secure the Obligations, any Equity Interest that is Voting Stock of such Foreign Subsidiary or FSHCO in excess of 65% of the outstanding Equity Interests of such class, (c) any

Equity Interests to the extent the pledge thereof would be prohibited by any Requirement of Law, (d) in the case of (i) any Equity Interests of any Subsidiary to the extent the pledge of such Equity Interests is prohibited by Contractual Requirements or (ii) any Equity Interests of any Subsidiary that is not a Wholly-Owned Subsidiary at the time such Subsidiary becomes a Subsidiary, any Equity Interests of each such Subsidiary described in clause (i) or (ii) to the extent (A) that a pledge thereof to secure the Obligations is prohibited by any applicable Contractual Requirement (other than customary non-assignment provisions which are ineffective under the Uniform Commercial Code or other applicable Requirements of Law), (B) any Contractual Requirement prohibits such a pledge without the consent of any other party; *provided* that this clause (B) shall not apply if (1) such other party is a Credit Party or a Wholly-Owned Subsidiary or (2) consent has been obtained to consummate such pledge (it being understood that the foregoing shall not be deemed to obligate the Borrower or any Subsidiary to obtain any such consent) and for so long as such Contractual Requirement or replacement or renewal thereof is in effect, or (C) a pledge thereof to secure the Obligations would give any other party (other than a Credit Party or a Wholly-Owned Subsidiary) to any Contractual Requirement governing such Equity Interests the right to terminate its obligations thereunder (other than customary non-assignment provisions that are ineffective under the Uniform Commercial Code or other applicable Requirement of Law), (e) the Equity Interests of any Immaterial Subsidiary and any Unrestricted Subsidiary, (f) the Equity Interests of any Subsidiary of a Foreign Subsidiary, (g) any Equity Interests of any Subsidiary to the extent that the pledge of such Equity Interests would result in material adverse tax consequences to the Borrower or any Subsidiary as reasonably determined by the Borrower in a writing delivered to the Administrative Agent, and (h) any Equity Interests set forth on Schedule 1.1(b) which have been identified on or prior to the Closing Date in writing to the Administrative Agent by an Authorized Officer of the Borrower and agreed to by the Administrative Agent.

"Excluded Subsidiary" shall mean (a) each Domestic Subsidiary listed on Schedule 1.1(b) and each future Domestic Subsidiary, in each case, for so long as any such Subsidiary does not constitute a Material Subsidiary, (b) each Domestic Subsidiary that is not a Wholly-Owned Subsidiary (for so long as such Subsidiary remains a non-wholly-owned Restricted Subsidiary), (c) each Domestic Subsidiary that is prohibited by any applicable Contractual Requirement or Requirement of Law from guaranteeing or granting Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (and for so long as such restriction or any replacement or renewal thereof is in effect) or that would require consent, approval, license or authorization of a Governmental Authority to guarantee or grant Liens to secure the Obligations at the time such Subsidiary becomes a Restricted Subsidiary (unless such consent, approval, license or authorization has been received), (d) any Foreign Subsidiary, (e) any Domestic Subsidiary (i) that is a FSHCO or (ii) that is a direct or indirect Subsidiary of a Foreign Subsidiary, (f) each other Domestic Subsidiary acquired pursuant to a Permitted Acquisition financed with Indebtedness of the type incurred pursuant to Section 10.1(k) and would be permitted by the proviso contained in subclause (C) of Section 10.1(k)(i) and each Restricted Subsidiary thereof that guarantees such Indebtedness to the extent and so long as the financing documentation relating to such Permitted Acquisition to which such Restricted Subsidiary is a party prohibits such Restricted Subsidiary from guaranteeing or granting a Lien on any of its assets to secure the Obligations, (g) any other Domestic Subsidiary with respect to which, (x) in the reasonable judgment of the Administrative Agent and the Borrower, the cost or other consequences of providing a Guarantee of or granting Liens to secure the Obligations shall be excessive in view of the benefits to be obtained by the Lenders therefrom or (y) providing such a Guarantee or granting such Liens would result in material adverse tax consequences as reasonably determined by the Borrower, and (h) each Unrestricted Subsidiary.

"Excluded Swap Obligation" means, with respect to any Credit Party, any Secured Hedge Transaction, if and to the extent that, all or a portion of the guarantee of such Credit Party of, or the grant by such Credit Party of a security interest to secure, such Secured Hedge Transaction (or any guarantee thereof) is or becomes (as a result of a Change in Law after the date such Secured Hedge Transaction is entered into) illegal under the Commodity Exchange Act of 1936, as amended, or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Credit Party's failure for any reason to constitute a Qualified ECP Guarantor at the time such Credit Party's guarantee or such Credit Party's grant of such security interest becomes effective with respect to such Secured Hedge Transaction. If a Hedging Obligation arises under a Hedge Agreement governing more than one Secured Hedge

Transaction, such exclusion shall apply only to the portion of such Hedging Obligation that is attributable to Secured Hedge Transactions for which such guarantee or security interest is or becomes illegal.

"Excluded Taxes" shall mean, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of any Credit Party hereunder or under any other Credit Document, (i) Taxes imposed on or measured by its overall net income or branch profits (however denominated, and including (for the avoidance of doubt) any backup withholding in respect thereof under Section 3406 of the Code or any similar provision of state, local or foreign law), and franchise (and similar) Taxes imposed on it (in lieu of net income Taxes), in each case by a jurisdiction (including any political subdivision thereof) as a result of such recipient being organized in, having its principal office in, or in the case of any Lender, having its applicable lending office in, such jurisdiction, or as a result of any other present or former connection with such jurisdiction (other than any such connection arising solely from this Agreement or any other Credit Documents or any transactions contemplated thereunder), (ii) U.S. federal withholding Tax imposed on any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document that is required to be imposed on amounts payable to a Lender (other than to the extent such Lender is an assignee pursuant to a request by the Borrower under Section 13.7) pursuant to laws in force at the time such Lender becomes a party hereto (or designates a new lending office), except to the extent that such Lender (or its assignor, if any) was entitled, immediately prior to the designation of a new lending office (or assignment), to receive additional amounts or indemnification payments from any Credit Party with respect to such withholding Tax pursuant to Section 5.4, (iii) any Tax imposed on any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document that is attributable to the Administrative Agent's, any Lender's or any other recipient's failure to comply with Section 5.4(d), (e), (h) or (i) or (iv) any Tax imposed under FATCA.

"Existing Letters of Credit" shall mean each letter of credit existing on the Closing Date and identified on Schedule 3.9 and any amendments, extensions and renewals thereof.[3]

"Existing RBL Agent" shall have the meaning provided in the recitals to this Agreement.

"Existing RBL Credit Agreement" shall have the meaning provided in the recitals to this Agreement.

"Existing RBL Credit Documents" shall have the meaning of the term "Credit Documents" set forth in the Existing RBL Credit Agreement.

"Existing RBL Lenders" shall have the meaning provided in the recitals to this Agreement.

"Exit Facility Term Sheet" shall mean the "Senior Secured Exit Facility Summary of Principal Terms and Conditions" attached to the Commitment Letter as Exhibit B thereto.

"Fair Market Value" shall mean, with respect to any asset or group of assets on any date of determination, the value of the consideration obtainable in a Disposition of such asset at such date of determination assuming a Disposition by a willing seller to a willing purchaser dealing at arm's length and arranged in an orderly manner over a reasonable period of time having regard to the nature and characteristics of such asset, as determined by the Borrower in good faith.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), or any current or future Treasury regulations promulgated thereunder or official administrative interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code, any intergovernmental agreement entered into in connection with the implementation of such sections of the Code,

---

[3] NTD: Existing LC's to be rolled into the DIP.

and any fiscal or regulatory legislation, rules or practices adopted pursuant to any such intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"Federal Funds Effective Rate" shall mean, for any day, the weighted average of the per annum rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers on such day, as published on the next succeeding Business Day by the Federal Reserve Bank of New York or, if such rate is not so published for any date that is a Business Day, the Federal Funds Effective Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal Funds brokers of recognized standing selected by it; provided that if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.

"Financial Officer" of any Person shall mean the Chief Financial Officer, principal accounting officer, Treasurer or Assistant Treasurer (or equivalent officer) of such Person.

"Foreign Plan" shall mean any employee benefit plan, program, policy, arrangement or agreement maintained or contributed to by the Borrower or any of its Subsidiaries with respect to employees employed outside the United States other than any government or state sponsored plan or similar program that is not administered by the Borrower or any of its Subsidiaries.

"Foreign Subsidiary" shall mean each Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Fronting Fee" shall have the meaning provided in Section 4.1(c).

"FSHCO" shall mean any Domestic Subsidiary that owns (directly or through its Subsidiaries) no material assets other than the Equity Interests (and Indebtedness, if applicable) of one or more Foreign Subsidiaries that are CFCs or other FSHCOs.

"Fund" shall mean any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course.

"GAAP" shall mean generally accepted accounting principles in the United States of America, as in effect from time to time.

"Governmental Authority" shall mean any nation, sovereign or government, any state, province, territory or other political subdivision thereof, and any entity or authority exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government, including a central bank or stock exchange.

"Granting Lender" shall have the meaning provided in Section 13.6(g).

"Guarantee" shall mean the Guarantee made by any Guarantor in favor of the Collateral Agent for the benefit of the Secured Parties, substantially in the form of Exhibit C.

"Guarantee Obligations" shall mean, as to any Person, any obligation of such Person guaranteeing or intended to guarantee any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of such Person, whether or not contingent, (a) to purchase any such Indebtedness or any property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such Indebtedness or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain financial condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness, (c) to purchase property, securities or

services primarily for the purpose of assuring the owner of any such Indebtedness of the ability of the primary obligor to make payment of such Indebtedness or (d) otherwise to assure or hold harmless the owner of such Indebtedness against loss in respect thereof; *provided*, *however*, that the term "Guarantee Obligations" shall not include endorsements of instruments for deposit or collection in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition or Disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness).  The amount of any Guarantee Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Indebtedness in respect of which such Guarantee Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Guarantors" shall mean Holdings and each Domestic Subsidiary listed on Schedule 1.1(e) and each other Domestic Subsidiary (other than an Excluded Subsidiary) that becomes a party to the Guarantee after the Closing Date pursuant to Section 9.11 or otherwise.

"Hazardous Materials" shall mean (a) any petroleum or petroleum products, natural gas or natural gas liquids, radioactive materials, friable asbestos or asbestos containing materials, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing regulated levels of polychlorinated biphenyls, and radon gas, (b) any chemicals, materials or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous waste", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", or "pollutants", or words of similar import, under any applicable Environmental Law and (c) any other chemical, material or substance, which is prohibited, limited or regulated by any Environmental Law.

"Hedge Agreements" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, future contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, total return swap, credit spread transaction, repurchase transaction, reserve repurchase transaction, securities lending transaction, weather index transaction, spot contracts, fixed-price physical delivery contracts, whether or not exchange traded, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement. Notwithstanding the foregoing, agreements or obligations to physically sell any commodity at any index-based price shall not be considered Hedge Agreements.

"Hedge Bank" shall mean (a) any Person (other than the Borrower or any of its Subsidiaries) that (x) at the time it enters into a Hedge Transaction is a Lender or Agent or an Affiliate of a Lender or Agent, or (y) at any time after it enters into a Hedge Transaction becomes a Lender or Agent or an Affiliate of a Lender or Agent or (b) with respect to any Hedge Transaction that is in effect on the Closing Date, any Person (other than the Borrower or any of its Subsidiaries) that (x) is a Lender or Agent or an Affiliate of a Lender or Agent on the Closing Date or (y) is listed on Schedule 1.1(f) (and, in the case of this clause (y), any Affiliate of such Person).

"Hedge Transaction" shall mean any trade or other transaction entered into by a Person under a Hedge Agreement.

"<u>Hedge Value</u>" shall mean, with respect to any commodity Hedge Transaction, the mark to market value of such Hedge Transaction.

"<u>Hedging Obligations</u>" shall mean, with respect to any Person, the obligations of such Person under Hedge Agreements.

"<u>Highest Lawful Rate</u>" means, with respect to each Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Loans under laws applicable to such Lender which are presently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws allow as of the date hereof.

"<u>Historical Financial Statements</u>" shall mean (a) the audited consolidated balance sheets of the Borrower and its consolidated Subsidiaries as of December 30, 2018, and the related audited statements of income and comprehensive income, statements of changes in shareholders' equity and statements of cash flows for each of the fiscal years in the three-year period ended December 31, 2018 and (b) the unaudited interim consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of June 30, 2019, and the related statement of income and comprehensive income, statement of changes in shareholders' equity and statement of cash flows for the fiscal quarter ended June 30, 2019.

"<u>Holdings</u>" shall have the meaning provided in the recitals to this Agreement.

"<u>Hydrocarbon Interests</u>" shall mean all rights, titles, interests and estates now or hereafter acquired in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature.

"<u>Hydrocarbons</u>" shall mean oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products refined or separated therefrom.

"<u>Immaterial Subsidiary</u>" shall mean any Subsidiary that is not a Material Subsidiary.

"<u>Indebtedness</u>" of any Person shall mean, if and to the extent (other than with respect to <u>clause (g)</u> below) the same would constitute indebtedness or a liability in accordance with GAAP, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments, (c) the deferred purchase price of assets or services that in accordance with GAAP would be required to be shown as a liability on the balance sheet of such Person (other than (i) any earn-out obligation until such obligation becomes a liability on the balance sheet of such Person in accordance with GAAP and (ii) obligations resulting under firm transportation contracts or take or pay contracts entered into in the ordinary course of business), (d) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder, (e) the principal component of all Capitalized Lease Obligations of such Person, (f) net Hedging Obligations of such Person, (g) all indebtedness (excluding prepaid interest thereon) of any other Person secured by any Lien on any property owned by such Person, whether or not such Indebtedness has been assumed by such Person, (h) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase in respect of Disqualified Stock (excluding accrued dividends that have not increased the liquidation preference of such Disqualified Stock), (i) the undischarged balance of any production payment created by such Person or for the creation of which such Person directly or indirectly received payment and (j) without duplication, all Guarantee Obligations of such Person; *provided* that Indebtedness shall not include (i) trade and other ordinary-course payables and accrued expenses arising in the ordinary course of business, (ii) deferred or prepaid revenues, (iii) purchase price holdbacks in respect of a portion of the purchase price of an asset to satisfy warranty or other unperformed obligations of the respective seller, (iv) in the case of the Borrower and its Restricted Subsidiaries,

(A) all intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (B) intercompany liabilities in connection with the cash management, tax and accounting operations of the Borrower and the Restricted Subsidiaries, (v) [reserved], (vi) Production Payments and Reserve Sales, (vii) in-kind obligations relating to net oil, natural gas liquids or natural gas balancing positions arising in the ordinary course of business and (viii) any obligation in respect of a farm-in agreement or similar arrangement whereby such Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interest therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an oil or gas property.

For purposes hereof, the amount of any net Hedging Obligations on any date shall be deemed to be the Swap Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (g) above shall be deemed to be equal to the lesser of (i) the aggregate unpaid amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Liabilities" shall have the meaning provided in Section 13.5.

"Indemnified Taxes" shall mean all Taxes imposed on or with respect to or measured by, any payment by or on account of any obligation of any Credit Party hereunder or under any other Credit Document other than (a) Excluded Taxes and (b) Other Taxes.

"Industry Investment" shall mean Investments and/or expenditures made in the ordinary course of, and of a nature that is or shall have become customary in, the Oil and Gas Business as a means of actively engaging therein through agreements, transactions, interests or arrangements that permit one to share risks or costs, comply with regulatory requirements regarding local ownership or satisfy other objectives customarily achieved through the conduct of Oil and Gas Business jointly with third parties, including: (1) ownership interests (directly or through equity) in oil and gas properties or gathering, transportation, processing, or related systems; and (2) Investments and/or expenditures in the form of or pursuant to operating agreements, processing agreements, farm-in agreements, farm-out agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling arrangements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), and other similar agreements (including for limited liability companies) with third parties.

"Ineligible Institution" shall mean, subject to the provisions of Section 13.6(i), the persons identified in writing to the Administrative Agent by the Borrower on or prior to the Closing Date, which list may be updated from time to time after the Closing Date with the consent of the Administrative Agent (not to be unreasonably withheld or delayed) to add any operational competitors of the Borrower.

"Information" shall have the meaning provided in Section 8.8(a).

"Initial Budget" shall have the meaning provided in Section 6(j).

"Initial Emergence Budget" shall have the meaning provided in Section 6(j).

"Initial Reserve Report" shall mean the reserve engineers' report, as of August 1, 2019.

"Intercompany Note" shall mean the Intercompany Subordinated Note, dated as of the Closing Date, substantially in the form of Exhibit I executed by the Borrower and each other Subsidiary of the Borrower.

"Interest Period" shall mean, with respect to any Loan, the interest period applicable thereto, as determined pursuant to Section 2.9.

"Investment" shall have the meaning provided in Section 10.5.

"ISP" shall mean, with respect to any Letter of Credit, the "International Standby Practices 1998" published by the Institute of International Banking Law & Practice (or such later version thereof as may be in effect at the time of issuance).

"Issuer Documents" shall mean, with respect to any Letter of Credit, the Letter of Credit Application, and any other document, agreement and instrument entered into by the applicable Issuing Bank and the Borrower (or any Restricted Subsidiary) or in favor of the applicable Issuing Bank and relating to such Letter of Credit.

"Issuing Bank" shall mean (a) JPMorgan Chase Bank, N.A., any of its Affiliates or any replacement or successor appointed pursuant to Section 3.6, (b) Citibank, N.A. and any of its Affiliates, and (c) if requested by the Borrower and reasonably acceptable to the Administrative Agent, any other Person who is a Lender at the time of such request and who accepts such appointment (it being understood that, if any such Person ceases to be a Lender hereunder, such Person will remain an Issuing Bank with respect to any Letter of Credit issued by such Person that remained outstanding as of the date such Person ceased to be a Lender). If the Borrower requests JPMorgan Chase Bank, N.A. to issue a Letter of Credit, JPMorgan Chase Bank, N.A. may, in its discretion, arrange for such Letter of Credit to be issued by Affiliates of the Administrative Agent or any Lender, and in each such case the term "Issuing Bank" shall include any such Affiliate or Lender with respect to Letters of Credit issued by such Affiliate or Lender. References herein and in the other Credit Documents to an Issuing Bank shall be deemed to refer to the Issuing Bank in respect of the applicable Letter of Credit or to all Issuing Banks, as the context requires.

"Junior Liens" means Liens on the Collateral that are subordinated to the Liens granted under the Credit Documents pursuant to an intercreditor agreement reasonably acceptable to the Administrative Agent.

"L/C Borrowing" shall mean an extension of credit resulting from a drawing under any Letter of Credit which has not been reimbursed on the date when made or refinanced as a Borrowing. All L/C Borrowings shall be denominated in Dollars.

"L/C Maturity Date" shall mean the date that is five Business Days prior to the Maturity Date.

"L/C Obligations" shall mean, as at any date of determination, the aggregate amount available to be drawn under all outstanding Letters of Credit plus the aggregate of all Unpaid Drawings, including all L/C Borrowings. For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of Rule 3.14 of the ISP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"L/C Participant" shall have the meaning provided in Section 3.3(a).

"L/C Participation" shall have the meaning provided in Section 3.3(a).

"Lender" shall have the meaning provided in the preamble to this Agreement.

"Lender Default" shall mean (i) the refusal or failure of any Lender to make available its portion of any incurrence of Loans or participations in Letters of Credit, which refusal or failure is not cured within two Business Days after the date of such refusal or failure; (ii) the failure of any Lender to pay over to the Administrative Agent, any Issuing Bank or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute; (iii) a Lender has notified the Borrower or the Administrative Agent that it does not intend or expect to comply with any of its funding obligations or has made a public statement to that effect with respect to its funding obligations under the DIP Facility, (iv) the failure by a Lender to confirm in a manner reasonably satisfactory to the Administrative

Agent that it will comply with its obligations under the DIP Facility, which failure is not cured after the date of such failure, (v) a Distressed Person has admitted in writing that it is insolvent or such Distressed Person becomes subject to a Lender-Related Distress Event or (vi) a Lender or any Person that directly or indirectly controls such Lender, as the case may be, is or becomes the subject of a Bail-In Action.

"Lender-Related Distress Event" shall mean, with respect to any Lender, that such Lender or any Person that directly or indirectly controls such Lender (each, a "Distressed Person"), as the case may be, is or becomes subject to a voluntary or involuntary case with respect to such Distressed Person under any debt relief law, or a custodian, conservator, receiver or similar official is appointed for such Distressed Person or any substantial part of such Distressed Person's assets, or such Distressed Person or any Person that directly or indirectly controls such Distressed Person is subject to a forced liquidation, or such Distressed Person makes a general assignment for the benefit of creditors or is otherwise adjudicated as, or determined by any Governmental Authority having regulatory authority over such Distressed Person or its assets to be, insolvent or bankrupt; *provided* that a Lender-Related Distress Event shall not be deemed to have occurred solely by virtue of (i) the ownership or acquisition of any equity interests in any Lender or any Person that directly or indirectly controls such Lender by a Governmental Authority or an instrumentality thereof so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender or (ii) an undisclosed administration pursuant to the laws of the Netherlands.

"Letter of Credit" shall have the meaning provided in Section 3.1 and shall include the Existing Letters of Credit.

"Letter of Credit Application" shall have the meaning provided in Section 3.2.

"Letter of Credit Commitment" shall mean $50,000,000, as the same may be reduced from time to time pursuant to Section 3.1.

"Letter of Credit Exposure" shall mean, with respect to any Lender, at any time, the sum of (a) the principal amount of any Unpaid Drawings in respect of which such Lender has made (or is required to have made) payments to the applicable Issuing Bank pursuant to Section 3.4(a) at such time and (b) such Lender's Commitment Percentage of the Letters of Credit Outstanding at such time (excluding the portion thereof consisting of Unpaid Drawings in respect of which the Lenders have made (or are required to have made) payments to the applicable Issuing Bank pursuant to Section 3.4(a)) minus the amount of cash or deposit account balances held by the Administrative Agent to Cash Collateralize outstanding Letters of Credit and Unpaid Drawings under Section 3.8.

"Letter of Credit Fee" shall have the meaning provided in Section 4.1(b).

"Letters of Credit Outstanding" shall mean, at any time, the sum of, without duplication, (a) the aggregate Stated Amount of all outstanding Letters of Credit and (b) the aggregate principal amount of all Unpaid Drawings in respect of all Letters of Credit.

"LIBOR Loan" shall mean any Loan bearing interest at a rate determined by reference to the LIBOR Rate (other than an ABR Loan bearing interest by reference to the LIBOR Rate by virtue of clause (c) of the definition of ABR).

"LIBOR Rate" shall mean, for any Interest Period with respect to any Borrowing of a LIBOR Loan, the interest rate per annum appearing on Reuters Screen LIBOR01 Page (or on any successor page or any successor service, or any substitute page or substitute for such service, providing rate quotations comparable to those currently provided on Reuters Screen LIBOR01 Page, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to dollar deposits in the London

interbank market) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, as the rate for dollar deposits with a maturity comparable to such Interest Period; provided that if the quoted interest rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.  In the event that such rate is not available at such time for any reason, then the "LIBOR Rate" with respect to such Borrowing of such LIBOR Loan for such Interest Period shall be determined by the Administrative Agent by reference to such other comparable publicly available service for displaying the offered rate for dollar deposits in the London interbank market as may be selected by the Administrative Agent and, in the absence of availability, then such rate shall be the rate at which dollar deposits of an amount comparable to the Borrowing of such LIBOR Loan and for a maturity comparable to such Interest Period are offered by the principal office of the Administrative Agent in immediately available funds in the London interbank market at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"Lien" shall mean, with respect to any asset, (a) any mortgage, preferred mortgage, deed of trust, lien, notice of claim of lien, hypothecation, pledge, charge, security interest or similar encumbrance in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset or (c) Production Payments and Reserve Sales and the like payable out of Oil and Gas Properties; provided that in no event shall an operating lease be deemed to be a Lien.

"Liquidity" shall mean, as of any date of determination, the sum of (a) the Available Commitment on such date and (b) the aggregate amount of Unrestricted Cash of the Borrower and the Restricted Subsidiaries at such date.

"Loan" shall mean any loan made by any Lender to the Borrower pursuant to this Agreement.

"Majority Lenders" shall mean, at any date, (a) Non-Defaulting Lenders having or holding a majority of the Adjusted Total Commitment at such date, or (b) if the Total Commitment has been terminated or for the purposes of acceleration pursuant to Section 11, Non-Defaulting Lenders having or holding a majority of the outstanding principal amount of the Loans and Letter of Credit Exposure (excluding the Loans and Letter of Credit Exposure of Defaulting Lenders) in the aggregate at such date.

"Material Adverse Effect" shall mean a circumstance or condition affecting the business, assets, operations, properties or financial condition of the Borrower and the Subsidiaries, taken as a whole, that would, individually or in the aggregate, materially adversely affect (a) the ability of the Borrower and the other Credit Parties, taken as a whole, to perform their payment obligations under this Agreement or any of the other Credit Documents or (b) the rights and remedies of the Agents and the Lenders under this Agreement or under any of the other Credit Documents; provided, however, that Material Adverse Effect shall expressly exclude any change, event or occurrence, arising individually or in the aggregate, from events that could reasonably be expected to result from the filing or commencement of the Chapter 11 Cases or the announcement of the filing or commencement of the Chapter 11 Cases.

"Material Indebtedness" shall mean Indebtedness (other than Loans and Letters of Credit) of any one or more of the Borrower or any Restricted Subsidiary in an aggregate principal amount exceeding $25,000,000.

"Material Subsidiary" shall mean, at any date of determination, each Restricted Subsidiary of the Borrower (a) whose Total Assets (when combined with the assets of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of the Monthly Test Period were equal to or greater than 5% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (b) whose revenues (when combined with the revenues of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Monthly Test Period were equal to or greater than 5% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP; provided that if, at any time and from time to time after the Closing Date, Restricted Subsidiaries that are not

Material Subsidiaries have, in the aggregate, (i) Total Assets (when combined with the assets of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) at the last day of such Monthly Test Period equal to or greater than 10.0% of the Consolidated Total Assets of the Borrower and the Restricted Subsidiaries at such date or (ii) revenues (when combined with the revenues of such Subsidiary's Subsidiaries, after eliminating intercompany obligations) during such Monthly Test Period equal to or greater than 10.0% of the consolidated revenues of the Borrower and the Restricted Subsidiaries for such period, in each case determined in accordance with GAAP, then the Borrower shall, on the date on which financial statements for such quarter are delivered pursuant to this Agreement, designate in writing to the Administrative Agent one or more of such Restricted Subsidiaries as "Material Subsidiaries."

"Maturity Date" shall mean the earliest to occur of (a) the Scheduled Maturity Date, (b) the effective date of an Acceptable Plan of Reorganization, (c) the closing of a sale of substantially all of the equity or assets of the Debtors (unless consummated pursuant to an Acceptable Plan of Reorganization), or (d) the termination of the DIP Facility during the continuation of an Event of Default, or termination under this Agreement or the DIP Order.

"Maximum Total Commitment" shall mean $[●][4].

"Measurement Date" means the fourth Friday following the Closing Date, commencing [●], 2019, and each fourth Friday thereafter.

"Minimum Borrowing Amount" shall mean, with respect to any Borrowing of Loans, $500,000 (or, if less, the entire remaining Commitments at the time of such Borrowing).

"Minority Investment" shall mean any Person (other than a Subsidiary) in which the Borrower or any Restricted Subsidiary owns Equity Interests.

"Monthly Financials" shall mean the financial statements delivered, or required to be delivered, pursuant to Section 9.1(b)(ii), together with the accompanying Authorized Officer's certificate delivered, or required to be delivered, pursuant to Section 9.1(c).

"Monthly Test Period" shall mean, as of any date of determination, the period of twelve consecutive calendar months then most recently ended for which Monthly Financials have been delivered to the Administrative Agent.

"Moody's" shall mean Moody's Investors Service, Inc. or any successor by merger or consolidation to its business.

"Mortgage" shall mean a mortgage or a deed of trust, deed to secure debt, trust deed, assignment of as-extracted collateral, fixture filing or other security document entered into by the owner of a Mortgaged Property and the Collateral Agent for the benefit of the Secured Parties in respect of that Mortgaged Property, substantially in the form of Exhibit D (with such changes thereto as may be necessary to account for local law matters) or otherwise in such form as agreed between the Borrower and the Collateral Agent.

"Mortgaged Property" shall mean the Oil and Gas Properties and other assets appertaining thereto that are encumbered by a Mortgage and such other Oil and Gas Properties and other assets appertaining thereto with respect to which a Mortgage is granted pursuant to Section 9.11 or is subject to a Lien under the terms of the DIP Order; provided that, notwithstanding any provision in any Mortgage to the contrary, in no event shall any Building (as defined in the applicable Flood Insurance Regulation) or Manufactured (Mobile) Home (as defined in the applicable Flood Insurance Regulation) located on the Mortgaged Properties (as defined in the applicable Mortgage) within an area having special flood hazards and in which flood insurance is available

---

[4] NTD: To be the commitments rolling into the DIP Credit Agreement.

under the National Flood Insurance Act of 1968 be included in the definition of "Mortgaged Property" or "Mortgaged Properties" and no such Building or Manufactured (Mobile) Home shall be encumbered by any Mortgage.  As used herein, "Flood Insurance Regulations" shall mean (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 (amending 42 USC 4001, et seq.), as the same may be amended or recodified from time to time, and (iv) the Flood Insurance Reform Act of 2004 and any regulations promulgated thereunder.

"Multiemployer Plan" shall mean a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Non-Consenting Lender" shall have the meaning provided in Section 13.7(b).

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Extension Notice Date" shall have the meaning provided in Section 3.2(b).

"Non-U.S. Lender" shall mean any Lender (a) that is not disregarded as separate from its owner for U.S. federal income tax purposes and that is not a "United States person" as defined by Section 7701(a)(30) of the Code, or (b) that is disregarded as separate from its owner for U.S. federal income tax purposes and whose regarded owner is not a "United States person" as defined by Section 7701(a)(30) of the Code.

"Notice of Borrowing" shall mean a request of the Borrower in accordance with the terms of Section 2.3(a) and substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent (acting reasonably).

"Notice of Conversion or Continuation" shall have the meaning provided in Section 2.6(a).

"Obligations" shall mean all advances to, and debts, liabilities, obligations, covenants and duties of, any Credit Party arising under any Credit Document or otherwise with respect to any Loan or Letter of Credit or under any Secured Cash Management Agreement or Secured Hedge Transaction, in each case, entered into with the Borrower or any of its Restricted Subsidiaries, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the filing of the Chapter 11 Cases.  Without limiting the generality of the foregoing, the Obligations of the Credit Parties under the Credit Documents (and any of their Restricted Subsidiaries to the extent they have obligations under the Credit Documents) include the obligation (including Guarantee Obligations) to pay principal, interest, charges, expenses, fees, attorney costs, indemnities and other amounts payable by any Credit Party under any Credit Document.  Notwithstanding the foregoing, (a) the obligations of the Borrower or any Restricted Subsidiary under any Secured Hedge Transaction and under any Secured Cash Management Agreement shall be secured and guaranteed pursuant to the Security Documents and the Guarantee only to the extent that, and for so long as, the other Obligations are so secured and guaranteed and (b) any release of Collateral or Guarantors effected in the manner permitted by this Agreement and the other Credit Documents shall not require the consent of the holders of Hedging Obligations under Secured Hedge Transactions or of the holders of Cash Management Obligations under Secured Cash Management Agreements. Notwithstanding the foregoing, Excluded Swap Obligations shall not be an Obligation of any Guarantor that is not a Qualified ECP Guarantor.

"Oil and Gas Business" shall mean:

(a)     the business of acquiring, exploring, exploiting, developing, producing, operating and disposing of interests in oil, natural gas, natural gas liquids, liquefied natural gas and other Hydrocarbons and mineral properties or products produced in association with any of the foregoing;

WEIL:\97169709\10\74473.0003

(b)      the business of gathering, marketing, distributing, treating, processing, storing, refining, selling and transporting of any production from such interests or properties and products produced in association therewith and the marketing of oil, natural gas, other Hydrocarbons and minerals obtained from unrelated Persons;

(c)      any other related energy business, including power generation and electrical transmission business, directly or indirectly, from oil, natural gas and other Hydrocarbons and minerals produced substantially from properties in which Holdings or its Restricted Subsidiaries, directly or indirectly, participate;

(d)      any business relating to oil field sales and service; and

(e)      any business or activity relating to, arising from, or necessary, appropriate, incidental or ancillary to the activities described in the foregoing clauses (a) through (d) of this definition.

"Oil and Gas Properties" shall mean (a) Hydrocarbon Interests, (b) the properties now or hereafter pooled or unitized with Hydrocarbon Interests, (c) all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority) which may affect all or any portion of the Hydrocarbon Interests, (d) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests, (e) all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests, (f) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Hydrocarbon Interests and (g) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or property (excluding drilling rigs, automotive equipment, rental equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, gas processing plants and pipeline systems and any related infrastructure to any thereof, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

"Other Taxes" shall mean any and all present or future stamp, registration, documentary, intangible, recording, filing or any other excise, property or similar Taxes (including interest, fines, penalties, additions to tax and related reasonable out-of-pocket expenses with regard thereto) arising from any payment made hereunder or made under any other Credit Document or from the execution or delivery of, registration or enforcement of, consummation or administration of, or otherwise with respect to, this Agreement or any other Credit Document; provided that such term shall not include any of the foregoing Taxes (i) that result from an assignment, grant of a participation pursuant to Section 13.6(c) or transfer or assignment to or designation of a new lending office or other office for receiving payments under any Credit Document ("Assignment Taxes") to the extent such Assignment Taxes are imposed as a result of a connection between the assignor/participating Lender and/or the assignee/Participant and the taxing jurisdiction (other than a connection arising solely from any Credit Documents or any transactions contemplated thereunder), except to the extent that any such action described in this proviso is requested or required by the Borrower, or (ii) that are Excluded Taxes.

"Overnight Rate" shall mean, for any day, the greater of (a) the Federal Funds Effective Rate and (b) an overnight rate determined by the Administrative Agent or the applicable Issuing Bank, as the case may be, in accordance with banking industry rules on interbank compensation.

"Parent Entity" shall mean any Person that is a direct or indirect parent company (which may be organized as a partnership) of Holdings and/or the Borrower, as applicable.

"Participant" shall have the meaning provided in Section 13.6(c).

"Participant Register" shall have the meaning provided in Section 13.6(c).

"Patriot Act" shall have the meaning provided in Section 13.18.

"PBGC" shall mean the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Pension Act" shall mean the Pension Protection Act of 2006, as it presently exists or as it may be amended from time to time.

"Permitted Acquisition" shall mean the acquisition, by merger or otherwise, by the Borrower or any of the Restricted Subsidiaries of assets (including any assets constituting a business unit, line of business or division) or Equity Interests, so long as (a) such acquisition and all transactions related thereto shall be consummated in all material respects in accordance with Requirements of Law; (b) if such acquisition involves the acquisition of Equity Interests of a Person that upon such acquisition would become a Subsidiary, such acquisition shall result in the issuer of such Equity Interests becoming a Restricted Subsidiary and, to the extent required by Section 9.11, a Guarantor; (c) such acquisition shall result in the Collateral Agent, for the benefit of the Secured Parties, being granted a security interest in any Equity Interests or any assets so acquired to the extent required by Section 9.11; (d) after giving effect to such acquisition, no Default or Event of Default shall have occurred and be continuing; and (e) after giving effect to such acquisition, the Borrower and its Restricted Subsidiaries shall be in compliance with Section 9.16.

"Permitted Acquisition Consideration" shall mean in connection with any Permitted Acquisition, the aggregate amount (as valued at the Fair Market Value of such Permitted Acquisition at the time such Permitted Acquisition is made) of, without duplication: (a) the purchase consideration paid or payable in cash for such Permitted Acquisition, whether payable at or prior to the consummation of such Permitted Acquisition or deferred for payment at any future time, whether or not any such future payment is subject to the occurrence of any contingency, and including any and all payments representing the purchase price and any assumptions of Indebtedness and/or Guarantee Obligations, "earn-outs" and other agreements to make any payment the amount of which is, or the terms of payment of which are, in any respect subject to or contingent upon the revenues, income, cash flow or profits (or the like) of any Person or business and (b) the aggregate amount of Indebtedness incurred or assumed in connection with such Permitted Acquisition; provided, in each case, that any such future payment that is subject to a contingency shall be considered Permitted Acquisition Consideration only to the extent of the reserve, if any, required under GAAP (as determined at the time of the consummation of such Permitted Acquisition) to be established in respect thereof for the Borrower or its Restricted Subsidiaries.

"Permitted Holders" shall mean (i) the Co-Investors (and each Person to whom any Co-Investor transfers Equity Interests of the Borrower or any Parent Entity in connection with the primary equity syndication following the Closing Date), (ii) officers, directors, employees and other members of management of the Borrower (or any of its Parent Entities) or any of its Restricted Subsidiaries who are or become holders of Equity Interests of the Borrower (or any Parent Entity), (iii) any Person that has no material assets other than the capital stock of the Borrower and that, directly or indirectly, holds or acquires beneficial ownership of 100% on a fully diluted basis of the voting Equity Interests of the Borrower, and of which no other Person or "group" (within the

meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date), other than any of the other Permitted Holders specified in clauses (i) and (ii), beneficially owns more than the greater of 35% and the percentage beneficially owned by the Permitted Holders specified in clauses (i) and (ii) on a fully diluted basis of the voting Equity Interests thereof and (iv) any "group" (within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the Closing Date) the members of which include any of the other Permitted Holders specified in clauses (i) and (ii) and that, directly or indirectly, hold or acquire beneficial ownership of the voting Equity Interests of the Borrower (a "Permitted Holder Group"), so long as (1) each member of the Permitted Holder Group has voting rights proportional to the percentage of ownership interests held or acquired by such member and (2) no Person or other "group" (other than the other Permitted Holders specified in clauses (i) and (ii)) beneficially owns more than the greater of 35% and the percentage beneficially owned by the Permitted Holders specified in clauses (i) and (ii) on a fully diluted basis of the voting Equity Interests held by the Permitted Holder Group.

"Permitted Investments" shall mean:

(a)     securities issued or unconditionally guaranteed by the United States government or any agency or instrumentality thereof, in each case having maturities and/or reset dates of not more than 24 months from the date of acquisition thereof;

(b)     securities issued by any state, territory or commonwealth of the United States of America or any political subdivision of any such state, territory or commonwealth or any public instrumentality thereof or any political subdivision of any such state, territory or commonwealth or any public instrumentality thereof having maturities of not more than 24 months from the date of acquisition thereof and, at the time of acquisition, having an investment grade rating generally obtainable from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, then from another nationally-recognized rating service);

(c)     commercial paper maturing no more than 12 months after the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally-recognized rating service);

(d)     time deposits with, or domestic and LIBOR certificates of deposit or bankers' acceptances maturing no more than two years after the date of acquisition thereof issued by, any Lender or any other bank or trust company having combined capital, surplus and undivided profits of not less than $500,000,000 in the case of domestic banks and $100,000,000 (or the Dollar equivalent thereof) in the case of foreign banks;

(e)     repurchase agreements with a term of not more than 180 days for underlying securities of the type described in clauses (a), (b) and (d) above entered into with any bank meeting the qualifications specified in clause (d) above or securities dealers of recognized national standing;

(f)     marketable short-term money market and similar funds (i) either having assets in excess of $500,000,000 or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally-recognized rating service);

(g)     shares of investment companies that are registered under the Investment Company Act of 1940 and substantially all the investments of which are one or more of the types of securities described in clauses (a) through (f) above; and

(h)       in the case of Investments by any Restricted Foreign Subsidiary or Investments made in a country outside the United States of America, other customarily utilized high-quality Investments in the country where such Restricted Foreign Subsidiary is located or in which such Investment is made.

"Permitted Liens" shall mean:

(a)       Liens for taxes, assessments or governmental charges or claims not yet overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP (or in the case of any Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction), or for property taxes on property that the Borrower or one of its Subsidiaries has determined to abandon if the sole recourse for such tax, assessment, charge or claim is to such property;

(b)       Liens in respect of property or assets of the Borrower or any of the Restricted Subsidiaries imposed by law, such as landlords', vendors', suppliers', carriers', warehousemen's, repairmen's, construction contractors', workers' and mechanics' Liens and other similar Liens arising in the ordinary course of business or incident to the exploration, development, operation or maintenance of Oil and Gas Properties, in each case so long as such Liens arise in the ordinary course of business and do not individually or in the aggregate have a Material Adverse Effect;

(c)       Liens arising from judgments or decrees in circumstances not constituting an Event of Default under Section 11.9;

(d)       Liens incurred or pledges or deposits made in connection with workers' compensation, unemployment insurance and other types of social security, old age pension, public liability obligations or similar legislation, and deposits securing liabilities to insurance carriers under insurance or self-insurance arrangements in respect of such obligations, or to secure (or secure the Liens securing) liability for reimbursement or indemnification obligations of (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to the Borrower or any Subsidiary;

(e)       deposits and other Liens securing (or securing the bonds or similar instruments securing) the performance of tenders, statutory obligations, plugging and abandonment obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (including letters of credit issued in lieu of such bonds or to support the issuance thereof) incurred in the ordinary course of business, including those incurred to secure health, safety and environmental obligations in the ordinary course of business, or otherwise constituting Investments permitted by Section 10.5;

(f)       ground leases, subleases, licenses or sublicenses in respect of real property on which facilities owned or leased by the Borrower or any of its Restricted Subsidiaries are located;

(g)       easements, rights-of-way, licenses, restrictions (including zoning restrictions), title defects, exceptions, deficiencies or irregularities in title, encroachments, protrusions, servitudes, permits, conditions and covenants and other similar charges or encumbrances (including in any rights-of-way or other property of the Borrower or its Restricted Subsidiaries for the purpose of roads, pipelines, transmission lines, transportation lines, distribution lines for the removal of gas, oil or other minerals or timber, and other like purposes, or for joint or common use of real estate, rights of way, facilities and equipment) not interfering in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole and, to the extent reasonably agreed by the Administrative Agent, any exception on the title reports issued in connection with any Oil and Gas Property;

(h)     (i) any interest or title of a lessor, sublessor, licensor or sublicensor under any lease, liens reserved in oil, gas or other Hydrocarbons, minerals, leases for bonus, royalty or rental payments and for compliance with the terms of such lease and (ii) any interest or title of a lessor, sublessor, licensor or sublicensor or secured by a lessor's, sublessor's, licensor's or sublicensor's interest under any lease, sublease, license or sublicense entered into by the Borrower or any Restricted Subsidiary in the ordinary course of business or otherwise permitted by this Agreement;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     Liens on goods or inventory the purchase, shipment or storage price of which is financed by a documentary letter of credit or bankers' acceptance issued for the account of the Borrower or any of its Restricted Subsidiaries; *provided* that such Lien secures only the obligations of the Borrower or such Restricted Subsidiaries in respect of such letter of credit or bankers' acceptance to the extent permitted under Section 10.1;

(k)     leases, licenses, subleases or sublicenses granted to others not interfering in any material respect with the business of the Borrower and its Restricted Subsidiaries, taken as a whole;

(l)     Liens arising from precautionary Uniform Commercial Code financing statement or similar filings made in respect of operating leases entered into by the Borrower or any of its Restricted Subsidiaries;

(m)     Liens created in the ordinary course of business in favor of banks and other financial institutions over credit balances of any bank accounts of the Borrower and the Restricted Subsidiaries held at such banks or financial institutions, as the case may be, to facilitate the operation of cash pooling and/or interest set-off arrangements in respect of such bank accounts in the ordinary course of business;

(n)     Liens which arise in the ordinary course of business under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, farm-in agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements that are usual or customary in the Oil and Gas Business and are for claims which are not delinquent or that are being contested in good faith and by appropriate proceedings for which appropriate reserves have been established to the extent required by and in accordance with GAAP; *provided* that any such Lien referred to in this clause does not materially impair the use of the property covered by such Lien for the purposes for which such property is held by the Borrower or any Restricted Subsidiary;

(o)     Liens on pipelines and pipeline facilities that arise by operation of law or other like Liens arising by operation of law in the ordinary course of business and incident to the exploration, development, operation and maintenance of Oil and Gas Properties, each of which is in respect of obligations that do not constitute Indebtedness for borrowed money and are not yet overdue for a period of more than 30 days or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP; and

(p)     any zoning or similar law or right reserved to or vested in any Governmental Authority to control or regulate the use of any real property that does not materially interfere with the ordinary conduct of the business of the Borrower and its Restricted Subsidiaries, taken as a whole.

"<u>Permitted Refinancing Indebtedness</u>" shall mean, with respect to any Indebtedness (the "<u>Refinanced Indebtedness</u>"), any Indebtedness issued or incurred in exchange for, or the net proceeds of which are used to modify, extend, refinance, renew, replace or refund (collectively to "<u>Refinance</u>" or a "<u>Refinancing</u>" or "<u>Refinanced</u>"), such Refinanced Indebtedness (or previous refinancing thereof constituting Permitted Refinancing Indebtedness); *provided* that (A) the principal amount (or accreted value, if applicable) of any such Permitted Refinancing Indebtedness does not exceed the principal amount (or accreted value, if applicable) of the Refinanced Indebtedness outstanding immediately prior to such Refinancing except by an amount equal to the unpaid accrued interest and premium thereon <u>plus</u> other amounts paid and fees and expenses incurred in connection with such Refinancing <u>plus</u> an amount equal to any existing commitment unutilized and letters of credit undrawn thereunder, (B) if the Indebtedness being Refinanced is Indebtedness permitted by <u>Section 10.1(i)</u> or <u>10.1(k)</u>, the direct and contingent obligors with respect to such Permitted Refinancing Indebtedness immediately prior to such Refinancing are not changed as a result of such Refinancing (except that a Credit Party may be added as an additional obligor), (C) other than with respect to a Refinancing in respect of Indebtedness permitted pursuant to <u>Section 10.1(h)</u>, such Permitted Refinancing Indebtedness shall have a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Refinanced Indebtedness, and (D) if the Indebtedness being Refinanced is Indebtedness permitted by <u>Section 10.1(i)</u> or <u>10.1(k)</u>, terms and conditions of any such Permitted Refinancing Indebtedness, taken as a whole, are not materially less favorable to the Lenders than the terms and conditions of the Refinanced Indebtedness being Refinanced (including, if applicable, as to collateral priority and subordination, but excluding as to interest rates, fees, floors, funding discounts and redemption or prepayment premiums); *provided* that a certificate of an Authorized Officer of the Borrower delivered to the Administrative Agent at least three Business Days prior to the incurrence or issuance of such Indebtedness, together with a reasonably detailed description of the material terms and conditions of such Indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the foregoing requirement shall be conclusive evidence that such terms and conditions satisfy the foregoing requirement.

"<u>Person</u>" shall mean any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any Governmental Authority.

"<u>Petition Date</u>" shall have the meaning provided in the recitals to this Agreement.

"<u>Petroleum Industry Standards</u>" shall mean the Definitions for Oil and Gas Reserves promulgated by the Society of Petroleum Engineers (or any generally recognized successor) as in effect at the time in question.

"<u>Plan</u>" shall mean any single-employer plan, as defined in Section 4001 of ERISA and subject to Title IV of ERISA, that is or was within any of the preceding six plan years maintained or contributed to by (or to which there is or was an obligation to contribute or to make payments to) the Borrower or an ERISA Affiliate (other than any Multiemployer Plan).

"<u>Plan Asset Regulations</u>" shall mean 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"<u>Prime Rate</u>" shall mean the rate of interest last quoted by The Wall Street Journal as the "<u>Prime Rate</u>" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Board (as determined by the Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

WEIL:\97169709\10\74473.0003

"Pro Forma Basis" shall mean, as to any Person, for any events as described below that occur subsequent to the commencement of a period for which the financial effect of such events is being calculated, and giving effect to the events for which such calculation is being made, such calculation as will give pro forma effect to such events as if such events occurred on the first day of the four consecutive fiscal quarter period ended on or before the occurrence of such event (the "Reference Period"): (i) in making any determination on a Pro Forma Basis, all Indebtedness (including Indebtedness issued, incurred or assumed as a result of, or to finance, any relevant transactions and for which the financial effect is being calculated, whether incurred under this Agreement or otherwise, but excluding normal fluctuations in revolving Indebtedness incurred for working capital purposes) issued, incurred, assumed or permanently repaid during the Reference Period (or, in the case of determinations made pursuant to Sections 10.1, 10.2, 10.5, 10.6 and 10.7, occurring during the Reference Period or thereafter and through and including the date upon which the respective Permitted Acquisition or relevant transaction is consummated) shall be deemed to have been issued, incurred, assumed or permanently repaid at the beginning of such period, and (ii) (A) any Subsidiary Redesignation then being designated, effect shall be given to such Subsidiary Redesignation and all other Subsidiary Redesignations after the first day of the relevant Reference Period and on or prior to the date of the respective Subsidiary Redesignation then being designated, collectively, and (B) any designation of a Restricted Subsidiary as an Unrestricted Subsidiary, effect shall be given to such designation and all other designations of Restricted Subsidiaries as Unrestricted Subsidiaries after the first day of the relevant Reference Period and on or prior to the date of the then applicable designation of a Restricted Subsidiary as an Unrestricted Subsidiary, collectively.

"Production Payments and Reserve Sales" shall mean the grant or transfer by the Borrower or any of its Restricted Subsidiaries to any Person of a royalty, overriding royalty, net profits interest, production payment (whether volumetric or dollar-denominated), partnership or other interest in Oil and Gas Properties, reserves or the right to receive all or a portion of the production or the proceeds from the sale of production attributable to such properties where the holder of such interest has recourse solely to such production or proceeds of production, subject to the obligation of the grantor or transferor to operate and maintain, or cause the subject interests to be operated and maintained, in a reasonably prudent manner or other customary standard or subject to the obligation of the grantor or transferor to indemnify for environmental, title or other matters customary in the Oil and Gas Business, including any such grants or transfers.

"Proved Developed Producing Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and "Developed Producing Reserves."

"Proved Developed Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves" or (b) "Developed Non-Producing Reserves."

"Proved Reserves" shall mean oil and gas reserves that, in accordance with Petroleum Industry Standards, are classified as both "Proved Reserves" and one of the following: (a) "Developed Producing Reserves", (b) "Developed Non-Producing Reserves" or (c) "Undeveloped Reserves".

"PTE" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"PV-10" shall mean, with respect to any Proved Developed Producing Reserves expected to be produced from any Oil and Gas Properties, the net present value, discounted at 10% per annum, of the future net revenues expected to accrue to the Borrower's and the Credit Parties' collective interests in such reserves during the remaining expected economic lives of such reserves, calculated in accordance with the most recent Bank Price Deck provided to the Borrower by the Administrative Agent.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to it in Section 13.25.

"Qualified ECP Guarantor" means, in respect of any Secured Hedge Transaction, each Credit Party that has total assets exceeding $10,000,000 at the time such Secured Hedge Transaction is incurred or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act of 1936, as amended, or any regulation promulgated thereunder.

"Qualified Equity Interests" means any Equity Interests of Holdings or the Borrower or any Parent Entity other than Disqualified Stock.

"Refinance" shall have the meaning provided in the definition of "Permitted Refinancing Indebtedness."

"Register" shall have the meaning provided in Section 13.6(b)(iv).

"Regulation U" shall mean Regulation U of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulation X" shall mean Regulation X of the Board as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Reimbursement Date" shall have the meaning provided in Section 3.4(a).

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, advisors, representatives and members of such Person or such Person's Affiliates and any Person that possesses, directly or indirectly, the power to direct or cause the direction of the management or policies of such Person, whether through the ability to exercise voting power, by contract or otherwise.

"Reportable Event" shall mean an event described in Section 4043 of ERISA and the regulations thereunder, other than any event as to which the 30-day notice period has been waived.

"Required Cash Collateral Amount" shall have the meaning provided in Section 3.8(c).

"Requirement of Law" shall mean, as to any Person, any law, treaty, rule, regulation, statute, order, ordinance, decree, judgment, consent decree, writ, injunction, settlement agreement or governmental requirement enacted, promulgated or imposed or entered into or agreed by any Governmental Authority, in each case applicable to or binding upon such Person or any of its property or assets or to which such Person or any of its property or assets is subject.

"Reserve Report" shall mean the Initial Reserve Report and any other subsequent report, in form and substance reasonably satisfactory to the Administrative Agent, setting forth, as of each June 30th or December 31st the Proved Reserves and the Proved Developed Reserves attributable to the Oil and Gas Properties of the Borrower and the Credit Parties, together with a projection of the rate of production and future net revenues, operating expenses (including production taxes and ad valorem expenses) and capital expenditures with respect thereto as of such date, based upon the most recent Bank Price Deck provided to the Borrower by the Administrative Agent.

"Reserve Report Certificate" shall mean a certificate of an Authorized Officer in substantially the form of Exhibit A certifying as to the matters set forth in Section 9.14(c).

"Restricted Foreign Subsidiary" shall mean a Foreign Subsidiary that is a Restricted Subsidiary.

"Restricted Payments" shall have the meaning provided in Section 10.6.

"Restricted Subsidiary" shall mean any Subsidiary of the Borrower other than an Unrestricted Subsidiary.

"S&P" shall mean Standard & Poor's Ratings Services or any successor by merger or consolidation to its business.

"Sanctioned Country" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of the Closing Date, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, or by the United Nations Security Council, the European Union or, any European Union member state, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country or (c) any Person owned or controlled by any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means all economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any European Union member state or, Her Majesty's Treasury of the United Kingdom or other relevant sanctions authority.

"Scheduled Dispositions" shall have the meaning provided in Section 10.4(i).

"Scheduled Maturity Date" shall mean [●], 2020[5], or, if such date is not a Business Day, the Business Day immediately following such date.

"SEC" shall mean the Securities and Exchange Commission or any successor thereto.

"Secured Cash Management Agreement" shall mean any agreement related to Cash Management Services provided following the Petition Date by and between the Borrower or any of its Restricted Subsidiaries and any Cash Management Bank.

"Secured Hedge Transaction" shall mean any Hedge Transaction entered into after the Petition Date by and between the Borrower or any of its Restricted Subsidiaries and any Hedge Bank.

"Secured Parties" shall mean, collectively, the Administrative Agent, the Collateral Agent, each Issuing Bank, each Lender, each Hedge Bank that is party to any Secured Hedge Transaction, each Cash Management Bank that is a party to any Secured Cash Management Agreement and each sub-agent pursuant to Section 12.2 appointed by the Administrative Agent with respect to matters relating to the Credit Documents or by the Collateral Agent with respect to matters relating to any Security Document.

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Documents" shall mean, collectively, (a) the Collateral Agreement, (b) the DIP Order and (c) each other security agreement or other instrument or document executed and delivered pursuant to

---

[5] NTD: 12 months from the Closing Date.

Section 9.11 or 9.13 or pursuant to any other such Security Documents or otherwise to secure or perfect the security interest in any or all of the Obligations.

"Senior 1.125L Secured 2026 Notes" shall mean the 7.750% senior secured notes due 2026 issued pursuant to the Senior 1.125L Secured 2026 Notes Indenture in an original aggregate principal amount of $1,000,000,000.

"Senior 1.125L Secured 2026 Notes Indenture" shall mean the Indenture, dated as of May 23, 2018, under which the Senior 1.125L Secured 2026 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior 1.25L Secured 2024 Notes" shall mean the 8.00% senior secured notes due 2024 issued pursuant to the Senior 1.25L Secured 2024 Notes Indenture in an original aggregate principal amount of $500,000,000.

"Senior 1.25L Secured 2024 Notes Indenture" shall mean the Indenture, dated as of November 29, 2016, under which the Senior 1.25L Secured 2024 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior 1.5L Secured 2024 Notes" shall mean the 9.375% senior secured notes due 2024 issued pursuant to the Senior 1.5L Secured 2024 Notes Indenture in an original aggregate principal amount of $1,091,792,000.

"Senior 1.5L Secured 2024 Notes Indenture" shall mean the Indenture, dated as of January 3, 2018, under which the Senior 1.5L Secured 2024 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior 1.5L Secured 2025 Notes" shall mean the 8.00% senior secured notes due 2025 issued pursuant to the Senior 1.5L Secured 2025 Notes Indenture in an original aggregate principal amount of $1,000,000,000.

"Senior 1.5L Secured 2025 Notes Indenture" shall mean the Indenture, dated as of February 6, 2017, under which the Senior 1.5L Secured 2025 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior Secured Notes" shall mean the Senior 1.125L Secured 2026 Notes, the Senior 1.25L Secured 2024 Notes, the Senior 1.5L Secured 2024 Notes and the Senior 1.5L Secured 2.25 Notes.

"Senior Secured Notes Indentures" shall mean the Senior 1.125L Secured 2026 Notes Indenture, the Senior 1.25L Secured 2024 Notes Indenture, the Senior 1.5L Secured 2024 Notes Indenture and the Senior 1.5L Secured 2.25 Notes Indenture.

"Senior Unsecured 2020 Notes" shall mean the 9.375% senior notes due 2020 issued pursuant to the Senior Unsecured 2020 Notes Indenture in an original aggregate principal amount of $2,000,000,000.

"Senior Unsecured 2020 Notes Indenture" shall mean the Indenture, dated as of April 24, 2012, under which the Senior Unsecured 2020 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior Unsecured 2022 Notes" shall mean the 7.75% senior notes due 2022 issued pursuant to the Senior Unsecured 2022 Notes Indenture in an original aggregate principal amount of $350,000,000.

"Senior Unsecured 2022 Notes Indenture" shall mean the Indenture, dated as of August 13, 2012, under which the Senior Unsecured 2022 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior Unsecured 2023 Notes" shall mean the 6.375% senior notes due 2023 issued pursuant to the Senior Unsecured 2023 Notes Indenture in an original aggregate principal amount of $800,000,000.

"Senior Unsecured 2023 Notes Indenture" shall mean the Indenture, dated as of May 28, 2015, under which the Senior Unsecured 2023 Notes were issued, among the Borrower and certain of the Subsidiaries party thereto and the trustee named therein from time to time, as amended, restated, supplemented or otherwise modified from time to time in accordance with the requirements thereof and of this Agreement.

"Senior Unsecured Notes" shall mean the Senior Unsecured 2020 Notes, the Senior Unsecured 2022 Notes and the Senior Unsecured 2023 Notes.

"Senior Unsecured Notes Indentures" shall mean the Senior Unsecured 2020 Notes Indenture, the Senior Unsecured 2022 Notes Indenture and the Senior Unsecured 2023 Notes Indenture.

"Sponsors" shall mean (a) Apollo Global Management, LLC, (b) Access Industries, Inc., (c) Riverstone Holdings, L.P., (d) Korea National Oil Corporation, and (e) the respective Affiliates of the Persons described in the foregoing clauses (a) through (d), excluding in each case any of their respective operating portfolio companies.

"SPV" shall have the meaning provided in Section 13.6(g).

"Stated Amount" of any Letter of Credit shall mean the maximum amount from time to time available to be drawn thereunder, determined without regard to whether any conditions to drawing could then be met.

"Subagent" shall have the meaning provided in Section 12.2.

"Subsidiary" of any Person shall mean and include (a) any corporation more than 50% of whose Equity Interests of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time Equity Interests of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries and (b) any limited liability company, partnership, association, joint venture or other entity of which such Person directly or indirectly through Subsidiaries has more than a 50% equity interest at the time. Unless otherwise expressly provided, all references herein to a "Subsidiary" shall mean a Subsidiary of the Borrower.

"Subsidiary Guarantor" shall mean each Subsidiary that is a Guarantor.

"Subsidiary Redesignation" shall have the meaning provided in the definition of "Unrestricted Subsidiary" contained in this Section 1.1(a).

WEIL:\97169709\10\74473.0003

"Successor Borrower" shall have the meaning provided in Section 10.3(a).

"Superpriority Claim" means a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code against a Debtor in any of the Chapter 11 Cases having priority over, subject to the terms of the DIP Order, any or all administrative expense claims, adequate protection and other diminution claims, priority and other unsecured claims, and all other claims against a Debtor or its estate, including claims of the kind specified in, or otherwise arising or ordered under, any sections of the Bankruptcy Code (including, without limitation, sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546, 552(b), 726, 1113 and/or 1114 thereof), whether or not such claim or expenses may become secured by a judgment Lien or other non-consensual Lien, levy or attachment.

"Supported QFC" has the meaning assigned to it in Section 13.25.

"Swap Termination Value" shall mean, in respect of any one or more Hedge Transactions, after taking into account the effect of any legally enforceable netting agreement relating to any Hedge Agreements under which such Hedge Transactions were entered into, (a) for any date on or after the date such Hedge Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedge Transactions, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedge Transactions (which may include a Lender or any Affiliate of a Lender).

"Taxes" shall mean any and all present or future taxes, duties, levies, imposts, assessments, deductions, withholdings or other similar charges imposed by any Governmental Authority whether computed on a separate, consolidated, unitary, combined or other basis and any interest, fines, penalties or additions to tax with respect to the foregoing.

"Termination Date" shall mean the earlier to occur of (a) the Maturity Date and (b) the date on which the Total Commitment shall have terminated.

"Total Assets" shall mean, as of any date of determination with respect to any Person, the amount that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a balance sheet of such Person at such date.

"Total Commitment" shall mean the sum of the Commitments of the Lenders; provided that the Total Commitment shall not at any time exceed the Maximum Total Commitment.

"Total Exposure" shall mean, with respect to any Lender at any time, the sum of (a) the aggregate principal amount of the Loans of such Lender then outstanding and (b) such Lender's Letter of Credit Exposure at such time.

"Transferee" shall have the meaning provided in Section 13.6(e).

"Type" shall mean, as to any Loan, its nature as an ABR Loan or a LIBOR Loan.

"U.S. Lender" shall mean any Lender other than a Non-U.S. Lender.

"U.S. Special Resolution Regime" has the meaning assigned to it in Section 13.25.

"UCC" shall mean the Uniform Commercial Code of the State of New York or of any other state the laws of which are required to be applied in connection with the perfection of security interests in any Collateral.

"Unfunded Current Liability" of any Plan shall mean the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the date hereof, exceeds the Fair Market Value of the assets allocable thereto.

"Uniform Customs" shall mean, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits as approved by the International Chamber of Commerce, commencing on July 1, 2007 (or such later version thereof as may be in effect at the time of issuance).

"Unpaid Drawing" shall have the meaning provided in Section 3.4(a).

"Unrestricted Cash" shall mean cash or cash equivalents of the Borrower or any of its Restricted Subsidiaries that would not appear as "restricted" on a consolidated balance sheet of the Borrower or any of its Restricted Subsidiaries.

"Unrestricted Subsidiary" shall mean (a) any Subsidiary of the Borrower that is formed or acquired after the Closing Date if, at such time or promptly thereafter, the Borrower designates such Subsidiary as an "Unrestricted Subsidiary" in a written notice to the Administrative Agent, (b) any Restricted Subsidiary designated as an Unrestricted Subsidiary by the Borrower in a written notice to the Administrative Agent; *provided* that in the case of each of (a) and (b), (i) such designation shall be deemed to be an Investment (or reduction in an outstanding Investment, in the case of a designation of an Unrestricted Subsidiary as a Restricted Subsidiary) on the date of such designation in an amount equal to the Fair Market Value of the Borrower's investment therein on such date and such designation shall be permitted only to the extent such Investment is permitted under Section 10.5 on the date of such designation, and (ii) no Default or Event of Default would result from such designation immediately after giving effect thereto and (c) each Subsidiary of an Unrestricted Subsidiary.  The Borrower may, by written notice to the Administrative Agent, re-designate any Unrestricted Subsidiary as a Restricted Subsidiary (each, a "Subsidiary Redesignation"), and thereafter, such Subsidiary shall no longer constitute an Unrestricted Subsidiary, but only if no Default or Event of Default would result from such Subsidiary Redesignation.

"Variance Measurement Period" shall have the meaning provided in Section 9.1(k).

"Variance Report" shall have the meaning provided in Section 9.1(k).

"Voting Stock" shall mean, with respect to any Person, such Person's Equity Interests having the right to vote for the election of directors (or equivalent governing body) of such Person under ordinary circumstances.

"Weighted Average Life to Maturity" shall mean, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"Wholly-Owned Subsidiary" of any person shall mean a subsidiary of such person, all of the Equity Interests of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable law) are owned by such person or another Wholly-Owned Subsidiary of such person.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

1.2     Other Interpretive Provisions.  With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other Credit Document:

(a)     The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)     The words "herein", "hereto", "hereof" and "hereunder" and words of similar import when used in any Credit Document shall refer to such Credit Document as a whole and not to any particular provision thereof.

(c)     Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

(d)     The term "including" is by way of example and not limitation.

(e)     The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

(f)     In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including".

(g)     Section headings herein and in the other Credit Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Credit Document.

(h)     Any reference to any Person shall be constructed to include such Person's successors or assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all of the functions thereof.

(i)     Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.

(j)     The word "will" shall be construed to have the same meaning as the word "shall".

(k)     The words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

1.3     Accounting Terms.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP, applied in a manner consistent with that used in preparing the Historical Financial Statements, except as otherwise specifically prescribed herein; *provided*, *however*, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Majority Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.  Notwithstanding any other provision contained herein, all

WEIL:\97169709\10\74473.0003

terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made (i) without giving effect to any election under Accounting Standards Codification 825-10-25 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein, and (ii) without giving effect to any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.

1.4     Rounding.  Any financial ratios required to be maintained or complied with by the Borrower pursuant to this Agreement (or required to be satisfied in order for a specific action to be permitted under this Agreement) shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.5     References to Agreements, Laws, Etc.  Unless otherwise expressly provided herein, (a) references to organizational documents, agreements (including the Credit Documents) and other Contractual Requirements shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto, but only to the extent that such amendments, restatements, amendment and restatements, extensions, supplements and other modifications are permitted by any Credit Document and (b) references to any Requirement of Law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law.

1.6     Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to New York City (daylight saving or standard, as applicable).

1.7     Timing of Payment or Performance.  When the payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment (other than as described in Section 2.9) or performance shall extend to the immediately succeeding Business Day.

1.8     [Reserved].

1.9     Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "LIBOR Loan").

1.10     Divisions.  For all purposes under the Credit Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized and acquired on the first date of its existence by the holders of its Equity Interests at such time.

SECTION 2.     Amount and Terms of Credit.

2.1     Commitments.

(a)     Subject to and upon the terms and conditions herein set forth, each Lender severally, but not jointly, agrees to make Loans denominated in Dollars to the Borrower, which Loans (i) shall be made initially on the Closing Date by converting a percentage of the loans outstanding of each Lender under the Existing RBL Credit Agreement set forth on Schedule 1.1(a) into Loans on the Closing Date,

(ii) shall otherwise be made at any time and from time to time on and after the entry of the DIP Order and prior to the Termination Date, (iii) may, at the option of the Borrower, be incurred and maintained as, and/or converted into, ABR Loans or LIBOR Loans; *provided* that all Loans made by each of the Lenders pursuant to the same Borrowing shall, unless otherwise specifically provided herein, consist entirely of Loans of the same Type, (iv) may be repaid and reborrowed in accordance with the provisions hereof, (v) shall not, for any Lender at any time, after giving effect thereto and to the application of the proceeds thereof, result in such Lender's Total Exposure at such time exceeding such Lender's Commitment Percentage at such time of the Total Commitment and (vi) shall not, after giving effect thereto and to the application of the proceeds thereof, result in the aggregate amount of all Lenders' Total Exposures at such time exceeding the Total Commitment.

(b)     Each Lender may at its option make any LIBOR Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan, *provided* that (i) any exercise of such option shall not affect the obligation of the Borrower to repay such Loan and (ii) in exercising such option, such Lender shall use its reasonable efforts to minimize any increased costs to the Borrower resulting therefrom (which obligation of the Lender shall not require it to take, or refrain from taking, actions that it determines would result in increased costs for which it will not be compensated hereunder or that it determines would be otherwise disadvantageous to it and in the event of such request for costs for which compensation is provided under this Agreement, the provisions of <u>Section 2.10</u> shall apply).

2.2     <u>Minimum Amount of Each Borrowing; Maximum Number of Borrowings</u>.   The aggregate principal amount of each Borrowing shall be in a minimum amount of at least the Minimum Borrowing Amount for such Type of Loans and in a multiple of $100,000 in excess thereof (except that Loans to reimburse the applicable Issuing Bank with respect to any Unpaid Drawing shall be made in the amounts required by <u>Section 3.3</u> or <u>Section 3.4</u>, as applicable).  More than one Borrowing may be incurred on any date; *provided* that at no time shall there be outstanding more than ten Borrowings of LIBOR Loans under this Agreement.

2.3     <u>Notice of Borrowing</u>.

(a)     Whenever the Borrower desires to incur Loans (other than borrowings to repay Unpaid Drawings), the Borrower shall give the Administrative Agent at the Administrative Agent's Office, (i) prior to 1:00 p.m. at least three Business Days' prior written notice (or telephonic notice promptly confirmed in writing) of each Borrowing of Loans if such Loans are to be initially LIBOR Loans (or prior to 12:00 p.m. noon two Business Days' prior written notice in the case of a Borrowing of Loans to be made on the Closing Date initially as LIBOR Loans) and (ii) written notice (or telephonic notice promptly confirmed in writing) prior to 11:00 a.m. on the date of each Borrowing of Loans that are to be ABR Loans.  Such notice (a "<u>Notice of Borrowing</u>") shall specify (A) the aggregate principal amount of the Loans to be made pursuant to such Borrowing, (B) the date of the Borrowing (which shall be a Business Day) and (C) whether the respective Borrowing shall consist of ABR Loans and/or LIBOR Loans and, if LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall promptly give each Lender written notice (or telephonic notice promptly confirmed in writing) of each proposed Borrowing of Loans, of such Lender's Commitment Percentage thereof and of the other matters covered by the related Notice of Borrowing.

(b)     Borrowings to reimburse Unpaid Drawings shall be made upon the notice specified in <u>Section 3.4(a)</u>.

(c)     Without in any way limiting the obligation of the Borrower to confirm in writing any notice it may give hereunder by telephone, the Administrative Agent may act prior to receipt of written confirmation without liability upon the basis of such telephonic notice believed by the Administrative Agent in good faith to be from an Authorized Officer of the Borrower.

2.4     Disbursement of Funds.

(a)     No later than 1:00 p.m. on the date specified in each Notice of Borrowing, each Lender will make available its pro rata portion of each Borrowing requested to be made on such date in the manner provided below.

(b)     Each Lender shall make available all amounts it is to fund to the Borrower under any Borrowing in immediately available funds to the Administrative Agent at the Administrative Agent's Office in Dollars, and the Administrative Agent will (except in the case of Borrowings to repay Unpaid Drawings) make available to the Borrower, by depositing or wiring to an account as designated by the Borrower in the Borrowing Notice to the Administrative Agent the aggregate of the amounts so made available in Dollars.  Unless the Administrative Agent shall have been notified by any Lender prior to the date of any such Borrowing (or, with respect to an ABR Loan, the date of such Borrowing prior to 1:00 p.m.) that such Lender does not intend to make available to the Administrative Agent its portion of the Borrowing or Borrowings to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on such date of Borrowing, and the Administrative Agent, in reliance upon such assumption, may (in its sole discretion and without any obligation to do so) make available to the Borrower a corresponding amount.  If such corresponding amount is not in fact made available to the Administrative Agent by such Lender and the Administrative Agent has made available such amount to the Borrower, the Administrative Agent shall be entitled to recover such corresponding amount from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor the Administrative Agent shall promptly notify the Borrower and the Borrower shall immediately pay such corresponding amount to the Administrative Agent in Dollars.  The Administrative Agent shall also be entitled to recover from such Lender or the Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the Borrower to the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to (i) if paid by such Lender, the Overnight Rate or (ii) if paid by the Borrower, the then-applicable rate of interest or fees, calculated in accordance with Section 2.8, for the respective Loans.

(c)     Nothing in this Section 2.4 shall be deemed to relieve any Lender from its obligation to fulfill its commitments hereunder or to prejudice any rights that the Borrower may have against any Lender as a result of any default by such Lender hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to fulfill its commitments hereunder).

2.5     Repayment of Loans; Evidence of Debt.

(a)     The Borrower hereby promises to pay to the Administrative Agent, for the benefit of the applicable Lenders, on the Maturity Date, the then outstanding Loans.

(b)     Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office from time to time, including the amounts of principal and interest payable and paid to such lending office from time to time under this Agreement.

(c)     The Administrative Agent, on behalf of the Borrower, shall maintain the Register pursuant to Section 13.6(b), and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each Loan made hereunder, the Type of each Loan made and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower and each Lender's share thereof.

WEIL\97169709\10\74473.0003

(d)      The entries made in the Register and accounts and subaccounts maintained pursuant to clauses (b) and (c) of this Section 2.5 shall, to the extent permitted by applicable Requirements of Law, be prima facie evidence of the existence and amounts of the obligations of the Borrower therein recorded; *provided*, *however*, that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e)      Any Lender may request that Loans made by it be evidenced by a promissory note substantially in the form of Exhibit H, as the case may be, evidencing the Loans owing to such Lender. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns). Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 13.6) be represented by one or more promissory notes in such form payable to the payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

        2.6      Conversions and Continuations.

(a)      Subject to the penultimate sentence of this clause (a), (i) the Borrower shall have the option on any Business Day to convert all or a portion equal to at least the Minimum Borrowing Amount (and in multiples of $100,000 in excess thereof) of the outstanding principal amount of Loans of one Type into a Borrowing or Borrowings of another Type and (ii) the Borrower shall have the option on any Business Day to continue the outstanding principal amount of any LIBOR Loans as LIBOR Loans for an additional Interest Period; *provided* that (A) no partial conversion of LIBOR Loans shall reduce the outstanding principal amount of LIBOR Loans made pursuant to a single Borrowing to less than the Minimum Borrowing Amount, (B) ABR Loans may not be converted into LIBOR Loans if an Event of Default is in existence on the date of the conversion and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such conversion, (C) LIBOR Loans may not be continued as LIBOR Loans for an additional Interest Period if an Event of Default is in existence on the date of the proposed continuation and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, and (D) Borrowings resulting from conversions pursuant to this Section 2.6 shall be limited in number as provided in Section 2.2. Each such conversion or continuation shall be effected by the Borrower by giving the Administrative Agent at the Administrative Agent's Office prior to 1:00 p.m. at least (1) three Business Days', in the case of a continuation of or conversion to LIBOR Loans or (2) the date of conversion, in the case of a conversion into ABR Loans, prior written notice (or telephonic notice promptly confirmed in writing) (each, a "Notice of Conversion or Continuation") specifying the Loans to be so converted or continued, the Type of Loans to be converted into or continued and, if such Loans are to be converted into or continued as LIBOR Loans, the Interest Period to be initially applicable thereto (if no Interest Period is selected, the Borrower shall be deemed to have selected an Interest Period of one month's duration). The Administrative Agent shall give each applicable Lender notice as promptly as practicable of any such proposed conversion or continuation affecting any of its Loans.

(b)      If any Event of Default is in existence at the time of any proposed continuation of any LIBOR Loans and the Administrative Agent has or the Majority Lenders have determined in its or their sole discretion not to permit such continuation, such LIBOR Loans shall be automatically converted on the last day of the current Interest Period into ABR Loans. If upon the expiration of any Interest Period in respect of LIBOR Loans, the Borrower has failed to elect a new Interest Period to be applicable thereto as provided in clause (a) above, the Borrower shall be deemed to have elected to continue such Borrowing as a LIBOR Loan with an Interest Period of one month's duration, effective as of the expiration date of such current Interest Period.

(c)     Notwithstanding anything to the contrary herein, the Borrower may deliver a Notice of Conversion or Continuation pursuant to which the Borrower elects to irrevocably continue the outstanding principal amount of any Loan subject to an interest rate Hedge Transaction as LIBOR Loans for each Interest Period until the expiration of the term of such applicable Hedge Transaction; *provided* that any Notice of Conversion or Continuation delivered pursuant to this Section 2.6(c) shall include a schedule attaching the relevant interest rate Hedge Transaction or related trade confirmation.

2.7     Pro Rata Borrowings.  Each Borrowing of Loans under this Agreement shall be made by the Lenders pro rata on the basis of their then applicable Commitment Percentages.  It is understood that (a) no Lender shall be responsible for any default by any other Lender in its obligation to make Loans hereunder and that each Lender severally but not jointly shall be obligated to make the Loans provided to be made by it hereunder, regardless of the failure of any other Lender to fulfill its commitments hereunder and (b) failure by a Lender to perform any of its obligations under any of the Credit Documents shall not release any Person from performance of its obligation under any Credit Document.

2.8     Interest.

(a)     The unpaid principal amount of each ABR Loan shall bear interest from the date of the Borrowing thereof until maturity (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin plus the ABR, in each case, in effect from time to time.

(b)     The unpaid principal amount of each LIBOR Loan shall bear interest from the date of the Borrowing thereof until maturity thereof (whether by acceleration or otherwise) at a rate per annum that shall at all times be the Applicable Margin plus the relevant LIBOR Rate, in each case, in effect from time to time.

(c)     If all or a portion of (i) the principal amount of any Loan or (ii) any interest payable thereon shall not be paid when due (whether at stated maturity, by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum that is (the "Default Rate") (A) in the case of overdue principal, the rate that would otherwise be applicable thereto plus 2% or (B) in the case of any overdue interest, to the extent permitted by applicable Requirements of Law, the rate described in Section 2.8(a) plus 2% from the date of such nonpayment to the date on which such amount is paid in full (after as well as before judgment).

(d)     Interest on each Loan shall accrue from and including the date of any Borrowing to but excluding the date of any repayment thereof and shall be payable in Dollars; *provided* that any Loan that is repaid on the same date on which it is made shall bear interest for one day.  Except as provided below, interest shall be payable (i) in respect of each ABR Loan, quarterly in arrears on the last Business Day of each March, June, September and December, (ii) in respect of each LIBOR Loan, on the last day of each Interest Period applicable thereto and, in the case of an Interest Period in excess of three months, on each date occurring at three-month intervals after the first day of such Interest Period, (iii) in respect of each Loan, (A) on any prepayment (on the amount prepaid), (B) at maturity (whether by acceleration or otherwise) and (C) after such maturity, on demand.

(e)     All computations of interest hereunder shall be made in accordance with Section 5.5.

(f)     The Administrative Agent, upon determining the interest rate for any Borrowing of LIBOR Loans, shall promptly notify the Borrower and the relevant Lenders thereof.  Each such determination shall, absent clearly demonstrable error, be final and conclusive and binding on all parties hereto.

2.9     Interest Periods.  At the time the Borrower gives a Notice of Borrowing or Notice of Conversion or Continuation in respect of the making of, or conversion into or continuation as, a Borrowing of

LIBOR Loans in accordance with Section 2.6(a), the Borrower shall give the Administrative Agent written notice (or telephonic notice promptly confirmed in writing) of the Interest Period applicable to such Borrowing, which Interest Period shall, at the option of the Borrower be (i) a one-, two-, three- or six- or (if available to all the Lenders making such LIBOR Loans as determined by such Lenders in good faith based on prevailing market conditions) a nine- or twelve-month period or (ii) any period shorter than one month (if available to all the Lenders making such LIBOR Loans as determined by such Lenders in good faith based on prevailing market conditions) as requested by the Borrower.

Notwithstanding anything to the contrary contained above:

(a)     the initial Interest Period for any Borrowing of LIBOR Loans shall commence on the date of such Borrowing (including the date of any conversion from a Borrowing of ABR Loans) and each Interest Period occurring thereafter in respect of such Borrowing shall commence on the day on which the next preceding Interest Period expires;

(b)     if any Interest Period relating to a Borrowing of LIBOR Loans begins on the last Business Day of a calendar month or begins on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period, such Interest Period shall end on the last Business Day of the calendar month at the end of such Interest Period;

(c)     if any Interest Period would otherwise expire on a day that is not a Business Day, such Interest Period shall expire on the next succeeding Business Day; *provided* that, if any Interest Period in respect of a LIBOR Loan would otherwise expire on a day that is not a Business Day, but is a day of the month after which no further Business Day occurs in such month, such Interest Period shall expire on the next preceding Business Day; and

(d)     the Borrower shall not be entitled to elect any Interest Period in respect of any LIBOR Loan if such Interest Period would extend beyond the Maturity Date.

2.10     Increased Costs, Illegality, Etc.

(a)     In the event that (x) in the case of clause (i) below, the Majority Lenders or (y) in the case of clauses (ii) and (iii) below, any Lender, shall have reasonably determined (which determination shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto):

(i)     on any date for determining the LIBOR Rate for any Interest Period that (A) deposits in the principal amounts of the Loans comprising such LIBOR Borrowing are not generally available in the relevant market, (B) by reason of any changes arising on or after the Closing Date affecting the interbank LIBOR market, adequate and fair means do not exist for ascertaining the applicable interest rate on the basis provided for in the definition of LIBOR Rate (including, without limitation, because the LIBOR Rate is not available or published on a current basis) or (C) the LIBOR Rate for such Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans included in such Borrowing for such Interest Period; or

(ii)     that, due to a Change in Law occurring at any time after the Closing Date, which Change in Law shall (A) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender, (B) subject any Lender to any Tax with respect to any Credit Document or any LIBOR Loan made by it (other than (i) Taxes indemnifiable under Section 5.4, or (ii) Excluded Taxes), or (C) impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or LIBOR Loans made by such Lender, which results in the cost to such Lender of making,

converting into, continuing or maintaining LIBOR Loans or participating in Letters of Credit (in each case hereunder) increasing by an amount which such Lender reasonably deems material or the amounts received or receivable by such Lender hereunder with respect to the foregoing shall be reduced; or

(iii)     at any time, that the making or continuance of any LIBOR Loan has become unlawful as a result of compliance by such Lender in good faith with any Requirement of Law (or would conflict with any such Requirement of Law not having the force of law even though the failure to comply therewith would not be unlawful);

then, and in any such event, such Lenders (or the Administrative Agent, in the case of clause (i) above) shall within a reasonable time thereafter give notice (if by telephone, confirmed in writing) to the Borrower and to the Administrative Agent of such determination (which notice the Administrative Agent shall promptly transmit to each of the other Lenders). Thereafter (x) in the case of clause (i) above, LIBOR Loans shall no longer be available until such time as the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice by the Administrative Agent no longer exist (which notice the Administrative Agent agrees to give at such time when such circumstances no longer exist), and any Notice of Borrowing or Notice of Conversion given by the Borrower with respect to LIBOR Loans that have not yet been incurred shall be deemed rescinded by the Borrower, (y) in the case of clause (ii) above, the Borrower shall pay to such Lender, promptly (but no later than fifteen days) after receipt of written demand therefor such additional amounts as shall be required to compensate such Lender for such increased costs or reductions in amounts receivable hereunder (it being agreed that a written notice as to the additional amounts owed to such Lender, showing in reasonable detail the basis for the calculation thereof, submitted to the Borrower by such Lender shall, absent clearly demonstrable error, be final and conclusive and binding upon all parties hereto) and (z) in the case of clause (iii) above, the Borrower shall take one of the actions specified in Section 2.10(b) as promptly as possible and, in any event, within the time period required by applicable Requirements of Law.

(b)     At any time that any LIBOR Loan is affected by the circumstances described in Section 2.10(a)(ii) or (iii), the Borrower may (and in the case of a LIBOR Loan affected pursuant to Section 2.10(a)(iii) shall) either (i) if the affected LIBOR Loan is then being made pursuant to a Borrowing, cancel such Borrowing by giving the Administrative Agent telephonic notice (confirmed promptly in writing) thereof on the same date that the Borrower was notified by a Lender pursuant to Section 2.10(a)(ii) or (iii) or (ii) if the affected LIBOR Loan is then outstanding, upon at least three Business Days' notice to the Administrative Agent, require the affected Lender to convert each such LIBOR Loan into an ABR Loan; *provided* that if more than one Lender is affected at any time, then all affected Lenders must be treated in the same manner pursuant to this Section 2.10(b).

(c)     If, after the Closing Date, any Change in Law relating to capital adequacy or liquidity requirements of any Lender or compliance by any Lender or its parent with any Change in Law relating to capital adequacy or liquidity requirements occurring after the Closing Date, has or would have the effect of reducing the rate of return on such Lender's or its parent's capital or assets as a consequence of such Lender's commitments or obligations hereunder to a level below that which such Lender or its parent could have achieved but for such Change in Law (taking into consideration such Lender's or its parent's policies with respect to capital adequacy or liquidity requirements), then from time to time, promptly (but in any event no later than fifteen days) after written demand by such Lender (with a copy to the Administrative Agent), the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or its parent for such reduction, it being understood and agreed, however, that a Lender shall not be entitled to such compensation as a result of such Lender's compliance with, or pursuant to any request or directive to comply with, any applicable Requirement of Law as in effect on the Closing Date (except as otherwise set forth in the definition of Change in Law). Each Lender, upon determining in good faith that any additional amounts will be payable pursuant to this Section 2.10(c), will give prompt written notice thereof to the Borrower, which notice shall set forth in reasonable detail the basis of the calculation of such additional amounts, although the failure to give

any such notice shall not, subject to <u>Section 2.13</u>, release or diminish the Borrower's obligations to pay additional amounts pursuant to this <u>Section 2.10(c)</u> upon receipt of such notice.

(d)     Notwithstanding anything to the contrary set forth in the foregoing <u>clause (a)</u>, if at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that (i) the circumstances set forth in <u>clause (a)(i)(B)</u> have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in <u>clause (a)(i)(B)</u> have not arisen but either (w) the supervisor for the administrator of the Reuters Screen LIBOR01 Page has made a public statement that the administrator of the Reuters Screen LIBOR01 Page is insolvent (and there is no successor administrator that will continue publication of the Reuters Screen LIBOR01 Page), (x) the administrator of the Reuters Screen LIBOR01 Page has made a public statement identifying a specific date after which the Reuters Screen LIBOR01 Page will permanently or indefinitely cease to be published by it (and there is no successor administrator that will continue publication of the Reuters Screen LIBOR01 Page), (y) the supervisor for the administrator of the Reuters Screen LIBOR01 Page has made a public statement identifying a specific date after which the Reuters Screen LIBOR01 Page will permanently or indefinitely cease to be published or (z) the supervisor for the administrator of the Reuters Screen LIBOR01 Page or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which the Reuters Screen LIBOR01 Page may no longer be used for determining interest rates for loans, then the Administrative Agent and the Borrower shall endeavor to establish an alternate rate of interest to the LIBOR Rate that gives due consideration to the then prevailing market convention for determining a rate of interest for syndicated loans in the United States at such time, and shall enter into an amendment to this Agreement to reflect such alternate rate of interest and such other related changes to this Agreement as may be applicable; <u>provided</u> that, if such alternate rate of interest as so determined would be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement.  Notwithstanding anything to the contrary in <u>Section 13.1</u>, such amendment shall become effective without any further action or consent of any other party to this Agreement so long as the Administrative Agent shall not have received, within five (5) Business Days of the date notice of such alternate rate of interest is provided to the Lenders, a written notice from the Majority Lenders stating that such Majority Lenders object to such amendment.  Until an alternate rate of interest shall be determined in accordance with this <u>clause (d)</u> (but, in the case of the circumstances described in <u>clause (ii)(w)</u>, <u>clause (ii)(x)</u> or <u>clause (ii)(y)</u> of the first sentence of this <u>Section 2.10(d)</u>, only to the extent the LIBOR Rate for such Interest Period is not available or published at such time on a current basis), (x) any Notice of Conversion or Continuation that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a LIBOR Rate Borrowing shall be ineffective, and (y) if any Notice of Borrowing requests a LIBOR Rate Borrowing, such Borrowing shall be made as an ABR Borrowing.

2.11     <u>Compensation</u>.  If (a) any payment of principal of any LIBOR Loan is made by the Borrower to or for the account of a Lender other than on the last day of the Interest Period for such LIBOR Loan as a result of a payment or conversion pursuant to <u>Section 2.5</u>, <u>2.6</u>, <u>2.10</u>, <u>5.1</u>, <u>5.2</u> or <u>13.7</u>, as a result of acceleration of the maturity of the Loans pursuant to <u>Section 11</u> or for any other reason, (b) any Borrowing of LIBOR Loans is not made on the date specified in a Notice of Borrowing, (c) any ABR Loan is not converted into a LIBOR Loan on the date specified in a Notice of Conversion or Continuation, (d) any LIBOR Loan is not continued as a LIBOR Loan on the date specified in a Notice of Conversion or Continuation or (e) any prepayment of principal of any LIBOR Loan is not made as a result of a withdrawn notice of prepayment pursuant to <u>Section 5.1</u> or <u>5.2</u>, the Borrower shall after the Borrower's receipt of a written request by such Lender (which request shall set forth in reasonable detail the basis for requesting such amount), pay to the Administrative Agent (within fifteen days after such request) for the account of such Lender any amounts required to compensate such Lender for any additional losses, costs or expenses that such Lender may reasonably incur as a result of such payment, failure to convert, failure to continue or failure to prepay, including any loss, cost or expense (excluding loss of anticipated profits) actually incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any Lender to fund or maintain such LIBOR Loan.

WEIL:\97169709\10\74473.0003

2.12    Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.10(a)(ii), 2.10(a)(iii), 2.10(c), 3.5 or 5.4 with respect to such Lender, it will, if requested by the Borrower use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event; provided that such designation does not cause such Lender or its lending office to suffer any economic, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of any such Section. Nothing in this Section 2.12 shall affect or postpone any of the obligations of the Borrower or the right of any Lender provided in Section 2.10, 3.5 or 5.4.

2.13    Notice of Certain Costs.  Notwithstanding anything in this Agreement to the contrary, to the extent any notice required by Section 2.10, 2.11, 3.5 or 5.4 is given by any Lender more than 180 days after such Lender has knowledge (or should have had knowledge) of the occurrence of the event giving rise to the additional cost, reduction in amounts, loss, tax or other additional amounts described in such Sections, such Lender shall not be entitled to compensation under Section 2.10, 2.11, 3.5 or 5.4, as the case may be, for any such amounts incurred or accruing prior to the 181st day prior to the giving of such notice to the Borrower; provided that if the circumstance giving rise to such claim is retroactive, then such 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

2.14    [Reserved].

2.15    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then the following provisions shall apply for so long as such Lender is a Defaulting Lender:

(a)    Commitment Fees shall cease to accrue on the unfunded portion of the Commitment of such Defaulting Lender pursuant to Section 4.1(a);

(b)    The Commitment and Total Exposure of such Defaulting Lender shall not be included in determining whether all Lenders or the Majority Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to Section 13.1); provided that any waiver, amendment or modification requiring the consent of all Lenders pursuant to Section 13.1 (other than Section 13.1(x)) or requiring the consent of each affected Lender pursuant to Section 13.1(i) or (ix) shall require the consent of such Defaulting Lender (which for the avoidance of doubt would include any change to the Maturity Date applicable to such Defaulting Lender, decreasing or forgiving any principal or interest due to such Defaulting Lender, any decrease of any interest rate applicable to Loans made by such Defaulting Lender (other than the waiving of post-default interest rates) and any increase in such Defaulting Lender's Commitment);

(c)    If any Letter of Credit Exposure exists at the time a Lender becomes a Defaulting Lender, then all or any part of such Letter of Credit Exposure of such Defaulting Lender will, subject to the limitation in the first proviso below, automatically be reallocated (effective on the day such Lender becomes a Defaulting Lender) among the Non-Defaulting Lenders pro rata in accordance with their respective Commitment Percentages; provided that (A) each Non-Defaulting Lender's Total Exposure may not in any event exceed the Commitment Percentage of the Total Commitment of such Non-Defaulting Lender as in effect at the time of such reallocation and (B) neither such reallocation nor any payment by a Non-Defaulting Lender pursuant thereto will constitute a waiver or release of any claim the Borrower, the Administrative Agent, the Issuing Banks or any other Lender may have against such Defaulting Lender or cause such Defaulting Lender to be a Non-Defaulting Lender, to the extent that all or any portion (the "unreallocated portion") of the Defaulting Lender's Letter of Credit Exposure cannot, or can only partially, be so reallocated to Non-Defaulting Lenders, whether by reason of the first proviso of this Section 2.15(c) or otherwise, the Borrower shall within two Business Days following notice by the Administrative Agent Cash Collateralize for the benefit of the applicable Issuing Bank only the Borrower's obligations corresponding to such Defaulting Lender's Letter of Credit Exposure

WEIL:\97169709\10\74473.0003

(after giving effect to any partial reallocation pursuant this Section 2.15(c)), in accordance with the procedures set forth in Section 3.8 for so long as such Letter of Credit Exposure is outstanding, if the Borrower Cash Collateralizes any portion of such Defaulting Lender's Letter of Credit Exposure pursuant to this Section 2.15(c), the Borrower shall not be required to pay any fees to such Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period such Defaulting Lender's Letter of Credit Exposure is Cash Collateralized, if the Letter of Credit Exposure of the Non-Defaulting Lenders is reallocated pursuant to this Section 2.15(c), then the Letter of Credit Fees payable for the account of the Lenders pursuant to Section 4.1(b) shall be adjusted in accordance with such Non-Defaulting Lenders' Commitment Percentages and the Borrower shall not be required to pay any Letter of Credit Fees to the Defaulting Lender pursuant to Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure during the period that such Defaulting Lender's Letter of Credit Exposure is reallocated, or if any Defaulting Lender's Letter of Credit Exposure is neither Cash Collateralized nor reallocated pursuant to this Section 2.15(c), then, without prejudice to any rights or remedies of any Issuing Bank or any Lender hereunder, all Letter of Credit Fees payable under Section 4.1(b) with respect to such Defaulting Lender's Letter of Credit Exposure shall be payable to such Issuing Bank until such Letter of Credit Exposure is Cash Collateralized and/or reallocated;

(d)      So long as any Lender is a Defaulting Lender, no Issuing Bank will be required to issue any new Letter of Credit or amend any outstanding Letter of Credit to increase the Stated Amount thereof, alter the drawing terms thereunder or extend the expiry date thereof, unless each Issuing Bank is reasonably satisfied that any exposure that would result from the exposure to such Defaulting Lender is eliminated or fully covered by the Commitments of the Non-Defaulting Lenders or by Cash Collateralization or a combination thereof in accordance with clause (c) above or otherwise in a manner reasonably satisfactory to such Issuing Bank, and participating interests in any such newly issued or increased Letter of Credit shall be allocated among Non-Defaulting Lenders in a manner consistent with Section 2.15(c)(i) (and Defaulting Lenders shall not participate therein); and

(e)      If the Borrower, the Administrative Agent and each Issuing Bank agree in writing in their discretion that a Lender that is a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon, as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will cease to be a Defaulting Lender and will be a Non-Defaulting Lender and any applicable cash collateral shall be promptly returned to the Borrower and any Letter of Credit Exposure of such Lender reallocated pursuant to Section 2.15(c) shall be reallocated back to such Lender; *provided* that, except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Non-Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

(f)      Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 11 or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 13.8), shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; *second*, to the payment on a pro rata basis of any amounts owing by that Defaulting Lender to each Issuing Bank; *third*, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *fourth*, if so determined by the Administrative Agent and the Borrower, to be held in a non-interest bearing deposit account and released in order to satisfy obligations of that Defaulting Lender to fund Loans under this Agreement; *fifth*, to the payment of any amounts owing to the Lenders or any Issuing Bank as a result of any judgment of a court of competent jurisdiction obtained by any Lender or such Issuing Bank against that

Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; *sixth*, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and *seventh*, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if such payment is a payment of the principal amount of any Loans or Unpaid Drawings, such payment shall be applied solely to pay the relevant Loans of, and Unpaid Drawings owed to, the relevant non-Defaulting Lenders on a pro rata basis prior to being applied in the manner set forth in this Section 2.15(f). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to Section 3.8 shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

2.16    Payments and Claims.

(a)    Payment of Obligations. On the Termination Date, the Lenders shall be entitled to immediate payment of all Obligations without further application to, or order of, the Bankruptcy Court.

(b)    No Discharge; Survival of Claims. Each Debtor agrees that (a) any Confirmation Order entered in the Chapter 11 Cases shall not discharge or otherwise affect in any way any of the Obligations, other than after the payment in full in cash to the Secured Parties of all Obligations (and the Cash Collateralization of all outstanding Letters of Credit in amount and subject to documentation satisfactory to the Issuing Bank) and termination of the Commitments on or before the effective date of an Acceptable Plan of Reorganization and (b) to the extent the Obligations are not satisfied in full, (i) the Obligations shall not be discharged by the entry of a Confirmation Order (and each Credit Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Administrative Agent, the Lenders, and each other Secured Party pursuant to the DIP Order and the Liens granted to the Administrative Agent pursuant to the DIP Order, in each case subject to the Carve-Out, shall not be affected in any manner by the entry of a Confirmation Order.

SECTION 3.    Letters of Credit.

3.1    Letters of Credit.

(a)    Subject to and upon the terms and conditions herein set forth, at any time and from time to time on and after the Closing Date and prior to the L/C Maturity Date, each Issuing Bank agrees, in reliance upon the agreements of the Lenders set forth in this Section 3, to issue upon the request of the Borrower and for the direct or indirect benefit of the Borrower and the Restricted Subsidiaries, a Dollar denominated letter of credit or letters of credit (the "Letters of Credit" and each, a "Letter of Credit") in such form and with such Issuer Documents as may be approved by the applicable Issuing Bank in its reasonable discretion; *provided* that the Borrower shall be a co-applicant of, and jointly and severally liable with respect to, each Letter of Credit issued for the account of a Restricted Subsidiary.

(b)    Notwithstanding the foregoing, (i) no Letter of Credit shall be issued the Stated Amount of which, when added to the Letters of Credit Outstanding at such time, would exceed the Letter of Credit Commitment then in effect, (ii) no Letter of Credit shall be issued the Stated Amount of which would cause the aggregate amount of all Lenders' Total Exposures at such time to exceed the Total Commitment then in effect, (iii) each Letter of Credit shall have an expiration date occurring no later than one year after the date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank, unless otherwise agreed upon by the Administrative Agent and the applicable Issuing Bank or as provided under Section 3.2(b); *provided* that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months or such longer period of time as

may be agreed upon by the applicable Issuing Bank, subject to the provisions of Section 3.2(b); *provided*, *further*, that in no event shall such expiration date occur later than the L/C Maturity Date unless arrangements which are reasonably satisfactory to the applicable Issuing Bank to Cash Collateralize (or backstop) such Letter of Credit have been made (and, in any event, no Lender shall have any obligation to fund any L/C Participation in respect of any Unpaid Drawing after the L/C Maturity Date), (iv) [reserved], (v) no Letter of Credit shall be issued if it would be illegal under any applicable Requirement of Law for the beneficiary of the Letter of Credit to have a Letter of Credit issued in its favor, (vi) no Letter of Credit shall be issued by an Issuing Bank after it has received a written notice from any Credit Party or the Administrative Agent or the Majority Lenders stating that a Default or Event of Default has occurred and is continuing until such time as such Issuing Bank shall have received a written notice (A) of rescission of such notice from the party or parties originally delivering such notice, (B) of the waiver of such Default or Event of Default in accordance with the provisions of Section 13.1 or (C) that such Default or Event of Default is no longer continuing, (vii) no Letter of Credit shall be issued by an Issuing Bank the Stated Amount of which, when added to the Letters of Credit Outstanding issued by such Issuing Bank, would exceed $50,000,000 (or such greater amount agreed to by such Issuing Bank in its sole discretion from time to time), and (viii) no Issuing Bank shall have an obligation to issue a Letter of Credit the proceeds of which would be available to any Person in any manner that would result in a violation of one or more policies of such Issuing Bank applicable to letters of credit generally.

(c)     Upon at least one Business Day's prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent and the applicable Issuing Bank (which notice the Administrative Agent shall promptly transmit to each of the applicable Lenders), the Borrower shall have the right, on any day, permanently to terminate or reduce the Letter of Credit Commitment in whole or in part; *provided* that, after giving effect to such termination or reduction, the Letters of Credit Outstanding shall not exceed the Letter of Credit Commitment.

3.2     Letter of Credit Applications.

(a)     Whenever the Borrower desires that a Letter of Credit be issued, amended or renewed for its account on its own behalf, or on behalf of its Restricted Subsidiaries, the Borrower shall hand deliver or telecopy (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and the Administrative Agent a Letter of Credit application, amendment request or any such document as may be approved by the applicable Issuing Bank (each, a "Letter of Credit Application"). Upon receipt of any Letter of Credit Application or amendment request, (i) the applicable Issuing Bank will use its best efforts to process such Letter of Credit Application on the Business Day on which such Letter of Credit Application is received, *provided* that such Letter of Credit Application is received no later than 12:00 p.m. on such Business Day, or (ii) otherwise, the first Business Day next succeeding receipt of such Letter of Credit Application. No Issuing Bank shall issue any Letters of Credit unless such Issuing Bank shall have received notice from the Administrative Agent that the conditions to such issuance have been met.

(b)     If the Borrower so requests in any applicable Letter of Credit Application, the applicable Issuing Bank may, in its sole and absolute discretion, agree to issue a Letter of Credit that has automatic extension provisions (each, an "Auto-Extension Letter of Credit"); *provided* that any such Auto-Extension Letter of Credit must permit such Issuing Bank to prevent any such extension at least once in each 12-month period (commencing with the date of issuance of such Letter of Credit) by giving prior notice to the beneficiary thereof not later than a day (the "Non-Extension Notice Date") in each such 12-month period to be agreed upon at the time such Letter of Credit is issued. Unless otherwise directed by the applicable Issuing Bank, the Borrower shall not be required to make a specific request to such Issuing Bank for any such extension. Once an Auto-Extension Letter of Credit has been issued, the Lenders shall be deemed to have authorized (but may not require) the applicable Issuing Bank to permit the extension of such Letter of Credit at any time to an expiry date not later than the L/C Maturity

WEIL:\97169709\10\74473.0003

Date; *provided*, *however*, that such Issuing Bank shall not permit any such extension if (i) such Issuing Bank has determined that it would not be permitted, or would have no obligation, at such time to issue such Letter of Credit in its revised form (as extended) under the terms hereof (by reason of the provisions of <u>clause (b)</u> of <u>Section 3.1</u> or otherwise), or (ii) it has received notice (which may be by telephone or in writing) on or before the day that is five Business Days before the Non-Extension Notice Date (A) from the Administrative Agent that the Majority Lenders have elected not to permit such extension or (B) from the Administrative Agent, any Lender or the Borrower that one or more of the applicable conditions specified in <u>Section 7</u> are not then satisfied, and in each such case directing such Issuing Bank not to permit such extension.

(c)     Each Issuing Bank (other than the Administrative Agent or any of its Affiliates) shall, at least once each week, provide the Administrative Agent with a list of all Letters of Credit issued by it that are outstanding at such time; *provided* that, upon written request from the Administrative Agent, such Issuing Bank shall thereafter notify the Administrative Agent in writing on each Business Day of all Letters of Credit issued on the prior Business Day by such Issuing Bank; *provided further* that the notification requirements of this <u>Section 3.2(c)</u> shall not apply with respect to any Existing Letter of Credit.

(d)     The making of each Letter of Credit Request shall be deemed to be a representation and warranty by the Borrower that the Letter of Credit may be issued in accordance with, and will not violate the requirements of, <u>Section 3.1(b)</u>.

3.3     <u>Letter of Credit Participations</u>.

(a)     Immediately upon the issuance by an Issuing Bank of any Letter of Credit (and on the Closing Date, with respect to the Existing Letters of Credit), such Issuing Bank shall be deemed to have sold and transferred to each Lender (each such Lender, in its capacity under this <u>Section 3.3</u>, an "<u>L/C Participant</u>"), and each such L/C Participant shall be deemed irrevocably and unconditionally to have purchased and received from such Issuing Bank, without recourse or warranty, an undivided interest and participation (each an "<u>L/C Participation</u>"), to the extent of such L/C Participant's Commitment Percentage, in each Letter of Credit, each substitute therefor, each drawing made thereunder and the obligations of the Borrower under this Agreement with respect thereto, and any security therefor or guaranty pertaining thereto.

(b)     In determining whether to pay under any Letter of Credit, the relevant Issuing Bank shall have no obligation relative to the L/C Participants other than to confirm that (i) any documents required to be delivered under such Letter of Credit have been delivered, (ii) such Issuing Bank has examined the documents with reasonable care and (iii) the documents appear to comply on their face with the requirements of such Letter of Credit. Any action taken or omitted to be taken by the relevant Issuing Bank under or in connection with any Letter of Credit issued by it, if taken or omitted in the absence of gross negligence or willful misconduct, shall not create for such Issuing Bank any resulting liability.

(c)     In the event that an Issuing Bank makes any payment under any Letter of Credit issued by it and the Borrower shall not have repaid such amount in full to such Issuing Bank pursuant to <u>Section 3.4(a)</u>, such Issuing Bank shall promptly notify the Administrative Agent and each L/C Participant of such failure, and each such L/C Participant shall promptly and unconditionally pay to the Administrative Agent for the account of such Issuing Bank, the amount of such L/C Participant's Commitment Percentage of such unreimbursed payment in Dollars and in immediately available funds; *provided*, *however*, that no L/C Participant shall be obligated to pay to the Administrative Agent for the account of such Issuing Bank its Commitment Percentage of such unreimbursed amount arising from any wrongful payment made by such Issuing Bank under any such Letter of Credit as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Issuing Bank.  Each

L/C Participant shall make available to the Administrative Agent for the account of the relevant Issuing Bank such L/C Participant's Commitment Percentage of the amount of such payment no later than 1:00 p.m. on the first Business Day after the date notified by such Issuing Bank in immediately available funds.  If and to the extent such L/C Participant shall not have so made its Commitment Percentage of the amount of such payment available to the Administrative Agent for the account of the relevant Issuing Bank, such L/C Participant agrees to pay to the Administrative Agent for the account of such Issuing Bank, forthwith on demand, such amount, together with interest thereon for each day from such date until the date such amount is paid to the Administrative Agent for the account of such Issuing Bank at a rate per annum equal to the Overnight Rate from time to time then in effect, plus any administrative, processing or similar fees customarily charged by such Issuing Bank in connection with the foregoing. The failure of any L/C Participant to make available to the Administrative Agent for the account of any Issuing Bank its Commitment Percentage of any payment under any Letter of Credit shall not relieve any other L/C Participant of its obligation hereunder to make available to the Administrative Agent for the account of such Issuing Bank its Commitment Percentage of any payment under such Letter of Credit on the date required, as specified above, but no L/C Participant shall be responsible for the failure of any other L/C Participant to make available to the Administrative Agent such other L/C Participant's Commitment Percentage of any such payment.

(d)     Whenever an Issuing Bank receives a payment in respect of an unpaid reimbursement obligation as to which the Administrative Agent has received for the account of such Issuing Bank any payments from the L/C Participants pursuant to clause (c) above, such Issuing Bank shall pay to the Administrative Agent and the Administrative Agent shall promptly pay to each L/C Participant that has paid its Commitment Percentage of such reimbursement obligation, in Dollars and in immediately available funds, an amount equal to such L/C Participant's share (based upon the proportionate aggregate amount originally funded by such L/C Participant to the aggregate amount funded by all L/C Participants) of the principal amount so paid in respect of such reimbursement obligation and interest thereon accruing after the purchase of the respective L/C Participations at the Overnight Rate.

(e)     The obligations of the L/C Participants to make payments to the Administrative Agent for the account of an Issuing Bank with respect to Letters of Credit shall be irrevocable and not subject to counterclaim, set-off or other defense or any other qualification or exception whatsoever and shall be made in accordance with the terms and conditions of this Agreement under all circumstances, including under any of the following circumstances:

(i)     any lack of validity or enforceability of this Agreement or any of the other Credit Documents;

(ii)     the existence of any claim, set-off, defense or other right that the Borrower may have at any time against a beneficiary named in a Letter of Credit, any transferee of any Letter of Credit (or any Person for whom any such transferee may be acting), the Administrative Agent, any Issuing Bank, any Lender or other Person, whether in connection with this Agreement, any Letter of Credit, the transactions contemplated herein or any unrelated transactions (including any underlying transaction between the Borrower and the beneficiary named in any such Letter of Credit);

(iii)     any draft, certificate or any other document presented under any Letter of Credit proving to be forged, fraudulent, invalid or insufficient in any respect or any statement therein being untrue or inaccurate in any respect;

(iv)     the surrender or impairment of any security for the performance or observance of any of the terms of any of the Credit Documents; or

(v)     the occurrence of any Default or Event of Default;

*provided*, *however*, that no L/C Participant shall be obligated to pay to the Administrative Agent for the account of any Issuing Bank its Commitment Percentage of any unreimbursed amount arising from any wrongful payment made by such Issuing Bank under a Letter of Credit as a result of acts or omissions constituting willful misconduct or gross negligence on the part of such Issuing Bank.

3.4     Agreement to Repay Letter of Credit Drawings.

(a)     The Borrower hereby agrees to reimburse the relevant Issuing Bank by making payment in Dollars to such Issuing Bank or to the Administrative Agent for the account of such Issuing Bank (whether with its own funds or with proceeds of the Loans) in immediately available funds, for any payment or disbursement made by such Issuing Bank under any Letter of Credit issued by it (each such amount so paid until reimbursed, an "Unpaid Drawing") (i) within one Business Day of the date of such payment or disbursement if such Issuing Bank provides notice to the Borrower of such payment or disbursement prior to 11:00 a.m. on such next succeeding Business Day (from the date of such payment or disbursement) or (ii) if such notice is received after such time, on the next Business Day following the date of receipt of such notice (such required date for reimbursement under clause (i) or (ii), as applicable, on such Business Day (the "Reimbursement Date")), with interest on the amount so paid or disbursed by such Issuing Bank, from and including the date of such payment or disbursement to but excluding the Reimbursement Date, at the per annum rate for each day equal to the rate described in Section 2.8(a); *provided* that, notwithstanding anything contained in this Agreement to the contrary, with respect to any Letter of Credit, (i) unless the Borrower shall have notified the Administrative Agent and such Issuing Bank prior to 11:00 a.m. on the Reimbursement Date that the Borrower intends to reimburse such Issuing Bank for the amount of such drawing with funds other than the proceeds of Loans, the Borrower shall be deemed to have given a Notice of Borrowing requesting that the Lenders make Loans (which shall be ABR Loans) on the Reimbursement Date in an amount equal to the amount at such drawing, and (ii) the Administrative Agent shall promptly notify each L/C Participant of such drawing and the amount of its Loan to be made in respect thereof, and each L/C Participant shall be irrevocably obligated to make a Loan to the Borrower in the manner deemed to have been requested in the amount of its Commitment Percentage of the applicable Unpaid Drawing by 12:00 noon on such Reimbursement Date by making the amount of such Loan available to the Administrative Agent. Such Loans made in respect of such Unpaid Drawing on such Reimbursement Date shall be made without regard to the Minimum Borrowing Amount and without regard to the satisfaction of the conditions set forth in Section 7. The Administrative Agent shall use the proceeds of such Loans solely for purpose of reimbursing the relevant Issuing Bank for the related Unpaid Drawing. In the event that the Borrower fails to Cash Collateralize any Letter of Credit that is outstanding on the L/C Maturity Date, the full amount of the Letters of Credit Outstanding in respect of such Letter of Credit shall be deemed to be an Unpaid Drawing subject to the provisions of this Section 3.4 except that such Issuing Bank shall hold the proceeds received from the Lenders as contemplated above as cash collateral for such Letter of Credit to reimburse any Drawing under such Letter of Credit and shall use such proceeds *first*, to reimburse itself for any Drawings made in respect of such Letter of Credit following the L/C Maturity Date, *second*, to the extent such Letter of Credit expires or is returned undrawn while any such cash collateral remains, to the repayment of obligations in respect of any Loans that have not paid at such time and *third*, to the Borrower or as otherwise directed by a court of competent jurisdiction. Nothing in this Section 3.4(a) shall affect the Borrower's obligation to repay all outstanding Loans when due in accordance with the terms of this Agreement.

(b)     The obligations of the Borrower under this Section 3.4 to reimburse the relevant Issuing Bank with respect to Unpaid Drawings (including, in each case, interest thereon) shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances and irrespective of any set-off, counterclaim or defense to payment that the Borrower or any other Person may have or have had against such Issuing Bank, the Administrative Agent or any Lender (including in its capacity as an L/C Participant), including any defense based upon (i) the failure of any drawing under a Letter of Credit (each a "Drawing") to conform

to the terms of the Letter of Credit, (ii) any non-application or misapplication by the beneficiary of the proceeds of such Drawing, (iii) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (iv) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (v) payment by the Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such letter of Credit, or (vi) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the Borrower's obligations hereunder.  None of the Administrative Agent, the Lenders or the Issuing Bank, nor any of their Related Parties, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of the Issuing Bank *provided* that the foregoing shall not be construed to excuse the relevant Issuing Bank from liability to the Borrower to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Borrower to the extent permitted by applicable law) suffered by the Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of the Issuing Bank (as finally determined by a court of competent jurisdiction), the Issuing Bank shall be deemed to have exercised care in each such determination.  In furtherance of the foregoing and without limiting the generality thereof, the parties hereto agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, the Issuing Bank that issued such Letter of Credit may in its sole discretion, either accept or make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

3.5     <u>Increased Costs</u>.  If, after the Closing Date, the adoption of any Change in Law shall either (a) impose, modify or make applicable any reserve, deposit, capital adequacy or similar requirement against Letters of Credit issued by any Issuing Bank, or any L/C Participant's L/C Participation therein, or (b) impose on any Issuing Bank or any L/C Participant any other conditions, costs or expenses affecting its obligations under this Agreement in respect of Letters of Credit or L/C Participations therein or any Letter of Credit or such L/C Participant's L/C Participation therein, and the result of any of the foregoing is to increase the cost to such Issuing Bank or such L/C Participant of issuing, maintaining or participating in any Letter of Credit, or to reduce the amount of any sum received or receivable by such Issuing Bank or such L/C Participant hereunder (other than (i) Taxes indemnifiable under <u>Section 5.4</u>, or (ii) Excluded Taxes) in respect of Letters of Credit or L/C Participations therein, then, promptly (and in any event no later than 15 days) after receipt of written demand to the Borrower by such Issuing Bank or such L/C Participant, as the case may be (a copy of which notice shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), the Borrower shall pay to such Issuing Bank or such L/C Participant such additional amount or amounts as will compensate such Issuing Bank or such L/C Participant for such increased cost or reduction, it being understood and agreed, however, that no Issuing Bank or L/C Participant shall be entitled to such compensation as a result of such Person's compliance with, or pursuant to any request or directive to comply with, any such Requirement of Law as in effect on the Closing Date.  A certificate submitted to the Borrower by the relevant Issuing Bank or an L/C Participant, as the case may be (a copy of which certificate shall be sent by such Issuing Bank or such L/C Participant to the Administrative Agent), setting forth in reasonable detail the basis for the determination of such additional amount or amounts necessary to compensate such Issuing Bank or such L/C Participant as aforesaid shall be conclusive and binding on the Borrower absent clearly demonstrable error.

3.6     <u>New or Successor Issuing Bank</u>.

(a)     Any Issuing Bank may resign as an Issuing Bank upon 30 days' prior written notice to the Administrative Agent, the Lenders and the Borrower.  The Borrower may replace any Issuing Bank for any reason upon written notice to such Issuing Bank and the Administrative Agent and may add Issuing Banks at any time upon notice to the Administrative Agent.  If an Issuing Bank shall resign or be replaced, or if the Borrower shall decide to add a new Issuing Bank under this Agreement, then the Borrower may appoint from among the Lenders a successor issuer of Letters of Credit or a new Issuing Bank, as the case may be, or, with the consent of the Administrative Agent (such consent not to be unreasonably withheld) and such new Issuing Bank, another successor or new issuer of Letters of Credit, whereupon such successor issuer shall succeed to the rights, powers and duties of the replaced or resigning Issuing Bank under this Agreement and the other Credit Documents, or such new issuer of Letters of Credit shall be granted the rights, powers and duties of an Issuing Bank hereunder, and the term "Issuing Bank" shall mean such successor or such new issuer of Letters of Credit effective upon such appointment.  The acceptance of any appointment as an Issuing Bank hereunder whether as a successor issuer or new issuer of Letters of Credit in accordance with this Agreement, shall be evidenced by an agreement entered into by such new or successor issuer of Letters of Credit, in a form reasonably satisfactory to the Borrower and the Administrative Agent and, from and after the effective date of such agreement, such new or successor issuer of Letters of Credit shall become an "Issuing Bank" hereunder. After the resignation or replacement of an Issuing Bank hereunder, the resigning or replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement and the other Credit Documents with respect to Letters of Credit issued by it prior to such resignation or replacement, but shall not be required to issue additional Letters of Credit. In connection with any resignation or replacement pursuant to this <u>clause (a)</u> (but, in case of any such resignation, only to the extent that a successor issuer of Letters of Credit shall have been appointed), either (i) the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall arrange to have any outstanding Letters of Credit issued by the resigning or replaced Issuing Bank replaced with Letters of Credit issued by the successor issuer of Letters of Credit or (ii) the Borrower shall cause the successor issuer of Letters of Credit, if such successor issuer is reasonably satisfactory to the replaced or resigning Issuing Bank, to issue "back-stop" Letters of Credit naming the resigning or replaced Issuing Bank as beneficiary for each outstanding Letter of Credit issued by the resigning or replaced Issuing Bank, which new Letters of Credit shall have a Stated Amount equal to the Letters of Credit being back-stopped and the sole requirement for drawing on such new Letters of Credit shall be a drawing on the corresponding back- stopped Letters of Credit.  After any resigning or replaced Issuing Bank's resignation or replacement as Issuing Bank, the provisions of this Agreement relating to an Issuing Bank shall inure to its benefit as to any actions taken or omitted to be taken by it (A) while it was an Issuing Bank under this Agreement or (B) at any time with respect to Letters of Credit issued by such Issuing Bank.

(b)     To the extent that there are, at the time of any resignation or replacement as set forth in <u>clause (a)</u> above, any outstanding Letters of Credit, nothing herein shall be deemed to impact or impair any rights and obligations of any of the parties hereto with respect to such outstanding Letters of Credit (including any obligations related to the payment of fees or the reimbursement or funding of amounts drawn), except that the Borrower, the resigning or replaced Issuing Bank and the successor issuer of Letters of Credit shall have the obligations regarding outstanding Letters of Credit described in <u>clause (a)</u> above.

3.7     <u>Role of Issuing Bank</u>. Each Lender and the Borrower agree that, in paying any drawing under a Letter of Credit, no Issuing Bank shall have any responsibility to obtain any document (other than any sight draft, certificates and documents expressly required by the Letter of Credit) or to ascertain or inquire as to the validity or accuracy of any such document or the authority of the Person executing or delivering any such document.  None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable to any Lender for (a) any action taken

or omitted in connection herewith at the request or with the approval of the Majority Lenders, (b) any action taken or omitted in the absence of gross negligence or willful misconduct or (c) the due execution, effectiveness, validity or enforceability of any document or instrument related to any Letter of Credit or Issuer Document. The Borrower hereby assumes all risks of the acts or omissions of any beneficiary or transferee with respect to its use of any Letter of Credit; *provided* that this assumption is not intended to, and shall not, preclude the Borrower's pursuing such rights and remedies as it may have against the beneficiary or transferee at law or under any other agreement. None of the Issuing Banks, the Administrative Agent, any of their respective affiliates nor any correspondent, participant or assignee of any Issuing Bank shall be liable or responsible for any of the matters described in <u>Section 3.3(e)</u>; *provided* that anything in such Section to the contrary notwithstanding, the Borrower may have a claim against an Issuing Bank, and such Issuing Bank may be liable to the Borrower, to the extent, but only to the extent, of any direct, as opposed to consequential or exemplary, damages suffered by the Borrower which the Borrower proves were caused by such Issuing Bank's willful misconduct or gross negligence or such Issuing Bank's unlawful failure to pay under any Letter of Credit after the presentation to it by the beneficiary of a sight draft and certificate(s) strictly complying with the terms and conditions of a Letter of Credit. In furtherance and not in limitation of the foregoing, any Issuing Bank may accept documents that appear on their face to be in order, without responsibility for further investigation, regardless of any notice or information to the contrary, and no Issuing Bank shall be responsible for the validity or sufficiency of any instrument transferring or assigning or purporting to transfer or assign a Letter of Credit or the rights or benefits thereunder or proceeds thereof, in whole or in part, which may prove to be invalid or ineffective for any reason.

       3.8    <u>Cash Collateral</u>.

       (a)    Upon the request of the Majority Lenders if, as of the L/C Maturity Date, there are any Letters of Credit Outstanding, the Borrower shall immediately Cash Collateralize the then Letters of Credit Outstanding.

       (b)    If any Event of Default shall occur and be continuing, the Majority Lenders may require that the L/C Obligations be Cash Collateralized.

       (c)    For purposes of this Agreement, "<u>Cash Collateralize</u>" shall mean to (i) pledge and deposit with or deliver to the Administrative Agent, for the benefit of the Issuing Banks and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to the amount of the Letters of Credit Outstanding required to be Cash Collateralized (the "<u>Required Cash Collateral Amount</u>") or (ii) if the relevant Issuing Bank benefiting from such collateral shall agree in its reasonable discretion, other forms of credit support (including any backstop letter of credit) in a face amount equal to 105% of the Required Cash Collateral Amount from an issuer reasonably satisfactory to such Issuing Bank, in each case under <u>clause (i)</u> and <u>(ii)</u> above pursuant to documentation in form and substance reasonably satisfactory to the Administrative Agent and the relevant Issuing Bank (which documents are hereby consented to by the Lenders). Derivatives of such term have corresponding meanings. The Borrower hereby grants to the Administrative Agent, for the benefit of the Issuing Banks and the L/C Participants, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing. Such cash collateral shall be maintained in blocked, interest bearing deposit accounts established by and in the name of the Borrower, subject at all times, in each case, to a Control Agreement.

       3.9    <u>Existing Letters of Credit</u>. Subject to the terms and conditions hereof, each Existing Letter of Credit that is outstanding on the Closing Date, listed on <u>Schedule 3.9</u> shall, effective as of the Closing Date and without any further action by the Borrower, be continued as a Letter of Credit hereunder and from and after the Closing Date shall be deemed a Letter of Credit for all purposes hereof and shall be subject to and governed by the terms and conditions hereof.

       3.10    <u>Applicability of ISP and UCP</u>. Unless otherwise expressly agreed to by the relevant Issuing Bank and the Borrower when a Letter of Credit is issued, (a) the rules of the ISP or the Uniform Customs

and Practice for Documentary Credits shall apply to each standby Letter of Credit and (b) the rules of the Uniform Customs and Practice for Documentary Credits, as most recently published by the International Chamber of Commerce at the time of issuance, shall apply to each commercial Letter of Credit.

3.11    Conflict with Issuer Documents.  In the event of any conflict between the terms hereof and the terms of any Issuer Document, the terms of this Agreement shall control.

3.12    Letters of Credit Issued for Restricted Subsidiaries.  Notwithstanding that a Letter of Credit issued or outstanding hereunder is in support of any obligations of, or is for the account of, a Restricted Subsidiary, the Borrower shall be obligated to reimburse the relevant Issuing Bank hereunder for any and all drawings under such Letter of Credit.  The Borrower hereby acknowledges that the issuance of Letters of Credit for the account of Restricted Subsidiaries inures to the benefit of the Borrower, and that the Borrower's business derives substantial benefits from the businesses of such Restricted Subsidiaries.

SECTION 4.    Fees; Commitments.

4.1    Fees.

(a)    The Borrower agrees to pay to the Administrative Agent in Dollars, for the account of each Lender (in each case pro rata according to the respective Commitment Percentages of the Lenders), a commitment fee (the "Commitment Fee") for each day from the Closing Date until but excluding the Termination Date.  Each Commitment Fee shall be payable by the Borrower quarterly in arrears on the last Business Day of each March, June, September and December (for the three-month period (or portion thereof) ended on such day for which no payment has been received) and on the Termination Date (for the period ended on such date for which no payment has been received pursuant to clause (i) above), and shall be computed for each day during such period at a rate equal to 0.50% per annum on the Available Commitment in effect on such day.

(b)    The Borrower agrees to pay to the Administrative Agent in Dollars for the account of the Lenders pro rata on the basis of their respective Letter of Credit Exposure, a fee in respect of each Letter of Credit (the "Letter of Credit Fee"), for the period from the date of issuance of such Letter of Credit until the termination or expiration date of such Letter of Credit computed at a rate for each day equal to 3.50% per annum on the average daily Stated Amount of such Letter of Credit.  Such Letter of Credit Fees shall be due and payable (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (i) above).

(c)    The Borrower agrees to pay to each Issuing Bank a fee in respect of each Letter of Credit issued by it (the "Fronting Fee"), for the period from the date of issuance of such Letter of Credit to the termination or expiration date of such Letter of Credit, computed at the rate for each day equal to 0.125% per annum (or such other amount as may be agreed in a separate writing between the Borrower and the relevant Issuing Bank) on the average daily Stated Amount of such Letter of Credit (or at such other rate per annum as agreed in writing between the Borrower and the relevant Issuing Bank).  Such Fronting Fees shall be due and payable by the Borrower (i) quarterly in arrears on the last Business Day of each March, June, September and December and (ii) on the Termination Date (for the period for which no payment has been received pursuant to clause (i) above).

(d)    The Borrower agrees to pay directly to each Issuing Bank upon each issuance of, drawing under, and/or amendment of, a Letter of Credit issued by it such amount as the relevant Issuing Bank and the Borrower shall have agreed upon for issuances of, drawings under or amendments of, letters of credit issued by it.

(e)     The Borrower agrees to pay to the Administrative Agent the administrative agent fees in the amounts and on the dates as set forth in writing from time to time between the Administrative Agent and the Borrower.

4.2     Voluntary Reduction of Commitments.

(a)     Upon at least two Business Days' prior written notice (or telephonic notice promptly confirmed in writing) to the Administrative Agent at the Administrative Agent's Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), the Borrower shall have the right, without premium or penalty, on any day, permanently to terminate or reduce the Commitments, in whole or in part; *provided* that (a) with respect to the Commitments, any such termination or reduction shall apply proportionately and permanently to reduce the Commitments of each of the Lenders (*provided* that (x) after giving effect to any such reduction and to the repayment of any Loans made on such date, the Total Exposure of any such Lender does not exceed the Commitment of such Lender and (y) for the avoidance of doubt, any such repayment of Loans contemplated by the preceding clause shall be made in compliance with the requirements of Section 5.3(a) with respect to the ratable allocation of payments hereunder), (b) any partial reduction pursuant to this Section 4.2 shall be in the amount of at least $1,000,000 and (c) after giving effect to such termination or reduction and to any prepayments of Loans or cancellation or Cash Collateralization of Letters of Credit made on the date thereof in accordance with this Agreement, the aggregate amount of the Lenders' Total Exposures shall not exceed the Total Commitment.

(b)     The Borrower may terminate the unused amount of the Commitment of a Defaulting Lender upon not less than two (2) Business Days' prior notice to the Administrative Agent (which will promptly notify the Lenders thereof), and in such event the provisions of Section 2.15(f) will apply to all amounts thereafter paid by the Borrower for the account of such Defaulting Lender under this Agreement (whether on account of principal, interest, fees, indemnity or other amounts), *provided* that such termination will not be deemed to be a waiver or release of any claim the Borrower, the Administrative Agent, any Issuing Bank or any Lender may have against such Defaulting Lender.

4.3     Mandatory Termination of Commitments.  The Total Commitment shall terminate at 5:00 p.m. on the Termination Date.

SECTION 5.     Payments.

5.1     Voluntary Prepayments.  The Borrower shall have the right to prepay Loans, without premium or penalty, in whole or in part from time to time on the following terms and conditions:

(a)     the Borrower shall give the Administrative Agent at the Administrative Agent's Office written notice (or telephonic notice promptly confirmed in writing) of its intent to make such prepayment, the amount of such prepayment and (in the case of LIBOR Loans) the specific Borrowing(s) being prepaid, which notice shall be given by the Borrower no later than 1:00 p.m. (i) in the case of LIBOR Loans, three Business Days prior to such prepayment and (ii) in the case of ABR Loans on the date of such prepayment and shall promptly be transmitted by the Administrative Agent to each of the Lenders;

(b)     each partial prepayment of (i) LIBOR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof, and (ii) any ABR Loans shall be in a minimum amount of $500,000 and in multiples of $100,000 in excess thereof; *provided* that no partial prepayment of LIBOR Loans made pursuant to a single Borrowing shall reduce the outstanding LIBOR Loans made pursuant to such Borrowing to an amount less than the applicable Minimum Borrowing Amount for such LIBOR Loans; and

(c)    any prepayment of LIBOR Loans pursuant to this <u>Section 5.1</u> on any day other than the last day of an Interest Period applicable thereto shall be subject to compliance by the Borrower with the applicable provisions of <u>Section 2.11</u>.

Each such notice shall specify the date and amount of such prepayment and the Type of Loans to be prepaid.  At the Borrower's election in connection with any prepayment pursuant to this <u>Section 5.1</u>, such prepayment shall not be applied to any Loans of a Defaulting Lender.

5.2    <u>Mandatory Prepayments</u>.

(a)    <u>Repayment following Optional Reduction of Commitments</u>.  If, after giving effect to any termination or reduction of the Commitments pursuant to <u>Section 4.2(a)</u>, the aggregate Total Exposures of all Lenders exceeds the Total Commitment (as reduced), then the Borrower shall on the same Business Day (i) prepay the remaining Loans on the date of such termination or reduction in an aggregate principal amount equal to such excess and (ii) if any excess remains after prepaying all of the Loans as a result of any Letter of Credit Exposure, pay to the Administrative Agent on behalf of the Issuing Banks and the L/C Participants an amount in cash or otherwise Cash Collateralize an amount equal to such excess as provided in <u>Section 3.8</u>.

(b)    [Reserved].

(c)    <u>Application to Loans</u>.  With respect to each prepayment of Loans elected under <u>Section 5.1</u> or required by <u>Section 5.2</u>, the Borrower may designate (i) the Types of Loans that are to be prepaid and the specific Borrowing(s) being repaid and (ii) the Loans to be prepaid; *provided* that (A) each prepayment of any Loans made pursuant to a Borrowing shall be applied pro rata among such Loans and (B) notwithstanding the provisions of the preceding <u>clause (A)</u>, no prepayment of Loans shall be applied to the Loans of any Defaulting Lender unless otherwise agreed to in writing by the Borrower. In the absence of a designation by the Borrower as described in the preceding sentence, the Administrative Agent shall, subject to the above, make such designation in its reasonable discretion with a view, but no obligation, to minimize breakage costs owing under <u>Section 2.11</u>.

(d)    <u>LIBOR Interest Periods</u>.  In lieu of making any payment pursuant to this <u>Section 5.2</u> in respect of any LIBOR Loan, other than on the last day of the Interest Period therefor so long as no Event of Default shall have occurred and be continuing, the Borrower at its option may deposit, on behalf of the Borrower, with the Administrative Agent an amount equal to the amount of the LIBOR Loan to be prepaid and such LIBOR Loan shall be repaid on the last day of the Interest Period therefor in the required amount.  Such deposit shall be held by the Administrative Agent in a corporate time deposit account established on terms reasonably satisfactory to the Administrative Agent, earning interest at the then customary rate for accounts of such type.  The Borrower hereby grants to the Administrative Agent, for the benefit of the Lenders, a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Such deposit shall constitute cash collateral for the LIBOR Loans to be so prepaid; *provided* that the Borrower may at any time direct that such deposit be applied to make the applicable payment required pursuant to this <u>Section 5.2</u>.

5.3    <u>Method and Place of Payment</u>.

(a)    All payments under this Agreement shall be made by the Borrower without set-off, counterclaim or deduction of any kind. Unless otherwise specifically provided herein, all such payments shall be made to the Administrative Agent for the ratable account of the Lenders entitled thereto or the Issuing Banks entitled thereto, as the case may be, not later than 2:00 p.m., in each case, on the date when due and shall be made in immediately available funds at the Administrative Agent's Office or at such other office as the Administrative Agent shall specify for such purpose by notice to the Borrower, it being understood that written or facsimile notice by the Borrower to the Administrative Agent to make

a payment from the funds in the Borrower's account at the Administrative Agent's Office shall constitute the making of such payment to the extent of such funds held in such account. All repayments or prepayments of any Loans (whether of principal, interest or otherwise) hereunder and all other payments under each Credit Document shall be made in Dollars. The Administrative Agent will thereafter cause to be distributed on the same day (if payment was actually received by the Administrative Agent prior to 2:00 p.m. or, otherwise, on the next Business Day in the sole discretion of the Administrative Agent) like funds relating to the payment of principal or interest or fees ratably to the Lenders or the Issuing Banks, as applicable, entitled thereto.

(b)    For purposes of computing interest or fees, any payments under this Agreement that are made later than 2:00 p.m. shall be deemed to have been made on the next succeeding Business Day in the sole discretion of the Administrative Agent. Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

5.4    Net Payments.

(a)    Any and all payments made by or on behalf of the Borrower or any Guarantor under this Agreement or any other Credit Document shall be made free and clear of, and without deduction or withholding for or on account of, any Taxes; *provided* that if the Borrower, any Guarantor, the Administrative Agent or any other applicable withholding agent shall be required by applicable Requirements of Law to deduct or withhold any Taxes from such payments, then (i) the applicable withholding agent shall make such deductions or withholdings as are reasonably determined by the applicable withholding agent to be required by any applicable Requirement of Law, (ii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority within the time allowed and in accordance with applicable Requirements of Law, and (iii) to the extent withholding or deduction is required to be made on account of Indemnified Taxes or Other Taxes, the sum payable by the Borrower or such Guarantor shall be increased as necessary so that after all required deductions and withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 5.4) the Administrative Agent, the Collateral Agent, or the applicable Issuing Bank or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions or withholdings been made. Whenever any Indemnified Taxes or Other Taxes are payable by the Borrower or such Guarantor, as promptly as possible thereafter, the Borrower or Guarantor shall send to the Administrative Agent for its own account or for the account of such Issuing Bank or Lender, as the case may be, a certified copy of an official receipt (or other evidence acceptable to such Issuing Bank or Lender, acting reasonably) received by the Borrower or such Guarantor showing payment thereof. Without duplication, after any payment of Taxes by any Credit Party or the Administrative Agent to a Governmental Authority as provided in this Section 5.4, the Borrower shall deliver to the Administrative Agent or the Administrative Agent shall deliver to the Borrower, as the case may be, a copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by laws to report such payment or other evidence of such payment reasonably satisfactory to the Borrower or the Administrative Agent, as the case may be.

(b)    The Borrower shall timely pay and shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender with regard to any Other Taxes (whether or not such Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority).

(c)    The Borrower shall indemnify and hold harmless the Administrative Agent, the Collateral Agent and each Lender within 15 Business Days after written demand therefor, for the full amount of any Indemnified Taxes or Other Taxes imposed on the Administrative Agent, the Collateral

Agent or such Lender, as the case may be (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 5.4), and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate setting forth in reasonable detail the basis and calculation of the amount of such payment or liability delivered to the Borrower by a Lender, the Administrative Agent or the Collateral Agent (as applicable) on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)        Each Lender shall deliver to the Borrower and the Administrative Agent, at such time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law and such other reasonably requested information as will permit the Borrower or the Administrative Agent, as the case may be, to determine (A) whether or not any payments made hereunder or under any other Credit Document are subject to Taxes, (B) if applicable, the required rate of withholding or deduction, and (C) such Lender's entitlement to any available exemption from, or reduction of, applicable Taxes in respect of any payments to be made to such Lender by any Credit Party pursuant to any Credit Document or otherwise to establish such Lender's status for withholding tax purposes in the applicable jurisdiction. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(e)        Without limiting the generality of Section 5.4(d), each Non-U.S. Lender with respect to any Loan made to the Borrower shall, to the extent it is legally eligible to do so:

(i)        deliver to the Borrower and the Administrative Agent, prior to the date on which the first payment to the Non-U.S. Lender is due hereunder, two copies of (A) in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", United States Internal Revenue Service Form W-8BEN or W-8BEN-E (or any applicable successor form) (together with a certificate (substantially in the form of Exhibit K) representing that such Non-U.S. Lender is not a bank for purposes of Section 881(c) of the Code, is not a "10-percent shareholder" (within the meaning of Section 871(h)(3)(B) of the Code) of the Borrower, is not a CFC related to the Borrower (within the meaning of Section 864(d)(4) of the Code) and the interest payments in question are not effectively connected with the conduct by such Lender of a trade or business within the United States), (B) Internal Revenue Service Form W-8BEN, W-8BEN-E or Form W-8ECI (or any applicable successor form), in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or reduced rate of, U.S. federal withholding tax on payments by the Borrower under this Agreement, (C) Internal Revenue Service Form W-8IMY (or any applicable successor form) and all necessary attachments (including the forms described in clauses (A) and (B) above, *provided* that if the Non-U.S. Lender is a partnership and not a participating Lender, and one or more of the partners is claiming portfolio interest treatment, the Non-Bank Tax Certificate may be provided by such Non-U.S. Lender on behalf of such partners) or (D) any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made; and

(ii)        deliver to the Borrower and the Administrative Agent two further copies of any such form or certification (or any applicable successor form) on or before the date that any such form or certification expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrower and

the Administrative Agent, and from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.

Any Non-U.S. Lender that becomes legally ineligible to update any form or certification previously delivered shall promptly notify the Borrower and the Administrative Agent in writing of such Non-U.S. Lender's inability to do so.

Each Person that shall become a Participant pursuant to Section 13.6 or a Lender pursuant to Section 13.6 shall, upon the effectiveness of the related transfer, be required to provide all the forms and statements required pursuant to this Section 5.4(e); *provided* that in the case of a Participant such Participant shall furnish all such required forms and statements to the Person from which the related participation shall have been purchased.

In addition, to the extent it is legally eligible to do so, each Agent shall deliver to the Borrower (x)(I) prior to the date on which the first payment by the Borrower is due hereunder or (II) prior to the first date on or after the date on which such Agent becomes a successor Agent pursuant to Section 12.9 on which payment by the Borrower is due hereunder, as applicable, two copies of a properly completed and executed IRS Form W-9 certifying its exemption from U.S. Federal backup withholding or a properly completed and executed applicable IRS Form W-8 certifying its non-U.S. status and its entitlement to any treaty benefits, and (y) on or before the date on which any such previously delivered documentation expires or becomes obsolete or invalid, after the occurrence of any event requiring a change in the most recent documentation previously delivered by it to the Borrower, and from time to time if reasonably requested by the Borrower, two further copies of such documentation.

(f)     If any Lender, any Issuing Bank, the Administrative Agent or the Collateral Agent, as applicable, determines, in its sole discretion, that it had received a refund of an Indemnified Tax or Other Tax for which a payment has been made by the Borrower or any Guarantor pursuant to this Agreement or any other Credit Document, which refund in the good faith judgment of such Lender, such Issuing Bank, the Administrative Agent or the Collateral Agent, as the case may be, is attributable to such payment made by the Borrower or any Guarantor, then the Lender, the Issuing Bank, the Administrative Agent or the Collateral Agent, as the case may be, shall reimburse the Borrower or such Guarantor for such amount (net of all reasonable out-of-pocket expenses of such Lender, such Issuing Bank, the Administrative Agent or the Collateral Agent, as the case may be, and without interest other than any interest received thereon from the relevant Governmental Authority with respect to such refund) as the Lender, the Issuing Bank, Administrative Agent or the Collateral Agent, as the case may be, determines in its sole discretion to be the proportion of the refund as will leave it, after such reimbursement, in no better or worse position (taking into account expenses or any taxes imposed on the refund) than it would have been in if the payment had not been required; *provided* that the Borrower or such Guarantor, upon the request of the Lender, the Issuing Bank, the Administrative Agent or the Collateral Agent, agrees to repay the amount paid over to the Borrower or such Guarantor (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Lender, the Issuing Bank, the Administrative Agent or the Collateral Agent in the event the Lender, the Issuing Bank, the Administrative Agent or the Collateral Agent is required to repay such refund to such Governmental Authority.  In such event, such Lender, the Issuing Bank, the Administrative Agent or the Collateral Agent, as the case may be, shall, at the Borrower's request, provide the Borrower with a copy of any notice of assessment or other evidence of the requirement to repay such refund received from the relevant Governmental Authority (*provided* that such Lender, such Issuing Bank, the Administrative Agent or the Collateral Agent may delete any information therein that it deems confidential).  A Lender, an Issuing Bank, the Administrative Agent or the Collateral Agent shall claim any refund that it determines is available to it, unless it concludes in its sole discretion that it would be adversely affected by making such a claim.  No Lender nor any Issuing Bank nor the Administrative Agent nor the Collateral Agent shall be obliged to make available its tax returns (or any other

information relating to its taxes that it deems confidential) to any Credit Party in connection with this clause (f) or any other provision of this Section 5.4.

(g)     If the Borrower determines that a reasonable basis exists for contesting an Indemnified Tax or Other Tax for which a Credit Party has paid additional amounts or indemnification payments, each Lender or Agent, as the case may be, shall use reasonable efforts to cooperate with the Borrower as the Borrower may reasonably request in challenging such Tax.  The Borrower shall indemnify and hold each Lender and Agent harmless against any out-of-pocket expenses incurred by such Person in connection with any request made by the Borrower pursuant to this Section 5.4(g).  Nothing in this Section 5.4(g) shall obligate any Lender or Agent to take any action that such Person, in its sole judgment, determines may result in a material detriment to such Person.

(h)     Each U.S. Lender shall deliver to the Borrower and the Administrative Agent two Internal Revenue Service Forms W-9 (or substitute or successor form), properly completed and duly executed, certifying that such U.S. Lender is exempt from United States federal backup withholding (i) on or prior to the Closing Date (or on or prior to the date it becomes a party to this Agreement), (ii) on or before the date that such form expires or becomes obsolete or invalid, (iii) after the occurrence of a change in the U.S. Lender's circumstances requiring a change in the most recent form previously delivered by it to the Borrower and the Administrative Agent, and (iv) from time to time thereafter if reasonably requested by the Borrower or the Administrative Agent.  Any U.S. Lender that becomes legally ineligible to update any form or certification previously delivered shall promptly notify the Borrower and the Administrative Agent in writing of such U.S. Lender's inability to do so.

(i)     If a payment made to any Lender or any Agent under this Agreement or any other Credit Document would be subject to U.S. federal withholding tax imposed by FATCA if such Lender or such Agent were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender or such Agent shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has or has not complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this Section 5.4(i), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(j)     For the avoidance of doubt, for purposes of this Section 5.4, the term "Lender" includes any Issuing Bank.

(k)     The agreements in this Section 5.4 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

5.5     Computations of Interest and Fees.

(a)     Except as provided in the next succeeding sentence, Interest on LIBOR Loans and ABR Loans shall be calculated on the basis of a 360-day year for the actual days elapsed. Interest on ABR Loans in respect of which the rate of interest is calculated on the basis of the Prime Rate and interest on overdue interest shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.

(b)     Fees and the average daily Stated Amount of Letters of Credit shall be calculated on the basis of a 360-day year for the actual days elapsed.

5.6     Limit on Rate of Interest.

(a)     No Payment Shall Exceed Lawful Rate.  Notwithstanding any other term of this Agreement, the Borrower shall not be obligated to pay any interest or other amounts under or in connection with this Agreement or otherwise in respect to any of the Obligations in excess of the amount or rate permitted under or consistent with any applicable law, rule or regulation.

(b)     Payment at Highest Lawful Rate.  If the Borrower is not obliged to make a payment that it would otherwise be required to make, as a result of Section 5.6(a), the Borrower shall make such payment to the maximum extent permitted by or consistent with applicable laws, rules and regulations.

(c)     Adjustment if Any Payment Exceeds Lawful Rate.  If any provision of this Agreement or any of the other Credit Documents would obligate the Borrower or any other Credit Party to make any payment of interest or other amount payable to any Lender in an amount or calculated at a rate that would be prohibited by any applicable Requirement of Law, then notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Requirements of Law, such adjustment to be effected, to the extent necessary, by reducing the amount or rate of interest required to be paid by the Borrower to the affected Lender under Section 2.8.

(d)     Rebate of Excess Interest.  Notwithstanding the foregoing, and after giving effect to all adjustments contemplated thereby, if any Lender shall have received from the Borrower an amount in excess of the maximum permitted by any applicable Requirement of Law, then the Borrower shall be entitled, by notice in writing to the Administrative Agent to obtain reimbursement from that Lender in an amount equal to such excess, and pending such reimbursement, such amount shall be deemed to be an amount payable by that Lender to the Borrower.

SECTION 6.     Conditions Precedent to Initial Borrowing.

The initial Borrowing under this Agreement is subject to the satisfaction of the following conditions precedent, except as otherwise agreed or waived pursuant to Section 13.1.

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     [Reserved].

(c)     The Administrative Agent shall have received, in the case of each Credit Party, each of the items referred to in subclauses (i), (ii) and (iii) below:

(i)     a copy of the certificate or articles of incorporation, certificate of limited partnership or certificate of formation, including all amendments thereto, of each Credit Party, in each case, certified as of a recent date by the Secretary of State (or other similar official) of the jurisdiction of its organization, and a certificate as to the good standing (to the extent such concept or a similar concept exists under the laws of such jurisdiction) of each such Credit Party as of a recent date from such Secretary of State (or other similar official);

(ii)     a certificate of the Secretary or Assistant Secretary or similar officer of each Credit Party dated the Closing Date and certifying:

(A)     that attached thereto is a true and complete copy of the bylaws (or partnership agreement, limited liability company agreement or other equivalent governing documents) of such Credit Party as in effect on the Closing Date,

(B)     that attached thereto is a true and complete copy of resolutions duly adopted by the board of directors (or managing general partner, managing member or equivalent) of such Credit Party authorizing the execution, delivery and performance of the Credit Documents to which such person is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect on the Closing Date,

(C)     that the certificate or articles of incorporation, certificate of limited partnership, articles of incorporation or certificate of formation of such Credit Party has not been amended since the date of the last amendment thereto disclosed pursuant to subclause (i) above,

(D)     as to the incumbency and specimen signature of each officer executing any Credit Document or any other document delivered in connection herewith on behalf of such Credit Party, and

(iii)     a certificate of a director or an officer as to the incumbency and specimen signature of the Secretary or Assistant Secretary or similar officer executing the certificate pursuant to subclause (ii) above.

(d)     The Administrative Agent (or its counsel) shall have received from each party thereto either (i) a counterpart of the Guarantee, the Collateral Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of the Guarantee, the Collateral Agreement.

(e)     All documents and instruments, including Uniform Commercial Code or other applicable personal property and financing statements, reasonably requested by the Collateral Agent to be filed, registered or recorded to create the Liens intended to be created by any Security Document and perfect such Liens having the priority set forth in the DIP Order shall have been delivered to the Collateral Agent for filing, registration or recording.

(f)     All representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects (except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date).

(g)     All "first-day" orders entered by the Bankruptcy Court following the commencement of the Chapter 11 Cases shall have not been reversed, vacated or stayed (except with the consent of the Majority Lenders).

(h)     The Bankruptcy Court shall have entered the DIP Order and such DIP Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and the Majority Lenders.

(i)     The Administrative Agent shall have received (i) a thirteen-week cash flow forecast for the thirteen-week period following the Closing Date attached hereto as Exhibit M (the "Initial Budget") and (ii) a cash flow forecast prepared on a monthly basis from the Closing Date through the

WEIL:\97169709\10\74473.0003

Borrower's anticipated date of emergence from the Chapter 11 Cases attached hereto as <u>Exhibit N</u> (the "<u>Initial Emergence Budget</u>").

(j)  The Agents shall have received all fees payable thereto or to any Lender (including any agent and arranger in respect of this DIP Facility) on or prior to the Closing Date and, to the extent invoiced, all other amounts due and payable pursuant to the Credit Documents on or prior to the Closing Date, including, to the extent invoiced, reimbursement or payment of all reasonable out-of-pocket expenses (including reasonable fees, charges and disbursements of Mayer Brown LLP) required to be reimbursed or paid by the Credit Parties hereunder or under any Credit Document.

(k)  (i) The Administrative Agent shall have received at least three (3) Business Days prior to the Closing Date all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation, the Patriot Act that has been requested not less than five (5) Business Days prior to the Closing Date and (ii) to the extent the Borrower qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, at least five (5) days prior to the Closing Date, any Lender that has requested, in a written notice to the Borrower at least ten (10) days prior to the Closing Date, a Beneficial Ownership Certification in relation to the Borrower shall have received such Beneficial Ownership Certification (provided that, upon the execution and delivery by such Lender of its signature page to this Agreement, the condition set forth in this clause (ii) shall be deemed to be satisfied).

(l)  After giving effect to any prepayment of Loans on the Closing Date, the amount of the Available Commitment shall be at least $[●][6].

(m)  The Borrower shall have entered into Hedge Transactions with hedge counterparties with respect to not less than 80% of their reasonably anticipated monthly projected production of oil from Proved Developed Producing Reserves for each of the twelve (12) full months immediately following the Petition Date, and such Hedge Transactions shall continue to be in effect on the Closing Date.

For purposes of determining compliance with the conditions specified in this <u>Section 6</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or satisfactory to a Lender unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 7.    <u>Conditions Precedent to All Subsequent Credit Events</u>.

The agreement of each Lender to make any Loan requested to be made by it on any date after the Closing Date (excluding Loans required to be made by the Lenders in respect of Unpaid Drawings pursuant to <u>Sections 3.3</u> and <u>3.4</u>), and the obligation of any Issuing Bank to issue Letters of Credit on any date (other than any Existing Letter of Credit) after the Closing Date, is subject to the satisfaction of the following conditions precedent:

(a)  At the time of each such Credit Event and also after giving effect thereto, (i) no Default or Event of Default shall have occurred and be continuing and (ii) all representations and warranties made by any Credit Party contained herein or in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on and as of the date of such Credit Event (except where such representations and warranties expressly

---

[6] NTD – Reasonable minimum amount to be inserted based on budget and updated cash flows projections at date of Final Order.

relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date).

(b)     Prior to the making of each Loan (other than any Loan made pursuant to Section 3.4(a)), the Administrative Agent shall have received a Notice of Borrowing (whether in writing or by telephone) meeting the requirements of Section 2.3(a).

(c)     Prior to the issuance of each Letter of Credit (other than any Existing Letter of Credit), the Administrative Agent and the applicable Issuing Bank shall have received a Letter of Credit Application meeting the requirements of Section 3.2(a).

(d)     The DIP Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any material respect without the prior written consent of the Majority Lenders and the Administrative Agent.

The acceptance of the benefits of each Credit Event after the Closing Date shall constitute a representation and warranty by each Credit Party to each of the Lenders that all the applicable conditions specified in Section 7 above have been satisfied as of that time.

SECTION 8.     Representations and Warranties.

In order to induce the Lenders to enter into this Agreement, to make the Loans and issue or participate in Letters of Credit as provided for herein, the Borrower makes, on the date of each Credit Event, the following representations and warranties to, and agreements with, the Lenders, all of which shall survive the execution and delivery of this Agreement and the making of the Loans and the issuance of the Letters of Credit:

8.1     Corporate Status.  Each of the Borrower and each Material Subsidiary (a) is a duly organized and validly existing corporation or other entity in good standing (or, if applicable in a foreign jurisdiction, enjoys the equivalent status under the laws of such jurisdiction of organization outside the United States) under the laws of the jurisdiction of its organization, (b) subject to entry of the DIP Order and subject to any restrictions arising on account of any Credit Party's status as a "debtor" under the Bankruptcy Court, has the corporate or other organizational power and authority to own its property and assets and to transact its business as now conducted and (c) has duly qualified and is authorized to do business and is in good standing (if applicable) in all jurisdictions where it is required to be so qualified, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

8.2     Corporate Power and Authority; Enforceability.  Subject to entry of the DIP Order and the terms thereof, each Credit Party has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is a party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is a party.  Each Credit Party has duly executed and delivered each Credit Document to which it is a party and each such Credit Document constitutes the legal, valid and binding obligation of such Credit Party enforceable in accordance with its terms, subject to entry of the DIP Order and further subject to the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization and other similar laws relating to or affecting creditors' rights generally and general principles of equity (whether considered in a proceeding in equity or law).

8.3     No Violation.  Subject to entry of the DIP Order and the terms thereof, none of the execution, delivery or performance by any Credit Party of the Credit Documents to which it is a party or the compliance with the terms and provisions thereof (a) will contravene any Requirement of Law except to the extent such contravention would not reasonably be expected to result in a Material Adverse Effect, (b) result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default that is not executed by the Bankruptcy Code under, or result in the creation or imposition of (or the obligation to create or impose)

any Lien upon any of the property or assets of such Credit Party or any of the Restricted Subsidiaries (other than Liens created under the Credit Documents or the DIP Order, any restrictions arising on account of the Borrower's or any Subsidiaries' status as a "debtor" under the Bankruptcy Code, and Permitted Liens) pursuant to the terms of any indenture, loan agreement, lease agreement, mortgage, deed of trust, agreement or other instrument to which such Credit Party or any of the Restricted Subsidiaries is a party or by which it or any of its property or assets is bound (any such term, covenant, condition or provision, a "Contractual Requirement") except, in each case of clause (a) and (b), to the extent such breach, default or Lien that would not reasonably be expected to result in a Material Adverse Effect or (c) violate any provision of the certificate of incorporation, by-laws or other organizational documents of such Credit Party or any of the Restricted Subsidiaries.

       8.4     Litigation.  Other than the Chapter 11 Cases and except as set forth on Schedule 8.4, there are no actions, suits or proceedings (including Environmental Claims) pending or, to the knowledge of the Borrower, threatened with respect to the Borrower or any of its Restricted Subsidiaries that would reasonably be expected to result in a Material Adverse Effect.

       8.5     Margin Regulations.  Neither the making of any Loan hereunder nor the use of the proceeds thereof will violate the provisions of Regulation U or Regulation X of the Board.

       8.6     Governmental Approvals.  Subject to entry of the DIP Order and the terms thereof, the execution, delivery and performance of each Credit Document do not require any consent or approval of, registration or filing with, or other action by, any Governmental Authority, except for (a) such as have been obtained or made and are in full force and effect, (b) filings and recordings in respect of the Liens created pursuant to the Security Documents or the DIP Order and (c) such consents, approvals, registrations, filings or actions the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect.

       8.7     Investment Company Act.  No Credit Party is required to be registered as an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

       8.8     True and Complete Disclosure.

       (a)     All written information (other than the Budget, estimates and information of a general economic nature or general industry nature) (the "Information") concerning Holdings, the Borrower, the Subsidiaries prepared by or on behalf of the foregoing or their representatives and made available to any Lenders or the Administrative Agent in connection with the DIP Facility or the other transactions contemplated hereby, when taken as a whole, was true and correct in all material respects, as of the date such Information was furnished to the Lenders and as of the Closing Date (with respect to Information provided prior to the Closing Date) and did not, taken as a whole, contain any untrue statement of a material fact as of any such date or omit to state a material fact necessary in order to make the statements contained therein, taken as a whole, not materially misleading in light of the circumstances under which such statements were made.

       (b)     As of the Closing Date, to the best knowledge of the Borrower, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

       8.9     Financial Condition; Financial Statements.  The Historical Financial Statements present fairly in all material respects the consolidated financial position of the Borrower and its consolidated Subsidiaries at the date of such information and for the period covered thereby and have been prepared in accordance with GAAP consistently applied except to the extent provided in the notes thereto, if any, subject, in the case of the unaudited financial information, to changes resulting from audit, normal year end audit adjustments and to the absence of footnotes.  Since the Closing Date, there has been no Material Adverse Effect.

8.10    Tax Matters.  Except where the failure of which would not, individually or in the aggregate, be reasonably expected to have a Material Adverse Effect or is excused by the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases, (a) each of the Borrower and the Subsidiaries has filed all federal income Tax returns and all other Tax returns, domestic and foreign, required to be filed by it (including in its capacity as withholding agent) and has paid all Taxes payable by it that have become due, other than those (i) not yet delinquent or (ii) being contested in good faith by appropriate proceedings and as to which adequate reserves have been provided to the extent required by and in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction) and (b) the Borrower and each of the Subsidiaries have provided adequate reserves in accordance with GAAP (or in the case of a Foreign Subsidiary, the comparable accounting principles in the relevant jurisdiction) for all Taxes of the Borrower and the Subsidiaries not yet due and payable.

8.11    Compliance with ERISA.

(a)    Each Plan is in compliance with ERISA, the Code and any applicable Requirement of Law; no Reportable Event has occurred (or is reasonably likely to occur) with respect to any Plan; no Plan is "insolvent" (within the meaning of Section 4245 of ERISA) or in "reorganization" (within the meaning of Section 4245 of ERISA) (or is reasonably likely to be insolvent or in reorganization); no Multiemployer Plan is in "endangered" or "critical" status (within the meaning of Section 432 of the Code or Section 305 of ERISA), and no written notice of any such insolvency, reorganization, or endangered or critical status has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; each Plan that is subject to Title IV of ERISA has satisfied the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, and there has been no determination that any such Plan is, or is expected to be, in "at risk" status (within the meaning of Section 303(i)(4) of ERISA); none of the Borrower or any ERISA Affiliate has incurred (or is reasonably likely to incur) any liability to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate, been notified in writing that it will incur any liability under any of the foregoing Sections with respect to any Plan; no proceedings have been instituted (or are reasonably likely to be instituted) to terminate or to reorganize any Plan or to appoint a trustee to administer any Plan, and no written notice of any such proceedings has been given to the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate; and no lien imposed under the Code or ERISA on the assets of the Borrower or any ERISA Affiliate exists (or is reasonably likely to exist) nor has the Borrower or, to the knowledge of the Borrower, any ERISA Affiliate been notified in writing that such a lien will be imposed on the assets of the Borrower or any ERISA Affiliate on account of any Plan, except to the extent that a breach of any of the representations or warranties in this Section 8.11(a) either (x) would not result, individually or in the aggregate, in an amount of liability that would be reasonably likely to have a Material Adverse Effect or (y) is excused by the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases.  No Plan has an Unfunded Current Liability that would, individually or when taken together with any other liabilities referenced in this Section 8.11(a), be reasonably likely to have a Material Adverse Effect or is excused by the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases.  With respect to any Multiemployer Plans, the representations and warranties in this Section 8.11(a), other than any made with respect to (i) liability under Section 4201 or 4204 of ERISA or (ii) liability for "termination" or "reorganization" (within the meaning of Title IV of ERISA) of such plans under ERISA, are made to the best knowledge of the Borrower.

(b)    All Foreign Plans are in compliance with, and have been established, administered and operated in accordance with, the terms of such Foreign Plans and applicable law, except for any failure to so comply, establish, administer or operate the Foreign Plans as would not reasonably be expected to have a Material Adverse Effect or is excused by the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases.  All contributions or other payments which are due with respect to each Foreign Plan have been made in full and there are no funding deficiencies thereunder, except to the extent any such

WEIL:\97169709\10\74473.0003

events would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect or is excused by the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases.

8.12    Subsidiaries.  Schedule 8.12 lists each Subsidiary of the Borrower (and the direct and indirect ownership interest of the Borrower therein), in each case existing on the Closing Date.  Each Guarantor, Material Subsidiary and Unrestricted Subsidiary as of the Closing Date has been so designated on Schedule 8.12.

8.13    Intellectual Property.  Other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court, the Borrower and each of the Restricted Subsidiaries own or have obtained valid rights to use all intellectual property, free from any burdensome restrictions, that is necessary for the operation of their respective businesses as currently conducted and as proposed to be conducted, except where the failure to obtain any such rights would not reasonably be expected to have a Material Adverse Effect.  The operation of the respective businesses of the Borrower and each of the Restricted Subsidiaries, as currently conducted and as proposed to be conducted, do not infringe, misappropriate, violate or otherwise conflict with the proprietary rights of any third party have obtained all intellectual property, except as would not reasonably be expected to have a Material Adverse Effect.

8.14    Environmental Laws.

Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect:

(a)    (i) the Borrower and each of the Subsidiaries and all Oil and Gas Properties are in compliance with all Environmental Laws; (ii) neither the Borrower nor any Subsidiary has received written notice of any Environmental Claim or any other liability under any Environmental Law; (iii) neither the Borrower nor any Subsidiary is conducting any investigation, removal, remedial or other corrective action pursuant to any Environmental Law at any location; and (iv) no underground storage tank or related piping, or any impoundment or disposal area containing Hazardous Materials has been used by the Borrower or any of its Subsidiaries or, to the knowledge of the Borrower, is located at, on or under any Oil and Gas Properties currently owned or leased by the Borrower or any of its Subsidiaries.

(b)    Neither the Borrower nor any of the Subsidiaries has treated, stored, transported, released or disposed or arranged for disposal or transport for disposal of Hazardous Materials at, on, under or from any currently or formerly owned or leased Oil and Gas Properties or facility in a manner that would reasonably be expected to give rise to liability of the Borrower or any Subsidiary under Environmental Law.

8.15    Properties.  Other than as a result of the Chapter 11 Cases and subject to any necessary orders or authorization of the Bankruptcy Court:

(a)    Each Credit Party has good and defensible title to the Oil and Gas Properties evaluated in the most recently delivered Reserve Report (other than those (i) disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (ii) leases that have expired in accordance with their terms and (iii) with title defects disclosed in writing to the Administrative Agent), and valid title to all its material personal properties, in each case, free and clear of all Liens other than Liens permitted by Section 10.2, except in each case where the failure to have such title would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  After giving full effect to the Liens permitted by Section 10.2, the Borrower or the Restricted Subsidiary specified as the owner owns the working interests and net revenue interests attributable to the Hydrocarbon Interests as reflected in the most recently delivered Reserve Report, and the ownership of such properties shall not in any material respect obligate the Borrower or such Restricted Subsidiary to bear the costs and expenses relating to the maintenance, development and operations of each such property in an amount in excess of the working interest of each property set forth in the most recently delivered Reserve Report that is not

-66-

offset by a corresponding proportionate increase in the Borrower's or such Restricted Subsidiary's net revenue interest in such property.

(b)     All material leases and agreements necessary for the conduct of the business of the Borrower and the Restricted Subsidiaries are valid and subsisting, in full force and effect, except to the extent that any such failure to be valid or subsisting would not reasonably be expected to have a Material Adverse Effect.

(c)     The rights and properties presently owned, leased or licensed by the Credit Parties including all easements and rights of way, include all rights and properties necessary to permit the Credit Parties to conduct their respective businesses as currently conducted, except to the extent any failure to have any such rights or properties would not reasonably be expected to have a Material Adverse Effect.

(d)     All of the properties of the Borrower and the Restricted Subsidiaries that are reasonably necessary for the operation of their businesses are in good working condition and are maintained in accordance with prudent business standards, except to the extent any failure to satisfy the foregoing would reasonably be expected to have a Material Adverse Effect.

8.16     [Reserved].

8.17     Insurance.  The properties of the Borrower and the Restricted Subsidiaries are insured in the manner contemplated by Section 9.3.

8.18     Gas Imbalances, Prepayments.   On the Closing Date, except as set forth on Schedule 8.18, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding [●] Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate, with respect to the Credit Parties' Oil and Gas Properties that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

8.19     Marketing of Production.  On the Closing Date, except as set forth on Schedule 8.19, no material agreements exist (which are not cancelable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the Closing Date.

8.20     Hedge Transactions.   Schedule 8.20 sets forth, as of the Closing Date, a true and complete list of all material commodity Hedge Transactions of each Credit Party, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark to market value thereof (as of the last Business Day of the most recent fiscal quarter preceding the Closing Date and for which a mark to market value is reasonably available), all credit support agreements relating thereto (including any margin required or supplied) and the counterparty to each such agreement.

8.21     Patriot Act; Sanctions.

(a)     On the Closing Date, each Credit Party is in compliance in all material respects with the material provisions of the Patriot Act.

(b)     The Borrower has implemented and maintains in effect policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions, and the Borrower, its Subsidiaries and their respective officers and directors and to the knowledge of the Borrower its employees and agents, are in compliance with Anti-Corruption Laws and applicable Sanctions in all

material respects. None of (a) the Borrower, any Subsidiary or to the knowledge of the Borrower or such Subsidiary any of their respective directors, officers or employees, or (b) to the knowledge of the Borrower, any agent of the Borrower or any Subsidiary that will act in any capacity in connection with or benefit from the credit facility established hereby, is a Sanctioned Person. No Borrowing or Letter of Credit, use of proceeds or other transaction contemplated by this Agreement will violate any Anti-Corruption Law or applicable Sanctions.

8.22    No Material Adverse Effect.  Since the Petition Date, there has been no event or circumstance that has had or would reasonably be expected to have a Material Adverse Effect.

8.23    Foreign Corrupt Practices Act.  None of the Borrower or any of the Restricted Subsidiaries, nor, to the knowledge of the Borrower or any of the Restricted Subsidiaries, or any of their directors, officers, agents or employees has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity, (ii) made any direct or indirect unlawful payment to any government official or employee from corporate funds, (iii) violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977 or the Bribery Act 2010 of the United Kingdom or similar law of the European Union or any European Union Member State or similar law of a jurisdiction in which the Borrower or any of the Restricted Subsidiaries conduct their business and to which they are lawfully subject or (iv) made any unlawful bribe, rebate, payoff, influence payment, kickback or other unlawful payment.

8.24    Budget.  To the best knowledge of the Borrower, the Credit Parties have not failed to disclose to the Administrative Agent (or any of its advisors) any material assumptions with respect to the Budget and the Borrower affirms the reasonableness of the material assumptions set forth in the Budget in all material respects.

8.25    Priority and Liens.  Upon entry of the DIP Order and the delivery and execution of this Agreement, the Obligations shall have the status and lien priority set forth in the DIP Order and herein.

SECTION 9.    Affirmative Covenants.

The Borrower hereby covenants and agrees that until the Total Commitment and each Letter of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to each applicable Issuing Bank following the termination of the Total Commitment) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations incurred hereunder (other than Hedging Obligations under Secured Hedge Transactions, Cash Management Obligations under Secured Cash Management Agreements or contingent indemnification obligations not then due and payable), are paid in full:

9.1    Information Covenants.  The Borrower will furnish to the Administrative Agent (which shall promptly make such information available to the Lenders in accordance with its customary practice):

(a)    Annual Financial Statements.  Within five days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 105 days after the end of each such fiscal year), the audited consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such fiscal year, and the related consolidated statements of operations, shareholders' equity and cash flows for such fiscal year, setting forth comparative consolidated figures for the preceding fiscal years (or, in lieu of such audited financial statements of the Borrower and the Restricted Subsidiaries, a detailed reconciliation, reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such

consolidated financial statements) prepared in accordance with GAAP, and, except with respect to such reconciliation, certified by independent certified public accountants of recognized national standing whose opinion shall not be materially qualified with a "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of the Maturity Date within one year from the date such opinion is delivered).  Notwithstanding the foregoing, the obligations in this Section 9.1(a) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower or (B) the Borrower's (or any direct or indirect parent thereof), as applicable, Form 10-K filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), (i) to the extent such information relates to a Parent Entity of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such Parent Entity and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other hand and (ii) to the extent such information is in lieu of information required to be provided under the first sentence of this Section 9.1(a), such materials are accompanied by an opinion of an independent registered public accounting firm of recognized national standing, which opinion shall not be materially qualified with a "going concern" or like qualification or exception (other than with respect to, or resulting from, the occurrence of the Maturity Date within one year from the date such opinion is delivered).

(b)      Quarterly and Monthly Financial Statements.  (i) Within five days after the date on which such financial statements are required to be filed with the SEC (after giving effect to any permitted extensions) with respect to each of the first three quarterly accounting periods in each fiscal year of the Borrower (or, if such financial statements are not required to be filed with the SEC, on or before the date that is 60 days after the end of each such quarterly accounting period), the consolidated balance sheets of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in each case as at the end of such quarterly period and the related consolidated statements of operations, shareholders' equity and cash flows for such quarterly accounting period and for the elapsed portion of the fiscal year ended with the last day of such quarterly period, and setting forth comparative consolidated figures for the related periods in the prior fiscal year or, in the case of such consolidated balance sheet, for the last day of the prior fiscal year (or, in lieu of such unaudited financial statements of the Borrower and the Restricted Subsidiaries, a detailed reconciliation reflecting such financial information for the Borrower and the Restricted Subsidiaries, on the one hand, and the Borrower and the Subsidiaries, on the other hand, reflecting adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such consolidated financial statements), all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows, of the Borrower and its consolidated Subsidiaries in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.  Notwithstanding the foregoing, the obligations in this Section 9.1(b) may be satisfied with respect to financial information of the Borrower and its consolidated Subsidiaries by furnishing (A) the applicable financial statements of any direct or indirect parent of the Borrower or (B) the Borrower's (or any direct or indirect parent thereof), as applicable, Form 10-Q filed with the SEC; *provided* that, with respect to each of clauses (A) and (B), to the extent such information relates to a parent of the Borrower, such information is accompanied by consolidating information that explains in reasonable detail the differences between the information relating to such parent and its consolidated Subsidiaries, on the one hand, and the information relating to the Borrower and its consolidated Subsidiaries and the Borrower and its consolidated Restricted Subsidiaries on a standalone basis, on the other.

(ii)      Commencing with the fiscal month ending [●], 2019, within thirty five days after the end of each fiscal month of the Borrower, the consolidated balance sheet and income statement of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, all of which shall be certified by a Financial Officer of the Borrower as fairly presenting in all material

respects the financial condition of the Borrower and the Subsidiaries and, if different, the Borrower and the Restricted Subsidiaries, in accordance with GAAP, subject to changes resulting from audit and normal year-end audit adjustments and the absence of footnotes.

(c)     Officer's Certificates.  At the time of the delivery of the financial statements provided for in Section 9.1(a) and Section 9.1(b), a certificate of a Financial Officer of the Borrower to the effect that no Default or Event of Default exists or, if any Default or Event of Default does exist, specifying the nature and extent thereof, which certificate shall set forth (i) the calculations required to establish whether the Borrower and its Restricted Subsidiaries were in compliance with the financial covenants set forth in Section 10.11 at the end of such period, and (ii) a specification of any change in the identity of the Restricted Subsidiaries, Guarantors and Unrestricted Subsidiaries as at the end of such fiscal year or period, as the case may be, from the Restricted Subsidiaries, Guarantors and Unrestricted Subsidiaries, respectively, provided to the Lenders on the Closing Date or the most recent fiscal year or period, as the case may be.

(d)     Notice of Default; Litigation; Change of Beneficial Ownership.  Promptly after an Authorized Officer of the Borrower or any of the Restricted Subsidiaries obtains actual knowledge thereof, notice of (i) the occurrence of any Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto, (ii) any litigation or governmental proceeding (other than the filing of the Chapter 11 Cases) pending against the Borrower or any of the Subsidiaries that would reasonably be expected to be determined adversely and, if so determined, to result in a Material Adverse Effect, and (iii) any change in the information provided in the Beneficial Ownership Certification delivered to such Lender that would result in a change to the list of beneficial owners identified in such certification.

(e)     Environmental Matters.  Promptly after obtaining actual knowledge of any one or more of the following environmental matters, unless such environmental matters would not, individually, or when aggregated with all other such matters, be reasonably expected to result in a Material Adverse Effect, notice of:

(i)     any pending or threatened Environmental Claim against any Credit Party or any Oil and Gas Properties;

(ii)     any condition or occurrence on any Oil and Gas Properties that (A) would reasonably be expected to result in noncompliance by any Credit Party with any applicable Environmental Law or (B) would reasonably be anticipated to form the basis of an Environmental Claim against any Credit Party or any Oil and Gas Properties;

(iii)     any condition or occurrence on any Oil and Gas Properties that would reasonably be anticipated to cause such Oil and Gas Properties to be subject to any restrictions on the ownership, occupancy, use or transferability of such Oil and Gas Properties under any Environmental Law; and

(iv)     the conduct of any investigation, or any removal, remedial or other corrective action in response to the actual or alleged presence, release or threatened release of any Hazardous Material on, at, under or from any Oil and Gas Properties.

All such notices shall describe in reasonable detail the nature of the claim, investigation, condition, occurrence or removal or remedial action and the response thereto.

(f)     Other Information.  (i) Promptly upon filing thereof, copies of any filings (including on Form 10-K, 10-Q or 8-K) or registration statements with, and reports to, the SEC or any analogous Governmental Authority in any relevant jurisdiction by the Borrower or any of the Subsidiaries (other

than amendments to any registration statement (to the extent such registration statement, in the form it becomes effective, is delivered to the Administrative Agent), exhibits to any registration statement and, if applicable, any registration statements on Form S-8), (ii) copies of all financial statements, proxy statements, notices and reports that the Borrower or any of the Subsidiaries shall send to the holders of any publicly issued debt of the Borrower and/or any of the Subsidiaries, in each case in their capacity as such holders, lenders or agents (in each case to the extent not theretofore delivered to the Administrative Agent pursuant to this Agreement), (iii) with reasonable promptness, but subject to the limitations set forth in the last sentences of Section 9.2(a) and Section 13.6, such other information regarding the operations, business affairs and the financial condition of the Borrower or the Restricted Subsidiaries as the Administrative Agent on its own behalf or on behalf of any Lender (acting through the Administrative Agent) may reasonably request in writing from time to time, and (iv) information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act and the Beneficial Ownership Regulation.

(g)     Certificate of Authorized Officer – Hedge Transactions.  Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all material commodity Hedge Transactions of the Borrower and each Credit Party, the material terms thereof (including the type, term, effective date, termination date and notional amounts or volumes), the net mark-to-market value thereof (as of the last Business Day of such fiscal year or period, as applicable and for which a mark-to-market value is reasonably available), any new credit support agreements relating thereto not listed on Schedule 8.20 or on any previously delivered certificate delivered pursuant to this clause (g), any margin required or supplied under any credit support document and the counterparty to each such agreement.

(h)     Certificate of Authorized Officer – Gas Imbalances.  Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, certifying that as of the last Business Day of the most recently ended fiscal year or period, as applicable, except as specified in such certificate, on a net basis, there are no gas imbalances, take or pay or other prepayments exceeding [●] Bcfe of Hydrocarbon volumes (stated on a gas equivalent basis) in the aggregate, with respect to the Credit Parties' Oil and Gas Properties that would require any Credit Party to deliver Hydrocarbons either generally or produced from their Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor.

(i)     Certificate of Authorized Officer – Production Report and Lease Operating Statement. Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth, for each calendar month during the then current fiscal year to date, the volume of production of Hydrocarbons and sales attributable to production of Hydrocarbons (and the prices at which such sales were made and the revenues derived from such sales) for each such calendar month from the Oil and Gas Properties, and setting forth the related ad valorem, severance and production taxes and lease operating expenses attributable thereto for each such calendar month.

(j)     Lists of Purchasers.  At the time of the delivery of the financial statements provided for in Section 9.1(a), a certificate of an Authorized Officer of the Borrower setting forth a list of Persons purchasing Hydrocarbons from the Borrower or any other Credit Party who collectively account for at least 85% of the revenues resulting from the sale of all Hydrocarbons from the Borrower and such other Credit Parties during the fiscal year for which such financial statements relate.

(k)     Budget Reporting.

(i)     On [●], 2019 and on each fourth Thursday thereafter the Company will provide to the Administrative Agent (i) a new thirteen-week budget covering the thirteen-week

period commencing on the immediately preceding Saturday and otherwise in form and substance substantially similar to the Initial Budget (such budget, together with the Initial Budget, the "Budget") and (ii) a new monthly budget covering the period commencing on the immediately preceding Saturday through the period ending on the Borrower's anticipated emergence from the Chapter 11 Cases and otherwise in form and substance substantially similar to the Initial Emergence Budget (such budget, together with the Initial Emergence Budget, the "Emergence Budget");

(ii)     Concurrently with the delivery of the new thirteen-week budget pursuant to clause (i) above, the Company will provide to the Administrative Agent a variance report (the "Variance Report") detailing the following:

(A)     the aggregate and line item detail for (1) Operating Disbursements[7] of the Credit Parties and their Subsidiaries during the four week period ending on the Measurement Date and (2) Operating Cash Receipts of the Credit Parties and their Subsidiaries during the four week period ending on the Measurement Date (in the case of the first Variance Report, for the period from [●], 2019 through [●], 2019) (the "Variance Measurement Period"); and

(B)     any variance (whether plus or minus and expressed as a percentage) between (1) the aggregate Operating Disbursements made during such Variance Measurement Period by the Credit Parties and their Subsidiaries against the aggregate Operating Disbursements set forth in the Budget for such Variance Measurement Period and (2) the aggregate Operating Cash Receipts made during such Variance Measurement Period by the Credit Parties and their Subsidiaries against the aggregate Operating Cash Receipts set forth in the Budget for such Variance Measurement Period.

(iii)     Promptly after an Authorized Officer of the Borrower obtains actual knowledge thereof, written notice (which may be electronic notice) of any material change to Operating Disbursements set forth in the Budget in an aggregate amount in excess of $20,000,000 through the Borrower's anticipated emergence from the Chapter 11 Cases; provided, that, any such written notice delivered to the counsel or advisors for the Administrative Agent shall constitute notice to the Administrative Agent as required by this clause (iii).

(l)     Certificate of Authorized Officer – Marketing Agreements.  Concurrently with any delivery of each Reserve Report, a certificate of an Authorized Officer of the Borrower, setting forth as of the last Business Day of the most recently ended fiscal year or period, as applicable, a true and complete list of all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that (i) represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and (ii) have a maturity or expiry date of longer than six months from the last day of such fiscal year or period, as applicable.

(m)     Advance Notice of Pleadings.  As soon as reasonably practicable in advance of filing with the Bankruptcy Court, the DIP Order and all other proposed orders and pleadings related to the Loans and the Credit Documents, any other financing or use of cash collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, Adequate Protection Liens, any plan of reorganization and/or any disclosure statement related thereto (and, in the case of the "second

---

[7] NTD: Operating Disbursements and Operating Cash Receipts are line items in budget.

day" orders, which shall be in form and substance reasonably satisfactory to the Majority Lenders (it being understood that drafts approved by counsel to the Majority Lenders prior to the Petition Date and all orders entered prior to the date of this Agreement are satisfactory)).

It is understood that (A) in the event that in respect of the Senior Unsecured Notes, the Senior Secured Notes or any Permitted Refinancing Indebtedness with respect thereto, the rules and regulations of the SEC permit the Borrower, Holdings or any Parent Entity to report at Holdings' or such Parent Entity's level on a consolidated basis, such consolidated reporting at Holdings' or such Parent Entity's level in a manner consistent with that described in clauses (a) and (b)(i) of this Section 9.1 for the Borrower will satisfy the requirements of Section 9.1(a) or Section 9.1(b)(i), as applicable, and (B) documents required to be delivered pursuant to Sections 9.1(a), Section 9.1(b) and Section 9.1(f) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Borrower posts such documents, or provides a link thereto on the Borrower's website on the Internet at the website address listed on Schedule 13.2 or (ii) on which such documents are transmitted by electronic mail to the Administrative Agent; provided that: (i) upon written request by the Administrative Agent, the Borrower shall deliver paper copies of such documents delivered pursuant to Sections 9.1(a), 9.1(b), 9.1(c) and 9.1(f) to the Administrative Agent for further distribution to each Lender until a written request to cease delivering paper copies is given by the Administrative Agent and (ii) the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents. Each Lender shall be solely responsible for timely accessing posted documents or requesting delivery of paper copies of such documents from the Administrative Agent and maintaining its copies of such documents.

9.2     Books, Records and Inspections.

(a)     The Borrower will, and will cause each Restricted Subsidiary to, permit officers and designated representatives of the Administrative Agent (at the direction of the Majority Lenders) or officers and designated representatives of the Majority Lenders (as accompanied by the Administrative Agent), to visit and inspect any of the properties or assets of the Borrower or such Restricted Subsidiary in whomsoever's possession to the extent that it is within such party's control to permit such inspection (and shall use commercially reasonable efforts to cause such inspection to be permitted to the extent that it is not within such party's control to permit such inspection), and to examine the financial records of the Borrower and any such Restricted Subsidiary and discuss the affairs, finances, accounts and condition of the Borrower or any such Restricted Subsidiary with its and their officers and independent accountants therefor, in each case of the foregoing upon reasonable advance notice to the Borrower, all at such reasonable times and intervals during normal business hours and to such reasonable extent as the Administrative Agent or the Majority Lenders may desire (and subject, in the case of any such meetings or advice from such independent accountants, to such accountants' customary policies and procedures); provided that, excluding any such visits and inspections during the continuation of an Event of Default (i) only the Administrative Agent on behalf of the Majority Lenders may exercise rights of the Administrative Agent and the Lenders under this Section 9.2, and (ii) only one such visit per fiscal year shall be at the Borrower's expense; provided, further, that when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) or any representative of the Majority Lenders may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. The Administrative Agent and the Majority Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants. Notwithstanding anything to the contrary in Section 9.1(f)(iii) or this Section 9.2, neither the Borrower nor any Restricted Subsidiary will be required to disclose, permit the inspection, examination or making copies or abstracts of, or discussion of, any document, information or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or their respective representatives or contractors) is prohibited by any Requirement of Law or

any binding agreement or (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product.

(b)     The Borrower will, and will cause each of the Restricted Subsidiaries to, maintain financial records in accordance with GAAP.

9.3     <u>Maintenance of Insurance</u>.   The Borrower will, and will cause each Restricted Subsidiary to, at all times maintain in full force and effect, pursuant to self-insurance arrangements or with insurance companies that the Borrower believes (in the good faith judgment of the management of the Borrower) are financially sound and reputable at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as the Borrower believes (in the good faith judgment of management of the Borrower) is reasonable and prudent in light of the size and nature of its business; and will furnish to the Administrative Agent, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried.  The Secured Parties shall be the additional insureds on any such liability insurance as their interests may appear and, if property insurance is obtained, the Collateral Agent shall be the loss payee under any such property insurance; *provided* that, so long as no Event of Default has occurred and is then continuing, the Secured Parties will provide any proceeds of such property insurance to the Borrower to the extent that the Borrower undertakes to apply such proceeds to the reconstruction, replacement or repair of the property insured thereby.

9.4     <u>Payment of Taxes</u>.  The Borrower shall, and shall cause each Restricted Subsidiary to, pay its obligations in respect of all Tax liabilities, assessments and governmental charges, before the same shall become delinquent or in default, except where (i) the amount or validity thereof is being contested in good faith by appropriate proceedings and the Borrower or a Subsidiary thereof has set aside on its books adequate reserves therefor in accordance with GAAP, (ii) the failure to make payment could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (iii) such payment is excused by, or otherwise prohibited by, the Bankruptcy Code or as a result of the Chapter 11 Cases.

9.5     <u>Consolidated Corporate Franchises</u>.   The Borrower will do, and will cause each Restricted Subsidiary to do, or cause to be done, all things necessary to preserve and keep in full force and effect its existence, corporate rights and authority, except to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; *provided*, *however*, that the Borrower and its Restricted Subsidiaries may consummate any transaction permitted under <u>Section 10.3</u>, <u>10.4</u> or <u>10.5</u>.

9.6     <u>Compliance with Statutes, Regulations, Etc</u>.  Subject to any necessary Bankruptcy Court approval, the Borrower will, and will cause each Restricted Subsidiary to, comply with all Requirements of Law applicable to it or its property, including all governmental approvals or authorizations required to conduct its business, and to maintain all such governmental approvals or authorizations in full force and effect, in each case except where (i) the failure to do so would not reasonably be expected to have a Material Adverse Effect or (ii) payment is excused by, or otherwise prohibited by, the provisions of the Bankruptcy Code or as a result of the Chapter 11 Cases.  The Borrower will maintain in effect and enforce policies and procedures designed to ensure compliance by the Borrower, its Subsidiaries and their respective directors, officers, employees and agents with Anti-Corruption Laws and applicable Sanctions.

9.7     <u>ERISA</u>.

(a)     Promptly after the Borrower knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), would be reasonably likely to have a Material Adverse Effect, the Borrower will deliver to the Administrative Agent a certificate of an Authorized Officer or any other senior officer of the

Borrower setting forth details as to such occurrence and the action, if any, that the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Borrower, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to an individual participant's benefits) or the Plan administrator with respect thereto: that a Reportable Event has occurred; that an accumulated funding deficiency has been incurred or an application is to be made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or any extension of any amortization period under Section 412 of the Code with respect to a Plan; that a Plan having an Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); that a Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); that a proceeding has been instituted against the Borrower or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the PBGC has notified the Borrower or any ERISA Affiliate of its intention to appoint a trustee to administer any Plan; that the Borrower or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Plan; or that the Borrower or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

(b)     Promptly following any request therefor, on and after the effectiveness of the Pension Act, the Borrower will deliver to the Administrative Agent copies of (i) any documents described in Section 101(k) of ERISA that the Borrower and any of its Subsidiaries may request with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the Borrower and any of its Subsidiaries may request with respect to any Multiemployer Plan; *provided* that if the Borrower or any of its Subsidiaries has not requested such documents or notices from the administrator or sponsor of the applicable Multiemployer Plan, the Borrower or the applicable Subsidiaries shall promptly make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof.

9.8     Maintenance of Properties.  Subject to any necessary order or authorization from the Bankruptcy Court, the Borrower will, and will cause each of the Restricted Subsidiaries to, except in each case, (x) where the failure to so comply would not reasonably be expected to result in a Material Adverse Effect or (y) for the rejection of any contract in connection with the pendency of the Chapter 11 Cases that is permitted pursuant to an Acceptable Plan of Reorganization or a motion filed by or after consultation with the Majority Lenders (it being understood that this Section 9.8 shall not restrict any transaction otherwise permitted by Section 10.3, 10.4 or 10.5):

(a)     operate its Oil and Gas Properties and other material properties or cause such Oil and Gas Properties and other material properties to be operated in a careful and efficient manner in accordance with the practices of the industry and in compliance with all applicable Contractual Requirements and all applicable Requirements of Law, including applicable proration requirements and Environmental Laws, and all applicable Requirements of Law of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom;

(b)     keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and preserve, maintain and keep in good repair, working order and efficiency (ordinary wear and tear excepted) all of its material Oil and Gas Properties and other material properties, including all equipment, machinery and facilities; and

(c)    to the extent a Credit Party is not the operator of any property, the Borrower shall use reasonable efforts to cause the operator to comply with this Section 9.8.

9.9    Transactions with Affiliates.  The Borrower will conduct, and cause each of the Restricted Subsidiaries to conduct, all transactions involving aggregate payments or consideration in excess of $5,000,000 with any of its Affiliates (other than the Borrower and the Restricted Subsidiaries or any entity that becomes a Restricted Subsidiary as a result of such transaction) on terms that are substantially as favorable to the Borrower or such Restricted Subsidiary as it would obtain at the time in a comparable arm's-length transaction with a Person that is not an Affiliate, as determined by the board of directors or managers of the Borrower or such Restricted Subsidiary in good faith; *provided* that the foregoing restrictions shall not apply to:

(a)    [reserved];

(b)    [reserved];

(c)    equity issuances, repurchases, retirements, redemptions or other acquisitions or retirements of Equity Interests by the Borrower (or any Parent Entity thereof) permitted under Section 10.6;

(d)    [reserved];

(e)    loans, advances and other transactions between or among the Borrower, any Subsidiary or any joint venture (regardless of the form of legal entity) in which the Borrower or any Subsidiary has invested (and which Subsidiary or joint venture would not be an Affiliate of the Borrower or such Subsidiary, but for the Borrower's or such Subsidiary's ownership of Equity Interests in such joint venture or such Subsidiary) to the extent permitted under Section 10;

(f)    employment and severance arrangements and health, disability and similar insurance or benefit plans between the Borrower (or any direct or indirect parent thereof) and the Subsidiaries and their respective directors, officers, employees or consultants (including management and employee benefit plans or agreements, subscription agreements or similar agreements pertaining to the repurchase of Equity Interests pursuant to put/call rights or similar rights with current or former employees, officers, directors or consultants and equity option or incentive plans and other compensation arrangements) in the ordinary course of business or as otherwise approved by the board of directors or managers of the Borrower (or any direct or indirect parent thereof);

(g)    [reserved];

(h)    transactions pursuant to agreements in existence on the Petition Date set forth on Schedule 9.9 or any amendment thereto or arrangement similar thereto to the extent such an amendment or arrangement is not adverse, taken as a whole, to the Lenders in any material respect (as determined by the Borrower in good faith);

(i)    Restricted Payments, redemptions, repurchases and other actions permitted under Section 10.6, and Section 10.7;

(j)    [reserved];

(k)    any issuance of Equity Interests or other payments, awards or grants in cash, securities, Equity Interests or otherwise pursuant to, or the funding of, employment arrangements, equity options and equity ownership plans approved by the board of directors or board of managers of the Borrower (or any direct or indirect parent thereof);

WEIL:\97169709\10\74473.0003

(l)       transactions with joint ventures for the purchase or sale of goods, equipment and services entered into in the ordinary course of business and in a manner consistent with prudent business practice followed by companies in the industry of the Borrower and its Subsidiaries;

(m)       [reserved];

(n)       the issuance, sale or transfer of Equity Interests of the Borrower to Holdings (or another Parent Entity) in connection with capital contributions by Holdings or such other Parent Entity to the Borrower;

(o)       any transaction in respect of which the Borrower delivers to the Administrative Agent a letter addressed to the board of directors or managers of the Borrower from an accounting, appraisal or investment banking firm, in each case of nationally-recognized standing that is in the good faith determination of the Borrower qualified to render such letter, which letter states that such transaction is (i) fair, from a financial point of view, to the Borrower or such Restricted Subsidiary or (ii) on terms, taken as a whole, that are no less favorable to the Borrower or such Restricted Subsidiary, as applicable, than would be obtained in a comparable arm's length transaction with a person that is not an Affiliate; and

(p)       transactions undertaken in good faith (as certified by a responsible financial or accounting officer of the Borrower) for the purpose of improving the consolidated tax efficiency of the Borrower, Holdings and the Subsidiaries and not for the purpose of circumventing any covenant set forth in this Agreement.

9.10       End of Fiscal Years; Fiscal Quarters.  The Borrower will, for financial reporting purposes, cause each of its, and each of its Restricted Subsidiaries', fiscal years and fiscal quarters to end on dates consistent with past practice; *provided*, *however*, that the Borrower may, upon written notice to the Administrative Agent change the financial reporting convention specified above to any other financial reporting convention reasonably acceptable to the Administrative Agent, in which case the Borrower and the Administrative Agent will, and are hereby authorized by the Lenders to, make any adjustments to this Agreement that are necessary in order to reflect such change in financial reporting.

9.11       Additional Guarantors, Grantors and Collateral.  Subject to any applicable limitations set forth in the Guarantee or the Security Documents, the Borrower will cause (i) any direct or indirect Domestic Subsidiary (other than any Excluded Subsidiary) formed or otherwise purchased or acquired after the Closing Date (including pursuant to a Permitted Acquisition) and (ii) any Domestic Subsidiary of the Borrower that ceases to be an Excluded Subsidiary, in each case within 30 days from the date of such formation, acquisition or cessation, as applicable (or such longer period as the Administrative Agent may agree in its reasonable discretion) to execute (A) a supplement to the Guarantee, substantially in the form of Exhibit I thereto, in order to become a Guarantor, (B) a supplement to the Collateral Agreement, substantially in the form of Exhibit I thereto, in order to become a grantor and a pledgor thereunder, and (C) a joinder to the Intercompany Note.

9.12       Use of Proceeds.  Subject to the DIP Order, the Borrower will use the proceeds of Loans and Letters of Credit for (i) the acquisition, development and exploration of Oil and Gas Properties, for working capital and general corporate purposes (including Permitted Acquisitions) and to support deposits required under purchase agreements pursuant to which the Borrower or its Subsidiaries may acquire Oil and Gas Properties and other assets, (ii) the payment of professional fees as provided for in the DIP Order, (iii) the payment of expenses incurred in the administration of the Chapter 11 Cases or permitted by the "first-day" or "second-day" orders and (iv) payments due hereunder or under the DIP Order.

9.13    Further Assurances.

(a)    Subject to the applicable limitations set forth in the Security Documents, the Borrower will, and will cause each other Credit Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture, filings, assignments of as-extracted collateral, Mortgages and other documents) that the Collateral Agent or the Majority Lenders may reasonably request, in order to grant, preserve, protect and perfect the validity and priority of the security interests created or intended to be created by the applicable Security Documents, all at the expense of the Borrower and the Restricted Subsidiaries.

(b)    [The Borrower agrees that it will, or will cause its relevant Subsidiaries to, complete each of the actions described on Schedule 9.13(b) as soon as commercially reasonable and by no later than the date set forth in Schedule 9.13(b) with respect to such action or such later date as the Administrative Agent may reasonably agree.]

(c)    Notwithstanding anything herein to the contrary, if the Collateral Agent and the Borrower reasonably determine in writing that the cost of creating or perfecting any Lien on any property is excessive in relation to the benefits afforded to the Lenders thereby, then such property may be excluded from the Collateral for all purposes of the Credit Documents. In addition, notwithstanding anything to the contrary in this Agreement, the Collateral Agreement, or any other Credit Document, (i) the Administrative Agent may grant extensions of time for or waivers of the requirements of the creation or perfection of security interests (including extensions beyond the Closing Date for the perfection of security interests in the assets of the Credit Parties on such date) where it reasonably determines, in consultation with the Borrower, that perfection or obtaining of such items is not required by law or cannot be accomplished without undue effort or expense by the time or times at which it would otherwise be required by this Agreement or the other Credit Documents, (ii) Liens required to be granted from time to time pursuant to this Agreement and the Security Documents shall be subject to exceptions and limitations set forth in the Security Documents and, to the extent appropriate in any applicable jurisdiction, as otherwise agreed between the Administrative Agent and the Borrower and (iii) the Administrative Agent and the Borrower may make such modifications to the Security Documents, and execute and/or allow such easements, covenants, rights of way or similar instruments (and Administrative Agent will agree to subordinate the lien of any mortgage to any such easement, covenant, right of way or similar instrument or record or agree to recognize any tenant pursuant to an agreement in a form and substance reasonably acceptable to the Administrative Agent), as are reasonable or necessary for Borrower's operations and otherwise permitted by this Agreement and the other Credit Documents.

9.14    Reserve Reports.

(a)    On or before March 31st and September 30th of each year, commencing [●], the Borrower shall furnish to the Administrative Agent a Reserve Report evaluating, as of the immediately preceding December 31st and June 30th, the Proved Reserves of the Borrower and the Credit Parties located within the geographic boundaries of the United States of America (or the Outer Continental Shelf adjacent to the United States of America), together with such other reports, data and supplemental information, as may, from time to time, be reasonably requested by the Majority Lenders. Each Reserve Report (x) as of December 31 shall be prepared by one or more Approved Petroleum Engineers or (y) as of June 30 shall be prepared by or under the supervision of the chief engineer of the Borrower or a Restricted Subsidiary.

(b)    [Reserved].

(c)      With the delivery of each Reserve Report, the Borrower shall provide to the Administrative Agent a Reserve Report Certificate from an Authorized Officer of the Borrower certifying that in all material respects:

(i)      in the case of Reserve Reports prepared by or under the supervision of the chief engineer of the Borrower or a Restricted Subsidiary (other than December 31 Reserve Reports), such Reserve Report has been prepared, except as otherwise specified therein, in accordance with the procedures used in the immediately preceding December 31 Reserve Report or the Initial Reserve Report, if no December 31 Reserve Report has been delivered;

(ii)      the information contained in the Reserve Report and any other information delivered in connection therewith is true and correct in all material respects;

(iii)      except as set forth in an exhibit to such certificate, the Borrower or another Credit Party has good and defensible title to the Oil and Gas Properties evaluated in such Reserve Report (other than those (x) Disposed of in compliance with Section 10.4 since delivery of such Reserve Report, (y) leases that have expired in accordance with their terms and (z) with title defects disclosed in writing to the Administrative Agent) and such Oil and Gas Properties are free of all Liens except for Liens permitted by Section 10.2;

(iv)      except as set forth on an exhibit to such certificate, on a net basis there are no gas imbalances, take or pay or other prepayments in excess of the volume specified in Section 8.18 with respect to the Credit Parties' Oil and Gas Property evaluated in such Reserve Report that would require the Borrower or any other Credit Party to deliver Hydrocarbons either generally or produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor;

(v)      none of the Oil and Gas Properties have been Disposed of since the date of the most recently delivered Reserve Report except those Oil and Gas Properties listed on such certificate as having been Disposed of; and

(vi)      the certificate shall also attach, as schedules thereto, a list of all material marketing agreements (which are not cancellable on 60 days' notice or less without penalty or detriment) entered into subsequent to the later of the Closing Date and the most recently delivered Reserve Report for the sale of production of the Credit Parties' Hydrocarbons at a fixed non-index price (including calls on, or other parties rights to purchase, production, whether or not the same are currently being exercised) that represent in respect of such agreements 2.5% or more of the Borrower's average monthly production of Hydrocarbon volumes and that have a maturity date or expiry date of longer than six months from the last day of such fiscal year or period, as applicable.

9.15      [Reserved].

9.16      Change in Business.  The Borrower and its Restricted Subsidiaries, taken as a whole, will not fundamentally and substantively alter the character of their business, taken as a whole, from the business conducted by them on the Closing Date, the business of Industry Investments by the Borrower and its Restricted Subsidiaries and other business activities incidental, reasonably related or ancillary to any of the foregoing.

9.17      Holdings Covenant.  Holdings covenants and agrees that until the Total Commitment and each Letter of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the relevant Issuing Banks following the termination of the Total Commitment) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations incurred hereunder (other than Hedging Obligations under Secured Hedge Transactions, Cash Management Obligations

under Secured Cash Management Agreements or contingent indemnification obligations not then due and payable), are paid in full, Holdings will not engage at any time in any business or business activity other than (i) ownership of the Equity Interests in the Borrower, together with activities related or incidental thereto, (ii) performance of its obligations under and in connection with the Credit Documents, the Senior Unsecured Notes, the Senior Secured Notes and the incurrence and performance of Indebtedness not prohibited by Section 10.1, (iii) issuing, selling and redeeming its Equity Interests, (iv) paying taxes, (v) holding directors' and shareholders' meetings, preparing corporate and similar records and other activities (including the ability to incur fees, costs and expenses relating to such maintenance) required to maintain its corporate or other legal structure or to participate in tax, accounting or other administrative matters as a member of the consolidated group of the Credit Parties, (vi) preparing reports to, and preparing and making notices to and filings with, Governmental Authorities and to its holders of Equity Interests, (vii) receiving, and holding proceeds of, Restricted Payments from the Borrower and the Subsidiaries and distributing the proceeds thereof to the extent not prohibited by Section 9.9 or Section 10.6, (viii) activities in connection with the formation and maintenance of the existence of any Parent Entity (it being understood that notwithstanding anything to the contrary herein or in any Credit Document, there shall be no restriction on the formation of any Parent Entity), (ix) providing indemnification to officers and directors, (x) activities permitted hereunder or as otherwise required by Requirements of Law and (xi) activities incidental to the business or activities described in each foregoing clause of this Section 9.17.

9.18    Bankruptcy Pleadings.  The Borrower shall use commercially reasonable efforts to provide the Administrative Agent copies of all material pleadings and motions (including any plan of reorganization and any disclosure statement related thereto) to be filed by or on behalf of the Borrower or any of the other Credit Parties with the Bankruptcy Court in the Chapter 11 Cases at least two (2) Business Days prior to filing (or such shorter period as the Administrative Agent may agree), which such pleadings shall include the Administrative Agent as a notice party.

SECTION 10.    Negative Covenants.

The Borrower hereby covenants and agrees that until the Total Commitment and each Letter of Credit have terminated (unless such Letters of Credit have been collateralized on terms and conditions reasonably satisfactory to the relevant Issuing Banks following the termination of the Total Commitment) and the Loans and Unpaid Drawings, together with interest, fees and all other Obligations incurred hereunder (other than Hedging Obligations under Secured Hedge Transactions, Cash Management Obligations under Secured Cash Management Agreements or contingent indemnification obligations not then due and payable), are paid in full:

10.1    Limitation on Indebtedness.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Indebtedness other than the following:

(a)    Indebtedness arising under (i) the Existing RBL Credit Agreement and the Existing RBL Credit Documents and (ii) the Credit Documents;

(b)    Indebtedness (including Guarantee Obligations thereunder) in respect of the Senior Unsecured Notes in aggregate outstanding principal amount not to exceed $[●] and any fees, underwriting discounts, premiums and other costs and expenses incurred in connection with the foregoing;

(c)    Indebtedness (including Guarantee Obligations thereunder) in respect of the Senior Secured Notes in aggregate outstanding principal amount not to exceed $[●] and any fees, underwriting discounts, premiums and other costs and expenses incurred in connection with the foregoing;

(d)    Indebtedness of (i) the Borrower or any Guarantor owing to the Borrower or any Subsidiary; provided that any such Indebtedness owing by a Credit Party to a Subsidiary that is not a Guarantor shall (x) be evidenced by the Intercompany Note or (y) otherwise be outstanding on the

Closing Date so long as such Indebtedness is evidenced by an intercompany note substantially in the form of Exhibit I or otherwise subject to subordination terms substantially identical to the subordination terms set forth in Exhibit I, in each case, to the extent permitted by Requirements of Law and not giving rise to material adverse tax consequences, (ii) any Subsidiary that is not a Guarantor owing to any other Subsidiary that is not a Guarantor and (iii) to the extent permitted by Section 10.5, any Subsidiary that is not a Guarantor owing to the Borrower or any Guarantor;

(e)       Indebtedness in respect of any bankers' acceptance, bank guarantees, letter of credit, warehouse receipt or similar facilities entered into in the ordinary course of business or consistent with past practice or industry practice (including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims);

(f)       subject to compliance with Section 10.5, Guarantee Obligations incurred by (i) Restricted Subsidiaries in respect of Indebtedness of the Borrower or other Restricted Subsidiaries that is permitted to be incurred under this Agreement (except that a Restricted Subsidiary that is not a Credit Party may not, by virtue of this Section 10.1(f) guarantee Indebtedness that such Restricted Subsidiary could not otherwise incur under this Section 10.1) and (ii) the Borrower in respect of Indebtedness of Restricted Subsidiaries that is permitted to be incurred under this Agreement; *provided* that if the Indebtedness being guaranteed under this Section 10.1(f) is subordinated to the Obligations, such Guarantee Obligations shall be subordinated to the Guarantee of the Obligations on terms at least as favorable to the Lenders as those contained in the subordination of such Indebtedness;

(g)       Guarantee Obligations (i) incurred in the ordinary course of business in respect of obligations of (or to) suppliers, customers, franchisees, lessors, licensees or sub-licensees or (ii) otherwise constituting Investments permitted by Sections 10.5(d), (g), (h), (i), (q), (r) and (s);

(h)       (i) Indebtedness (including Indebtedness arising under Capital Leases) incurred prior to or within 270 days following the acquisition, construction, lease, repair, replacement, expansion or improvement of assets (real or personal, and whether through the direct purchase of property or the Equity Interests of a Person owning such property) to finance the acquisition, construction, lease, repair, replacement expansion, or improvement of such assets; (ii) Indebtedness arising under Capital Leases (A) in effect on the Closing Date and (B) Capital Leases incurred after the Closing Date in an aggregate amount not to exceed $50,000,000; and (iii) any Permitted Refinancing Indebtedness issued or incurred to Refinance any such Indebtedness;

(i)       Indebtedness outstanding on the Petition Date (*provided* that any Indebtedness that is in excess of $1,000,000 individually shall only be permitted under this clause (i) to the extent such Indebtedness is set forth on Schedule 10.1) and any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness;

(j)       Indebtedness in respect of Hedge Transactions;

(k)       [reserved];

(l)       [reserved];

(m)       [reserved];

(n)       Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds and completion guarantees and similar obligations not in connection with money borrowed, in each case provided in the ordinary course of business or consistent with past practice, including those incurred to

secure health, safety and environmental obligations in the ordinary course of business or consistent with past practice;

(o)     (i) other additional Indebtedness and (ii) any Permitted Refinancing Indebtedness issued or incurred to Refinance such Indebtedness, *provided* that the aggregate principal amount of Indebtedness outstanding at any time pursuant to this Section 10.1(o) shall not at the time of incurrence thereof and immediately after giving effect thereto and the use of proceeds thereof on a Pro Forma Basis, exceed $15,000,000;

(p)     Indebtedness consisting of additional debtor-in-possession financing secured by Junior Liens and liens junior to the Prepetition Obligations (as defined in the DIP Order); *provided* that the aggregate principal amount of Indebtedness outstanding at any time pursuant to this Section 10.1(p) shall not at the time of incurrence thereof and immediately after giving effect thereto and the use of proceeds thereof on a Pro Forma Basis, exceed $150,000,000;

(q)     Cash Management Obligations, Cash Management Services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business;

(r)     Indebtedness incurred in the ordinary course of business in respect of obligations of the Borrower or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services that are not greater than sixty (60) days past the date of invoice or delinquent or which are being contested in good faith by appropriate action and for which adequate reserves have been maintained in accordance with GAAP;

(s)     Indebtedness arising from agreements of the Borrower or any Restricted Subsidiary providing for indemnification, adjustment of purchase price or similar obligations (including earn-outs), in each case assumed or entered into in connection with any Permitted Acquisitions, other Investments and the Disposition of any business, assets or Equity Interests not prohibited hereunder;

(t)     Indebtedness of the Borrower or any Restricted Subsidiary consisting of (i) obligations to pay insurance premiums or (ii) obligations contained in firm transportation or supply agreements or other take or pay contracts, in each case arising in the ordinary course of business;

(u)     Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Borrower (or, to the extent such work is done for the Borrower or its Subsidiaries, any direct or indirect parent thereof) and the Restricted Subsidiaries incurred in the ordinary course of business;

(v)     [reserved];

(w)     Indebtedness consisting of obligations of the Borrower and the Restricted Subsidiaries under deferred compensation or other similar arrangements incurred by such Person in connection with Permitted Acquisitions or any other Investment permitted hereunder;

(x)     Indebtedness associated with bonds or surety obligations required by Requirements of Law or by Governmental Authorities in connection with the operation of Oil and Gas Properties in the ordinary course of business;

(y)     [reserved];

(z)     Indebtedness of the Borrower or any Restricted Subsidiary to any joint venture (regardless of the form of legal entity) that is not a Subsidiary arising in the ordinary course of business

in connection with the Cash Management Services (including with respect to intercompany self-insurance arrangements) of the Borrower and its Restricted Subsidiaries;

(aa)     Indebtedness incurred on behalf of, or Guarantee Obligations in respect of the Indebtedness of, joint ventures (regardless of the form of legal entity) that are not Subsidiaries in principal amount, when aggregated with the outstanding principal amount of Indebtedness incurred pursuant to this <u>clause (aa)</u>, not to exceed, at the time of incurrence thereof, $1,000,000; and

(bb)     all premiums (if any), interest (including post-petition interest), fees, expenses, charges, and additional or contingent interest on obligations described in clauses (a) through (z) above.

10.2     Limitation on Liens.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, create, incur, assume or suffer to exist any Lien upon any property or assets of any kind (real or personal, tangible or intangible) of the Borrower or any Restricted Subsidiary, whether now owned or hereafter acquired, except:

(a)     Liens arising under (i) the Existing RBL Credit Agreement and the Existing RBL Credit Documents to secure the obligations thereunder and (ii) the Credit Documents to secure the Obligations (including Liens contemplated by Section 3.8) or permitted in respect of any Mortgaged Property by the terms of the applicable Mortgage;

(b)     Permitted Liens;

(c)     (x) Liens (including liens arising under Capital Leases to secure Capital Lease Obligations) securing Indebtedness permitted pursuant to Section 10.1(h); *provided* that (i) such Liens attach concurrently with or within 270 days after the acquisition, lease, repair, replacement, construction, expansion or improvement (as applicable) financed thereby, (ii) other than the property financed by such Indebtedness, such Liens do not at any time encumber any property, except for replacements thereof and accessions and additions to such property and the proceeds and the products thereof and customary security deposits and (iii) with respect to Capital Leases, such Liens do not at any time extend to or cover any assets (except for accessions and additions to such assets, replacements and products thereof and customary security deposits) other than the assets subject to such Capital Leases; *provided* that in each case individual financings provided by one lender may be cross collateralized to other financings provided by such lender (and its Affiliates), and (y) Liens on the assets of a Restricted Subsidiary that is not a Credit Party securing Indebtedness permitted pursuant to Section 10.1;

(d)     Liens existing on the Petition Date; *provided* that any Lien securing Indebtedness in excess of $1,000,000 individually or $10,000,000 in the aggregate (when taken together with all other Liens securing obligations outstanding in reliance on this clause (d) that are not listed on Schedule 10.2(d)) shall only be permitted to the extent such Lien is listed on Schedule 10.2(d);

(e)     Liens to secure any refinancing, refunding, extension, renewal or replacement (or successive refinancings, refundings, extensions, renewals or replacements) as a whole, or in part, of any Indebtedness secured by any Lien permitted by this Section 10.2; *provided*, *however*, that (x) such new Lien shall be limited to all or part of the same type of property that secured the original Lien (plus improvements on and accessions to such property), (y) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (A) the outstanding principal amount or, if greater, committed amount of the applicable Indebtedness at the time the original Lien became a Lien permitted hereunder, and (B) an amount necessary to pay any fees and expenses, including premiums, related to such refinancing, refunding, extension, renewal or replacement and (z) on the date of the incurrence of the Indebtedness secured by such Liens, the grantors of any such Liens shall not be any

different than the grantors of the Liens securing the debt being refinanced, refunded, extended, renewed or replaced;

(f)        [reserved];

(g)        [reserved];

(h)        Liens securing Indebtedness or other obligations (i) of the Borrower or a Restricted Subsidiary in favor of a Credit Party and (ii) of any Restricted Subsidiary that is not a Credit Party in favor of any Restricted Subsidiary that is not a Credit Party;

(i)        Liens (i) of a collecting bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection, (ii) attaching to commodity trading accounts or other commodity brokerage accounts incurred in the ordinary course of business and (iii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of set-off);

(j)        Liens (i) on cash advances in favor of the seller of any property to be acquired in an Investment permitted pursuant to Section 10.5 to be applied against the purchase price for such Investment, and (ii) consisting of an agreement to Dispose of any property in a transaction permitted under Section 10.4, in each case, solely to the extent such Investment or Disposition, as the case may be, would have been permitted on the date of the creation of such Lien;

(k)        Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale or purchase of goods entered into by the Borrower or any of the Restricted Subsidiaries in the ordinary course of business permitted by this Agreement;

(l)        Liens deemed to exist in connection with Investments in repurchase agreements permitted under Section 10.5;

(m)        Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(n)        Liens that are contractual rights of set-off (i) relating to the establishment of depository relations with banks not given in connection with the issuance or incurrence of Indebtedness, (ii) relating to pooled deposit or sweep accounts of the Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Borrower and the Restricted Subsidiaries or (iii) relating to purchase orders and other agreements entered into with customers of the Borrower or any Restricted Subsidiary in the ordinary course of business;

(o)        Liens solely on any cash earnest money deposits made by the Borrower or any of the Restricted Subsidiaries in connection with any letter of intent or purchase agreement permitted hereunder;

(p)        Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(q)        Liens in respect of Production Payments and Reserve Sales; provided that such Liens attach at all times only to the Oil and Gas Properties from which the Production Payments and Reserve Sales have been conveyed;

(r)        [reserved];

(s)     [reserved];

(t)     Liens on Equity Interests in a joint venture securing obligations of such joint venture so long as the assets of such joint venture do not constitute Collateral;

(u)     Liens securing any Indebtedness permitted by Section 10.1(c) or Section 10.1(p);

(v)     Liens arising pursuant to Section 107(l) of the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9607(l), or other Environmental Law, unless such Lien (i) by action of the lienholder, or by operation of law, takes priority over any Liens arising under the Credit Documents on the property upon which it is a Lien, and (ii) such Lien materially impairs the use of the property covered by such Lien for the purposes for which such property is held;

(w)     [reserved];

(x)     Liens securing Indebtedness not to exceed $5,000,000 in the aggregate outstanding at any time;

(y)     [reserved];

(z)     [reserved]; and

(aa)    Adequate Protection Liens.

10.3    Limitation on Fundamental Changes.  Except as permitted by Section 10.4 or 10.5, the Borrower will not, and will not permit any of the Restricted Subsidiaries to, enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of, all or substantially all its business units, assets or other properties, except that:

(a)     any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into the Borrower; *provided* that (i) the Borrower shall be the continuing or surviving Person or, in the case of a merger, amalgamation or consolidation with or into the Borrower, the Person formed by or surviving any such merger, amalgamation or consolidation (if other than the Borrower) shall be an entity organized or existing under the laws of the United States, any state thereof, the District of Columbia or any territory thereof (the Borrower or such Person, as the case may be, being herein referred to as the "Successor Borrower"), (ii) the Successor Borrower (if other than the Borrower) shall expressly assume all the obligations of the Borrower under this Agreement and the other Credit Documents pursuant to a supplement hereto or thereto in form reasonably satisfactory to the Administrative Agent, (iii) no Default or Event of Default has occurred and is continuing at the date of such merger, amalgamation or consolidation or would result from such consummation of such merger, amalgamation or consolidation, and (iv) if such merger, amalgamation or consolidation involves the Borrower and a Person that, prior to the consummation of such merger, amalgamation or consolidation, is not a Subsidiary of the Borrower (A) each Guarantor, unless it is the other party to such merger, amalgamation or consolidation or unless the Successor Borrower is the Borrower, shall have by a supplement to the Guarantee confirmed that its Guarantee shall apply to the Successor Borrower's obligations under this Agreement, (B) each Subsidiary grantor and each Subsidiary pledgor, unless it is the other party to such merger, amalgamation or consolidation or unless the Successor Borrower is the Borrower, shall have by a supplement to the Credit Documents confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, (C) each mortgagor of a Mortgaged Property, unless it is the other party to such merger, amalgamation or consolidation or unless the Successor Borrower is the Borrower, shall have by an amendment to or restatement of the applicable Mortgage confirmed that its obligations thereunder shall apply to the Successor Borrower's obligations under this Agreement, (D) the Borrower shall have delivered to the Administrative Agent an officer's certificate

-85-

stating that such merger, amalgamation or consolidation and any supplements to the Credit Documents preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the Security Documents, (E) if reasonably requested by the Administrative Agent, an opinion of counsel shall be required to be provided to the effect that such merger, amalgamation or consolidation does not violate this Agreement or any other Credit Document; *provided*, *further*, that if the foregoing are satisfied, the Successor Borrower (if other than the Borrower) will succeed to, and be substituted for, the Borrower under this Agreement and (F) such merger, amalgamation or consolidation shall comply with all the conditions set forth in the definition of the term "Permitted Acquisition" or is otherwise permitted under Section 10.5;

(b)     any Subsidiary of the Borrower or any other Person may be merged, amalgamated or consolidated with or into any one or more Subsidiaries of the Borrower; *provided* that (i) in the case of any merger, amalgamation or consolidation involving one or more Restricted Subsidiaries, (A) a Restricted Subsidiary shall be the continuing or surviving Person or (B) the Borrower shall take all steps necessary to cause the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Restricted Subsidiary) to become a Restricted Subsidiary, (ii) in the case of any merger, amalgamation or consolidation involving one or more Guarantors, a Guarantor shall be the continuing or surviving Person or the Person formed by or surviving any such merger, amalgamation or consolidation (if other than a Guarantor) shall execute a supplement to the Guarantee, the Collateral Agreement and any applicable Mortgage, and a joinder to the Intercompany Note, each in form and substance reasonably satisfactory to the Collateral Agent in order for the surviving Person to become a Guarantor, and pledgor, mortgagor and grantor of Collateral for the benefit of the Secured Parties and to acknowledge and agree to the terms of the Intercompany Note, (iii) no Default or Event of Default has occurred and is continuing on the date of such merger, amalgamation or consolidation or would result from the consummation of such merger, amalgamation or consolidation and (iv) if such merger, amalgamation or consolidation involves a Subsidiary and a Person that, prior to the consummation of such merger, amalgamation or consolidation, is not a Restricted Subsidiary of the Borrower, (A) the Borrower shall have delivered to the Administrative Agent an officer's certificate stating that such merger, amalgamation or consolidation and such supplements to any Credit Document preserve the enforceability of the Guarantee and the perfection and priority of the Liens under the Collateral Agreement and (B) such merger, amalgamation or consolidation shall comply with all the conditions set forth in the definition of the term "Permitted Acquisition" or is otherwise permitted under Section 10.5;

(c)     any Restricted Subsidiary that is not a Guarantor may (i) merge, amalgamate or consolidate with or into any other Restricted Subsidiary and (ii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower, a Guarantor or any other Restricted Subsidiary of the Borrower;

(d)     any Subsidiary Guarantor may (i) merge, amalgamate or consolidate with or into any other Subsidiary Guarantor, (ii) merge, amalgamate or consolidate with or into any other Subsidiary which is not a Guarantor or Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to any other Subsidiary that is not a Guarantor; *provided* that if such Subsidiary Guarantor is not the surviving entity, such merger, amalgamation or consolidation shall be deemed to be, and any such Disposition shall be, (A) an "Investment" and subject to the limitations set forth in Section 10.5 and (B) a "Disposition" and subject to the limitations set forth in Section 10.4; and (iii) Dispose of any or all of its assets (upon voluntary liquidation or otherwise) to the Borrower or any other Guarantor;

(e)     any Restricted Subsidiary may liquidate or dissolve if (i) the Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Borrower and is not materially disadvantageous to the Lenders and (ii) to the extent such Restricted Subsidiary is a Credit Party, any assets or business of such Restricted Subsidiary not otherwise Disposed of or transferred in accordance

with Section 10.4 or 10.5, in the case of any such business, discontinued, shall be transferred to, or otherwise owned or conducted by, a Credit Party after giving effect to such liquidation or dissolution;

(f)     [reserved]; and

(g)     to the extent that no Default or Event of Default would result from the consummation of such Disposition, the Borrower and the Restricted Subsidiaries may consummate a merger, dissolution, liquidation, consolidation or Disposition, the purpose of which is to effect a Disposition permitted pursuant to Section 10.4.

10.4     Limitation on Sale of Assets.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, (x) convey, sell, lease, sell and leaseback, assign, farm-out, transfer or otherwise dispose (in one transaction or in a series of transactions and whether effected pursuant to a division or otherwise) (each of the foregoing a "Disposition") of any of its property, business or assets (including receivables and leasehold interests), whether now owned or hereafter acquired, or terminate, unwind or create any off-setting positions in respect of any commodity hedge positions or any other Hedge Transaction, whether now in effect or hereafter created or entered into, or (y) sell to any Person (other than the Borrower or a Guarantor) any shares owned by it of any Restricted Subsidiary's Equity Interests, except that:

(a)     the Borrower and the Restricted Subsidiaries may Dispose of (i) inventory and other goods held for sale, including Hydrocarbons, obsolete, worn out, used or surplus equipment, vehicles and other assets (other than accounts receivable) in the ordinary course of business (including equipment that is no longer necessary for the business of the Borrower or its Restricted Subsidiaries or is replaced by equipment of at least comparable value and use), (ii) Permitted Investments, and (iii) assets for the purposes of charitable contributions or similar gifts to the extent such assets are not material to the ability of the Borrower and its Restricted Subsidiaries, taken as a whole, to conduct its business in the ordinary course;

(b)     the Borrower and the Restricted Subsidiaries may Dispose of any Oil and Gas Properties or any interest therein or the Equity Interests of any Restricted Subsidiary or of any Minority Investment owning Oil and Gas Properties (and including, but without limitation, Dispositions in respect of Production Payments and Reserve Sales and in connection with net profits interests, operating agreements, farm-ins, joint exploration and development agreements and other agreements customary in the oil and gas industry for the purpose of developing such Oil and Gas Properties); *provided* that such Disposition (i) is for Fair Market Value (determined by the Borrower in good faith), (ii) does not exceed $25,000,000 in the aggregate with all other Dispositions permitted by this Section 10.4(b);

(c)     the Borrower and the Restricted Subsidiaries may Dispose of property or assets to the Borrower or to a Restricted Subsidiary; *provided* that if the transferor of such property is a Credit Party (i) the transferee thereof must either be a Credit Party or (ii) such transaction is permitted under Section 10.5;

(d)     the Borrower and any Restricted Subsidiary may affect any transaction permitted by Section 10.2, 10.3, 10.5 or 10.6;

(e)     the Borrower and the Restricted Subsidiaries may lease, sublease, license or sublicense (on a non-exclusive basis with respect to any intellectual property) real, personal or intellectual property in the ordinary course of business;

(f)     Dispositions (including like-kind exchanges) of property (other than Oil and Gas Properties) to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are applied to the purchase price of such replacement property, in each case under Section 1031 of the Code or otherwise;

WEIL:\97169709\10\74473.0003

(g)        Dispositions of Hydrocarbon Interests to which no Proved Reserves are attributable and farm-outs of undeveloped acreage to which no Proved Reserves are attributable and assignments in connection with such farm-outs;

(h)        Dispositions of Investments in joint ventures (regardless of the form of legal entity) to the extent required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture arrangements and similar binding arrangements to the extent the same would be permitted under Section 10.5(i);

(i)        Dispositions listed on Schedule 10.4(i) (each, a "Scheduled Disposition" and collectively, the "Scheduled Dispositions");

(j)        transfers of property (i) subject to a Casualty Event or in connection with any condemnation proceeding with respect to Collateral; *provided* that the net cash proceeds of such Casualty Event or condemnation proceeding, if any, are received by the Borrower or a Subsidiary Guarantor or (ii) in connection with any Casualty Event or any condemnation proceeding, in each case with respect to property that does not constitute Collateral;

(k)        Dispositions of accounts receivable (i) in connection with the collection or compromise thereof or (ii) to the extent the proceeds thereof are used to prepay any Loans then outstanding;

(l)        the termination or unwinding of, or creation of any off-setting positions in respect of, any commodity hedge positions or any other Hedge Transaction to the extent otherwise permitted by this Agreement;

(m)        Dispositions of Oil and Gas Properties that are not Collateral and other assets not included in the Collateral in the aggregate amount not to exceed $1,000,000 with all other Dispositions permitted by this Section 10.4(m); and

(n)        Disposition of any asset between or among the Borrower and/or its Restricted Subsidiaries as a substantially concurrent interim Disposition in connection with an Investment otherwise permitted pursuant to Section 10.5 or a Disposition otherwise permitted pursuant to clauses (a) through (m) above.

10.5        Limitation on Investments.  The Borrower will not, and will not permit any of the Restricted Subsidiaries, to (i) purchase or acquire (including pursuant to any merger, consolidation or amalgamation with a person that is not a Wholly-Owned Subsidiary immediately prior to such merger, consolidation or amalgamation) any Equity Interests, evidences of Indebtedness or other securities of any other Person, (ii) make any loans or advances to or guarantees of the Indebtedness of any other person, or (iii) purchase or otherwise acquire (in one transaction or a series of related transactions) (x) all or substantially all of the property and assets or business of another Person or (y) assets constituting a business unit, line of business or division of such Person (each, an "Investment"), except:

(a)        extensions of trade credit and purchases of assets and services (including purchases of inventory, supplies and materials) in the ordinary course of business;

(b)        Investments in assets that constituted Permitted Investments at the time such Investments were made;

(c)        loans and advances to officers, directors, employees and consultants of the Borrower (or any direct or indirect parent thereof) or any of its Restricted Subsidiaries for reasonable and

WEIL:\97169709\10\74473.0003

customary business-related travel, entertainment, relocation and analogous ordinary business purposes (including employee payroll advances);

(d)      (i) Investments existing on, or made pursuant to legally binding written commitments in existence on, the Petition Date as set forth on Schedule 10.5(d), (ii) Investments existing on the Petition Date of the Borrower or any Subsidiary in any other Subsidiary and (iii) any extensions, renewals or reinvestments thereof, so long as the amount of any Investment made pursuant to this clause (d) is not increased at any time above the amount of such Investment set forth on Schedule 10.5(d) (other than pursuant to an increase as required by the terms of any such Investment as in existence on the Petition Date and set forth on Schedule 10.5(d) as of the Petition Date);

(e)      Investments received in connection with the bankruptcy or reorganization of suppliers or customers and in settlement of delinquent obligations of, and other disputes with, customers arising in the ordinary course of business or upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment;

(f)      [reserved];

(g)      Investments (i) by the Borrower in any Guarantor or by any Guarantor in the Borrower, (ii) by any Restricted Subsidiary that is not a Guarantor in the Borrower or any other Restricted Subsidiary, and (iii) by the Borrower or any Guarantor in any Restricted Subsidiary that is not a Guarantor, valued at the Fair Market Value (determined by the Borrower in good faith) of such Investment at the time each such Investment is made, in an aggregate amount outstanding pursuant to this Section 10.5(g)(iii) that, at the time such Investment is made, would not exceed $5,000,000;

(h)      [reserved];

(i)      [reserved];

(j)      Investments, *provided* that the aggregate amount outstanding of all such Investments, valued at the Fair Market Value (determined by the Borrower in good faith) of each such Investment at the time made, shall not exceed $25,000,000;

(k)      Investments constituting non-cash proceeds of Dispositions of assets to the extent permitted by Section 10.4;

(l)      [reserved];

(m)      Investments consisting of Restricted Payments permitted under Section 10.6;

(n)      [reserved];

(o)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors and other credits to suppliers in the ordinary course of business;

(p)      Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers consistent with past practices;

(q)      advances of payroll payments to employees, consultants or independent contractors or other advances of salaries or compensation to employees, consultants or independent contractors, in each case in the ordinary course of business;

(r)        guarantee obligations of the Borrower or any Restricted Subsidiary of leases (other than Capital Leases) or of other obligations that do not constitute Indebtedness, in each case entered into in the ordinary course of business;

(s)        Investments held by a Person acquired (including by way of merger or consolidation) after the Closing Date otherwise in accordance with this Section 10.5 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger or consolidation and were in existence on the date of such acquisition, merger or consolidation;

(t)        Investments in Industry Investments and in interests in additional Oil and Gas Properties and gas gathering systems related thereto or Investments related to farm-out, farm-in, joint operating, joint venture, joint development or other area of mutual interest agreements, other similar industry investments, gathering systems, pipelines or other similar oil and gas exploration and production business arrangements whether through direct ownership or ownership through a joint venture or similar arrangement;

(u)        [reserved];

(v)        To the extent constituting Investments, Hedge Transactions permitted by Section 10.1 and Section 10.10;

(w)        Investments consisting of Indebtedness, fundamental changes, Dispositions and Restricted Payments permitted under Sections 10.1, 10.3, 10.4 and 10.6 (other than 10.6(c));

(x)        in the case of the Borrower and its Restricted Subsidiaries, Investment consisting of (i) intercompany Indebtedness having a term not exceeding 364 days (inclusive of any roll-over or extensions of terms) and made in the ordinary course of business and (ii) intercompany current liabilities in connection with the cash management, tax and accounting operations of the Borrower and the Restricted Subsidiaries;

(y)        Investments resulting from pledges and deposits under clauses (c), (d) and (e) of the definition of "Permitted Liens" and clauses (j), (o), (w) and (x) of Section 10.2;

(z)        advances in the form of a prepayment of expenses, so long as such expenses are being paid in accordance with customary trade terms of the Borrower or the relevant Restricted Subsidiary;

(aa)        Investments consisting of licensing of intellectual property pursuant to joint marketing arrangements with other Persons in the ordinary course of business; and

(bb)        any Investment constituting a Disposition or transfer of any asset between or among the Borrower and/or its Restricted Subsidiaries as a substantially concurrent interim Disposition or transfer in connection with an Investment otherwise permitted pursuant to clauses (a) through (aa) above or in connection with a Disposition permitted pursuant to Section 10.4.

10.6        Limitation on Restricted Payments.  The Borrower will not directly or indirectly pay any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any of its Equity Interests (other than dividends and distributions on Equity Interests payable solely by the issuance of additional Qualified Equity Interests) or redeem, purchase, retire or otherwise acquire for value any of its Equity Interests or the Equity Interests of any Parent Entity or set aside any amount for any such purpose (other than through the issuance of additional Qualified Equity Interests), or permit any Restricted Subsidiary to purchase or otherwise acquire for consideration (except in connection with an Investment permitted under Section 10.5) any Equity Interests of

the Borrower or any Parent Entity, now or hereafter outstanding (all of the foregoing, "Restricted Payments"); except that:

(a)     the Borrower may (or may pay Restricted Payments to permit any Parent Entity thereof to) redeem in whole or in part any of its or a Parent Entity's Equity Interests in exchange for another class of its (or such parent's) Equity Interests or with proceeds from substantially concurrent equity contributions or issuances of new Equity Interests; *provided* that such new Equity Interests contain terms and provisions at least as advantageous to the Lenders in all material respects to their interests as those contained in the Equity Interests redeemed thereby, and the Borrower may pay Restricted Payments payable solely in the Equity Interests (other than Disqualified Stock not otherwise permitted by Section 10.1) of the Borrower;

(b)     the Borrower may pay Restricted Payments in an amount equal to withholding or similar Taxes payable or expected to be payable by any present or former employee, director, manager or consultant (or their respective Affiliates, estates or immediate family members) and any repurchases of Equity Interests in consideration of such payments including deemed repurchases in connection with the exercise of stock options so long as the aggregate amount of all such payments does not exceed $1,000,000;

(c)     to the extent constituting Restricted Payments, the Borrower may make Investments permitted by Section 10.5;

(d)     to the extent constituting Restricted Payments, the Borrower may enter into and consummate transactions expressly permitted by Section 10.3;

(e)     [reserved];

(f)      the Borrower may make and pay Restricted Payments to Holdings or any other Parent Entity of the Borrower:

(i)     [reserved];

(ii)     the proceeds of which shall be used to allow any Parent Entity to pay its operating expenses incurred in the ordinary course of business and other corporate overhead costs and expenses (including administrative, legal, accounting and other professional costs and expenses) to the extent attributable to the ownership or operation of the Borrower, it being understood that 100% of the foregoing costs and expenses shall be deemed attributable to the ownership and operation of the Borrower at all times when such Parent Entity does not have any material operations and Holdings owns no material assets other than the Equity Interests of the Borrower;

(iii)     the proceeds of which shall be used by such Parent Entities to pay Restricted Payments contemplated by Section 10.6(b); and

(iv)     the proceeds of which shall be used to pay fees and expenses (including franchise or similar taxes) required to maintain its corporate existence, customary salary, bonus and other benefits payable to, and indemnities provided on behalf of, officers, employees and consultants of any Parent Entity, to the extent such salaries, bonuses, other benefits and indemnities are attributable to the ownership or operation of the Borrower and the Restricted Subsidiaries, it being understood that 100% of the foregoing costs and expenses shall be deemed attributable to the ownership and operation of the Borrower at all times when such Parent Entity does not have any material operations and Holdings owns no material assets other than the Equity Interests of the Borrower;

(g)     [reserved];

(h)     the Borrower may pay any dividends or distributions within 60 days after the date of declaration thereof, if at the date of declaration such payment would have complied with the provisions of this Agreement;

(i)     [reserved];

(j)     [reserved]; and

(k)     the Borrower may make payments described in Sections 9.9(f) and (h) (subject to the conditions set out therein).

10.7    Limitations on Debt Payments and Amendments.

(a)     The Borrower will not, and will not permit any Restricted Subsidiary to prepay, repurchase or redeem or otherwise defease the Senior Unsecured Notes or the Senior Secured Notes (or any Permitted Refinancing Indebtedness in respect of any of the foregoing)(it being understood that payments of regularly-scheduled cash interest in respect of the Senior Unsecured Notes or the Senior Secured Notes (or any Permitted Refinancing Indebtedness in respect of any of the foregoing)); *provided*, *however*, that the Borrower or any Restricted Subsidiary may prepay, repurchase, redeem or defease the Senior Unsecured Notes or the Senior Secured Notes (or any Permitted Refinancing Indebtedness in respect of any of the foregoing) (A) in exchange for or with the proceeds of any Permitted Refinancing Indebtedness or (B) by converting or exchanging the Senior Unsecured Notes or the Senior Secured Notes (or any Permitted Refinancing Indebtedness in respect of any of the foregoing) to Qualified Equity Interests of the Borrower or any Parent Entity;

(b)     The Borrower will not amend or modify the Senior Unsecured Notes Indentures or the Senior Secured Notes Indentures that constitutes Material Indebtedness or the terms applicable thereto or the documentation governing any Permitted Refinancing Indebtedness thereof, other than amendments or modifications that (A) would not be materially adverse to the Lenders (as determined in good faith by the Borrower), taken as a whole, or (B) otherwise comply with the definition of "Permitted Refinancing Indebtedness" that may be incurred to Refinance any such Indebtedness; and

(c)     Notwithstanding the foregoing and for the avoidance of doubt, nothing in this Section 10.7 shall prohibit (i) the repayment or prepayment of intercompany subordinated Indebtedness owed among the Borrower and/or the Restricted Subsidiaries, in either case unless an Event of Default has occurred and is continuing and the Borrower has received a notice from the Collateral Agent instructing it not to make or permit the Borrower and/or the Restricted Subsidiaries to make any such repayment or prepayment or (ii) substantially concurrent transfers of credit positions in connection with intercompany debt restructurings so long as such Indebtedness is permitted by Section 10.1 after giving effect to such transfer.

10.8    Negative Pledge Agreements.  The Borrower will not, and will not permit any of the Restricted Subsidiaries to, enter into or permit to exist any Contractual Requirement (other than this Agreement or any other Credit Document or any documentation in respect of secured Indebtedness otherwise permitted hereunder) that limits the ability of the Borrower or any Guarantor to create, incur, assume or suffer to exist Liens on property of such Person for the benefit of the Secured Parties with respect to the Obligations or under the Credit Documents; *provided* that the foregoing shall not apply to each of the following Contractual Requirements that:

(a)     (i) exist on the Petition Date and (to the extent not otherwise permitted by this Section 10.8) are listed on Schedule 10.8 and (ii) to the extent Contractual Requirements permitted by

subclause (i) are set forth in an agreement evidencing Indebtedness or other obligations, are set forth in any agreement evidencing any Permitted Refinancing Indebtedness incurred to Refinance such Indebtedness or obligation so long as such Permitted Refinancing Indebtedness does not expand the scope of such Contractual Requirement;

(b)        are binding on a Restricted Subsidiary at the time such Restricted Subsidiary first becomes a Restricted Subsidiary of the Borrower, so long as such Contractual Requirements were not entered into solely in contemplation of such Person becoming a Restricted Subsidiary of the Borrower;

(c)        represent Indebtedness permitted under Section 10.1 of a Restricted Subsidiary of the Borrower that is not a Guarantor so long as such Contractual Requirement applies only to such Subsidiary and its Subsidiaries;

(d)        arise pursuant to agreements entered into with respect to any sale, transfer, lease or other Disposition permitted by Section 10.4 and applicable solely to assets under such sale, transfer, lease or other Disposition;

(e)        are customary provisions in joint venture agreements and other similar agreements permitted by Section 10.5 and applicable to joint ventures or otherwise arise in agreements which restrict the Disposition or distribution of assets or property in oil and gas leases, joint operating agreements, joint exploration and/or development agreements, participation agreements and other similar agreements entered into in the ordinary course of the oil and gas exploration and development business;

(f)        are negative pledges and restrictions on Liens in favor of any holder of Indebtedness permitted under Section 10.1, but solely to the extent any negative pledge relates to the property financed by or the subject of such Indebtedness;

(g)        are customary restrictions on leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate to the assets subject thereto;

(h)        comprise restrictions imposed by any agreement relating to secured Indebtedness permitted pursuant to Section 10.1 to the extent that such restrictions apply only to the property or assets securing such Indebtedness;

(i)        are customary provisions restricting subletting or assignment of any lease governing a leasehold interest of the Borrower or any Restricted Subsidiary;

(j)        are customary provisions restricting assignment of any agreement entered into in the ordinary course of business;

(k)        restrict the use of cash or other deposits imposed by customers under contracts entered into in the ordinary course of business;

(l)        are imposed by Requirements of Law;

(m)        exist under any documentation governing any Permitted Refinancing Indebtedness incurred to Refinance any Indebtedness but only to the extent such Contractual Requirement is not materially more restrictive, taken as a whole, than the Indebtedness being refinanced;

(n)        customary net worth provisions contained in real property leases entered into by any Restricted Subsidiary of the Borrower, so long as the Borrower has determined in good faith that such

WEIL:\97169709\10\74473.0003

net worth provisions would not reasonably be expected to impair the ability of the Borrower and the Restricted Subsidiaries to meet their ongoing obligation;

(o)        are customary restrictions and conditions contained in the document relating to any Lien, so long as (i) such Lien is a Permitted Lien and such restrictions or conditions relate only to the specific asset subject to such Lien and (ii) such restrictions and conditions are not created for the purpose of avoiding the restrictions imposed by this Section 10.8;

(p)        are restrictions imposed by any agreement relating to Indebtedness incurred pursuant to Section 10.1 or Permitted Refinancing Indebtedness in respect thereof, to the extent such restrictions are not materially more restrictive, taken as a whole, than the restrictions contained in the Credit Documents or documentation with respect to the Senior Unsecured Notes or the Senior Secured Notes as determined by the Borrower in good faith;

(q)        are restrictions regarding licenses or sublicenses by the Borrower and the Restricted Subsidiaries of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property);

(r)        are encumbrances or restrictions contained in an agreement or other instrument of a Person acquired by or merged or consolidated with or into the Borrower or any Restricted Subsidiary, or of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from such Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated; and

(s)        are encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (r) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower's board of directors, no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

10.9    Limitation on Subsidiary Distributions.  The Borrower will not, and will not permit any of its Restricted Subsidiaries that are not Guarantors to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or consensual restriction on the ability of any such Restricted Subsidiary to pay dividends or make any other distributions to the Borrower or any Restricted Subsidiary on its Equity Interests or with respect to any other interest or participation in, or measured by, its profits or transfer any property to the Borrower or any Restricted Subsidiary except (in each case) for such encumbrances or restrictions existing under or by reason of:

(a)        contractual encumbrances or restrictions in effect on the Petition Date, including pursuant to the Credit Documents and any Hedging Obligations;

(b)        the Senior Unsecured Notes Indenture, the Senior Unsecured Notes and related guarantees, the Senior Secured Notes Indenture, the Senior Secured Notes, and related guarantees and any related collateral documents and the Existing RBL Credit Agreement and the Existing RBL Credit Documents;

(c)        purchase money obligations for property acquired in the ordinary course of business and Capital Lease Obligations that impose restrictions on transferring the property so acquired;

WEIL:\97169709\10\74473.0003

(d)        any applicable Requirement of Law;

(e)        any agreement or other instrument of a Person acquired by or merged or consolidated with or into the Borrower or any Restricted Subsidiary, or of an Unrestricted Subsidiary that is designated a Restricted Subsidiary, or that is assumed in connection with the acquisition of assets from such Person, in each case that is in existence at the time of such transaction (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any Person, or the properties or assets of any Person, other than the Person and its Subsidiaries, or the property or assets of the Person and its Subsidiaries, so acquired or designated;

(f)        contracts for the sale of assets, including customary restrictions with respect to a Subsidiary of the Borrower pursuant to an agreement that has been entered into for the sale or disposition of all or substantially all of the Equity Interests or assets of such Subsidiary;

(g)        secured Indebtedness otherwise permitted to be incurred pursuant to Section 10.1 and Section 10.2 that limit the right of the Credit Parties to dispose of the assets securing such Indebtedness;

(h)        restrictions on cash or other deposits or net worth imposed by customers under contracts entered into in the ordinary course of business;

(i)        other Indebtedness, Disqualified Stock or preferred stock of (i) Restricted Subsidiaries permitted to be incurred subsequent to the Petition Date pursuant to Section 10.1 so long as either (A) the provisions relating to such encumbrance or restriction contained in such Indebtedness are no less favorable to the Borrower, taken as a whole, as determined by the board of directors of the Borrower in good faith, than the provisions contained in this Agreement as in effect on the Petition Date or (B) any such encumbrance or restriction contained in such Indebtedness does not prohibit (except upon a default or an event of default thereunder) the payment of dividends in an amount sufficient, as determined by the board of directors of the Borrower in good faith, to impair the ability of the Borrower to make scheduled payments of cash interest on the Loans when due or (ii) Foreign Subsidiaries as to such Foreign Subsidiaries and their Subsidiaries;

(j)        customary provisions in joint venture agreements or agreements governing property held with a common owner and other similar agreements or arrangements relating solely to such joint venture or property;

(k)        customary provisions contained in leases, sub-leases, licenses, sub-licenses or similar agreements, in each case, entered into in the ordinary course of business; and

(l)        any encumbrances or restrictions imposed by any amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings of the contracts, instruments or obligations referred to in clauses (a) through (k) above; *provided* that such amendments, modifications, restatements, renewals, increases, supplements, refundings, replacements or refinancings are, in the good faith judgment of the Borrower's board of directors, no more restrictive in any material respect with respect to such encumbrance and other restrictions taken as a whole than those prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

10.10   Hedge Transactions.  The Borrower will not, and will not permit any Restricted Subsidiary to, enter into any Hedge Transaction with any Person other than:

(a)        Hedge Transactions in respect of commodities entered into not for speculative purposes the net notional volumes for which (when aggregated with other commodity Hedge Transactions then in effect, other than puts, floors and basis differential swaps on volumes already

hedged pursuant to other Hedge Transactions) do not exceed, as of the date the latest hedging transaction is entered into under a Hedge Agreement, 85% of the reasonably anticipated Hydrocarbon production from the Credit Parties' total Proved Reserves (as forecast based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.14(a), as applicable) for the sixty-six (66) month period from the date of creation of such hedging arrangement (the "Ongoing Hedges").

(b)     Other Hedge Transactions (other than any Hedge Transaction in respect of equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions) entered into not for speculative purposes.

(c)     It is understood that for purposes of this Section 10.10, the following Hedge Transactions shall not be deemed speculative or entered into for speculative purposes: (i) any commodity Hedge Transaction intended, at inception of execution, to hedge or manage any of the risks related to existing and or forecasted Hydrocarbon production of the Borrower or its Restricted Subsidiaries (whether or not contracted) and (ii) any Hedge Transaction intended, at inception of execution, (A) to hedge or manage the interest rate exposure associated with any debt securities, debt facilities or leases (existing or forecasted) of the Borrower or its Restricted Subsidiaries, (B) for foreign exchange or currency exchange management, (C) to manage commodity portfolio exposure associated with changes in interest rates or (D) to hedge any exposure that the Borrower or its Restricted Subsidiaries may have to counterparties under other Hedge Transactions such that the combination of such Hedge Transactions is not speculative taken as a whole.

(d)     For purposes of entering into or maintaining Ongoing Hedges under Section 10.10(a), forecasts of reasonably projected Hydrocarbon production volumes and reasonably anticipated Hydrocarbon production from the Credit Parties' total Proved Reserves based upon the Initial Reserve Report or the most recent Reserve Report delivered pursuant to Section 9.14(a), as applicable, shall be revised to account for any increase or decrease therein anticipated because of information obtained by Borrower or any other Credit Party subsequent to the publication of such Reserve Report including the Borrower's or any other Credit Party's internal forecasts of production decline rates for existing wells and additions to or deletions from anticipated future production from new wells and acquisitions coming on stream or failing to come on stream

10.11   Financial Covenants.

(a)     Liquidity.  The Borrower will not permit Liquidity to be less than $25,000,000 as of the end of each Business Day.

(b)     Asset Coverage Ratio.  The Borrower will not permit the Asset Coverage Ratio as of the last day of any Monthly Test Period ending on the last day of each fiscal month of the Borrower to be less than 1.25 to 1.00.

10.12   [Reserved].

10.13   Use of Credit Extensions in Violation of Sanctions.  The Borrower will not request any Borrowing or Letter of Credit, and the Borrower shall not use, and shall procure that its Subsidiaries and its or their respective directors, officers, employees and agents shall not use, the proceeds of any Borrowing or Letter of Credit (A) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws, (B) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country, to the extent such activities, business or transaction would be prohibited by Sanctions if conducted by a corporation incorporated in the United States or in a European Union member state, or (C) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

10.14   <u>Superpriority Claims</u>.  The Borrower will not, and will not permit any of its Restricted Subsidiaries, without the consent of the Administrative Agent, to create or permit to exist any Superpriority Claim other than Superpriority Claims permitted by the DIP Order and the orders approving the "first day" motions in respect of the Chapter 11 Cases; provided, however that such Superpriority Claims shall be subject to the Carve-Out.

10.15   <u>Bankruptcy Orders</u>.  The Borrower will not, and will not permit any of its Restricted Subsidiaries to (a) obtain or seek to obtain any stay from the Bankruptcy Court on the exercise of the Administrative Agent's or any Lender's remedies hereunder or under any other Credit Document, except as specifically provided in the DIP Order, (b) without the consent of the Majority Lenders, seek to change or otherwise modify any DIP Order, or (c) without the consent of the Majority Lenders, propose, file, solicit votes with respect to or support any chapter 11 plan or debtor in possession financing unless (i) such plan or financing would, on the date of effectiveness, pay in full in cash all Obligations or (ii) such plan is an Acceptable Plan of Reorganization.

SECTION 11.   <u>Events of Default</u>.

Upon the occurrence of any of the following specified events (each an "<u>Event of Default</u>"):

11.1   <u>Payments</u>.  The Borrower shall (a) default in the payment when due of any principal of the Loans or (b) default, and such default shall continue for five or more days, in the payment when due of any interest on the Loans or any Unpaid Drawings, fees or of any other amounts owing hereunder or under any other Credit Document (other than any amount referred to in <u>clause (a)</u> above).

11.2   <u>Representations, Etc</u>.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or any certificate delivered or required to be delivered pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made.

11.3   <u>Covenants</u>.  Any Credit Party shall:

(a)   default in the due performance or observance by it of any term, covenant or agreement contained in <u>Section 9.1(d)(i)</u>, <u>9.5</u> (solely with respect to the Borrower) or <u>Section 10.11</u>; or

(b)   default in the due performance or observance by it of any term, covenant or agreement (other than those referred to in <u>Section 11.1</u> or <u>11.2</u> or <u>clause (a)</u> of this <u>Section 11.3</u>) contained in this Agreement or any Security Document and such default shall continue unremedied for a period of at least 30 days after receipt of written notice thereof by the Borrower from the Administrative Agent.

11.4   <u>Default Under Other Agreements</u>.

(a)   The Borrower or any of the Restricted Subsidiaries shall (i) default in any payment with respect to any Material Indebtedness (other than the Indebtedness described in <u>Section 11.1</u>) beyond the period of grace, if any, provided in the instrument of agreement under which such Indebtedness was created or (ii) default in the observance or performance of any agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist (other than, (1) with respect to Indebtedness in respect of any Hedge Transaction, termination events or equivalent events pursuant to the terms of the corresponding Hedge Agreements under which such Hedge Transaction is entered into and (2) secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement), the effect of which default or other event or condition is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, any such

Indebtedness to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, unless, in the case of each of the foregoing, such holder or holders shall have (or through its or their trustee or agent on its or their behalf) waived such default in a writing to the Borrower; *provided* that this clause (a) shall not apply to any Indebtedness outstanding hereunder any Indebtedness of any Credit Party that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Credit Party) unless such Indebtedness has been accelerated and the enforcement of remedies with respect to such Indebtedness shall not have been stayed by the commencement of the Chapter 11 Cases, or

(b)     Without limiting the provisions of clause (a) above, any such default under any such Material Indebtedness shall cause such Material Indebtedness to be declared to be due and payable, or required to be prepaid other than by a regularly scheduled required prepayment or as a mandatory prepayment (and, (i) with respect to Indebtedness in respect of any Hedging Obligations, other than due to a termination event or equivalent event pursuant to the terms of the Hedge Agreements under which the applicable Hedge Transaction was entered into and (ii) other than secured Indebtedness that becomes due as a result of a Disposition (including as a result of Casualty Event) of the property or assets securing such Indebtedness permitted under this Agreement), prior to the stated maturity thereof; *provided* that this clause (b) shall not apply to any Indebtedness outstanding hereunder any Indebtedness of any Credit Party that was incurred prior to the Petition Date (or, if later, the date on which such Person became a Credit Party) unless such Indebtedness has been accelerated and the enforcement of remedies with respect to such Indebtedness shall not have been stayed by the commencement of the Chapter 11 Cases.

11.5     [Reserved].

11.6     ERISA.

(a)     Except to the extent excused by the Bankruptcy Court or as a result of the filing of the Chapter 11 Cases, any Plan shall fail to satisfy the minimum funding standard required for any plan year or part thereof or a waiver of such standard or extension of any amortization period is sought or granted under Section 412 of the Code; any Plan is or shall have been terminated or is the subject of termination proceedings under ERISA (including the giving of written notice thereof); an event shall have occurred or a condition shall exist in either case entitling the PBGC to terminate any Plan or to appoint a trustee to administer any Plan (including the giving of written notice thereof); any Plan shall have an accumulated funding deficiency (whether or not waived); the Borrower or any ERISA Affiliate has incurred or is likely to incur a liability to or on account of a Plan under Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code (including the giving of written notice thereof); and

(b)     there would result from any event or events set forth in clause (a) of this Section 11.6 the imposition of a lien, the granting of a security interest, or a liability, or the reasonable likelihood of incurring a lien, security interest or liability; and

(c)     such lien, security interest or liability will or would be reasonably likely to have a Material Adverse Effect.

11.7     Guarantee.  The Guarantee or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof and thereof) or any Guarantor or any other Credit Party shall assert in writing that any such Guarantor's obligations under the Guarantee are not to be in effect or are not to be legal, valid and binding obligations (other than pursuant to the terms hereof or thereof).

11.8     Security Documents.  The Collateral Agreement, Mortgage or any other Security Document pursuant to which assets of the Borrower and the Credit Parties with an aggregate fair market value

in excess of $25,000,000 are pledged as Collateral or any material provision thereof shall cease to be in full force or effect (other than pursuant to the terms hereof or thereof) or any grantor thereunder or any other Credit Party shall assert in writing that any grantor's obligations under the Collateral Agreement, the Mortgage or any other Security Document are not in effect or not legal, valid and binding obligations (other than pursuant to the terms hereof or thereof).

11.9     Judgments.  One or more monetary judgments or decrees shall be entered against the Borrower or any of the Restricted Subsidiaries involving a liability of $25,000,000 or more in the aggregate for all such judgments and decrees for the Borrower and the Restricted Subsidiaries (to the extent not paid or covered by insurance provided by a carrier not disputing coverage), which judgments are not discharged or effectively waived or stayed (including as a result of the automatic stay under the Chapter 11 Cases) for a period of 60 consecutive days.

11.10     Change of Control.  A Change of Control shall have occurred.

11.11     Bankruptcy Related Events.

(a)     The filing of a motion by the Credit Parties seeking dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code.

(b)     The dismissal or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code.

(c)     The appointment of a trustee, examiner (other than a fee examiner) or other person with expanded powers in any of the Chapter 11 Cases.

(d)     The payment or granting of adequate protection (other than the Adequate Protection Liens) without the prior written consent of the Majority Lenders or the Administrative Agent (at the direction of the Majority Lenders).

(e)     Any Liens granted with respect to the DIP Facility shall cease to be valid, perfected and enforceable in all material respects with the priority in the DIP Order.

(f)     The entry of one or more orders of the Bankruptcy Court modifying the automatic stay to allow any third party to proceed with foreclosure (or a deed in lieu of foreclosure) against assets having a value in excess of $25,000,000 in the aggregate without the prior written consent of the Majority Lenders.

(g)     The Credit Parties failure to comply with any other material term of the DIP Order.

(h)     (i) An order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying (for a period of seven (7) days or more), vacating or otherwise modifying the DIP Order, or any Credit Party shall apply for the authority to do so, in each case in a manner that is materially adverse to the Administrative Agent or the Lenders, without the prior written consent of the Administrative Agent and the Majority Lenders; (ii) an order shall have been entered by the Bankruptcy Court modifying the Adequate Protection Liens granted in the DIP Order in a manner that is materially adverse to the Administrative Agent or the Lenders without the prior written consent of the Administrative Agent and the Majority Lenders, (iii) an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by the Administrative Agent or any of the Lenders of any amounts received in respect of the obligations under the Credit Documents, (iv) any Credit Party shall file a motion or other request with the Bankruptcy Court seeking any financing under Section 364(d) of the Bankruptcy Code secured by any of the Collateral that does not provide for payment in full of the Obligations (other than contingent indemnity obligations not then due) (without the prior consent of the

Administrative Agent and the Majority Lenders) or (v) other than with respect to the Carve-Out, a final non-appealable order in the Chapter 11 Cases shall be entered charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Lenders.

(i)       Except as permitted by the DIP Order or as otherwise agreed to by the Administrative Agent and the Majority Lenders, any Credit Party shall make any payment on the Senior Secured Notes and the Senior Unsecured Notes, other than (x) payments set forth in the Budget or (y) payments provided for in the DIP Order or authorized by the Bankruptcy Court in accordance with the "first day" orders of the Bankruptcy Court; *provided*, however, any fees or expenses paid in connection with any plan support agreement or backstop commitment agreement approved by the Bankruptcy Court shall not be considered a payment on the Senior Secured Notes.

(j)       Any of the Credit Parties shall seek to, or shall support (whether by way of motion or other pleadings filed with the Bankruptcy Court or any other writing executed by any Credit Party) any motion to, (1) disallow in whole or in part any of the obligations arising under this Agreement or any other Credit Document, (2) disallow in whole or in part any of the Indebtedness owed by the Credit Parties under the Prepetition Note Documents or (3) challenge the validity and enforceability of the Liens or security interests granted under any of the Credit Documents or in the DIP Order.

then, and in any such event, subject to the DIP Order and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent, upon the written request of the Majority Lenders, shall, by written notice to the Borrower, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against the Borrower or any other Credit Party, except as otherwise specifically provided for in this Agreement: (a) declare the Total Commitment terminated, whereupon the Commitment of each Lender shall forthwith terminate immediately and any fees theretofore accrued shall forthwith become due and payable without any other notice of any kind; (b) declare the principal of and any accrued interest and fees in respect of any or all Loans and any or all Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and/or (c) demand cash collateral in respect of any outstanding Letter of Credit pursuant to Section 3.8(b) in an amount equal to the aggregate Stated Amount of all Letters of Credit issued and then outstanding. In addition, subject to the DIP Order, after the occurrence and during the continuance of an Event of Default, the Administrative Agent and the Lenders will have all other rights and remedies available at law and equity.

11.12   Application of Proceeds.  Any amount received by the Administrative Agent or the Collateral Agent from any Credit Party (or from proceeds of any Collateral) following any acceleration of the Obligations under this Agreement shall be applied:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, disbursements and other charges of counsel payable under Section 12.7 and amounts payable under Article II) payable to the Administrative Agent and/or Collateral Agent in such Person's capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest and Letter of Credit Fees) payable to the Lenders and the Issuing Banks (including fees, disbursements and other charges of counsel payable under Section 12.7) arising under the Credit Documents and amounts payable under Article II, ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid Letter of Credit Fees and interest on the Loans and Unpaid Drawings, ratably among the Lenders and the Issuing Banks in proportion to the respective amounts described in this clause Third payable to them;

-100-

Fourth, (i) to payment of that portion of the Obligations constituting unpaid principal of the Loans, the Unpaid Drawings and Obligations then owing under Secured Hedge Transactions and the Secured Cash Management Agreements and (ii) to Cash Collateralize that portion of Letters of Credit Outstanding comprising the aggregate undrawn amount of Letters of Credit to the extent not otherwise Cash Collateralized by the Borrower pursuant to Section 3.8, ratably among the Lenders, the Issuing Banks, the Hedge Banks and the Cash Management Banks in proportion to the respective amounts described in this clause Fourth held by them; *provided* that (x) any such amounts applied pursuant to the foregoing clause (ii) shall be paid to the Administrative Agent for the ratable account of the applicable Issuing Bank to Cash Collateralize such Letters of Credit Outstanding, (y) subject to Section 3.8, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to this clause Fourth shall be applied to satisfy drawings under such Letters of Credit as they occur and (z) upon the expiration of any Letter of Credit, the pro rata share of cash collateral attributable to such expired Letter of Credit shall be distributed in accordance with this clause Fourth;

Fifth, to the payment of all other Obligations of the Credit Parties owing under or in respect of the Credit Documents that are due and payable to the Administrative Agent and the other Secured Parties on such date, ratably based upon the respective aggregate amounts of all such Obligations owing to the Administrative Agent and the other Secured Parties on such date; and

Last, the balance, if any, after all of the Obligations have been paid in full, to the Borrower or as otherwise required by Requirements of Law.

Subject to Section 3.8, amounts used to Cash Collateralize the aggregate undrawn amount of Letters of Credit pursuant to clause Fourth above shall be applied to satisfy drawings under such Letters of Credit as they occur. If any amount remains on deposit as cash collateral after all Letters of Credit have either been fully drawn or expired, such remaining amount shall be applied to the other Obligations, if any, in the order set forth above.

SECTION 12.    The Agents.

12.1    Appointment.

(a)    Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Credit Documents and irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  The provisions of this Section 12 (other than Section 12.9 with respect to the Borrower) are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as third party beneficiary of any such provision.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities (except those expressly set forth herein, or any fiduciary relationship with the Collateral Agent, any Issuing Bank or any Lender) (regardless of whether a Default has occurred and is continuing), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Administrative Agent.

(b)    The Administrative Agent, each Lender and each Issuing Bank hereby irrevocably designate and appoint the Collateral Agent as the agent with respect to the Collateral, and each of the Administrative Agent, each Lender and each Issuing Bank irrevocably authorizes the Collateral Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Collateral Agent by the terms of this Agreement and the other Credit Documents, together with such

other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Collateral Agent shall not have any duties or responsibilities (except those expressly set forth herein) or any fiduciary relationship with the Administrative Agent, any Issuing Bank or any Lender (regardless of whether a Default has occurred and is continuing), and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Credit Document or otherwise exist against the Collateral Agent.  Without limiting the generality of the foregoing, the Collateral Agent shall not be subject to any fiduciary or other implied duties.

12.2    Delegation of Duties.  The Administrative Agent and the Collateral Agent may each execute any of its duties under this Agreement and the other Credit Documents by or through agents, sub-agents, employees or attorneys-in-fact (each, a "Subagent") and shall be entitled to advice of counsel concerning all matters pertaining to such duties; provided, however, that no such Subagent shall be authorized to take any action with respect to any Collateral unless and except to the extent expressly authorized in writing by the Administrative Agent.  If any Subagent, or successor thereto, shall die, become incapable of acting, resign or be removed, all rights, powers, privileges and duties of such Subagent, to the extent permitted by law, shall automatically vest in and be exercised by the Administrative Agent until the appointment of a new Subagent. Neither the Administrative Agent nor the Collateral Agent shall be responsible for the negligence or misconduct of any Subagents selected by it in the absence of gross negligence or willful misconduct (as determined in the final judgment of a court of competent jurisdiction).

12.3    Exculpatory Provisions.  No Agent nor any of its officers, directors, employees, agents, attorneys-in-fact or Affiliates shall be (a) liable for any action lawfully taken or omitted to be taken by any of them under or in connection with this Agreement or any other Credit Document (except for its or such Person's own gross negligence or willful misconduct, as determined in the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein) or (b) responsible in any manner to any of the Lenders or any participant for any recitals, statements, representations or warranties made by any of the Borrower, any other Credit Party or any officer thereof contained in this Agreement or any other Credit Document or in any certificate, report, statement or other document referred to or provided for in, or received by such Agent under or in connection with, this Agreement or any other Credit Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Credit Document, or, except with respect to any physical certificate or instrument representing Pledged Securities (as defined in the Collateral Agreement) in the possession of the Agent, the perfection or priority of any Lien or security interest created or purported to be created under the Security Documents or for any failure of the Borrower or any other Credit Party to perform its obligations hereunder or thereunder.  No Agent shall be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party or any Affiliate thereof.  The Collateral Agent shall not be under any obligation to the Administrative Agent, any Lender or any Issuing Bank to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of any Credit Party.  The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to, the administration, submission or any other matter related to the rates in the definition of "LIBOR Rate" or with respect to any comparable or successor rate thereto, or replacement rate therefor.

12.4    Reliance by Agents.  The Administrative Agent and the Collateral Agent shall be entitled to rely, and shall be fully protected in relying, upon any writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or instruction believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent or the Collateral Agent.  The Administrative Agent may deem and treat the Lender specified in the Register with respect to any amount owing hereunder as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the

Administrative Agent.  The Administrative Agent and the Collateral Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Majority Lenders as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent and the Collateral Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Majority Lenders, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans; *provided* that the Administrative Agent and Collateral Agent shall not be required to take any action that, in its opinion or in the opinion of its counsel, may expose it to liability or that is contrary to any Credit Document or applicable Requirements of Law.  For purposes of determining compliance with the conditions specified in Section 6 and Section 7 on the Closing Date, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

        12.5    Notice of Default.  Neither the Administrative Agent nor the Collateral Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent or Collateral Agent, as applicable, has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, it shall give notice thereof to the Lenders and the Collateral Agent.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Majority Lenders; *provided* that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders except to the extent that this Agreement requires that such action be taken only with the approval of the Majority Lenders or each individual lender, as applicable.

        12.6    Non-Reliance on Administrative Agent, Collateral Agent and Other Lenders.  Each Lender expressly acknowledges that neither the Administrative Agent nor the Collateral Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates has made any representations or warranties to it and that no act by the Administrative Agent or Collateral Agent hereinafter taken, including any review of the affairs of the Borrower or any other Credit Party, shall be deemed to constitute any representation or warranty by the Administrative Agent or Collateral Agent to any Lender or any Issuing Bank.  Each Lender and each Issuing Bank represents to the Administrative Agent and the Collateral Agent that it has, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into, the business, operations, property, financial and other condition and creditworthiness of the Borrower and each other Credit Party and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent, Collateral Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and any other Credit Party. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, neither the Administrative Agent nor the Collateral Agent shall have any duty or responsibility to provide any Lender with any credit or other information concerning the business, assets, operations, properties, financial condition, prospects or creditworthiness of the Borrower or any other Credit Party that may come into the possession of the Administrative Agent or Collateral Agent any of their respective officers, directors, employees, agents, attorneys-in-fact or Affiliates.

        12.7    Indemnification.  The Lenders severally agree to indemnify the Administrative Agent and the Collateral Agent, each in its capacity as such (to the extent not reimbursed by the Credit Parties and

without limiting the obligation of the Credit Parties to do so), ratably according to their respective portions of the Commitments or Loans, as applicable, outstanding in effect on the date on which indemnification is sought (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with their respective portions of the Total Exposure in effect immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans) be imposed on, incurred by or asserted against the Administrative Agent or the Collateral Agent in any way relating to or arising out of the Commitments, this Agreement, any of the other Credit Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by the Administrative Agent or the Collateral Agent under or in connection with any of the foregoing; *provided* that no Lender shall be liable to the Administrative Agent or the Collateral Agent for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from such Administrative Agent's or the Collateral Agent's, as applicable, gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction; *provided*, *further*, that no action taken in accordance with the directions of the Majority Lenders (or such other number or percentage of the Lenders as shall be required by the Credit Documents) shall be deemed to constitute gross negligence or willful misconduct for purposes of this <u>Section 12.7</u>.  In the case of any investigation, litigation or proceeding giving rise to any liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time occur (including at any time following the payment of the Loans), this <u>Section 12.7</u> applies whether any such investigation, litigation or proceeding is brought by any Lender or any other Person.  Without limitation of the foregoing, each Lender shall reimburse the Administrative Agent and the Collateral Agent upon demand for its ratable share of any costs or out-of-pocket expenses (including attorneys' fees) incurred by such Agent in connection with the preparation, execution, delivery, administration, modification, amendment or enforcement (whether through negotiations, legal proceedings or otherwise) of, or legal advice rendered in respect of rights or responsibilities under, this Agreement, any other Credit Document, or any document contemplated by or referred to herein, to the extent that such Agent is not reimbursed for such expenses by or on behalf of the Borrower; *provided* that such reimbursement by the Lenders shall not affect the Borrower's continuing reimbursement obligations with respect thereto.  If any indemnity furnished to any Agent for any purpose shall, in the opinion of such Agent, be insufficient or become impaired, such Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided*, in no event shall this sentence require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's pro rata portion thereof; and *provided further*, this sentence shall not be deemed to require any Lender to indemnify any Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement resulting from such Agent's gross negligence or willful misconduct.  The agreements in this <u>Section 12.7</u> shall survive the termination of this Agreement and the repayment of the Loans and payment of all other amounts payable hereunder.

12.8    <u>Agents in Its Individual Capacities</u>.  Each Agent and its Affiliates may make loans to, accept deposits from and generally engage in any kind of business with the Borrower and any other Credit Party as though such Agent were not an Agent hereunder and under the other Credit Documents.  With respect to the Loans made by it, each Agent shall have the same rights and powers under this Agreement and the other Credit Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "<u>Lender</u>" and "<u>Lenders</u>" shall include each Agent in its individual capacity.

12.9    <u>Successor Agents</u>.  Each of the Administrative Agent and Collateral Agent may at any time give notice of its resignation to the Lenders, the Issuing Banks and the Borrower.  If the Administrative Agent and/or Collateral Agent becomes a Defaulting Lender, then such Administrative Agent or Collateral Agent, may be removed as the Administrative Agent or Collateral Agent, as the case may be, at the reasonable request of the Borrower and the Majority Lenders.  Upon receipt of any such notice of resignation or removal, as the case may be, the Majority Lenders shall have the right, subject to the consent of the Borrower (not to be unreasonably withheld or delayed) so long as no Default under <u>Section 11.1</u> is continuing, to appoint a successor,

which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States.  If, in the case of a resignation of a retiring Agent, no such successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may on behalf of the Lenders and the Issuing Banks, appoint a successor Agent meeting the qualifications set forth above.  Upon the acceptance of a successor's appointment as the Administrative Agent or Collateral Agent, as the case may be, hereunder, and upon the execution and filing or recording of such financing statements, or amendments thereto, and such other instruments or notices, as may be necessary or desirable, or as the Majority Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted by the Security Documents, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Credit Documents (if not already discharged therefrom as provided above in this <u>Section 12.9</u>).  The fees payable by the Borrower (following the effectiveness of such appointment) to such Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Agent's resignation hereunder and under the other Credit Documents, the provisions of this <u>Section 12</u> (including <u>Section 12.7</u>) and <u>Section 13.5</u> shall continue in effect for the benefit of such retiring Agent, its Subagents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Agent was acting as an Agent.

Any resignation of any Person as Administrative Agent pursuant to this <u>Section 12.9</u> shall also constitute its resignation as Issuing Bank.  Upon the acceptance of a successor's appointment as Administrative Agent hereunder, (a) such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Issuing Bank, (b) the retiring Issuing Bank shall be discharged from all of their respective duties and obligations hereunder or under the other Credit Documents, and (c) the successor Issuing Bank shall issue letters of credit in substitution for the Letters of Credit, if any, outstanding at the time of such succession or make other arrangements satisfactory to the retiring Issuing Bank to effectively assume the obligations of the retiring Issuing Bank with respect to such Letters of Credit.

12.10   <u>Withholding Tax</u>.  To the extent required by any applicable Requirement of Law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax.  If the Internal Revenue Service or any authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any reason (including because the appropriate form was not delivered, was not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstances that rendered the exemption from, or reduction of, withholding tax ineffective), such Lender shall indemnify the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by any applicable Credit Party and without limiting the obligation of any applicable Credit Party to do so) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Tax or otherwise, including penalties, additions to Tax and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Credit Document against any amount due to the Administrative Agent under this <u>Section 12.10</u>.   For the avoidance of doubt, for purposes of this <u>Section 12.10</u>, the term "Lender" includes any Issuing Bank.

12.11   <u>Security Documents and Collateral Agent under Security Documents and Guarantee</u>. Each Secured Party hereby further authorizes the Administrative Agent or Collateral Agent, as applicable, on behalf of and for the benefit of Secured Parties, to be the agent for and representative of the Secured Parties with respect to the Collateral and the Security Documents.  Subject to <u>Section 13.1</u>, without further written consent or authorization from any Secured Party, the Administrative Agent or Collateral Agent, as applicable, may (a) execute any documents, releases or instruments necessary in connection with a Disposition of assets permitted by this Agreement, (b) release any Lien encumbering any item of Collateral that is the subject of such Disposition of assets or with respect to which Majority Lenders (or such other Lenders as may be required to give such consent under <u>Section 13.1</u>) have otherwise consented or (c) release any applicable Guarantor from the

-105-

Guarantee in connection with such Disposition or with respect to which Majority Lenders (or such other Lenders as may be required to give such consent under Section 13.1) have otherwise consented.  The Lenders and the Issuing Banks (including in their capacities as potential Cash Management Banks and potential Hedge Banks) irrevocably agree that (x) the Collateral Agent may, without any further consent of any Lender, enter into or amend any other intercreditor agreement with the collateral agent or other representatives of the holders of Indebtedness that is permitted to be secured by a Lien on the Collateral that is permitted under this Agreement, (y) the Collateral Agent may rely exclusively on a certificate of an Authorized Officer of the Borrower as to whether any such other Liens are permitted and (z) any such intercreditor agreement referred to in clause (x) above, entered into by the Collateral Agent, shall be binding on the Secured Parties. Furthermore, the Lenders and the Issuing Banks (including in their capacities as potential Cash Management Bank and potential Hedge Banks) hereby authorize the Administrative Agent and the Collateral Agent to subordinate any Lien on any property granted to or held by the Administrative Agent or Collateral Agent under any Credit Document to the holder of any Lien on such property that is permitted by clause (j) of the definition of "Permitted Liens" and clauses (c), (e) (with respect to Liens securing Indebtedness permitted under Section 10.1), (f), (j), (o), (p) and (t) of Section 10.2 or otherwise permitted to be senior to the Liens of Administrative Agent or Collateral Agent on such property; *provided* that prior to any such request, the Borrower shall have in each case delivered to the Administrative Agent a certificate of an Authorized Officer of the Borrower certifying that such subordination is permitted under this Agreement.

12.12    Right to Realize on Collateral and Enforce Guarantee.

(a)    Anything contained in any of the Credit Documents to the contrary notwithstanding, the Borrower, the Agents and each Secured Party hereby agree that (a) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Guarantee, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Administrative Agent, on behalf of the Secured Parties in accordance with the terms hereof and all powers, rights and remedies under the Security Documents may be exercised solely by the Collateral Agent, and (b) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale or other disposition, the Collateral Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition and the Collateral Agent, as agent for and representative of the Secured Parties (but not any Lender or Lenders in its or their respective individual capacities unless the Majority Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Collateral Agent at such sale or other disposition.

(b)    Subject to the DIP Order, the Secured Parties hereby irrevocably authorize the Collateral Agent to credit bid all or any portion of the Obligations (including by accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (i) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions, or (ii) at any other sale, foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) the Collateral Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid by the Collateral Agent at the written direction of the Majority Lenders on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that shall vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) for the asset or assets so purchased (or for the equity interests or debt instruments of the acquisition vehicle or vehicles that are issued in connection with such purchase).  In connection with any such bid (i) the Collateral Agent shall be authorized to form one or more acquisition vehicles and to assign any

successful credit bid to such acquisition vehicle or vehicles, (ii) each of the Secured Parties' ratable interests in the Obligations that were credit bid shall be deemed without any further action under this Agreement to be assigned to such vehicle or vehicles for the purpose of closing such sale, (iii) the Collateral Agent shall be authorized to adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by the Administrative Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or equity interests thereof, shall be governed, directly or indirectly, by, and the governing documents shall provide for, control by the vote of the Majority Lenders or their permitted assignees under the terms of this Agreement or the governing documents of the applicable acquisition vehicle or vehicles, as the case may be, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Majority Lenders contained in Section 13.1 of this Agreement), (iv) the Collateral Agent on behalf of such acquisition vehicle or vehicles shall be authorized to issue to each of the Secured Parties, ratably on account of the relevant Obligations that were credit bid, interests, whether as equity, partnership, limited partnership interests or membership interests, in any such acquisition vehicle and/or debt instruments issued by such acquisition vehicle, all without the need for any Secured Party or acquisition vehicle to take any further action, and (v) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of Obligations credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Secured Parties pro rata and the equity interests and/or debt instruments issued by any acquisition vehicle on account of such Obligations shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.  Notwithstanding that the ratable portion of the Obligations of each Secured Party are deemed assigned to the acquisition vehicle or vehicles as set forth in clause (ii) above, each Secured Party shall execute such documents and provide such information regarding the Secured Party (and/or any designee of the Secured Party that will receive interests in or debt instruments issued by such acquisition vehicle) as the Administrative Agent may reasonably request in connection with the formation of any acquisition vehicle, the formulation or submission of any credit bid or the consummation of the transactions contemplated by such credit bid.

        12.13   Administrative Agent May File Proofs of Claim.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, arrangement, adjustment, composition or other judicial proceeding relative to the Borrower or any of its Subsidiaries, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

        (a)   to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Indebtedness that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel, to the extent due under Section 13.5) allowed in such judicial proceeding; and

        (b)   to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, to the extent due under Section 13.5.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Indebtedness or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

12.14   <u>Certain ERISA Matters</u>.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans, the Letters of Credit or the Commitments,

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84 14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, and the conditions for exemptive relief thereunder are and will continue to be satisfied in connection therewith,

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Letters of Credit, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement, or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)     In addition, unless <u>sub-clause (i)</u> in the immediately preceding <u>clause (a)</u> is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in <u>sub-clause (iv)</u> in the immediately preceding <u>clause (a)</u>, such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Credit Party, that:

(i)     none of the Administrative Agent or any of their respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation

WEIL:\97169709\10\74473.0003

or exercise of any rights by the Administrative Agent under this Agreement, any Credit Document or any documents related to hereto or thereto),

(ii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21, as amended from time to time) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50 million, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E),

(iii)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the obligations),

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Letters of Credit, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Letters of Credit, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder, and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any its Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Letters of Credit, the Commitments or this Agreement.

(c)     The Administrative Agent hereby informs the Lenders that it is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Letters of Credit, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans, the Letters of Credit or the Commitments for an amount less than the amount being paid for an interest in the Loans, the Letters of Credit or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Credit Documents or otherwise, including structuring fees, commitment fees, arrangement fees, facility fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, letter of credit fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

SECTION 13.     Miscellaneous.

13.1     Amendments, Waivers and Releases.

(a)     Except as expressly set forth in this Agreement, neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, supplemented or modified except in accordance with the provisions of this Section 13.1. The Majority Lenders may, or, with the written consent of the Majority Lenders, the Administrative Agent and/or the Collateral Agent shall, from time to time, (a) enter into with the relevant Credit Party or Credit Parties written amendments, supplements or modifications hereto and to the other Credit Documents or (b) waive in writing, on such terms and conditions as the Majority Lenders or the Administrative Agent and/or Collateral Agent, as the case

may be, may specify in such instrument, any of the requirements of this Agreement or the other Credit Documents or any Default or Event of Default and its consequences; *provided*, *however*, that each such waiver and each such amendment, supplement or modification shall be effective only in the specific instance and for the specific purpose for which given; *provided*, *further*, that no such waiver and no such amendment, supplement or modification shall (i) forgive or reduce any portion of any Loan or reduce the stated rate (it being understood that only the consent of the Majority Lenders shall be necessary to waive any obligation of the Borrower to pay interest at the Default Rate or amend Section 2.8(e)), or forgive any portion of, or extend the Maturity Date or the date for the payment, of the Loans or any interest or fee payable hereunder (other than as a result of waiving the applicability of any post-default increase in interest rates), or extend the final expiration date of any Lender's Commitment or extend the final expiration date of any Letter of Credit beyond the L/C Maturity Date, or increase the amount of the Commitment of any Lender, or make any Loan, interest, fee or other amount payable in any currency other than Dollars, in each case without the written consent of each Lender directly and adversely affected thereby, or (ii) amend, modify or waive any provision of this Section 13.1 in a manner that would reduce the voting rights of any Lender, or reduce the percentages specified in the definition of the term "Majority Lenders" (it being understood that, with the consent of the Majority Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Majority Lenders on substantially the same basis as the Loans and Commitments are included on the Closing Date), or amend any other provision of this Agreement that expressly provides that the consent of all Lenders or all affected Lenders is required, or consent to the assignment or transfer by the Borrower of its rights and obligations under any Credit Document to which it is a party (except as permitted pursuant to Section 10.3), in each case without the written consent of each Lender directly and adversely affected thereby, or (iii) amend the provisions of Section 4.2(a) or Section 11.12 or any analogous provision of any Security Document, in a manner that would by its terms alter the proportionate reduction of Commitments or the pro rata sharing of payments required thereby, without the prior written consent of each Lender directly and adversely affected thereby, or (iv) amend, modify or waive any provision of Section 12 without the written consent of the then-current Administrative Agent and Collateral Agent, as applicable, or any other former or current Agent to whom Section 12 then applies in a manner that directly and adversely affects such Person, or (v) amend, modify or waive any provision of Section 3 with respect to any Letter of Credit without the written consent of each Issuing Bank to whom Section 3 then applies in a manner that directly and adversely affects such Person, or (vi) [reserved], or (vii) release all or substantially all of the Guarantors under the Guarantee (except as expressly permitted by the Guarantee or this Agreement) without the prior written consent of each Lender, or (viii) release all or substantially all of the Collateral under the Security Documents (except as expressly permitted by the Security Documents or this Agreement) without the prior written consent of each Lender, or (ix) amend Section 2.9 so as to permit Interest Period intervals greater than six months without regard to availability to Lenders, without the written consent of each Lender directly and adversely affected thereby, or (x) [reserved], or (xi) affect the rights or duties of, or any fees or other amounts payable to, any Agent under this Agreement or any other Credit Document without the prior written consent of such Agent.  Any such waiver and any such amendment, supplement or modification shall apply equally to each of the affected Lenders and shall be binding upon the Borrower, such Lenders, the Administrative Agent and all future holders of the affected Loans.  In the case of any waiver, the Borrower, the Lenders and the Administrative Agent shall be restored to their former positions and rights hereunder and under the other Credit Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; it being understood that no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereon.  In connection with the foregoing provisions, the Administrative Agent may, but shall have no obligations to, with the concurrence of any Lender, execute amendments, modifications, waivers or consents on behalf of such Lender whose consent is required hereunder.

(b)     Without the consent of any Lender or Issuing Bank, the Credit Parties and the Administrative Agent or Collateral Agent may (in their respective sole discretion, or shall, to the extent required by any Credit Document) enter into any amendment, modification or waiver of any Credit

Document, or enter into any new agreement or instrument, to effect the granting, perfection, protection, expansion or enhancement of any security interest in any Collateral or additional property to become Collateral for the benefit of the Secured Parties, or as required by local law to give effect to, or protect any security interest for the benefit of the Secured Parties, in any property or so that the security interests therein comply with applicable law or this Agreement or in each case to otherwise enhance the rights or benefits of any Lender under any Credit Document.

(c)     [Reserved].

(d)     Notwithstanding the foregoing, technical and conforming modifications to the Credit Documents may be made with the consent of the Borrower and the Administrative Agent (i) if such modifications are not adverse to the Lenders or (ii) to the extent necessary to cure any ambiguity, omission, defect or inconsistency so long as, in each case with respect to this clause (ii), the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Majority Lenders stating that the Majority Lenders object to such amendment.

13.2     Notices.   Unless otherwise expressly provided herein, all notices and other communications provided for hereunder or under any other Credit Document shall be in writing (including by facsimile transmission).  All such written notices shall be mailed, faxed or delivered to the applicable address, facsimile number or electronic mail address, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(a)     if to the Borrower, the Administrative Agent, the Collateral Agent or any Issuing Bank, to the address, facsimile number, electronic mail address or telephone number specified for such Person on Schedule 13.2 or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the other parties; and

(b)     if to any other Lender, to the address, facsimile number, electronic mail address or telephone number specified in its Administrative Questionnaire or to such other address, facsimile number, electronic mail address or telephone number as shall be designated by such party in a notice to the Borrower, the Administrative Agent, the Collateral Agent and the Issuing Banks.

All such notices and other communications shall be deemed to be given or made upon the earlier to occur of (i) actual receipt by the relevant party hereto and (ii)(A) if delivered by hand or by courier, when signed for by or on behalf of the relevant party hereto; (B) if delivered by mail, three Business Days after deposit in the mails, postage prepaid; (C) if delivered by facsimile, when sent and receipt has been confirmed by telephone; and (D) if delivered by electronic mail, when delivered; *provided* that notices and other communications to the Administrative Agent or the Lenders pursuant to Sections 2.3, 2.6, 2.9, 4.2 and 5.1 shall not be effective until received.

13.3     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Credit Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Requirements of Law.

13.4     Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Credit Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans hereunder.

13.5    <u>Payment of Expenses; Indemnification</u>.

(a)    The Borrower agrees to pay or reimburse on a monthly basis (and in any event as required by the DIP Order), without the requirement of prior Bankruptcy Court approval and whether incurred before or after the Petition Date, (a) the Agents for all their reasonable and documented out-of-pocket costs and expenses incurred in connection with the preparation and execution and delivery of, and any amendment, waiver, supplement or modification to, this Agreement and the other Credit Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees, disbursements (including recording and filing fees) and other charges of Mayer Brown LLP, in its capacity as counsel to the Agents, and one counsel in each appropriate local jurisdiction (excluding any allocated costs of in-house counsel) and certain reasonable and documented out-of-pocket costs and expenses of Lenders as the Borrower may agree to pay or reimburse, and (b) each Issuing Bank and Agent for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Credit Documents and any such other documents, in each case, whether before or after the occurrence of an Event of Default, including the reasonable fees, disbursements and other charges of one counsel, and one counsel in each appropriate local jurisdiction to the Administrative Agent, Collateral Agent and the other Agents (unless there is an actual or perceived conflict of interest in which case each such Person may, with the Borrower's consent (not to be unreasonably withheld or delayed), retain its own counsel),

(b)    The Borrower agrees to pay, indemnify, and hold harmless each Lender, Issuing Bank and Agent and their respective Related Parties from and against any and all other liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever, whether or not such proceedings are brought by the Borrower, any of its Related Parties or any other third Person, including reasonable and documented fees, disbursements and other charges of one primary counsel for all such Persons, taken as a whole, and, if necessary, by a single firm of local counsel in each appropriate jurisdiction for all such Persons, taken as a whole (unless there is an actual or perceived conflict of interest in which case each such Person may, with the consent of the Borrower (not to be unreasonably withheld or delayed), retain its own counsel), with respect (i) the execution, delivery, enforcement, performance and administration of this Agreement, the other Credit Documents and any such other documents and (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such indemnified person or any of its Related Parties (other than any trustee or advisor)) or to any actual or alleged presence, release or threatened release of Hazardous Materials involving or attributable to the Borrower, any of its Subsidiaries or any of the Oil and Gas Properties (all the foregoing in this <u>clause (b)</u>, collectively, the "<u>Indemnified Liabilities</u>"); *provided* that the Borrower shall have no obligation hereunder to any Agent or any Lender or any of their respective Related Parties with respect to Indemnified Liabilities to the extent to have resulted from (i) the gross negligence or willful misconduct of the party to be indemnified or any of its Related Parties as determined by a final non-appealable judgment of a court of competent jurisdiction, (ii) any material breach of any Credit Document by the party to be indemnified or (iii) disputes, claims, demands, actions, judgments or suits not arising from any act or omission by the Borrower or its Affiliates, brought by an indemnified Person against any other indemnified Person (other than disputes, claims, demands, actions, judgments or suits involving claims against any Agent in its capacity as such).  No Person entitled to indemnification under <u>clause (b)</u> of this <u>Section 13.5</u> shall be liable for any damages arising from the use by others of any information or other materials obtained through internet, electronic, telecommunications or other information transmission systems (including IntraLinks or SyndTrak Online) in connection with this Agreement, except to the extent that such damages have resulted from the willful misconduct or gross negligence of

the party to be indemnified or any of its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable decision), nor (except solely as a result of the indemnification obligations of the Borrower or any of its Subsidiaries set forth above) shall any such Person, the Borrower or any of its Subsidiaries have any liability for any special, punitive, indirect or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) relating to this Agreement or any other Credit Document or arising out of its activities in connection herewith or therewith (whether before or after the Closing Date).

(c)      All amounts payable under this Section 13.5 shall be paid within 10 Business Days of receipt by the Borrower of an invoice relating thereto setting forth such expense in reasonable detail, accompanied, if requested by the Borrower, by reasonable supporting documentation.  The agreements in this Section 13.5 shall survive repayment of the Loans and payment of all other amounts payable hereunder.  This Section 13.5 shall not apply with respect to any Taxes other than Taxes that represent liabilities, obligations, losses, damages, penalties, claims, demands, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever resulting from a non-Tax claim, which shall be governed exclusively by Section 5.4 and, to the extent set forth therein, Sections 2.10 and 3.5.

13.6      Successors and Assigns; Participations and Assignments.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), except that (i) except as expressly permitted by Section 10.3, the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section 13.6.  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of each Issuing Bank that issues any Letter of Credit), Participants (to the extent provided in clause (c) of this Section 13.6) and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent, the Collateral Agent, each Issuing Bank and the Lenders and each other Person entitled to indemnification under Section 13.5) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)      (i)      Subject to the conditions set forth in clause (b)(ii) below, any Lender may at any time assign to one or more assignees (other than Holdings, the Borrower, its Subsidiaries, any natural person, any Ineligible Institution or any Defaulting Lender) all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans (including participations in L/C Obligations) at the time owing to it) with the prior written consent of:

(A)      the Borrower (not to be unreasonably withheld or delayed); provided that no consent of the Borrower shall be required for an assignment if an Event of Default under Section 11.1 has occurred and is continuing or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund; and

(B)      the Administrative Agent and each Issuing Bank (in each case, not to be unreasonably withheld or delayed).

(ii)      Assignments shall be subject to the following additional conditions:

(A)      except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such

assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000 and increments of $1,000,000 in excess thereof, unless each of the Borrower, each Issuing Bank and the Administrative Agent otherwise consents (which consents shall not be unreasonably withheld or delayed); *provided* that no such consent of the Borrower shall be required if an Event of Default under Section 11.1 has occurred and is continuing; *provided*, *further*, that contemporaneous assignments to a single assignee made by Affiliates of Lenders and related Approved Funds shall be aggregated for purposes of meeting the minimum assignment amount requirements stated above;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, together with a processing and recordation fee in the amount of $3,500; *provided* that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment; and

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire and applicable Tax forms (including those described in Sections 5.4(d), (e), (h) and (i), as applicable).

(iii)     Subject to acceptance and recording thereof pursuant to clause (b)(iv) of this Section 13.6, from and after the effective date specified in each Assignment and Acceptance, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.10, 2.11, 3.5, 5.4 and 13.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 13.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (c) of this Section 13.6.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount (and stated interest) of the Loans and L/C Obligations and any payment made by each Issuing Bank under any applicable Letter of Credit owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). Further, the Register shall contain the name and address of the Administrative Agent and the lending office through which each such Person acts under this Agreement. The entries in the Register shall be conclusive absent manifest error, and the Borrower, the Administrative Agent, the Collateral Agent, each Issuing Bank and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower, the Collateral Agent, each Issuing Bank and, solely with respect to itself, each other Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) of this Section 13.6 (unless waived) and any written consent to such

assignment required by clause (b) of this Section 13.6, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.

(c)      (i)      Any Lender may, without the consent of the Borrower, the Administrative Agent or any Issuing Bank, sell participations to one or more banks, credit insurers or other entities other than any Defaulting Lender, any Ineligible Institution (to the extent that the list of Ineligible Institutions has been made available to all Lenders), the Borrower or any Subsidiary of the Borrower (each, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); *provided* that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent, each Issuing Bank and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clause (i) or (ii) of the second proviso of the second sentence of Section 13.1(a) that affects such Participant, *provided* that the Participant shall have no right to consent to any modification to the percentages specified in the definitions of the terms "Majority Lenders". Subject to clause (c)(ii) of this Section 13.6, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10, 2.11, 3.5 and 5.4 to the same extent as if it were a Lender (subject to the limitations and requirements of those Sections and Sections 2.12 and 13.7) as though it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 13.6). To the extent permitted by Requirements of Law, each Participant also shall be entitled to the benefits of Section 13.8(b) as though it were a Lender; provided such Participant agrees to be subject to Section 13.8(a) as though it were a Lender.

(ii)      A Participant shall not be entitled to receive any greater payment under Section 2.10, 2.11, 3.5 or 5.4 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent (which consent shall not be unreasonably withheld); *provided* that the Participant shall be subject to the provisions in Section 2.12 as if it were an assignee under clauses (a) and (b) of this Section 13.6. Each Lender that sells a participation shall, acting solely for this purpose as a nonfiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"). The entries in the Participant Register shall be conclusive, absent manifest error, and each party hereto shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. No Lender shall have any obligation to disclose all or any portion of the Participant Register to any Person (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(d)      Any Lender may, without the consent of the Borrower, any Issuing Bank or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or any central bank having jurisdiction over such Lender, and this Section 13.6 shall not apply to any such pledge or assignment of a security interest; *provided* that

no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  In order to facilitate such pledge or assignment or for any other reason, the Borrower hereby agrees that, upon request of any Lender at any time and from time to time after the Borrower has made its initial borrowing hereunder, the Borrower shall provide to such Lender, at the Borrower's own expense, a promissory note, substantially in the form of <u>Exhibit H</u>, evidencing the Loans owing to such Lender.

(e)     Subject to <u>Section 13.16</u>, the Borrower authorizes each Lender to disclose to any Participant, secured creditor of such Lender or assignee (each, a "<u>Transferee</u>") and any prospective Transferee this Agreement and the other Credit Documents, information regarding the Loans and the Letters of Credit, and any and all financial information in such Lender's possession concerning the Borrower and its Affiliates that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates pursuant to this Agreement or that has been delivered to such Lender by or on behalf of the Borrower and its Affiliates in connection with such Lender's credit evaluation of the Borrower and its Affiliates prior to becoming a party to this Agreement.

(f)     The words "execution," "signed," "signature," and words of like import in any Assignment and Acceptance shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(g)     Notwithstanding anything to the contrary contained herein, any Lender (a "<u>Granting Lender</u>") may grant to a special purpose funding vehicle (a "SPV"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make the Borrower pursuant to this Agreement; *provided* that (i) nothing herein shall constitute a commitment by any SPV to make any Loan and (ii) if an SPV elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPV hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPV shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPV, it shall not institute against, or join any other person in instituting against, such SPV any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this <u>Section 13.6</u>, any SPV may (A) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions (consented to by the Borrower and Administrative Agent) providing liquidity and/or credit support to or for the account of such SPV to support the funding or maintenance of Loans and (B) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPV.  This <u>Section 13.6(g)</u> may not be amended without the written consent of the SPV.  Notwithstanding anything to the contrary in this Agreement, subject to the following sentence, each SPV shall be entitled to the benefits of <u>Sections 2.10, 2.11, 3.5</u> and <u>5.4</u> to the same extent as if it were a Lender (subject to the limitations and requirements of <u>Sections 2.10, 2.11, 3.5</u> and <u>5.4</u> as though it were a Lender), and <u>Sections 2.12</u> and <u>13.7</u>, and has acquired its interest by assignment pursuant to <u>clause (b)</u> of this <u>Section 13.6</u>.  Notwithstanding the prior

sentence, an SPV shall not be entitled to receive any greater payment under Section 2.10, 2.11, 3.5 or 5.4 than its Granting Lender would have been entitled to receive absent the grant to such SPV, unless such grant to such SPV is made with the Borrowers' prior written consent (which consent shall not be unreasonably withheld or delayed).

(h)     [Reserved].

(i)     Ineligible Institutions.  The Borrower has delivered to the Administrative Agent on or prior to the Closing Date a list of Ineligible Institutions, which list may be updated from to time by the Borrower in order to add one or more operational competitors of the Borrower to such list; provided that (A) in order to be effective, any such update must be provided in writing to the Administrative Agent at JPMDQ_Contact@jpmorgan.com (or such other address as the Administrative Agent (including any successor Administrative Agent) shall designate in writing to the Borrower) with confirmation of receipt requested, (B) such update shall not be effective until three (3) Business Days after receipt of written confirmation from the Administrative Agent, (C) notwithstanding anything to the contrary included in the original list of Ineligible Institutions or any such update to such list, no Affiliate of any specified Ineligible Institution shall be considered an Ineligible Institution unless Affiliates are expressly indicated in the original list or any such update and then only to the extent any such Affiliate is clearly identifiable solely on the basis of the similarity of its name to the specified Ineligible Institution, and (D) in no event shall any updates to the list of Ineligible Institutions provide for retroactive effect (and any statement to the contrary contained in any such update shall be disregarded and have no effect).  In the event that a Lender proposes in good faith to assign all or a portion of its Commitments and Loans in accordance with clause (b) of this Section 13.6 to a bona fide assignee, such Lender may request in writing to the Borrower (with a copy to the Administrative Agent) that the Borrower confirm in writing that the specified proposed assignee is not an Ineligible Institution, and the Borrower will either respond to such request in good faith promptly following receipt, but in any event with three (3) Business Days or, if the Borrower does not so respond, such Lender may deem such proposed assignee as not constituting an Ineligible Institution.  The Administrative Agent shall not be responsible or have any liability for, or have any duty to ascertain, inquire into, monitor or enforce, compliance with the provisions hereof relating to Ineligible Institutions.  Without limiting the generality of the foregoing, the Administrative Agent shall not (i) be obligated to ascertain, monitor or inquire as to whether any assignee Lender or Participant or prospective assignee Lender or Participant is an Ineligible Institution or (ii) have any liability with respect to or arising out of any assignment or participation of Commitments or Loans, or disclosure of confidential information, to any Ineligible Institution.

13.7     [Reserved].

13.8     Adjustments; Set-off.

(a)     If any Lender (a "benefited Lender") shall at any time receive any payment in respect of any principal of or interest on all or part of the Loans made by it, or the participations in Letter of Credit Obligations held by it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender entitled thereto, if any, in respect of such other Lender's Loans, or interest thereon, such benefited Lender shall (i) notify the Administrative Agent of such fact, and (ii) purchase for cash at face value from the other Lenders a participating interest in such portion of each such other Lender's Loans, or shall provide such other Lenders with the benefits of any such collateral, or the proceeds thereof, as shall be necessary to cause such benefited Lender to share the excess payment or benefits of such collateral or proceeds ratably in accordance with the aggregate principal of and accrued interest on their respective Loans and other amounts owing them; provided, however, that, (A) if all or any portion of such excess payment or benefits is thereafter recovered from such benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery,

WEIL:\97169709\10\74473.0003

but without interest and (B) the provisions of this paragraph shall not be construed to apply to (1) any payment made by the Borrower or any other Credit Party pursuant to and in accordance with the terms of this Agreement and the other Credit Documents or (2) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, Commitments or participations in Drawings to any assignee or participant. Each Credit Party consents to the foregoing and agrees, to the extent it may effectively do so under Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Credit Party rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Credit Party in the amount of such participation.

(b)      Subject to the DIP Order, after the occurrence and during the continuance of an Event of Default, in addition to any rights and remedies of the Lenders provided by Requirements of Law, each Lender shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable Requirements of Law, upon any amount becoming due and payable by the Borrower hereunder or under any Credit Document (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.15(f)</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Collateral Agent, the Issuing Banks, and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Lender agrees promptly to notify the Borrower (and the Credit Parties, if applicable) and the Administrative Agent after any such set-off and application made by such Lender; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

13.9      <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by facsimile or other electronic transmission, *i.e.* a "pdf" or a "tif"), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

13.10      <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

13.11      <u>Integration</u>.  This Agreement and the other Credit Documents represent the agreement of the Borrower, the Guarantors, the Collateral Agent, the Administrative Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Borrower, the Guarantors, any Agent nor any Lender relative to subject matter hereof not expressly set forth or referred to herein or in the other Credit Documents.  To the extent there are any inconsistencies between the terms of this Agreement or any Credit Document and the DIP Order, the provisions of the DIP Order shall govern.

13.12      <u>GOVERNING LAW</u>.      THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND

INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

13.13    <u>Submission to Jurisdiction; Waivers</u>.   Each party hereto hereby irrevocably and unconditionally:

(a)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Credit Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, in the courts of the State of New York and the courts of the United States of America for the Southern District of New York, in each case located in New York County, and appellate courts from any thereof;

(b)    consents that any such action or proceeding shall be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(c)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Person at its address set forth on <u>Schedule 13.2</u> at such other address of which the Administrative Agent shall have been notified pursuant to <u>Section 13.2</u>;

(d)    agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by Requirements of Law or shall limit the right to sue in any other jurisdiction;

(e)    waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this <u>Section 13.13</u> any special, exemplary, punitive or consequential damages; and

(f)    agrees that a final judgment in any action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

13.14    <u>Acknowledgments</u>.   The Borrower hereby acknowledges that:

(a)    it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Credit Documents;

(b)    (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Credit Document) are an arm's-length commercial transaction between the Borrower and the other Credit Parties, on the one hand, and the Administrative Agent, the Issuing Banks, the Lenders and the other Agents on the other hand, and the Borrower and the other Credit Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated hereby and by the other Credit Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, each of the Administrative Agent, the other Agents, the Issuing Banks, and the Lenders, is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary for any of the Borrower, any other Credit Parties or any of their respective Affiliates, equity holders, creditors or employees or any other Person; (iii) none of the Administrative Agent, any other Agent, any Issuing Bank or any Lender has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Credit Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification

hereof or of any other Credit Document (irrespective of whether the Administrative Agent or any other Agent, any Issuing Bank, or any Lender has advised or is currently advising any of the Borrower, the other Credit Parties or their respective Affiliates on other matters) and none of the Administrative Agent, any Agent, any Issuing Bank or any Lender has any obligation to any of the Borrower, the other Credit Parties or their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Credit Documents; (iv) the Administrative Agent and its Affiliates, each other Agent and each of its Affiliates, each Issuing Bank and each of its Affiliates and each Lender and its Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower and its respective Affiliates, and none of the Administrative Agent, any other Agent, or any Lender has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; (v) neither it nor any of its Subsidiaries will assert any claim against the Administrative Agent, any Agent, any Issuing Bank or any Lender based on an alleged breach of fiduciary duty by any such Person in connection with this Agreement and the transactions contemplated hereby; and (vi) none of the Administrative Agent, any Agent, any Issuing Bank or any Lender has provided and none will provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Credit Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate.  The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and each Agent with respect to any breach or alleged breach of agency or fiduciary duty; and

(c)      no joint venture is created hereby or by the other Credit Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Borrower, on the one hand, and any Lender, on the other hand.

13.15   WAIVERS OF JURY TRIAL.   THE BORROWER, EACH AGENT, EACH ISSUING BANK AND EACH LENDER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

13.16   Confidentiality.  The Administrative Agent, each other Agent, any Issuing Bank and each other Lender shall hold all information not marked as "public information" and furnished by or on behalf of the Borrower or any of its Subsidiaries with respect to the Borrower or any of its subsidiaries and their businesses ("Confidential Information"), confidential in accordance with its customary procedure for handling confidential information of this nature and in any event may make disclosure (a) as required or requested by any Governmental Authority, self-regulatory agency or representative thereof or pursuant to legal process or applicable Requirements of Law, (b) to such Lender's or the Administrative Agent's, any Issuing Bank's or such other Agent's attorneys, advisors, financial or business consultants, accountants, independent auditors, trustees, agents or Affiliates (and any Affiliate's attorneys, professional advisors, independent auditors, trustees or agents), in each case who need to know such information in connection with the administration of the Credit Documents and are informed of the confidential nature of such information, (c) to an investor or prospective investor in a securitization that agrees its access to information regarding the Credit Parties, the Loans and the Credit Documents is solely for purposes of evaluating an investment in a securitization and who agrees to treat such information as confidential, (d) to a trustee, collateral manager, servicer, backup servicer, noteholder or secured party in connection with the administration, servicing and reporting on the assets serving as collateral for a securitization and who agrees to treat such information as confidential, (e) to a nationally recognized ratings agency that requires access to information regarding the Credit Parties, the Loans and Credit Documents in connection with ratings issued with respect to a securitization, and (f) to the extent such Confidential Information becomes public other than by reason of disclosure by such Person in breach of this Agreement; (g) to any other party to this Agreement, (h) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder, or (i) subject to an agreement containing provisions substantially the same as those of this Section 13.16, to (1) any assignee of or Participant in, or any prospective assignee of

or Participant in, any of its rights and obligations under this Agreement, or (2) any actual or prospective party (or its advisors) to any swap, derivative or other transaction relating to the Borrower and its obligations; *provided* that unless specifically prohibited by applicable Requirements of Law, each Lender, the Administrative Agent, any Issuing Bank and each other Agent shall endeavor to notify the Borrower (without any liability for a failure to so notify the Borrower) of any request made to such Lender, the Administrative Agent, any Issuing Bank or such other Agent, as applicable, by any governmental, regulatory or self-regulatory agency or representative thereof (other than any such request in connection with an examination of the financial condition of such Lender by such governmental agency) for disclosure of any such non-public information prior to disclosure of such information; *provided further* that in no event shall any Lender, the Administrative Agent, any Issuing Bank or any other Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary. In addition, each Lender, the Administrative Agent and each other Agent may provide Confidential Information to prospective Transferees or to any pledgee referred to in <u>Section 13.6</u> or to prospective direct or indirect contractual counterparties in Hedge Agreements to be entered into in connection with Loans made hereunder as long as such Person is advised of and agrees to be bound by the provisions of this <u>Section 13.16</u> or confidentiality provisions at least as restrictive as those set forth in the <u>Section 13.16</u>.

13.17    <u>Release of Collateral and Guarantee Obligations.</u>

(a)    The Lenders hereby irrevocably agree that the Liens granted to the Collateral Agent by the Credit Parties on any Collateral shall be automatically released (i) in full, as set forth in <u>clause (b)</u> below, (ii) upon the Disposition of such Collateral (including as part of or in connection with any other Disposition permitted hereunder) to any Person other than another Credit Party (other than Holdings), to the extent such Disposition is made in compliance with the terms of this Agreement (and the Collateral Agent may rely conclusively on a certificate to that effect provided to it by any Credit Party upon its reasonable request without further inquiry), (iii) to the extent such Collateral is comprised of property leased to a Credit Party, upon termination or expiration of such lease, (iv) if the release of such Lien is approved, authorized or ratified in writing by the Majority Lenders (or such other percentage of the Lenders whose consent may be required in accordance with <u>Section 13.1</u>), (v) to the extent the property constituting such Collateral is owned by any Guarantor, upon the release of such Guarantor from its obligations under the Guarantee in accordance with the second succeeding sentence and [Section 5(g) of the Guarantee]) and (vi) as required by the Collateral Agent to effect any Disposition of Collateral in connection with any exercise of remedies of the Collateral Agent pursuant to the Security Documents.  Any such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those being released) upon (or obligations (other than those being released) of the Credit Parties in respect of) all interests retained by the Credit Parties, including the proceeds of any Disposition, all of which shall continue to constitute part of the Collateral except to the extent otherwise released in accordance with the provisions of the Credit Documents.  Additionally, the Lenders hereby irrevocably agree that the Guarantors shall be released from the Guarantees upon consummation of any transaction permitted hereunder resulting in such Subsidiary ceasing to constitute a Restricted Subsidiary or otherwise becoming an Excluded Subsidiary.  The Lenders hereby authorize the Administrative Agent and the Collateral Agent, as applicable, to execute and deliver any instruments, documents, and agreements necessary or desirable to evidence and confirm the release of any Guarantor or Collateral pursuant to the foregoing provisions of this paragraph, all without the further consent or joinder of any Lender.  Any representation, warranty or covenant contained in any Credit Document relating to any such Collateral or Guarantor shall no longer be deemed to be repeated.  In connection with any release hereunder, the Administrative Agent and Collateral Agent shall promptly (and the Lenders hereby authorize the Administrative Agent and Collateral Agent to) take such action and execute any such documents as may be reasonably requested by the Borrower and at the Borrower's expense in connection with the release of any Liens created by any Credit Document in respect of such Subsidiary, property or asset (including the termination of any Control Agreement).

(b)    Notwithstanding anything to the contrary contained herein or any other Credit Document, when all Obligations (other than (i) Hedging Obligations in respect of any Secured Hedge

Transaction, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent or indemnification obligations not then due) have been paid in full in cash or equivalents thereof, all Commitments have terminated or expired and no Letter of Credit shall be outstanding that is not Cash Collateralized or back-stopped, upon request of the Borrower, the Administrative Agent and/or Collateral Agent, as applicable, shall (without notice to, or vote or consent of, any Secured Party) take such actions as shall be required to release its security interest in all Collateral, and to release all obligations under any Credit Document, whether or not on the date of such release there may be any (i) Hedging Obligations in respect of any Secured Hedge Transaction, (ii) Cash Management Obligations in respect of any Secured Cash Management Agreements and (iii) any contingent or indemnification obligations not then due. Any such release of Obligations shall be deemed subject to the provision that such Obligations shall be reinstated if after such release any portion of any payment in respect of the Obligations guaranteed thereby shall be rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower or any Guarantor, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any Guarantor or any substantial part of its property, or otherwise, all as though such payment had not been made.

13.18    USA PATRIOT Act.  The Agents and each Lender hereby notify the Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies each Credit Party, which information includes the name and address of each Credit Party and other information that will allow such Agent and such Lender to identify each Credit Party in accordance with the Patriot Act.

13.19    Payments Set Aside.  To the extent that any payment by or on behalf of the Borrower is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share of any amount so recovered from or repaid by any Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the applicable Overnight Rate from time to time in effect.

13.20    Reinstatement.  This Agreement shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any other Secured Party upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, the Borrower or any substantial part of its property, or otherwise, all as though such payments had not been made.

13.21    Disposition of Proceeds.  The Security Documents contain an assignment by the Borrower and/or the Guarantors unto and in favor of the Collateral Agent for the benefit of the Lenders of all of the Borrower's or each Guarantor's interest in and to their as-extracted collateral in the form of production and all proceeds attributable thereto which may be produced from or allocated to the Mortgaged Property.  The Security Documents further provide in general for the application of such proceeds to the satisfaction of the Obligations described therein and secured thereby.  Notwithstanding the assignment contained in such Security Documents, until the occurrence of an Event of Default and subject to the DIP Order, (a) the Administrative Agent and the Lenders agree that they will neither notify the purchaser or purchasers of such production nor take any other action to cause such proceeds to be remitted to the Administrative Agent or the Lenders, but the Lenders will instead permit such proceeds to be paid to the Borrower and its Subsidiaries and (b) the Lenders

hereby authorize the Administrative Agent to take such actions as may be necessary to cause such proceeds to be paid to the Borrower and/or such Subsidiaries.

13.22    Collateral Matters; Hedge Agreements.  The benefit of the Security Documents and of the provisions of this Agreement relating to any Collateral securing the Obligations shall also extend to and be available on a pro rata basis pursuant to terms agreed upon in the Credit Documents to any Person (a) under any Secured Hedge Transaction, in each case, after giving effect to all netting arrangements relating in any Hedge Agreements under which such Secured Hedge Transaction was entered into or (b) under any Secured Cash Management Agreement *provided* that, with respect to any Secured Hedge Transaction or Secured Cash Management Agreement that remains secured after the Hedge Bank thereto or the Cash Management Bank thereunder is no longer a Lender or an Affiliate of a Lender, the provisions of Section 12 shall also continue to apply to such Hedge Bank or Cash Management Bank in consideration of its benefits hereunder and each such Hedge Bank or Cash Management Bank, as applicable, shall, if requested by the Administrative Agent, promptly execute and deliver to the Administrative Agent all such other documents, agreements and instruments reasonably requested by the Administrative Agent to evidence the continued applicability of the provisions of Section 12.  No Person shall have any voting rights under any Credit Document solely as a result of the existence of obligations owed to it under any such Secured Hedge Transaction or Secured Cash Management Agreement.

13.23    Agency of the Borrower for the Other Credit Parties.  Each of the other Credit Parties hereby appoints the Borrower as its agent for all purposes relevant to this Agreement and the other Credit Documents, including the giving and receipt of notices and the execution and delivery of all documents, instruments and certificates contemplated herein and therein and all modifications hereto and thereto.

13.24    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.  Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

13.25    Acknowledgement Regarding Any Supported QFCs.  To the extent that the Credit Documents provide support, through a guarantee or otherwise, for Hedge Agreements or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution

WEIL:\97169709\10\74473.0003

-123-

Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Credit Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States or any other state of the United States):

In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Credit Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Credit Documents were governed by the laws of the United States or a state of the United States. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

**[SIGNATURE PAGES FOLLOW]**

WEIL:\97169709\10\74473.0003

EXECUTION VERSION

<u>Exhibit B</u>

<u>EP Energy LLC</u>
<u>Senior Secured Exit Facility</u>
<u>Summary of Principal Terms and Conditions</u>

Set forth below is a summary of the principal terms and conditions for the Exit Facility.  Capitalized terms used but not defined shall have the meanings set forth in the Commitment Letter to which this <u>Exhibit B</u> is attached.

| | |
|---|---|
| <u>Borrower:</u> | EP Energy LLC, a Delaware limited liability company (the "***Borrower***"). |
| <u>Holdings:</u> | EPE Acquisition, LLC, a Delaware limited liability company ("***Holdings***"). |
| <u>Exit Facility Administrative Agent:</u> | JPMorgan Chase Bank, N.A. ("***JPMCB***"), acting through one or more of its branches or affiliates, will act as sole administrative agent for the Exit Facility (as defined below) (in such capacity, the "***Exit Facility Administrative Agent***") and sole collateral agent for the Exit Facility (in such capacity, the "***Exit Facility Collateral Agent***"), and will perform the duties customarily associated with such roles. |
| <u>Lead Arranger:</u> | JPMCB will act as the lead arranger for the Exit Facility (in such capacity, the "***Exit Facility Arranger***"), and will perform the duties customarily associated with such role. |
| <u>Bookrunner:</u> | JPMCB will act as the bookrunner for the Exit Facility (the "***Exit Facility Bookrunner***"), and will perform the duties customarily associated with such role. |
| <u>Exit Facility:</u> | On the Exit Facility Conversion Date (as defined below), the DIP Facility and all outstanding Prepetition RBL Claims that were not converted into the DIP Facility will, subject to the terms and conditions set forth herein, automatically be converted to the senior secured exit credit facility comprising the Exit Revolving Facility and the Exit Term Facility (each as defined below) (collectively, the "***Exit Facility***"). |
| <u>Exit Revolving Facility:</u> | On the Exit Facility Conversion Date, the DIP Facility and the remaining principal amount of any Prepetition RBL Claims (if any) of each Prepetition RBL Lender that is also a DIP Lender[1] (as defined below) will, subject to the terms and conditions set forth herein, automatically be converted to a senior secured, first-out, revolving credit facility subject to a Borrowing Base (as defined below) and with commitments in an aggregate maximum principal amount of up to $629,420,912 *less* the aggregate principal amount of the Exit Term Facility, if any, (the "***Exit Revolving Facility***"). |

---

[1] To the extent 100% Lender approval is obtained, the second out tranche mechanics/terms will be removed.

733723764 12335469

EXECUTION VERSION

The loans under the Exit Revolving Facility are collectively referred to as "***Revolving Loans***" and the lenders making commitments under the Exit Revolving Facility are collectively referred to as "***Revolving Lenders***".

Each Revolving Lender's "***Commitment***" under the Exit Revolving Facility means, with respect to such Revolving Lender, its commitment to make Revolving Loans and acquire participations in Letters of Credit under the Exit Revolving Facility, expressed as an amount that shall be at any time the lesser of (i) such Revolving Lender's Maximum Exit Commitment Amount (as defined below) and (ii) such Revolving Lender's Applicable Revolving Commitment Percentage (as defined below) of an amount equal to (x) the Borrowing Base at such time *minus* (y) the Term Facility Amount (as defined below) at such time.

As of the Exit Facility Conversion Date, each Revolving Lender's commitment with respect to the Exit Facility shall be listed on the commitment schedule to the Exit Facility Documentation (with respect to each Revolving Lender, such Revolving Lender's "***Maximum Exit Commitment Amount***").   Thereafter, no Revolving Lender's Commitment shall be increased above such amount without its consent notwithstanding an increase in the Borrowing Base approved by all of the Revolving Lenders.

"***Applicable Revolving Commitment Percentage***" means, at any time, for each Revolving Lender, the percentage obtained by dividing (a) such Revolving Lender's Maximum Exit Commitment Amount at such time by (b) the aggregate amount of all Revolving Lender's Maximum Exit Commitment Amounts at such time; *provided* that at any time when the Commitments have been terminated, each Revolving Lender's Applicable Revolving Commitment Percentage shall be the percentage obtained by dividing (i) such Revolving Lender's Total Revolving Outstandings (as defined below) at such time by (ii) the aggregate Total Revolving Outstandings of all Revolving Lenders at such time.

Exit Term Facility:

On the Exit Facility Conversion Date, the aggregate principal amount of any Prepetition RBL Claims of each Prepetition RBL Lender that is not a DIP Lender (if any, the "***Term Lenders***" and together with the Revolving Lenders, collectively, the "***Lenders***") will automatically be converted to a non-amortizing, last-out term loan facility secured in a manner *pari passu* with the Exit Revolving Facility (the "***Exit Term Facility***").  The loans under the Exit Term Facility are collectively referred to as "Term Loans" and together with Revolving Loans, the "***Exit Loans***". "***Term Facility Amount***" means, at any time from and after the Exit Facility Conversion Date, an amount equal to the aggregate outstanding principal of all Term Loans at such time.

Without limiting the payment priority set forth in the mandatory and voluntary prepayment provisions below, all proceeds of Collateral (as defined below) after the occurrence and during the continuance

of an event of default shall be allocated, *first*, to pay all amounts outstanding under the Exit Revolving Facility (including, without limitation, interest, principal, fees, unreimbursed amounts drawn under Letters of Credit (as defined below) and cash-collateralization of undrawn Letters of Credit) and, *second*, to pay amounts outstanding under the Exit Term Facility.

| | |
|---|---|
| <u>Swingline Facility:</u> | In connection with the Exit Revolving Facility, JPMCB (in such capacity, the "***Swingline Lender***") will make available to the Borrower a swingline facility (the "***Swingline Facility***") in U.S. dollars under which the Borrower may make short-term borrowings upon same-day notice ((so long as notice delivered by 3:00 pm New York City time) in a maximum amount at any time outstanding not to exceed $25,000,000 and in a minimum amount of $100,000 and integral increments of $10,000 in excess thereof, subject to customary notice requirements *provided* that no swingline loans shall be made if such swingline loan would cause the Total Revolving Outstandings to exceed the Revolving Loan Limit (as defined below). Except for purposes of calculating the commitment fee described below, any such swingline borrowings will reduce Availability (as defined below) under the Exit Revolving Facility on a dollar-for-dollar basis. Repayment of swingline loans must occur on or prior to the earlier of 15 business day after the making of such loan or the swingline maturity date. |

Upon notice from the Swingline Lender, the Revolving Lenders will be unconditionally obligated to purchase participations in any swingline loan, on a pro rata basis, based upon their commitments under the Exit Revolving Facility.

If any Revolving Lender becomes a Defaulting Lender (as defined below), then the swingline exposure of such Defaulting Lender will automatically be reallocated among Revolving Lenders that are not Defaulting Lenders, on a pro rata basis in accordance with their Commitments under the Exit Revolving Facility, up to an amount such that the revolving credit exposure of each Revolving Lender that is not a Defaulting Lender does not exceed its respective Commitment. In the event such reallocation does not fully cover the exposure of such Defaulting Lender, the Swingline Lender may require the Borrower to repay such "uncovered" exposure in respect of the swingline loans and will have no obligation to make new swingline loans to the extent such swingline loans would cause Total Revolving Outstandings to exceed the aggregate Commitments of the Revolving Lenders that are not Defaulting Lenders.

| | |
|---|---|
| <u>Letters of Credit:</u> | The Exit Revolving Facility will be available to the Borrower for the purpose of issuing letters of credit up to an aggregate amount of $100,000,000 (the "***Letters of Credit***"); *provided* that no Letter of Credit shall be issued if the stated amount of such Letter of Credit would cause the Total Revolving Outstandings to exceed the Revolving Loan Limit. Letters of Credit will be issued by JPMCB, Citi, and other consenting Revolving Lenders at the Borrower's |

request if reasonably acceptable to the Exit Facility Administrative Agent (each, an "**Issuing Bank**").  Each Letter of Credit shall expire not later than the earlier of (a) one year after its date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank and (b) the fifth business day prior to the final maturity of the Exit Facility; *provided* that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months or such longer period of time as may be agreed by the applicable Issuing Bank (which in no event shall extend beyond the date referred to in clause (b) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably satisfactory to the relevant Issuing Bank at 103% of the undrawn stated amount thereof, *provided*, that no Revolving Lender shall be required to fund participations in Letters of Credit after the maturity date applicable to its respective Commitment).  Each Issuing Bank (other than the Exit Facility Administrative Agent or its affiliates) shall provide at least once weekly a list of all then outstanding Letters of Credit issued by it.

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the Exit Revolving Facility) within one business day after the drawing if notice thereof is received from the relevant Issuing Bank by 11:00 am New York City time on the next business day following such drawing (or within one business day of receipt of the notice if notice is received after 11:00 am).  To the extent that the Borrower does not reimburse the Exit Facility Administrative Agent for the account of the Issuing Bank within the time period specified above, the Revolving Lenders under the Exit Revolving Facility shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their respective Commitments.

If any Revolving Lender becomes a Defaulting Lender (as defined below), then the Letter of Credit exposure of such Defaulting Lender will automatically be reallocated among the Revolving Lenders that are not Defaulting Lenders pro rata in accordance with their Commitments under the Exit Revolving Facility up to an amount such that the revolving credit exposure of each such non-Defaulting Revolving Lender does not exceed its respective Commitment.  In the event that such reallocation does not fully cover the Letter of Credit exposure of such Defaulting Lender, the applicable Issuing Bank may require the Borrower to cash collateralize such "uncovered" exposure in respect of each outstanding Letter of Credit at 103% of the undrawn stated amount thereof and will have no obligation to issue new Letters of Credit, or to extend, renew or amend existing Letters of Credit to the extent Letter of Credit exposure would exceed the Commitments of the Revolving Lenders that are not Defaulting Lenders, unless such "uncovered" exposure is cash collateralized to such Issuing Bank's reasonable satisfaction at 103% of the undrawn stated amount thereof.

EXECUTION VERSION

| | |
|---|---|
| Defaulting Lenders: | The Exit Facility shall also contain usual and customary provisions regarding Defaulting Lenders. |

"*Defaulting Lender*" means any Lender that (a) has failed, within two business days of the date required to be funded or paid, to (i) fund any portion of its Revolving Loans, (ii) fund any portion of its participations in Letters of Credit or swingline loans or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Lender notifies the Exit Facility Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under the Exit Facility Documentation (as defined below) (unless such writing or public statement indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Revolving Loan under the Exit Facility Documentation cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three business days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Revolving Loans and participations in then outstanding Letters of Credit and swingline loans under the Exit Facility Documentation, *provided* that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Exit Facility Administrative Agent, or (d) has become the subject of (i) a bankruptcy event or (ii) a bail-in action under the European Union bail-in regime.

| | |
|---|---|
| Purpose / Use of Proceeds: | On the Exit Facility Conversion Date, (a) the Prepetition RBL Claims of the Term Lenders shall be automatically converted into Term Loans on a dollar for dollar basis, (b) the proceeds of Revolving Loans up to an aggregate amount such that the Borrower satisfies the conditions precedent to the Exit Facility Conversion Date (including the Term Facility Amount and the borrowing of Revolving Loans hereunder) may be used (i) to repay in full all outstanding amounts owing under the DIP Facility, (ii) for payments contemplated by the Approved Plan, and (iii) for the payment of fees and expenses in connection with the Transactions (including fees and expenses related to the Credit Parties' emergence from the Chapter 11 Cases); and (c) letters of credit under the DIP Facility that are outstanding on the Exit Facility Conversion Date shall automatically be deemed to have been issued under the Exit Revolving Facility. |

"*Approved Plan*" means a chapter 11 plan for the Credit Parties (as defined below) and, at the Borrower's option, any other affiliated debtors and debtors in possession, which shall (a) be consistent in all material respects with this Term Sheet and give effect to the transactions contemplated by this Term Sheet, or (b) otherwise be in form and substance reasonably satisfactory to the Exit Facility Administrative Agent and the Required Revolving Lenders (as defined below).  For the avoidance of doubt, the plan described in the "Restructuring Term Sheet" attached as Exhibit A to the Plan Support Agreement filed in the Chapter 11 Cases on October 18, 2019 shall constitute an Approved Plan.

On any date <u>after</u> the Exit Facility Conversion Date:

(a) the proceeds of Revolving Loans will be used by the Borrower (i) for the acquisition, development and exploration of oil and gas properties, (ii) to provide for the working capital needs of the Borrower and its restricted subsidiaries and (iii) for other general corporate purposes of the Borrower and its restricted subsidiaries (including, without limitation, for permitted acquisitions), subject to the limitations set forth below the section captioned "Revolving Availability"; and

(b) swingline loans and Letters of Credit (as defined below) will be used by the Borrower and its restricted subsidiaries for general corporate purposes and to support deposits required under purchase agreements pursuant to which the Borrower or one or more restricted subsidiaries may acquire oil and gas properties and other assets.

|  |  |
|---|---|
| <u>Revolving Availability:</u> | From and after the Exit Facility Conversion Date, so long as the Total Revolving Outstandings do not exceed the Revolving Loan Limit: (i) loans under the Exit Revolving Facility will be available at any time (on same day notice in the case of ABR loans (as defined in <u>Annex I</u>)) if notice is made prior to 11:00 am New York City time on such day, or prior to 1:00 pm New York City time at least 3 business days, in the case of LIBOR loans, in minimum principal amounts of $500,000 and increments of $100,000 in excess thereof, (ii) Letters of Credit will be available to be issued as described in the section captioned "Letters of Credit," (iii) swingline loans will be available as described in the section captioned "Swingline Facility", and (iv) amounts repaid under the Exit Revolving Facility may be reborrowed. |

The "*Total Revolving Outstandings*" means, at any time, the aggregate principal amount of Revolving Loans then outstanding *plus* the aggregate stated amount of all issued Letters of Credit and, without duplication, all unreimbursed disbursements under any Letter of Credit as of such date (unless cash collateralized or backstopped at 103% of the stated amount thereof pursuant to arrangements reasonably acceptable to the relevant Issuing Bank), and the aggregate principal amount at such time outstanding under the Swingline Facility.

The "***Revolving Loan Limit***" means, at any time, the lesser of (i) the aggregate amount of the Revolving Lenders' Maximum Exit Commitment Amount and (ii) the amount (if positive) equal to the Borrowing Base (as defined below) then in effect *less* the Term Facility Amount at such time.

"***Availability***" shall mean an amount (if positive) equal to the Revolving Loan Limit *less* Total Revolving Outstandings.

Borrowing Base:

The borrowing base for the Exit Facility (the "***Borrowing Base***") at any time shall be based on (i) the Credit Parties' proved oil and gas reserves included in the most recently delivered Reserve Report (as defined below) that are located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the terms set forth below, and (ii) such other reports, data and supplemental information (including the existence of any hedge transactions or other indebtedness) as may be reasonably requested by the Required Revolving Lenders ("***Other Engineering Materials***").

Not less than thirty (30) days prior to, the Borrower's anticipated Exit Facility Conversion Date, the Borrower shall deliver to the Exit Administrative Agent and the Revolving Lenders a reserve report prepared as of December 31, 2019 (the "***Initial Reserve Report***") by Netherland, Sewell & Associates, Inc., Ryder Scott Company Petroleum Consultants, L.P., DeGolyer and MacNaughton, Cawley, Gillespie & Associates, Inc., or another independent petroleum engineering firm reasonably acceptable to the Exit Facility Administrative Agent and the Borrower (any such firm, an "***Approved Petroleum Engineer***") and any Other Engineering Materials (and, to the extent the actual date of the hearing to confirm the Approved Plan is materially delayed, such updates or supplemental material prepared internally by the Borrower as the Exit Facility Administrative Agent shall reasonably request). Within fifteen (15) days after receipt by the Exit Facility Administrative Agent of such Reserve Report and Other Engineering Materials, the Exit Facility Administrative Agent shall recommend to the Revolving Lenders an initial Borrowing Base to become effective on the Exit Facility Conversion Date. Thereafter, the Revolving Lenders shall, not later than fifteen (15) days after receipt of the Exit Facility Administrative Agent's recommended initial Borrowing Base, approve the recommended initial Borrowing Base or propose an alternative initial Borrowing Base. The Exit Facility Administrative Agent and each Revolving Lender shall determine the initial Borrowing Base in its respective sole discretion and consistent with its respective normal and customary oil and gas lending criteria as they exist at the particular time (and, for the avoidance of doubt, in a manner consistent with its application of any guidelines promulgated by the Office of the Comptroller of the Currency or other governmental authority as then in effect ("***Regulatory Guidelines***")). The initial Borrowing Base shall (a) be the largest amount approved by the Exit Facility Administrative Agent and all of the Revolving Lenders, (b) become

effective on the Exit Facility Conversion Date, and (c) remain in effect until the Borrowing Base is otherwise redetermined in accordance with the Exit Facility Documentation.

From and after the Exit Facility Conversion Date, the Borrowing Base shall be redetermined semi-annually on or about May 1st and November 1st of each year, commencing with the first May 1st or November 1st to occur at least 90 days after the Exit Facility Conversion Date, based upon (a) a reserve report prepared as of the immediately preceding December 31st and June 30th, respectively, and other related information, and delivered on or before April 1st and October 1st, respectively (each such report, a "***Reserve Report***"), and (b) Other Engineering Materials, if any, required to be delivered to the Exit Facility Administrative Agent.

Each Reserve Report as of December 31st shall be prepared by one or more Approved Petroleum Engineers. Each Reserve Report as of June 30th shall be prepared, at the election of the Borrower, (x) by one or more Approved Petroleum Engineers or (y) by or under the supervision of the chief engineer of the Borrower in a manner consistent with the preceding December 31st Reserve Report.

Unscheduled redeterminations of the Borrowing Base may be made at any time (a) at the request of the Borrower (including prior to the first scheduled redetermination date as described above) not more than twice in any period of 12 consecutive months, (b) at the request of the Exit Facility Administrative Agent (at the direction of the Required Revolving Lenders), following the first scheduled redetermination, not more than twice in any period of 12 consecutive months, and (c) if requested by the Borrower, at any time between scheduled redeterminations in the event it acquires oil and gas properties with proved reserves that are to be Borrowing Base Properties (as defined below) having a PV 10 (calculated at the time of acquisition) in excess of 5% of the Borrowing Base in effect immediately prior to such acquisition.

To the extent any redetermination represents an increase in the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved by all of the Revolving Lenders and, to the extent any redetermination represents a decrease in, or reaffirmation prior of, the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved by the Required Revolving Lenders. Each redetermination of the Borrowing Base shall be made by the Exit Facility Administrative Agent and each Revolving Lender in its respective sole discretion and consistent with its respective normal and customary oil and gas lending criteria as they exist at the particular time (and, for the avoidance of doubt, in a manner consistent with its application of the Regulatory Guidelines).

In addition to the foregoing, after the Exit Facility Conversion Date, the Borrowing Base will also be subject to adjustments between redeterminations as a result of:

(i)      sales or other dispositions (including in connection with the designation of unrestricted subsidiaries and investments or dispositions of equity interest in a restricted subsidiary owning oil and gas properties) of Borrowing Base Properties included in the most recently delivered Reserve Report relied on by the Revolving Lenders in determining the Borrowing Base, since the later of (A) the last redetermination date and (B) the last adjustment made pursuant to this clause (i) or the following clause (ii), with an aggregate borrowing base value exceeding 7.5% (or 10% in the aggregate, when combined with any monetization, disposition, or termination of any hedge or swap positions contemplated in the following clause (ii)) of the Borrowing Base then in effect whereupon the Borrowing Base may be reduced by an amount up to the aggregate borrowing base value of such sold or disposed Borrowing Base Properties and monetized, disposed or terminated hedge positions, as applicable and without duplication of any reduction pursuant to the following clause (ii);

(ii)     monetization, disposition or early termination of any hedge or swap positions (net of any positions entered into (1) contemporaneously with such monetization, disposition or termination or (2) subsequent to the last redetermination of the Borrowing Base) relied on by the Revolving Lenders in determining the Borrowing Base, since the later of (A) the last redetermination date and (B) the last adjustment made pursuant to this clause (ii) or the preceding clause (i), with an aggregate borrowing base value exceeding 7.5% (or 10% in the aggregate, when combined with any sales or dispositions of Borrowing Base Properties contemplated in the preceding clause (i)) of the Borrowing Base then in effect, whereupon the Borrowing Base may be reduced by an amount up to the aggregate borrowing base value of such monetized, disposed or terminated hedge positions and such sold or disposed Borrowing Base Properties, as applicable and without duplication of any reduction pursuant to the preceding clause (i); and

(iii)    the issuance or incurrence of any Permitted Additional Debt (as defined below) (other than Permitted Additional Debt constituting permitted refinancing indebtedness incurred to refinance indebtedness, but only to the extent that the aggregate principal amount of permitted refinancing indebtedness incurred to refinance such indebtedness does not result in an increase in the principal amount thereof above the principal amount originally incurred or issued up to the original principal amount of the refinanced indebtedness), in which case the Borrowing Base shall be automatically reduced by $0.25 for every $1.00 of Permitted Additional Debt.

The Borrower may within three (3) business days of its receipt of a new Borrowing Base notice, elect in its sole discretion a reduced Borrowing Base.

"***Permitted Additional Debt***" shall mean any senior, senior subordinated or subordinated indebtedness issued by the Borrower or a Guarantor (as defined below), (a) the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the 120th day after the Maturity Date (as defined below) as of the date of determination (other than customary offers to purchase upon a change of control, asset sale or casualty or condemnation event and customary acceleration rights after an event of default), (b) the covenants, events of default, guarantees and other terms of which (other than interest rate, fees, funding discounts and redemption or prepayment premiums determined by the Borrower to be "market" rates, fees, discounts and premiums at the time of issuance or incurrence of any such indebtedness), taken as a whole, are determined by the Borrower to be "market" terms on the date of issuance or incurrence and in any event are not adverse to the interests of the Exit Facility Administrative Agent, the Exit Facility Collateral Agent or the Lenders in any material respect, taken as a whole, relative to the terms of the Borrower's Indenture dated as of May 28, 2015, and do not require the maintenance or achievement of any financial performance standards other than as a condition to taking specified actions; *provided* that a certificate of an authorized officer of the Borrower delivered to the Exit Facility Administrative Agent at least three business days prior to the incurrence or issuance of such indebtedness, together with a reasonably detailed description of the material terms and conditions of such indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the relevant criteria set forth above, as applicable, shall be conclusive evidence that such terms and conditions satisfy such relevant standard, (c) if such indebtedness is subordinated in right of payment to the Obligations (as defined below), the terms of such indebtedness provide for customary subordination of such indebtedness to the Obligations and (d) no subsidiary of the Borrower (other than a Guarantor) is an obligor under such indebtedness.

Accordion:

The Exit Facility will permit the Borrower to increase commitments under the Exit Revolving Facility (any such increase, an "***Incremental Increase***") at any time on or after the Exit Facility Conversion Date in a minimum amount of $10,000,000 per increase (and increments of $1,000,000 above that minimum), by up to a maximum aggregate incremental commitment increase of $300,000,000; *provided* that (a) the Exit Revolving Facility shall not exceed an amount equal to the Borrowing Base then in effect *less* the Term Facility Amount; (b) no existing Lender will be required to participate in any such Incremental Increase without its consent; (c) no event of default under the Exit Facility shall exist before or after giving effect thereto; (d) the Incremental Increase

shall be on the same terms and pursuant to the same documentation applicable to the Exit Revolving Facility (*provided* that the Applicable Margin (as defined below) of such Incremental Increase may be higher than that for the then existing Exit Revolving Facility, in which case, the Applicable Margin for the then existing Exit Revolving Facility shall be increased to be consistent with that for such Incremental Increase); and (e) the maturity date of the Incremental Increase shall be the same as the Maturity Date.

The Borrower may seek commitments in respect of the Incremental Increase, in its sole discretion, from either existing Revolving Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) or from additional banks, financial institutions and other institutional lenders or investors who will become Revolving Lenders in connection therewith ("***Additional Lenders***"), or from both existing Revolving Lenders and Additional Lenders, in each case with the consent of the Exit Facility Administrative Agent, the Swingline Lender and each Issuing Bank (in each case, such consent not to be unreasonably withheld or delayed).

| | |
|---|---|
| <u>Interest Rates and Fees:</u> | As set forth on Annex I to this Exhibit B. |

<u>Default Rate:</u>

If any principal of or interest on any Loan or any fee payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Loan, 2% plus the rate otherwise applicable to such Loan or (ii) in the case of any other amount, 2% plus the rate applicable to ABR Loans.

<u>Final Maturity:</u>

The Exit Facility will mature, and lending commitments will terminate, on the earlier of July 31, 2024 and the date that is four (4) years after the Exit Facility Conversion Date (such date, the "***Maturity Date***").

<u>Guarantees:</u>

All obligations of the Credit Parties (the "***Obligations***") under (i) the Exit Facility and the Exit Facility Documentation, (ii) interest rate protection, commodity trading or hedging, currency exchange or other hedging or swap arrangements permitted under the Exit Facility Documentation and entered into with (x) any Revolving Lender, the Exit Facility Arranger, the Exit Facility Bookrunner, the Exit Facility Administrative Agent or any affiliate of a Revolving Lender, the Exit Facility Arranger, the Exit Facility Bookrunner or the Exit Facility Administrative Agent and (y) counterparties under hedging arrangements in effect on or prior to the Exit Facility Conversion Date, (collectively, the "***Hedging Arrangements***") and (iii) treasury and cash management arrangements entered into with any Revolving Lender or any affiliate of a Revolving Lender ("***Treasury Arrangements***") will be unconditionally guaranteed jointly and severally on a *pari passu* senior secured basis (the "***Guarantees***") by Holdings and each existing and subsequently acquired or organized direct or indirect domestic restricted

subsidiary of the Borrower other than (i) any subsidiary of a foreign subsidiary or (ii) any FSHCO (as defined below), as reorganized pursuant to the Approved Plan (the "*Subsidiary Guarantors*"; together with Holdings, collectively, the "*Guarantors*" and together with the Borrower, collectively, the "*Credit Parties*"); *provided* that the guarantee by Holdings shall be non-recourse and limited to the equity interests of the Borrower); provided, further than certain subsidiaries will not be required to be Subsidiary Guarantors consistent with the Documentation Principles.

Subject to the investments covenant in the Exit Facility Documentation and other customary limitations for exit financings of this type, the Borrower may designate any subsidiary as an "unrestricted subsidiary" and subsequently redesignate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the representations and warranties, covenants, events of default or other provisions of the Exit Facility Documentation, and the results of operations, indebtedness and cash of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial metric contained in the Exit Facility Documentation except to the extent of distributions in the form of cash or cash equivalents actually received therefrom up to a limit to be mutually agreed.

The Exit Facility Documentation shall contain customary provisions to address the status of Guarantors as eligible contract participants.

Security:

The Obligations, the Guarantees and any Hedging Arrangements or Treasury Arrangements will be secured by first-priority security interests in substantially all of the present and after acquired assets of each of the Credit Parties (collectively, but excluding the Excluded Assets (as defined consistent with the Documentation Principles), the "*Collateral*"), including, (a) a first-priority perfected pledge of all the capital stock of the Borrower, each Subsidiary Guarantor and each direct, material restricted subsidiary held by any Credit Party (which pledge, in the case of any subsidiary (x) that is a foreign subsidiary or (y) that owns no material assets (directly or through subsidiaries) other than equity interests (and debt, if applicable) of one or more foreign subsidiaries that are controlled foreign corporations, as defined in Section 957 of the Internal Revenue Code of 1986, as amended (a "*FSHCO*") shall be limited to 65% of the voting power of the voting capital stock), (b) first-priority perfected real property mortgages and deeds of trust on oil and gas reserves, together with the right, title and interest in and to the real property interests from which such oil and gas reserves are derived or on which such oil and gas reserves are located or to which such interests are attributed or derived, of the Credit Parties located in the United States or the outer continental shelf adjacent to the United States included in the most recent Reserve Report delivered to the Exit Facility Administrative Agent (such oil and gas reserves, and related rights, titles and interests, the "*Borrowing Base Properties*") and representing not less than 90% of the PV-10 value of the Credit Parties' proved oil and gas reserves included in

the most recent Reserve Report and (c) a first-priority perfected security interest in all other tangible (other than real property and other oil and gas properties) and intangible assets of the Credit Parties (including but not limited to as-extracted collateral, accounts receivable, inventory, equipment, general intangibles, investment property, deposit accounts (subject to control agreements) other than certain excluded accounts, securities accounts (subject to control agreements), intellectual property and the proceeds of the foregoing).  For the avoidance of doubt, notwithstanding the security and collateral requirements set forth herein, certain "excepted liens" to be agreed, which shall be customary for transactions of this type in the oil & gas exploration and production industry, may exist ("***Permitted Liens***").

In connection with each Reserve Report, the Borrower shall provide to the Exit Facility Administrative Agent such title information as the Exit Facility Administrative Agent may reasonably request, satisfactory to the Exit Facility Administrative Agent, setting forth the status of title to at least 85% of the PV-10 of any Borrowing Base Properties included in such Reserve Report that were not included in the Initial Reserve Report.

All the above-described pledges, security interests and mortgages shall be created on terms set forth in the Exit Facility Documentation, and none of the Collateral or other assets of the Credit Parties shall be subject to other pledges, security interests or mortgages except for customary and usual exceptions for financings of this type (including liens securing permitted junior lien indebtedness subject to existing intercreditor agreements) and Permitted Liens.

<u>Mandatory Prepayments/<br>Adjustments of the Borrowing<br>Base:</u>

"***Borrowing Base Deficiency***" means the aggregate amount of the outstanding Exit Loans, Letters of Credit (including unreimbursed amounts drawn on any Letter of Credit that have not been cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the relevant Issuing Bank), amounts outstanding under swingline loans and outstanding Term Loans, exceeds the Borrowing Base then in effect.

If, at any time after a redetermination of the Borrowing Base in connection with a scheduled or interim redetermination, a Borrowing Base Deficiency exists, then the Borrower shall, within ten (10) business days after written notice from the Exit Facility Administrative Agent to the Borrower of such Borrowing Base Deficiency, notify the Exit Facility Administrative Agent that it intends to take one or a combination of the following actions:

(a)      within thirty (30) days after such election provide additional Borrowing Base Properties to the extent necessary to eliminate such Borrowing Base Deficiency;

(b)       within thirty (30) days after such election, prepay the Loans (in the manner provided below) in an amount sufficient to eliminate such Borrowing Base Deficiency; or

(c)       prepay Loans (in the manner provided below) in an amount sufficient to eliminate such Borrowing Base Deficiency in six equal monthly installments with interest, beginning on the 30th day after the Borrower's receipt of notice of such Borrowing Base Deficiency from the Exit Facility Administrative Agent (as such Borrowing Base Deficiency may be reduced during such six-month period as a result of a Borrowing Base redetermination or other adjustment of the Borrowing Base described herein);

*provided*, in each case, that any such Borrowing Base Deficiency must be cured prior to the Maturity Date;

*provided further*, that any Loan repayments or prepayment pursuant to the foregoing clauses (b) and (c) shall be applied in the following manner: *first*, to the prepayment of Revolving Loans and unreimbursed amounts drawn on any Letter of Credit that have not been cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the relevant Issuing Bank; *second*, if a Borrowing Base Deficiency remains, to provide cash collateral for undrawn amounts under any outstanding Letters of Credit; and *third*, if a Borrowing Base Deficiency remains, to prepay Term Loans.

If the Borrowing Base is reduced as the result of an asset sale, disposition, early monetization or termination of any hedge or swap position or the issuance of Permitted Additional Debt (as described in the section captioned "Borrowing Base") and a Borrowing Base Deficiency results from such reduction, then within one (1) business day after written notice from the Exit Facility Administrative Agent to the Borrower of such Borrowing Base Deficiency, the Borrower shall eliminate such Borrowing Base Deficiency by prepaying loans for application in the manner described above.

To the extent that any reduction in the Borrowing Base results in the Borrowing Base being less than the sum of (x) the aggregate Maximum Exit Commitment Amounts of the Revolving Lenders *plus* (y) the Term Facility Amount, the then-effective Maximum Exit Commitment Amounts of each Revolving Lender shall also be automatically reduced pro rata by the amount of such difference.

<u>Voluntary Prepayments and Reductions in Commitments</u>:

Voluntary reductions of the unutilized portion of the Commitments in a minimum amount of $1,000,000 will be permitted at any time upon two business days' notice, and voluntary prepayments of borrowings under the Exit Revolving Facility will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium or penalty, subject to reimbursement of the Revolving Lenders' redeployment costs actually incurred in the case of a prepayment of LIBOR (as defined

EXECUTION VERSION

in Annex I) borrowings other than on the last day of the relevant interest period.

Additionally, any Borrowing Base Deficiency resulting from a voluntary termination of commitments shall be required to be eliminated on the date of such termination by prepaying loans for application in the manner described above.

Documentation:

The definitive documentation for the Exit Facility (the "***Exit Facility Documentation***") shall be negotiated in good faith and shall contain the representations, warranties, covenants and events of default set forth in this Term Sheet (in each case with materiality thresholds, baskets, exceptions, limitations, qualifications and grace and cure periods to be mutually agreed) and such other provisions customary and usual for exit financings of this type as the parties may mutually agree; provided, that, for the avoidance of doubt, the Exit Facility Credit Agreement shall be negotiated using, but is anticipated to be more restrictive than, the prepetition form of Credit Agreement as the precedent document (collectively, the "***Documentation Principles***").

The Exit Facility Documentation shall include usual and customary provisions in syndicated loan transactions including provisions addressing European Union Bail-In matters, QFC Stay Rules, the discontinuation of the LIBOR and incorporation of alternative rates, lender representations regarding source of funds, Beneficial Ownership/FinCEN compliance, corporate divisions, and credit bidding.

Without limitation in any respect of other provisions included in the Prepetition RBL Facility, the Exit Facility Documentation shall not include provisions substantively comparable to the definition of "Applicable Equity Amount" or baskets or carve-outs by reference thereto, or provisions allowing for classes of Lenders to extend their individual maturity dates (such as those set forth in section 2.17 of the Prepetition RBL Facility).

Conditions to Exit Facility
Conversion Date:

The effectiveness of the Exit Facility and the obligation on the part of the Revolving Lenders to make Revolving Loans available to the Borrower and to acquire participations under the Exit Revolving Facility shall be subject to the conditions precedent set forth below (collectively, the "***Exit Facility Conditions Precedent***" and the date on which such Exit Facility Conditions Precedent are satisfied, the "***Exit Facility Conversion Date***"):

The Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Exit Facility Administrative Agent and the Revolving Lenders, confirming the Approved Plan including approval of the Facilities and releases and exculpation (the "***Confirmation Order***"), and the Confirmation Order shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that would reasonably be expected to

EXECUTION VERSION

adversely affect the interests of the Exit Facility Administrative Agent, the Exit Facility Collateral Agent or the Revolving Lenders and authorizing the Borrower and its restricted subsidiaries to execute, deliver and perform under the Exit Facility Documentation.

The "Effective Date" of the Approved Plan (the "*Plan Effective Date*") and all material transactions contemplated in the Approved Plan or in the Confirmation Order to occur on the Plan Effective Date shall have occurred (or concurrently with the occurrence of Exit Facility Conversion Date, shall occur) in accordance with the terms thereof and in compliance with applicable law, the applicable orders of the Bankruptcy Court and material regulatory approvals.

The DIP Order approving DIP Facility remains in full force and effect and has not been reversed, vacated, stayed, or otherwise modified without the prior written consent of the DIP Agent and DIP Lenders, the DIP Facility remains in effect immediately prior to the Exit Facility Conversion Date, and no event of default shall have occurred and be continuing under the DIP Facility that has not been waived by the Majority Lenders.

All obligations under the DIP Facility shall have been (or concurrently with the Exit Facility Conversion Date shall be), to the extent not automatically converted into Exit Revolving Loans, repaid in full in cash (or, with respect to Letters of Credit, deemed issued under the Exit Revolving Facility).

All obligations (including accrued but unpaid interest, fees, expenses and other amounts) owing under the Prepetition RBL Facility shall have been (or concurrently with the Exit Facility Conversion Date shall be), to the extent not automatically converted into Exit Revolving Loans, repaid in full in cash (or, with respect to Letters of Credit, deemed issued under the Exit Revolving Facility).

The Exit Facility Administrative Agent shall have received satisfactory evidence that immediately after the consummation of the Approved Plan, total outstanding debt for borrowed money net of unrestricted cash and cash equivalents of Holdings, the Borrower and its restricted subsidiaries shall not exceed $1,600,000,000, including not more than $1,500,000,000 in outstanding principal amount under all junior lien indebtedness or other unsecured indebtedness, provided that for purposes of determining compliance with the foregoing condition, the aggregate principal amount of outstanding Term Loans (if any) shall be net of unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries; *provided*, that such caps may be adjusted in a manner to be mutually agreed to reflect certain transactions related to Wolfcamp Drillco Operating L.P. ("*Jeter*") that may be consummated on the Exit Facility Conversion Date.

The sum of the Credit Parties' outstanding principal amount of secured indebtedness (including under any Term Facility Amount) *plus* Availability shall not exceed $2,200,000,000 (the "*Maximum*

***Secured Debt Capacity Condition***"); *provided*, that such cap may be adjusted in a manner to be mutually agreed to reflect certain transactions related to Jeter that may be consummated on the Exit Facility Conversion Date.

The Credit Parties shall have minimum Liquidity of $350,000,000 (calculated in a manner that does not include any cash or cash equivalents netted against outstanding Exit Loans, as required above). "***Liquidity***" shall mean at any time an amount (if positive) equal to Availability *plus* unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries at such time, *minus* the amount of any Borrowing Base Deficiency existing at such time; *provided*, that such minimum liquidity may be adjusted in a manner to be mutually agreed to reflect certain transactions related to Jeter that may be consummated on the Exit Facility Conversion Date.

The Credit Parties shall have entered into hedging transactions with hedge counterparties with respect to not less than 80% of their reasonably anticipated monthly projected production of oil from proved developed producing reserves for each of full calendar months then remaining in the fiscal year ending December 31, 2020.

The Exit Facility Administrative Agent shall have received a customary solvency certificate (after giving effect to the Approved Plan) from the chief financial officer of the Borrower.

Delivery of customary documents and certificates (including organizational documents, evidence of corporate authorization and specimen signatures) and customary legal opinions dated as of the Exit Facility Conversion Date and such other documentation that the Exit Facility Administrative Agent may reasonably request in order to effectuate the Exit Facility.

The Exit Facility Conversion Date shall occur not later than the Maturity Date (as defined in the DIP Credit Agreement).

The Borrower shall have paid or caused to be paid all fees required to be paid to the Exit Facility Arranger, the Exit Facility Administrative Agent and the Lenders under, or in connection with, the Exit Facility, including under the Fee Letters. All reasonable and documented out-of-pocket fees and expenses (including reasonable and documented fees and expenses of outside counsel) required to be paid to the Exit Facility Administrative Agent on or before the Exit Facility Conversion Date shall have been paid to the extent invoiced at least one business day prior to the Exit Facility Conversion Date.

To the extent not otherwise included in the disclosure statement relating to the Approved Plan, the Exit Facility Administrative Agent shall have received a pro forma consolidated balance sheet and any other applicable financial statements of the Borrower and its restricted subsidiaries as of the most recent month and fiscal

quarter ended prior to the Exit Facility Conversion Date for which financial statements are available; provided that for purposes of such financial statements, working capital expenditures will not be required to be included in such financial statements; provided, further, that such financial statements shall not take into account any "fresh start accounting".

All representations and warranties shall be true and correct except in the case of any representation and warranty that expressly related to a given date, such representation and warranty shall be true and correct in all respects as of the respective date.

All actions necessary to establish that the Exit Facility Collateral Agent will have a perfected first priority security interest in the collateral under the Exit Facility shall have been taken, including (i) the Exit Facility Administrative Agent shall be reasonably satisfied that, upon recording of mortgages or other instruments, in each case, in the appropriate filing offices, it shall have a first priority lien on at least 90% of the PV-10 of the Borrowing Base Properties subject to Permitted Liens and (ii) the Borrower's execution and delivery of control agreements in connection with its deposit accounts or securities accounts, as applicable.

Each requesting Revolving Lender shall have received all information in respect of the Credit Parties reasonably requested that is required under applicable "know your customer," anti-terrorism, anti-money laundering, anti-bribery, beneficial ownership or similar law and regulations, in each case, to the extent requested at least 3 business days prior to the Exit Facility Conversion Date and the making of the loans, and the use of proceeds thereof, by the Credit Parties (after giving pro forma effect to the equity ownership on the Exit Facility Conversion Date) shall not result in violation of any anti-terrorism, anti-money laundering, anti-bribery, beneficial ownership or similar law and regulations applicable to the Credit Parties.

The Exit Facility Administrative Agent shall have received such title information as the Exit Facility Administrative Agent may reasonably request in form and substance satisfactory to the Exit Facility Administrative Agent, setting forth the status of title to certain Borrowing Base Properties included in the Initial Reserve Report that have been identified by the Exit Administrative Agent.

**Conditions to All Subsequent Borrowings:**

After the Exit Facility Conversion Date, the making of each Revolving Loan or issuance of Letter of Credit under the Exit Revolving Facility shall be conditioned upon (a) the accuracy of representations and warranties set forth in the Exit Facility Documentation in all material respects with the same effect as though made on and as of such date, except in the case of any representation and warranty which (x) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (y) is qualified by

a materiality or material adverse effect standard in which case such representation and warranty shall be true and correct in all respects, (b) delivery of a customary borrowing notice and (c) the absence of any default or event of default continuing at the time of, and after giving effect to the making of, such extension of credit.

|  |  |
|---|---|
| Representations and Warranties: | Consistent with the Documentation Principles, including: corporate status; corporate power and authority, qualification, execution, delivery and enforceability of Exit Facility Documentation; with respect to the execution, delivery and performance of the Exit Facility Documentation, no violation of, or conflict with, law, charter documents or no breach or default under material agreements; litigation; margin regulations; material governmental approvals with respect to the execution, delivery and performance of the Exit Facility Documentation; Investment Company Act; anti-corruption laws and sanctions; absence of undisclosed liabilities; complete and accurate disclosure; financial condition and financial statements; since the Exit Facility Conversion Date, no Material Adverse Effect (as defined below); tax matters; compliance with ERISA; subsidiaries; intellectual property; creation and perfection of security interests; environmental laws; properties; consolidated closing date solvency; gas imbalances and prepayments; marketing of production; hedging agreements and transactions; insurance; PATRIOT Act and sanctions; foreign corrupt practices act; deposit accounts, securities accounts and commodities accounts; and no knowledge of non-exempt prohibited transactions. |

"*Material Adverse Effect*" shall mean a circumstance or condition affecting the business, assets, operations, properties or financial condition of the Borrower and its subsidiaries, taken as a whole, that, individually or in the aggregate, would materially adversely affect (a) the ability of the Borrower and the other Credit Parties, taken as a whole, to perform their payment obligations under the Exit Facility Documentation or (b) the rights and remedies of the Exit Facility Administrative Agent, the Exit Facility Collateral Agent and the Lenders under the Exit Facility Documentation.

|  |  |
|---|---|
| Affirmative Covenants: | Consistent with the Documentation Principles, including: delivery of annual and quarterly financial statements and other information (within five days after the date such financial statements are to be filed with the SEC, or if such financials are not to be filed with the SEC, on or before 105 days after the end of the fiscal year for annual financial statements and on or before 60 days after the end of each of the first three quarterly accounting periods, and with annual financial statements to be accompanied, by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit other than solely with respect to, or resulting solely from (i) an upcoming maturity date under the Exit Facility occurring within one year from the time such opinion is delivered or (ii) any potential inability to satisfy any financial maintenance covenant on a future date or in a future period); compliance certificates; delivery of information and notices (including environmental matters, insurance certificate, hedge |

transactions, gas imbalances, production reporting and lease operating statements, list of purchasers, incurrence of debt, budget, projections, and marketing agreements); delivery of notices of litigation, defaults and certain material events; inspections (including books and records); maintenance of organizational existence and rights; maintenance of insurance; payment of taxes; compliance with laws (including environmental laws); ERISA; maintenance of fiscal year and fiscal quarters; additional guarantors, grantors and collateral; use of proceeds; further assurances on collateral matters; reserve reports; title information; and maintenance of properties.

The Borrower shall provide to the Administrative Agent (a) within 30 days following the Exit Facility Conversion Date reasonably satisfactory evidence that the Credit Parties shall have entered into hedging transactions with hedge counterparties with respect to not less than 40% of their reasonably anticipated monthly projected production of oil from proved developed producing reserves through and including the first anniversary of the Exit Facility Conversion Date and (b) within 60 days following the Exit Facility Conversion Date reasonably satisfactory evidence that the Credit Parties shall have entered into hedging transactions with hedge counterparties with respect to not less than 80% of their reasonably anticipated monthly projected production of oil from proved developed producing reserves through and including the first anniversary of the Exit Facility Conversion Date.

In addition, Holdings will be subject to a covenant relating to its passive holding company status that prohibits Holdings from engaging in business activities other than its direct or indirect ownership of the equity interests of the Borrower and activities and liabilities incidental thereto; including the incurrence and performance of indebtedness not otherwise prohibited by the Exit Facility.

| | |
|---|---|
| <u>Negative Covenants:</u> | Consistent with the Documentation Principles, including limitations (to be applicable to the Borrower and its restricted subsidiaries) on: |

(a)      the incurrence or maintenance of debt, with exceptions for (i) debt outstanding under the Exit Facility Documentation (including Hedging Arrangements, Treasury Arrangements and the Guarantees thereof); (ii) debt for borrowed money outstanding on the Exit Facility Conversion Date (subject to the terms of any applicable existing intercreditor agreements) and permitted refinancings thereof; (iii) Permitted Additional Debt subject to limitations to be mutually agreed; and (iv) subject to thresholds, basket sizes or other qualifications acceptable to be mutually agreed consistent with the Documentation Principles, certain other additional permitted debt;

(b)      the incurrence or maintenance of liens, with exceptions for (i) liens created under the Exit Facility Documentation

(including those liens securing the any Hedging Arrangements and any Treasury Arrangements); (ii) liens securing debt for borrowed money outstanding on the Exit Facility Conversion Date (subject to the terms of any applicable existing intercreditor agreements); (iii) liens customary in the operation of the oil and gas industry and/or the Borrower's and its restricted subsidiaries' business; (iv) Permitted Additional Debt subject to limitations to be mutually agreed and (v) subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles, certain other permitted liens;

(c)     mergers, amalgamations, divisions and other fundamental changes;

(d)     asset sales, leases, transfers or other dispositions, or early monetization or early termination of any hedge or swap positions, with exceptions for (i) sales of hydrocarbons in the ordinary course; (ii) dispositions of worn out or obsolete equipment; (iii) dispositions of oil and gas properties, subject to adjustment of the Borrowing Base in the case of assets or hedge or swap positions relied on by the Revolving Lenders in determining the Borrowing Base and other conditions, provided that, except in the case of certain types of dispositions to be agreed (e.g., farmouts, de minimis dispositions, similar trades of assets), at least 75% of the proceeds thereof shall be payable in cash; and (iv) subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles, certain other permitted dispositions;

(e)     investments, with exceptions (subject to thresholds, basket sizes or other qualifications acceptable to the Exit Facility Administrative Agent and the Revolving Lenders) for certain other permitted investments;

(f)     dividends or distributions on, or redemptions of, capital stock, with exceptions for (i) so long as, in the case of this clause (i), (A) no event of default exists or would result therefrom, (B) the Leverage Ratio calculated on a pro forma basis for such restricted payment would not exceed 2.25 to 1.00 and (C) there is, on a pro forma basis after giving effect to such restricted payment, minimum Availability of at least 15%; and (ii) subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles, certain other permitted dividends, distributions or redemption (including customary tax distributions);

(g)     prepayments or redemptions of the indebtedness for borrowed money under material unsecured or junior lien

debt documents and amendments of material unsecured or junior lien debt documents, with exceptions for (i) certain other prepayments so long as, in the case of this clause (i), (A) no event of default exists or would result therefrom, (B) the Leverage Ratio calculated on a pro forma basis for such restricted payment would not exceed 3.50 to 1.00 and (C) there is, on a pro forma basis after giving effect to such restricted payment, minimum Availability of at least 15%; (ii) prepayments or redemptions of intercompany debt to the extent that no event of default exists and is continuing; (iii) subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles, certain other prepayments or redemption; and (iv) amendments or other modifications that would not be detrimental to the Exit Facility Administrative Agent, the Exit Facility Collateral Agent or the Revolving Lenders in any material respect;

(h)     limitations on negative pledges and subsidiary distributions;

(i)      commodity hedging that does not exceed the limits set forth under "Commodity Hedging" below;

(j)      transactions with affiliates with exceptions (subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles) for certain permitted transactions;

(k)     change in business;

(k)     establishment of any deposit account, securities account or commodities account, without compliance with collateral control requirements; and

(l)      use of credit extensions in violation of sanctions.

Financial Covenants:          Limited to:

1.  a maximum ratio of Consolidated Net Funded Debt to Consolidated EBITDAX for the most recently completed four fiscal quarter period from the Closing Date (the "***Leverage Ratio***"), commencing with the first full fiscal quarter ending following the Exit Facility Conversion Date, of 4.0 to 1.00; and

2.  a minimum ratio of Consolidated Current Assets (as defined below) to Consolidated Current Liabilities (as defined below) for the most recently completed four fiscal quarter period (the "***Current Ratio***"), commencing with the first full fiscal quarter ending following the Exit Facility Conversion Date, of 1.00 to 1.00.

"*Consolidated EBITDAX*" means, for any period, the sum of consolidated net income of the Borrower and its restricted subsidiaries for such period in accordance with GAAP *plus* the following expenses or charges to the extent deducted from consolidated net income in such period: (a) interest expense, (b) income and franchise taxes, (c) depreciation, depletion, amortization, exploration expenses and other noncash charges (including non-cash losses resulting from mark-to-market in respect of hedging transactions), (d) losses from asset dispositions (other than hydrocarbons produced in the ordinary course of business), (e) actual fees and transaction costs incurred by the Credit Parties in connection with the closing of the Exit Facility and the Transactions occurring on or about the Exit Facility Conversion Date, (f) the negative effects of non-cash adjustments from the adoption of fresh start accounting in connection with the consummation of the Approved Plan, (g) expenses related to dispositions, equity issuances, debt incurrence and amendments to the Exit Facility Documentation, (h) any losses resulting from the early termination of any hedging transaction, (i) non-recurring expenses and charges in an aggregate amount not to exceed a percentage of Consolidated EBITDAX to be agreed (calculated prior to giving effect to the addbacks described in this clause (i)) for such period, (j) all noncash charges and expenses in respect of stock options, incentive programs and other equity compensation for management or employees, officers or directors, and (h) any other add-back, adjustment and/or exclusion set forth in the model most recently made available to the Exit Facility Arranger prior to the date of the Commitment Letter *minus* (a) all gains from asset dispositions (other than hydrocarbons produced in the ordinary course of business), (b) all noncash income, and (c) any gains resulting from the early termination of any hedging transaction, in each case to the extent added to consolidated net income in such period.

"*Consolidated Net Funded Debt*" means, as of any date of determination, the aggregate principal amount of indebtedness for borrowed money, capital leases and disqualified equity interests of the Borrower and its restricted subsidiaries outstanding as of the last day of each fiscal quarter, which aggregate amount may be reduced by the aggregate amount of unrestricted cash held by the Borrower and its restricted subsidiaries in deposit accounts subject to the Exit Facility Collateral Agent's control; *provided*, that such reduction shall be capped at $50,000,000 if there are any outstanding Revolving Loans at the end of the applicable fiscal quarter.

"*Consolidated Current Assets*" means, as of any date of determination, the current assets of the Borrower and its restricted subsidiaries determined on a consolidated basis in accordance with GAAP, plus, to the extent not already included therein, (x) Availability as of such date (only to the extent that the Borrower is permitted to borrow such amount as of such date under the terms of the Exit Facility Documentation) and (y) any marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds and commercial paper of the

Borrower and its restricted subsidiaries as of such date; *provided* that for purposes of this definition, current assets shall exclude non-cash assets required to be included in consolidated current assets of the Borrower and its restricted subsidiaries as a result of the application of Accounting Standards Codifications 815 or 410.

"**Consolidated Current Liabilities**" means, as of any date of determination, the current liabilities of the Borrower and its restricted subsidiaries determined on a consolidated basis in accordance with GAAP, *minus*, to the extent included therein, the current portion of long-term indebtedness outstanding under the Exit Facility Documentation; *provided* that for purposes of this definition, current liabilities shall exclude non-cash liabilities required to be included in consolidated current liabilities of the Borrower and its restricted subsidiaries as a result of the application of Accounting Standards Codifications 815 or 410, but shall expressly include any unpaid liabilities for cash charges or payments that have been incurred as a result of the termination of any hedge transaction.

All ratios and calculations shall be measured on a pro forma basis (to be defined in a manner to be mutually agreed).

The financial covenants will be tested with respect to the Borrower and its restricted subsidiaries on a consolidated basis beginning with the last day of the fiscal quarter of the Borrower specified above and thereafter will be tested as of the last day of each fiscal quarter ended thereafter for which financial statements are delivered.

There will be equity cure rights providing that cash equity contributions made to the Borrower within 10 business days of the date on which financial statements are due will be included in the calculation of Consolidated EBITDAX and Consolidated Current Assets solely for the purposes of determining compliance with the financial covenants; *provided* that, (a) there shall be no more than two quarters in each four consecutive fiscal quarter period in respect of which an equity cure may be made, (b) no more than three equity cures may be made during the term of the Exit Facility, (c) the amount of any equity cure shall be no more than the amount required to cause the Borrower to be in pro forma compliance with the applicable financial covenant to which the breach or default occurred, (d) all equity cures will be disregarded for purposes of any financial ratio determination other than for determining compliance with the applicable financial covenant (and will not be credited as an addition to the applicable restricted payments build-up provisions), (e) no Revolving Lender shall be required to make any extension of credit during the 10-business-day period referred to above unless the Borrower shall have received the proceeds of the cash equity contribution, and (f) to the extent the Borrower exercises more than one equity cure in any single fiscal quarter, each such exercise shall count as a separate exercise of a cure right.

| | |
|---|---|
| Commodity Hedging: | Commodity hedging transactions shall be limited for any month to no more than 85% of the reasonably anticipated projected production for such month from the total proved oil and gas reserves of the Credit Parties (based on the most recently delivered Reserve Report) for the period not exceeding 66 months from the date such hedging arrangement is created (the "***Ongoing Hedges***"); *provided*, that, in addition to the Ongoing Hedges, in connection with a proposed acquisition (each, a "***Proposed Acquisition***") by a Credit Party of oil and gas properties, the Credit Parties may also enter into incremental hedging transactions with approved counterparties with respect to the Credit Parties' reasonably anticipated projected monthly production from the Borrowing Base Properties having notional volumes not in excess of 15% of the Credit Parties' existing projected monthly production (based on the most recently delivered Reserve Report) prior to the consummation of such Proposed Acquisition for each month during a period not exceeding 36 months from the date such hedging arrangement is created, during the period between (a) the date on which such Credit Party signs a definitive acquisition agreement in connection with a Proposed Acquisition and (b) the earliest of (i) the date such Proposed Acquisition is consummated, (ii) the date such acquisition is terminated and (iii) 90 days after such definitive acquisition agreement was executed (or such longer period as to which the Exit Facility Administrative Agent may agree); *provided* that all such incremental hedging transactions entered into with respect to a Proposed Acquisition shall be terminated or unwound within 90 days following the date such acquisition is terminated. Hedging contracts which hedge the same volumes, but different elements of commodity risk thereof, shall not be aggregated together when calculating the percentage of production hedged. |
| | For purposes of entering into or maintaining Ongoing Hedges, forecasts of reasonably projected hydrocarbon production volumes and reasonably anticipated hydrocarbon production from the Credit Parties' total proved reserves based upon the initial Reserve Report or the most recent Reserve Report, as applicable, shall be revised to account for any increase or decrease therein anticipated because of information obtained by Borrower or any other Credit Party subsequent to the delivery of such Reserve Report including the Borrower's or any other Credit Party's internal forecasts of production decline rates for existing wells and additions to or deletions from anticipated future production from new wells and acquisitions coming on stream or failing to come on stream. |
| Events of Default: | Consistent with the Documentation Principles, including limitations (to be applicable to the Borrower and its restricted subsidiaries) on: nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect; cross default and cross acceleration to indebtedness in excess of $100,000,000; bankruptcy of the Borrower or any of its restricted subsidiaries; monetary judgments in excess of $100,000,000; ERISA events; actual or asserted invalidity of the Exit Facility Documentation, Guarantees, security |

documents or any intercreditor agreement; and change of control (to be defined to be mutually agreed).

Voting:

Amendments and waivers of the Exit Facility Documentation for the Exit Facility will require the approval of the Borrower and the Revolving Lenders holding more than 50% of the aggregate amount of the commitments then outstanding under the Exit Facility (the "**Majority Lenders**"), except that:

(i)       the consent of each Lender directly and adversely affected thereby shall be required with respect to: (A) increases in the commitment of such Lender, (B) reductions or forgiveness of principal, interest (except only Majority Lender consent is required to waive payment of the Default Rate of interest) or fees owing to such Lender, (C) extensions or postponement of final maturity of the Exit Loans and commitments of such Lender, (D) make any Exit Loan (including any interest or fees thereunder) payable in any currency other than US Dollars, (E) releases of all or substantially all of the value of the Guarantees or releases of liens on all or substantially all of the Collateral (other than in connection with any sale of Collateral or the release or sale of the relevant Guarantor permitted by the Exit Facility), (F) assignment by the Borrower of its rights and obligations under any Exit Facility Documentation (unless otherwise permitted in connection with a merger, consolidation, liquidation or similar transaction under the limitations of fundamental changes provision of the Exit Facility Documentation), (G) modifications to any of the voting rights of Lenders (H) modifications to the pro rata waterfall provisions, to the extent such modifications would reduce the ratable allocation of payments, and (I) amend the interest period provision so as to permit interest period intervals greater than six months;

(ii)      the consent of Revolving Lenders holding not less than $66^{2/3}\%$ of the aggregate amount of the Commitments then outstanding under the Exit Facility (or if the Commitments have been terminated, Revolving Lender's holding not less than $66^{2/3}\%$ of the Total Revolving Outstandings) (the "**Required Revolving Lenders**") will be required in the case of decreases in, or reaffirmations of, the Borrowing Base;

(iii)     the consent of all of the Lenders will be required to approve increases in the Borrowing Base; and

(iv)      customary protections for the Exit Facility Administrative Agent, the Issuing Banks and the Swingline Lender will be provided.

The Exit Facility shall contain customary provisions permitting the Borrower to replace non-consenting Lenders in connection with amendments and waivers requiring the Required Revolving Lenders

26

or the consent of all Lenders or of all Lenders directly affected thereby so long as the Majority Lenders shall have consented thereto.

<table>
<tr><td>

Cost and Yield Protection:

</td><td>

Usual for facilities and transactions of this type, with provisions protecting the Lenders from withholding and other tax liabilities in form and substance reasonably satisfactory to the Borrower and the Exit Facility Administrative Agent; *provided* that requests for additional payments due to increased costs from market disruption shall be limited to circumstances generally affecting the banking market and when Lenders holding a majority of the commitments under the Exit Facility have made such a request; *provided, further*, that protection for increased costs imposed as a result of rules enacted or promulgated under the Dodd-Frank Act or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) shall be included (but solely for such costs that would have been included if they had been otherwise imposed under the applicable increased cost provisions). The Exit Facility shall contain provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Lender who asserts such claim without premium or penalty.

</td></tr>
<tr><td>

Assignments and Participations:

</td><td>

The Lenders will be permitted to assign Revolving Loans and Commitments (including participation in Letters of Credit and swingline loans) and Term Loans with the prior written consent of the Borrower (not to be unreasonably withheld or delayed); *provided* that no Lender shall assign to any "Ineligible Institution" (provided, that provisions with respect to such Ineligible Institutions shall be consistent with the Exit Facility Administrative Agent's standard policies), Defaulting Lender, any natural person, the Borrower, Holdings or any affiliate of the Borrower or Holdings, and no consent of the Borrower shall be required after the occurrence and during the continuance of a payment or bankruptcy event of default or for assignments to affiliates, another Lender an affiliate of a Lender, or an approved fund.  All assignments will require the consent of the Exit Facility Administrative Agent, the Swingline Lender and each Issuing Bank (in each case, not to be unreasonably withheld or delayed).  Each assignment will be not less than $5,000,000 (and increments of $1,000,000 in excess thereof) or, if less, all of such Lender's remaining loans and commitments of the applicable class.   The Exit Facility Administrative Agent shall receive a processing and recordation fee of $3,500 for each assignment (unless waived by the Exit Facility Administrative Agent).

The Lenders will be permitted to sell participations in the Exit Facility without restriction, other than to a Defaulting Lender, an Ineligible Institution, any natural person, the Borrower, Holdings or any affiliate of the Borrower or Holdings.   Voting rights of participants shall be limited to matters in respect of (a) increases in commitments participated to such participants, (b) reductions of principal, interest or fees payable to such participant or forgiveness thereof, (c) extensions of final maturity of the Loans or

</td></tr>
</table>

EXECUTION VERSION

commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees or all or substantially all of the Collateral, and for clarification purposes, not include the right to vote on waivers of defaults or events of default.

Expenses and Indemnification:

The Borrower shall pay all reasonable documented out-of-pocket costs and expenses of the Exit Facility Administrative Agent and the Exit Facility Collateral Agent (without duplication) in connection with the syndication of the Exit Facility and the preparation, execution, delivery, administration, amendment, waiver or modification and enforcement of the Exit Facility Documentation (including the reasonable fees and expenses of counsel identified herein; provided, that, in the case of counsel, limited to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the Exit Facility Administrative Agent and the Exit Facility Collateral Agent, taken as a whole, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction)).

The Borrower shall pay all reasonable documented out-of-pocket costs and expenses of each Issuing Bank, the Exit Facility Administrative Agent, the Exit Facility Collateral Agent, and each Lender (without duplication), incurred in connection with the enforcement or preservation of any rights under the Exit Facility Documentation whether before or after the occurrence of an event of default, including the reasonable fees, disbursements and other charges of counsel (including local counsel in each appropriate jurisdiction; provided, that, in the case of counsel, limited to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to such parties, taken as a whole, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction)).

The Borrower will indemnify and hold harmless the Exit Facility Administrative Agent, the Exit Facility Collateral Agent, the Issuing Banks, the Exit Facility Arranger, the Exit Facility Bookrunners and the Lenders (without duplication) and their respective affiliates, and the officers, directors, employees, agents, advisors, representatives, controlling persons, members and the successors of the foregoing (each, an "**_Indemnified Person_**") from and against any and all losses, claims, damages, penalties, demands, actions, judgments, suits costs, expenses, disbursements or liabilities of any kind or nature (regardless of whether any such Indemnified Person is a party thereto and whether any such proceeding is brought by the Borrower or any other person) and reasonable and documented fees, disbursements and other charges of counsel incurred in connection with investigating or defending any of the foregoing with respect to the execution, delivery, enforcement, performance and administration of any Exit Facility Documentation, any Exit Loan

or Letter of Credit or the use of the proceeds therefrom, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such Indemnified Person or any of its related Indemnified Persons (other than any trustee or advisor)) or to any actual or alleged presence, release or threatened release of hazardous materials involving or attributable to the Borrower, any of its subsidiaries or any of the oil and gas properties (limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the Indemnified Persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected Indemnified Persons), provided that the foregoing indemnity will not, as to any Indemnified Person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its controlled affiliates, directors, officers or employees, advisors or agents (collectively, the "***Related Parties***"), (ii) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or control affiliate of such Indemnified Person under this Commitment Letter or (iii) to the extent arising from any dispute solely among Indemnified Persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Lead Arranger, arranger (with respect to any Incremental Commitments), administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with the Exit Credit Facility or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates.

Release:

The Approved Plan shall include and provide for a full release from liability from the Credit Parties' bankruptcy estate and the Credit Parties (and any other debtors) in favor of the Exit Facility Administrative Agent, each of the Lenders, each Issuing Bank, the Exit Facility Arranger, the Exit Facility Bookrunner, each other agent party to the Exit Facility, each Prepetition Lender, each administrative agent, collateral agent, other agent, arranger or letter of credit issuer under the Prepetition RBL Facility, any of the foregoing party to any Hedging Arrangements, any of the foregoing party to any Treasury arrangements, and each of the foregoing entities' current and former affiliates, directors, officers, managers, employees, predecessors, successors, assigns, subsidiaries, agents, financial advisors, legal advisors, attorneys, accountants, investment bankers, consultants, representatives, from and against any and all claims or causes of action related in any respect to the Prepetition RBL Facility, any prepetition hedges or swaps among the parties thereto (or their affiliates), any treasury arrangements among the

parties thereto (or their affiliates), the Credit Parties' Chapter 11 Cases, and that arose, existed, or could have been asserted (in any respect) on or prior to Plan Effective Date, other than the performance of contractual obligations arising under open Hedging Arrangements under which the Debtors are in the money.   The release shall be in a form and substance satisfactory to the Exit Facility Administrative Agent.

The substance of the release described above shall be set forth in the Approved Plan (and approved by the Confirmation Order), and, upon execution of the Exit Facility Documentation, brought down to the Exit Facility Conversion Date and, if different, the Plan Effective Date.

| | |
|---|---|
| <u>Governing Law and Forum</u>: | New York. |
| <u>Confidentiality</u>: | Consistent with the Prepetition RBL Facility. |
| <u>Counsel to the Exit Facility Administrative Agent</u>: | Mayer Brown LLP |

ANNEX I

| Interest Rates: | The Applicable Margin in respect of the Exit Facility will be adjusted for Borrowing Base Usage as set forth below. |

"***Applicable Margin***" means for any day, with respect to any Adjusted LIBOR rate or ABR (as defined below) borrowing or with respect to any Unused Commitment Fee, the applicable rate per annum set forth below based on the applicable Borrowing Base Usage on such day:

| Borrowing Base Usage | Unused Commitment Fee | Applicable Margin | |
|---|---|---|---|
| | | ABR Loans | LIBOR Loans |
| $X \leq 30\%$ | 0.375% | 1.50% | 2.50% |
| $>30\%\ X \leq 60\%$ | 0.375% | 1.75% | 2.75% |
| $>60\%\ X \leq 80\%$ | 0.50% | 2.00% | 3.00% |
| $>80\%\ X \leq 90\%$ | 0.50% | 2.25% | 3.25% |
| $X >90\%$ | 0.50% | 2.50% | 3.50% |

Letter of Credit Fees:

A per annum fee equal to the spread over Adjusted LIBOR under the Exit Facility will accrue on the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter, commencing with the first full fiscal quarter ending after the Exit Facility Conversion Date, and upon the termination of the Exit Revolving Facility, in each case for the actual number of days elapsed over a 360-day year.  Such fees shall be distributed to the Revolving Lenders participating in the Exit Revolving Facility pro rata in accordance with the amount of each such Revolving Lender's Applicable Exit Commitment Percentage.  In addition, the Borrower shall pay to the relevant Issuing Bank, for its own account, (a) a fronting fee equal to 0.125% per annum of the aggregate face amount of outstanding Letters of Credit or such other amount as may be agreed in writing by the Borrower and such Issuing Bank, payable in arrears at the end of each quarter and upon the termination of the Exit Revolving Facility, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary issuance and administration fees to be mutually agreed.

LIBOR Periods:

The Borrower may elect interest periods of 1, 2, 3 or 6 months for Adjusted LIBOR borrowings.

Interest Calculation:

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans determined by reference to the Prime Rate (as defined below)) and interest shall be payable at the end of each interest period and, in any event, at least every three months.

"***Prime Rate***" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street

Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Exit Facility Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Exit Facility Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"*NYFRB Rate*" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or such day is not a business day, the immediately preceding business day); provided that if none of such rates are published for any day that is a business day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Exit Facility Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero.

"*Overnight Bank Funding Rate*" means, for any day, the rate comprised of both overnight federal funds and overnight Eurodollar borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the NYFRB as set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as an overnight bank funding rate.

|   |   |
|---|---|
| <u>ABR:</u> | "*ABR*" is the Alternate Base Rate, which is the highest of (x) the Prime Rate, (y) the NYFRB Rate plus $^1/_2$ of 1.0% and (z) one-month Adjusted LIBOR plus 1.00% per annum; *provided* that such rate shall not be less than zero. |
| <u>Adjusted LIBOR</u> | "*LIBOR*" means the London interbank offered rate as administered by ICE Benchmark Administration (or any successor administrator of such rate) for dollars for a period equal to the Interest Period displayed on pages LIBOR01 or LIBOR02 by Reuters (or on any successor or substitute page reasonably selected by the Exit Facility Administrative Agent), or if not available on any such page, an interpolated rate determined by the Exit Facility Agent in accordance with its customary procedures.  Adjusted LIBOR will at all times include statutory reserves, *provided* that such rate shall not be less than zero. |
| <u>Commitment Fees:</u> | The Borrower will pay a fee (the "*Commitment Fee*"), in an amount computed on a daily basis equal to the Revolving Loan Limit *less* the Total Revolving Outstandings on each date, multiplied by the applicable percentage specified as the "Unused Commitment Fee" in the table set forth above under the definition of "Applicable Margin" corresponding to the Borrowing Base |

Usage as of the end of such day.  The Commitment Fee shall be payable quarterly in arrears after the Exit Facility Conversion Date, commencing with the first full fiscal quarter ending after the Exit Facility Conversion Date, and upon the termination of the Commitments, calculated based on the actual number of days elapsed over a 360-day year.  For purposes of calculating the Commitment Fee, "Total Revolving Outstandings" shall not include the amount of any outstanding swingline loans (if any).

**<u>Exhibit A-2</u>**

**Employee Incentive Plan Term Sheet**

**EXHIBIT A-2**

**EP ENERGY CORPORATION**

**EMPLOYEE INCENTIVE PLAN TERM SHEET**

The following describes the principal terms of the equity-based employee incentive plan (the "***EIP***") to be adopted by the Reorganized EP Parent in connection with the Restructuring. This term sheet does not contain all of the terms and conditions of the EIP. Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the Term Sheet (including Annex 1).

| | |
|---|---|
| **Effective Date** | The EIP will become effective on the Effective Date. The terms of the EIP and the Emergence Awards (defined below) will be approved as part of the Plan. |
| **Administration** | The New Board, or a committee thereof, will administer the EIP. |
| | The New Board has the authority to prescribe the terms of awards under the EIP and to make all administrative determinations under the EIP. |
| **Participants** | Participants of the EIP will include officers and employees of the Company who are designated by the New Board to receive awards under the EIP. |
| | Participants who receive the Emergence Awards are officers of the Reorganized EP Parent as set forth below. |
| **Award Pool** | 10% of the New Common Shares on the Effective Date, on a fully diluted basis (including shares issuable under the EIP), will be reserved for issuance under the EIP (the "***Award Pool***"). |
| | If an outstanding award expires or is forfeited, cancelled or otherwise terminated, the shares underlying such award shall again be available under the Award Pool. In addition, shares that are held back or tendered to cover the exercise price or tax withholding obligations with respect to an award shall not be available under the Award Pool. |
| | Up to 70% of the Award Pool will be allocated to the Emergence Awards. |
| **EIP Awards** | The EIP will be an "omnibus" incentive plan that provides for the grant of various types of equity awards, based on the value of the New Common Shares: stock options (ISOs and NQSOs), stock appreciation rights, restricted stock (including performance shares), restricted stock units (including performance units) and other stock-based awards. |
| | The terms of vesting, exercise and other terms and conditions of EIP awards will be determined by the New Board and set forth in award agreements issued under the EIP, as determined by the New Board. |
| | The terms of the Emergence Awards are set forth below. |
| **Corporate Reorganizations/ Change in Control**[1] | Outstanding awards and the Award Pool will be subject to customary anti-dilution adjustments for changes in capitalization and other reorganization events. |
| | Outstanding time based RSUs will vest on a Change in Control. Double trigger vesting for PSUs to the extent performance is achieved (as further set forth below) |

---

[1] "***Change in Control***" means mean the occurrence of any of the following after the Effective Date:

(a)   an acquisition immediately after which any "Person" (as the term "person" is used for purposes of Section 13(d) or 14(d) of the Exchange Act) possesses direct or indirect "Beneficial Ownership" (within the meaning of Rule 13d-3 promulgated under the Exchange Act) of 50% or more

WEIL:\97150284\4\42780.0003

| | upon a termination of employment by the Company without Cause or a resignation for Good Reason within 12 months following a Change in Control. |
|---|---|

| **Terms of Emergence Awards** | |
|---|---|
| **Grant of Emergence Awards** | The CEO and seven (7) other officers of the Reorganized EP Parent (identified on Schedule 1 attached hereto) will receive the initial grants of awards under the EIP (the "***Emergence Awards***").<br><br>The Emergence Awards will be granted and become effective on the Effective Date. |
| **Emergence Award Pool** | Up to 70% of the Award Pool will be granted as the Emergence Awards, as set forth in the attached Schedule 1.<br><br>The remaining 30% of the Award Pool (or such greater amount if not used as Emergence Awards) is reserved for future grants as determined by the New Board, in consultation with the CEO. |
| **Form of Emergence Awards** | Emergence Awards will be granted as follows:<br><br>• 30% in the form of time-vesting restricted stock units ("RSUs").<br><br>• 70% in the form of performance-vesting restricted stock units ("PSUs"). |

---

(on a fully diluted basis) of either (A) the then outstanding shares of common stock (the "***Outstanding Company Common Stock***"); or (B) the combined voting power of the then outstanding voting securities of the Company entitled to vote in the election of directors (the "***Outstanding Company Voting Securities***"); but excluding any acquisition by the Company or any of its subsidiaries, by any employee benefit plan sponsored or maintained by the Company or any of its subsidiaries, or any acquisition pursuant to a transaction that complies with paragraphs (i), (ii) and (iii) of subsection (d) below;

(b)     a change in the composition of the Board such that members of the Board during any consecutive 12-month period (the "***Incumbent Directors***") cease to constitute a majority of the Board of Directors.  Any person becoming a director through election or nomination for election approved by a valid vote of at least two-thirds of the Incumbent Directors shall be deemed an Incumbent Director; provided, however, that no individual becoming a director as a result of an actual or threatened election contest, as such terms are used in Rule 14a-12 of Regulation 14A promulgated under the Exchange Act, or as a result of any other actual or threatened solicitation of proxies or consents by or on behalf of any person other than the Board shall be deemed to be an Incumbent Director; or

(c)     the approval by the shareholders of the Company of a plan of complete dissolution or liquidation of the Company; or

(d)     consummation of a reorganization, merger, share exchange, consolidation or sale or other disposition of all or substantially all of the assets of the Company ("***Corporate Transaction***"); excluding, however, such a Corporate Transaction pursuant to which:

(i)     all or substantially all of the individuals and entities who have Beneficial Ownership, respectively, of the Outstanding Company Common Stock and Outstanding Company Voting Securities immediately prior to such Corporate Transaction will have Beneficial Ownership, directly or indirectly, of more than 50% of, respectively, the outstanding shares of common stock and the combined voting power of the then outstanding voting securities entitled to vote generally in the election of directors, as the case may be, of the corporation resulting from such Corporate Transaction (including, without limitation, the Company or a corporation that as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries) (the "***Resulting Corporation***") in substantially the same proportions as their ownership, immediately prior to such Corporate Transaction, of the Outstanding Company Common Stock and Outstanding Company Voting Securities, as the case may be;

(ii)    no Person (other than (1) the Company, (2) an employee benefit plan (or related trust) sponsored or maintained by the Company or Resulting Corporation, or (3) any entity controlled by the Company or Resulting Corporation) will have Beneficial Ownership, directly or indirectly, of 50% or more of, respectively, the outstanding shares of common stock of the Resulting Corporation or the combined voting power of the outstanding voting securities of the Resulting Corporation entitled to vote generally in the election of directors, except to the extent that such ownership existed prior to the Corporate Transaction; and

(iii)   individuals who were members of the Incumbent Board will continue to constitute at least a majority of the members of the board of directors of the Resulting Corporation.

(e)     For the avoidance of doubt, notwithstanding anything to the contrary it shall not be a Change of Control if the Principal Investors (to be defined to include Apollo, Elliott and their respective affiliates own 50% or more of the Company's Voting Securities or control the Board.

| Vesting Terms | RSUs vest 25% per year over 4 years, based on continued employment. |
|---|---|
| | PSUs vest 25% per year over 4 years, based on continued employment and the achievement of pre-established performance goals. |
| | PSU performance goals will be determined prior to the Effective Date based on [TBD]. |
| **Termination of Employment** | RSUs granted as Emergence Awards will vest pro-rata upon termination of employment by the Company without Cause or for Good Reason or upon a participant's death or disability, based on the date of termination. |
| | PSUs granted as Emergence Awards will vest pro-rata (based on actual performance through the end of the performance period) upon termination of employment by the Company without Cause or for Good Reason or upon a participant's death or disability, based on the date of termination. |
| | For the avoidance of doubt, upon a termination for Cause or a voluntary resignation without Good Reason, all unvested RSUs will be forfeited. For the avoidance of doubt, upon a termination for Cause all outstanding PSUs will be forfeited and upon a voluntary resignation without Good Reason all unvested PSUs shall be forfeited. |
| | Cause and Good Reason shall have the meanings ascribed to such terms in the participant's employment agreement. |
| | Upon a Change in Control, outstanding Emergence Awards subject to time based vesting only (RSUs) will fully vest. |
| | Upon a termination by the Company without Cause or by the participant for Good Reason occurring within the 12-month period following a Change in Control, (Emergence Awards subject performance-vesting (the PSUs) shall become vested to the extent the applicable performance goals have been achieved as of the date of such termination and if such performance goal are not achieved then the PSUs shall be forfeited. |
| **Payment of Emergence Awards** | RSUs and PSUs are payable in New Common Shares within thirty (30) days after vesting (for purposes of clarity the PSUs will only vest if both the time based and performance based goals are achieved), subject to net settlement for tax purposes. |
| **Call Right; Stockholders Agreement** | As a condition to the grant of any Emergence Awards, each Executive agrees to be bound by a customary stockholders agreement, which among other things will include a call right in favor of the Company to repurchase any shares upon termination of employment. |

**SCHEDULE 1**

**EMERGENCE AWARD ALLOCATION**

CEO: 25%

Individual allocations for other officer roles to be within the ranges below, but not to exceed 75% in the aggregate, as determined by the CEO in consultation with the representatives of the New Board prior to Effective Date.

Senior Vice President, Engineering and Subsurface (8-11%)

Senior Vice President, Operations (8-11%)

Senior Vice President, Chief Financial Officer and Treasurer (8-11%)

Vice President, Marketing (8-11%)

Vice President, Land and Administration (8-11%)

Vice President, Geological and Geophysical (8-11%)

Vice President, General Counsel and Corporate Secretary (8-11%)

**Exhibit A-3**

**Management Employment Agreement Terms**

**EXHIBIT A-3**

**EP ENERGY CORPORATION**

**MANAGEMENT EMPLOYMENT AGREEMENT TERMS**

The following describes the principal terms of the employment agreements (the "*Employment Agreements*") to be entered into between the Company and certain officers (the "*Executives*") in connection with the Restructuring. This term sheet does not contain all of the terms and conditions of the Employment Agreements. Capitalized terms used but not otherwise defined herein will have the meanings ascribed to such terms in the Term Sheet (including Annex 1).

| Effective Date | The date of the Company's emergence from Chapter 11 pursuant to the Plan. |
| --- | --- |
| | The new Employment Agreements will replace the existing employment agreements and arrangements with the Executives that will remain in effect through the Reorganization. |
| Title | Title<br>President and Chief Executive Officer<br>Senior Vice President, Engineering and Subsurface<br>Senior Vice President, Operations<br>Senior Vice President, Chief Financial Officer and Treasurer<br>Vice President, Marketing<br>Vice President, Land and Administration<br>Vice President, Geological and Geophysical<br>Vice President, General Counsel and Corporate Secretary |

| Base Salary and Target Annual Bonus | Title | Base Salary | Target Annual Bonus |
| --- | --- | --- | --- |
| | President and CEO | $850,000 | 100% of Base Salary |
| | SVP, Engineering and Subsurface | $400,000 | 75% of Base Salary |
| | SVP, Operations | $400,000 | 75% of Base Salary |
| | SVP, CFO and Treasurer | $350,000 | 75% of Base Salary |
| | VP, Marketing | $307,000 | 75% of Base Salary |
| | VP, Land and Administration | $300,000 | 75% of Base Salary |
| | VP, Geological and Geophysical | $300,000 | 75% of Base Salary |
| | VP, General Counsel and Corporate Secretary | $300,000 | 75% of Base Salary |

| Term | Initial term ends on 4th anniversary of Effective Date, with automatic 12 month renewals unless either party provides 30 days' prior written notice of non-renewal. |
|---|---|
| **Severance upon a Termination by Company without Cause, Resignation by Executive with Good Reason or Non-Renewal by Company** | CEO<br>• The sum of (i) 2x Base Salary and (ii) 1x Target Annual Bonus, of which six months Base Salary is payable in substantially equal installments over 6 month period post termination and the remainder is paid in a lump sum on the seventh month.<br>• Annual Bonus for year in which termination occurs, prorated to reflect actual performance through the date of termination.<br>• 18 months of continued coverage for Executive and Executive's spouse and dependents under the Company's health and welfare plans at active employee rates.<br><br>Other Officers<br>• 1x sum of (i) Base Salary and (ii) Target Annual Bonus of which six months Base Salary is payable in substantially equal installments over 6 month period post termination and the remainder is paid in a lump sum on the seventh month.<br>• Annual Bonus for year in which termination occurs, prorated to reflect actual performance through the date of termination.<br>• 12 months of continued coverage for Executive and Executive's spouse and dependents under the Company's health and welfare plans at active employee rates.<br><br>Severance subject to Executive's release of claims against the Company and compliance with post employment restrictive covenants. |
| **Severance upon a Termination by Company without Cause, Resignation by Executive with Good Reason or upon Non-Renewal by Company, in each case, within 18 months following a Change in Control** | CEO<br>• 2x the sum of (i) Base Salary and (ii) Target Annual Bonus, payable in a lump sum following termination.<br>• Pro-rata Target Annual Bonus for year in which termination occurs, based on the date of termination.<br>• 18 months of continued coverage for Executive and Executive's spouse and dependents under the Company's health and welfare plans at active employee rates.<br><br>Other Officers<br>• 1.5x the sum of (i) Base Salary and (ii) Target Annual Bonus, payable in a lump sum following termination.<br>• Pro-rata Target Annual Bonus for year in which termination occurs, based on the date of termination.<br>• 18 months of continued coverage for Executive and Executive's spouse and dependents under the Company's health and welfare plans at active employee rates.<br><br>Accelerated vesting of Emergence Awards under the EIP (as described in **Exhibit A-2**). |

WEIL:\97217414\4\42780.0003

| | |
|---|---|
| | Severance subject to Executive's release of claims against the Company and compliance with post employment restrictive covenants. |
| **Restrictive Covenants** | • Non-competition in the Market Area[1] for the 12 months post-termination (24 months for the CEO if he is eligible for severance as a result of termination without Cause, for Good Reason or non-renewal by the Company).<br>• Non-solicitation of customers, suppliers, employees and contractors for 12 months post-termination (24 months for the CEO if he is eligible for severance as a result of termination without Cause, for Good Reason or non-renewal by the Company).<br>• Perpetual confidentiality and assignment of intellectual property<br>• Cooperation in defense of claims against Company and its subsidiaries during employment and for 24 months thereafter. |
| **Benefits** | Eligible to participate in same benefit plans in which similarly situated senior executives are eligible to participate. |
| **Miscellaneous** | Notwithstanding anything to the contrary in that certain retention bonus letter agreement by and between Executive and the Company dated July __, 2019 Executive's severance shall not be subject to reduction as set forth in Section 3 of such letter agreement.<br><br>Section 280G "best net-of-tax" provision. To the extent any payments and benefits that Executive has the right to receive in connection with a "change in control" (within the meaning of Section 280G of the Internal Revenue Code of 1986, as amended (the "*Code*")) would constitute "parachute payments" (as defined in Section 280G of the Code), such payments and benefits shall be (i) reduced by the minimum amount necessary so that no portion of the payments and benefits are subject to the excise tax imposed by Section 4999 of the Code or (ii) paid in full, whichever produces the better net after-tax position to Executive, taking into account the excise tax under Section 4999 and any other applicable taxes. |
| **Defined Terms** | "Cause" means: (i) Executive's material breach of the Employment Agreement or any other written agreement between Executive and the Company, or Executive's material breach of any policy or code of conduct established by the Company in a writing previously provided to Executive and which is applicable to Executive that is reasonably likely to have a material adverse effect on the business or reputation of the Company; (ii) Executive's willful misconduct, fraud, theft or embezzlement, or Executive's breach of fiduciary |

---

[1] "Market Area" means (A) the Eagle Ford Shale; (B) the Altamont Field within the Uinta Basin (including the Bluebell and Cedar Rim fields); (C) the Southern Midland Basin; or (D) any other location within 12.5 miles of any area in which the Company or its direct or indirect subsidiaries (the "Company Group"): (1) is engaged in the Company's business or in which any member of the Company Group otherwise owned property or interests related to the Company's business within 12 months prior to Executive's termination; or (2) has made material plans to conduct the Company's business within the 12 months prior to Executive's termination of which Executive is aware; provided, however, that the Market Area shall not include any basin in which no member of the Company Group is engaged in the Company's business on the effective date of Executive's termination."

WEIL:\97217414\4\42780.0003

|  | duty; (iii) the conviction or indictment of Executive for, or plea of *nolo contendere* by Executive to, any felony (or state law equivalent) or crime involving moral turpitude; or (iv) Executive's willful failure or refusal, other than due to disability, to perform Executive's obligations pursuant to the Employment Agreement, or to follow any lawful directive of the Board of Directors of the Company (the "Board"); provided, however, that if the Executive's actions or omissions as set forth in clause (i) or (iv) are curable by Executive, such actions or omissions must remain uncured for 10 days after the Board has provided Executive written notice of the obligation to cure such actions or omissions. Notwithstanding the foregoing, the Board may suspend the Executive while it conducts an investigation if it has a good faith basis to investigate whether Cause exists and such suspension shall not constitute Good Reason.<br><br>"Good Reason" means: (i) a material diminution in Executive's Base Salary or Target Annual Bonus; (ii) a material diminution in Executive's title, authority, duties or responsibilities; (iii) a material breach by the Company of any of its covenants or obligations under the Employment Agreement; or (iv) the relocation of the geographic location of Executive's principal place of employment which increases the Executive's one way commute by more than 50 miles from the location of Executive's principal place of employment as of the Effective Date. Notwithstanding the foregoing or any other provision of the Agreement to the contrary, any assertion by Executive of a termination for Good Reason shall not be effective unless the condition described (i), (ii), (iii) or (iv) must have arisen without Executive's consent, Executive must provide written notice to the Board of the existence of such condition within 30 days following the initial existence of such condition, the condition specified in such notice must remain uncorrected for 30 days following the Board's receipt of written notice and Executive's termination of employment must occur within 60 days after the initial existence of the condition specified in such notice.<br><br>"Change in Control" shall have the meaning ascribed to such term in the EIP. |
|---|---|
| **Emergence Bonus** | The following Executives will receive a cash bonus in the amounts set forth below, payable in a lump sum immediately following the Effective Date, subject to continued employment on the Effective Date. Such bonuses reflect certain unpaid amounts in respect of prior incentive bonuses.<br><br>Name        Amount<br>SVP, Engineering and Subsurface    $30,000<br>SVP, Operations    $40,000<br>SVP, CFO and Treasurer    $20,000<br>VP, Marketing    $18,420<br>VP, Land and Administration    $22,500<br>VP, Geological and Geophysical    $22,500<br>VP, GC and Corporate Secretary    $27,500 |

4

**<u>Exhibit B</u>**

**Form of Joinder for Additional Supporting Creditors**

**JOINDER TO PLAN SUPPORT AGREEMENT**

This JOINDER, dated as of [●], 2019, to the Plan Support Agreement (as amended, supplemented, or otherwise modified from time to time, the "***PSA***"), by and among the Company and the Supporting Creditors is executed and delivered by [●] (the "***Joining Party***") as of [●], 2019.  Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the PSA.

1.      <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the PSA, a copy of which is attached to this Joinder Agreement as <u>Annex I</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions hereof).  The Joining Party shall hereafter be deemed to be a "Supporting Noteholder" or "Supporting Creditor" and a "Party" for all purposes under the PSA and with respect to any and all Claims held by such Joining Party.

2.      <u>Representations and Warranties</u>.   The Joining Party hereby makes the representations and warranties of the Supporting Creditors set forth in <u>Section 7</u> and <u>Section 20</u> of the PSA to each other Party to the PSA.

3.      <u>Governing Law</u>.  This Joinder Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of New York without giving effect to the conflict of laws principles thereof.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**Additional Supporting Creditor**

Name:_____

By:_____

Title:_____

Principal Amount of RBL Loans, as applicable:  $_____

Principal Amount of 2024 1.5L Notes, as applicable: $_____

Principal Amount of 2025 1.5L Notes, as applicable: $_____

All other Claims:_____

Notice Address:_____

_____

_____

Fax:_____

Attn:_____

E-mail:_____

With a copy to:_____

_____

_____

Fax:_____

Attn:_____

E-mail:_____

*[Signature Page to Joinder to Plan Support Agreement]*

**<u>Exhibit C</u>**

**Organizational Chart**



**EP ENERGY**

**As of the Petition Date**

| Outstanding Funded Indebtedness | |
|---|---|
| RBL Facility | $629M |
| 1.125L Notes | $1,000M |
| 1.25L Notes | $500M |
| 1.5 L Notes | $2,092M |
| **Total Secured Debt** | **$4,221M** |
| | |
| Unsecured Debt: | |
| 6.375% Senior Notes | $323M |
| 7.75% Senior Notes | $182M |
| 9.375% Senior Notes | $182M |
| **Total Unsecured Debt** | **$688M** |
| | |
| **Total Funded Debt** | **$4,909M** |

**Legend:**
- ☐ Debtor Entity
- ☐ Non-Debtor Entity
- ☐ RBL Obligor
- ☐ 1.125L Obligor
- ☐ 1.25L Obligor
- ☐ 2024 1.5L Obligor
- ☐ 2025 1.5L Obligor
- ☐ 2023 Unsecured Notes Obligor
- ☐ 2022 Unsecured Notes Obligor
- ☐ 2020 Unsecured Notes Obligor

**RBL Credit Facility**
Borrower: EP Energy, LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $629M
Maturity: November 23, 2021

**7.750% 1.125L due 2026**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $1,000M
Maturity: May 15, 2026

**8.000% 1.25L due 2024**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $500M
Maturity: November 29, 2024

**9.375% 1.5L due 2024**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $1,092M
Maturity: May 1, 2024

**8.000% 1.5L due 2025**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $1,000M
Maturity: February 15, 2025

**6.375% UNS due 2023**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $323M
Maturity: June 15, 2023

**7.775% UNS due 2022**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $182M
Maturity: September 1, 2022

**9.375% UNS due 2020**
Issuer: EP Energy LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $182M
Maturity: May 1, 2020

**Exhibit D**

**Liquidation Analysis**

EXHIBIT D

**LIQUIDATION ANALYSIS**

As part of the chapter 11 process, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court determine that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive under the plan value that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Second Amended Joint Chapter 11 Plan of EP Energy Corporation and its Affiliated Debtors* (the "**Plan**").

Below is a summary of an illustrative liquidation analysis (the "**Liquidation Analysis**") assuming that the Debtors pursue a hypothetical liquidation under chapter 7. Per chapter 7 requirements, the Debtors' assets would be disposed under the direction of a chapter 7 Trustee ("**Trustee**"). The illustrative sale proceeds would provide for lower recoveries relative to the recoveries under the Plan and as a result the Debtors believe that under the Plan, Holders of Claims would receive value greater than the amounts that such Holders would receive if the Debtors were forced to liquidate under chapter 7, and that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

A.      **Limitations and Key Assumptions Underlying the Hypothetical Liquidation**

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

The Debtors prepared the illustrative Liquidation Analysis with the assistance of FTI Consulting. The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims based upon a review of the Debtors' financial statements to account for estimated liabilities as necessary. The Liquidation Analysis does not contemplate a sale of the Debtors' business on a going concern basis. The Liquidation Analysis includes estimates for Claims as part of the Chapter 11 Cases which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and Trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis, and the bar date to file proofs of claim has not yet passed. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and interests under the Plan. **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

The Debtors note that the assumptions utilized in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors or a chapter 7 Trustee. Accordingly, there can be no guarantees that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter 7 liquidation not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and

1

delayed creditor recoveries.

**THE DEBTORS RESERVE THEIR RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

1. **General Assumptions**

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

a) **Administrative Procedures and Conversion of Cases**

For purposes of the chapter 7 Liquidation Analysis, the Debtors assume that each of the Chapter 11 Cases are converted to a chapter 7 case and consolidated during the chapter 7 proceeding for procedural purposes only. Since EP Energy Corporation (the "Parent Company") is not a guarantor to the Debtors' secured and unsecured debt, the Parent Company's illustrative liquidation analysis has been presented separately from the other Debtors. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, the Debtors' operational costs, etc. would likely be higher than if the cases were consolidated.

b) **Professionals Involved in the Chapter 7 Proceedings**

As part of the chapter 7 case, the Debtors assume that the Trustee would choose to retain certain professionals, including counsel, advisors and investment bankers, among others, to provide expertise and assistance in the liquidation of the Debtors. The Liquidation Analysis illustratively assumes that the existing counsel, advisors, and consultants would be replaced by the Trustee with new professionals.

c) **Timing Considerations of Chapter 7 Cases**

The Liquidation Analysis assumes the conversion to Chapter 7 occurs on March 31, 2020 (the "Conversion Date"), and the Trustee's advisors would require time to get up to speed before a process could begin to liquidate the assets. While the Debtors' oil and gas properties may be sold in several transactions, this analysis assumes that they are all sold by July 31, 2020, four months after the start of the liquidation. The Liquidation Analysis assumes the oil and gas properties are sold as of an effective date on March 31, 2020. An additional four months are assumed for a wind down of the estate.

It is assumed that the Debtors' use of cash collateral would be limited and that the Debtors would not have funds to support any process other than an orderly and expedited wind-down of the Debtors' business by the trustee to convert the Debtors' assets to cash and limit the amount of administrative expenses. There can be no assurance, however, that the liquidation would be completed in a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized.

In an actual liquidation, the process and length of wind-down could be significantly longer and more expensive than the amounts assumed herein and thereby significantly reduce the actual recoveries compared to this analysis. For example, the potential for priority, contingent, and other Claims; litigation; rejection costs; and the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Also, in the context of a liquidation, there would likely be potential offset Claims, particularly with respect to joint interest billings that would take time to reconcile and resolve. Additionally, certain of the joint operating agreements may be non-assignable (absent consent from the other working interest owners) which could result in potential asset transfer issues in the context of a chapter 7 liquidation. Also, a number of factors in a liquidation could affect the Trustee's ability to sell the Debtors' oil

2

and gas assets for their current market value. These risks include if they are forced to halt production for a period of time or lose relationships with vendors, customers, royalty owners, joint interest owners, and midstream firms. There is a high risk that the employee base could deteriorate and the Trustee could be challenged to gather appropriate information on the assets for the sales process. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

### d)   Trustee Fees for Chapter 7 Administration

The Debtors assume that under a chapter 7 liquidation, the Trustee would require fees necessary to facilitate a sale of the Debtors' business. The illustrative Liquidation Analysis assumes that such fees would likely be approximately three percent (3%) of the available liquidation proceeds in excess of $1 million and excluding cash. These fees are assumed to be earned for the Trustee's creation and development of materials for marketing and the facilitation of the solicitation process for the parties, in addition to general administrative expenses, such as Trustee's compensation. Additionally, per section 326(a) of the Bankruptcy Code, for a case under chapter 7, the Court may allow reasonable compensation for the Trustee's services not to exceed three percent (3%) of such moneys disbursed or turned over in the case by the Trustee to parties in interest, excluding the Debtors, but including holders of secured Claims.

### e)   Additional Claims

The cessation of the Debtors' business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the proposed Plan. Examples of these kinds of Claims include tax liabilities, employee Claims, Claims related to rejection of executory contracts, incremental costs associated with plugging and abandoning liabilities, and litigation Claims. While some of these Claims could be significant, no adjustment has been made for these potential Claims unless specified in the assumptions to the Liquidation Analysis.

### B.   Consummation of the Plan Will Provide Greater Value than Under a Hypothetical Liquidation through Chapter 7 of the Bankruptcy Code

As presented in the illustrative Liquidation Analysis, the Debtors believe that a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code would result in reductions in the value to be realized by constituents as compared to the distributions that are contemplated under the Plan. As a result, the Debtors believe that Consummation of the Plan will provide a substantially greater return to constituents than would any liquidation under chapter 7 of the Bankruptcy Code.

3

# LIQUIDATION ANALYSIS

## Guarantor Debtors[1]

| Liquidation Analysis | Note | Actual 30-Sep | Adj. | Forecast 31-Mar | Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | | | | | | | | | | |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $189,508 | ($167,258) | $22,251 | $22,251 | 100% | $22,251 | 100% | $22,251 | 100% |
| Trade Accounts Receivable | B | 118,070 | (12,319) | 105,750 | 95,175 | 90% | 100,463 | 95% | 105,750 | 100% |
| Joint Interest Billing Receivable | C | 7,031 | 24,368 | 31,399 | 25,119 | 80% | 26,689 | 85% | 28,259 | 90% |
| Other Receivable | D | 7,423 | (7,423) | - | - | N/A | - | N/A | - | N/A |
| Net Derivatives Receivables | E | 42,894 | (23,686) | 19,208 | 4,802 | 25% | 7,203 | 38% | 9,604 | 50% |
| Other Current Assets | F | 38,797 | (32,129) | 6,668 | - | 0% | 833 | 13% | 1,667 | 25% |
| Net Oil & Gas Properties | G | 3,916,102 | - | 3,916,102 | 1,271,635 | 32% | 1,382,272 | 35% | 1,492,909 | 38% |
| Other Net Property, Plant & Equipment | H | 31,958 | (6,961) | 24,997 | 1,746 | 7% | 2,780 | 11% | 3,813 | 15% |
| **Total Gross Liquidation Proceeds** | | $4,351,783 | ($225,409) | $4,126,375 | $1,420,728 | | $1,542,491 | | $1,664,254 | |
| Encumbered Value | | | | | $1,402,054 | | $1,521,063 | | $1,640,071 | |
| Unencumbered Value | | | | | $18,674 | | $21,428 | | $24,182 | |
| (-) Net Wind-Down Expenses | I | | | | ($20,815) | | ($20,815) | | ($20,815) | |
| (-) Post-Conversion Cash Flow | J | | | | (77,308) | | (77,308) | | (77,308) | |
| (-) Chapter 7 Trustee Fees | K | | | | (41,954) | 3.00% | (45,607) | 3.00% | (49,260) | 3.00% |
| (-) Chapter 7 Trustee Legal & Financial Advisors | L | | | | (34,962) | 2.50% | (34,205) | 2.25% | (32,840) | 2.00% |
| (-) Chapter 11 Professional Fees Carve-Out | M | | | | (18,587) | | (18,587) | | (18,587) | |
| **Total Net Liquidation Proceeds** | | | | | $1,227,102 | | $1,345,968 | | $1,465,444 | |
| Remaining Encumbered Value | | | | | 1,227,102 | | 1,345,968 | | 1,465,444 | |
| Remaining Unencumbered Value | | | | | - | | - | | - | |

| Claims Recovery Analysis ($000s) | | | Claims Estimates | | | Low | | Mid | | High | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Class | Claims | Note | Low | Mid | High | $ | % | $ | % | $ | % |
| 1 | Other Secured Claims | N | 4,463 | 4,463 | 4,463 | 4,463 | 100% | 4,463 | 100% | 4,463 | 100% |
| 2 | Other Priority Claims | O | - | - | - | - | N/A | - | N/A | - | N/A |
| 3 | DIP Claims | P | 263,539 | 263,539 | 263,539 | 263,539 | 100% | 263,539 | 100% | 263,539 | 100% |
| 3 | RBL Claims | Q | 327,089 | 327,089 | 327,089 | 327,089 | 100% | 327,089 | 100% | 327,089 | 100% |
| 4 | 1.125L Notes Claims | R | 1,000,000 | 1,000,000 | 1,000,000 | 632,012 | 63% | 750,878 | 75% | 870,353 | 87% |
| 5 | 1.25L Notes Claims | S | 513,667 | 513,667 | 513,667 | - | 0% | - | 0% | - | 0% |
| 6 | Secured 1.5L Notes Claims | T | 2,186,618 | 2,186,618 | 2,186,618 | - | 0% | - | 0% | - | 0% |
| | Administrative Claims | U | 185,026 | 185,026 | 185,026 | - | 0% | - | 0% | - | 0% |
| 7 | Deficiency Claims | V | 3,068,273 | 2,949,406 | 2,829,931 | - | 0% | - | 0% | - | 0% |
| 7 | Unsecured Claims | V | 918,130 | 834,312 | 750,494 | - | 0% | - | 0% | - | 0% |
| 8 | Convenience Claims | W | - | - | - | - | N/A | - | N/A | - | N/A |
| 9 | Intercompany Claims | X | - | - | - | - | N/A | - | N/A | - | N/A |
| 10 | Subordinated Claims | Y | - | - | - | - | N/A | - | N/A | - | N/A |
| 11 | Existing Equity Interests | Z | - | - | - | - | N/A | - | N/A | - | N/A |
| 12 | Other Equity Interests | AA | - | - | - | - | N/A | - | N/A | - | N/A |
| 13 | Intercompany Interests | AB | - | - | - | - | N/A | - | N/A | - | N/A |
| **Total Claims Recovery** | | | $8,466,803 | $8,264,119 | $8,060,826 | $1,227,102 | | $1,345,968 | | $1,465,444 | |

## EP Energy Corporation

| Liquidation Analysis | Note | Actual 30-Sep | Adj. | Forecast 31-Mar | Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | | | | | | | | | | |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $644 | ($644) | $0 | $0 | N/A | $0 | N/A | $0 | N/A |
| Investments in Subsidiaries | AC | (599,216) | - | (599,216) | - | 0% | - | 0% | - | 0% |
| **Total Gross Liquidation Proceeds** | | ($598,571) | ($644) | ($599,216) | $0 | | $0 | | $0 | |
| (-) Net Wind-Down Expenses | I | | | | $0 | | $0 | | $0 | |
| (-) Post-Conversion Cash Flow | J | | | | - | | - | | - | |
| (-) Chapter 7 Trustee Fees | K | | | | - | 3.00% | - | 3.00% | - | 3.00% |
| (-) Chapter 7 Trustee Legal & Financial Advisors | L | | | | - | 2.50% | - | 2.25% | - | 2.00% |
| (-) Chapter 11 Professional Fees Carve-Out | M | | | | - | | - | | - | |
| **Total Net Liquidation Proceeds** | | | | | $0 | | $0 | | $0 | |

[1] Guarantor Debtors include EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092).

## C.     <u>Notes to Liquidation Analysis</u>

### *Gross Liquidation Proceeds*

### A. Cash and Equivalents

- Cash consists of cash in bank accounts and highly liquid investment securities that have original maturities of one year or less.

- The Liquidation Analysis assumes that the Debtors will have access to the cash in its accounts upon conversion of the cases to Chapter 7. However, the secured lenders may have the right to sweep this cash to pay down their Claims upon conversion, which could adversely affect the Trustee's ability to run an orderly liquidation.

- EP Energy Corporation's cash balance is expected to be depleted as of the Conversion Date for the Parent Company's post-petition obligations.

### B. Trade Accounts Receivable

- Balances include amounts due for oil, gas and NGL production accrued through the chapter 7 Conversion Date and not yet received from the Debtors' customers.

- These receivables are expected to be highly collectible, but there could be a risk that the Debtors' customers could make Claims against the estate in a liquidation and attempt to set off their Claims with the Debtors' receivables.

- The analysis assumes that the Trustee would be able to retain the necessary personnel at the Debtors to assist in calculating and collecting these receivables. If the Trustee did not have sufficient access to capital or for any other reason was not able to retain these key personnel, that could negatively impact recovery of these receivables.

- For the purposes of the Liquidation Analysis, recoveries of trade receivables are estimated to be highly recoverable due to the short-term contractual obligations of the receivable counterparties and the low probability of contractual breaches. An ultimate recovery range of 90% to 100% is estimated for trade receivables.

### C. Joint Interest Billing Receivables

- Joint Interest Billing Receivables include receivables from joint interest owners for their share of lease operating expenses, capital expenditures, production taxes, and gathering and transport fees, among other items.

- These receivables are expected to be less collectible than receipts for production as joint interest owners are likely to attempt to offset their potential Claims against the estate for unpaid royalties, lost revenue, and potential other disputes by holding back these receivables and potential other disputes.

- Furthermore, collecting these receipts is further dependent on retaining company personnel to calculate the appropriate bills, and any loss in personnel can negatively impact the Trustee's ability to collect. An ultimate recovery range of 80% to 90% is estimated for Joint Interest Billing Receivables.

### D. Other Receivables

- Other Receivables include tax receivable, intercompany receivables, and other miscellaneous receivables.

- The Debtors anticipate receiving certain tax receivables, which account for the majority of the assets in this category, before the Conversion Date.

- The Liquidation Analysis assumes that no Other Receivables remain as of the Conversion Date. Conversely,

if any Other Receivables should remain, recovery would be negligible, if any.

**E. Net Derivatives Receivables**

- Net Derivatives Receivables include net receivables from hedge settlement partners.

- These receivables are expected to be collectable but are highly susceptible to daily movements in commodity prices and hedge settlement partners may deduct fees or costs to terminate hedges prematurely.

- Values shown are net of derivative settlements expected to be received prior to the Conversion Date.

- To account for commodity price risk and potential termination costs, an ultimate recovery range of 50 to 75% is estimated for Net Derivatives Receivables.

**F. Other Current Assets**

- Other Current Assets include prepaid expenses, prepaid insurance, deferred charges related to the Debtors' employee retention program for 2019 performance, and other vendor deposits.

- Prepaid insurance and deferred charged related to the deferred retention plan are assumed to run off, or otherwise have no salvage value, in the course of the wind-down. Most of the remaining Other Current Assets are not expected to be recoverable under a liquidation scenario.

- For the purposes of the Liquidation Analysis, an ultimate recovery range of 0% to 25% is assumed for Other Current Assets.

**G. Net Oil & Gas Properties**

- Given the daily production and depletion of oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prompt and broad marketing of the assets over a four-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets. The Liquidation Analysis assumes that the Trustee will expend minimal capital necessary to maintain production and preserve asset value.

- The liquidation of the Debtors' oil and gas properties includes proved reserves and unproved reserves that are assumed to generate an aggregate sale value in the range of $1.272 billion to $1.493 billion based on risk adjusted discount rates for proved and unproved reserves, adjusted to account for current market conditions, limited operational performance history for certain of the Debtors' assets, and the impact of the sale in a forced liquidation.

- Proceeds from Net Oil & Gas Properties are assumed to be adjusted for a buyer's assumption of approximately $17.4 million of royalties payable in suspense. The suspense liabilities represent royalty obligations of the Debtors where title work may still be in process or the applicable royalty owners cannot be located and payments may escheat to state governments in the future.

- The income approach considered the Debtors' reserve report with an effective date as of March 31, 2020 using the NYMEX strip as of December 6, 2019 for the commodity price forecast.  The source of the reserve data and associated cash flows is the Debtors' corporate model and business plan as of December 2019. Depending on the reserve category, certain risk adjustments were made to the discounted cash flow values for proved and unproved reserves.

- The Liquidation Analysis does not account for the potential loss of unproved reserves as a result of lease acreage that the Debtors may lose upon the cessation of drilling and completion capital expenditures, under contractual continuous drilling obligations or lease expiration provisions.

**H. Other Net Property, Plant & Equipment**

- Net Other Property, Plant & Equipment, mainly consists of capitalized leases, office furniture, fixtures, and computer equipment, for which only a limited recovery is assumed.

- For the purpose of the Liquidation Analysis, an ultimate recovery of 7% to 15% is estimated for Net Other Property, Plant & Equipment.

*Liquidation Costs*

**I. Net Wind-Down Expenses**

- The Liquidation Analysis assumes the sale of the Debtors' oil and gas assets on July 31, 2020 and an additional four-month post-closing wind-down period. During the eight-month total wind-down period, the Liquidation Analysis assumes the Debtors will continue to employ the workforce required during the asset marketing and sale process and ensuing wind-down of the estate.

- The Trustee is assumed to reduce employee and other related expenses upon the conversion of the case and throughout the eight-month liquidation timeframe. This Liquidation Analysis includes the cost of an employee retention program equal to a blended rate of 35% of total employee compensation.

**J. Post-Conversion Cash Flow**

- The Liquidation Analysis assumes that the Trustee will make payments necessary to maintain existing production during the four-month sales process to preserve value of the marketed oil and gas assets.

- These expenses include: (1) royalty payments where the Debtors have collected funds for the benefit of royalty owners; (2) oil and gas production taxes related to the sale of produced oil and gas assets prior to the Conversion Date; (3) gathering, processing and transportation counterparties that might be able to shut-in production of certain oil and gas properties in the event of nonpayment; and (4) certain lease operating expense vendors necessary for the continued operation of producing oil and gas wells.

**K. Chapter 7 Trustee Fees**

- Section 326 of the Bankruptcy Code provides for fees payable to the Trustee of 3.0% for liquidation proceeds in excess of $1 million, excluding cash.

**L. Chapter 7 Trustee Legal and Financial Advisors**

- Professional fees include estimates for certain legal and financial advisory professionals required during the wind-down period.

- These professionals are assumed to be paid 2.0% to 2.5% of the gross liquidation proceeds, excluding cash.

**M. Chapter 11 Professional Fees Carve-Out**

- Chapter 11 Professional Fees Carve-Out includes unpaid professional fees for professionals retained by the Debtors pursuant to section 327, 238, or 363 of the Bankruptcy Code and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code, incurred prior to the Carve Out Trigger Date as defined in the DIP Order.

*Recovery Analysis*

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

**N. Class 1 – Other Secured Claims**

- Other Secured Claims include accrued and unpaid property taxes. The Liquidation Analysis projects a full recovery on account of these Claims.

**O. Class 2 – Other Priority Claims**

- No Class 2 Claims are estimated, and, therefore, no recovery on account of these Claims is projected.

**P. Class 3 - DIP Claims**

- Class 3 Claims consist of approximately $263.5 million in outstanding DIP Claims, consisting of principal and letters of credit assumed to be drawn on the Conversion Date, plus accrued and unpaid pre- and post-Conversion Date interest.

- While not included in the Class 3 Claims, unpaid professional fees included in the Chapter 11 Professional Fees Carve-Out would otherwise be considered pari-passu with the other DIP Claims.

- The Liquidation Analysis projects that all allowed and undisputed DIP Claims (including all claims for adequate protection pursuant to the order approving the DIP) will be paid in full.

**Q. Class 3 - RBL Claims**

- Class 3 Claims consist of approximately $327.1 million in outstanding RBL Claims, consisting of principal, plus accrued and unpaid pre- and post-Conversion Date interest.

- The Liquidation Analysis projects that all allowed and undisputed RBL Claims will be paid in full.

**R. Class 4 – 1.125 Lien Notes Claims**

- The Liquidation Analysis assumes there will be approximately $1.000 billion in outstanding Class 4 Claims consisting of principal, plus accrued and unpaid pre-Petition Date interest.

- The Liquidation Analysis <u>excludes</u> approximately $97.8 million of a potential make-whole claim that the 1.125 Lien Noteholders could attempt to assert.  Since no recovery scenarios assume that Class 4 Claims will recover in full, no make-whole claim has been included in any of the recovery scenarios.

- The Liquidation Analysis projects the Class 4 Claims will be paid approximately 63% to 87%.

**S. Class 5 – 1.25 Lien Notes Claims**

- The Liquidation Analysis assumes there will be approximately $513.7 million in outstanding Class 5 Claims consisting of principal, plus accrued and unpaid pre-Petition Date interest.

- The Liquidation Analysis <u>excludes</u> approximately $30 million of a potential make-whole claim that the 1.25 Lien Noteholders could attempt to assert. Since no recovery scenarios assume that Class 5 Claims will recover in full, no make-whole claim has been included in any of the recovery scenarios.

- The Liquidation Analysis projects the Class 5 Claims will receive no recovery.

**T. Class 6 – Secured 1.5 Lien Notes Claims**

- The Liquidation Analysis assumes there will be approximately $2.187 billion in outstanding Class 6 Claims consisting of principal, plus accrued and unpaid pre-petition interest.

- The Liquidation Analysis projects the Class 6 Claims will receive no recovery.

## U. Administrative Claims

- Administrative Claims include approximately $159.0 million of unpaid post-petition trade vendor payables and accrued liabilities and other costs and expenses of administration of the Debtors' estates during the Chapter 11 Cases. This estimate is exclusive of claims that might otherwise have administrative status but which are assumed to be paid in the Post-Conversion Cash Flow or which are included in the Chapter 11 Professional Fees Carve-Out.

- In addition to the above, Administrative Claims include the $26 million Backstop Agreement Termination Fee to the Commitment Parties.

- The cessation of the business in a liquidation would likely incur other Claims including contract rejection Claims unless specified herein. No attempt has been made here to value such liabilities, unless specified herein.

- The Liquidation Analysis projects no recovery for holders of Administrative Claims.

- Adequate protection claims in the form of superpriority administrative claims granted under the DIP Order (ECF No. 482) are entitled to recover out of all prepetition and postpetition property of the applicable Debtors, excluding the Carve-Out (*provided*, that such claims must be satisfied out of property other than avoidance actions or the proceeds thereof before being satisfied out of avoidance actions or the proceeds thereof). The Liquidation Analysis does not take into account recoveries that may occur on account of any such adequate protection claims.

## V. Class 7 – Unsecured Claims

- The Liquidation Analysis assumes that there will be approximately $3.580 billion to $3.986 billion in Class 7 Claims.

- Class 7 Claims consist of approximately $2.830 billion to $3.068 billion of deficiency claims relating to the 1.125 Lien Notes Claims, the 1.25 Lien Notes Claims, and the Secured 1.5 Lien Notes Claims. In addition, Class 7 includes approximately $710.1 million of Unsecured Notes Claims, inclusive of principal plus pre-petition accrued and unpaid interest; and approximately $40.4 million to $208.1 million of General Unsecured Claims, inclusive of estimates of pending litigation claims and contract rejection damages for contracts included in contract rejection motions approved by the Court.

- The inclusion of estimates of pending litigation claims are provided for the illustrative purposes of this Liquidation Analysis and do not represent an admission of liability or degree of fault by the Debtors. In the event these Cases are converted to a Chapter 11 liquidation, additional contracts would likely be rejected, thereby increasing Class 7 Claims by the amount of additional damages arising out of such additional contract rejections.

- The Liquidation Analysis projects no estimated recovery for Class 7 Claims.

## W. Class 8 - Convenience Claims

- The Debtors estimate that there will be no Class 8 recoveries.

## X. Class 9 - Intercompany Claims

- The Liquidation Analysis does not take into account intercompany claims among the Debtors.

- The Debtors estimate that there will be no Class 9 recoveries.

**Y. Class 10 – Subordinated Claims**

- The Debtors estimate that there will be no Class 10 recoveries.

**Z. Class 11 – Existing Equity Interests**

- The Debtors estimate that there will be no Class 11 recoveries.

**AA. Class 12 – Other Equity Interests**

- The Debtors estimate that there will be no Class 12 recoveries.

**AB. Class 13 – Intercompany Interests**

- The Debtors estimate that there will be no Class 13 recoveries.

**AC. Investment in Subsidiaries**

- The Liquidation Analysis assumes that Investments in Subsidiaries, which include EP Energy Corporation's equity interests in the Guarantor Debtors and have a negative value generate no liquidation proceeds for distribution.

## Exhibit E

**Financial Projections**

# EXHIBIT E
# FINANCIAL PROJECTIONS

*The prospective financial information included in this Disclosure Statement has been prepared by, and is the responsibility of, the Debtors' management team ("**Management**"). No independent auditors have examined, compiled or performed any procedures with respect to the accompanying prospective financial information.*

*The Debtors do not, as a matter of course, publish their business plans, budgets or strategies or disclose projections or forecasts of their anticipated financial positions, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets, strategies, projections or forecasts of their anticipated financial positions, results of operations or cash flows to creditors or equity interest holders prior to the Effective Date of the Plan or to include such information in documents required to be filed with the SEC or otherwise make such information publicly available.*

*The assumptions, projections and other financial information contained in this section contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.*

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Management has prepared financial projections (the "**Projections**") for April 2020 through December 2024 (the "**Projection Period**"). The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations assuming the consummation of the Plan. The Projections are presented on a consolidated basis, including estimates of operating results for all Debtor entities. The Projections will also assist each holder of a claim or interest in determining whether to vote to accept or reject the Plan. In general, as illustrated by the Projections, the reduction of debt on the Debtors' balance sheet will substantially reduce future interest expense and improve future cash flows. Based on the Projections, the Debtors should have sufficient cash flow to pay and service their post-restructuring debt obligations and to operate their business. The Debtors believe that the Confirmation Date and Effective Date of the Plan are not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF A COMPREHENSIVE FRESH START ACCOUNTING ANALYSIS, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES. ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED BELOW IN SECTION [XI], A VARIETY OF RISK FACTORS COULD AFFECT THE

REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED. ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN SECTION XI BELOW AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES AND ANY RESULTING CHANGES TO THE PROJECTIONS COULD BE MATERIAL.

**1) General Assumptions**

**a. Overview**

The Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore liquids-rich oil and natural gas assets in the United States.

**b. Presentation**

The Projections are presented on a consolidated basis, including estimates of operating results for the Debtor entities in total.

**c. Accounting Policies**

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to Accounting Standards Certification ("**ASC**") 852-10, as issued by the Financial Accounting Standards Board.

**d. Methodology**

Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections. In preparation of the Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The Projections were developed on a bottoms-up basis and incorporate multiple sources of information, including general business and economic conditions.

**e. Plan Consummation**

The operating assumptions assume that the Restructuring Transaction will be consummated pursuant to the Plan and that the Plan will be confirmed and consummated by March 31, 2020 and reflect the estimated cash impact of the Plan's treatment of each class of claims or interests. The Debtors do not believe a change in the assumed date of the consummation of the Plan would materially impact the post-confirmation capital structure, their operating performance, these Projections or the underlying economics associated with the Plan.

**2) Assumptions with Respect to the Projected Income Statement**

**a. Production**

Forecasted oil, natural gas and natural gas liquids ("**NGL**") volumes for operated production are based on production estimates by Management and contemplate future commodity prices and anticipated operated rig activity. Forecasted volumes for non-operated production are based on anticipated development plans of outside operators obtained through active dialogue with those operators.

| FORECASTED VOLUMES Equivalent MBOE/day | Apr. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Permian | 16.3 | 15.4 | 14.2 | 13.0 | 12.0 |
| Eagle Ford | 39.5 | 33.9 | 33.4 | 37.1 | 33.0 |
| NEU/Altamont | 24.5 | 29.1 | 32.7 | 33.7 | 38.9 |
| **Total Volumes** | **80.3** | **78.4** | **80.3** | **83.8** | **83.9** |

**b. Revenues**

Revenues are derived from the sale of the consolidated **Reorganized Debtors'** share of oil, natural gas and NGL production primarily from its owned working interests in the Permian Basin, Eagle Ford Basin and Northeastern Utah.

**c. Commodity Pricing**

Revenues are sensitive to changes in the prices received for oil and natural gas production. Oil and natural gas production are sold at prevailing market prices, which may be volatile and subject to numerous factors which are outside of the Reorganized Debtors' control. The Projections assume New York Mercantile Exchange ("**NYMEX**") futures strip pricing for crude oil and natural gas as of **December 6, 2019**, as shown in the chart below: Assumptions regarding realized pricing (i.e., "differentials") from NYMEX are based on input from Management and existing marketing, gathering and transportation contracts with purchasers of the Reorganized Debtors' production.

| FORECASTED PRICE DECK | Apr. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Oil ($bbl) | $ 57.16 | $ 53.35 | $ 51.58 | $ 50.94 | $ 50.97 |
| Gas ($/mcf) | $ 2.30 | $ 2.44 | $ 2.45 | $ 2.48 | $ 2.53 |

**d. Rig Count**

Contemplating the forecasted commodity pricing, Management has assumed the following operated rig counts, as shown in the chart below:

| FORECASTED RIGS | Apr. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 |
|---|---|---|---|---|---|
| Permian | 0 | 0 | 0 | 0 | 0 |
| Eagle Ford | 0.5 | 1 | 1 | 1 | 1 |
| NEU/Altamont | 2 | 2 | 2 | 2 | 2.5 |
| Total | 2.5 | 3 | 3 | 3 | 3.5 |

**e. Transportation Costs**

Transportation costs are based on forecast production and the terms of existing transportation contracts. Certain savings are forecast for contracts that are anticipated to be rejected or renegotiated. As contracts

expire, they are assumed to be replaced with new arrangements at Management's estimate of market rates.

**f. Operating Costs**

Lease operating expenses ("**LOE**"), gathering and transportation expenses, and production taxes are based on Management estimates of future production, activity, and revenue. LOE includes, among other items, lifting costs, fuel, certain payroll, maintenance and repair and outside services.

**g. Income Taxes**

For the forecast period, no Federal Income Taxes are projected to be paid due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs. The projections show a net tax benefit each year building a deferred tax asset. Tax projections have not been approved by a licensed tax professional and do not constitute a thorough and exhaustive tax analysis performed on behalf of the Debtors.

**h. General and Administrative**

General and Administrative Costs ("**G&A**") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead. Projected G&A is based on a department by department budget.

**i. Depreciation, Depletion & Amortization**

Depreciation, Depletion and Amortization ("**DD&A**") is forecasted using the units of production method ("**UOP**") for oil and gas properties and the straight-line method for fixed assets. The amortization base in the UOP calculation includes the sum of proved property, net of accumulated DD&A, estimated future development costs (future costs to access and develop proved reserves), and asset retirement costs, less related salvage value.

**j. Reorganization Expenses**

Reorganization expenses consist of actual and estimated fees for professional advisors, financing fees and other costs directly attributable to the Chapter 11 Cases. Expenses and other costs associated with the restructuring are forecasted to be approximately $84.5 million. These expenses are forecast to be paid by March 31, 2020 and there are therefore no reorganization expenses in the Projection Period.

**3) Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

The projected Consolidated Balance Sheet was developed using September 30, 2019 unaudited financial results as a starting point and adjusted on a go-forward basis, incorporating projected results from operations and cash flows over the Projection Period.

**a. Capital Expenditures**

Projections for capital expenditures were prepared with consideration of the Debtors' current drilling program and future estimates in the development of the Permian Basin, Eagle Ford Basin and Northeastern Utah. These expenditures include capital associated with drilling and completing new wells, improving operational efficiency and building infrastructure. Capital expenditures also include

expenditures directed at maintaining lease acreage positions, capitalized maintenance, and geological and geophysical expenditures.

All plugging and abandonment related obligations anticipated during the Projection Period are assumed to be addressed in the ordinary course, and are accounted for in the Projections.

**b. Working Capital**

The Projections contemplate timing of forecasted receivables, payables and interest payments that are consistent with the timing experienced with the Debtors' historical receipts and payments.

**c. Pro Forma Adjustments Related to Emergence**

The Balance Sheet included in the Projections presents a pro forma view assuming the effect of certain adjustments related to the Debtors' Restructuring Transactions. These adjustments primarily relate to the exchange of 1.5L Notes and 1.25L Notes for equity as well as the $325 million rights offering proceeds. While the 2020 through 2024 Projections roll-forward the effect of such pro forma adjustments, fresh-start accounting pursuant to ASC 852-10 principles have not been applied.

**d. Capital Structure**

The Projections include secured financing in the form of 1) a $629 million reserve based revolving Exit Facility, 2) $1 billion in reinstated 1.125L Notes and 3) $362 million in reinstated 1.25L Notes. The Projections also include a $463 million Equity Rights Offering at emergence in the form of 1) $325 million of cash and 2) $138 million in equitized 1.25L Notes. Proceeds under the Exit Facility and Equity Rights Offering will allow the Reorganized Debtors to finance day-to-day operations and the forecasted capital plan.

Assuming an Effective Date of March 31, 2020, the Exit Facility will mature on March 31, 2024 and the 1.25L Notes will mature on May 1, 2024. The Projections are presented through year end 2024 and these debt issuances are assumed to be refinanced upon their respective maturities. This is assumed for illustrative purposes only and the Projections do not contemplate any other debt financings or equity issuances.

**e. Interest Expense**

Interest Expense includes interest on all tranches of the Reorganized Debtors' debt. Interest on the Exit Facility is assumed at a constant LIBOR rate of 2.2% and the applicable rate grid is based on the pre-petition Borrowing Base of $1.36 billion.

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on December 12,2019*

| CONSOLIDATED INCOME STATEMENT | | | | | |
|---|---|---|---|---|---|
| ($ in Thousands) | Apr.-Dec. 2020E | 2021E | 2022E | 2023E | 2024E |
| **OPERATING REVENUE** | | | | | |
| Oil | 669,730 | 767,641 | 774,939 | 797,887 | 810,285 |
| Natural Gas | 42,250 | 66,968 | 66,328 | 74,445 | 73,861 |
| NGLs | 51,047 | 67,074 | 61,343 | 68,029 | 63,254 |
| **Total Physical Sales** | $ 763,027 | $ 901,683 | $ 902,611 | $ 940,362 | $ 947,399 |
| **TOTAL OPERATING REVENUE** | $ 763,027 | $ 901,683 | $ 902,611 | $ 940,362 | $ 947,399 |
| **OPERATING EXPENSES** | | | | | |
| Transportation Costs | 41,865 | 50,820 | 45,267 | 42,510 | 38,378 |
| Lease Operating Expense | 111,421 | 150,711 | 154,989 | 161,703 | 163,746 |
| General & Administrative | 49,791 | 62,284 | 62,284 | 62,284 | 62,284 |
| Depreciation, Depletion & Amortization | 376,349 | 487,825 | 499,797 | 521,804 | 523,504 |
| Exploratory Costs | 1,022 | 2,672 | 2,672 | 2,672 | 2,672 |
| Other Terminations | 3,000 | - | - | - | - |
| Taxes Other Than Income | 54,388 | 61,353 | 61,227 | 63,911 | 64,790 |
| **Total Operating Expenses** | $ 637,837 | $ 815,664 | $ 826,236 | $ 854,884 | $ 855,375 |
| **Operating Income (Loss)** | $ 125,190 | $ 86,018 | $ 76,374 | $ 85,478 | $ 92,025 |
| **INCOME (LOSS) FROM OPERATIONS** | | | | | |
| Other-Income(Expense) | (940) | (1,253) | (1,253) | (1,253) | (1,253) |
| Interest Expense | (91,240) | (116,976) | (115,273) | (115,429) | (113,848) |
| **Income (Loss) Before Income Taxes** | $ 33,011 | $ (32,211) | $ (40,152) | $ (31,204) | $ (23,077) |
| **LOSS FROM CONTINUING OPERATIONS BEFORE INCOME TAX** | | | | | |
| Income Tax Expense (Benefit) | 6,932 | (6,764) | (8,432) | (6,553) | (4,846) |
| **NET (LOSS) INCOME** | $ 26,079 | $ (25,447) | $ (31,720) | $ (24,651) | $ (18,231) |
| **NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS** | $ 26,079 | $ (25,447) | $ (31,720) | $ (24,651) | $ (18,231) |
| **EBITDAX RECONCILIATION** | | | | | |
| Net Income (Loss) Attributable to Common Shareholders | 26,079 | (25,447) | (31,720) | (24,651) | (18,231) |
| Depreciation, Depletion & Amortization | 376,349 | 487,825 | 499,797 | 521,804 | 523,504 |
| Interest Expense | 91,240 | 116,976 | 115,273 | 115,429 | 113,848 |
| Exploration Expense | 1,022 | 2,672 | 2,672 | 2,672 | 2,672 |
| Hedge Settlements | (2,617) | - | - | - | - |
| Income Tax Expense | 6,932 | (6,764) | (8,432) | (6,553) | (4,846) |
| **Adjusted EBITDAX** | $ 499,944 | $ 576,515 | $ 578,844 | $ 609,954 | $ 618,201 |

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on December 12,2019*

| CONSOLIDATED BALANCE SHEET ($ in Thousands) | Pre-Reorg 3/31/2020 | Debt Discharge | Equity Raise | Credit Facility Refinancing | Post-Reorg 3/31/2020 | 2020E | 2021E | 2022E | 2023E | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| Cash & Cash Equivalents | 54,838 | | 325,000 | (358,379) | 21,458 | 19,077 | 17,809 | 23,429 | 21,881 | 22,433 |
| Restricted Cash | 925 | | | | 925 | 925 | 925 | 925 | 925 | 925 |
| Accounts Receivable | 133,244 | | | | 133,244 | 142,064 | 136,389 | 134,486 | 135,772 | 142,158 |
| Materials and Supplies | 45,442 | | | | 45,442 | 45,442 | 45,442 | 45,442 | 45,442 | 45,442 |
| Deferred Income Tax | - | | | | - | - | - | 8,264 | 14,817 | 19,663 |
| Other | 22,863 | | | | 22,863 | 16,523 | 15,270 | 14,017 | 12,764 | 11,510 |
| **Total Current Assets** | $ 257,312 | $ - | $ 325,000 | $ (358,379) | $ 223,933 | $ 224,031 | $ 215,836 | $ 226,562 | $ 231,601 | $ 242,131 |
| **Property, Plant & Equipment, net** | $ 3,971,689 | $(1,359,442) | $ - | $ - | $ 2,612,246 | $ 2,518,592 | $ 2,434,262 | $ 2,403,241 | $ 2,346,187 | $ 2,292,494 |
| **Other Non-Current Assets** | $ 22,118 | $ - | $ - | $ - | $ 22,118 | $ 22,118 | $ 22,118 | $ 22,118 | $ 22,118 | $ 22,118 |
| **TOTAL ASSETS** | $ 4,251,118 | $(1,359,442) | $ 325,000 | $ (358,379) | $ 2,858,297 | $ 2,764,740 | $ 2,672,216 | $ 2,651,921 | $ 2,599,906 | $ 2,556,743 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable-Trade | 203,475 | | | | 203,475 | 99,281 | 129,308 | 140,943 | 133,641 | 138,832 |
| Derivative Instruments | 2,617 | | | | 2,617 | - | - | - | - | - |
| Accrued Interest | 161,259 | (118,863) | | | 42,396 | 12,639 | 12,300 | 12,258 | 12,196 | 12,073 |
| Deferred Income Tax | - | | | | - | 6,932 | 168 | - | - | - |
| Reserves-Current | 11,250 | | | | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 | 11,250 |
| Asset Retirement Obligation | 2,900 | | | | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 | 2,900 |
| Accrued Taxes Other Than Income | 29,243 | | | | 29,243 | 29,243 | 29,243 | 29,243 | 29,243 | 29,243 |
| Other | 17,258 | | | | 17,258 | 17,258 | 17,258 | 17,258 | 17,258 | 17,258 |
| **Total Current Liabilities** | $ 428,002 | $ (118,863) | $ - | $ - | $ 309,139 | $ 179,504 | $ 202,426 | $ 213,851 | $ 206,488 | $ 211,555 |
| **Debt** | | | | | | | | | | |
| DIP Facility | 268,669 | | | (268,669) | - | - | - | - | - | - |
| Exit Facility | | | | 225,000 | 225,000 | 235,000 | 145,000 | 145,000 | 125,000 | 95,000 |
| RBL | 314,710 | | | (314,710) | - | - | - | - | - | - |
| 1.125L Notes due May 2026 | 1,000,000 | | | | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 |
| 8.000% 1.25L Notes Due November 2024 | 500,000 | | (138,000) | | 362,000 | 362,000 | 362,000 | 362,000 | 362,000 | 362,000 |
| 9.375% 1.5L Notes Due May 2024 | 1,091,792 | (1,091,792) | | | - | - | - | - | - | - |
| 8.000% 1.5L Notes due February 2025 | 1,000,000 | (1,000,000) | | | - | - | - | - | - | - |
| 9.375% Senior Unsecured Notes Due May 2020 | 182,034 | (182,034) | | | - | - | - | - | - | - |
| 7.750% Senior Unsecured Notes Due Sept. 2022 | 182,319 | (182,319) | | | - | - | - | - | - | - |
| 6.375% Senior Unsecured Notes Due June 2023 | 323,801 | (323,801) | | | - | - | - | - | - | - |
| **Total Debt** | $ 4,863,325 | $(2,779,946) | $ (138,000) | $ (358,379) | $ 1,587,000 | $ 1,597,000 | $ 1,507,000 | $ 1,507,000 | $ 1,487,000 | $ 1,457,000 |
| **Other Long Term Liabilities** | | | | | | | | | | |
| Asset Retirement Obligation | 41,268 | | | | 41,268 | 41,268 | 41,268 | 41,268 | 41,268 | 41,268 |
| Other | 20,890 | | | | 20,890 | 20,890 | 20,890 | 20,890 | 20,890 | 20,890 |
| **Total Other Long Term Liabilities** | $ 62,158 | $ - | $ - | $ - | $ 62,158 | $ 62,158 | $ 62,158 | $ 62,158 | $ 62,158 | $ 62,158 |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| Common Stock | 2,555 | (2,465) | | | 90 | 90 | 90 | 90 | 90 | 90 |
| Additional Paid-in-Capital | 3,542,672 | (3,105,762) | 463,000 | | 899,910 | 899,910 | 899,910 | 899,910 | 899,910 | 899,910 |
| Retained Earnings | (4,646,591) | 4,646,591 | | | - | 26,079 | 632 | (31,088) | (55,740) | (73,971) |
| Treasury Stock | (1,003) | 1,003 | | | | | | | | |
| **Total Stockholders' Equity** | $(1,102,367) | $ 1,539,367 | $ 463,000 | $ - | $ 900,000 | $ 926,079 | $ 900,632 | $ 868,912 | $ 844,260 | $ 826,029 |
| **Total Liabilities & Equity** | $ 4,251,118 | $(1,359,442) | $ 325,000 | $ (358,379) | $ 2,858,297 | $ 2,764,740 | $ 2,672,216 | $ 2,651,921 | $ 2,599,906 | $ 2,556,743 |

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on December 12, 2019*

| CONSOLIDATED STATEMENT OF CASH FLOWS | | Apr.-Dec. 2020E | | 2021E | | 2022E | | 2023E | | 2024E |
|---|---|---|---|---|---|---|---|---|---|---|
| ($ in Thousands) | | | | | | | | | | |
| **OPERATING** | | | | | | | | | | |
| Net Income (loss) | $ | 26,079 | $ | (25,447) | $ | (31,720) | $ | (24,651) | $ | (18,231) |
| **Adjustments:** | | | | | | | | | | |
| DD&A | | 376,349 | | 487,825 | | 499,797 | | 521,804 | | 523,504 |
| Amortization of equity compensation expense | | 5,400 | | - | | - | | - | | - |
| | | 388,681 | | 481,060 | | 491,365 | | 515,251 | | 518,658 |
| **Asset and Liability Changes** | | | | | | | | | | |
| Accounts receivable | | (8,820) | | 5,674 | | 1,904 | | (1,287) | | (6,386) |
| Accounts payable | | (104,194) | | 30,027 | | 11,634 | | (7,302) | | 5,191 |
| Derivative Instruments | | (2,617) | | - | | - | | - | | - |
| Accrued interest | | (29,756) | | (340) | | (41) | | (62) | | (124) |
| Other current asset changes | | 940 | | 1,253 | | 1,253 | | 1,253 | | 1,253 |
| NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES | $ | 270,313 | $ | 492,228 | $ | 474,395 | $ | 483,203 | $ | 500,362 |
| **INVESTING** | | | | | | | | | | |
| Capital expenditures | | (282,694) | | (403,495) | | (468,776) | | (464,751) | | (469,810) |
| NET CASH (USED IN) PROVIDED BY INVESTING ACTIVITIES | $ | (282,694) | $ | (403,495) | $ | (468,776) | $ | (464,751) | $ | (469,810) |
| **FINANCING** | | | | | | | | | | |
| Exit Facility Draws / (Repayments) | | 10,000 | | (90,000) | | - | | (20,000) | | (30,000) |
| NET CASH PROVIDED BY FINANCING ACTIVITIES | $ | 10,000 | $ | (90,000) | $ | - | $ | (20,000) | $ | (30,000) |
| **CASH - BEGINNING** | $ | 21,458 | $ | 19,077 | $ | 17,809 | $ | 23,429 | $ | 21,881 |
| **NET (DECREASE) INCREASE IN CASH** | $ | (2,382) | $ | (1,267) | $ | 5,619 | $ | (1,548) | $ | 552 |
| **CASH - ENDING** | $ | 19,077 | $ | 17,809 | $ | 23,429 | $ | 21,881 | $ | 22,433 |

**<u>Exhibit F</u>**

**Rights Offering Procedures**

## EP ENERGY CORPORATION

## RIGHTS OFFERING PROCEDURES

Pursuant to the *Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and its Affiliate Debtors* (as such plan of reorganization may be amended, modified or supplemented from time to time in accordance with its terms, the "*Plan*") of EP Energy Corporation, a Delaware company (the "*Company*") and its affiliated debtors (collectively, the "*Debtors*"), each holder of an Allowed 1.5 Lien Notes Claim is being granted a subscription right (each, a "*Subscription Right*") to purchase shares of common stock, par value $0.01 per share (the "*New Common Shares*") of the Company offered pursuant to this Rights Offering.

The New Common Shares issuable upon exercise of a Subscription Right are being distributed and issued without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance upon the exemption provided by Section 4(a)(2) thereof, and as more fully described in these Rights Offering Procedures.

None of the Subscription Rights or New Common Shares issuable upon exercise of such rights distributed pursuant to these Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no New Common Shares may be sold or transferred except pursuant to an effective registration statement or pursuant to an exemption from registration under the Securities Act.

Other than as provided in Section 2.9 of the Backstop Commitment Agreement (as defined below), which permits the (i) transfer of Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser and (ii) the transfer of a Commitment Party's 1.5 Lien Notes Claims following the Rights Offering Record Date without a corresponding transfer of Subscription Rights, the Subscription Rights are not detachable from Allowed Claims (as defined below), and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Common Shares, the 1.5L Notes Claims and any related claims), except as set forth in Section 5 herein, and any such sale, transfer, assignment, pledge, hypothecation, participation, encumbrance or disposal of the Allowed Claims (except, with respect to the settlement of Allowed Claims held on the Rights Offering Record Date or in accordance with Section 2.9 of the Backstop Commitment Agreement) shall void the Subscription Rights.

The Rights Offering is being conducted in good faith and in compliance with the Bankruptcy Code. In accordance with Section 1125(e) of the Bankruptcy Code, any person that participates, in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a security offered

or sold under the plan of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such participation, for violation of any applicable law, rule, or regulation governing the offer, issuance, sale or purchase of securities.

Each of the New Common Shares issued upon exercise of a Subscription Right, and each book-entry position or certificate issued in exchange for or upon the transfer, sale or assignment of any such New Common Share, shall be deemed to contain or be stamped or otherwise imprinted with, as applicable, a legend in substantially the following form:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [ISSUANCE DATE], HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*ACT*"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

[●], 2020

Eligible Claimants (as defined below) should note the following times relating to the Rights Offering:

| Date | Calendar Date | Event |
|---|---|---|
| Rights Offering Record Date………………………. | [●], 2020 | The date and time for the determination of the holders entitled to participate in the Rights Offering. |
| Subscription Commencement Date.. | 9:00 a.m. New York City Time on [●], 2020 | Commencement of the Rights Offering. |
| Subscription Expiration Deadline … | 5:00 p.m. New York City Time on [●], 2020 | The deadline for Eligible Claimants to subscribe for New Common Shares. An Eligible Claimant's rights offering subscription exercise form (the "**Rights Offering Subscription Form**") (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and executed subscription agreement (the "**Subscription Agreement**") must be returned to (a) its securities nominee (the "**Nominee**") or (b) if such Eligible Claimant does not hold its 1.5 Lien Notes through a Nominee (such Eligible Claimant, a "**Registered Holder**") or is otherwise directed to do so by its Nominee, Prime Clerk LLC (the "**Subscription Agent**"), in either case so that such documents are actually received by the Subscription Agent on or before the Subscription Expiration Deadline.

Eligible Claimants who are not Initial Commitment Parties must deliver the Aggregate Purchase Price (as defined below) on or prior to the Subscription Expiration Deadline.

Eligible Claimants who are Initial Commitment Parties must deliver the Aggregate Purchase Price (as defined below) and, if applicable, their Exchange Subscription Amount (as defined below) by the Backstop Funding Deadline (as defined below). |

**Terms used and not defined herein shall have the meaning assigned to them in the Plan (as defined below) or the Backstop Commitment Agreement, as the case may be.**

To Eligible Claimants:

EP Energy Corporation and certain of its directly- and indirectly-owned subsidiaries, as chapter 11 debtors and debtors in possession (such subsidiaries, together with the Company, the "***Debtors***"), are seeking to implement a proposed financial restructuring of their existing funded debt and certain other obligations pursuant to the Plan and related disclosure statement (the "***Disclosure Statement***").

The New Common Shares, with an aggregate purchase price of $475,000,000 (the "***Rights Offering Amount***"), may be subscribed for by Eligible Claimants. Each holder of 1.5L Notes Claims (as defined in the Plan) on the Rights Offering Record Date that is either (i) an institutional "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act or (ii) a qualified institutional buyer as defined in Rule 144A under the Securities Act (each such holder, an "***Eligible Holder***") will receive Subscription Rights with respect to the 1.5L Notes Claims held or beneficially held[1] by such Eligible Holder as of the Rights Offering Record Date (such 1.5L Notes Claims, "***Allowed Claims***" and an Eligible Holder of Allowed Claims, an "***Eligible Claimant***").

Each Eligible Claimant has the right, but not the obligation, subject to and in accordance with these Rights Offering Procedures, to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) (x) timely pays the applicable Aggregate Purchase Price and (y) in the case of certain Commitment Parties, timely delivers its applicable Exchange Subscription Amount.

In addition, no Eligible Claimant shall be entitled to participate in the Rights Offering unless its Aggregate Purchase Price is received by the Subscription Agent and, if applicable, its Exchange Subscription Amount is received by the Debtors, in each case with respect to the New Common Shares it subscribes for (i) in the case of an Eligible Claimant that is not an Initial Commitment Party, by the Subscription Expiration Deadline, and (ii) in the case of an Eligible Claimant that is an Initial Commitment Party, by the deadline and in the form and manner specified in the Backstop Commitment Agreement (the "***Backstop Funding Deadline***"). No interest is payable on any funding of the Aggregate Purchase Price (but, for the avoidance of doubt, interest shall continue to accrue on all Reinstated 1.25 Lien Notes in accordance with their terms). If the Rights Offering is terminated for any reason, your Aggregate Purchase Price and Exchange Subscription Amount will be returned to you promptly.

---

[1] For these purposes, 1.5 Lien Notes Claims held or beneficially owned, shall include only those Allowed Claims that are properly reflected in the Rights Offering Subscription Form delivered by an Eligible Claimant in accordance with these Rights Offering Procedures.

Before electing to participate in the Rights Offering, all Eligible Claimants should review the Disclosure Statement (including the risk factors described in the section entitled "Factors Related to the Rights Offering") and the Plan, and, in each case, any amendments, supplements or other modifications thereto, in addition to these Rights Offering Procedures and the instructions contained in the Rights Offering Subscription Form. A copy of the Disclosure Statement is available from the Subscription Agent and on the Debtors' restructuring website at http://www.primeclerk.com/EPEnergy.

**In order to participate in the Rights Offering, you must complete all the steps outlined below. If all of the steps outlined below are not completed by the Subscription Expiration Deadline or the Backstop Funding Deadline, as applicable, you shall be deemed to have forever and irrevocably relinquished and waived your right to participate in the Rights Offering.**

1.      **Rights Offering**

Eligible Claimants have the right, but not the obligation, to participate in the Rights Offering.  Only Eligible Claimants as of the Rights Offering Record Date may participate in the Rights Offering.

Subject to the terms and conditions set forth in the Plan, these Rights Offering Procedures and the Subscription Agreement, each Eligible Claimant is entitled to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, determined in accordance with Item 2 of the Rights Offering Subscription Form annexed hereto as Exhibit A, as set forth below.

<u>Reinstated 1.25 Lien Notes Exchange Subscription</u>

Each Eligible Claimant that is a Commitment Party and has an Exchange Amount (as defined in the Backstop Commitment Agreement) ("***Exchange Claimant***") is entitled to and required pursuant to the Backstop Commitment Agreement to (x) exercise its Subscription Rights to subscribe for a number of New Common Shares (the "***Exchange Shares***") equal to (i) such Commitment Party's Exchange Amount, divided by (ii) the Exchange Purchase Price (as defined in the Backstop Commitment Agreement), and (y) in payment for such New Common Shares, to assign for cancellation Reinstated 1.25 Lien Notes held by such Commitment Party with a principal amount equal to its Exchange Amount (such Reinstated 1.25 Lien Notes, such Commitment Party's "***Exchange Subscription Amount***").  Upon such assignment for cancellation, the Company will pay such Commitment Party in cash all accrued but unpaid interest to, but not including, the Effective Date on such Reinstated 1.25 Lien Notes assigned for cancellation.

Assuming that the Aggregate Fully Diluted Common Shares will equal [●] shares, the Exchange Purchase Price will be $[●] per share.  The Company may, subject to the consent of the Requisite Commitment Parties and in accordance with the Plan, determine

to issue a greater or lesser number of shares of New Common Shares on the Effective Date, which would result in a proportional adjustment to both the Exchange Purchase Price and the Exchange Shares pursuant to the definitions of such terms in the Backstop Commitment Agreement and these Rights Offering Procedures.

<u>Cash Subscription</u>

Each Eligible Claimant is entitled to exercise its Subscription Rights to subscribe for New Common Shares (the "***Cash Shares***") for aggregate cash consideration (such Eligible Claimant's "***Aggregate Purchase Price***") not to exceed (i) such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Rights Offering Record Date) of $475,000,000, minus (ii) if such Eligible Claimant is a Commitment Party, such Eligible Claimant's Exchange Amount (if any).  The number of Cash Shares issued to each Eligible Claimant electing to exercise its Subscription Rights will equal such Eligible Claimant's Aggregate Purchase Price divided by the Cash Purchase Price (as defined in the Backstop Commitment Agreement).

Assuming that the Aggregate Fully Diluted Common Shares will equal [●] shares, the Cash Purchase Price will be $[●] per share. The Company may, subject to the consent of the Requisite Commitment Parties and in accordance with the Plan, determine to issue a greater or lesser number of shares of New Common Shares on the Effective Date, which would result in a proportional adjustment to both the Cash Purchase Price and the Cash Shares pursuant to the definitions of such terms in the Backstop Commitment Agreement and these Rights Offering Procedures.

There will be no over-subscription privilege in the Rights Offering. Any New Common Shares that are unsubscribed by the Eligible Claimants entitled thereto will not be offered to other Eligible Claimants but will be purchased by the applicable Commitment Parties in accordance with the Backstop Commitment Agreement.  Subject to the terms and conditions of the Backstop Commitment Agreement, each Commitment Party has agreed to purchase (on a several and not joint basis) a certain portion of the Unsubscribed Shares.

Eligible Claimants will be subject to restrictions under the Securities Act on their ability to resell the New Common Shares, as discussed in more detail in Article VII of the Disclosure Statement, entitled "Transfer Restrictions and Consequences Under Federal Securities Laws."

**SUBJECT TO THE TERMS AND CONDITIONS OF THE SUBSCRIPTION AGREEMENT, AND THE BACKSTOP COMMITMENT AGREEMENT IN THE CASE OF ANY COMMITMENT PARTY, ALL SUBSCRIPTIONS SET FORTH IN THE SUBSCRIPTION AGREEMENT ARE IRREVOCABLE.**

**2.      Subscription Period**

7

The Rights Offering will commence on the Subscription Commencement Date and will expire on the Subscription Expiration Deadline.  Each Eligible Claimant intending to purchase New Common Shares in the Rights Offering must affirmatively elect to exercise its Subscription Rights in the manner set forth in the Rights Offering Subscription Form by the Subscription Expiration Deadline, and must pay for any such exercise by the Subscription Expiration Deadline or Backstop Funding Deadline, as applicable.

Any exercise of Subscription Rights after the Subscription Expiration Deadline will not be allowed and any purported exercise received by the Subscription Agent after the Subscription Expiration Deadline, regardless of when the documents or payment relating to such exercise were sent, will not be honored, except that the Company shall have the discretion, with the consent of the Requisite Commitment Parties, to allow any exercise of Subscription Rights after the Subscription Expiration Deadline.

The Subscription Expiration Deadline may be extended by the Debtors with the consent of the Requisite Commitment Parties or as required by law.

**3.      Delivery of Subscription Agreement**

Each Eligible Claimant may exercise all or any portion of such Eligible Claimant's Subscription Rights, subject to the terms and conditions of the Plan, these Rights Offering Procedures and the Subscription Agreement.  In order to facilitate the exercise of the Subscription Rights, beginning on the Subscription Commencement Date, the Subscription Agent will send these Rights Offering Procedures and a Subscription Agreement to each Eligible Claimant, together with any additional appropriate instructions for the proper completion, due execution, and timely delivery of the executed Subscription Agreement and the payment of the applicable Aggregate Purchase Price and Exchange Subscription Amount, if applicable, for its New Common Shares set forth in Item 2 of such Eligible Claimant's Rights Offering Subscription Form.

To effectuate delivery of the aforementioned documents, the Subscription Agent is authorized to rely on (i) information or registers provided by the applicable indenture trustees of the 1.5 Lien Notes and (ii) securities position reports requested and obtained from DTC for purposes of distribution. In addition, appropriate service of the aforementioned documents will be deemed completed by the Subscription Agent upon delivery of such documents to DTC and the applicable Nominees (or such Nominees' agents); *provided* that the Subscription Agent will instruct such Nominees (or their agents) to immediately distribute such documents to the underlying Noteholders in accordance with their customary procedures.

**4.      Exercise of Subscription Rights**

(a)      In order to validly exercise its Subscription Rights, each Eligible Claimant that is not an Initial Commitment Party must:

i.      return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or

appropriate IRS Form W-8, as applicable) to the Subscription Agent (if a Registered Holder), or its Nominee (or as otherwise directed by its Nominee) so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.       promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay or have paid the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer **ONLY** of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form.

   (b)     In order to validly exercise its Subscription Rights, each Eligible Claimant that is an Initial Commitment Party must:

i.        return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and

ii.       no later than the Backstop Funding Deadline, (i) pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), in accordance with Section 2.4 of the Backstop Commitment Agreement by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of the Rights Offering Subscription Form and (ii) transfer via book-entry, Reinstated 1.25 Lien Notes in an amount equal to its Exchange Amount to an account specified by the Debtors in accordance with the Funding Notice.

With respect to 4(a) and 4(b) above, Eligible Claimants that hold 1.5L Notes Claims through a Nominee must duly complete, execute and return their Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable), and completed Subscription Agreement in accordance with the instructions herein directly to their Nominee (or as otherwise directed by their Nominee) in sufficient time to allow their Nominee to process their information and deliver to the Subscription Agent their completed Rights Offering Subscription Form on or before the Subscription Expiration Deadline.

Eligible Claimants that are Record Holders must duly complete, execute and return their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and completed Subscription Agreement, directly to the Subscription Agent on or before the Subscription Expiration Deadline.

In all cases, Eligible Claimants that are not Initial Commitment Parties must deliver payment of the applicable Aggregate Purchase Price payable for the New Common Shares elected to be purchased by such Eligible Claimant to the Subscription Agent on or prior to the

Subscription Expiration Deadline.  Eligible Claimants that are Initial Commitment Parties must deliver their payment of the applicable Aggregate Purchase Price payable for the New Common Shares elected to be purchased with cash by such Eligible Claimant in accordance with Section 2.4 of the Backstop Commitment Agreement and deliver their Exchange Subscription Amount via book-entry transfer to an account specified by the Debtors no later than the Backstop Funding Deadline.

In the event that the funds received by the Subscription Agent do not correspond to the Aggregate Purchase Price payable for the New Common Shares elected to be purchased by such Eligible Claimant, the number of the New Common Shares deemed to be purchased for cash by such Eligible Claimant will be the lesser of (a) the number of the New Common Shares elected to be purchased by such Eligible Claimant and (b) the number of the New Common Shares determined by dividing the amount of the funds received on account by the Cash Purchase Price, in each case up to the number of New Common Shares permitted to be purchased for cash by such Eligible Claimant.

The cash paid to the Subscription Agent in accordance with these Rights Offering Procedures (and with respect to the Commitment Parties, the Backstop Commitment Agreement) will be deposited and held by the Subscription Agent in a segregated account, which may be an escrow account, held in an agreed upon financial institution until distributed in connection with the settlement of the Rights Offering on the Effective Date or returned to Eligible Claimants as provided in Section 7.  The Subscription Agent may not use such cash for any other purpose prior to the Effective Date and may not encumber or permit such cash to be encumbered with any lien or similar encumbrance. The cash held by the Subscription Agent hereunder and the Reinstated 1.25 Lien Notes held by the Debtors hereunder shall not be deemed part of or property of the Debtors' bankruptcy estates.

## 5.  Transfer Restriction; Revocation

Other than as provided in Section 2.9 of the Backstop Commitment Agreement, which permits the (i) transfer of Subscription Rights held by any Commitment Party to any such Commitment Party's Related Purchaser and (ii) the transfer of a Commitment Party's 1.5 Lien Notes Claims following the Rights Offering Record Date without a corresponding transfer of Subscription Rights, the Subscription Rights are not detachable from Allowed Claims and may not be sold, transferred, assigned, pledged, hypothecated, participated, donated or otherwise encumbered or disposed of, directly or indirectly (including through derivatives, options, swaps, forward sales or other transactions in which any person receives the right to own or acquire any current or future interest in the Subscription Rights, the New Common Shares, the 1.5L Notes Claims and any related claims) (collectively, "*transfer*" or "*transferred*").  In connection with a transfer of Subscription Rights by any Commitment Party to a Commitment Party's Related Purchaser (in addition to any documentation required by the Backstop Commitment Agreement), the Related Purchaser shall deliver upon the exercise of such Subscription Rights a Rights Offering Subscription Form (including its accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement to its Nominee or to the Subscription Agent.

Other than as provided in Section 2.9 of the Backstop Commitment Agreement described above, any transfer or assignment following the Rights Offering Record Date of the corresponding Allowed Claim (except with respect to the settlement of Allowed Claims held on the Rights Offering Record Date) shall void the Subscription Right, and neither such Eligible Claimant nor the purported transferee will receive any New Common Shares otherwise purchasable on account of such voided Subscription Rights.

However, in connection with the exercise of the Subscription Rights, the Eligible Claimant shall have the right to designate the receipt of the New Common Shares to another person that is a Related Fund or a custodian for a Related Fund (such person shall deliver an IRS Form W-9 or appropriate IRS Form W-8, as applicable) by completing Exhibit B to the Rights Offering Subscription Form. Any such designation and delivery of New Common Shares shall be subject to compliance with applicable securities laws relating to the transfer of restricted securities.

Once an Eligible Claimant has properly exercised its Subscription Rights, subject to the terms and conditions of the Subscription Agreement and the Backstop Commitment Agreement in the case of any Commitment Party, such exercise will be irrevocable.

### 6.     Failure to Exercise Subscription Rights

Unexercised Subscription Rights will be relinquished on the Subscription Expiration Deadline. If, on or prior to the Subscription Expiration Deadline, the Subscription Agent for any reason does not receive from an Eligible Claimant a duly completed applicable Rights Offering Subscription Form and Subscription Agreement and, other than in the case of an Eligible Claimant that is an Initial Commitment Party, the applicable Aggregate Purchase Price, such Eligible Claimant shall be deemed to have irrevocably relinquished and waived its right to participate in the Rights Offering. None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.

Any attempt to exercise Subscription Rights after the Subscription Expiration Deadline shall be null and void and the Debtors shall not be obligated (but, with the consent of the Requisite Commitment Parties, shall be permitted) to honor any such purported exercise received by the Subscription Agent after the Subscription Expiration Deadline regardless of when the documents relating thereto were sent.

The method of delivery of the applicable Subscription Agreement, Rights Offering Subscription Form and any other required documents is at each Eligible Claimant's option and sole risk, and delivery will be considered made only when actually received by the Subscription Agent. If delivery is by mail, registered mail with return receipt requested, properly insured, is encouraged and strongly recommended. In all cases, you should allow sufficient time to ensure timely delivery prior to 5:00 p.m. (prevailing Eastern Time) on the Subscription Expiration Deadline

### 7.     Return of Payment

Unless the Effective Date has occurred, the Rights Offering will be deemed automatically

terminated without any action of any party upon the earliest of (i) revocation of the Plan or rejection of the Plan by all classes entitled to vote, (ii) termination of the Plan Support Agreement (as defined in the Backstop Commitment Agreement) in accordance with its terms, (iii) termination of the Backstop Commitment Agreement in accordance with its terms, and (iv) March 19, 2020 (as may be extended pursuant to Section 2.3(a) of the Backstop Commitment Agreement), which date may be extended by the Debtors with the consent of the Requisite Commitment Parties.

If the Rights Offering is terminated or otherwise not consummated, any cash paid to the Subscription Agent will be returned, together with any Reinstated 1.25 Lien Notes actually transferred via book entry, to the applicable Eligible Claimant as soon as reasonably practicable, but in no event later than five Business Days after the date on which the Rights Offering is terminated.  No interest will be paid on any returned cash (but, for the avoidance of doubt, interest shall continue to accrue on the Reinstated 1.25 Lien Notes in accordance with their terms).

8.      **Settlement of the Rights Offering and Distribution of the New Common Shares**

The settlement of the Rights Offering is conditioned on confirmation of the Plan by the Bankruptcy Court, compliance by the Debtors with these Rights Offering Procedures, satisfaction of the conditions precedent set forth in the Backstop Commitment Agreement and the occurrence of the Effective Date. The Debtors intend that the New Common Shares will be issued in book-entry form in accordance with the practices and procedures of DTC, and that DTC, or its nominee, will be the holder of record of such New Common Shares. The Company will cause the New Common Shares to be credited to the accounts at DTC through which the respective Eligible Claimants or Nominees, as applicable, held the applicable Allowed 1.5L Notes Claims, and/or to any Related Fund or custodian for a Related Fund that an Eligible Claimant so designates in the Rights Offering Subscription Form in accordance with Section 5 above, and, for 1.5 Lien Notes held through Nominees, the Nominees will arrange for the credit of the New Common Shares to the individual accounts of the applicable Eligible Claimants and/or to any Related Fund or custodian for a Related Fund that an Eligible Claimant so designated in the Rights Offering Subscription Form in accordance with Section 5 above. For Registered Holders, the Subscription Agent will obtain delivery instructions directly from Registered Holders that participate in the Rights Offering.  Although it is expected that all distributions of New Common Shares will occur through The Depository Trust Company, there is no guarantee that this will occur.

No distributions will be made other than through DTC if the New Common Shares are permitted to be held through DTC's book entry system.  If for any reason the New Common Shares cannot be issued in book-entry form in accordance with the practices and procedures of DTC, the New Common Shares will be issued and registered in the name of the subscribing Eligible Claimants on the books and records of the applicable transfer agent of the New Common Shares, subject to the terms of the Plan and applicable law.  After the initial issuance of the New Common Shares, Eligible Claimants may transfer such New Common Shares in accordance with the procedures of the applicable transfer agent and applicable law.

9.      **Fractional Shares**

No fractional rights or New Common Shares will be issued in the Rights Offering. All share allocations (including each Eligible Claimant's New Common Shares) will be calculated and rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be round to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower whole number.  No consideration shall be provided, whether in cash or otherwise, in lieu of fractional shares that are rounded down.

10.     **Validity of Exercise of Subscription Rights**

All questions concerning the timeliness, viability, form, and eligibility of any exercise of Subscription Rights will be determined in good faith by the Debtors, with the consent of the Requisite Commitment Parties, and, if necessary, subject to a final and binding determination by the Bankruptcy Court. The Debtors, with the consent of the Requisite Commitment Parties, may waive or reject any defect or irregularity in, or permit such defect or irregularity to be corrected within such time as they may determine in good faith, the purported exercise of any Subscription Rights. Subscription Agreements will be deemed not to have been received or accepted until all irregularities have been waived or cured within such time as the Debtors determine in good faith with the consent of the Requisite Commitment Parties.  In addition, the Debtors, with the consent of the Requisite Commitment Parties, may permit any such defect or irregularity to be cured within such time as they may determine in good faith to be appropriate.

For the avoidance of doubt and notwithstanding the above, the Debtor and its agents are not required to inform parties of any defect or irregularity with their submission of documents or payments and may reject such submissions without previously notifying the party prior to such rejection. Additionally, each such irregularity or defect, if reviewed, will be done so on an individual submission basis.

*Before exercising any Subscription Rights, Eligible Claimants should read the Disclosure Statement and the Plan for information relating to the Debtors and the risk factors to be considered.*

11.     **Modification of Procedures**

With the prior written consent of the Requisite Commitment Parties, the Debtors reserve the right to modify these Rights Offering Procedures, or adopt additional procedures consistent with these Rights Offering Procedures, to effectuate the Rights Offering and to issue the New Common Shares; *provided*, *however*, that the Debtors shall provide prompt written notice to each Eligible Claimant (which may be through such Eligible Claimant's Nominee) of any material modification to these Rights Offering Procedures made after the Subscription Commencement Date, which notice may be provided through posting such notice on the Subscription Agent's website at https://cases.primeclerk.com/epenergy. In so doing, and subject to the consent of the Requisite Commitment Parties, the Debtors may execute and enter into agreements and take further action that the Debtors determine in good faith are necessary and appropriate to effectuate

and implement the Rights Offering and the issuance of the New Common Shares. Nothing in this paragraph shall be construed so as to permit the Debtors to modify the terms of any executed and delivered Subscription Agreement without the consent of the Eligible Claimant that is a party thereto.

The Debtors may undertake procedures to confirm that each participant in the Rights Offering is in fact an Eligible Claimant, including, but not limited to, requiring additional certifications by such participant to that effect and other diligence measures, if any, as the Debtors deem reasonably necessary.

### 12. DTC

Some or all of the 1.5 Lien Notes are held in book-entry form in accordance with the practices and procedures of the DTC. The Debtors intend to comply with the practices and procedures of DTC for the purpose of conducting the Rights Offering, and, subject to compliance with Section 12 hereof, these Rights Offering Procedures will be deemed appropriately modified to achieve such compliance.

Without limiting the foregoing, the Company intends that, to the extent practicable, the New Common Shares will be issued in book entry form, and that DTC, or its nominee, will be the holder of record of such New Common Shares. The ownership interest of each holder of such New Common Shares, and transfers of ownership interests therein, is expected to be recorded on the records of the direct and indirect participants in DTC. It is expected that the New Common Shares will be allocated to Eligible Claimants that validly exercise their Subscription Rights through DTC on or as soon as practicable after the Effective Date. To the extent the New Common Shares are not eligible to be held through DTC, the Offered Shares will be allocated to Eligible Claimants based on the information provided in Item 6 on the Rights Offering Subscription Form.

### 13. Inquiries and Transmittal of Documents; Subscription Agent

The Rights Offering Instructions attached hereto should be read carefully and strictly followed by the Eligible Claimants.

Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone numbers: 917-947-2373 (international) or 877-502-9869 (domestic, toll free) or via email to epenergysubscription@primeclerk.com with "EP Energy Corporation Rights Offering" in the subject line.

The risk of non-delivery of all documents and payments to the Subscription Agent is on the Eligible Claimants electing to exercise its Subscription Rights and not the Debtors or the Subscription Agent.

Registered Holders and Nominees (or Eligible Claimants that are instructed by their Nominees to return the Rights Offering Subscription Form directly to the Subscription Agent) must return the Rights Offering Subscription Form and the appropriate IRS tax form by no later than the Subscription Expiration Deadline to the following:

<div align="center">

**EP Energy Corporation Rights Offering Processing**
**c/o Prime Clerk, LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**Email: epenergysubscription@primeclerk.com**

</div>

All documents relating to the Rights Offering are available from the Subscription Agent at this address. In addition, these documents, together with all filing made with the Court by the Debtors, are available free of charge from the Debtors' restructuring website at http://www.primeclerk.com/epenergy.

**Only choose one method of return. If you choose to return the applicable documents via email, do not follow up with hard copies.**

**14.    Backstop Commitment Agreement**

The Debtors are party to that certain Backstop Commitment Agreement (the "***Backstop Commitment Agreement***"), dated October 18, 2019, with the Commitment Parties. In the event of any conflict between these Rights Offering Procedures and the terms of the Backstop Commitment Agreement, the terms of the Backstop Commitment Agreement will control.

The Rights Offering has been backstopped by the Commitment Parties in an amount equal to $463,000,000.  Each of the Commitment Parties, severally and not jointly, has agreed, pursuant to the Backstop Commitment Agreement by and among the Company and the Commitment Parties party thereto, dated as of October 18, 2019 (as amended and supplemented from time to time) (the "***Backstop Commitment Agreement***"), to the extent the cash proceeds of the Rights Offering is less than $325,000,000, to purchase New Common Shares in an amount that results in the aggregate cash proceeds to the Company being equal to $325,000,000. Certain of the Commitment Parties, severally and not jointly, have also agreed, pursuant to the Backstop Commitment Agreement, to purchase Exchange Shares pursuant to the Rights Offering for an aggregate Exchange Subscription Amount of $138,000,000.  As consideration for their undertakings in the Backstop Commitment Agreement, the Commitment Parties will receive the Backstop Commitment Premium (as defined in the Backstop Commitment Agreement).

<center>**EP ENERGY CORPORATION**</center>

<center>**RIGHTS OFFERING INSTRUCTIONS FOR ELIGIBLE CLAIMANTS**</center>

**Terms used and not defined herein or in the Subscription Agreement shall have the meaning assigned to them in the Plan.**

**To elect to participate in the Rights Offering, you must follow the instructions set out below:**

1.  **<u>Insert</u>** the principal amount of the Notes that you held as of the Rights Offering Record Date in Item 1 of your Rights Offering Subscription Form.  If your Nominee holds the Notes issued by the Debtors on your behalf and you do not know the principal amount, please contact your Nominee immediately.

2.  **<u>Complete</u>** (for Eligible Claimants that are not Commitment Parties only) the calculation in Item 2a of your Rights Offering Subscription Form, which calculates the maximum number of New Common Shares available for you to purchase for cash. Such amount must be rounded down to the nearest whole share.

3.  **<u>Complete</u>** (for Eligible Claimants that are not Commitment Parties only) the calculation in Item 2b of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Common Shares that you elect to purchase.

4.  **<u>Complete</u>** (for Commitment Parties only) the calculation in Item 2c of your Rights Offering Subscription Form, which calculates the number of New Common Shares for which you are required to subscribe in exchange for Reinstated 1.25 Lien Notes. Such amount must be rounded down to the nearest whole share.

5.  **<u>Complete</u>** (for Commitment Parties only) the calculation in Item 2d of your Rights Offering Subscription Form, which calculates maximum number of New Common Shares available for you to purchase for cash.

6.  **<u>Complete</u>** (for Commitment Parties only) the calculation in Item 2e of your Rights Offering Subscription Form, which calculates the Aggregate Purchase Price for the New Common Shares that you elect to purchase.

7.  **<u>Check the box</u>** in Item 3 of your Rights Offering Subscription Form if you are an Initial Commitment Party to make the representation therein.

8.  **<u>Complete</u>** the wire refund information requested in Item 5, which will be used by the Subscription Agent in the event a refund is due.

9.  **<u>Complete</u>** Item 6 and provide the information needed for the registration of the New Common Shares.

<center>16</center>

10. **Read, complete, and sign** the certification in Item 7 of your Rights Offering Subscription Form.

11. **Read and countersign** the Subscription Agreement. Such execution shall indicate your acceptance and approval of the terms and conditions set forth therein.

12. **Read, complete, and sign** an IRS Form W-9 if you are a U.S. person. If you are a non-U.S. person, read, complete, and sign an appropriate IRS Form W-8. These forms may be obtained from the IRS at its website: www.irs.gov.

13. **Return** your signed Subscription Agreement and Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to, as applicable, the Subscription Agent or to your Nominee in accordance with their instructions in sufficient time to allow your Nominee to process your instructions and prepare and deliver your Rights Offering Subscription Form to the Subscription Agent, in each case prior to the Subscription Expiration Deadline.  Submissions directly to the Subscription Agent may be made either via email (in PDF or other standard format) to epenergysubscription@primeclerk.com or to the following physical address via first class mail, hand delivery, or overnight mail:

> **EP Energy Corporation Rights Offering Processing**
> **c/o Prime Clerk, LLC**
> **One Grand Central Place**
> **60 East 42nd Street, Suite 1440**
> **New York, NY 10165**

14. **Arrange for full payment** of the Aggregate Purchase Price by wire transfer of immediately available funds, calculated in accordance with Item 2 of your Rights Offering Subscription Form.  An Eligible Claimant that is not a Commitment Party should follow the payment instructions as provided in Item 4 of the Rights Offering Subscription Form. An Eligible Claimant that is an Initial Commitment Party should follow the payment instructions in the Funding Notice delivered by the Subscription Agent to the Commitment Parties in accordance with the Backstop Commitment Agreement.

> **The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [●], 2020.**
>
> **Rights Offering Subscription Forms (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) must be received by the Subscription Agent by the Subscription Expiration Deadline or the Subscription Rights represented by your Rights Offering Subscription Form will <u>NOT</u> be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.**

**Eligible Claimants that are not Initial Commitment Parties should follow the delivery and payment instructions provided in the Rights Offering Subscription Form, and must deliver the appropriate funding directly to the Subscription Agent no later than the Subscription Expiration Deadline. Eligible Claimants that are Initial Commitment Parties should follow the payment instructions in the Funding Notice, and must deliver the appropriate funding in accordance with Section 2.4 of the Backstop Commitment Agreement no later than the Backstop Funding Deadline.  If you do not deliver the appropriate funding by the applicable deadline, the subscription represented by your Rights Offering Subscription Form will <u>NOT</u> be recognized, and the associated Subscription Rights will be deemed forever relinquished and waived.  None of the Company, the Debtors, the Subscription Agent or any of the Commitment Parties will have any liability for any such failure.**

**Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number or email address: +1 877-502-9869 (domestic toll-free) or +1 917-947-2373  (for international calls) or epenergysubscription@primeclerk.com. To obtain copies of the documents, please visit https://cases.primeclerk.com/epenergy.**

## Exhibit A

**Rights Offering Subscription Form**

**EP ENERGY CORPORATION**

**RIGHTS OFFERING SUBSCRIPTION FORM FOR USE BY ELIGIBLE CLAIMANTS FOR THE RIGHTS OFFERING IN CONNECTION WITH THE JOINT CHAPTER 11 PLAN OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**

<div style="border:1px solid black; padding:10px">

**SUBSCRIPTION EXPIRATION DEADLINE**

**The Subscription Expiration Deadline is 5:00 p.m. New York City Time on [●], 2020.**

**In order to validly exercise its Subscription Rights, each Eligible Claimant that is not an Initial Commitment Party must return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent (if a Registered Holder), or its Nominee (or as otherwise directed by its Nominee) so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline, and promptly upon returning its Subscription Agreement and Rights Offering Subscription Form to the Subscription Agent, but in no event later than the Subscription Expiration Deadline, pay or have paid the applicable Aggregate Purchase Price to the Subscription Agent by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of this Rights Offering Subscription Form.**

**In order to validly exercise its Subscription Rights, each Eligible Claimant that is an Initial Commitment Party must return a duly executed Subscription Agreement along with a duly completed and executed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) to the Subscription Agent, so that such documents are actually received by the Subscription Agent by the Subscription Expiration Deadline; and no later than the Backstop Funding Deadline, pay the applicable Aggregate Purchase Price (in accordance with the terms and conditions and in the form and manner set forth in the Backstop Commitment Agreement), in accordance with Section 2.4 of the Backstop Commitment Agreement by wire transfer ONLY of immediately available funds in accordance with the instructions included in Item 4 of this Rights Offering Subscription Form and transfer via book-entry, Reinstated 1.25 Lien Notes in an amount equal to its Exchange Amount to an account specified by the Debtors in accordance with the Funding Notice.**

**The New Common Shares issuable upon exercise of a Subscription Right are being distributed and issued without registration under the Securities Act of 1933, as amended (the "*Securities Act*"), in reliance upon the exemption provided by Section 4(a)(2) thereof, and as more fully described in the Rights Offering Procedures.**

**None of the Subscription Rights or New Common Shares issuable upon exercise of such rights distributed pursuant to the Rights Offering Procedures have been or will be registered under the Securities Act, nor any state or local law requiring registration for offer and sale of a security, and no New Common Shares may be sold or transferred except pursuant to an effective registration statement or pursuant to an exemption from registration under the Securities Act.**

</div>

> **Please consult the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures for additional information with respect to the Rights Offering and this Rights Offering Subscription Form.**
>
> **The record date for the Rights Offering is [●], 2020 (the "Subscription Record Date").**
>
> **Terms used and not defined herein shall have the meaning assigned to them in the Rights Offering Procedures.**

Each Eligible Claimant has the right, but not the obligation, subject to and in accordance with the Rights Offering Procedures, to subscribe for New Common Shares for aggregate consideration up to such Eligible Claimant's pro rata share (measured as the proportion that the Allowed Claims held by such Eligible Claimant bears to the aggregate amount of Allowed Claims as of the Subscription Record Date) of $475,000,000, provided that it (i) timely and properly executes and delivers its Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and Subscription Agreement, and makes certain customary representations and warranties set forth therein, to the Subscription Agent in advance of the Subscription Expiration Deadline and (ii) (x) timely pays the applicable Aggregate Purchase Price by the Subscription Expiration Deadline (or, in the case of the Initial Commitment Parties, by the Backstop Funding Deadline) and (y) in the case of certain Commitment Parties, timely delivers its applicable Exchange Subscription Amount.

To subscribe, fill out Items 1, 2a and 2b (if applicable) or Items 2c, 2d, and 2e (if applicable), 3 (if applicable), 5, and 6, and read, complete and sign Item 7 below.

Each Eligible Claimant who wishes to have the New Common Shares issued in the name of a Related Fund or a custodian of a Related Fund (a "Custodian"), must complete Exhibit B hereto.

"Related Fund" has the meaning set forth in the Backstop Commitment Agreement.

**Item 1.  Maximum Subscription Amount.**

The undersigned Eligible Claimant certifies that, as of the Subscription Record Date, it held or beneficially owned Notes in the following principal amounts and that the person executing this form is an authorized signatory of such Eligible Claimant. For purposes of this Subscription Form, do not adjust the principal (face) amount of your Notes for any accrued and unpaid or unmatured interest, other than as specifically directed by this Subscription Form. (If a Nominee holds your Notes on your behalf and you do not know the principal amount, please contact your Nominee immediately).

**IMPORTANT NOTE: IF YOU HOLD YOUR NOTES THROUGH MORE THAN ONE NOMINEE, YOU MUST COMPLETE AND RETURN A SEPARATE SUBSCRIPTION FORM TO EACH APPLICABLE NOMINEE. YOU MAY NOT AGGREGATE POSITIONS HELD BY DIFFERENT NOMINEES ON A SINGLE SUBSCRIPTION FORM.**

| Notes | CUSIP/ISIN | Principal Amount of Notes | | Adjustment for Accrued and Unpaid Interest | | Allowed Claim |
|---|---|---|---|---|---|---|
| a. 9.375% Senior Secured Notes due 2024 | 268787AH1/ U2937LAE4 | $_____ | X | [●] | = | $_____<br>Item 1a |
| b. 8.000% Senior Secured Notes due 2025 | 268787AF5/ U2937LAD6 | $_____ | X | [●] | = | $_____<br>Item 1b |
| c. Total Allowed Claims (sum Item 1a and Item 1b) | | $_____<br>Item 1c | | | | |
| d. Maximum Subscription Amount (Item 1c divided by $[2,092,000,000] and then multiplied by $475,000,000) | | $_____<br>Item 1d | | | | |

**Item 2.  Rights.**

**2a. Calculation of Maximum Number of New Common Shares For Which the Undersigned May Subscribe (For Eligible Claimants that are not Commitment Parties Only). If you are a Commitment Party, skip Item 2a and Item 2b and proceed to Item 2c.**

The maximum number of New Common Shares for which the undersigned may subscribe is calculated as follows:

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert Maximum Subscription Amount from Item 1d above) | / | $[●] | = | _____<br>(Maximum Number of New Common Shares For Which the Undersigned May Subscribe) (Round fractions equal to or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |

**2b. Aggregate Purchase Price (For Eligible Claimants that are not Commitment**

3

**Parties Only)**. By filling in the following blanks, the undersigned Eligible Claimant is indicating that it is committing to subscribe for and purchase the number of New Common Shares specified below (specify a number of New Common Shares, which is not greater than the Maximum Number of New Common Shares calculated in Item 2a above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

| | | | | | |
|---|---|---|---|---|---|
| _____<br>(Indicate number of New Common Shares the undersigned elects to purchase) | X | $[●] | = | $_____<br>Aggregate Purchase Price | |

**2c. Calculation of Number of New Common Shares Subscribed In Exchange for Reinstated 1.25 Lien Notes (For Commitment Parties Only)**. **If you are not a Commitment Party, skip Item 2c, Item 2d, and Item 2e and proceed to Item 3.**

The number of New Common Shares in exchange for Reinstated 1.25 Lien Notes for which the undersigned is required to subscribe is calculated as follows:

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert your Exchange Amount (as defined in the Backstop Commitment Agreement)) | / | [●] | = | _____<br>(Number of New Common Shares) (Round fractions equal to or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |

**2d. Calculation of Maximum Number of New Common Shares For Which the Undersigned May Subscribe For Cash. (For Commitment Parties Only)**. The maximum number of New Common Shares for which the undersigned may subscribe for cash is calculated as follows:

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert Maximum Subscription Amount from Item 1d above) | − | _____<br>(Insert your Exchange Amount) | = | _____<br>(Maximum Cash Subscription Amount) |

| | | | | |
|---|---|---|---|---|
| _____<br>(Insert Maximum Cash Subscription Amount above) | X | [●] | = | _____<br>(Maximum Number of New Common Shares For Which the Undersigned May Subscribe For Cash) (Round fractions equal to |

| | | | | or greater than ½ to the next higher whole number, and fractions less than ½ to the next lower whole number) |
|---|---|---|---|---|

**2e. Aggregate Purchase Price (For Commitment Parties Only).** By filling in the following blanks, the undersigned Eligible Claimant is indicating that it is committing to subscribe for and purchase the number of New Common Shares specified below (specify a number of New Common Shares the undersigned elects to purchase for cash, which is not greater than the Maximum Number of New Common Shares calculated in Item 2d above), on the terms and subject to the conditions set forth in the Subscription Agreement and the Rights Offering Procedures.

| _____ (Indicate number of New Common Shares the undersigned elects to purchase) | X | $[●] | = | $_____ Aggregate Purchase Price |
|---|---|---|---|---|

## Item 3.  Eligible Holder Representation.

(*This section is for <u>all</u> parties who wish to participate in the Rights Offering*).

☐     The undersigned and any Related Fund or Custodian is an Eligible Holder (as defined in the Rights Offering Procedures), meaning that such holder (i) has reviewed the definitions of accredited investor and qualified institutional buyer annexed hereto as Exhibit A and is an institutional accredited investor within the meaning of Rule 501(a) promulgated under Regulation D of the Securities Act or a qualified institutional buyer as defined in Rule 144A under the Securities Act and (ii) has made the representations set forth in the Subscription Agreement.

## Item 4.  Payment and Delivery Instructions

Eligible Claimants that are not Initial Commitment Parties must submit payment of the Aggregate Purchase Price calculated pursuant to Item 2b or Item 2e, as applicable, to the Subscription Agent by wire transfer ONLY in accordance with the following wire instructions:

*Domestic wire*:

| **Account Name :** | [●] |
|---|---|
| **Bank Account No.:** | [●] |
| **ABA/Routing No.:** | [●] |
| **Bank Name:** | [●] |
| **Bank Address:** | [●] |

| **Reference:** | [Name of Eligible Claimant Subscribing] |
|---|---|

*International wire*:

| **Correspondent/Intermediary Bank SWIFT** | [●] |
|---|---|
| **Correspondent/Intermediary Bank Name** | [●] |
| **Correspondent/Intermediary Bank Address** | [●] |
| **Beneficiary Account Number** | [●] |
| **Beneficiary Name** | [●] |
| **Beneficiary Address** | [●] |
| **Memo, Special Instructions, Originator to Beneficiary Information, Bank to Bank Information** | [●]<br>[Name of Eligible Claimant Subscribing] |

Please note that the failure to include the Eligible Claimant name in the reference field of any domestic or international wire payment may result in the rejection of the corresponding Rights Offering submission. In addition, please also note that payments cannot be aggregated, and one wire should be sent per Subscription Form submission.

**For Eligible Claimants That Are Not Initial Commitment Partie**s. Eligible Claimants that are not Initial Commitment Parties must deliver their subscription payment (along with their completed Rights Offering Subscription Form (with accompanying IRS Form W-9 or appropriate IRS Form W-8, as applicable) and properly executed Subscription Agreement) to the Subscription Agent by the Subscription Expiration Deadline.

**For Initial Commitment Parties.** Eligible Claimants that are Initial Commitment Parties must deliver payment of the Aggregate Purchase Price directly to the Subscription Agent pursuant to the wire instructions above no later than the Backstop Funding Deadline.

**Item 5.  Refund Information**

Please use the chart below to provide the appropriate wire information in the event the Subscription Agent must refund of any (or all) of your subscription payment.  If payment of the Aggregate Purchase Price will be made by your Nominee on your behalf, the wire information in this Item 5 should be your Nominee's information, and any refund will be issued to your

Nominee.

| | |
|---|---|
| Account Name: | |
| Bank Account No.: | |
| ABA/Routing No.: | |
| Bank Name: | |
| Bank Address: | |
| Reference: | |

**Item 6. Registration Information for New Common Shares**

In the event the New Common Shares will not be eligible to be initially distributed through DTC, please indicate on the lines provided below the Eligible Claimant's name and address as you would like it to be reflected on the Debtors' or the transfer agent's records (as applicable).

If the Eligible Claimant is designating any Related Fund or Custodian to receive the New Common Shares on its behalf, please complete <u>Exhibit B</u> to this Rights Offering Subscription Form.

Registration Line 1: _____

Registration Line 2 (if needed):_____

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email:_____

**Item 7.  Certification.**

        The undersigned certifies that: (i) the undersigned or a Related Fund or Custodian whom the undersigned has designated to receive the New Common Shares pursuant to Exhibit B is an Eligible Holder as set forth in Item 3 above and in the Subscription Agreement, (ii) the undersigned is an Eligible Claimant and as of the Subscription Record Date beneficially held Notes in the principal amount set forth in Item 1 above, (iii) the undersigned received a copy of the Plan, the Disclosure Statement, the Subscription Agreement and the Rights Offering Procedures, (iv) the undersigned understands that the exercise of its Subscription Rights under the Rights Offering is subject to all the terms and conditions set forth in the Plan, the Subscription Agreement and the Rights Offering Procedures, and (v) the undersigned understands that, subject to the terms and conditions of the Subscription Agreement, and the Backstop Commitment Agreement in the case of any Commitment Party, the exercise of its

7

Subscription Rights is irrevocable.

**The undersigned acknowledges that, by executing the Subscription Agreement and this Rights Offering Subscription Form, the undersigned Eligible Claimant has elected to subscribe for the number of New Common Shares designated in Item 2 above and will be bound to pay for the New Common Shares it has subscribed for and that it may be liable to the Debtors to the extent of any nonpayment.**

Date: _____

Name of Eligible Claimant: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

If Initial Commitment Party, check here ☐ **(ONLY CHECK THIS BOX IF YOU ARE CERTAIN THIS APPLIES TO YOU. IF YOU ARE UNSURE, DO NOT CHECK THIS BOX AND PLEASE CONTACT THE SUBSCRIPTION AGENT.)**

Signature: _____

Name of Signatory: _____

Title: _____

Telephone Number: _____

Fax: _____

Email: _____

**PLEASE RETURN THIS RIGHTS OFFERING SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W-8, AS APPLICABLE) AND THE SUBSCRIPTION AGREEMENT TO THE SUBSCRIPTION AGENT.**

**IF YOU HOLD YOUR NOTES THROUGH A NOMINEE, PLEASE RETURN THIS SUBSCRIPTION FORM (WITH ACCOMPANYING IRS FORM W-9 OR APPROPRIATE IRS FORM W- 8, AS APPLICABLE) ONLY TO YOUR NOMINEE (OR AS OTHERWISE DIRECTED BY YOUR NOMINEE). DO NOT RETURN THIS FORM DIRECTLY TO THE SUBSCRIPTION AGENT (UNLESS OTHERWISE DIRECTED TO DO SO BY YOUR NOMINEE).**

**PLEASE NOTE: NO SUBSCRIPTION WILL BE VALID UNLESS THIS RIGHTS OFFERING SUBSCRIPTION FORM AND THE SIGNED SUBSCRIPTION AGREEMENT, ALONG WITH THE APPROPRIATE FUNDS (SOLELY WITH RESPECT TO ELIGIBLE CLAIMANTS THAT ARE NOT INITIAL COMMITMENT PARTIES) ARE VALIDLY SUBMITTED TO THE SUBSCRIPTION AGENT BY THE SUBSCRIPTION EXPIRATION DEADLINE. FORMS MAY BE SUBMITTED TO THE PHYSICAL ADDRESS BELOW OR VIA EMAIL AT:**

<div align="center">

**EP Energy Corporation Rights Offering Processing**
**c/o Prime Clerk, LLC**
**One Grand Central Place**
**60 East 42nd Street, Suite 1440**
**New York, NY 10165**
**EPEnergySubscription@primeclerk.com.**

</div>

**ELIGIBLE CLAIMANTS THAT ARE INITIAL COMMITMENT PARTIES MUST DELIVER THE APPROPRIATE FUNDING DIRECTLY TO THE SUBSCRIPTION AGENT NO LATER THAN THE BACKSTOP FUNDING DEADLINE.**

**Questions relating to the Rights Offering should be directed to the Subscription Agent at the following phone number or email address: 877-502-9869 (domestic toll-free) or +1 917-947-2373 (for international calls) or epenergysubscription@primeclerk.com with "EP Energy Corporation Rights Offering" in the subject line. To obtain copies of the documents, please visit https://cases.primeclerk.com/epenergy.**

**EXHIBIT A**

 "Accredited Investor" as defined in Rule 501 of Regulation D of the Securities Act shall mean any person who comes within any of the following categories, at the time of the sale of the securities to the person:

(1)     Any bank as defined in Section 3(a)(2) of the Securities Act of 1933 (the "Act"), or any savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Act whether acting in its individual or fiduciary capacity; any broker or dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended; any insurance company as defined in Section 2(a)(13) of the Act; any investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of that Act; any Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958; any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, if such plan has total assets in excess of $5,000,000; any employee benefit plan within the meaning of the Employee Retirement Income Security Act of 1974 if the investment decision is made by a plan fiduciary, as defined in Section 3(21) of such act, which is either a bank, savings and loan association, insurance company, or registered investment adviser, or if the employee benefit plan has total assets in excess of $5,000,000 or, if a self-directed plan, with investment decisions made solely by persons that are Accredited Investors;

(2)     Any private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940;

(3)     Any organization described in Section 501(c)(3) of the Internal Revenue Code, corporation, Massachusetts or similar business trust, or partnership, not formed for the specific purpose of acquiring the securities offered, with total assets in excess of $5,000,000;

(4)     Any director, executive officer, or general partner of the issuer of the securities being offered or sold, or any director, executive officer, or general partner of a general partner of that issuer;

(5)     Any natural person whose individual net worth, or joint net worth with that person's spouse, exceeds $1,000,000;

(i) Except as provided in clause (ii) paragraph (5), for purposes of calculating net worth under this paragraph (5):

(A) The person's primary residence shall not be included as an asset;

(B) Indebtedness that is secured by the person's primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and

(C) Indebtedness that is secured by the person's primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability;

(ii) Clause (i) of this paragraph (5) will not apply to any calculation of a person's net worth made in connection with a purchase of securities in accordance with a right to purchase such securities, provided that:

(A) Such right was held by the person on July 20, 2010;

(B) The person qualified as an Accredited Investor on the basis of net worth at the time the person acquired such right; and

(C) The person held securities of the same issuer, other than such right, on July 20, 2010.

(6)     Any natural person who had an individual income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and has a reasonable expectation of reaching the same income level in the current year;

(7)     Any trust, with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the securities offered, whose purchase is directed by a sophisticated person as described in Rule 506(b)(2)(ii) under the Act; and

(8)     Any entity in which all of the equity owners are Accredited Investors.


"Qualified institutional buyer" as defined in Rule 144A under the Securities Act shall mean:

(i)     Any of the following entities, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity:

(A) Any insurance company as defined in section 2(a)(13) of the Act;

(B) Any investment company registered under the Investment Company Act or any business development company as defined in section 2(a)(48) of that Act;

(C) Any Small Business Investment Company licensed by the U.S. Small Business Administration under section 301(c) or (d) of the Small Business Investment Act of 1958;

(D) Any plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees;

(E) Any employee benefit plan within the meaning of title I of the Employee Retirement Income Security Act of 1974;

(F) Any trust fund whose trustee is a bank or trust company and whose participants are exclusively plans of the types identified in paragraph (a)(1)(i) (D) or (E) of this section, except trust funds that include as participants individual retirement accounts or H.R. 10 plans.

(G) Any business development company as defined in section 202(a)(22) of the Investment Advisers Act of 1940;

(H) Any organization described in section 501(c)(3) of the Internal Revenue Code, corporation (other than a bank as defined in section 3(a)(2) of the Act or a savings and loan association or other institution referenced in section 3(a)(5)(A) of the Act or a foreign bank or savings and loan association or equivalent institution), partnership, or Massachusetts or similar business trust; and

(I) Any investment adviser registered under the Investment Advisers Act.

(ii)     Any dealer registered pursuant to section 15 of the Exchange Act, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $10 million of securities of issuers that are not affiliated with the dealer, Provided, That securities constituting the whole or a part of an unsold allotment to or subscription by a dealer as a participant in a public offering shall not be deemed to be owned by such dealer;

(iii)    Any dealer registered pursuant to section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a qualified institutional buyer;

(iv)    Any investment company registered under the Investment Company Act, acting for its own account or for the accounts of other qualified institutional buyers, that is part of a family of investment companies which own in the aggregate at least $100 million in securities of issuers, other than issuers that are affiliated with the investment company or are part of such family of investment companies. Family of investment companies means any two or more investment companies registered under the Investment Company Act, except for a unit investment trust whose assets consist solely of shares of one or more registered investment companies, that have the same investment adviser (or, in the case of unit investment trusts, the same depositor), Provided That, for purposes of this section:

(A) Each series of a series company (as defined in Rule 18f-2 under the Investment Company Act [17 CFR 270.18f-2]) shall be deemed to be a separate investment company; and

(B) Investment companies shall be deemed to have the same adviser (or depositor) if their advisers (or depositors) are majority-owned subsidiaries of the same parent, or if one investment company's adviser (or depositor) is a majority-owned subsidiary of the other investment company's adviser (or depositor);

(v)     Any entity, all of the equity owners of which are qualified institutional buyers, acting for its own account or the accounts of other qualified institutional buyers; and

(vi)    Any bank as defined in section 3(a)(2) of the Act, any savings and loan association or other institution as referenced in section 3(a)(5)(A) of the Act, or any foreign bank or savings and loan association or equivalent institution, acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with it and that has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of sale under the Rule in the case of a U.S. bank or savings and loan association, and not more than 18 months preceding such date of sale for a foreign bank or savings and loan association or equivalent institution.

**EXHIBIT B**

**Special Delivery Instructions**

**IF THERE IS MORE THAN ONE DESIGNEE, COMPLETE A SEPARATE FORM
FOR <u>EACH</u> DESIGNEE.
YOU MUST SPECIFY THE NUMBER OF NEW COMMON SHARES
FOR <u>EACH</u> DESIGNEE.**

**Please complete ONLY if New Common Shares are to be issued in the name of a Related Fund or a Custodian rather than the Eligible Claimant. Any such designated party must also complete an IRS Form W-8 or IRS Form W-9, as applicable.**

Issue New Common Shares in the name of: _____

Number of New Common Shares:_____

Name: _____

U.S. Federal Tax EIN/SSN (optional for Non-U.S. persons): _____

If Non-U.S. person, check here and attach appropriate IRS Form W- 8 ☐

If U.S. person, check here and attach IRS Form W-9 ☐

**A. Please indicate on the lines provided below the Registration Name of the designee in whose name the New Common Shares should be issued:**

Registration Line 1:_____

Registration Line 2:_____
(if needed)

Address 1:_____

Address 2:_____

Address 3:_____

Address 4:_____

Telephone:_____

Email: _____

**B. Wire information in the event a refund is needed:**

| Account Name: | |
|---|---|
| Bank Account No.: | |
| ABA/Routing No.: | |

| Bank Name: | |
| --- | --- |
| Bank Address: | |
| Reference: | |

**<u>Exhibit G</u>**

**Ad Hoc Proposal (October 27, 2019)**

## EXHIBIT A

---

## EP ENERGY CORPORATION

## RESTRUCTURING TERM SHEET

## October ~~18~~26, 2019

---

This restructuring term sheet (this "***Term Sheet***") presents the principal terms of a proposed financial restructuring (the "***Restructuring***") of the existing capital structure of EP Energy Corporation ("***EP Parent***") and its subsidiaries identified below (collectively with EP Parent, the "***Company***" or the "***Debtors***"), which Restructuring will be consummated pursuant to a chapter 11 plan containing the terms set forth herein to be confirmed in the cases commenced on October 3, 2019 (the "***Petition Date***") in the United Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***"; Ch. 11 Case No. 19-35654 *et al.*, the "***Chapter 11 Cases***"). This is the Term Sheet referred to in, and appended to, the Plan Support Agreement dated as of October ~~18~~[__], 2019, by and among the Company and the other parties signatory thereto (as amended, supplemented, or otherwise modified from time to time, the "***PSA***"). Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in **Annex 1**.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR WILL IT BE CONSTRUED AS) AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OR REJECTIONS AS TO ANY PLAN OF REORGANIZATION, IT BEING UNDERSTOOD THAT SUCH AN OFFER, IF ANY, ONLY WILL BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND/OR OTHER APPLICABLE LAWS.**

**THIS TERM SHEET DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTS INCORPORATING THE TERMS SET FORTH HEREIN. THE CLOSING OF ANY TRANSACTION WILL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTS. EXCEPT AS SET FORTH IN THE PSA, NO BINDING OBLIGATIONS WILL BE CREATED BY THIS TERM SHEET UNLESS AND UNTIL BINDING DEFINITIVE DOCUMENTS ARE EXECUTED AND DELIVERED BY ALL APPLICABLE PARTIES.**

| **OVERVIEW** | |
|---|---|
| **Company:** | EP Parent, EPE Acquisition, LLC; EP Energy LLC; Everest Acquisition Finance Inc.; EP Energy Global LLC; EP Energy Management, L.L.C.; EP Energy Resale Company, L.L.C.; EP Energy E&P Company, L.P. |
| **Claims and Interests to be Restructured:** | <u>RBL Claims</u>: consisting of approximately $629.4 million in principal amount, including reimbursement obligations in respect of letters of credit, plus all other secured obligations, including unpaid interest, fees, and other expenses arising and payable under that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "***RBL Facility***", and the Claims thereunder, the "***RBL Claims***"), by and among EP Energy LLC, as borrower, EPE Acquisition, LLC, JPMorgan Chase Bank, N.A., as administrative agent (the "***RBL Agent***") and as collateral agent, and the lenders (the "***RBL Lenders***") party thereto from time to time.<br><br><u>Senior Secured Notes Claims</u>: consisting of:<br><br>  a)  $1 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 7.750% Senior Secured Notes due 2026 (the "***1.125L Notes*** <u>" and holders of the 1.125L Notes, the "*1.125L Noteholders*</u>") under that certain indenture, dated as of May 23, 2018 (as amended, modified, or otherwise supplemented from time to time, the "***1.125L Notes Indenture***," and the Claims thereunder, the "***1.125L Notes Claims***")*,* by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers (the "***Co-Issuers***")*,* each of the guarantors named therein, and UMB Bank, National Association, as successor indenture trustee and notes collateral agent;<br><br>  b)  $500 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 8.000% Senior Secured Notes due 2024 (the "***1.25L Notes*** <u>" and holders of the 1.25L Notes, the "*1.25L Noteholders*</u>") under that certain indenture, dated as of November 29, 2016 (as amended, modified, or otherwise supplemented from time to time, the "***1.25L Notes Indenture***," and the Claims thereunder, the "***1.25L Notes Claims***")*,* by and among the Co-Issuers, each of the guarantors named therein, and, BOKF, NA, as successor indenture trustee and notes collateral agent;<br><br>  c)  Approximately $1.092 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 9.375% Senior Secured Notes due 2024 (the "***2024 1.5L Notes***," and the holders thereof, the "***2024 1.25L Noteholders***") under that certain indenture, dated as of January 3, 2018 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2024 1. 5L Notes Claims***") by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as indenture trustee and collateral agent; and |

d) $1 billion in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 8.000% Senior Secured Notes due 2025 (the "***2025 1.5L Notes***," and collectively with the 2024 1.5L Notes, the "***1.5L Notes***," and the holders of the 2025 1.5L Notes, the "***2025 1.5L Noteholders***", and collectively with the 2024 1.5L Noteholders, the "***1.5L Noteholders***") under that certain indenture, dated as of February 6, 2017 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2025 1.5L Notes Claims***", and collectively with the 2024 1.5L Notes Claims, the "***1.5L Notes Claims***" and together with 1.125L Notes Claims and the 1.25L Notes Claims, the "***Senior Secured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Trust, National Association, as indenture trustee and collateral agent

Unsecured Notes Claims: consisting of

a) Approximately $182 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 9.375% Senior Notes due 2020 under that certain indenture, dated as of April 24, 2012 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2020 Unsecured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee;

b) Approximately $182 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 7.750% Senior Notes due 2022 under that certain indenture, dated as of August 13, 2012 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2022 Unsecured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee; and

c) Approximately $323 million in principal amount, plus unpaid interest, fees, and other expenses arising and payable pursuant to the 6.375% Senior Notes due 2023 under that certain indenture, dated as of May 28, 2015 (as amended, modified, or otherwise supplemented from time to time) (the Claims thereunder, the "***2023 Unsecured Notes Claims***"), by and among the Co-Issuers, each of the guarantors named therein, and Wilmington Savings Fund Society, FSB, as indenture trustee.

General Unsecured Claims: consisting of any prepetition Claim against the Company that is not an RBL Claim, a Senior Secured Notes Claim, an Unsecured Notes Claim (each as defined herein), an Intercompany Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code (the "***General Unsecured Claims***"). For the avoidance of doubt, deficiency claims in respect of the ~~1.5 Lien~~Senior Secured Notes Claims ("***~~1.5L~~ Deficiency Claims***") are not General Unsecured Claims.

| | |
|---|---|
| | <u>Existing Equity Interests</u>: consisting of shares of the Class A common stock of EP Parent that existed immediately prior to the Effective Date, including any restricted stock of EP Parent that vests prior to the Effective Date. |
| | <u>Other Equity Interests</u>: consisting of the Class B common stock of EP Parent that existed immediately prior to the Effective Date and all other Interests in EP Parent other than Existing Equity Interests. |
| | <u>Subordinated Claims</u>: consisting of any prepetition Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise. |
| **TRANSACTION OVERVIEW** | |
| **Overview of Restructuring:** | The Restructuring will be implemented through the Chapter 11 Cases commenced by the Company to pursue confirmation of a prenegotiated chapter 11 plan consistent with the terms herein. |
| | As a component of the Restructuring and consistent with the Rights Offering Documents, each eligible ~~1.5~~1.125L Noteholder will be offered the right to purchase up to its Pro Rata share of ~~New Common Shares~~Convertible Notes for an aggregate value of up to $~~475~~250 million (as described below, the "***Rights Offering***"). |
| | The Company may also, with the consent of the Initial Supporting Noteholders, consummate a private placement of New Common Shares, subject to dilution by the Jeter Shares and EIP Shares, for an aggregate purchase price of up to $75 million (the "***Private Placement***"), in Cash, on terms acceptable to the Company and the Initial Supporting Noteholders. |
| | The proceeds of the Rights Offering and the Private Placement will be used by the Company to (i) pay down the DIP Facility and the RBL Facility, (ii) pay all reasonable and documented Restructuring Expenses, and (iii) fund Plan distributions, case administration expenses, and exit costs. The terms of the Rights Offering shall be in accordance with the Backstop Agreement to be executed concurrently with the PSA and otherwise acceptable to the Initial Supporting Noteholders. |
| | On the Effective Date, Apollo and Access may contribute their equity interests in Jeter to the Reorganized Debtors in exchange for the Jeter Shares, subject to the agreement of the Company, Access, Apollo, and the Initial Supporting Noteholders, in their respective sole discretion. |
| | As of the Effective Date, the DIP Claims, RBL Claims, 1.5L Notes Claims, Unsecured Notes Claims, General Unsecured Claims, Existing Equity Interests, and Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect. |

| DIP Financing; Use of Cash Collateral | The Restructuring will be financed by (i) consensual use of Cash collateral on final terms to be acceptable to the Initial Supporting Noteholders, and (ii) a postpetition senior secured superpriority priming revolving loan facility (the "***DIP Facility***") on terms and conditions acceptable to the Initial Supporting Noteholders, it being acknowledged that the Commitment Letter and related exhibits attached ~~hereto~~ as **Exhibit A-1** *to the Motion of Debtors for Order (I) Authorizing Entry into Backstop Commitment Agreement, (II) Approving Obligations Thereunder, and (III) Granting Related Relief* [Docket # 181] (the "***Initial Backstop Motion***") (the "***Exit Commitment Letter***") are acceptable to the Initial Supporting Noteholders. The DIP Facility will roll-up up to 50.0% of the obligations under the RBL Facility, applied Pro Rata among the exposures of the RBL Lenders that elect to participate in the Exit Facility by the Voting Deadline to receive its Pro Rata share of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. Upon emergence, the DIP Facility will convert dollar for dollar into first lien, first-out revolving loans under the Exit Facility.<br><br>In the event that the DIP Lenders are unwilling to amend the DIP Facility and Exit Commitment Letter to allow for the Restructuring contemplated by this Term Sheet, the Initial Supporting Noteholders will work with the Debtors in good faith to find replacement financing on terms and conditions acceptable to the Initial Supporting Noteholders and the Debtors.  In the event that such replacement financing cannot be found, the Initial Supporting Noteholders will fund up to $100 million of new Senior Secured Notes (senior to the new 2L Notes and junior to the Exit Facility), to the extent needed to maintain the commitment for the Exit Facility, which notes shall be on market terms with other terms and conditions acceptable to the Initial Supporting Noteholders and the Debtors. |
| **TREATMENT OF CLAIMS AND INTEREST** | |
| **Administrative Expense Claims and Priority Tax Claims:** | Except to the extent that a holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim or an Allowed Priority Tax Claim will receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **DIP Claims:** | On the Effective Date, to the extent the DIP Facility is not paid down in full from the proceeds of the Rights Offering or the Private Placement, each holder of an Allowed DIP Claim will receive its Pro Rata share (taking into account the elections made by holders of Allowed RBL Claims as provided below) of first lien, first-out |

| | revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement. |
|---|---|
| **Class 1**<br><br>**Other Secured Claims:** | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Holders, (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 2**<br><br>**Other Priority Claims:** | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the consent of the Initial Supporting Holders, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 3**<br><br>**RBL Claims:** | On the Effective Date, each holder of an Allowed RBL Claim will receive its Pro Rata share of the Exit Facility as a first lien, second-out term loan under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that elects to participate in the Exit Facility by the Voting Deadline shall receive its Pro Rata share (with the holders of Allowed DIP Claims) of first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.<br><br>**Impaired – Entitled to Vote.** |
| **Class 4**<br><br>**1.125L Notes Claims:** | On the Effective Date, ~~all Allowed 1.125L Notes Claims will (i) be reinstated in the principal amount of $1 billion in accordance with section 1124(2) of the Bankruptcy Code and the 1.125L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.125L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance~~ |

| | |
|---|---|
| | ~~and in compliance with the terms of the 1.125L Notes Indenture, a portion of the 1.125L Notes Claims, or (ii) receive new notes on terms acceptable to the Initial Supporting Noteholders and the Company.~~ each holder of an Allowed 1.125L Notes Claim will receive on account of the such Allowed 1.125L Notes Claim, in full and final satisfaction of such Allowed 1.125L Notes Claim, its Pro Rata Share of (i) the New 2L Notes, (ii) 89.1% of the New Common Shares, subject to dilution by the Convertible Notes, the Private Placement, the Jeter Shares, the EIP Shares, the 1.25L Notes Warrants and the 1.5L Notes Warrants, and (iii) the right to participate in the Rights Offering.<br><br>~~**Unimpaired – Presumed to Accept.**~~<br><br>In addition, the Debtors shall cause to be paid on or before the Effective Date all fees, costs, and expenses of the indenture trustee payable under the 1.125L Notes Indenture and the other notes documents related thereto, including but not limited to all fees and expenses of the indenture trustee's legal counsel and financial advisors.<br><br>**Impaired – Entitled to Vote.** |
| **Class 5**<br>**1.25L Notes Claims:** | On the Effective Date, ~~all Allowed 1.25L Notes Claims will (i) be reinstated in the principal amount of $500 million in accordance with section 1124(2) of the Bankruptcy Code and the 1.25L Notes Indenture and continued after the Effective Date in accordance with the terms of the 1.25L Notes Indenture; *provided*, that on the Effective Date the Debtors may, with the consent of the Initial Supporting Noteholders, deliver a notice of redemption with respect to or otherwise voluntarily prepay (including by way of tender offer), in accordance and in compliance with the terms of the 1.25L Notes Indenture, a portion of the 1.25L Notes Claims, or (ii) receive new notes on terms acceptable to the Initial Supporting Noteholders and the Company.~~<br><br>~~**Unimpaired – Presumed to Accept.**~~ each holder of an Allowed 1.25L Notes Claim will receive on account of such Allowed 1.25L Notes Claim, in full and final satisfaction of such Allowed 1.25L Claim, its pro rata share of (i) 9.9% of the New Common Shares, subject to dilution by the Convertible Notes, the Private Placement, the Jeter Shares, the 1.25L Notes Warrants, the 1.5L Notes Warrants, and the EIP Shares, (ii) the 1.25L Notes Warrants, and (iii) provided such class votes to accept the plan, the right to participate in the Rights Offering.<br><br>**Impaired – Entitled to Vote.** |
| **Class 6**<br>**1.5L Notes Claims:** | On the Effective Date, each holder of an Allowed 1.5L Notes Claim will receive on account of ~~the secured portion of~~ such Allowed 1.5L Notes Claim, in full and final satisfaction of ~~the secured portion of~~ such Allowed 1.5L Notes Claim, its Pro Rata share of (i) ~~99.0% of~~ the ~~New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, the Jeter~~ |

| | |
|---|---|
| | ~~Shares, and the EIP Shares,~~Unsecured Claims Pool and (ii) the ~~right to participate in the Rights Offering~~1.5L Notes Warrants.<br><br>**Impaired – Entitled to Vote.** |
| **Class 7**<br><br>**Unsecured Claims:** | On the Effective Date, each holder of Allowed 2020 Unsecured Notes Claims, 2022 Unsecured Notes Claims, and 2023 Unsecured Notes Claims (collectively, "***Unsecured Notes Claims***", and the holders of such Claims, the "***Unsecured Noteholders***"), ~~1.5L~~ Deficiency Claims, and General Unsecured Claims (collectively with Unsecured Notes Claims, "***Unsecured Claims***") will receive, in full and final satisfaction of such Unsecured Claim, their Pro Rata share of ~~1.0% of~~ the ~~New Common Shares, subject to dilution by the Rights Offering Shares, the Private Placement, the Backstop Commitment Premium, the Jeter Shares, and the EIP Shares~~Unencumbered Claims Pool (the "***Unsecured Shares***"); *provided*, *that* a convenience class may be established under the Plan (with such Plan provisions being acceptable to the Initial Supporting Noteholders) to provide distributions up to an aggregate amount in Cash to be specified under the Plan.<br><br>**Impaired – Entitled to Vote.** |
| **Class 8**<br><br>**Intercompany Claims:** | All Intercompany Claims will be adjusted, reinstated, or discharged in the Company's discretion, subject to the reasonable consent of the Initial Supporting Noteholders.<br><br>**Unimpaired – Presumed to Accept.** |
| **Class 9**<br><br>**Subordinated Claims:** | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and Holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.<br><br>**Impaired – Deemed to Reject.** |
| **Class 10**<br><br>**Existing Equity Interests:** | On the Effective Date, Existing Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. Each holder of Existing Equity Interests will receive its Pro Rata share of $500,000 in Cash.<br><br>**Impaired – Entitled to Vote.** |
| **Class 11**<br><br>**Other Equity Interests** | On the Effective Date, Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. No holder of Other Equity Interests will receive a distribution.<br><br>**Impaired – Deemed to Reject.** |

| | |
|---|---|
| **Class 12**<br><br>**Intercompany Interests:** | All Allowed Intercompany Interests shall either be (i) cancelled (or otherwise eliminated) and receive no distribution under the Plan or (ii) reinstated.<br><br>**Unimpaired – Presumed to Accept.** |
| **OTHER MATERIAL PROVISIONS** | |
| **Rights Offering:** | Pursuant to the Rights Offering, eligible 1.51.125L Noteholders and 1.25L Noteholders will be offered the right to purchase New Common Shares$187.5 million and $62.5 million, respectively, of Convertible Notes, for an aggregate purchase priceamount of up to $475,000,000$250 million (the "***Rights Offering Amount***"), provided that if Class 4 1.25L Notes Claims does not vote to accept the plan, the $62.5 million will be allocated to the 1.125L Noteholders.<br><br>The overall percentage of New Common Shares being issued in the Rights Offering, in each case subject to dilution by the Jeter Shares and the EIP Shares, is approximately 76.2%-78.0%, consisting of (i) approximately 55.6% in the case of Rights Offering Shares purchased forConvertible Notes will: (i) be convertible at the holder's option into equity at a 42.5% discount to the equity value implied by a $1.677 billion TEV at the time of conversion and mandatorily convertible at maturity if not previously converted; (ii) have a maturity 7 years from the issue date; (iii) accrue interest at an annual rate of 10.0%, 6.0% payable in cash and 4.0% payable-in-kind; and (iiiv) approximately 20.6%-22.4% in the case of Rights Offering Shares purchased for Reinstated 1.25L Notes, depending on the amount of Reinstated 1.25L Notes being exchanged in the Rights Offering (which amount will be between $138,000,000 and $150,000,000)have other customary terms, conditions, and covenants to be negotiated that are acceptable to the Company and the Initial Supporting Noteholders.<br><br>The Rights Offering will be backstopped by the Backstop Parties pursuant to the Backstop Agreement in exchange for (i) the Backstop Commitment Premium, and (ii) the right to exchange Reinstated 1.25L Notes as described below. Subject to the terms of the Backstop Agreement, the Backstop Parties shall backstop the aggregate purchase price of $463 million, (a) $220.6 million of which shall be backstopped by Apollo ($20.6 million of which shall be funded through the exchange of $20.6 million in aggregate principal amount of Reinstated 1.25L Notes held by Apollo on the terms set forth in the Backstop Agreement, which amount shall reduce the aggregate amount of Apollo's purchase rights in the Rights Offering on a dollar for dollar basis), (b) $192.4 million of which shall be backstopped by Elliott ($117.4 million of which shall be funded through the exchange of $117.4 million in aggregate principal amount of Reinstated 1.25L |

|  | ~~Notes held by Elliott on the terms set forth in the Backstop Agreement, which amount shall reduce the aggregate amount of Elliott's purchase rights in the Rights Offering on a dollar for dollar basis), (c) $42.5 million shall be backstopped by Avenue, and (d) $7.5 million shall be backstopped by Access,~~ *provided*, ~~that an additional $12 million aggregate purchase price, to be funded through the exchange of Reinstated 1.25L Notes on the terms set forth in the Backstop Agreement, may be backstopped by the Backstop Parties~~ ~~with the consent of~~ the Initial Supporting Noteholders ~~in accordance with the terms of the Backstop Agreement. The Company shall pay all accrued but unpaid interest in Cash to the holders of the Reinstated 1.25L Notes in connection with the foregoing exchanges.~~ ~~Discount: Rights Offering Shares will be issued at an aggregate purchase price of up to $475,000,000 at a price per share representing: (i) in the case of Rights Offering Shares purchased for cash, a 35% discount to the Stated Equity Value, and (ii) in the case of Rights Offering Shares purchased by Backstop Parties in exchange for Reinstated 1.25L Notes, a 25.7% discount to the Stated Equity Value.~~

Each eligible ~~1.5~~1.125L Noteholder and 1.25L Noteholder will be entitled to join the Backstop Agreement within ten (10) Business Days of the date on which the Debtors file the motion to approve the Backstop Agreement on terms acceptable to the Initial Supporting Noteholders. |
| **Exit Facility:** | On the Effective Date, the RBL Facility and the DIP Facility will be replaced with a $629 million first lien revolving exit credit facility (the "***Exit Facility***") on terms and conditions acceptable to the Initial Supporting Noteholders and the Company. |
| **Jeter Contribution:** | On the Effective Date, Apollo and Access may contribute their equity interests in Jeter to the Reorganized Debtors in exchange for the Jeter Shares, subject to the agreement of the Company, Access, Apollo, and the Initial Supporting Noteholders, in their respective sole discretion. |
| **GENERAL PROVISIONS** ||
| **Executory Contracts and Unexpired Leases:** | As of and subject to the occurrence of the Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (i) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (iii) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (iv) is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, which shall be acceptable to the Initial Supporting Noteholders. |

| | |
|---|---|
| **Board of Directors:** | The Board of Directors will consist of (i) the Reorganized Debtors' chief executive officer and (ii) the members selected by the Initial Supporting Noteholders in consultation with the Company (the "***New Board***"). Provisions regarding the removal, appointment, and replacement of members of the New Board to be determined by the Initial Supporting Noteholders in consultation with the Company. |
| **Charter, By-Laws and Organizational Documents:** | The New Corporate Governance Documents will be acceptable to the Initial Supporting Noteholders and the Company and will become effective as of the Effective Date. |
| **Private Company:** | The Reorganized Debtors shall take the steps necessary to be a private company that is not listed on a national securities exchange and without Exchange Act reporting obligations upon emergence or as soon as possible thereafter in accordance with the SEC rules; *provided*, that from and after the Plan Effective Date, Reorganized EP Parent shall be required to provide (via separate agreement or in its organizational documents) to its shareholders such audited annual and unaudited quarterly financial statements for such periods, with such statements being prepared in accordance with U.S. GAAP on a private company basis (for the avoidance of doubt, no SAS 100 review or compliance with any other requirement of Regulation S-X under the Securities Act is required in connection with the delivery of the required financial statements). |
| **Employee Incentive Plan:** | The Plan will provide for the establishment of a post-emergence employee incentive plan on the Effective Date (the "***Employee Incentive Plan***" or the "***EIP***"). All awards issued under the EIP, including restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares (the "***EIP Shares***") will be dilutive of all other equity interests in the Reorganized Debtors. 10% of the New Common Shares, on a fully diluted basis, shall be reserved for issuance in connection with the Employee Incentive Plan. The other terms of the Employee Incentive Plan shall be consistent with the terms set forth on **Exhibit A-2** annexed ~~hereto~~to the ***Initial Backstop Motion*** and otherwise in form and substance acceptable to the Initial Supporting Noteholders and the Company. |
| **Employment Agreements:** | All employment agreements and severance plans that exist as of the Petition Date will be assumed, as may be amended, pursuant to the Plan. The Debtors will enter into new employment agreements with their officers, to be effective on the Effective Date, consistent with the terms set forth on **Exhibit A-3** annexed ~~hereto~~to the ***Initial Backstop Motion***. |
| **Cancellation of Notes, Instruments, Certificates and other Documents:** | On the Effective Date of the Plan, ~~other than the 1.125L Notes and 1.25L Notes being reinstated pursuant to the Plan,~~ all notes, instruments, certificates evidencing debt of the Company and Interests in EP Parent will be cancelled and obligations of the Company thereunder will be |

| | |
|---|---|
| | discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make further distributions to the applicable holders on account of their Claims. |
| **Vesting of Assets:** | On the Effective Date, pursuant to sections 1141(b)-(c) of the Bankruptcy Code, all assets of the Company will vest in the Reorganized Debtors free and clear of all liens, Claims, and encumbrances. |
| **Hedging Program:** | The Company shall consult with the Initial Supporting Noteholders on any material changes to its hedging program. |
| **Survival of Indemnification Obligations and D&O Insurance:** | No obligations of the Company pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Company or such directors, officers, agents, or employees, based upon any act or omission for or on behalf of the Company will be discharged or impaired by confirmation of the Plan. All such obligations will be deemed and treated as executory contracts to be assumed by the Company under the Plan and will continue as obligations of the Reorganized Debtors. Any Claim based on such obligations of the Company will be an Allowed Claim. |
| | In addition, after the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect or purchased as of the Petition Date, and all members, managers, directors, and officers of the Company who served in such capacity at any time prior to the Effective Date and all other individuals covered by such insurance policies will be entitled to the full benefits of each such policy for the full term of such policy regardless of whether such members, managers, directors, officers, or other individuals remain in such positions after the Effective Date. |
| **Conditions to Effectiveness:** | Effectiveness of the Plan will be subject to the satisfaction of customary conditions to confirmation and effectiveness (as applicable), as well as such other conditions that are satisfactory to the Company and the Initial Supporting Noteholders, including the following (as applicable): |
| | i. the Backstop Agreement shall remain in full force and effect and shall not have been terminated, and the parties thereto shall be in compliance therewith; |
| | ii. ~~the Reinstated Debt shall have been reinstated, or shall have been given such other treatment (as applicable), in accordance with the terms and conditions of this Term Sheet;~~ |
| | ~~iii.~~ |
| | ii. the Bankruptcy Court shall have entered the Backstop Order, in form and substance acceptable to the Initial Supporting Noteholders, and |

|  | such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered; |
|--|--|
| ~~iv~~iii. | the Definitive Documents (as defined in the PSA) will contain terms and conditions consistent in all material respects with this Term Sheet and the PSA and otherwise satisfactory or reasonably satisfactory, as applicable, in form and substance to the Initial Supporting Noteholders; |
| ~~v~~iv. | the PSA shall remain in full force and effect and shall not have been terminated; |
| ~~vi~~v. | all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or duly waived, and the Exit Facility, including all documentation related thereto, is in form and substance satisfactory to the Initial Supporting Noteholders and the Company and in effect; |
| ~~vii~~vi. | the Bankruptcy Court shall have entered the Disclosure Statement Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered; |
| ~~viii~~vii. | the Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Initial Supporting Noteholders, and such order shall not have been reserved, stayed, amended, modified, dismissed, vacated or reconsidered; |
| ~~ix~~viii. | the Rights Offering and if applicable, the Private Placement shall have been conducted, in all material respects, in accordance with the Backstop Order, the Rights Offering Procedures, the Backstop Agreement, and any other relevant transaction documents; |
| ~~x~~ix. | the New Corporate Governance Documents shall be in full force and effect; |
| ~~xi~~x. | all waiting periods imposed by any Governmental Entity or Antitrust Authority in connection with the transactions contemplated by the Backstop Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances under the Antitrust Laws in connection with the transactions contemplated by the Backstop Agreement shall have been obtained; |
| ~~xii~~xi. | the Registration Rights Agreement shall have been executed and delivered by the Company, shall otherwise have become effective with respect to the Supporting Noteholders and the other parties thereto, and shall be in full force and effect; |
| ~~xiii~~xii. | the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods will have expired; |

| | |
|---|---|
| | xiv xii. the final version of the Plan, Plan Supplement, and all of the schedules, documents and exhibits contained therein, and all other schedules, documents, supplements, and exhibits to the Plan shall be consistent with the PSA, and in form and substance acceptable to the Initial Supporting Noteholders; |
| | xv xiv. the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date and the conditions to the occurrence of the Effective Date (other than any conditions relating to the occurrence of the Closing) set forth in the Plan shall have been satisfied or, with the prior consent of the Initial Supporting Noteholders waived in accordance with the terms of the Plan; |
| | xvi xv. the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the PSA; and |
| | xvii xvi. all Restructuring Expenses to the extent invoiced at least three (3) Business Days before the Effective Date by the Supporting Noteholder Advisors shall have been paid in full by the Debtors in accordance with the Backstop Agreement. |
| | The conditions to effectiveness may be waived, in whole or in part, in writing by the Debtors and the Initial Supporting Noteholders. |
| **Releases by Debtors:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents and the documents in the Plan Supplement, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged, by the Debtors, the Reorganized Debtors, and the Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives and any and all other Persons that may purport to assert any Cause of Action derivatively, by or through the foregoing Persons, from any and all Claims and Causes of Action (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, whether in law or equity, whether sounding in tort or contract, whether arising under federal or state statutory or common law, or any other applicable international, foreign, or domestic law, rule, statute, regulation, treaty, right, duty, requirements or otherwise that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject |

| | |
|---|---|
| | matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of Claims and Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the PSA, the Definitive Documents and the documents in the Plan Supplement or related agreements, instruments, or other documents relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. |
| **Releases by Third-Parties:** | As of the Effective Date, except for the rights and remedies that remain in effect from and after the Effective Date to enforce the Plan and the obligations contemplated by the Definitive Documents, and the documents in the Plan Supplement or as otherwise provided in any order of the Bankruptcy Court, on and after the Effective Date, the Released Parties will be deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Releasing Parties, from any and all Claims and Causes of Action whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, contract, tort, or otherwise by statute, violations of federal or state securities laws or otherwise, that such holders or their estates, affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other Persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Reorganized Debtors, or their Estates, the Chapter 11 Cases, the Restructuring, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements or interactions between any Debtor and any Released Party, the Restructuring, the restructuring of any Claims or Interests before or during the Chapter 11 Cases, the negotiation, formulation, preparation, or consummation of the Plan, the PSA, the Definitive Documents and the documents in the Plan Supplement, or related agreements, instruments, or other documents, relating thereto, or the solicitation of votes with respect to the Plan, in all cases based upon any act or omission, transaction, agreement, event, or other occurrences taking place on or before the Effective Date. |

| | |
|---|---|
| **Exculpation:** | To the fullest extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party will be released and exculpated from, any Claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, Exit Facility, the Rights Offering, the Private Placement, the Employee Incentive Plan, the Disclosure Statement, the PSA, the Restructuring, and the Plan (including the Definitive Documents and the documents in the Plan Supplement), or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors; or the transactions in furtherance of any of the foregoing; other than Claims or Causes of Action arising out of or related to any act or omission of an Exculpated Party that constitutes intentional fraud or willful misconduct as determined by a Final Order, but in all respects such Persons will be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Exculpated Parties have acted in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of securities pursuant to the Plan and, therefore, are not, and on account of such distributions will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan, including the issuance of securities thereunder. The exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. |
| **Discharge and Injunction:** | The Plan will contain customary discharge and injunction provisions acceptable to the Initial Supporting Noteholders. |
| **Tax Structure:** | To the extent practicable, the Restructuring contemplated by this Term Sheet will be structured so as to obtain the most beneficial structure for the Company, the Initial Supporting Noteholders and the Company's equity holders post-—Restructuring, as determined by the Company with the consent of the Initial Supporting Noteholders and in consultation with Access and Apollo. |
| **Retention of Jurisdiction:** | The Plan will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or agreements, and (v) other purposes. |

| Restructuring Transactions: | On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, subject to the reasonable consent of the Initial Supporting Noteholders, may take all actions consistent with this Plan as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with this Plan. |
|---|---|
| **Consent Rights** | All consent rights not otherwise set forth herein shall be set forth in the PSA. |

| **Summary of Material Terms of Backstop Agreement** | |
|---|---|
| **Backstop Commitment**<br><br>*See Backstop Agreement § 2.2* | The Initial Supporting Noteholders (the "***Initial Commitment Parties***") and any Additional Supporting Noteholder (defined below; together with the Initial Commitment Parties, the "***Commitment Parties***") will backstop (i) $325250 million of the cash portion of the Rights Offering and (ii) $138 million of the debt equitization portion of the Rights Offeringthe "***Backstop Commitment***"). |
| **Open Joinder Period**<br><br>*See Backstop Agreement §10.17* | Until November 4[__], 2019, qualifying 1.51.125L Noteholders and 1.25L Noteholders will be permitted to join the Backstop Agreement as an additional supporting noteholder ("***Additional Supporting Noteholder***") and (i) assume up to their pro rata portion of the Cash Purchase ObligationBackstop Commitment (and receive a corresponding pro rata portion of the Commitment Premium and Termination Fee) and (ii) to the extent that such additional Commitment Party also holds 1.25L Notes, commit to participate in the Exchange Transaction (for which no Commitment Fee or Termination Fee will be allocated and/or payable) (, subject to certain limitations specified in the Backstop Agreement).‡ |
| **Backstop Commitment Premium**<br><br>*See Backstop Agreement § 3.1* | At Closing, the Commitment Parties will receive $26 million of additional New Common Shares, payable at the Cash Purchase Price, allocated pro rata among the Commitment Parties based on their relative obligations with respect toPremium, the cash portion of the backstop commitmentwhich shall be fully earned upon entry of the Proposed Order (defined below). |
| **Termination Fee**<br><br>*See Backstop Agreement § 9.6(b)* | $26,000,00018.75 million payable in cash if the Backstop Agreement is terminated other than a termination pursuant to specific subset of termination triggers. |

---

‡ The aggregate amount of 1.25L Notes exchanged by Additional Supporting Noteholders will be capped at $33 million. In addition, the Company and the Requisite Commitment Parties may adjust the Commitment Amount, Exchange Amount, Commitment Premium and Termination Fee amounts for the Supporting Noteholders so that the aggregate Commitment Amount does not exceed $475 million and the total Exchange Amount of all Commitment Parties (including all Additional Commitment Parties) does not exceed $150 million.

| Expense Reimbursement *See Backstop Agreement § 3.3* | The Supporting Noteholders will be entitled to receive reimbursement of certain reasonable and documented out-of-pocket fees and expenses incurred in connection with the Debtors' restructuring. In addition, the Company will pay all filing fees, if any, required by the Hart-Scott-Rodino Act or any other antitrust law in connection with the restructuring. |
|---|---|
| Debtor Covenants *See Backstop Agreement Art VI* | The Debtors ~~have agreed~~will agree to various covenants, including, but not limited to (i) use commercially reasonable efforts to obtain ~~approval~~entry of ~~the~~ an order in form and substance acceptable to the Initial Commitment Parties approving the Backstop Agreement (the "***Proposed Order***"), an order approving the DIP Facility, an order approving solicitation procedures and a disclosure statement in respect of the Plan (the "**Plan Solicitation Order**"), and an order approving the Plan ~~(the "Confirmation Order")~~, (ii) conduct their business in the ordinary course, (iii) provide the Commitment Parties access to information, including certain financial information, (iv) use commercially reasonable efforts to consummate the transactions contemplated by the Backstop Agreement and Plan, and (v) enter into a registration rights agreement in form and substance reasonably acceptable to a majority of the ~~Requisite~~ Commitment Parties and the Company. |
| Indemnification Obligations *See Backstop Agreement § 8.1* | The Debtors will indemnify and hold harmless each Commitment Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective Representatives and controlling persons from and against all losses arising out of or in connection with the Backstop Agreement or the transactions contemplated thereby; provided, that the foregoing indemnity will not, apply to losses (a) as to a ~~Defaulting~~defaulting Commitment Party or its ~~Related Parties~~related parties, or (b) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct or gross negligence of an Indemnified Person. |
| Conditions Precedent *See Backstop Agreement Art. VII* | The closing of the Backstop Agreement ~~is~~will be subject to the satisfaction of certain closing conditions, including, but not limited to: (a) with respect to the obligations of the Commitment Parties and the Company: (i) entry of the Proposed Order, the Plan Solicitation Order and the Confirmation Order; (ii) the Rights Offering having been completed in accordance with its applicable terms; (iii) the effective date of the Plan shall having occurred; (iv) antitrust approvals and applicable third party consents (if any) having been obtained; (v) the PSA not having been terminated; and (vi) the Exit Facility being in effect; and (b) additionally, the obligations of the Commitment Parties are subject to the following conditions: (i) compliance by the Debtors, in all material respects, with the Plan; (ii) delivery of the Registration Rights Agreement and effective organizational documents of the reorganized companies; (iii) no material adverse effect occurring since the date of the Backstop Agreement; ~~(iv) the debt that is contemplated to be reinstated by the PSA being reinstated;~~ and (iv) the Commitment Premium being paid. |

| | |
|---|---|
| ~~**Milestones**~~<br><br>*~~See~~* ~~Backstop Agreement § 6.16~~ | ~~The Backstop Agreement provides for certain termination rights, based upon the failure to satisfy certain milestones (the "**Milestones**"). Specifically, the following Milestones apply:~~<br><br>~~(a)   File motion to approve Backstop Agreement by October 18, 2019;~~<br><br>~~(b)   Entry of order approving Backstop Agreement by November 18, 2019; provided that if the Court is unable to hear or fully consider this Motion by November 12, 2019, then the Milestone date shall be November 25, 2019;~~<br><br>~~(c)   Entry of order approving DIP Facility by December 2, 2019;~~<br><br>~~(d)   Entry of Plan Solicitation Order by January 8, 2019;~~<br><br>~~(e)   Entry of order approving Rights Offering procedures by January 8, 2020;~~<br><br>~~(f)   Entry of Confirmation Order by February 28, 2020, unless the Court has commenced a hearing on confirmation of the Plan, then by March 16, 2020.~~<br><br>~~(g)   Effective date of Plan occurs by March 19, 2020.~~ |
| **Other Termination Events**<br><br>*~~See~~* ~~Backstop Agreement Art. IX~~ | The Backstop Agreement may be terminated by:<br><br>(a)   **either the Company or the Commitment Parties** if (i) closing has not occurred by ~~March 19~~[May 1, 2020], (ii) the PSA is terminated pursuant to its terms, (iii) the Company or any of the Debtors enter into a definitive written agreement with respect to an Alternative Restructuring,[21] (iv) there occurs certain material breaches by the Commitment Parties or the Company, respectively, (v) any law is enacted, or order issued, prohibiting the contemplated transactions, (vi) the Chapter 11 Cases are dismissed or converted or (vii) the ~~BCA Approval~~Proposed Order or Confirmation Order are reversed;<br><br>(b)   **the Commitment Parties** (i) if a material adverse event occurs after the date of the Backstop Agreement, (ii) the Company ~~fails to meet the Milestones, (iii) the Company~~ takes certain actions adverse to the transactions contemplated by the Backstop Agreement or ~~the 1.5L Note Claims (e.g., the Company makes amendments to certain transaction agreements or orders without the prior consent of the Commitment Parties) or (iv~~(iii) an event of default under the DIP Facility occurs that results in acceleration thereof; or<br><br>(c)   **the Company** (i) if the Proposed Order is denied, or (ii) the board of directors or analogous governing body of the Company determines that proceeding with the Restructuring is inconsistent with its fiduciary duties. |
| ~~**No Shop; Fiduciary Out**~~ | ~~The Debtors will not take any action that is materially inconsistent with the Backstop Agreement, the PSA or the Plan or that would delay approvals of the Disclosure Statement, the solicitation procedures, or confirmation or consummation of the Plan, including seeking, soliciting,~~ |

---

[21] "**Alternative Restructuring**" means any dissolution, winding up, liquidation, reorganization, recapitalization, assignment for the benefit of creditors, merger, transaction, consolidation, business combination, joint venture, partnership, sale of all or substantially all assets, financing (debt or equity), restructuring (in each case, of all or substantially all of the Company, its assets, or its capital structure), or repurchase, refinancing, extension or repayment of a material portion of the Company's funded debt (in each case, outside of the ordinary course of business) other than in accordance with or in furtherance of the Restructuring.

| | |
|---|---|
| *See* Backstop Agreement § 6.15; 9.3; 10.15 | or supporting any Alternative Restructurings; provided, that the foregoing limitations shall not apply if in response to any receipt of a written proposal to engage in an Alternative Restructuring, the board of directors (or other applicable governing body thereof) of the Debtors reasonably determines in good faith and after consultation with outside counsel that the failure to take any such action would be inconsistent with the exercise of its fiduciary duties under applicable Law.<br><br>Neither the Debtors, nor the Debtors' directors, managers, or officers, are required to take or refrain from taking any action, to the extent such person or persons determines, based on the advice of counsel, that taking, or refraining from taking, such action, as applicable, would be inconsistent with applicable law or its fiduciary obligations.<br><br>Also, the Company may terminate the Backstop Agreement (subject to payment of the Termination Fee) if it determines in good faith, based upon advice of counsel, that proceeding with the restructuring contemplated by the PSA would be inconsistent with the exercise of the fiduciary duties under applicable law of the board of directors or analogous governing body of the Company. |

## ANNEX 1

**Defined Terms**

| Defined Terms | |
|---|---|
| "*1.25L Notes Warrants*" | Warrants for 70.60% of the New Common Shares (subject to dilution by the Convertible Notes, the Private Placement, the Jeter Shares, and the EIP Shares) with a strike price equal to a total enterprise value for the Reorganized Debtors of $1.7 billion and a 1-year term.<br><br>The 1.25L Notes Warrants will have customary terms and conditions acceptable to the Company and the Initial Supporting Noteholders, including but not limited to a condition that they may be exercised only if the fair market value of the New 2L Notes and Convertible Notes are at the time of such exercise equal to or greater than the outstanding principal amount of such New 2L Notes and Convertible Notes plus any accrued and unpaid interest. |
| "*1.5L Notes Warrants*" | Warrants for 26.40% of the New Common Shares (subject to dilution by the Convertible Notes, the Private Placement, the Jeter Shares, and the EIP Shares) with a strike price equal to a total enterprise value for the Reorganized Debtors of $1.9 billion and a 1-year term.<br><br>The 1.5L Notes Warrants will have customary terms and conditions acceptable to the Company and the Initial Supporting Noteholders, including but not limited to a condition that they may be exercised only if the fair market value of the New 2L Notes and Convertible Notes are at the time of such exercise equal to or greater than the outstanding principal amount of such New 2L Notes and Convertible Notes plus any accrued and unpaid interest. |
| "*Access*" | Access Industries, Inc. |
| "*Administrative Expense Claim*" | Any right to payment constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), (ii) Fee Claims, and (iii) Restructuring Expenses. |
| "*Allowed*" | With reference to any Claim or Interest against a Debtor, (a) (i) that is timely filed by the Bar Date, or (ii) as to which there exists |

| Defined Terms | |
|---|---|
| | no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order. With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the Bankruptcy Court; provided, however, that notwithstanding the foregoing, the Reorganized Debtors will retain all claims and defenses with respect to allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan. |
| "*Antitrust Authorities*" | The United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws. |
| "*Apollo*" | Apollo Global Management, LLC and its affiliates. |
| "~~*Avenue*~~" | ~~Affiliates of Avenue Capital Group that are Supporting Noteholders~~ |
| "*Backstop Agreement*" | The backstop commitment agreement entered into simultaneously with the PSA, and attached thereto ~~as Exhibit B~~. |
| "*Backstop Commitment Premium*" | The amount to be paid as consideration to the Backstop Parties on the Effective Date, pursuant to the terms and conditions to be set forth in the Plan and the Backstop Agreement, ~~in~~equal to 7.5% of the ~~form of Rights Offering Shares, issued at a price per share equal to a 35% discount to the Stated Equity Value, equal to 8% of the aggregate Cash commitments of the Backstop Parties pursuant to the Backstop Agreement (*i.e.*, $325,000,000).~~principal amount |

| **Defined Terms** ||
|---|---|
| | of the Convertible Notes ($18.75 million), payable in cash, and 5% ($12.5 million) payable in New Common Shares at conversion. |
| "***Backstop Order***" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, approving the Debtors' entry into and performance under the Backstop Agreement and the PSA, which remains in full force and effect and is not subject to a stay. |
| "***Backstop Parties***" | The Supporting Noteholders that are signatories to the Backstop Agreement and each party that executes a joinder thereto. |
| "***Bar Date***" | The dates by which Proofs of Claim must be filed with respect to Claims against the Debtors, as ordered by the Bankruptcy Court pursuant to a bar date order or other applicable order, or pursuant to the Plan. |
| "***Business Day***" | Any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, NY are authorized or required by law or executive order to close. |
| "***Cash***" | Legal tender of the United States of America. |
| "***Cause of Action***" | Any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lieu indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws). For the avoidance of doubt, Cause of Action also includes (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (ii) the right to object to Claims or Interests, (iii) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (iv) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (v) any state law fraudulent transfer claim. |

| **Defined Terms** | |
|---|---|
| "***Chapter 11 Cases***" | The jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court. |
| "***Claim***" | A "claim," as defined in section 101(5) of the Bankruptcy Code, as against any Debtor. |
| "***Confirmation Date***" | The date on which the Bankruptcy Court enters the Confirmation Order. |
| "***Confirmation Order***" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, as evidenced in writing, confirming the Plan in the Chapter 11 Cases, which remains in full force and effect and is not subject to a stay. |
| "***Convertible Notes***" | The $250 million principal amount of Senior Secured Convertible Notes issued by EP Parent, as reorganized, guaranteed by the other Reorganized Debtors, and secured on a junior priority lien basis to the Exit Facility and New 2L Notes by all assets of the Reorganized Debtors. |
| "***DIP Agent***" | JPMorgan Chase Bank, N.A. |
| "***DIP Claim***" | All Claims held by the DIP Lenders on account of arising under, or relating to the DIP Facility or the DIP Orders, which includes Claims for all principal amounts outstanding, interest, reasonable and documented fees, expenses, costs and other charges of the DIP Lenders. |
| "***DIP Credit Agreement***" | The credit agreement governing the terms of the DIP Facility. |
| "***DIP Lenders***" | The lenders party to the DIP Credit Agreement. |
| "***DIP Order***" | The interim or final orders, as applicable, of the Bankruptcy Court authorizing, among other things, the Debtors to enter into and make borrowings under the DIP Facility and granting certain rights, protections, and liens to and for the benefit of the DIP Lenders. |
| "***Disclosure Statement***" | The disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code. |
| "***Disclosure Statement Order***" | The order of the Bankruptcy Court, in form and substance satisfactory to the Initial Supporting Noteholders, as evidenced in writing, approving the Disclosure Statement in the Chapter 11 |

| **Defined Terms** | |
|---|---|
| | Cases, which remains in full force and effect and is not subject to a stay. |
| "*Effective Date*" | The date upon which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with the terms thereof and the Plan becomes effective. |
| ~~"*Elliott*"~~ | ~~Elliott Associates, L.P., and Elliott International, L.P. and their respective affiliates.~~ |
| "*Entity*" | An "entity," as defined in section 101(15) of the Bankruptcy Code. |
| "*Estate(s)*" | Individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code. |
| "*Exchange Act*" | The Securities Exchange Act of 1934. |
| "*Exculpated Parties*" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) any statutory committee appointed in the Chapter 11 Cases, and (iv) with respect to each of the foregoing Persons in clauses (i) through (iii), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Exit Credit Agreement*" | The RBL Credit Agreement, as amended and restated on the Effective Date. |
| "*Exit Facility Lenders*" | The lenders from time to time party to the Exit Credit Agreement, including any applicable permitted assignees thereof. |
| "*Existing Equity Interests*" | Shares of the Class A common stock of EP Parent that existed immediately prior to the Effective Date, including any restricted stock of EP Parent that vests prior to the Effective Date. |
| "*Fee Claim*" | A Claim for professional services rendered or costs incurred on or after the Petition Date through the Confirmation Date by professional persons retained by an order of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases. |
| "*Final Order*" | An order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, |

| **Defined Terms** | |
|---|---|
| | vacatur, modification, or amendment, whether by appeal or by writ of certiorari; provided, however, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order. |
| "***Governmental Entity***" | Any U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof). |
| "***Initial Supporting Noteholders***" | ~~Each of Apollo and Elliott.~~The beneficial holders, or investment managers, advisors, or subadvisors to beneficial holders of the 1.125L Notes and 1.25L Notes who are signatories to the PSA as of the date of the PSA. |
| "***Intercompany Claim***" | Any Claim against a Debtor held by another Debtor. |
| "***Intercompany Interest***" | An Interest in a Debtor held by another Debtor, other than any Existing Equity Interests or Other Equity Interests (including any Class B common stock of EP Parent held by EPE Employee Holdings, II, LLC). |
| "***Interest***" | Any equity interest (as defined in section 101(16) of the Bankruptcy Code) in the Company, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in the Company, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Company, that existed immediately before the Effective Date, and including any equity interest issued to the Company's current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards. |
| "***Jeter***" | Wolfcamp Drillco Operating L.P. |

| **Defined Terms** | |
|---|---|
| "*Jeter Shares*" | New Common Shares issued in consideration of the contribution of equity interests in Jeter to the Reorganized Debtors, which shall be subject to dilution by the ~~EIP~~EIP Shares. |
| "*New 2L Notes*" | The $750 million principal amount of Senior Secured Notes issued by EP Parent, as reorganized, guaranteed by the other Reorganized Debtors, and secured on a second priority lien basis to the Exit Facility by all assets of the Reorganized Debtors.  The New 2L Notes will have an annual cash interest rate of 9.5%, a maturity date of 6 years from the issue date, and other customary terms, conditions, and covenants to be negotiated that are acceptable to the Company and the Initial Supporting Noteholders. |
| "*New Common Shares*" | Shares of common stock of Reorganized EP Parent to be issued on the Effective Date. |
| "*New Corporate Governance Documents*" | The certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized EP Parent, which shall be acceptable to the Initial Supporting Noteholders. |
| "*Other Equity Interests*" | Class B common stock of EP Parent that existed immediately prior to the Effective Date and all other Interests in EP Parent other than Existing Equity Interests. |
| "*Other Priority Claim*" | Any Claim other than an Administrative Expense Claim or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code. |
| "*Other Secured Claim*" | A Secured Claim other than a Priority Tax Claim, a DIP Claim, an RBL Claim, a 1.125L Notes Claim, 1.25L Notes Claim and a 1.5L Notes Claim. |
| "*Person*" | Any individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity. |
| "*Plan*" | The prearranged chapter 11 plan of reorganization of the Company implementing the Restructuring, including all appendices, exhibits, schedules, and supplements thereto, as may be modified from time to time in accordance with its terms and the PSA. |
| "*Plan Supplement*" | A supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits, in |

| **Defined Terms** | |
|---|---|
| | each case subject to the terms and provisions of the PSA (including any consent rights in favor of the Initial Supporting Noteholders) relevant to the implementation of the Plan, to be filed with the Bankruptcy Court, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the PSA (including any consent rights in favor of the Supporting Noteholders), which shall include. but not be limited to (i) the New Corporate Governance Documents, (ii) the number and slate of directors to be appointed to the New Board to the extent known and determined, (iii) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (iv) the Employee Incentive Plan, (v) the Exit Facility documents, (vi) a schedule of retained Causes of Action, and (vii) the Schedule of Rejected Contracts. |
| "*Priority Tax Claim*" | Any Secured Claim or unsecured Claim of a governmental unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code. |
| "*Pro Rata*" | The proportion that an Allowed Claim or Interest in a particular class bears to the aggregate amount of Allowed Claims or Interests in that class. |
| "*Registration Rights Agreement*" | The registration rights agreement to be entered into as of the Effective Date, which shall have terms that are customary for a transaction of this nature and shall be in form and substance acceptable to the Initial Supporting Noteholders and the Company. |
| "*Released Parties*" | Collectively, (i) the Debtors, (ii) the Reorganized Debtors, (iii) the Supporting Noteholders, (iv) the arrangers, agents and lenders under the Exit Facility, (v) the DIP Agent and DIP Lenders under the DIP Facility, (vi) the RBL Agent and the RBL Lenders under the RBL Facility, (vii) the Backstop Parties, (viii) holders of Existing Equity Interests, on account of their contributions under the Plan, (ix) with respect to each of the foregoing Persons, in clauses (i) through (viii), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective |

| **Defined Terms** | |
|---|---|
| | heirs, executors, estates, and nominees, in each case in their capacity as such. |
| | Notwithstanding the foregoing, upon the request of any of the Debtors or their estates, the Initial Supporting Noteholders will agree to exclude from the "Released Parties", for purposes of the "Releases by Debtors" and/or the "Releases by Third Parties, " any holders of Existing Equity Interests or any Other Equity Interests and any of their respective affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. |
| "*Reinstated 1.125L Notes*" | The 1.125L Notes, issued pursuant to the 1.125L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.125L Notes that have not been redeemed or repaid prior to the Closing. |
| "*Reinstated 1.25L Notes*" | The 1.25L Notes, issued pursuant to the 1.25L Indenture, upon being rendered unimpaired pursuant to Section 1124(2) of the Bankruptcy Code pursuant to the Plan to the extent of 1.25L Notes that have not been redeemed or repaid prior to the Closing. |
| "*Reinstated Debt*" | The Reinstated 1.125L Notes and the Reinstated 1.25L Notes. |
| "*Releasing Parties*" | Collectively, (i) the holders of all Claims or Interests that vote to accept the Plan, (ii) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (iii) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (iv) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, (v) all other holders of Claims and Interests, and (vi) the Released Parties. |
| "*Reorganized Debtors*" | Each of the Debtors as reorganized on the Effective Date in accordance with the Plan. |
| "*Reorganized EP Parent*" | EP Parent as reorganized on the Effective Date in accordance with the Plan. |

| Defined Terms | |
|---|---|
| "*Restructuring Expenses*" | The reasonable and documented fees and out-of-pocket expenses payable to the Supporting Noteholder Advisors as set forth in the Backstop Agreement (and in the case of Debevoise & Plimpton LLP, subject to the cap set forth therein). |
| "*Restructuring Transactions*" | One or more transactions pursuant to section 1123(a)(5)(D) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the consummation of the transactions provided for under or contemplated by the PSA and this Term Sheet, (ii) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan, the PSA, and this Term Sheet, and that satisfy the requirements of applicable law, (iii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, the PSA, and this Term Sheet, and (iv) all other actions that the Debtors or Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the PSA and this Term Sheet. |
| "*Rights Offering Shares*" | New Common Shares issued pursuant to the Rights Offering. |
| "*Rights Offering Documents*" | Collectively, the Backstop Agreement and the Rights Offering Procedures. |
| "*Rights Offering Procedures*" | The rights offering procedures in form and substance acceptable to the Initial Supporting Noteholders setting forth the procedures for the 1.51.125L Noteholders and 1.25L Noteholders to participate in the Rights Offering. |
| "*Schedule of Rejected Contracts*" | The schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time. |
| "*Schedules*" | The schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, which shall be reasonably acceptable to the Initial Supporting Noteholders. |

| **Defined Terms** | |
|---|---|
| "*Secured Claim*" | A Claim (i) secured by a lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Code, or (ii) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code. |
| "*Securities Act*" | Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and any rules and regulations promulgated thereby. |
| "*Solicitation Materials*" | Collectively, the Disclosure Statement and the related solicitation materials. |
| "~~*Stated Equity Value*~~"[3] | ~~The stated equity value of the Reorganized Debtors of $900 million.~~ |
| "*Subordinated Claim*" | A Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise. |
| "*Supporting Noteholder Advisors*" | ~~Milbank LLP, Houlihan Lokey Capital, Inc., W.D. Von Gonten & Co., DeGolyer & MacNaughton Corp., Cole Schotz P.C., Paul, Weiss, Rifkind, Wharton & Garrison LLP, Porter Hedges LLP, in its capacity as local Texas counsel to certain of the Supporting Noteholders, Moelis & Company, and Debevoise & Plimpton LLP.~~Morrison & Foerster LLP, Foley & Lardner LLP, Lear & Lear PLLC, and PJT Partners LP. |
| "*Supporting Noteholders*" | The Supporting Noteholders that are signatories to the PSA, and any subsequent 1.5L Noteholder that becomes party thereto in accordance with the terms of the PSA. |
| "*Unimpaired*" | With respect to a Claim, Interest, or a class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code. |
| "*Unsecured Claims Pool*" | A pool of New Common Shares equal to 1% of New Common Shares, subject to dilution by the Convertible Notes, the Private Placement, the Jeter Shares,  the 1.25L Notes Warrants, the 1.5L Notes Warrants, and the EIP Shares. |
| "*Voting Deadline*" | The date and time to be set by the Bankruptcy Court as the deadline for Impaired holders of Claims to vote to accept or reject the Plan. |

---

[3] ~~Stated Equity Value is for purposes of calculations of Rights Offering amounts and not for establishing performance goals related to EIP.~~