**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| EP ENERGY CORPORATION, *et al.*,[1] | Case No. 19-35654 (MI) |
| Debtors. | (Jointly Administered) |

**OBJECTION TO CONFIRMATION OF THE FOURTH AMENDED JOINT CHAPTER
11 PLAN OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS**
**[Re: Docket No. 685]**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' mailing address is 1001 Louisiana Street, Houston, TX 77002.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................... iii

PRELIMINARY STATEMENT ....................................................................................................... 1

ARGUMENT ....................................................................................................................................... 3

I.  The 1.125L Notes are Impaired by the Plan and May Not be Reinstated Under Section 1124(2) of the Bankruptcy Code .......................................................................................... 4

    A.  The Plan Impairs Class 4 by Purporting to Reinstate the 1.125L Notes Without Curing Applicable Defaults .................................................................................... 6

        i.  The Debtors Are in Breach of Section 6.01(e) of the 1.125L Notes Indenture ........................................................................................................ 7

        ii.  The Plan Does Not Cure the Default ........................................................... 8

        iii.  The Cross-Acceleration Defaults are Not Defaults of a Kind Specified in Section 365(b)(2) ........................................................................................ 9

    B.  The Plan Impairs Class 4 by Purporting to Reinstate the 1.125L Notes For Less Than the Full Allowed Amount .......................................................................... 12

        i.  As of the Petition Date, the Total Amount of Allowed 1.125L Notes Claims was $1,177,651,774 .................................................................... 12

        ii.  The Plan Impairs the 1.125L Notes Claims by Providing For Less Than the Full Allowed Amount .................................................................... 15

    C.  The Plan Does Not Compensate the 1.125L Noteholders for Reasonable Reliance Damages ........................................................................................................ 18

    D.  The Plan Alters the Legal, Contractual, or Equitable Rights of the 1.125L Noteholders Under the Priority Lien Intercreditor Agreement ............................ 19

        i.  The Plan Violates the Waterfall Set Forth in Section 2.01 of the Priority Lien ICA .................................................................................................... 19

        ii.  The Plan Alters the Rights of 1.125L Noteholders Under the Priority Lien ICA's Turnover Provision ................................................................. 23

    E.  Several Other Provisions of the Plan Alter the Legal, Equitable, or Contractual Rights of the 1.125L Noteholders .......................................................................... 24

        i.  The Plan Impairs the Rights Provided on Account of the 1.125L Notes Under the Cash Collateral Order ............................................................... 24

        ii.  The 1.125L Notes are Impaired by the Plan's Third-Party Release ......... 25

        iii.  The Plan Purports to Alter the Change of Control Rights Provided Under the 1.125L Notes Indenture .................................................................... 27

II.  The Plan Cannot be Confirmed Because it Violates Section 1123(a)(4) of the Bankruptcy Code .................................................................................................................... 31

A.    The 1.25L Notes Exchange Was Only Open to a Small Preferred Group of 1.25L Noteholders .................................................................................................. 32

B.    The 1.25L Notes Exchange is Treatment "For" a Claim ...................................... 33

C.    The 1.25L Notes Exchange is Treatment Under the Plan...................................... 34

III.    The Plan Cannot be Confirmed Because Holders of 1.25L Notes That Participate in the 1.25L Notes Exchange are Receiving a Greater Than 100% Recovery .......................... 36

IV.    The Plan Cannot be Confirmed Because it is Not Feasible Within the Meaning of Section 1129(a)(11) of the Bankruptcy Code .................................................................. 38

A.    Feasibility Legal Standard ................................................................................ 38

B.    The Debtors' Business Plan and Underlying Projections are Highly Speculative 40

C.    The Debtors Cannot Demonstrate that They Will be Able to Repay or Refinance Their Outstanding Indebtedness at Maturity........................................................ 45

    i.    Mr. D'Souza Understates the Debtors' Leverage Ratio ........................... 46

    ii.   Mr. D'Souza's Assumptions Regarding the High Yield Market for E&P Issuers are Flawed................................................................................... 47

    iii.  Under a Reasonable Set of Assumptions, the Debtors Will Have Little to No Equity Cushion Following Emergence ................................................ 48

D.    The Debtors Have Failed to Account for the Applicable Premium due to the 1.125L Noteholders............................................................................................. 48

    i.    The Debtors Must Reserve for the Applicable Premium Pending Final Resolution of the Successor Trustee's Claim ........................................... 49

    ii.   The Debtors Cannot Satisfy the Conditions Precedent to the Plan's Effective Date ....................................................................................... 50

    iii.  The Debtors Cannot Demonstrate That They Will be Solvent at Emergence, as Required Under the Exit Credit Agreement ...................... 51

CONCLUSION.................................................................................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 1111 Myrtle Ave. Grp., LLC,*
    598 B.R. 729 (Bankr. S.D.N.Y. 2019) ..................................................................17

*In re 139-141 Owners Corp.,*
    313 B.R. 364 (S.D.N.Y. 2004) ............................................................................17

*Ad Hoc Comm. Of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.),*
    933 F.3d 918 (8th Cir. 2019) .............................................................................33

*Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp. (In re Dana Corp.),*
    412 B.R. 53 (S.D.N.Y. 2008) .............................................................................31

*In re Adelphia Bus. Solutions, Inc.,*
    341 B.R. 416 (Bankr. S.D.N.Y. 2003) ................................................................48

*Ahuja v. Lightsquared Inc. (In re Mayflower Cmtys., Inc.),*
    No. 19-30283 (HDH), 2019 WL 4732379 (Bankr. N.D. Tex. Sept. 26, 2019) ......37

*Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.),*
    874 F.3d 787 (2d Cir. 2017), *cert. denied,* No. 17-1291, 2018 U.S. LEXIS 3822 (June 18, 2018)............................................................................................12

*In re Applied Safety, Inc.,*
    200 B.R. 576 (Bankr. E.D. Pa. 1996) .................................................................38

*Begier v. IRS,*
    496 U.S. 53 (1990)......................................................................................31, 36

*Bistrian v. Easthampton Sand & Gravel Co. (In re Easthampton Sand & Gravel Co.),*
    25 B.R. 193 (Bankr. E.D.N.Y. 1982)..................................................................11

*Blackwell v. Rio Mgmt. (In re Blackwell),*
    267 B.R. 732 (Bankr. W.D. Tex. 2001)...............................................................29

*In re Bos. Generating, LLC,*
    440 B.R. 302 (Bankr. S.D.N.Y. 2010) ................................................................22

*In re Breitburn Energy Partners LP*,
    582 B.R. 321 (Bankr. S.D.N.Y. 2018)........................................................................31

*Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd.)*,
    921 F.2d 569 (5th Cir. 1991) .....................................................................................38

*In re Centr. Med. Ctr., Inc.*,
    122 B.R. 568 (Bankr. E.D. Mo. 1990).......................................................................32

*In re Chadda*,
    No. 07-12665-bif, 2007 WL 3407375 (Bankr. E.D. Pa. Nov. 9, 2007).............................38, 39

*In re Chassix Holdings, Inc.*,
    533 B.R. 64 (Bankr. S.D.N.Y. 2015).........................................................................26

*In re CHC Grp. Ltd.*,
    No. 16-31854 (BJH), 2017 WL 11093971 (Bankr. N.D. Tex. Mar. 3, 2017) ........................33

*Cutcliff v. Reuter (In re Reuter)*,
    427 B.R. 727 (Bankr. W.D. Mo. 2010), *aff'd*, 443 B.R. 427 (B.A.P. 8th Cir.
    2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012).................................................................4

*Czyzewski v. Jevic Holding Corp.*,
    137 S.Ct. 973 (2017).................................................................................................35

*Del. Tr. Co. v. Energy Intermediate Holding Co. (In re Energy Future Holdings Corp.)*,
    842 F.3d 247 (3d Cir. 2016).......................................................................................12

*In re Duval Manor Assocs.*,
    191 B.R. 622 (Bankr. E.D. Pa. 1996) .......................................................................39

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'Ship)*,
    116 F.3d 790 (5th Cir. 1997) .....................................................................................38

*HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*,
    364 F.3d 355 (1st Cir. 2004)......................................................................................22

*Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*,
    419 B.R. 585 (Bankr. S.D.N.Y. 2009).......................................................................22

*In re Jones*,
    32 B.R. 951 (Bankr. D. Utah 1983) ...........................................................................10

*Keystone Gas Gathering, L.L.C. v. Ad Hoc Comm. (In re Ultra Petroleum Corp.)*,
    943 F.3d 758 (5th Cir. 2019) .....................................................................................15

-iv-

*L & J Anaheim Assocs. v. Kawasaki Leasing Int'l, Inc. (In re L & J Anaheim Assocs.)*,
   995 F.2d 940 (9th Cir. 1993) ........................................................................5, 11

*In re Lakeside Glob. II, Ltd.*,
   116 B.R. 499 (Bankr. S.D. Tex. 1989) ...............................................................38

*Lernout & Hauspie Speech Prods. v. Baker (In re Lernout & Hauspie Speech Prods., N.V.)*,
   264 B.R. 336 (Bankr. D. Del. 2001) ..................................................................29

*Lifemark Hosps., Inc. v. Liljeberg Enters. (In re Liljeberg Enters., Inc.)*,
   304 F.3d 410 (5th Cir. 2002) .......................................................................10, 11

*In re LightSquared, Inc.*,
   534 B.R. 522 (S.D.N.Y. 2015) ............................................................................37

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
   150 F.3d 503 (5th Cir. 1998) .......................................................................33, 34

*In re MCorp Fin., Inc.*,
   137 B.R. 219 (Bankr. S.D. Tex. 1992) .................................................................4

*In re Mirant Corp.*,
   No. 03-46590-DML-11, 2005 WL 6440372 (Bankr. N.D. Tex. May 24, 2005)....................50

*In re Moody Nat'l SHS Hous. H, LLC*,
   426 B.R. 667 (Bankr. S.D. Tex. 2010) (Isgur, J.) ........................................... *passim*

*In re Moshe*,
   567 B.R. 438 (E.D.N.Y. 2017) ............................................................................16

*In re NNN 3500 Maple 26, LLC*,
   No. 13-30402-HDH-11, 2014 WL 1407320 (Bankr. N.D. Tex. Apr. 10, 2014) .....................5

*Nw. Bank Worthington v. Ahlers*,
   485 U.S. 197 (1988)............................................................................................36

*In re Peaches Records & Tapes, Inc.*,
   51 B.R. 583 (B.A.P. 9th Cir. 1985)......................................................................11

*In re Pearville, L.P.*,
   No. 10-34074, 2010 Bankr. LEXIS 6240 (Bankr. S.D. Tex. Dec. 13, 2010) ..........................4

*Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*,
   761 F.2d 1374 (9th Cir. 1985) ............................................................................48

*In re Pratt Vineyards, LLC*,
   No. 10-35071-A-12, 2011 WL 10657053 (Bankr. E.D. Cal. June 7, 2011) ..........................47

*In re Quigley*,
   437 B.R. 102 (Bankr. S.D.N.Y. 2010) ...................................................................................38

*In re Rexford Props., LLC*,
   558 B.R. 352 (Bankr. C.D. Cal. 2016)...................................................................................29

*In re Sagamore Partners, Ltd.*,
   610 Fed. Appx. 864 (11th Cir. 2015) ....................................................................................16

*Save Our Springs (S.O.S) Alliance, Inc. v. WSI (II)-COS, L.L.C.*,
   632 F.3d 168 (5th Cir. 2011) ................................................................................................48

*In re Silverman*,
   13 B.R. 72 (Bankr. D. Mass. 1981) .......................................................................................25

*In re Smith*,
   123 B.R. 863 (Bankr. C.D. Cal. 1992)...................................................................................15

*In re Spansion, Inc.*,
   426 B.R. 114 (Bankr. D. Del. 2010) ......................................................................................49

*In re Star Ambulance Serv., LLC*,
   540 B.R. 251 (Bankr. S.D. Tex. 2015) ..................................................................................39

*In re Sultan Realty, LLC*,
   No. 12-10119 (SMB), 2012 WL 6681845 (Bankr. S.D.N.Y. Dec. 21, 2012) ........................16

*In re SunEdison, Inc.*
   576 B.R. 453 (Bankr. S.D.N.Y. 2017) ...................................................................................26

*In re TCI 2 Holdings, LLC*,
   428 B.R. 117 (Bankr. D.N.J. 2010) ................................................................................33, 50

*Thomas v. Union Carbide Agric. Prods. Co.*,
   473 U.S. 568 (1985)..............................................................................................................29

*U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*,
   730 F.3d 88 (2d Cir. 2013).............................................................................................10, 12

*United States v. AWECO, Inc. (In re AWECO, Inc.)*,
   725 F.2d 293 (5th Cir. 1984) ................................................................................................35

*In re Vill. at Camp Bowie I, L.P.*,
   454 B.R. 702 (Bankr. N.D. Tex. 2011), *aff'd*, 710 F.3d 239 (5th Cir. 2013) ..........................4

ny-1813349

*In re W.R. Grace & Co.*,
  475 B.R. 34 (D. Del. 2012), *aff'd,* 729 F.3d 332 (3d Cir. 2013) ...........................................39

*In re W.R. Grace*,
  729 F.3d 311 (3d Cir. 2013)................................................................................................31

*In re Young Broad. Inc.*,
  430 B.R. 99 (Bankr. S.D.N.Y. 2010) ..................................................................................39

**Statutes**

11 U.S.C. § 510(a) ..................................................................................................................22

11 U.S.C. § 108(b)(2) ...............................................................................................................9

11 U.S.C. § 365(b)(2) .............................................................................................................10

11 U.S.C. § 502(a) ..................................................................................................................13

11 U.S.C. § 1123(a)(4)........................................................................................................31, 32

11 U.S.C. § 1124...................................................................................................................15, 18

11 U.S.C. § 1124(1) ..................................................................................................................4

11 U.S.C. § 1124(2) ...............................................................................................................5, 16

11 U.S.C. § 1124(2)(A)............................................................................................................7, 9

11 U.S.C. § 1124(2)(C) ...........................................................................................................18

11 U.S.C. § 1124(2)(E) ....................................................................................................... *passim*

11 U.S.C. § 1129(a)(1)..............................................................................................................4

11 U.S.C. § 1129(a)(8)..............................................................................................................6

11 U.S.C. § 1129(a)(11)...........................................................................................................38

28 U.S.C. § 2201(a) ................................................................................................................29

N.Y. U.C.C. § 9-939 (McKinney 2014) ...................................................................................22

**Other Authorities**

Black's Law Dictionary (10th ed. 2014)...................................................................................10

S. Rep. No. 95-989 (1978) .........................................................................................................7

ny-1813349

UMB Bank, National Association, in its capacity as successor trustee and successor notes collateral agent to Wilmington Trust, National Association (the "Successor Trustee") under that certain Indenture, dated as of May 23, 2018 (as modified, supplemented or amended and in effect on the date hereof, the "1.125L Notes Indenture"), with respect to EP Energy LLC's and Everest Acquisition Finance Inc.'s offering of their 7.750% Senior Secured Notes due May 15, 2026 (the "1.125L Notes"), and the ad hoc group of unaffiliated senior secured noteholders (the "Ad Hoc Group"),[1] by and through their undersigned counsel, hereby submit this objection (the "Objection") to confirmation of the *Fourth Amended Joint Chapter 11 Plan of EP Energy Corporation and its Affiliated Debtors* [Docket No. 685] (the "Plan").[2] In support of the Objection, the Successor Trustee and the Ad Hoc Group incorporate by reference the *Declaration of Jamie A. Levitt in Support of the Objection to Confirmation of the Fourth Amended Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors* (the "Levitt Decl."), filed contemporaneously herewith. In further support of the Objection, the Successor Trustee and the Ad Hoc Group respectfully state as follows:

## **PRELIMINARY STATEMENT**

1.      A court may confirm a plan of reorganization ***only*** if the plan complies with section 1129 of the Bankruptcy Code. For the reasons more fully described below, the Plan fails to meet a number of these requirements. Confirmation must be denied.

---

[1] The Ad Hoc Group is comprised of certain unaffiliated funds, accounts, and/or managers of funds or accounts that collectively hold, control, or otherwise have discretionary authority over more than $1.1 billion of the Debtors' funded indebtedness, including, but not limited to, more than $830 million of the 1.125L Notes issued by EP Energy LLC and Everest Acquisition Finance Inc. under the 1.125L Notes Indenture and more than $136.9 million of the 1.25L Notes issued by EP Energy LLC and Everest Acquisition Financing Inc. under the indenture dated as of November 29, 2016. *See Amended Verified Statement Pursuant to Federal Rule of Bankruptcy Procedure 2019* [Docket No. 820].

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

2.      Although there are many factors to consider in approving a plan under section 1129, the Debtors have selected an exceptionally narrow path to confirmation, with success or failure hinging on whether the Debtors' treatment of Class 4—1.125L Notes Claims—"impairs" such claims within the meaning of section 1124 of the Bankruptcy Code.  If the 1.125L Notes Claims are impaired, the Plan fails, obviating the need to consider the other elements of section 1129.

3.      The Plan alters (and impairs) the legal, equitable, and contractual rights with respect to the 1.125L Notes Claims in a number of ways.  Most notably, the Plan seeks to "reinstate" the 1.125L Notes in an amount approximately $177,651,774 less than the allowed amount of the oversecured 1.125L Notes Claims.  The Debtors seek to ignore the plain language of the 1.125L Notes Indenture, which has added approximately $177,651,774 to the principal amount of the 1.125L Notes as liquidated damages, an amount that is payable irrespective of whether the 1.125L Notes are repaid or redeemed.  In other words, the $177,651,774 is not a "make whole."  The Debtors have waived the right to object to the character and quantum of the 1.125L Notes Claims in connection with confirmation, and such claims are deemed allowed in the amount of $1,177,651,774 for that purpose.  If sections 1129 and 1124 of the Bankruptcy Code prohibit the reinstatement of the oversecured 1.125L Notes Claims in an amount less than the full deemed allowed amount (which they clearly do), then the 1.125L Notes Claims are impaired, and the Plan cannot be confirmed.

4.      The Plan also violates section 1123(a)(4) of the Bankruptcy Code.  Although the Plan generally provides for reinstatement of the 1.25L Notes, $138 million in principal amount of those notes held by the Supporting Noteholders will instead be exchanged for New Common Shares at a 25.7% discount to the Stated Equity Value.  Thus, although all Allowed 1.25L Notes

Claims are placed into the same creditor class under the Plan (Class 5), not all Allowed 1.25L Notes Claims will receive the same treatment.  This structure violates the Bankruptcy Code's "central policy" of equal treatment for claims in the same creditor class as embodied in section 1123(a)(4) of the Bankruptcy Code.

5.      Finally, the evidence at the confirmation hearing will show that the Plan is not feasible because, among other things, (a) the Plan will leave the Debtors overleveraged and (b) the Debtors' business plan and projections, which are dependent upon the Debtors converting into a single-basin operator in its largely untested basin in Northeastern Utah, are speculative and unrealistic.  Moreover, the Plan and projections become only more speculative and unrealistic when the full amount of the 1.125L Notes Claims is taken into account.

6.      The Debtors—who know holders of the 1.125L Notes Claims (the "1.125L Noteholders") oppose the Plan—have chosen a confirmation path that does not utilize "cram down" with respect to the 1.125L Notes Claims.  Of course, the Debtors could have pursued a different plan, but they did not.  Now, they bear the heavy (and impossible) burden of proving the Plan's treatment of the 1.125L Notes Claims does not impair such claims within the meaning of section 1124, that the Plan's unequal treatment of claims in Class 5 is permissible, and that the Plan is otherwise feasible.  This is a burden they simply cannot meet.

7.      In sum, the evidence at the confirmation hearing will establish that the Plan suffers from a raft of critical deficiencies that cannot be cured and that preclude confirmation as a matter of law.

## ARGUMENT

8.      The Debtors bear the burden of proving by a preponderance of the evidence that the Plan satisfies section 1129 of the Bankruptcy Code and all other applicable provisions of the

3

Bankruptcy Code incorporated thereby.  *See* 11 U.S.C. § 1129(a)(1); *In re Pearville, L.P.*, No.

10-34074, 2010 Bankr. LEXIS 6240, at *6 (Bankr. S.D. Tex. Dec. 13, 2010); *In re MCorp Fin.,*

*Inc.*, 137 B.R. 219, 225 (Bankr. S.D. Tex. 1992).

9.     The Debtors cannot carry that burden, and the Plan cannot be confirmed because:

(a) the 1.125L Notes are impaired by the Plan and accordingly may not be reinstated pursuant to

section 1124(2) of the Bankruptcy Code; (b) the Plan provides disparate treatment for 1.25L

Notes Claims in violation of section 1123(a)(4) of the Bankruptcy Code; (c) the Plan delivers a

greater-than-100% recovery to Class 5 in violation of section 1129(b); and (d) the Plan is not

feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

**I.     The 1.125L Notes are Impaired by the Plan and May Not be Reinstated Under
        Section 1124(2) of the Bankruptcy Code**

10.     The Plan provides that claims in Class 4 (Allowed 1.125L Notes Claims) will be

reinstated pursuant to section 1124(2) of the Bankruptcy Code and that such claims are deemed

to be unimpaired.  (Plan § 4.4.)  The Debtors bear the burden of proving compliance with and

satisfaction of section 1124(2).  Absent such proof, a claim is presumed to be impaired.  *See*

*Cutcliff v. Reuter (In re Reuter)*, 427 B.R. 727, 773 (Bankr. W.D. Mo. 2010), *aff'd*, 443 B.R. 427

(B.A.P. 8th Cir. 2011), *aff'd*, 686 F.3d 511 (8th Cir. 2012).

11.     Demonstrating satisfaction of section 1124 is a heavy burden.  It is well-

established that Congress gave "'impairment' the broadest possible meaning."  *See In re Vill. at*

*Camp Bowie I, L.P.*, 454 B.R. 702, 708 (Bankr. N.D. Tex. 2011), *aff'd*, 710 F.3d 239 (5th Cir.

2013).  Thus, section 1124(1) provides that a claim is impaired unless the plan "leaves unaltered

the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such

claim . . . ." 11 U.S.C. § 1124(1).  "[A]ny alteration of [a creditor's] rights constitutes

impairment even if the value of the rights is enhanced."  *See L & J Anaheim Assocs. v. Kawasaki*

*Leasing Int'l, Inc. (In re L & J Anaheim Assocs.),* 995 F.2d 940, 942 (9th Cir. 1993) (citation omitted).

12.     Section 1124(2) is a very narrow exception that applies only to the impairment of a "contractual provision or applicable law" that entitles a holder of claim "to demand or receive accelerated payment of such claim . . . after the occurrence of a default." *See In re NNN 3500 Maple 26, LLC*, No. 13-30402-HDH-11, 2014 WL 1407320, at *5 (Bankr. N.D. Tex. Apr. 10, 2014) ("[A] plan may cure a default by de-accelerating the note, but *any* other change in the arrangement between the debtor and creditor constitutes impairment." (citation omitted)).

13.     Section 1124(2) further provides that a class of claims is deemed impaired under a plan, unless the plan:

> (A) cures any such default that occurred before or after the commencement of the case under this title, other than a default of a kind specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not require to be cured;
>
> (B) reinstates the maturity of such claim or interest as such maturity existed before such default;
>
> (C) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law;
>
> (D) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and
>
> (E) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

11 U.S.C. § 1124(2).

14.     The Plan does not satisfy these requirements because it: (a) seeks to reinstate the 1.125L Notes without curing all applicable defaults; (b) purports to reinstate the 1.125L Notes

for less than the total allowed amount of the 1.125L Notes Claims as of the Petition Date; (c)

fails to provide for payment of reasonable reliance damages; (d) alters the rights of the 1.125L

Noteholders under the Priority Lien ICA (defined below); (e) alters the rights of the 1.125L

Noteholders under the Cash Collateral Order; (f) purports to release claims and causes of action

that the 1.125L Noteholders might have against the Debtors and various third parties; and (g)

purports to nullify the rights of 1.125L Noteholders upon a "Change of Control."  A finding that

the 1.125L Notes are impaired under the Plan precludes confirmation as a matter of law.  *See* 11

U.S.C. § 1129(a)(8) (requiring that to confirm a plan, the court must find that each class of

claims has either accepted the plan or is not impaired by the plan).[3]

### A. The Plan Impairs Class 4 by Purporting to Reinstate the 1.125L Notes Without Curing Applicable Defaults

15.     As of the Petition Date, there were at least three Events of Default under the terms

of the 1.125L Notes Indenture, including an Event of Default triggered by the filing of the

Debtors' chapter 11 petitions (*see* Levitt Decl. Exh. A, 1.125L Notes Indenture § 6.01(f)), the

Debtors' failure to pay outstanding indebtedness of more than $125 million (*Id.* at § 6.01(e)), and

the Debtors' failure to repay the 1.125L Notes following acceleration (*Id.* at § 6.01(b)).  By

operation of the acceleration clause set forth in section 6.02 of the 1.125L Notes Indenture and

applicable law, the $1 billion in principal amount of the 1.125L Notes outstanding as of the date

immediately preceding the Petition Date became immediately due and payable on the Petition

---

[3] The Debtors cannot now "cram down" on Class 4 pursuant to section 1129(b) of the Bankruptcy Code.  The Plan was not proposed as a cram down, and the Debtors did not solicit votes from holders of Class 4 Claims as required by section 1126(a) of the Bankruptcy Code ████████

ny-1813349

Date.  *See, e.g.*, S. Rep. No. 95-989, at 63 (1978) ("[B]ankruptcy operates as the acceleration of the principal amount of all claims against the debtor.").

16.     Section 1124(2) provides that in order to reinstate this $1 billion in principal amount of 1.125L Notes Claims, the Plan must cure all pre-petition defaults, other than defaults of a kind specified in section 365(b)(2) of the Bankruptcy Code.  11 U.S.C. § 1124(2)(A).  The Plan fails to satisfy that requirement because it does not, and indeed cannot, cure the default under section 6.01(e) of the 1.125L Notes Indenture.

     **i.**     **The Debtors Are in Breach of Section 6.01(e) of the 1.125L Notes Indenture**

17.     Section 6.01(e) of the 1.125L Notes Indenture contains a cross-acceleration default provision.  That section provides that an Event of Default occurs when "there is a failure by Holdings or any Significant Subsidiary . . . to pay any Indebtedness . . . within any applicable grace period after final maturity or the acceleration of any such Indebtedness by the holders thereof because of a default, in each case, if the total amount of such Indebtedness unpaid or accelerated exceeds $125.0 million . . . ."  (1.125L Notes Indenture § 6.01(e).)

18.     The Debtors are in default under section 6.01(e) of the 1.125L Notes Indenture because the 1.25L Notes, 1.5L Notes, and Unsecured Notes were accelerated but have not been paid.  Prior to the Petition Date, the Debtors failed to make a $40 million coupon payment for the 1.5L Notes due on August 15, 2019, and a $7.05 million coupon payment for the 2022 Unsecured Notes due on September 3, 2019.  (*Declaration of David Rush in Support of Debtors' Chapter 11 Petitions and Related Requests for Relief* ¶ 18 [Docket No. 16] (the "First Day Decl.").)  Thereafter, prior to expiration of the 30-day grace period provided for under the applicable indentures, the Debtors filed petitions commencing these chapter 11 cases on October 3, 2019.

19. Under the indentures governing the 1.25L Notes, the 1.5L Notes and each of the Unsecured Notes, the commencement of these chapter 11 cases triggered an Event of Default and automatic acceleration of the outstanding principal and interest. (Levitt Decl. Exhs., C-F, 1.25L Notes Indenture § 6.01(f); 2022 Unsecured Notes Indenture §§ 6.01(f), (g); 2025 1.5L Notes Indenture §§ 6.01(f), (g); 2024 1.5L Notes Indenture §§ 6.01(f), (g).) Under the Plan, the 1.5L Notes and each of the Unsecured Notes will not be paid, and the respective indentures governing them will be cancelled. (Plan §§ 4.6, 4.7, 5.5.) As a result, there is clearly an Event of Default under section 6.01(e) of the 1.125L Notes Indenture as of the Petition Date.

### ii.   The Plan Does Not Cure the Default

20. The method for curing a default under an instrument of indebtedness to be reinstated is governed by the underlying agreement and applicable non-bankruptcy law. *See In re Moody Nat'l SHS Hous. H, LLC*, 426 B.R. 667, 671 (Bankr. S.D. Tex. 2010) (Isgur, J.) (citing 11 U.S.C. § 1123(d)). Section 6.02 of the 1.125L Notes Indenture sets forth the method for curing an Event of Default under section 6.01(e). It provides, in relevant part, that an Event of Default under 6.01(e) and its consequences "shall be annulled, waived and rescinded . . . if within *20 days* after such Event of Default arose the Issuers deliver an Officer's Certificate to the Trustee stating that (x) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged or (y) the holders thereof have rescinded or waived the acceleration . . . giving rise to such Event of Default or (z) the default that is the basis for such Event of Default has been cured . . . ." (1.125L Notes Indenture § 6.02.) (emphasis added)

21. The Plan does not satisfy any of these conditions. Acceleration of the 1.25L Notes, 1.5L Notes, and Unsecured Notes has not been rescinded. And, although the Debtors seek to discharge the 1.5L Notes and Unsecured Notes under the Plan, far more than twenty days

have elapsed since those notes were accelerated on October 3, 2019.[4]  Thus, the Debtors have

not, and indeed cannot, satisfy the contractual method for curing the default under section

6.01(e) of the 1.125L Notes Indenture.  (1.125L Notes Indenture § 6.02.)

22.     Far from effectuating a cure or otherwise returning the parties to pre-default

conditions, the Plan permanently alters the parties' rights and obligations under the 1.125L Notes

Indenture.  The cross-acceleration default provision was included so that if the Debtors fail to

cure a default in certain "Indebtedness" in short-order ("within 20 days"), the 1.125L

Noteholders would be vested with an option to: (a) accelerate the Debtors' outstanding

obligations under the 1.125L Notes Indenture (*see* 1.125L Notes Indenture § 6.02) and exercise

remedies, or alternatively (b) negotiate a waiver or amendment with the Debtors (*see* 1.125L

Notes Indenture § 6.04.)  In each case, the 1.125L Noteholders would have the right to make the

decision based on their sense of the risks and the impact the proposed "fix" of the defaults would

have on them as creditors.  The Plan, however, would deprive them of exactly that bargained-for

right by forcing upon them a fundamental change in the corporate structure, ownership, and

capitalization of the Debtors.  This is the opposite of a cure.

### iii.     The Cross-Acceleration Defaults are Not Defaults of a Kind Specified in Section 365(b)(2)

23.     Section 1124(2)(A) carves out of its cure requirements "a default of a kind

specified in section 365(b)(2) of this title or of a kind that section 365(b)(2) expressly does not

require to be cured."  11 U.S.C. § 1124(2)(A).  Section 365(b)(2) provides that to assume an

executory contract or unexpired lease, a debtor need not cure a default that is a breach of a

---

[4]  To the extent that section 108(b) of the Bankruptcy Code operates to extend the cure period until "60 days after the order for relief," it also bears noting that more than sixty days have elapsed since October 3, 2019.  *See* 11 U.S.C. § 108(b)(2).

provision relating to four specified conditions or circumstances set forth in section 365(b)(2)(A)-(D), none of which apply here. *See* 11 U.S.C. § 365(b)(2).

24.     As this Court has recognized, "the defaults described in section 365(b)(2) are defaults under leases or executory contracts." *See Moody*, 426 B.R. at 673. A bond indenture is not an executory contract, and "[i]t would stretch the language of § 1124(2)(A) far beyond its plain meaning" to "apply the § 365(b)(2) exception that is contained in § 1124(2)(A)" to a non-executory contract. *Id.* at 674. Thus, under this Court's ruling in *Moody*, the section 365(b)(2) exception does not apply here. *Cf. In re Jones*, 32 B.R. 951, 957 (Bankr. D. Utah 1983) ("Section 1124 is supposed to be a measuring rod for impairment. A measuring rod with inconstant increments, changing between measurements, is useless." (internal citation omitted)).

25.     Moreover, even if the exception did apply to non-executory contracts, section 6.01(e) of the 1.125L Notes Indenture is not an *ipso facto* clause of the kind specified in section 365(b)(2). An *ipso facto* clause is a clause that "modifies the relationship of contracting parties due to the filing of a bankruptcy petition." *U.S. Bank Trust Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d 88, 91 n.1 (2d Cir. 2013) (citation omitted); Black's Law Dictionary (10th ed. 2014) (defining an "ipso facto clause" as a "contract clause that specifies the consequences of a party's bankruptcy"). Rather than specifying the consequences of the Debtors' bankruptcy, section 6.01(e) specifies the consequences of a payment default under any outstanding indebtedness of more than $125 million, regardless of the cause for that default.

26.     Section 6.01(e) is also not a clause that bases a default on "insolvency or financial condition" within the meaning of section 365(b)(2)(A). The Fifth Circuit has squarely rejected the notion that a cross-default clause fits within the scope of section 365(b)(2)(A). *See Lifemark Hosps., Inc. v. Liljeberg Enters. (In re Liljeberg Enters., Inc.)*, 304 F.3d 410, 444-45 (5th Cir.

10

2002) (holding that a cross-default provision is not one that "impermissibly hinges on [the debtor's] financial condition . . . ."); *accord Bistrian v. Easthampton Sand & Gravel Co. (In re East Hampton Sand & Gravel Co.)*, 25 B.R. 193, 198 (Bankr. E.D.N.Y. 1982). In any event, section 6.01(e) specifies the consequences of a default under any other outstanding indebtedness of as little as a penny more than $125 million—which is a mere 2.5% of the Debtors' total outstanding indebtedness—regardless of the cause for or effect of that default. Section 6.01(e) is clearly not based on the Debtors' "insolvency or financial condition." *Cf. In re Peaches Records & Tapes, Inc.*, 51 B.R. 583, 590 (B.A.P. 9th Cir. 1985) (where lessor had a right to terminate "upon the insolvency" of the debtors).

27.     To be sure, courts have recognized that "[f]ederal bankruptcy policy is offended where the non-debtor party seeks enforcement of a cross-default provision in an effort to extract priority payments under an unrelated agreement" under "section 365(b) (which requires curing of defaults[ )] . . . by treating unrelated unsecured debt as a *de facto* priority obligation." *See Liljeberg*, 304 F.3d at 445 (citation omitted). But that is not what is happening here. Rather, enforcing the cross-acceleration default would simply require the Court to apply the "fair and equitable" standard set forth in section 1129(b) of the Bankruptcy Code instead of the "impairment" standard set forth in section 1124. That result would be consistent with Congress's intent to give impairment the broadest possible meaning. *See L & J Anaheim Assocs.*, 995 F.2d at 942 (impairment results from "any alteration of [a creditor's] rights . . . ."). In these circumstances, failure to enforce the cross-defaults would offend, rather than be consistent with, federal bankruptcy policy. Indeed, as the Fifth Circuit found in *In re Liljeberg Enterprises, Inc.*, the "enforcement of a cross-default provision should not be refused where to do so would thwart

11

the non-debtor party's bargain." *Liljeberg*, 304 F.3d at 445 (quoting *Kopel v. Campanile* (*In re Kopel*), 232 B.R. 57, 64 (Bankr. E.D.N.Y. 1999)).

> **B.    The Plan Impairs Class 4 by Purporting to Reinstate the 1.125L Notes For Less Than the Full Allowed Amount**

28.    The Plan purports to "reinstate" the 1.125L Notes in the principal amount of $1 billion, which is less than the total amount of Allowed 1.125L Notes Claims as of the Petition Date.  (Plan § 4.4.)  A plan that provides for less than the full amount of an allowed claim impairs that claim and does not satisfy section 1124 of the Bankruptcy Code.

> **i.    As of the Petition Date, the Total Amount of Allowed 1.125L Notes Claims was $1,177,651,774**

29.    The Debtors issued the 1.125L Notes on or about May 23, 2018 in the original principal amount of $1 billion.  As a condition to the issuance, the initial purchasers of the 1.125L Notes required the Debtors to add a liquidated damages provision in section 6.02 of the 1.125L Notes Indenture that was not included in any of the indentures or credit agreements governing the more than $2.8 billion of outstanding funded indebtedness issued by the Debtors prior to 2018.  (*See* Levitt Decl. Exhs., A, C-E, G-I, 1.25L Indenture; 2025 1.5L Indenture; 2020 Unsecured Notes Indenture; 2022 Unsecured Notes Indenture; 2023 Unsecured Notes Indenture; RBL Credit Agreement.)

30.    Section 6.02 of the 1.125L Notes Indenture establishes and liquidates the damages incurred by holders at any time that the 1.125L Notes "are accelerated or otherwise become due prior to their stated maturity," irrespective of any remedies available to or thereafter exercised by or on behalf of the holders of the 1.125L Notes and irrespective of whether the 1.125L Notes are thereafter repaid or redeemed.  (1.125L Notes Indenture § 6.02.)  This liquidated damages provision is *not* a "make-whole," as suggested by the Debtors, and it is not linked to or

contingent upon redemption or repayment of the 1.125L Notes.[5]  To be clear, the 1.125L Notes

Indenture contains a separate "make-whole" provision in Article III of the 1.125L Notes

Indenture.  That "make-whole" provision is not presently implicated by the Plan because the

Debtors seek to "reinstate," not redeem or repay, the 1.125L Notes.

31.     The operation of the liquidated damages provision set forth in section 6.02 of the

1.125L Notes Indenture is rather straightforward.  Following an Event of Default, on the date

that the 1.125L Notes become due prior to their Stated Maturity, the then-outstanding principal

amount of the 1.125L Notes increases automatically and irrevocably by an agreed-upon

liquidated damages premium amount.  Section 6.02 of the 1.125L Notes Indenture provides that

when "the Applicable Premium becomes due and payable it shall be deemed to be principal of

the Notes and interest shall accrue on the full principal amount of the Notes (including the

Applicable Premium) from and after the applicable triggering event . . . ."  (1.125L Notes

Indenture § 6.02.)

32.     As outlined above, as of the Petition Date, a number of Events of Default existed,

and pursuant to the terms of the 1.125L Notes Indenture and applicable law, (a) the original $1

billion principal amount accelerated, automatically becoming due and payable, and (b) the

Applicable Premium was automatically added to the principal amount of the 1.125L Notes.

Thus, as reflected in the proof of claim filed by the Successor Trustee, the total liquidated

amount owed on account of the 1.125L Notes as of the Petition Date was equal to (i) the

accelerated original principal amount ($1 billion) plus (ii) the liquidated damages or "Applicable

---

[5]  *Cf. Del. Tr. Co. v. Energy Intermediate Holding Co. (In re Energy Future Holdings Corp.)*, 842 F.3d 247, 254 (3d Cir. 2016) (where the make-whole came due only upon an election to "redeem all or a part of the Notes"); *Apollo Global Mgmt., LLC v. Bokf, NA (In re MPM Silicones, L.L.C.)*, 874 F.3d 787, 801 (2d Cir. 2017) (where the make-whole came due only if the issuer determined to "redeem the Notes at its option"); *U.S. Bank Tr. Nat'l Ass'n v. AMR Corp. (In re AMR Corp.)*, 730 F.3d at 94 (where the make-whole accrued only upon "voluntary redemption").

Premium" ($177,651,774), plus (iii) any accrued and unpaid interest and other fees, costs, and expenses due under the terms of the 1.125L Notes Indenture.  No objection to the Successor Trustee's proof of claim has been filed, and it is thus "deemed allowed."  11 U.S.C. § 502(a).

33.     On January 24, 2020, the Successor Trustee filed a complaint against the Debtors seeking a declaratory judgment that, as of the Petition Date, the full amount asserted in the proof of claim was due and owing pursuant to the terms of the 1.125L Notes Indenture, valid under applicable non-bankruptcy law, and not subject to disallowance under the Bankruptcy Code. (*See* Levitt Decl. Exh. J, Complaint [Adv. Proc. No. 20-03020, Docket No. 1].)  The complaint explained that if the Court agreed that the Applicable Premium was part of the allowed claim as of the Petition Date, the Successor Trustee would argue, at confirmation, that the Plan impairs the Successor Trustee's claim and that the 1.125L Notes may not be "reinstated" as proposed.

34.     The Court has not issued a decision on the merits of the complaint, and the adversary proceeding has been "abated."  However, during a status conference held on January 30, 2020, the Court ruled that for purposes of confirmation, "we will treat the [Successor Trustee's] claim as an allowed claim, in the amount for which it was filed . . . ."  (*See* Levitt Decl. Exh. K, Transcript of Hearing at 29:13-14, In re EP Energy Corp., No. 19-35674 (Bankr. S.D. Tex. Jan. 30, 2020).)  Thus, for purposes of Plan confirmation, the Successor Trustee's allowed claim, as of the Petition Date, is $1,177,651,774.  In other words, the question before this Court has been simplified and narrowed because the allowed amount of the Successor Trustee's claim under state law, the Bankruptcy Code, and other applicable law (including in equity) is assumed by the Court to be $1,177,651,774 for purposes of confirmation.  (*Id.* at 29:13-14.)[6]

---

[6] As determined by the Court at the January 30, 2020 status conference, the Debtors cannot raise objections to the

14

### ii.    The Plan Impairs the 1.125L Notes Claims by Providing For Less Than the Full Allowed Amount

35.    During the January 30, 2020 status conference, the Court asked the parties to address a single question related to the amount of the reinstated claim in their confirmation pleadings: whether a chapter 11 plan may provide for "payment of less than the full amount of the allowed claim and still leave [it] unimpaired . . . ." (*Id.* at 29:10-24.)

36.    This Court answered that precise question in the negative in *Moody*, 426 B.R. at 675.  As the Court observed, "[t]he provision of the Bankruptcy Code that allows for confirmation of a plan over the objection of an unimpaired creditor is § 1129(a)(8)" and "[t]he text of that provision holds that it is the claim that must not be impaired."  *Id.* at 676; *see also* 11 U.S.C. § 1124 (providing that "each claim" in a class must be unimpaired for the class to be deemed unimpaired).  That claim "must be determined in accordance with state law, *as of the petition date.*"  *Moody*, 426 B.R. at 676 (emphasis added).[7]  Here, because the Successor Trustee's allowed claim, calculated and determined as of the Petition Date, includes the Applicable Premium, the Applicable Premium is a portion of the claim that must be unimpaired for Class 4 to be deprived of voting rights.  *See id.* ("Because RLJ's allowed claim must include pre-petition default interest, the default interest is a portion of the claim that must be unimpaired under § 1129(a)(8).");  *In re Smith*, 123 B.R. 863, 867 (Bankr. C.D. Cal. 1992) ("[I]mpairment

---

character or quantum of the claim in connection with confirmation of the Plan.

[7] As the Fifth Circuit recently made clear, for purposes of section 1124, the "claim" is also subject to the disallowance provisions set forth in section 502, which states that "'the court . . . *shall allow* [a] claim in [the requested] amount, *except to the extent that*' any one of nine conditions apply." *Keystone Gas Gathering, L.L.C. v. Ad Hoc Comm. (In re Ultra Petroleum Corp.)*, 943 F.3d 758, 764-65 (5th Cir. 2019) (citing 11 U.S.C. § 502).  None of the conditions of section 502 limit the 1.125L Notes Claims, which are clearly oversecured given the implied total enterprise value under the Plan.  (*See* Disclosure Statement, at 140.)  Moreover, as indicated above, the Debtors cannot raise any objections pursuant to section 502 in connection with confirmation because the 1.125L Notes Claims have been deemed allowed for such purposes in the amount of $1,177,651,774.

ny-1813349

results if the plan denies claimholders the right to payment to the extent their claims are ultimately allowed.").

37.     Section 1124(2) does not compel a different result.  That section merely defines how a chapter 11 plan must treat "each claim" in a class in order for the class to be deemed unimpaired.  *See* 11 U.S.C. § 1124.  It says nothing about how to determine the amount of "each claim," and it does not empower a debtor to disregard any portion of an otherwise valid, enforceable, and allowed claim.  In other words, section 1124 is not a claims disallowance provision.  *See Moody*, 426 B.R. at 671, 675 (holding that "determining the amount of the claims" is governed by § 502 and state law and that section 1124(2) is not "a mechanism by which a debtor has substantive authority to truncate a creditor's contractual and state law rights . . . ."); *In re Sultan Realty, LLC*, No. 12-10119 (SMB), 2012 WL 6681845, at *9 (Bankr. S.D.N.Y. Dec. 21, 2012) (holding that section 1124(2) "does not bear on the allowed amount of [a secured creditor's] claim, but instead, determines whether the treatment of the class that includes [such secured creditor's] claim is impaired."); *accord In re Sagamore Partners, Ltd.*, 620 Fed. App'x. 864 (11th Cir. 2015); *In re Moshe*, 567 B.R. 438 (E.D.N.Y. 2017).

38.     Moreover, on its face, section 1124(2) applies only to a "contractual provision or applicable law" that entitles a holder of claim "to demand or receive *accelerated payment* of such claim . . . after the occurrence of a default."  11 U.S.C. § 1124(2) (emphasis added).  The Applicable Premium provided for in section 6.02 of the 1.125L Notes Indenture simply liquidates damages and adds the damages to the outstanding principal balance of the 1.125L Notes.  If it is a contractual provision that entitles the 1.125L Noteholders to "demand or receive accelerated payment," then the Applicable Premium must be part of "such claim" that is

reinstated.  If it is not, then the exception in 1124(2) does not apply, and any alteration of the legal, equitable, or contractual rights is impairment under section 1124(1).

39.     Although subsections 1124(2)(A) and (B) permit a chapter 11 plan to cure pre- and post-petition defaults and "reinstate[ ] the maturity," the effect of those subsections is strictly limited by subsection 1124(2)(E), which provides that, for a claim to be unimpaired, a plan may not otherwise "alter [the claimholder's] legal, equitable, or contractual rights . . . ."  11 U.S.C. § 1124(2)(E).  Section 1124(2)(B) is also clear that it permits reinstatement of "such claim," and nothing less.  Thus, a plan that cures defaults and reinstates the maturity date of an allowed claim does not nullify other contractual and legal rights owed on account of that claim as of the Petition Date – even if those rights arose as a consequence of acceleration.  *See Moody*, 426 B.R. at 672 (section 1124(2)(B) is not "a mechanism by which a debtor has substantive authority to truncate a creditor's contractual and state law rights . . . ."); *In re 139-141 Owners Corp.*, 313 B.R. 364, 368 (S.D.N.Y. 2004) ("Because the denial of a mortgagee's contractual right to interest at a default rate does 'alter' the secured creditor's contractual rights within the meaning of subsection [D] of Section 1124(2) . . . Section 1124(2) . . . does not provide a statutory basis for judicial nullification of a contract right to default rate interest." (citation omitted)); *In re 1111 Myrtle Ave. Grp., LLC*, 598 B.R. 729, 737 n.4 (Bankr. S.D.N.Y. 2019) ("[W]hile a debtor may utilize bankruptcy to cure a pre-petition default in order to de-accelerate the loan, a debtor is not entitled to 'cure' the imposition of default interest following the default.").

40.     Simply put, section 1124(2) sets forth requirements for unimpairing the "claim," but it does not govern the amount of "such claim."  *See Moody*, 426 B.R. at 673.  Thus, if the Successor Trustee was otherwise entitled to the Applicable Premium as of the Petition Date

(which it was), the Debtors may not use section 1124(2) to abrogate that contractual and legal right.

### C.   The Plan Does Not Compensate the 1.125L Noteholders for Reasonable Reliance Damages

41.     Even if this Court were to determine that sections 1124(2)(A) and (B) somehow limit the Applicable Premium, the Applicable Premium reflects liquidated damages that must be allowed pursuant to section 1124(2)(C).  Section 1124(2)(C) provides that to render a claim unimpaired, a chapter 11 plan must "compensate[ ] the holder of such claim . . . for any damages incurred as a result of any reasonable reliance by such holder" on a contractual provision entitling the claimholder to demand or receive accelerated payment of such claim after the occurrence of a default.  11 U.S.C. § 1124(2)(C).  Damages under section 1124(2)(C) are available even if the contractual provision on which the creditor relied is an *ipso facto* clause. *See* 11 U.S.C. § 1124, Legislative Statements (explaining that under section 1124(2)(C) "a class of claims is not impaired under the circumstances of section 1124(2) if damages are paid to rectify reasonable reliance engaged in by the holder of a claim or interest arising from the prepetition breach of a contractual provision, *such as an ipso facto or bankruptcy clause*, or law").

42.     Here, the Plan does not provide for the payment of any section 1124(2)(C) damages to holders of 1.125L Notes Claims.  The Successor Trustee and the Ad Hoc Group reserve the right to prove that they are entitled to such damages in the event that the Applicable Premium is ultimately determined to be disallowed or otherwise not due and owing for any reason.[8]  The Successor Trustee and the Ad Hoc Group also specifically reserve the right to

---

[8]  As noted, however, the 1.125L Notes Claims are deemed allowed in the amount asserted in the Successor Trustee's proof of claim for purposes of confirmation.  The Debtors cannot object to the allowance of such claims in connection with confirmation pursuant to sections 1124(2)(C), 502, or 506 of the Bankruptcy Code or otherwise.

prove that damages under section 1124(2)(C) are owed to them in an amount equal to the

Applicable Premium set forth in section 6.02 of the 1.125L Notes Indenture.  Among other

reasons, the Debtors "expressly acknowledged," in the 1.125L Notes Indenture, "that their

agreement to pay the [Applicable Premium] . . . is a material inducement to holders to purchase

the [1.125L] Notes" and that they "shall be estopped" from claiming otherwise.  (1.125L Notes

Indenture § 6.02.)

D.     **The Plan Alters the Legal, Contractual, or Equitable Rights of the 1.125L Noteholders Under the Priority Lien Intercreditor Agreement**

43.     Pursuant to the Plan, holders of Allowed 1.5L Notes Claims will receive (a) a Pro

Rata share of 100% of the New Common Shares (subject to dilution) and (b) either the right to

participate in the 1.5L Rights Offering or a combination of cash and New Common Shares for

Non-Eligible Offerees.  (Plan § 4.6.)  The Plan also provides for payment of all fees incurred by

the 1.5L Notes Indenture Trustees in cash.  (Plan § 5.15).  These proposed distributions are

contrary to, and if approved will alter, the "legal, equitable and contractual" rights of the holders

of 1.125L Notes Claims under the *Priority Lien Intercreditor Agreement*, dated as of August 24,

2016 (the "Priority Lien ICA").  (*See* Levitt Decl. Exh. L).[9]

i.     **The Plan Violates the Waterfall Set Forth in Section 2.01 of the Priority Lien ICA**

44.     The Priority Lien ICA governs certain intercreditor rights and obligations among

the "First-Priority Lien Obligations Secured Parties" (which include the Prepetition RBL Agent,

---

[9]  The other Intercreditor Agreements have provisions similar to the Priority Lien ICA but address the rights among different groupings of creditors.  There are three Intercreditor Agreements implicated by the Plan:  (i) The Senior Priority Lien Intercreditor Agreement dated as of May 23, 2018, (ii) the Additional Priority Lien Intercreditor Agreement dated as of November 29, 2016, and (iii) the Priority Lien ICA.  The arguments and objections set forth herein with respect to the Priority Lien ICA apply equally to the other Intercreditor Agreements to the extent such Intercreditor Agreements alter the rights of the Successor Trustee, the 1.25L Notes Trustee, the Prepetition RBL Lenders, or the holders of 1.125L Notes Claims or 1.25L Notes Claims.  This Objection shall be deemed to be an objection to the Plan's treatment of all such rights under each of these other Intercreditor Agreements.  The Successor Trustee and the Ad Hoc Group reserve all rights.

ny-1813349

the Successor Trustee, the 1.25L Notes Trustee, the Prepetition RBL Lenders, and the holders of

the 1.125L Notes Claims and the 1.25L Notes Claims) and the "Second-Priority Lien Obligations

Secured Parties" (which include the 1.5L Notes Trustees and the holders of the 1.5L Notes

Claims).  RBL Claims, 1.125L Notes Claims, and 1.25L Notes Claims are designated as "First-

Priority Lien Obligations" and 1.5L Notes Claims are designated as "Second-Priority Lien

Obligations."  (First Day Decl. ¶ 60(c).)

45.     Section 2.01(a) of the Priority Lien ICA sets forth a strict distribution waterfall,

which generally provides that no "distribution" may be made in respect of 1.5L Notes Claims

until the RBL Claims, 1.125L Notes Claims, and 1.25L Notes Claims are paid in full.  Section

2.01(a) provides, in relevant part, as follows:

> Anything contained herein or in any of the First-Priority Lien Obligations
> Documents or the Second-Priority Lien Obligations Documents to the contrary
> notwithstanding, if an Event of Default has occurred and is continuing, and . . .
> any *distribution is made in respect of any Collateral in any Insolvency or
> Liquidation Proceeding* with respect to any Grantor, the Proceeds (subject, in the
> case of any such distribution, to Section 2.06 hereof) (all proceeds of any sale,
> collection or other liquidation of any Collateral and all *proceeds of any such
> distribution* being collectively referred to as "Proceeds") shall be applied as
> follows:
>
> FIRST, to the Applicable First Lien Agent for distribution in accordance with any
> applicable First-Priority Lien Obligations Documents until payment in full of all
> First-Priority Lien Obligations, and
>
> SECOND, to the Applicable Second Lien Agent for distribution in accordance
> with any applicable Second-Priority Lien Obligations Documents until payment
> in full of all Second-Priority Lien Obligations.

46.     Under this framework, any distribution to holders of 1.5L Notes or to the 1.5L

Notes Trustees, including for fees and expenses, is improper if three conditions are satisfied: (a)

an Event of Default has occurred and is continuing; (b) the RBL Claims, 1.125L Notes Claims,

and 1.25L Notes Claims have not received "payment in full"; and (c) the distribution is made "in

respect of any Collateral" or from the proceeds of Collateral.

20

47.     Each of the foregoing conditions is satisfied here.  Multiple Events of Default have occurred and are continuing under the 1.125L Notes Indenture, and the 1.125L Notes and 1.25L Notes are being reinstated rather than paid in full.  (Plan §§ 4.4, 4.5.)  Moreover, as stipulated in the Court's order authorizing the Debtors to use cash collateral [Docket No. 482] (the "Cash Collateral Order"), the 1.125L Notes are secured by a validly perfected lien on all or substantially all of the Debtors' assets, including cash.  (Levitt Decl. Exh. M, Cash Collateral Order ¶¶ 7, 9(b), 4(d).)  Thus, any cash distributions to the 1.5L Notes Trustees in payment of their fees and expenses and to holders of 1.5L Notes Claims that are Non-Eligible Offerees are clearly being made from proceeds of Collateral.

48.     Similarly, the Plan is premised on the assumption that the 1.5L Notes are undersecured rather than unsecured.  Thus, although Allowed 1.5L Notes Claims (Class 6) and holders of Allowed Unsecured Claims (Class 7A) will both receive a distribution of New Common Shares under the Plan, Class 6 will receive a higher proportion of the New Common Shares and, as a consequence, a higher proportional recovery.  (*See* Disclosure Statement, at 15-16, estimating a 15.16% recovery for Class 6 and a 3.46% recovery for Class 7A).  The 1.5L Notes Claims are not senior in right of payment to Allowed Unsecured Claims in any respect. Accordingly, the secured status of the 1.5L Notes is the only reason Class 6 is receiving a higher recovery than Class 7A. ████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

Thus, the Plan distribution to Class 6 is being made "in respect of . . . Collateral" securing such claims. *See Oxford English Dictionary* (defining "in respect of" to include "[i]n view of, by

reason of, because of (a fact, circumstance, etc.); on account of"). Thus, the Plan distributions to Class 6 and the 1.5L Notes Trustees plainly violate section 2.01 of the Priority Lien ICA.

49.     Bankruptcy is no occasion for the Debtors to disregard the terms of the Priority Lien ICA. The Priority Lien ICA is governed by New York law, and by its terms, it is "intended to be and shall be enforceable as a 'subordination agreement' under Section 510(a) of the Bankruptcy Code." (Priority Lien ICA § 2.06(a).) It is thus fully enforceable in bankruptcy. *See* 11 U.S.C. § 510(a) ("A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law."); N.Y. U.C.C. Law § 9-339 (McKinney 2014) (authorizing "subordination by agreement"); *see also In re Bos. Generating, LLC*, 440 B.R. 302, 318 (Bankr. S.D.N.Y. 2010) (An "[i]ntercreditor [a]greement is an enforceable agreement under section 510(a) of the Bankruptcy Code . . . ."); *HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*, 364 F.3d 355, 361 (1st Cir. 2004) ("Subordination agreements are essentially inter-creditor arrangements.").[10] Indeed, the parties expressly agreed that the Priority Lien ICA "shall continue in full force notwithstanding the commencement of any proceeding under the Bankruptcy Code" and that the "priorities provided for" in the Priority Lien ICA "shall not be altered or otherwise affected by," among other things, any restructuring "of either the Second-Priority Lien Obligations (or any part thereof) or the First-Priority Lien Obligations (or any part thereof)." (Priority Lien ICA §§ 2.01(b), 2.06(a).)

---

[10] Section 10.10 of the Plan provides that "[t]he allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise." This is simply untrue and contradicted by the facts and other provisions of the Plan and relevant agreements described above. To the extent this provision of the Plan does not acknowledge and preserve the rights of the 1.125L Notes under the Intercreditor Agreements, the Plan alters the legal, contractual, and equitable rights of the holders of the 1.125L Notes Claims.

ny-1813349

50.     In seeking to make a distribution to holders of 1.5L Notes Claims and the 1.5L

Notes Trustees before the 1.125L Notes Claims or 1.25L Notes Claims are paid in full in cash,

the Plan, if confirmed, will alter contractual, legal, and equitable rights under the Priority Lien

ICA.  That is the definition of impairment.  *See* 11 U.S.C. § 1124(2)(E); *see also Ion Media*

*Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.)*,

419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) ("[P]lainly worded contracts establishing priorities . .

. should be enforced and creditor expectations should be appropriately fulfilled.").

> ii.     **The Plan Alters the Rights of 1.125L Noteholders Under the Priority**
>         **Lien ICA's Turnover Provision**

51.     Pursuant to section 2.04(b) of the Priority Lien ICA, the Second-Priority Lien

Obligations Secured Parties agreed that if any of them receive or "realize" any "payment in

respect of" any Collateral "in any Insolvency or Liquidating Proceeding" at any time prior to the

payment in full in cash of the First-Priority Lien Obligations (*i.e.*, the "Discharge of the First-

Priority Lien Obligations") then such party shall hold "such Collateral, proceeds or payment" in

trust for the First-Priority Lien Obligations Secured Parties and transfer such to the Applicable

First Lien Agent.  (Priority Lien ICA § 2.04(b.).)

52.     Although the Plan purports to leave the Intercreditor Agreements in full force and

effect, sections 10.5 (*Injunction against Interference with Plan*) and 10.6 (*Plan Injunction*) of the

Plan could be read to circumscribe or prevent the Successor Trustee or the 1.125L Noteholders

from enforcing the turnover provision following confirmation.  Section 10.5 of the Plan enjoins

"all holders of Claims" and their respective representatives, upon entry of the Confirmation

Order, "from taking any action to interfere with the implementation or the occurrence of the

Effective Date."  (Plan § 10.5.)  Section 10.6 enjoins such parties, upon entry of the

Confirmation Order, from acting or proceeding in any manner that does not conform to or

comply with the provisions of the Plan, or commencing or continuing any action that does not comply with or is inconsistent with the provisions of the Plan.  (Plan § 10.6.)

53.     To the extent that these provisions interfere with the ability of the Successor Trustee or the 1.125L Noteholders to enforce section 2.04(b), the Plan clearly alters their contractual, legal, and equitable rights.  *See* 11 U.S.C. § 1124(2)(E).

**E.      Several Other Provisions of the Plan Alter the Legal, Equitable, or Contractual Rights of the 1.125L Noteholders**

54.     Several other provisions of the Plan impair the 1.125L Notes by altering the legal, equitable, or contractual rights of the claimholders, including (a) the rights provided to them under the Cash Collateral Order, (b) their legal right to commence suit against various third parties that are being released under the Plan, and (c) their rights upon a "Change of Control" under the 1.125L Notes Indenture.

**i.      The Plan Impairs the Rights Provided on Account of the 1.125L Notes Under the Cash Collateral Order**

55.     The pre-petition secured parties consented to the Debtors' use of cash collateral during these chapter 11 cases on the basis of the agreements, rights, and protections set forth in the Cash Collateral Order.  Among those agreements, rights, and protections, in paragraph 4, the Debtors stipulated that, as of the Petition Date, they "were indebted to the 1.125 Lien Noteholders, *without defense, counterclaim or offset of any kind*, in the aggregate principal amount of not less than $1,000,000,000 in respect of the . . . .1.125 Lien Indenture . . . plus accrued and unpaid interest thereon and fees and expenses, if any . . . ."  (Cash Collateral Order ¶ 4(d)) (emphasis added).  The Debtors also stipulated that "the liens and security interests granted to the 1.125 Lien Collateral Agent (for the ratable benefit of the 1.125 Lien Noteholders) to secure the Prepetition 1.125 Lien Obligations are . . . valid, binding, perfected, enforceable,

second priority . . . liens on and security interests in substantially all of the Collateral . . . ."  (*Id.* at ¶ 4(e).)

56.     Yet while the Plan purports to treat the Allowed 1.125L Notes Claims as "unimpaired," if approved, it would also eliminate precisely the same rights that were provided on account of those claims in the Cash Collateral Order.  Specifically, section 10.11 of the Plan provides that "[t]he Reorganized Debtors shall have, retain, reserve, and entitled to assert . . . rights of setoff or recoupment, and other legal or equitable defenses" with respect to the 1.125L Notes to the same extent and "as fully as if the Chapter 11 Cases had not been commenced." (Plan § 10.11).  Section 3.4 of the Plan likewise provides that "nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims."  (Plan § 3.4.)

57.     The stipulations embodied in paragraph 4 of the Cash Collateral Order were negotiated as part of the consideration for the Debtors' consensual use of cash collateral.  Thus, the stipulations have all of the essential characteristics of a mutual contract, and there can be no question that the rights provided to the Successor Trustee and the 1.125L Noteholders are contractual or legal rights.  *Cf. In re Silverman*, 13 B.R. 72, 74 (Bankr. D. Mass. 1981) (holding that the debtor's so-ordered post-petition stipulation with a secured lender "had all of the essential characteristics of a mutual contract.").  The provisions in the Plan purporting to eliminate these rights render the 1.125L Notes Claims impaired.  *See* 11 U.S.C. § 1124(2)(E) (plan must "not otherwise alter the legal, equitable, or contractual rights . . . .").

### ii.     The 1.125L Notes are Impaired by the Plan's Third-Party Release

58.     Section 10.7(b) of the Plan provides a broad release of claims and causes of action by the "Releasing Parties" to a long list of "Released Parties," including the Debtors, the

Reorganized Debtors, the Supporting Noteholders, the DIP Lenders, the Prepetition RBL

Lenders, the Backstop Parties, pre-petition shareholders, and each of their respective

subsidiaries, affiliates, current and former directors and officers, employees, agents, financial

advisors, and various other parties.  (Plan § 10.7(b).)  Pursuant to the Court's order approving the

Disclosure Statement and proposed solicitation procedures, the Debtors were directed to mail a

Notice of Non-Voting Status to holders of 1.125L Notes Claims together with a form providing

such holders with the opportunity to opt-out of the third-party releases.  (*See* Docket No. 691.)

Holders that do not affirmatively opt out by completing the form and mailing it to the Debtors'

noticing agent are deemed to be "Releasing Parties" under the Plan.  (Plan § 1.1.)

59.     To the extent that holders of 1.125L Notes Claims are deemed to be "Releasing

Parties," the third-party release results in impairment.  At present, 1.125L Noteholders and/or the

Successor Trustee have rights under the 1.125L Notes Indenture and applicable non-bankruptcy

law to pursue claims and causes of action against the Debtors and various third parties.  Insofar

as the Plan seeks to curtail those rights, it alters "legal, equitable, or contractual rights."  *See In*

*re Chassix Holdings, Inc.*, 533 B.R. 64, 81 (Bankr. S.D.N.Y. 2015) ("If a creditor must release a

claim against a third party under a plan . . . it is difficult to understand how such a creditor could

properly be considered to be 'unimpaired' by the Plan . . . .").

60.     Moreover, the third-party releases cannot be considered a voluntary waiver of

rights, notwithstanding the fact that claimholders were purportedly given an opportunity to

affirmatively opt-out.  The 1.125L Notes Indenture and the Plan are both governed by New York

law (Plan § 12.7) and under New York law, "[a]bsent a duty to speak, silence does not constitute

consent."  *See In re SunEdison, Inc.* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017).

61.     The amendment, waiver, and modification provisions in the 1.125L Notes

Indenture likewise make clear that there can generally be no waiver of rights absent affirmative

consent.  For instance, section 12.06 of the 1.125L Notes Indenture provides that "[n]o

modification, amendment or waiver of any provision of this Article XII, nor the consent to any

departure by any Subsidiary Guarantor therefrom, shall in any event be effective unless the same

shall be in writing and signed by the Trustee, and then such waiver or consent shall be effective

only in the specific instance and for the purpose for which it was given."  (1.125L Notes

Indenture § 12.06.)  Similarly, amendments generally require consent from the Successor

Trustee, the Notes Collateral Agent, and holders of 1.125L Notes.[11]  (*See id.* §§ 9.01, 9.02.)  To

the extent that the third-party release results in any amendment, waiver, or modification of rights

conferred under the 1.125L Notes Indenture, it alters the 1.125L Noteholders' contractual, legal,

and equitable rights.

### iii.     The Plan Purports to Alter the Change of Control Rights Provided Under the 1.125L Notes Indenture

62.     A Change of Control occurs under the 1.125L Notes Indenture upon "the

acquisition by any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2)

of the Exchange Act, or any successor provision) . . . other than any of the Permitted Holders, in

a single transaction or in a related series of transactions . . . of more than 50% of the total voting

power of the Voting Stock of [EP Energy LLC]."  (*See* 1.125L Notes Indenture § 1.01.)

Permitted Holders include the "Sponsors" (*e.g.*, Apollo and Riverstone Holdings, L.P.) and

---

[11]  The proposed releases here highlight the importance of requiring affirmative consent for waiving rights under the 1.125L Notes Indenture.  Deeming holders of notes under an indenture to grant broad releases can have unintended consequences.  For example, certain provisions of the 1.125L Notes Indenture, including sections 6.05 and 6.06, require holders with certain minimum holdings of notes to direct the Successor Trustee with respect to remedies and other matters.  To the extent that the Plan deems sufficient holders (e.g., holders with more than 50% of the outstanding notes) to have provided releases without their consent, the ability of remaining, non-releasing holders to direct the Successor Trustee could be adversely affected and impaired.

certain directors and officers, but does not include Elliott, Avenue, or the various other entities that will receive New Common Shares under the Plan and Rights Offering.  (*Id.*)

63.     The 1.125L Notes Indenture provides that if a Change of Control occurs, each noteholder has the right to require the Debtors to repurchase its 1.125L Notes at a price equal to 101% of the principal amount (*i.e.*, up to $1.01 billion), plus accrued and unpaid interest. (1.125L Notes Indenture § 4.08(a).)  In light of the risk that consummation of the Plan could trigger a liability of that magnitude, the Debtors are seeking to eliminate noteholder Change of Control rights.   Section 10.12 of the Plan provides that "[a]ny term of any . . . prepetition obligation applicable to a Debtor shall be void and of no further force and effect with respect to any Debtor to the extent that such . . . obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on . . . the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation . . . ."  (Plan § 10.12.)

64.     Whether or not a Change of Control actually does occur on the Effective Date, there can be no question that section 10.12 of the Plan impairs the 1.125L Noteholders because it eliminates a key protection under the 1.125L Notes Indenture.  *See* 11 U.S.C. § 1124(2)(E). Indeed, even if consummation of the Plan does not trigger a Change of Control by itself, the 1.125L Notes Indenture provides that a Change of Control may occur "in a related series of transactions."  (*See* 1.125L Notes Indenture § 1.01.)  Thus, in the absence of section 10.12 of the Plan, a 1.125L Noteholder would be entitled to demonstrate that the proportional change in ownership resulting from a combination of the Plan and some future transaction amounts to a "Change of Control."  (*Id.*)  However, section 10.12 is arguably broad enough to bar Change of

Control rights in such circumstances because they would arise "as a result of"—that is, as a but-for consequence of—consummation of the Plan.

65.     The Debtors are clearly aware that section 10.12 of the Plan alters the 1.125L Noteholders' contractual and legal rights.  That is why they included a provision at the end of section 10.12 providing that "the Confirmation Order will confirm that as of the Effective Date no 'Change of Control' (as defined therein) has occurred under any of the Reinstated Debt as a result of the Plan or otherwise."  (Plan § 10.12.)

66.     But, if it is in fact true that consummation of the Plan will not trigger a Change of Control, section 10.12 is completely unnecessary.  The only purpose for including it in the Plan is to circumscribe the rights of the 1.125L Noteholders by preventing them from showing, in the future, that the change in ownership resulting from the Plan—either by itself or in conjunction with future transactions—has caused a Change of Control.  That is impairment.  *See In re Rexford Props., LLC*, 558 B.R. 352, 368 (Bankr. C.D. Cal. 2016) ("any alteration of the rights constitutes impairment . . . .") (citation omitted).

67.     Moreover, the Debtors' attempt to use the Confirmation Order as a vehicle to obtain a declaratory judgment—that is, a judgment "declar[ing] rights and other legal relations," *see* 28 U.S.C. § 2201(a)—that the Plan will not cause a Change of Control is improper.  Neither the Ad Hoc Group nor any other party in interest is currently contending that consummation of the Plan will trigger a Change of Control.  There is accordingly no "actual controversy."  *See* 28 U.S.C. § 2201(a) (court may only grant declaratory judgment "[i]n a case of actual controversy"); *Lernout & Hauspie Speech Prods. v. Baker (In re Lernout & Hauspie Speech Prods., N.V.)*, 264 B.R. 336, 340 (Bankr. D. Del. 2001) (applying the requirements of the Declaratory Judgment Act to a contested matter).

68.     The order sought by the Debtors is also improper because it is based on unknown, future, and/or contingent facts and is thus not ripe for adjudication.  *See Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985) (if the purported injury is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all," the claim is not ripe for adjudication); *Blackwell v. Rio Mgmt. (In re Blackwell)*, 267 B.R. 732, 740 (Bankr. W.D. Tex. 2001) (bankruptcy courts "cannot exercise subject matter jurisdiction over the matter until it is fully ripe for adjudication").  The Debtors seek a ruling based on facts at a specific point in time (as of the confirmation hearing) that a Change of Control will not occur at a future point in time (on the Effective Date).  Between those two dates, there are a number of ways for proportional ownership interests to change among the Supporting Noteholders.  For example, the Supporting Noteholders are not obligated to deliver the "Cash Funding Amount" until three days prior to the Effective Date.  If one of them defaults, the others are entitled to purchase the defaulting party's commitments.  (Levitt Decl. Exh. O, Backstop Agreement §§ 2.3, 2.4(b).) Similarly, after entry of the Confirmation Order but before the Effective Date, a group of non-Permitted Holders could enter into an express or putative agreement that results in formation of a "group" within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, such that their holdings would have to be aggregated for purposes of determining whether a Change of Control has occurred.  (*See* 1.125L Notes Indenture § 1.01.)

69.     Ultimately, the 1.125L Notes Indenture places the burden of monitoring stock ownership and alerting creditors of any Change of Control squarely on the Debtors.  (1.125L Notes Indenture § 4.08(b), obligating the Debtors to provide written notice within 30 days after any Change of Control.)  The Debtors' request for a declaration in the Confirmation Order that

would effectively relieve them of that duty is improper, and, if granted, would clearly alter and impair the parties' respective rights and duties under the indenture.  *See* 11 U.S.C. § 1124(2)(E).

70.  The Debtors' request should thus be denied.

## II. The Plan Cannot be Confirmed Because it Violates Section 1123(a)(4) of the Bankruptcy Code

71.     On the Effective Date of the Plan, $138 million in face amount of 1.25L Notes held by Apollo, Access, and the other Supporting Noteholders parties to the Backstop Agreement will be exchanged for New Common Shares at a 25.7% discount (the "1.25L Notes Exchange"). All other 1.25L Notes (including those held by members of the Ad Hoc Group) will be reinstated pursuant to section 1124(2) of the Bankruptcy Code.  (Plan § 4.5.)  Thus, although all Allowed 1.25L Notes Claims are placed into the same creditor class under the Plan (Class 5), not all Allowed 1.25L Notes Claims will receive the same treatment.  This structure violates the Bankruptcy Code's "central policy" of equal treatment for claims in the same creditor class, *see Begier v. IRS*, 496 U.S. 53, 58 (1990), and runs afoul of the clear command of section 1123(a)(4) of the Bankruptcy Code.  *See* 11 U.S.C. § 1123(a)(4) (a plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest.").

ny-1813349

**A.**   **The 1.25L Notes Exchange Was Only Open to a Small Preferred Group of 1.25L Noteholders**

72.     The "key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity."  *Ad Hoc Comm. of Personal Injury Asbestos Claimants v. Dana Corp., (In re Dana Corp.)*, 412 B.R. 53, 62 (S.D.N.Y. 2008); *accord In re W.R. Grace*, 729 F.3d 311, 327 (3d Cir. 2013).   Thus, a chapter 11 plan that provides two different forms of consideration for creditors in a single class does not violate section 1123(a)(4) if each creditor had the same opportunity to receive either treatment.  *Cf. In re Breitburn Energy Partners LP*, 582 B.R. 321, 358 (Bankr. S.D.N.Y. 2018) ("Although the subscribers and non-subscribers will receive different value on account of their allowed claims, all Class 5A members had the same opportunity to subscribe or not subscribe to the rights offering on the same terms."); *In re Centr. Med. Ctr., Inc.*, 122 B.R. 568, 574 (Bankr. E.D. Mo. 1990) ("'same treatment' under Section 1123(a)(4) simply means that all members of a class must be subjected to the same procedure.").

73.     That standard is not satisfied here.  The right to participate in the 1.25L Notes Exchange is exclusive to the Supporting Noteholders (as Commitment Parties), and the right to join the Backstop Agreement as a Commitment Party was limited to eligible holders of 1.5L Notes (who had a mere 10 days to opt in and were not specifically notified of the opt-in period). (Backstop Agreement § 10.17(a).)  Holders of 1.25L Notes that did not also hold 1.5L Notes and therefore could not join the Backstop Agreement did not have any opportunity (let alone the "same opportunity") to participate in the 1.25L Notes Exchange.[12]  Several members of the Ad Hoc Group fall into that category.  (*See Amended Verified Statement* [Docket No. 820].)

---

[12] The Backstop Agreement also limited the extent to which any cross-holders that joined the Backstop Agreement could participate in the 1.25L Notes Exchange.  Such holders could participate only in their pro rata share of $33 million at a ratio of 13.00 to 6.00.  The same limitations did not apply to the Supporting Noteholders.

### B.    The 1.25L Notes Exchange is Treatment "For" a Claim

74.    The Debtors apparently intend to argue that the exclusive right of the Commitment Parties to participate in the 1.25L Notes Exchange is permissible because it is merely consideration for their backstop commitments.  (Disclosure Statement Reply ¶ 64 [Docket No. 615].)  That argument misconstrues the entire body of case law sanctioning backstop fees and is directly contrary to binding Fifth Circuit precedent.

75.    By its plain text, section 1123(a)(4) mandates equal "treatment for each claim" in a class.  *See* 11 U.S.C. § 1123(a)(4).  It does not mandate equal treatment "for" each claimholder. Thus, a plan "may treat one set of claim holders more favorably than another so long as the treatment is not *for* the claim but *for* distinct legitimate rights or contributions from the favored group separate from the claim."  *See, e.g.*, *Ad Hoc Comm. Of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019) (emphasis added).  In the backstop context, this principle has been applied to justify commitment fees and other incentives paid to a creditor in exchange for a new-money commitment.  *See, e.g.*, *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (backstop fee paid to certain creditors satisfied section 1123(a)(4) because it was not paid on account of their claims but as consideration for new funding they committed).

76.    The Fifth Circuit has erected a bright line standard for distinguishing treatment "for" a claim with treatment "for" something else.  Under that standard, a distribution to a creditor is made "for" its claim when it is made "in satisfaction of the [creditor's] claims against [the estate.]"  *See Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998).  Thus, special treatment is only proper in the backstop context when there is a clear delineation between what a creditor receives in exchange for its new money

33

commitment and what it receives in satisfaction of its claim against the estate.  Courts across the country uniformly follow that principle.[13]

77.     Here, there is no delineation between what the Debtors are now trying to write off as proper backstop consideration for the Commitment Parties and the ultimate treatment of their claims against the estates.  Immediately upon the Effective Date, $138 million in principal amount of 1.25L Notes held by the Supporting Noteholders will be satisfied and discharged in exchange for New Common Shares.  This cannot be characterized as anything but treatment "for"—that is, "in satisfaction of," *Mabey*, 150 F.3d at 518-19—those Allowed 1.25L Notes Claims.  Indeed, the Backstop Agreement itself does not even characterize the exclusive right to participate in the 1.25L Notes Exchange as backstop consideration.  Only the Commitment Premium and Expense Reimbursement serve that function.  (*See* Backstop Agreement §§ 3.1-3.4.)

### C.     The 1.25L Notes Exchange is Treatment Under the Plan

78.     The Debtors also apparently intend to argue that the Plan actually does provide for equal treatment of all Allowed 1.25L Notes Claims.  The Debtors assert that section 4.5 of the Plan, on its face, purports to provide for reinstatement of all Allowed 1.25L Notes Claims without exception.  (Backstop Reply ¶ 97 [Docket No. 431].)  They say that the 1.25L Notes Exchange is being consummated pursuant to the Rights Offering and not pursuant to the Plan

---

[13] *See, e.g.*, *TCI 2 Holdings*, 428 B.R. at 133 (where "all holders of allowed Second Lien Note claims . . . [were to] receive the same treatment on account of their claims" but those that were backstop parties also received a fee "offered as consideration for the[ir] $225 million commitment"); *Peabody*, 933 F.3d at 923 (where "holders of Class-5B claims were expected to receive [an] approximately 22.1%" recovery on account of their claims and those that were backstop parties  also received "premiums in exchange for promptly agreeing to backstop the arrangement"); *In re CHC Grp. Ltd.*, No. 16-31854 (BJH), 2017 WL 11093971, at *11 (Bankr. N.D. Tex. Mar. 3, 2017) (holding that the plan did not violate section 1123(a)(4) because "[t]he Put Option Premium payable to the Plan Sponsors is not a distribution on their Class 5 Claims").

and that equal treatment mandates accordingly do not apply.  (*Id.*)  That argument is flawed, both as a matter of fact and a matter of law.

79.     The Debtors' argument ignores the substance of the Plan and accompanying documents, which make clear that reinstatement of Allowed 1.25L Notes Claims and the 1.25L Notes Exchange will occur simultaneously.  Section 4.5 of the Plan provides that the reinstatement of "Allowed 1.125L Notes Claims" will occur "on the Effective Date," and section 5.11(a) requires the Debtors to "consummate the Rights Offering" (including the 1.25L Notes Exchange) on the Effective Date.  Similarly, a condition precedent to the Effective Date is that "the Rights Offering . . . shall have been conducted . . . ." (Plan § 9.2(e).)  These provisions clearly indicate that immediately on the Effective Date, $138 million of 1.25L Notes held by the Supporting Noteholders will be converted into New Common Shares, and all other 1.25L Notes will be reinstated.

80.     The Backstop Agreement also confirms that the 1.25L Notes participating in the 1.25L Notes Exchange will never actually be reinstated.  Under the Backstop Agreement, the Supporting Noteholders are obligated to "assign[ ]" and transfer those 1.25L Notes via "book-entry transfer" "to the applicable Debtors . . . for cancellation" by "[n]o later than *three (3) Business Days prior to the Effective Date*."  (Backstop Agreement § 2.4(a)(i), 2.4(a)(vi), 2.4(b)) (emphasis added).  Those 1.25L Notes will be cancelled immediately upon the Effective Date. (*Id.* §§ 2.2(a)(ii), 2.4(a)(i), 2.5(b), 7.1(f).)  Thus, the notion that "all Allowed 1.25L Notes Claims" are being reinstated under the Plan or that the 1.25L Notes held by the Supporting Noteholders are receiving the same treatment as other Class 5 Claims is simply false.

81.     The Debtors' argument is also contrary to case law holding that a debtor cannot circumvent core confirmation requirements by simply seeking to provide for the forbidden

treatment in a non-plan agreement.  *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 977 (2017) (bankruptcy courts do not have flexibility "to make general end-of-case distributions that would be flatly impermissible in a Chapter 11 plan or Chapter 7 liquidation."); *United States v. AWECO, Inc. (In re AWECO, Inc.*), 725 F.2d 293, 298 (5th Cir. 1984) (establishing a *per se* rule against pre-plan settlements that violate the absolute priority rule).  In *AWECO*, the Fifth Circuit reasoned: "As soon as a debtor files a petition for relief, fair and equitable settlement of creditors' claims becomes a goal of the proceedings.  The goal does not suddenly appear during the process of approving a plan of compromise." *Id.*  If confirmation rules were to have no role outside of confirmation, "bankruptcy courts would have the discretion" to favor creditors in ways prohibited by Chapter 11 "so long as the approval of the settlement came before the plan." *Id.*

82.     The reasoning in *AWECO* applies equally in the context of an agreement that violates section 1123(a)(4).  Like the absolute priority rule, "[e]quality of distribution among creditors is a central policy of the Bankruptcy Code . . . ." *Begier*, 496 U.S. at 53.  And like the pre-plan settlement in *AWECO*, the parties here are seeking to use the Rights Offering to give special treatment to 1.25L Notes Claims held by the insider-led group of Supporting Noteholders.  This is precisely what section 1123(a)(4) is designed to prevent.[14]

### III.    The Plan Cannot be Confirmed Because Holders of 1.25L Notes That Participate in the 1.25L Notes Exchange are Receiving a Greater Than 100% Recovery

83.     The exchange of $138 million in principal amount of the Commitment Parties' 1.25L Notes is to be at a 25.7% discount to the Stated Equity Value of $900 million.  When that

---

[14]  The fact that the 1.25L Notes Exchange will result in incremental deleveraging does not justify a structure that violates section 1123(a)(4) of the Bankruptcy Code.  *Cf. Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 207 (1988) (explaining that courts cannot deviate from the procedures "specified by the Code," even when they sincerely "believ[e] that . . . creditors would be better off").

discount is taken into account, the value of the equity implied by the Plan to be distributed in exchange for 1.25L Notes equals $173 million.[15]

84.      The remaining $362 million in principal amount of 1.25L Notes that are not tendered in the 1.25L Notes Exchange will be reinstated.  The sum of the face amount of the reinstated 1.25L Notes and the value of the New Common Shares to be issued in the 1.25L Notes Exchange is $535 million.  Given that a total of only $500 million of the 1.25L Notes are outstanding, the $535 million distribution generates a greater-than-100% recovery for the class.

| Equity Value Build | | Blended 1.25L Recovery Build | |
|---|---:|---|---:|
| Plan Equity Value | $900 | Equity Value to 1.25L | $173 |
| (+) Net Debt | 1,569 | Take Back Debt to 1.25L | $362 |
| Plan TEV | $2,469 | Total Value to 1.25L | $535 |
| | | (/) 1.25L Face Value | 500 |
| Plan Equity Value | $900 | % Recovery to 1.25L | 106.9% |
| (x) Discount to Equitized 1.25L | 25.7% | | |
| Discounted Plan Equity Value | $669 | *Memo: Recovery to Equitized 1.25L* | |
| | | Equity Value to 1.25L | $173 |
| Equitized 1.25L | $138 | Equitized 1.25L Face Value | 138 |
| (/) Discounted Plan Equity Value | 669 | Recovery to Equitized 1.25L | 125.2% |
| % Equity to Equitized 1.25L | 20.6% | | |
| save[()] | 7.0% | | |
| Fully Diluted % Equity to Equitized 1.25L | 19.2% | | |
| | | | |
| Plan Equity Value | $900 | | |
| (x) Fully Diluted % Equity to Equitized 1.25L | 19.2% | | |
| Equity Value to 1.25L | $173 | | |

85.      In the event that the Debtors are forced to cram-down on any of the classes below Class 5, the greater-than-100% recovery for Class 5 will prohibit confirmation.  To be fair and equitable "(1) the plan may not give property to a junior class 'on account of' their claims or interests without holders of senior classes receiving the full value of their claims; and (2) the plan may not give property to senior classes in excess of the full value of their claims."  *In re LightSquared, Inc.*, 534 B.R. 522 (S.D.N.Y. 2015); *accord Ahuja v. Lightsquared Inc. (In re*

---

[15] The Successor Trustee and the Ad Hoc Group do not agree with the values implied by the Plan and reserve all rights to dispute such value and advance any other value.  On its face, however, the Plan's own implied value dooms its proposed treatment of the 1.25L Notes.

*Mayflower Cmtys., Inc.)*, No. 19-30283 (HDH), 2019 WL 4732379, at *10 (Bankr. N.D. Tex.

Sept. 26, 2019).  That requirement cannot be satisfied here.

## IV.    The Plan Cannot be Confirmed Because it is Not Feasible Within the Meaning of Section 1129(a)(11) of the Bankruptcy Code

86.    The evidence at the confirmation hearing will demonstrate that the Debtors cannot

satisfy their burden of demonstrating that the Plan is feasible within the meaning of section

1129(a)(11) of the Bankruptcy Code.

### A.    Feasibility Legal Standard

87.    Section 1129(a)(11) of the Bankruptcy Code provides that a court "shall confirm a

plan only if . . . (11) [c]onfirmation of the plan is not likely to be followed by the liquidation, or

the need for further financial reorganization, of the debtor or any successor to the debtor under

the plan, unless such liquidation or reorganization is proposed in the plan."  11 U.S.C. §

1129(a)(11).  The Debtors bear the burden of proving that the Plan is feasible by a

preponderance of the evidence.  *Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re*

*T-H New Orleans Ltd. P'Ship)*, 116 F.3d 790, 802 (5th Cir. 1997) (*citing In re Briscoe Enter.,*

*Ltd. II*, 994 F.2d 1160, 1165 (5th Cir. 1993)).

88.    To meet the feasibility requirement, "[t]he plan must be workable and stand a

reasonable likelihood of success."  *In re Quigley*, 437 B.R. 102, 142 (Bankr. S.D.N.Y. 2010)

(citing *Kane v. Johns-Manville Corp.* 843 F.2d 636, 649 (2d Cir. 1988)).  In other words, the

plan must be "reasonably likely [to] succeed[] on its own terms without a need for further

reorganization on the debtor's part." *In re Applied Safety, Inc.*, 200 B.R. 576, 584 (Bankr. E.D.

Pa. 1996).

89.    "[T]he purpose of the chapter 11 feasibility requirement is to prevent

confirmation of 'visionary schemes.'"  *In re Chadda*, No. 07-12665-bif, 2007 WL 3407375, at

*4 (Bankr. E.D. Pa. Nov. 9, 2007) (citing *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985)); *accord In re Lakeside Glob. II, Ltd.*, 116 B.R. 499, 508 (Bankr. S.D. Tex. 1989) ("The purpose of the feasibility requirement is 'to prevent confirmation of visionary schemes which promise creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation.'"). Thus, courts may deny confirmation of a plan based on speculative or wholly subjective projections. *See Canal Place Ltd. P'ship v. Aetna Life Ins. Co. (In re Canal Place Ltd.)*, 921 F.2d 569, 579 (5th Cir. 1991) ("Speculative, conjectural or unrealistic projections by Debtor cannot support Debtor's predictions of future performance.").

90.     For example, "a glaring discrepancy between the facts surrounding past performance and activity and predictions for the future is strong evidence that a debtor's projections are flawed and the plan is not feasible." *In re Young Broad. Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010) (quoting *In re Trevarrow Lanes, Inc.*, 183 B.R. 475, 482 (Bankr. E.D. Mich. 1995)). Further, "[s]incerity, honesty and willingness are not sufficient to make the plan feasible… [and] [t]he test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Chadda*, 2007 WL 3407375, at *4 (quoting *In re Hoffman*, 52 B.R. 212, 215 (Bankr. D.N.D. 1985)).

91.     In assessing feasibility, courts consider a variety of factors, including (a) the adequacy of the debtor's capital structure, (b) the earning power of the business, (c) the current economic conditions, (d) management's abilities, (e) the probability of the continuation of the same management, and (f) any other related matters that are probative with respect to the prospects of a sufficiently successful operation to enable performance of a reorganization plan's provisions. *See In re Star Ambulance Serv., LLC*, 540 B.R. 251, 266 (Bankr. S.D. Tex. 2015)

39

(citation omitted).  Courts also consider whether the debtor will be insolvent at emergence.  *See In re W.R. Grace & Co.*, 475 B.R. 34, 163 n. 137 (D. Del. 2012), *aff'd*, 729 F.3d 332 (3d Cir. 2013); *see also In re Duval Manor Assocs.*, 191 B.R. 622, 632 (Bankr. E.D. Pa. 1996) ("Basically, feasibility involves the question of emergence of the reorganized Debtor in a solvent condition and with reasonable prospects of financial stability and success.") (quoting 5 Collier on Bankruptcy ¶ 1129.02 (15th Ed. 1989)).

92.    The Debtors cannot satisfy their burden of proving that the Plan is feasible.  As the evidence at the confirmation hearing will demonstrate: (a) the Debtors' business plan and the projections underlying it are highly speculative; (b) the Debtors will not be able to repay or refinance their outstanding indebtedness at maturity; (c) the Debtors have failed to account for the Applicable Premium due to the 1.125L Noteholders and therefore cannot demonstrate that they are able to satisfy all of their obligations under the Plan; (d) the Debtors cannot satisfy the conditions precedent to the Plan's Effective Date; and (e) the Debtors cannot at emergence meet critical conditions precedent under the Exit Facility.

**B.    The Debtors' Business Plan and Underlying Projections are Highly Speculative**

93.    ███████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████  As set forth herein, the business plan and

corporate model are highly speculative at best and erroneous at worst.

94.   The Debtors are a Houston, Texas-based independent energy company focused on

the acquisition, production, exploration, and development of onshore oil and gas assets in the

United States. ███████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████  These expenditures "include capital associated

with drilling and completing new wells, improving operational efficiency and building

infrastructure."  (*See* Disclosure Statement, Exh. E, Financial Projections, at 4.)

41

95. 

96.

███████████████████████████████████████████

██████████████████████████████████

97.    ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████

████████████████████

98.    ████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████

99.    ███████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

43



100.    In addition to being highly speculative, the Debtors' business plan and underlying operational projections are subject to a number of flaws, including the following:



ny-1813349



101.   In sum, Mr. D'Souza's conclusions regarding Plan feasibility are based on erroneous data and highly speculative projections.  His conclusions should be given no evidentiary weight.

**C.     The Debtors Cannot Demonstrate that They Will be Able to Repay or Refinance Their Outstanding Indebtedness at Maturity**

102.   ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

i.   **Mr. D'Souza Understates the Debtors' Leverage Ratio**

103.   ██████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
█████████████████████████████

104.   ██████████████████████████████████████
██████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
██████

105.   ███████████████████████████████████████
████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████
█████████████████████████████████

### ii. Mr. D'Souza's Assumptions Regarding the High Yield Market for E&P Issuers are Flawed

106. ██████████████████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████

107. ██████████████████████████████

██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██

108. ██████████████████████████████

██████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████

### iii. Under a Reasonable Set of Assumptions, the Debtors Will Have Little to No Equity Cushion Following Emergence

109.   ███████████████████████████████████████████████████████

███████████████████████████████ Equity value is unquestionably an important factor in determining whether a debtor has a reasonable prospect of refinancing its outstanding indebtedness. *See, e.g.*, *In re Pratt Vineyards, LLC*, No. 10-35071-A-12, 2011 WL 10657053, at *3 (Bankr. E.D. Cal. June 7, 2011) (finding "[a]n equity cushion of 28% to 34% will significantly increase the likelihood of a refinance of the property at the end of the five-year plan term.").

110.   The evidence at the confirmation hearing will demonstrate that the Debtors have not considered the impact of an equity cushion on their ability to refinance their funded indebtedness and that they will need to create significant equity value before 2024 and 2026, an undertaking that carries considerable risk. ███████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████

### D. The Debtors Have Failed to Account for the Applicable Premium due to the 1.125L Noteholders

111.   The Debtors have admittedly failed to consider the implications of the $177,651,774 Applicable Premium or allowance of the Successor Trustee's claim in its total asserted amount of $1,177,651,774.  Instead, the Plan improperly provides that "[t]he 1.125L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $1 billion."  (Plan § 1.1.)  When the Applicable Premium is accounted for, it is clear that the

Debtors cannot satisfy the assumptions upon which their emergence from bankruptcy are premised.

> **i.     The Debtors Must Reserve for the Applicable Premium Pending Final Resolution of the Successor Trustee's Claim**

112.    To satisfy section 1129(a)(11), a debtor must affirmatively prove that it will be able to meet its obligations under the plan.  Thus, at a minimum, the Debtors must reserve for the $177,651,774 Applicable Premium pending final resolution of the Successor Trustee's claim. *See Save Our Springs (S.O.S) Alliance, Inc. v. WSI (II)-COS, L.L.C.*, 632 F.3d 168, 173 (5th Cir. 2011) (affirming denial of confirmation where plan provided for creditor claims to be satisfied through the establishment of a $60,000 creditor fund from donations but the debtor only had $20,000 of pledges, the pledges were not firm commitments, and it would have been extremely difficult for the debtor to instead satisfy creditor claims out of the debtor's general fund); *Pizza of Haw., Inc. v. Shakey's, Inc. (In re Pizza of Haw., Inc.)*, 761 F.2d 1374, 1382 (9th Cir. 1985) (bankruptcy court's finding that chapter 11 plan was feasible was vacated and bankruptcy court was ordered to estimate amount of creditor's claim in connection with confirmation where the plan "failed to provide for the possibility that [a creditor] would recover a large judgment in the civil case" and the creditor's claim exceeded the debtor's proposed working capital upon emergence); *In re Adelphia Bus. Solutions, Inc.*, 341 B.R. 416, 419 (Bankr. S.D.N.Y. 2003) (conditioning its finding that the plan was feasible on the debtor establishing a reserve for disputed administrative claim); *In re Spansion, Inc.*, 426 B.R. 114, 146 (Bankr. D. Del. 2010) (requiring a reserve for disputed administrative claim because creditors "should not be subject to the risk that the newly reorganized debtor lacks the funds or the motivation to resolve the outstanding dispute.").

### ii. The Debtors Cannot Satisfy the Conditions Precedent to the Plan's Effective Date

113.     Under the plain language of the 1.125L Notes Indenture, when the Applicable Premium accrues, it is automatically added to the outstanding principal balance.  (1.125L Notes Indenture § 6.02.)  Here, however, if the Debtors reinstate the 1.125L Notes in their total allowed amount of $1,177,651,774, they will not be able to satisfy the conditions precedent to the Closing Date (as defined in the Exit Credit Agreement) or the Effective Date of the Plan.  Specifically, the Debtors will not be able to (a) satisfy the limit on outstanding indebtedness; and (b) meet their liquidity requirements.

114.     Section 6(p) of the Exit Credit Agreement provides that, as a condition precedent to its effectiveness, the Debtors must demonstrate that "immediately after the consummation of the Plan of Reorganization, total outstanding indebtedness for borrowed money . . . shall not exceed $1,600,000,000."  (Exit Credit Agreement § 6(p).) ███████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

115.     The Debtors might argue, alternatively, that they can satisfy the Applicable Premium by paying it in full or reserving the funds necessary to pay it in full on the Effective Date.  That too would prevent the Debtors from satisfying the conditions precedent under the Exit Credit Agreement, which include a requirement that the Debtors "shall have Liquidity equal to or greater than $350,000,000."  (Exit Credit Agreement § 6(r).) ████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

ny-1813349

██████████████████████████████████████████████████

████████████████████████████████████

116.     Failure to satisfy the conditions precedent set forth in the Exit Credit Agreement would prevent the Plan from going effective.  (*See* Plan § 9.2(m), providing that the Effective Date shall not occur unless "all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived . . . .")  A Plan that does not have a reasonable probability of becoming effective is not feasible within the meaning of section 1129(a)(11).  *See In re TCI 2 Holdings*, 428 B.R. at 148 ("The plan proponent bears the burden to show by a preponderance of the evidence that the proposed chapter 11 plan has a reasonable probability of success . . . .") (citations omitted).

### iii.     The Debtors Cannot Demonstrate That They Will be Solvent at Emergence, as Required Under the Exit Credit Agreement

117.     A critical element of any feasibility analysis is whether the company will be insolvent upon emergence from bankruptcy.  If "the transactions contemplated by the Plan would render [the debtor] insolvent or leave it with inadequate capital, the [p]lan will not be feasible and so may not be confirmed."  *In re Mirant Corp.*, No. 03-46590-DML-11, 2005 WL 6440372, at *7 (Bankr. N.D. Tex. May 24, 2005).  Solvency at emergence is especially crucial here because it is a condition precedent to effectiveness of the Exit Credit Agreement, which is, in the Debtors' own words, "critical" to enable the Debtors to "emerge from bankruptcy with sufficient liquidity to operate their business."  (*See Motion of Debtors for Final Order Authorizing Debtors to Enter into and Perform under Exit Financing Agreements* ¶ 80 [Docket No. 182] (citation omitted).)  Specifically, pursuant to section 8.16 of the Exit Credit Agreement, the Debtors are required to represent and warrant that "[o]n the Closing Date . . . the Borrower on a consolidated basis with its Restricted Subsidiaries will be Solvent . . . ."  (Exit Credit Agreement § 8.16

[Docket No. 785].)[16]  The obligation of the lenders under the Exit Credit Agreement does not become effective until the representation and warranty in section 8.16 is "true and correct in all material respects."  (*Id.* § 6(g).)  Even if the Debtors are prepared to sign the Exit Credit Agreement with these provisions in place, if the Debtors' representation and warranty regarding solvency is later determined to be untrue, it will trigger an Event of Default under the Exit Credit Agreement.  (*Id.* § 11.2.)

118.



---

16   The definition of "Solvency" is extremely broad: "'Solvent' means, with respect to any Person, that as of the Closing Date, (i) the fair value of the assets of such Person and its Subsidiaries on a consolidated basis, at a fair valuation, will exceed the debts and liabilities, direct, subordinated, contingent or otherwise, of such Person and its Subsidiaries on a consolidated basis; (ii) the present fair saleable value of the property of such Person and its Subsidiaries on a consolidated basis will be greater than the amount that will be required to pay the probable liability of such Person and its Subsidiaries on a consolidated basis on their debts and other liabilities, direct, subordinated, contingent or otherwise, as such debts and other liabilities become absolute and matured; (iii) such Person and its Subsidiaries on a consolidated basis will be able to pay their debts and liabilities, direct, subordinated, contingent or otherwise, as such debts and liabilities become absolute and matured; and (iv) such Person and its Subsidiaries on a consolidated basis will not have unreasonably small capital with which to conduct the businesses in which they are engaged as such businesses are now conducted and are proposed to be conducted following the Closing Date."  (Exit Credit Agreement § 1.1.)

ny-1813349

119. ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

120.    Moreover, standing alone, the fact that the Supporting Noteholders were willing to make a new money investment in the reorganized company at an implied total enterprise value of approximately $2.5 billion is not, in fact, probative of fair market value. ████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ This "flexibility" will allow the Supporting Noteholders, once in control of the Debtors after the Effective Date and prior to the repayment in full of the Reinstated Debt, to prefer their own debt and equity interests over the claims and rights of the holders of the Reinstated Debt, including by, among other things, paying themselves dividends or transferring assets to unrestricted subsidiaries that might benefit such Supporting Noteholders. Thus, there are many factors bearing on the Supporting Noteholders' investment decision and their anticipated return on investment. Given the many self-interested and other aspects affecting the Supporting Noteholders' interests in these cases, the implied equity value is simply not a relevant or close proxy for actual fair market value.

121.     For the foregoing reasons, the Plan is not feasible within the meaning of section 1129(a)(11) of the Bankruptcy Code.

## CONCLUSION

122.     The Successor Trustee and the Ad Hoc Group respectfully request that the Court enter an order (a) denying confirmation of the Plan and (b) granting such other and further relief as the Court deems just and proper.

ny-1813349

Dated: February 19, 2020
      Houston, Texas

*/s/ John P. Melko*
John P. Melko
FOLEY GARDERE
Foley & Lardner LLP
1000 Louisiana, Suite 2000
Houston, Texas 77002
Telephone: (713) 276-5727
jmelko@foley.com

*Special Counsel for the Ad Hoc Group and
Texas Counsel for the Successor Trustee*

-and-

Dennis L. Jenkins (admitted *pro hac vice*)
Brett H. Miller (admitted *pro hac vice*)
Jamie Levitt (admitted *pro hac vice*)
Michael Birnbaum (admitted *pro hac vice*)
Craig Damast (admitted *pro hac vice*)
Rahman Connelly (admitted *pro hac vice*)
MORRISON & FOERSTER LLP
250 West 55th Street
New York, New York 10019
Telephone: (212) 468-8000
djenkins@mofo.com
brettmiller@mofo.com
jlevitt@mofo.com
mbirnbaum@mofo.com
cdamast@mofo.com
rconnelly@mofo.com

*Counsel for the Ad Hoc Group and Lead
Counsel for the Successor Trustee*

James Millar (admitted *pro hac vice*)
DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas, 41st Floor
New York, NY 10036-2714
Telephone: (212) 248-3140
james.millar@dbr.com

-and-

Vincent P. Slusher
Kristen L. Perry
DRINKER BIDDLE & REATH LLP
1717 Main Street
Suite 5400
Dallas, TX 75201-7367
Telephone: (469) 357-2500
vince.slusher@dbr.com
kristen.perry@dbr.com

*Counsel to the Successor Trustee*

Certificate of Conference

Counsel for the Ad Hoc Group and the Successor Trustee hereby certify that they have conferred with the Debtors' professional advisors regarding the Plan and certain of the objections thereto set forth herein, but the parties were unable to resolve the matter.

/s/ John P. Melko
John P. Melko