# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | **Chapter 11** |
| **EP ENERGY CORPORATION**, *et al.*, | § § | **Case No. 19-35654 (MI)** |
| Debtors.[1] | § § § § § | **(Jointly Administered)** |

## DISCLOSURE STATEMENT FOR FIFTH AMENDED JOINT CHAPTER 11 PLAN OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford Carlson
Stephanie Morrison (admitted *pro hac vice*)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Ronit Berkovich (admitted *pro hac vice*)
Scott R. Bowling (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and*
*Debtors in Possession*

Dated: July 13, 2020
　　　　Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 601 Travis St., Suite 1400, Houston, TX 77002.

**DISCLOSURE STATEMENT, DATED JULY 13, 2020**

**Solicitation of Votes on the
Plan of Reorganization of**

**EP ENERGY CORPORATION, *ET AL.***

THIS SOLICITATION OF VOTES (THE "SOLICITATION") IS BEING CONDUCTED TO OBTAIN SUFFICIENT VOTES TO ACCEPT THE FIFTH AMENDED JOINT CHAPTER 11 PLAN OF EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS IN THE ABOVE-CAPTIONED CHAPTER 11 CASES (COLLECTIVELY, THE "DEBTORS") ATTACHED HERETO AS EXHIBIT A (THE "PLAN").

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON AUGUST 19, 2020 UNLESS EXTENDED BY THE DEBTORS.

THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS JULY 15, 2020 (THE "VOTING RECORD DATE").

---

**RECOMMENDATION BY THE DEBTORS**

The special committee of the board of directors of EP Energy Corporation and each of the governing bodies for each of its affiliated debtors have unanimously approved the transactions contemplated by the Solicitation and the Plan. The Debtors believe the Plan is in the best interests of all stakeholders and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Further, holders of 98% in aggregate principal amount of the Claims under the Debtors' RBL Facility (as defined herein), have agreed to vote in favor of an Approved Plan (as defined in the Exit Term Sheet).

---

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THE DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

THE ISSUANCE OF AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW COMMON SHARES PURSUANT TO SECTION 4.4(A) OF THE PLAN, WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS

AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE. SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE STOCKHOLDERS AGREEMENT, THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. SUBJECT TO THE TRANSFER PROVISIONS, IF ANY, AND OTHER APPLICABLE PROVISIONS SET FORTH IN THE STOCKHOLDERS AGREEMENT, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE SECURITIES ISSUED PURSUANT TO THE PLAN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION (SUCH AS THAT REFERRED TO IN THE PRECEDING PARAGRAPH AND UNDER THE CAPTION "FINANCIAL PROJECTIONS" ELSEWHERE IN THIS DISCLOSURE STATEMENT) AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING

"CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW, AS WELL AS THE VOLATILITY OF AND POTENTIAL FOR SUSTAINED LOW OIL, NATURAL GAS AND NGLS PRICES, THE SUPPLY AND DEMAND FOR OIL, NATURAL GAS AND NGLS, CHANGES IN COMMODITY PRICES FOR OIL AND NATURAL GAS, THE DEBTORS' ABILITY TO MEET PRODUCTION VOLUME TARGETS, THE UNCERTAINTY OF ESTIMATING PROVED RESERVES AND UNPROVED RESOURCES, THE DEBTORS' ABILITY TO DEVELOP PROVED UNDEVELOPED RESOURCES AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES AND OTHER FACTORS LISTED IN THE DEBTORS' SEC FILINGS.  PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.  THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE ANY FORWARD-LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THE DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE TO ACCEPT THE PLAN, (II) HOLDERS OF ALL

**CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN, (IV) HOLDERS OF ALL CLAIMS AND INTERESTS THAT ARE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH THEREIN BUT DO NOT OPT OUT, AND (V) THE RELEASED PARTIES.**

**HOLDERS OF CLAIMS IN VOTING CLASSES (3, 4, 5B, 6, AND 9) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR BALLOT.  HOLDERS OF CLAIMS IN NON-VOTING CLASSES (1, 2, 5A, 7, 8, 10 AND 11) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS AND NOTICE OF RIGHT TO OPT OUT OF CERTAIN RELEASES.  SEE <u>EXHIBIT G</u> FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.**

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION.................................................................................................................8

    A.     Overview of Restructuring.........................................................................8
    B.     DIP-to-Exit Commitment..........................................................................12
    C.     UCC Challenge Period.............................................................................14
    D.     Inquiries...................................................................................................14

II. SUMMARY OF PLAN TREATMENT ...........................................................................15

III. OVERVIEW OF DEBTORS' OPERATIONS .................................................................20

    A.     Business Overview...................................................................................20
         1.     General Overview...........................................................................20
         2.     Drilling Operations........................................................................21
         3.     Joint Ventures................................................................................22
         4.     Hedging.........................................................................................22
    B.     Debtors' Corporate History and Structure...............................................23
         1.     Corporate History..........................................................................23
         2.     Debtors' Corporate and Governance Structure .............................23
    C.     Equity Ownership ....................................................................................24
    D.     Prepetition Indebtedness..........................................................................25
         1.     RBL Claims...................................................................................26
         2.     1.125L Notes Claims.....................................................................26
         3.     1.25L Notes Claims.......................................................................27
         4.     1.5L Notes Claims.........................................................................27
         5.     Intercreditor Agreements...............................................................28
         6.     Unsecured Notes Claims................................................................28
         7.     Other Claims..................................................................................29
         8.     Prepetition Legal Proceedings .......................................................30
         9.     Intercompany Claims.....................................................................30
         10.    Decommissioning, Reclamation and Plugging and Abandonment Obligations for Federal Oil & Gas Leases ..........................................31

IV. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ...............31

    A.     Continued Weakness in Oil & Gas Exploration and Production Industry .......31
    B.     Prepetition Restructuring Efforts .............................................................32
         1.     Operational Initiatives....................................................................32
         2.     Strategic Transactions....................................................................32
         3.     Leverage and Liquidity Concerns ..................................................32
         4.     Special Committee Appointed to Oversee Strategic Process............33
         5.     Debtors Engage with Creditors and Other Parties .........................33
         6.     Utilization of Grace Period and Entry into Forbearance Agreements.......34
         7.     Agreement in Principle with Initial Supporting Noteholders.............35
         8.     Negotiations Regarding Tax Attributes ..........................................35

|     |     | 9. | Employee Incentive Plan and New Executive Employment Agreement Negotiations to Be Included in Plan Supplement | 36 |
| C. | | | Prepetition Analysis | 37 |
| | | 1. | Independent Investigation | 37 |
| | | 2. | Mortgage Lien Analysis | 38 |
| D. | | | Prepetition Compensation Program | 40 |

**V. OVERVIEW OF CHAPTER 11 CASES** ... 40

| A. | Commencement of Chapter 11 Cases and First Day Motions | 40 |
| B. | First Day Motions | 40 |
| C. | Procedural Motions and Retention of Professionals | 41 |
| D. | Retention of Chapter 11 Professionals | 41 |
| E. | Postpetition Novation of Hedges | 42 |
| F. | Execution of Backstop Commitment Agreement and Plan Support Agreement and Entry into DIP Facility and Existing Commitment Letter | 42 |
| G. | Appointment of Creditors' Committee | 42 |
| H. | MSB Adversary Complaints | 44 |
| | 1. Lien Invalidation Lawsuit – Adv. Pro. No. 19-03660 | 44 |
| | 2. C Lease Lawsuit – Adv. Pro. No. 20-03019 | 45 |
| I. | Altamont Adversary Complaint | 47 |
| J. | Exclusivity | 47 |
| K. | Statements and Schedules, and Claims Bar Dates | 48 |
| L. | Request for Equity Committee | 48 |
| M. | Prior Disclosure Statement and Prior Plan | 48 |
| N. | Severance Motion | 50 |
| O. | Development of a New Plan of Reorganization | 50 |
| P. | Alternative Plan Proposal | 51 |

**VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** ... 51

**VII. CERTAIN TAX CONSEQUENCES OF PLAN** ... 53

| A. | Consequences to the Debtors | 54 |
| | 1. Cancellation of Debt | 54 |
| | 2. Limitation of NOL Carryforwards and Other Tax Attributes | 55 |
| B. | Consequences to Holders of Certain Claims | 56 |
| | 1. RBL Claims | 57 |
| | 2. 1.125L Notes Claims | 60 |
| | 3. Convenience Claims and Parent Unsecured Claims | 62 |
| | 4. Distributions in Discharge of Accrued Interest or OID | 62 |
| | 5. Character of Gain or Loss | 63 |
| | 6. Tax Treatment of Disputed Claims Reserve | 63 |
| C. | Treatment of Existing Parent Equity Interests | 64 |
| D. | Withholding on Distributions and Information Reporting | 64 |

**VIII. CERTAIN RISK FACTORS TO BE CONSIDERED** ... 65

| A. | Certain Bankruptcy Law Considerations | 65 |
| | 1. General | 65 |
| | 2. Risk of Non-Confirmation of the Plan | 66 |
| | 3. Non-Consensual Confirmation and Conversion into Chapter 7 Cases | 66 |
| | 4. Risk of Non-Occurrence of the Effective Date | 66 |

|  |  | 5. | Risks Related to Possible Objections to the Plan | 67 |
|  |  | 6. | Releases, Injunctions, and Exculpations Provisions May Not Be Approved | 67 |
|  | B. | | Risks Related to Exit Facility | 67 |
|  |  | 1. | Defects in Collateral Securing the Exit Facility | 67 |
|  |  | 2. | Failure to Perfect Security Interests in Collateral | 68 |
|  |  | 3. | Casualty Risk of Collateral | 68 |
|  |  | 4. | Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors | 68 |
|  |  | 5. | Risk that Remaining Lender May Not Sign Up to the Exit Facility | 68 |
|  |  | 6. | Effectiveness of Exit Facility | 69 |
|  | C. | | Additional Factors Affecting the Value of Reorganized Debtors | 69 |
|  |  | 1. | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary | 69 |
|  |  | 2. | Risks Associated with the Debtors' Business and Industry | 70 |
|  |  | 3. | DIP Facility | 71 |
|  |  | 4. | Post-Effective Date Indebtedness | 71 |
|  | D. | | Factors Relating to Securities to Be Issued under Plan | 72 |
|  |  | 1. | Market for Securities | 72 |
|  |  | 2. | Potential Dilution | 72 |
|  |  | 3. | Significant Holders | 72 |
|  |  | 4. | Equity Interests Subordinated to Reorganized Debtors' Indebtedness | 72 |
|  |  | 5. | Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares | 73 |
|  |  | 6. | No Intention to Pay Dividends | 73 |
|  |  | 7. | Reorganized EP Energy will be a Private Company | 73 |
|  | E. | | Additional Factors | 73 |
|  |  | 1. | Debtors Could Withdraw Plan | 73 |
|  |  | 2. | Debtors Have No Duty to Update | 73 |
|  |  | 3. | No Representations Outside the Disclosure Statement Are Authorized | 74 |
|  |  | 4. | No Legal or Tax Advice Is Provided by the Disclosure Statement | 74 |
|  |  | 5. | No Admission Made | 74 |
|  |  | 6. | Certain Tax Consequences | 74 |
| IX. | VOTING PROCEDURES AND REQUIREMENTS | | | 74 |
|  | A. | | Voting Deadline | 74 |
|  | B. | | Voting Procedures | 75 |
|  | C. | | Parties Entitled to Vote | 75 |
|  |  | 1. | Fiduciaries and Other Representatives | 77 |
|  |  | 2. | Agreements Upon Furnishing Ballots | 77 |
|  |  | 3. | Change of Vote | 77 |
|  | D. | | Waivers of Defects, Irregularities, etc. | 77 |
|  | E. | | Further Information, Additional Copies | 78 |
| X. | CONFIRMATION OF PLAN | | | 78 |
|  | A. | | Confirmation Hearing | 78 |
|  | B. | | Objections to Confirmation | 78 |
|  | C. | | Requirements for Confirmation of Plan | 79 |
|  |  | 1. | Acceptance of Plan | 80 |

|  | 2. | Best Interests Test | 81 |
|  | 3. | Feasibility | 81 |

XI. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN .................................. 82

| A. | Alternative Plan of Reorganization | 82 |
| B. | Sale under Section 363 of the Bankruptcy Code | 83 |
| C. | Liquidation Under Chapter 7 of Bankruptcy Code | 83 |

XII. CONCLUSION AND RECOMMENDATION .................................. 83

**Exhibit A**:    Plan

**Exhibit B**:    Amended Commitment Letter

**Exhibit C**:    Organizational Chart

**Exhibit D**:    Liquidation Analysis

**Exhibit E**:    Financial Projections

**Exhibit F**:    Valuation Analysis

**Exhibit G**:    Release Provisions

# I.
# INTRODUCTION

## A.    Overview of Restructuring

EP Energy Corporation ("**EP Energy**" or "**EP Parent**") and its debtor affiliates[2] (each, a "**Debtor**," and collectively, the "**Debtors**" or the "**Company**") submit this disclosure statement (as may be amended from time to time, the "**Disclosure Statement**") in connection with the Solicitation of votes on the *Fifth Amended Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors* dated July 13, 2020 attached hereto as **Exhibit A** (the "**Plan**").

The purpose of this Disclosure Statement is to provide information of a kind, and in sufficient detail, to enable creditors of, and holders of interests in, the Debtors that are entitled to vote on the Plan to make an informed decision on whether to vote to accept or reject the Plan. This Disclosure Statement contains summaries of the Plan, certain statutory provisions, events contemplated in the chapter 11 cases that commenced (the "**Chapter 11 Cases**") on October 3, 2019 (the "**Petition Date**"), and certain documents related to the Plan.[3]

---

[2] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are:  EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 601 Travis St., Suite 1400, Houston, TX 77002.

[3] Capitalized terms used in the Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between the Disclosure Statement and the Plan, the Plan will govern.

As described in more detail below, the Debtors faced certain financial difficulties prior to the Petition Date and commenced these Chapter 11 Cases to accomplish a successful restructuring of their business through a substantial deleveraging of their capital structure to reduce the go-forward cost of capital for their otherwise healthy operations, as well as reject certain executory contracts the Debtors are party to that are burdensome to the Debtors' operations and estates.

In early March 2020, the Debtors were on the cusp of emerging from these Chapter 11 Cases after the Bankruptcy Court confirmed the Debtors' *Fourth Amended Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors* [Docket No. 685] (the "**Prior Plan**"), which would have enabled the Debtors to exit chapter 11 by eliminating billions in dollars of debt and providing for new capital to fund the restructuring and the Debtors' business going forward. The Prior Plan was the product of several months of hard work and careful planning by the independent special committee of the board of directors of the Company (the "**Special Committee**") and the Debtors' management team.  The Debtors worked hard to achieve substantial support for the Prior Plan, including the acceptance of the Prior Plan from all voting classes and the support of the Prior Plan from most of their key stakeholders, including the official committee of unsecured creditors (the "**Creditors' Committee**"), and ultimately achieved confirmation of the Prior Plan over objections raised by the ad hoc group of 1.125 Noteholders (the "**Ad Hoc Group**") and Storey Minerals, Ltd., Maltsberger/Storey Ranch LLC, Rene R. Barrientos, Ltd. ("**MSB**").  *See Proposed Findings of Fact, Conclusions of Law and Order (I) Confirming Fourth Amended Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors and (II) Granting Related Relief* [Docket No. 1049] (the "**Original Confirmation Order**").

Unfortunately, in the days following the Bankruptcy Court's oral ruling confirming the Prior Plan on March 6, 2020, Saudi Arabia and Russia implemented price reductions that severely affected the price of oil and gas, causing United States oil prices to fall by more than 30%. The spread of the disease caused by the novel coronavirus ("**COVID-19**") also resulted in the crash of financial markets. As a result, the Debtors became unable to satisfy all of the conditions to the effectiveness of their exit facility and therefore could not consummate the Prior Plan.

At the same time, the Backstop Parties asserted (i) that the proposed confirmation order left open the possibility that Reliance Damages and Pecuniary Losses (as defined in the Original Confirmation Order) could have been held to be payable to holders of 1.125 Lien Notes Claims and 1.25 Lien Notes Claims in excess of the reasonable and documented advisor fees and expenses provided for in the 1.125 Lien Indenture and 1.25 Lien Indenture, which was inconsistent with the treatment set forth in the Plan Support Agreement (as defined below) and the Prior Plan and certain Backstop Parties' investment theses; (ii) that the Debtors had materially breached certain provisions of the Plan Support Agreement by filing a proposed confirmation order that was inconsistent with the Plan Support Agreement; and (iii) that a Supporting Noteholder Termination Event (as defined in the Plan Support Agreement) had occurred and was continuing.

Following the above confluence of events, the Debtors agreed to terminate their backstop commitment agreement (the "**Backstop Agreement**") and the plan support agreement (the "**Plan Support Agreement**").  *See Amended Stipulation of Settlement Regarding Backstop Agreement and Plan Support Agreement* [Docket No. 1104] (the "**Termination Stipulation**"). Under the terms of the Termination Stipulation, the Backstop Parties (as defined in the Prior Plan)

also agreed, among other things, to waive the $26 million termination fee under the Backstop Agreement. The Debtors and the Backstop Parties also exchanged mutual releases from any and all claims (as further described in the Termination Stipulation) arising from, *inter alia*, these Chapter 11 Cases, the Backstop Agreement, the Plan Support Agreement, and the Prior Plan. The Backstop Parties also agreed not to contest any restructuring of the Debtors so long as such restructuring does not provide treatment that is less favorable to the Backstop Parties' claims than the treatment provided to other holders of claims in the same respective class. Consequently, the Bankruptcy Court vacated the Prior Plan on March 23, 2020. *See Order Vacating Order Confirming Plan* [Docket No. 1103] (the "**Vacatur Order**").

Following entry of the Vacatur Order, oil prices continued to fall and, in fact, for the first time in history, U.S. crude oil futures dropped to below zero (as low as -$37 per barrel for crude oil), presenting further challenges for the Debtors. The Debtors were proactive in responding to these challenges by, among other things, (i) developing a new business plan, (ii) exploring strategic alternatives with their advisors, (iii) engaging in discussions with several of their major stakeholders, including the RBL Lenders (as defined below) and the advisors to the Ad Hoc Group, regarding potential paths forward, and (iv) taking steps to reduce costs, including rejecting several burdensome executory contracts and implementing a reduction in their workforce. Moreover, as of the date hereof, oil prices have risen from their record lows, helping to facilitate a path forward toward emergence from these Chapter 11 Cases.

The Plan is the result of extensive good faith negotiations, overseen by the Debtors' independent Special Committee, between the Debtors and a number of their key economic stakeholders, including the RBL Lenders and the Ad Hoc Group. The holders of approximately 98% of the Claims under the Debtors' prepetition RBL Facility have agreed to support the exit term sheet attached to the Amended Commitment Letter (as defined below) and the Debtors are hopeful that 100% of the holders of such claims (and 100% of the holders of DIP Claims) will execute the Amended Commitment Letter and agree to provide similar support. To the extent any holder of RBL Claims does not execute the Amended Commitment Letter, then either the Existing Commitment Letter (as defined below), or the Amended Commitment Letter may be modified or replaced to provide that non-consenting lenders will, with respect to their Claims under the Debtors' prepetition RBL Facility (but not, for the avoidance of doubt, under the DIP Facility) receive first lien, second-out term loans under the Exit Credit Agreement on a dollar-for-dollar basis under the Plan. Moreover, based on negotiations with the advisors to the Ad Hoc Group, the Debtors expect that the holders of Claims in the Ad Hoc Group will support the Plan.

The Plan provides for a comprehensive restructuring of the Company's balance sheet. The transactions contemplated in the Plan will strengthen the Company by substantially reducing its debt and preserve in excess of 450 jobs. Specifically, the proposed restructuring contemplates, among other things:

- a reduction of current debt on the Debtors' balance sheet by approximately $4.4 billion,

- access to an approximately $629 million exit credit facility (the "**Exit Facility**"), which RBL Lenders holding 98% of the Claims under the Debtors' prepetition RBL Facility have committed to provide support for, and which the Debtors' prepetition RBL Facility and postpetition DIP Facility will "roll" into on the effective date of the Plan ("**Effective Date**").

The Debtors believe that upon consummation of the Plan and the transactions contemplated thereby, the post-emergence enterprise will have the ability to withstand the challenges and volatility of the oil and gas industry and succeed as a leading operator in their three main regions: Northeastern Utah, the Eagle Ford shale in South Texas, and the Permian basin in West Texas.

The Plan provides for the following treatment of claims and equity interests:

- Each holder of an Allowed **DIP Claim** that executes the Amended Commitment Letter by the Voting Deadline will receive on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement; provided that each holder of an Allowed DIP Claims that does not execute the Amended Commitment Letter by the Voting Deadline shall receive such treatment with respect to its Allowed DIP Claim as may be agreed to or as may otherwise comply with the Bankruptcy Code.

- Each holder of an Allowed **RBL Claim** that executes the Amended Commitment Letter by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement; *provided* that each holder of an Allowed RBL Claim that does not execute the Amended Commitment Letter by the Voting Deadline shall receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement.

- Holders of Allowed **1.125L Notes Claims** will receive on account of such Allowed 1.125L Notes Claim, in full and final satisfaction of such Allowed 1.125L Notes Claim, their Pro Rata share of 100% of the New Common Shares (which shall be distributed to holders of Allowed 1.125L Notes Claims on or about the Effective Date), subject to dilution solely by the EIP Shares.

- Holders of Allowed **Unsecured Claims** (*i.e.*, 1.25L Notes Claims, 1.5L Notes Claims, Unsecured Notes Claims, and General Unsecured Claims, but not Convenience Class Claims (defined below)) will not receive any distribution on account of such Allowed Unsecured Claims. Although holders of Unsecured Claims are receiving no recovery under the Plan, following discussions with the Creditors' Committee, the Plan provides for payment of the reasonable and documented compensation, fees, expenses and disbursements incurred by the 1.25L Notes Trustee, the 1.5L Notes Trustees, and the Unsecured Notes Trustees. In addition, the Debtors have agreed to waive Avoidance Actions against Ongoing Trade Parties following the Effective Date.

- Holders of **Parent Unsecured Claims** will receive, on the later of (i) the Effective Date, and (ii) the date on which such Parent Unsecured Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in cash of 100% of such Allowed Parent Unsecured Claim, or (b) its Pro Rata share of the Cash on EP Energy's balance sheet on the Effective Date.

- Holders of Allowed **Convenience Claims** (*i.e.*, Claims that would otherwise be a General Unsecured Claim but are (i) Allowed in the amount of $100,000 or less, or (ii) irrevocably reduced to the Convenience Claim Amount at the election of the holder on a Class 6 Ballot

in accordance with the Plan) will receive the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) their Pro Rata share of the Convenience Claim Distribution Amount which is $175,000.

- Holders of **Existing Parent Equity Interests** will receive, on account of available assets of EP Energy, their Pro Rata share of $300,000 in Cash.

### B.    DIP-to-Exit Commitment

On October 18, 2019, the Debtors reached an agreement with the RBL Lenders holding 100% of the Claims under the Debtors' RBL Facility (the "**Exit Commitment Parties**") to secure their commitment to support the Exit Facility (as such facility was contemplated at such time and described in the exit term sheet attached to the Existing Commitment Letter), including to convert 50% of the obligations under their RBL Facility into a $314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility (the "**DIP Facility**") and upon the Effective Date of the Plan, to convert their remaining obligations under the RBL Facility and the DIP Facility into the Exit Facility contemplated at such time (the "**DIP-to-Exit Facility**").

During the months leading up to the Petition Date, the Debtors conducted a thorough marketing process and engaged in extensive negotiations that resulted in obtaining a commitment to provide the Exit Facility on the best available terms. Each of the other exit financing offers received by the Debtors were significantly less attractive than the DIP-to-Exit Facility due to one or more of the following: (i) a meaningfully smaller committed exit facility relative to the DIP-to-Exit Facility, (ii) a requirement that the Debtors take market risk due to syndications on a best-efforts basis, (iii) increased negative carry costs associated with the use of cash collateral, and/or (iv) significantly higher fees.

The RBL Agent and RBL Lenders conditioned the Exit Facility on it being part of a DIP-to-Exit Facility that included a roll up (the "**Roll-Up**") of 50% of the obligations owed under the RBL Credit Agreement into the DIP Facility. The Debtors agreed to the Roll-Up as part of a package deal that included the Exit Commitment Parties' (i) commitment to provide an approximately $629 million Exit Facility, (ii) commitment to vote to accept an Approved Plan (as defined in the Exit Term Sheet), and (iii) consent to the Debtors' continued use of Cash Collateral. No new-money financing was provided to the Debtors in connection with the DIP Facility.

On November 25, 2019, the Bankruptcy Court entered an order approving the Debtors' entry into the DIP Facility and their obligations under the Existing Commitment Letter (as defined below) and related fee letters [Docket No. 482] (the "**DIP Order**").

Although the Original Confirmation Order was vacated by the Bankruptcy Court and the Prior Plan was not consummated, the DIP-to-Exit Facility remained in effect. However, the terms of the Exit Facility, as contemplated in the term sheet attached to the Existing Commitment Letter, cannot be satisfied because the Prior Plan cannot be consummated at this time. Therefore, the Exit Facility as previously contemplated cannot be implemented. As the DIP Facility is set to mature on November 25, 2020, the Debtors promptly began negotiations with the RBL Lenders with respect to terms of an acceptable plan pursuant to which the Exit Facility could be consummated.

In July 2020, following lengthy, arms-length discussions between the Debtors and the RBL Lenders, the Debtors and a majority (over 90%) of the RBL Lenders agreed in principle to amend the Existing Commitment Letter to, among other things, (i) extend the maturity of the Exit Facility to the date that is three (3) years from the date of emergence, (ii) amend the definition of "Approved Plan" and the conditions precedent to effectiveness of the Exit Facility, and (iii) amend certain financial covenants. These amendments would enable the Debtors to maintain the Exit Facility commitment despite there being no additional capital investment during these Chapter 11 Cases or pursuant to the Plan. The holders of approximately 98% of the Claims under the Debtors' prepetition RBL Facility have agreed to the terms of the Amended Commitment Letter (as defined below) and the Debtors are hopeful that the holders of the remaining Claims under the Debtors' prepetition RBL Facility will agree as well after the Debtors file the terms publicly with the filing of the Disclosure Statement, and the Amended Commitment Letter will be effective. To the extent any holder of RBL Claims does not execute the Amended Commitment Letter by the Voting Deadline, then (1) with respect to its Allowed RBL Claims such non-consenting RBL Lender will receive first lien, second-out term loans under the Exit Credit Agreement on a dollar-for-dollar basis under the Plan; and (2) with respect to its Allowed DIP Claims such non-consenting RBL Lender will receive such treatment as may be agreed or as may otherwise comply with the Bankruptcy Code.

As set forth in further detail in the amended Exit Term Sheet attached to the Amended Commitment Letter, a copy of which is annexed hereto as **Exhibit B**, on the Effective Date, the DIP Facility and the remaining principal amount of any Allowed RBL Claims of each RBL Lender that executes the Amended Commitment Letter by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of creditor participations under the Exit Credit Agreement (the "**Exit Revolving Facility**") that will be subject to a Borrowing Base (as defined in the Exit Term Sheet) and with commitments in an aggregate maximum principal amount of up to $629,420,912 (less the aggregate principal amount of any Exit Term Facility (as defined below)). If there are any non-consenting RBL Lenders, the aggregate principal amount of any Allowed RBL Claims of each RBL Lender that has not elected to participate in the Exit Revolving Facility will automatically be converted to a non-amortizing last-out term loan facility secured in a manner *pari passu* with the Exit Revolving Facility (the "**Exit Term Facility**").[4]

The Debtors and the Exit Commitment Parties' original agreements are memorialized in that certain $314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility and $629,420,912 Senior Secured Revolving Exit Facility Commitment Letter, dated October 18, 2019 (the "**Existing Commitment Letter**," and as amended, restated or supplemented from time to time including pursuant to the amendment accomplishing the modifications described above, the "**Amended Commitment Letter**"). If the Exit Facility Conversion Date (as defined in the Amended Commitment Letter) occurs prior to November 1, 2020, then (based on a reserve report prepared as of December 31, 2019), the Initial Borrowing Base (as defined in the Amended Commitment Letter) shall be $650,000,000; *provided, however*, that if the Exit Facility Conversion Date has not occurred prior to November 1, 2020,

---

[4] The Debtors do not anticipate that any RBL Claims will convert into the Exit Term Facility because holders of 100% in aggregate principal amount of the Claims under the Debtors' RBL Facility agreed to participate in the Exit Revolving Facility in the Existing Commitment Letter, and the Debtors are hopeful that the holders will also execute the Amended Commitment Letter.

then such Initial Borrowing Base may be redetermined by the Exit Facility Agent and the RBL Lenders in accordance with the methodology described in the Amended Commitment Letter using the reserve report prepared as of June 30, 2020, and required to be delivered under the DIP Facility Credit Agreement on or before September 30, 2020 and such other information as required under the DIP Facility Credit Agreement.

### C.     UCC Challenge Period

On January 8, 2020, the Debtors, Apollo Management Holdings, L.P. ("**Apollo**") and Elliot Management Corporation ("**Elliot**" and together with Apollo, the "**Initial Supporting Noteholders**") reached an agreement in principle with the Creditors' Committee that resolved the Creditors' Committee's objections to confirmation of the Prior Plan. The detailed terms of the agreement in principle were subsequently negotiated among the Creditors' Committee, the Commitment Parties, and the Debtors, resulting in a settlement (the "**UCC Settlement**").

In connection with the UCC Settlement, the Creditors' Committee agreed to certain limited modifications of its rights under the DIP Order [Docket No. 730] (the "**DIP Order Amendment**"). The Creditors' Committee agreed that it would not assert a Challenge to the RBL Obligations or otherwise against the RBL Secured Parties (as such terms are defined in the DIP Order). In addition, and subject to the foregoing, the Creditors' Committee's investigation, discovery or prosecution of any Challenge would be stayed (and the Challenge Period would be accordingly stayed and tolled solely for the Creditors' Committee) subject to the occurrence of the Effective Date, the Debtors' repudiation or cessation to prosecute the Plan, or certain other events (the "**Challenge Stay Period**"). Further, upon the occurrence of the Effective Date, the Challenge Period would expire as to the Creditors' Committee. The Debtors memorialized the foregoing agreements in a DIP Order Amendment filed with the Bankruptcy Court.

Subsequently, when the Original Confirmation Order was vacated by the Bankruptcy Court, and the Backstop Agreement and Plan Support Agreement were terminated, the Debtors and Creditors' Committee entered into another agreement to further modify the DIP Order [Docket No. 1105] (the "**Second DIP Order Amendment**"). Pursuant to the Second DIP Order Amendment, subject to the right of the Creditors' Committee to seek a further extension by order of the Bankruptcy Court for good cause shown, the Challenge Stay Period was extended through the date that is 45 calendar days from the earlier of (i) June 6, 2020, (ii) the date on which the Debtors file a motion to approve a disclosure statement for a modified chapter 11 plan, or (iii) the date on which the Debtors file a motion to approve bidding procedures for the sale of all or substantially all of the Debtors' assets. Accordingly, the Challenge Stay Period expires on July 21, 2020.

### D.     Inquiries

If you have any questions about the packet of materials you have received, please contact Prime Clerk LLC, the Debtors' voting agent (the "**Voting Agent**"), at 1-877-502-9869 (domestic toll-free) or 1-917-947-2373 (international). Additional copies of this Disclosure Statement, the Plan, or the Plan Supplement (when filed) are available upon written request made to the Voting Agent at the following address:

EP Energy Ballot Processing
c/o Prime Clerk, LLC
830 Third Avenue, 3rd Floor
New York, NY 10022

Copies of this Disclosure Statement, which includes the Plan and the Plan Supplement (when filed) are also available on the Voting Agent's website, https://cases.primeclerk.com/EPEnergy.  PLEASE DO NOT DIRECT INQUIRIES TO THE BANKRUPTCY COURT.

WHERE TO FIND ADDITIONAL INFORMATION: The Company may provide additional information, including, but not limited to, financial reports, which may be obtained by visiting the Company's website at  http://www.epenergy.com/financial-reports.html.  The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on March 25, 2020 is incorporated as if fully set forth herein and is a part of this Disclosure Statement.

## II.
## SUMMARY OF PLAN TREATMENT

The following table summarizes: (1) the treatment of Claims and Interests under the Plan; (2) which Classes are impaired by the Plan; (3) which Classes are entitled to vote on the Plan; and (4) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, *see* Section VI—Summary of the Plan below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in Section XI.C.4—Valuation below.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 1 (Other Secured Claims) | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the reasonable consent of the Requisite 1.125L Noteholders (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | Unimpaired **(Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |
| 2 (Other Priority Claims) | The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the reasonable consent of the Requisite 1.125L Noteholders (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. | Unimpaired **(Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A  Estimated Percentage Recovery: N/A |

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 3 (RBL Claims) | Each holder of an Allowed RBL Claim that executes the Amended Commitment Letter by the Voting Deadline shall receive on a dollar-for-dollar basis, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement; *provided* that each holder of an Allowed RBL Claim that does not execute the Amended Commitment Letter by the Voting Deadline shall receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement. | Impaired **(Entitled** to vote) | Estimated Allowed Amount: $314,710,456 Estimated Percentage Recovery: 100% |
| 4 (1.125L Notes Claims) | On the Effective Date, each holder of an Allowed 1.125L Notes Claim will receive on account of such Allowed 1.125L Notes Claim, in full and final satisfaction of such Allowed 1.125L Notes Claim, its Pro Rata share of 100% of the New Common Shares (which shall be distributed to holders of Allowed 1.125L Notes Claims on or about the Effective Date), subject to dilution on the Effective Date solely by the EIP Shares.[5] On the Effective Date the 1.125L Notes Indenture will be cancelled, released, and extinguished and will be of no further force or effect except as set forth herein, whether surrendered for cancellation or otherwise. | Impaired **(Entitled** to vote) | Estimated Allowed Amount: $1,000,000,000[6] Estimated Percentage Recovery: 38.53% |

---

[5]  Ten percent (10%) of the New Common Shares on the Effective Date, on a fully diluted basis (including shares issuable under the Employee Incentive Plan), will be reserved for issuance under the Employee Incentive Plan.

[6]  For simplicity, the estimated Allowed amount of 1.125L Notes Claims includes the aggregate original principal amount of $1 billion plus any "Applicable Premium" due under the 1.125L Notes Indenture, accrued and unpaid interest thereon and any other amounts due under the 1.125L Notes Indenture and applicable law.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 5A (Unsecured Claims) | All Unsecured Claims (excluding, for the avoidance of doubt, any Convenience Claim) shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Unsecured Claims will not receive any distribution on account of such Allowed Unsecured Claims. | Impaired **(Not entitled** to vote because deemed to reject) | Estimated Allowed Amount: $3,526,351,425 Estimated Percentage Recovery: N/A |
| 5B (Parent Unsecured Claims) | Except to the extent that a holder of a Parent Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Parent Unsecured Claim, each holder of an Allowed Parent Unsecured Claim will receive, on the later of (i) the Effective Date, and (ii) the date on which such Parent Unsecured Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in cash of 100% of such Allowed Parent Unsecured Claim, or (b) its Pro Rata share of the Cash on EP Energy's balance sheet on the Effective Date. | Impaired **(Entitled** to vote)[7] | Estimated Allowed Amount: $692.36 Estimated Percentage Recovery: 100%[8] |

---

[7] Class 5B is assumed to be Impaired solely for purposes of soliciting vote to accept or reject the Plan. The Debtors reserve all rights to the extent that Class 5B is in fact Unimpaired.

[8] As of the date hereof, the Debtors believe that the class of Parent Unsecured Claims consists of one Allowed Claim totaling $692.36 and that Allowed Parent Unsecured Claim will ultimately be paid in full.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 6 (Convenience Claims) | Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of (i) the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount. Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: $1,750,000 Estimated Percentage Recovery: 10%[9] |
| 7 (Intercompany Claims) | On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' or Reorganized Debtors' discretion, subject to the reasonable consent of the Requisite 1.125L Noteholders. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A Estimated Percentage Recovery: N/A |
| 8 (Subordinated Claims) | All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims. | Impaired (**Not entitled** to vote because deemed to reject) | Estimated Allowed Amount: N/A Estimated Percentage Recovery: N/A |

---

[9] Based on holders of General Unsecured Claims less than the Convenience Claim amount (*i.e.*, assuming no holders of Claims in Class 5A elect to treat their Claims as Convenience Claims), the Debtors estimate that Class 6 Claims will recover 10% of such Allowed Convenience Claim. Otherwise, holders of Convenience Claims will receive their Pro Rata share of the Convenience Claim Distribution Amount.

| Class and Designation | Treatment | Impairment and Entitlement to Vote | Estimated Allowed Amount and Approx. Percentage Recovery |
|---|---|---|---|
| 9 (Existing Parent Equity Interests) | Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $300,000 in Cash. On the Effective Rata Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. | Impaired (**Entitled** to vote) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 10 (Other Equity Interests) | Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise. No holder of Other Equity Interests will receive a distribution. | Impaired (**Not entitled** to vote because deemed to reject) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |
| 11 (Intercompany Interests) | Intercompany Interests are Unimpaired. On the Effective Date, all Intercompany Interests, the Debtors' or the Reorganized Debtors' discretion, subject to the reasonable consent of the Requisite 1.125L Noteholders, will be (i) cancelled (or otherwise eliminated) or (ii) reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure and shall otherwise receive no recovery or distributions. | Unimpaired (**Not entitled** to vote because presumed to accept) | Estimated Allowed Amount: N/A<br><br>Estimated Percentage Recovery: N/A |

## III.
## OVERVIEW OF DEBTORS' OPERATIONS

### A.    Business Overview

#### 1.    General Overview

EP Energy operates as an independent exploration and production company engaged in the acquisition and development of unconventional onshore oil and natural gas properties in the United States. In 2018, EP Energy had operating revenues of approximately $1.324 billion. The Company's revenues are generated primarily through the physical sale of oil, natural gas, and natural gas liquids to third-party customers at spot or market prices under both short and long-term contracts, as well as settlements of the Company's in-the-money commodity hedge positions. The Debtors operate through a diverse base of producing assets and are focused on the development of drilling inventory located in three areas: the Eagle Ford shale in South

Texas, the Permian basin in West Texas, and Northeastern Utah. The Debtors have established significant contiguous leasehold positions in each of their three areas, representing approximately 463,000 net acres in total (as of May 2019).

The Debtors' strategy is to invest in opportunities that provide the highest return across their asset base, continually seek out operating and capital efficiencies, effectively manage costs, and identify accretive acquisition opportunities and divestitures—all with the objective of enhancing the Debtors' portfolio, growing asset value, improving cash flow and increasing financial flexibility. Each of the Debtors' areas is characterized by a long-lived reserve base and high drilling success rates. The Debtors' mission is to set the standard for the efficient development of hydrocarbons in the United States.

In addition to opportunities in its existing portfolio, the Company continuously explores strategic acquisitions of leasehold acreage or acquisitions of producing assets that allow the Company to leverage existing expertise in its operating areas, balance exposure to regions, basins and commodities, help achieve or enhance risk-adjusted returns competitive with those available in existing programs and increase reserves. The Company also continuously evaluates its asset portfolio and sells oil and natural gas properties if such properties no longer meet long-term objectives.

As of the Petition Date, the Debtors employed approximately 360 employees and a supplemental workforce of approximately 180 temporary employees and independent contractors in their operations.

## 2. Drilling Operations

The Debtors' operations are capital-intensive, with capital expenditures and asset acquisitions in 2019 totaling approximately $536 million in the aggregate ($517 million excluding acquisitions). In 2019, the Debtors completed 67 gross wells, and as of December 31, 2019 had a total of 41 gross wells drilled, but not completed, across its programs. The Debtors operate approximately 95% of their producing wells. Further, during 2019, the Debtors completed (i) 54 gross wells in the Eagle Ford for a total of 847 net operated wells, (ii) 13 gross wells in Northeastern Utah for a total of 345 net operated wells, and (iii) 0 gross wells in the Permian basin for a total of 353 net operated wells.

As of December 31, 2019, the Debtors had proven reserves of 189.7 million barrels of oil equivalent ("**MMBoe**"), including 92.9 million barrels of proved oil reserves, 39.5 million barrels of proved natural gas liquids reserves, and 343.8 billion cubic feet of proved natural gas reserves, representing 49%, 21%, and 30%, respectively, of total proved reserves. All of the Company's total proved reserves are proved developed producing assets, which generated average production of 70.9 thousand barrels of oil equivalent per day ("**MBoe/d**") in 2019 from approximately 1,806 gross wells. During the 12 months ended December 31, 2019, the Company

produced on average approximately 70,898 Boe per day, compared to 80,654 Boe per day during the same period in 2018.[10]

### 3.    Joint Ventures

In addition to the Debtors' owned properties, the Debtors are party to certain joint ventures in their asset areas to enhance the development of wells, hold acreage, and/or improve near-term economics in its existing programs.  In Northeastern Utah, the Company's joint venture partner is participating in the development of 53 wells, and as of December 31, 2019, the Debtors drilled and completed 51 wells under the joint venture agreement.   Under the joint venture agreement, the Debtors fund less than half of the drilling costs for a 50% working interest in the joint venture wells and sell the associated production to its joint venture partner.

Moreover, since 2017, EP Energy has been party to a joint venture with Wolfcamp Drillco Operating L.P. ("**Jeter Drillco**") to fund future oil and natural gas development in the Permian basin and the Eagle Ford Shale (the "**Jeter Drillco JV**").  Under the Jeter Drillco JV, Jeter Drillco agreed to fund 60% of the estimated drilling, completion, and equipping costs in the joint venture wells, divided into two approximately $225 million investment tranches, in exchange for a 50% working interest.  The Company is the operator of Jeter Drillco's assets.  Under the Jeter Drillco JV, once Jeter achieves a specified internal rate of return on its invested capital in each tranche, a portion of its working interest reverts to the Company.  The Debtors have completed the planned activity in the first tranche, having completed 69 wells in the Permian basin.  In April 2018, the parties amended the Jeter Drillco JV to direct the second tranche investment to the Eagle Ford shale.  Wells in the Eagle Ford shale began producing in the third quarter of 2018.  As of the second quarter 2019, the Debtors drilled and completed all wells in the Eagle Ford under the amended agreement and the Debtors have completed the planned activity in the second tranche.

### 4.    Hedging

The Company utilizes derivative contracts to hedge its exposure to commodity price fluctuations and reduce the variability in the Company's cash flows associated with anticipated sales of future oil and natural gas production.  As of March 31, 2020, the Company had derivative contracts in the form of fixed price swaps and three-way collars on 10.6 MMBbls of oil in 2020 (5.8 MMBbls in three-way collars, 4.8 MMBbls in crude oil fixed price swaps) and 1.1 MMBbls in 2021 (0.9 MMBbls in three-way collars and 0.2 MMBbls in crude oil fixed price swaps).  In addition to the contracts above, the Company has derivative contracts related to locational basis differences on its oil production in the form of 1.1 MMBbls in cushing basis swaps in 2020.

All of the Debtors' open hedging agreements relate to its crude oil production.  As of March 31, 2020, the aggregate mark-to-market value of all derivative assets and liabilities related to Company's prepetition and postpetition hedging agreements, calculated using standard industry valuation processes, was a net derivative asset of approximately $212 million (subject to daily fluctuations).  The Company's obligations under its hedges are secured by the same collateral

---

[10]  Average production was lower as a result of, among other reasons downstream third-party operational issues and constraints in the Eagle Ford shale and Permian basin, fewer wells placed on production in the Eagle Ford shale, reduced drilling activity in Northeastern Utah, and a reduction in capital allocated to the Permian basin.

(on the same priority) that secures its obligations under the RBL Credit Agreement. All of the Debtors' hedge counterparties are also RBL Lenders under the RBL Facility. Pursuant to the DIP Order, the Debtors' Prepetition Hedge Obligations and any Postpetition Hedge Agreements with a Postpetition Hedge Bank are treated as DIP Obligations (each as defined in the DIP Order).

**B.     Debtors' Corporate History and Structure**

**1.     Corporate History**

On February 14, 2012, affiliates of Apollo, Riverstone Holdings LLC ("**Riverstone**"), Access Industries, Inc. ("**Access**"), and Korean National Oil Corporation ("**KNOC**", and collectively with Apollo, Riverstone, and Access, the "**Sponsors**"), along with other co-investors, formed EPE Acquisition, LLC ("**AcqCo**"). On May 24, 2012, the Sponsors acquired Debtor EP Energy LLC's predecessor and its subsidiaries from El Paso Corporation for approximately $7.2 billion in cash in a spin-out sale transaction that was consummated in connection with the $21.1 billion cash and stock merger of El Paso Corporation and Kinder Morgan, Inc. The acquisition was partly financed through the issuance of approximately $4.25 billion of debt by the Company.

On August 30, 2013, EP Energy was formed and the Sponsors and other members of AcqCo contributed their membership interests in AcqCo to EP Energy in exchange for common stock in EP Energy, resulting in EP Energy becoming the 100% equity owner of AcqCo. Subsequently, in January 2014, EP Energy completed an initial public offering of 35.2 million shares of Class A common stock (approximately 14% of Class A common stock at the time) and received net proceeds of approximately $664 million (the "**2013 IPO**"). EP Energy's Class A common stock commenced trading on the New York Stock Exchange (the "**NYSE**") on January 17, 2014 under the ticker symbol "EPE". EP Energy's Class A common stock was delisted from the NYSE May 23, 2019 and, beginning on May 24, 2019, the Class A common stock of EP Energy began trading on the OTC Pink marketplace under the symbol "EPEG". On April 24, 2020, EP Energy deregistered its Class A common stock, and suspended its public reporting obligations with the SEC.

**2.     Debtors' Corporate and Governance Structure**

Collectively, EP Energy and its direct and indirect subsidiaries consist of nine (9) entities organized under the laws of the State of Delaware, eight (8) of which are Debtors in these Chapter 11 Cases.[11] A chart illustrating the Debtors' organizational structure as of the Petition Date is annexed hereto as **Exhibit C**.

EP Energy's board of directors generally functions as the Company's governing board. On June 4, 2019, the Board of Directors of EP Energy (the "**Board**") established the Special Committee, comprised of three independent directors, to evaluate the Company's strategic alternatives, and to the extent applicable, negotiate, and implement one or more capital structure transactions. Accordingly, the Special Committee, by virtue of its mandate, serves as the

---

[11] EPE Employee Holdings II, LLC ("**Employee Holdings**") is the only subsidiary of EP Energy that is not a debtor in these Chapter 11 Cases. Employee Holdings has no operations or liabilities. Its only asset is Class B common stock of EP Energy held for the benefit of current and former employees of the Company. The Company believes that the Class B common stock is worthless.

Company's governing body with respect to the restructuring and these Chapter 11 Cases. The Special Committee approved the Debtors' entry into the Backstop Commitment Agreement and Plan Support Agreement as well as the filing of the Plan.

Each Debtor other than EP Energy (which was formerly a NYSE-listed corporation) is either a member-managed or manager-managed limited liability company or a corporation with a one-person or two-person board of directors, with the exception of one partnership entity that is managed by its general partner. EP Energy's Board consists of the following thirteen directors:

| Name | Position |
|------|----------|
| Alan R. Crain | Chairman; Independent Director; Special Committee Member |
| Gregory A. Beard | Director |
| Scott R. Browning | Director |
| Carol Flaton | Independent Director; Chair of Special Committee |
| Jae Hwii Gwag | Director |
| Wilson B. Handler | Director |
| J. Barton Kalsu | Independent Director; Special Committee Member |
| Rajen Mahagaokar | Director |
| Russell E. Parker | Director; President and CEO |
| Robert C. Reeves | Independent Director |
| Robert Tichio | Director |
| Rakesh Wilson | Director |
| Donald A. Wagner | Director |

The Company has highly experienced managers for its operations. The Company's core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Russell E. Parker | President and Chief Executive Officer |
| Kyle A. McCuen | Senior Vice President and Chief Financial Officer |
| David Rush | Chief Restructuring Officer |
| Chad D. England | Senior Vice President, Operations |
| Jace D. Locke | Vice President, General Counsel and Corporate Secretary |
| Peter D. Addison | Vice President, Land and Land Administration |
| Mark E. Hargis | Vice President, Geoscience |
| Dennis M. Price | Vice President, Marketing |

### C.  **Equity Ownership**

EP Energy was formerly a publicly listed company that filed annual reports with, and furnished other information to, the SEC. As indicated above, the Company's Class A common stock was delisted from the NYSE on May 23, 2019 and, beginning on May 24, 2019, the Class A common stock of the Company began trading on the OTC Pink marketplace under the symbol "EPEG". On April 24, 2020, EP Energy deregistered its Class A common stock, and suspended its public reporting obligations with the SEC.

As of June 30, 2020, (i) 254,248,648 shares of EP Energy's $0.01 par value Class A common stock were issued and outstanding, and (ii) 237,256 shares of the EP Energy's $0.01 par value Class B common stock were issued and outstanding.

Holders of Class A common shares are entitled to one vote per Class A shares on all matters to be voted on by EP Energy's stockholders.  The Company understands that EP Energy's Class A common stock is currently held 39.1% by Apollo as record holder, 13.7% by Access, 12.3% by Riverstone, 12.3% by KNOC, and 22.6% by other shareholders.  All of the other Debtors are wholly-owned direct or indirect subsidiaries of EP Energy.

Class B common shares are non-voting shares that are held by certain current and former employees who were issued such shares in 2012, in addition to a smaller portion that were issued to non-debtor affiliate Employee Holdings in late 2013 in advance of the Company's 2013 IPO.  Class B common shares entitle holders to receive proceeds in the form of cash or Class A common shares upon certain performance events that did not occur prior to the Petition Date (*e.g.*, the Sponsors receiving a return of at least 1.0x their invested capital plus a stated return).

EP Energy terminated the registration underlying its prepetition stock-based compensation plans (the 2014 Omnibus Incentive Plan and 2017 Employment Inducement Plan), as of March 31, 2020, and no longer issues equity compensation or other stock-based awards to any of the Company's employees or non-employee directors.

### D.     Prepetition Indebtedness

Immediately prior to the Petition Date, the Debtors' funded prepetition indebtedness was approximately $4.909 billion (plus accrued and unpaid interest and other expenses), consisting of the following:

| Name | Principal Amount (approximate) | Lien Priority and Collateral |
|---|---|---|
| RBL Claims | $629 million[12] | First lien on substantially all of the Debtors' assets |
| 1.125L Notes Claims | $1 billion | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims |
| 1.25L Notes Claims | $500 million | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims and 1.125L Notes Claims |
| 1.5L Notes Claims | $2.092 billion | First lien on substantially all of the Debtors' assets, subject to prior payment of RBL Claims, 1.125L Notes Claims, and 1.25L Note Claims |
| Unsecured Notes Claims | $688 million | N/A |
| **Total** | **$4.909 billion** | |

---

[12] Including $27 million of outstanding letters of credit.

In connection with the DIP Order, the Bankruptcy Court approved the "roll-up" of 50% of the commitments under the RBL Facility into the DIP Facility. Accordingly, the current principal amount of the RBL Claims is approximately $315 million.

The below description of the Debtors' prepetition indebtedness is for informational purposes only and is qualified in its entirety by reference to the specific agreements evidencing such indebtedness.

### 1. RBL Claims

Certain of the Debtors are parties to that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified, or otherwise supplemented from time to time, the "**RBL Credit Agreement**", and the claims thereunder, the "**RBL Claims**") between EP Energy LLC, as borrower (the "**RBL Borrower**"), AcqCo, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in its capacity as such, the "**RBL Agent**") and issuing bank, and the lenders party thereto (the "**RBL Lenders**") that provided for a commitment of approximately $629 million, including a sublimit for a letter of credit facility (the "**RBL Facility**"). As noted above, in connection with the DIP Order, the Bankruptcy Court approved the "roll-up" of 50% of the commitments under the RBL Facility into the DIP Facility. Accordingly, the current principal amount of the RBL Claims is approximately $315 million.

All of the Debtors, other than EP Energy and the RBL Borrower, are guarantors under the RBL Facility. As of the Petition Date, the RBL Facility was fully drawn, including approximately $27 million in letters of credit that remained outstanding but were undrawn as of the date thereof, plus any applicable interest, fees, and other amounts outstanding under the RBL Credit Agreement. The RBL Claims are secured by a first-priority security interest in and liens (subject to certain permitted liens) on substantially all of the assets of AcqCo and its direct and indirect subsidiaries, including the vast majority of such entities' oil and natural gas properties, cash, accounts receivable, and other material assets.

On July 22, 2019, in the ordinary course of the Company's business and to reduce interest exposure, the Company utilized excess cash on hand to pay down its RBL Facility by approximately $60 million. Subsequently, to provide the Company with increased liquidity and help ensure that the Debtors' operations could continue in the ordinary course of business in a potential restructuring, on August 1, 2019, the Debtors drew down on the remaining capacity under their RBL Facility (approximately $268 million).

### 2. 1.125L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**1.125L Indenture**", and the claims thereunder, the "**1.125L Notes Claims**"), dated as of May 23, 2018, among EP Energy LLC and Everest Acquisition Finance Inc. ("**Acquisition FinanceCo**", and together with EP Energy LLC, the "**EP Co-Issuers**") as co-issuers, each of the guarantors named therein (each of EP Energy LLC's direct and indirect subsidiaries, the "**Debtor Guarantors**"), and UMB Bank, National Association, as successor indenture trustee and notes collateral agent. The obligations under the 1.125L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens on substantially all of the assets of the EP Co-Issuers and the Debtor Guarantors,

including the vast majority of such entities' oil and natural gas properties, cash, accounts receivable, and other material assets (the "**Collateral**").

The liens securing the obligations under the 1.125L Indenture are junior in priority to the liens securing the RBL Claims. As of the Petition Date, the aggregate amount outstanding under the 1.125L Indenture was $1 billion in original principal amount, plus any "Applicable Premium" due under the 1.125L Indenture, any unpaid interest, fees, premiums, or other amounts due thereunder.

### 3. 1.25L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**1.25L Indenture**", and the claims thereunder, the "**1.25L Notes Claims**"), dated as of November 29, 2016, among the EP Co-Issuers, the Debtors Guarantors, and BOKF, NA, as successor indenture trustee and notes collateral agent. The obligations under the 1.25L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 1.25L Indenture are junior in priority to the liens securing the RBL Claims and the 1.125L Notes Claims. As of the Petition Date, the aggregate amount outstanding under the 1.25L Indenture was $500 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

### 4. 1.5L Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2024 1.5L Indenture**", and the claims thereunder, the "**2024 1.5L Notes Claims**"), dated as of January 3, 2018, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee and notes collateral agent. The obligations under the 2024 1.5L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 2024 1.5L Indenture are junior in priority to the liens securing the RBL Claims, the 1.125L Notes Claims, and the 1.25L Notes Claims, and are *pari passu* with the 2025 1.5L Notes Claims (as defined herein). As of the date hereof, the aggregate amount outstanding under the 2024 1.5L Indenture is $1.092 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2025 1.5L Indenture**", and together with the 2024 1.5L Indenture, the "**1.5L Indentures**", and the claims thereunder, the "**2025 1.5L Notes Claims**", and together with the 2024 1.5L Notes Claims, the "**1.5L Notes Claims**"), dated as of February 6, 2017, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee and notes collateral agent. The obligations under the 2025 1.5L Indenture are jointly and severally guaranteed by each of the Debtor Guarantors and are secured by junior-priority liens over the Collateral. The liens securing the obligations under the 2025 1.5L Indenture are junior in priority to the liens securing the RBL Claims, the 1.125L Notes Claims, and the 1.25L Notes Claims, and are *pari passu* with the 2024 1.5L Notes Claims. As of the Petition Date, the aggregate amount outstanding under the 2025 1.5L Indenture was $1 billion in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

## 5.    Intercreditor Agreements

The rights of the Debtors' prepetition secured parties with respect to the Collateral are governed by three intercreditor agreements (collectively, the "**Intercreditor Agreements**"):

(a)    the rights as between the RBL Agent on one hand, and the notes collateral agent under the 1.125L Indenture on the other, are governed by that certain *Senior Priority Lien Intercreditor Agreement* dated as of May 23, 2018, with RBL Claims being "First-Priority Lien Obligations" thereunder, and 1.125L Notes Claims being "Second-Priority Lien Obligations" thereunder;

(b)    the rights as between the RBL Agent and the notes collateral agent under the 1.125L Indenture on one hand, and the notes collateral agent under the 1.25L Indenture on the other, are governed by that certain *Additional Priority Lien Intercreditor Agreement* dated as of November 29, 2016, with RBL Claims and 1.125L Notes Claims being "First-Priority Lien Obligations" thereunder, and 1.25L Notes Claims being "Second-Priority Lien Obligations" thereunder; and

(c)    the rights as between the RBL Agent and the notes collateral agent under the 1.125L Indenture and the 1.25L Indenture on one hand, and the notes collateral agent under the 1.5L Indentures on the other, are governed by that certain *Priority Lien Intercreditor Agreement* dated as of August 24, 2016, with RBL Claims, 1.125L Notes Claims, and 1.125L Notes Claims being "First-Priority Lien Obligations" thereunder, and 1.5L Notes Claims being "Second-Priority Lien Obligations" thereunder.

The Intercreditor Agreements govern, among other things, the priority of distribution of the Collateral and proceeds thereof between the prepetition secured parties.

## 6.    Unsecured Notes Claims

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2020 Unsecured Notes Indenture**"), dated as of April 24, 2012, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Trust, National Association, as indenture trustee.  The obligations under the 2020 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2020 Unsecured Notes Indenture was $182 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2022 Unsecured Notes Indenture**"), dated as of August 13, 2012, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Services Fund Society, FSB, as indenture trustee.  The obligations under the 2022 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2022 Unsecured Notes Indenture was $182 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

Certain of the Debtors are party to that certain Indenture (as amended, modified, or otherwise supplemented from time to time, the "**2023 Unsecured Notes Indenture**"), dated as of May 28, 2015, among the EP Co-Issuers, the Debtors Guarantors, and Wilmington Services Fund Society, FSB, as indenture trustee.  The obligations under the 2023 Unsecured Notes Indenture are jointly and severally guaranteed by each of the Debtor Guarantors.  As of the Petition Date, the aggregate amount outstanding under the 2023 Unsecured Notes Indenture was $323 million in principal amount, plus any unpaid interest, fees, premiums, or other amounts due thereunder.

### 7.    Other Claims

The Company has other claims against it that do not consist of long-term funded debt.  Among other things, as described below, the Company is a defendant in numerous civil actions that may give rise to substantial unsecured claims, most of which are contingent, unliquidated, and disputed.  The Debtors estimate that the aggregate amount of litigation claims asserted against the Debtors is approximately $75 million.[13]

Further, in the ordinary course of their business, the Debtors incur trade debt with numerous vendors in connection with their operations.  The Company has a number of unsecured prepetition obligations to certain of its vendors that do not benefit from state-law lien rights or setoff rights.  However, a significant number of the Debtors' prepetition trade obligations have been satisfied by the Debtors in accordance with first day relief granted by the Bankruptcy Court (as described below).

On November 18, 2019, the Debtors filed their schedules of assets and liabilities (the "**Schedules**") and statements of financial affairs (the "**Statements**") detailing known claims against the Debtors. Since the expiration of the Bar Date (as defined below), the Debtors have been analyzing the approximately 985 proofs of claim filed in these Chapter 11 Cases.  As of the date hereof, the Debtors estimate that Allowed Unsecured Claims against the Debtors, after all Unsecured Claims have been reconciled, will be approximately $3,526,351,425,[14] including 1.25L Notes Claims of $513,666,667, 1.5L Notes Claims of $2,186,617,532, Unsecured Notes Claims of $710,067,228, and General Unsecured Claims (including litigation claims, trade claims, and contract rejection claims) in the aggregate amount of approximately $116,000,000.  The Debtors estimate that Allowed Parent Unsecured Claims are *de minimis*.

The Debtors reviewed, analyzed, and reconciled objections to the filed Claims.  The Debtors identified Claims they believe should be disallowed because, among other things, the Claims are duplicative, without merit, overstated, or such Claims have already been paid pursuant to orders of the Bankruptcy Court.  The Debtors have already objected to 275 Claims [Docket Nos. 653, 654, 655, 656, 657, 707, 708, 709].  The Bankruptcy Court sustained objections to 160 of these Claims, which are now either disallowed or allowed Claims at amounts agreed upon by the

---

[13]  Litigation claims amounting to approximately $460 million have been filed, including MSB filing duplicative $64 million claims seven (7) times. Therefore, excluding duplicates, the Debtors' estimate of litigation claims is $75 million.

[14]  The 1.125L Notes deficiency claim is not included in the total for Unsecured Claims amount.

Debtors and the respective Claimant [Docket Nos. 1169, 1170, 1171, 1172, 1173, 1174, 1175, 1176].

### 8.    Prepetition Legal Proceedings

Certain Debtors are named as defendants from time to time in routine litigation proceedings including, but not limited to, personal injury and breach of contract disputes. For example, see Section V.H. herein describing the MFN Lawsuit (as defined below). In management's view, Claims made in connection with the legal proceedings will be Allowed in an amount that is less than the claimed amount, and the outcome of these proceedings will not have a material adverse effect on the Debtors' financial position, results of operations, or cash flows. The Debtors, however, cannot predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

### 9.    Intercompany Claims

In the ordinary course of business, the Debtors enter into intercompany transactions with one another ("**Intercompany Transactions**," and any intercompany receivable and payable generated pursuant to an Intercompany Transaction, "**Intercompany Claim**") including when, among other things, (i) Debtors EP Energy, EP Energy E&P Company, L.P. ("**EP OpCo**"), and EP Energy LLC receive funds into their bank accounts on behalf of other Debtors, (ii) Debtors EP Energy, Ep OpCo, EP Energy Management, L.L.C., and EP Energy LLC make payments and disbursements out of their Bank Accounts on behalf of other Debtors, and (iii) funds are transferred between and among the Debtors.[15]

Intercompany Transactions and Intercompany Claims between Debtors are not generally settled by actual transfers of cash among the Debtors. Instead, the Debtors track all Intercompany Transactions and Intercompany Claims electronically in their centralized accounting system, the results of which are recorded concurrently on the applicable Debtor's balance sheets and regularly reconciled. The accounting system requires that all general ledger entries be balanced at the legal-entity level; therefore, when the accounting system enters an intercompany receivable on one entity's balance sheet, it also automatically creates a corresponding intercompany payable on the applicable affiliate's balance sheet. This results in a net balance of zero when consolidating all intercompany accounts.

The Debtors maintain records of all transactions processed through their cash management system. During these Chapter 11 Cases, the Debtors have kept and will continue to keep records of any postpetition Intercompany Transactions and Intercompany Claims.

---

[15] The Debtors do not transact or have any intercompany claims with their non-Debtor affiliate, EPE Employee Holdings II, LLC. In addition, EP Parent is not a debtor or creditor on account of any Intercompany Claim. The Debtors' Intercompany Claims are detailed in the Schedules and Statements, available at: https://cases.primeclerk.com/EPEnergy/Home-DocketInfo?DocAttribute=4807&DocAttrName=SchedulesSOFA.

10. **Decommissioning, Reclamation and Plugging and Abandonment Obligations for Federal Oil & Gas Leases**

The United States asserts that (i) the Debtors that are lessees ("**Federal Debtor Lessees**") under federal and Indian oil and gas leases and grants of rights-of-way (collectively, the "**Federal Leases**") and have, and will retain, continuing decommissioning, plugging and abandonment and reclamation obligations (collectively, the "**P&A Obligations**") under the terms of their Federal Leases and the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331 *et seq.* ("**OCSLA**"), the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 *et seq.* ("**MLA**"), the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351 *et seq.* ("**MLAAL**"), the Act of March 3, 1909, 25 U.S.C. § 396 (the "**1909 Act**") and the Indian Mineral Leasing Act, 25 U.S.C. §§ 396a-g ("**IMLA**") and their respective implementing regulations (OCSLA, MLA, MLAAL, the 1909 Act, IMLA and any other statutes or applicable implementing regulations shall be referred to as the "Applicable Federal Laws") until such P&A Obligations are completed; (ii) Federal Debtor Lessees' offshore P&A Obligations are joint and several in nature (*see* 30 C.F.R. § 250.1701); (iii) for onshore and Indian leases, P&A Obligations are continuing in nature and cannot be divested by assignment or transfer (*see* 43 C.F.R. §§ 3106.7-2, 3106.7-6; 25 C.F.R. §§ 211.47(c), (d), (e), (g) and (i) (for tribal leases) and 212.47 (applicable to allotted leases)); and (iv) Federal Debtor Lessees must satisfy various maintenance and monitoring obligations, financial assurance obligations and other regulatory obligations as set forth in Applicable Federal Laws. The United States believes that the Federal Debtor Lessees' P&A Obligations, financial assurance obligations, and maintenance and monitoring obligations will likely be significant.

## IV.
## KEY EVENTS LEADING TO
## COMMENCEMENT OF CHAPTER 11 CASES

### A.    Continued Weakness in Oil & Gas Exploration and Production Industry

As has been well documented, the distressed market conditions in the oil and gas industry, which began in 2014 and have been exacerbated by recent events, have negatively impacted all levels of the industry, including upstream companies that produce oil and gas. As evidenced by the numerous chapter 11 filings or other announcements of debt restructurings in the industry, the impact of the volatility of the commodity markets on the Debtors' businesses is clear. Notably, oil and natural gas prices dropped precipitously in 2014 and 2015 and have held at depressed levels for the last several years. Prior to the Petition Date both the decline and the length of this trough have been greater than what anyone in the business could have reasonably anticipated, resulting in a substantial decline in revenue, reserves, and asset values across the industry. Further, in March 2020, for the first time in history, U.S. crude oil futures dropped to below zero (as low as -$37 per barrel for crude oil) as a result of COVID-19 and the Russia-Saudi Arabia price reductions.

The Debtors, of course, have not been immune to these adverse market conditions and the impact on its reserves, cash flow, and ability to service its outstanding indebtedness. As with many of its peers, this drastic and prolonged drop in prices and the severe dislocations it caused to the Debtors' operations have impacted their asset base and put the Debtors in a stressed financial situation.

### B.    Prepetition Restructuring Efforts

#### 1.    Operational Initiatives

In November 2017, the Board announced a change in senior leadership with Russell E. Parker joining the Company and becoming its President and Chief Executive Officer, along with a new streamlined management structure.  In connection with the leadership change, the majority of the prior management team departed the organization.  The change in senior leadership was a move from an asset-based to a function-based organization, which was intended to enable greater flexibility in allocating capital and resources to specific assets and to improve the Debtors' cost structure and create efficiencies.

Further, the Debtors undertook a number of operational efforts to improve its financial position.  Through vendor cost reduction initiatives, business optimization, and general efficiencies, the Debtors significantly reduced their cash operating cost structure.  For example, the Debtors reduced their run-rate general and administrative expenses by approximately 24% and its lease operating expense by 27% since Q3 2017.[16]

#### 2.    Strategic Transactions

Facing a declining revenue and asset-base on account of commodity prices, and approximately $365 million of annual interest expense, in 2018 the Debtors took a number of strategic steps in an effort to improve its asset portfolio and financial flexibility and address its capital structure and liquidity needs, including (i) completing $277 million in acquisitions in the Eagle Ford shale and divesting of certain assets in Northeastern Utah for approximately $177 million, (ii) exchanging approximately $1.147 billion of the Unsecured Notes maturing in 2020, 2022, and 2023, for the new $1.092 billion of 2024 1.5L Notes, (iii) repurchasing $134 million of Unsecured Notes for approximately $89 million in cash, (iv) issuing $1 billion in senior secured 1.125L Notes maturing in 2026 and using the net proceeds to repay in full the outstanding amounts at that time under the RBL Facility, and (v) extending the maturity of the RBL Facility from May 2019 to November 2021.

#### 3.    Leverage and Liquidity Concerns

Despite these efforts, it became apparent that the Debtors' revenue and cash flow generating capacity would not be sufficient to service its outstanding debt on a long-term basis and to maintain the liquidity necessary to operate its businesses and preserve its long-term viability and enterprise value.  In March 2019, EP Energy stated in its Form 10-K annual report that its projections showed that, based on its then-forecasted EBITDAX (assuming approximately $55/barrel of oil), cash on hand, and remaining capacity under the RBL Facility, the Debtors would not have sufficient liquidity available to repay the 2020 Unsecured Notes at maturity and meet their working capital needs and/or fund their planned capital expenditures.[17]

---

[16] Based on Q3 2017 compared to 2019 (through May).

[17] Later, on May 9, 2019, the Company noted in its first-quarter 10-Q that there was substantial doubt about its ability to continue as a going concern.

### 4.    Special Committee Appointed to Oversee Strategic Process

Beginning in April 2019, certain ad hoc committees comprised of certain of the Company's creditors began to organize, engage advisors, and deliver letters to the Company, each asking that the Company consider certain strategic alternatives. These creditors included (i) the Ad Hoc Group, (ii) certain holders of the Company's 1.5L Notes, including Elliott and Apollo, and (iii) an ad hoc group of holders of the Company's Unsecured Notes (as defined herein) (the "**Ad Hoc Unsecured Noteholder Group**"). Around this time, certain 1.5L Noteholders, including Elliott, and the Ad Hoc Unsecured Noteholder Group also delivered unsolicited proposals for potential restructuring and refinancing transactions, respectively.

On June 4, 2019, the Board established the Special Committee (and appointed to it independent members of the Board who are not affiliated with the Sponsors) to evaluate the Company's strategic alternatives, and to the extent applicable, negotiate, and implement one or more capital structure transactions. The Company also retained Weil, Gotshal & Manges LLP ("**Weil**") as counsel, Evercore Group L.L.C. ("**Evercore**") as investment banker, and FTI Consulting, Inc. ("**FTI**") (initially solely as financial advisor) to explore strategic alternatives and assist it in both (i) evaluating certain other sources of incremental liquidity, including additional debt issuances, refinancings, and asset sales, and (ii) potentially developing and implementing a comprehensive plan to restructure its balance sheet, whether in-court or out-of-court. The independent members of the Board also retained Davis Polk & Wardwell LLP ("**Davis Polk**") as counsel and consulted with Davis Polk from time to time regarding various issues. The Special Committee did not retain additional financial advisors or additional legal counsel thereafter.

### 5.    Debtors Engage with Creditors and Other Parties

In the months leading up to the Petition Date, the Company engaged in continuous discussions with its existing stakeholders with respect to a range of strategic transactions, including various out-of-court financing and capital markets transactions and potential comprehensive recapitalization and/or restructuring solutions. Such stakeholders included (i) the Company's RBL Lenders, (ii) the Ad Hoc Group, (iii) the certain 1.5L Noteholders, including Elliot, (iv) Apollo (the Company's largest prepetition equity sponsor and one of the Company's largest noteholders, holding 1.25L Notes and 1.5L Notes), (v) the Ad Hoc Unsecured Noteholder Group, and (vi) certain other creditors. The Debtors also contacted five institutions outside of the Debtors' existing capital structure with respect to liability management options.

The Debtors executed non-disclosure agreements with (i) the advisors to (a) Elliott (Milbank LLP, Houlihan Lokey, Inc., W.D Von Gonten & Co., and DeGolyer and MacNaughton Corp.), (b) Apollo (Paul, Weiss, Rifkind, Wharton & Garrison LLP and Moelis & Company LLC), (c) the Ad Hoc Group (Morrison & Foerster LLP and PJT Partners LP), and (d) the Ad Hoc Unsecured Noteholder Group (Stroock & Stroock & Lavan LLP, Rothschild & Co., and Intrepid Financial Partners), and (ii) certain members of certain of the foregoing constituencies. The Debtors also (x) established a data room to facilitate providing diligence to the foregoing advisors, (y) held a significant number of diligence calls and meetings between management, the Company's advisors and such parties and/or their respective advisors, and (z) participated in a number of in-person meetings with a number of such parties to discuss potential in-court restructurings and out-of-court transactions.

From May to mid-August 2019, the Debtors' advisors had numerous calls and meetings with advisors to (i) the Ad Hoc Group regarding, among other things, the terms of a potential restructuring, (ii) the certain 1.5L Noteholders, including Elliott and Apollo, to discuss a potential debt-for-equity transaction coupled with an equity rights offering, and (iii) the Ad Hoc Unsecured Noteholder Group to discuss a potential new financing transaction and/or unsecured notes repurchase.  During this period, the Special Committee met regularly to analyze and consider EP's strategic options, including the proposals made by the ad hoc committees.  The Special Committee meticulously weighed whether the Company should raise new money financing (including by, through its advisors, soliciting numerous indications of interest from potential lenders) to give the Company runway to continue to implement its business plan and make its scheduled coupon payments, or to implement a comprehensive restructuring of the Company.

The principal out-of-court strategies that the Special Committee considered (among other strategies) involved (i) fully utilizing the ability to raise up to an incremental $371 million of senior secured debt financing for additional funding or as an exchange, (ii) investing assets in an "unrestricted" subsidiary and utilizing such baskets to raise incremental financing to augment the Company's liquidity or fund a cash tender for existing securities of the Company at a discount to par value, and/or (iii) issuing new debt securities for existing securities of the Company at a discount to par value. However, absent an unforeseeable, substantial, and sustained rise in commodity prices, these potential transactions did not offer a sufficient solution to address the Debtors' balance sheet problems.  Further, as commodity prices continued to drop over the summer of 2019, access to the capital markets for oil and gas exploration and production firms became extremely limited.

The Debtors also began negotiating competing restructuring proposals with Elliott and Apollo on one hand, and the Ad Hoc Group, on the other, as well as Exit Facility terms with JPM and other prospective RBL Lenders.  The Debtors also continued to have discussions with other stakeholders and financing sources.

### 6. Utilization of Grace Period and Entry into Forbearance Agreements

Prior to the payment dates for their (i) $40 million coupon payment due on August 15, 2019 for the Company's 2025 1.5L Notes (the "**1.5L Coupon**"), and (ii)  $7.05 million coupon payment due on September 3, 2019 for the Company's 2022 Unsecured Notes, the Debtors elected not to pay such coupons and instead utilized the 30-day grace periods in respect of such coupon payments in order to preserve liquidity and continue negotiations with stakeholders as long as possible.[18]

Frequent discussions with the Debtors' stakeholders continued throughout the grace period.  After entering the grace periods, the Debtors also continued to consider whether an out-of-court refinancing transaction on terms proposed by the Ad Hoc Unsecured Noteholder Group could be consummated, but given market conditions (i) such a transaction did not appear to

---

[18] On August 15, 2019, the Debtors filed an 8-K disclosing that the 1.5L Notes coupon payment would not be made when due.  On September 3, 2019, the Debtors filed an 8-K disclosing that the unsecured coupon payment would not be made when due.

offer a viable long-term capital structure solution for the Debtors, and (ii) in any event, capital providers in the market were not willing to finance the new money required in such a transaction.

To allow discussions to continue past the expiry of the grace period on the 1.5L Coupon, on September 14, 2019, the Debtors entered into forbearance agreements with parties holding more than 70% of the 2025 1.5L Notes (the "**1.5L Forbearance**") through September 22, 2019, and with the RBL Lenders through October 3, 2019 (but terminating upon the termination of the 1.5L Forbearance) (collectively with the 1.5L Forbearance, the "**Forbearance Agreements**"). The 1.5L Forbearance was subsequently extended through October 3, 2019 to allow negotiations to continue.

During this period, EP and its advisors held numerous in-person meetings and conference calls with the principals of and advisors to the Ad Hoc Group, Elliott, and Apollo to discuss EP's go-forward business plan and negotiate the terms of a potential restructuring transaction. The Debtors exchanged competing proposals with these creditors with respect to a potential restructuring backstopped by a new money equity investment in EP. The Debtors also made a proposal to the Ad Hoc Group and the Initial Supporting Noteholders that would provide for all such parties to provide a new money equity investment in the Debtors and support a chapter 11 plan. Further, EP and its advisors engaged in continuing negotiations with its RBL Lenders regarding a potential restructuring, including the consensual use of cash collateral in a chapter 11 case and provision of a committed exit reserve-based lending facility.

### 7. Agreement in Principle with Initial Supporting Noteholders

Ultimately, after months of diligence and negotiations, the Initial Supporting Noteholders agreed in principle to backstop $463 million of an equity rights offering in connection with a deleveraging chapter 11 plan, and no other creditor or ad hoc group agreed to make a new money investment in the Debtors at sufficiently attractive terms. Accordingly, after thoroughly exploring all options available to the Company and extensive negotiations with creditors across the Company's capital structure, the Special Committee authorized the Debtors to reach an agreement in principle with the Initial Supporting Noteholders and commence these Chapter 11 Cases to pursue the transactions contemplated thereby.

### 8. Negotiations Regarding Tax Attributes

In connection with entry into the Plan Support Agreement and the filing of the Prior Plan, the Debtors and the Initial Supporting Noteholders negotiated the treatment of holders of the Existing Parent Equity Interests. During such negotiations, the parties focused on certain tax attributes of EP Parent and its Debtor subsidiaries, including (i) federal net operating loss carryforwards ("**NOLs**") that, as of the Petition Date were estimated to exceed $3.3 billion, (ii) federal interest expense carryforwards under section 163(j) of Title 26 of the United States Code that, as of the Petition Date, were estimated to exceed approximately $393 million, and (iii) other tax benefits, including tax basis in excess of the fair market value of the assets (collectively, the "**Tax Attributes**"). As of December 31, 2019, the NOLs were estimated to exceed $2.9 billion and the federal interest expense carryforwards under section 163(j) of Title 26 of the United States Code were estimated to exceed approximately $297 million.

The Tax Attributes may reduce future taxable income and thus future tax liability, subject to certain statutory limitations.

For U.S. federal income tax purposes, the Tax Attributes are currently treated as residing at EP Parent rather than the Debtor subsidiaries which are generally disregarded as separate from EP Parent for U.S. federal income tax purposes.  During the course of negotiations with the Initial Supporting Noteholders, the Debtors raised arguments suggesting that the Tax Attributes might have independent value from which only EP Parent (and not the Debtor subsidiaries) could benefit from.  The Debtors also raised arguments that because none of the holders of Claims on account of the Debtors' funded debt hold such claims against EP Parent, any value of the Tax Attributes should inure to the benefit of the Existing Parent Equity Interest Holders.  In addition, without EP Parent's participation as a Debtor under the Plan, participation to which the Existing Parent Equity Holders could potentially have objected, the Debtors expect that the Reorganized Debtors (excluding EP Parent) would have a significantly lower tax basis in their assets and no access to the existing NOLs or other valuable Tax Attributes that would remain at EP Parent.  However, independent utilization of the Tax Attributes by EP Parent would entail surmounting significant practical and legal hurdles, including (i) the fact that EP Parent would have to generate taxable income in order to utilize the Tax Attributes, which would require new capital contributions by Existing Parent Equity Interest Holders to acquire or develop a new business able to generate taxable income, and (ii) EP Parent's ability to continue as a going concern.

Thus, while it is not clear whether the Tax Attributes have independent value (and, if they do, whether any such value should inure to the benefit of the Existing Parent Equity Holders), the Debtors and the advisors to the Ad Hoc Group determined that, taking into account those uncertainties, the significant hurdles to independent utilization, the uncertainty as to the value of the Tax Attributes to the Reorganized Debtors (as discussed in Section VIII.A.2 (Limitations of NOL Carryforwards and Other Tax Attributes), and the potential for unidentified liabilities of EP Parent, weighed against the potential future tax savings that the Tax Attributes could provide to the Reorganized Debtors and the other assets of EP Parent, a $300,000 payment to the Existing Parent Equity Interest Holders under the Plan on account of the Tax Attributes of EP Parent would be in the best interests of all stakeholders.

### 9. Employee Incentive Plan and New Executive Employment Agreement Negotiations to Be Included in Plan Supplement

In connection with the formulation and negotiation of the Employee Incentive Plan ("**EIP**") term sheet (annexed to the Plan Supplement) and the New Executive Employment Agreement Term Sheet (as defined in the Plan and annexed to the Plan Supplement), the Debtors were advised by an independent compensation consultant, Longnecker & Associates.  EIP and New Executive Employment Agreement negotiations were led by the Debtors' senior management team, overseen by the Special Committee.

Certain material terms of the EIP include:

- Participants of the EIP will include officers and employees of the Company and its subsidiaries who are designated by the New Board to receive awards under the EIP.

- 10% of the New Common Shares on the Effective Date, on a fully diluted basis (including shares issuable under the EIP), will be reserved for issuance under the EIP (the "**Award Pool**").

### C.  <u>Prepetition Analysis</u>

#### 1.  **Independent Investigation**

Prior to the Petition Date, Carol Flaton, in her capacity as both an independent director and member of the Special Committee, oversaw an investigation (the "**Independent Investigation**") into certain potential claims and estate causes of action in connection with (a) related party transactions (the "**RPTs**") between the Company and its Sponsors and (b) the general operation of the business and Board practices.  The RPTs included transactions involving the Company and its Sponsors from May 2012 to October 2019 including (i) certain debt purchases by Apollo and Access in late 2018 and 2019; (ii) the Jeter Drillco JV and certain payable disputes in connection therewith; (iii) a management fee paid to Phoenix Natural Resources LLC to release members of its leadership team to join EP Energy; (iv) reimbursement payments made to Sponsors pursuant to the Stockholders Agreement of EP Energy Corporation, dated as of August 30, 2013 (the "**Existing Stockholders Agreement**") in relation to Board activities and transactions; (v) an August 2016 term loan exchange transaction; (vi) fees paid to Apollo and Riverstone as co-managers to underwrite bond offerings in May 2015 and November 2016; (vii) payments made to various Apollo affiliates Pegasus Optimization Partners, LLC, Express Energy Services, and Hexion Inc. f/k/a Momentive Specialty Chemicals Inc., under drilling services and supply agreements; (viii) a $6.25 million management fee paid to Sponsors in January 2014 pursuant to a May 2012 Management Agreement; (ix) an $83.3 million transaction fee paid to Sponsors in January 2014 pursuant to a May 2012 Management Agreement; (x) the incurrence of an obligation, and payment of, a $71.5 million transaction fee to the Sponsors in connection with the acquisition from El Paso Corporation in May 2012; and (xi) a dividend paid from proceeds of a PIK note issuance in December 2012 and a dividend paid from asset sale proceeds in June 2013.  The Independent Investigation covered all RPTs between the Company and the Sponsors in the 6-year period preceding the Petition Date.  In connection with the Independent Investigation, Ms. Flaton directed Weil to assist in evaluating the colorability of any potential claims and estate causes of action related to the RPTs.

The Independent Investigation took place over the course of two months and involved an extensive factual and legal analysis, where Weil conferred with and reported on its investigation to Ms. Flaton throughout.  In connection with the Independent Investigation, ten separate interviews were conducted, extensive documentation was reviewed, and the Company's governance practices and controls were carefully reviewed.  Additional information related to the Company's governance, including its Related Party Transaction Policy, is available at http://www.epenergy.com/about/governance.html.

At the conclusion of the Independent Investigation, no colorable claims were identified belonging to the Company related to the RPTs or conduct by officers or directors, other than a potential non-material preference claim for reimbursements to Sponsors of reasonable expenses related to Board activities and transactions per the Existing Stockholders Agreement, which may be subject to valid defenses.  The Independent Investigation concluded that the other claims were not colorable because, among other things, the Company has a robust governance

protocol for evaluating related party transactions and debt trading by the Sponsors which was followed at all operative times.  The Company's governance protocol includes a related party transaction policy that requires only independent members to vote on related party transactions and was adhered to for the transactions investigated with each transaction being evaluated before it was approved.  For example, with respect to the Project Jeter Drillco JV, competing proposals were considered, and the transactions were deemed to be substantively fair before they were approved.  Given that there are no colorable claims, any such claims lack any measurable value.  Further, when litigation costs were considered, it was concluded that such claims would likely have a negative value to the Company.  Based upon the results of the Independent Investigation, Ms. Flaton concluded and therefore recommended to the Special Committee that any transaction should include releases for officers, directors, and Sponsors if such transaction is otherwise the best transaction available to the Company and is in the best interests of the Company and its stakeholders.  Specifically, the releases were supported because there were no colorable claims identified in the Independent Investigation.  Moreover, if the Sponsors provided any consideration to the Company in any such transaction, then such consideration significantly outweighs the benefits of preserving any potential claims.

Although the Original Confirmation Order was vacated by the Bankruptcy Court, at the conclusion of the confirmation hearing on the Prior Plan, the Bankruptcy Court found that these releases were (i) an integral and necessary part of the Prior Plan, (ii) fair, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Interests, (iii) in exchange for the good and valuable consideration provided by the released parties, (iv) a good faith settlement and compromise of the claims released by the Debtors and their Estates, and (v) represented a valid exercise of the Debtors' business judgment.  Further, the Debtors and the Backstop Parties provided mutual releases in the Termination Stipulation from any and all claims arising from, *inter alia*, these Chapter 11 Cases, the Backstop Agreement, the Plan Support Agreement, and the Prior Plan.

## 2.  Mortgage Lien Analysis

Prior to the Petition Date, the Debtors' advisors conducted an independent analysis of the quality and value of the mortgages filed in association with the Debtors' four tranches of secured funded debt.  The Company's books and records were reviewed to determine (i) the technical validity of all filed mortgages to assure that individual mortgage forms satisfied relevant technical legal requirements (the "**Technical Validity Analysis**") and (ii) the lien coverage ratio, or the asset value of mortgaged properties to total asset value (the "**Lien Coverage Analysis**").

The Technical Validity Analysis included a comprehensive search of UCC financing statements in Utah and filed mortgages in Texas and Utah.  FTI manually reviewed each of the 91 mortgage documents to determine whether (i) the document is legible, (ii) the mortgagor name is correct, (iii) the mortgagee name is correct, (iv) the trustee name is correct, (v) party signatures are present, (vi) the document is notarized, and (vii) the document is properly recorded (stamped with book/liber/volume number, page number, date, and time).  In addition, Weil manually reviewed each of the 91 mortgage documents to determine the following: (i) within each secured loan tranche, relative to the base form for that tranche, the language of the grant, the language of the security agreement (for fixtures/as-extracted collateral), enforcement provisions, the description of debt, whether the mortgage has a valid "catchall/all assets in county" provision,

(ii) documented discrepancies between tranches of debt, and (iii) whether UCC's filed in Utah were validly extended.

Moreover, the Lien Coverage Analysis was performed using various reserve databases, including the most recent fall 2019 reserve report (the "**Fall 2019 Reserve Report**"), which was conducted during August and September of 2019 and provided to the RBL Agent.[19] The coverage ratio of the total proved value of mortgaged oil and gas leases to total Company reserve value (unrisked PV-10), based on the Fall 2019 Reserve Report, are as follows for each of the secured debt tranches:[20][21][22]

| Loan | PDP (Proved Developed Producing) | PNP (Proved Not Producing) | PUD (Proven Undeveloped Reserves) | Total |
|---|---|---|---|---|
| **RBL Facility** | 98.6% | 97.1% | 92.1% | 97.2% |
| **1.125L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **1.25L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **1.5L Notes** | 98.6% | 97.1% | 91.9% | 97.1% |
| **Total** | **98.6%** | **97.1%** | **92.1%** | **97.2%** |

As shown above, for each of the secured debt tranches, the Debtors determined that their prepetition secured lenders had valid, perfected liens in over 98.6% of the Debtors' proved developed producing reserves, 97.1% of the Debtors' proved developed non-producing reserves, and 92.1% of the Debtors' proved undeveloped reserves.

---

[19] A copy of the Debtors' most recent publicly filed annual reserve report is attached as Exhibit 99.1 to Annual Report on Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on March 25, 2020, available at https://www.sec.gov/Archives/edgar/data/1584952/000158495220000005/0001584952-20-000005-index.htm. The estimates of proved reserves in such report may have been revised due to a number of factors, including as a result of future operations, effects of regulation by governmental agencies, or geopolitical or economic risks. The proved reserves included in such report are estimates only and should not be construed as being exact quantities, and if recovered, the revenues therefrom, and the actual costs related thereto, could be more or less than the estimated amounts.

[20] The values in the coverage ratio include $2.2 million of oil and gas leases that are potentially impacted by the Technical Validity Analysis, which if excluded would reduce the total coverage ratio in each tranche by 0.09%.

[21] Results shown are based solely on unrisked PV-10 values.

[22] Drilled Uncompleted Wells are included in the PNP reserve category in the Fall 2019 Reserve Report.

D.      **Prepetition Compensation Program**

On May 29, 2019, the Compensation Committee of the Board approved the implementation of a Key Employee Retention Program (the "**KERP**") for all employees of the Company.  The KERP was designed to retain employees of the Company in their current roles over the near term while providing them with financial stability.  Pursuant to the KERP, employees must continue their employment with the Company for approximately thirteen months or they will forfeit the full amount of the retention payment. The KERP payments are in lieu of any bonuses or long-term incentive awards, if any, that would otherwise be due or payable to the KERP participants for 2019 performance.  If, before June 30, 2020, a KERP participant is terminated for cause or voluntarily terminates his or her employment with the Company without good reason (other than as a result of death or disability) such participant must repay his or her KERP payment in full. The KERP was formulated with the input and based upon the recommendations of the Compensation Committee's independent compensation consultant.[23]

The Company's named executive officers were awarded the following amounts under the KERP:

| Name | Position | Amount |
| --- | --- | --- |
| Russell E. Parker | President and Chief Executive Officer | $ 2,392,800 |
| Chad D. England | Senior Vice President, Operations | $   813,600 |
| Raymond J. Ambrose | Senior Vice President, Engineering and Subsurface | $   572,000 |
| Kyle A. McCuen | Senior Vice President and Chief Financial Officer | $   543,000 |
| Jace D. Locke | Vice President, General Counsel and Corporate Secretary | $   543,000 |

**V.**
**OVERVIEW OF CHAPTER 11 CASES**

A.      **Commencement of Chapter 11 Cases and First Day Motions**

On October 3, 2019, the Debtors commenced their Chapter 11 Cases.  The Debtors continue managing their properties and operating their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      **First Day Motions**

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court to enable the Debtors to facilitate a smooth transition into chapter 11 and minimize any disruptions to the Debtors' operations (the "**First Day Motions**").  The Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered various orders authorizing the Debtors to, among other things:

- Restrict certain transfers of equity interests in the Debtors [Docket Nos. 56, 313];

---

[23] The KERP was not subject to the Independent Investigation.

- Pay certain prepetition taxes and assessments [Docket No. 57];

- Continue paying employee wages and benefits [Docket No. 58];

- Continue insurance and surety bond programs [Docket No. 61];

- Obtain use of cash collateral [Docket No. 65];

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [Docket Nos. 66, 327];

- Pay certain prepetition joint interest billing, royalty, and lienable operating expenses [Docket No. 67];

- Establish procedures for utility companies to request adequate assurance of payment and to prohibit utility companies from altering or discontinuing service [Docket No. 99]; and

- Reject a burdensome executory contract with Ruby Pipeline, L.L.C. [Docket No. 319].[24]

### C.    Procedural Motions and Retention of Professionals

The Debtors have filed various motions regarding procedural issues that are common to chapter 11 cases of similar size and complexity as these Chapter 11 Cases. The Bankruptcy Court granted substantially all of the relief request in such motions and entered various orders authorizing the Debtors to, among other things:

- Jointly administer the Debtors' estates [Docket No. 26]

- File a consolidated creditor matrix and list of 30 largest unsecured creditors and modify the requirement to file a list of equity security holders [Docket No. 59];

- Establish procedures for the interim compensation and reimbursement of expenses of chapter 11 professionals [Docket No. 318]; and

- Employ professionals utilized by the Debtors in the ordinary course of business [Docket No. 317].

### D.    Retention of Chapter 11 Professionals

The Debtors filed several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include (i) FTI (including designating David Rush to serve as Chief Restructuring Officer); (ii) Evercore, as investment banker; (iii) Weil, as counsel to the Debtors; and (iv) Prime Clerk LLC, as claims, noticing, and solicitation agent; and (v) Ernst &

---

[24] Since the Petition Date, the Debtors filed motions seeking to reject other burdensome contracts [Docket Nos. 535, 589, and 600].

Young LLP, as auditor.  The Bankruptcy Court entered orders authorizing the retention of such professionals [Docket Nos. 316 (FTI), 328 (Evercore), 315 (Weil), 114 (Prime Clerk), and 497 (Ernst & Young)].  Those orders, as well as the professionals' engagement letters and related filings, can be accessed at https://cases.primeclerk.com/EPEnergy/Home-DocketInfo.

### E.       Postpetition Novation of Hedges

Following the Petition Date, DNB Bank AKA ("**DNB**"), one of the Debtors' hedging counterparties, informed the Debtors that it intended to terminate each of its outstanding hedging transactions with the Debtors unless such hedging transactions were successfully novated and such novation was approved by the Bankruptcy Court.  After negotiations, J. Aron & Company (the "**J. Aron**"), one of the Debtors' other hedging counterparties, DNB, and the Debtors agreed that DNB would novate its position under such hedging transactions to J. Aron and the Debtors would pay a $1 million novation fee to J. Aron.  On October 16, 2019, the Bankruptcy Court entered the order granting the relief requested [Docket No. 155].

### F.       Execution of Backstop Commitment Agreement and Plan Support Agreement and Entry into DIP Facility and Existing Commitment Letter

Following the Petition Date, the Debtors and their advisors worked to finalize definitive documentation to memorialize their agreement in principle with the Supporting Noteholders and secure the commitments necessary to prosecute their restructuring.

On October 18, 2019, following months of good-faith, arms'-length negotiations, the Debtors (i) entered into the Backstop Commitment Agreement and Plan Support Agreement with the Supporting Noteholders, and (ii) reached an agreement with the Exit Commitment Parties to provide the DIP-to-Exit Facility.  The DIP-to-Exit Facility is described further in Section I herein.

Following hearings held on November 20 and 21, 2019, the Bankruptcy Court overruled the objections to the Backstop Commitment Agreement, found that the Special Committee was independent and not influenced by Apollo, Access, or Elliott, and entered an order approving the Debtors' entry into the Backstop Commitment Agreement [Docket No. 483].  Prior to such hearing, the Supporting Noteholders also agreed to waive a "no-shop" provision that they had negotiated for in the Backstop Commitment Agreement.

The Debtors also negotiated a consensual resolution of all of the objections to the DIP-to-Exit Facility other than an objection filed by MSB [Docket No. 377].  Following the hearings held on November 20 and 21, 2019, the Bankruptcy Court overruled MSB's objection.  Following the Bankruptcy Court's ruling, the Debtors filed a proposed final order approving the DIP-to-Exit Facility [Docket No. 479], to which all parties that had filed objections consented as to form.  On November 25, 2019, the Bankruptcy Court entered the final order approving the DIP-to-Exit Facility [Docket No. 482].

### G.       Appointment of Creditors' Committee

On October 21, 2019, the Creditors' Committee was appointed by the Office of the United States Trustee for Region 7 (the "**U.S. Trustee**") pursuant to section 1102 of the Bankruptcy Code to represent the interests of unsecured creditors in these Chapter 11 Cases

[Docket No. 200]. The members of the Creditors' Committee are: (i) Wilmington Trust, N.A.; (ii) Wilmington Savings Fund Society, FSB; (iii) Rene R. Barrientos, Ltd. ("**Barrientos**")[25]; and (iv) Antora Peak Capital Management LP. The Creditors' Committee has retained Stroock & Stroock & Lavan LLP and Polsinelli PC as co-counsel, Pachulski Stang Ziehl & Jones LLP as conflicts counsel, AlixPartners LLP as its financial advisor, and Jefferies Group LLC as its investment banker. The Bankruptcy Court entered orders authorizing the Creditors' Committee's retention of such professionals [Docket Nos. 652 (Stroock), 649 (Polsinelli), 648 (Pachulski), 650 (AlixPartners), and 651 (Jefferies)]. Barrientos has since resigned from the Creditors' Committee. On May 7, 2020, the Creditors' Committee filed a motion to withdraw Polsinelli PC and substitute Fox Rothschild LLP as counsel to the Creditors' Committee [Docket No. 1216]. The Bankruptcy Court entered an order authorizing the withdrawal and substitution of counsel [Docket No. 1273].

Prior to the UCC Settlement, the Creditors' Committee, in the exercise of its fiduciary duties, had begun investigating (i) the extent of the liens and claims of certain of the Debtors' secured creditors, including the holders of RBL Claims, 1.125L Notes Claims, 1.25L Notes Claims, and 1.5L Notes Claims, (ii) the prepetition trading activities of Apollo and Access, and (iii) potential avoidance actions, including potential claims against certain insiders of the Debtors. The proposed releases under the Plan would release estate causes of action related to such matters. In connection with the Second DIP Order Amendment, the Creditors' Committee agreed to pause its investigation of such matters until the date that is 45 calendar days from the earlier of (i) June 6, 2020, (ii) the date on which the Debtors file a motion to approve a disclosure statement for a modified chapter 11 plan, or (iii) the date on which the Debtors file a motion to approve bidding procedures for the sale of all or substantially all of the Debtors' assets. Accordingly, the Challenge Stay Period expires on July 21, 2020.

The Creditors' Committee also determined that it would not assert a Challenge (as such term is defined in the DIP Order) against the RBL Agent or RBL Lenders. As discussed herein, the Debtors conducted the Independent Investigation and determined that there are no colorable estate causes of action related to the matters that had been under review by the Creditors' Committee. Further, at the conclusion of the confirmation hearing on the Prior Plan, the Bankruptcy Court found that these releases were (i) an integral and necessary part of the Prior Plan, (ii) fair, reasonable, and in the best interests of the Debtors, the Estates, and holders of Claims and Interests, (iii) in exchange for good and valuable consideration provided by the released parties, (iv) a good faith settlement and compromise of the claims released by the Debtors and their Estates, and (v) represented a valid exercise of the Debtors' business judgment.

In light of the Original Confirmation Order being vacated, the Debtors and the Backstop Parties memorialized the releases in the Prior Plan by including them in the Termination Stipulation. Specifically, the Debtors and the Backstop Parties provided mutual releases in the Termination Stipulation from any and all claims arising from, *inter alia*, these Chapter 11 Cases, the Backstop Agreement, the Plan Support Agreement, and the Prior Plan; provided that (i) the releases provided to the Backstop Parties will not apply to any claims, causes of action, or other Challenges the Creditors' Committee may assert in connection with the Challenge Period and

---

[25] Barrientos resigned from the Creditors' Committee shortly after his appointment.

(ii) the releases will not affect, impair, or operate as a release of rights of the Creditors' Committee under the DIP Order.

### H.   MSB Adversary Complaints

Certain of the Debtors and Maltsberger/Storey Ranch, LLC ("**Maltsberger**"), Storey Minerals, Ltd. ("**Storey**"), and Barrientos (together with Maltsberger and Storey, "**MSB**") are party to adversary proceedings in these Chapter 11 Cases, including the following:

### 1.   Lien Invalidation Lawsuit – Adv. Pro. No. 19-03660

The Debtors filed an adversary proceeding in October 2019 requesting a declaratory judgment that MSB does not hold a judgment lien with respect to a currently-on-appeal final judgment entered in a state-court lawsuit brought by MSB against Debtor EP OpCo in 2018 (the "**Lien Invalidation Lawsuit**"). On April 6, 2020, the Bankruptcy Court granted summary judgment in favor of the Debtors and held that MSB does not hold a valid judgment lien on any of the assets of EP OpCo (the "**Lien Invalidation Judgment**"). The Bankruptcy Court issued a memorandum opinion to accompany its Lien Invalidation Judgment.

In the underlying state-court lawsuit, MSB sued EP OpCo in the 81st District Court of La Salle County, Texas alleging breach of a most favored-nations clause (the "**MFN Clause**") in three oil and gas leases (the "**MFN Lawsuit**"). The MFN Lawsuit covers the three "A" leases. EP OpCo agrees that the MFN Clause in the three "A" leases was triggered by EP OpCo's acquisition of certain third-party leases in a large lease-acquisition transaction in January 2018, but the parties assert competing constructions of the MFN Clause and dispute the amount due to MSB under the MFN Clause. The parties litigated the MFN Lawsuit over the course of a year and in March 2019 EP OpCo and MSB each filed cross-motions for summary judgment regarding the construction of the MFN Clause.

On June 6, 2019, the state trial court granted in part and denied in part MSB's motion for partial summary judgment, holding that (i) EP OpCo breached the MFN Clause and owes an MFN payment calculated from the difference between bonus rate already paid to MSB and the bonus rate provided in one of the third-party leases at issue, and (ii) MSB is not entitled to an MFN payment based on the delay rental rate in the "A" leases. On July 11, 2019, the state court entered a judgment in favor of MSB in the aggregate amount of approximately $41.1 million ($17.5 million to Maltsberger, $17.5 million to Storey, and $6.1 million to Barrientos) (the "**Final Judgment**").

EP OpCo perfected an appeal from the Final Judgment on July 17, 2019 and superseded the Final Judgment by depositing a cashier's check with the trial court clerk the same day. MSB filed a contest to the adequacy of the supersedeas deposit, but the state court has not heard or ruled upon MSB's supersedeas contest. The Final Judgment therefore remains superseded, and EP OpCo's appeal remains pending in the Texas Fourth Court of Appeals.

MSB obtained an abstract of judgment from the trial court clerk on July 16, 2019 (the "**Abstract of Judgment**"), and recorded the Abstract of Judgment in the Real Property Records of La Salle County on August 22, 2019. MSB asserts claims against EP OpCo as reflected by the Abstract of Judgment in the aggregate amount of approximately $41,034,055.00, plus

attorney's fees, expenses, and costs, and for other obligations as set forth in its proofs of claim on file (the "**MSB Claims**").

On October 31, 2019, the Debtors filed a complaint against MSB in the Bankruptcy Court, seeking a declaratory judgment that MSB does not hold a valid judgment lien based on the Abstract of Judgment or, alternatively, that the purported judgment lien should be avoided as a preferential transfer under section 547 of the Bankruptcy Code.

On January 6, 2020, the Debtors filed a motion for summary judgment that the Abstract of Judgment does not give rise to a valid judgment lien under Texas law. The parties briefed the issue and, after a hearing, the Bankruptcy Court granted the Debtors' motion and issued the Lien Invalidation Judgment and accompanying memorandum opinion on April 6, 2020. On April 20, 2020, MSB filed a motion to reconsider the Lien Invalidation Judgment. On May 5, 2020, the Bankruptcy Court entered a stipulation and order abating the motion to reconsider.

The Debtors believe the Bankruptcy Court's Lien Invalidation Judgment is correct under Texas law and that it is unlikely that the Bankruptcy Court will grant MSB's motion to reconsider (though it is possible). For similar reasons, the Debtors further believe it is unlikely that the Lien Invalidation Judgment would be vacated or reversed on appeal (though it is possible). Yet even if the Bankruptcy Court were to grant MSB's motion to reconsider, or if the Lien Invalidation Judgment were vacated or reversed on appeal, then the Debtors would request that the Bankruptcy Court consider and rule upon the Debtors' alternative avoidance claim under section 547 of the Bankruptcy Code. The Debtors believe that their alternative avoidance claim will prevail. Yet even if the Debtors were to not prevail on their alternative avoidance claim, the Debtors would then move to value the collateral and determine the extent and priority of the resulting MSB lien in view of the very substantial funded secured claims that were perfected years before MSB filed its liens. MSB would have an allowed secured claim based on the value of any unencumbered property, which the Debtors believe is not significant. Under such circumstances, MSB could argue that the secured portion of its claims, if any, is entitled to the same treatment as the "Other Secured Claims" in Class 1 and therefore unimpaired pursuant to the Plan.

## 2.    C Lease Lawsuit – Adv. Pro. No. 20-03019

On July 12, 2019, the day after entry of the Final Judgment in the MFN Lawsuit regarding the "A" leases, MSB filed a new, separate lawsuit against EP OpCo alleging breach of the identical MFN Clause in the three "C" leases, based on the same transaction and occurrence giving rise to the MFN Lawsuit (the "**C Lease Lawsuit**"). EP OpCo removed the C Lease Lawsuit to the Bankruptcy Court in January 2020. MSB asserts that it may be able to obtain a declaration that the "A" and "C" leases have terminated due to EP OpCo's alleged failure to comply with the currently-on-appeal Final Judgment in the state-court MFN Lawsuit. To be clear, MSB seeks to amend its live complaint in the C Lease Lawsuit to add these combined "A" and "C" lease termination claims, but at present there is no live pleading by MSB in any court, state or federal, containing MSB's purported termination claims. In addition, MSB asserts that its termination claims under the "A" and "C" leases are not Claims that can be discharged in bankruptcy.

The Debtors believe that MSB's termination claims fail for a number of reasons, including (a) they are unripe or, alternatively, barred by res judicata based on the Final Judgment in the MFN Lawsuit; (b) termination is not available as a remedy for breach of the MFN Clause,

because under Texas law the MFN Clause is a covenant giving rise to money damages, not a condition giving rise to termination; (c) even if termination were an available remedy, MSB already elected and obtained the remedy of money damages in the MFN Lawsuit and cannot now seek termination; and (d) the MFN Clause in the "C" Leases has not been triggered.  On February 22, 2020, EP OpCo filed a motion for summary judgment for dismissal of all live claims in the C Lease Lawsuit based on its affirmative defense of res judicata (the "**Res Judicata MSJ**").  MSB opposed the Res Judicata MSJ and in its response argued for the first time that its termination claims are not barred by res judicata because they are "judgment enforcement" claims that "only arose" after entry of the Final Judgment in the MFN Lawsuit.  In its Reply, EP OpCo explained that any such "judgment enforcement" claims are unripe under Texas law "until the case is disposed of on appeal."  *Street v. Honorable Second Court of Appeals*, 756 S.W.2d 299, 301 (Tex. 1988).  The Bankruptcy Court held a hearing regarding the Res Judicata MSJ and related motions (including MSB's motion to remand the lawsuit to state court) on July 9, 2020. At the hearing, the Bankruptcy Court indicated that it intended to abate the C Lease Lawsuit pending complete disposition of the MFN Lawsuit on appeal. The Bankruptcy Court instructed the parties to present an agreed form of abatement order.

The Debtors believe (i) that MSB's termination claims will fail; and (ii) that they have complied with all terms of the "A" and "C" leases, including the MFN Clause (and the Debtors dispute any allegation that they have not); however, the Debtors acknowledge that termination of the "A" and "C" leases could materially impact the Debtors' projections and treatment under the Plan.

On March 6, 2020, at the conclusion of the Confirmation Hearing on the Prior Plan, the Bankruptcy Court made the following findings, in the context of the feasibility of the Prior Plan, with respect to whether MSB could terminate the A Lease and the Debtors' operations thereunder:[26] (i) the Debtor failed to perform under the MSB Contracts (as defined in the Plan) as required prepetition; (ii) it was more likely than not that the Debtors would be found to have breached the A Leases; (iii) such breach would yield a monetary remedy and not a non-monetary remedy under the terms of documents; and (iv) that MSB more likely than not elected a monetary remedy with respect to the A Leases.  Therefore, the Bankruptcy Court ultimately found that the types of defaults at issue in the litigation would likely lead only to monetary relief and not non-monetary relief in terms of the termination of the lease, and that as to the A Leases, MSB elected the remedy of monetary relief.

In addition to these findings, the Bankruptcy Court directed the Debtors to add language to Original Confirmation Order regarding the Plan's effect on MSB's claims.  The Debtors complied with the Bankruptcy Court's directive and, after conferring with counsel for MSB, amended the proposed confirmation order to include agreed language addressing the Plan's effect on MSB's claims.  In light of the vacatur of the Original Confirmation Order, the Debtors have provided for the same treatment of MSB's claims in the Plan using the same agreed language that was included in the Original Confirmation Order.  *See* Plan, § 5.2.

---

[26] The Bankruptcy Court explicitly noted that these findings were not conclusions and could not be used for purposes of collateral estoppel or res judicata.

## I.    **Altamont Adversary Complaint**

On November 22, 2019, Kinder Morgan Altamont LLC ("**Kinder**") filed an adversary complaint (the "**Altamont Complaint**") against EP OpCo, seeking (i) a declaration that the Altamont Agreement[27] is a covenant that runs with the land and cannot be rejected; (ii) alternatively, if the Altamont Agreement does not satisfy the privity of estate requirement for a covenant running with the land, a declaration that the Altamont Agreement is an equitable servitude that cannot be rejected; (iii) a declaration that the Omnibus Agreement[28] is integrated and non-severable from the Altamont Agreement; or (iv) alternatively, if the Bankruptcy Court determines that the Altamont Agreement is neither a covenant running with the land nor an equitable servitude, an order pursuant to section 365(d)(2) of the Bankruptcy Code compelling the Debtors to assume or reject the Altamont Agreement.[29]  On January 6, 2020, EP OpCo filed a motion to dismiss the Altamont Complaint.

On January 17, 2020, the Bankruptcy Court held the Altamont Adversary Proceeding in abeyance and ordered the Debtors to file a notice stating whether EPLP intends to assume or reject the Altamont Agreement and Omnibus Agreement (together, the "**Altamont Agreements**") no later than February 28, 2020.  On February 28, 2020, the Debtors announced to the Bankruptcy Court that EPLP did not intend to reject the Altamont Agreements. The Debtors subsequently moved to assume the Altamont Agreements pursuant to the Original Confirmation Order.  However, the Bankruptcy Court subsequently entered an order vacating the Confirmation Order and, therefore, the assumption of the Altamont Agreements never became effective pursuant to the Confirmation Order.  On April 24, 2020, the Debtors filed a motion to assume the Altamont Agreements and on May 25, 2020, the Bankruptcy Court entered an order authorizing the Debtors to assume the Altamont Agreements.  Accordingly, this adversary proceeding is moot.

## J.    **Exclusivity**

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**").  In addition, section 1121(c)(3) of the Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a

---

[27]    The Altamont Agreement is defined to mean that certain gas purchasing/processing contract entered into between Kinder and EP OpCo, dated November 14, 2017, and made effective June 1, 2010 (as amended, modified, or supplemented).

[28]    The Omnibus Agreement is defined to mean that certain omnibus agreement entered into between El Paso E&P and El Paso Midstream, by which Kinder and EP OpCo became successor-in-interest to, dated February 8, 2012, and made effective January 1, 2012 (as amended, modified, or supplemented).

[29]    On October 8, 2019, Kinder filed a motion [Docket No. 105] seeking entry of an order "lifting the automatic stay for cause to require [EP OpCo] to provide adequate assurance that it has the financial wherewithal to perform under the [Altamont Agreement], a non-executory contract, that in accordance with sections 365(c) and 365(e)(2)(B) of the Bankruptcy Code, [Kinder] shall not be required to provide financial accommodations to [EP OpCo] and expend further funds absent a court order that the [Altamont Agreement] is not an executory contract or to the extent that it is deemed to be an executory contract, Debtor has assumed the [Altamont Agreement] and for such other and future relief to which [Kinder] may be entitled."  This motion was subsequently withdrawn prior to the filing of the Altamont Complaint.

period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**").  Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.  The Exclusive Periods currently remain in effect and expire on October 31, 2020, and December 31, 2020, respectively.

### K.      Statements and Schedules, and Claims Bar Dates

On October 7, 2019, the Bankruptcy Court entered an order approving (i) December 16, 2019 as the deadline for all creditors or other parties in interest to file proofs of Claim (the "**Bar Date**"); and (ii) March 31, 2020 as the deadline for all Governmental Entities to file a proof of Claim [Docket No. 98].

The Debtors provided notice of the Bar Date, and published notice of the Bar Date in the national edition of the *New York Times* and the *Houston Chronicle*.

On November 18, 2019, the Debtors filed their Schedules and Statements, detailing known claims against the Debtors.  Further, as of the date hereof, over 985 proofs of Claim had been filed against the Debtors asserting in the aggregate approximately $21 billion.  The Debtors continue to review, analyze, and reconcile objections to the filed Claims.  The Debtors have identified Claims they believe should be disallowed because, among other things, the Claims are duplicative, without merit, overstated, or such Claims have already been paid pursuant to orders of the Bankruptcy Court.  The Debtors have already objected to 275 Claims.  The Bankruptcy Court sustained objections to 160 of these Claims, which are now either disallowed or allowed Claims at amounts agreed upon by the Debtors and the respective Claimant.  The Debtors will continue to reconcile objections to the filed Claims as appropriate.

Further, the Debtors intend to reject certain executory contracts pursuant to the Plan. Any counterparty to an executory contract that is rejected must file and serve a proof of Claim on the applicable Debtor that is party to the applicable executory contract to be rejected by no later than the applicable bar date governed by the Plan of the Bankruptcy Court order governing such rejection.

### L.      Request for Equity Committee

On October 17, 2019 [Docket No. 160] and November 25, 2019 [Docket No. 488], Mr. Duane Morley Cox filed pleadings in these Chapter 11 Cases seeking, among other various relief, the appointment of an official equity committee in these Chapter 11 Cases.  On December 13, 2019, the Debtors filed an objection [Docket No. 543] to such relief on the grounds that the proposed appointment of an equity committee is plainly inappropriate.  Mr. Cox filed a reply brief on December 26, 2019 [Docket No. 592].  On February 12, 2020, the Bankruptcy Court held a hearing, and at the conclusion of the hearing, the Bankruptcy Court denied Mr. Cox's request to appoint an equity committee.  *See also* [Docket No. 879].

### M.      Prior Disclosure Statement and Prior Plan

On November 18, 2019, the Debtors filed the Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors [Docket No. 429] and the Disclosure Statement for Joint Chapter 11 Plan of Reorganization of EP Energy Corporation and Its Affiliated Debtors [Docket

No. 430] (as amended, the "**Prior Disclosure Statement**").  The Debtors subsequently amended the Prior Plan and the Prior Disclosure Statement [Docket Nos. 536, 537, 613, 614, 638, 639, 642, 643,674, 685, 686].  The Debtors received objections to the Prior Disclosure Statement from (i) the United States Department of Interior [Docket No. 564], (ii) MSB [Docket No. 565], (iii) the Creditors' Committee [Docket No. 566], (iv) UMB Bank, National Association and the Ad Hoc Group [Docket No. 569], (v) Wilmington Savings Fund Society, FSB [Docket No. 570], and (vi) Wilmington Trust, National Association [Docket No. 596].

  The hearing to approve the Prior Disclosure Statement was held on January 8, 2020. Prior to the hearing, the Debtors resolved all objections to the Prior Disclosure Statement, entered into the global UCC Settlement with the Creditors' Committee, and further amended the Prior Plan [Docket No. 685].  On January 14, 2020, the Bankruptcy Court entered an order approving the Prior Disclosure Statement [Docket No. 691].  The Debtors subsequently filed a plan supplement containing various documents that were integral to, and were considered part of, the Prior Plan, and that were approved pursuant to confirmation of the Prior Plan [Docket No. 785].

  Prior to the confirmation hearing, numerous objections to the Prior Plan were filed, including by MSB and the Ad Hoc Group.  After a heavily contested confirmation hearing that began on February 26, 2020, the Bankruptcy Court overruled the objections, orally confirmed the Prior Plan on March 6, 2020, and entered the Original Confirmation Order on March 12, 2020. However, in the days immediately following the Bankruptcy Court's oral ruling confirming the Prior Plan, Saudi Arabia and Russia implemented price reductions that severely affected the price of oil and gas, causing United States oil prices to fall by more than 30%.  The spread of COVID-19 also resulted in the crash of financial markets.  As a result, the Debtors became unable to satisfy all of the conditions to the effectiveness of their exit facility and therefore could not consummate the Prior Plan.

  At the same time, the Backstop Parties asserted (i) that the proposed confirmation order left open the possibility that Reliance Damages and Pecuniary Losses (as defined in the Original Confirmation Order) could have been held to be payable to holders of 1.125 Lien Notes Claims and 1.25 Lien Notes Claims in excess of the reasonable and documented advisor fees and expenses provided for in the 1.125 Lien Indenture and 1.25 Lien Indenture, which was inconsistent with the treatment set forth in the Plan Support Agreement (as defined below) and the Prior Plan and certain Backstop Parties' investment theses; (ii) that the Debtors had materially breached certain provisions of the Plan Support Agreement by filing a proposed confirmation order that was inconsistent with the Plan Support Agreement; and (iii) that a Supporting Noteholder Termination Event (as defined in the Plan Support Agreement) had occurred and was continuing.

  Following the above confluence of events, the Debtors agreed to terminate the Backstop Agreement and the Plan Support Agreement with the Backstop Parties.  Under the terms of the Termination Stipulation, the Backstop Parties also agreed, among other things, to waive the $26 million termination fee under the Backstop Agreement.  The Debtors and the Backstop Parties exchanged mutual releases from any and all claims (as further described in the Termination Stipulation) arising from, *inter alia*, these Chapter 11 Cases, the Backstop Agreement, the Plan Support Agreement, and the Prior Plan.

Consequently, the Bankruptcy Court vacated the Original Confirmation Order [Docket Nos. 1103, 1104]. The Debtors and the Creditors' Committee agreed to further modify the DIP Order to extend the Challenge Stay Period to July 21, 2020.

### N.   Severance Motion

To address the risk of key members of the Debtors' management team departing the Company following the entry of the Vacatur Order, on May 1, 2020, the Debtors filed a motion seeking authority to include certain officers in their previously approved rank and file severance program (the "**Severance Motion**") [Docket No. 1210]. The Bankruptcy Court approved the Severance Motion on May 27, 2020 [Docket No. 1262].

### O.   Development of a New Plan of Reorganization

As noted above, following entry of the Vacatur Order, oil prices continued to fall and, in fact, for the first time in history, U.S. crude oil futures dropped to below zero (as low as -$37 per barrel for crude oil), presenting further challenges for the Debtors. The Debtors were proactive in responding to these challenges by, among other things, (i) developing a new business plan, (ii) exploring strategic alternatives with their advisors, (iii) engaging in discussions with several of their major stakeholders, including the RBL Lenders and the Ad Hoc Group, regarding potential paths forward, and (iv) taking steps to reduce their costs, including rejecting several burdensome executory contracts and implementing a reduction in the Debtors' workforce [Docket Nos. 589, 600, 765, 1113, 1189]. As a result of such efforts, the Debtors were able to obtain the support of over 90% of the RBL Lenders holding 98% of the RBL Claims with respect to an Approved Plan and the advisors to the Ad Hoc Group (*i.e.*, the largest holders of the 1.125L Notes Claims) with respect to the Plan. Further, the Plan was developed based on feedback from the Creditors' Committee.

In July 2020, following lengthy, arms-length discussions between the Debtors and the RBL Lenders, the Debtors and a majority (over 90%) of the RBL Lenders agreed in principle to amend the Existing Commitment Letter to, among other things, (i) extend the maturity of the Exit Facility to the date that is three (3) years from the date of emergence, (ii) amend the definition of "Approved Plan" and the conditions precedent to effectiveness of the Exit Facility, and (iii) amend certain financial covenants. These amendments would enable the Debtors to maintain the Exit Facility commitment despite there being no additional capital investment during these Chapter 11 Cases or pursuant to the Plan. The holders of approximately 98% of the Claims under the Debtors' prepetition RBL Facility have agreed to the terms of the Amended Commitment Letter and the Debtors are hopeful that the holders of the remaining Claims under the Debtors' prepetition RBL Facility will agree as well after the Debtors file the terms publicly with the filing of the Disclosure Statement, and the Amended Commitment Letter will be effective. To the extent any holder of RBL Claims does not execute the Amended Commitment Letter by the Voting Deadline, then (1) with respect to its Allowed RBL Claims such non-consenting RBL Lender will receive first lien, second-out term loans under the Exit Credit Agreement on a dollar-for-dollar basis under the Plan; and (2) with respect to its Allowed DIP Claims such non-consenting RBL Lender will receive such treatment as may be agreed or as may otherwise comply with the Bankruptcy Code.

P. **Alternative Plan Proposal**

On June 30, 2020, Elliott delivered a proposal to the Board to acquire substantially all of the Debtors' assets pursuant to a sale under section 363 of the Bankruptcy Code. The Debtors reviewed the proposal and analyzed its strengths and weaknesses. The Special Committee considered the proposal and determined it was not actionable.  The Debtors understand that the proposal was shared with advisors to the Ad Hoc Group and the RBL Lenders.

## VI.
## TRANSFER RESTRICTIONS AND
## CONSEQUENCES UNDER FEDERAL SECURITIES LAWS

The issuance of and the distribution under the Plan of the New Common Shares pursuant to Section 4.4(a) of the Plan will be exempt from registration under section 5 of the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the New Common Shares will be exempt from the registration requirements of the Securities Act, and state and local securities laws.  These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such New Common Shares generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

"Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of Section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

Transfers of New Common Shares will be subject to the transfer provisions and other applicable provisions that may be set forth in the Stockholders Agreement.

\* \* \* \* \*

*Legends*.  To the extent certificated or issued by way of direct registration on the records of the Reorganized EP Energy's transfer agent, certificates evidencing the New Common Shares held by holders of 10% or more of the outstanding New Common Shares, or who are otherwise underwriters as defined in section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "**ACT**"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Debtors and Reorganized Debtors, as applicable, reserve the right to reasonably require certification, legal opinions or other evidence of compliance with Rule 144 as a condition to the removal of such legend.  .

In any case, recipients of securities issued under or in connection with the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

BECAUSE OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE AND THE HIGHLY FACT-SPECIFIC NATURE OF THE AVAILABILITY OF EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT, INCLUDING THE EXEMPTIONS AVAILABLE UNDER SECTION 1145 OF THE BANKRUPTCY CODE AND RULE 144 UNDER THE SECURITIES ACT, NONE OF THE DEBTORS MAKE ANY REPRESENTATION CONCERNING THE ABILITY OF ANY PERSON TO DISPOSE OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN.  THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF THE SECURITIES TO BE ISSUED UNDER OR OTHERWISE ACQUIRED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY

FREELY TRADE SUCH SECURITIES AND THE CIRCUMSTANCES UNDER WHICH THEY MAY RESELL SUCH SECURITIES.

## VII.
## CERTAIN TAX CONSEQUENCES OF PLAN

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain holders of Claims and Existing Parent Equity Interests.  The following summary does not address the U.S. federal income tax consequences to holders of Claims who are paid in full in cash, unimpaired or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**Tax Code**"), U.S. Treasury regulations ("**Treasury Regulations**"), judicial authorities, published positions of the Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or any court.  No assurance can be given that the IRS will not assert, or that a court will not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, or local tax consequences of the contemplated transactions, nor does it address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, controlled foreign corporations, passive foreign investment companies, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt entities or organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on net investment income, persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction or who may hold both Claims and Existing Parent Equity Interests, and persons who use the accrual method of accounting and report income on an "applicable financial statement").  This summary does not address the U.S. federal income tax consequences of the transactions to non-U.S. taxpayers.  In addition, this discussion does not address U.S. federal taxes other than income taxes.

The following discussion assumes that all Claims and Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that the various debt and other arrangements to which the Debtors are parties are respected for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion also assumes, that (i) Reorganized EP Energy will be the existing EP Energy corporate entity, it will not be a reincorporated entity or another new entity, and it will not be a member of a consolidated tax group of which it is not the common parent, and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from EP Energy for U.S. federal income tax purposes will continue to be disregarded as separate from EP Energy following the Effective Date (the "**Current Structure**").  However, under the Plan, the definition of "Reorganized EP Energy" allows for alternative structures, including the possibility that Reorganized EP Energy could be a different entity that acquires the assets or equity of the existing EP Energy.  Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors, holders of Claims and holders of Interests described herein.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances.  All holders of Claims and Interests are urged to consult their own tax advisors for the U.S. federal, state, local and other tax consequences applicable under the Plan.

## A.      Consequences to the Debtors

For U.S. federal income tax purposes, EP Energy is the common parent of an affiliated group of companies that files a single consolidated U.S. federal income tax return (the "**Tax Group**"), of which the other Debtors are members or are disregarded entities, directly or indirectly, wholly-owned by a member of the Tax Group.  The Debtors estimate that, as of December 31, 2019, the Tax Group had in excess of $2.9 billion of NOLs, disallowed interest expense carryforwards in excess of $297 million, and certain other Tax Attributes (including an aggregate tax basis in assets substantially in excess of their estimated fair market value).

The amount of any such NOLs and other Tax Attributes remain subject to audit and adjustment by the IRS.  In addition, equity trading activity and certain other actions prior to the Effective Date could result in an ownership change of the Tax Group independent of the Plan, which could adversely affect the ability to utilize the Tax Group's Tax Attributes.  In an attempt to minimize the likelihood of such an ownership change occurring, the Debtors obtained a final order from the Bankruptcy Court authorizing certain protective equity trading effective as of the Petition Date [Docket No. 313].

As discussed below, in connection with the implementation of the Plan, the Debtors expect that the amount of the Tax Group's NOL carryforwards will be eliminated, and the amount of certain other Tax Attributes will be reduced.  In addition, the subsequent utilization of certain remaining Tax Attributes following the Effective Date may be severely restricted.

### 1.      Cancellation of Debt

In general, the Tax Code provides that a debtor in a bankruptcy case must reduce certain of its Tax Attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets—by the amount of any cancellation of debt ("**COD**") incurred pursuant to a confirmed chapter 11 plan.  Although not free from doubt, it is expected that carryover of disallowed interest expense would not be a tax attribute subject to such reduction.  The amount of COD incurred is generally the amount by which the indebtedness

discharged exceeds the value of any consideration given in exchange therefor. Certain statutory or judicial exceptions may apply to limit the amount of COD incurred for U.S. federal income tax purposes. If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other Tax Attributes. Any reduction in Tax Attributes in respect of COD generally does not occur until after the determination of the debtor's net income or loss for the taxable year in which the COD is incurred.

In connection with the implementation of the Plan, the Debtors expect to incur a substantial amount of COD for U.S. federal income tax purposes. The amount of COD and resulting attribute reduction is primarily dependent on the fair market value of the New Common Shares. Based on the Equity Value (*see* Exhibit F —Valuation Analysis), the Debtors expect the Tax Group's NOL carryforwards will be eliminated and certain other Tax Attributes (such as the Debtors' tax basis in its assets) will be reduced.

## 2.    Limitation of NOL Carryforwards and Other Tax Attributes

Following the Effective Date, any NOL carryforwards, disallowed interest expense carryforwards and certain other Tax Attributes ("**Pre-Change Losses**") may be subject to limitation under section 382 of the Tax Code. Any such limitation applies in addition to, and not in lieu of, the reduction of Tax Attributes that results from COD arising in connection with the Plan.

Under section 382 of the Tax Code, if a corporation (or consolidated group) undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(*l*)(5) of the Tax Code discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally are subject to an annual limitation. The Debtors anticipate that the issuance of the New Common Shares pursuant to the Plan will result in an ownership change of the Tax Group.

(a)    Annual Limitation

In the event of an ownership change, the amount of the annual limitation to which a corporation (or consolidated group) that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation (or common parent of the consolidated group) immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (*e.g.*, 0.89% for ownership changes occurring in July 2020). For a corporation (or consolidated group) in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately after (rather than before) the ownership change after giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

In addition, if a loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a currently

effective IRS notice treated as recognized) during the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its Pre-Change Losses against such built-in gain income in addition to its regular annual allowance. Alternatively, if a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.  In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless the actual amount of such gain or loss is greater than the lesser of (1) $10,000,000.00 or (2) fifteen percent of the fair market value of its assets (with certain adjustments) before the ownership change.  On September 9, 2019, the IRS issued proposed regulations that would significantly modify the calculation and treatment of net unrealized built-in gains and losses; however, the IRS recently amended the proposed effective date provision to exempt from the new regulations ownership changes pursuant to chapter 11 cases filed prior to the regulations becoming effective.  Thus, the proposed regulations should not apply to the Debtors.

Based on existing IRS interpretations, the Debtors expect to be in a net unrealized built-in gain position as of the Effective Date.  Accordingly, even though the Debtors have an aggregate tax basis in their assets substantially in excess of their estimated fair market value, the Debtors do not expect that any future depletion, amortization, depreciation or losses attributable to such excess tax basis (after reduction for COD arising in connection with the Plan) to be limited by any resulting annual limitation.

If a corporation (or consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

(b)     Special Section 382(*l*)(5) Bankruptcy Exception

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan.  Under this rule, existing NOLs and NOL carryforwards (and possibly certain tax credits) would be subject to reduction in respect of certain interest deductions previously claimed in respect of debt exchanged for stock pursuant to the Plan, and a second ownership change within two years following the first ownership change would eliminate the Debtors' ability to utilize any Pre-Change Losses from periods before the second ownership change.  It is uncertain whether the Debtors will qualify for this exception, and, if applicable, whether the Debtors will elect not to have it apply.  The Plan is not premised on the application of such exception.

B.      **Consequences to Holders of Certain Claims**

This summary discusses the U.S. federal income tax consequences to U.S. Holders of Allowed RBL Claims, 1.125L Notes Claims, and Parent Unsecured Claims.  As used herein,

the term "**U.S. Holder**" means a beneficial owner of Claims or Existing Parent Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims or Existing Parent Equity Interests, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any such Claims or Existing Parent Equity Interests, you should consult your own tax advisor.

As indicated above, the discussion herein is based on the Current Structure and any deviation therefrom could materially change the U.S. federal income tax consequences described herein.

## 1.     RBL Claims

On the Effective Date, holder of an Allowed RBL Claim that executes the Amended Commitment Letter by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement (the "**New Loan Obligations**") and letter of credit participations under the Exit Credit Agreement; *provided* that each holder of an Allowed RBL Claim that does not execute the Amended Commitment Letter by the Voting Deadline shall receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement.

(a)     Gain or Loss on the Exchange of RBL Claims

For U.S. federal income tax purposes, the purported exchange of a new debt instrument for an existing debt instrument will be respected as an exchange, as a result of which (among other things) gain or loss is realized, if the terms of the new debt instrument compared to existing debt instrument constitute a "significant modification." The applicable Treasury Regulations concerning modification of debt instruments generally provide that an exchange occurs when, based on all the facts and circumstances and taking into account all changes in the terms of the debt instrument collectively (other than certain specified changes which are tested separately), the legal rights or obligations that are altered, and the degree to which they are altered, are economically significant. The Debtors believe that the exchange of Allowed RBL Claims for

New Loan Obligations is likely to be treated as a "significant modification" of the Allowed RBL Claims, and the remainder of this discussion so assumes.

Accordingly, the Debtors believe that the receipt of the New Loan Obligations in exchange for Allowed RBL Claims will be a fully taxable transaction to holders. In general, a U.S. Holder of Allowed RBL Claims should recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the "issue price" (as defined below) of the New Loan Obligations received in satisfaction of its Claims (other than any consideration received in respect of any Claim for accrued but unpaid interest), and (ii) the holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest). *See* Section B.5 below — Character of Gain or Loss. A U.S. Holder of Allowed RBL Claims will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* Section B.4 below — Distributions in Discharge of Accrued Interest or OID.

The "issue price" of any of the New Loan Obligations depends on whether, at any time during the 31-day period ending 15 days after the Effective Date, the New Loan Obligations or the Allowed RBL Claims are considered traded on an "established market." Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market. It is sufficient if there is a readily available sales price for an executed purchase or sale of the New Loan Obligations or Allowed RBL Claims, or if there is one or more "firm quotes" or "indicative quotes" with respect to the New Loan Obligations or Allowed RBL Claims, in each case as such terms are defined in applicable Treasury Regulations. If any of the New Loan Obligations received are considered traded on an established market, the issue price of such New Loan Obligations for U.S. federal income tax purposes will equal their fair market value as of the Effective Date. If any New Loan Obligations are not considered traded on an established market but the Allowed RBL Claims are so treated, the issue price of the New Loan Obligations for U.S. federal income tax purposes will be based on the fair market value of the Allowed RBL Claims. Alternatively, if the Allowed RBL Claims are also not considered traded on an established market, the issue price of the New Loan Obligations for U.S. federal income tax purposes generally will be their stated principal amount. If EP Energy determines that any of the New Loan Obligations or the Allowed RBL Claims are traded on an established market, such determination and the determination of issue price will be binding on a holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the EP Energy's determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

As of the date hereof, the Debtors do not believe that the RBL Claims would currently be considered traded on an established market; however the relevant determination date for such purpose is the Effective Date and there can be no assurances that a sufficient market will not arise in respect of the RBL Claims or the New Loan Obligations between now and 15 days after the Effective Date. Accordingly, holders of RBL Claims are urged to consult their own tax advisors regarding such determination and the gain or loss that such holder may recognize upon implementation of the Plan.

If the RBL Claims or the New Loan Obligations are treated as traded on an established market and the New Loan Obligations are determined to be issued at a discount, it is possible that the final agreed terms of the New Loan Obligations may implicate the provisions of the Treasury Regulations relating to "contingent payment debt instruments." For example, if the

New Loan Obligations are issued at a discount, the obligation of the Reorganized Debtors to prepay the loan if there is a reduction in the "borrowing base" could subject the New Loan Obligations to treatment as contingent payment debt instrument depending on the likelihood as of the Effective Date that such prepayments might actually occur.  Based in part on the principle terms contained in the Amended Commitment Letter and the Financial Projections, as well as the likely absence of an established market, the Debtors do not currently expect to treat the New Loan Obligations as contingent payment debt instruments, and the tax discussion herein assumes that the New Loan Obligations are not contingent payment debt instruments.  However, the Debtors' determination will be made based on the facts and circumstances as of the Effective Date, including the final agreed terms of the New Loan Obligations.  No assurance can be provided that the Debtors' treatment would be sustained if challenged by the IRS.  Treatment as a contingent payment debt instrument could affect the timing and amount of a holder's income and could cause the gain from the sale or other disposition of New Loan Obligations to be treated as ordinary income rather than capital gain.  Holders of New Loan Obligations are urged to consult their own tax advisors regarding the possible application of the contingent payment debt instrument rules to the New Loan Obligations.

> (b)     Stated Interest and Original Issue Discount on New Loan Obligations

Payments of stated interest on the New Loan Obligations generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received in accordance with the holder's regular method of tax accounting.

The New Loan Obligations may be treated as issued with original issue discount ("**OID**").  A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as described in the preceding section) by at least a statutorily defined *de minimis* amount.  The "stated redemption price at maturity" of the New Loan Obligations for this purpose would include all principal and interest payable over the term of the New Loan Obligations, other than "qualified stated interest," *i.e.*, stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer).  The stated interest payable on the New Loan Obligations should be considered qualified stated interest for this purpose. Accordingly, New Loan Obligations should be considered to be issued with OID for U.S. federal income tax purposes only if the stated principal amount of the respective New Loan Obligation exceeds its issue price by at least a *de minimis* amount.

If the New Loan Obligations are issued with OID, a U.S. Holder of New Loan Obligations generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the holder receives cash payments of interest on the obligation.  Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash.  Any OID that a holder includes in income will increase the holder's adjusted tax basis in the New Loan Obligations.  A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the New Loan Obligations; instead, such payments will reduce the holder's adjusted tax basis in the New Loan Obligations by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on the New Loan Obligations for each day during the taxable year on which such holder holds the New Loan Obligations, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes. The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period. The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the New Loan Obligations at the beginning of the accrual period multiplied by the yield to maturity of the New Loan Obligations less the amount of any qualified stated interest allocable to such accrual period. The "adjusted issue price" of the New Loan Obligations at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the New Loan Obligations in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the New Loan Obligations other than qualified stated interest.

The rules regarding the determination of issue price and OID are complex. Accordingly, U.S. Holders of Allowed RBL Claims are urged to consult their own tax advisors regarding the possible application of the OID rules to the New Loan Obligations.

### 2. 1.125L Notes Claims

Pursuant to the Plan, each holder of an Allowed 1.125L Notes Claim will receive, in full and final satisfaction of such Allowed 1.125L Notes Claim, New Common Shares.

#### (a) Status as a Security

The U.S. federal income tax consequences of the Plan to a U.S. Holder of an Allowed 1.125L Notes Claim depends, in part, on whether a holder's Allowed 1.125L Notes Claim constitutes a "security" for U.S. federal income tax purposes.

The term "security" is not defined in the Tax Code or in Treasury Regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute securities. Additionally, the IRS has ruled that new debt obligations with a term of less than five years issued in exchange for and bearing the same terms (other than interest rate) as securities should also be classified as securities for this purpose, since the new debt represents a continuation of the holder's investment in the corporation in substantially the same form.

The Allowed 1.125L Notes Claims had an eight (8) year maturity at issuance. Although it is the determination of whether the new instrument constitutes a security that generally controls, that determination may be governed by whether the exchanged instrument constituted a security based on the IRS ruling mentioned above. The Debtors intend to take the position and,

unless otherwise indicated, the rest of this discussion assumes that the Allowed 1.125L Notes Claims qualify as securities for U.S. federal income tax purposes. U.S. Holders of Allowed 1.125L Notes Claims are urged to consult their own tax advisors regarding the appropriate status of their Allowed 1.125L Notes Claims for U.S. federal income tax purposes.

(b)      Recapitalization Treatment

A U.S. Holder's receipt of New Common Shares and other consideration, if any, in exchange for Allowed 1.125L Notes Claims (that are treated as "securities" for U.S. federal income tax purposes) will qualify as a "recapitalization" for U.S. federal income tax purposes. Accordingly, in general, a U.S. Holder of an Allowed 1.125L Notes Claim will not recognize any gain or loss upon the exchange of its Claim. However, a U.S. Holder will have interest income to the extent of any consideration allocable to accrued but unpaid interest or possibly accrued OID not previously included in income (*see* Section B.4 below — Distributions in Discharge of Accrued Interest or OID).

In a recapitalization exchange, a U.S. Holder's aggregate tax basis in the New Common Shares should equal such U.S. Holder's adjusted tax basis in its Allowed 1.125L Notes Claim, increased by any interest income recognized in the exchange.   In general, the holder's holding period in the New Common Shares received would include the holder's holding period for its Claim, except to the extent that such shares were issued in respect of a Claim for accrued but unpaid interest.

(c)      Disposition of New Common Shares

In general, unless a nonrecognition provision applies to a future disposition, and subject to the discussion below with respect to the potential carryover of accrued market discount (*see* Section B.5 below — Character of Gain or Loss), U.S. Holders generally will recognize capital gain or loss upon the sale or exchange of the New Common Shares in an amount equal to the difference between (i) the holder's adjusted tax basis in the New Common Shares held and (ii) the sum of the cash and the fair market value of any property received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Shares is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

However, any gain recognized by a U.S. Holder upon a disposition of the New Common Shares received in exchange for its Claim (or any stock or property received for such New Common Shares in a later tax-free exchange) generally will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions previously claimed as a result of the write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, and (ii) with respect to a cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

### 3.     Convenience Claims and Parent Unsecured Claims

The Plan provides that holders of Allowed Convenience Claims will receive distributions in Cash equal to the lesser of (a) 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount.  The Plan further provides that holders of Allowed Parent Unsecured Claims will receive distributions in Cash equal to the lesser of (i) the amount of such Claim or (ii) the holder's Pro Rata share of the Cash on EP Parent's balance sheet on the Effective Date, in full and final satisfaction of their Claims.

In general, a U.S. Holder of Allowed Convenience Claims or Allowed Parent Unsecured Claims receiving Cash in full and final satisfaction of its Claims, should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of Cash received in respect of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* Section B.5 below — Character of Gain or Loss.  A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or accrued OID not previously included in income.  *See* Section B.4 below — Distributions in Discharge of Accrued Interest or OID.

In the event of the subsequent disallowance of any Disputed Convenience Claim Disputed Parent Unsecured Claim, it is possible that a holder of a previously Allowed Convenience Claim or Allowed Parent Unsecured Claim may receive additional distributions in respect of its Claim, except that any such additional distributions will not be treated for U.S. federal income tax purposes as additional consideration received in respect of its Claim to the extent treated as interest income under the imputed interest provisions of the Tax Code.  Accordingly, it is possible that the recognition of any loss realized by a holder with respect to an Allowed Convenience Claim or Allowed Parent Unsecured Claim may be deferred until all Convenience Claims or Parent Unsecured Claims, as applicable, are allowed or disallowed.  Alternatively, it is possible that a holder will have additional gain in respect of any additional distributions received in respect of its Allowed Convenience Claim or Allowed Parent Unsecured Claim.  *See also* Section B.6 below — Tax Treatment of Disputed Claims Reserve.

### 4.     Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income).  Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed or accrued OID was previously included in its gross income and is not paid in full.  However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current loss with respect to any accrued unpaid OID.

Section 6.13 of the Plan provides that, except as otherwise required by law, consideration received in respect of an Allowed RBL Claim, Allowed 1.125L Notes Claim or an Allowed Parent Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the

remainder of the Claim, including any Claim for accrued but unpaid interest.  There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes.  *U.S. Holders of Allowed Claims are urged to consult their own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.*

### 5.     Character of Gain or Loss

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction.

A holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code.  A holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the holder's adjusted tax basis in its Claim is less than the stated redemption price of such Claim at maturity by at least a statutorily defined *de minimis* amount.  Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued.  If a holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange but, if the exchange qualifies for recapitalization treatment, only up to the amount of gain that the holder recognizes in the exchange.

In the case of an exchange of an Allowed 1.125L Notes Claim that qualifies for recapitalization treatment, the Tax Code indicates that any accrued market discount in respect of the Claim should not be currently includible in income under Treasury Regulations to be issued.  Any accrued market discount that is not included in income should carry over to any nonrecognition property received in exchange therefor, *i.e.*, to the New Common Shares.  Any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Shares should then be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury Regulations implementing this rule have not been issued.

### 6.     Tax Treatment of Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash or other property held in the Disputed Claims Reserve on account of Disputed Convenience Claims and Disputed Parent Unsecured Claims as held in a "disputed ownership fund" governed

by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, the Disbursing Agent, and the holders of Convenience Claims and Parent Unsecured Claims) will be required to report for tax purposes consistently with such treatment.  Accordingly, the Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the reserve will be taxable to such entity.

Any distributions from the reserve to holders of Allowed Claims will be treated for U.S. federal income tax purposes as if received directly from the Debtors on their Allowed Claims. The Disbursing Agent will be responsible for payment, out of the cash in the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve.  Accordingly, distributions from the reserve will be net of any taxes relating to the retention, disposition and distribution of assets in the reserve.  In the event, and to the extent, any cash of the reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the reserve may be sold to pay such taxes.

## C.      Treatment of Existing Parent Equity Interests

On the Effective Date, each holder of Existing Parent Equity Interests will receive its Pro Rata share of $300,000 in Cash in cancellation, release, and extinguishment of its Existing Parent Equity Interests.

In general, a U.S. Holder of Existing Parent Equity Interests should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of Cash received in respect of its Existing Parent Equity Interests, and (ii) the U.S. Holder's adjusted tax basis in the Existing Parent Equity Interests exchanged.  Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its Existing Parent Equity Interests is more than one year.  A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders.  The deductibility of capital loss is subject to significant limitations.

As indicated above, the foregoing discussion does not address holders of Existing Parent Equity Interests that also hold Claims or the U.S. federal income tax consequences to non-U.S. Holders.  All holders of Existing Parent Equity Interests are urged to consult their own tax advisors regarding the U.S. federal income tax treatment to them under the Plan.

## D.      Withholding on Distributions and Information Reporting

All distributions to holders of RBL Claims, 1.125L Notes Claims, Convenience Claims, Parent Unsecured Claims and Existing Parent Equity Interests under the Plan are subject to any applicable tax withholding, including backup withholding and withholding on distributions to non-U.S. Holders (such as due to the application of the Foreign Investment in Real Property Tax Act).

Under U.S. federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 24%).  Backup withholding generally applies if the U.S.

Holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions. *Holders are urged to consult their own tax advisors regarding the potential application of U.S. withholding taxes to the transactions contemplated under the Plan and whether any distributions to them would be subject to withholding.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

The foregoing summary has been provided for informational purposes only. All holders of Claims and Interests are urged to consult their own tax advisors concerning the federal, state, local and other tax consequences applicable under the Plan.

## VIII.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Before voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in the Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.

THIS SECTION PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THE FACTORS BELOW SHOULD NOT BE REGARDED AS THE ONLY RISKS ASSOCIATED WITH THE PLAN OR ITS IMPLEMENTATION. ADDITIONAL RISK FACTORS IDENTIFIED IN THE DEBTORS' PUBLIC FILINGS WITH THE SEC MAY ALSO BE APPLICABLE TO THE MATTERS SET OUT HEREIN AND SHOULD BE REVIEWED AND CONSIDERED IN CONJUNCTION WITH THIS DISCLOSURE STATEMENT, TO THE EXTENT APPLICABLE. THE RISK FACTORS SET FORTH IN THE DEBTORS' ANNUAL REPORT ON FORM 10-K FOR THE FISCAL YEAR ENDED DECEMBER 31, 2019 FILED WITH THE SEC ON MARCH 25, 2020 ARE HEREBY INCORPORATED BY REFERENCE. NEW FACTORS, RISKS AND UNCERTAINTIES EMERGE FROM TIME TO TIME AND IT IS NOT POSSIBLE TO PREDICT ALL SUCH FACTORS, RISKS AND UNCERTAINTIES.

### A.    Certain Bankruptcy Law Considerations

#### 1.    General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is

impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy cases to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees. The cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.    Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.

Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan. Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

### 3.    Non-Consensual Confirmation and Conversion into Chapter 7 Cases

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. *See* Section XI.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 4.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date and that there is not a material risk that the Debtors will not be able to obtain any necessary governmental approvals (including any antitrust approval), there can be no assurance as to the timing of the Effective Date. The transactions contemplated under the Plan

may require a review under the Hart-Scott-Rodino Antitrust Improvements Act. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 5. Risks Related to Possible Objections to the Plan

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan. Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

### 6. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article X.7 of the Plan provides for certain releases, injunctions, and exculpations, for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan, and annexed hereto as **Exhibit G**, are subject to objection by parties in interest and may not be approved. If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

### B. Risks Related to Exit Facility

### 1. Defects in Collateral Securing the Exit Facility

The indebtedness under the Exit Facility will be secured, subject to certain exceptions and permitted liens, by security interests in substantially all assets of the Reorganized Debtors (henceforth, the "**Collateral**"). The Collateral securing the Exit Facility may be subject to exceptions, defects, encumbrances, liens, and other imperfections. Further, the Debtors have not conducted appraisals of any of their assets constituting Collateral to determine if the value of the Collateral upon foreclosure or liquidation equals or exceeds the amount of the Exit Facility or such other obligation secured by the Collateral. Accordingly, it cannot be assured that the remaining proceeds from a sale of the Collateral would be sufficient to repay holders of the obligations under the Exit Facility all amounts owed in accordance therewith. The fair market value of the Collateral is subject to fluctuations based on factors that include, among others, the ability to sell Collateral in an orderly manner, general economic conditions, the availability of buyers, the Reorganized Debtors' failure to implement their business strategy, and similar factors. The amount received upon a sale of Collateral would be dependent on numerous factors, including the actual fair market value of the Collateral at such time, and the timing and manner of the sale. By its nature, portions of the Collateral may be illiquid and may have no readily ascertainable market value. In the event of a subsequent foreclosure, liquidation, bankruptcy, or similar proceeding, it cannot be assured that the proceeds from any sale or liquidation of the Collateral will be sufficient to pay the Reorganized Debtors' obligations under the Exit Facility, in full or at

all.  There can also be no assurance that the Collateral will be saleable, and, even if saleable, the timing of its liquidation would be uncertain.  Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the Exit Facility.

### 2.      Failure to Perfect Security Interests in Collateral

The failure to properly perfect liens on the Collateral could adversely affect the Exit Facility Agent's ability to enforce its respective rights with respect to the Collateral for the benefit of itself and the holders of the Exit Facility.  In addition, applicable law requires that certain property and rights acquired after the grant of a general security interest or lien can only be perfected at the time such property and rights are acquired and identified.  There can be no assurance that the Exit Facility Agent will monitor, or that the Reorganized Debtors will inform the Exit Facility Agent of the future acquisition of property and rights that constitute Collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired Collateral.  The Exit Facility Agent has no obligation to monitor the acquisition of additional property or rights that constitute Collateral or the perfection of any security interests therein.  Such failure may result in the loss of the practical benefits of the liens thereon or of the priority of the liens securing the notes against third parties.

### 3.      Casualty Risk of Collateral

The Reorganized Debtors will be obligated by the Exit Facility to maintain adequate insurance or otherwise insure against hazards as is customarily done by companies having assets of a similar nature in the same or similar localities.  There are, however, certain losses that may either be uninsurable or not economically insurable, in whole or in part.  As a result, it is possible that the insurance proceeds will not compensate the Reorganized Debtors fully for their losses.  If there is a total or partial loss of any of the pledged Collateral, the insurance proceeds received may be insufficient to satisfy the secured obligations of the Reorganized Debtors, including the Exit Facility.

### 4.      Any Future Pledge of Collateral Might Be Avoidable in a Subsequent Bankruptcy by the Reorganized Debtors

Any future pledge of Collateral in favor of the Exit Facility Agent, including pursuant to security documents delivered after the date of the Exit Facility, might be avoidable by the pledgor (as a subsequent debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the securities under the Exit Facility to receive a greater recovery than if the pledge had not been given, and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

### 5.      Risk that Remaining Lender May Not Sign Up to the Exit Facility

The holders of approximately 98% of the Claims under the Debtors' prepetition RBL Facility have agreed to the terms of the Amended Commitment Letter and the Debtors are hopeful that the holders of the remaining Claims under the Debtors' prepetition RBL Facility will agree as well after the Debtors file the terms publicly with the filing of the Disclosure Statement,

and the Amended Commitment Letter will be effective.  However, there can be no assurance that the remaining RBL Lenders will execute and deliver the Amended Commitment Letter.  As such, there is a risk that less than 100% of the holders of Claims under the Prepetition RBL Facility will commit to the Exit Facility.

### 6. Effectiveness of Exit Facility

The effectiveness of the Exit Facility and the commitment of the Exit Lenders to make revolving loans available to the Reorganized Debtor are subject to the conditions precedent, including as set forth in the Exit Term Sheet, which include the following material conditions (i) entry of the Confirmation Order in form and substance reasonably satisfactory to the Exit Facility Agent and the Required Revolving Lenders (as defined in the Amended Commitment Letter), (ii) the Effective Date of the Plan occurring, (iii) all obligations under the DIP Facility and RBL Facility, to the extent not automatically converted into the Exit Facility, being repaid in full in cash, (iv) the Exit Facility Agent shall have received satisfactory evidence that immediately after the consummation of the Plan, total outstanding debt for borrowed money net of unrestricted cash and cash equivalents of EPE Acquisition LLC, EP Energy LLC and its restricted subsidiaries shall not exceed $525,000,000, (v) the only outstanding secured indebtedness for borrowed money of the Credit Parties (as defined in the Amended Commitment Letter) shall be the indebtedness arising under the Exit Facility, and (vi) the Credit Parties shall have minimum Liquidity (as defined in the Amended Commitment Letter) of $100,000,000 (subject to adjustments as set forth in the Amended Commitment Letter).

### C. Additional Factors Affecting the Value of Reorganized Debtors

### 1. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained herein is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, customer demand for the Reorganized Debtors' products, inflation, and other unanticipated market and economic conditions.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court including any natural disasters, terrorist attacks, or health epidemics may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

## 2.    Risks Associated with the Debtors' Business and Industry

The risks associated with the Debtors' businesses and industry are more fully described in the Debtors' SEC filings, including Form 10-K for the fiscal year ended December 31, 2019, filed with the SEC on March 25, 2020.  The risks associated with the Debtors' businesses and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- risk and uncertainties relating to the effects of disruption from the Chapter 11 Cases making it more difficult to maintain business and operational relationships, to retain key executives and to maintain various licenses and approvals necessary for the Debtors to conduct the Debtors' business;

- risk and uncertainties relating to the Debtors' ability to complete definitive documentation in connection with any financing and the amount, terms and conditions of any such financing;

- risk and uncertainties relating to the Debtors' ability to obtain requisite support for the Plan from various stakeholders; the Debtors' ability to confirm and consummate the Plan; and Reorganized EP Energy's ability to continue as a going concern;

- risk and uncertainties relating to the trading of the Debtors' securities;

- risk and uncertainties relating to events outside of the Debtors' control, including an epidemic or outbreak of an infectious disease, such as the novel coronavirus (COVID-19), and the potential effects on the Debtors' operations and/or on domestic and international demand for crude oil and natural gas, delays, supply chain disruptions, travel restrictions and other events resulting therefrom that may impact the oil and gas industry;

- the volatility and potential for sustained low oil, natural gas, and natural gas liquids prices;

- the supply and demand for oil, natural gas, and natural gas liquids; and potential risks relating to agreements and negotiations among members of the Organization of the Petroleum Exporting Countries;

- changes in commodity prices and basis differentials for oil and natural gas;

- the Debtors' ability to meet production volume targets;

- the uncertainty of estimating proved reserves and unproved resources;

- the Debtors' ability to develop proved undeveloped reserves;

- the future level of operating and capital costs;

- the availability and cost of financing to fund future exploration and production operations;

- the Debtors' ability to comply with the covenants in various financing documents, including making principal and interest payments or to obtain any necessary consents, waivers or forbearances thereunder;

- the Debtors' ability to generate sufficient cash flow to meet their debt obligations and commitments;

- the Debtors' ability to borrow under existing debt agreements to fund their operations;

- the Debtors' ability to obtain necessary governmental approvals for proposed exploration and production projects and to successfully construct and operate such projects;

- actions by credit ratings agencies, including potential downgrades;

- credit and performance risk of the Debtors' lenders, trading counterparties, customers, vendors, suppliers and third party operators;

- general economic and weather conditions in geographic regions or markets we serve, or where operations are located, including the risk of a global recession and negative impact on demand for oil and/or natural gas;

- the uncertainties associated with governmental regulation, including any potential changes in federal and state tax laws and regulations; and

- competition.

### 3.    DIP Facility

The DIP Facility, along with the use of cash on hand (cash collateral), is intended to provide liquidity to the Debtors during the pendency of the Chapter 11 Cases.  If the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust or lose access to their financing.  The DIP Facility matures on November 25, 2020.  There is no assurance that the Debtors will be able to obtain additional financing from the Debtors' existing lenders or otherwise. In either such case, the liquidity necessary for the orderly functioning of the Debtors' business may be materially impaired.

### 4.    Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have $500 million of secured funded indebtedness outstanding composed of the Exit Facility (assumed to be drawn in an amount of $500 million on the Effective Date).  The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### D.  Factors Relating to Securities to Be Issued under Plan

#### 1.  Market for Securities

There is currently no market for the New Common Shares, and there can be no assurance as to the development or liquidity of any market for any such securities.

The Reorganized Debtors are under no obligation to list the New Common Shares on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  Further, the New Common Shares will be subject to transfer restrictions, if any, in the Stockholders Agreement.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in the Disclosure Statement depending upon many factors including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for the Reorganized Debtors.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

#### 2.  Potential Dilution

The ownership percentage represented by the New Common Shares distributed on the Effective Date under the Plan, will be subject to dilution from the equity issued in connection with the Employee Incentive Program, any other shares that may be issued in connection with the Plan or post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

#### 3.  Significant Holders

Certain holders of 1.125L Claims are expected to acquire a significant ownership interest in the New Common Shares pursuant to the Plan.  Such holders, if their decisions are aligned, may be in a position to control the outcome of all actions requiring stockholder approval, including the election of directors, without the approval of other stockholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Shares.

#### 4.  Equity Interests Subordinated to Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Shares would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Shares will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

5.      **Valuation of New Common Shares Not Intended to Represent Trading Value of New Common Shares**

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Shares in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (a) prevailing interest rates; (b) conditions in the financial markets; (c) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (d) other factors that generally influence the prices of securities.  The actual market price of the New Common Shares is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Shares to rise and fall.  Accordingly, the value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Shares in the public or private markets.

6.      **No Intention to Pay Dividends**

Reorganized EP Energy may not pay any dividends on the New Common Shares and may instead retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Common Shares may depend entirely upon any future appreciation in the value of the New Common Shares.  There is, however, no guarantee that the New Common Shares will appreciate in value or even maintain their initial value.

7.      **Reorganized EP Energy will be a Private Company**

Reorganized EP Energy is not expected to be subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.  As a result, holders of the New Common Shares may receive less information with respect to the Debtors' business than they would have received if Reorganized EP Energy was subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act.

E.      **Additional Factors**

1.      **Debtors Could Withdraw Plan**

The Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

2.      **Debtors Have No Duty to Update**

The statements contained in the Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of the Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update the Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside the Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in the Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, the Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by the Disclosure Statement

The contents of the Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

The Disclosure Statement is not legal advice to you. The Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article VII thereof.

### IX.
### VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a claim in a Voting Class as of the Record Date (an "**Eligible Holder**") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in the Disclosure Statement are subject to the terms and conditions of the Plan.

### A. Voting Deadline

All Eligible Holders have been sent a Ballot together with the Disclosure Statement. Such holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies the Disclosure Statement to cast your vote.

The Debtors have engaged Prime Clerk LLC as their Voting Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan. **FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING**

DEADLINE OF 4:00 P.M. (PREVAILING CENTRAL TIME) ON AUGUST 19, 2020, UNLESS EXTENDED BY THE DEBTORS.

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE VOTING AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE VOTING AGENT AT:

**Prime Clerk LLC**
**Telephone: (877) 502-9869 (domestic toll free) or (917) 947-2373 (international)**
**E-mail: EPEnergyinfo@primeclerk.com (with "EP Energy" in the subject line)**

Additional copies of the Disclosure Statement are available upon request made to the Voting Agent, at the telephone numbers or e-mail address set forth immediately above.

### B.      Voting Procedures

The Debtors are providing copies of the Disclosure Statement (including all exhibits and appendices), related materials, and a Ballot (collectively, a "**Solicitation Package**") to record holders in the Voting Classes.

Eligible Holders in the Voting Classes should provide all of the information requested by the Ballot, and should (a) complete and return all Ballots received in the enclosed, self-addressed, postage-paid envelope provided with each such Ballot to the Voting Agent, or electronically via e-mail to EPEnergyinfo@primeclerk.com with "EP Energy" in the subject line, or (b) submit a Ballot electronically via the E-Ballot voting platform on Prime Clerk's website by visiting https://cases.primeclerk.com/EPEnergy, clicking on the "Submit E-Ballot" link, and following the instructions set forth on the website.

HOLDERS ARE STRONGLY ENCOURAGED TO SUBMIT THEIR BALLOTS VIA THE E-BALLOT PLATFORM.

### C.      Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless: (1) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (2) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems

such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of: (1) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan; and (2) Interests as acceptance by interest holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

The Claims and Interests in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

Class 3 — RBL Claims

Class 4 — 1.125L Notes Claims

Class 5B — Parent Unsecured Claims

Class 6 — Convenience Class

Class 9 — Existing Parent Equity Interests

An Eligible Holder should vote on the Plan by completing a Ballot in accordance with the instructions therein and as set forth above.

All Ballots must be signed by the Eligible Holder, or any person who has obtained a properly completed Ballot proxy from the Eligible Holder by the Record Date. Unless otherwise ordered by the Bankruptcy Court, Ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted. The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the Ballots. Any Ballot marked to both accept and reject the Plan will not be counted. If you return more than one Ballot voting different claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted. An otherwise properly executed Ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Date and the Petition Date including interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite votes for acceptance have been received, only Eligible Holders who actually vote will be counted.

The failure of a holder to deliver a duly executed Ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions will not be counted as votes for or against the Plan.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

### 1.    Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another, acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Ballot of each Eligible Holder for whom they are voting.

### 2.    Agreements Upon Furnishing Ballots

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept: (a) all of the terms of, and conditions to, this Solicitation; and (b) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, 10.7, 10.8, and 10.9 therein. All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

### 3.    Change of Vote

Any party who has previously submitted to the Voting Agent before the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent before the Voting Deadline a subsequent, properly completed Ballot voting for acceptance or rejection of the Plan.

### D.    **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy

Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### E.    Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your claims or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, or any exhibits to such documents, please contact the Voting Agent.

### X.
### CONFIRMATION OF PLAN

### A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. On, or as promptly as practicable after, the Petition Date, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

### B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

a) **Debtors** at
EP Energy Corporation
601 Travis St., Suite 1400, Houston, TX 77002
Houston, Texas 77042
Attn:   Jace Locke, Esq.

b) **Counsel to Debtors** at
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Alfredo R. Pérez (Alfredo.Perez@weil.com)
            Clifford Carlson (Clifford.Carlson@weil.com)
            Stephanie Morrison (Stephanie.Morrison@weil.com)

-and-

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:   Matthew S. Barr (Matt.Barr@weil.com)
          Ronit Berkovich (Ronit.Berkovich@weil.com)
          Scott R. Bowling (Scott.Bowling@weil.com)
          David J. Cohen (DavidJ.Cohen@weil.com)

c)  **Counsel to the Ad Hoc Group of 1.125L Noteholders** at
Morrison & Foerster LLP
250 West 55th Street
New York, New York 10019
Tel: (212) 468-8000
Attn:   Brett H. Miller (brettmiller@mofo.com)
          Dennis L. Jenkins (djenkins@mofo.com)

d)  **Counsel to the Creditors' Committee** at
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York 10038
Tel: (212) 806-5400
Attn:   Kristopher M. Hansen (khansen@stroock.com)
          Frank A. Merola (fmerola@stroock.com)
          Erez E. Gilad (egilad@stroock.com)
          Jonathan D. Canfield (jcanfield@stroock.com)

e)  **Office of the U.S. Trustee** at
Office of the U.S. Trustee for Region 7
515 Rusk Street, Suite 3516
Houston, Texas 77002

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.  <u>**Requirements for Confirmation of Plan**</u>

The Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the Plan is (1) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (2) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (3) feasible.

### 1. Acceptance of Plan

Under the Bankruptcy Code, a Class accepts a chapter 11 plan if (1) holders of two-thirds (2/3) in amount and (2) with respect to holders of Claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the Plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.

### 2.    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit D.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### 3.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "**Financial Projections**") for the fiscal years 2020 through 2025 (the "**Projection Period**"). The Financial Projections, and the assumptions on which they are based, are annexed hereto as

**Exhibit E**.  Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan.  The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production domestically and internationally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Debtors operate, regulatory changes, and a variety of other factors.  Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in the Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

**XI.**
**ALTERNATIVES TO CONFIRMATION
AND CONSUMMATION OF PLAN**

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (A) the preparation and presentation of an alternative reorganization; (B) the a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (C) a liquidation under chapter 7 of the Bankruptcy Code.

**A.**     **Alternative Plan of Reorganization**

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either: (a) a reorganization and continuation of the Debtors' businesses or (b) an orderly liquidation of their assets.  The Debtors, however,

believe that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.  Sale under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Subject to the terms of the Intercreditor Agreements, holders of RBL Claims, 1.125L Notes Claims, 1.25L Notes Claims, and 1.5L Notes Claims and the DIP Lenders would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of 1.125L Notes Claims, 1.25L Notes Claims, and 1.5L Notes Claims and the DIP Lenders would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of its assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

### C.  Liquidation Under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the  Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

### XII.
### CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims and Interests in Classes 3, 4, 5B, 6 and 9 to vote in favor thereof.

Dated: July 13, 2020
       Houston, Texas

Respectfully submitted,

EP ENERGY CORPORATION, on behalf of itself
and its undersigned subsidiaries

*/s/ David Rush*

Name: David Rush
Title:   Chief Restructuring Officer

EPE ACQUISITION, LLC
EP ENERGY LLC
EVEREST ACQUISITION FINANCE INC.
EP ENERGY GLOBAL LLC
EP ENERGY MANAGEMENT, L.L.C.
EP ENERGY RESALE COMPANY, L.L.C.
EP ENERGY E&P COMPANY, L.P.

**<u>Exhibit A</u>**

**Plan**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § | Chapter 11 |
|  | § |  |
| EP ENERGY CORPORATION, *et al.*, | § | Case No. 19-35654 (MI) |
|  | § |  |
|  | § | (Jointly Administered) |
| Debtors.[1] | § |  |
|  | § |  |

## FIFTH AMENDED JOINT CHAPTER 11 PLAN OF
## EP ENERGY CORPORATION AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Alfredo R. Pérez
Clifford W. Carlson
Stephanie N. Morrison (admitted *pro hac vice*)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: July 13, 2020
         Houston, Texas

**WEIL, GOTSHAL & MANGES LLP**
Matthew S. Barr (admitted *pro hac vice*)
Ronit Berkovich (admitted *pro hac vice*)
Scott R. Bowling (admitted *pro hac vice*)
David J. Cohen (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: EP Energy Corporation (2728), EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092). The Debtors' primary mailing address is 601 Travis Street, Suite 1400, Houston, TX 77002.

## Table of Contents

**ARTICLE I.**   **Definitions and Interpretation.** ..........................................................................1

1.1   Definitions...........................................................................................................1

1.2   Interpretation; Application of Definitions; Rules of Construction. .................18

1.3   Reference to Monetary Figures.........................................................................18

1.4   Consent Rights of the Requisite 1.125L Noteholders......................................18

1.5   Controlling Document. .....................................................................................18

**ARTICLE II.**   **Administrative Expense Claims, Fee Claims, DIP Claims, and Priority Tax Claims.**..............................................................................................................19

2.1   Treatment of Administrative Expense Claims...................................................19

2.2   Treatment of Fee Claims...................................................................................19

2.3   Treatment of DIP Claims and Commitments.....................................................20

2.4   Payment of Fees and Expenses Under DIP Order. ...........................................20

2.5   Treatment of Priority Tax Claims. ....................................................................20

**ARTICLE III.**   **Classification of Claims and Interests.**...............................................................21

3.1   Classification in General....................................................................................21

3.2   Formation of Debtor Groups for Convenience Only. .......................................21

3.3   Summary of Classification of Claims and Interests..........................................21

3.4   Special Provision Governing Unimpaired Claims.............................................22

3.5   Separate Classification of Other Secured Claims. ............................................22

3.6   Elimination of Vacant Classes. .........................................................................22

3.7   Voting Classes; Presumed Acceptance by Non-Voting Classes........................22

3.8   Voting; Presumptions; Solicitation. ..................................................................23

3.9   Cramdown...........................................................................................................23

3.10   No Waiver...........................................................................................................23

| | | |
|---|---|---|
| **ARTICLE IV.** | **Treatment of Claims and Interests**.................................................................**23** |
| 4.1 | Class 1: Other Secured Claims. .................................................................. | 23 |
| 4.2 | Class 2:  Other Priority Claims. ................................................................ | 24 |
| 4.3 | Class 3:  RBL Claims................................................................................. | 24 |
| 4.4 | Class 4:  1.125L Notes Claims................................................................... | 25 |
| 4.5 | Class 5A:  Unsecured Claims. .................................................................... | 25 |
| 4.6 | Class 5B:  Parent Unsecured Claims. ........................................................ | 25 |
| 4.7 | Class 6:  Convenience Claims.................................................................... | 25 |
| 4.8 | Class 7:  Intercompany Claims. ................................................................. | 26 |
| 4.9 | Class 8:  Subordinated Claims. .................................................................. | 26 |
| 4.10 | Class 9:  Existing Parent Equity Interests. ............................................... | 26 |
| 4.11 | Class 10:  Other Equity Interests. ............................................................. | 26 |
| 4.12 | Class 11:  Intercompany Interests. ............................................................ | 27 |
| 4.13 | Treatment of Vacant Classes. .................................................................... | 27 |
| **ARTICLE V.** | **Means for Implementation**..........................................................................**27** |
| 5.1 | Compromise and Settlement of Claims, Interests, and Controversies............ | 27 |
| 5.2 | Treatment of MSB Claims, Interests, and Controversies. .............................. | 27 |
| 5.3 | Continued Corporate Existence; Effectuating Documents; Further Transactions. ................................................................................................. | 28 |
| 5.4 | Corporate Action........................................................................................ | 29 |
| 5.5 | Plan Funding. ............................................................................................. | 30 |
| 5.6 | Cancellation of Existing Securities and Agreements...................................... | 30 |
| 5.7 | Cancellation of Certain Existing Security Interests. ...................................... | 31 |
| 5.8 | Officers and Boards of Directors. ................................................................. | 32 |
| 5.9 | Employee Incentive Plan. ............................................................................. | 33 |
| 5.10 | Authorization, Issuance, and Delivery of New Common Shares. ................... | 33 |

5.11       Exit Credit Agreement. .................................................................33

5.12       Intercompany Interests; Corporate Reorganization. .........................34

5.13       Restructuring Transactions. ...........................................................34

5.14       Indenture Trustee Fees and Expenses. ............................................34

5.15       Private Company. ..........................................................................36

5.16       Member Expenses. .........................................................................36

**ARTICLE VI.    Distributions. ..............................................................36**

6.1        Distributions Generally. .................................................................36

6.2        No Postpetition Interest on Claims. .................................................36

6.3        Date of Distributions. ....................................................................36

6.4        Distribution Record Date. ..............................................................37

6.5        Distributions after Effective Date ...................................................37

6.6        Disbursing Agent. .........................................................................37

6.7        Delivery of Distributions. ..............................................................37

6.8        Unclaimed Property. ......................................................................38

6.9        Satisfaction of Claims. ...................................................................38

6.10       Manner of Payment under Plan. .....................................................38

6.11       Fractional Shares and De Minimis Cash Distributions. ....................38

6.12       No Distribution in Excess of Amount of Allowed Claim. ..................39

6.13       Allocation of Distributions Between Principal and Interest. .............39

6.14       Exemption from Securities Laws. ....................................................39

6.15       Setoffs and Recoupments. ..............................................................39

6.16       Rights and Powers of Disbursing Agent. .........................................40

6.17       Withholding and Reporting Requirements. ......................................40

**ARTICLE VII.   Procedures for Disputed Claims.**....................................................**41**

   7.1      Allowance of Claims.........................................................................41

   7.2      Claims Objections............................................................................41

   7.3      Estimation of Claims........................................................................41

   7.4      Adjustment to Claims Register Without Objection. .......................42

   7.5      Time to File Objections to Claims. ..................................................42

   7.6      Disallowance of Claims. ..................................................................42

   7.7      Amendments to Claims.....................................................................42

   7.8      No Distributions Pending Allowance. ..............................................43

   7.9      Disputed Claims Reserve..................................................................43

   7.10    Distributions After Allowance. ........................................................44

   7.11    Claims Resolution Procedures Cumulative. .....................................44

**ARTICLE VIII. Executory Contracts and Unexpired Leases. ...............................44**

   8.1      General Treatment. ...........................................................................44

   8.2      Determination of Cure Amounts and Deemed Consent. ..................45

   8.3      Payments Related to Assumption of Contracts and Leases.............46

   8.4      Rejection Damages Claims. ..............................................................46

   8.5      Survival of the Debtors' Indemnification Obligations.....................46

   8.6      Employee Arrangements...................................................................47

   8.7      Insurance Policies. ...........................................................................47

   8.8      Modifications, Amendments, Supplements, Restatements, or Other Agreements. ....................................................................................48

   8.9      Reservation of Rights.......................................................................48

**ARTICLE IX.   Conditions Precedent to Occurrence of Effective Date. ...............49**

   9.1      Conditions Precedent to Effective Date............................................49

   9.2      Waiver of Conditions Precedent. .....................................................50

9.3       Effect of Failure of a Condition. ...................................................................50

**ARTICLE X.      Effect of Confirmation.**...............................................................**50**

10.1      Binding Effect. .............................................................................................50

10.2      Vesting of Assets. .........................................................................................51

10.3      Discharge of Claims Against and Interests in Debtors. ...............................51

10.4      Pre-Confirmation Injunctions and Stays. .....................................................52

10.5      Injunction Against Interference With Plan. ..................................................52

10.6      Plan Injunction. ............................................................................................52

10.7      Releases.........................................................................................................53

10.8      Exculpation. ..................................................................................................56

10.9      Injunction Related to Releases and Exculpation...........................................56

10.10    Subordinated Claims. ....................................................................................57

10.11    Retention of Causes of Action and Reservation of Rights. ..........................57

10.12    Ipso Facto and Similar Provisions Ineffective. ............................................57

10.13    Indemnification and Reimbursement Obligations. .......................................57

**ARTICLE XI.      Retention of Jurisdiction.** ..........................................................**58**

11.1      Retention of Jurisdiction. .............................................................................58

**ARTICLE XII.     Miscellaneous Provisions.**..........................................................**60**

12.1      Exemption from Certain Transfer Taxes. .....................................................60

12.2      Request for Expedited Determination of Taxes.............................................60

12.3      Dates of Actions to Implement Plan. ...........................................................60

12.4      Amendments. ................................................................................................60

12.5      Revocation or Withdrawal of Plan................................................................61

12.6      Severability. ..................................................................................................61

12.7      Governing Law. ............................................................................................62

12.8      Immediate Binding Effect.................................................................62

12.9      Successors and Assigns....................................................................62

12.10     Entire Agreement. ...........................................................................62

12.11     Computing Time. .............................................................................62

12.12     Exhibits to Plan. ..............................................................................62

12.13     Notices. ............................................................................................62

12.14     Reservation of Rights.......................................................................63

12.15     Dissolution of Creditors' Committee...............................................64

Each of EP Energy Corporation; EPE Acquisition, LLC; EP Energy LLC; Everest Acquisition Finance Inc.; EP Energy Global LLC; EP Energy Management, L.L.C.; EP Energy Resale Company, L.L.C.; and EP Energy E&P Company, L.P. (each, a "***Debtor***" and collectively, the "***Debtors***") proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in Section 1.1 below.

# ARTICLE I.        DEFINITIONS AND INTERPRETATION.

## 1.1        *Definitions.*

The following terms shall have the respective meanings specified below:

***1.125L Notes*** means the 7.750% senior secured notes due 2026 issued pursuant to the 1.125L Notes Indenture.

***1.125L Notes Claims*** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the 1.125L Notes, the 1.125L Notes Indenture, or any of the security documents governing or evidencing any security interests entered into in connection therewith, including accrued but unpaid interest, costs, fees and indemnities through the Effective Date.  The 1.125L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate original principal amount of $1 billion plus any "Applicable Premium" due under the 1.125L Notes Indenture, accrued and unpaid interest thereon and any other amounts due under the 1.125L Notes Indenture and applicable law.  For the avoidance of doubt, neither the 1.125L Notes Trustee Fees and Expenses nor the Ad Hoc 1.125L Noteholder Group Fees and Expenses are 1.125L Notes Claims.

***1.125L Notes Indenture*** means that certain Indenture, dated as of May 23, 2018, by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 1.125L Notes Trustee, as the same may be amended, modified, or otherwise supplemented from time to time.

***1.125L Notes Trustee Fees and Expenses*** means the reasonable and documented compensation, fees, out-of-pocket expenses, disbursements, and indemnity claims incurred by the 1.125L Notes Trustee, including, without limitation, attorneys', financial advisors' and agents' fees, expenses, and disbursements.  For the avoidance of doubt, the 1.125L Notes Trustee Fees and Expenses shall include, without limitation, to the extent not previously paid in connection with the Chapter 11 Cases, all outstanding reasonable and documented fees and expenses (including any transaction or completion fees) of the professional advisors retained by or on behalf of the 1.125L Notes Trustee at the direction of the Ad Hoc 1.125L Noteholder Group, including fees and expenses incurred by (a) Morrison & Foerster LLP pursuant to that certain engagement letter, dated October 3, 2019, with the 1.125L Notes Trustee, (b) Foley & Lardner LLP pursuant to that certain engagement letter, dated October 3, 2019, with the 1.125L Notes Trustee, (c) Faegre Drinker Biddle & Reath LLP pursuant to that certain engagement letter, dated October 3, 2019, with the 1.125L Notes Trustee, and (d) PJT Partners LP pursuant to that certain engagement letter, dated October 3, 2019, with Morrison & Foerster LLP, as counsel to the 1.125L Notes Trustee.

***1.125L Notes Trustee*** means UMB Bank, National Association, in its capacity as successor indenture trustee and notes collateral agent under the 1.125L Notes Indenture.

***1.25L Notes*** means the 8.000% senior secured notes due 2024 issued pursuant to the 1.25L Notes Indenture.

***1.25L Notes Claims*** means all Claims, other than Claims subject to subordination in accordance with section 510(b) of the Bankruptcy Code, arising from or based upon the 1.25L Notes, the 1.25L Notes Indenture, or any of the security documents governing or evidencing any security interests entered into in connection therewith, including accrued but unpaid interest, costs, fees and indemnities through the Effective Date.  The 1.25L Notes Claims shall be deemed Allowed on the Effective Date in the aggregate principal amount of $500 million plus any accrued and unpaid interest thereon and other amounts due as of the Petition Date, as adjusted and reduced by postpetition payments of interest and advisor fees.

***1.25L Notes Indenture*** means that certain Indenture, dated as of November 29, 2016, by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 1.25L Notes Trustee, as the same may be amended, modified, or otherwise supplemented from time to time.

***1.25L Notes Trustee*** means BOKF, NA, in its capacity as successor indenture trustee and notes collateral agent under the 1.25L Notes Indenture.

***1.5L Notes*** means, collectively, the 2024 1.5L Notes and the 2025 1.5L Notes.

***1.5L Notes Claims*** means, collectively, the 2024 1.5L Notes Claims and the 2025 1.5L Notes Claims.

***1.5L Notes Indentures*** means the 2024 1.5L Notes Indenture and the 2025 1.5L Notes Indenture, together.

***1.5L Notes Trustees*** means the 2024 1.5L Notes Trustee and the 2025 1.5L Notes Trustee, together.

***2020 Unsecured Notes Claims*** means all Claims arising under or based upon the 9.375% senior notes due 2020 or the 2020 Unsecured Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $189,286,918.

***2020 Unsecured Notes Indenture*** means that certain Indenture dated as of April 24, 2012 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2020 Unsecured Notes Indenture Trustee.

***2020 Unsecured Notes Trustee*** means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2020 Unsecured Notes Indenture.

**2022 Unsecured Notes Claims** means all Claims arising under or based upon the 7.750% senior notes due 2022 or the 2022 Unsecured Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $190,729,276.

**2022 Unsecured Notes Indenture** means that certain Indenture, dated as of August 13, 2012 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2022 Unsecured Notes Indenture Trustee.

**2022 Unsecured Notes Trustee** means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2022 Unsecured Notes Indenture.

**2023 Unsecured Notes Claims** means all Claims arising under or based upon the 6.375% senior notes due 2023 or the 2023 Unsecured Notes Indenture, the aggregate principal amount plus accrued and unpaid interest thereon of which outstanding as of the Petition Date was $330,051,034.

**2023 Unsecured Notes Indenture** means that certain Indenture, dated as of May 28, 2015 (as amended, modified, or otherwise supplemented from time to time) by and among the EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2023 Unsecured Notes Indenture Trustee.

**2023 Unsecured Notes Trustee** means Wilmington Savings Fund Society, FSB, as successor indenture trustee under the 2023 Unsecured Notes Indenture.

**2024 1.5L Notes** means the 9.375% senior secured notes due 2024 issued pursuant to the 2024 1.5L Notes Indenture.

**2024 1.5L Notes Claims** means all Claims arising under the 2024 1.5L Notes or 2024 1.5L Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $1,135,293,088.

**2024 1.5L Notes Indenture** means that that certain Indenture, dated as of January 3, 2018 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2024 1.5L Notes Trustee.

**2024 1.5L Notes Trustee** means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the 2024 1.5L Notes Indenture.

**2025 1.5L Notes** means the 8.000% senior secured notes due 2025 issued pursuant to the 2025 1.5L Notes Indenture.

**2025 1.5L Notes Claims** means all Claims arising under the 2025 1.5L Notes or 2025 1.5L Notes Indenture, of which the aggregate principal amount plus accrued and unpaid interest thereon as of the Petition Date was $1,051,324,444.

**2025 1.5L Notes Indenture** means that that certain Indenture, dated as of February 6, 2017 (as amended, modified, or otherwise supplemented from time to time) by and among EP Energy LLC and Everest Acquisition Finance Inc., as co-issuers, each of the guarantors named therein, and the 2025 1.5L Notes Trustee.

**2025 1.5L Notes Trustee** means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the 2025 1.5L Notes Indenture.

**Ad Hoc 1.125L Noteholder Group** means the ad hoc group comprising certain holders of, among other claims, 1.125L Notes Claims as set forth in the *Amended Verified Statement Pursuant to Federal Rule of Bankruptcy Procedure 2019* (ECF No. 820).

**Ad Hoc 1.125L Noteholder Group Fees and Expenses** means, collectively, to the extent not previously paid in connection with the Chapter 11 Cases and to the extent not constituting 1.125L Notes Trustee Fees and Expenses, all outstanding reasonable and documented fees (including any transaction or completion fees) and out-of-pocket expenses of any professional advisors retained on behalf of the Ad Hoc 1.125L Noteholder Group, including (a) Morrison & Foerster LLP, (b) Foley & Lardner LLP, and (c) PJT Partners LP.

**Administrative Bar Date** means the date that requests for payment of Administrative Expense Claims (other than Fee Claims) must be filed with the Bankruptcy Court and served on the Debtors or the Reorganized Debtors, as applicable, that is thirty (30) days after the Effective Date.

**Administrative Expense Claim** means any Claim constituting a cost or expense of administration incurred during the Chapter 11 Cases of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under sections 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries, or commissions for services and payments for goods and other services and leased premises), and (b) Fee Claims. For the avoidance of doubt, DIP Claims are not Administrative Expense Claims.

**Allowed** means, with respect to any Claim against or Interest in a Debtor, (a) (i) that is timely filed by the bar date established in the Chapter 11 Cases, or (ii) as to which there exists no requirement for the holder of a Claim to file such Claim under the Plan, the Bankruptcy Code, the Bankruptcy Rules or a Final Order, (b) (i) that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and (ii) for which no contrary proof of claim has been timely filed, or (c) allowed under the Plan or by a Final Order. With respect to any Claim described in clause (a) above, such Claim will be considered allowed only if, and to the extent that, (A) no objection to the allowance of such Claim has been asserted, or may be asserted, on or before the time period set forth in the Plan, and no request for estimation or other challenge, including pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, (B) an objection to such Claim is asserted and such Claim is subsequently allowed pursuant to a Final Order, (C) such Claim is settled pursuant to an order of the Bankruptcy Court, or (D) such Claim is allowed pursuant to the Plan or any agreements related thereto and such allowance is approved and authorized by the

Bankruptcy Court; *provided*, *however*, that notwithstanding the foregoing, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are reinstated or otherwise unimpaired pursuant to the Plan.

*Antitrust Authorities* means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other Governmental Entity having jurisdiction pursuant to the Antitrust Laws.

*Antitrust Laws* means the Sherman Antitrust Act, the Clayton Antitrust Act, the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, the Federal Trade Commission Act and all other United States, federal or state or foreign or multinational statutes, rules, regulation, orders, decrees, administrative or judicial doctrines or other laws, including antitrust, competition and merger control laws, that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of lessening or negatively impacting competition, monopolization or restraint of trade.

*Asset* means all of the rights, title, and interests of a Debtor in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

*Assumption Dispute* means an unresolved objection regarding assumption, Cure Amount, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption of an executory contract or unexpired lease.

*Avoidance Actions* means all claims and causes of action to avoid a transfer of property or an obligation incurred by the Debtors arising under sections 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code, and applicable nonbankruptcy law.

*Bankruptcy Code* means title 11 of the United States Code, as amended from time to time, as applicable to these Chapter 11 Cases.

*Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

*Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure as promulgated by Supreme Court of the United States under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

*Business Day* means any day other than a Saturday, a Sunday or any other day on which banking institutions in New York, New York are authorized or required by law or executive order to close.

***Cash*** means legal tender of the United States of America.

***Cause of Action*** means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license, and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal securities laws).  For the avoidance of doubt, Cause of Action also includes (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity, (b) the right to object to Claims or Interests, (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, (d) any claim or defense including fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code, and (e) any state law fraudulent transfer claim.

***Chapter 11 Cases*** means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Petition Date in the Bankruptcy Court.

***Claim*** means a "claim," as defined in section 101(5) of the Bankruptcy Code, against any Debtor.

***Class*** means any group of Claims or Interests classified under the Plan pursuant to section 1122(a) of the Bankruptcy Code.

***Collateral*** means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid, is properly perfected as of the Petition Date, and is not subject to avoidance under the Bankruptcy Code or applicable nonbankruptcy law.

***Commitment Letter Amendment*** means the executed amendment to the existing commitment letter for the DIP Facility Credit Agreement and the Exit Credit Agreement, the form of which is attached to the Disclosure Statement as Exhibit B (as may be amended, restated, or supplemented from time to time).

***Confirmation Date*** means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

***Confirmation Hearing*** means the hearing to be held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

***Confirmation Order*** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**Convenience Claim** means any Claim that would otherwise be a General Unsecured Claim that is (i) Allowed in the Convenience Claim Amount or less, or (ii) irrevocably reduced (and liquidated, if applicable) to the Convenience Claim Amount at the election of the holder of the Allowed General Unsecured Claim evidenced on the election form timely and validly submitted by such holder; *provided* that a General Unsecured Claim may not be subdivided into multiple Claims of the Convenience Claim Amount or less for purposes of receiving treatment as a Convenience Claim; *provided further*, that to the extent that a holder of a Convenience Claim against a Debtor holds any joint and several liability claims, guaranty claims, or other similar claims against any other Debtors arising from or relating to the same obligations or liability as such Convenience Claim, such holder shall only be entitled to a distribution on one Convenience Claim against the Debtors in full and final satisfaction of all such Claims.

**Convenience Claim Amount** means $100,000.

**Convenience Claim Distribution Amount** means the aggregate amount of Cash distributed to holders of Allowed Convenience Class Claims against the Debtors, which amount shall not exceed $175,000.

**Creditors' Committee** means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code as it may be constituted from time to time.

**Cure Amount** means the payment of Cash or the distribution of other property (as the Debtors or the Reorganized Debtors, as applicable (subject to the reasonable consent of the Requisite 1.125L Noteholders), and the counterparty to an executory contract or unexpired lease of the Debtors may agree or the Bankruptcy Court may order) necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease and (b) permit the Debtors to assume such executory contract or unexpired lease under section 365(a) of the Bankruptcy Code.

**Cure Notice** means the notice of proposed Cure Amount to be paid in connection with an executory contract or unexpired lease of the Debtors that may be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall be reasonably acceptable to the Requisite 1.125L Noteholders and shall include (a) procedures for objecting to proposed assumptions or assumptions and assignments of executory contracts and unexpired leases, (b) any Cure Amount to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

**D&O Policy** means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

**Debtor(s)** has the meaning set forth in the introductory paragraph of the Plan.

**Debtor in Possession** means, with respect to a Debtor, that Debtor in its capacity as a debtor in possession pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

**DIP Facility** means the postpetition senior secured superpriority priming revolving loan facility approved by the DIP Order.

**DIP Agent** means JPMorgan Chase Bank, N.A., solely in its capacity as administrative agent and collateral agent under the DIP Facility Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Facility Credit Agreement.

**DIP Claim** means any Claim held by the DIP Facility Lenders or the DIP Agent arising under or relating to the DIP Facility Credit Agreement or the DIP Order, which includes Claims for all principal amounts outstanding of up to $314,710,456 (which is subject to reduction based on the amount outstanding as of the Effective Date), plus interest, reasonable and documented out-of-pocket fees, expenses, costs and other charges of the DIP Agent or DIP Lenders arising and required to be repaid under the DIP Facility Credit Agreement.

**DIP Commitments** means obligations of the DIP Facility Lenders on account of unfunded loans under the DIP Facility Credit Agreement.

**DIP Facility Credit Agreement** means the credit agreement governing the terms of the DIP Facility dated as of November 25, 2019, by and among EP Energy LLC, as borrower, EPE Acquisition LLC, the DIP Agent, and the DIP Facility Lenders, with any amendments, restatements, amendments and restatements, modifications or supplements thereto as permitted by the DIP Order.

**DIP Facility Lenders** means the lenders from time to time party to the DIP Facility Credit Agreement.

**DIP Order** means the *Final Order (I) Authorizing Use of Cash Collateral; (II) Authorizing Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to Prepetition Secured Parties; and (V) Granting Related Relief* (ECF No. 482), authorizing the Debtors to enter into the DIP Facility Credit Agreement and access the DIP Facility.

**Disbursing Agent** means any Entity in its capacity as a disbursing agent under section 6.6 hereof, including any Debtor or Reorganized Debtor, as applicable, that acts in such a capacity.

**Disclosure Statement** means the Disclosure Statement for the Plan, which shall be in form and substance reasonably acceptable to the Requisite 1.125L Noteholders, as supplemented from time to time (and any changes thereto shall be reasonably acceptable to the Requisite 1.125L Noteholders), which is prepared and distributed in accordance with sections 1125, 1126(b), or 1145 of the Bankruptcy Code, Bankruptcy Rules 3016 and 3018, or other applicable law, and all exhibits, schedules, supplements, modifications, amendments, annexes, and attachments to such disclosure statement.

**Disputed** means, with respect to a Claim, (a) any Claim, which Claim is disputed under Section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim,

proof of which was required to be filed by order of the Bankruptcy Court but as to which a proof of claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent or disputed, and as to which no request for payment or proof of claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*Disputed Claims Reserve* means the reserve established pursuant to and governed by Section 7.9 of the Plan.

*Distribution Record Date* means, except as otherwise provided in the Plan, the Effective Date.

*DTC* means The Depository Trust Company, a limited-purpose trust company organized under the New York State Banking Law.

*Effective Date* means the date which is the first Business Day on which (a) all conditions to the effectiveness of the Plan set forth in Section 9.2 of the Plan have been satisfied or waived in accordance with the terms of the Plan, (b) no stay of the Confirmation Order is in effect, and (c) the substantial consummation of the Plan occurs pursuant to 11 U.S.C. § 1101(2).

*EIP Shares* means the awards issued under the Employee Incentive Plan, including restricted stock units, options, New Common Shares, or other rights exercisable, exchangeable, or convertible into New Common Shares, or a combination thereof, to be issued pursuant to the Plan and the Employee Incentive Plan, which shall be dilutive of all other equity interests in the Reorganized Debtors.

*EIP Term Sheet* means the term sheet annexed to the Plan Supplement, which shall be in form and substance reasonably acceptable to the Requisite 1.125L Noteholders, that sets forth the material provisions of the Employee Incentive Plan.

*Employee Arrangements* means all employment and severance arrangements, programs, and policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans.  For the avoidance of doubt, the New Executive Employment Agreements and the agreements provided for in the EIP Term Sheet are not Employee Arrangements.

*Employee Incentive Plan* means the employee incentive plan to be implemented pursuant to Section 5.9 of the Plan, which shall be consistent with the terms set forth in the EIP Term Sheet and be otherwise in form and substance reasonably acceptable to the Requisite 1.125L Noteholders.

*Entity* means an "entity," as defined in section 101(15) of the Bankruptcy Code.

*EP Energy* means EP Energy Corporation.

*EPLP* means EP Energy E&P Company, L.P.

*Estate(s)* means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

*Exchange Act* means the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

*Exculpated Parties* means collectively, and in each case in their capacities as such during the Chapter 11 Cases (a) the Debtors, (b) the Reorganized Debtors, (c) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), and (d) with respect to each of the foregoing Persons in clauses (a) through (c), such Persons' predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*Existing Parent Equity Interests* means shares of Class A common stock of EP Energy that existed immediately prior to the Effective Date, including any restricted stock in EP Energy that vests prior to the Effective Date.

*Exit Credit Agreement* means that certain Amended and Restated Credit Agreement, to be dated as of the Effective Date, by and among EP Energy LLC, as borrower, EPE Acquisition LLC, as holdings, the Exit Agent, and the Exit Lenders, which shall be in form and substance substantially consistent with the Exit Term Sheet or on terms otherwise acceptable to the Debtors and the Requisite 1.125L Noteholders.

*Exit Facility* means the first lien exit credit facility arising pursuant to the Exit Credit Agreement with aggregate commitments not in excess of $629,420,912.

*Exit Facility Agent* means the administrative agent and collateral agent under the Exit Credit Agreement.

*Exit Lenders* means the lenders from time to time party to the Exit Credit Agreement, including any permitted assignees thereof.

*Exit Term Sheet* means that certain term sheet attached to the Commitment Letter Amendment that sets forth the principal terms of the Exit Facility and, together with any amendments thereto, shall be in form and substance reasonably acceptable to the Requisite 1.125L Noteholders.

*Fee Claim* means a Claim for professional services rendered or costs incurred on or after the Petition Date through the Effective Date by Professional Persons retained by an order

10

of the Bankruptcy Court pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code in the Chapter 11 Cases.

*Fee Escrow Account* means an interest-bearing account in an amount equal to the total estimated amount of Fee Claims and funded by the Debtors on or before the Effective Date.

*Final Order* means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that: (a) is in full force and effect; (b) is not stayed; and (c) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of *certiorari; provided*, *however*, that the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

*General Unsecured Claim* means any Claim, other than a Parent Unsecured Claim, against the Debtors that is not an RBL Claim, a 1.125L Notes Claim, a 1.25L Notes Claim, a 1.5L Notes Claim, a Convenience Claim, an Intercompany Claim, an Unsecured Notes Claim, or a Claim that is secured, subordinated, or entitled to priority under the Bankruptcy Code.

*Governmental Entity* means U.S. or non-U.S. international, regional, federal, state, municipal or local governmental, judicial, administrative, legislative or regulatory authority, entity, instrumentality, agency, department, commission, court or tribunal of competent jurisdiction (including any branch, department or official thereof).

*Impaired* means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

*Indemnification Obligation* means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

*Indenture Trustee Charging Lien* means any Lien or other priority in payment in favor of the Indenture Trustees against distributions to be made to holders of Allowed Notes Claims for payment of any Indenture Trustee Fees and Expenses.

*Indenture Trustee Fees and Expenses* means the 1.125L Notes Trustee Fees and Expenses and the Other Indenture Trustee Fees and Expenses.

*Indenture Trustees* means the 1.125L Notes Trustee, the 1.25L Notes Trustee, the 1.5L Notes Trustees, and the Unsecured Notes Trustees.

*Indentures* means the 1.125L Notes Indenture, the 1.25L Notes Indenture, the 1.5L Notes Indentures, and the Unsecured Notes Indentures.

**Intercompany Claim** means any Claim against a Debtor held by another Debtor.

**Intercompany Interest** means an Interest in a Debtor other than any Existing Parent Equity Interests or Other Equity Interests.

**Intercreditor Agreements** means collectively, (a) that certain Priority Lien Intercreditor Agreement, dated as of August 24, 2016, among JP Morgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, Wilmington Trust, National Association, as the Initial Other Authorized Representative and each additional Authorized Representative from time to time party thereto; (b) that certain Amended and Restated Senior Lien Intercreditor Agreement, dated as of August 24, 2016, among JP Morgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, and EP Energy LLC and the Subsidiaries of EP Energy LLC named therein; (c) that certain Additional Priority Lien Intercreditor Agreement, dated as of November 29, 2016, by and among JPMorgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, BOKF, N.A., as successor Notes Facility Agent and Applicable Second Lien Agent, EP Energy LLC and the Subsidiaries of EP Energy LLC named therein; and (d) that certain Senior Priority Lien Intercreditor Agreement, dated as of May 23, 2018, by and among JPMorgan Chase Bank, N.A., as RBL Facility Agent and Applicable First Lien Agent, UMB Bank, National Association, as successor Notes Facility Agent and Applicable Second Lien Agent, EP Energy LLC and the Subsidiaries of EP Energy LLC named therein. The Intercreditor Agreements will not be cancelled and will remain in full force and effect on the Effective Date.

**Interest** means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, and any other security or equity interest in any of the Debtors, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest or other instrument, evidencing any fixed or contingent ownership interest in any of the Debtors, whether or not transferable and whether fully vested or vesting in the future, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest in the Debtors, that existed immediately before the Effective Date, and including any equity interest issued to any of the Debtors' current or former employees and non-employee directors various forms of long-term incentive compensation including stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, Cash awards, and other stock-based awards.

**Lien** has the meaning set forth in section 101(37) of the Bankruptcy Code.

**Member Expenses** means the reasonable and documented out-of-pocket expenses of the members of the Creditors' Committee as of the Effective Date (excluding the fees and expenses of such members' counsel).

**MSB Contracts** means the oil and gas leases, surface use agreements and other related agreements, including without limitation, those listed on items 2 through 21 of the MSB Owners' Addendum to Proof of Claim, attached as Exhibit A to the MSB Proofs of Claim.

**MSB Owners** means Storey Minerals, Ltd., Storey Surface, Ltd., Maltsberger, LLC, Maltsberger/Storey Ranch, LLC, Maltsberger/Storey Ranch Lands, LLC, the Estate of Sarah Lee Maltsberger, and Rene R. Barrientos, Ltd.

**MSB Proofs of Claim** means proofs of claim 289, 291, 295, 298, 299, 301 and 395.

**MSB Stipulation** means the *Stipulation and Order (I) Granting Limited Relief from the Automatic Stay to Allow Continuance of Prepetition Action Solely to Prosecute the MSB A Lease Appeal and (II) Withdrawing Remaining Relief Requested* (ECF No. 802).

**New Board** means the initial board of directors of Reorganized EP Energy.

**New Common Share Distribution Procedures** means the procedures annexed to the Plan Supplement governing distribution of New Common Shares pursuant to the Plan, which shall be in form and substance reasonably acceptable to the Requisite 1.125L Noteholders.

**New Common Shares** means shares of common stock, par value $0.01 per share, of Reorganized EP Energy to be issued (a) on the Effective Date, (b) upon implementation of the Employee Incentive Plan, or (c) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents of Reorganized EP Energy, in each case subject to the terms of the Plan and the New Corporate Governance Documents.

**New Corporate Governance Documents** means the certificates of incorporation, certificates of formation, bylaws, limited liability company agreements, the Stockholders Agreement, and the operating agreements or other similar organizational or formation documents, as applicable, of the Reorganized Debtors, which shall be in form and substance acceptable to the Requisite 1.125L Noteholders.

**New Executive Employment Agreement Term Sheet** means the term sheet annexed to the Plan Supplement, which shall be in form and substance reasonably acceptable to the Requisite 1.125L Noteholders, that sets forth the material provisions of the New Executive Employment Agreements.

**New Executive Employment Agreements** means the new employment agreements, dated as of the Effective Date, to employ the following executive officers: (a) Russell Parker; (b) Chad England, (c) Kyle McCuen, (d) Dennis Price, (e) Pete Addison, (f) Mark Hargis, and (g) Jace Locke, which shall be consistent with the New Executive Employment Agreement Term Sheet and otherwise in form and substance reasonably acceptable to the Requisite 1.125L Noteholders.

**Ongoing Trade Party** means a third-party provider of goods or services to the Debtors that, as determined by the Debtors in their good faith business judgment, facilitates the Debtors' operations in the ordinary course of business and will continue to do so after the Effective Date. The MSB Owners are not Ongoing Trade Parties.

**Other Equity Interests** means Class B common stock of EP Energy that existed immediately prior to the Effective Date and all other Interests in EP Energy other than Existing Parent Equity Interests.

**Other Indenture Trustee Fees and Expenses** means the reasonable and documented compensation, fees, expenses, and disbursements incurred by the 1.25L Notes Trustee, the 1.5L Notes Trustees, and the Unsecured Notes Trustees, including, without limitation,

attorneys' and agents' fees, expenses and disbursements, whether prior to or after the Petition Date and whether prior to or after the Effective Date, in each case to the extent payable or reimbursable under the respective Indentures.

*Other Priority Claim* means any Claim other than an Administrative Expense Claim, a DIP Facilities Claim, or a Priority Tax Claim that is entitled to priority of payment as specified in section 507(a) of the Bankruptcy Code.

*Other Secured Claim* means any Secured Claim against a Debtor other than a Priority Tax Claim, a DIP Claim, an RBL Claim, or a 1.125L Notes Claim.  For the avoidance of doubt, 1.25L Notes Claims and 1.5L Notes Claims are not Secured Claims or Other Secured Claims.

*Parent Unsecured Claim* means any Claim against EP Energy that is not a Secured Claim or a Subordinated Claim.

*Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

*Petition Date* means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

*Plan* means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as may be modified from time to time in accordance with the Bankruptcy Code and the terms hereof.

*Plan Distribution* means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under the Plan.

*Plan Supplement* means a supplement or supplements to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, to be filed with the Bankruptcy Court no later than ten (10) calendar days before the Voting Deadline, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, which shall include, but not be limited to (a) the New Corporate Governance Documents of EP Energy, including, for the avoidance of doubt, the Stockholders Agreement, (b) the number and slate of directors to be appointed to the New Board to the extent known and determined, (c) with respect to the members of the New Board, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, (d) the EIP Term Sheet; (e) the Exit Credit Agreement, (f) a schedule of retained Causes of Action, (g) the Schedule of Rejected Contracts, (h) the New Executive Employment Agreement Term Sheet, and (i) the New Common Share Distribution Procedures.

*Prepetition RBL Agent* means JPMorgan Chase Bank N.A., as administrative agent and collateral agent, solely in its capacity as administrative agent and collateral agent under the Prepetition RBL Credit Agreement.

*Prepetition RBL Credit Agreement* means that certain Credit Agreement, dated as of May 24, 2012 (as amended, restated, amended and restated, modified or otherwise supplemented from time to time), by and among EP Energy, as borrower, EPE Acquisition, LLC, the Prepetition RBL Agent, and the lenders party thereto from time to time, as in effect immediately prior to the Effective Date.

*Prepetition RBL Facility* means the revolving credit facility arising under the Prepetition RBL Credit Agreement.

*Prepetition RBL Lenders* means the Lenders (as defined in the Prepetition RBL Credit Agreement) party to the Prepetition RBL Credit Agreement immediately prior to the Effective Date.

*Priority Tax Claim* means any Secured Claim or unsecured Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*Pro Rata* means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of all Allowed Claims or Interests in that Class.

*Professional Person* means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, excluding any ordinary course professional retained pursuant to an order of the Bankruptcy Court.

*RBL Claim* means any Claim arising under the Prepetition RBL Credit Agreement.

*Released Parties* means, collectively, (a) the Debtors, (b) the Reorganized Debtors, (c) the Exit Facility Agent and the Exit Lenders under the Exit Facility, (d) the DIP Agent and DIP Lenders under the DIP Facility, (e) the Prepetition RBL Agent and the Prepetition RBL Lenders under the Prepetition RBL Facility, (f) the Hedge Banks (as defined in the Prepetition RBL Credit Agreement), (g) holders of Existing Parent Equity Interests, on account of their contributions under the Plan, (h) the 1.125L Notes Trustee, (i) the Indenture Trustees, (j) the Creditors' Committee and the current and former members of the Creditors' Committee (solely in their capacities as such), (k) the Ad Hoc 1.125L Noteholder Group and the current and former members of the Ad Hoc 1.125L Noteholder Group, and (l) with respect to each of the foregoing Persons, in clauses (a) through (k), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such Persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such. Notwithstanding the foregoing, any Person that opts out of the releases set forth in Section 10.7(b) of the Plan shall not be deemed a Released Party thereunder.

*Releasing Parties* means collectively, (a) the holders of all Claims or Interests that vote to accept the Plan, (b) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (c) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan but do not opt out of granting the releases set forth herein, (d) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (e) the Released Parties.

*Reorganized Debtors* means the Debtors, as reorganized as of the Effective Date in accordance with the Plan.

*Reorganized EP Energy* means EP Energy, (a) as reorganized pursuant to and under the Plan, (b) any successor thereto, by merger, consolidation, or otherwise or (c) a new corporation or limited liability company that may be formed or caused to be formed by EP Energy to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of EP Energy and issue the New Common Shares to be distributed or sold pursuant to the Plan, and in the case of (b) or (c), subject to the consent of the Requisite 1.125L Noteholders.

*Requisite 1.125L Noteholders* means holders of at least 50.01% of the outstanding principal amount of the 1.125L Notes Claims.

*Restructuring* means the financial restructuring of the Debtors, the principal terms of which are set forth in the Plan and Plan Supplement.

*Restructuring Transactions* means one or more transactions pursuant to section 1123(a)(5) of the Bankruptcy Code to occur on the Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, subject to the reasonable consent of the Requisite 1.125L Noteholders, including (a) the consummation of the transactions provided for under or contemplated by the Plan and any mergers, amalgamations, consolidations, arrangements, continuances, transfers, conversions, sales, dispositions, or other corporate transactions necessary or appropriate to implement the Plan, (b) the execution and delivery of appropriate agreements or other documents containing terms that are consistent with or reasonably necessary to implement the terms of the Plan and that satisfy the requirements of applicable law, (c) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any property, right, liability, duty, or obligation on terms consistent with the terms of the Plan, and (d) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine are necessary or appropriate and consistent with the Plan.

*Schedule of Rejected Contracts* means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time, which shall be reasonably acceptable to the Requisite 1.125L Noteholders.

*Schedules* means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code.

*Secured Claim* means a Claim to the extent (a) secured by a Lien on property of a Debtor's Estate, the amount of which is equal to or less than the value of such property as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.

*Secured Notes Claims* means the 1.125L Notes Claims, the 1.25L Notes Claims, and the 1.5L Notes Claims, regardless of whether such claims are Secured Claims or Unsecured Claims.

*Securities Act* means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a–77aa, and the rules and regulations promulgated thereunder.

*Security* means any "security" as such term is defined in section 101(49) of the Bankruptcy Code.

*Solicitation Materials* means collectively, the Disclosure Statement and the related solicitation materials.

*Stockholders Agreement* means the stockholders agreement to be entered into (or as may be deemed entered into, as applicable) by the Reorganized Debtors and the holders of New Common Shares, on the Effective Date that will govern certain matters related to the governance of the Reorganized Debtors.

*Subordinated Claim* means a Claim that is subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

*Tax Code* means the Internal Revenue Code of 1986, as amended from time to time.

*Unimpaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124(2) of the Bankruptcy Code.

*Unsecured Claim* means 1.25L Notes Claims, 1.5L Notes Claims, Unsecured Notes Claims, and General Unsecured Claims.

*Unsecured Notes Claims* means 2020 Unsecured Notes Claims, 2022 Unsecured Notes Claims, and 2023 Unsecured Notes Claims.

*Unsecured Notes Indentures* means the 2020 Unsecured Notes Indenture, 2022 Unsecured Notes Indenture, and 2023 Notes Indenture.

*Unsecured Notes Trustees* means the 2020 Unsecured Notes Trustee, the 2022 Unsecured Notes Trustee, and the 2023 Unsecured Notes Trustee.

*U.S. Trustee* means the United States Trustee for Region 7.

*Voting Deadline* means August 19, 2020 at 4:00 p.m. (Prevailing Central Time), or such date and time as may be set by the Bankruptcy Court.

### 1.2     *Interpretation; Application of Definitions; Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in or exhibit to the Plan, as the same may be amended, waived, or modified from time to time in accordance with the terms hereof.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (d) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### 1.3     *Reference to Monetary Figures.*

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America unless otherwise expressly provided.

### 1.4     *Consent Rights of the Requisite 1.125L Noteholders*

Any and all consent rights of the Requisite 1.125L Noteholders referenced in the Plan with respect to the form and substance of the Plan Supplement, and the transactions contemplated thereby, to the extent given, not given, or otherwise withheld, may be communicated by email transmission by counsel.

### 1.5     *Controlling Document.*

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control unless otherwise specified in such Plan Supplement document.  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

**ARTICLE II.        ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

### 2.1     *Treatment of Administrative Expense Claims.*

On (or as soon thereafter as is reasonably practicable) the later of (a) the Effective Date and (b) the first Business Day after the date that is thirty (30) calendar days after the date each Administrative Expense Claim becomes an Allowed Administrative Expense Claim, each holder of an Allowed Administrative Expense Claim (other than a Fee Claim) shall receive in full and final satisfaction of such Claim, either (x) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (y) such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the reasonable consent of the Requisite 1.125L Noteholders, and the holder of such Allowed Administrative Expense Claim will have agreed upon in writing; *provided*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities. For the avoidance of doubt, the treatment provided for in this Section 2.1 of the Plan shall not apply to DIP Claims.

### 2.2     *Treatment of Fee Claims.*

(a)     All Professional Persons seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), or 1103 of the Bankruptcy Code shall (i) file, on or before the date that is forty five (45) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Fee Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

(b)     On or prior to the Effective Date, the Debtors shall establish and fund the Fee Escrow Account.  The Debtors shall fund the Fee Escrow Account with Cash equal to the Professional Persons' good faith estimates of the Fee Claims.  Funds held in the Fee Escrow Account shall not be considered property of the Debtors' Estates or property of the Reorganized Debtors, but shall revert to the Reorganized Debtors only after all Fee Claims allowed by the Bankruptcy Court have been irrevocably paid in full.  The Fee Escrow Account shall be held in trust for Professional Persons and for no other parties until all Fee Claims Allowed by the Bankruptcy Court have been paid in full.  Fee Claims owing to the applicable Professional Persons shall be paid in full, in Cash, to such Professional Persons from funds held in the Fee Escrow Account when such Claims are Allowed by an order of the Bankruptcy Court or authorized to be paid under the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* (ECF No. 318); *provided*, that the Reorganized Debtors' obligations

with respect to Fee Claims shall not be limited by nor deemed limited to the balance of funds held in the Fee Escrow Account. To the extent that funds held in the Fee Escrow Account are insufficient to satisfy the amount of accrued Fee Claims owing to the Professional Persons, such Professional Persons shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section 2.1 of the Plan. No Liens, claims, or interests shall encumber the Professional Fee Escrow in any way.

(c)     Any objections to Fee Claims shall be served and filed (i) no later than twenty one (21) days after the filing of the final applications for compensation or reimbursement or (ii) such later date as ordered by the Bankruptcy Court upon a motion of the Reorganized Debtors.

### 2.3     *Treatment of DIP Claims and Commitments.*

On the Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim and DIP Commitment, each holder of an Allowed DIP Claim or DIP Commitment shall receive, either (a) in the case of each holder of Allowed DIP Claims and DIP Commitments that executes the Commitment Letter Amendment by the Voting Deadline, on a dollar-for-dollar basis, first-lien, first-out revolving loans or revolving commitments (as applicable) under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement or (b) such other or less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Requisite 1.125L Noteholders, and the holder of such Allowed DIP Claims will have agreed upon in writing or as may otherwise comply with the Bankruptcy Code. Upon the indefeasible payment or satisfaction of the Allowed DIP Claims in Cash and/or in the form of first-lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement, on the Effective Date, all Liens granted to secure the Allowed DIP Claims shall be terminated and of no further force and effect.

### 2.4     *Payment of Fees and Expenses Under DIP Order.*

On the later of (a) the Effective Date and (b) the date on which such fees, expenses or disbursements would be required to be paid under the terms of the DIP Order, the Debtors or the Reorganized Debtors (as applicable) shall pay all fees, expenses and disbursements of the DIP Agent and otherwise required to be paid under or pursuant to the applicable DIP Order. All payments of fees, expenses, or disbursements pursuant to this section shall be subject in all respects to the terms of the applicable DIP Order.

### 2.5     *Treatment of Priority Tax Claims.*

On the Effective Date or as soon thereafter as is reasonably practicable (but in no event later than 30 days after the Effective Date), each holder of an Allowed Priority Tax Claim shall receive in full and final satisfaction of such Claim, either (a) Cash in an amount equal to the Allowed amount of such Claim or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code or (b) or such other less favorable treatment as to which the Debtors or the Reorganized Debtors, as applicable, subject to the reasonable consent of the Requisite 1.125L Noteholders, and the holder of such Allowed Administrative Expense claim will

have agreed upon in writing; *provided*, that Allowed Priority Tax Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities.

## ARTICLE III.        CLASSIFICATION OF CLAIMS AND INTERESTS.

### 3.1     *Classification in General.*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

### 3.2     *Formation of Debtor Groups for Convenience Only.*

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger of consolidation of any legal entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal entities.

### 3.3     *Summary of Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are:  (a) Impaired and Unimpaired under the Plan; (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code; and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| Class 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| Class 3 | RBL Claims | Impaired | Yes |
| Class 4 | 1.125L Notes Claims | Impaired | Yes |

| **Class** | **Type of Claim or Interest** | **Impairment** | **Entitled to Vote** |
|---|---|---|---|
| Class 5A | Unsecured Claims | Impaired | No (Deemed to reject) |
| Class 5B | Parent Unsecured Claims | Impaired[2] | Yes |
| Class 6 | Convenience Claims | Impaired | Yes |
| Class 7 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| Class 8 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 9 | Existing Parent Equity Interests | Impaired | Yes |
| Class 10 | Other Equity Interests | Impaired | No (Deemed to reject) |
| Class 11 | Intercompany Interests | Unimpaired | No (Presumed to accept) |

### 3.4    *Special Provision Governing Unimpaired Claims.*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 3.5    *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing a different Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of voting to accept or reject the Plan and receiving Plan Distributions.

### 3.6    *Elimination of Vacant Classes.*

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes that votes on the Plan shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

### 3.7    *Voting Classes; Presumed Acceptance by Non-Voting Classes.*

With respect to each Debtor, if a Class contained Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

---

[2] Class 5B is assumed to be Impaired solely for purposes of soliciting votes to accept or reject the Plan.  The Debtors reserve all rights to the extent that Class 5B is in fact Unimpaired.

### 3.8 *Voting; Presumptions; Solicitation.*

(a) **Acceptance by Certain Impaired Classes**.  Only holders of Allowed Claims or Interests in Classes 3, 4, 5B, 6, and 9 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  An Impaired Class of Interests shall have accepted the Plan if the holders of at least two-thirds (2/3) in amount of the Allowed Interests actually voting in such Class have voted to accept the Plan.  Holders of Claims or Interests in Classes 3, 4, 5B, 6, and 9 shall receive ballots containing detailed voting instructions.

(b) **Deemed Acceptance by Unimpaired Classes**.  Holders of Claims and Interests in Classes 1, 2, 7, and 11 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c) **Deemed Rejection by Certain Impaired Classes**.  Holders of Claims and Interests in Classes 5A, 8, and 10 are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

### 3.9 *Cramdown.*

If any Class is deemed to reject the Plan or is entitled to vote on the Plan and does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.  If a controversy arises as to whether any Claims or Interests, or any class of Claims or Interests, are impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

### 3.10 *No Waiver.*

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

## ARTICLE IV.        TREATMENT OF CLAIMS AND INTERESTS.

### 4.1 *Class 1: Other Secured Claims.*

(a) **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, but with the reasonable consent of the Requisite 1.125L Noteholders (i) such holder will receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10)

Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such holder will receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(b)  **Impairment and Voting**: Allowed Other Secured Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Secured Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Secured Claims.

### 4.2  *Class 2:  Other Priority Claims.*

(a)  **Treatment**:  The legal, equitable, and contractual rights of the holders of Allowed Other Priority Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim will, at the option of the Debtors or the Reorganized Debtors, but with the reasonable consent of the Requisite 1.125L Noteholders (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

(b)  **Impairment and Voting**: Allowed Other Priority Claims are Unimpaired. In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Other Priority Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Other Priority Claims.

### 4.3  *Class 3:  RBL Claims.*

(a)  **Treatment**: Each holder of an Allowed RBL Claim that does not execute the Commitment Letter Amendment by the Voting Deadline will receive, on a dollar-for-dollar basis, first lien, second-out term loans under the Exit Credit Agreement; *provided*, that each holder of an Allowed RBL Claim that executes the Commitment Letter Amendment by the Voting Deadline shall receive on a dollar-for-dollar basis first lien, first-out revolving loans under the Exit Credit Agreement and letter of credit participations under the Exit Credit Agreement.

(b)  **Impairment and Voting**:  RBL Claims are Impaired.  Holders of Allowed RBL Claims are entitled to vote on the Plan.

(c)  **Allowance**: The RBL Claims shall be deemed Allowed on the Effective Date, consisting of $314,710,456 in principal amount, plus all other secured obligations, including unpaid interest, fees, and other reasonable and documented expenses arising and payable under the Prepetition RBL Credit Agreement that have not become DIP Claims pursuant to the DIP Order.

4.4     *Class 4:  1.125L Notes Claims.*

(a)     **Treatment**:  On the Effective Date, each holder of an Allowed 1.125L Notes Claim will receive on account of such Allowed 1.125L Notes Claim, in full and final satisfaction of such Allowed 1.125L Notes Claim, its Pro Rata share of 100% of the New Common Shares (which shall be distributed to holders of Allowed 1.125L Notes Claims on or about the Effective Date), subject to dilution on the Effective Date solely by the EIP Shares.  On the Effective Date, the 1.125L Notes Indenture will be cancelled, released, and extinguished and will be of no further force or effect except as set forth herein, whether surrendered for cancellation or otherwise.

(b)     **Impairment and Voting**:  1.125L Notes Claims are Impaired.  Holders of Allowed 1.125L Notes Claims are entitled to vote on the Plan.

4.5     *Class 5A:  Unsecured Claims.*

(a)     **Treatment**:  All Unsecured Claims shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Unsecured Claims will not receive any distribution on account of such Allowed Unsecured Claims.

(b)     **Impairment and Voting**:  Allowed Unsecured Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Unsecured Claims are conclusively deemed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Unsecured Claims.

4.6     *Class 5B:  Parent Unsecured Claims.*

(a)     **Treatment**:  Except to the extent that a holder of a Parent Unsecured Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Parent Unsecured Claim, each holder of an Allowed Parent Unsecured Claim will receive, on the later of (i) the Effective Date, and (ii) the date on which such Parent Unsecured Claim becomes allowed, or, in each case, as soon as reasonably practicable thereafter, the lesser of (x) payment in cash of 100% of such Allowed Parent Unsecured Claim, or (y) its Pro Rata share of the Cash on EP Energy's balance sheet on the Effective Date.

(b)     **Impairment and Voting**:   Allowed Parent Unsecured Claims are Impaired.[3]  Holders of Allowed Parent Unsecured Claims are entitled to vote on the Plan.

4.7     *Class 6:  Convenience Claims.*

(a)     **Treatment**: Except to the extent that a holder of an Allowed Convenience Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Convenience Claim, each holder of an Allowed Convenience Claim will receive, on the later of (i) the Effective Date and (ii) the date on which such Convenience Claim becomes Allowed, or, in

---

[3] Class 5B is assumed to be Impaired solely for purposes of soliciting vote to accept or reject the Plan.  The Debtors reserve all rights to the extent that Class 5B is Unimpaired.

each case, as soon as reasonably practicable thereafter, the lesser of (a) payment in Cash of 10% of such Allowed Convenience Claim, or (b) its Pro Rata share of the Convenience Claim Distribution Amount.  Allowed Convenience Claims shall not include interest from and after the Petition Date or include any penalty on such Claim.

(b) **Impairment and Voting**: Allowed Convenience Claims are Impaired. Holders of Allowed Convenience Claims are entitled to vote on the Plan.

### 4.8 *Class 7:  Intercompany Claims.*

(c) **Treatment**:  On or after the Effective Date, all Intercompany Claims shall be adjusted, reinstated, or discharged in the Debtors' or Reorganized Debtors' discretion, subject to the reasonable consent of the Requisite 1.125L Noteholders.

(d) **Impairment and Voting**:  All Allowed Intercompany Claims are deemed Unimpaired.  In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Claims are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Claims.

### 4.9 *Class 8:  Subordinated Claims.*

(a) **Treatment**:   All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Allowed Subordinated Claims will not receive any distribution on account of such Allowed Subordinated Claims.

(b) **Impairment and Voting**: Allowed Subordinated Claims are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Subordinated Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Subordinated Claims.

### 4.10 *Class 9:  Existing Parent Equity Interests.*

(a) **Treatment**:  Each holder of Allowed Existing Parent Equity Interests will receive its Pro Rata share of $300,000 in Cash.  On the Effective Date, Existing Parent Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.

(b) **Impairment and Voting:** Existing Parent Equity Interests are Impaired. Holders of Existing Parent Equity Interests are entitled to vote on the Plan.

### 4.11 *Class 10:  Other Equity Interests.*

(a) **Treatment**:  Other Equity Interests will be cancelled, released, and extinguished and will be of no further force or effect, whether surrendered for cancellation or otherwise.  No holder of Other Equity Interests will receive a distribution.

(b)     **Impairment and Voting**:   Other Equity Interests are Impaired.   In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Equity Interests are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to Other Equity Interests.

### 4.12     *Class 11:  Intercompany Interests.*

(a)     **Treatment**:   Intercompany Interests are Unimpaired.   On the Effective Date, all Intercompany Interests, in the Debtors' or the Reorganized Debtors' discretion, subject to the reasonable consent of the Requisite 1.125L Noteholders, will be (i) cancelled (or otherwise eliminated) or (ii) reinstated or contributed to the applicable Debtor solely to maintain the Debtors' corporate structure and shall otherwise receive no recovery or distributions.

(b)     **Impairment and Voting**:   Intercompany Interests are Unimpaired.   In accordance with section 1126(f) of the Bankruptcy Code, the holders of Allowed Intercompany Interests are conclusively presumed to accept the Plan and are not entitled to vote to accept or reject the Plan, and the votes of such holders shall not be solicited with respect to such Allowed Intercompany Interests.

### 4.13     *Treatment of Vacant Classes.*

Any Claim or Interest in a Class that is considered vacant under Section 3.6 of the Plan shall receive no Plan Distribution.

## ARTICLE V.          MEANS FOR IMPLEMENTATION.

### 5.1     *Compromise and Settlement of Claims, Interests, and Controversies.*

Pursuant to sections 363 and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and holders of such Allowed Claims and Allowed Interests, and is fair, equitable, and reasonable.

### 5.2     *Treatment of MSB Claims, Interests, and Controversies.*

(a)     EPLP and certain of the MSB Owners are parties to the MSB Contracts. EPLP and the MSB Owners contend that each has, among other things, rights, remedies, entitlements, and defenses pursuant to applicable law, including bankruptcy law, and the MSB Contracts.

(b)    Postpetition to Pre-Effective Date and Administrative Claims.  Nothing in the Plan or the Confirmation Order, except the Administrative Bar Date, shall modify or otherwise alter (i) the right of the MSB Owners to file an Administrative Claim for alleged damages related to postpetition, but pre-Effective Date, actions of the Debtors in respect of the MSB Contracts, or (ii)  defenses, counterclaims, or rights of the Debtors and the Reorganized Debtors, as applicable, to object on any basis to any such alleged Administrative Claims.

(c)    Proofs of Claim.  Nothing in the Plan or the Confirmation Order shall be construed as a waiver by the Debtors or the Reorganized Debtors, as applicable, of any defenses, counterclaims or their right to object to any and all proofs of claim related to the MSB Contracts, including the MSB Proofs of Claim, and each of the Debtors and the Reorganized Debtors, as applicable, and the MSB Owners fully reserve all rights, claims and defenses with respect to any claims, rights, or entitlements for further determination by any court of competent jurisdiction.

(d)    A Lease Appeal.  Nothing in the Plan or the Confirmation Order modifies, alters or otherwise affects the MSB Stipulation, among other things, modifying the automatic stay to allow the MSB Owners and the Debtors to exhaust their respective appellate remedies to final determination in the MSB A Lease Appeal (as defined in the MSB Stipulation).

(e)    Pending Litigation.  Nothing in the Plan or the Confirmation Order modifies, alters or otherwise affects the rights of the Debtors or the Reorganized Debtors, as applicable, and the MSB Owners to exhaust all of their respective rights, defenses and remedies to final determination in the pending cases styled as follows:  (i) EPLP vs. Maltsberger/Storey Ranch, LLC, Storey Minerals, Ltd., and Rene R. Barrientos, Ltd., Adversary Proceeding No. 19-03660; and (ii) Maltsberger/Storey Ranch, LLC, Storey Minerals, Ltd., and Rene R. Barrientos, Ltd. vs. EPLP, Adversary Proceeding No. 20-03019, all currently pending before the Bankruptcy Court.

(f)    Prepetition Rights.  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the MSB Owners shall retain any real property interests and equitable remedies under the MSB Contracts that do not constitute Claims; *provided*, that the Bankruptcy Court retains exclusive jurisdiction to determine whether any dispute with respect to the foregoing comprises a Claim, which threshold determination may be heard upon motion of the MSB Owners or the Debtors or Reorganized Debtors, as applicable.

(g)    Post-Effective Date Rights.  Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the MSB Contracts are not amended, limited or otherwise changed, and shall remain fully enforceable from and after the Effective Date, and nothing in the Plan or Confirmation Order modifies, alters or otherwise affects the Debtors' or Reorganized Debtors', as applicable, or the MSB Owners' post-Effective Date rights, duties or obligations under the MSB Contracts.

**5.3    *Continued Corporate Existence; Effectuating Documents; Further Transactions.***

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the

respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents or other applicable corporate governance documents.

(b)     On or after the Effective Date, without prejudice to the rights of any party to a contract or other agreement with any Reorganized Debtor, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and the New Corporate Governance Documents or other applicable corporate governance documents, as such Reorganized Debtor may determine is reasonable and appropriate, including, subject to the consent of the Requisite 1.125L Noteholders, causing:  (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; (iv) a Reorganized Debtor to convert its form of entity; or (v) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter, and such action and documents are deemed to require no further action or approval (other than any requisite filings required under the applicable state, provincial and federal or foreign law).

(c)     On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate the Plan, including, subject to the  reasonable consent of the Requisite 1.125L Noteholders:  (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Supplement and that satisfy the requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate organizational documents governing the Reorganized  Debtors, including the Reorganized Debtors' respective New Corporate Governance Documents, and any amendments or restatements thereto, or any documents governing any Reorganized Debtor's reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law and, as necessary, other constituent documents, including, without limitation, the organizational documents governing non-Debtor subsidiaries, as permitted by the laws of their respective states of incorporation; (iv) the Restructuring Transactions; and (v) all other actions that the applicable entities determine to be necessary or appropriate, including, making filings or recordings that may be required by applicable law.

## 5.4     *Corporate Action.*

(a)     Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the assumption of executory contracts and unexpired leases as provided herein, (ii) the selection of the managers, directors, or officers for the Reorganized Debtors, (iii) the distribution of the New Common Shares, (iv) the entry into or execution of the Exit Credit Agreement and definitive documentation related thereto, (v) entry into the Stockholders Agreement by the Reorganized Debtors and the holders of New Common Shares party thereto, (vi) entry into or execution of the New Executive Employee Agreements, (vii)  implementation and performance under the Employee Incentive Plan in

29

accordance with Section 5.9 hereof, and (viii) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.

(b)     On or before (as applicable) the Effective Date, the appropriate directors, officers, and managers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to, subject to the reasonable consent of the Requisite 1.125L Noteholders, issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan).  The authorizations and approvals contemplated by this Section 5.4 shall be effective notwithstanding any requirements under nonbankruptcy law.

### 5.5     *Plan Funding.*

Plan Distributions of Cash shall be funded from the Debtors' Cash on hand as of the applicable date of such Plan Distribution and from the proceeds of the Exit Facility.

### 5.6     *Cancellation of Existing Securities and Agreements.*

(a)     Except for the purpose of evidencing a right to and allowing holders of Claims to receive a distribution under the Plan, and except as otherwise set forth in the Plan, or in the Plan Supplement or any related agreement, instrument, or document, on the Effective Date, all agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents evidencing or creating any prepetition Claim or Interest (collectively, the "**Cancelled Agreements**") (except that the following shall not be Cancelled Agreements: the agreements, instruments, notes, certificates, indentures, mortgages, security documents, and other instruments or documents governing, relating to and/or evidencing (i) certain Intercompany Interests not modified by the Plan, (ii) the Intercreditor Agreements (including the Intercreditor Agreements themselves) and (iii) any security interests granted in connection with or with respect to the Prepetition RBL Facility, DIP Facility and/or the Exit Facility which secure the Exit Facility) and any rights of any holder in respect thereof shall be deemed cancelled and of no force or effect and the Debtors shall not have any continuing obligations thereunder; *provided*, *however*, that each of the Cancelled Agreements shall continue in effect solely for the purposes of, (x) allowing holders of Claims or Interests to receive distributions under the Plan on account of such Claims or Interests and (y) allowing and preserving the rights of the Prepetition RBL Agent, DIP Agent, and Indenture Trustees, as applicable, to (1) make distributions on account of such Claims or Interests; (2) maintain, enforce, and exercise their respective liens, including their Indenture Trustee Charging Liens, as applicable, under the terms of the applicable agreements, or any related or ancillary document, instrument, agreement, or principle of law, against any money or property distributed or allocable on account of such Claims, as applicable; (3) seek compensation and reimbursement for any reasonable and documented fees and expenses incurred in connection with the implementation of the Plan; (4) maintain, enforce, and exercise any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other claim or

entitlement that the Prepetition RBL Agent, DIP Agent, or Indenture Trustees may have under the Plan, the applicable credit agreement, Indentures, collateral agreements, or pledge agreements; (5) appear and raise issues in these Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court after the Effective Date on matters relating to the Plan or the applicable credit agreements or Indentures; and (6) execute documents pursuant to Section 5.7 of the Plan; *provided, further*, that the Prepetition RBL Agent, DIP Agent, and Indenture Trustees may take such further action to implement the terms of the Plan, including the Restructuring Transactions, as agreed to with the Debtors or the Reorganized Debtors, as applicable, and subject to the reasonable consent of the Requisite 1.125L Noteholders, to the extent not inconsistent with the Confirmation Order or the Plan.

   (b) On and after the Effective Date, all duties, responsibilities or obligations of the Prepetition RBL Agent, the holders of RBL Claims, the DIP Agent, the holders of DIP Claims, the Indenture Trustees, the holders of 1.125L Notes Claims, the holders of 1.25L Notes Claims, the holders of 1.5L Notes Claims, and the holders Unsecured Notes Claims, in each case under (i) the Prepetition RBL Credit Agreement, the other Credit Documents (as defined in the Prepetition RBL Credit Agreement), and all other agreements, instruments, and other documents evidencing RBL Claims, (ii) the DIP Facility Credit Agreement, the other Credit Documents (as defined in the DIP Facility Credit Agreement), and all other agreements, instruments, and other documents evidencing DIP Claims and (iii) the Indentures, the other Notes Documents (as defined in the applicable Indentures), and all other agreements, instruments, and other documents evidencing 1.125L Notes Claims, 1.25L Notes Claims, 1.5L Notes Claims, or Unsecured Notes Claims, as applicable, shall, in each case, be fully discharged, and such Persons shall have no rights or obligations arising from or related to such agreements, instruments, Securities, or other documentation or the cancellation thereof, except the rights provided for pursuant to the Plan.  For the avoidance of doubt, the Debtors and the Reorganized Debtors (in each case, subject to the reasonable consent of the Requisite 1.125L Noteholders), the Prepetition RBL Agent, the DIP Agent, the Indenture Trustees, and the Disbursing Agent may (x) make post-Effective Date Distributions or take such other action to exercise their rights and discharge their obligations relating to the interests of the holders of such Claims in accordance with the Plan, and (y) may take any other action necessary to cause the Plan to become Effective, including by implementing the Restructuring Transactions set forth in the Plan.

   (c) If the record holder of any Secured Note or Unsecured Note is DTC or its nominee or another securities depository or custodian thereof, and such Secured Note or Unsecured Note is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each beneficial holder of such Secured Note or Unsecured Note shall be deemed to have surrendered such Note upon surrender of the applicable global security by DTC or such other securities depository or custodian thereof.

   **5.7** *__Cancellation of Certain Existing Security Interests.__*

   (a) Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be

reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(b)     After the Effective Date, the distributions to holders on account of Allowed 1.125L Notes Claims, and the payment of the 1.125L Notes Trustee Fees and Expenses (including, without limitation, attorneys' and financial advisors' reasonable and documented fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the Secured Notes Claims, including, without limitation, the preparation and filing, in form, substance, and content acceptable to the 1.125L Notes Trustee, 1.25L Notes Trustee, and 1.5L Notes Trustees, as applicable, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the 1.125L Notes Trustee, 1.25L Notes Trustee, or 1.5L Notes Trustees, including, without limitation, UCC-3 termination statements.

### 5.8     _Officers and Boards of Directors._

(a)     On or after the Effective Date, the members of the New Board shall be appointed to serve pursuant to the terms of the applicable New Corporate Governance Documents. Russell Parker, EP Energy's chief executive officer, shall serve as a member of the New Board. The composition of the boards of directors, managers, or other similar governing bodies, as applicable, of each Reorganized Debtor shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code and shall be set forth in the New Corporate Governance Documents.

(b)     Except as otherwise provided in the Plan Supplement, the officers of the respective Reorganized Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by the New Corporate Governance Documents.

(c)     Except to the extent that a member of the board of directors, managers, or other similar governing body, as applicable, of a Debtor continues to serve as a director, manager, or other governing Person, as applicable, of such Reorganized Debtor on the Effective Date, the members of the board of directors, managers, or other similar governing body, as applicable, of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director, manager, or other governing Person shall be deemed to have resigned or shall otherwise cease to be a director, manager, or other governing Person, as applicable, of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors, managers, or other governing Persons, as applicable, of each of the Reorganized Debtors shall serve pursuant to the terms of the New Corporate Governance Documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.9     *Employee Incentive Plan.*

On the Effective Date, the New Board shall adopt the Employee Incentive Plan. Ten percent (10%) of the New Common Shares on the Effective Date, on a fully diluted basis (including shares issuable under the Employee Incentive Plan), will be reserved for issuance under the Employee Incentive Plan.

### 5.10     *Authorization, Issuance, and Delivery of New Common Shares.*

On the Effective Date, Reorganized EP Energy is authorized to issue or cause to be issued and shall issue the New Common Shares for distribution in accordance with the terms of the Plan and the New Common Share Distribution Procedures without the need for any further board, stockholder or other corporate action. All of the New Common Shares, issuable under the Plan, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable. Reorganized EP Energy's New Corporate Governance Documents shall have provided for sufficient shares of authorized New Common Shares to effectuate the issuance of New Common Shares contemplated by and in connection with the Plan, including the Employee Incentive Plan, and Reorganized EP Energy shall issue or reserve for issuance a sufficient number of shares of New Common Shares to effectuate all such issuances. Each holder of New Common Shares shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Common Shares (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document. Notwithstanding the foregoing, the Debtors or the Reorganized Debtors, as applicable, with the consent of the Requisite 1.125L Noteholders, may condition the distribution of any New Common Shares issued pursuant to the Plan upon the recipient thereof duly executing and delivering to the Debtors or the Reorganized Debtors, as applicable, counter-signatures to the Stockholders Agreement.

### 5.11     *Exit Credit Agreement.*

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Credit Agreement without further (a) notice to or order or other approval of the Bankruptcy Court, (b) act or omission under applicable law, regulation, order, or rule, (c) vote, consent, authorization, or approval of any Person, or (d) action by the holders of Claims or Interests. The Exit Credit Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit Credit Agreement (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, (a) all letters of credit issued under the Prepetition RBL Credit Agreement, shall be deemed issued or reissued, as applicable, under the Exit Credit

Agreement in accordance with the terms and conditions of the Exit Credit Agreement, (b) all Liens and security interests granted pursuant to, or in connection with, the Prepetition RBL Credit Agreement or Exit Credit Agreement shall (i) be reaffirmed and ratified by the applicable Reorganized Debtors and continue in full force and effect pursuant to the Exit Credit Agreement, and (ii) be deemed granted by the Reorganized Debtors pursuant to the Exit Credit Agreement, (c) all Liens and security interests granted pursuant to, or in connection with the Prepetition RBL Credit Agreement or the Exit Credit Agreement, as applicable, (including any Liens and security interests granted on the Assets) shall (i) be valid, binding, perfected, enforceable Liens and security interests in the property described in the Exit Credit Agreement and the other "Loan Documents" (as defined therein), with the priorities established in respect thereof under applicable nonbankruptcy law and the applicable Intercreditor Agreements, and (ii) not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

The Reorganized Debtors and the Persons granted Liens and security interests under the Exit Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

### 5.12   *Intercompany Interests; Corporate Reorganization.*

To the extent reinstated under the Plan, on the Effective Date, the Intercompany Interests (a) shall be reinstated for the ultimate benefit of the holders of Claims that receive New Common Shares under the Plan, and shall receive no recovery or distribution, and (b) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

### 5.13   *Restructuring Transactions.*

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, may take all actions consistent with the Plan and the Confirmation Order, as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

### 5.14   *Indenture Trustee Fees and Expenses.*

On the Effective Date, and without any further notice to, or action, order, or approval of the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall pay all outstanding undisputed 1.125L Notes Trustee Fees and Expenses and all outstanding Ad

Hoc 1.125L Noteholder Group Fees and Expenses in full in Cash without a reduction to recoveries to holders of 1.125L Notes Claims; *provided* that the 1.125L Notes Trustee and the Ad Hoc 1.125L Noteholder Group shall provide the Debtors with summary invoices for the outstanding and unpaid 1.125L Notes Trustee Fees and Expenses and Ad Hoc 1.125L Noteholder Group Fees and Expenses (including, in each case, without limitation, attorneys' and financial advisors' fees and expenses) for which payment is sought by no later than five (5) days prior to the Effective Date (or as soon thereafter as is reasonably practicable). Such summary invoices may (but are not required to) include estimates for the respective fees and expenses anticipated through the Effective Date and, in the case of the 1.125L Notes Trustee, the release of any Liens required under the Plan.

On the Effective Date, and without any further notice to, or action, order, or approval of, the Bankruptcy Court, the Debtors or the Reorganized Debtors, as applicable, shall distribute Cash to the 1.25L Notes Trustee, the 1.5L Notes, and the Unsecured Notes Trustees, as applicable, in an amount equal to the Other Indenture Trustee Fees and Expenses; *provided* that each of the 1.25L Notes Trustee, the 1.5L Notes Trustees, and the Unsecured Notes Trustees shall provide the Debtors with summary invoices for the Other Indenture Trustee Fees and Expenses (including, without limitation, attorneys' fees and expenses) for which they seek payment no later than five (5) days prior to the Effective Date. Such summary invoices may (but are not required to) include estimates for the Other Indenture Trustee Fees and Expenses anticipated through the Effective Date and the release of any Liens required under the Plan.

If the Debtors object to the reasonableness of any Indenture Trustee Fees and Expenses, including estimates thereof, the Debtors shall (a) provide written notification within four (4) Business Days of receipt of the summary invoices and/or estimates, (b) on the Effective Date, pay in Cash the undisputed portion of the Indenture Trustee Fees and Expenses, and (c) escrow the amount of any disputed portion of the Indenture Trustee Fees and Expenses pending any consensual resolution or resolution by the Bankruptcy Court. Upon the receipt of such notification the applicable Indenture Trustee may assert its Indenture Trustee Charging Lien to pay the disputed portion of its Indenture Trustee Fees and Expenses to the extent provided under the applicable Indenture or may submit such dispute for resolution by the Bankruptcy Court. For the avoidance of doubt, nothing herein shall be deemed to impair, waive, discharge, or negatively impact or affect the rights of any Indenture Trustees to exercise their respective Indenture Trustee Charging Liens pursuant to the terms of the applicable Indentures.

To the extent any Indenture Trustee provides services or incurs costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, or the Indentures (as applicable) from and after the Effective Date, such Indenture Trustee shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, payment, in Cash, as reasonable compensation for such services and out-of-pocket expenses (including, without limitation, attorneys' and financial advisors' reasonable and documented fees and out-of-pocket expenses) incurred in connection with such services. The payment of such compensation and expenses will be made as soon as reasonably practicable, but in any case within the earlier of (a) the date upon which the Indenture Trustee releases any Liens under the Plan or (b) ten (10) days following the applicable Indenture Trustee's notification of the Debtors or the Reorganized Debtors, as applicable, of the amount of such costs or expenses.

### 5.15   *Private Company.*

The Reorganized Debtors shall not have any class of equity securities listed on a national securities exchange and shall take the steps necessary to be a private company without Exchange Act reporting obligations upon emergence.

### 5.16   *Member Expenses.*

The outstanding Member Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases).  All Member Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least three (3) Business Days before the anticipated Effective Date (or such shorter period as the Debtors may agree); *provided*, that such estimate shall not be considered an admission or limitation with respect to such Member Expenses; *provided, further,* that the members shall return any excess Member Expenses if such estimate exceeds the actual amount of the applicable Member Expenses.  On the Effective Date, final invoices for all Member Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  Nothing herein shall preclude the Debtors from objecting to the estimated or final invoices for such Member Expenses and, after lodging such an objection, the parties may schedule a hearing with the Bankruptcy Court seeking a ruling with respect to the objection.


## ARTICLE VI.      DISTRIBUTIONS.

### 6.1   *Distributions Generally.*

Subject to the New Common Share Distribution Procedures, the Disbursing Agent shall make all Plan Distributions to the appropriate holders of Allowed Claims and Allowed Interests in accordance with the terms of the Plan.

### 6.2   *No Postpetition Interest on Claims.*

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.3   *Date of Distributions.*

Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account

of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof.

### 6.4    *Distribution Record Date.*

(a)     As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, shall be deemed closed, and there shall be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors nor the Disbursing Agent shall have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

(b)     In connection with any distribution under the Plan to be effected through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise), the Debtors and the Reorganized Debtors, as applicable, shall be entitled to recognize and deal for all purposes under the Plan with holders of Claims in each Class to the extent consistent with the customary practices of DTC used in connection with such distributions.  Notwithstanding anything in the Plan to the contrary, all New Common Shares to be distributed under the Plan shall be issued and distributed in accordance with the New Common Share Distribution Procedures.

### 6.5    *Distributions after Effective Date*

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.6    *Disbursing Agent.*

Subject to the New Common Share Distribution Procedures, all distributions under the Plan shall be made by the Disbursing Agent on and after the Effective Date as provided herein. The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.17 of the Plan.

### 6.7    *Delivery of Distributions.*

Subject to Section 6.4(b) of the Plan, the Disbursing Agent shall issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, shall make all distributions to any holder of an Allowed Claim as and when required by the Plan at: (a) the address of such holder on the books and records of the Debtors or their agents; or (b) at the

address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution shall be made to such holder without interest.

Distributions of the New Common Shares will be made in accordance with the New Common Share Distribution Procedures.

### 6.8    *Unclaimed Property.*

One year from the later of: (a) the Effective Date and (b) the date that is ten Business Days after the date a Claim is first Allowed, all distributions that remain payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

For the avoidance of doubt, a distribution shall be deemed unclaimed if a holder has not: (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

### 6.9    *Satisfaction of Claims.*

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 6.10    *Manner of Payment under Plan.*

Except as specifically provided herein, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 6.11    *Fractional Shares and De Minimis Cash Distributions.*

No fractional New Common Shares shall be distributed. When any distribution would otherwise result in the issuance of a number of New Common Shares that is not a whole number, the New Common Shares subject to such distribution shall be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 shall be rounded to the next higher whole number, and (b) fractions less than 1/2 shall be rounded to the next lower

whole number.  The total number of New Common Shares to be distributed on account of Allowed 1.125L Notes Claims, and the EIP Shares shall be adjusted as necessary to account for the rounding provided for herein.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) New Common Share or $50.00 in Cash. Fractional New Common Shares that are not distributed in accordance with this section shall be returned to, and ownership thereof shall vest in, Reorganized EP Energy.

### 6.12    *No Distribution in Excess of Amount of Allowed Claim.*

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim (plus any postpetition interest on such Claim solely to the extent permitted by Section 6.2 of the Plan).

### 6.13    *Allocation of Distributions Between Principal and Interest.*

Except as otherwise required by law, consideration received in respect of an Allowed RBL Claim, Allowed 1.125L Notes Claim or Allowed Parent Unsecured Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 6.14    *Exemption from Securities Laws.*

The offer, issuance, and distribution under the Plan of the New Common Shares pursuant to Section 4.4(a) of the Plan shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  Subject to the transfer provisions, if any, and other applicable provisions set forth in the Stockholders Agreement, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the Stockholders Agreement, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

### 6.15    *Setoffs and Recoupments.*

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim, other than the Secured Notes Claims and the Unsecured Notes Claims, and the distributions to be made pursuant to the Plan on account of such Allowed Claim any and all claims, rights, and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date to the extent such setoff or recoupment is either (a) agreed in amount among the relevant Reorganized Debtor(s), and holder of the Allowed Claim or (b) otherwise adjudicated by the

Bankruptcy Court or another court of competent jurisdiction; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder shall constitute a waiver or release by a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

### 6.16 *Rights and Powers of Disbursing Agent.*

(a) Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to:  (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b) Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business; *provided*, that the payment of such fees and expenses shall not override the Reorganized Debtors' obligation to pay any fees and expenses incurred by the Indenture Trustees, if they act as the Disbursing Agent.

### 6.17 *Withholding and Reporting Requirements.*

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and any other distributing party shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all Plan Distributions shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Plan Distribution that is subject to withholding, the distributing party may request a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable to each such holder, and any other applicable forms.  If such form is requested and not submitted to the distributing party within 10 days of the request, the distributing party may, in its discretion, either (a) withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax, or (b) require the intended recipient of such distribution to provide the withholding agent with an amount of Cash sufficient to satisfy such withholding tax as a condition to receiving such distribution.  If such form is requested and submitted to the distributing party within 10 days of the request, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax; provided that, the distributing party shall first notify the intended recipient of such contemplated sale and offer the intended recipient a reasonable opportunity to provide sufficient Cash to satisfy such withholding tax in lieu of such sale.  The distributing party shall have the right, but not the obligation, not to make a Plan Distribution until its withholding

obligation is satisfied pursuant to the preceding sentences. If an intended recipient of a non-Cash Plan Distribution has agreed to provide the withholding agent with the Cash necessary to satisfy the withholding tax pursuant to this section and such person fails to comply before the date that is 180 days after the request is made, the amount of such Plan Distribution that was not distributed shall irrevocably revert to the applicable Reorganized Debtor and such Claim in respect of such Plan Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. The distributing party may require a holder of an Allowed Claim or Interest to complete and return a Form W-8 or W-9, as applicable, to each such holder, and any other applicable forms.

Notwithstanding the above, each holder of an Allowed Claim or Interest that is to receive a Plan Distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding, and other tax obligations, on account of such Plan Distribution.

## ARTICLE VII.        PROCEDURES FOR DISPUTED CLAIMS.

### 7.1      *Allowance of Claims.*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), Allowing such Claim. On and after the Effective Date, each of the Debtors or the Reorganized Debtors shall have and retain any and all rights and defenses such Debtor had with respect to any Claim immediately before the Effective Date.

### 7.2      *Claims Objections.*

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Debtors' claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 7.3      *Estimation of Claims.*

Before or after the Effective Date, the Debtors or the Reorganized Debtors may at any time request that the Bankruptcy Court estimate any Disputed Claim or Disputed Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy

Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed, contingent, or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated.

### 7.4 *Adjustment to Claims Register Without Objection.*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5 *Time to File Objections to Claims.*

Any objections to a Claim shall be filed on or before the date that is the later of (a) 180 days after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors, as such deadline may be extended from time to time.

### 7.6 *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.7 *Amendments to Claims.*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be filed or amended without the prior authorization of the Bankruptcy Court, and the Reorganized Debtors.

**7.8**    *No Distributions Pending Allowance.*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

**7.9**    *Disputed Claims Reserve.*

(a)    The Disputed Claims Reserve shall be determined prior to the Confirmation Hearing, based on the Debtors' good faith estimates, and shall be established on or about the Effective Date.

(b)    To the extent applicable, there shall be withheld Cash (i) from the Convenience Claim Distribution Amount in an amount that would be distributable to any Disputed Convenience Claims had such Disputed Claim been Allowed on the Effective Date, and (ii) from EP Energy in an amount that would be distributable to any Disputed Parent Unsecured Claims had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).

(c)    Subject to definitive guidance from the Internal Revenue Service (the "**IRS**") or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat any cash and other property held in the Disputed Claims Reserve as held by a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.

(d)    The Disbursing Agent shall hold in the Disputed Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such payments, or other distributions shall be held for the benefit of, as applicable, (i) holders of Disputed Convenience Claims against the Debtors whose Claims are subsequently Allowed, (ii) holders of Disputed Parent Unsecured Claims against EP Energy whose Claims are subsequently Allowed, and (iii) other parties (if any) entitled thereto hereunder.  The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

(e)    To the extent that a Disputed Convenience Claim or Disputed Parent Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled hereunder out of the Disputed Claims Reserve.  No interest shall be paid with respect to any

Disputed Convenience Claim or Disputed Parent Unsecured Claim that becomes an Allowed Claim after the Effective Date.

(f)     If applicable, in the event the remaining withheld Cash from the Convenience Claim Distribution Amount is insufficient to satisfy all the Disputed Convenience Claims that have become Allowed, such Allowed Convenience Claims shall be satisfied Pro Rata from such remaining Cash. After all Cash has been distributed, no further distributions shall be made in respect of Disputed Convenience Claims. At such time as all Disputed Convenience Claims have been resolved, any remaining withheld Cash from the Convenience Claim Amount issued in the Disputed Claims Reserve shall revert to the Reorganized Debtors.

(g)     If applicable, in the event the remaining withheld Cash from EP Energy is insufficient to satisfy all the Disputed Parent Unsecured Claims that have become Allowed, such Allowed Parent Unsecured Claims shall be satisfied Pro Rata from such remaining Cash. After all Cash has been distributed, no further distributions shall be made in respect of the Disputed Parent Unsecured Claims. At such time as all Disputed Claims have been resolved, any remaining withheld Cash from EP Energy in the Disputed Claims Reserve shall revert to EP Energy.

### 7.10     *Distributions After Allowance.*

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Allowed Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

### 7.11     *Claims Resolution Procedures Cumulative.*

All of the Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with the Plan or any mechanism approved by the Bankruptcy Court.

## ARTICLE VIII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

### 8.1     *General Treatment.*

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which any of the Debtors are parties shall be deemed assumed, unless such contract or lease (a) was previously assumed, assumed and assigned, or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court, (b) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto, (c) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date, or (d) is specifically designated as a contract or lease to be rejected on the Schedule of

Rejected Contracts, which shall be reasonably acceptable to the Requisite 1.125L Noteholders. The assumption of executory contracts and unexpired leases hereunder may include, subject to the reasonable consent of the Requisite 1.125L Noteholders, the assignment of certain such contracts. Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each executory contract and unexpired lease assumed pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any Final Order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

The Debtors reserve the right, on or before 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the Confirmation Hearing, or such other time as may be agreed in writing between the Debtors and the applicable counterparty, to amend the Schedule of Rejected Contracts, subject to the reasonable consent of the Requisite 1.125L Noteholders, to add or remove any executory contract or unexpired lease; *provided* that if the Confirmation Hearing is adjourned or continued, such amendment right shall be extended to 5:00 p.m. (prevailing Central Time) on the date that is seven (7) days before the rescheduled or continued Confirmation Hearing, and this proviso shall apply in the case of any and all subsequent adjournments and continuances of the Confirmation Hearing; *provided*, *further* that the Debtors may amend the Schedule of Rejected Contracts to add or delete any executory contracts or unexpired leases after such date to the extent agreed with the relevant counterparties, subject to the reasonable consent of the Requisite 1.125L Noteholders, and entry of an order of the Bankruptcy Court.

### 8.2   *Determination of Cure Amounts and Deemed Consent.*

(a)      The Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts, which shall be reasonably acceptable to the Requisite 1.125L Noteholders.

(b)      The Debtors shall serve a Cure Notice, which shall supersede the *Notice of Cure Amounts with Respect to Executory Contracts and Unexpired Leases of Debtors*, dated January 27, 2020 (ECF No. 735) and shall be reasonably acceptable to the Requisite 1.125L Noteholders, on parties to executory contracts and unexpired leases no later than thirty (30) days prior to the Confirmation Hearing in accordance with the order approving the Disclosure Statement.  If a counterparty to any executory contract or unexpired lease that the Debtors intend to assume or assume and assign is not listed on the applicable Cure Notice, the proposed Cure Amount for such executory contract or unexpired lease shall be deemed to be zero dollars ($0).

(c)     Any counterparty to an executory contract or unexpired lease shall have the time prescribed by the order approving the Disclosure Statement to object to the proposed assumption, assumption and assignment, or related Cure Amount listed on the Cure Notice.

(d)     The Bankruptcy Court will determine any Assumption Dispute by entry of an order; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any Assumption Dispute with the reasonable consent of the Requisite 1.125L Noteholders, and without any further notice to any other party or any action, order, or approval of the Bankruptcy Court; *provided, further*, that where an Assumption Dispute relates solely to the applicable Cure Amount, the Debtors may, with the reasonable consent of the Requisite 1.125L Noteholders, assume and/or assume and assign the applicable executory contract or unexpired lease prior to the resolution of such Assumption Dispute.  If there is an Assumption Dispute, the Debtors or the Reorganized Debtors, as applicable, reserve the right to reject or nullify the assumption or assignment of the applicable executory contract or unexpired lease no later than thirty (30) days after an order of the Bankruptcy Court resolving such Assumption Dispute becomes a Final Order.

### 8.3     *Payments Related to Assumption of Contracts and Leases.*

(a)     Any Cure Amounts shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of the Cure Amount as reflected in the applicable Cure Notice, in Cash on the Effective Date, subject to the limitations described in Section 8.2 of the Plan, or on such other terms as the parties to such executory contracts or unexpired leases and the Debtors may otherwise agree.  If no Cure Amount is reflected in the applicable Cure Notice, no Cure Amount shall be deemed to be owing, unless otherwise ordered by the Bankruptcy Court.

(b)     Assumption or assumption and assignment of any executory contract or unexpired lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims against any Debtor or defaults by any Debtor, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the date that the Debtors assume or assume and assign such executory contract or unexpired lease.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed or assumed and assigned shall be deemed disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, upon the assumption of such executory contract or unexpired lease.

### 8.4     *Rejection Damages Claims.*

Any counterparty to a contract or lease that is identified on the Schedule of Rejected Contracts or is otherwise rejected by the Debtors must file and serve a proof of Claim on the applicable Debtor that is party to the contract or lease to be rejected no later than thirty (30) days after the later of (a) the Confirmation Date or (b) the effective date of rejection of such executory contract or unexpired lease.

### 8.5     *Survival of the Debtors' Indemnification Obligations.*

Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current and former officers, directors, members,

managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation. All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors. Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

### 8.6     *Employee Arrangements.*

(a)     Subject to section 8.6(b) of the Plan, all Employee Arrangements shall be treated as executory contracts under the Plan and, on the Effective Date, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code. Subject to section 8.6(b) of the Plan, the Employee Arrangements are not amended, limited or otherwise changed, and shall not be amended, limited, or otherwise changed absent consent of the Requisite 1.125L Noteholders.

(b)     Any Interests, stock options, restricted stock, restricted stock units and other stock-based awards granted prior to the Effective Date to a current or former employee, officer, director or contractor under an Employee Arrangement or otherwise shall be deemed cancelled on the Effective Date. For the avoidance of doubt, if an Employee Arrangement that is assumed under the Plan provides in part for an award or potential award of Interests, stock options, restricted stock units or other stock-based awards in the Debtors, such Employee Arrangement shall be assumed in all respects other than the provisions relating to such awards.

### 8.7     *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms. All other insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)      In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## 8.8 *Modifications, Amendments, Supplements, Restatements, or Other Agreements.*

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instruments, or other document is listed in any notices of assumed contracts.

## 8.9 *Reservation of Rights.*

(a)      Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)      Except as explicitly provided in the Plan, nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)      Nothing in the Plan shall increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(c)      If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall, subject to the consent of the Requisite 1.125L Noteholders, have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## ARTICLE IX.          CONDITIONS PRECEDENT TO OCCURRENCE OF EFFECTIVE DATE.

### 9.1     *Conditions Precedent to Effective Date.*

The Effective Date shall not occur unless all of the following conditions precedent have been satisfied or waived in accordance with the Plan:

(a)     the Bankruptcy Court shall have entered an order approving the Disclosure Statement and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(b)     the documents contained in the Plan Supplement will contain terms and conditions consistent in all material respects with the Plan, and shall be in form and substance acceptable or reasonably acceptable, as applicable, to the Requisite 1.125L Noteholders;

(c)     the Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably acceptable to the Requisite 1.125L Noteholders, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(d)     the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Effective Date;

(e)     the Restructuring to be implemented on the Effective Date shall be consistent with the Plan;

(f)     all conditions precedent to the effectiveness of the Exit Facility shall have been satisfied or waived, and the Exit Facility, including all documentation related thereto, shall be in form and substance satisfactory to the Debtors and the Requisite 1.125L Noteholders;

(g)     the New Corporate Governance Documents shall become effective and in full force and effect as of the Effective Date and in shall be in form and substance acceptable to the Requisite 1.125L Noteholders;

(h)     the New Executive Employment Agreements shall be in full force and effect;

(i)     the Debtors shall have obtained all material authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan, including Bankruptcy Court approval, and each of the other transactions contemplated by the Restructuring, and such material authorizations, consents, regulatory approvals, rulings, or documents shall not be subject to unfulfilled conditions and shall be in full force and effect, and all applicable regulatory waiting periods shall have expired;

(j)     all applicable waiting periods (if any) imposed by any Antitrust Authority in connection with the transactions contemplated by the Plan shall have terminated or expired and all applicable authorizations, approvals, consents, or clearances required under the Antitrust Laws

in connection with the transactions contemplated by the Plan (if any) shall have been obtained; and

(k)     all Member Expenses to the extent invoiced at least three (3) Business Days before the Effective Date that are not subject to an objection by the Debtors shall have been paid in full by the Debtors.

### 9.2     *Waiver of Conditions Precedent.*

(a)     Each of the conditions precedent to the occurrence of the Effective Date may be waived in writing by the Debtors and the Requisite 1.125L Noteholders without leave of or order of the Bankruptcy Court.  If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court.  If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)     Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.

(c)     The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

### 9.3     *Effect of Failure of a Condition.*

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the Effective Date, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Person, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any holders of 1.125L Notes Claims, or any other Person.

## ARTICLE X.     EFFECT OF CONFIRMATION.

### 10.1     *Binding Effect.*

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan shall bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless

of whether the Claim or Interest of such holder is Impaired under the Plan and whether such holder has accepted the Plan.

### 10.2   *Vesting of Assets.*

Except as otherwise provided in the Plan, the Confirmation Order or any Plan Supplement, on and after the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or the Reorganized Debtors during the Chapter 11 Cases or under or in connection with the Plan shall vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without notice to, supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional Persons' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.3   *Discharge of Claims Against and Interests in Debtors.*

Upon the Effective Date, except as otherwise expressly provided in the Plan or in the Confirmation Order, the distributions, rights and treatment to be made under the Plan, shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests relate to services performed by employees of the Debtors before the Effective Date and that arise from a termination of employment, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a proof of claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the holder of such a Claim or Interest has accepted the Plan.  Any default or "event of default" by the Debtors or affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

Each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest, and any affiliate of such holder, shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of

and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor

### 10.4  *Pre-Confirmation Injunctions and Stays.*

Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  The *Final Order Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Stock of Debtors* (ECF No. 313) shall remain in full force and effect following the Effective Date solely with respect to transfers of Existing Parent Equity Interests and Other Equity Interests prior to the Effective Date.

### 10.5  *Injunction Against Interference With Plan.*

Except as otherwise provided in the Plan or in the Confirmation Order, upon the entry of the Confirmation Order, all holders of Claims and Interests and all other parties in interest, along with their respective present and former affiliates, employees, agents, officers, directors, and principals, shall be enjoined from taking any action to interfere with the implementation or the occurrence of the Effective Date.

### 10.6  *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned

in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)     By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.6 of the Plan.

### 10.7   *Releases.*

(a)     **RELEASES BY THE DEBTORS.  AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS, AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS**

53

**GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.**

**(b)      <u>RELEASES BY HOLDERS OF CLAIMS AND INTERESTS</u>. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY**

ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

(c)     *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Exit Credit Agreement (and the definitive documentation related thereto), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns,

in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

### 10.8    *Exculpation.*

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, EXIT FACILITY, THE EMPLOYEE INCENTIVE PLAN, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, AND THE PLAN (INCLUDING THE DOCUMENTS IN THE PLAN SUPPLEMENT), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND RESPONSIBILITIES PURSUANT TO THE PLAN.  THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER.  THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.

10.10    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

10.11    *Retention of Causes of Action and Reservation of Rights.*

(a)    Except as otherwise provided in the Plan, including Sections 10.5, 10.6, 10.7, 10.8 and 10.9, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

(b)    Notwithstanding Section 10.11(a), on the Effective Date, the Reorganized Debtors shall be deemed to have released all Avoidance Actions against Ongoing Trade Parties; *provided*, *however*, that the Reorganized Debtors shall be entitled to prosecute Avoidance Actions with respect to transfers made to Ongoing Trade Parties prior to the Petition Date in connection with, pursuant to, or under an executory contract or unexpired lease that is rejected by the Debtors during the Debtors' Chapter 11 Cases or pursuant to the Plan.

10.12    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the Restructuring.

10.13    *Indemnification and Reimbursement Obligations.*

For purposes of the Plan, (a) Indemnification Obligations to current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity prior to, on or subsequent to the Petition Date shall be assumed by the Reorganized Debtors and (b) Indemnification Obligations of the Debtors arising from services as current and

57

former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity during the period from and after the Petition Date shall be Administrative Expense Claims.  In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any current and former directors', officers', members', managers', agents' or employees' insurance policies (including any "tail policy") in effect as of the Petition Date, and all current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

## ARTICLE XI.        RETENTION OF JURISDICTION.

### 11.1    *Retention of Jurisdiction.*

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)    to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)    to issue and enforce injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person or

other Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning any reserves with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether a Person or entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged hereunder or for any other purpose;

(q)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

(r)     to recover all Assets of the Debtors and property of the Estates, wherever located;

(s)     to hear and determine matters related to the DIP Facilities and the Final DIP Order; and

(t)     to enter a final decree closing each of the Chapter 11 Cases.

## ARTICLE XII.     MISCELLANEOUS PROVISIONS.

### 12.1     *Exemption from Certain Transfer Taxes.*

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any Lien, mortgage, deed of trust or other security interest, (c) all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, (d) any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, (e) the grant of collateral under the Exit Credit Agreement and (f) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

### 12.2     *Request for Expedited Determination of Taxes.*

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.3     *Dates of Actions to Implement Plan.*

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day but shall be deemed to have been completed as of the required date.

### 12.4     *Amendments.*

(a)     Plan Modifications.  The Plan may be amended, modified, or supplemented by the Debtors, with the consent of the Requisite 1.125L Noteholders, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional

disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims pursuant to the Plan, the Debtors, with the consent of the Requisite 1.125L Noteholders, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented. The Debtors, subject to the reasonable consent of the Requisite 1.125L Noteholders, shall have the right to amend the documents contained in, and exhibits to, the Plan Supplement in accordance with the terms of the Plan through the Effective Date.

(b)      Certain Technical Amendments. Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court.

## 12.5   *Revocation or Withdrawal of Plan.*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors. If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption or rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Person; (ii) prejudice in any manner the rights of such Debtor or any other Person; or (iii) constitute an admission of any sort by any Debtor or any other Person.

## 12.6   *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, subject to the consent of the Requisite 1.125L Noteholders, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this section, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be) and (c) nonseverable and mutually dependent.

**12.7** *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Supplement document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflicts of laws thereof (other than section 5-1401 and section 5-1402 of the New York General Obligations Law).

**12.8** *Immediate Binding Effect.*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns.

**12.9** *Successors and Assigns.*

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Person.

**12.10** *Entire Agreement.*

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

**12.11** *Computing Time.*

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**12.12** *Exhibits to Plan.*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

**12.13** *Notices.*

All notices, requests, and demands hereunder shall be in writing (including by facsimile or email transmission) and, unless otherwise provided herein, shall be deemed to have

been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

if to the Debtors or the Reorganized Debtors:

> EP ENERGY CORPORATION
> 601 Travis Street, Suite 1400
> Houston, Texas 77002
> Attn:  Jace D. Locke
>
> – and –
>
> WEIL, GOTSHAL & MANGES LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attn:  Matthew S. Barr, Esq., Alfredo R. Pérez, Esq., Ronit Berkovich, Esq.,
> and Scott Bowling, Esq.
> Telephone:  (212) 310-8000
> Facsimile:  (212) 310-8007
>
> *Attorneys for the Debtors*

A notice is deemed to be given and received (a) if sent by first-class mail, personal delivery, or courier, on the date of delivery if it is a Business Day and the delivery was made prior to 4:00 p.m. (local time in place of receipt) and otherwise on the next Business Day, or (b) if sent by electronic mail, when the sender receives an email from the recipient acknowledging receipt; *provided* that an automatic "read receipt" does not constitute acknowledgment of an email for purposes of this Section.  Any party may change its address for service from time to time by providing a notice in accordance with the foregoing.  Any element of a party's address that is not specifically changed in a notice will be assumed not to be changed.

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002; *provided*, that the U.S. Trustee need not file such a renewed request and shall continue to receive documents without any further action being necessary.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of entities receiving documents pursuant to Bankruptcy Rule 2002 to the U.S. Trustee and those entities that have filed such renewed requests.

### 12.14  *Reservation of Rights.*

Except as otherwise provided herein, the Plan shall be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of (a) the Debtors with respect to

any Claims or Interests prior to the Effective Date or (b) any holder of a Claim or Interest or other entity prior to the Effective Date.

### 12.15 *Dissolution of Creditors' Committee.*

On the Effective Date, the Creditors' Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases, provided that following the Effective Date, the Creditors' Committee shall continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications, and any relief related thereto, for compensation by professional persons retained in the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, 503(b), or 1103 of the Bankruptcy Code and requests for allowance of Administrative Expense Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeals to which the Creditors' Committee is a party.

Dated: July 13, 2020
       Houston, Texas

Respectfully submitted,

  /s/ *David Rush*
  Name:  David Rush
  Title:  Chief Restructuring Officer

**EP ENERGY CORPORATION**
**EPE ACQUISITION LLC**
**EP ENERGY, LLC**
**EVEREST ACQUISITION FINANCE INC.**
**EP ENERGY GLOBAL LLC**
**EP ENERGY MANAGEMENT, L.L.C.**
**EP ENERGY RESALE COMPANY, L.L.C.**
**EP ENERGY E&P COMPANY, L.P.**

## Exhibit B

**Amended Commitment Letter**

*Execution Version*

| | | | |
|---|---|---|---|
| JPMorgan Chase Bank, N.A.<br>383 Madison Avenue<br>New York, NY 10179 | Citibank, N.A.<br>383 Greenwich Street<br>New York, NY 100013 | BMO Harris Financing, Inc.<br>111 West Monroe Street, 4th<br>Floor<br>Chicago, IL 60603 | Credit Suisse AG,<br>Cayman Islands Branch<br>11 Madison Avenue<br>New York, NY 10016 |
| Royal Bank of Canada<br>3 World Financial Center<br>200 Vesey Street, 12th Floor<br>New York, NY 10281 | The Toronto-Dominion Bank,<br>New York Branch<br>31 West 32nd Street<br>New York, NY 10019 | DNB Capital LLC<br>200 Park Avenue, 31st Floor<br>New York, NY 10166 | Sumitomo Mitsui Banking<br>Corporation<br>277 Park Avenue<br>New York, NY 10172 |
| Mizuho Bank, Ltd.<br>1251 Avenue of the Americas<br>New York, NY 10020 | Goldman Sachs Bank USA<br>200 West Street<br>New York, NY 10282 | Credit Suisse Loan Funding LLC<br>11 Madison Avenue<br>New York, NY 10016 | |

**CONFIDENTIAL**

July 13, 2020

EP Energy LLC
EPE Acquisition LLC
1001 Louisiana Street
Houston, TX 77002
Attention:  Kyle McCuen, Senior Vice President,
    Chief Financial Officer and Treasurer

<u>$314,710,456 Senior Secured Superpriority Priming Debtor-in-Possession Revolving Facility</u>
<u>$629,420,912 Senior Secured Revolving Exit Facility</u>
<u>Amendment to Commitment Letter</u>

Ladies and Gentlemen:

Reference is made to (a) the Commitment Letter dated October 18, 2019 (the "***Original Commitment Letter***", including, without limitation, the Exit Facility Term Sheet attached thereto as Exhibit B (the "***Original Exit Facility Term Sheet***")), among JPMorgan Chase Bank, N.A. ("***JPMorgan***"), Citibank, N.A. ("***Citi***"), BMO Harris Financing, Inc. ("***BMOH***"), Credit Suisse AG, Cayman Islands Branch ("***CSAG***"), Royal Bank of Canada ("***RBC***"), The Toronto-Dominion Bank, New York Branch ("***TD***"), DNB Capital LLC ("***DNB***") and Sumitomo Mitsui Banking Corporation ("***SMBC***" and together with JPMorgan, Citi, BMOH, CSAG, RBC, TD, and DNB, collectively, the "***Original Commitment Parties***"), EPE Acquisition LLC, a Delaware limited liability company ("***Holdings***"), and EP Energy LLC, a Delaware limited liability company ("***Borrower***" and together with Holdings, "***you***"), (b) that certain Joinder Letter dated October 31, 2019 (the "***CSLF Joinder Letter***"), delivered by Credit Suisse Loan Funding LLC ("***CSLF***") and accepted by you and JPMorgan, (c) that certain Joinder Letter dated November 1, 2019 (the "***Mizuho Joinder Letter***"), delivered by Mizuho Bank, Ltd. ("***Mizuho***") and accepted by you and JPMorgan, and (d) that certain Joinder Letter dated November 21, 2019 (the "***GS Joinder Letter***", together with the CSLF Joinder Letter and the Mizuho Joinder Letter, the "***Joinder Letters***"), delivered by Goldman Sachs Bank USA ("***GS***" and together with the Original Commitment Parties, CSLF and Mizuho, collectively, the "***Commitment Parties***") and accepted by you and JPMorgan.  Capitalized terms used but not defined in this Amendment to the Commitment Letter, including, without limitation, in the Revised Exit Facility Term Sheet as defined below (this "***Amendment***"; the Original Commitment Letter as amended and supplemented by the Joinder Letters and this Amendment, the "***Commitment Letter***") have the meanings assigned to such terms in the Original Commitment Letter.

The Commitment Parties constitute all of the Prepetition RBL Lenders, each of whom also committed to the DIP Facility and the Exit Facility pursuant to the Original Commitment Letter (either as direct parties thereto or, as described above with respect to certain Commitment Parties, by individually executing those

certain joinders thereto). Therefore, as of the date hereof, all Prepetition RBL Claims are Prepetition Consenting RBL Claims.

On November 25, 2019, the Bankruptcy Court entered the DIP Order (as amended through the date hereof) authorizing you and the Commitment Parties to enter into the DIP Credit Agreement, which became effective on November 25, 2019, applicable to $314,710,456 of post-petition revolving financing, including for letters of credit.

On March 12, 2020, the Bankruptcy Court entered an order confirming the Fourth Amended Joint Chapter 11 Plan of EP Energy Corporation and Its Affiliated Debtors (the "***Fourth Amended Plan***") and granting related relief (the "***March 2020 Confirmation Order***"). On March 23, 2020, the Bankruptcy Court entered an order vacating the March 2020 Confirmation Order and acknowledging that the Fourth Amended Plan never became effective.

Following the Bankruptcy Court's order on March 23, 2020, the Borrower and its subsidiaries have developed an updated business plan to support a revised plan of reorganization (the "***Proposed Revised Plan***"), which is different from, and does not constitute, an "Approved Plan" under the terms set forth in the Original Exit Facility Term Sheet. You have requested an amendment to the Original Commitment Letter in order to update and revise the terms of the Original Exit Facility Term Sheet, and each Commitment Party desires to commit severally (and not jointly) to lend under an exit facility, on substantially the terms described herein, and subject to the conditions precedent set forth herein, including in <u>Exhibit B</u> attached hereto (the "***Revised Exit Facility Term Sheet***"), pursuant to which the DIP Facility and all (but not less than all) of the remaining outstanding Prepetition RBL Claims that were not converted into a portion of the DIP Facility will be converted into a senior secured reserve-based revolving exit facility in an aggregate principal amount of up to $629,420,912 and subject to an initial borrowing base of $650,000,000 (unless such initial borrowing base is redetermined in accordance with the terms set forth in the Revised Exit Facility Term Sheet).

In addition, you have requested that, subject to its receipt of a disclosure statement and solicitation materials in form and substance reasonably acceptable to the Exit Facility Administrative Agent approved by the Bankruptcy Court relating to an Approved Plan (as defined in the Revised Exit Facility Term Sheet), each Commitment Party commit to vote or cause to be voted its Prepetition RBL Claims in a timely manner in favor of such Approved Plan (to the extent entitled to vote on such Approved Plan) and to accept such Approved Plan by delivering its duly executed and completed ballot or ballots relating thereto (and not to change or withdraw its votes except on the terms included herein).

1.  <u>Amendments to Original Commitment Letter</u>

(a)  Exhibit B to the Original Commitment Letter is hereby amended and restated in its entirety by <u>Exhibit B</u> attached to this Amendment.

(b)  For the avoidance of doubt:

(i)  The term "***DIP Credit Agreement***" refers to the Senior Secured Superpriority Debtor-in-Possession Credit Agreement, dated as of November 25, 2019, by and among Holdings, the Borrower, JPMorgan, as Administrative Agent and Collateral Agent, the Commitment Parties, as Lenders thereunder, and the other Persons party thereto. The term "***DIP Facility***" refers to the facility thereunder.

(ii)  The term "***Exit Facility***" is hereby amended to refer to the senior secured reserve-based revolving exit facility that is consistent with the terms of the Revised Exit Facility Term Sheet, and the term "***Exit Facility Credit Agreement***" refers to the credit agreement evidencing such Exit Facility.

2

(iii) The terms "*Exit Revolving Facility*", "*Exit Term Facility*" and "*Term Lender*" no longer have significance under the Revised Exit Facility Term Sheet.

2.   Commitments and Undertakings

In connection with the Transactions, subject to the terms and conditions set forth in this Amendment and the Original Commitment Letter, each of the Commitment Parties is pleased to advise you of its several (and not joint) commitment to:

(a)   provide the commitment amount of the Exit Facility set forth opposite such Commitment Party's name on Exhibit A attached to this Amendment, which in the aggregate for all such Commitment Parties comprises 100% of the Commitments under the Exit Facility; and

(b)   subject to its receipt of a disclosure statement and solicitation materials in form and substance reasonably acceptable to the Exit Facility Administrative Agent approved by the Bankruptcy Court relating to an Approved Plan:

(i)   timely vote or cause to be voted each Commitment Party's Prepetition RBL Claims in favor of such Approved Plan (to the extent entitled to vote on such Approved Plan) and to accept such Approved Plan by delivering its duly executed and completed ballot or ballots relating thereto; and

(ii)   not change or withdraw (or cause or direct to be changed or withdrawn) any such vote described in clause (b)(i) above; *provided*, *however*, that notwithstanding anything herein to the contrary, a Commitment Party's vote may, upon written notice to the Borrower, be revoked (and, upon such revocation, deemed void *ab initio*) by such Commitment Party at any time following the termination of the Commitment Letter pursuant to the terms thereof with respect to such Commitment Party.

Subject to the satisfaction of the conditions set forth in section 4 below and upon the approval of this Amendment by the Bankruptcy Court, the commitment of each Commitment Party to provide, lend under or be a party to, the exit facility described in the Original Exit Facility Term Sheet is fully superseded by and replaced with such Commitment Party's several (and not joint) commitment hereunder.

3.   Syndication; Termination of Incremental Commitments

JPMorgan's undertakings with respect to the Incremental Commitments are hereby terminated and JPMorgan shall have no further obligations with respect thereto.

4.   Conditions

Each Commitment Party's commitments and agreements hereunder are subject to (a) receipt by the Administrative Agent on or before [_____] of an executed counterpart of this Amendment from each Commitment Party, Holdings and Borrower and (b) the conditions set forth in the Revised Exit Facility Term Sheet under the heading "Conditions to Exit Facility Conversion Date", including without limitation, the DIP Order approving the DIP Facility remaining in full force and effect and the Bankruptcy Court entering the Confirmation Order. It is understood and agreed that there are no conditions (implied or otherwise) to the commitments hereunder, other than the conditions set forth in, or referred to in, this Section 4.

5.   Release

You hereby reaffirm and ratify, for yourselves and on behalf of any of your respective affiliates, as if executed and issued on and as of the date on which this Amendment becomes effective, any and all releases provided for under Section 4(l) of the DIP Order, in accordance with the terms thereof, in favor of (i) JPMorgan

or any Commitment Party under this Amendment, (ii) the Administrative Agent, Collateral Agent, any Issuing Bank or any Lenders, each as defined in the DIP Credit Agreement, (iii) all former and current RBL Secured Parties (as defined in the DIP Order) and all affiliates of the RBL Secured Parties, and (iv) with respect to each of the foregoing Persons, in clauses (i) through (iii), each of their affiliates, predecessors, successors, assigns, subsidiaries, affiliates, current and former officers and directors, principals, equity holders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such persons' respective heirs, executors, estates, and nominees, in each case in their capacity as such.

6. <u>Miscellaneous</u>

This Amendment may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Amendment that is an Electronic Signature transmitted by telecopy, emailed pdf. or any other electronic means that reproduces an image of an actual executed signature page shall be effective as delivery of a manually executed counterpart of this Amendment. As used herein, "***Electronic Signature***" means an electronic symbol or process attached to, or associated with, a contract or other record and adopted by a Person with the intent to sign, authenticate or accept such contract or record. This Amendment, together with the Original Commitment Letter, the Fee Letters, the CSLF Joinder Letter, the Mizuho Joinder Letter, the GS Joinder Letter, the DIP Credit Agreement and the Credit Documents (as defined in the DIP Credit Agreement), are the only agreements that have been entered into among us and you with respect to the Credit Facilities and set forth the entire understanding of the parties with respect thereto. This Amendment and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions, this Commitment Letter (as amended), the Fee Letters, the DIP Credit Agreement, the Credit Documents (as defined in the DIP Credit Agreement) or the performance of services hereunder or thereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions or the other transactions contemplated hereby, this Commitment Letter (as amended), the Fee Letters, the DIP Credit Agreement, the Credit Documents (as defined in the DIP Credit Agreement) or the performance of services hereunder or thereunder.

You shall use commercially reasonable efforts to provide JPMorgan with copies of all material pleadings and motions (including any plan of reorganization and any disclosure statement related thereto) to be filed by or on behalf of the Borrower or any of the other Credit Parties with the Bankruptcy Court in the Chapter 11 Cases at least two (2) Business Days prior to filing (or such shorter period as the Administrative Agent may agree), which such pleadings shall include the Administrative Agent as a notice party.

Except as expressly amended or modified hereby, each provision of the Original Commitment Letter is hereby ratified and confirmed, and all references to the "Commitment Letter" (including, in the CSLF Joinder Letter, the Mizuho Joinder Letter, and the GS Joinder Letter, respectively) shall be deemed to be references to the Original Commitment Letter as amended or modified hereby. In furtherance of the forgoing and for the avoidance of doubt, this Amendment and its contents are subject to the representations, warranties, fees, conditions, expense reimbursement, indemnification, jurisdiction, venue, service of process, waiver of jury trial,

sharing of information, affiliate activities, absence of fiduciary relationship, confidentiality, assignments (including restrictions set forth in Section 10 thereof), USA PATRIOT Act, and expiry or termination provisions of the Original Commitment Letter, which shall be incorporated herein, *mutatis mutandis*, and apply hereto to the same extent as if more fully set forth herein.

[*Signature Pages Follow*]

We are pleased to have been given the opportunity to assist you in connection with this important financing.

Very truly yours,

JPMORGAN CHASE BANK, N.A.

By: _____
    Name:
    Title:

*Amendment to Commitment Letter Signature Page*

CITIBANK, N.A.

By: _____
    Name:
    Title:

BMO HARRIS FINANCING, INC.


By: _____
     Name:
     Title:

*Amendment to Commitment Letter Signature Page*

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

ROYAL BANK OF CANADA


By: _____
    Name:
    Title:

THE TORONTO-DOMINION BANK,
NEW YORK BRANCH


By: _____
    Name:
    Title:

DNB CAPITAL LLC


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

*Amendment to Commitment Letter Signature Page*

SUMITOMO MITSUI BANKING CORPORATION

By: _____
    Name:
    Title:

CREDIT SUISSE LOAN FUNDING LLC
By: _____
Name:
Title:

*Amendment to Commitment Letter Signature Page*

MIZUHO BANK, LTD.

By: _____
Name:
Title:

GOLDMAN SACHS BANK USA

By: _____
Name:
Title:

Accepted and agreed to as of
the date first above written:


EP ENERGY LLC


By: _____
Name:
Title:


EPE ACQUISITION LLC


By: _____
Name:
Title:


*Amendment to Commitment Letter Signature Page*

**Exhibit A**
Commitment Amount of Each Commitment Party

| Commitment Party | Commitment Amount |
|---|---|
| JPMorgan Chase Bank, N.A. | $85,000,000.00 |
| Citibank, N.A. | $85,000,000.00 |
| BMO Harris Financing, Inc. | $150,000,000.00 |
| Credit Suisse AG, Cayman Islands Branch | $74,000,000.00 |
| Royal Bank of Canada | $85,000,000.00 |
| The Toronto-Dominion Bank, New York Branch | $46,947,275.00 |
| DNB Capital LLC | $28,000,000.00 |
| Sumitomo Mitsui Banking Corporation | $21,000,000.00 |
| Credit Suisse Loan Funding LLC | $11,000,000.00 |
| Mizuho Bank, Ltd. | $20,000,000.00 |
| Goldman Sachs Bank USA | $23,473,637.00 |
|  |  |
| **Total** | **$629,420,912.00** |

*Amendment to Commitment Letter Signature Page*

**Exhibit B**
Revised Exit Facility Term Sheet


*(Attached hereto)*

*Execution Version*

<u>Exhibit B</u>

EP Energy LLC
<u>Senior Secured Exit Facility</u>
<u>Amended and Restated Summary of Principal Terms and Conditions</u>

Set forth below is a summary of the principal terms and conditions for the Exit Facility.  Capitalized terms used but not defined shall have the meanings set forth in that certain Commitment Letter dated as of October 18, 2019, as amended by the Amendment to Commitment Letter dated as of July 13, 2020, to which this <u>Exhibit B</u> is attached.

| | |
|---|---|
| <u>Borrower:</u> | EP Energy LLC, a Delaware limited liability company (the "***Borrower***"). |
| <u>Holdings:</u> | EPE Acquisition, LLC, a Delaware limited liability company ("***Holdings***"). |
| <u>Exit Facility Administrative Agent:</u> | JPMorgan Chase Bank, N.A. ("***JPMCB***"), acting through one or more of its branches or affiliates, will act as sole administrative agent for the Exit Facility (as defined below) (in such capacity, the "***Exit Facility Administrative Agent***") and sole collateral agent for the Exit Facility (in such capacity, the "***Exit Facility Collateral Agent***"), and will perform the duties customarily associated with such roles. |
| <u>Lead Arranger:</u> | JPMCB will act as the lead arranger for the Exit Facility (in such capacity, the "***Exit Facility Arranger***"), and will perform the duties customarily associated with such role. |
| <u>Bookrunner:</u> | JPMCB will act as the bookrunner for the Exit Facility (the "***Exit Facility Bookrunner***"), and will perform the duties customarily associated with such role. |
| <u>Exit Facility:</u> | On the Exit Facility Conversion Date (as defined below), the DIP Facility and all outstanding Prepetition RBL Claims that were not converted into the DIP Facility will, subject to the terms and conditions set forth herein, automatically be converted to a senior secured revolving credit facility subject to a Borrowing Base (as defined below) and with commitments in an aggregate maximum principal amount of up to the aggregate Maximum Exit Commitment Amount (as defined below) (the "***Exit Facility***").  The loans under the Exit Facility are collectively referred to as "***Revolving Loans***" and the lenders making commitments under the Exit Facility are collectively referred to as "***Revolving Lenders***". |
| | Each Revolving Lender's "***Commitment***" under the Exit Facility means, with respect to such Revolving Lender, its commitment to make Revolving Loans and acquire participations in Letters of Credit under the Exit Facility, expressed as an amount that shall be at any time the lesser of (i) such Revolving Lender's Maximum Exit Commitment Amount and (ii) such Revolving Lender's Applicable |

Revolving Commitment Percentage (as defined below) of an amount equal to the Borrowing Base.

As of the Exit Facility Conversion Date, each Revolving Lender's commitment with respect to the Exit Facility shall be listed on the commitment schedule to the Exit Facility Documentation (with respect to each Revolving Lender, such Revolving Lender's "***Maximum Exit Commitment Amount***"). The aggregate Maximum Exit Commitment Amount as of the Exit Facility Conversion Date shall be not more than $629,420,912. No Revolving Lender's Commitment shall be increased above such Revolving Lender's Maximum Exit Commitment Amount without its consent notwithstanding an increase in the Borrowing Base approved by all of the Revolving Lenders.

"***Applicable Revolving Commitment Percentage***" means, at any time, for each Revolving Lender, the percentage obtained by dividing (a) such Revolving Lender's Maximum Exit Commitment Amount at such time by (b) the aggregate amount of all Revolving Lender's Maximum Exit Commitment Amounts at such time; *provided* that at any time when the Commitments have been terminated, each Revolving Lender's Applicable Revolving Commitment Percentage shall be the percentage obtained by dividing (i) such Revolving Lender's Total Revolving Outstandings (as defined below) at such time by (ii) the aggregate Total Revolving Outstandings of all Revolving Lenders at such time.

| | |
|---|---|
| Swingline Facility: | In connection with the Exit Facility, JPMCB (in such capacity, the "***Swingline Lender***") will make available to the Borrower a swingline facility (the "***Swingline Facility***") in U.S. dollars under which the Borrower may make short-term borrowings upon same-day notice (so long as notice delivered by 3:00 pm New York City time) in a maximum amount at any time outstanding not to exceed $25,000,000 and in a minimum amount of $100,000 and integral increments of $10,000 in excess thereof, subject to customary notice requirements *provided* that no swingline loans shall be made if such swingline loan would cause the Total Revolving Outstandings to exceed the Revolving Loan Limit (as defined below). Except for purposes of calculating the commitment fee described below, any such swingline borrowings will reduce Availability (as defined below) under the Exit Facility on a dollar-for-dollar basis. Repayment of swingline loans must occur on or prior to the earlier of 15 business day after the making of such loan or the swingline maturity date. |

Upon notice from the Swingline Lender, the Revolving Lenders will be unconditionally obligated to purchase participations in any swingline loan, on a pro rata basis, based upon their commitments under the Exit Facility.

If any Revolving Lender becomes a Defaulting Lender (as defined below), then the swingline exposure of such Defaulting Lender will automatically be reallocated among the Revolving Lenders that are

not Defaulting Lenders, on a pro rata basis in accordance with their commitments under the Exit Facility, up to an amount such that the revolving credit exposure of each Revolving Lender that is not a Defaulting Lender does not exceed its respective Commitment.  In the event such reallocation does not fully cover the exposure of such Defaulting Lender, the Swingline Lender may require the Borrower to repay such "uncovered" exposure in respect of the swingline loans and will have no obligation to make new swingline loans to the extent such swingline loans would cause Total Revolving Outstandings to exceed the aggregate Commitments of the Revolving Lenders that are not Defaulting Lenders.

Letters of Credit:

The Exit Facility will be available to the Borrower for the purpose of issuing letters of credit up to an aggregate amount of $65,000,000 (the "***Letters of Credit***"); *provided* that no Letter of Credit shall be issued if the stated amount of such Letter of Credit would cause the Total Revolving Outstandings to exceed the Revolving Loan Limit.  Letters of Credit will be issued by JPMCB, Citi, and other consenting Revolving Lenders at the Borrower's request if reasonably acceptable to the Exit Facility Administrative Agent (each, an "***Issuing Bank***").  Each Letter of Credit shall expire not later than the earlier of (a) one year after its date of issuance or such longer period of time as may be agreed by the applicable Issuing Bank and (b) the fifth business day prior to the Maturity Date of the Exit Facility; *provided* that any Letter of Credit may provide for automatic renewal thereof for additional periods of up to 12 months or such longer period of time as may be agreed by the applicable Issuing Bank (which in no event shall extend beyond the date referred to in clause (b) above, except to the extent cash collateralized or backstopped pursuant to arrangements reasonably satisfactory to the relevant Issuing Bank at 103% of the undrawn stated amount thereof, *provided*, that no Revolving Lender shall be required to fund participations in Letters of Credit after the maturity date applicable to its respective Commitment).  Each Issuing Bank (other than the Exit Facility Administrative Agent or its affiliates) shall provide at least once weekly a list of all then outstanding Letters of Credit issued by it.

Drawings under any Letter of Credit shall be reimbursed by the Borrower (whether with its own funds or with the proceeds of borrowings under the Exit Facility) within one business day of the drawing if notice thereof is received from the relevant Issuing Bank by 11:00 am New York City time on the next business day following such drawing (or within one business day of receipt of the notice if notice is received after 11:00 am).  To the extent that the Borrower does not reimburse the Exit Facility Administrative Agent for the account of the Issuing Bank within the time period specified above, the Revolving Lenders under the Exit Facility shall be irrevocably obligated to reimburse the Issuing Bank pro rata based upon their Applicable Revolving Commitment Percentage.

If any Revolving Lender becomes a Defaulting Lender (as defined below), then the Letter of Credit exposure of such Defaulting

Lender will automatically be reallocated among the Revolving Lenders that are not Defaulting Lenders, on a pro rata basis in accordance with their Applicable Revolving Commitment Percentages, up to an amount such that the Total Revolving Outstandings of each Revolving Lender that is not a Defaulting Lender does not exceed its respective Commitment.  In the event that such reallocation does not fully cover the Letter of Credit exposure of such Defaulting Lender, the Borrower shall cash collateralize (for the benefit of the applicable Issuing Bank) such "uncovered" exposure in respect of each outstanding Letter of Credit at 103% of the undrawn stated amount thereof and no Issuing Bank will have an obligation to issue new Letters of Credit, or to extend, renew or amend existing Letters of Credit to the extent Letter of Credit exposure would exceed the aggregate Commitments of the Revolving Lenders that are not Defaulting Lenders, unless such "uncovered" exposure is cash collateralized to such Issuing Bank's reasonable satisfaction at 103% of the undrawn stated amount thereof.

Defaulting Lenders:

The Exit Facility shall also contain usual and customary provisions regarding Defaulting Lenders.

"*Defaulting Lender*" means any Revolving Lender that (a) has failed, within two business days of the date required to be funded or paid, to (i) fund any portion of its Revolving Loans, (ii) fund any portion of its participations in Letters of Credit or swingline loans or (iii) pay over to any Credit Party any other amount required to be paid by it hereunder, unless, in the case of clause (i) above, such Revolving Lender notifies the Exit Facility Administrative Agent in writing that such failure is the result of such Revolving Lender's good faith determination that a condition precedent to funding (specifically identified and including the particular default, if any) has not been satisfied, (b) has notified the Borrower or any Credit Party in writing, or has made a public statement to the effect, that it does not intend or expect to comply with any of its funding obligations under the Exit Facility Credit Agreement (unless such writing or public statement indicates that such position is based on such Revolving Lender's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Revolving Loan under the Exit Facility Credit Agreement cannot be satisfied) or generally under other agreements in which it commits to extend credit, (c) has failed, within three business days after request by a Credit Party, acting in good faith, to provide a certification in writing from an authorized officer of such Revolving Lender that it will comply with its obligations (and is financially able to meet such obligations as of the date of certification) to fund prospective Revolving Loans and participations in then outstanding Letters of Credit and swingline loans under the Exit Facility Credit Agreement, *provided* that such Revolving Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon such Credit Party's receipt of such certification in form and substance satisfactory to it and the Exit Facility Administrative Agent, or (d) has become the subject of (i) a

bankruptcy event or (ii) a bail-in action under the European Union or United Kingdom bail-in regime.

Purpose / Use of Proceeds:

On the Exit Facility Conversion Date, the proceeds of Revolving Loans up to an aggregate amount such that the Borrower satisfies the conditions precedent to the Exit Facility Conversion Date may be used (i) to repay in full all outstanding amounts owing under the DIP Credit Agreement and the Prepetition RBL Credit Agreement (including by automatic conversion of such amounts into Revolving Loans), (ii) for payments contemplated by the Approved Plan (including fees and expenses related to the Credit Parties' emergence from the Chapter 11 Cases), and (iii) for the payment of fees and expenses in connection with the Transactions; and letters of credit under the DIP Facility that are outstanding on the Exit Facility Conversion Date shall automatically be deemed to have been issued under the Exit Facility.

"*Approved Plan*" means a chapter 11 plan for the Credit Parties (as defined below) and, at the Borrower's option, any other affiliated debtors and debtors in possession, that shall (a) be consistent in all material respects with this Revised Exit Facility Term Sheet and give effect to the transactions contemplated by this Revised Exit Facility Term Sheet, or (b) otherwise be in form and substance reasonably satisfactory to the Exit Facility Administrative Agent and the Required Revolving Lenders (as defined below).

On any date after the Exit Facility Conversion Date:

(a) the proceeds of Revolving Loans (including any swingline loans) will be used by the Borrower (i) for the acquisition, development and exploration of oil and gas properties, (ii) to provide for the working capital needs of the Borrower and its restricted subsidiaries and (iii) for general corporate purposes of the Borrower and its restricted subsidiaries (including, without limitation, acquisitions of oil and gas properties and other assets), subject to the limitations set forth below the section captioned "Revolving Availability"; and

(b) Letters of Credit will be used by the Borrower and its restricted subsidiaries for general corporate purposes and to support deposits required under purchase agreements pursuant to which the Borrower or its restricted subsidiaries may acquire oil and gas properties and other assets.

Revolving Availability:

From and after the Exit Facility Conversion Date, so long as the Total Revolving Outstandings do not exceed the Revolving Loan Limit: (i) loans under the Exit Facility will be available at any time (on same day notice in the case of Revolving Loans that bear interest at a rate determined by reference to ABR (as defined in Annex I)) if notice is made prior to 11:00 am New York City time on such day, or prior to 1:00 pm New York City time at least 3 business days (in the case of Revolving Loans that bear interest at a rate determined by reference to LIBOR (as defined in Annex I)), in

minimum principal amounts of $500,000 and increments of $100,000 in excess thereof, (ii) Letters of Credit will be available to be issued as described in the section captioned "Letters of Credit," (iii) swingline loans will be available as described in the section captioned "Swingline Facility", and (iv) amounts repaid under the Exit Facility may be reborrowed.

The "*Total Revolving Outstandings*" means, at any time, the aggregate principal amount of Revolving Loans then outstanding *plus* the aggregate stated amount of all issued Letters of Credit and, without duplication, all unreimbursed disbursements under any Letter of Credit as of such date (unless cash collateralized or backstopped at 103% of the stated amount thereof pursuant to arrangements reasonably acceptable to the relevant Issuing Bank), and the aggregate principal amount at such time outstanding under the Swingline Facility.

The "*Revolving Loan Limit*" means, at any time, the lesser of (i) the aggregate amount of the Revolving Lenders' Maximum Exit Commitment Amount and (ii) the Borrowing Base (as defined below) then in effect.

"*Availability*" shall mean an amount (if positive) equal to the Revolving Loan Limit *less* Total Revolving Outstandings.

Borrowing Base:

The borrowing base for the Exit Facility (the "*Borrowing Base*") at any time shall be based on (i) the Credit Parties' proved oil and gas reserves included in the most recently delivered Reserve Report (as defined below) that are located within the geographic boundaries of the United States or the outer continental shelf adjacent to the United States, determined in accordance with the terms set forth below, and (ii) such other reports, data and supplemental information (including the existence of any hedge transactions or other indebtedness) as may be reasonably requested by the Required Revolving Lenders ("*Other Engineering Materials*").

The Borrower has heretofore delivered to the Exit Facility Administrative Agent and the Revolving Lenders a reserve report prepared as of December 31, 2019 (the "*2019 Year-End Reserve Report*"), together with the Other Engineering Materials associated therewith.  If the Exit Facility Conversion Date occurs prior to November 1, 2020, then (based on the 2019 Year-End Reserve Report and such Other Engineering Materials), from the Exit Facility Conversion Date until the Borrowing Base is redetermined in accordance with the Exit Facility Documentation, the initial Borrowing Base shall be $650,000,000; *provided*, *however*, that if the Exit Facility Conversion Date has not occurred prior to November 1, 2020, then such initial Borrowing Base may be redetermined by the Exit Facility Administrative Agent and the Revolving Lenders in accordance with the methodology described below using the reserve report prepared as of June 30, 2020, and required to be delivered under the DIP Credit Agreement on or before September 30, 2020 (the "*2020 Midyear Reserve Report*")

and such other information as required under the DIP Credit Agreement. For purposes of this Revised Exit Facility Term Sheet, (i) the "***Initial Borrowing Base***" shall refer to the $650,000,000 initial Borrowing Base or the redetermined initial Borrowing Base that becomes effective on the Exit Facility Conversion Date, as applicable, and (ii) the "***Initial Reserve Report***" shall refer correspondingly to the 2019 Year-End Reserve Report or the 2020 Midyear Reserve Report, as applicable.

Within fifteen (15) days after receipt by the DIP Facility Administrative Agent of the 2020 Midyear Reserve Report and related information, if applicable, the Exit Facility Administrative Agent shall recommend to the Revolving Lenders a redetermined initial Borrowing Base to become effective on the Exit Facility Conversion Date if such Exit Facility Conversion Date has not occurred prior to November 1, 2020. Thereafter, the Revolving Lenders shall, not later than fifteen (15) days after receipt of the Exit Facility Administrative Agent's recommendation for the initial Borrowing Base, approve the recommended initial Borrowing Base or propose an alternative initial Borrowing Base. The Exit Facility Administrative Agent and each Revolving Lender shall redetermine the initial Borrowing Base in its respective sole discretion and consistent with its respective normal and customary oil and gas lending criteria as they exist at the particular time (and, for the avoidance of doubt, in a manner consistent with its application of any guidelines promulgated by the Office of the Comptroller of the Currency or other governmental authority as then in effect ("***Regulatory Guidelines***")) and the redetermined initial Borrowing Base shall (a) be the largest amount approved by the Exit Facility Administrative Agent and all of the Revolving Lenders, (b) become effective on the Exit Facility Conversion Date, and (c) remain in effect until the Borrowing Base is otherwise redetermined in accordance with the Exit Facility Documentation.

From and after the Exit Facility Conversion Date, the Borrowing Base shall be redetermined semi-annually on or about May 1st and November 1st of each year, commencing with May 1, 2021, based upon (a) a reserve report prepared as of the immediately preceding December 31st and June 30th, respectively, and other related information, and delivered on or before April 1st and October 1st, respectively (each such report, a "***Reserve Report***"), and (b) Other Engineering Materials, if any, required to be delivered to the Exit Facility Administrative Agent.

Each Reserve Report as of December 31st shall be prepared by one or more of Netherland, Sewell & Associates, Inc., Ryder Scott Company, L.P., DeGolyer and MacNaughton, Cawley, Gillespie & Associates, Inc., or another independent petroleum engineering firm reasonably acceptable to the Exit Facility Administrative Agent and the Borrower (any such firm, an "***Approved Petroleum Engineer***"). Each Reserve Report as of June 30th shall be prepared, at the election of the Borrower, (x) by one or more Approved Petroleum Engineers or (y) by or under the supervision of the chief engineer of

the Borrower in a manner consistent with the preceding December 31st Reserve Report.

Unscheduled redeterminations of the Borrowing Base may be made at any time (a) at the request of the Borrower, not more than twice in any period of 12 consecutive months, (b) at the request of the Exit Facility Administrative Agent (at the direction of the Required Revolving Lenders), not more than twice in any period of 12 consecutive months, and (c) if requested by the Borrower, at any time between scheduled redeterminations in the event it acquires oil and gas properties with proved reserves that are to be Borrowing Base Properties (as defined below) having a PV 10 (calculated at the time of acquisition) in excess of 5% of the Borrowing Base in effect immediately prior to such acquisition.

To the extent any redetermination represents an increase in the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved by all of the Revolving Lenders and, to the extent any redetermination represents a decrease in, or reaffirmation of, the Borrowing Base in effect prior to such redetermination, such Borrowing Base will be the largest amount approved by the Required Revolving Lenders.  Each redetermination of the Borrowing Base shall be made by the Exit Facility Administrative Agent and each Revolving Lender in its respective sole discretion and consistent with its respective normal and customary oil and gas lending criteria as they exist at the particular time (and, for the avoidance of doubt, in a manner consistent with its application of the Regulatory Guidelines).

In addition to the foregoing, after the Exit Facility Conversion Date, the Borrowing Base will also be subject to adjustments between redeterminations as a result of:

(i)     sales or other dispositions (including in connection with the designation of unrestricted subsidiaries and investments or dispositions of equity interest in a restricted subsidiary owning oil and gas properties) of Borrowing Base Properties included in the most recently delivered Reserve Report relied on by the Revolving Lenders in determining the Borrowing Base, since the later of (A) the last redetermination date and (B) the last adjustment made pursuant to this clause (i) or the following clause (ii), with an aggregate borrowing base value exceeding 5.0% in the aggregate, when combined with any monetization, disposition, or termination of any hedge or swap positions contemplated in the following clause (ii), of the Borrowing Base then in effect whereupon the Borrowing Base may be reduced by an amount up to the aggregate borrowing base value of such sold or disposed Borrowing Base Properties and monetized, disposed or terminated hedge positions, as applicable and without duplication of any reduction pursuant to the following clause (ii);

(ii)     monetization, disposition or early termination of any hedge or swap positions (net of any positions entered into (1) contemporaneously with such monetization, disposition or termination or (2) subsequent to the last redetermination of the Borrowing Base) relied on by the Revolving Lenders in determining the Borrowing Base, since the later of (A) the last redetermination date and (B) the last adjustment made pursuant to this <u>clause (ii)</u> or the preceding <u>clause (i)</u>, with an aggregate borrowing base value exceeding 5.0% in the aggregate, when combined with any sales or dispositions of Borrowing Base Properties contemplated in the preceding <u>clause (i)</u>, of the Borrowing Base then in effect, whereupon the Borrowing Base may be reduced by an amount up to the aggregate borrowing base value of such monetized, disposed or terminated hedge positions and such sold or disposed Borrowing Base Properties, as applicable and without duplication of any reduction pursuant to the preceding <u>clause (i)</u>; and

(iii)     the issuance or incurrence of any Permitted Additional Debt (as defined below) (other than Permitted Additional Debt constituting permitted refinancing indebtedness incurred to refinance indebtedness, but only to the extent that the aggregate principal amount of permitted refinancing indebtedness incurred to refinance such indebtedness does not result in an increase in the principal amount thereof above the principal amount originally incurred or issued up to the original principal amount of the refinanced indebtedness), in which case the Borrowing Base shall be automatically reduced by $0.25 for every $1.00 of Permitted Additional Debt.

The Borrower may within three (3) business days of its receipt of a new Borrowing Base notice, elect in its sole discretion a reduced Borrowing Base.

"***Permitted Additional Debt***" shall mean any senior unsecured, senior subordinated unsecured or subordinated unsecured indebtedness issued by the Borrower or a Guarantor (as defined below), (a) the terms of which do not provide for any scheduled repayment, mandatory redemption or sinking fund obligation prior to the 120th day after the Maturity Date (as defined below) (other than customary offers to purchase upon a change of control, asset sale or casualty or condemnation event and customary acceleration rights after an event of default), (b) the covenants, events of default, guarantees and other terms of which (other than interest rate, fees, funding discounts and redemption or prepayment premiums determined by the Borrower to be "market" rates, fees, discounts and premiums at the time of issuance or incurrence of any such indebtedness), taken as a whole, are determined by the Borrower to be "market" terms on the date of issuance or incurrence and in any event are not adverse to the interests of the Exit Facility Administrative Agent, the Exit Facility Collateral Agent or the

9

Revolving Lenders in any material respect, and do not require the maintenance or achievement of any financial performance standards other than as a condition to taking specified actions; *provided* that a certificate of an authorized officer of the Borrower delivered to the Exit Facility Administrative Agent at least three business days prior to the incurrence or issuance of such indebtedness, together with a reasonably detailed description of the material terms and conditions of such indebtedness or drafts of the documentation relating thereto, stating that the Borrower has determined in good faith that such terms and conditions satisfy the relevant criteria set forth above, as applicable, shall be conclusive evidence that such terms and conditions satisfy such relevant standard, (c) if such indebtedness is subordinated in right of payment to the Obligations (as defined below), the terms of such indebtedness provide for customary subordination of such indebtedness to the Obligations and (d) no subsidiary of the Borrower (other than a Guarantor) is an obligor under such indebtedness.

Accordion:

The Exit Facility will permit the Borrower to increase commitments under the Exit Facility (any such increase, an "***Incremental Increase***") at any time on or after the Exit Facility Conversion Date in a minimum amount of $10,000,000 per increase (and increments of $1,000,000 above that minimum), by up to a maximum aggregate incremental commitment increase of $300,000,000; *provided* that (a) the Exit Facility shall not exceed an amount equal to the lesser of (i) $929,420,912 and (ii) the Borrowing Base then in effect; (b) no existing Revolving Lender will be required to participate in any such Incremental Increase without its consent; (c) no event of default under the Exit Facility shall exist before or after giving effect thereto; (d) the Incremental Increase shall be on the same terms and pursuant to the same documentation applicable to the Exit Facility (*provided* that the Applicable Margin (as defined below) of such Incremental Increase may be higher than that for the then existing Exit Facility, in which case, the Applicable Margin for the then existing Exit Facility shall be increased to be consistent with that for such Incremental Increase); and (e) the maturity date of the Incremental Increase shall be the same as the Maturity Date.

The Borrower may seek commitments in respect of the Incremental Increase, in its sole discretion, from either existing Revolving Lenders (each of which shall be entitled to agree or decline to participate in its sole discretion) or from additional banks, financial institutions and other institutional lenders or investors who will become Revolving Lenders in connection therewith ("***Additional Lenders***"), or from both existing Revolving Lenders and Additional Lenders, in each case with the consent of the Exit Facility Administrative Agent, the Swingline Lender and each Issuing Bank (in each case, such consent not to be unreasonably withheld or delayed).

Interest Rates and Fees:

As set forth on Annex I to this Exhibit B.

| | |
|---|---|
| Default Rate: | If any principal of or interest on any Revolving Loan or any fee payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of any Revolving Loan, 2% plus the rate otherwise applicable to such Revolving Loan or (ii) in the case of any other amount, 2% plus the rate applicable to Revolving Loans that bear interest at a rate determined by reference to ABR (as defined in <u>Annex I</u>). |
| Final Maturity: | The Exit Facility will mature, and lending commitments will terminate, on the date that is three (3) years after the Exit Facility Conversion Date (such date, the "***Maturity Date***"). |
| Guarantees: | All obligations of the Credit Parties (the "***Obligations***") under (i) the Exit Facility and the Exit Facility Documentation, (ii) interest rate protection, commodity trading or hedging, currency exchange or other hedging or swap arrangements permitted under the Exit Facility Documentation and entered into with (x) any Revolving Lender, the Exit Facility Arranger, the Exit Facility Bookrunner, the Exit Facility Administrative Agent or any affiliate of a Revolving Lender, the Exit Facility Arranger, the Exit Facility Bookrunner or the Exit Facility Administrative Agent and (y) counterparties under hedging arrangements in effect on or prior to the Exit Facility Conversion Date, (collectively, the "***Hedging Arrangements***") and (iii) treasury and cash management arrangements entered into with any Revolving Lender or any affiliate of a Revolving Lender ("***Treasury Arrangements***") will be unconditionally guaranteed jointly and severally on a *pari passu* senior secured basis (the "***Guarantees***") by Holdings and each existing and subsequently acquired or organized direct or indirect domestic restricted subsidiary of the Borrower other than (x) any subsidiary of a foreign subsidiary or (y) any FSHCO (as defined below), as reorganized pursuant to the Approved Plan (the "***Subsidiary Guarantors***"; together with Holdings, collectively, the "***Guarantors***" and together with the Borrower, collectively, the "***Credit Parties***"); *provided* that the guarantee by Holdings shall be non-recourse and limited to the equity interests of the Borrower; *provided*, *further* that certain subsidiaries will not be required to be Subsidiary Guarantors consistent with the Documentation Principles. Any payments received by the Exit Facility Administrative Agent or the Exit Facility Collateral Agent from any Credit Party (including from proceeds of any Collateral (as defined below)) following any acceleration of the Obligations under the Exit Facility or any bankruptcy event of default shall be applied in a manner consistent with the Prior Exit RBL Agreement (as defined below).<br><br>Subject to the investments covenant in the Exit Facility Documentation and other customary limitations for exit financings of this type, the Borrower may designate any subsidiary as an "unrestricted subsidiary" and subsequently redesignate any such unrestricted subsidiary as a restricted subsidiary. Unrestricted subsidiaries will not be subject to the representations and |

warranties, covenants, events of default or other provisions of the Exit Facility Documentation, and the results of operations, indebtedness and cash of unrestricted subsidiaries will not be taken into account for purposes of calculating any financial metric contained in the Exit Facility Documentation except to the extent of distributions in the form of cash or cash equivalents actually received therefrom up to a limit to be mutually agreed.

The Exit Facility Documentation shall contain customary provisions to address the status of Guarantors as eligible contract participants.

Security:

The Obligations, the Guarantees and any Hedging Arrangements or Treasury Arrangements will be secured by first-priority security interests in substantially all of the present and after acquired assets of each of the Credit Parties (collectively, but excluding the Excluded Assets (as defined consistent with the Documentation Principles, the "***Collateral***"), including, (a) a first-priority perfected pledge of all the capital stock of the Borrower, each Subsidiary Guarantor and each direct, material restricted subsidiary held by any Credit Party (which pledge, in the case of any subsidiary (x) that is a foreign subsidiary or (y) that owns no material assets (directly or through subsidiaries) other than equity interests (and debt, if applicable) of one or more foreign subsidiaries that are controlled foreign corporations, as defined in Section 957 of the Internal Revenue Code of 1986, as amended (a "***FSHCO***") shall be limited to 65% of the voting power of the voting capital stock), (b) first-priority perfected real property mortgages and deeds of trust on oil and gas reserves, together with the right, title and interest in and to the real property interests from which such oil and gas reserves are derived or on which such oil and gas reserves are located or to which such interests are attributed or derived, of the Credit Parties located in the United States or the outer continental shelf adjacent to the United States included in the most recent Reserve Report delivered to the Exit Facility Administrative Agent (such oil and gas reserves, and related rights, titles and interests, the "***Borrowing Base Properties***") and representing not less than 90% of the PV-10 value of the Credit Parties' proved oil and gas reserves included in the most recent Reserve Report and (c) a first-priority perfected security interest in all other tangible (other than real property and other oil and gas properties) and intangible assets of the Credit Parties (including but not limited to as-extracted collateral, accounts receivable, inventory, equipment, general intangibles, investment property, deposit accounts (subject to control agreements) other than certain excluded accounts, securities accounts (subject to control agreements), intellectual property and the proceeds of the foregoing).   For the avoidance of doubt, notwithstanding the security and collateral requirements set forth herein, certain "excepted liens" customary for transactions of this type in the oil & gas exploration and production industry shall be permitted, as further described in item (b) under the section captioned "Negative Covenants" ("***Permitted Liens***").

In connection with each Reserve Report, the Borrower shall provide to the Exit Facility Administrative Agent such title information, in form and substance reasonably acceptable to the Exit Facility Administrative Agent, setting forth the status of title to at least 85% of the PV-10 of any Borrowing Base Properties included in such Reserve Report that were not included in the Initial Reserve Report.

All the above-described pledges, security interests and mortgages shall be created on terms set forth in the Exit Facility Documentation, and none of the Collateral or other assets of the Credit Parties shall be subject to other pledges, security interests or mortgages except for customary and usual exceptions for financings of this type and Permitted Liens.

**Mandatory Prepayments/ Adjustments of the Borrowing Base:**

"***Borrowing Base Deficiency***" means the Total Revolving Outstandings exceeds the Borrowing Base then in effect.

If, at any time after a redetermination of the Borrowing Base in connection with a scheduled or interim redetermination, a Borrowing Base Deficiency exists, then the Borrower shall, within ten (10) business days after written notice from the Exit Facility Administrative Agent to the Borrower of such Borrowing Base Deficiency, notify the Exit Facility Administrative Agent that it intends to take one or a combination of the following actions:

(a)        within thirty (30) days after such election provide additional Borrowing Base Properties to the extent necessary to eliminate such Borrowing Base Deficiency;

(b)        within thirty (30) days after such election, prepay the Loans (in the manner provided below) in an amount sufficient to eliminate such Borrowing Base Deficiency; or

(c)        prepay Loans (in the manner provided below) in an amount sufficient to eliminate such Borrowing Base Deficiency in six equal monthly installments with interest, beginning on the 30th day after the Borrower's receipt of notice of such Borrowing Base Deficiency from the Exit Facility Administrative Agent;

*provided*, in each case, that any such Borrowing Base Deficiency must be cured prior to the Maturity Date;

*provided further*, that any Loan repayments or prepayment pursuant to the foregoing clauses (b) and (c) shall be applied in the following manner: *first*, to the prepayment of Revolving Loans and unreimbursed amounts drawn on any Letter of Credit that have not been cash collateralized or backstopped pursuant to arrangements reasonably acceptable to the relevant Issuing Bank; and *second*, if a Borrowing Base Deficiency remains, to provide cash collateral for undrawn amounts under any outstanding Letters of Credit.

If the Borrowing Base is reduced as the result of an asset sale, disposition, early monetization or termination of any hedge or swap position or the issuance of Permitted Additional Debt (as described in the section captioned "Borrowing Base") and a Borrowing Base Deficiency results from such reduction, then within one (1) business day after written notice from the Exit Facility Administrative Agent to the Borrower of such Borrowing Base Deficiency, the Borrower shall eliminate such Borrowing Base Deficiency by prepaying loans for application in the manner described above.

To the extent that any reduction in the Borrowing Base results in the Borrowing Base being less than the aggregate Maximum Exit Commitment Amounts of the Revolving Lenders, the then-effective Maximum Exit Commitment Amounts of each Revolving Lender shall also be automatically reduced pro rata by the amount of such difference.

If Holdings, the Borrower, and its Restricted Subsidiaries hold aggregate cash and cash equivalents as of the last Business Day of any week in excess of $40,000,000 (excluding certain cash and cash equivalents held in certain specified types of accounts (e.g., payroll or trust accounts) or for which checks have already been written or ACH transactions have already been initiated, or are reasonably anticipated to be written or initiated within 3 Business Days of such date of determination) ("**Excess Cash**"), the Borrower shall, on or before the immediately succeeding Business Day, prepay the Revolving Loans in an aggregate principal amount equal to or greater than the amount of such excess.

<u>Voluntary Prepayments and Reductions in Commitments</u>:

Voluntary reductions of the unutilized portion of the Commitments in a minimum amount of $1,000,000 will be permitted at any time upon two business days' notice, and voluntary prepayments of borrowings under the Exit Facility will be permitted at any time, in minimum principal amounts of $500,000 or increments of $100,000 in excess thereof, without premium or penalty, subject to reimbursement of the Revolving Lenders' redeployment costs actually incurred in the case of a prepayment of LIBOR (as defined in Annex I) borrowings other than on the last day of the relevant interest period.

Additionally, any Borrowing Base Deficiency resulting from a voluntary termination of commitments shall be required to be eliminated on the date of such termination by prepaying loans for application in the manner described above.

<u>Documentation</u>:

The definitive documentation for the Exit Facility (the "**Exit Facility Documentation**") shall be negotiated in good faith and shall contain the representations, warranties, covenants and events of default set forth in this Revised Exit Facility Term Sheet (in each case with materiality thresholds, baskets, exceptions, limitations, qualifications and grace and cure periods to be mutually agreed) and such other provisions customary and usual for exit financings of this

type as the parties may mutually agree; *provided* that, for the avoidance of doubt, the Exit Facility Credit Agreement shall be negotiated using, but is anticipated to be more restrictive than, the "Proposed Execution Version" of the Senior Secured Credit Agreement to be dated March 2020, distributed to the DIP Lenders on March 13, 2020 (the "***Prior Exit RBL Agreement***") as the precedent document (collectively, the "***Documentation Principles***").

The Exit Facility Documentation shall include usual and customary provisions in syndicated loan transactions including provisions addressing European Union and United Kingdom Bail-In matters, QFC Stay Rules, the discontinuation of the LIBOR and incorporation of alternative rates, lender representations regarding source of funds, Beneficial Ownership/FinCEN compliance, corporate divisions, credit bidding, and electronic signatures. For the avoidance of doubt, the Exit Facility Documentation shall include provisions substantively consistent with the provisions of section 13.16 (concerning the release of Guarantors and Collateral) and section 13.21 (concerning collateral matters extending to Hedging Arrangements) of the Prior Exit RBL (collectively, the "***Hedging Arrangement Collateral Related Provisions***").

Without limitation in any respect of other provisions included in the Prepetition RBL Facility, the Exit Facility Documentation shall not include provisions substantively comparable to the definition of "Applicable Equity Amount" or baskets or carve-outs by reference thereto, or provisions allowing for classes of Revolving Lenders to extend their individual maturity dates (such as those set forth in section 2.17 of the Prepetition RBL Facility).

<u>Conditions to Exit Facility Conversion Date:</u>

The effectiveness of the Exit Facility and the obligation on the part of the Revolving Lenders to make Revolving Loans available to the Borrower and to acquire participations under the Exit Facility shall be subject to the conditions precedent set forth below (collectively, the "***Exit Facility Conditions Precedent***" and the date on which such Exit Facility Conditions Precedent are satisfied, the "***Exit Facility Conversion Date***"):

The Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Exit Facility Administrative Agent and the Required Revolving Lenders, confirming the Approved Plan including approval of the Exit Facility and releases and exculpation (the "***Confirmation Order***"), and the Confirmation Order shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that would reasonably be expected to adversely affect the interests of the Exit Facility Administrative Agent, the Exit Facility Collateral Agent, or the Revolving Lenders and authorizing the Borrower and its restricted subsidiaries to execute, deliver and perform under the Exit Facility Documentation.

The "Effective Date" of the Approved Plan (the "***Plan Effective Date***") and all material transactions contemplated in the Approved Plan or in the Confirmation Order to occur on the Plan Effective Date shall have occurred (or concurrently with the occurrence of Exit Facility Conversion Date, shall occur) in accordance with the terms thereof and in compliance with applicable law, the applicable orders of the Bankruptcy Court and material regulatory approvals.

The DIP Order approving the DIP Facility remains in full force and effect and has not been reversed, vacated, stayed, or otherwise modified without the prior written consent of the DIP Agent and DIP Lenders, the DIP Facility remains in effect immediately prior to the Exit Facility Conversion Date, and no event of default shall have occurred and be continuing under the DIP Facility that has not been waived by the Majority Lenders.

All obligations under the DIP Facility shall have been (or concurrently with the Exit Facility Conversion Date shall be), to the extent not automatically converted into Exit Revolving Loans, repaid in full in cash (or, with respect to Letters of Credit, deemed issued under the Exit Facility).

All obligations (including accrued but unpaid interest, fees, expenses and other amounts) owing under the Prepetition RBL Facility shall have been (or concurrently with the Exit Facility Conversion Date shall be), to the extent not automatically converted into Revolving Loans, repaid in full in cash (or, with respect to Letters of Credit, deemed issued under the Exit Facility).

The Exit Facility Administrative Agent shall have received satisfactory evidence that immediately after the consummation of the Approved Plan, total outstanding debt for borrowed money net of unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries shall not exceed $525,000,000 and the only outstanding secured indebtedness for borrowed money of the Credit Parties shall be the indebtedness arising under the Exit Facility.

The Credit Parties shall have minimum Liquidity equal to or greater than the Liquidity Threshold as of the Exit Facility Conversion Date, after giving effect to the consummation of the Approved Plan, including the repayment or conversion of the Prepetition RBL Facility and the DIP Facility and the deemed issuance of Letters of Credit, each as specified above. "***Liquidity***" shall mean at any time an amount equal to Availability *plus* unrestricted cash and cash equivalents of the Borrower and its restricted subsidiaries at such time, *minus* the amount of any Borrowing Base Deficiency existing at such time. "***Liquidity Threshold***" means, if the Exit Facility Conversion Date occurs (a) before October 1, 2020, $100,000,000, (b) on or after October 1, 2020 and before the date in clause (c), $115,000,000, (c) on or after November 1, 2020 and before the date in clause (d), $130,000,000 and (d) on or after December 1, 2020, $145,000,000.

The Exit Facility Administrative Agent shall have received a customary solvency certificate (after giving effect to the Approved Plan) from the chief financial officer of the Borrower.

Delivery of customary documents and certificates (including organizational documents, evidence of corporate authorization and specimen signatures) and customary legal opinions dated as of the Exit Facility Conversion Date and such other documentation that the Exit Facility Administrative Agent may reasonably request in order to effectuate the Exit Facility.

The Exit Facility Conversion Date shall occur not later than the Maturity Date (as defined in the DIP Credit Agreement).

The Borrower shall have paid or caused to be paid all fees required to be paid to the Exit Facility Arranger, the Exit Facility Administrative Agent and the Revolving Lenders under, or in connection with, the Exit Facility, including under the Fee Letters. All reasonable and documented out-of-pocket fees and expenses (including reasonable and documented fees and expenses of outside counsel) required to be paid to the Exit Facility Administrative Agent on or before the Exit Facility Conversion Date shall have been paid to the extent invoiced at least one business day prior to the Exit Facility Conversion Date.

To the extent not otherwise included in the disclosure statement relating to the Approved Plan, the Exit Facility Administrative Agent shall have received a pro forma consolidated balance sheet and any other applicable financial statements of the Borrower and its restricted subsidiaries as of the most recent month and fiscal quarter ended prior to the Exit Facility Conversion Date for which financial statements are available; provided that for purposes of such financial statements, working capital expenditures will not be required to be included in such financial statements; provided, further, that such financial statements shall not take into account any "fresh start accounting".

All representations and warranties shall be true and correct in all material respects (unless already qualified by materiality) except in the case of any representation and warranty that expressly related to a given date, such representation and warranty shall be true and correct in all respects as of the respective date.

All actions necessary to establish that the Exit Facility Collateral Agent will have a perfected first priority security interest in the collateral under the Exit Facility shall have been taken, including (i) the Exit Facility Administrative Agent shall be reasonably satisfied that, upon recording of mortgages or other instruments, in each case, in the appropriate filing offices, it shall have a first priority lien on at least 90% of the PV-10 of the Borrowing Base Properties subject to Permitted Liens and (ii) the Borrower's execution and delivery of control agreements in connection with its deposit accounts or securities accounts, as applicable.

17

Each requesting Revolving Lender shall have received at least 3 business days prior to the Exit Facility Conversion Date and the making of the loans (to the extent requested at least 5 business days prior thereto) all information in respect of the Credit Parties reasonably requested that is required under applicable "know your customer," anti-terrorism, anti-money laundering, anti-bribery, beneficial ownership or similar law and regulations, and the use of proceeds thereof, by the Credit Parties (after giving pro forma effect to the equity ownership on the Exit Facility Conversion Date) shall not result in violation of any anti-terrorism, anti-money laundering, anti-bribery, beneficial ownership or similar law and regulations applicable to the Credit Parties; provided that to the extent Holdings or the Borrower (or another relevant entity) qualifies as a "legal entity customer" under the beneficial ownership regulations and any Revolving Lender has requested a beneficial ownership certificate at least 10 days prior to the Exit Facility Conversion Date, then such Revolving Lender shall have received such certificate at least five days prior to the Exit Facility Conversion Date.

The Exit Facility Administrative Agent shall have received such title information as the Exit Facility Administrative Agent may reasonably request in form and substance satisfactory to the Exit Facility Administrative Agent, setting forth the status of title to certain Borrowing Base Properties included in the Initial Reserve Report that have been identified by the Exit Administrative Agent.

|  |  |
|---|---|
| Conditions to All Subsequent Borrowings: | After the Exit Facility Conversion Date, the making of each Revolving Loan or issuance of Letter of Credit under the Exit Facility shall be conditioned upon (a) the accuracy of representations and warranties set forth in the Exit Facility Documentation in all material respects with the same effect as though made on and as of such date, except in the case of any representation and warranty which (x) expressly relates to a given date, such representation and warranty shall be true and correct in all material respects as of the respective date and (y) is qualified by a materiality or material adverse effect standard in which case such representation and warranty shall be true and correct in all respects, (b) delivery of a customary borrowing notice, (c) the absence of any default or event of default continuing at the time of, and after giving effect to the making of, such extension of credit and (d) after giving pro forma effect to the making of such Revolving Loans, including the use of proceeds thereof, the Credit Parties shall not have any Excess Cash (and the delivery of any borrowing notice shall constitute a certification that the forgoing condition shall be satisfied). |
| Representations and Warranties: | Consistent with the Documentation Principles, including: corporate status; corporate power and authority, qualification, execution, delivery and enforceability of Exit Facility Documentation; with respect to the execution, delivery and performance of the Exit Facility Documentation, no violation of, or conflict with, law, charter documents or no breach or default under material |

18

agreements; litigation; margin regulations; material governmental approvals with respect to the execution, delivery and performance of the Exit Facility Documentation; Investment Company Act; complete and accurate disclosure; financial condition and financial statements; since the Exit Facility Conversion Date, no Material Adverse Effect (as defined below); tax matters; compliance with ERISA; subsidiaries; intellectual property; environmental laws; properties; consolidated closing date solvency; gas imbalances and prepayments; marketing of production; hedging agreements and transactions; insurance; anti-corruption laws and sanctions; beneficial ownership; deposit accounts, securities accounts and commodities accounts; no non-exempt prohibited transactions; and creation and perfection of security interests.

"*Material Adverse Effect*" shall mean a circumstance or condition affecting the business, assets, operations, properties or financial condition of the Borrower and its subsidiaries, taken as a whole, that, individually or in the aggregate, would materially adversely affect (a) the ability of the Borrower and the other Credit Parties, taken as a whole, to perform their payment obligations under the Exit Facility Documentation or (b) the rights and remedies of the Exit Facility Administrative Agent, the Exit Facility Collateral Agent and the Revolving Lenders under the Exit Facility Documentation.

|                          |                          |
| ------------------------ | ------------------------ |
| <u>Affirmative Covenants:</u> | Consistent with the Documentation Principles, including: delivery of annual and quarterly financial statements and other information (within five days after the date such financial statements are to be filed with the SEC, or if such financials are not to be filed with the SEC, on or before 105 days after the end of the fiscal year for annual financial statements and on or before 60 days after the end of each of the first three quarterly accounting periods (or 90 days with respect to the first quarterly reporting period after the Exit Facility Conversion Date), and with annual financial statements to be accompanied, by an audit opinion from nationally recognized auditors that is not subject to qualification as to "going concern" or the scope of such audit other than solely with respect to, or resulting solely from an upcoming maturity date under the Exit Facility occurring within one year from the time such opinion is delivered); compliance certificates; delivery of information and notices (including environmental matters, insurance certificate, hedge transactions, gas imbalances, production reporting and lease operating statements, list of purchasers, budget and projections for at least four subsequent full fiscal quarters to be delivered concurrently with each Reserve Report, and marketing agreements); delivery of notices of litigation, defaults, changes in beneficial ownership and certain material events; inspections (including books and records); maintenance of organizational existence and rights; maintenance of insurance; payment of taxes; compliance with laws (including environmental laws); ERISA; maintenance of fiscal year and fiscal quarters; additional guarantors, grantors and collateral; use of proceeds; further assurances on collateral matters; reserve reports; title information; and maintenance of properties. |

The Borrower and its restricted subsidiaries shall comply with the hedging requirements described in the section captioned "Commodity Hedging".

In addition, Holdings will be subject to a covenant relating to its passive holding company status that prohibits Holdings from engaging in business activities other than its direct or indirect ownership of the equity interests of the Borrower and activities and liabilities incidental thereto; including the incurrence and performance of indebtedness not otherwise prohibited by the Exit Facility.

Negative Covenants:

Consistent with the Documentation Principles, including limitations (to be applicable to the Borrower and its restricted subsidiaries) on:

(a)    the incurrence or maintenance of debt, with exceptions for (i) debt outstanding under the Exit Facility Documentation (including Hedging Arrangements, Treasury Arrangements and the Guarantees thereof); (ii) Permitted Additional Debt (and permitted refinancings thereof) in an aggregate principal amount not to exceed $100,000,000 provided that the Borrower shall be in pro forma compliance after giving effect to such debt and the adjustment to the Borrowing Base required above; (iii) debt in an aggregate principal amount not to exceed $20,000,000 and (iv) certain other additional permitted debt, subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles;

(b)    the incurrence or maintenance of liens, with exceptions for (i) liens created under the Exit Facility Documentation (which secure the Obligations, including without limitation Hedging Arrangements and Treasury Arrangements); (ii) liens customary in the operation of the oil and gas industry and/or the Borrower's and its restricted subsidiaries' business; (iii) liens in respect of other borrowed money debt in an aggregate principal amount not to exceed $20,000,000 and only if such liens are junior liens and (iv) certain other permitted liens subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles;

(c)    mergers, amalgamations, divisions and other fundamental changes;

(d)    asset sales, leases, transfers or other dispositions, or early monetization or early termination of any hedge or swap positions, with exceptions for (i) sales of hydrocarbons in the ordinary course; (ii) dispositions of worn out or obsolete equipment; (iii) dispositions of oil and gas properties, subject to adjustment of the Borrowing Base as described above and other conditions, provided that except

20

in the case of certain types of dispositions to be agreed (e.g. farmouts, de minimis dispositions, similar trades of assets) at least 75% of the proceeds thereof shall be payable in cash and, if such disposition is of the equity interests of a restricted subsidiary, then such disposition shall include all of the equity interests owned by the Borrower or its restricted subsidiaries in such restricted subsidiary; and (iv) certain other permitted dispositions subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles;

(e)     investments, with exceptions (subject to thresholds, basket sizes or other qualifications acceptable to the Exit Facility Administrative Agent and the Revolving Lenders) for certain other permitted investments;

(f)     dividends or distributions on, or redemptions of, capital stock, with exceptions for (i) dividends or distribution payable solely in capital stock (other than disqualified capital stock), (ii) customary redemptions in respect of stock option plans, (iii) customary tax distributions, (iv) distributions to any parent entity for costs and expenses to maintain its corporate existence, and (v) subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles, certain other permitted dividends, distributions or redemption; provided that (for the avoidance of doubt) dividends or distributions on, and redemptions of, capital stock payable in cash or other assets shall not be permitted;

(g)     prepayments or redemptions of the indebtedness for borrowed money under material unsecured debt documents and amendments of material unsecured debt documents, with exceptions for (i) prepayments or redemptions of intercompany debt to the extent that no event of default exists and is continuing and other baskets to be mutually agreed, and (ii) amendments or other modifications that would not be detrimental to the Revolving Lenders in any material respect;

(h)     limitations on negative pledges and subsidiary distributions;

(i)     commodity hedging that does not exceed the limits set forth under "Commodity Hedging" below;

(j)     transactions with affiliates with exceptions (subject to thresholds, basket sizes or other qualifications to be mutually agreed consistent with the Documentation Principles) for certain permitted transactions;

(k)     change in business;

(l)    establishment of any deposit account, securities account or commodities account, without compliance with collateral control requirements; and

(m)    use of credit extensions in violation of sanctions.

**Financial Covenants:**    Limited to:

1.    a maximum ratio of Consolidated Net Funded Debt to Consolidated EBITDAX for the most recently completed four fiscal quarter period from the Closing Date (the "***Leverage Ratio***"), commencing with the first full fiscal quarter ending following the Exit Facility Conversion Date, of 3.00 to 1.00; provided that with respect to each of the first three full fiscal quarters ending after the Exit Facility Conversion Date, Consolidated EBITDAX as of the last of each such fiscal quarter shall be annualized (i) for the first full fiscal quarter, by multiplying Consolidated EBITDAX for such fiscal quarter by four (4); (ii) for the second full fiscal quarter, by multiplying Consolidated EBITDAX for the period of the two full fiscal quarters ending after the Exit Facility Conversation Date by two (2); and (iii) for the third full fiscal quarter ending after the Exit Facility Conversation Date, by multiplying Consolidated EBITDAX for the three fiscal quarters ending after the Exit Facility Conversation Date by four-thirds (4/3); and

2.    a minimum ratio of Consolidated Current Assets (as defined below) to Consolidated Current Liabilities (as defined below) for the most recently completed four fiscal quarter period (the "***Current Ratio***"), commencing with the first full fiscal quarter ending following the Exit Facility Conversion Date, of 1.00 to 1.00.

"***Consolidated EBITDAX***" means, for any period, the sum of consolidated net income of the Borrower and its restricted subsidiaries for such period in accordance with GAAP *plus* the following expenses or charges to the extent deducted from consolidated net income in such period: (a) interest expense, (b) income and franchise taxes, (c) depreciation, depletion, amortization, exploration expenses and other noncash charges (including non-cash losses resulting from mark-to-market in respect of hedging transactions), (d) losses from asset dispositions (other than hydrocarbons produced in the ordinary course of business), (e) actual fees and transaction costs incurred by the Credit Parties in connection with the closing of the Exit Facility and the Transactions occurring on or about the Exit Facility Conversion Date, (f) the negative effects of non-cash adjustments from the adoption of fresh start accounting in connection with the consummation of the Approved Plan, (g) expenses related to dispositions, equity issuances, debt incurrence and amendments to the Exit Facility Documentation, (h) any losses resulting from the early termination of any hedging transaction, (i) non-recurring expenses and charges

22

in an aggregate amount not to exceed 10% of Consolidated EBITDAX (calculated prior to giving effect to the addbacks described in this clause (i)) for such period, and (j) all noncash charges and expenses in respect of stock options, incentive programs and other equity compensation for management or employees, officers or directors, *minus* (a) all gains from asset dispositions (other than hydrocarbons produced in the ordinary course of business), (b) all noncash income, (c) any gains resulting from the early termination of any hedging transaction and (d) income attributable to or equity in income of any joint venture or unrestricted subsidiary, in each case to the extent added to consolidated net income in such period; *provided* that Consolidated EBITDAX shall be increased by the aggregate amount of dividends or distributions in cash actually received during such period by the Borrower or any restricted subsidiary from any joint venture or unrestricted subsidiary, so long as the Consolidated EBITDAX attributable to such amounts does not exceed 15% of the unadjusted Consolidated EBITDAX for such period.

"*Consolidated Net Funded Debt*" means, as of any date of determination, the aggregate principal amount of indebtedness for borrowed money, capital leases and disqualified equity interests of the Borrower and its restricted subsidiaries outstanding as of the last day of each fiscal quarter, which aggregate amount may be reduced by the aggregate amount of unrestricted cash held by the Borrower and its restricted subsidiaries in deposit accounts subject to the Exit Facility Collateral Agent's control; *provided*, that such reduction shall be capped at $25,000,000 if there are any outstanding Revolving Loans at the end of the applicable fiscal quarter.

"*Consolidated Current Assets*" means, as of any date of determination, the current assets of the Borrower and its restricted subsidiaries determined on a consolidated basis in accordance with GAAP, plus, to the extent not already included therein, (x) Availability as of such date (only to the extent that the Borrower is permitted to borrow such amount as of such date under the terms of the Exit Facility Documentation) and (y) any marketable securities, treasury bonds and bills, certificates of deposit, investments in money market funds and commercial paper of the Borrower and its restricted subsidiaries as of such date; *provided* that for purposes of this definition, current assets shall exclude non-cash assets required to be included in consolidated current assets of the Borrower and its restricted subsidiaries as a result of the application of Accounting Standards Codifications 815 or 410.

"*Consolidated Current Liabilities*" means, as of any date of determination, the current liabilities of the Borrower and its restricted subsidiaries determined on a consolidated basis in accordance with GAAP, *minus*, to the extent included therein, the current portion of long-term indebtedness outstanding under the Exit Facility Documentation; *provided* that for purposes of this definition, current liabilities shall exclude non-cash liabilities required to be included in consolidated current liabilities of the

Borrower and its restricted subsidiaries as a result of the application of Accounting Standards Codifications 815 or 410, but shall expressly include any unpaid liabilities for cash charges or payments that have been incurred as a result of the termination of any hedge transaction.

All ratios and calculations shall be measured on a pro forma basis.

The financial covenants will be tested with respect to the Borrower and its restricted subsidiaries on a consolidated basis beginning with the last day of the fiscal quarter of the Borrower specified above and thereafter will be tested as of the last day of each fiscal quarter ended thereafter for which financial statements are delivered (each such day, a "***Testing Date***").

There will be equity cure rights providing that cash equity contributions made to the Borrower within 10 business days of the date on which financial statements are due will be included in the calculation of Consolidated EBITDAX and Consolidated Current Assets solely for the purposes of determining compliance with the financial covenants; *provided* that, (a) there shall be no more than two quarters in each four consecutive fiscal quarter period in respect of which an equity cure may be made, (b) no more than three equity cures may be made during the term of the Exit Facility, (c) the amount of any equity cure shall be no more than the amount required to cause the Borrower to be in pro forma compliance with the applicable financial covenant to which the breach or default occurred, (d) all equity cures will be disregarded for purposes of any financial ratio determination other than for determining compliance with the applicable financial covenant, (e) no Revolving Lender shall be required to make any extension of credit during the 10-business-day period referred to above unless the Borrower shall have received the proceeds of the cash equity contribution, and (f) to the extent the Borrower exercises more than one equity cure in any single fiscal quarter, each such exercise shall count as a separate exercise of a cure right.

<u>Commodity Hedging:</u>

The Borrower and its restricted subsidiaries shall be required to enter into and maintain commodity hedging transactions in the amounts and by the dates specified below:

(a) With respect to oil production anticipated during the 12-month period beginning with the first full month after the Exit Facility Conversion Date, the Borrower and its restricted subsidiaries shall enter into commodity hedge transactions of the Required Hedge Types with respect to 75% of Reference Volumes (the "***First Year Required Hedges***"), with the Borrower and its restricted subsidiaries entering into not less than 50% of the First Year Required Hedges on or before the Exit Facility Conversion Date and 50% of the First Year Required Hedges on or before the thirtieth day after the Exit Facility Conversion Date.

(b) With respect to oil production anticipated during the 12-month period beginning with the thirteenth full month after the Exit Facility Conversion Date, the Borrower and its restricted subsidiaries shall enter into commodity hedge transactions of the Required Hedge Types with respect to 55% of Reference Volumes (the "*Second Year Required Hedges*"), with the Borrower and its restricted subsidiaries entering into not less than 50% of the Second Year Required Hedges on or before the thirtieth day after the Exit Facility Conversion Date and 50% of the Second Year Required Hedges on or before the sixtieth day after the Exit Facility Conversion Date.

(c) With respect to oil production anticipated during the 12-month period beginning with the twenty-fifth full month after the Exit Facility Conversion Date, the Borrower and its restricted subsidiaries shall enter into commodity hedge transactions of the Required Hedge Types with respect to 35% of Reference Volumes (the "*Third Year Required Hedges*") on or before the sixtieth day after the Exit Facility Conversion Date.

With respect to the hedging requirements set forth above, any commodity hedging transactions in effect on the Exit Facility Conversion Date shall be included in calculating compliance with the thresholds set forth above.

"*Required Hedge Types*" means commodity hedging transactions that are (i) with respect to not less than 25% of the First Year Required Hedges, Second Year Required Hedges and Third Year Required Hedges, as applicable, swaps, and (ii) with respect to the remaining First Year Required Hedges, Second Year Required Hedges and Third Year Required Hedges, either swaps or traditional two-way collars, in each case, having a strike or floor price, as applicable, of $35 per barrel or higher.

"**Reference Volumes**" means, with respect to each relevant period, the reasonably anticipated projected production of oil for such period from the total proved developed producing reserves of the Credit Parties, as demonstrated in the Initial Reserve Report.

Without limiting the above requirements with respect to the First Year Required Hedges, the Second Year Required Hedges or the Third Year Required Hedges, commodity hedging transactions shall be limited for any month to no more than (i) with respect to any month during the period of twenty-four (24) months from the date such hedging arrangement is created, 85% of the reasonably anticipated projected production for such month from the total proved oil and gas reserves of the Credit Parties (based on the most recently delivered Reserve Report) and (ii) with respect to any month during the period from twenty-five (25) months through sixty (60) months from the date such hedging arrangement is created, 85% of the reasonably anticipated projected production for such month from the proved developed producing oil and gas reserves of the Credit Parties (based on the most recently delivered Reserve

Report) for the period (collectively, the "**Ongoing Hedges**"); *provided*, that, in addition to the Ongoing Hedges, in connection with a proposed acquisition (each, a "**Proposed Acquisition**") by a Credit Party of oil and gas properties, the Credit Parties may also enter into incremental hedging transactions with approved counterparties with respect to the Credit Parties' reasonably anticipated projected monthly production from the Borrowing Base Properties having notional volumes not in excess of 15% of the Credit Parties' existing projected monthly production (based on the most recently delivered Reserve Report) prior to the consummation of such Proposed Acquisition for each month during a period not exceeding 36 months from the date such hedging arrangement is created, during the period between (a) the date on which such Credit Party signs a definitive acquisition agreement in connection with a Proposed Acquisition and (b) the earliest of (i) the date such Proposed Acquisition is consummated, (ii) the date such acquisition is terminated and (iii) 90 days after such definitive acquisition agreement was executed (or such longer period as to which the Exit Facility Administrative Agent may agree); *provided* that all such incremental hedging transactions entered into with respect to a Proposed Acquisition shall be terminated or unwound within 90 days following the date such acquisition is terminated. Hedging contracts which hedge the same volumes, but different elements of commodity risk thereof, shall not be aggregated together when calculating the percentage of production hedged.

For purposes of entering into or maintaining Ongoing Hedges, forecasts of reasonably projected hydrocarbon production volumes and reasonably anticipated hydrocarbon production from the Credit Parties' total proved reserves based upon the Initial Reserve Report or the most recent Reserve Report, as applicable, shall be revised to account for any increase or decrease therein anticipated because of information obtained by Borrower or any other Credit Party subsequent to the delivery of such Reserve Report including the Borrower's or any other Credit Party's internal forecasts of production decline rates for existing wells and additions to or deletions from anticipated future production from new wells and acquisitions coming on stream or failing to come on stream.

| | |
|---|---|
| Events of Default: | Consistent with the Documentation Principles, including limitations (to be applicable to the Borrower and its restricted subsidiaries) on: nonpayment of principal, interest or other amounts; violation of covenants; incorrectness of representations and warranties in any material respect on any relevant date; cross default and cross acceleration to indebtedness in excess of $30,000,000; bankruptcy of the Borrower or any of its restricted subsidiaries; monetary judgments in excess of $50,000,000; ERISA events; actual or asserted invalidity of the Exit Facility Documentation, Guarantees or security documents or any intercreditor agreement; and change of control (to be defined as mutually agreed). |
| Voting: | Amendments and waivers of the Exit Facility Documentation will require the approval of the Borrower and the Revolving Lenders |

holding more than 50% of the aggregate amount of the commitments then outstanding under the Exit Facility (the "**Majority Lenders**"), except that:

(i)      the consent of each Revolving Lender directly and adversely affected thereby (or, with respect to the following clauses (E), (F), (G), (I) and (K), that is an affiliate of a counterparty to a Hedging Arrangement that is directly and adversely affected thereby) shall be required with respect to: (A) increases in the commitment of such Revolving Lender, (B) reductions or forgiveness of principal, interest (except only Majority Lender consent is required to waive payment of the Default Rate of interest) or fees owing to such Revolving Lender, (C) extensions or postponement of Maturity Date of the Revolving Loans and commitments of such Revolving Lender, (D) making any Revolving Loan (including any interest or fees thereunder) payable in any currency other than US Dollars, (E) releases of all or substantially all of the value of the Guarantees or releases of liens on all or substantially all of the Collateral (other than in connection with any sale of Collateral or the release or sale of the relevant Guarantor permitted by the Exit Facility), (F) assignment by the Borrower of its rights and obligations under any Exit Facility Documentation (unless otherwise permitted in connection with a merger, consolidation, liquidation or similar transaction under the limitations of fundamental changes provision of the Exit Facility Documentation), (G) modifications to any of the voting rights of Revolving Lenders, (H) modifications to the proportionate reduction of Commitments or the pro rata sharing of payments provisions, (I) modifications to the pro rata waterfall provisions to the extent such modifications would alter the ratable allocation of payments, (J) amendments to the interest period provision so as to permit interest period intervals greater than six months, and (K) modifications to the Hedging Arrangement Collateral Related Provisions;

(ii)     the consent of Revolving Lenders holding not less than $66^{2/3}\%$ of the aggregate amount of the Commitments (excluding Commitments of Defaulting Lenders) then outstanding under the Exit Facility (or if the Commitments have been terminated, Revolving Lender's holding not less than $66^{2/3}\%$ of the Total Revolving Outstandings) (the "**Required Revolving Lenders**") will be required in the case of decreases in, or reaffirmations of, the Borrowing Base;

(iii)    the consent of all of the Revolving Lenders will be required to approve increases in the Borrowing Base; and

(iv)    customary protections for the Exit Facility Administrative Agent, the Issuing Banks and the Swingline Lender will be provided.

27

The Exit Facility shall contain customary provisions permitting the Borrower to replace non-consenting Revolving Lenders in connection with amendments and waivers requiring the Required Revolving Lenders or the consent of all Revolving Lenders or of all Revolving Lenders directly affected thereby so long as the Majority Lenders shall have consented thereto.

Cost and Yield Protection:

Usual for facilities and transactions of this type and consistent with the Exit Facility Administrative Agent's customary documentation standards as in effect on the Exit Facility Conversion Date, with provisions protecting the Revolving Lenders from withholding and other tax liabilities in form and substance reasonably satisfactory to the Borrower and the Exit Facility Administrative Agent; *provided,* that protection for increased costs imposed as a result of rules enacted or promulgated under the Dodd-Frank Act or the Basel Committee on Banking Regulations and Supervisory Practices (or any successor or similar authority) shall be included (but solely for such costs that would have been included if they had been otherwise imposed under the applicable increased cost provisions). The Exit Facility shall contain provisions regarding the timing for asserting a claim under these provisions and permitting the Borrower to replace a Revolving Lender who asserts such claim without premium or penalty.

Assignments and Participations:

The Revolving Lenders will be permitted to assign Revolving Loans and Commitments (including participation in Letters of Credit and swingline loans) with the prior written consent of the Borrower (not to be unreasonably withheld or delayed and which such consent shall be deemed unless the Borrower provides a written objection within 10 business days of receipt of notice thereof); *provided* that no Revolving Lender shall assign to any "Ineligible Institution" (provided, that provisions with respect to such Ineligible Institutions shall be consistent with the Exit Facility Administrative Agent's standard policies), any Defaulting Lender, any natural person, the Borrower, Holdings or any affiliate of the Borrower or Holdings, and no consent of the Borrower shall be required after the occurrence and during the continuance of a payment or bankruptcy event of default or for assignments to, another Revolving Lender, an affiliate of a Revolving Lender, or an approved fund.   All assignments will require the consent of the Exit Facility Administrative Agent, the Swingline Lender and each Issuing Bank (in each case, not to be unreasonably withheld or delayed).   Each assignment will be not less than $5,000,000 (and increments of $1,000,000 in excess thereof) or, if less, all of such Revolving Lender's remaining loans and commitments.   The Exit Facility Administrative Agent shall receive a processing and recordation fee of $3,500 for each assignment (unless waived by the Exit Facility Administrative Agent).

The Revolving Lenders will be permitted to sell participations in the Exit Facility without restriction, other than to a Defaulting Lender, an Ineligible Institution, any natural person, the Borrower, Holdings or any affiliate of the Borrower or Holdings.   Voting rights of

participants shall be limited to matters in respect of (a) increases in commitments participated to such participants, (b) reductions of principal, interest or fees payable to such participant or forgiveness thereof, (c) extensions of final maturity of the Loans or commitments in which such participant participates and (d) releases of all or substantially all of the value of the Guarantees or all or substantially all of the Collateral, and for clarification purposes, not include the right to vote on waivers of defaults or events of default.

Expenses and Indemnification:

The Borrower shall pay all reasonable documented out-of-pocket costs and expenses of the Exit Facility Administrative Agent and the Exit Facility Collateral Agent (without duplication) in connection with the syndication of the Exit Facility and the preparation, execution, delivery, administration, amendment, waiver or modification and enforcement of the Exit Facility Documentation (including the reasonable fees and expenses of counsel identified herein; provided, that, in the case of counsel, limited to the reasonable and documented out-of-pocket fees, disbursements and other charges of a single counsel to the Exit Facility Administrative Agent and the Exit Facility Collateral Agent, taken as a whole, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction)).

The Borrower shall pay all reasonable documented out-of-pocket costs and expenses of each Issuing Bank, the Exit Facility Administrative Agent, the Exit Facility Collateral Agent, and each Revolving Lender (without duplication), incurred in connection with the enforcement or preservation of any rights under the Exit Facility Documentation whether before or after the occurrence of an event of default, including the reasonable fees, disbursements and other charges of counsel (including local counsel in each appropriate jurisdiction; provided, that, in the case of counsel, limited to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to such parties, taken as a whole, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction)).

The Borrower will indemnify and hold harmless the Exit Facility Administrative Agent, the Exit Facility Collateral Agent, the Issuing Banks, the Exit Facility Arranger, the Exit Facility Bookrunners and the Revolving Lenders (without duplication) and their respective affiliates, and the officers, directors, employees, agents, advisors, representatives, controlling persons, members and the successors of the foregoing (each, an "***Indemnified Person***") from and against any and all losses, claims, damages, penalties, demands, actions, judgments, suits costs, expenses, disbursements or liabilities of any kind or nature (regardless of whether any such Indemnified Person is a party thereto and whether any such proceeding is brought by the Borrower or any other person) and reasonable and documented fees,

disbursements and other charges of counsel incurred in connection with investigating or defending any of the foregoing with respect to the execution, delivery, enforcement, performance and administration of any Exit Facility Documentation, any Revolving Loan or Letter of Credit or the use of the proceeds therefrom, including, without limitation, any of the foregoing relating to the violation of, noncompliance with or liability under, any Environmental Law (other than by such Indemnified Person or any of its related Indemnified Persons (other than any trustee or advisor)) or to any actual or alleged presence, release or threatened release of hazardous materials involving or attributable to the Borrower, any of its subsidiaries or any of the oil and gas properties (limited, in the case of counsel, to the reasonably and documented out-of-pocket fees, disbursements and other charges of a single counsel to the Indemnified Persons, including (if necessary) one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected Indemnified Persons), provided that the foregoing indemnity will not, as to any Indemnified Person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its controlled affiliates, directors, officers or employees, advisors or agents (collectively, the "***Related Parties***"), (ii) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or control affiliate of such Indemnified Person under this Commitment Letter or (iii) to the extent arising from any dispute solely among Indemnified Persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Exit Facility Arranger, arranger (with respect to any Incremental Increase), administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with the Exit Credit Facility or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates.

Release of Prepetition Claims:

The Approved Plan shall include and provide for a full release from liability from the Credit Parties' bankruptcy estate and the Credit Parties (and any other debtors) in favor of the Exit Facility Administrative Agent, each of the Revolving Lenders, each Issuing Bank, the Exit Facility Arranger, the Exit Facility Bookrunner, each other agent party to the Exit Facility, each Prepetition Lender, each administrative agent, collateral agent, other agent, arranger or letter of credit issuer under the Prepetition RBL Facility, any of the foregoing party to any Hedging Arrangements, any of the foregoing party to any Treasury Arrangements, and each of the foregoing entities' current and former affiliates, directors, officers, managers, employees, predecessors, successors, assigns, subsidiaries, agents, financial advisors, legal advisors, attorneys, accountants, investment

bankers, consultants, representatives, from and against any and all claims or causes of action related in any respect to the Prepetition RBL Facility, any prepetition hedges or swaps among the parties thereto (or their affiliates), any treasury arrangements among the parties thereto (or their affiliates), the Credit Parties' Chapter 11 Cases, and that arose, existed, or could have been asserted (in any respect) on or prior to Plan Effective Date, other than the performance of contractual obligations arising under open Hedging Arrangements under which the Debtors are in the money.   The release shall be in a form and substance satisfactory to the Exit Facility Administrative Agent.

The substance of the release described above shall be set forth in the Approved Plan (and approved by the Confirmation Order), and, upon execution of the Exit Facility Documentation, brought down to the Exit Facility Conversion Date and, if different, the Plan Effective Date.

| | |
|---|---|
| <u>Governing Law and Forum</u>: | New York. |
| <u>Confidentiality</u>: | Consistent with the Prepetition RBL Facility. |
| <u>Counsel to the Exit Facility Administrative Agent</u>: | Mayer Brown LLP |

ANNEX I

Interest Rates:      The Applicable Margin in respect of the Exit Facility will be adjusted for Borrowing Base Usage as set forth below.

"*Applicable Margin*" means for any day, with respect to any Adjusted LIBOR rate or ABR (both, as defined below in this Annex I) borrowing or with respect to any Unused Commitment Fee, the applicable rate per annum set forth below based on the applicable Borrowing Base Usage on such day:

(a) if such day is on or after the Exit Facility Conversion Date and is not during a Leverage Ratio Based Pricing Reduction Period:

| Borrowing Base Usage | Unused Commitment Fee | Applicable Margin | |
|---|---|---|---|
| | | ABR Loans | LIBOR Loans |
| X ≤ 25% | 0.50% | 2.50% | 3.50% |
| >25% X ≤50% | 0.50% | 2.75% | 3.75% |
| >50% X≤75% | 0.50% | 3.00% | 4.00% |
| >75% X ≤90% | 0.50% | 3.25% | 4.25% |
| X >90% | 0.50% | 3.50% | 4.50% |

(b) if such day is during a Leverage Ratio Based Pricing Reduction Period:

| Borrowing Base Usage | Unused Commitment Fee | Applicable Margin | |
|---|---|---|---|
| | | ABR Loans | LIBOR Loans |
| X ≤ 25% | 0.50% | 2.25% | 3.25% |
| >25% X ≤50% | 0.50% | 2.50% | 3.50% |
| >50% X≤75% | 0.50% | 2.75% | 3.75% |
| >75% X ≤90% | 0.50% | 3.00% | 4.00% |
| X >90% | 0.50% | 3.25% | 4.25% |

"*Leverage Ratio Based Pricing Reduction Period*" means the period (a) beginning on the first business day immediately following a Testing Date (i) on which the Leverage Ratio is less than 1.50 to 1.00 and (ii) with respect to which the Borrower has delivered a compliance certificate demonstrating such Leverage Ratio and (b) ending on the first Testing Date on which the Leverage Ratio is equal to or greater than 1.50 to 1.00.

Letter of Credit Fees:      A per annum fee equal to the spread over Adjusted LIBOR under the Exit Facility will accrue on the aggregate face amount of outstanding Letters of Credit, payable in arrears at the end of each quarter, commencing with the first full fiscal quarter ending after

the Exit Facility Conversion Date, and upon the termination of the Exit Facility, in each case for the actual number of days elapsed over a 360-day year. Such fees shall be distributed to the Revolving Lenders participating in the Exit Facility pro rata in accordance with the amount of each such Revolving Lender's Applicable Revolving Commitment Percentage. In addition, the Borrower shall pay to the relevant Issuing Bank, for its own account, (a) a fronting fee equal to 0.125% per annum of the aggregate face amount of outstanding Letters of Credit or such other amount as may be agreed in writing by the Borrower and such Issuing Bank, payable in arrears at the end of each quarter and upon the termination of the Exit Facility, calculated based upon the actual number of days elapsed over a 360-day year, and (b) customary issuance and administration fees to be mutually agreed.

LIBOR Periods:

The Borrower may elect interest periods of 1, 2, 3 or 6 months for Adjusted LIBOR borrowings.

Interest Calculation:

Calculation of interest shall be on the basis of the actual days elapsed in a year of 360 days (or 365 or 366 days, as the case may be, in the case of ABR loans determined by reference to the Prime Rate (as defined below)) and interest shall be payable at the end of each interest period and, in any event, at least every three months.

"*Prime Rate*" means the rate of interest last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Exit Facility Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Exit Facility Administrative Agent). Each change in the Prime Rate shall be effective from and including the date such change is publicly announced or quoted as being effective.

"*NYFRB Rate*" means, for any day, the greater of (a) the Federal Funds Effective Rate in effect on such day and (b) the Overnight Bank Funding Rate in effect on such day (or if such day is not a business day, the immediately preceding business day); provided that if none of such rates are published for any day that is a business day, the term "NYFRB Rate" means the rate for a federal funds transaction quoted at 11:00 a.m. on such day received by the Exit Facility Administrative Agent from a federal funds broker of recognized standing selected by it; provided, further, that if any of the aforesaid rates as so determined be less than zero, such rate shall be deemed to be zero.

"*Overnight Bank Funding Rate*" means, for any day, the rate comprised of both overnight federal funds and overnight LIBOR borrowings by U.S.-managed banking offices of depository institutions, as such composite rate shall be determined by the

NYFRB as set forth on its public website from time to time, and published on the next succeeding business day by the NYFRB as an overnight bank funding rate.

ABR:

"**ABR**" is the Alternate Base Rate, which is the highest of (x) the Prime Rate, (y) the NYFRB Rate plus $^{1}/_{2}$ of 1.0% and (z) one-month Adjusted LIBOR plus 1.00% per annum; *provided* that if the Alternate Base Rate would be less than 1.00%, such rate shall be deemed to be 1.00%.

Adjusted LIBOR

"**LIBOR**" means the London interbank offered rate as administered by ICE Benchmark Administration (or any successor administrator of such rate) for dollars for a period equal to the Interest Period displayed on pages LIBOR01 or LIBOR02 by Reuters (or on any successor or substitute page reasonably selected by the Exit Facility Administrative Agent), or if not available on any such page, an interpolated rate determined by the Exit Facility Administrative Agent in accordance with its customary procedures; *provided* that if such rate would be less than 1.00%, such rate shall be deemed to be 1.00%. Adjusted LIBOR will at all times include statutory reserves.

Commitment Fees:

The Borrower will pay a fee (the "**Commitment Fee**"), in an amount computed on a daily basis equal to the Revolving Loan Limit *less* the Total Revolving Outstandings on each date, multiplied by the applicable percentage specified as the "Unused Commitment Fee" in the table set forth above under the definition of "Applicable Margin" corresponding to the Borrowing Base Usage as of the end of such day. The Commitment Fee shall be payable quarterly in arrears after the Exit Facility Conversion Date, commencing with the first full fiscal quarter ending after the Exit Facility Conversion Date, and upon the termination of the Commitments, calculated based on the actual number of days elapsed over a 360-day year. For purposes of calculating the Commitment Fee, "Total Revolving Outstandings" shall not include the amount of any outstanding swingline loans (if any).

**<u>Exhibit C</u>**

**Organizational Chart**



**EP ENERGY**

**As of the Petition Date**

| Outstanding Funded Indebtedness | |
|---|---|
| RBL Facility | $629M |
| 1.125L Notes | $1,000M |
| 1.25L Notes | $500M |
| 1.5 L Notes | $2,092M |
| **Total Secured Debt** | **$4,221M** |
| | |
| Unsecured Debt: | |
| 6.375% Senior Notes | $323M |
| 7.75% Senior Notes | $182M |
| 9.375% Senior Notes | $182M |
| **Total Unsecured Debt** | **$688M** |
| | |
| | |
| **Total Funded Debt** | **$4,909M** |

**Legend:**

- ⬜ Debtor Entity
- ⬛ Non-Debtor Entity
- 🟦 RBL Obligor
- 🟧 1.125L Obligor
- 🟪 1.25L Obligor
- 🟦 2024 1.5L Obligor
- 🟨 2025 1.5L Obligor
- 🟩 2023 Unsecured Notes Obligor
- 🟪 2022 Unsecured Notes Obligor
- 🟦 2020 Unsecured Notes Obligor

**RBL Credit Facility**
Borrower: EP Energy, LLC / Everest Acquisition Finance, Inc.
Outstanding Principal: $629M
Maturity: November 23, 2021

**7.750% 1.125L due 2026**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $1,000M
Maturity: May 15, 2026

**8.000% 1.25L due 2024**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $500M
Maturity: November 29, 2024

**9.375% 1.5L due 2024**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $1,092M
Maturity: May 1, 2024

**8.000% 1.5L due 2025**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $1,000M
Maturity: February 15, 2025

**6.375% UNS due 2023**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $323M
Maturity: June 15, 2023

**7.775% UNS due 2022**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $182M
Maturity: September 1, 2022

**9.375% UNS due 2020**
Issuer: EP Energy LLC /Everest Acquisition Finance, Inc.
Outstanding Principal: $182M
Maturity: May 1, 2020

**<u>Exhibit D</u>**

**Liquidation Analysis**

# LIQUIDATION ANALYSIS

As part of the chapter 11 process, Section 1129(a)(7) of the Bankruptcy Code requires that a bankruptcy court determine that a chapter 11 plan provides, with respect to each class, that each holder of a claim or an equity interest in such class either (i) has accepted the plan or (ii) will receive under the plan value that is not less than the amount that the holder would receive if the debtors had liquidated under chapter 7.

All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Chapter 11 Plan of Reorganization* (the "**Plan**").

Below is a summary of an illustrative liquidation analysis (the "**Liquidation Analysis**") assuming that the Debtors pursue a hypothetical liquidation under chapter 7. Per chapter 7 requirements, the Debtors' assets would be disposed under the direction of a chapter 7 Trustee ("**Trustee**"). The illustrative sale proceeds would provide for lower recoveries relative to the recoveries under the Plan and as a result the Debtors believe that under the Plan, Holders of Claims would receive value greater than the amounts that such Holders would receive if the Debtors were forced to liquidate under chapter 7, and that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

## A.    Limitations and Key Assumptions Underlying the Hypothetical Liquidation

**THE ILLUSTRATIVE LIQUIDATION ANALYSIS PRESENTED HEREIN HAS BEEN PREPARED SOLELY FOR THE PURPOSES AND USE OF THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT OR CLAIM TO REPRESENT ANY ASSUMPTIONS OR COMPARISONS FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.**

The Debtors prepared the illustrative Liquidation Analysis with the assistance of FTI Consulting. The Liquidation Analysis contains numerous estimates, including estimated Allowed Claims based upon a review of the Debtors' financial statements to account for estimated liabilities as necessary. The Liquidation Analysis does not contemplate a sale of the Debtors' business on a going concern basis. The Liquidation Analysis includes estimates for Claims as part of the Chapter 11 Cases which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative Claims, and chapter 7 administrative claims such as wind down costs and Trustee fees. To date, the Bankruptcy Court has not estimated or otherwise fixed the total amount of Allowed Claims used for purposes of preparing the Liquidation Analysis, and while the bar date to file proofs of claim has passed, reconciliations are ongoing. Therefore, the Debtors' estimate of Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and interests under the Plan. **THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASES COULD MATERIALLY DIFFER FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.**

The Debtors note that the assumptions utilized in developing the Liquidation Analysis are inherently subject to significant uncertainties and contingencies, many of which are beyond the control of the Debtors or a chapter 7 Trustee. Accordingly, there can be no guarantees that the values assumed in the Liquidation Analysis would be realized if the Debtors were actually liquidated. In addition, any liquidation would take place in the future, at which time circumstances may exist which cannot presently be predicted.

The Debtors recognize that there are other potential alternatives that could occur in a hypothetical chapter 7 liquidation not presented in the Liquidation Analysis, including alternatives that would give rise to reduced and delayed creditor recoveries.

**THE DEBTORS RESERVE THEIR RIGHT TO SUPPLEMENT, MODIFY, OR ADJUST ANY PART OF THE ILLUSTRATIVE LIQUIDATION ANALYSIS, INCLUDING A CHANGE OF THE UNDERLYING ASSUMPTIONS AND ANALYSIS SET FORTH HEREIN.**

### 1.     General Assumptions

The following general assumptions were considered by the Debtors and their advisors as assumptions that would be applicable in any hypothetical chapter 7 liquidation.

### a)      Administrative Procedures and Conversion of Cases

For purposes of the chapter 7 Liquidation Analysis, the Debtors assume that each of the Chapter 11 Cases are converted to a chapter 7 case and consolidated during the chapter 7 proceeding for procedural purposes only.  Since EP Energy Corporation (the "Parent Company") is not a guarantor to the Debtors' secured and unsecured debt, the Parent Company's illustrative liquidation analysis has been presented separately from the other Debtors. In the event that the Debtors were to be liquidated in separately administered chapter 7 cases, the administrative costs to the Debtors in each of the cases, including professional fees, Trustee fees, the Debtors' operational costs, etc. would likely be higher than if the cases were consolidated.

### b)      Professionals Involved in the Chapter 7 Proceedings

As part of the chapter 7 case, the Debtors assume that the Trustee would choose to retain certain professionals, including counsel, advisors and investment bankers, among others, to provide expertise and assistance in the liquidation of the Debtors. The Liquidation Analysis illustratively assumes that the existing counsel, advisors, and consultants would be replaced by the Trustee with new professionals.

### c)      Timing Considerations of Chapter 7 Cases

The Liquidation Analysis assumes the conversion to Chapter 7 occurs on September 30, 2020 (the "Conversion Date"), and the Trustee's advisors would require time to get up to speed before a process could begin to liquidate the assets. While the Debtors' oil and gas properties may be sold in several transactions, this analysis assumes that they are all sold by January 31, 2021, four months after the start of the liquidation. The Liquidation Analysis assumes the oil and gas properties are sold as of an effective date on September 30, 2020. An additional four months are assumed for a wind down of the estate.

It is assumed that the Debtors' use of cash collateral would be limited and that the Debtors would not have funds to support any process other than an orderly and expedited wind-down of the Debtors' business by the trustee to convert the Debtors' assets to cash and limit the amount of administrative expenses. There can be no assurance, however, that the liquidation would be completed in a limited timeframe, nor is there any assurance that the recoveries assigned to the Debtors' assets would in fact be realized.

In an actual liquidation, the process and length of wind-down could be significantly longer and

more expensive than the amounts assumed herein and thereby significantly reduce the actual recoveries compared to this analysis. For example, the potential for priority, contingent, and other Claims; litigation; rejection costs; and the final determination of Allowed Claims could substantially impact both the timing and amount of the distribution of the asset proceeds to the creditors. Also, in the context of a liquidation, there would likely be potential offset Claims, particularly with respect to joint interest billings that would take time to reconcile and resolve. Additionally, certain of the joint operating agreements may be non-assignable (absent consent from the other working interest owners) which could result in potential asset transfer issues in the context of a chapter 7 liquidation. Also, a number of factors in a liquidation could affect the Trustee's ability to sell the Debtors' oil and gas assets for their current market value. These risks include if they are forced to halt production for a period of time or lose relationships with vendors, customers, royalty owners, joint interest owners, and midstream firms. There is a high risk that the employee base could deteriorate and the Trustee could be challenged to gather appropriate information on the assets for the sales process. Accordingly, there can be no assurance that the values reflected in the Liquidation Analysis would be realized if the Debtors were, in fact, to undergo such a liquidation and the actual amounts received could be materially different (including materially less) than the amounts shown herein.

### d)       Trustee Fees for Chapter 7 Administration

The Debtors assume that under a chapter 7 liquidation, the Trustee would require fees necessary to facilitate a sale of the Debtors' business. The illustrative Liquidation Analysis assumes that such fees would likely be approximately three percent (3%) of the available liquidation proceeds in excess of $1 million and excluding cash. These fees are assumed to be earned for the Trustee's creation and development of materials for marketing and the facilitation of the solicitation process for the parties, in addition to general administrative expenses, such as Trustee's compensation. Additionally, per section 326(a) of the Bankruptcy Code, for a case under chapter 7, the Court may allow reasonable compensation for the Trustee's services not to exceed three percent (3%) of such moneys disbursed or turned over in the case by the Trustee to parties in interest, excluding the Debtors, but including holders of secured Claims.

### e)       Additional Claims

The cessation of the Debtors' business in a chapter 7 liquidation is likely to trigger certain Claims that otherwise would not exist under the proposed Plan. Examples of these kinds of Claims include tax liabilities, employee Claims, Claims related to rejection of executory contracts, incremental costs associated with plugging and abandoning liabilities, and litigation Claims. While some of these Claims could be significant, no adjustment has been made for these potential Claims unless specified in the assumptions to the Liquidation Analysis.

### B.       Consummation of the Plan Will Provide Greater Value than Under a Hypothetical Liquidation through Chapter 7 of the Bankruptcy Code

As presented in the illustrative Liquidation Analysis, the Debtors believe that a liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code would result in reductions in the value to be realized by constituents as compared to the distributions that are contemplated under the Plan. As a result, the Debtors believe that Consummation of the Plan will provide a substantially greater return to constituents than would any liquidation under chapter 7 of the Bankruptcy Code.

# LIQUIDATION ANALYSIS

## Guarantor Debtors[30]

| Liquidation Analysis | Note | Actual 31-Mar | Adj. | Forecast 30-Sep | Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | | | | | | | | | | |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $15,515 | $44,489 | $60,004 | $60,004 | 100% | $60,004 | 100% | $60,004 | 100% |
| Trade Accounts Receivable | B | 80,251 | (41,449) | 38,801 | 34,921 | 90% | 36,861 | 95% | 38,801 | 100% |
| Joint Interest Billing Receivable | C | 5,717 | (5,122) | 595 | 476 | 80% | 506 | 85% | 536 | 90% |
| Other Receivable | D | 7,802 | (7,802) | - | - | N/A | - | N/A | - | N/A |
| Net Derivatives Receivables | E | 211,943 | (138,920) | 73,023 | 47,465 | 65% | 51,116 | 70% | 54,767 | 75% |
| Inventory | F | 36,817 | 8,000 | 44,817 | 8,175 | 18% | 13,060 | 29% | 17,946 | 40% |
| Other Current Assets | G | 16,135 | (12,614) | 3,521 | - | 0% | - | 0% | - | 0% |
| Net Oil & Gas Properties | H | 1,081,445 | (40,758) | 1,040,687 | 594,604 | 57% | 628,786 | 60% | 662,969 | 64% |
| Other Net Property, Plant & Equipment | I | 25,358 | (3,586) | 21,771 | 893 | 4% | 1,563 | 7% | 2,234 | 10% |
| Other Non Current Assets | J | 10,086 | (8,613) | 1,473 | 1,179 | 80% | 1,289 | 88% | 1,399 | 95% |
| **Total Gross Liquidation Proceeds** | | **$1,491,068** | **($206,375)** | **$1,284,693** | **$747,717** | | **$793,186** | | **$838,656** | |
| Encumbered Value | | | | | $737,994 | | $782,665 | | $827,336 | |
| Unencumbered Value | | | | | $9,723 | | $10,522 | | $11,320 | |
| (-) Net Wind-Down Expenses | K | | | | ($23,490) | | ($23,490) | | ($23,490) | |
| (-) Post-Conversion Cash Flow | L | | | | (37,852) | | (37,852) | | (37,852) | |
| (-) Chapter 7 Trustee Fees | M | | | | (20,631) | 3.00% | (21,995) | 3.00% | (23,360) | 3.00% |
| (-) Chapter 7 Trustee Legal & Financial Advisors | N | | | | (17,193) | 2.50% | (16,497) | 2.25% | (15,573) | 2.00% |
| (-) Chapter 11 Professional Fees Carve-Out | O | | | | (17,267) | | (17,267) | | (17,267) | |
| **Total Net Liquidation Proceeds** | | | | | **$631,283** | | **$676,085** | | **$721,114** | |
| Remaining Encumbered Value | | | | | $631,283 | | $676,085 | | $721,114 | |
| Remaining Unencumbered Value | | | | | - | | - | | - | |

| Claims Recovery Analysis ($000s) | | Claims Estimates Low | Claims Estimates Mid | Claims Estimates High | Low $ | Low % | Mid $ | Mid % | High $ | High % |
|---|---|---|---|---|---|---|---|---|---|---|
| Class Claims | Note | | | | | | | | | |
| 1  Other Secured Claims | P | - | - | - | - | N/A | - | N/A | - | N/A |
| 2  Other Priority Claims | Q | - | - | - | - | N/A | - | N/A | - | N/A |
| 3  DIP Claims | R | 217,456 | 217,456 | 217,456 | 217,456 | 100% | 217,456 | 100% | 217,456 | 100% |
| 3  RBL Claims | S | 321,101 | 321,101 | 321,101 | 321,101 | 100% | 321,101 | 100% | 321,101 | 100% |
| 4  1.125L Notes Claims | T | 1,000,000 | 1,000,000 | 1,000,000 | 92,726 | 9% | 137,528 | 14% | 182,557 | 18% |
| Administrative Claims | U | 6,900 | 6,900 | 6,900 | - | 0% | - | 0% | - | 0% |
| 5A  Deficiency Claims | V | 907,274 | 862,472 | 817,443 | - | 0% | - | 0% | - | 0% |
| 5A  Unsecured Claims | V | 3,526,351 | 3,619,942 | 3,713,532 | - | 0% | - | 0% | - | 0% |
| 5B  Parent Unsecured Claims | W | - | - | - | - | N/A | - | N/A | - | N/A |
| 6  Convenience Claims | X | - | - | - | - | N/A | - | N/A | - | N/A |
| 7  Intercompany Claims | Y | - | - | - | - | N/A | - | N/A | - | N/A |
| 8  Subordinated Claims | Z | - | - | - | - | N/A | - | N/A | - | N/A |
| 9  Existing Equity Interests | AA | - | - | - | - | N/A | - | N/A | - | N/A |
| 10  Other Equity Interests | AB | - | - | - | - | N/A | - | N/A | - | N/A |
| 11  Intercompany Interests | AC | - | - | - | - | N/A | - | N/A | - | N/A |
| **Total Claims Recovery** | | **$5,979,083** | **$6,027,872** | **$6,076,433** | **$631,283** | | **$676,085** | | **$721,114** | |

---

[30] Guarantor Debtors include EPE Acquisition, LLC (5855), EP Energy LLC (1021), Everest Acquisition Finance Inc. (0996), EP Energy Global LLC (7534), EP Energy Management, L.L.C. (5013), EP Energy Resale Company, L.L.C. (9561), and EP Energy E&P Company, L.P. (7092).

**EP Energy Corporation**

| Liquidation Analysis | | Actual | Adj. | Forecast | Low | | Mid | | High | |
|---|---|---|---|---|---|---|---|---|---|---|
| ($000s) | Note | 31-Mar | | 30-Sep | $ | % | $ | % | $ | % |
| **Gross Liquidation Proceeds** | | | | | | | | | | |
| Cash & Cash Equivalents | A | $644 | ($644) | $0 | $0 | N/A | $0 | N/A | $0 | N/A |
| Other Receivable | D | 320 | (320) | - | - | N/A | - | N/A | - | N/A |
| Investments in Subsidiaries | AD | (1,532,562) | - | (1,532,562) | - | 0% | - | 0% | - | 0% |
| **Total Gross Liquidation Proceeds** | | **($1,531,597)** | **($965)** | **($1,532,562)** | **$0** | | **$0** | | **$0** | |
| (-) Net Wind-Down Expenses | K | | | | $0 | | $0 | | $0 | |
| (-) Post-Conversion Cash Flow | L | | | | - | | - | | - | |
| (-) Chapter 7 Trustee Fees | M | | | | - | 3.00% | - | 3.00% | - | 3.00% |
| (-) Chapter 7 Trustee Legal & Financial Advisors | N | | | | - | 2.50% | - | 2.25% | - | 2.00% |
| (-) Chapter 11 Professional Fees Carve-Out | O | | | | - | | - | | - | |
| **Total Net Liquidation Proceeds** | | | | | **$0** | | **$0** | | **$0** | |

| Claims Recovery Analysis ($000s) | | | Claims Estimates | | Low | | Mid | | High | |
|---|---|---|---|---|---|---|---|---|---|---|
| Class  Claims | Note | Low | Mid | High | $ | % | $ | % | $ | % |
| 5B    Parent Unsecured Claims | W | $1 | $1 | $1 | - | 0% | - | 0% | - | 0% |
| **Total Claims Recovery** | | **$1** | **$1** | **$1** | **$0** | | **$0** | | **$0** | |

## C.    Notes to Liquidation Analysis

### Gross Liquidation Proceeds

### A. Cash and Equivalents

- Cash consists of cash in bank accounts and highly liquid investment securities that have original maturities of one year or less.

- The Liquidation Analysis assumes that the Debtors will have access to the cash in its accounts upon conversion of the cases to Chapter 7. However, the secured lenders may have the right to sweep this cash to pay down their Claims upon conversion, which could adversely affect the Trustee's ability to run an orderly liquidation.

- EP Energy Corporation's cash balance is expected to be depleted as of the Conversion Date for the Parent Company's post-petition obligations.

### B. Trade Accounts Receivable

- Balances include amounts due for oil, gas and NGL production accrued through the chapter 7 Conversion Date and not yet received from the Debtors' customers.

- These receivables are expected to be highly collectible, but there could be a risk that the Debtors' customers could make Claims against the estate in a liquidation and attempt to set off their Claims with the Debtors' receivables.

- The analysis assumes that the Trustee would be able to retain the necessary personnel at the Debtors to assist in calculating and collecting these receivables. If the Trustee did not have sufficient access to capital or for any other reason was not able to retain these key personnel, that could negatively impact recovery of these receivables.

- For the purposes of the Liquidation Analysis, recoveries of trade receivables are estimated to be highly recoverable due to the short-term contractual obligations of the receivable counterparties and the low probability of contractual breaches. An ultimate recovery range of 90% to 100% is estimated for trade receivables.

## C. Joint Interest Billing Receivables

- Joint Interest Billing Receivables include receivables from joint interest owners for their share of lease operating expenses, capital expenditures, production taxes, and gathering and transport fees, among other items.

- These receivables are expected to be less collectible than receipts for production as joint interest owners are likely to attempt to offset their potential Claims against the estate for unpaid royalties, lost revenue, and potential other disputes by holding back these receivables and potential other disputes.

- Furthermore, collecting these receipts is further dependent on retaining company personnel to calculate the appropriate bills, and any loss in personnel can negatively impact the Trustee's ability to collect. An ultimate recovery range of 80% to 90% is estimated for Joint Interest Billing Receivables.

## D. Other Receivables

- Other Receivables include tax receivable, intercompany receivables, and other miscellaneous receivables.

- The Debtors anticipate receiving certain tax receivables, which account for the majority of the assets in this category, before the Conversion Date.

- The Liquidation Analysis assumes that no Other Receivables remain as of the Conversion Date for the Debtors. Conversely, if any Other Receivables should remain, recovery would be negligible, if any.

- EP Energy Corporation's Other Receivables include certain tax receivables, which are expected to be collected prior to the Conversion Date.

## E. Net Derivatives Receivables

- Net Derivatives Receivables include net receivables from hedge settlement partners.

- These receivables are expected to be collectable but are highly susceptible to daily movements in commodity prices and hedge settlement partners may deduct fees or costs to terminate hedges prematurely.

- Values shown are net of derivative settlements expected to be received prior to the Conversion Date.

- To account for commodity price risk and potential termination costs, an ultimate recovery range of 65% to 75% is estimated for Net Derivatives Receivables.

## F. Inventory

- Inventory includes materials and supplies, long lead time items, and crude oil and natural gas storage.

- The Debtors anticipate an increase in materials and supplies to be used for future projects, which are expected to be received prior to the Conversion Date.

- For the purposes of the Liquidation Analysis, an ultimate recovery range of 18% to 40% is assumed for Inventory.

## G. Other Current Assets

- Other Current Assets include prepaid expenses, prepaid insurance, and other vendor deposits.

- Prepaid insurance is assumed to be utilized during the liquidation period and provide no recovery value. Deferred charges related to the deferred retention plan are assumed to run off, or otherwise have no salvage value, in the course of the wind-down. All of the remaining Other Current Assets are not expected to be recoverable under a liquidation scenario.

- For the purposes of the Liquidation Analysis, no recovery is assumed for Other Current Assets.

## H. Net Oil & Gas Properties

- Given the daily production and depletion of oil and gas assets, the Liquidation Analysis assumes the Trustee will pursue a prompt and broad marketing of the assets over a four-month period, with the divestiture directed by a qualified investment bank or firm that specializes in managing oil and gas acquisitions and divestitures. It also assumes the Trustee will not incur additional risk or have access to capital necessary to continue development, drilling, or completion of the oil and gas assets. The Liquidation Analysis assumes that the Trustee will expend minimal capital necessary to maintain production and preserve asset value.

- The liquidation of the Debtors' oil and gas properties includes proved reserves and unproved reserves that are assumed to generate an aggregate sale value in the range of $594.6 million to $663.0 million based on risk adjusted discount rates for proved and unproved reserves, adjusted to account for current market conditions, limited operational performance history for certain of the Debtors' assets, and the impact of the sale in a forced liquidation.

- Proceeds from Net Oil & Gas Properties are assumed to be adjusted for a buyer's assumption of approximately $17.1 million of royalties payable in suspense. The suspense liabilities represent royalty obligations of the Debtors where title work may still be in process or the applicable royalty owners cannot be located and payments may escheat to state governments in the future.

- The income approach considered the Debtors' reserve report with an effective date as of September 30, 2020 using the NYMEX strip as of June 24, 2020 for the commodity price forecast. The source of the reserve data and associated cash flows is the Debtors' corporate model and business plan as of June 2020. Depending on the reserve category, certain risk adjustments were made to the discounted cash flow values for proved and unproved reserves.

- The Liquidation Analysis does not account for the potential loss of unproved reserves as a result of lease acreage that the Debtors may lose upon the cessation of drilling and completion capital expenditures, under contractual continuous drilling obligations or lease expiration provisions.

## I. Other Net Property, Plant & Equipment

- Net Other Property, Plant & Equipment, mainly consists of capitalized leases, office furniture, fixtures, and computer equipment, for which only a limited recovery is assumed.

- For the purpose of the Liquidation Analysis, an ultimate recovery of 4% to 10% is estimated for Net Other Property, Plant & Equipment.

## J. Other Non Current Assets

- Other Non Current Assets primarily consist of operating leases and crude oil inventory.

- Operating leases are forecasted to be written off prior to the Conversion Date, while crude oil inventory is assumed to remain at the Conversion Date.

- For the purposes of the Liquidation Analysis, an ultimate recovery range of 80% to 95% is assumed for Other Non Current Assets.

*Liquidation Costs*

### K. Net Wind-Down Expenses

- The Liquidation Analysis assumes the sale of the Debtors' oil and gas assets on January 31, 2020 and an additional four-month post-closing wind-down period. During the eight-month total wind-down period, the Liquidation Analysis assumes the Debtors will continue to employ the workforce required during the asset marketing and sale process and ensuing wind-down of the estate.

- The Trustee is assumed to reduce employee and other related expenses upon the conversion of the case and throughout the eight-month liquidation timeframe. This Liquidation Analysis includes the cost of an employee retention program equal to a blended rate of 35% of total employee compensation.

### L. Post-Conversion Cash Flow

- The Liquidation Analysis assumes that the Trustee will make payments necessary to maintain existing production during the four-month sales process to preserve value of the marketed oil and gas assets.

- These expenses include: (1) royalty payments where the Debtors have collected funds for the benefit of royalty owners; (2) oil and gas production taxes related to the sale of produced oil and gas assets prior to the Conversion Date and accrued and unpaid property taxes as of the Conversion Date; (3) gathering, processing and transportation counterparties that might be able to shut-in production of certain oil and gas properties in the event of nonpayment; (4) certain lease operating expense vendors necessary for the continued operation of producing oil and gas wells; and (5) certain liabilities related to employee benefits accrued prior to the Conversion Date.

### M. Chapter 7 Trustee Fees

- Section 326 of the Bankruptcy Code provides for fees payable to the Trustee of 3.0% for liquidation proceeds in excess of $1 million, excluding cash.

### N. Chapter 7 Trustee Legal and Financial Advisors

- Professional fees include estimates for certain legal and financial advisory professionals required during the wind-down period.

- These professionals are assumed to be paid 2.0% to 2.5% of the gross liquidation proceeds, excluding cash.

### O. Chapter 11 Professional Fees Carve-Out

- Chapter 11 Professional Fees Carve-Out includes unpaid professional fees for professionals retained by the Debtors pursuant to section 327, 238, or 363 of the Bankruptcy Code and the Committee pursuant to section 328 or 1103 of the Bankruptcy Code, incurred prior to the Carve Out Trigger Date as defined in the DIP Order.

*Recovery Analysis*

Any available net proceeds would be allocated to the applicable creditors and equity holders in strict priority in accordance with section 726 of the Bankruptcy Code:

**P. Class 1 – Other Secured Claims**

- No Class 1 Claims are estimated, and, therefore, no recovery on account of these Claims is projected.

**Q. Class 2 – Other Priority Claims**

- No Class 2 Claims are estimated, and, therefore, no recovery on account of these Claims is projected.

**R. Class 3 - DIP Claims**

- Class 3 Claims consist of approximately $217.5 million in outstanding DIP Claims, consisting of principal and letters of credit assumed to be drawn on the Conversion Date, plus accrued and unpaid pre- and post-Conversion Date interest.

- While not included in the Class 3 Claims, unpaid professional fees included in the Chapter 11 Professional Fees Carve-Out would otherwise be considered pari-passu with the other DIP Claims.

- The Liquidation Analysis projects that all allowed and undisputed DIP Claims (including all claims for adequate protection pursuant to the order approving the DIP) will be paid in full.

**S. Class 3 - RBL Claims**

- Class 3 Claims consist of approximately $321.1 million in outstanding RBL Claims, consisting of principal, plus accrued and unpaid pre- and post-Conversion Date interest.

- The Liquidation Analysis projects that all allowed and undisputed RBL Claims will be paid in full.

**T. Class 4 – 1.125 Lien Notes Claims**

- The Liquidation Analysis assumes there will be approximately $1.0 billion in outstanding Class 4 Claims consisting of principal, plus any "Applicable Premium" due under the 1.125L Notes Indenture, accrued and unpaid interest thereon and any other amounts due under the 1.125L Notes Indenture and applicable law.

- The Liquidation Analysis <u>excludes</u> any potential make-whole claim that the 1.125 Lien Noteholders could attempt to assert.  Since no recovery scenarios assume that Class 4 Claims will recover in full, no make-whole claim has been included in any of the recovery scenarios.

- The Liquidation Analysis projects the Class 4 Claims will be paid approximately 9% to 18%.

**U. Administrative Claims**

- Administrative Claims include approximately $6.9 million of unpaid post-petition trade vendor payables and accrued liabilities and other costs and expenses of administration of the Debtors' estates during the Chapter 11 Cases. This estimate is exclusive of claims that might otherwise have administrative status but which are assumed to be paid in the Post-Conversion Cash Flow or which are included in the Chapter 11 Professional Fees Carve-Out.

- The cessation of the business in a liquidation would likely incur other Claims including contract rejection Claims unless specified herein. No attempt has been made here to value such liabilities,

unless specified herein.

- The Liquidation Analysis projects no recovery for holders of Administrative Claims.

- Adequate protection claims in the form of superpriority administrative claims granted under the DIP Order (ECF No. 482) are entitled to recover out of all prepetition and postpetition property of the applicable Debtors, excluding the Carve-Out (*provided*, that such claims must be satisfied out of property other than avoidance actions or the proceeds thereof before being satisfied out of avoidance actions or the proceeds thereof). The Liquidation Analysis does not take into account recoveries that may occur on account of any such adequate protection claims.

## V. Class 5A – Unsecured Claims

- The Liquidation Analysis assumes that there will be approximately $4.4 billion to $4.5 billion in Class 5A Claims.

- Class 5A Claims consist of approximately:

    o $817.4 million to $907.3 million of deficiency claims relating to the 1.125 Lien Notes Claims.

    o $513.7 million in outstanding 1.25 Lien Notes Claims consisting of principal, plus accrued and unpaid pre-Petition Date interest.

    o $2.187 billion in outstanding Secured 1.5 Lien Notes Claims consisting of principal, plus accrued and unpaid pre-Petition Date interest.

    o $710.1 million of Unsecured Notes Claims, inclusive of principal plus pre-petition accrued and unpaid interest; and approximately $116.0 million to $303.2 million of General Unsecured Claims, inclusive of estimates of pending litigation claims and contract rejection damages for contracts included in contract rejection motions approved by the Court.

- The Liquidation Analysis excludes approximately $30 million of a potential make-whole claim that the 1.25 Lien Noteholders could attempt to assert. Since no recovery scenarios assume that Class 5A Claims will recover in full, no make-whole claim has been included in any of the recovery scenarios.

- The inclusion of estimates of pending litigation claims are provided for the illustrative purposes of this Liquidation Analysis and do not represent an admission of liability or degree of fault by the Debtors. In the event these Cases are converted to a Chapter 11 liquidation, additional contracts would likely be rejected, thereby increasing Class 5A Claims by the amount of additional damages arising out of such additional contract rejections.

- The Liquidation Analysis projects no estimated recovery for Class 5A Claims.

## W. Class 5B – Parent Unsecured Claims

- The Debtors estimate that there will be no Class 5B recoveries.

## X. Class 6 - Convenience Claims

- The Debtors estimate that there will be no Class 6 recoveries.

## Y. Class 7 - Intercompany Claims

- The Liquidation Analysis does not take into account intercompany claims among the Debtors.

- The Debtors estimate that there will be no Class 7 recoveries.

**Z. Class 8 – Subordinated Claims**

- The Debtors estimate that there will be no Class 8 recoveries.

**AA. Class 9 – Existing Equity Interests**

- The Debtors estimate that there will be no Class 9 recoveries.

**AB. Class 10 – Other Equity Interests**

- The Debtors estimate that there will be no Class 10 recoveries.

**AC. Class 11 – Intercompany Interests**

- The Debtors estimate that there will be no Class 11 recoveries.

**AD. Investment in Subsidiaries**

- The Liquidation Analysis assumes that Investments in Subsidiaries, which include EP Energy Corporation's equity interests in the Guarantor Debtors and have a negative value generate no liquidation proceeds for distribution.

**Exhibit E**

**Financial Projections**

# FINANCIAL PROJECTIONS

*The prospective financial information included in this Disclosure Statement has been prepared by, and is the responsibility of, the Debtors' management team ("**Management**"). No independent auditors have examined, compiled or performed any procedures with respect to the accompanying prospective financial information.*

*The Debtors do not, as a matter of course, publish their business plans, budgets or strategies or disclose projections or forecasts of their anticipated financial positions, results of operations or cash flows. Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans, budgets, strategies, projections or forecasts of their anticipated financial positions, results of operations or cash flows to creditors or equity interest holders prior to the Effective Date of the Plan or to include such information in documents required to be filed with the SEC or otherwise make such information publicly available.*

*The assumptions, projections and other financial information contained in this section contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995.*

The Debtors believe that the Plan meets the feasibility requirements set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan. In connection with the planning and development of a plan of reorganization and for the purposes of determining whether such plan would satisfy this feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.

Management has prepared financial projections (the "**Projections**") for October 2020 through December 2025 (the "**Projection Period**"). The Projections were prepared by Management and are based on a number of assumptions made by Management with respect to the potential future performance of the Reorganized Debtors' operations assuming the consummation of the Plan. The Projections are presented on a consolidated basis, including estimates of operating results for all Debtor entities. The Projections will also assist each holder of a claim or interest in determining whether to vote to accept or reject the Plan. In general, as illustrated by the Projections, the reduction of debt on the Debtors' balance sheet will substantially reduce future interest expense and improve future cash flows. Based on the Projections, the Debtors should have sufficient cash flow to pay and service their post-restructuring debt obligations and to operate their business. The Debtors believe that the Confirmation Date and Effective Date of the Plan are not likely to be followed by the liquidation or further reorganization of the Reorganized Debtors. Accordingly, the Debtors believe that the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

THESE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH PUBLISHED GUIDELINES OF THE SEC OR GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS FOR PREPARATION AND PRESENTATION OF PROSPECTIVE FINANCIAL INFORMATION. THE PROJECTED BALANCE SHEETS DO NOT REFLECT THE IMPACT OF A COMPREHENSIVE FRESH START ACCOUNTING ANALYSIS, WHICH COULD RESULT IN A MATERIAL CHANGE TO ANY OF THE PROJECTED VALUES. ALTHOUGH MANAGEMENT HAS PREPARED THE PROJECTIONS IN GOOD FAITH AND BELIEVES THE ASSUMPTIONS TO BE REASONABLE, IT IS IMPORTANT TO NOTE THAT THE DEBTORS OR THE REORGANIZED DEBTORS CAN PROVIDE NO ASSURANCE THAT SUCH ASSUMPTIONS WILL BE REALIZED. AS DESCRIBED BELOW IN SECTION VIII, A VARIETY OF RISK FACTORS COULD AFFECT THE REORGANIZED DEBTORS' FINANCIAL RESULTS AND MUST BE CONSIDERED.

ACCORDINGLY, THE PROJECTIONS SHOULD BE REVIEWED IN CONJUNCTION WITH A REVIEW OF THE RISK FACTORS SET FORTH IN SECTION XI BELOW AND THE ASSUMPTIONS DESCRIBED HEREIN, INCLUDING ALL RELEVANT QUALIFICATIONS AND FOOTNOTES AND ANY RESULTING CHANGES TO THE PROJECTIONS COULD BE MATERIAL.

**1) General Assumptions**

**a. Overview**

The Debtors are an independent energy company focused on the acquisition, production, exploration and development of onshore liquids-rich oil and natural gas assets in the United States.

**b. Presentation**

The Projections are presented on a consolidated basis, including estimates of operating results for the Debtor entities in total.

**c. Accounting Policies**

The Projections have been prepared using accounting policies that are materially consistent with those applied in the Debtors' historical financial statements. The Projections do not reflect all of the adjustments necessary to implement fresh-start accounting pursuant to Accounting Standards Certification ("**ASC**") 852-10, as issued by the Financial Accounting Standards Board.

**d. Methodology**

Key personnel from all of the Debtors' operating areas and across various functions provided input in the development of the Projections. In preparation of the Projections, the Debtors considered the current commodity price environment, historical operating/production performance and operating costs. The Projections were developed on a bottoms-up basis and incorporate multiple sources of information, including general business and economic conditions.

**e. Plan Consummation**

The operating assumptions assume that the Restructuring Transaction will be consummated pursuant to the Plan and that the Plan will be confirmed and consummated by September 30, 2020 and reflect the estimated cash impact of each class of claims or interests. The Debtors do not believe a change in the assumed date of the consummation of the Plan would materially impact the post-confirmation capital structure, their operating performance, these Projections or the underlying economics associated with the Plan.

**2) Assumptions with Respect to the Projected Income Statement**

**a. Production**

Forecasted oil, natural gas and natural gas liquids ("**NGL**") volumes for operated production are based on production estimates by Management and contemplate future commodity prices and anticipated operated rig activity. Forecasted volumes for non-operated production are based on anticipated development plans of outside operators obtained through active dialogue with those operators.

| FORECASTED VOLUMES Equivalent MBOE/day | Oct. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|
| Permian | 18.2 | 16.4 | 14.6 | 13.3 | 12.1 | 11.1 |
| Eagle Ford | 18.4 | 25.0 | 23.9 | 17.9 | 15.1 | 13.3 |
| NEU/Altamont | 17.2 | 16.1 | 17.0 | 18.1 | 20.5 | 25.1 |
| **Total Volumes** | **53.8** | **57.5** | **55.5** | **49.3** | **47.8** | **49.6** |

**b. Revenues**

Revenues are derived from the sale of the consolidated **Reorganized Debtors'** share of oil, natural gas and NGL production primarily from its owned working interests in the Permian Basin, Eagle Ford Basin and Northeastern Utah.

**c. Commodity Pricing**

Revenues are sensitive to changes in the prices received for oil and natural gas production. Oil and natural gas production are sold at prevailing market prices, which may be volatile and subject to numerous factors which are outside of the Reorganized Debtors' control. The Projections assume New York Mercantile Exchange ("**NYMEX**") futures strip pricing for crude oil and natural gas as of **June 24, 2020**, as shown in the chart below: Assumptions regarding realized pricing (i.e., "differentials") from NYMEX are based on input from Management and existing marketing, gathering and transportation contracts with purchasers of the Reorganized Debtors' production.

| FORECASTED PRICE DECK | Oct. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|
| Oil ($bbl) | $ 38.56 | $ 39.53 | $ 40.82 | $ 42.11 | $ 43.34 | $ 43.34 |
| Gas ($/mcf) | $ 2.25 | $ 2.59 | $ 2.42 | $ 2.35 | $ 2.36 | $ 2.36 |

**d. Rig Count**

Contemplating the forecasted commodity pricing, Management has assumed the following operated rig counts, as shown in the chart below:

| FORECASTED RIGS | Oct. 2020 - Dec. 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 |
|---|---|---|---|---|---|---|
| Permian | 0 | 0 | 0 | 0 | 0 | 0 |
| Eagle Ford | 0 | 0 | 0 | 0 | 0 | 0 |
| NEU/Altamont | 0 | 0.5 | 1 | 1 | 1 | 2 |
| Total | 0 | 0.5 | 1 | 1 | 1 | 2 |

**e. Transportation Costs**

Transportation costs are based on forecast production and the terms of existing transportation contracts. Certain savings are forecast for contracts that are anticipated to be rejected or renegotiated. As contracts expire, they are assumed to be replaced with new arrangements at Management's estimate of market rates.

**f. Operating Costs**

Lease operating expenses ("**LOE**"), gathering and transportation expenses, and production taxes are based on Management estimates of future production, activity, and revenue. LOE includes, among other items, lifting costs, fuel, certain payroll, maintenance and repair and outside services.

**g. Income Taxes**

For the forecast period, no Federal Income Taxes are projected to be paid due to the impact of deductions for depletion, depreciation, intangible drilling costs, and NOLs. The projections show a net tax benefit each year building a deferred tax asset until 2025. Tax projections have not been approved by a licensed tax professional and do not constitute a thorough and exhaustive tax analysis performed on behalf of the Debtors.

**h. General and Administrative**

General and Administrative Costs ("**G&A**") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead. Projected G&A is based on a department by department budget.

**i. Depreciation, Depletion & Amortization**

Depreciation, Depletion and Amortization ("**DD&A**") is forecasted using the units of production method ("**UOP**") for oil and gas properties and the straight-line method for fixed assets. The amortization base in the UOP calculation includes the sum of proved property, net of accumulated DD&A, estimated future development costs (future costs to access and develop proved reserves), and asset retirement costs, less related salvage value.

**j. Reorganization Expenses**

Reorganization expenses consist of actual and estimated fees for professional advisors, financing fees and other costs directly attributable to the Chapter 11 Cases. Expenses and other costs associated with the restructuring are forecasted to be approximately $87.4 million in 2020. These expenses are forecast to be paid by September 30, 2020 and there are therefore no reorganization expenses in the Projection Period. Reorganization expenses incurred since inception of these Chapter 11 Cases on October 3. 2019 are forecasted to total $125.6 million through the end of the Case.

**3) Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

The projected Consolidated Balance Sheet was developed using March 31, 2020 unaudited financial results as a starting point and adjusted on a go-forward basis, incorporating projected results from operations and cash flows over the Projection Period.

**a. Capital Expenditures**

Projections for capital expenditures were prepared with consideration of the Debtors' current drilling program and future estimates in the development of the Permian Basin, Eagle Ford Basin and Northeastern Utah. These expenditures include capital associated with drilling and completing new wells, improving operational efficiency and building infrastructure. Capital expenditures also include

expenditures directed at maintaining lease acreage positions, capitalized maintenance, and geological and geophysical expenditures.

All plugging and abandonment related obligations anticipated during the Projection Period are assumed to be addressed in the ordinary course, and are accounted for in the Projections.

**b. Working Capital**

The Projections contemplate timing of forecasted receivables, payables and interest payments that are consistent with the timing experienced with the Debtors' historical receipts and payments.

**c. Pro Forma Adjustments Related to Emergence**

The Balance Sheet included in the Projections presents a pro forma view assuming the effect of certain adjustments related to the Debtors' Restructuring Transactions. These adjustments primarily relate to the exchange of 1.125L Notes for equity. While the 2020 through 2025 Projections roll-forward the effect of such pro forma adjustments, fresh-start accounting pursuant to ASC 852-10 principles have not been applied.

**d. Capital Structure**

The Projections include secured financing in the form of a $629 million reserve based revolving Exit Facility. Proceeds under the Exit Facility will allow the Reorganized Debtors to finance day-to-day operations and the forecasted capital plan.

Assuming an Effective Date of September 30, 2020, the Exit Facility will mature on September 30, 2023. The Projections are presented through year end 2025 and the Exit Facility is assumed to be refinanced upon its maturity. This is assumed for illustrative purposes only and the Projections do not contemplate any other debt financings or equity issuances.

**e. Interest Expense**

Interest Expense includes interest on the Reorganized Debtors' debt. Interest on the Exit Facility is assumed at a constant LIBOR rate of 1.00% and the applicable rate grid is based on the Borrowing Base of $650 million.

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on July 6, 2020*

## CONSOLIDATED INCOME STATEMENT

| ($ in Thousands) | Oct - Dec 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|
| **OPERATING REVENUE** | | | | | | |
| Oil | 87,719 | 388,858 | 384,036 | 348,432 | 353,419 | 385,265 |
| Natural Gas | 10,556 | 60,608 | 55,097 | 45,627 | 42,481 | 40,562 |
| NGLs | 9,323 | 37,106 | 35,397 | 29,343 | 25,891 | 23,364 |
| **TOTAL OPERATING REVENUE** | $ 107,598 | $ 486,572 | $ 474,530 | $ 423,402 | $ 421,790 | $ 449,190 |
| **OPERATING EXPENSES** | | | | | | |
| Transportation Costs | 6,959 | 29,629 | 28,128 | 23,326 | 20,516 | 18,650 |
| Lease Operating Expense | 30,051 | 127,998 | 127,499 | 123,331 | 122,174 | 123,269 |
| General & Administrative | 11,331 | 41,297 | 33,038 | 33,038 | 33,038 | 33,038 |
| Depreciation, Depletion & Amortization | 59,068 | 251,820 | 243,166 | 215,860 | 209,223 | 217,122 |
| Exploratory Costs | 375 | 1,402 | 1,402 | 1,402 | 1,402 | 1,402 |
| Other Terminations | 3,000 | - | - | - | - | - |
| Taxes Other Than Income | 6,968 | 34,403 | 33,226 | 30,042 | 29,989 | 31,835 |
| **Total Operating Expenses** | $ 117,753 | $ 486,549 | $ 466,460 | $ 426,998 | $ 416,342 | $ 425,316 |
| **Operating Income (Loss)** | $ (10,154) | $ 22 | $ 8,070 | $ (3,596) | $ 5,448 | $ 23,874 |
| Other-Income(Expense) | (343) | (1,373) | (1,373) | (1,373) | (1,373) | (1,373) |
| Interest Expense | (5,934) | (18,944) | (14,802) | (10,234) | (7,134) | (6,165) |
| **Income (Loss) Before Income Taxes** | $ (16,432) | $ (20,294) | $ (8,104) | $ (15,203) | $ (3,058) | $ 16,336 |
| Income Tax Expense (Benefit) | (3,451) | (4,262) | (1,702) | (3,193) | (642) | 3,431 |
| **NET (LOSS) INCOME** | $ (12,981) | $ (16,032) | $ (6,402) | $ (12,010) | $ (2,416) | $ 12,905 |
| **NET INCOME (LOSS) ATTRIBUTABLE TO COMMON SHAREHOLDERS** | $ (12,981) | $ (16,032) | $ (6,402) | $ (12,010) | $ (2,416) | $ 12,905 |
| **EBITDAX RECONCILIATION** | | | | | | |
| Net Income (Loss) Attributable to Common Shareholders | (12,981) | (16,032) | (6,402) | (12,010) | (2,416) | 12,905 |
| Depreciation, Depletion & Amortization | 59,068 | 251,820 | 243,166 | 215,860 | 209,223 | 217,122 |
| Interest Expense | 5,934 | 18,944 | 14,802 | 10,234 | 7,134 | 6,165 |
| Exploration Expense | 375 | 1,402 | 1,402 | 1,402 | 1,402 | 1,402 |
| Hedge Settlements | 50,710 | 11,837 | - | - | - | - |
| Income Tax Expense | (3,451) | (4,262) | (1,702) | (3,193) | (642) | 3,431 |
| Other Non-Recurring | 1,480 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 |
| **Adjusted EBITDAX** | $ 101,135 | $ 265,081 | $ 252,639 | $ 213,666 | $ 216,074 | $ 242,399 |

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on July 6,2020*

| CONSOLIDATED BALANCE SHEET<br>($ in Thousands) | Pre-Reorg<br>9/30/2020 | Debt<br>Discharge | Credit<br>Facility<br>Refinancing | Post-Reorg<br>9/30/2020 | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | |
| **Current Assets** | | | | | | | | | | |
| Cash & Cash Equivalents | 58,575 | (36,240) | (12,023) | 10,312 | 20,048 | 23,001 | 19,000 | 21,737 | 20,718 | 17,984 |
| Accounts Receivable | 52,136 | | | 52,136 | 74,218 | 69,893 | 64,035 | 61,486 | 64,116 | 65,419 |
| Inventory | 44,817 | | | 44,817 | 44,817 | 36,817 | 36,817 | 36,817 | 36,817 | 36,817 |
| Derivative Instruments | 62,546 | | | 62,546 | 11,837 | | | | | |
| Other | 11,162 | | | 11,162 | 10,819 | 9,447 | 8,074 | 6,702 | 5,329 | 3,956 |
| **Total Current Assets** | $ 229,236 | $ (36,240) | $ (12,023) | $ 180,974 | $ 161,738 | $ 139,157 | $ 127,926 | $ 126,742 | $ 126,979 | $ 124,176 |
| **Property, Plant & Equipment, net** | $ 1,062,458 | $ (246,588) | $ - | $ 815,870 | $ 774,081 | $ 674,352 | $ 551,207 | $ 445,385 | $ 415,024 | $ 392,594 |
| **Other Non-Current Assets** | | | | | | | | | | |
| Unamortized Debt Issue Costs | 1,967 | (1,967) | | | | | | | | |
| Deferred Income Tax | - | | | - | 3,451 | 7,712 | 9,414 | 12,607 | 13,249 | 9,819 |
| Other | 1,686 | | | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 | 1,686 |
| **Other Non-Current Assets** | $ 3,653 | $ (1,967) | $ - | $ 1,686 | $ 5,137 | $ 9,399 | $ 11,100 | $ 14,293 | $ 14,935 | $ 11,505 |
| **TOTAL ASSETS** | $ 1,295,347 | $ (284,795) | $ (12,023) | $ 998,530 | $ 940,956 | $ 822,908 | $ 690,234 | $ 586,420 | $ 556,938 | $ 528,275 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | |
| **Current Liabilities** | | | | | | | | | | |
| Accounts Payable-Trade | 94,897 | (36,240) | | 58,658 | 71,128 | 89,646 | 73,835 | 72,395 | 85,489 | 84,043 |
| Accrued Interest | 1,931 | | (1,931) | - | 1,801 | 1,267 | 806 | 443 | 283 | 159 |
| Reserves-Current | 1,443 | | | 1,443 | 1,443 | 1,443 | 1,443 | 1,443 | 1,443 | 1,443 |
| Asset Retirement Obligation | 2,178 | | | 2,178 | 2,178 | 2,178 | 2,178 | 2,178 | 2,178 | 2,178 |
| Accrued Taxes Other Than Income | 5,291 | | | 5,291 | 5,291 | 5,291 | 5,291 | 5,291 | 5,291 | 5,291 |
| Other | 1,607 | | | 1,607 | 2,744 | 2,744 | 2,744 | 2,744 | 2,744 | 2,744 |
| **Total Current Liabilities** | $ 107,348 | $ (36,240) | $ (1,931) | $ 69,178 | $ 84,585 | $ 102,569 | $ 86,297 | $ 84,493 | $ 97,428 | $ 95,859 |
| **Debt** | | | | | | | | | | |
| DIP Facility | 195,382 | | (195,382) | | | | | | | |
| Exit Facility | - | | 500,000 | 500,000 | 440,000 | 320,000 | 210,000 | 120,000 | 80,000 | 40,000 |
| RBL | 314,710 | | (314,710) | | | | | | | |
| **Total Debt** | $ 510,092 | $ - | $ (10,092) | $ 500,000 | $ 440,000 | $ 320,000 | $ 210,000 | $ 120,000 | $ 80,000 | $ 40,000 |
| **Other Long Term Liabilities** | | | | | | | | | | |
| Asset Retirement Obligation | 43,292 | | | 43,292 | 43,292 | 43,292 | 43,292 | 43,292 | 43,292 | 43,292 |
| Other | 1,060 | | | 1,060 | 1,060 | 1,060 | 1,060 | 1,060 | 1,060 | 1,060 |
| **Total Other Long Term Liabilities** | $ 44,352 | $ - | $ - | $ 44,352 | $ 44,352 | $ 44,352 | $ 44,352 | $ 44,352 | $ 44,352 | $ 44,352 |
| **Liabilities Subject to Compromise** | | | | | | | | | | |
| 1.125L Notes due May 2026 | 1,000,000 | (1,000,000) | | | - | - | - | - | - | - |
| 8.000% 1.25L Notes Due November 2024 | 500,000 | (500,000) | | | - | - | - | - | - | - |
| 9.375% 1.5L Notes Due May 2024 | 1,091,792 | (1,091,792) | | | - | - | - | - | - | - |
| 8.000% 1.5L Notes due February 2025 | 1,000,000 | (1,000,000) | | | - | - | - | - | - | - |
| 9.375% Senior Unsecured Notes Due May 2020 | 182,034 | (182,034) | | | - | - | - | - | - | - |
| 7.750% Senior Unsecured Notes Due Sept. 2022 | 182,319 | (182,319) | | | - | - | - | - | - | - |
| 6.375% Senior Unsecured Notes Due June 2023 | 323,801 | (323,801) | | | - | - | - | - | - | - |
| Contracts | 104,504 | (104,504) | | | - | - | - | - | - | - |
| Debt interest payable | 130,405 | (130,405) | | | - | - | - | - | - | - |
| Legal Liabilities | 26,417 | (26,417) | | | - | - | - | - | - | - |
| AP unsecured liabilities | 1,785 | (1,785) | | | - | - | - | - | - | - |
| **Total Liabilities Subject to Compromise** | $ 4,543,057 | $ (4,543,057) | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| Common Stock | 2,548 | | | 90 | 90 | 90 | 90 | 90 | 90 | 90 |
| Additional Paid-in-Capital | 3,546,856 | (3,161,946) | | 384,910 | 384,910 | 384,910 | 384,910 | 384,910 | 384,910 | 384,910 |
| Retained Earnings | (7,457,894) | 7,457,894 | | - | (12,981) | (29,013) | (35,415) | (47,426) | (49,842) | (36,937) |
| Treasury Stock | (1,012) | 1,012 | | | | | | | | |
| **Total Stockholders' Equity** | $ (3,909,502) | $ 4,294,502 | $ - | $ 385,000 | $ 372,019 | $ 355,987 | $ 349,585 | $ 337,574 | $ 335,158 | $ 348,063 |
| **Total Liabilities & Equity** | $ 1,295,347 | $ (284,795) | $ (12,023) | $ 998,530 | $ 940,956 | $ 822,908 | $ 690,234 | $ 586,420 | $ 556,938 | $ 528,275 |

**EP Energy Corp Disclosure Statement Exhibits**
*Prepared on July 6,2020*

| CONSOLIDATED STATEMENT OF CASH FLOWS<br>($ in Thousands) | Oct - Dec 2020E | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|
| **OPERATING** | | | | | | |
| Net Income (loss) | $ (12,981) | $ (16,032) | $ (6,402) | $ (12,010) | $ (2,416) | $ 12,905 |
| **Adjustments:** | | | | | | |
| DD&A | 59,068 | 251,820 | 243,166 | 215,860 | 209,223 | 217,122 |
| Deferred taxes | (3,451) | (4,262) | (1,702) | (3,193) | (642) | 3,431 |
| | 55,618 | 247,558 | 241,464 | 212,667 | 208,581 | 220,553 |
| **Asset and Liability Changes** | | | | | | |
| Accounts receivable | (22,082) | 4,324 | 5,858 | 2,549 | (2,629) | (1,303) |
| Accounts payable | 12,470 | 18,519 | (15,812) | (1,440) | 13,094 | (1,445) |
| Derivative Instruments | 50,710 | 11,837 | - | - | - | - |
| Accrued interest | 1,801 | (534) | (460) | (364) | (159) | (124) |
| Inventory | - | 8,000 | - | - | - | - |
| Other current asset changes | 343 | 1,373 | 1,373 | 1,373 | 1,373 | 1,373 |
| Other current liability changes | 1,136 | - | - | - | - | - |
| **NET CASH PROVIDED BY (USED IN) OPERATING ACTIVITIES** | $ 87,015 | $ 275,044 | $ 226,021 | $ 202,774 | $ 217,843 | $ 231,959 |
| **INVESTING** | | | | | | |
| Capital expenditures | (17,279) | (152,091) | (120,021) | (110,038) | (178,862) | (194,692) |
| **NET CASH (USED IN) PROVIDED BY INVESTING ACTIVITIES** | $ (17,279) | $ (152,091) | $ (120,021) | $ (110,038) | $ (178,862) | $ (194,692) |
| **FINANCING** | | | | | | |
| Exit Facility Draws / (Repayments) | (60,000) | (120,000) | (110,000) | (90,000) | (40,000) | (40,000) |
| **NET CASH PROVIDED BY FINANCING ACTIVITIES** | $ (60,000) | $ (120,000) | $ (110,000) | $ (90,000) | $ (40,000) | $ (40,000) |
| **CASH - BEGINNING** | $ 10,312 | $ 20,048 | $ 23,001 | $ 19,000 | $ 21,737 | $ 20,718 |
| **NET (DECREASE) INCREASE IN CASH** | $ 9,736 | $ 2,953 | $ (4,000) | $ 2,737 | $ (1,019) | $ (2,733) |
| **CASH - ENDING** | $ 20,048 | $ 23,001 | $ 19,000 | $ 21,737 | $ 20,718 | $ 17,984 |
| **LIQUIDITY** | | | | | | |
| Exit Facility Commitments | $ 629,421 | $ 629,421 | $ 629,421 | $ 629,421 | $ 629,421 | $ 629,421 |
| Exit Facility Balance | (440,000) | (320,000) | (210,000) | (120,000) | (80,000) | (40,000) |
| Outstanding LCs | (16,931) | (16,931) | (16,931) | (16,931) | (16,931) | (16,931) |
| Exit Facility Availability | $ 172,490 | $ 292,490 | $ 402,490 | $ 492,490 | $ 532,490 | $ 572,490 |
| Cash Balance | 20,048 | 23,001 | 19,000 | 21,737 | 20,718 | 17,984 |
| **AVAILABLE LIQUIDITY** | $ 192,538 | $ 315,491 | $ 421,490 | $ 514,227 | $ 553,208 | $ 590,474 |

**<u>Exhibit F</u>**

**Valuation Analysis**

## VALUATION ANALYSIS

THE VALUATION INFORMATION CONTAINED IN THE FOLLOWING ANALYSIS IS NOT A PREDICTION OR GUARANTEE OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN. THIS VALUATION IS PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING ADEQUATE INFORMATION AS REQUIRED BY SECTION 1125 OF THE BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS OR EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN TO MAKE AN INFORMED JUDGMENT ABOUT THE PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS AGAINST THE DEBTORS. IN ADDITION, THE VALUATION OF NEWLY-ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT. ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDITY THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE PRICES OF SECURITIES.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY EVERCORE REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE. ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATED OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH EVERCORE'S VALUATION ANALYSIS.

Solely for purposes of the Plan [1] and the Disclosure Statement, Evercore Group L.L.C. ("**Evercore**"), as investment banker and financial advisor to the Debtors, has estimated the total enterprise value (the "**Total Enterprise Value**") and implied equity value (the "**Equity Value**") of the Reorganized Debtors on a going concern basis and pro forma for the transactions contemplated by the Plan.

In estimating the Total Enterprise Value of the Debtors, Evercore met with the Debtors' senior management team to discuss the Debtors' assets, operations and future prospects, reviewed the Debtors' historical financial information, reviewed certain of the Debtors' internal financial and operating data, including the Debtors' reserve report, reviewed the Debtors' financial projections for the Reorganized Debtors provided in Exhibit F to the Disclosure Statement (the "**Projections**"), reviewed publicly available third-party information and conducted such other studies, analyses, and inquiries Evercore deemed appropriate.

The valuation analysis herein represents a valuation of the Reorganized Debtors as the continuing operators of the businesses and assets of the Debtors, after giving effect to the Plan, based on the application of standard valuation techniques. The estimated values set forth in this Exhibit F: (a) do not purport to constitute an appraisal of the assets of the Reorganized Debtors; (b) do not constitute an

---

[1] Capitalized terms used but not otherwise defined in this Exhibit F have the meanings ascribed to such terms in the *Amended Joint Plan of Reorganization of EP Energy Corporation., et al., Pursuant to Chapter 11 of the Bankruptcy Code* (the "**Plan**").

opinion on the terms and provisions or fairness from a financial point of view to any Holder of the consideration to be received by such Holder under the Plan; (c) do not constitute a recommendation to any Holder of Claims or Equity Interests as to how such Holder should vote or otherwise act with respect to the Plan; and (d) do not necessarily reflect the actual market value that might be realized through a sale or liquidation of the Reorganized Debtors.

In preparing the estimates set forth below, Evercore has relied upon the accuracy, completeness, and fairness of financial, reserve and other information furnished by the Debtors. Evercore did not attempt to independently audit or verify such information, nor did it perform an independent appraisal of the assets or liabilities of the Reorganized Debtors.

The estimated values set forth herein assume that the Reorganized Debtors will achieve their Projections in all material respects. Evercore has relied on the Debtors' representation and warranty that the Projections: (a) have been prepared in good faith; (b) are based on fully disclosed assumptions, which, in light of the circumstances under which they were made, are reasonable; (c) reflect the Debtors' best currently available estimates; and (d) reflect the good faith judgments of the Debtors. Evercore does not offer an opinion as to the attainability of the Projections. As disclosed in the Disclosure Statement, the future results of the Reorganized Debtors are dependent upon various factors, many of which are beyond the control or knowledge of the Debtors and Evercore, and consequently are inherently difficult to project.

This analysis contemplates facts and conditions known and existing as of the date of the Disclosure Statement. Events and conditions subsequent to this date, including updated projections, as well as other factors, could have a substantial effect upon the Total Enterprise Value. Among other things, failure to consummate the Plan in a timely manner may have a materially negative effect on the Total Enterprise Value. For purposes of this valuation, Evercore has assumed that no material changes that would affect value will occur between the date of the Disclosure Statement and the assumed Effective Date.

Evercore did not consider any one analysis or factor to the exclusion of any other analyses or factors. Accordingly, Evercore believes that its analysis and views must be considered as a whole and that selecting portions of its analysis and factors could create a misleading or incomplete view of the processes underlying the preparation of the valuation. Reliance on only one of these methodologies used or portions of the analysis performed could create a misleading or incomplete conclusion.

The following is a summary of analyses performed by Evercore to arrive at its recommended range of estimated Total Enterprise Value for the Reorganized Debtors.

A. Net Asset Value

The value of the Debtors' oil and gas reserves was estimated using a net asset value ("**NAV**") analysis. The NAV analysis estimates the value of the business by calculating the sum of the present value of expected future cash flows to be generated by the Company's reserves.  The cash flows from the reserves are derived from wells that are currently producing hydrocarbons, as well as, from wells that will be drilled in the future.  Under this methodology, future cash flows are discounted using various discount rates depending on the reserve category or type curve. The Total Enterprise Value for the Company is then calculated by adjusting the reserve value for the aggregate discounted cash flows for future general and administrative costs, non-drill capital expenditures, other fixed expenses and corporate items not included in the cash flows from the reserves, hedges and cash taxes.

B.  Comparable Company Analysis

The comparable company analysis estimates the value of a company based on a relative comparison with other publicly traded companies with similar operating and financial characteristics. Under this methodology, the enterprise value for each selected public company is determined by examining the trading prices for the equity securities of such company in the public markets and adding either the aggregate amount or market value of outstanding net debt for such company. Such enterprise values are commonly expressed as multiples of various measures of financial and operating statistics, such as earnings before interest, taxes, depreciation, depletion, amortization and exploration expenses ("**EBITDAX**") and production. The Total Enterprise Value is then calculated by applying these multiples to the Reorganized Debtors' projected financial and operational metrics. The selection of public comparable companies for this purpose was based upon the geographic location, scale, percentage of developed and undeveloped reserves, quantum of reserves relative to production and percentage of reserves represented by oil and natural gas liquids relative to natural gas, as well as, other characteristics that were deemed relevant.

C.  Precedent Transactions Analysis

Precedent transactions analysis estimates the value of a company by examining public and private transactions on both a corporate and asset-level basis. Under this methodology, transaction values are commonly expressed as multiples of various measures of financial and operating statistics, such as EBITDAX and production. The selection of asset-level transactions for this purpose was based upon the commodity weighting, reserve life, asset type, commodity price environment, development level, relative size, geographic location, and other characteristics that were deemed relevant.

The selection of corporate transactions for this purpose was based upon the asset type, relative size and other characteristics that were deemed relevant. The Total Enterprise Value in this case is calculated by applying multiples of EBITDAX to the Reorganized Debtors' actual and projected financial results.

D.  Total Enterprise Value and Implied Equity Value

The assumed range of the reorganization value, as of an assumed Effective Date of September 30, 2020, reflects work performed by Evercore on the basis of information with respect to the business and assets of the Debtors available to Evercore as of the date of the Disclosure Statement. It should be understood that, although subsequent developments may affect Evercore's conclusions, Evercore does not have any obligation to update, revise, or reaffirm its estimate.

As a result of the analysis described herein, Evercore estimated the Total Enterprise Value of the Reorganized Debtors to be approximately $750 million to $1 billion, with a midpoint of $875 million as of the assumed Effective Date of September 30, 2020. Based on the assumed pro forma net debt of $490 million as of the Emergence Date, the Total Enterprise Value implies an Equity Value range of $260 million to $510 million, with a midpoint of $385 million. This estimate is based in part on information provided by the Debtors, solely for purposes of the Plan. For purposes of this analysis, Evercore assumes that no material changes that would affect value as stipulated in the Plan between the date of the Disclosure Statement and the Effective Date.

The estimate of Total Enterprise Value set forth herein is not necessarily indicative of actual outcomes, which may be significantly more or less favorable than those set forth herein depending on the results of the Debtors' operations or changes in the financial markets. Additionally, these estimates of value represent hypothetical enterprise and equity values of the Reorganized Debtors as the continuing

operator of the Debtors' businesses and assets, and do not purport to reflect or constitute appraisals, liquidation values, or estimates of the actual market value that may be realized through the sale of any securities to be issued pursuant to the Plan, which may be significantly different than the amounts set forth herein. Such estimates were developed solely for purposes of formulation and negotiation of the Plan and analysis of implied relative recoveries to creditors thereunder. The value of an operating business such as the Debtors' businesses is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of such businesses.

Evercore's estimated valuation range of the Reorganized Debtors does not constitute a recommendation to any Holder of Claims or Equity Interests as to how such Holder should vote or otherwise act with respect to the Plan. The estimated value of the Reorganized Debtors set forth herein does not constitute an opinion as to the fairness from a financial point of view to any Holder of the consideration to be received by such Holder under the Plan or of the terms and provisions of the Plan. Because valuation estimates are inherently subject to uncertainties, none of the Debtors, Evercore, or any other person assumes responsibility for their accuracy or any differences between the estimated valuation ranges herein and any actual outcome.

Evercore is acting as investment banker and financial advisor to the Debtors, and will not be responsible for, and will not provide, any tax, accounting, actuarial, legal or other specialist advice.

## Exhibit G

**Release Provisions**

## RELEASE PROVISIONS

### 10.6    *Plan Injunction.*

(a)    Except as otherwise provided in the Plan or in the Confirmation Order, from and after the Effective Date, all Persons who have held, hold, or may hold Claims or Interests, and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan shall preclude such Persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate from exercising their rights and remedies, or obtaining benefits, pursuant to and consistent with the terms of the Plan.

(b)    By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Interest shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 0 of the Plan.

### 10. 7    *Releases.*

(a)    **RELEASES BY THE DEBTORS.  AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED, BY THE DEBTORS, THE REORGANIZED DEBTORS, AND THE ESTATES, IN EACH CASE ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE SUCCESSORS, ASSIGNS,**

**AND REPRESENTATIVES AND ANY AND ALL OTHER PERSONS THAT MAY PURPORT TO ASSERT ANY CAUSE OF ACTION DERIVATIVELY, BY OR THROUGH THE FOREGOING PERSONS, FROM ANY AND ALL CLAIMS, INTERESTS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, AND CAUSES OF ACTION, LOSSES, REMEDIES, OR LIABILITIES WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ACCRUED OR UNACCRUED, EXISTING OR HEREINAFTER ARISING, WHETHER IN LAW OR EQUITY, WHETHER SOUNDING IN TORT OR CONTRACT, WHETHER ARISING UNDER FEDERAL OR STATE STATUTORY OR COMMON LAW, OR ANY OTHER APPLICABLE INTERNATIONAL, FOREIGN, OR DOMESTIC LAW, RULE, STATUTE, REGULATION, TREATY, RIGHT, DUTY, REQUIREMENTS OR OTHERWISE THAT THE DEBTORS, THE REORGANIZED DEBTORS, THE ESTATES, OR THEIR AFFILIATES WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING OF CLAIMS AND INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.**

**ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(a) OF THE PLAN (the "<u>DEBTOR RELEASES</u>"), WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER THE PLAN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE DEBTOR RELEASES ARE: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE RELEASED CLAIMS RELEASED BY THE DEBTORS, THE REORGANIZED DEBTORS AND THE ESTATES, (III) IN THE BEST INTERESTS OF THE DEBTORS, THE ESTATES AND ALL HOLDERS OF CLAIMS AND INTERESTS, (IV) FAIR, EQUITABLE AND REASONABLE, (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY**

FOR HEARING, AND (VI) A BAR TO ANY OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THE ESTATES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

(b)    **RELEASES BY HOLDERS OF CLAIMS AND INTERESTS**. AS OF THE EFFECTIVE DATE, EXCEPT FOR THE RIGHTS AND REMEDIES THAT REMAIN IN EFFECT FROM AND AFTER THE EFFECTIVE DATE TO ENFORCE THE PLAN AND THE OBLIGATIONS CONTEMPLATED BY THE DOCUMENTS IN THE PLAN SUPPLEMENT, ON AND AFTER THE EFFECTIVE DATE, THE RELEASED PARTIES WILL BE DEEMED CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED BY THE RELEASING PARTIES, FROM ANY AND ALL CLAIMS AND CAUSES OF ACTION WHATSOEVER (INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREINAFTER ARISING, IN LAW, EQUITY, CONTRACT, TORT, OR OTHERWISE BY STATUTE, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, THAT SUCH HOLDERS OR THEIR ESTATES, AFFILIATES, HEIRS, EXECUTORS, ADMINISTRATORS, SUCCESSORS, ASSIGNS, MANAGERS, ACCOUNTANTS, ATTORNEYS, REPRESENTATIVES, CONSULTANTS, AGENTS, AND ANY OTHER PERSONS CLAIMING UNDER OR THROUGH THEM WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR ON BEHALF OF THE HOLDER OF ANY CLAIM OR INTEREST OR OTHER PERSON, BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE REORGANIZED DEBTORS, OR THEIR ESTATES, THE CHAPTER 11 CASES, THE RESTRUCTURING, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR INTEREST THAT IS TREATED IN THE PLAN, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS OR INTERACTIONS BETWEEN ANY DEBTOR AND ANY RELEASED PARTY, THE RESTRUCTURING, THE RESTRUCTURING OF ANY CLAIMS OR INTERESTS BEFORE OR DURING THE CHAPTER 11 CASES, THE NEGOTIATION, FORMULATION, PREPARATION, OR CONSUMMATION OF THE PLAN, THE DOCUMENTS IN THE PLAN SUPPLEMENT, OR RELATED AGREEMENTS, INSTRUMENTS, OR OTHER DOCUMENTS, RELATING THERETO, OR THE SOLICITATION OF VOTES WITH RESPECT TO THE PLAN, IN ALL CASES BASED UPON ANY ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCES TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE.

ENTRY OF THE CONFIRMATION ORDER BY THE BANKRUPTCY COURT SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE RELEASES IN SECTION 10.7(B) OF THE PLAN (THE "THIRD-PARTY RELEASE"), WHICH INCLUDES, BY REFERENCE, EACH OF THE RELATED PROVISIONS AND DEFINITIONS UNDER

THE PLAN, AND, FURTHERMORE, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD-PARTY RELEASE IS (I) CONSENSUAL, (II) ESSENTIAL TO THE CONFIRMATION OF THE PLAN, (III) GIVEN IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE RELEASED PARTIES, (IV) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD-PARTY RELEASE, (V) IN THE BEST INTERESTS OF THE DEBTORS AND THEIR ESTATES, (VI) FAIR, EQUITABLE AND REASONABLE, (VII) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING, AND (VIII) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE THIRD-PARTY RELEASE.

        (c)      *Release of Liens*.  Except as otherwise specifically provided in the Plan or in any contract, instrument, release, or other agreement or document contemplated under or executed in connection with the Plan, including the Exit Credit Agreement (and the definitive documentation related thereto), on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is secured and Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or filing being required to be made by the Debtors.

        **10.8**    *Exculpation.*

        TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, NO EXCULPATED PARTY WILL HAVE OR INCUR, AND EACH EXCULPATED PARTY WILL BE RELEASED AND EXCULPATED FROM, ANY CLAIM OR CAUSE OF ACTION IN CONNECTION WITH OR ARISING OUT OF THE ADMINISTRATION OF THE CHAPTER 11 CASES; THE NEGOTIATION AND PURSUIT OF THE DIP FACILITY, EXIT FACILITY, THE EMPLOYEE INCENTIVE PLAN, THE DISCLOSURE STATEMENT, THE RESTRUCTURING, AND THE PLAN (INCLUDING THE DOCUMENTS IN THE PLAN SUPPLEMENT), OR THE SOLICITATION OF VOTES FOR, OR CONFIRMATION OF, THE PLAN; THE FUNDING OF THE PLAN; THE OCCURRENCE OF THE EFFECTIVE DATE; THE ADMINISTRATION OF THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN; THE ISSUANCE OF SECURITIES UNDER OR IN CONNECTION WITH THE PLAN; THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE DEBTORS OR THE REORGANIZED DEBTORS; OR THE TRANSACTIONS IN FURTHERANCE OF ANY OF THE FOREGOING; OTHER THAN CLAIMS OR CAUSES OF ACTION ARISING OUT OF OR RELATED TO ANY ACT OR OMISSION OF AN EXCULPATED PARTY THAT CONSTITUTES INTENTIONAL FRAUD OR WILLFUL MISCONDUCT AS DETERMINED BY A FINAL ORDER, BUT IN ALL RESPECTS SUCH PERSONS WILL BE ENTITLED TO REASONABLY RELY UPON THE ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND

RESPONSIBILITIES PURSUANT TO THE PLAN.  THE EXCULPATED PARTIES HAVE ACTED IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE WITH REGARD TO THE SOLICITATION AND DISTRIBUTION OF SECURITIES PURSUANT TO THE PLAN AND, THEREFORE, ARE NOT, AND ON ACCOUNT OF SUCH DISTRIBUTIONS WILL NOT BE, LIABLE AT ANY TIME FOR THE VIOLATION OF ANY APPLICABLE LAW, RULE, OR REGULATION GOVERNING THE SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN OR SUCH DISTRIBUTIONS MADE PURSUANT TO THE PLAN, INCLUDING THE ISSUANCE OF SECURITIES THEREUNDER.  THE EXCULPATION WILL BE IN ADDITION TO, AND NOT IN LIMITATION OF, ALL OTHER RELEASES, INDEMNITIES, EXCULPATIONS, AND ANY OTHER APPLICABLE LAW OR RULES PROTECTING SUCH EXCULPATED PARTIES FROM LIABILITY.

### 10.9    *Injunction Related to Releases and Exculpation.*

The Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released pursuant to the Plan, including the claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities released or exculpated in the Plan or the Confirmation Order.